1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1


UNITED STATES OF AMERICA,

     Plaintiff,                  September 26, 2023
                                9:33 a.m.
     vs.

JAVIER HERNANDEZ,

     Defendant.              Pages 1 THROUGH 206

_____


TRANSCRIPT OF TRIAL DAY 1
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE
And a Jury of  12



Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                        Brian Dobbins, AUSA
                        Arielle Klepach, AUSA
                        99 Northeast 4th Street
                        Miami, Florida 33132


FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                        PO BOX 545960
                        Surfside, Florida 33154-9998


COURT REPORTER:     Yvette Hernandez
                        U.S. District Court
                        400 North Miami Avenue, Room 10-2
                        Miami, Florida 33128
                        yvette_hernandez@flsd.uscourts.gov

**I N D E X**

Certificate..................................... 206
Voir Dire ...................................... 10
Jury Sworn ..................................... 103
Preliminary Jury Instructions .................. 104
Government Opening Statement ................... 117
Defense Opening Statement ...................... 128

**W I T N E S S**

**ON BEHALF OF THE GOVERNMENT:**                                PAGE
ESTHALIN BENITEZ
DIRECT EXAMINATION BY MR. DOBBINS                             134
CROSS-EXAMINATION BY MR. FEIGENBAUM                           165

JOSE CARLOS MARTINEZ ALFONSO
DIRECT EXAMINATION BY MS. KLEPACH                             167
CROSS-EXAMINATION BY MR. FEIGENBAUM                           199

**E X H I B I T S**

| GOVERNMENT'S EX. NO.: | OFFERED | ADMITTED |
|---|---|---|
| 101 | 146 | 146 |
| 103 | 147 | 148 |
| 105 | 162 | 162 |
| 1 | 190 | 190 |
| 102 | 191 | 191 |

(Call to order of the Court, 9:33 a.m.)

COURTROOM DEPUTY: Calling Criminal Case Number 22-20557, United States of America v. Javier Hernandez.

Counsel, please state your appearances for the record.

MS. KLEPACH: Good morning again, Your Honor. Arielle Klepach and Brian Dobbins on behalf of the United States. We're joined by FBI Special Agent Sergio Francisco.

THE COURT: All right. Good morning once again.

MR. FEIGENBAUM: Good morning, Your Honor. Marty Feigenbaum on behalf of Javier Hernandez. He is present before the Court with the assistance of a Spanish interpreter.

THE COURT: All right. And good morning to each of you.

Go ahead and have a seat.

Mr. Hernandez, I do see that you are wearing an earpiece that allows you to hear the interpreter. Is the equipment working properly, sir?

THE DEFENDANT: (Through Interpreter.) Yes.

THE COURT: If at any time, sir, the equipment stops working, or you are unable to hear the interpreter, if you will let the Court know. All right, sir?

THE DEFENDANT: Okay.

THE COURT: All right.

Mr. Dobbins, and/or Ms. Klepach, since the Court did just accept the plea of guilty from Mr. Aranda with regard to

Count 5, based on a Plea Agreement, has that changed the number of days that it will take to try this case?

MS. KLEPACH:  Yes, Judge.  We believe it's going to take closer to seven to nine days.

THE COURT:  Mr. Feigenbaum, do you believe that that's a fair estimate, sir?

MR. FEIGENBAUM:  I couldn't say on behalf of them.  I believe --

THE COURT:  No.  I know.  But understanding the time that might be necessary from your client's behalf.

MR. FEIGENBAUM:  Yes, Your Honor.  But we also may present a Defense case.  So ...

THE COURT:  All right.  Then let me give you a schedule.  And it would be the same schedule that I would give to the jurors in order to determine whether there is a hardship on their behalf and make sure that we don't have an issue moving forward.

We would obviously proceed with a full day today from nine to five.  And that obviously depends on the jurors' schedule.  Tomorrow, since we do have some matters in the morning, we would proceed at 11 a.m.  And that would be a full day until five p.m.

On Thursday, the 28th, we have some matters in the morning, so we would have an afternoon session.  That would be from one to five p.m.

I am -- and I have been able to arrange my schedule for Friday.  And on Friday we would be able to proceed -- we'd have an extended lunch period, most likely an hour and a half, but we would proceed a full day from nine to five with that extended lunch period.  And that would take us through week one.

Week two, beginning on October 2nd, that would be a full day from nine to five.  On October 3rd, we have some matters in the afternoon.  So that would be a half a day, from nine to 12:30.

We would not be in session -- my apologies.  On Wednesday the 4th would be a full day, from nine to five.  On Thursday would be a half day -- actually, my apologies.  On Thursday, we would not be in session.  And then on -- that's on 10/5.  On 10/6, which is Friday, we have some matters in the morning.  So we would begin at 10:30, and that would be a full day to five p.m.

So far, that is -- one, two -- so far, that's seven days.  If we need to return on the third week, Monday is Columbus Day, and that's a day that we will not be in session.  So we would proceed on -- if we needed the third week, would be -- on October 10th would be a full day and October 11th would be a full day, and that would give the full nine days.

Does the schedule that I have given present a personal hardship for you or any of your anticipated witnesses?

MS. KLEPACH: Not on behalf of the Government, Your Honor. Thank you.

MR. FEIGENBAUM: Your Honor, I'm okay with all those dates and times.

Tomorrow, they put me number one to go to an arraignment across the street, but I would definitely be here by 11 o'clock. So tomorrow we start at 11, I understand?

THE COURT: Yes. That's correct.

MR. FEIGENBAUM: Yeah. I'll be with Judge Reid.

So as Your Honor said, it brought us up through the 11th of October. Before, I had your schedule was no court on the 12th and 13th of October.

THE COURT: Well, I've given you until the 11th. That gives you -- you've asked for -- or least the Government has asked for seven to nine days. That would give us the nine days. To the extent that we needed to proceed further, I would not give the jurors the 12th and the 13th. But looking at the schedule, I actually am going to be out of the district on the 12th and 13th. So if we needed to have day number 10 and 11, we would move to the week of the 16th.

So we would not be in session on 10/12 or 10/13, but I'm anticipating that given the schedule that we would be able to complete in trial by the 11th.

MR. FEIGENBAUM: That's if there's no Defense case, as I understand it from the Government. But I do think there is a

7

very real possibility of a Defense case.  That would be possibly two days.

THE COURT:  Then we would certainly address that with the jury at the appropriate time.  But I don't want to overwhelm them at this point, unless we know moving forward how much time.  I think that it's likely that we might get through the Government's case a little bit faster than they anticipated.

Okay.  And then I say that with the understanding that I do not want to have any gaps in time.  Witnesses should be ready to go.  We'll certainly take a morning comfort break, and an afternoon comfort break, and a one-hour period for lunch, with the exception of the one day that I did advise that I would need an hour and a half for that lunch break for another event that we have.

Okay?  All right.  Then, given that schedule -- I have given you the jury questionnaires.  I have also given you a seating chart, as well as the information with regard to the placement of the jurors.  I do anticipate that we will place 20 on each side of the gallery.

I would ask in just a few moments that you move your chairs so that you are facing the jurors.  I'm not offended.  Certainly it makes sense to be facing the jurors.

Let me also state that, at the time that this case proceeded to an arraignment, the Court did enter an order.

Looking at the docket in Mr. Hernandez's case, that order is Docket Entry 14.  And at that time, the Court did state specifically regarding pretrial procedures that:  "Before the trial begins, counsel for both parties shall be prepared to indicate whether they have complied with the following procedure:  Should any plea offer be made by the Government, but not accepted by the Defendant, the Government shall attach to any such offer a cover sheet with space for the Defendant and the Defendant's attorney to certify that the Defendant has reviewed the plea offer.

"The cover sheet shall also include space for the Defendant and the Defendant's attorney to certify the dates of signature.

"This document shall be signed by the Defendant and the Defendant's attorney before trial.  The document shall not be provided with the Court or otherwise provided to the Court, but shall be maintained within the Government's case file.

"The parties shall not advise the Court whether any plea offer has been made, or, if so, of the contents of any plea offer that might have been made.

"Before trial begins, the Court will specifically inquire as to whether the parties have complied with this paragraph of this Court's order.  The parties shall respond with either a yes or a no, without further elaboration.  If no plea offer has been made, or if a plea offer has been made, and

the requirements of this paragraph have been satisfied, the answer shall be yes."

Has the Government fully complied with this Court's order?

MS. KLEPACH: Yes, Your Honor.

THE COURT: And has the Defendant and the Defendant's attorney fully complied with this Court's order?

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: All right, then.

Is there anything that we need to address before we begin preparing for the prospective panel to come into the courtroom?

MS. KLEPACH: Not on behalf of the Government.

MR. FEIGENBAUM: I just need to step out for two minutes, Your Honor.

THE COURT: All right. Certainly.

(Pause in proceedings.)

THE COURT: Are both sides ready to proceed?

On behalf of the Government?

MS. KLEPACH: We are, Your Honor.

THE COURT: On behalf of the Defendant, Mr. Hernandez?

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: All right, then.

Scott, we can bring in the jury.

COURT SECURITY OFFICER: All rise for the jury,

10

please.

(Before the panel, 9:49 a.m.)

THE COURT:  Good morning to everyone.

(Pause in proceedings.)

THE COURT:  Good morning to everyone.  And thank you for your patience.

I'm going to ask if everyone will please stand to be placed under oath.

COURTROOM DEPUTY:  Please raise your right hand for me, please.

(Panel sworn.)

COURTROOM DEPUTY:  Thank you.

THE COURT:  All answering in the affirmative.

Please have a seat.

Good morning, Ladies and Gentlemen.  And thank you for your patience.

I know that you were here very early this morning.  I want to thank you for honoring your summons and being here today.

My name is Beth Bloom.  I am a United States district judge.  On behalf of my colleagues, I want to welcome you to the Wilkie D. Ferguson, Jr. United States Courthouse.

Now, I understand that, for most of you, you had to shuffle and rearrange your personal and professional matters, and we certainly do appreciate that.  As we know, the right to

a trial by jury is one of our most cherished rights.  In time of peace, it is the most important service that you can provide to your country as a United States citizen.  So I thank you once again.  As we know, the right to a trial by jury is recognized, preserved, and protected by our constitution.  And as such, it is important that you honored your summons and you are here today.

I am certainly aware that, for many of you, this may be a new experience for you.  Just with a show of hands, how many of you have served on either a federal or state jury, or even a grand jury, just with a show of hands?

Not too many of you.

All right.  Well, I certainly know that these proceedings may be completely unfamiliar, and I don't want you to feel apprehensive or feel inadequate in any way.  As we go along, I will certainly acquaint you with the proceedings and instruct you on what your role is and what your duties will be.  In essence, you will be the judges of facts.  You are going to determine what the facts of this case are if you are selected and serving on our jury.

In order for you to know the court personnel with whom you'll be working with, let me introduce them to you at this time.  The courtroom deputy that brought you into the courtroom is Liz Gariazzo, and she serves as my assistant, and she certainly administrates and administers the cases that comprise

the Court's docket, and she coordinates the day-to-day operation of the Court.

Our court reporter that is seated in front of me is Yvette Hernandez. She transcribes and takes down everything that is said in the courtroom, including the statements that that I'm making and also the answers that you may be giving to certain questions that are asked. So it is important that you respond not with a nod or a shake of the head, but you respond verbally. It is also important that you wait for the microphone to be given to you.

And the microphone will be given to you by our wonderful court security officer, Scott Campbell, whose job is to enforce the Court's orders and take charge of you, the jury. If there is a matter that needs to be brought to my attention, please ask Officer Campbell, and he will make certain that I will become aware of it.

Do any of you know me or any of the court personnel? If so, please raise your hand.

Seeing no hands raised.

I know you spent a good amount of time with each other down in the jury pool, and also when you were brought up through the elevators. Do any of you know anyone else on the panel? If so, please raise your hand.

Seeing no hands raised.

Before you came to the tenth floor, you were given a

juror questionnaire.  The juror questionnaire allows us to expedite the jury selection process.  I'm going to ask that you take it out of your purse, your pocket, your wallet, and if you'll have it in your hand at this time.

Is there anyone that does not have a copy of their completed juror questionnaire?  If so, just raise your hand, and we'll make sure that we give you a copy of what you have been -- provided to us.

You may not have realized that we were going to rely upon your thorough answers to those questions.  So I'm going to ask that you take the time and review your answers to those questions that were asked of you, and raise your hand if anyone wants to change or add to any of their answers in the juror questionnaires.

Just take the time that you need now, and then we'll proceed -- I see some hands over to my left.  And that's in the second row.

And if you'll wait -- if I don't identify you by name, if you would be kind enough to identify yourself by name.

Is that Ms. Santos?

Okay.  Ms. Santos, if you'll -- actually, in the second row.  Ms. Santos, if you'll stand up.  And if we can provide the microphone to Ms. Santos.

Ms. Santos is Juror Number 28.

Yes, Ms. Santos?

PROSPECTIVE JUROR:  Hi.  Good morning.

Question 11 says:  "If a family member or close friend has been a victim" -- excuse me.  Sorry.  Question 12 -- sorry -- Question 10.  "Has a close family member or friend been accused or arrested of a crime?"

My mother served 18 months.  My brother is currently in prison.  My other brother was accused as well of aggravated assault.  And I didn't put that down, so I wanted to mention that.

THE COURT:  All right.  So let's -- your mother's sentence was imposed as a result of a conviction for what type of offense?

PROSPECTIVE JUROR:  I think it was like fraud.

THE COURT:  All right.  And with regard to your two brothers, can you share with the Court what the nature of those offenses are.

PROSPECTIVE JUROR:  I have to say it here?

THE COURT:  Okay.  Would you feel more comfortable saying that outside the presence of the other individuals?

That's fine.  We can certainly take that at the appropriate time with regard to your brothers.

PROSPECTIVE JUROR:  Thanks.

THE COURT:  Okay.  All right, then.

PROSPECTIVE JUROR:  Also, I was accused as well of -- in 2008 -- aggravated assault, criminal mischief, and something

15

with a deadly firearm.  So I just want you guys to know.

THE COURT:  Yes.  Of course.  And thank you, Ms. Santos.  Thank you for adding that to your questionnaire. Thank you.

All right.  In the front row.  And if we can identify the individual.  Is that Mr. -- is it Mr. Queral?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Yes.  Mr. Queral is Juror Number 21.

Hold on, sir.

Yes?

PROSPECTIVE JUROR:  On Question Number 7, I put that I was on a jury before.  But I was not chosen.  I participated and they give me a certificate, but I was not chosen.

THE COURT:  All right.  So you were not sworn in as a member of the jury.  You were brought in similar to being brought in here?

PROSPECTIVE JUROR:  Similar to this, but I was not chosen.

THE COURT:  Thank you, sir.

And that is Ms. Castillo?

PROSPECTIVE JUROR:  Yes, ma'am.

THE COURT:  Ms. Castillo is Juror Number 23.

PROSPECTIVE JUROR:  I was just looking over Question Number 12, regarding if you or a close family member or friend has ever worked for a law enforcement agency, such as a police

department.  I did state about my father and my husband formerly being a recruit, but my sister was also a Miami-Dade state attorney prosecutor.  So I don't know if that -- you know, just in case.

THE COURT:  It was in criminal and in juvenile.

Okay.  And is she currently there, your sister?

PROSPECTIVE JUROR:  She -- last year.  Until last year.

THE COURT:  Until last year.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  All right.  Thank you, Ms. Castillo.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Anyone else, Ladies and Gentlemen?

And that is in the third row.  Is that Ms. Armas?

Ms. Armas is Juror Number 37.

PROSPECTIVE JUROR:  Hi.  Good morning.

THE COURT:  Morning.

PROSPECTIVE JUROR:  I'm just referring to Question 11. Because I rewrote what I wrote in Question 10 to 11.  So I misread Question 11.  So I just kind of wanted to denote that.

THE COURT:  All right.  What would be the answer to Question 11?

PROSPECTIVE JUROR:  It would be no.

THE COURT:  Okay.

PROSPECTIVE JUROR:  No.

THE COURT: Any other changes, Ms. Armas?

PROSPECTIVE JUROR: No. That's it.

THE COURT: Thank you, Ms. Armas.

PROSPECTIVE JUROR: Thank you.

THE COURT: Anyone else, Ladies and Gentlemen?

And that is Ms. Espinoza, Juror Number 35.

PROSPECTIVE JUROR: Yes. I just wanted to clarify Question Number 10. I don't know of any close family member, but I was a little unsure about how to answer that one for myself. I do have like traffic violations -- I don't know if it's considered as a convicted crime, and that was back in 2014, 2015 -- and possession, for the smallest amount.

THE COURT: Possession of?

PROSPECTIVE JUROR: Marijuana.

THE COURT: All right.

All right. And when were you involved with regard to the possession of marijuana?

PROSPECTIVE JUROR: That was -- 2013, I think it was, 2012, one of those two years.

THE COURT: Any other additions to Question 10?

PROSPECTIVE JUROR: No, ma'am.

THE COURT: Or anything on the questionnaire?

PROSPECTIVE JUROR: No. Those were the only ones that I thought of.

THE COURT: Thank you, Ms. Espinoza.

18

Anyone else?

And before we move over here, is there anyone else that would like to change any of their answers?

All right.  We're moving over to my right.  And that is in the third row.  And let me make sure that is -- is it Ms. Bosse?  I apologize.  How do you pronounce your last name?

PROSPECTIVE JUROR:  Bosse.

THE COURT:  Bosse.

Good morning.

And Ms. Bosse is Juror Number 17.

PROSPECTIVE JUROR:  Yes.  On Question Number 11 -- and I don't know if I answer -- like, I was a victim of identity theft.  Does that count as a victim?

THE COURT:  Yes.  That counts as a victim.

You were a victim of identity theft.  And when was that?

PROSPECTIVE JUROR:  One was 2014.  And I just had a recent one with AT&T, last year, when I find out on my credit report.

THE COURT:  All right.  Thank you, Ms. Bosse.

Any other changes?

PROSPECTIVE JUROR:  (No verbal response.)

THE COURT:  Okay.  No further changes.

All right.  And that is also in the third row.  Ms. Jacques?

19

PROSPECTIVE JUROR:  Yes.

THE COURT:  Ms. Jacques is Juror Number 13.

Yes, Ms. Jacques?

PROSPECTIVE JUROR:  I have a question for Number 10.  "If you or any close family" -- it's my uncle.  I don't remember the year.  He was arrest for DUI.  So I don't know.

THE COURT:  All right.  And was that more than 10 years ago?

PROSPECTIVE JUROR:  No.  Like 2021.  Between 2021 or 2022.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Any other changes?

PROSPECTIVE JUROR:  No.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Okay.

THE COURT:  Anyone else, Ladies and Gentlemen?

In the second row.  And that is Ms. Gutierrez, Juror Number 9.

PROSPECTIVE JUROR:  Yes.  Hi.

Question 10.  It's my cousin.  I forgot to put he was arrested for DUI, I think in the 90's or 2000 -- I forgot -- and possession of cocaine.  And my ex-brother-in-law for multiple.  I have no idea.  I forgot the years, though.  But he's been arrested a couple of times.

20

THE COURT:  All right.  Thank you, Ms. Gutierrez.

Any other changes?

Okay.  We're back over to my left, on the first row, Ms. Revilla.  And Ms. Revilla is Juror Number 26.

PROSPECTIVE JUROR:  Hi.  Good morning.

Just a question on -- regarding for law enforcement for Number 12.  Do you want us to specify a person or just put general family is in Miami-Dade Police Department, fire department, so on and so forth?

THE COURT:  Well, you said your spouse.  And which family member was with the -- these are separate family members.  Can you advise who they are and their relation to you with the Miami-Dade Police Department.

PROSPECTIVE JUROR:  So for the Miami-Dade Police Department, my cousin is Freddy Ramirez -- Alfredo Ramirez.

THE COURT:  Okay.  And you don't need to identify the person that is in the --

PROSPECTIVE JUROR:  That's what I was asking --

THE COURT:  But I would identify who it is in relation to you.

PROSPECTIVE JUROR:  Oh.  Cousin.

THE COURT:  Yes.  Whether close family friend --

PROSPECTIVE JUROR:  Cousin, cousin, cousin.

THE COURT:  Okay.  So you have cousins with the Miami-Dade Police Department, City of Miami Police, City of

Miami Fire Department?

PROSPECTIVE JUROR: Yes.

THE COURT: And are they all currently working there?

PROSPECTIVE JUROR: Yes.

THE COURT: All right. Thank you.

Any other changes?

Okay. We're back over -- anyone here before -- I think Officer Campbell is going to -- like a ping pong ball.

Let's go back over here to my right. And that's in the second row. And that is -- is that Mr. Pena?

PROSPECTIVE JUROR: Yes.

THE COURT: Yes, sir?

Juror Number 10.

PROSPECTIVE JUROR: Hello. Back in 1992, I just remember I used to work at a store. And like around four o'clock in the morning, everybody -- we got robbed by a masked man, and we got tied up and thrown in the cooler.

THE COURT: Yes. That is what you answered in Question 11.

PROSPECTIVE JUROR: No. This was another situation.

THE COURT: So you stated you were robbed at gunpoint back in 1996. There was another incident?

PROSPECTIVE JUROR: Yeah. This one was in '92.

THE COURT: Okay. 1992.

PROSPECTIVE JUROR: Which -- I worked at a store back

then.

THE COURT:  All right, sir.

PROSPECTIVE JUROR:  And the whole -- the whole crew got robbed.

THE COURT:  All right.  I'm sorry to hear that.

Are there any other changes?

PROSPECTIVE JUROR:  No.  That's about it.

THE COURT:  All right.  Mr. Pena, I'm going to stay with you, sir, because there were some questions that you did not answer.  I know you put lines, but a line is very different than a "not applicable" or "yes" or "no."  So what would your answer be to 5?  Is that applicable?  Do you have children?

PROSPECTIVE JUROR:  I have -- well, he's like my stepson.  He's 23.

THE COURT:  All right.  And where does he work?

PROSPECTIVE JUROR:  He works at Baptist Hospital.

THE COURT:  Okay.  What does he do at Baptist Hospital?

PROSPECTIVE JUROR:  He's -- he works in the kitchen.

THE COURT:  Thank you, sir.

And have you ever served in the military?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Question 9, I didn't see an answer to that.

PROSPECTIVE JUROR:  I really don't read the newspaper.

23

THE COURT:  Okay.  What about -- do you have any favorite TV shows and/or websites?

PROSPECTIVE JUROR:  Just the regular social media and stuff like that.  I watch a lot of like, you know, TV series.

THE COURT:  What does that mean, sir?  Could you be a little bit more specific.

PROSPECTIVE JUROR:  Like "Game of Thrones," "Breaking Bad," stuff like that.

THE COURT:  "Game of Thrones," "Breaking Bad."

And when you speak of regular websites, could you be specific.

PROSPECTIVE JUROR:  Just social media.  Stuff like --

THE COURT:  What type of social media?

PROSPECTIVE JUROR:  -- Facebook, Instagram.  You know, the regular social media.

THE COURT:  Okay.  Facebook, Instagram, anything else?

PROSPECTIVE JUROR:  TikTok.

THE COURT:  Anything else, sir?

PROSPECTIVE JUROR:  That's about it.

THE COURT:  All right.  And your answer to Question 10?  You just put a little dash.

PROSPECTIVE JUROR:  No, not that I know of.

THE COURT:  All right.  So the answer would be no.

What about Question 12?

PROSPECTIVE JUROR:  Not that I know of, no.

24

THE COURT:  All right.  And Question 14?

"Is there anything in your background or personal feelings that would affect your ability to be fair and impartial to both sides?"

PROSPECTIVE JUROR:  No.  No.  I don't think so.

THE COURT:  All right.  Thank you, Mr. Pena.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Ladies and Gentlemen, any other changes?

All right.  We're still over here, and we're in the third row.  And is that Ms. Bosse?

PROSPECTIVE JUROR:  Yes.

Yeah.  On Number 10 -- and I put:  "No."  And that's the same -- I was accused of identity theft, but I never went to court.

THE COURT:  Okay.  I'm sorry.  Question -- you were accused of identity theft.  And what happened to those charges?

PROSPECTIVE JUROR:  And -- when I had a lawyer and called the company, and I just find out my background was clear, never went to the court.  Was in Minneapolis, somewhere else.

THE COURT:  Was this a criminal charge?

PROSPECTIVE JUROR:  They just -- because the person took the money, and they asked me to pay the money back, but I was -- refused.

THE COURT:  Okay.  Let me ask the question.  Were you,

a close friend, or family member, ever accused, arrested, or convicted of a crime?

PROSPECTIVE JUROR:  Not -- I just accused.

THE COURT:  Okay.  So you were accused of identity theft?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And what happened to those charges?

PROSPECTIVE JUROR:  And the case was just missing -- dismissed, and I never --

THE COURT:  All right.  So the case was dismissed. Thank you.

Okay.  Any other changes, Ms. Bosse?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.

Ladies and Gentlemen, any other changes or additions to the questionnaires?

All right.  Thank you.

Now, if I ask you a question, or the lawyers ask you a question, and it is personal -- certainly we are asking questions to get to know you in an effort to select fair and impartial jurors.  You may be well suited to sit on another case, perhaps not this case, because we walk into this courtroom not as a newborn baby, but with life's experiences. And it's the experiences that we may have had, the relationships that we may hold, or the opinions that we may

have that may have an effect on your ability to be fair and impartial in this case.

So with regard to the questions that are asked in an effort to get to know you, if there is a question that's a little bit too personal, all you need to do is just let the Court know and we'll take your response at the time that we take an appropriate break with just the attorneys and myself.

Let me formally call the case at this time. This is a criminal case. And the case is the United States of America v. Javier Hernandez.

If I may ask the attorneys to introduce themselves, as well as all at counsel table.

First, on behalf of the Government.

MS. KLEPACH: Good morning, everyone. My name is Arielle Klepach, and I represent the United States.

MR. DOBBINS: Good morning, everyone. My name is Brian Dobbins. I'm an assistant United States attorney also representing the United States. And also present at counsel table is Special Agent Sergio Francisco from the Federal Bureau of Investigation.

Good morning.

THE COURT: And is the Government ready to proceed to trial?

MS. KLEPACH: We are, Your Honor.

THE COURT: Thank you.

On behalf of the Defendant?

MR. FEIGENBAUM:  Good morning, everybody.  My name is Marty Feigenbaum.  I'm a local defense attorney here.  And sitting next to me is Javier Hernandez.

THE DEFENDANT:  (In English.)  Good morning.  My name is Javier Hernandez.

THE COURT:  Thank you, Mr. Hernandez.

And Mr. Feigenbaum, is the Defendant ready to proceed to trial?

MR. FEIGENBAUM:  Yes, Your Honor.  We are.

I apologize.  I didn't have -- I didn't have -- my microphone on.  Did you hear me okay?

THE COURT:  I heard you.  Let's make sure that the jurors heard you.  So you would if like to reintroduce yourself.  Of course.

MR. FEIGENBAUM:  Yes, Ladies and Gentlemen.  I have this little microphone thing they have for the courtroom.  I didn't press the green button.  So my name is Marty Feigenbaum.  I'm a local defense attorney here, and this is Javier Hernandez sitting next to me.

Thank you.

THE COURT:  And is the Defendant ready to proceed to trial?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

Now, Ladies and Gentlemen, I'm now going to ask the Government to read the names of potential witnesses -- that is persons who may be coming into the courtroom to provide testimony during the course of this trial -- and to read the names of witnesses who may or may not be called as witnesses. I'm going to ask that you listen carefully so that you can let me know if you recognize any of the names.

Ms. Klepach?

MS. KLEPACH: Thank you, Your Honor.

United States Coast Guard Investigative Services Special Agent Evan Sanborn; Jose Carlos Martinez Alfonso; Yondiel Rodriguez; Esthalin Benitez Castillo; Eddis Castillo; FBI Special Agent Michael Betancourt; FBI Digital Forensic Examiner Arturo Ortega; FBI Senior Digital Forensic Examiner Ricardo Soto; Officer Angel Seca Matus, Officer Ricardo Paz Echeverria; Officer Mario Almanza Vasquez; FBI Task Force Officer Gabriel Rose; John Teteris; Officer Josh Ferris; Bart Drake; Luis Barata; William Sheehan; John Wiesner; Lisa Wiesner; Officer Hans Gullekson; Detective Michael Holmberg, Officer Stacey Walker; Robert Maytum; Robert Mauceli; FBI Special Agent Christopher Adam Goodrich; Stephen Farlow; Officer Juan Mendoza Moo; FBI Special Agent Freddy Batista; Reynaldo Crespo Marquez; FBI Special Agent Sergio Francisco; Roberto Marrero; Bruce Nelson; Tammie Beasley; Lisa Carinhas; Jim Johnson; Yarisleidys Pedrozo Lopez; HSI Special Agent

Gidell Casadesus; John Derleth; Sergeant David Christiansen; Sergeant Braulio Castineira; Keith Rosenn; FBI Special Agent Aaron Spielvogel; Robert Maytum; Ann Zick; Jeffrey Martin; FBI Special Agent Lauren Watson; Chad Robert Smith; Ramon Reyes Aranda; Jose Miguel Gonzalez Vidal; and Mario Alberto Enrique Lopez.

THE COURT:  Thank you, Ms. Klepach.

Ladies and Gentlemen, does anyone know any of those individuals?  If so, please raise your hand.

Seeing no hands raised.

You were introduced to the attorneys, as well as the agent, as well as the Defendant, Mr. Hernandez.  Do any of you know any of them?  If so, please raise your hand.

Seeing no hands raised.

We are here today because an Indictment -- yes?

MR. FEIGENBAUM:  Judge, I may have a couple witnesses.

THE COURT:  All right.  Certainly.

MR. FEIGENBAUM:  Do I go ahead and announce them now?

THE COURT:  Yes.  Of course.  That would be helpful.  Thank you.

MR. FEIGENBAUM:  Yes, Judge.

Good morning again.

I may call two witnesses.  Let us know if you have heard their names or you know them.  One is Daniel P. Riemer.  He's a former Palm Beach County Sheriff's Department officer.

He's a private investigator for a bunch of years after that. And also Thomas Pullen.  He's an expert digital forensic examiner.  Thomas Pullen and Daniel Riemer.

THE COURT:  Thank you, Mr. Feigenbaum.

Now, Ladies and Gentlemen, do you know any of those individuals?  If so, please raise your hand.

Seeing no hands raised.

We are here today because an Indictment was filed informing the Defendant, Mr. Hernandez, that he is accused of certain crimes.  And he was called upon to respond to that Indictment.  The Indictment is not evidence.  The Defendant in this case responded to the accusations contained in the Indictment by saying four words:  "I am not guilty."  And those words carry a great deal of weight because we will soon be commencing a jury trial where the Government is required to prove beyond a reasonable doubt that the Defendant is guilty before he may be found guilty.

The fact that the Indictment exists does not mean that that which is alleged actually happened.  That is what you, if you are selected as a Member of the Jury, will be required to determine, and that is what the Government must prove to you beyond a reasonable doubt.

At this time, I am going to read the Indictment to you, that charges the Defendant with five separate counts. Those five separate counts include conspiracy to encourage

aliens to enter the United States for financial gain, conspiracy to transport stolen vessels, conspiracy to traffic in certain motor vehicles, to export a motor vehicle with tampered identification number, and to alter motor vehicle identification numbers, trafficking in certain motor vehicles, and money laundering conspiracy.

Count 1 states the following:  "Beginning in and around February 2018, the exact date being unknown to the grand jury, through on or about January 20th, 2019, in Miami-Dade County, in the Southern District of Florida and elsewhere, the Defendant, Javier Hernandez, did knowingly and intentionally combine, conspire, and confederate, and agree with persons known and unknown to the grand jury to commit an offense against the United States, that is, encouraging and inducing an alien to come to, enter, and reside in the United States, for the purpose of commercial advantage and private financial gain, knowing and in reckless disregard of the fact that such coming to, entering, and residence was in violation of law.

"Count 2.  Conspiracy to Transport Stolen Vessels. Beginning in and around December 2017, the exact date being unknown, through on or about September 30th, 2022, in Miami-Dade County, in the Southern District of Florida and elsewhere, the Defendants, Javier Hernandez and Ramon Reyes Aranda, did knowingly and intentionally combine, conspire, confederate, and agree with each other and with other persons

known and unknown to the grand jury to commit an offense against the United States, that is, to knowingly transport, in foreign commerce a vessel, knowing the vessel to have been stolen, in violation of law."

The allegations within the Indictment set forth the purpose of the conspiracy and the manner and means and certain overt acts. And this Indictment, if you are selected, as a member of the jury, will be received by you and may be taken with you to the jury room to assist in your deliberations.

Count 3 states that: "Beginning in or around September 2019 through on or about October 17th, 2019, in Miami-Dade County, in the Southern District of Florida, the Defendant, Javier Hernandez, did willfully, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with other persons to commit an offense against the United States to knowingly buy, receive, possess, and obtain control of, with intent to sell and otherwise dispose of, a motor vehicle, knowing that an identification number for such motor vehicle had been removed, obliterated, tampered with, and altered, in violation of law; to knowingly export a motor vehicle, knowing that the identification number had been removed, obliterated, tampered with, and altered, in violation of law; and to knowingly, remove, obliterate, and tamper with, and alter identification number for a motor vehicle, in violation of law."

That allegation within the Indictment sets forth the purpose of the conspiracy, the manner and means, and certain overt acts.

Count 4, Trafficking in Certain Motor Vehicles, states that:  "From on or about September 30th, 2019 to October 17th, 2019, in Miami-Dade County, in the Southern District of Florida, the Defendant, Javier Hernandez, did knowingly buy, receive, possess, and obtain control of, with intent to sell and otherwise dispose of, a motor vehicle, knowing that an identification number for such motor vehicle had been removed, obliterated, tampered with, and altered, in violation of law."

Count 5, charging a money laundering conspiracy, alleges that:  "Beginning in December 2017, and continuing until September 30th, 2022, in Miami-Dade County, in the Southern District of Florida, the Defendants, Javier Hernandez and Ramon Reyes Aranda, did knowingly combine, conspire, confederate, and agree with each other and other persons known and unknown to the grand jury to commit an offense against the United States to transport, transmit, and transfer a monetary instrument and funds to a place in the United States, from and through a place outside the United States, with the intent to promote the carrying of specified unlawful activity.

"It is alleged that the specified unlawful activity is the transportation of stolen vessels, in violation of law.  It is alleged the specified unlawful activity is the trafficking

in motor vehicles with altered identification numbers, in violation of law. It is alleged that the specified unlawful activity is an offense against a foreign nation, specifically Mexico, including bribery of a public official, in violation of law."

Ladies and Gentlemen, does anyone know anything about this case, either through your own personal knowledge or through reading about it in any news media or any way that you have information about this case? If so, please raise your hand.

Seeing no hands raised.

Is there anyone, just knowing the nature of the offenses to be tried in this case, that you believe that you could not serve as a fair and impartial juror? If so, please raise your hand.

Okay. We will first start over to my left. And that's in the second row. Ms. Santos?

PROSPECTIVE JUROR: Judge, there's no way for me to be unbiased in this case.

Just by looking at the Defendant, I know he's of Cuban descent, because of his last name. And that just -- like, that -- he reminds me of my father, and there's no way for me to be unbiased in this case. I just want to express that. I already feel like he's not guilty, and that's going to be my mind set. Because of my background, I don't think I would be a

good fit to be -- I'm of Cuban descent, and I just don't feel right -- I think he's a hero for doing that. So --

THE COURT: Thank you, Ms. Santos. I appreciate you sharing that with the Court.

Anyone else, Ladies and Gentlemen?

And I believe -- anyone else over here?

Okay. There's a gentleman over here on the second row. Mr. Menendez, Juror Number 8.

PROSPECTIVE JUROR: Good morning.

I don't think I'm -- I could be impartial to this. Hearing all the witnesses that the United States has, I -- I don't think that we would have -- or the United States would have wasted all that time, and money, and resources for somebody to be here who's innocent. So I think there has to be some element of guilt in this.

THE COURT: Well, Mr. Menendez, you do know that the Government carries the sole burden of proving all the elements of these offenses. Mr. Hernandez has no burden. Are you willing to hold the Government to that burden?

PROSPECTIVE JUROR: Yeah.

THE COURT: Well, you just expressed to the Court that based on the names of the witnesses and the number of witnesses that you have a concern about holding the Government to its burden; is that correct?

PROSPECTIVE JUROR: I don't understand the question.

36

THE COURT:  Well, you stood up and you stated that you believed that based on the Government's listing of its witnesses that it would not bring this case but for the fact that you believe that the Government may have a strong case; however, the trial has not yet begun, sir.  So you understand that, right now, as Mr. Hernandez sits before the Court, he is presumed innocent and it's the Government's sole burden --

PROSPECTIVE JUROR:  I understand.  I'm just telling you my personal feeling.

THE COURT:  Yes.  I understand.

And I guess, Mr. Menendez, my question to you is:  Can you hold the Government to its burden or do you already come here before the Court with a feeling that the Government has already satisfied its burden even though the case has not yet begun?

PROSPECTIVE JUROR:  I mean, in all honesty, yes.  I mean, I -- again, hearing all those Indictments, and all the resources that the Government has spent on bringing him to this point, I mean, it's just my personal feeling.

THE COURT:  All right.  Thank you, Mr. Menendez.

Anyone else, Ladies and Gentlemen?

All right.  Let me follow up, because Mr. Menendez brought up certain points, and that is with regard to the Government's witnesses.  As you know, this is a criminal case. There are three basic rules about a criminal case that you must

keep in mind. And I'm going to explain them now; however, the Court is going to give you specific instructions if you are selected to serve on the jury.

First, the Defendant is presumed innocent until proven guilty. The Indictment against the Defendant, brought by the Government, is only an accusation, nothing more. It is not proof of guilt or anything else. The Defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the Government until the very end of the case. The Defendant has no burden to prove his innocence, or to present any evidence, or to testify. And since the Defendant has the right to remain silent, the law prohibits you from arriving at your verdict by considering that the Defendant may not have testified.

Third, the Government must prove the Defendant's guilt beyond a reasonable doubt. I will give you further instructions on this point later. But bear in mind that, in this respect, a criminal case is much different from a civil case, where the burden is a preponderance by the greater weight of the evidence.

Is there anyone, Ladies and Gentlemen, that cannot follow the law with regard to the Defendant's presumption of innocence, the burden of proof resting on the Government until the very end of the case, and the Government's proof that requires proof beyond and to the exclusion of every reasonable

doubt?  Is there anyone that cannot follow that law?  If so, please raise your hand.

Seeing no hands raised.

Ladies and Gentlemen, is there anyone that is taking any medication that may make you sleepy or groggy?  If so, please raise your hand.

Okay.  If we can proceed -- Ms. Santos?

PROSPECTIVE JUROR:  Can I tell you in private?

THE COURT:  Yes.  Of course.  In private.  Yes.  Of course.

PROSPECTIVE JUROR:  Okay.  I do take medication.

THE COURT:  All right.  And let's move to -- and certainly we'll take that up at the appropriate break.

Anyone else over to my left?

And that's in the last row.  Ms. Comeau -- oh, no.  My apologies.  Ms. Occhi?

PROSPECTIVE JUROR:  Yes.  Occhi.

THE COURT:  Occhi.

PROSPECTIVE JUROR:  At this very moment, I'm taking a medication for radiculopathy, which is a lumbosacral issue that I have on September 16.  Do you need the name of the medicine?

THE COURT:  Is the medication required to be taken during the course of -- from this point until -- is this post-surgery?  Have you already had the --

PROSPECTIVE JUROR:  No surgery.  It's just a spine

39

injury.

THE COURT:  All right.  And does the medication Ms. Occhi, make you sleepy?

PROSPECTIVE JUROR:  It is.  It is affecting nevous system -- the central nervous system.  But you know, it's something --

THE COURT:  Do you believe that that would have an effect on your ability to stay attentive and to focus on the facts of this case?

PROSPECTIVE JUROR:  I believe that the only problem is that I cannot be sitting without moving here and there or standing up.

THE COURT:  Of course.  And if at any time you need to take a break, or stand up and move about, certainly feel free to do so.

And that applies to everyone, Ladies and Gentlemen. Some of us may have conditions of the neck, back, or legs that may affect you for long periods of time.  And please -- if we haven't had a break, and you need to stand up, please do so.

Thank you, Ms. Occhi.

PROSPECTIVE JUROR:  You're welcome.

THE COURT:  Anyone else, Ladies and Gentlemen, that is taking any medication that may make you sleepy or groggy?

And that is Ms. Bacchus, Juror Number 2?

PROSPECTIVE JUROR:  Yes.  I do take medication.  But

can I talk to you about it privately?

THE COURT:  Yes.  Of course.  Ms. Bacchus, we'll take that at the appropriate break.

Anyone else, Ladies and Gentlemen?

Okay.  And Ms. Zavala, Juror Number 3.

PROSPECTIVE JUROR:  I have Sjogren's Syndrome and fibromyalgia.  I do take Advil, and it does make me sleepy, but I don't think that it will affect me.

THE COURT:  Okay.  Thank you, Ms. Zavala.  Appreciate that.

Anyone else, Ladies and Gentlemen?

All right.  Is there anyone that has a condition of the back, neck, or legs that may affect you for sitting for more than say 15 or 20 minutes?  If so, please raise your hand.

Okay.  Over here.  And that is Ms. Bacchus and also Ms. Areces -- my apologies.  No.  That is Ms. Bosse.

And Ms. Bosse, will that affect you from serving as a juror in this case or would you be able to alleviate any of the discomfort by standing up or taking an appropriate break?

PROSPECTIVE JUROR:  Not really affecting me.  But I have radiation in discs, and sometimes the pain just start to stress, just restrict my neck and my back.

THE COURT:  Okay.  And if at any time you need to take a break, just let the Court know and we'll certainly accommodate your condition.

41

Now, Ladies and Gentlemen, does anyone have any disability, that is, a hearing deficit, that may affect you from serving as a juror that we would certainly want to accommodate?  If so, please raise your hand.

And I know, Ms. Bacchus, you had advised the Court with regard to your condition.  Is there anything -- did you want to speak further with regard to your condition?

PROSPECTIVE JUROR:  I just get into a car accident. An 18-wheeler run right in my car, and I have pain from my shoulder to my neck.

THE COURT:  Now, it's alleviated through the medication, but is there any accommodation that the Court can provide, or would it help you if you just stood up or moved about?

PROSPECTIVE JUROR:  Move around.

THE COURT:  Okay.  All right.  Certainly, Ms. Bacchus. Just let the Court know when you need to do that.

Does anyone have any disability that the Court would need to accommodate?  If so, please raise your hand.

Seeing no hands raised.

Has anyone been convicted of a felony offense that has not been set aside by a pardon or a post-conviction proceeding? If so, please raise your hand.

Seeing no hands raised.

Is there anyone that has a Florida driver's license,

but you've moved out of the county of Miami-Dade? If so, please raise your hand.

Seeing no hands raised.

Is there anyone that has any moral, religious, or philosophical reason why you could not sit in judgment of another and serve as a fair and impartial juror? If so, please raise your hand.

Okay. And let me just make sure -- that is Ms. Santos?

PROSPECTIVE JUROR: Yes, ma'am.

THE COURT: Yes.

PROSPECTIVE JUROR: Judge, in my personal beliefs, I don't believe in man-made rules. I don't believe in judging another for them. And this is just my belief system. And I just don't -- I will not be biased on it because these are rules that are made by man, and you guys are going to judge somebody on somebody's else's thoughts and beliefs. So I just feel like why should I have to --

THE COURT: All right. So would your -- the opinion that you do not believe in man-made rules, would that also apply to the United States Constitution?

PROSPECTIVE JUROR: That is correct.

THE COURT: All right. Thank you, Ms. Santos.

Anyone else, Ladies and Gentlemen?

And that is -- hold on. Let me make sure. That is

Mr. Bennefield?

PROSPECTIVE JUROR: Yes.

THE COURT: Yes, sir?

PROSPECTIVE JUROR: Yes. I -- just because of my Christian views, I may have -- not be in agreement with a lot of the accusations.

THE COURT: All right. So would your Christian views prevent you from serving as a juror?

PROSPECTIVE JUROR: No, it wouldn't.

THE COURT: All right. So is there anything about your Christian views that would affect your ability to serve as a fair and impartial juror in this case, Mr. Bennefield?

PROSPECTIVE JUROR: No.

THE COURT: All right. Because I know you did state on your questionnaire: "Christian views," and I just want to make sure that I understand, when you say: "Christian views," if there is anything about those views that would somewhat conflict with your duty as a juror to determine what the facts are and to hold the Government to its burden of proving each of the elements of these five offenses beyond and to the exclusion of every reasonable doubt.

PROSPECTIVE JUROR: Not at all.

THE COURT: All right. Thank you, sir.

Anyone else?

Yes. Of course. And that is -- I just want to make

sure -- Mr. Nelson?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Yes, sir?

PROSPECTIVE JUROR:  Yes.  I'm a Christian.  I don't really believe in judging people.  I do tend to judge people based on my beliefs.  So ...

THE COURT:  All right.  And do you believe that serving as the judges of facts and determining whether the Government has met its burden -- do you believe that that is inconsistent with your religious views?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you believe that that would affect your ability to serve as a fair and impartial juror, sir?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right, sir.

Anyone else?

COURT SECURITY OFFICER:  One more, Judge.

THE COURT:  Okay.  Yes.  Mr. -- is that Mr. -- no.  My apologies.  Mr. Comeau?

PROSPECTIVE JUROR:  Comeau.

THE COURT:  Yes, sir?

PROSPECTIVE JUROR:  My son had charges brought against him.  And through that experience, I don't think the truth came out.  I mean, he was never convicted, but I think that experience gives me an impartiality to not be as fair as I

45

should be here.

THE COURT: You mean partiality.

PROSPECTIVE JUROR: Or partiality.

THE COURT: In other words, you don't believe that you can be fair?

PROSPECTIVE JUROR: I don't. I don't believe all the facts came out, and I believe it was just an economies of scale sort of.

THE COURT: All right. And can you set aside that experience with your son being arrested in California -- would that have an effect on your ability to serve as a fair and impartial juror in this case?

PROSPECTIVE JUROR: I would have said yes, but sitting here makes me wonder.

THE COURT: Okay. So do you believe that it would have an effect?

PROSPECTIVE JUROR: I guess I do.

THE COURT: All right. Thank you, sir.

PROSPECTIVE JUROR: Yes.

THE COURT: Now, Ladies and Gentlemen, some of you have stated that family members -- some of you have stated that you yourself were involved in the criminal justice system. Is there anyone, based on that experience, that you believe that that would have an effect on your ability to serve as a fair and impartial juror in this case? If so, please raise your

hand.

And that is Ms. Ponce?

PROSPECTIVE JUROR:  Yes.

Okay.  I don't answer before because I was thinking what is my proper answer to give here.  But I was victim of the fraud with a registration on my car on 2001, because I was driving with a temporary -- a temporary tag for three years, and because the dealer, they took my money.  For this reason, I can't be impartial.

THE COURT:  All right.  You believe because you were a victim of having the theft of your tag --

PROSPECTIVE JUROR:  Exactly.  Exactly.  Almost I lost my car because they can't give it to me the title when I pay in full my car, in regarding -- with the tag.

THE COURT:  All right.  And would that affect your ability to serve as a fair and impartial --

PROSPECTIVE JUROR:  Exactly.  Exactly.

THE COURT:  Thank you, Ms. Ponce.

PROSPECTIVE JUROR:  Okay.  Thank you.

THE COURT:  Is there anyone else, Ladies and Gentlemen?

All right.  In the first row, Ms. Castillo -- oh.  Actually, Mr. De La Cruz.

PROSPECTIVE JUROR:  Yes.  Mr. De La Cruz.

I feel bad for this.  But I think that my English is

not good for this process because I don't understand exactly what happened and all the words that are speak here. You know? I think that it's very important understand a hundred percent what happened in a process, all the words, and -- you know? And the second is that my older son is lawyer here in the federal court of Miami. I don't know if it's important that I say that.

THE COURT: All right. And you did say it in your answer to the questionnaire: "Lawyer, federal court Miami."

PROSPECTIVE JUROR: Yes.

THE COURT: But Mr. De La Cruz, are there some words that I have said that you did not understand?

PROSPECTIVE JUROR: Yes. Because I think that it's my English that is not the best. You know?

THE COURT: All right. All right. Thank you, Mr. De La Cruz.

PROSPECTIVE JUROR: You're welcome.

THE COURT: Is there anyone else, Ladies and Gentlemen, that you believe that there's a language barrier, that English is not your first language, and that it would affect your ability to serve as a fair and impartial juror?

All right. Seeing no further hands raised.

I see some other hands raised -- yes -- on the first row. And that is Ms. Castillo?

PROSPECTIVE JUROR: Yes, Judge. I just feel like I

might be biased just because my sister was a prosecutor. She has told me experiences as an attorney of what some of her cases consist of. So based on probably evidence that the prosecution has, I might be biased on certain things.

THE COURT: Well, right now, Ms. Castillo, the trial has not yet begun. And I've advised you of what the Government has alleged by way of the Indictment, and you did not raise your hand, which tells me that you don't know anything about the facts of the case. So the fact that your sister is a prosecutor, how would that cause you to be biased?

PROSPECTIVE JUROR: She was -- she handles criminal cases.

THE COURT: Yes.

PROSPECTIVE JUROR: So not that she told me information like -- like a defendant's information, but just information about certain cases, and how it's handled, and different things that happen. I just don't want to be biased towards the Defendant on previous conversations that I might have had.

THE COURT: Well, do you believe that you could hold the Government to its burden and render a decision based solely on the testimony and evidence presented in this courtroom?

PROSPECTIVE JUROR: What do you mean by "burden," Your Honor?

THE COURT: Well, the burden that rests on the

Government is to prove each of the allegations beyond and to the exclusion of every reasonable doubt.

Right now, Mr. Hernandez sits here with the presumption of innocence. He has no burden at all. So do you believe that you could hold the Government to its high burden of proof?

PROSPECTIVE JUROR: Yes.

THE COURT: Do you believe that you could listen to the testimony, and consider the evidence, and render a decision based solely on the evidence and testimony presented in this courtroom?

PROSPECTIVE JUROR: I think so.

THE COURT: All right. So when you say: "I think so," is there anything that the Court would need to be aware of, other than your sister worked for the state attorney's office?

PROSPECTIVE JUROR: Yeah. No. Nothing else.

THE COURT: Okay. So once again, do you believe that you could render a decision based solely on the evidence and testimony presented in this courtroom?

PROSPECTIVE JUROR: Yes.

THE COURT: All right. Thank you, Ms. Castillo.

Anyone else, Ladies and Gentlemen?

Okay. I see in the back. It's Ms. Jacques.

PROSPECTIVE JUROR: Yes.

50

THE COURT: Okay. If we could wait for the microphone for Ms. Jacques.

PROSPECTIVE JUROR: Yes. Good morning again.

THE COURT: Good morning.

PROSPECTIVE JUROR: I work for Jackson Health System, but I work at TGK Jail. So I need to know if I have any concerns over here. I don't know.

THE COURT: Do you have any concerns, Ms. Jacques?

PROSPECTIVE JUROR: No. I work at the jail. So that was my question.

THE COURT: All right. Do you believe that the fact that you work for the Jackson Health System, but you work at the Turner Gilford Knight Center -- do you believe that that would have any effect on your ability to serve as a fair and impartial juror?

PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you, Ms. Jacques.

Anyone else, Ladies and Gentlemen?

All right. Now let me go through the schedule. The parties and I have decided on a schedule that will allow us to present this case to you if you are selected to serve on the jury. And the schedule will be as follows: Today will be a full day. When I say: "Full day," we're going to take an appropriate break. Certainly, as you can see, it's well in the morning. We're certainly going to take a break before the noon

hour.  We'll take a recess for lunch and we will take a break in the afternoon.  But today will be a full day until nine -- from nine -- which -- you came here earlier than that -- until five p.m.

Tomorrow, Wednesday, we will begin at 11 a.m., since we have some matters in the courtroom, and until five o'clock.  Thursday will be a half a day, from one to five p.m.  And Friday will be a full day, from nine to five p.m.

We will then begin the next week, and it will be a week where we'll have some trial, but some days we won't have trial.  On Monday it will be a full day, from nine to five.  On Tuesday, it will be a half a day in the morning, from nine to 12:30.  On Wednesday, it will be a full day from nine to five.  Thursday we will not be in session.  And Friday will be somewhat of a full day.  We'll begin late, at 10:30, until about five o'clock.  And if we need to, the third week, we will come back on that Monday and Tuesday, and they will be full days.  That is the anticipated schedule.  And for those of you that are employed, certainly we would give you a letter to provide to your employer, but that is the anticipated schedule.

Now, is there anyone that has a great personal hardship that would prevent you from serving on this jury?  If so, please raise your hand.

And we'll first start to my right, and then we'll move to my left.

So Juror Number 1 -- my apologies -- Ms. Almeida.  If we will begin with Ms. Almeida, please.

PROSPECTIVE JUROR:  Hi.  Good morning.

THE COURT:  Good morning.

PROSPECTIVE JUROR:  I do HR and I do payroll.  I do payroll for three days -- I ask to be excused -- tomorrow being my worst because I have to run my reports and put it through.  If I don't do it, I have 70 people that are not going to get paid on Friday.

THE COURT:  Yes.  And what happens, Ms. Almeida, when you are not at work because you are ill?  Who does your job?

PROSPECTIVE JUROR:  So far I haven't been ill and nobody does it.  Like, nobody would kick in.

THE COURT:  So you are the only individual that does payroll?

PROSPECTIVE JUROR:  I'm the only one.

THE COURT:  And where do you work?

PROSPECTIVE JUROR:  I work for POM MRI.

THE COURT:  And how many employees work at POM MRI?

PROSPECTIVE JUROR:  Like 70.

THE COURT:  Seventy.  Seven zero.

So you do know that by law POM MRI has the responsibility to allow you to serve.  As I stated, in time of peace, it's the most important service you can provide to your county.  So while I recognize -- and I say this to everyone --

that we certainly have important work to do both at work and at home, that is not a great personal hardship, and you and your employer will need to either work around the schedule that I provided -- as I stated, tomorrow will be a short day. You'll have the morning. And on Thursday you'll have the entire morning, since we won't be in session. But I do not consider that a great personal hardship. But thank you, Ms. Almeida. Thank you for bringing that to the Court's attention.

PROSPECTIVE JUROR: Okay.

THE COURT: All right. Juror Number 4, Mr. Soria?

PROSPECTIVE JUROR: Your Honor, I have two items. I don't know if I'd put them in a great personal hardship category. But I am currently a plaintiff in an active case here in the Southern District court. It's a breach of contract case, and nothing is scheduled for that case over the next two weeks. So I don't think that that would be a problem. What we are pending is the Judge's ruling on a motion for summary judgment. And that could come any day, and I don't know what happens once that ruling happens. So I think I could work around that, but I just want to make the Court aware of that.

But the reason why I really raised by hand was because I was anticipating a two-week period, and as you gave the schedule -- I am scheduled to leave on Sunday, the 8th of October, for a critical industry conference within my industry. It's a once-a-year event. And I didn't think that the third

54

week was part of this.  So I apologize for that.

THE COURT:  And where is your industry conference?

PROSPECTIVE JUROR:  It's in Phoenix, Arizona.

THE COURT:  And when does the conference begin?

PROSPECTIVE JUROR:  Sunday night.

THE COURT:  Sunday night, October 8th?

PROSPECTIVE JUROR:  Correct.

THE COURT:  And have you already paid for your ticket, sir?

PROSPECTIVE JUROR:  I'm registered, yes.

THE COURT:  All right.  But you've already -- you have your plane tickets to travel --

PROSPECTIVE JUROR:  I do.

THE COURT:  -- to Phoenix?

PROSPECTIVE JUROR:  Yes, I do.

THE COURT:  All right.  Thank you, Mr. Soria.

All right.  And Ms. Zavala?

Can you give the microphone to Ms. Zavala.

Thank you.

PROSPECTIVE JUROR:  Yes.  I just wanted to know if I can talk to you in private about, like, my hardship.

THE COURT:  Yes.  Of course.

All right.  Anyone else, Ladies and Gentlemen?

Okay.  In the third row, is that Ms. Arguelles?

PROSPECTIVE JUROR:  Yes.

55

THE COURT: Yes?

PROSPECTIVE JUROR: Hi. I apologize. I have two small children. I'm the primary caretaker. I don't -- I'm not from here. So I don't have family here. And just transporting them -- one of my children has sensory processing disorder. So with her special needs, it's really tricky for her to be in the care of other caretakers.

THE COURT: And Ms. Arguelles, are you the only one -- and I see you placed that on your questionnaire -- are you the only caretaker of your children?

PROSPECTIVE JUROR: No. I'm -- with my husband, who is a business owner.

THE COURT: All right. And are you able to make arrangements for your husband to take the children to school or to care for them while you're serving?

PROSPECTIVE JUROR: So for instance, today he is out of town. So I don't have anybody to pick them up from school today. I was able to get -- I'm a teacher at the school. So -- we don't live in the area. It's a 45-minute drive to the school. So it's not like I could have a neighbor to pick them up. It's a distance. I don't have anybody to drive other than my husband, and he's out of town.

THE COURT: And when would you need to leave today to pick up your children?

PROSPECTIVE JUROR: School gets out at 3:30.

THE COURT:  So you would need to leave about 2:30?

PROSPECTIVE JUROR:  2:30.  I live in Aventura.

THE COURT:  All right.  And would that be each day that your husband is out of town?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And how long do you anticipate your husband being out of town?

PROSPECTIVE JUROR:  Today is the only day he's out of town.

THE COURT:  All right.  So on the other days, can your husband pick up your children?

PROSPECTIVE JUROR:  I don't know every day, as far as the three weeks.

THE COURT:  All right.  Are you anticipating your husband being out of town during those --

PROSPECTIVE JUROR:  Not out of town.  Just his business.  What he does has time constraints for him to get the children.

THE COURT:  All right.  Thank you, Ms. Arguelles.

And Ms. Bosse?

PROSPECTIVE JUROR:  Yes, Your Honor.  I don't know if I can explain it to you in private.

THE COURT:  All right.  Ms. Bosse, we'll take that up in private.

Okay.  Anyone else, Ladies and Gentlemen?

A lot of hands.

All right. Well, hold on. Let's go over here to Ms. Hernandez -- actually, that is Ms. Areces.

PROSPECTIVE JUROR: Hi, Your Honor.

THE COURT: Hello.

PROSPECTIVE JUROR: Hi. I also have two small children and nobody to pick them up from school over the next two weeks. They are also out of school on October 6th. There's no school at all.

THE COURT: Is there anyone else besides yourself that could pick up your two children?

PROSPECTIVE JUROR: Unfortunately, not.

THE COURT: Do you have family that can pick up your two children?

PROSPECTIVE JUROR: My family all works. I'm pretty much the only one. I have somebody picking up them up today because I didn't know how long I would be here. But as far as every other day, I don't have any help.

THE COURT: All right. So right now, who's picking up your children from school?

PROSPECTIVE JUROR: My mother today.

THE COURT: And can you arrange with family members for your children to be picked up while you've serving?

PROSPECTIVE JUROR: Unfortunately, I cannot. I also take other people's children home.

58

THE COURT:  Now, do you work full-time, Ms. Areces?

PROSPECTIVE JUROR:  I do.  And another concern I have is I get paid by the hour.  I'm a contract attorney.  So I am currently on a project that's three weeks exactly, which I've already worked the first week.  I have two more weeks left.

THE COURT:  So when you're working full-time, who is caring for your children?

PROSPECTIVE JUROR:  I'm logging off to pick them up, to drop them off wherever they would need to go.

THE COURT:  Well, what time do you drop them off in the morning?

PROSPECTIVE JUROR:  They get to school at -- they leave the house at 7:15.

THE COURT:  All right.

PROSPECTIVE JUROR:  My husband takes them to school. I sign on to work.  I work till about 2:30.  I log off of work. I pick them up.  I take them to their various after-school activities.  I come back.  I log back on.

THE COURT:  And is your husband able to help with the children?

PROSPECTIVE JUROR:  Unfortunately, not.

THE COURT:  Is that because your husband works full-time?

PROSPECTIVE JUROR:  Yes.  He's a judge.

THE COURT:  And is he able to adjust his schedule?

PROSPECTIVE JUROR:  I don't think so.

THE COURT:  You don't think so or you haven't had a conversation with him?

PROSPECTIVE JUROR:  He's a criminal court judge in ROC court.

THE COURT:  And what time do your children need to be picked up?

PROSPECTIVE JUROR:  I leave at 2:30 every day to pick them up -- 2:45.

THE COURT:  And what time is their school over with?

PROSPECTIVE JUROR:  2:45.

THE COURT:  All right.  Thank you, Ms. Areces.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  All right.  And Ms. Hernandez -- if we can move over here to Ms. Hernandez at the end.

PROSPECTIVE JUROR:  Could I speak to you privately about it?

THE COURT:  All right.  Certainly.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Anyone else over here before we take the microphone over to the other side?

Yes.  Mr. Menendez?

PROSPECTIVE JUROR:  And may I speak to you in private as well?

THE COURT:  All right.  Certainly.

And let's move over to my left.

Any great personal hardship, Mr. Queral?

PROSPECTIVE JUROR:  Yes.  Okay.  I work as a self-employed.  So I work mostly from nine to five, and I work on the weekend for an employer.  So the two -- I can come maybe morning or afternoon, but not the whole day because I still have some works that are pending.  And in the weekend I have the -- I have to work from nine -- from ten to five.

THE COURT:  Yes.  Mr. Queral, I don't consider that a great personal hardship, sir.  You'll need to adjust your schedule and work either in the morning when we're not in session, the afternoon when we're not in session, or the evening.  All right, sir?

PROSPECTIVE JUROR:  Okay.

THE COURT:  Thank you.

Anyone else, Ladies and Gentlemen?

PROSPECTIVE JUROR:  Good morning.  I have three items just for your consideration.  This afternoon, I have a follow-up for my first mammogram -- sorry.

THE COURT:  What time is your mammogram?

PROSPECTIVE JUROR:  It's at one.

THE COURT:  All right.  Is that here at University of Miami?

PROSPECTIVE JUROR:  No.  It's at the diagnostic center on Galloway.

61

THE COURT:  All right.

PROSPECTIVE JUROR:  And then -- sorry -- pull myself together.

And then tomorrow I have -- I work at FIU, which -- my employer is very understanding, but I have a large work meeting that we've been preparing for months for.  And I mean, if I don't go, my male counterpart will take the lead, and I just worked hard to be at that meeting.

THE COURT:  What time is the meeting?

PROSPECTIVE JUROR:  I believe it's either at one or two in the afternoon.

THE COURT:  All right.  Are you able to move the meeting earlier?

PROSPECTIVE JUROR:  I can try.

And then my husband does leave tomorrow morning for work.  So I would be taking my kids.  And he comes back Friday morning.  And the earliest I can drop them off is eight a.m.  I do have them signed up for after care.  So I think the afternoons would be okay.  And then he leaves again Sunday until Tuesday.  So it would be just the morning challenge.

THE COURT:  All right.  What time do you think you can get to the courthouse after dropping off your children?

PROSPECTIVE JUROR:  I assume right around nine.  I drop them off at eight in South Miami.  Just traffic and parking.

THE COURT:  All right.  And what time would you need to leave to pick them up?

PROSPECTIVE JUROR:  I have not driven them in this direction to their school before, but I would be with traffic. The latest I could get there is six.  So I assume 4:30 or five should work.

THE COURT:  So the only issue would be tomorrow morning's meeting.  You're going to see if you can schedule it in the morning, since we're not in session until eleven o'clock.  And today, with regard to your follow-up of your mammogram --

PROSPECTIVE JUROR:  To reschedule that.  Yes.

THE COURT:  -- would there -- and that's today at one p.m?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Anything else, Ms. Prevolis?

PROSPECTIVE JUROR:  No.  I -- just the meeting tomorrow is with executive leadership, so I don't see them rescheduling, but understood.

THE COURT:  Okay.  All right.  Do you think you can make the call and see perhaps if it could be scheduled in the morning?

PROSPECTIVE JUROR:  Sure.

THE COURT:  Okay.  Thank you, Ms. Prevolis.

Anyone else, Ladies and Gentlemen?

Ms. Castillo?

PROSPECTIVE JUROR: Yes. Judge, while I can make some arrangements, based on the schedule that you provided, right now, I'm the only one that can take my kids in the morning. There was an exception today because my brother-in-law was able to take my kids. But because my husband is a recruit, he has to be at the City of Miami before 5:30. So as far as dropping off, I'm the one that drops off the kids. And then the picking up I can try to make --

THE COURT: So what time would you be able to get here and what time would you need to leave?

PROSPECTIVE JUROR: I live in Kendall. I might get here around nine. Between nine, 9:30.

THE COURT: All right. And what time would you need to leave?

PROSPECTIVE JUROR: 2:45, because my girls get out at 3:05.

THE COURT: And your husband can't assist you in the afternoon by picking them up?

PROSPECTIVE JUROR: Unfortunately, he cannot Tuesday through Fridays. Mondays he can.

THE COURT: And that's because he's --

PROSPECTIVE JUROR: He's a recruit right now.

THE COURT: Right. But why is it that he could not do that?

64

PROSPECTIVE JUROR:  Because he goes into the academy at -- he has to be there at five, 5:30 to report.  He gets out at four, and the academy is all the way down here.  And the drive from here to Kendall at that time is pretty hectic.

THE COURT:  All right.  So you would need to leave by 2:45.

All right.  Thank you, Ms. Castillo.

Okay.  And in the third row, that is Ms. Espinoza -- no.  I'm sorry.  My apologies.  That is Ms. Ponce.

PROSPECTIVE JUROR:  Okay.  Yes.  My problem is my English.  I don't fully understand what they say here.  I am lost, totally lost.  That is my problem now.  I don't understand some points here.  I am lost now.

THE COURT:  Okay.  So you're having some difficulty with the English language.

PROSPECTIVE JUROR:  Exactly --

THE COURT:  All right.  Thank you, Ms. Ponce.

Mr. Comeau?

PROSPECTIVE JUROR:  I'll just speak to you in private.

THE COURT:  All right.

Anyone else on this side?

Mr. Ruiz?

PROSPECTIVE JUROR:  Yeah.  Difficulty with the scheduling, as far as like the third week.  I have a flight Sunday, October 8th, I believe it is.

65

THE COURT:  And where are you traveling to?

PROSPECTIVE JUROR:  Nashville, Tennessee, for a manager meeting.

THE COURT:  All right.  And do you already have your tickets for that meeting?

PROSPECTIVE JUROR:  Yes, I do.

THE COURT:  All right.  And that can be provided to the Court?

PROSPECTIVE JUROR:  Absolutely.

THE COURT:  All right.  And you would need to leave October 8th; is that correct?

PROSPECTIVE JUROR:  Sunday.  If that's the 8th, I believe.

THE COURT:  All right.  Thank you, sir.

PROSPECTIVE JUROR:  Thank you.

Anyone else, Ladies and Gentlemen, on this side?

Yes, Ms. Soto?

PROSPECTIVE JUROR:  Yes.  Hi.  Good morning.

In the second week, I have a flight to Mexico, coming back for the third week, and I don't know if that is going to interfere.  I have to --

THE COURT:  And is that for business or for pleasure?

PROSPECTIVE JUROR:  That is to make my passport, my Venezuelan passport in the Venezuelan embassy there.

THE COURT:  So when are you leaving to travel to

Mexico?

PROSPECTIVE JUROR:  October 5.

THE COURT:  And when will you be returning?

PROSPECTIVE JUROR:  October 9.

THE COURT:  All right.  So you may not be available that week -- well, the 5th is -- October 5th is a Thursday, and we're not in session on that date.  And then you'll be back on the 9th?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.

Any other issue with the other dates, Ms. Soto?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

Anyone else, Ladies and Gentlemen, on this side?

All right.  And this gentleman -- Mr. Davis?

PROSPECTIVE JUROR:  Yes.  I believe it's not this Saturday, but next weekend, I have a flight to Tallahassee. And I'm looking to see if I can -- I'm leaving on Friday night, which won't be a problem, but I'm not supposed to come back till Monday.  So I'm going to see if I can move that to Sunday and come back Sunday.  I'm going to work on that.

THE COURT:  All right.  So you could be able to be back on Sunday?

PROSPECTIVE JUROR:  Well, I'm going to try to see if I can get a flight on Sunday.

THE COURT:  And which day would you be coming back if you couldn't get a flight?

PROSPECTIVE JUROR:  Monday.

THE COURT:  Monday -- which Monday, the 2nd or the 9th?

PROSPECTIVE JUROR:  Hold on.  Let me look at my calendar.

(Pause in proceedings.)

PROSPECTIVE JUROR:  So it's the -- let me work on it. I think I can make it work on the weekend, where I fly on the weekend, but let me make sure.  I'm supposed to go to Tallahassee for the weekend of the 8th.

THE COURT:  All right.  But you'll be able to work on it.  Thank you, sir.

Anyone else, Ladies and Gentlemen?

All right, then.  There are some individuals that we need to speak with in the courtroom -- we'll speak with one at a time and those individuals are:  Mr. Comeau, Ms. Bosse, Mr. Menendez, Ms. Zavala, Ms. Bacchus, Ms. Hernandez.  And I believe those are the only individuals that requested to speak with the Court individually.  So I would ask that those individuals -- if you will remain in the vestibule area that is right outside of this courtroom.

The rest of the individuals, we are going to take a recess.  We'll take a recess for about 25 minutes.  I would ask

that you look at your watch. Look at the person to the left and to the right of you, since we will be lining you up in the same manner. And the individuals that I have stated, if you will remain right outside in the vestibule. And the rest of you, if you will step outside, the restrooms are right across the hall and we'll take a short recess.

COURT SECURITY OFFICER: All rise for the jury, please.

THE COURT: We can first begin with Ms. Bacchus. Ms. Bacchus can remain in the courtroom.

(Panel not present, 11:04 a.m.)

THE COURT: All right.

So go ahead and have seat.

And Ms. Bacchus -- where is Ms. Bacchus?

And I think there are two other individuals that are still in the courtroom. Let me ask that you step outside in the vestibule, so we can give Ms. Bacchus her privacy, and we will certainly give you the same.

All right. So Ms. Bacchus, what is it that you needed to let the Court know?

Okay. You need a microphone. Can I have the court security officer provide a microphone to Ms. Bacchus.

Liz, can we give a microphone.

Okay. There we go.

All right. Ms. Bacchus?

PROSPECTIVE JUROR: I go to therapy two time a week, three time a week, Monday, Wednesday, and Friday.

THE COURT: All right. What times do you go?

PROSPECTIVE JUROR: Five o'clock.

THE COURT: At five o'clock. So what time would we need to conclude court so you would be able to get to therapy?

PROSPECTIVE JUROR: I have to leave here like 4:30.

THE COURT: Okay. All right. Thank you, Ms. Bacchus. If you'll step outside.

And if we can bring in another individual that wanted to speak to the Court, Ms. Zavala.

Thank you, Ms. Bacchus.

(Panel Member Number 2 exits the courtroom.)

(Panel Member Number 3 enters the courtroom.)

THE COURT: Okay. Ms. Zavala, what is it that you wanted the Court to know?

PROSPECTIVE JUROR: Oh, okay. So I've been looking for -- I'm a registered nurse. I've been looking for a job that's not bedside because I have a doctor's note that I can no longer do bedside nursing. And I finally got an opportunity. It's called Monte Nido & Affiliates. It's like an adolescent home for girls that have like bulimia, anorexia, and like psychiatric disorders.

So they told me it would take about two weeks for them to give me the -- like, they do background checks and stuff.

So they were hoping that by the -- because I told them I have jury duty. And it said two weeks on the letter, so I assumed it would be two weeks. So they told me that hopefully it would take two weeks and I can start after I'm done with jury duty. I just didn't want to like lose this opportunity because I haven't been working, and I need to work.

THE COURT: Well, by law, you're not going to lose the opportunity if you're on jury duty. So just let your potential employer, Monte Nido & Affiliates, know that you are serving on a jury. And as we get closer to the end of that two-week period, to the extent that your service will be needed on this third week, you'll just let them know.

PROSPECTIVE JUROR: Oh, okay. So they can't take the opportunity from me?

THE COURT: They certainly cannot take it away because you're serving on a jury. But I would certainly communicate with your potential employer.

PROSPECTIVE JUROR: Oh, okay. I just wanted to know that. Thank you.

THE COURT: Okay?

Thank you, Ms. Zavala.

And if we can bring in either Ms. Hernandez or Menendez.

(Panel Member Number 3 exits the courtroom.)

(Panel Member Number 7 enters the courtroom.)

THE COURT:  Is this Ms. Hernandez?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Yes, Ms. Hernandez?

PROSPECTIVE JUROR:  Hi.  So tomorrow at 11 a.m. I start a new job, and it's my first day there.  The scheduling, we're not sure about.  We were going to like talk about it there, once I like learned everything.  It's at a doctor's office, and I'm like organizing documents on the computer and stuff.  I'm not sure if there's anything else that I have to do.  We were going to discuss it there, and we were, again, going to discuss the scheduling there too.

THE COURT:  And did you advise your new employer that you have been called to jury duty?

PROSPECTIVE JUROR:  Yes.  She knows --

THE COURT:  All right.  So she knows that you may not be there tomorrow, since you may be selected.

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right, then.  Thank you, Ms. Hernandez.

If we can call in Mr. Menendez.

(Panel Member Number 7 exits the courtroom.)

COURT SECURITY OFFICER:  I believe Mr. Menendez changed his mind, Judge.

THE COURT:  All right.  What about Ms. Bosse?

COURT SECURITY OFFICER:  Bosse?

THE COURT: Bosse. B-O-S-S-E.

And then Juror Number 17, please. And then after that, Juror Number 40, Mr. Comeau.

(Panel Member Number 17 enters the courtroom.)

THE COURT: Yes, Ms. Bosse?

PROSPECTIVE JUROR: Yes, Her Honor. I have a very large responsibility now, and I work two job. I work in the OR Baptist Hospital, and it's very hard. And I have my dad, and he's very -- Alzheimer's, in the hospital, very bad.

THE COURT: All right. So your father is in the hospital. And the nature of your disability is?

PROSPECTIVE JUROR: He has Alzheimer's and dementia, and he just diagnosed with --

THE COURT: But you said that you have a large disability. Can you share that with me.

PROSPECTIVE JUROR: Responsibility.

THE COURT: Oh. Responsibility caring for your father.

PROSPECTIVE JUROR: And I have my daughter. I have to take her to after school, who is in need of -- on Thursday --

THE COURT: And Ms. Bosse, are you the only caretaker for your father?

PROSPECTIVE JUROR: Yes.

THE COURT: All right. And are you there on a full-time basis?

PROSPECTIVE JUROR:  And I work full-time job and per diem jobs.  And now he's in the hospital.  I have to go to the hospital every day in the morning.

THE COURT:  All right.  So are you able to go to the hospital in the morning -- I know that you work at Baptist Health; is that correct?

PROSPECTIVE JUROR:  Baptist Health in the OR, and I work at UM --

THE COURT:  All right.  Now, do your employers know that you have been called to jury duty?

PROSPECTIVE JUROR:  No.  I did not know much about jury duty.  I thought that was only one day.  I call out today because I supposed to go to work at three.

THE COURT:  All right.  So do you visit your father after your full-time job?

PROSPECTIVE JUROR:  Yes.  And I have it -- at home, my husband and my son, but now my son in school and my husband work full-time.  And he's -- he was in a rehab because of -- after surgery.

THE COURT:  All right.  Well, certainly I would let your employers know that you have been called to jury duty, so that they are aware.  And in terms of your -- the care of your father, certainly I understand the responsibility, but it does appear that based on your full-time job that you are able to manage caring for your father and working.  So do you believe

that you could serve as a juror if you were selected?

PROSPECTIVE JUROR: For three weeks, I don't see it's possible, because at sometime I have to leave -- on Thursday, I have to take my daughter -- I have to pick up my daughter and take her to after school tutoring because she has a problem with everything with the --

THE COURT: How old is your daughter? She's a senior?

PROSPECTIVE JUROR: She's eight years old.

THE COURT: So you have a daughter that's eight years old?

PROSPECTIVE JUROR: Yes. In third grade.

THE COURT: All right. All right. Thank you, Ms. Bosse.

Are there any questions by either side with regard to Ms. Bosse?

Hold on.

(Pause in proceedings.)

MR. DOBBINS: None from the Government, Your Honor.

THE COURT: Mr. Feigenbaum?

MR. FEIGENBAUM: No, Your Honor.

THE COURT: All right. Thank you, Ms. Bosse.

(Panel Member Number 17 exits the courtroom.)

THE COURT: Okay. I was advised on the record, Mr. Comeau, Juror Number 40, did ask to speak with the Court. If Mr. Comeau is outside, Scott. And as well, Liz gave me

75

Number 24 and Number 38. And if they are outside, if -- 24, Gonzalez, and 38 Shinhoster.

(Panel Member Number 40 enters the courtroom.)

THE COURT: All right. And this is Mr. Comeau?

PROSPECTIVE JUROR: Yes.

THE COURT: Yes, sir?

PROSPECTIVE JUROR: I'm a commissioned advisor broker. So right now the kid -- my assistant is on paternity leave till the end of next week. I'll try to get him back. But if I don't work, I don't make money.

THE COURT: Well, that's understood, sir. How would that prevent you from serving?

PROSPECTIVE JUROR: I mean, it's going to be a hardship financially. I mean, if the kid would come back early -- I mean, the next two weeks I'm stuck.

THE COURT: Okay. When you speak of the kid, I'm not quite sure ...

PROSPECTIVE JUROR: The person who works for me. So I have no coverage.

THE COURT: All right, sir. Have you advised your assistant that you have been called to jury duty?

PROSPECTIVE JUROR: Yeah. He knew of that. But you know, this is -- every other time I've been called, I get the call that I don't have to show up. So I mean, this is all new today.

THE COURT: Okay. Well, as I stated, it is the most important service you can provide to your country. So I understand that you may have had certain assumptions based on your past experiences --

PROSPECTIVE JUROR: I may have had assumptions?

THE COURT: -- but have you advised your assistant that you might be called to jury duty?

PROSPECTIVE JUROR: I said yes. And he's entitled to get that time. I mean, look, I think it's very important. I'm not diminishing this. Just this week and next week are bad.

THE COURT: Yes, sir.

All right. Thank you, Mr. Comeau.

PROSPECTIVE JUROR: Yeah.

(Panel Member Number 40 exits the courtroom.)

THE COURT: And Scott, if we can see if Juror Number 24 and 38 are outside.

COURT SECURITY OFFICER: Number 24 and 30?

THE COURT: And 38.

Both asked to speak to the Court.

(Pause in proceedings.)

(Panel Member Number 24 enters the courtroom.)

THE COURT: All right. Good morning. And this is?

PROSPECTIVE JUROR: Stephanie Gonzalez.

THE COURT: All right. Ms. Gonzalez --

PROSPECTIVE JUROR: Yes.

THE COURT: -- is -- hold on. Let me just make sure -- is Juror Number 24.

Yes, Ms. Gonzalez?

PROSPECTIVE JUROR: Good morning. I just wanted to mention -- because when you were speaking of personal hardships, I was just thinking I didn't want to think this is like an inconvenience or anything that's going on, but I've been dealing with vertigo for the like the past year. And I currently went to the doctor, and I was told to go to therapy for it. And you know, I just started doing the therapy last week. And then, you know, with the two weeks off -- they told me that it was fine to come to jury duty, but I'm just concerned of missing jury -- I'm sorry -- missing my therapy and how it's going to affect me.

THE COURT: And when is your therapy sessions?

PROSPECTIVE JUROR: I'm supposed to go twice a week.

THE COURT: What are the hours?

PROSPECTIVE JUROR: They are open between seven in the morning, I believe, till six. And I would go at seven in the morning before work.

THE COURT: Are you able to do that and also serve on the jury?

PROSPECTIVE JUROR: I don't see it to be a problem. But whenever I do my therapy, sometimes I do end up feeling kind of nauseous. I feel bad. It just depends of what we're

doing in the therapy. And the therapy -- I was told to do it for about four to six weeks. It just depends how fast -- how much better I'll get throughout the time.

THE COURT: All right.

PROSPECTIVE JUROR: Yeah.

THE COURT: So perhaps we can play it by ear and see how you're feeling after your therapy. Is your therapy here, close?

PROSPECTIVE JUROR: It's down by 88th and Kendall.

THE COURT: All right. So if you had you therapy at seven a.m., what time do you believe that you could arrive at the courthouse?

PROSPECTIVE JUROR: It depends on the traffic. But I do get out of therapy around -- I would say about the latest 8:30, maybe 8:45.

THE COURT: Okay. So you could be about here about 9:30.

PROSPECTIVE JUROR: I would like to say yes.

THE COURT: Okay. Is there anything -- and how many weeks have you been having the therapy?

PROSPECTIVE JUROR: I just started last week. I've only done it for one week.

THE COURT: All right. And do you have a schedule this week of your therapy sessions?

PROSPECTIVE JUROR: No. When I mentioned to them

about jury duty, they did tell me: "Just play it by ear. If you're not supposed to go in, then you can call the day before and go ahead, schedule your appointment."

My only concern is that if I do call the day before and that they don't have the appointment available at seven a.m.

THE COURT: Right. And of course, this week, as you know, we're not starting tomorrow until 11. And on Thursday we're not starting until one p.m. So you would certainly be able to place the time that's needed for the therapy.

PROSPECTIVE JUROR: Of course. Yes.

THE COURT: Okay. Anything else, Ms. Gonzalez?

PROSPECTIVE JUROR: No. That's all.

THE COURT: Thank you.

PROSPECTIVE JUROR: Thank you.

(Panel Member Number 24 exits the courtroom.)

THE COURT: Okay. If we can bring in Juror Number 38.

(Pause in proceedings.)

(Panel Member Number 38 enters the courtroom.)

THE COURT: All right. Is this Ms. Shinhoster?

PROSPECTIVE JUROR: Hi.

THE COURT: Yes. Ms. Shinhoster, what is it that you needed to advise the Court of?

PROSPECTIVE JUROR: So yesterday, my knee -- it was around maybe, I want to say, 12 a.m. -- 12-something -- my knee

popped out for about 15 minutes.  But my sister's knee, like before, like it popped out.  So I didn't really think that it would -- like, I'm in pain, but I didn't think that it was like that big of a deal.  But like right now I'm in like real bad pain, and I'm wondering if there's any -- I don't know how this works.  Is there any, like, medical people here that --

THE COURT:  No.  There are no medical people.  Do you think you can take some Advil for your pain?

PROSPECTIVE JUROR:  I don't have any.  But if there's some, then I would like some, yes.

THE COURT:  All right.  So is that the only issue, is that you're in pain with regard to your knee?  Do you have any doctor's appointments that you have scheduled?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.

PROSPECTIVE JUROR:  Because I thought I was going to be, like, okay.  But then, like, now the pain is like shooting up my leg.  So it's --

THE COURT:  All right.  And perhaps, Ms. Shinhoster -- there's some individuals outside.  Perhaps someone has some Advil or Tylenol for you.

Is there anything further that the Court needs to be aware of?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you.

COURTROOM DEPUTY:  Judge, I believe on the seventh floor, in the Constitution Cafe, they have Advil.

THE COURT:  All right.  Ms. Shinhoster, on the seventh floor, at the Constitution Cafe, the courtroom deputy has advised that they do have some Tylenol.

PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay?  I hope you feel better.

(Panel Member Number 24 exits the courtroom.)

(Panel Member Number 28 enters the courtroom.)

THE COURT:  All right.  Let's bring in -- who is this?

PROSPECTIVE JUROR:  Hello, Judge.

THE COURT:  Hello.  What is your name?

PROSPECTIVE JUROR:  My name is Jennifer Santos.

THE COURT:  Yes, Ms. Santos?

PROSPECTIVE JUROR:  I just wanted to add for the Court's records -- you did ask what medications I take.  I am currently a medical marijuana card holder, due to my PTSD and my extreme anxiety.  And I just don't feel that being highly medicated, as I am all the time, I would be of great use to the Court.  I just feel like it's going to impair my proper judgment.  And I'm -- unfortunately need to be medicated in order to have a better quality of life and not, you know, end up in like a mental institution.

THE COURT:  All right.  Of course.

PROSPECTIVE JUROR:  So this really works for me.

THE COURT:  And Ms. Santos, did you drive here today?

PROSPECTIVE JUROR:  I did not.  I took the Metrorail.

THE COURT:  All right, then.  All right.  Thank you.  Thank you for bringing that to the Court's attention.

PROSPECTIVE JUROR:  Yes, ma'am.

(Panel Member Number 28 exits the courtroom.)

THE COURT:  All right.  Two items that I do need to discuss with the parties.  First and foremost, I noted that throughout the proceedings Mr. Hernandez was not using his earpiece.  Is Mr. Hernandez proficient in the English language or has he chosen not to actively participate in jury selection?

Is there a reason why Mr. Hernandez, on his own accord, took off his earpiece?

MR. FEIGENBAUM:  I don't know, Judge.

THE DEFENDANT:  (Through Interpreter.)  Sometimes I understand English well, and I was able to understand what they were talking about.

THE COURT:  All right.  Well, I would certainly suggest that -- we have interpreters here throughout the trial, that if Mr. Hernandez is in need of the interpreter that he use those services.

MR. FEIGENBAUM:  Yeah, Judge.  I agree.  I've been representing him since he was a target about a year and a half ago, and I always talked to him in Spanish.

THE COURT:  All right, then.

MR. FEIGENBAUM:  He does have some knowledge.  But he doesn't feel comfortable, especially with legal matters.

THE COURT:  All right.  Might I suggest that before we begin to select our jury -- why don't we take a short recess, say about -- would 10 minutes be acceptable to the parties?

MS. KLEPACH:  Yes.  Thank you, Judge.

THE COURT:  All right.  Let me also suggest, since we have all of the jurors outside, that -- if I can just ask the court security officer to allow access into the jury room.  We have two restrooms for your use.  I think that might be better, to use those restrooms.  And let's go ahead and take a 10-minute recess.

(Recess from 11:23 a.m. to 11:34 a.m.)

THE COURT:  All right.  I would suggest that you turn your chairs around, so that we can engage in selection of our jury.

And let me acknowledge the presence of the Defendant.

(Pause in proceedings.)

THE COURT:  All right.  Let us begin to select our jury.  Addressing -- and go ahead and have a seat.  Addressing all the cause challenges, looking at the jury as a whole, we can first start with the cause challenges for the Government, and then we'll move to the Defendant.

Any for-cause challenges, looking at the panel as a whole?

MR. DOBBINS:  Yes, Your Honor.  You want me -- I'm sorry.  Do you want me to go one at a time?

THE COURT:  Yes.  Thank you.

MR. DOBBINS:  The first one, I believe, would be Juror Number 4.

THE COURT:  Is that due to the conference in Phoenix?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  All right.  The juror is stricken for cause.

MR. DOBBINS:  Judge, Juror Number 5 had written on her questionnaire that she wasn't sure she could be fair and impartial, but I don't believe we actually addressed that with her.  And she didn't respond when Your Honor --

THE COURT:  Juror Number 5 said:  "Not sure."

MR. DOBBINS:  Right.  And she didn't really respond, though, when you asked the follow-up questions to the group about whether they could be fair and impartial.  So I'm just not sure that that's -- I think maybe that's something we want to bring --

THE COURT:  All right.  So is that also a question mark for the Defendant, Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Then let's bring in Juror

Number 5 as we continue to move through the for-cause challenges.

All right.  Continuing.

Juror Number 5, Cisneros.

MR. DOBBINS:  We're bringing Juror Number 5 in?

THE COURT:  Yes.  But we can continue with the for cause until Ms. Cisneros --

MR. DOBBINS:  Juror Number 8 was the next one for the Government, Your Honor.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  All right.  Juror is stricken.

And let me say that if I agree with you, or there's no objection, there's no need to proceed with argument.

(Panel Member Number 5 enters the courtroom.)

THE COURT:  This is Ms. Maria Cisneros, Juror Number 5.

Ms. Cisneros, in your questionnaire, on Question 14, you were asked if there was anything in your background or personal feelings that might affect your ability to be fair and impartial, and your answer was:  "Not sure."  Is there anything that the Court should be made aware as to why you could not serve as a fair and impartial juror?

PROSPECTIVE JUROR:  No, not at the moment.

THE COURT:  Okay.  And when you say:  "Not at the

moment," is there anything at all in your background that the Court would need to be aware of, any experience, any relationship, any opinion that would have an effect on your ability to serve as a fair and impartial juror?

PROSPECTIVE JUROR:  Not at this moment.  I don't think so.

THE COURT:  Okay.  And when you say:  "I don't think so," we speak, as human beings, in conditional terms.  Is there any hesitation on your part?

PROSPECTIVE JUROR:  No.  Other than, you know, it's just a lot of time off of work.

THE COURT:  Yes.  Of course.  And I understand that. And I understand you're a teacher and that certainly your work is important, but you do understand service on a jury is the most important service you can provide to your country.  So is there anything within your background, your experiences, or opinions that would affect your ability to serve as a fair and impartial juror?

PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Okay.  And when you say:  "I don't think so," is there any hesitation on your part?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you, Ms. Cisneros.

(Panel Member Number 5 exits the courtroom.)

THE COURT:  Okay.  And I think we left off with Juror

Number 8, who was stricken for cause.

MR. DOBBINS: Yes, Your Honor.

The next one I would bring up is Juror Number 11 brought up his religious views. I know that the Court asked him, and it just was unclear to me. He said that he didn't believe he could judge other people, but then he said he could be fair and impartial and judge the case. So it was just -- it was very confusing. So I don't know if we should bring him back in maybe just to clarify that, or if there's an objection --

THE COURT: Well, I did ask him with regard to his Christian views, and he stated that he could serve as a fair and impartial juror. And I did advise of the role of serving as a judge of the facts, and there was nothing, based on the questions and responses of Mr. Bennefield, that would lead this Court to have any reasonable doubt as to why he could not serve as a fair and impartial juror.

MR. DOBBINS: Understood, Your Honor.

THE COURT: Any further for-cause challenges?

MR. DOBBINS: Yes, Your Honor.

Juror Number 17, Ms. Bosse.

THE COURT: Is there any objection?

MR. FEIGENBAUM: No, Your Honor.

THE COURT: All right. Based on her role as a caretaker for her father and her 8-year-old child, I believe

that she has set forth sufficient cause and the juror is stricken.

Any further for-cause challenges?

MR. DOBBINS:  Yes, Judge.  We would move to strike Juror Number 18 for cause.  She had the child care issues.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  The juror is stricken.

MR. DOBBINS:  And Judge, we would move for Juror Number 19, also for cause.  She had child care issues.

THE COURT:  Could we bring in Ms. Areces, Juror Number 19, please.

(Panel Member Number 19 enters the courtroom.)

THE COURT:  Good morning once again, Ms. Areces.  You work full-time, correct?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Your husband is a judge, correct?

PROSPECTIVE JUROR:  Correct.

THE COURT:  And your mother-in-law has been a judge for quite a long time.

PROSPECTIVE JUROR:  Correct.

THE COURT:  And you have advised the Court that you are unable to serve as a juror because there is no one to pick up your children, correct?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And that is, every day you are the one that leaves at 2:45 to pick up your children?

PROSPECTIVE JUROR:  2:30, yes.  It depends on the day.  Today my mom has them because I'm here.

THE COURT:  Okay.  So are you the person every day that picks up your children?

PROSPECTIVE JUROR:  It depends on the day.  But yes, at some point either at 2:45 or at five, or whenever whatever they are doing lets out, I'm picking somebody up at some point.

THE COURT:  And you stated that your family is full of judges and lawyers.  Based on your family, and the support that you have, are there other individuals, including your husband, your mother, your mother-in-law, or any other individual that can pick up your children as you are serving on this jury?

PROSPECTIVE JUROR:  It will just depend on the day, Judge.

THE COURT:  Yes.  I understand.

PROSPECTIVE JUROR:  I don't know.

THE COURT:  But can you make these arrangements, so that you can provide the most important service that you can provide as a citizen?

PROSPECTIVE JUROR:  I don't think I can do it for two weeks in a row.

THE COURT:  You don't believe that you could find other individuals to pick up your children?

PROSPECTIVE JUROR:  Correct.

THE COURT:  Okay.  And you do realize, obviously, with a family of judges and lawyers, the importance of service on a jury.

PROSPECTIVE JUROR:  Yes.  In fact, I had deferred this twice before.  And I finally thought, well, let me just go because I'm never technically going to be available.  I wanted to make sure to come and try to do as much as I could.

THE COURT:  But you're not able to set aside that inconvenience, in allowing other family members to assist, so that you could serve on the jury?

PROSPECTIVE JUROR:  Yeah.  That's correct.  I also get paid hourly, Judge.  So if I don't work for the next two weeks, I don't make any money.

THE COURT:  Right.  Well, you know that that's not a personal hardship --

PROSPECTIVE JUROR:  Of course.  But I'm a contract employee.  So I'm always shifting around my hours to find the personal time to do the kid pick-up and fill in my hours from seven to seven, and --

THE COURT:  And you have consulted with your family, and your family believes that you're not able to serve on the jury?

PROSPECTIVE JUROR:  I have not consulted with them about the following two weeks.  I have just consulted with my

mother about today.

THE COURT:  All right.  So you haven't taken the time to see if, in fact, you could serve?

PROSPECTIVE JUROR:  I can ask, but I'm pretty sure I know the answer.  I know tomorrow I have to pick up my children and three other children.

THE COURT:  But I'm speaking of the support that you have in your family, if you were to ask them.

PROSPECTIVE JUROR:  I could ask them.

THE COURT:  Do you think that would be helpful?

PROSPECTIVE JUROR:  I don't know the answer.  Like I said, it's a -- I'm constantly puzzle piecing around my days with my children.

THE COURT:  Yes.  Do you think you could see if, in fact --

PROSPECTIVE JUROR:  You would like me to call somebody?

THE COURT:  Well, I'm wondering if, in fact, you were to alert them that you may be selected as a juror that perhaps they would see if your children could be picked up so you could fulfill your service.

PROSPECTIVE JUROR:  I can call and ask, but I have a feeling I'm not going to be able to be here for the next two weeks.

THE COURT:  All right.  Thank you, Ms. Areces.

PROSPECTIVE JUROR:  Thank you.

(Panel Member Number 19 exits the courtroom.)

THE COURT:  All right.  While unfortunate, I believe that Ms. Areces has set forth a basis for a for-cause challenge.  Is there any objection?

MR. DOBBINS:  We made it, Judge, so no objection from the Government.

THE COURT:  Mr. Feigenbaum?

MR. FEIGENBAUM:  No objection.

THE COURT:  All right.  The juror is stricken.

Any further for-cause challenges?

MR. DOBBINS:  Yes, Your Honor.

Juror Number 21.  He said he had a language issue.

THE COURT:  Was it Mr. Queral or Mr. De La Cruz?

MR. DOBBINS:  Mr. Queral and Mr. De Las Cruz both said it.  They raised it at different times.  But Mr. Queral is the first one.

THE COURT:  Yes.  I don't know why my notes don't reflect that with Mr. Queral.  Did he raise his hand?  Was he questioned by the Court?  I know Mr. De La Cruz and Ms. Ponce.  But was it your recollection as well, Mr. Feigenbaum, Juror Number 21?

MR. FEIGENBAUM:  Yes.  He spoke twice at least.

THE COURT:  No.  But is it your recollection that he himself stated he has a language barrier?

93

MR. FEIGENBAUM:  I think he did mention that.

THE COURT:  Okay.  All right.  Then the juror is stricken based on the language barrier.

MR. DOBBINS:  Next would be Juror Number 22, Judge. She has a medical appointment today.  It seems like that's a serious thing.  She was very emotionally affected by that -- by telling us about that.  So I think --

THE COURT:  Any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  Juror is stricken.

MR. DOBBINS:  The next one would be Juror Number 28 for a number of reasons, but she said she could not be fair and impartial.  She's on medical marijuana, suffering from PTSD, and she specifically stated she could not be --

THE COURT:  Any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  Juror is stricken.

MR. DOBBINS:  Juror Number 33, Mr. De La Cruz, also said he had a language issue.

THE COURT:  Yes.  Any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  Based on the language barrier, the juror is stricken.

MR. DOBBINS:  Juror Number 34, Ms. Ponce.  She stated that she could not be fair and impartial, as well as stated

that she had a language issue -- and I believe her questionnaire -- she wrote her answers in Spanish.

THE COURT: Any objection?

MR. FEIGENBAUM: No objection.

THE COURT: Juror is stricken.

MR. DOBBINS: Juror Number 36, Mr. Nelson, stated he had religious issues, that he could not just sit in judgment of another human being.

THE COURT: Any objection?

MR. FEIGENBAUM: No objection.

THE COURT: Juror is stricken.

MR. DOBBINS: And then Juror Number 40, a number of issues, but primarily stated he could not be fair and impartial based on how his son -- he felt his son was treated by the criminal justice system.

THE COURT: Any objection?

MR. FEIGENBAUM: No objection.

THE COURT: The juror is stricken.

MR. DOBBINS: That's it.

THE COURT: Mr. Feigenbaum, any further for-cause challenges?

MR. FEIGENBAUM: No further cause challenges.

THE COURT: All right. Then let us proceed with the peremptory challenges.

MR. FEIGENBAUM: Your Honor, how many peremptories

95

does the Defense get?

THE COURT:  Ten.  And the jury [sic] maintains the six.

All right.  So we will first address the first 12. Almeida, Bacchus, Zavala, Cisneros, Mairena, Hernandez, Gutierrez, Pena, Bennefield, Ojomo, Jacques, and Mitchell. Those are the first 12.

Any peremptory challenges to be exercised, looking at that panel, on behalf of the Government?

MR. DOBBINS:  Judge, I'm sorry.  Could you just tell us how we're going to do -- is it one at a time or --

THE COURT:  Well, we're looking at the panel as a whole.  I do allow back-striking, but we will proceed alternating with peremptory challenges.

First, on behalf of the Government.  If you tender the panel, then we'll move to the Defendant.  If the Defendant tenders the panel, then that will be the panel.

On behalf of the Government?

MR. DOBBINS:  Judge, we would move for -- to strike Juror Number 7.

THE COURT:  All right.  Marie Tilor, Juror Number 15, joins the panel.

On behalf of the Defendant?

MR. FEIGENBAUM:  Okay.  So Your Honor, so Juror Number 7 is stricken by the Government?

THE COURT:  That's correct.

MR. FEIGENBAUM:  And the Government gets how many?

THE COURT:  The Government has six.

MR. FEIGENBAUM:  Okay.  We would thank and excuse Juror Number 1.

THE COURT:  All right.  Juror Number 1 is stricken. And Venesa White, Juror Number 16 joins the panel.  On behalf of --

MR. FEIGENBAUM:  I'm so sorry.  Should I tell you all the strikes we have for --

THE COURT:  No.  We're going to alternate one by one.

Venesa White joins the panel.

On behalf of the Government?

MR. DOBBINS:  Judge, we would move to strike Juror Number 2.

THE COURT:  Charles David, Juror Number 20, joins the panel.

On behalf of the Defendant?

MR. FEIGENBAUM:  We would -- we can back-strike, Your Honor?  We would move to strike Juror Number 20.

THE COURT:  Aname Castillo joins the panel.

On behalf of the Government?

MR. DOBBINS:  One moment, Your Honor.

(Pause in proceedings.)

MR. DOBBINS:  Judge, we would move to strike Juror

Number 11.

THE COURT:  Stephanie Gonzalez joins the panel, Juror Number 24.

On behalf of the Defendant?

MR. FEIGENBAUM:  Judge, we move to strike Juror Number 23.

THE COURT:  Allan Castro joins the panel, Juror Number 25.

On behalf of the Government?

(Pause in proceedings.)

THE COURT:  On behalf of the Government?

MR. DOBBINS:  Judge, we accept the panel as is.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  Judge, I've only used three strikes so far?

MR. DOBBINS:  Yes.

THE COURT:  Yes.

MR. FEIGENBAUM:  Okay.  And we're up to?

THE COURT:  Allan Castro.

MR. FEIGENBAUM:  Uh-huh.  We did not strike for cause Number 24; is that correct?

THE COURT:  We did not.

MR. FEIGENBAUM:  We move to strike Juror Number 10.

THE COURT:  Anne Revilla joins the panel.

Any additional peremptory strikes on behalf of the

Government?

MR. FEIGENBAUM: One moment.

THE COURT: On behalf of the Government.

MR. FEIGENBAUM: Oh.

THE COURT: They've tendered, but now there is a new addition to the panel.

MR. FEIGENBAUM: I see.

MR. DOBBINS: No, Judge. We accept the panel as is.

THE COURT: All right. On behalf of the Defendant?

MR. FEIGENBAUM: We'll move to strike Number 9.

THE COURT: Vickie Murphy joins the panel, Juror Number 27.

(Pause in proceedings.)

MR. DOBBINS: Judge, at this time, we move to strike Juror Number 13, please.

THE COURT: You said 15?

MR. DOBBINS: Thirteen -- one three. I'm sorry.

THE COURT: Thirteen.

Antonio Gomez Real joins the panel, Juror Number 29.

On behalf of the Defendant?

MR. FEIGENBAUM: One moment, Your Honor.

(Pause in proceedings.)

MR. FEIGENBAUM: Move to strike Number 14.

THE COURT: Juror Number 30, Thorp-Fairshter, joins the panel.

On behalf of the Government?  Do you tender this panel?

(Pause in proceedings.)

THE COURT:  Does the Government tender this panel?

MR. DOBBINS:  We tender the panel, Your Honor.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  Move to strike Number 16.

THE COURT:  Christopher Ruiz joins the panel.

I do need to make the parties aware that Christopher Ruiz is leaving for Nashville for a meeting on October 8th. That's not a basis for cause.  We would accommodate the schedule.  But I did need to advise you of that fact.

MR. FEIGENBAUM:  Which number was that?

THE COURT:  That's Juror Number 31.

Juror Number 32 is also traveling to Mexico the second week, October 5th through the 9th, is not available.  But we are running out of jurors.  So I'm going to suggest that we work with their schedules, given that the parties have exercised a good number of challenges.

Does the Government tender?

MR. DOBBINS:  Yes, Judge.  We tender the panel.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  Move to strike Juror Number 31.

THE COURT:  Gabriela Soto joins the panel.

Does the Government tender?

MR. DOBBINS:  Judge, may have a quick count on the challenges --

THE COURT:  The Government has used four and the Defendant has used eight.

MR. DOBBINS:  Thank you, Your Honor.

THE COURT:  It doesn't mean that the Government needs to exercise, nor does the Defendant need to exercise all the challenges.  Just noting that we have five jurors remaining.

On behalf of the Government, do you tender?

MR. DOBBINS:  We tender the panel, Your Honor.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  Strike number 32, please.

THE COURT:  Katherine Espinoza, Juror Number 35, joins the panel.

Does the Government tender?

MR. DOBBINS:  One second, Your Honor.

(Pause in proceedings.)

MR. DOBBINS:  The Government would tender, Your Honor.

MR. FEIGENBAUM:  How many have I used, Your Honor?

THE COURT:  You've used nine.

MR. FEIGENBAUM:  So we're up to 35, you said?

THE COURT:  That's correct.

MR. FEIGENBAUM:  Move to strike.

THE COURT:  Whom?  Who do you move to strike?

MR. FEIGENBAUM:  Number 35.

THE COURT:  All right.  Joann Armas joins the panel.

Does the Government tender?

MR. DOBBINS:  Government would tender the panel, Your Honor.

THE COURT:  All right.  And the Defendant has exhausted.  Does the Defendant tender as well?

MR. FEIGENBAUM:  I believe I'm out of peremptories, Your Honor.

THE COURT:  That's correct.

All right.  Then the panel consists of the following: Maria -- I'm sorry -- Gloria Zavala, Maria Cisneros, Franklin Mairena, Ireti Ojomo, Marie Tilor, Stephanie Gonzalez, Allan Castro, Anne Revilla, Vickie Murphy, Antonio Gomez Real, Jonathan Thorp-Fairshter, and Joann Armas.

I was hoping to proceed with two alternates, but I will give the parties an opportunity to challenge either Jamyiah Shinhoster or Sylvia Occhi, or is there any objection to allowing these individuals to serve as alternates?

MR. DOBBINS:  Both of those jurors are acceptable as alternates to the Government.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  One moment, Your Honor.

(Pause in proceedings.)

MR. FEIGENBAUM:  Acceptable.

THE COURT:  All right.  Then those will be our

alternates.

All right.  Mr. Hernandez, I have observed that you have been actively participating in the selection of this jury.  Before we bring in the members and swear them in as Members of the Jury to try this case, do you have any objection to this panel?

THE DEFENDANT:  (Through Interpreter.)  No.  Everything's fine.

THE COURT:  All right.  Then I would suggest that we bring in the individuals, swear them in collectively as a group.  I will give them the preliminary instructions.  And then I would suggest we take an hour recess for lunch, and then we'll proceed with the testimony in the afternoon.  Is that acceptable to both sides?

MR. FEIGENBAUM:  Yes, Your Honor.  But right before you break for lunch, I just have a couple quick questions.

THE COURT:  Certainly -- oh.  You mean on the other side of swearing in the jury?

MR. FEIGENBAUM:  Yes.

THE COURT:  Yes.  Of course.

MS. KLEPACH:  That's acceptable.  Thank you, Judge.

THE COURT:  All right.  Then let's bring in the Members of the Jury.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the panel, 12:02 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated.

We have selected a jury to try the case of the United States of America v. Javier Hernandez.  I'm going to ask the following individuals, who have been selected, to stand, make your way to the jury box, and you will be sworn in collectively as our jury to try this case:

Gloria Zavala, Maria Cisneros, Franklin Mairena, Ireti Margaret Ojomo, Marie Ermine Tilor, Stephanie Gonzalez, Allan Castro, Anne Nicole Revilla, Vickie Lynn Murphy, Antonio Gomez Real, Jonathan Thorp-Fairshter, Joann Armas, Jamyiah Shinhoster, and Sylvia Occhi.

COURTROOM DEPUTY:  If you will all stand up for me, please.

(Jury sworn, 12:06 p.m.)

COURTROOM DEPUTY:  Thank you.

THE COURT:  All answering in the affirmative.

With the exception of the Members of the Jury that have been selected, I'm going to be able to excuse the rest of you from the courtroom.  I'm not excusing you from the courthouse.  I would ask that you return to the jury pool on the fifth floor, and they will give you further instructions.

Thank you for giving us the opportunity to get to know

you.  Have a pleasant afternoon.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Panel excused, 12:07 p.m.)

THE COURT:  All right.  Members of the Jury, please have a seat.

Welcome.

I do want to let you know that we are going to be providing preliminary instructions and then we will take a one-hour recess for lunch.

Members of the Jury:

Now that you have been sworn, I do need to explain some basic principles about a criminal trial and your duty as jurors.  These are preliminary instructions.  At the end of the trial, I will give you more detailed instructions.

It will be your duty to decide what happened, so you can determine whether the Defendant is guilty or not guilty of the crimes charged in the Indictment.

At the end of the trial, I will explain the law that you must follow to reach your verdict.  And you must follow the law as I explain it to you, even if you do not agree with the law.

You must decide the case solely on the evidence presented here in the courtroom.  Evidence can come in many forms.  It can be testimony about what someone saw, or heard,

or smelled, it can be an exhibit admitted into evidence, and it can be someone's opinion.

Some evidence proves a fact indirectly, such as a witness who saw wet grass outside and people walking into the courthouse carrying wet umbrellas.

Indirect evidence is sometimes called circumstantial evidence, and it is simply a chain of circumstances that proves a fact.

As far as the law is concerned, it makes no difference whether evidence is direct or indirect.  You may choose to believe or disbelieve either kind and should give every piece of evidence whatever weight you think it deserves.

Certain things are not evidence, and must not be considered, and I will list them for you now.

Statements and arguments of the lawyers.  In their opening statements and closing arguments, the lawyers will discuss the case, but their remarks are not evidence.

Questions and objections of lawyers.  The lawyers' questions are not evidence.  Only the witnesses' answers are evidence.

You should not think that something is true just because a lawyer's question suggests that it is.  For instance, if a lawyer asks a witness:  "You saw the defendant hit his sister, didn't you," that question is not evidence whatsoever of what the witness saw or what the defendant did, unless the

witness agrees with it.

There are Rules of Evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit, and a lawyer on the other side thinks that it is not permitted by the Rules of Evidence, then that lawyer may object.  If I overrule the objection, then the question may be answered and the exhibit received.  If I sustain the objection, then the question cannot be answered and the exhibit cannot be received.

Whenever I sustain an objection to a question, you must ignore the question and try not to guess what the answer would have been.

Sometimes I may order that certain evidence be stricken, and that you disregard or ignore the evidence.  And that means that when you are deciding the case you must not consider that evidence.

Some evidence is admitted only for a limited purpose. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and no other.

In reaching your verdict, you may have to decide what testimony to believe and what testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may

take into account the opportunity and ability of the witness to see, or hear, or know the things testified to, the witness's memory, the witness's manner while testifying, the witness's interest in the outcome of the case and any bias or prejudice, whether other evidence contradicted the witness's testimony, the reasonableness of the witness's testimony in light of all the evidence, and any other factors that bear on believability. I will give you additional guidelines for determining credibility of witnesses at the end of the case.

As you know, this is a criminal case. There are three basic rules about a criminal case that you must keep in mind. First, the Defendant is presumed innocent until proven guilty. The Indictment against the Defendant, brought by the Government, is only an accusation, nothing more. It is not proof of guilt or anything else, and the Defendant therefore does start out with a clean slate.

Second, the burden of proof is on the Government until the very end of the case. The Defendant has no burden to prove his innocence, or to present any evidence, or to testify. Since the Defendant has the right to remain silent, and may choose whether to testify, you cannot legally put any weight on a defendant's choice not to testify. It is not evidence.

Third, the Government must prove the Defendant's guilt beyond a reasonable doubt. And I will give you further instructions on this point later, but bear in mind that the

level of proof required is high.

Our law requires jurors to follow certain instructions regarding their personal conduct in order to help assist and assure a just and fair trial. I will now give you these instructions.

Number one, do not talk either among yourselves or with anyone else about anything related to the case. You may tell the people with whom you live and your employer that you are a juror, and give them information about when you will be required to be in court, but you may not discuss with them or anyone else anything related to the case.

Two, do not at any time during the trial request, accept, agree to accept, or discuss with any person any type of payment or benefit in return for supplying any information about the trial.

Three, you must promptly tell me about any incident you know of involving an attempt by any person to improperly influence you or any other member of the jury.

Four, do not visit or view the premises or place where the charged crime was allegedly committed or any other premises or place involved in the case. And you must not use the Internet Maps, or Google Earth, or any other program or device to search for a view of any location discussed in the testimony.

Five, do not read, watch, or listen to any accounts or

discussions related to the case, which may be reported by newspapers, television, radio, the Internet, or any other news media.

And finally, do not attempt to research any fact, issue, or law related to this case, whether by discussion with others, by library or Internet research, or by any other means or source.

In this age of instant electronic communication and research, I want to emphasize that, in addition to not talking face to face with anyone about the case, you must not communicate with anyone about the case by any other means, and that includes text messages, telephone, email, Internet chat, chat rooms, blogs, or social networking websites, such as Facebook, Twitter, and the like.

You must not provide any information about the case to anyone by any means whatsoever, and that includes posting information about the case or what you are doing in the case on any device or Internet site, including blogs, chat rooms, social websites, or any other means. And you must not use Google or otherwise search for any information about the case or the law that applies to the case, or the people involved in the case, including the Defendant, the witnesses, the lawyers, or myself.

It is important that you understand why these rules exist and why they are so important. Our law does not permit

jurors to talk with anyone else about the case or to permit anyone to talk to you about the case, because only jurors are authorized to render a verdict.  Only you have been found to be fair, and only you have promised to be fair.  No one else is so qualified.

Our law also does not permit jurors to talk among themselves about the case until the Court tells them to begin deliberations, because premature discussions can lead to a premature final decision.

Our law also does not permit you to visit a place discussed in the testimony.  First, you cannot be sure that the place is in the same condition as it was on the day in question.  Second, even if it were in the same condition, once you go to a place discussed in the testimony to evaluate the evidence, in light of what you see, you become a witness, not a juror, and as a witness you may now have a mistaken view of the scene that neither party may have a chance to correct, and that is not fair.

Finally, our law requires that you not read or listen to any news accounts of the case and that you not attempt to research any fact, issue, or law related to the case.  Your decision must be based solely on the testimony or other evidence presented in this courtroom.

Also, the law often uses words and phrases in special ways.  So it is important that any definition you hear come

only from me and not from any other source. It would not be fair to the parties for you to base your decision on some reporter's view or opinion, or upon information that you acquire outside the courtroom.

These rules are designed to help guarantee a fair trial, and our law accordingly sets forth serious consequences if the rules are not followed. I trust that each of you understand and appreciate the importance of following these rules. And in accord with your oath and promise, I know that you will do so.

Now, you have been given a pad and pen. And as we move forward, if you wish, you may take notes to help you remember what witnesses said. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. Do not let your note-taking distract you so that you do not hear other answers by witnesses.

When you leave the courtroom, your notes should be left in the jury room.

Whether or not you take notes, you should rely on your own memory of what was said. Notes are to assist your memory only. They are not entitled to any greater weight than your memory or impression about the testimony.

Now, after lunch, the trial will begin. First, the Government will make an opening statement, which is simply an

112

outline to help you understand the evidence as it comes in.

Next, the Defendant's attorney may, but does not have to, make an opening statement.  Opening statements are neither evidence nor argument.

The Government will then present its witnesses, and counsel for the Defendant may cross-examine them.

Following the Government's case, the Defendant may, if he wishes, present witnesses, whom the Government may cross-examine.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you, and I will instruct you on the law.  After that, you will go to the jury room to deliberate and decide your verdict.

Now, Ladies and Gentlemen, let me advise you of some comforts of home.  As you go into the jury room, you will see that we have a coffee maker.  You can make coffee or tea.  We also have a microwave.  We have a refrigerator.  You are not required to go out to eat lunch.  You certainly can, but you certainly can bring in snacks and lunch, and we have refreshments as well.

Please do remember that, as we take recesses, we cannot get started unless all of you are present.  So it is very important that you be prompt, so we can move this case as efficiently as we can with all of you ready to come into the

courtroom.

As I stated, we will take a one-hour recess for lunch. It's about 12:20.  So we'll take a recess until 1:20.  So I would ask that you be in the jury room at 12:20, ready to come in the courtroom as we begin the opening statements.  All right?

So have a pleasant lunch, and I will see you back here at 1:20.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury not present, 12:19 p.m.)

THE COURT:  All right.  Go ahead and have a seat.

Mr. Feigenbaum, you wanted to bring up an issue, sir?

MR. FEIGENBAUM:  Yes, Your Honor.  This is real quick.

I have a couple of plastic containers that have my binders and stuff.  They're very heavy.  Am I allowed to leave them in the courtroom in the evening?

THE COURT:  Yes.  Might I suggest -- I think there are some dates, particularly tomorrow, where we have some other matters here in the courtroom.  However, since we are in trial, the attorney rooms are for you.  So I would suggest that you can place your items in the attorney conference room.  There are two, one on each side.  And you can certainly make use of that room.  And that room will also be locked, as will the courtroom, at the end of the day.

114

The only reason I say that, Mr. Feigenbaum, is that, depending upon the size, since we do have some matters tomorrow, that we will need to have the Defendant brought in from custody, and that means that we'll need to make use of that area behind you.

MR. FEIGENBAUM:  Okay.  Very well.

So I will leave them in an attorney room --

THE COURT:  Yes.

MR. FEIGENBAUM:  -- right outside.  And I appreciate that.  I was just worried about -- concerned about the security for them.

THE COURT:  Yes.  Of course.  And the courtroom will be locked, as well as the attorney conference rooms will be locked.  So you'll have full use of those conference rooms.

MR. FEIGENBAUM:  Thank you so much.

THE COURT:  Okay.  Any other issue that we need to address before we recess for lunch?

MS. KLEPACH:  Not from the Government.  Thank you.

THE COURT:  How much time does each side need for opening statements?

MS. KLEPACH:  About 20 minutes, Your Honor.

THE COURT:  Is 20 minutes acceptable to the Defendant?

MR. FEIGENBAUM:  Yes, Your Honor.  I don't think I would go over that.  I'll try not to.

THE COURT:  All right.  And you have your first

witness ready to go after that time?

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  Okay.  Is there anything we need to address before we recess for lunch?

MS. KLEPACH:  No.

MR. DOBBINS:  I don't believe so, Your Honor.  Thank you.

THE COURT:  Okay.  I'll see you back here at 1:20.

Have a pleasant lunch.

(Recess from 12:21 p.m. to 1:19 p.m.)

THE COURT:  All right.  Welcome back.

Let me acknowledge the presence of the Defendant.

Go ahead and have a seat.

We're just waiting to see whether we have all of our jurors.

While we're waiting, let me remind you that, as I bring in coffee and tea throughout the day, please feel free to bring in a beverage into the courtroom.

Are both sides ready to proceed?  On behalf of the Government?

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right, then.

MS. KLEPACH:  Your Honor, if I could just have a

moment to queue up a PowerPoint while the --

THE COURT:  Yes.  Of course.

MS. KLEPACH:  Thank you.

THE COURT:  Ms. Klepach, just let me know when you're ready to proceed.

MS. KLEPACH:  Thank you, Judge.

Just one minute.

(Pause in proceedings.)

MS. KLEPACH:  Ready, Judge.

THE COURT:  Okay.  Let's bring the jury in.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 1:21 p.m.)

COURT SECURITY OFFICER:  One is in the restroom, Judge.

THE COURT:  All right.

(Pause in proceedings.)

THE COURT:  Welcome back, Ladies and Gentlemen of the Jury.

Please be seated, everyone.

I trust that you had a pleasant lunch and ready to get to work.

Let me advise of two matters.  One is, as you can see, I bring in coffee and tea throughout the day.  Please feel free to bring a beverage in, so that you are comfortable.  And

certainly, since we all have different needs, if you do need to take a break earlier than I'm suggesting -- I usually look about an hour, an hour and a half, depending upon where we are with the testimony -- all you need to do is just let me know or let the court security officer know, and we will certainly all take a break together.

Secondly, throughout the time that we are together, you may be in the public area, perhaps during the lunch break, or even in the morning, in the afternoon, and you may see the attorneys, the agents, and the Defendant, and note that they are not exchanging any pleasantries. Please do not be offended. Please understand that they are under a direct court order not to have any contact with you. So there will not be any exchange of pleasantries in the morning, including a "good morning" or a "good evening." So please don't be offended. Please recognize and appreciate that they are abiding by my order.

At this point in time, we will proceed with opening statements.

On behalf of the Government?

MS. KLEPACH: Thank you, Your Honor.

May I proceed?

THE COURT: Yes. Of course.

MS. KLEPACH: Boats, bribes, and bodies. That's what this case is about; an alien smuggling organization, aimed at

moving Cuban migrants into the United States, an organization that built their business on the desperation of Cuban migrants searching for a better life here in the United States.  And as part of their scheme, they stole boats and they paid bribes to Mexican law enforcement officials.

And this Defendant, Javier Hernandez, was instrumental to the functioning of that scheme.  Why?  Because he stole the boats that helped fund the organization's activities that helped to bribe those Mexican officials.  In short, he provided them with the money.

For his actions, the Defendant is charged with five different crimes, or counts.  The first count is Conspiracy to Encourage and Induce Aliens to Enter the United States for Financial Gain.  And all that means is that the Defendant entered into an agreement with other people to bring migrants from outside of the United States into the United States for a profit.

In Count 2, the Defendant is charged with conspiracy to transport stolen vessels.  And what that means is that he agreed with other people to transport boats and cars that were stolen from inside of the United States to somewhere outside.

In Count 3, he is charged with conspiracy to traffic in certain motor vehicles, export a motor vehicle with a tampered identification number, and to alter motor vehicle identification numbers.  And again, a conspiracy is an

agreement.  And that count charges him with agreeing with other people to traffic in certain cars, knowing that the vehicle identification numbers of those cars had been tampered with.

Count 4 charges him with actually trafficking in certain motor vehicles, meaning that he took control of a car, knowing the vehicle identification number had been tampered with, and moved it to outside of the United States.

Finally, Count 5 charges the Defendant with money laundering conspiracy.  And money laundering conspiracy is an agreement to transfer money into the United States from outside with the purpose of promoting some other crime.  And in this case, those other crimes are the other crimes charged in the Indictment that I just spoke about, and bribery of a foreign official.

So where does the story start?  As I mentioned, this is a case that really began with an investigation into the smuggling of Cuban migrants from outside of the United States into it.  And this investigation had been going on for years, and law enforcement identified the way that this criminal scheme worked and how the group would recruit the migrants to bring them over here.  And what would happen is that the criminal group would smuggle these migrants on boats from Cuba and actually bring them to Mexico before bringing them to the United States.

But when they got to Mexico, the group would extort

the migrants' families for the smuggling fee.  They would demand $10,000 for each migrant that was brought into Mexico. And if they didn't pay, they threatened the migrants' family members that they would cause physical harm to their loved ones.  If they did pay, then they would be transported from Mexico to the US/Mexico border and be brought into the United States as promised.

Now, this is a scheme that went on for years, and actually started as early as 2009.  But you will hear that two of the leaders of this organization, Jose Miguel Gonzalez Vidal, who you will hear referred to as "Chupa," and Reynaldo Crespo Marquez, who you will hear referred to as "El Niño," actually didn't become connected to this Defendant, Mr. Hernandez, until 2017.  And he became connected to this Defendant through other members of the organization.  One of those people being Mario Alberto Enrique Lopez, who you will hear referred to as "Neco."

In essence, Neco knew that there was a person named Ramon Reyes Aranda, who lived in Naples and who would steal boats in Naples.  And Ramon Reyes Aranda needed a buyer for those boats.  Neco, as a member of the organization, knew that Chupa and El Niño would be the perfect buyers for Ramon Reyes Aranda's boats, and so he connected them.

From there, the relationship developed, and they put Reyes in touch with Javier Hernandez.  And the two of them,

from that point forward, worked together to steal the boats and bring them from Naples to Mexico to help fund the organization's activities.

And you're going to hear that Ramon Reyes Aranda was actually charged as a codefendant in this case, but he has since pled guilty and taken responsibility for his involvement in this criminal scheme.

And Ladies and Gentlemen, over the course of the next couple of weeks, you're going to hear a lot of different witnesses and you're going to see a lot of different evidence about how this went down. But the actual scheme itself is simple. Ramon Reyes Aranda would search for boats in Naples that were easy targets, that could be stolen at night when the owners, who often didn't live in Florida, weren't looking. And when he found these boats that could be easily stolen, he would talk to Javier Hernandez, tell him when it was safe to come over and steal the boats, and then Javier Hernandez would make the drive from Miami to Naples and captain the boats from Naples over to Mexico.

These boats later went on to fund the organization's activities in many ways, including, as I mentioned, by bribing Mexican law enforcement to stay out of their hair, and by reselling the boats to other buyers in Mexico to help fund their activities and their lifestyles there.

You're also going to hear that other members of the

organization paid Javier Hernandez and Ramon Reyes Aranda for their activities and their participation.

But law enforcement actually didn't know about this piece of this criminal scheme until 2019.  And that's because, in 2019, you're going to hear that Hernandez had an encounter with Mexican law enforcement, and that encounter was really the kickoff to this piece -- this financial piece of the investigation.

And so, during that encounter, Hernandez told Mexican law enforcement that he got to Mexico on a green boat and that he had docked the boat at Neco's marina.  Mexican law enforcement happened to be surveilling the area around Neco's marina at that time, due to something unrelated, and they coincidently stopped a truck that was carrying a green boat.

The driver of that truck:  Neco.  And when asked to provide the documents to support his ownership of that boat, Neco couldn't provide it.  In essence, Mexican law enforcement had been in communication with the FBI and knew that they were looking into Neco and this criminal organization.

When all of this was said and done, they made the connection that Javier Hernandez's trip to Mexico may be related to what the FBI was looking into.  And so they seized Javier Hernandez's cell phone and turned it over to the FBI, which the FBI then searched pursuant to a search warrant.

And the cell phone evidence is really what gets us to

where we are today, because that evidence is going to tell you all about this scheme in black and white, and how it is that they were able to succeed in doing this for so long.  You're going to see the text messages between Ramon Reyes Aranda and Javier Hernandez, the photos of the boats that they were looking to steal, discussions about the weather patterns and when it was safe to travel, and the like.

And when the two were satisfied that boat A is an appropriate target for them to steal, you're going to see records, like cell site data, that is going to show you that Javier Hernandez then traveled from Miami to Naples, as I described, to steal these boats that had been identified by Ramon Reyes.

And the Indictment charges certain overt acts, and those are acts that are taken in furtherance of the conspiracy that is charged in Count 2.  And many of these overt acts relate to the theft of particular boats, which took place between December 2018 all the way until November of 2022.  And you're going to hear from some of the owners of those boats and the law enforcement officers that responded to the scene of those stolen boats.  And you're going to see evidence about all of these different boats, which are the overt acts that are going to be referred to that are charged in Count 2.

As I mentioned, you're also going to see cell tower records.  But in addition to those cell tower records, you're

also going to have airline and travel records. And what those are going to show you is that for all of Javier Hernandez's flights from Mexico to the United States, which correspond to the timing of when these boats were stolen, there's no corresponding outbound flight. And what that evidence is going to show you is exactly what I just said, that he drove from Miami to Naples, took those boats, and drove the boats to Mexico, and the only way for him to get back was by taking a plane.

Once the boats arrived in Mexico, the organization would procure fraudulent documents for the boats, so that they could be resold without being detected by law enforcement, and that's what they did for years. And Hernandez knew that the money from these stolen boats went directly to fund the smuggling organization's activities. And the evidence will show that he knew that the organization was extorting the migrants' families for the smuggling fee. And that's the substance of what is related to Counts 1 and 2 of the Indictment.

Now, Counts 3 and 4, as I mentioned, have to do with a motor vehicle, specifically, a Toyota Tundra. Because as law enforcement's investigation continued, they learned that Javier Hernandez had actually stolen a Toyota Tundra and driven it from the United States to the US/Mexico border for the purpose of bribing a Mexican law enforcement official.

Again, you'll see the cell site evidence that's going to show you Javier Hernandez's travel over from Miami, across the southern border, and into Mexico.  And most importantly, you're going to see text messages between Javier Hernandez and a prospective Cuban migrant, where he actually brags to this migrant that they have the Mexican police chief and other officials, quote, in their pockets.  And that once they managed to get that stolen car over to the Mexican police chief, that then they would be able to get the police to, quote, loosen the reigns.  And once the police loosen the reigns, they'd be able to get her the papers that she needed to come to the United States.  And the theft of that Toyota Tundra is what relates to Counts 3 and 4 of the Indictment.

And the evidence of bribing Mexican officials using stolen boats and cars, well, that's where we get Count 5.  And in addition to the messages discussing the illicit proceeds that they obtained from these boats and this car, you will see screenshots of financial transactions and records showing that the Defendants were sent money to promote some other crime. Again, those other crimes being the theft of the vessels and motor vehicles that we've talked about, as well as the bribery of a foreign official.

So how are we going to prove all of this?  Well, Ladies and Gentlemen, during this trial, you are going to be taken inside of this conspiracy.  You're going to see how it

worked and hear all about it from people who were in it.  And after you hear and see all this evidence, you're going to be left with no reasonable doubt as to the Defendant's guilt for these five crimes.

But the evidence is generally going to fall into a couple of different categories.  The first we've already talked about, which is the cell phone evidence, where you will see the discussions, again, plain as can be, and they were pretty explicit about what they were doing about these stolen boats and what they were going to do with them.

But the second category is witness testimony.  You're going to hear from multiple people who were a part of this conspiracy.  And they're going to tell you about how the organization worked, how they were able to change the vehicle identification numbers and the hull identification numbers on the boats -- that's the same thing as a VIN for a car.  It's called a HIN -- and how they were able to make the boats look legitimate.

But let's get one thing straight from the beginning. These are not good people.  You're going to hear from alien smugglers, from forgers, from thieves.  But Ladies and Gentlemen, these are the people that were in business with Javier Hernandez.  And so they're going to be the ones who are really going to be able to tell you how this worked and how they were able to pull this off for such a long time without

getting caught.

But they've since pled guilty and taken responsibility for their involvement in this criminal scheme, and they're going to come before you and testify in the hopes of receiving a recommendation for a sentence reduction from the United States.  But all that means is that you're just going to have to evaluate their testimony carefully and you're going to have to consider whether what they tell you is corroborated by the independent evidence in this case, which it will be the phones, the cell site records, the airline records.

And it's also going to be corroborated by the Defendant's own words.  Because as if all of this were not enough, you're going to hear that Javier Hernandez actually spoke with the FBI before he was arrested in this case.  And what did he tell them?

Well, he admitted to his involvement in this scheme, and he said that he knew the organization was smuggling migrants, that he knew the organization was extorting the migrants' families if they didn't pay, that he would steal the boats to facilitate it.  In fact, he actually admitted to stealing and piloting over 20 boats over the course of this period of time, and making over $200,000 from the conspiracy or from the organization in exchange for what he did.  That's it.

You're going to see it all in front of you over the next couple of weeks in black and white.  You're going to see

this criminal organization and the way that they took advantage of desperate people for their own personal and financial gain.

And at the conclusion of this trial, we are going to ask you to return the only verdict that is consistent with the overwhelming evidence in this case, and that is a verdict of guilty on all counts.

Thank you.

THE COURT: Thank you, Ms. Klepach.

Mr. Feigenbaum, does the Defendant wish to present an opening statement?

MR. FEIGENBAUM: Yes, Judge, please.

THE COURT: All right.

MR. FEIGENBAUM: Judge, may I ask, does this lectern turn around that way?

THE COURT: A little bit. I think you have a little bit of leeway. There are some wires on the bottom. Just be mindful.

MR. FEIGENBAUM: If Mr. Campbell might assist.

Good afternoon. Couple of things. When you first saw the -- I think it was the first slide that the prosecutor had, it showed Mr. Hernandez with a bunch of people, and it looks like something out of maybe a movie where they're showing the New York organized crime family. And you see that, and a natural tendency of people is to kind of stop listening after that.

Well, that photo was put together -- when somebody's arrested and charged in a case, they take a photo and then they can -- you know, the Government prosecutors, they can take it and put it with other people.  But it's like when you see a Netflix movie or something and they're showing a criminal organization.  So it gives an initial very bad impression.  I would ask you -- as the Judge has said from the beginning of the case, remember, as Mr. Hernandez sits there, he has a clean slate.  He is presumed innocent, and the burden of the Government -- the entire burden is on the Government to prove him guilty of each and every essential element of the crime beyond and to the exclusion of a reasonable doubt.

The next thing that kind of struck me was that the prosecutor said even Mr. Hernandez told FBI agents who interviewed him that he knew about this organization and described what that organization does, as if -- as if to give the impression that he was -- he was in the organization. People know about things that go on.  People know about things that go on in the neighborhood.  That does not make a neighbor guilty for what another neighbor is doing.

Regarding that particular interview that agents -- federal agents conducted with Mr. Hernandez, let me give you a little detail.  That was on April 18, 2022.  April 18, 2022. The Government prosecutor earlier had said in her opening statement the events she was talking about were from 2017 to

2019.

So one of the things that's very important to tell you from the beginning, so that you don't shut your mind, so that you don't close your eyes to what you just heard, to keep your mind open during the entire evidence that's going to be presented to you on the witness stand, and maybe some physical evidence also, is this:  On April 18, 2022, two federal agents went to his residence in Miami Beach, an apartment, and knock on the door.  He was there.  He let them in.  He agreed to talk to them without an attorney.  They asked him questions.  He gave answers.  He didn't ask them for any promises that they wouldn't do anything to him.  They never said that they were promising anything.  They had a conversation.  And the conversation they had in April of 2022 was about things that happened in 2018 and 2019.

Now, the other people that the prosecutor showed you on -- with those other people in that slide, are defendants in another case in this court.  It's called, for short, the Gonzalez Vidal case.  Let's just call it the Vidal case.  That case is still pending on another floor.  I think on the next floor up in this courthouse.

So in that case, there were six defendants who were going to all go to trial.  Some of those defendants got charged in August of 2020.  And then the case got a few more defendants at the beginning of 2021.  And all of those defendants in that

Vidal case, up on the next floor up, were going to go to trial, and the trial was set for October 10, 2023, which is --

MS. KLEPACH:  Judge, I'm going to object to this, as it's not pertinent to this matter, and it's not -- I don't expect any of this will come into evidence.

THE COURT:  The objection is overruled at this point. You may continue.

MR. FEIGENBAUM:  Thank you, Judge.

So the reason why it is relevant, and why it does matter, is because this prosecutor just told you that he is part of the Gonzalez Vidal conspiracy.  He is supposed to be on the screen with those other people.  Except he, Javier Hernandez, was never charged in that case that started up in August of 2020.

So you know -- with the boats and the human smuggling and so forth, that's what that other case involves, and worse. But -- so in April of 2022, which is two years after the other people get charged, the Vidal case defendants get charged.  If Javier's cell phone, which was seized in Mexico by Mexican police was, as she said, the main evidence where he is talking to other people in that Vidal conspiracy, and he is doing things that he shouldn't be doing, like being involved in boats and migrant smuggling -- if they had his phone -- in November 2019 is when the Mexican police got it.

November 2019, you will hear the Mexican police gave

his phone to the FBI.  Within a day or two, the FBI sent two agents to Mexico to pick up that phone, and they did a download extraction on it on February 26th, 2020.  February 26th, 2020. The Vidal case, as I say, is still pending.  All of the defendants in the Vidal case that were ready to go to trial in a couple of weeks, they've all recently pled guilty.  But if he was part of them, like you saw on that lineup they put up there, why did they never charge Javier Hernandez?

Because when the FBI came to his residence, April 18, 2022, long after the Vidal defendants have their own case, they wanted his help.  He said he had nothing to help them with in that case.  They go:  "Well, we think you do."  He didn't have anything to help.

Guess what happens?  That was April 18, 2022.  At the end of November, 2022, last year, they charge him with a crime, two counts.  I get appointed to represent him by the Court. And now:  "Mr. Hernandez, do you want to help us out?"  He says:  "I got nothing to help you out with."

What happens?  That was November -- end of November 2022.  In March of this year, 2023:  "Got nothing to help us with?"  They file another Indictment.  They amend the original charges and they add three counts.  They add three counts, including money laundering.

"You want to help us out?"

"I got nothing to help you out with.  I didn't do

133

anything wrong.  I didn't knowingly and willingly participate in that Vidal case."

Here we are.

So I think you're going to learn a lot about who is Javier Hernandez, how this case came about.  Just keep in mind the timeline.  November 2019, the Mexican police have an encounter with him and they take his phone.  They give the phone within a day or two to the FBI.  The FBI did an extraction, which means they take everything out of it and look at everything that's there -- it's done with a software program called Cellebrite -- within a couple of months, February 2020.

And they never -- with all that information, and with that Gonzalez Vidal case going on with another judge in this building, they never charge him.  Yet, they're telling you he was an integral part of that Vidal case.  And why?  Why wasn't he charged?  He wasn't charged initially even two years, when they had -- for two years, when they had the extraction from his phone, he was never charged with anything.  And if they had evidence that he was part of the Vidal group, they would have charged him two or three years before he was charged in this case.

He was charged for an improper purpose.  Hope to be able to talk to you more about this during the case.  Please keep an open mind, and thank you.

THE COURT:  Thank you, Mr. Feigenbaum.

If the Government will call its first witness, please.

MR. DOBBINS:  Yes, Your Honor.

At this time, the Government would call to the stand Mr. Esthalin Benitez Castillo.  And we're going to need the aid of Spanish interpreters.  So we also have ...

THE COURT:  Certainly.  Thank you.

All right.  Good afternoon.

Sir, if you'll come forward, remain standing, raise your right hand to be placed under oath.

ESTHALIN BENITEZ, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Would you please state your name and also spell it for the record.

THE WITNESS:  (Through Interpreter.)  Esthalin Benitez.  E-S-T-H-A-L-I-N B-E-N-I-T-E Z.

COURTROOM DEPUTY:  Thank you.

MR. DOBBINS:  May I proceed, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  Sir, can you tell the Members of the Jury how old you are.

A.  Forty-three.

Q.  And where were you born?

A.   Cuba, Havana.

Q.   How far did you go in school?

A.   Ninth grade.

Q.   And when did you come here to the United States?

A.   I left Cuba on January 4th, and I got to the coast of
Mexico on January 6th.

Q.   Okay.  But when did you get to the United States?

A.   Oh.  I passed through the border on January 20th.

Q.   Okay.  Do you recall what year?

A.   2019.

Q.   Prior to you coming to the US, did you work in Cuba?

A.   Yes.

Q.   What kind of work did you do?

A.   I was a fisherman, and later a driver.

Q.   And now that you've been living here in the US, are you
currently employed?

A.   Yes.

Q.   What kind of work do you do here?

A.   Plumbing.

Q.   And what county and state do you live in?

A.   Live in the state of Florida in Lee County.

Q.   Okay.  Prior to you coming to the US in 2019, did you ever
try to come to the United States from Cuba before?

A.   Yes.  Twice.

Q.   And what happened when you tried to come?

A.   The first time, I was arrested by the Cuban police.   And the second time, we left on a boat made by ourselves.   We had to go back.   When we went back, we were caught by the Cuban Coast Guard.

Q.   And prior to coming here to the United States, did you have any family members that lived here in the United States?

A.   Yes.

Q.   What kind of family did you have that lived here?

A.   I have my uncle, Eddie Castillo, Lazaro Castillo, Joel Rodriguez, and David Castillo.

Q.   And what county do they live in, the state?

A.   They live in Miami-Dade County.

Q.   So let's talk a little bit about the time that you were successful in coming to the United States.

A.   Okay.

Q.   How did you learn to -- or how did you learn about traveling from Cuba to Mexico on January 4th of 2019?

A.   A friend of ours who came on the same trip -- his name is Eddis Mar, who is the one who told us to take a transportation to go to the place where -- that took us to the place from where we were going to leave.

Q.   So when Eddis Mar told you about this plan, where were you living, what part of Cuba?

A.   I was living in Havana, Batabanó, Havana.

Q.   And where was Eddis Mar telling you that you would be

leaving from, what part of Cuba?

A. From Bahia Honda.

Q. And did Eddis Mar tell you if there would be any cost to making this trip?

A. No. He didn't give a price for -- or any money for the trip.

Q. How much notice did you have before you left Havana to go to Bahia Honda?

A. So we were told from the time we were told until we got there, about four hours.

Q. Okay. And how long did it take you to get from Havana to Bahia Honda?

A. About four hours more or less.

Q. I see. Prior to your trip from Havana to Bahia Honda, did Eddis Mar give you a specific date that you would be leaving or did he just tell you spur-of-the-moment: "You can get on and we can take you there"?

A. No. That was just on the spur-of-the-moment, fast.

Q. And what happened when you got to -- when you arrived at Bahia Honda?

A. There, a person was waiting for us. They took us to some hill. We slept on that hill that night, and the following day we were taken to the edge of the coast.

Q. Okay. And what did you see -- well, when you say: "We were taken," how many people were with you?

A.   We were an average of 15 to 18, more or less.

Q.   And when you were take taken to the coast, what did you see there?

A.   When we got there, all of us were sitting by the edge until about 4:30 in the afternoon.  That's when the boat came in.

Q.   Okay.  And when the boat came in, can you describe what the boat looked like.

A.   It was a boat like the ones that you see here, white, two engines outboard.  It was about 28 to 30 feet long.

Q.   Did it have a cabin on board or was it open and have just a center console?

A.   Just with a center console.

Q.   And how did you and the other 14 to 17 people get out to the boat?

A.   Well, by ourselves.  We had to swim from the edge.  We had to swim and try to climb up by ourselves.

Q.   Now, when you got on this boat, where did you think you were going next?

A.   I always thought, since I left the Cuban coast, that we were going to the US.

Q.   Did you think you were going directly to the US or that you were going to take a detour?

A.   No.  I thought we were going to go directly to the US.

Q.   And where did you end up traveling on that boat?

A.   To Merida, Mexico.

Q.   How many people were -- other than yourself, the 14 to 17 other Cubans that had swam out to the boat, how many other people were on the boat piloting and/or assisting in piloting the boat?

A.   The pilot and one other person.

Q.   Were you able to tell their nationalities?

A.   I heard of one of them speaking, by his accent, that he was Cuban.

Q.   Okay.  And was that the pilot or the person who was assisting?

A.   The pilot.

Q.   Did you see either the pilot or the assistant communicating with anybody with any kind of cell phone or other type of device?

A.   Yes.  They had a satellite telephone that they would use all the time and communicate with someone.  I don't know who it was.

Q.   And where did you and the 14 to 17 other people sit on that boat?

A.   At the bow of the boat.

Q.   Were there enough seats for everybody or were you sitting on the structure of the boat or on the floor of the boat?

A.   There were no seats.  On the floor.

Q.   Were you provided with life jackets?

A.   No.

Q. Approximately, how long did it take you to get from Bahia Honda in Cuba to Merida in Mexico?

A. We left on the 4th and we got into Mexico on the 6th.

Q. So would it be fair to say it took approximately two days?

A. Uh-huh.

Q. And what happened when you arrived in -- at the coast of Mexico?

A. Two people were waiting for us there, Tonito and Hanser. And they got us into a van, a gray van, and we were transferred to a house.

Q. Okay. You stated that there were two people waiting there, and you gave the names Tonito and Hanser. Did you know those people when you first arrived?

A. No.

Q. Okay. How did you learn those names or nicknames?

A. I knew that those were their names because when we were in that house where we were kidnapped I heard those names.

Q. Okay. So you were taken -- how did you get from the boat to the shore where the van was?

A. We had to get underwater, we swam, and then we walked to the edge.

Q. Okay. And were you given any kind of choice to get into the van or could you have gone somewhere else on your own?

A. No. We had to get on the van.

Q. Where did the van -- where did Hanser and Tonito take you

in the van?

A. They took us to a house that was gray or light yellow. It had like a big entrance like this. And we were taken to a room without our clothes.

Q. Okay. What happened to your clothes?

A. They ordered us to take it off.

Q. Did they order you to take the clothes off in the van or somewhere else?

A. No. Inside the house.

Q. You were describing for the jury what the house looked like, and you said it had an entrance like this and you moved your hands. Could you just describe what you meant, like what the entrance looked like. If you could describe it, instead of using your hands, please.

A. Well, the front door had like two columns with concrete, and a gate, like a gate.

Q. Now, once you were taken into this room, how many people were taken into the room with you?

A. All of us that came on the boat. There were about 15 to 18 people in there.

Q. Okay. So after they made you take off your clothes, what did they -- what, if anything, did they tell you to do next?

A. Well, the next day, they asked us for our relatives' phone numbers, and they called our relatives to ask what was supposed to be the price for the trip.

Q. And how much was that price?

A. Ten thousand dollars.

Q. How did you know that they were asking your relatives for the price of the trip?

A. Because they called the numbers in front of us.

Q. Okay. And did they put the phones up to their ear or did they communicate over the phone in another way so that you could hear what was going on?

A. They had it on speakerphone.

Q. Okay. Were you the first that -- oh. Let me go back.

Who were the people that were making these phone calls?

A. Tonito and Hanser.

Q. And were you the first person that they asked for a relative's phone number to make that call?

A. No.

Q. Okay. How many other people went before you?

A. About three before me.

Q. Okay. And what did you observe happen when Hanser and Tonito made these calls with the three people before you?

A. They would call their relative. If the relative answered that they didn't have the money to get them out of there, they would get them standing up against the wall naked, and with a piece of wood, a wooden board, they would beat that person.

Q. And when they were hitting the person with that wooden board, were they doing anything else either with their phone or

other equipment?

A.   Yes.  One was doing the beating and the other was videotaping what was going on by WhatsApp.

Q.   And after they did that to the first three people, what did they ask you?

A.   The same.  They asked me for the -- my uncle's cell phone, to call him.  And they called my uncle, and they told him:  "If you don't have the money, we're going to kill him."

Q.   Okay.

A.   So my uncle said:  "Don't touch him.  I'm going to send you the $2,500 that I have."

Q.   And so what happened to you after your uncle told them that?

A.   Well, they left me there until my uncle sent that first amount of money.  And when he sent that first amount of money -- after they got that first amount of money, they gave me clothes and they took me outside.

Q.   Okay.  So let's go back.  So you tell -- they tell -- your uncle tells them he'll pay, and so they didn't hit you with the board, right?

A.   No.

Q.   Did they -- what did they do next?  Did they talk to the other people's relatives that they hadn't talked to yet?

A.   Yes.  Uh-huh.

Q.   And what did you see happen?

A.   The same.  They would do the same.  They would beat them with that wooden board, and they would give them electrical current with a -- like with a club.

Q.   Like a Taser?

A.   Uh-huh.

Q.   Now, you said they didn't do anything to you.  Did you leave that room that first day?

A.   Uh-huh.

Q.   Where did you go?

A.   To the living room.

Q.   Okay.  Was your uncle able to make that first payment right away or did it take a couple days?

A.   No.  It took him about two to three days to send that first $2,500.

Q.   Okay.  And prior to that payment being made, did they let you leave the room with the other people who couldn't pay or were you allowed to walk freely amongst that house?

A.   I had to stay in the room.

Q.   How long -- were you in that room for approximately two to three days?

A.   Uh-huh.

Q.   And in that time, were you provided any clothing?

A.   No.  Neither clothing or water or food.

Q.   What about the other migrants who couldn't pay?

A.   No.  No neither.

Q.  Did you see -- other than that first day, did you see Hanser, Tonito, or anybody else come back in to make additional phone calls on other days while you were still in that room?

A.  No.  Just -- only when they would come into that room where we were -- on that room, they would make those phone calls, where they were keeping us.

Q.  Right.  But what I'm asking is -- you said that you were in that room for between approximately two to three days --

A.  Uh-huh.

Q.  -- did they come into the room to make those phone calls more than once or was it a one-time-only thing?

A.  No.  Several times.

Q.  Was it only Hanser and Tonito or were there other people that did this?

A.  Just the two of them.

        MR. DOBBINS:  Your Honor, if I may -- I don't know if you prefer me to do it with just the witness only or if you want we to approach.  I'm happy to do it either way.

        THE COURT:  Are you using the exhibits electronically?

        MR. DOBBINS:  No.  I was going to use the ELMO, if that was all right.

        THE COURT:  All right.  So then if we can just show the witness.

        Thank you.

        MR. DOBBINS:  I'm not as technically proficient to use

things electronically, Judge.  Sorry.

BY MR. DOBBINS:

Q.  All right, sir.  So if you look on that monitor, I'm going to show you what's been marked as Government's Exhibit 1.  And I can zoom out.

A.  Uh-huh.

Q.  Hang on a second.

This is Government's Exhibit 101 for identification.  Do you recognize the individual in that photo, sir?

A.  (In English.)  Yes.

Q.  And how do you know who that person is?

A.  (Through Interpreter.)  That's Hanser.

Q.  Okay.  And is that a fair and accurate depiction of what Hanser looks like?

A.  Yes, more or less.  He looks pretty good.

MR. DOBBINS:  Your Honor, at this time, the Government would move Government's Exhibit 101 into evidence.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  All right.  Admitted into evidence.

(Government's Exhibit 101 received into evidence.)

THE COURT:  And Ladies and Gentlemen, just let me know if your screen is not working.

All right.  Seems that everyone's screen is on.

All right.  Thank you.

BY MR. DOBBINS:

Q.   All right.  So now that the jury can see it, Mr. Benitez Castillo, who is this we're looking at in Government's Exhibit 101?

A.   He is one of the people who picked us up on the Merida, in the coast of Mexico -- Merida -- that transferred us to the house where they were keeping us, and he was one of the people who was beating the migrants.

MR. DOBBINS:  Okay.  If I could just go to the witness stand only again, Your Honor.

THE COURT:  All right.  Certainly.

BY MR. DOBBINS:

Q.   Showing you Government's Exhibit 103 for identification. Do you recognize that photograph, sir?

A.   I can't see it that well.

(In English.)  Oh, yeah.

Q.   Is that better?

A.   (Through Interpreter.)  Yes.

Q.   And do you recognize the person in that photo?

A.   Tonito.

Q.   Okay.  And is that a fair and accurate representation of what Tonito looked like when you encountered him in 2019?

A.   Yes.

MR. DOBBINS:  Okay.  Your Honor, at this time, the Government would move Government's Exhibit 103 into evidence.

148

THE COURT:  Any objection?

MR. FEIGENBAUM:  No objection, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 103 received into evidence.)

MR. DOBBINS:  If we may publish it for the jury.

THE COURT:  You may.

BY MR. DOBBINS:

Q.  All right.  Mr. Benitez Castillo, could you again just tell us who this is we're looking at in the photograph and how you know them.

A.  This is Tonito.  This is the second person that picked us up on the shoreline of Merida, who transferred us to the house where we were staying, and he is one of the people that was beating the migrants.

Q.  All right.  Now, you said that after two to three days you were -- well, you were let out of that room.

A.  Yes.  Yes.  After my uncle made that payment.

Q.  Prior to that -- prior to your uncle making the payment, for those two to three days, how did Hanser and Tonito keep you and the other people in that room?

A.  Can you repeat the question.

Q.  Yes.  Maybe I'll rephrase it.

Did you or any of the other people that were kept in that room try to leave that room?

A.  No.

Q.  Why not?

A.  Because they wouldn't let us.  The door was closed.

Q.  Okay.  In addition to the door being closed, was it locked in any way?

A.  With a lock.

Q.  Now, after your uncle made that first payment, you stated that you were able to leave that room.  Where were you taken at that time?

A.  To the living room in the house.

Q.  Okay.  At that time, were you given anything by Tonito, Hanser, or anybody else?

A.  They gave me water and a little bit of food.

Q.  Did they provide you with any clothing at that time?

A.  Yes.  A short and a T-shirt.

Q.  Okay.  And you said you were in the living room.  Were you allowed to leave the house at that time?

A.  No.

Q.  Why not?

A.  Because they wouldn't let us.

Q.  Okay.  How would they not let you?

A.  The door was closed.

Q.  Was it -- now, once you went into the living room, was it only Hanser and Tonito that were there or did you see other people?

A.  There were other people inside the house.

Q.   Okay.  Were they all migrants like you, trying to get to the United States, or were they working with Hanser and Tonito?

A.   No.  They were people who were with them.

Q.   Okay.  And during that time, did you learn -- or overhear any of their names or nicknames?

A.   The only other person I heard by the name they were calling him, El Niño.

Q.   Okay.  And did you actually ever see El Niño?

A.   Yes.

Q.   Okay.  What did you see El Niño do when he came to the house?

A.   El Niño would just come in to give orders and then he would leave.

Q.   When you say he would give orders, what kind of orders would you hear El Niño give?

A.   He would ask Hanser and Tonito about the people who had already paid the money.  And whoever had not yet paid had to be beaten.

Q.   How many -- oh.  I'm sorry.  I'll hold up.

     (Pause in proceedings.)

BY MR. DOBBINS:

Q.   How many other migrants were with you in the living room that their relatives had paid?

A.   It was me and two others.

Q.   Were they both Cuban as well?

A. Yes.

Q. And were you able to tell what nationality Hanser, Tonito, and Niño were?

A. Well, just by their accent, the way in which they spoke to us, for me, they were Cuban.

Q. And the two other Cuban migrants that were with you, were they men, women, or one of each?

A. They both were men.

Q. And did you only stay in the living room or was there another room that you were allowed to use?

A. No.  In that house, we were in the living room.  After that house, they moved us to another house.

Q. Was there any furniture in the living room?

A. Yes.

Q. What kind of furniture?

A. A sofa, a table.

Q. And how long were you there in the living room before you were taken to another house?

A. So I was there that day in that house.  And I think it was that very same night that they came in and they said we had to get out of there fast, and we left quickly to another house.

Q. Okay.  And when you say:  "They came in and said we had to get out of there fast," who was it that was saying that?

A. Well, them, because they themselves talked amongst each other saying how we had to get out of there quickly.

Q.   But who was it that was talking amongst each other?

A.   Oh.

(In English.)  Okay.  Sorry.

(Through Interpreter.) Tonito and Hanser.

Q.   And so where were you taken at that time?

A.   So we were taken to another house.  It was another house that was kind of like yellow, and it was -- oh, and it had bars all around it.

Q.   When you say:  "Bars all around it," are you referring to the windows and doors of the house or something else?

A.   Yes.

Q.   Yes, the doors and the windows?

A.   Yes.

Q.   And how many people traveled with you from the first house to that new house with the bars on the windows and the doors?

A.   Well, it was almost all of us, like before, like the 15 to 18 I mentioned.  But one of them escaped.  So that person took off running.

Q.   And did you try to escape?

A.   No.  I was too scared.

Q.   Why were you scared?

A.   I was afraid they were going to kill me.

Q.   So you described the outside of this new house.  Where were you taken within that second house when you got there?

A.   So they put the people who had not paid the money in one

153

room.  And the people who had paid the money, they were put in a different room.

Q.  So were you put in the room with the people that had paid some money?

A.  Yes.

Q.  And in this new house, approximately, how long were you there?

A.  So after that house, I was there for about another four days.

Q.  And how many people were in the room with you?

A.  So it was me, the other two people, and there was this other guy.  And I believe that some of his family -- relatives had paid part of the money.

Q.  And what kind of room was this that you were in with these three other people?

A.  So it was just like a normal room.  It was a room sort of like, I would say, maybe for a couple, where the mattress was on the floor and there was also a hammock.

Q.  And is that where you and the three other people slept?

A.  Yes.

Q.  Were you allowed to leave that room?

A.  Just to go to the kitchen and the bathroom.

Q.  Okay.  And who -- did anybody watch you while you went to the kitchen or the bathroom to make sure that you didn't try to escape?

A.   Yeah.   They were always sitting down on a sofa that they had in the living room there.

Q.   Were you allowed to leave that house in any way?

A.   No.

Q.   Did you try to leave that house?

A.   No.

Q.   Why not?

A.   Because I was afraid.

Q.   So after that -- you said you were there for approximately four days.   Did something happen where Hanser and Tonito let you leave the house?

A.   So yes.   It was my uncle -- and they were able to get money from him and family members that were here, and they transferred it over to them who were over there.   So it was paid and therefore they took me out of there.

Q.   Okay.   When you say "they" took you out of there, who was it that took you out of the house?

A.   So they took me and the two other people who had also paid the money to another house, and then took us to somewhere where we were able to cross the border.

Q.   Okay.   Now, Merida is not near the US border, right?

A.   No.

Q.   So how did you get to this other house that was closer to the border?

A.   Well, they put us in a car, and then they took us to that

house that belonged to that man.

Q.   Okay.  And did you learn who that man's name was?

A.   Yes.  It's Rey.

Q.   And was Rey's house still in Mexico?

A.   In Merida.

Q.   So how did you get from Rey's house in Merida to the border with the United States?

A.   Well, he took us to a bus station.  So they put us on a bus, and then the bus took us to Reynosa.  And then -- and then in Reynosa we were picked up by a lady in a car.

Q.   Okay.  Now, when Rey took you to the bus station to put you on the bus, did they provide you or the other two Cuban migrants that you were traveling with with anything to communicate with anybody else?

A.   So Rey gave me a phone and he gave me 4,000 Mexican pesos.

Q.   Did he give that to the other two Cuban migrants as well or did you share that?

A.   No.  He gave it all to me, so in case anything happened that I would be able to have that money to pay the patrol people.

Q.   When you say the:  "The patrol people," what do you mean, the police?

A.   Yeah.  The Mexican police.

Q.   And then, when you got off the bus, you said you met a woman.  Did you ever learn her name?

A. No. I mean, I know that she was a lady. She picked us up in her car. She took us up the road to a place where you see there's a bridge, and then you can see the flag showing the United States, and then she said: "Walk that way."

Q. Okay. And so is that when you crossed the border from -- the border near Reynosa into the United States?

A. Yes. Around there.

Q. Okay. And did you go to the Border Patrol checkpoint to check in with the Border Patrol?

A. Yes. I surrendered there.

Q. Okay. Did you make any claims to try to gain entry into the United States?

A. Well, I -- yes. I filed for -- like, the asylum application.

Q. Okay. And where were you taken from the border to be processed?

A. I was taken from the border to Nuevo Laredo in Texas.

Q. And were you let go or were you held there?

A. No. Actually, they kept us there for about five days. And then I was transferred to New York, to Buffalo in New York, for three months.

Q. Okay. And when you say you were transferred to Buffalo, New York for three months, were you being held in an Immigration facility?

A. Yes. In an Immigration detention center.

157

Q.   Okay.   Prior to being moved to Buffalo, New York, did an Immigration officer come and interview you about your political asylum claim in Nuevo Laredo?

A.   Yes.

Q.   Okay.   And did they ask you how you came to arrive in Mexico and then come to the US border from Mexico?

A.   Yes.

Q.   And what did you tell them?   What did you tell them about how you came to Mexico from Cuba and how you got to the US border?

A.   So I told this Immigration officer that I had arrived at the Mexican coast on a very rickety-type boat that we ourselves had made.

Q.   Okay.   Was that true or -- was that true, when you told them that?

A.   No.

Q.   Okay.   Why didn't you tell them about Hanser, Niño, and Tonito?

A.   Because when we were inside that house, they had told us that we could never mention anything that had to do with the boat that we came on, or we could not mention them either.

Q.   And while you were held, whose phone numbers were they calling to get in touch with -- for you to get set free with a payment?

A.   Well, with respect to my phone, they had my uncle's phone

158

number.

Q.   Okay.   Did you ever hear them talk about collecting money either -- did you ever hear them talk about how they could get the money from the family members?

A.   No.

Q.   Okay.   Were you later approached by another Immigration officer when you were held in New York to clarify some of your answers that you had given to the Immigration officer in Nuevo Laredo?

A.   Yes.

Q.   Okay.   And did they ask you about some of the discrepancies in what you had told them?

A.   Yes.

Q.   And what did you tell them the reason was for those discrepancies?

A.   Well, I told him about the whole thing about the political asylum that I had claimed for when I tried to enter, that I had been persecuted and harassed in Cuba, but I also mentioned how I had tried to come here because I couldn't find any work there, and I had tried to come here two times.

Q.   And so was your political asylum claim granted or was it denied?

A.   No.   I was given parole.

Q.   Okay.   And when you were paroled, where did you go?

A.   I came to the city of Miami.

Q.   Okay.   And do you currently have your work permit?

A.   I have my residency.

Q.   And how did you get that?

A.   Because I applied for it through the Cuban Adjustment Act.

Q.   And through the Cuban Adjustment Act, how long did you have to be living here in the United States before you could apply for that?

A.   One year and one day.

Q.   Did there come a time later when you were approached by members of the Federal Bureau of Investigation to talk about how you came to the United States?

THE INTERPRETER:   Counsel, can you just repeat the last part of the question, when the FBI ...

THE WITNESS:   Yes.

BY MR. DOBBINS:

Q.   And did you tell them -- this time, did you tell them about the trip you made to Merida and the houses that were run by Hanser and Tonito, or did you tell them something else?

A.   No.   I did.   I told them all about that.

Q.   About Hanser and Tonito?

A.   Yes.   Of course.

Q.   Did they show you any photographs and ask you to pick anybody out of any photographs?

A.   Yes.  Yes.

(Pause in proceedings.)

THE COURT:  Mr. Dobbins, let me know when it might be a good time to give the jurors a break.

MR. DOBBINS:  I've got maybe two or three minutes, Judge.

THE COURT:  All right, sir.

MR. DOBBINS:  If I may just have the ELMO for the witness only, Your Honor.

THE COURT:  Certainly.

MR. DOBBINS:  Or I can approach.

THE COURT:  Are we able to provide it just for the witness?

BY MR. DOBBINS:

Q.   Showing you Government's Exhibit 105.

THE INTERPRETER:  We cannot see it.  Up at the top, there's a shadow.

This is the Interpreter speaking.

THE COURT:  Is there a way to move the screen so the shadow -- I can see from the light.

THE INTERPRETER:  Is this flexible, Your Honor?

THE COURT:  There you go.  You should be able to adjust the angle of it.

THE INTERPRETER:  No.  It doesn't seem to be flexible.

THE COURT:  In the back?

THE INTERPRETER:  Yes, Your Honor.

Counsel, if you can just move it up because we're not

able to see the Government exhibit number.

Thanks.

BY MR. DOBBINS:

Q.  Do you recognize this series of photographs?

A.  Yes.

Q.  Okay.  And how do you recognize this series of photographs? Is this something you've seen before?

A.  Yes.  I can see El Nino's face here.

Q.  Okay.  Is this a series of six photographs where you were asked to pick just one photograph?

A.  Yes.

Q.  Or I should ask:  Were you shown this series of six photographs and asked if you recognized anybody in these six photographs?

A.  Yes.  I recognize Mr. El Niño.

Q.  Okay.  And what did the FBI agents ask you to do on the picture where you recognized El Niño?

A.  No.  I mean, I just saw it and I immediately recognized his face.

Q.  Did they ask you to write anything on it, on the picture?

A.  Oh, yes.  My signature.  And I signed.

Q.  Did one of the FBI agents sign as well?

A.  Yes.

Q.  Is this a fair and accurate copy of the photographic lineup where you picked out the picture of El Niño?

162

A.   Yes.

MR. DOBBINS:  Your Honor, at this time, the Government would move into evidence Government's Exhibit 105.  I don't actually think it might be on your exhibit list --

THE COURT:  Yes.  It's not on the exhibit list.

Is there any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  All right.  And the next item would be Exhibit 104.

Has the Government listed this -- have you tagged it as 105?

MR. DOBBINS:  I've tagged it as 105 because we have another picture that's 104.

THE COURT:  All right.  Without objection, Exhibit 105 admitted into evidence.

(Government's Exhibit 105 received into evidence.)

MR. DOBBINS:  And if we can just publish it briefly for the jury.

THE COURT:  Certainly.

BY MR. DOBBINS:

Q.   All right.  Sir, what numbered picture is it that you identified El Niño?

A.   Number 2.

Q.   And you see a signature that's then crossed out under Photo Number 5.  Is that your signature?

A.   Yes.   That is my signature.

Q.   And is that your signature under Photograph Number 2?

A.   Yes.

Q.   Okay.  And which one, again, was the picture of El Niño?

A.   Number 2.

MR. DOBBINS:  One moment, Your Honor.

(Pause in proceedings.)

MR. DOBBINS:  Your Honor, I have no further questions. So if you wanted to take a break at this point ...

THE COURT:  All right.  Ladies and Gentlemen, let's go ahead and take a 15-minute recess.

COURT SECURITY OFFICER:  All rise for the jury.

THE COURT:  Hold on, sir.

Please allow the jurors to come on through.

If we can escort the jurors in the back.

(Jury not present, 2:57 p.m.)

THE COURT:  All right.  We're on a 15-minute recess.

(Recess from 2:57 p.m. to 3:20 p.m.)

MR. FEIGENBAUM:  Judge, one quick matter.

THE COURT:  Yes, sir.

MR. FEIGENBAUM:  I don't think we invoked the Rule of Sequestration, but I would like to do it.

THE COURT:  All right.  So a rule of procedure has been invoked that requires that all individuals who are expected to testify remain outside of the courtroom.

Since I am not familiar with the witnesses, let me advise the attorneys of record, who are officers of the court, if you will advise the respective witnesses, once they come into the courtroom, that that rule has been invoked, they are not to discuss their anticipated testimony, the testimony of any individual, or any aspect of the case while they are waiting for their testimony.  All right?

Let me also raise, for scheduling purposes, that we had some matters that needed to be rescheduled by the parties. So we have tomorrow morning -- instead of eleven o'clock, we can start at ten o'clock, if that would be helpful.

MR. FEIGENBAUM:  The only thing was I said could go to that arraignment across the street.

THE COURT:  And what time was that?

MR. FEIGENBAUM:  Ten.

THE COURT:  At ten.  All right.  Then we'll keep it at eleven o'clock.  Not a problem.

Okay.  Both sides ready to continue?

Let me acknowledge the presence of the Defendant.

Are we ready to proceed?

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  Okay.  Let's make sure we have all our jurors, please.

(Pause in proceedings.)

(Before the Jury, 3:21 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated.

And we will continue with the testimony, beginning with the cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon, Mr. Benitez.

A.  Good afternoon.

Q.  I just want to be clear on one thing.  You told the prosecutor that Photo Number 2 is someone called El Niño?

A.  Yes.

Q.  And his name is Reynaldo Crespo Marquez.

A.  Oh, okay.  I don't know him by his name.

MR. FEIGENBAUM:  Can we stipulate to that?

MR. DOBBINS:  Sure.

MR. FEIGENBAUM:  Government stipulates.

THE COURT:  All right.

MR. FEIGENBAUM:  Thank you.

No further questions.

THE COURT:  All right.  Any redirect?

MR. DOBBINS:  No, Your Honor.

Thank you.

THE COURT:  All right.  Is the witness excused?

MR. DOBBINS:  For the Government, yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.

You are excused.

(Witness excused.)

THE COURT:  And the Government's next witness.

THE WITNESS:  Thank you.

MS. KLEPACH:  Yes, Your Honor.  The United States calls Jose Carlos Martinez Alfonso.

(Pause in proceedings.)

THE COURT:  All right.  Good afternoon.

Sir, if you'll remain standing, raise your right hand to be placed under oath.

JOSE CARLOS MARTINEZ ALFONSO, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Would you please state your name and also spell it for the record.

THE WITNESS:  (Through Interpreter.)  Jose Carlos Martinez Alfonso.

J-O-S-E C-A-R-L-O-S M-A-R-T-I-N-E Z.

COURTROOM DEPUTY:  Thank you.

MS. KLEPACH:  May I inquire?

THE COURT:  Yes.  Of course.

MS. KLEPACH:  Thank you.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  How old are you?

A.  Thirty-three years old.

Q.  Where do you currently live?

A.  In Miami.

Q.  How long have you lived in Miami?

A.  Three years.

Q.  Where are you from originally?

A.  Cuba.

Q.  Where in Cuba are you from?

A.  Artemisa.

Q.  How long have you been in the United States?

A.  Three years.

Q.  What do you do for work?

A.  I have my own company, JC Installation.  I install cabinets.

Q.  Before you came to the United States, what did you do for work in Cuba?

A.  I was a math professor.

Q.  When did you first leave Cuba?

A.  May 2018.  I don't remember the day.

Q.  What caused you to leave Cuba?

A.   Well, the reason was that I felt there was no future for me in Cuba, and I'm against the dictatorship in Cuba.

Q.   Was there anything in particular going on with respect to teachers at the time that you left Cuba?

A.   If teachers in Cuba suspend a student, their salary goes down.  You have to pass all the students, even if they don't know.  Otherwise -- otherwise, you're considered a bad teacher and they fire you.

Q.   Sir, I'm just going to ask you to slow down just a little bit.  Okay?

And did that affect your decision to want to leave Cuba?

A.   That was one of the reasons.  I was out of a job.

Q.   When did you first think about leaving the country?

A.   The first time I thought of leaving the country was around when I was 20/21 years old, that I saw what was happening in my country, that I had no future.

Q.   And how old were you when you actually left Cuba?

A.   When I left Cuba, I was 28 years old.

Q.   Did you make efforts during those seven years to try to leave?

A.   Yes.  We tried.  We tried in groups to go by boat, but with never -- with no success.

Q.   Did there come a time in 2018 when you were approached with an opportunity to leave Cuba?

A.   No.

Q.   When were you first approached about leaving Cuba?

A.   I was on my way home, and a group of people from Artemisa, from my hometown -- and since I had already mentioned to some of them that -- my desire to go to the US -- they saw me, and they were already on cars, and they told me that they had a boat ready to go to the US.  So I got on with them, and that's when we started the trip to come here.

Q.   When did this conversation take place?

A.   That same day, that same minute.

Q.   What year was this?

A.   May 2018.

Q.   Okay.  Did you know the person who approached you with this opportunity?

A.   Most of them.  It wasn't just one person who mentioned that they were going to the US.

Q.   What was your relationship to those people?

A.   We're all from the same hometown.

Q.   You mentioned that they approached you in a car; is that right?

A.   I was walking, and they approached me.  They stopped the car.  And since everybody knows each other, because it's a town and everybody knows each other -- so they told me:  "Jose Carlos" -- I got close to the window, and they said:  "We're going on a boat to the United States.  Do you want to leave?" And right there and then, I said:  "Yes."  I left with the

clothes that I was wearing.

Q. Did you get into the car?

A. Yes.  We got in the car.

Q. Did any of the people in the car tell you whether you would have to pay anything to go on this trip to the United States?

A. Once I got in, I spoke with them, whether there was money to be paid.  And that's when I was told that once I got to the United States I would have to have a relative who would pick me up and be responsible for paying $3,000.  So I would have to work -- at that moment, I didn't know -- I didn't know how the world worked because I had never left Cuba before.

Q. All right, sir.  I don't want to interrupt you, but I'm just going to ask you again to please slow down.  Okay?

A. Okay.

Q. Thank you.

    Okay.  When you got into the car, what did you have with you?

A. A shirt, my pants, a wallet, and my cell phone.

Q. Okay.  Did you tell anybody that you were leaving?

A. No.

Q. Did you have family in the United States at the time?

A. A brother.

Q. What's his name?

A. Yondiel Martinez.

Q. Why didn't you tell anybody that you were leaving?

A.   Because, in Cuba, I couldn't tell anybody because I didn't know how they would react, whether they were going to call the police.

Q.   So you mentioned that you had a bag with you.  Did you have personal documents in that bag?

A.   My ID card, my driver's license, and my phone.

Q.   After you got into the car, what happened next?

A.   From there, we went to another municipality, another town, Pinar Del Rio.  From there, we got off the car.  We started to getting on a hill, on the grass.  We got on the grass.  From there, the person who was guiding us took us to a house in Sanguily and there, there was another group who were also going to get on that same boat.

Q.   How far was this location from where you were originally picked up?

A.   Forty minutes.

Q.   Okay.  How did you know where to go?

A.   No.  I didn't know.  I got on the car, and I didn't know where I was heading.

Q.   You mentioned that after you got out of the car you walked to another location?

A.   Yes.

Q.   How did you know where to go at that point?

A.   Because in the car there was one who was guiding us.

Q.   Okay.  And did you follow that person?

A.   Yes.  Yes.  All of us followed that person.

Q.   You mentioned that there was another migrant group.

A.   At the house where we stayed the night, because it was already night.

Q.   Do you know where the house was where you ended up spending the night?

A.   No.

Q.   How many group of people -- excuse me.  How many people were in the group of migrants that you met up with?

A.   With the ones we met, there were seven.

Q.   And what about the ones you traveled with?  How many were there?

A.   There were eight or nine.

Q.   You mentioned that you spent the night?

A.   Yes.

Q.   What were the arrangements where you spent the night?

A.   Nothing.  We stayed there.  And at about three in the morning, we left the house.

Q.   At the time that you left the house, did you have all of your personal effects with you?

A.   Yes.

Q.   What happened after you left the house?

A.   We crossed some roads.  You couldn't see anything.  It was very early in the morning.  And we got to a -- and we got to a place close to the sea.

Q.  I'm sorry.  Did you say:  "Close to the sea"?

THE INTERPRETER:  Yes.  A mangrove.

BY MS. KLEPACH:

Q.  How did you know where to go from the house to the mangrove?

A.  No.  There were two people guiding us.

Q.  Okay.  Did they say anything to you?

A.  No.

Q.  What happened when you got to the area with the mangrove?

A.  There, we were kind of hiding.  And at about 12 noon the boat was coming in.

Q.  Okay.  So how long were you hiding in this area with the mangroves?

A.  Since about five in the morning, when we arrived, until 12.

Q.  Okay.  How were you hiding?

A.  Like this, under some trees.  It was full of plants, and we were kind of hiding in the middle.

Q.  How many people were with you at that time?

A.  There were about 16 or 17.  Sixteen or 17, and two others that were waiting.  I don't know who they were.

Q.  What happened after you saw the boat approaching?

A.  The boat was approaching, and one of the people that was guiding us took off his shirt and put it on a stick, and put it like that, like kind of to -- making a signal.  And when the boat approached, he let us know, and we left.  We started

swimming towards the boat.

Q. Okay.  Let me back up for a second.  How many people did you see on the boat when it pulled up towards you?

A. Two people.

Q. How far did you have to swim from the shore to get to the boat?

A. Two meters -- two or three meters.

Q. And how were you able to get onto the boat?

A. Well, you start swimming.  And when they get close, you hold onto the boat and you get on it as well as you can.

Q. Can you describe the boat.

A. It was a white boat with three engines.  That's what I remember.

Q. Was there a cabin?

A. There was a small cabin in the center, and that's it.

Q. Was there anywhere to go inside?

A. Under the boat, no.

Q. Did either of the people who were on the boat when it first approached you say anything after you got on?

A. No.  When we got on, the only thing was that -- when we got on, all they said was:  "Get on the front," because if the Coast Guard comes by, if someone tries to get to the engines, they'll leave or we'll leave.

Q. So can you explain that.  Who would leave?

A. Those that were driving or that were at the rudder of the

boat, all they tell you is, when you're going to get on it, to get on the front, because if one of the Coast Guards comes by, they will start the boat and leave.

Q.   Meaning that the people driving the boat you were on would leave if they saw the Coast Guard?

A.   Yes.

Q.   Okay.  Did all of the people that you were with on the shore manage to get onto the boat?

A.   Yes.

Q.   Okay.  What happened after you-all got on the boat?

A.   Well, the boat left.

Q.   Where did you believe you were going at that point?

A.   To the United States.

Q.   Okay.  Did you see the captains to the boat communicate with anyone?

A.   No.

Q.   Okay.  Were there any seats on the boat?

A.   No.

Q.   Were there any life vests on the boat?

A.   I did not see them.

Q.   Where did you sit on the boat, if there weren't any seats?

A.   All of us were on the front of the boat, because on the sides and on the back it was full of fuel tanks.

Q.   What were the weather conditions like?

A.   At the beginning was good.  Later, it started raining hard

and there were a lot of waves.

Q. A lot of waves?

THE INTERPRETER: Waves.

BY MS. KLEPACH:

Q. During the boat ride, did the captain say anything to you?

A. Just to hold on, because whoever fell on the sea would stay there.

Q. About how long were you on the boat?

A. The trip lasted about 17 to 18 hours.

Q. About what portion of that was in rough weather conditions?

A. Like the middle hours, between five to six hours.

Q. And was it light out or dark out at that time?

A. It was already dark.

Q. Before you made landfall, did there come a time when other people boarded the boat?

A. Yes. About two hours before getting to land. About two hours before.

Q. Can you tell the jury what happened at that time.

A. The boat stopped, and another boat came with about four or five people. Two of those people got on, and they send us to give everything we had, like watches, chains, phones, wallets, everything that one had on.

Q. At some point, were you asked to write down information for a family member?

A. While we were on the car -- when we got on the car, the one

that was guiding us said that if we didn't know that number by heart, or if we didn't have it on our phone, we should write it on a piece of paper, writing down the name and the phone number of those we had here.

Q. Okay. And did you do that, write that information on a piece of paper?

A. Yes. In case I lost my phone number, I wrote that information on a piece of paper.

Q. Was that also taken from you when the other people boarded the boat?

A. Yes. Everything; the wallet, the documents, the phone.

Q. Okay. Do you know who the people were that boarded the boat with you?

A. No.

Q. Were they armed?

A. No.

Q. After those people came onto the boat and took the personal effects from you, what was the next thing that happened?

A. They left on their own boat, and we continued our trip.

Q. How much longer were you on the boat?

A. Two hours, over an hour -- almost two hours.

Q. Did you then make landfall?

A. We got there and they ordered us to get off the boat.

Q. Did you have to swim, or did they actually pull up to the shore?

A.   No.   We were close to the shoreline.

Q.   And what happened after you got off the boat?

A.   As soon as we got off the boat, out of the -- behind the plants, six or seven people showed up with machetes on their hands.

Q.   And what, if anything, did they do?

A.   They asked us to stand in two rows, and we walked on the sand.  They asked us to stand in a circle, and they were around us, and they ordered us to get low behind the plants.

Q.   Okay.  Did you know where you were at that point?

A.   At that moment, no.

Q.   Where did you think you were?

A.   United States.

Q.   Did those people with machetes eventually escort you to a van?

A.   So we were crouched down and a white van pulled up.  They put on like a ski mask over our head, and they put us into this van.

Q.   What kind -- you said a ski mask.  Can you describe what they put over your head.

A.   Yes.  Like a cover, something that covers you, like a hood over your head, so that you can't see anything.

Q.   So just to be clear, was it a hood or was it a mask?

A.   No.  So it was something that they put over our head, where you were completely covered.  You couldn't see out of it.

Q.   Okay.  And what happened at that point?

A.   So they put us into the van, and then the van took off.

Q.   Did there come a time that you learned you were not in the United States?

A.   Well, not at that time.  I -- it was later on.

Q.   How long were you in the van?

A.   I don't know.  It was the journey from the van to that -- like Finca --

THE INTERPRETER:  Which could be either a farm or an estate, like a country house.

THE WITNESS:  -- that they took us to.

BY MS. KLEPACH:

Q.   Okay.  So while you were on the van, did they ever allow you to take the hoods off?

A.   No.

Q.   Did they say anything to you while you were in the van?

A.   No.

Q.   And where did they take you?

A.   Well, we went to -- they call it the Finca.

Q.   Can you describe the Finca.

A.   So the Finca is this very large house with lots of patio area.  It's got a large pool.  That's it.

Q.   Okay.  What happened when you got there?

A.   So when we got there, then they did take the hood off of us.  They told us to get out.  They told us that we had to take

all of our clothes off that we are wearing.  And then they put some of us in a bathroom, so that you can kind of rinse yourself off of it.  So then they started handing out clothing. So they might give you a pair of shorts or a pair of pants, whatever clothing that they had there that might fit you, to wear.

Q.  Okay.  And you keep referring to "they."  Are they the same people that were with you or escorted you to the van, or were these other people?

A.  Oh.  I'm referring to those people who were there at the Finca.

Q.  So these are different people from the people that were on the van?

A.  Well, the thing is that the people in the van were all -- also had their faces and heads covered.  So I had never seen them until that moment.

Q.  Did you later learn the names of the people who greeted you at the Finca?

A.  Yes.

Q.  What were their names?

A.  Josvani, Tonito, Hanser, El Gringo, and that's it.

Q.  Okay.  What, if anything, did they tell you about what you were doing at the Finca?

A.  So when we got to the Finca, that's when we like sort of took a shower or rinsed ourselves off, and then we changed

clothing.  They put us -- all of us into a room.  And then -- so then Tonito and Hanser come, and then they say to us -- they said to us:  "When the bosses arrive, then we'll start talking."

Q.  You mentioned they put you in a room.  What was the room like?

A.  Well, it's a room in a house.

Q.  Was there any furniture?

A.  No.  So all of us who had arrived there, we had to sit down on the floor.

Q.  Were you given any food or water?

A.  They gave us a piece of bread and a refreshment drink.

Q.  Did they tell you anything other than that they were waiting for the bosses?

A.  So there, Tonito and Hanser start calling people one by one.  And when it was my turn -- so Tonito and Hanser asked me -- they said to me:  "What did they tell you for you to come here?"  And that's when I told them:  "Well, I was walking, and then the people who approached me, that group of people who approached me said to me:  'Would you like to go to the United States on a motorboat,'" and that what I had to pay was $3,000, working for that here in the United States.  And then they began to laugh, and that's when I realized I was not in the United States.  And -- because they said to me:  "Three thousand dollars, that's not even enough money for gasoline."

And that's when they told me that I was in Mexico.

Q.   Okay.  Did there come a time when the people that they referred to as the bosses arrived?

A.   Yes.

Q.   Can you tell the jury what happened at that time.

A.   So two people arrived, and they said they were the bosses, and those two people were El Chupa and El Niñito.

Q.   What happened when they arrived?

A.   So when they arrived, they were there, they were smoking marijuana.

So a short while later, they approached us and then they said to us that we were going to have a spend a week there. And then in two groups they were going to be taking us to this Calabozo, like a cell or a holding cell.

Q.   Did they tell you why you would have to be there for a week?

A.   No.

Q.   How long were you actually at the Finca?

A.   Five or six days.

Q.   Can you describe for the jury what happened during those five or six days.

A.   So we were there in that room.  That's where they would give us a piece of bread and a drink, like a refreshment drink. And you know, we could go to the bathroom and go back and forth like that.

Q.  Were you allowed to go anywhere other than the bathroom?

A.  No.  No.

Q.  You mentioned that there was no furniture in that room. Where did you sleep?

A.  We all slept on the floor.

Q.  Were you given any other clothing?

A.  No.  We had the same clothing.

Q.  What, if anything, else happened during those four or five days at the Finca?

A.  No one would speak to you.  No, nothing.

Q.  Did there come a time that you were a taken to the place that they referred to as the Calabozo?

A.  Yes.

Q.  How were you taken there?

A.  So once again, they put the hood over your head, and they put you in the same -- or they put you in a van, and then they take you to the Calabozo.  It's a house, but they refer to the house as the Calabozo.

Q.  Did they tell you anything about why you would go to the Calabozo?

A.  Well, because if they tell you that you're going to be going to the Calabozo, that's when the good stuff starts.

Q.  What do you mean:  "The good stuff"?

A.  Well, that's what they were telling us, that good things were going to -- well, that -- what they were saying is that:

"If your family members don't pay up, then they're going to start torturing you."

Q. At any point in the four or five days when you were at the Finca, do you know if any attempts were made to contact your family?

A. I don't know.

Q. What happened when you arrived at the Calabozo?

A. So when we arrived at the Calabozo -- so it's like a -- so it's like the terrace area of the house and it's sealed off. So they put all of the people in there. And on the floor -- they had thrown down on the floor some sheets and some pillows. And there, we had to spend about two or three days until they started making the phone calls.

Q. You mentioned that this was a terrace area. Was it exposed to the elements?

A. No. No. It's part of the very same house, and it's like at the back of the house. It's like a room and it's completely sealed off. I mean, it doesn't even have -- there's no closets, just four walls in the same house, part of the same house.

Q. In addition to the blankets and the pillows, was there any furniture in that room?

A. There wasn't even a door in the room. No.

Q. Were you allowed to leave that room?

A. Only when I needed to go to the bathroom.

185

Q.  How many people were in that room with you?

A.  Eighteen people.

Q.  You mentioned that you were in that room for about two or three days?

A.  Yes.  That was until they started making those phone calls.

Q.  And what, if anything, happened in those two or three days before the phone calls started being made?

A.  No.  Nothing happened.

Q.  Who was there with you in the Calabozo other than the migrants?

A.  Tonito, Hanser, and Josvani, El Chupa, and El Niñito.  El Chupa and El Niñito would go there, but they didn't live there.

Q.  Okay.  Did there come a time when Chupa and El Niñito came to the Calabozo to make phone calls to your family?

A.  Yes.

Q.  Can you tell us what happened then.

A.  So one by one, they had us leave the room and go into the living room.  And so, when you go into the living room, then they hand you over the documents that you had given them when you met them out at sea.  And so then you have to pick up your documents or things, whether it's your wallet, your bag, your phone.  Well, you only got your phone if you had a family relative's name registered on your phone.  Otherwise, you didn't.  You know, you might have put it on a piece of paper.

And then they say to you:  "Look, we're going to be calling

one of your relatives.  See who you have who's a relative in the United States, or we're going to call a relative in Cuba or anywhere in the world who's going to pay the money for you."

So in my case, I said:  "Look, I have a brother in the United States.  Let me call him."  And then they say to you:  "Okay.  We're going to let you make a phone call to your brother.  And the only thing we're going to tell you is that if your brother says to you that he won't pay the money for you, we are going to kill you."

Q.  So were you able to call your brother?

A.  So I dialed my brother's cell phone number until he answered the phone.  So when he answered the phone, I was crying, and I said to my brother -- I said to my brother:  "Brother, I'm here in Mexico.  I've been kidnapped, and they are telling me that they're going to kill me if you don't pay them money for me."  And then they take the phone away from you and then they speak to my brother.

Q.  What did they say to your brother?

A.  And then they said to my brother:  "Look, if you don't pay up," then that they're going to kill me.  And so my brother says to them -- because the phone was on speaker:  "How much are they charging?"  And they say to him:  "Ten thousand dollars," and with that money they would take me to the border. But if I wanted to save my life, they would -- it would be $6,000 and they would let me go in Mexico.

Q.   So what happened after that phone call with your brother?

A.   So my brother tells them not to hit me, not to beat me up, that they should call him back the next day at one o'clock.

Q.   Did they?

A.   So when they tell me that, they said:  "Okay.  Now we're going to go take you back that to that room that you were in, and we're going to continue with the other people in that room. If you see that we're going to become like aggressive" -- and they began to hit the people.  I had to say that at one o'clock that he should -- so you know, the thing is, they were smoking marijuana and all of that there.  They were going to continue with the phone calls.  If the other people say that they're not going to pay, then they begin to beat up all the other people. And I didn't want them to get confused and then beat me up.

     I had to tell them that my brother, remember, was going to be calling the next day, that they had to call him back the next day at one o'clock.  Because my brother had told them that they shouldn't harm me.  So they thought that he was going to pay them back the next day by one o'clock.  So that's why they said that to me, and I didn't want them to get confused and then begin to beat me up.

Q.   So did they call your brother back the next day?

A.   So the next day arrived, and they began to call my brother at one o'clock in the afternoon, and my brother didn't answer his phone.  And when my brother did answer the phone, he said

188

he didn't have the money to pay for me.

Q. So what happened then?

A. So then they call me -- that's Tonito, Hanser, and Josvani -- and they put me in this room that they had gotten ready to torture people in. And inside that room was El Chupa and El Niñito. They told me to take all my clothes off, and that I have to lean up against the wall. They pulled out my testicles, and Hanser put a knife on my neck. Tony put one on my ribs. And then Josvani takes a board of wood and hits me on the buttocks. Yeah.

Q. How many times did he hit you?

A. Until I bled.

Q. Do you need a minute?

A. No. No. It's just that when you remember ...

Q. Did they say anything to you?

A. So after they had done this to me, so then Chupa comes along and starts taking photographs of me. They take me out of there and they give me two pills, and they throw me in like a closet. And that's when Josvani says to me, and Tonito says to me, and they say to me: "Just in a short while, we're going to come back and get you again."

Q. Did they come back to get you again?

A. Well, the thing is that after me they took -- put another person in there. And a short while passed, and Chupa left, and they put another person in there after me, and I'm there inside

that closet.

So I'm inside the closet, but the closet door is open. I'm just inside the closet. And that person comes out kind of like going down the hallway -- coming down the hallway, because apparently they struck him in the head with some -- like something like a bat or something. And so they tell me and two other people that we have to clean him up in the bathtub.

And so we begin to clean up all his -- the blood that's on him. And then they take us to the area where everybody else was. And a short while goes by, and once again Chupa comes back. And that guy that they struck on the head with that bat or stick, the family member had paid him during that period of time that Chupa had left. They had gotten in touch with him and they had already paid him the money. And when he arrived and he saw that the person who had paid the money had been struck on the head with this bat, it looks like those days they got a little bit afraid, and I could probably say that thanks to that they didn't strike me again.

Q. So you mentioned Chupa a couple of times.

A. Yes.

MS. KLEPACH: May I have the ELMO for just the witness, please.

BY MS. KLEPACH:

Q. Jose Carlos, I'm showing you what's been marked for the record as Government Number 1. Do you recognize this?

A.   Yes.

Q.   Who is that?

A.   El Chupa.

Q.   Is that a fair and accurate depiction of what he looked like during the events that you just described?

A.   Yes.

MS. KLEPACH:   At this time, the Government offers Exhibit 1 into evidence.

THE COURT:   You said Exhibit 1?

MS. KLEPACH:   Yes.

THE COURT:   Is there any objection?

MR. FEIGENBAUM:   No, Your Honor.   Exhibit 1.

THE COURT:   All right.   Admitted into evidence.

(Government's Exhibit 1 received into evidence.)

MS. KLEPACH:   May we publish to the jury, please?

THE COURT:   You may.

BY MS. KLEPACH:

Q.   Okay.   Now I'm going to show you what is in evidence as Government's Exhibit 101.

Who is that?

A.   Hanser.

Q.   And can you remind us, what was his role.

A.   So he was at the Finca when we arrived at the Finca.   He was also at the Calabozo, and he was one of the people who tortured me.

191

Q.   Now I'm going to show you what's in evidence as Government Government's Exhibit 103.  Who is that?

A.   Tonito.

Q.   What was his role?

A.   He was at the Finca, and later on at the Calabozo, and he was one of the ones that tortured me.

MS. KLEPACH:  And finally, if I may have the ELMO for just the witness, please.

BY MS. KLEPACH:

Q.   I'm going to show you what's been marked for identification as Government's Exhibit 102.

Do you recognize this?

A.   Josvani.

Q.   And is that a fair and accurate depiction of what Josvani looked like during the events that you just described?

A.   Yes.

MS. KLEPACH:  At this time, the Government offers Exhibit 102 into evidence.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 102 received into evidence.)

MS. KLEPACH:  May we publish, please?

THE COURT:  You may.

MS. KLEPACH:  Thank you.

BY MS. KLEPACH:

Q.   Okay.  Jose Carlos, were your family members eventually able to pay money to these people?

A.   Once I saw what my brother had said, that they said that my brother couldn't pay the money for me, I told them to give me the opportunity to call my father back in Cuba.  That he didn't have the money, but he would do anything so I wouldn't be killed.

And they gave me an opportunity to call him, and I spoke with him.  And my father called my brother and told him not to let them kill me there.  So my father paid $2,000 in Cuba and my brother paid 3,000 here in the United States.

Q.   What does your father do for work?

A.   My father works for a cattle company, cows, things like that.  But he asked for that money at the bank.

Q.   And what about your brother?

A.   My brother is a truck driver.

Q.   Do you know how he was able to get part of the money?

A.   Working.  Because he didn't pay it all at once.

Q.   How long did it take for him to pay that money?

A.   About four days.  Every day, he would pay about a thousand dollars.

Q.   What happened after -- withdrawn.

Between the time of that one p.m. phone call and the time that your family was able to pay the $5,000, what was going on?

A.   So while the relatives are saying that they're going to pay the money that is being demanded from them, they do not hit you.  They keep you in that room.  And if your relatives start paying, they kind of tell you that now you have the right to get two pieces of bread, one soda.  And it stayed like that until the money was all paid.

Q.   Okay.  And during that time, were you kept in that room without the furniture?

A.   Yes.  Without furniture.

Q.   Were you allowed to leave that room other than to go to the bathroom?

A.   No.

Q.   And were you given food other than those two pieces of bread per day?

A.   While it was getting close to what -- the money that they were asking, at night you would be given a meal.

Q.   How long were you at the Calabozo?

A.   I couldn't tell you exactly, but it was close to a month, the month of May, close to getting to June.

Q.   And did there come a time when you were released from the Calabozo?

A.   Once my brother paid all the $3,000, and my father paid the $2,000 that he paid in Cuba, and when my brother said he had no more money to pay, about two or three days later, they brought me a new set of clothes.  They took me to like a bus terminal.

They got me in a bus. And once the bus stopped, I was already in Cancun.

Q. Were any of the other migrants with you?

A. Just one other.

Q. Do you know where the others went?

A. The others, as they were paying, left. But him and I were the last ones to pay.

Q. When you boarded the bus to Cancun, did you have any of your personal items with you?

A. No. I didn't get on in Cancun. They took me. I didn't know where I was. They took me. They got me on a bus. And once I got on the bus, the last stop was Cancun.

Q. Right. When you got onto that bus, did you have any of your personal items with you?

A. Yes. My driver's license, not my cell phone, my ID card, and that was it.

Q. Did they tell you anything about how to get to the United States?

A. No. Once it wasn't the $10,000, they just left me there.

Q. So what did you do when you were in Cancun?

A. So we were in Cancun, we were there and on the street. We were there, just the two of us, alone. There was no phone, no cell phone or anything. There's a small park across from there. So him and I were just sitting there in the park. It was already night.

But in Cancun, there's plenty of Cubans.  And there at the park we tried to find someone who would let us use a cell phone.  And another person who was also Cuban started talking to us and took us to some small rooms that they have there in Cancun, that there's some Cubans there.  And there was an older man who's from Artemisia that knew the person that was hanging out with me.  He knew his family.

So they gave us food.  We spent the night there.  And that man was going to Cuba.  He was going to Cuba two days later, and told us that he had already paid that whole month of rent, that if we wanted we could stay those days there.  And once he would come back from Artemisia, he would go to my family's house, and to his family, to see if they could send us something to leave there because he was also afraid of us staying there.

So that's how it happened.  The man went back to Cuba.  And once he came back, my father, all he was able to send me were $30, and the guy received a hundred dollars.  And then he gave us a box of tobacco.  So with that money that we were sent, we could get the -- so first -- for the tickets.  First, we bought a cell phone.  And then on Facebook, we found a friend of ours from Artemisia that was living in Campeche.  And he told us: "If you manage to get here, I will help you.  I have work."  So that man gave us the box of tobaccos in order to get the tickets.  We got on a bus in Cancun and left for Campeche.

So we got to Campeche.  The man was working with a construction crew.  These were people that had a church, but worked with a construction crew.  So he introduced us to this Mexican man, and we sold the tobacco.  We paid for a small room with the 800 Mexican pesos that we managed from the sale of the tobacco, and we started working in construction in Campeche.

But the man that was renting us the rooms realized that we didn't have papers, and that's when he told us that we couldn't keep on renting there.  So the man that we were working with told us to -- that he would let us stay in a house that he was remodeling.  So we lived there for about eight months without electricity, in the worst conditions possible that a person could live in.  And later on, those two other guys that were with me left to come to the United States.

But since I didn't want to go back to Cuba, and I was afraid to be arrested, I stayed there -- living there.  And later on, I met a Mexican woman and her family helped me out and took me to Merida.  And in Merida, I was living there.  I enrolled in a program called "Coman."  And while I was there, I was working, and a friend whom I had told him my story saw a YouTube video.  And it showed that they had arrested Hanser and El Niñito, that they had been arrested in Texas.  And he told me:  "These are people who were arrested that were bringing people to Mexico.  Aren't these the people that brought you?"  And I said:  "Yes.  These are the people who kidnapped me."

And it said you can communicate to this number if you have any information.  So I called one of the two guys that had been with me in Campeche, who was already in the United States, and I told him:  "Listen, they arrested Hanser and El Niñito."  So I was happy because I thought that justice was going to be made.  "Didn't you say that once those people were arrested you were going to speak out?  They are already in the jail in the United States, in case you want to testify."  So I sent him the video.  And later on -- that's all I told him.

Later on, he contacted -- he contacted the FBI agents at that number that was showing up there.  And it seems -- well, I don't know, but it seems like he spoke with them and he told them about me, that I had also had been through that.  So the agent sent me a text.  They contacted me, and they told me if I was willing to testify.  And I said yes, that if they would come to Mexico I would tell them my story.

Q.  Okay.  So let me ask you a couple follow-up questions.

Why had you not contacted law enforcement before being made aware of this YouTube video?

A.  No.  Because in Mexico, I didn't have the courage to contact the authorities.  Because the first thing they tell you there is that if you approach someone to tell them something, or you talk to somebody, they kill you.  How was I going to contact someone if I was in Cancun?  People would go by with guns in their hands and the police would just turn the other

198

way.

Q.  So when did you first become aware of this YouTube video?

A.  I was working, and my friend was watching YouTube, and that's when he told me.  He was the one who told me:  "Look, they arrested two people that were -- that were kidnapping people in Mexico."  And when I saw that it said Hanser and Niñito, and I saw the pictures, I realized they were the same ones who had brought me.

Q.  When was this?  What year?

A.  That was in 2020.

Q.  And did FBI agents eventually come to Mexico to speak with you?

A.  Yes.

Q.  Okay.  And did they help you gain entry into the United States?

A.  Yes.

Q.  Do you know how you were able to enter the United States?

A.  I entered the US and they gave me a parole.

Q.  And what is your current status in the United States?

A.  Resident.

Q.  How were you able to obtain residency?

A.  After a year and a day, I got an attorney, and through the Cuban Adjustment Act I applied for the residency.  And about 10 or 11 months later, I got it at home.

Q.  Okay.

MS. KLEPACH:  Just one moment.

THE COURT:  Certainly.

(Pause in proceedings.)

MS. KLEPACH:  I have no further questions for this witness.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon, Mr. Martinez.

A.  Good afternoon.

Q.  How are you doing?

A.  Everything is good.

Q.  You mentioned that you were happy that two of the people who tortured you had been put in jail here, correct?

A.  Yes.

Q.  And that was for something that happened to you in May of 2018?

A.  I don't understand the question.

Q.  When you were in that place in Mexico, where you got tortured, was that in the month of May in 2018?

A.  May 2018, yes.

Q.  Okay.  The two people that you learned had been put in jail here were Hanser and Niñito?

A.  Yes.

Q.  And Hanser is somebody named Yancer Sergio Ramos Valdez,

correct?

A.  I don't know.  I don't know.

MR. FEIGENBAUM:  Could the Government stipulate to that?

MS. KLEPACH:  Yes, Your Honor.

BY MR. FEIGENBAUM:

Q.  And the second person --

THE COURT:  All right.  So hold on.  That is a stipulation by the parties.

You may continue.

BY MR. FEIGENBAUM:

Q.  And the second person who had tortured you, who you told the Government you would come and testify against, was Niñito, who is Reynaldo Crespo Marquez?

A.  Niñito.

Q.  And you also identified someone who was known as Chupa?

A.  Yes.

Q.  And you identified Government's Exhibit 1.

MR. FEIGENBAUM:  If I may put it on the ELMO, please.

THE WITNESS:  Yes.

BY MR. FEIGENBAUM:

Q.  That's Chupa.  And his name is Jose Miguel Gonzalez Vidal, correct?

A.  It's Chupa.

MR. FEIGENBAUM:  Would the Government stipulate to

that?

MS. KLEPACH:  Yes.

MR. FEIGENBAUM:  Thank you.

Good luck to you, sir.

No further questions.

THE COURT:  All right.  Any redirect?

MS. KLEPACH:  No, Your Honor.

THE COURT:  All right.  Is the witness excused?

MS. KLEPACH:  Yes.

THE COURT:  Thank you, sir.

You are excused.

(Witness excused.)

THE COURT:  Unless the Government has a short witness, is this a good time for us to recess for the evening?

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  All right.  Ladies and Gentlemen, thank you.  I know you've been here since early this morning.  We are going to recess for the evening.

Recall tomorrow we will start precisely at eleven o'clock.  It will be a full day, I would ask that you make your way into the building and be ready to come into the courtroom at eleven o'clock a.m.

Since we're coming in a little late, I certainly do want to give you a lunch recess, but I think we can have the lunch recess at or about one o'clock, depending upon where we

are with the witnesses.

And recall for that for Thursday it will be a half a day, from one p.m. to five p.m., and Friday will be a full day from nine a.m. to five p.m.

So please remember, as you exit the building, that you are not to discuss this case with anyone, nor permit anyone to speak with you. Everything learned about the case is learned within this courtroom.

I would ask that you place your juror notebooks in the jury room. The jury room will remain locked, and I will see you tomorrow morning precisely at 11 a.m.

Have a nice evening.

COURT SECURITY OFFICER: All rise for the jury.

(Jury not present, 4:52 p.m.)

THE COURT: All right.

Go ahead and have a seat.

Two items that I do need to address, first and foremost, the wonderful women that are assisting us, are they certified interpreters?

THE INTERPRETER: They are.

THE COURT: All right. And I note that they obviously are here because the United States Attorney's Office has brought them before this Court. Mr. Feigenbaum, is there any objection to the interpreters' qualifications?

MR. FEIGENBAUM: No, Your Honor.

THE COURT:  All right.  Then let me thank you, and I will see you tomorrow.

As well -- and I'm not certain, Mr. Dobbins and Ms. Klepach, with regard to the need for the interpreters. What I would like to do is moving forward if I can have a list of the witnesses you anticipate calling for each day.

So tomorrow at 11 a.m., who will be your first witness?

MS. KLEPACH:  Our first witness tomorrow will be Evan Sanborn.

THE COURT:  All right.  And after that?

MS. KLEPACH:  After that, it will be Officer Angel Seca Matus, Officer Mario Almanza Vasquez, Officer Juan Mendoza Moo.  And if we get to him, FBI Special Agent Aaron Spielvogel.

THE COURT:  All right.  Then it appears that you are not going to be in need of your interpreters, but obviously we'll have the court interpreters for Mr. Hernandez.

MS. KLEPACH:  Judge, several of those witnesses -- the officers are Mexican law enforcement officers.

THE COURT:  Ah.  Okay.  Of course.

All right.  Thank you.  Have a nice evening.

Are there any other issues that we need to address this evening?

MR. FEIGENBAUM:  Just one thing.

It's -- and I've spoken to the prosecutors, who have

been great about these things.  I do have this expert witness Dan Riemer, who -- per Your Honor's order, the parties stipulated that an expert could be present for another expert's testimony.  So Mr. Riemer does plan on being here tomorrow at 11 a.m.  So he would be an exception to the Rule of Sequestration.

And I'm always -- and I know the Government attorneys are also looking to make sure that we enforce that rule.  But as to Mr. Riemer, I would like to have him just sit at counsel table during the testimony of Evan Sanborn, the Government's first witness tomorrow.

THE COURT:  All right.  Certainly.

Is there a need for the expert to sit at counsel table, as opposed to being present in the courtroom to listen and observe?

MR. FEIGENBAUM:  That's fine.  That's totally fine.

THE COURT:  Only because then there would be a need to introduce the individual, who is not an attorney, is not an officer of the court.  He can certainly --

MR. FEIGENBAUM:  That's fine.

THE COURT:  I certainly believe that he is excluded from the Rule of Sequestration.  And the Government agrees?

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  All right.  Of course.  So he is welcome to come into the courtroom.

Any other issues that we need to address?

MR. FEIGENBAUM:  No, Your Honor.

MS. KLEPACH:  Not on behalf of the Government.

THE COURT:  All right, then.  I'll see the parties at 11 a.m.

Recall that the use of the conference rooms are for you, and you can certainly use them throughout the course of the trial.  Just let the court security officer know when you've placed the items in, so we can lock it.  And we'll certainly lock the courtroom.  But take the time that you need to exit, and I'll see you tomorrow morning at 11 a.m.

MR. FEIGENBAUM:  Thank you, Judge.

MS. KLEPACH:  Thank you.

COURT SECURITY OFFICER:  All rise.

(Proceedings adjourned at 4:56 p.m.)

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698

UNITED STATES OF AMERICA      )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 26th day of September, 2023, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 206.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 6th day of June, 2024.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov