IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1


UNITED STATES OF AMERICA,

      Plaintiff,                          September 27, 2023
                                         11:00 a.m.
    vs.

JAVIER HERNANDEZ,

      Defendant.                          Pages 1 THROUGH 141

_____


TRANSCRIPT OF TRIAL DAY 2
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE
And a Jury of  12



Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                    Brian Dobbins, AUSA
                    Arielle Klepach, AUSA
                    99 Northeast 4th Street
                    Miami, Florida 33132


FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                    PO BOX 545960
                    Surfside, Florida 33154-9998


COURT REPORTER:     Yvette Hernandez
                    U.S. District Court
                    400 North Miami Avenue, Room 10-2
                    Miami, Florida 33128
                    yvette_hernandez@flsd.uscourts.gov

**I N D E X**

Certificate.................................. 141


**W I T N E S S**

**ON BEHALF OF THE GOVERNMENT:**                              PAGE
SPECIAL AGENT EVAN SANBORN
DIRECT EXAMINATION BY MS. KLEPACH                               6
CROSS-EXAMINATION BY MR. FEIGENBAUM                            38
REDIRECT EXAMINATION BY MS. KLEPACH                           51

OFFICER MARIO ALMANZA VASQUEZ
DIRECT EXAMINATION BY MR. DOBBINS                             59
CROSS-EXAMINATION BY MR. FEIGENBAUM                           79
REDIRECT EXAMINATION BY MR. DOBBINS                           88
RECROSS BY MR. FEIGENBAUM                                     97

OFFICER JUAN MENDOZA
DIRECT EXAMINATION BY MR. DOBBINS                            102
CROSS-EXAMINATION BY MR. FEIGENBAUM                          116
REDIRECT EXAMINATION BY MR. DOBBINS                          118

OFFICER ANGEL ISAIAS SECA MATUS
DIRECT EXAMINATION BY MS. KLEPACH                            123
CROSS-EXAMINATION BY MR. FEIGENBAUM                          132
REDIRECT EXAMINATION BY MS. KLEPACH                          138


**E X H I B I T S**

| GOVERNMENT'S EX. NO.: | OFFERED | ADMITTED |
|---|---|---|
| 106 | 13 | 13 |
| 3 | 74 | 74 |
| 2 | 113 | 113 |
| 60 | 114 | 114 |
| 19 | 131 | 131 |
| 28 | 131 | 131 |

(Call to order of the Court, 11:00 a.m.)

THE COURT:  All right.  Good morning to everyone.

MS. KLEPACH:  Good morning.

MR. DOBBINS:  Good morning, Judge.

THE COURT:  Go ahead and have a seat.

How is everyone this morning?

MR. DOBBINS:  Excellent.  Thank you, Judge.

THE COURT:  Let's go ahead and call the case and we can get started.

COURTROOM DEPUTY:  Calling Criminal Case Number 22-20557, United States of America v. Javier Hernandez.

Counsel, please state your appearances for the record.

MS. KLEPACH:  Good morning, Your Honor.  Arielle Klepach and Brian Dobbins for the United States, joined by Special Agent Sergio Francisco from the FBI.

THE COURT:  Good morning.

MR. FEIGENBAUM:  Good morning, Your Honor.  Marty Feigenbaum on behalf of Javier Hernandez.  He's present before the Court with the assistance of two interpreters.

Let me also introduce Daniel P. Riemer.  He is in the back here.  He is, as you know, my maritime expert.

THE COURT:  Yes.  Of course.

Good morning.

And let me make sure, Mr. Hernandez, that the earpiece that you are using is working properly.

THE DEFENDANT:  (Through Interpreter.)  Perfectly.

THE COURT:  If at any time the equipment stops working, or you're unable to hear the interpreter, if you'll let the Court know.  All right?

THE DEFENDANT:  Okay.

THE COURT:  And let me thank our interpreters for being here this morning.

THE INTERPRETER:  Thank you, Your Honor.  It's a pleasure.

THE COURT:  All right.  I believe we're waiting for one more juror, and then we're ready to proceed.

Does the Government have its next witness?

MS. KLEPACH:  Yes, Your Honor.  The next witness is going to be Evan Sanborn.

THE COURT:  All right.  And we have all of our jurors.

Are both sides ready to proceed?

MS. KLEPACH:  Yes.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  And do recall, for purposes of scheduling, that at or around one o'clock we'll take our one-hour recess for lunch.

Okay.  Let's bring in the jury.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 11:01 a.m.)

THE COURT: All right. Good morning, Ladies and Gentlemen. It's good to see each of you.

Thank you for being so prompt. I hope that you had a pleasant evening and a good morning.

Please be seated, everyone.

And once again, let me remind you that you are certainly welcome to bring in beverages to make yourself comfortable, and you certainly can bring in a pillow to make yourself comfortable.

And we are ready to proceed.

Recall that we will take a one-hour recess for lunch at one o'clock.

On behalf of the Government, your next witness.

MS. KLEPACH: Yes, Your Honor.

The United States calls Evan Sanborn.

THE COURT: Good morning, sir.

(Pause in proceedings.)

THE COURT: Sir, let me ask you that you step forward, remain standing, raise your right hand to be placed under oath.

SPECIAL AGENT EVAN SANBORN, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY: Thank you.

Have a seat.

Could you please state your name and also spell it for the record.

THE WITNESS: First name's Evan, E-V-A-N. Last name

Sanborn, S-A-N-B, as in boy, O-R-N.

COURTROOM DEPUTY:  Thank you.

MS. KLEPACH:  May I inquire?

THE COURT:  Yes.  Of course.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.  Good morning, sir.

A.  Good morning.

Q.  Where you are you employed?

A.  I'm currently employed by the US Coast Guard.  I'm an active duty chief warrant officer for 24 years, and I'm currently a special agent with the Coast Guard Investigative Service.

Q.  What is the Coast Guard Investigative Service?

A.  So we are the criminal investigative branch of the United States Coast Guard.  We investigate felony-level violations of the Uniform Code of Military Justice -- that's related to Coast Guard members -- and we also investigate felony-level violations of regulations that the Coast Guard has authority over.

Q.  What regulations does the Coast Guard have authority over?

A.  So generally, that's any type of maritime-related crime that occurs on -- outside, you know, US jurisdiction.  So within the SMTJ.

Also, we deal with pollution cases, smuggling cases,

merchant mariner fraud, sex assault on the high seas, just various miscellaneous cases.

Q.  All right.  You said:  "SMTJ"?

A.  Yeah.  Special maritime jurisdiction.

Q.  Okay.  What is that?

A.  So that's -- it's when we have jurisdiction in the high seas, where nobody else has jurisdiction.

Q.  How long have you been with the Coast Guard Investigative Service?

A.  For 14 years.

Q.  And prior to joining the Coast Guard Investigative Service, what did you do?

A.  So I spent 10 years in the uniformed Coast Guard.  I was a boatswain mate first class.  Seven of those 10 years, I spent in The Florida Keys working on two patrol boats in the Coast Guard station, where we primarily worked interdiction operations in the Florida Straits, so south of The Keys, dealing primarily with Cuban migrant flow on either chugs, rafts, or organized smuggling ventures on go-fast boats.

Q.  Okay.  And what are your current duties and responsibilities?

A.  So I'm currently assigned to the resident agent office in Houston, Texas.

Q.  And prior to being assigned to the office in Houston, Texas, where else were you stationed?

A.   So I spent four years assigned -- in Tampa, Florida assigned to -- it's the R8 in St. Pete, St. Petersburg, Florida.   There, I primarily worked vessel thefts up and down the Southwest Florida coast.   That's all the way from the Everglades all the way up to the Panhandle of Florida.

Q.   Okay.   Can you talk about some of -- withdrawn.

How long were you stationed in the Houston area?

A.   Currently, I've only been there for about a month.

Q.   And how long were you stationed in Tampa?

A.   Four years.

Q.   When you were stationed in Tampa, did you become familiar with maritime crossings between Florida and Mexico?

A.   Yes.

Q.   How did you become familiar with those?

A.   So immediately upon arriving, it became apparent to us that there was a group stealing boats that were taking them down to the Yucatan Peninsula to be used in migrant smuggling from the west coast of Cuba over to Mexico.   And that was because the historical trends of migrant smuggling between The Florida Keys and Cuba -- law enforcement had saturated that area so much, it had pushed the organizations outward, first up into Southwest Florida, and then finally down to the Yucatan Channel, where they would smuggle the migrants then across from the west coast of Cuba into the Yucatan Peninsula, and then bring them up via land over the Texas border, and then bring them into the

country.

Q. So what about your duties and responsibilities in the time you were stationed in Tampa helped you become familiar with these patterns?

A. So we initiated what we called a Southwest Florida Theft Working Group. So that included over 40 state, local, and federal agencies focused on maritime theft activity. Primarily, the initial focus was on the high-end boat thefts occurring along the coast that we assessed at the time were being taken down to the Yucatan Peninsula. But that expanded over that four-year period into maritime theft of boats on trailers, thefts of other maritime equipment -- so your GPS units, items like that -- F-Series pickup trucks, because the groups were stealing trucks to then steal boats --

THE COURT: Ms. Klepach, the interpreters are requesting that the witness just slow down just a little bit. I would appreciate it.

Thank you, sir.

THE WITNESS: Okay. So a four-year-long theft working group. We expanded out and we basically became the clearinghouse for -- all information or reports of maritime theft activity came through the Coast Guard, through myself. We were able to assess those thefts to determine whether we thought it was a more organized theft or we thought it was a more localized theft, for the potential of finally making some

type of federal case on a bigger organization and not just kind of one-off thefts throughout the coast.

Q. What was your role within that working group?

A. I ran that working group.

Q. Okay. And how many different agencies were part of that working group?

A. It was well over 40.

Q. And how long did that go on?

A. It went on, I'd say, from 2016 till 2019. After I left, I think they continued on for maybe another six months before it kind of dissolved.

Q. Okay. Have you ever testified before?

A. Probably last time in trial was in 2008, approximately.

Q. And when you testified previously, were you qualified as an expert?

A. Yes, I was.

Q. Was that in state or federal court?

A. Federal court, Southern District of Florida, in Key West.

Q. Okay. What were you qualified as an expert in?

A. It was just boat characteristics and migrant smuggling.

Q. Have you ever been denied expert qualification?

A. No.

        MS. KLEPACH: Your Honor, at this time, the United States tenders the witness as an expert in migrant smuggling and boat characteristics.

MR. FEIGENBAUM:  No objection, Your Honor.

THE COURT:  All right, then.  Let's proceed.

BY MS. KLEPACH:

Q.  All right.  So you've talked a bit about this, but can you explain in more detail the general practices employed by boat smugglers who steal boats on the west coast of Florida.

A.  So like I mentioned before, because of the trend shift in the mid-2000s, historically, the organized migrant smuggling would occur between The Florida Keys and Cuba, which was only about a 90-mile gap at its closest approach.  At that point, they had access to boats from South Florida, and they didn't need to steal boats back then.  They just had plenty of boats to use.

Once they moved down to the Yucatan Peninsula, they no longer had access to all those boats they were using when they were operating out of The Florida Keys or Southwest Florida. So they resorted to stealing boats to bring them down there then to use to run that gap.

When I got down there in 2015, it was apparent to us that they were still stealing high-end boats from Southwest Florida and taking them down to the Yucatan Peninsula.  I would say on average two a month.

Q.  How did you know that they were taking the boats to the Yucatan Peninsula?

A.  So generally, we were getting information either from Coast

Guard aircraft that were patrolling the Gulf of Mexico or the Yucatan Channel, that were doing overflights over smuggling events. So they would ID boats that we would know to be stolen. We had patrol craft that were transiting north and south through that area that were running across them.

We were receiving information from foreign governments, the Mexican Government, and sometimes the Cuban Government, on smuggling ventures that we could correlate to theft activity --

THE COURT: And once again, if we can just slow down a little bit, sir.

THE WITNESS: Sorry.

THE COURT: Thank you.

THE WITNESS: And then we were also working with insurance agencies who were sending recovery agents down to Mexico to locate and sometimes recover the boats.

BY MS. KLEPACH:

Q. Did you often recover the boats?

A. We recovered a handful of them. Not too many of them, but some were recovered.

Q. How far is the journey from, let's say, Naples to Mexico?

A. Give or take, it's about a 400-mile transit down through the Gulf of Mexico into the Yucatan Channel. And that varies depending on whether you're going into the north coast of the Yucatan into Progreso or if you're going down to Cancun or Isla Mujeres.

MS. KLEPACH:  May I have the ELMO for just the witness, please.

BY MS. KLEPACH:

Q.   Agent Sanborn, I'm showing you what's been marked for identification as Government 106.  Do you recognize this?

A.   Yes, I do.  It's the Gulf of Mexico.

Q.   Is this a fair and accurate depiction of the Gulf of Mexico?

A.   Yes.

MS. KLEPACH:  At this time, the United States offers Exhibit 106 into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 106 received into evidence.)

MS. KLEPACH:  Okay.  So may we publish?

THE COURT:  You may.

MS. KLEPACH:  Thank you.

BY MS. KLEPACH:

Q.   So we were just talking about the variations in the possible journeys from the west coast of Florida to the Gulf Mexico.  Can you explain to the jury what you meant by drawing on the map and explaining the different routes that we could take from the west coast of Florida to the Gulf of Mexico.

A.   So generally, the thefts were occurring between Naples and

as far north as north of Tampa.  But most of the thefts were occurring in Collier or Lee County, so the counties to the south, near the Everglades.

They would -- once they stole the boat, which was usually on a boat lift or at the dock -- so these weren't boats that were on trailers in their backyard.  These boats were already with the water.  They would steal the boat, and they'd take it direct offshore and head straight down to Mexico, either that way or that way right there through the Straits.

Sometimes they would head out to the west a little bit more and then cut down.  And the reason they did that was to avoid the Key West area of operations, which was in here, where Key West had heavy patrol via air and sea for the migrant traffic coming up from Cuba.  So that was mostly raft at that time.  So they knew where those AOR lines were, and they would avoid that Key West AOR, cut out into the Gulf and then down to Mexico.

Q.  Okay.  What is an AOR?

A.  That's an area of responsibility.

Q.  All right.  So an area of responsibility for who?

A.  For the Coast Guard Sector in Key West.

Q.  Okay.  I'm just going to clear this.

So we were talking a little bit about the Yucatan Peninsula and the different places where the boats may end up.  Can you point to that on the map, please.

A.  Yeah.  So Progreso is on the north coast.  Cancun is right

there.  So either those two spots right there.  Sorry.

Q.  Thank you.

Okay.  So you mentioned that it was approximately a 400-mile journey from the west coast of Florida to the Yucatan Peninsula?

A.  Four hundred to 500 miles.  If you're coming from the north side near Tampa, it could be upwards of 500, but generally between four and 500 miles.

Q.  How long does a maritime journey like that take?

A.  Average speed, 30 knots, maybe anywhere between 13 to 16 hours.  So under a day.

Q.  Does the weather in that area vary?

A.  Yes.  So the weather in the Gulf of Mexico, especially off the Southwest Florida Coast is affected by low fronts that move down from kind of the west to the east.  And as they move down through the Gulf of Mexico, they turn up the water and they make it rough.

So when a low comes in, on the front of that low, you still have good weather.  But on the backside of that low, the wind picks up, the sea state picks up, and it becomes really choppy and rough out there.  So that was one of those factors that we saw the boat thefts -- thieves using is, they would steal a boat right on the edge of a weather front moving down through the area.  And that was so they could get out in front of it, still have good weather on the transit down, but on the back

16

end of that, because the weather was bad, it was less likely that Coast Guard patrols would be on the water.  And it was a way to avoid Coast Guard because it was less likely they'd encounter them, knowing that that weather front was down through and making it rough out there.

Q.  I'm going to ask you to slow down one more time.

A.  Sorry.

Q.  What kind of skill does somebody need to have to drive a boat from Naples to the Gulf of Mexico -- or through the Gulf of Mexico, rather?

A.  You need to be a well-trained mariner.  So unlike operating a boat near the coastline, where you have navigational aids, you can see where you're going, you have help, you're going out into open ocean where the weather can change immediately.  You have to navigate by electronics, so your GPS and your chart plotter.

It's just not something you undertake on a weekend.  You need to plan it out.  There's logistics involved with the fuel, everything else.  If you run into any problems out there, there's not a lot of help.  Again, that's a lightly patrolled area for the Coast Guard.  So if you were to have issues out there, help is not nearby for you.  So it's a dangerous journey to head down there.

Q.  Are there boats that can make it from Naples to Mexico without stopping for fuel?

A.   Yes.   Your larger yachts, anything 45-foot and up.   So your 50, 60-foot, 75-foot, you know, mega yachts have no problem making that journey.

Q.   What about the boats that you were seeing stolen during this time period?   Could they make it from Naples to Mexico without stopping for fuel?

A.   So early on, in probably 2016, 2017, the types of boats they were stealing were more than 30 feet in length, generally had three outboard engines on the back.   So three engines. They were an open design center console.   So that means you drive from the middle.   It has a very big open deck area.

The boats they were stealing -- Yellowfin was common -- those boats have a maximum range of 600 miles because they're built for deep offshore fishing, for like tuna and swordfish. So those boats are built to go deep offshore.   They have large fuel capacity, and they are built to run in open ocean.   And that's why they wanted those boats because you could fit a lot of people into that boat, up into the bow of that boat.   They were very conducive for smuggling.   And we had plenty of examples of that from the overflights down in the Yucatan Channel of them using those similar-type boats for smuggling events.

We did see, in 2018, a shift in that trend, where they started stealing smaller 28- to 32-foot higher end -- so EdgeWater and Grady-White are kind of a high-end boat.   They

usually had cabins.  So they no longer had an open deck.  They usually only had about two outboard engines, instead of three -- so less power -- and they had less internal fuel capacity.  So they had probably a maximum range of anywhere between two to 300 miles.

That being said, if it's a 400-mile journey, you need additional fuel to make that trip down there.  You can't do it on the internal fuel.  And those fuel assessments are made on perfect conditions, optimal weight -- so not having a lot of weight in your boat -- good weather conditions.  All those things factor into fuel efficiency on your way down.

Q.  Okay.  That's a lot of information.  Let's just break that down a little bit.  So we've heard a lot of different terms.  The first I think you mentioned are outboard engines.  What's an outboard engine?

A.  So generally, the types of engines you'll find on a boat are a full inboard, an inboard/outboard, and then an outboard engine.  A full inboard is when you have the engine inside the boat and the prop is attached to a shaft that comes through the bottom of the boat.  An inboard/outboard has the drive that hangs out the back of the boat.  And then an outboard engine, the entire engine assembly sits on the back of the boat.  So it's completely external to the boat itself.

Q.  So it is literally outboard of the boat?

A.  Yes.  And that's your -- generally, Yamaha, Suzuki,

Mercury, are your primary makers of the engines -- Evinrude.

Q.  You also mentioned a center console.

A.  Yes.

Q.  What is that?

A.  So again, that's just an -- it's an open-design boat.  So open deck space, no cabin.  So you can't go inside anywhere. And generally, you drive from the center of the boat, in the middle, and usually has a canopy T-top over the top of you.  So wide open boat.  You're driving from the middle, in a console, center console.

Q.  And is there any shelter on that boat, other than right over where the person would drive?

A.  There would be a small area, usually within the center console.  And usually these boat builders -- that's where they'll put the bathroom, in there.

Q.  We've also heard the names Yellowfin, EdgeWater, and Grady-White.  What are those?

A.  Those are boat manufacturers.

Q.  What, if anything, did you encounter with respect to the need for external fuel tanks in these boat thefts that you investigated?

A.  So again, a couple factors go into the boat theft when you're taking it all the way down to the Yucatan.  Generally, we assessed that the boat thieves didn't always know how much fuel was in the boat when they were stealing it.  I think most

people don't usually -- if you go out for the weekend, and you come back, you don't necessarily fuel your boat with three to 500 gallons of fuel, especially, you know, how expensive the prices are.  I think most people go out and they'll put as much fuel as they need just to go out for the weekend.

So the thieves would have to take that into consideration and sometimes bring enough fuel with them to make that journey, not knowing how much fuel is actually in the boat.

What we saw, and what was consistent, was they were using 15-gallon plastic fuel containers, usually either clear in color or blue.  They're usually re-purposed from like laundry detergent.  So they're not actually built for fuel.  They're actually not certified to have fuel in them.  But those are the types of containers they'd use.

They'd use those containers because one adult male could actually -- or adult -- could move those containers around by themselves.  And while you're underway, you could actually dead lift one and siphon the fuel into the boat.  So one individual could actually do that by themselves.

So if you went with something bigger, say a fuel bladder, you would have to bring a fuel pump with you and there's all those other issues.  So they prefer the 15-gallon fuel containers.

Generally, they bring -- what we saw was anywhere from 20 to 30 of these containers.  They'd bring them, load them onto

the boat either at the point of theft, a nearby property sometimes under construction -- sometimes we've seen where they'd meet another boat offshore and take that fuel on board, or we've even seen them pick up fuel from a full staff somewhere out at sea, say, tied to an Aids To Navigation or a tower.  We've seen that in the past as well.

But generally they'd load it at the point of theft and they'd leave with all the fuel they need, regardless of how much fuel is actually in the boat.

Q.   How did you know about this?

A.   So this was from -- either we would -- individuals would get arrested before they committed the theft, and we'd find the fuel there.  We've recovered fuel containers on, say, abandoned islands, like Cayo Costa, which is -- it's a national park where they'd stash fuel drums out there.

We've interdicted other vessels that, after a theft, we'd encounter them after coming in, and they were providing fuel logistic support.

Generally one, two days after the theft, we'd actually find empty fuel drums floating out in the ocean.  So that was indicative of a potential theft and a boat making that transit down.  Because once they fuel the boat, they toss the container over the side.

Q.   Did you investigate whether these boat thieves would physically alter the vessels in any way?

A.   Yes.  So with the higher-end boats being taken to the Yucatan, what we consistently saw was, once they got down there, they were altering the hull identification number, the name of the boat, and any other registration markings that could tie it back to the stolen boat record.

So your hull identification number is a number similar to a vehicle identification number on your car, like a VIN, that you see up on your windshield.  And a hull identification number is required by every boat manufacturer -- any boat manufactured after 1972 by the Coast Guard.

Every boat will have a primary hull identification number, what we refer to as a HIN, on the back transom of the boat, on the outer side of the boat, and then they'll also have a secondary HIN hidden inside somewhere inside the boat.

In addition, you'll sometimes have vessel names on the outside of the boat.  If it is Coast Guard documented, that's a requirement to have a name and hailing port on your boat.  Or if it's state registered, you'll have the registration numbers and a registration stickier on the exterior of the boat.

So they would remove and alter and usually put either bogus or cloned numbers back on that boat, and then they could register it in Mexico or anywhere else that boat went.

Q.   Are you familiar with how an individual would alter or create a fake HIN number?

A.   So generally, what we saw -- the good ones would find a

similar make, model, and year of that boat that existed somewhere in the United States, and they would take a variation or that entire HIN itself and they would put it on the stolen boat. So if anybody ran that boat, it wouldn't come back stolen, but the HIN looked like a legitimate HIN for that make, model, and year of the boat.

Q. How is that information accessible, HINs of boats that have not been stolen?

A. So generally, you can just go to a marina sometimes, and just go look at new boats, and they can get them that way. They can just walk down to the dock. They can find it in somebody's yard. Sometimes people, when they're selling their boats online, will list a HIN. Never a good idea, but they do. Or there are some open-source Internet databases that you can run boat registrations, say Coast Guard documented boats, which sometimes do provide the HIN of that vessel.

Q. Okay. And are there any features of a HIN that are specific to the boat's manufacturer?

A. So the HIN is made up of 12 total digits. The first three is going to be your MIC code, your manufacturer identification code. And that is specific to the manufacturer of the boat.

Usually, your last two digits in that HIN number is the year of manufacture. So generally you can look at a 12-digit HIN and immediately know it is this manufacturer and it was produced in this year.

All the numbers in between are a serial number and month and year of production. So they're a little bit more confusing to read. But generally, when we look at a HIN, at first glance, we're looking at: Does the manufacturer match the boat it's on and does the year match the year we're looking at, because hull designs do change over the years.

Q. Okay. So now let's talk more specifically about the boat theft trends that you saw between February 2018 until about December of 2019.

A. Okay. So we classified boat thefts in Southwest Florida -- and again, this is specific to Southwest Florida because boat thefts that occur, say, on the east coast of Florida are vastly different. There's different reasons to steal boats over there. But generally, the high-end boats that we were seeing coming off of your boat lifts and from the docks were going directly there.

We didn't have any information at the time that any of the thefts occurring over, say, in the Miami/Fort Lauderdale side were ending up in the Yucatan. Generally, those were going to the Bahamas or somewhere else in the Caribbean.

So we would classify -- every time we'd get a report of the theft, we'd look at it and say: "Does this meet the criteria for our Yucatan-bound boats or does it meet the criteria for what?" Like a second criteria we saw was boats being stolen on trailers, which is very common. So they'd go and they'd steal

a boat on a trailer, they'd tow it to a nearby area, they'd strip out the boat for all its components and parts, to include the outboard engines, and then they'd just dump the hull and trailer.  So the purpose of that theft was not actually the boat itself.  It was all the components that they could then resell.

It turns out, in 2018, we later determined that those thefts being perpetrated by land with trailers, they were stealing those outboard engines and they were actually exporting them through South Florida down to the Yucatan Peninsula.  So it turns out that same organization that was working down there stealing entire boats out of Southwest Florida had shifted -- even though they were still stealing some boats -- but they had shifted largely to stealing trailer boats in Florida, and then getting those outboard engines out of Florida either via ship -- commercial shipping or air freight through Miami International, and they were shipping them down to the Yucatan Peninsula.

The third kind of theft we'd look at would be a more localized theft.  It was generally your smaller boats that we knew couldn't make that transit out into open ocean, and they were likely perpetrated by someone locally.  Generally, we would recover those boats within a week or a month of the theft, usually locally or in a county nearby.  So just a more localized theft that we didn't attribute to a more organized

criminal enterprise.

THE COURT:  Ms. Klepach, if we can just ask the witness to slow down a little bit, please.  It would be helpful to the interpreters.

MS. KLEPACH:  Thank you.

THE WITNESS:  Additional trends that we can talk about -- I'm sorry.  Generally, they stole boats -- at least the ones going down to the Yucatan were primarily committed at night.  So the thefts would occur in the middle of the night.  That was to avoid law enforcement, it was to avoid being detected by the homeowners --

BY MS. KLEPACH:

Q.  I'm going to interrupt you again.  I'm sorry.  Please just slow down.

A.  Okay.  The nighttime thefts were -- the purpose was to avoid law enforcement and to avoid being detected by the homeowners or nearby neighbors.  Because generally, once they stole a boat in a canal, they had to transit out to open ocean, and you had to pass through a lot of heavily-populated areas.  So if they did that in the middle of the night, say, after ten o'clock, you know, but before sunrise, generally, they could go undetected at that time.

We also saw they wouldn't turn on the navigation lights.  So generally they like to steal boats during a full moon, where there was a lot of ambient light from the moon and you didn't

have to use a flashlight, or a spotlight, or anything else. They could generally see the area they were operating in.

They also like to operate during high tide. And that was to avoid running aground or hitting bottom on the way out.

We also saw indications of surveillance prior to the theft. So generally, we assessed that they were going out, identifying these potential boats up to two weeks before they would actually steal them. And we would pick up on that because local law enforcement would encounter these individuals out there either on the properties, on the boats, or nearby conducting surveillance in preparation for a theft, you know, days or weeks later.

Q. How did you know that the boats were being stolen at night?

A. So it was based on -- so after the report of theft -- unfortunately, a lot of these boats -- these high-end boats were stolen from homes that weren't -- they were kind of second homes to people that live up in New England, or Ohio, or something, and there was nobody living in it at the time. So generally, the thefts -- there was a delay in the reporting to us.

Sometimes we wouldn't get reports of these thefts days, if not weeks, after the theft actually occurred. And then working with state and local law enforcement, we'd go in there and review surveillance video from the point of theft from other residents. Sometimes they had a GPS tracking device installed

on board their boat. But because they'd never actually set it up when they'd purchased the boat, it didn't activate properly or it didn't give them the notifications that their boat had, in fact, been stolen. But we were able to go back and look at the track history on that, and we could see it going down to the Yucatan Peninsula.

Q. Okay. Did there come a time when you were contacted by Homeland Security Investigations and the FBI regarding your investigations in this area?

A. So in the Fall of 2019, we became aware that the FBI and HSI were working an investigation in the Yucatan Peninsula that we believed at the time was probably related to our investigation domestically in Southwest Florida. We had contacted them, spoke to them, and it turns out a lot of these same individuals that we were looking at, they were also looking at as well.

Q. How had you developed those targets on your end?

A. Generally through phone records, because we weren't making direct contact with anybody on the Mexico side. The individuals either stealing the boats or providing logistical support to the boat thieves generally were talking to people in Mexico, and that's how we were making those connections to Mexico, through phone records.

Q. So what was your involvement in this investigation after you were contacted by those agencies?

A.   So in late 2019, after we had gotten together with the Bureau and HSI on their investigation, they had reached out to me after a Southport boat had been seized by the Mexican Government in the Yucatan that had been completely stripped out -- so all of its identifiable markings had been removed from the boat, the HIN, the registration numbers, the names. Even the serial numbers on the engines had been removed.  So it was completely stripped.

And they had reached out to me -- and this boat had been interdicted with Mr. Hernandez on board -- and they had requested help in identifying the boat to find out if it had, in fact, been stolen from the US.

So they had sent me some photographs of the boat -- of the engines, the overall boat.  And based on those photographs and what we knew about the trends of boat thefts, we were able to go back and look at the days prior to that interdiction in the Yucatan, and I was able to locate a Southport boat.  And I'll tell you right now Southport boats are generally rare in South Florida.  In my 24 years in the Coast Guard, this is honestly my first time ever running across the manufacturer of Southport.  They're built up in Portland, Maine.  So it's just an unusual boat for South Florida.  So it had some very unique, distinct characteristics in its hull design.

So once we were able to find a Southport boat reported stolen out of Naples, Florida days -- I think it was reported

after -- two days after that.  It was a delayed theft.  But based on the statements from the owner, it was actually taken before it ended up in Yucatan.  So a delayed theft, but the owner just hadn't seen it for a while.

We were able to make that correlation.  I put FBI and HSI in contact with the Naples PD to coordinate with them directly on that Southport boat.

Q.   Okay.  And you said:  "Delayed theft."  What do you mean by that?

A.   It was delayed reporting.  I'm sorry.  So reporting by the owner.  So the owner didn't report it stolen until, I think, two days after I had been contacted by the FBI.  But in his report, he says the last time he saw it was two -- so there's a two-week time span of when it could have been stolen prior to that, and that fit within the window of what we were looking at.

Q.   All right.  Were you later provided travel records that pertained to Javier Hernandez?

A.   Yes.  So the FBI provided me with his travel records, which showed over a dozen inbound flights from Mexico into South Florida, with no outbound flights, which -- we've seen that before with boat thieves who were taking the boats to Mexico, because they'd steal the boat, drive it down to Mexico, obviously never check in with CBP, or check out through Customs, and then they'd fly back into the US.  So you'd have a

31

lot of inbounds, no outbounds, which was indicative of the type of activity we were looking at.

The ask by FBI was to try to take all those inbound flights and correlate them to boat thefts.  I was able to do that.  I was able to correlate 13 of his inbound flights to 13 potential thefts in Southwest Florida that fit within the date ranges of him flying back.  So usually generally within a week of him flying back was the time frame we were looking at boat thefts.  And like I said, think I correlated 13 of them total.

Q.  Okay.  And earlier we talked about some of the unique characteristics of the boat theft patterns that you investigated as -- with your involvement in that working group.  Can you talk about how the boat thefts that you correlated to Mr. Hernandez's travel fit or didn't fit into those patterns that you were seeing at that time.

A.  So like I had said earlier, in 2018, we saw a shift in the type of boats they were stealing.  They were no longer stealing your larger triple outboard center consoles that we assessed were conducive for migrant smuggling.  They were stealing higher-end smaller boats that we assessed at the time were not being used in migrant smuggling, but were actually just being sold.  So they'd bring them down to Mexico and sell them to somebody down there to make money.

So when -- and we had already assessed a handful of boats.  It was probably eight to 10 boat thefts that we saw a very

similar MO of:  They were all occurring, again, on the edge of those weather fronts we talked about, they were all occurring at night, they were taking them off boat lifts, and the way they are disabling the boat lifts.  They would somehow disable the boat lift and it would just automatically drop it into the water.  So what we were finding was that the boat lifts had been somehow lowered into water and the boat had been taken.  So that was consistent.

And then general -- the overall type of boats they were stealing, we thought at the time were all perpetrated by the same group or same individual.

So once the FBI had come to me with those travel records, and we started doing the correlating based on Mr. Hernandez's inbound flights, it matched up almost perfectly with the boat thefts that we had already assessed we believed were committed by the same group or individual.

Q.  Okay.

MS. KLEPACH:  Okay.  One moment.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.  Okay.  So we've talked a little bit about how you were able to correlate particular boat thefts with Mr. Hernandez's outbound flights.  Can you be a little bit more specific about thefts of particular vessels and how you were able -- or what you were able to correlate with those records.

A.   So generally, those thefts that were going down to the Yucatan were -- compared to the rest of the thefts in South Florida, were kind of rare.  Like I said, I think two a month on average.  Compared to the overall amount of thefts that were occurring in Florida at that time, it's not that many.

But the boats that were being stolen were very high-end boats, very expensive.  But there weren't that many to actually work with.  I mean, over that period of time, between 2016, 2018, I mean, you were probably only looking at two dozen boats total stolen in that fashion.  So it wasn't a large amount of boats for us to look at to correlate those travel records to, because we already had visibility.  And we actually had all of those boats set aside as potential -- potentially going to the Yucatan.  We already knew -- we knew a lot about all those thefts already.  So it was very easy for us to link up those travel records to those thefts because we had already done the legwork up to that point.

Q.   Okay.  So I want to talk about one boat that was reported stolen out of Marco Island called the *Mellow Yellow*.  Do you recall investigating that particular vessel theft?

A.   I do recall being notified of that theft.  As far as investigative work, we were mainly -- like I said, we received the information, we do an assessment on it, and then we provide that feedback back to the local detectives to actually work it, unless there was something we needed to go down there for.

But generally, I didn't physically go down to every theft. But I was well aware of every theft. But yes, I do recall that one.

Q. And do you recall whether or not you were able to correlate the timeline of the theft of the *Mellow Yellow* with Mr. Hernandez's travel records?

A. Yes. That theft did correlate with one of his inbound flights.

Q. Next, I want to talk about a boat that was reported stolen out of Naples that was called the *Ultimaytum*. Do you remember that boat or that investigation? And what, if anything, were you able to do with respect to correlating that vessel with Mr. Hernandez's travel records?

A. Same thing. Based on the time and date of the suspected theft, it correlated to his inbound travel. So again, we'd factor in the amount of time we believed from the point of theft to how long it would take to get down to the Yucatan. And then usually it was within days he would be flying back into the country.

Q. Next, I want to talk about a boat called the *Reel Estate*.

A. Yes.

Q. Do you recall that vessel?

A. I do.

Q. Where was that stolen out of?

A. I don't recall off the top of my head. It was going to be

off the Southwest Coast.  I don't recall exactly which county it came out of.

Q.  Do you recall compiling missing boat flyers as part of your investigation in this case?

A.  Yes.

Q.  Would reviewing that document refresh your memory --

A.  Absolutely.

Q.  -- as to where it was stolen from?

A.  Yes.

          MS. KLEPACH:  May I approach the witness?

          THE COURT:  You may.

     (Pause in proceedings.)

          THE WITNESS:  So this was taken out of Naples, Florida.

BY MS. KLEPACH:

Q.  Do you recall when it was taken?

A.  Again, I'd have to look at that.  I'm sorry.

Q.  That's okay.

     (Pause in proceedings.)

          THE WITNESS:  So again, this was taken in -- it says June 6th, 2019.  So June of '19.

BY MS. KLEPACH:

Q.  Okay.  And what, if anything, were you able to determine with respect to that vessel and its correlation with Mr. Hernandez's travel records?

36

A.   He had an inbound flight days after that boat was stolen.

Q.   All right.  And finally, I want to talk about the green vessel that was recovered in Mexico.

What, if anything, were you able to identify with regard to that vessel and its correlation to Mr. Hernandez's travel records?

A.   I don't recall if that vessel was part of that correlation to those flight records.  I don't believe I made a correlation.  Of those 13 correlated thefts to his travel records, I don't believe that one was included.

Q.   All right.

A.   I'm not sure if we just -- I'm not sure I did that correlation.

Q.   All right.  But again, can you remind us how it is that you were able to identify Mr. Hernandez as a potential target to this investigation.

A.   That information was provided to me from the FBI from the Mexican Government, that he was on scene with that boat when they stopped it.

Q.   All right.

A.   And it was on land, I believe, on a trailer, is where they interdicted it.

            MS. KLEPACH:  One moment.

      (Pause in proceedings.)

BY MS. KLEPACH:

Q.   Just a couple more questions about that green vessel.  You testified earlier that that vessel had been stripped of many of its identifying characteristics.

A.   Yes.

Q.   Given that, how were you able to trace this vessel back to a theft in Naples?

A.   So I believe the way -- so we initially looked at the hull design, and we couldn't necessarily -- just looking at the hull, we couldn't match it to any -- and again, I said it was a very unique boat.  So it wasn't a hull that I had seen before.  So I wasn't able to make an identification just visually by the hull design.

    Based on what we knew about the thefts in Southwest Florida, I was able to go back through NCIC records we have from reported stolen boats and find a stolen Southport, which then, once we looked at it -- what that boat was, we were able to make the distinction that, yes, it matches what they had down there.

Q.   Did you know that it was a Southport at the time that it was recovered?

A.   Initially, no.  And again, I had never seen a Southport before.  So it was the first time I had ever seen a boat of that manufacturer before.

Q.   Okay.  So what is it about the information that you

received or reviewed in NCIC that assisted you in making that connection?

A.   So once we received that -- once we saw that report, and it matched the area generally where the boats were being stolen, the time frame and the overall length was about right, we were able to take that HIN number, the hull identification number, pull the manufacturer identification code off that, and the year, and then you're basically able to Google year, length, and make of a boat and get a general depiction of what you're looking at.  And it matched up with that perfectly.

Q.   What is NCIC?

A.   National Criminal Information Center.  So it's the FBI's repository for all -- anything that's stolen gets put in NCIC as stolen.  Same with cars, boats, weapons.

MS. KLEPACH:  I have no further questions for this witness.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.   It's still:  "Good morning."

A.   Good morning.

Q.   Good morning, Mr. Sanborn.  Welcome to South Florida.

A.   Thank you.

Q.   You're living out in Houston, you said, now?

A.   Currently, yes.

Q. Very well.

How is it?

A. Hot.

Q. All right. Well, you were talking about travel records that correlated with Mr. Hernandez flying back from Yucatan, I guess, or Cancun?

A. Uh-huh.

Q. Cancun is in actually a different state, Quintana Roo, right?

A. Generally in the same area, yes.

Q. Yeah. It's the same area of the Yucatan Peninsula.

Just the fact that somebody went over in a boat, and then flew back because the boat was delivered there, doesn't mean that person stole the boat.

A. Not necessarily.

Q. All right. So I think you started off your testimony, among other things, talking about -- about 40 police agencies were working together to investigate boat thefts?

A. Yes.

Q. All right. And those would include State of Florida law enforcement agencies?

A. FDLE, yes. Correct.

Q. And also Naples Police Department?

A. Yes.

Q. Marco Island Police Department?

A.   Yes.

Q.   Collier County in general?

A.   Yes.

Q.   Okay.  And I believe you said the task force was operating between 2016 and 2019?

A.   Approximately, yes.

Q.   All right.  And I think you said early 2020 it stopped functioning?

A.   Late 2019, probably 2020.

Q.   Okay.  So you mentioned that some -- I think they're called marine air patrol planes.

A.   Yes.

Q.   And what other kind of information would you get that helped your investigations?

A.   So we would have the aircraft, or a C130 aircraft from the Coast Guard, that were flying down to support ships that were operating in the area.  So when we had Coast Guard ships either transiting through the Yucatan or physically patrolling that area, they would be supported by Coast Guard aircraft generally flying out of Clearwater, Florida.

Your C130s, they would go down.  They would do overflights over suspected smuggling boats, and they would provide that imagery back to us for analysis.

Q.   All right.  There weren't any marine patrol aircraft reports about Mr. Hernandez, correct?

A.   No.   And just a correction.   Generally, all those aircraft reports were -- they were targeting the migrant smuggling between the Yucatan and Cuba.   So they weren't patrolling in that general transit area for the boats being stolen out of South Florida down there.

Q.   Now, when you were talking about boats being stolen, the boats that you were investigating with your task force, they were being stolen from residences?

A.   Yes.

Q.   And those residences sometimes were second homes for wealthy people?

A.   Correct.

Q.   And wealthy people, they usually have pretty good surveillance cameras, right?

A.   Generally, yes.

      MS. KLEPACH:   Objection.   Speculation, lack of foundation.

      THE COURT:   If the witness knows.   Overruled.

BY MR. FEIGENBAUM:

Q.   And marinas where nice boats are kept, they have surveillance cameras?

A.   Most do.

Q.   Are marinas -- where people keep expensive boats, they don't have surveillance cameras?

A.   No, they do.   Most do.

42

Q.   Okay.  Hotels and -- hotels that have docks for their guests, they have good surveillance cameras?

A.   Yes.

Q.   Are you familiar with the Superseding Indictment that is what we're here about in this case?

A.   No.

Q.   You were asked about four boats that had names, *Mellow Yellow, Ultimaytum, Reel Estate,* and *Luca Brasi*?

A.   Yes.

Q.   Do you know whether Mr. Hernandez is charged with driving any of those boats to Mexico?

A.   I believe --

        MS. KLEPACH:  Objection.  Lack of foundation.  The witness has already said he didn't know.

        THE COURT:  Overruled.  If the witness knows, the witness may answer.

        THE WITNESS:  I believe they're included in the charges.

BY MR. FEIGENBAUM:

Q.   Okay.  If you had a chance to look at the Superseding Indictment, would that help you?

A.   Sure.

Q.   Okay.  Got to find it.  Let me see if I can -- do you have a copy handy?

        (Pause in proceedings.)

MR. FEIGENBAUM: Your Honor, in just one second, could I approach the witness to refresh his recollection?

THE COURT: Certainly.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q. Let me show you something, Mr. Sanborn.

So is that -- does that refresh your recollection of what the charging document is in this case?

A. Yes. All four boats are listed on here.

Q. Okay. So look after -- it says that a boat -- go with the first boat. I think was in December of 2018.

A. Okay.

Q. On the first of the four boats, it charges or alleges that Mr. Hernandez stole -- what was the first boat?

A. This would be the *Mellow Yellow*.

Q. Okay. Does it say after that that he transported it to Mexico?

MS. KLEPACH: Objection, Judge. He's asking the witness to read directly from the Indictment. This isn't in evidence.

THE COURT: Mr. Sanborn, does this refresh your recollection with regard to the facts of this case, sir?

THE WITNESS: Yes, that the boats are included --

THE COURT: All right. Overruled.

BY MR. FEIGENBAUM:

Q. Yeah. So it refreshes as to the allegations of four boats.
But my question is: Looking at the date of December-something 2018, with the first boat, does it say, apart from the allegation that Mr. Hernandez stole the boat along with somebody else, that he transported it to Mexico?

A. No. This specifically says that they took possession of a stolen boat.

Q. Does it say Mr. Hernandez transported it to Mexico?

A. It does not.

Q. Okay. Could you go to the next one. I believe it is June of 2019.

A. *Reel Estate.*

Q. Yes, sir. Allegation that Mr. Hernandez and someone else stole the boat, right?

A. Yes.

Q. Does it say Mr. Hernandez transported it to Mexico?

A. No.

Q. The next one's July 2019. What's the name of that boat?

A. *Ultimaytum*.

Q. It says: "Allegation." Mr. Hernandez stole that boat along with somebody else, right?

A. Yes.

Q. Does it say Mr. Hernandez drove that boat or transported it to Mexico?

A.   It does not.

Q.   Go to the last one.  That's the *Luca Brasi.*  That's November 2019.  There's an allegation that Mr. Hernandez and someone else stole the boat, right?

A.   (No verbal response.)

Q.   That one says an allegation that Mr. Hernandez -- transported I think is the word -- the boat to Mexico?

A.   Says transported, yes.

Q.   Okay.  So three out of the four allege that he stole the boat.  Doesn't allege that he transported it to Mexico.  That's only the last one; is that right?

A.   Correct.  In this Indictment, yes.

Q.   Okay.  I've looked at the evidence that the prosecutors gave during this case.  I didn't see any surveillance video of Mr. Hernandez being involved --

          MS. KLEPACH:  Objection.  Is this a question?

          THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Okay.  Did you review the evidence in this case as part of a team that investigated this case?

A.   All the evidence, no.

Q.   Okay.  Did you review video surveillance evidence?

A.   The only evidence I would have reviewed at the time of the theft was back in 2018, 2019, when I worked with those departments directly.  If it was available, we reviewed it.

Q.   Okay.  Do you recall any video evidence regarding those four boats?

A.   I don't recall off the top of my head.  I want to say one of them we had surveillance video of the boat transiting out, but we were not able to make an ID on it.

Q.   Okay, sir.  If somebody has a legal journey from Southwest Florida to Mexico -- people do that, right?  They drive their boats from Southwest Florida to -- they go to Cancun?

A.   Yes.

Q.   They go to Progreso?

A.   Yes.

Q.   Legitimate, legal, things to do?

A.   Yes.

Q.   If they leave their boat there, because they're going to spend a few months, but they want to come back to South Florida, they fly back?

A.   Yes.

Q.   There's no record of an outbound travel, but there is a return travel?

A.   There is.

Q.   You said that traveling on a boat -- a pleasure boat from Southwest Florida to Yucatan is a dangerous journey?

A.   It is, yes.

Q.   But you just said that people who have pleasure craft do make that journey to Yucatan.

A.   So generally the individuals that are making that journey are experienced mariners.  Most people that have larger boats actually contract licensed captains to transport their boat down there for them.

Q.   Now, you were talking about the Southport boat that was all stripped out completely.

A.   Yes.

Q.   Can you do a complete stripping of a boat within a few hours of arriving on a boat?

A.   You could, yes.

Q.   Just a couple of hours?

A.   Probably, yes.

Q.   What's involved in stripping a boat?

A.   Removing anything worth value.  So the engines, the electronics, rod holders, and then removing all the identifiable markings.  So that's your registration numbers, the name on the back, and grinding down the HIN number.

Q.   Yes, sir.

     And what I was referring to more was stripping the paint off of it.  The fiberglass -- it has a fiberglass hull, right?

A.   Uh-huh.

Q.   So if you want to strip out the color and strip out the outer layer of the fiberglass --

A.   That could take a while, yes.

Q.   That could take hours and hours?

A.   Possibly, yes.

Q.   Have you ever done it?

A.   Personally, no.

Q.   But you're aware how people do it?

A.   Yes.

Q.   How do you strip out all that fiberglass covering?

A.   With a sander or a sandblaster.

Q.   Okay.  And that's a multiple-hour process?

A.   Yes.

Q.   Okay.  So you were talking about this last boat --

MR. FEIGENBAUM:  If I'm using the microphone, is it okay to turn off this thing?

THE COURT:  Yes.  Of course.

MR. FEIGENBAUM:  Let me know.

BY MR. FEIGENBAUM:

Q.   Anyway, so you were talking about the last boat.  I think you said something like Mr. Hernandez was, you said, stopped -- or tell us that again about Mr. Hernandez and that last boat.

A.   The report I received from the FBI was that Mr. Hernandez was with the boat when it was stopped.

Q.   Where was it stopped?

A.   I don't know the exact location, just that it was in Mexico.

Q.   Okay.  So you don't really know?

A.   No.

Q.   Okay.  So if somebody is coming into Mexico from the US on a boat, they would show their passport at some kind of border control in Mexico?

A.   I'm not aware of the procedures in Mexico for customs.

Q.   Okay.  At least I gather from your testimony that the Naples police were investigating this theft of this fourth boat?

A.   Not yet, no.  They weren't aware of it immediately.

Q.   Okay.  But within what, a couple of days, you said the Naples police became aware that there was a boat that matched something that was stolen in Naples?

A.   If I recall, I got the report on the 22nd, the owner reported it stolen on the 24th, and I believe my query was completed on the 25th.

Q.   Okay.  Do you know when any FBI agents went down to Merida to work with the Mexican police there?

A.   Unaware.

Q.   All right.  And till what date did you work in Southwest Florida on these kinds of investigations?

A.   So I left in the Fall of 2019 of August time frame.

Q.   So the last boat was November of 2019.  You were no longer working Southwest Florida at that time?

A.   So the last one on here was July of 17.  I was there for that one.  So I was not in South Florida during the theft of the *Luca Brasi.*

Q.   All right.  But at least you can tell us that local law enforcement -- State of Florida law enforcement would be working with the FBI and would be made aware by the FBI of these kinds of investigations?

A.   I'm not sure of their relationship between the FBI and the FDLE.

Q.   Well, I mean, like Naples police.  In the case of the fourth boat, the Mexican police got in touch with the FBI, right?

A.   I put the FBI in contact with the Naples Police Department once we'd identified the potential theft.

Q.   The fourth boat?

A.   Yes.

Q.   But were you still working here at that time?

A.   No.  I was helping them from Seattle.

Q.   Okay.  So Naples knew about the theft within days -- or the boat from the theft within days of it being discovered in Mexico, right?

A.   Yes.

Q.   And did you learn that the Mexican police had taken down all the personal information from Mr. Hernandez?

A.   I don't know the details of the encounter in Mexico.

Q.   Do you know whether, to this day, the -- well, let's -- okay.  Let's start with to this day.  Do you know whether the Naples police, to this day, have ever contacted Mr. Hernandez?

A.  I have no idea.

Q.  Okay.  Do you know if the FBI ever contacted Mr. Hernandez after -- well, let me finish the question -- after the Mexican police said:  "We found this guy on this boat, which may turn out to be stolen," do you know if the FBI ever contacted Mr. Hernandez?

A.  I don't know.

Q.  Do you know if the Homeland Security Investigations group ever contacted Mr. Hernandez -- after he's in Mexico, the Mexican police say:  "We've got this guy who came on this boat. We think it's stolen," do you know if Homeland Security ever contacted Mr. Hernandez at least for the next few years?

A.  I do not.

MR. FEIGENBAUM:  I appreciate your time, sir.

THE WITNESS:  Thank you.

MR. FEIGENBAUM:  Tender the witness.

THE COURT:  All right.  Any redirect?

MS. KLEPACH:  Briefly.

THE COURT:  Certainly.

REDIRECT EXAMINATION

BY MS. KLEPACH:

Q.  All right.  Just a couple follow-up questions, sir.

You were asked about marine air patrol planes and whether those planes ever issued reports about Mr. Hernandez.  Do you remember that question?

A.   Yes.

Q.   Can you explain to the jury what a marine air patrol plane does.

A.   It patrols the area looking for -- and again, in that area of the Yucatan Channel, they were patrolling specifically for migrant smuggling.

Q.   Do they patrol for targets of investigations?

A.   They do sometimes, yes.

Q.   Okay.  Is it possible to see who is on a particular boat from a marine air patrol plane?

A.   Yes, if we can get close enough and we recognize who's on there, but not good enough to do anything like facial recognition or anything like that.

Q.   Okay.  You were also asked about surveillance cameras at marinas and at particular homes.

A.   Yes.

Q.   Do you know which of these homes, if any, had surveillance cameras?

A.   I do not have knowledge -- direct knowledge of that.

Q.   Do you know which, if any, marinas relevant to this case had surveillance cameras?

A.   No.

Q.   You were also asked about people who make lawful journeys from the west coast of Florida to Mexico.  Do those people check in generally with Customs and Border Protection when they

do that?

A. They do. It's actually required by Customs. And there's a couple different ways they can do that, either in person, over the phone, or via the ROAM app, which is an app on your phone that you can now check in and out of Customs.

Generally, most legitimate traffic transiting down to the Yucatan will actually make a stop in Key West on their way down, because it's the last place you can fuel before you make that transit down. It is also a port of entry. So you can also check in or check out with CBP there. You do see transits off the Southwest Florida coast, but it's usually your larger vessels making that run. But generally most of your legitimate traffic stops in Key West --

MR. FEIGENBAUM: Objection, Your Honor. Unresponsive to the question. And I would ask the question be repeated because I didn't understand it. There was a lot of answer that didn't deal with the question.

THE COURT: The objection is overruled. It appears to be responsive.

You're asking for the question to be repeated, so you can understand it?

MR. FEIGENBAUM: I would like to just be able to ask one follow-up as a recross. That's just one question --

THE COURT: At this point, the request is denied for a recross, and let's continue. The objection is overruled.

MS. KLEPACH:  Thank you.

BY MS. KLEPACH:

Q.  So what exactly is the requirement in terms of checking in with CBP?

A.  I'm not sure of the exact requirement.  I just know it is a requirement.

Q.  Okay.  Based on your review of the records in this case, were there -- did Mr. Hernandez check in with CBP prior to any of his inbound flights from Mexico?

A.  I'm not aware of any check-ins, no.

MS. KLEPACH:  One moment.

MR. FEIGENBAUM:  Judge, I renew my request for one recross.  The question is --

THE COURT:  All right.  And again, we are in the middle of redirect.  The request is denied.

Let's continue.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.  So let's go back to talking about the marine air patrol planes.  Were you first made aware of Mr. Hernandez as a target by the FBI?

A.  Yes.

Q.  Okay.  And so what, if any -- withdrawn.

Would there -- would marine and air patrol planes have been aware of Mr. Hernandez absent you informing them of him?

A.   No.

Q.   Okay.   And did you ever inform marine air patrol about Mr. Hernandez as a target?

A.   Generally, we do not inform the marine patrol of an individual.  We would inform them of a type of boat to look for, because they can't ID individuals from the air.  They can ID the vessel itself that we're looking for.

Q.   Okay.  Now I want to talk a little bit about the information that you received regarding what happened in Mexico.  Was that information that you received from the FBI?

A.   Yes.

Q.   Do you have any personal knowledge of the interactions between Mr. Hernandez and the Mexican law enforcement officials?

A.   No.

Q.   Do you have any direct personal knowledge about when or how those interactions took place between Mr. Hernandez and the Mexican law enforcement officials?

A.   No.

          MR. FEIGENBAUM:   Could I ...

BY MS. KLEPACH:

Q.   And with respect to *the Luca Brasi,* the vessel that was recovered in Mexico, do you have any direct personal knowledge about the condition of that boat?

A.   Other than the photographs provided to me by the FBI,

that's all I had to work with.

Q.  And do you know exactly when that boat was recovered by Mexican law enforcement?

A.  No.

MS. KLEPACH:  No further questions.

THE COURT:  All right.  The witness is excused.

Thank you.

MR. FEIGENBAUM:  No one recross?

THE COURT:  Does the Government have an objection to one question on a recross?

MR. DOBBINS:  Yes, Your Honor.  We don't believe there's a basis for it at this point.

THE COURT:  The Court agrees.

The witness is excused.

(Witness excused.)

THE COURT:  The Government's next witness, please.

MR. DOBBINS:  Your Honor, at this time, the Government would call to the stand Police Officer Mario Almanza Vasquez.

(Pause in proceedings.)

THE COURT:  Good afternoon.

All right, sir.  If you'll remain standing, raise your right hand to be placed under oath.

OFFICER MARIO ALMANZA VASQUEZ, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

THE COURT:  Go ahead and have a seat.

And Mr. Dobbins, let's just wait for Mr. Feigenbaum.

Sir, are we ready to proceed?

MR. DOBBINS: Judge, before we get started with this witness, it may be helpful just to approach the bench just for a brief moment to inform the Court of something.

THE COURT: All right. Come on forward.

(At sidebar on the record.)

THE COURT: There's a microphone for everyone.

MR. DOBBINS: Just wanted to let the Court know -- I informed Mr. Feigenbaum as well, but this witness is the police officer who arrested Mr. Hernandez in Mexico. And per the -- I believe it was the second motion in limine, which we had a -- sort of a stipulation this will be an encounter. But as I told Mr. Feigenbaum, it's going to be necessary -- and I've instructed him not to bring up the arrest for the drugs. But I think it would be necessary for me to lead him a little bit so that we can get to that point, so we avoid any conversation about that.

THE COURT: For that purpose, is there any objection?

MR. FEIGENBAUM: No.

THE COURT: Could you speak into the mic.

MR. FEIGENBAUM: No, I do not. And I appreciate Mr. Dobbins bringing that up. Depending on how the testimony goes, as I had put in my motion, I may actually reserve the right to talk about the other things that happened.

THE COURT:  To the extent on cross-examination that you open the door, then certainly.  I think what Mr. Dobbins, as I understand, is telling the Court is that he's attempting to adhere to the Court's ruling.

MR. FEIGENBAUM:  Yes.  And I was careful the way I did the motion to say that; depending on the circumstances.  And if I do -- if I open the door, I take the consequences of that.

THE COURT:  Of course.  All right.  Anything further?

MR. DOBBINS:  No, Your Honor.  Thank you for the time.

(End of discussion at sidebar.)

THE COURT:  All right.  I apologize for that, Ladies and Gentlemen of the Jury.

Do we need to take a recess?

Yes.  Of course.  Let's take a five-minute recess.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury not present, 12:21 p.m.)

THE COURT:  We have a lot of jurors and only two restrooms, so let's make it a 10-minute recess.  See you back here in 10 minutes.

MR. DOBBINS:  Thank you, Your Honor.

(Recess from 12:22 p.m. to 12:33 p.m.)

THE COURT:  All right.  Welcome back.

All right.  Both sides ready to proceed?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Then let's bring the jurors in.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 12:34 p.m.)

THE COURT:  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

MR. DOBBINS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Good afternoon, sir.

A.  (Through Interpreter.)  Good afternoon.

Q.  Sir, where are you currently employed?

A.  I work for the State Investigative Police in the area of Yucatan.

Q.  Okay.  And is that the State of Yucatan?

A.  Yes.

Q.  And how long have you been employed as a police officer for the Yucatan State Police?

A.  Approximately, seven years.

Q.  What is your current rank?

A.  I am a police officer first level.

Q.  And how long have you been a police officer first level?

A.   Approximately, seven years.

Q.   What are your current duties and responsibilities as a police officer first level?

A.   So depending on the -- so it all depends on the area in where I happen to be.  According to that area, then responsibilities and duties are assigned to me.

Q.   Okay.  And where are you currently assigned?

A.   So currently, I am assigned to the -- Agency Number 29. That's part of the Public Prosecutor's Office, and it has to do with young boys, girls, and victims.

Q.   Okay.  Were you working for the Yucatan State Police in 2000 -- in around November of 2019?

A.   Yes.  I was working for them.

Q.   And where were you assigned in or around November of 2019?

A.   So I was at a command center in Puerto de Progreso in Yucatan at the time.

Q.   Okay.  Prior to becoming a police officer first degree in the Yucatan State Police, did you have any other prior law enforcement?

A.   So before I worked for the Investigative Police Unit or division, I was assigned and worked for the Preventive Police and also in Yucatan.

Q.   And how long did you do that for?

A.   Approximately, 17 years.

Q.   Okay.  And when you say it's Preventive Police, what does

that mean?

A.   So the only thing we do is patrol in order to prevent crimes from occurring.

Q.   So when you were in the Preventive Police for the 17 years, were you in marked police cars?

A.   Yes.

Q.   And are you always wearing a uniform when you're on patrol?

A.   Yes.

Q.   All right.  You described your current position as a police officer first as being with the Investigative Police.  Can you describe -- what's the difference there between the Investigative Police and the Preventive Police?

A.   So as I mentioned to you, Preventive Police, the only thing we do is we patrol in our cars in order to prevent crimes from occurring.  And the Investigative Police, if we're doing that, then we are actually investigating crimes that could occur or that have occurred.

Q.   And when you're with the Investigative Police, are you traveling around in marked police cars?

A.   No.

Q.   Okay.  And when you're working for the Investigative Police, are you in uniform or in plainclothes?

A.   So we are dressed in plainclothes.  But if we have to have contact with any person, then we will wear the uniform so that that person knows that we're part of law enforcement.

62

Q.  And when you say:  "The uniform," what do you mean?

A.  So we will wear a certain vest, which has a badge and the badge says:  "PII," which stands for Investigative Police.  And we also wear a certain kind of cap, and that identifies us as working for the State Police.

Q.  And so that would be different than the uniform you're wearing here today; is that correct?

A.  Yes.  It is different.

Q.  And what kind of training have you gone through to become a police officer first in the Investigative Police Unit?

A.  So we have to take courses on investigative police techniques.  We also likewise have to go to an academy.

Q.  And how long is the academy training?

A.  So we have to go to the academy for approximately six months.  And then the courses that we have to take, each course lasts approximately two months.

Q.  Okay.  Do you receive ongoing training or are these courses continuously as you continue to work in the Investigative Police?

A.  Yes.  We do still continue to receive training.

Q.  And who leads the investigation -- well, let me ask this first:  You said you're a police first.  Is that like police officer in the first degree?

A.  Yes.  You could say it's a police in the first degree.

Q.  Are there any other levels of police officer within the

Investigative Police?

A.   Yes.   There are other levels.

Q.   And is police officer first the highest level of police officer in the Investigative Police?

A.   No.   There are levels that are higher than that level.

Q.   Okay.   Who directs investigations from the Investigative Police?  Are you -- well, let me ask the question.  Who directs the investigations for the Investigative Police?

A.   So the Public Prosecutor's Office is the entity that would direct the investigations, and then we have to go and investigate them.

Q.   So are you assigned cases to investigate on your own or do you just receive tasks with the -- from the Public Prosecutor's Office?

A.   So the Public Prosecutor's Office tells us whether or not a crime or something has been reported to them, and we take it from there.  Or if we receive word that something has happened, then we advise the Public Prosecutor's Office, and then after that it gets investigated.

Q.   Okay.   I'd like to direct your attention at this time to November 21st, 2019, at approximately 12:30 in the morning. Were you working for the Yucatan State Police Investigative Police on that date and time?

A.   Yes.   I was working then.

Q.   And where were you stationed on that date and time?

A.   I was at the -- I was at the Progreso base.

Q.   And is Progreso an area that's near the town of Merida in Mexico?

A.   Yes.

Q.   Did there come a time on November 21st, 2019, at around 12:30 a.m., that you were directed to go to the area of Calle 29 by 142nd and 142nd A of Colonia Nueva Yucalpeten in Progreso?

         MR. DOBBINS:   That's spelled U-C -- I'm sorry. Y-U-C-A-L-P-E-T-E-N.

         THE WITNESS:   Yes.   I was told about that, and I was directed to go to that area because an anonymous report --

BY MR. DOBBINS:

Q.   Let's stop there, and just -- were you directed -- the question was:   Were you just directed to go there, sir?

A.   Okay.

Q.   Were you directed to go there, sir?

A.   Yes.

Q.   And did you -- were you traveling alone or with a partner?

A.   I had a partner with me.   Well, actually, there were two partners with me.

Q.   Were you-all in the same vehicle or in separate vehicles?

A.   We were all in the same vehicle.

Q.   Okay.   And was this an unmarked vehicle?

A.   Yes.   It was not marked.

Q. Okay. And were you wearing plainclothes, but wearing things to identify you as police, as you described earlier?

A. Yes.

Q. And did you encounter an individual named Javier Hernandez at that location, on that early-morning hours of November 19th of -- I'm sorry -- November 21st of 2019.

A. Yes.

Q. Okay. And did you talk to this individual named Javier Hernandez on that early morning?

A. Yes.

Q. Okay. Did you ask him his name and where he was from?

A. Yes.

Q. Okay. And what did he tell you?

A. He told me he was Cuban American and he had come from Miami.

Q. Okay. Did you ask him for any paperwork at that time to show or to prove who he was?

A. Yes. Because since he told me that he was from another country, which is not Mexico, we have to verify his identity.

Q. And what did he provide you with?

A. The only thing he showed me was a driver's license.

Q. When you encountered Javier Hernandez, was he near a vehicle of some sort?

A. Yes.

Q. What kind of vehicle?

A.   It was a -- could be either a pickup truck Infiniti, white in color, QX80.

Q.   Okay.

THE INTERPRETER:  The interpreter would just like to note that the word that the witness has used could be something besides a pickup truck.  It could be something else.  He would have to clarify, but ...

BY MR. DOBBINS:

Q.   Okay.  If we could clarify.  Was it a pickup truck or some other type of vehicle?

A.   Yeah.  So in Mexico when we say:  "Camioneta," we're referring to a car that has four doors and the back is closed.

THE INTERPRETER:  So it could be like a van.  Perhaps that's what the witness is referring to.

BY MR. DOBBINS:

Q.   Okay.  So when you say that Javier Hernandez provided you with the -- this ID, do you recall what kind of ID it was?

A.   No.  I don't recall.

Q.   Okay.  Did he provide you with a passport or any other documentation that would show that he was legally within the Mexico -- in Mexico?

A.   No.  He did not show me any document.

Q.   Did you ask him to show you any documents that proved that he was legally present in Mexico?

A.   Yes.

Q.  And what did he tell you in response to that?

A.  That he had no document.

Q.  Did he tell you how he had arrived in Mexico?

A.  Yes.

Q.  What did he say?

A.  So he told me that he had come to Mexico from Miami.  He had come to Mexico on a yacht.  The yacht was green in color.

I asked him if he had registration for the yacht, and he said no.

Q.  What else did he tell you about the green yacht and what he had done with it?

A.  He told me that he had left the yacht at a marina, a marina called Akumal.  And the only thing he mentioned that it was left there with a person by the name of Neco.

Q.  All right.  When he was standing by the Infiniti QX80, was the driver's side door open or closed?

A.  Open.

Q.  Okay.  And where was Mr. Hernandez standing in relation to the QX80?

A.  So he was standing right at the side of the driver's side, on that door, and he was just about to get into the car.

Q.  Okay.  Now, do you know -- are you aware of what kind of documents somebody would need if they are entering Mexico, whether it be a flight or via boat?

A.  Yes.

68

Q.   And what kind of documents, or approvals, or paperwork would somebody need if they were coming to your country via a flight or boat?

A.   So they would need to have a passport, and on the passport they would have to have some kind of a stamp from the National Institute of Migration.

Q.   Okay.  And again, when you asked Mr. Hernandez for that, was he able to provide that?

A.   No.

Q.   Did he tell you whether or not he even had that paperwork?

A.   No.  He didn't say anything.  He didn't mention that he had them.

Q.   Okay.  Did you search Mr. Hernandez and/or the QX80 at that time?

A.   Yes.

Q.   And did you find any communication devices in the QX80?

A.   Yes.

Q.   What did you find?

A.   Well, I found two cellular telephones.

Q.   What kind of cellular phones?  Do you recall?

A.   No.

Q.   Is there something that would refresh your recollection?

A.   Well, if I could see them, perhaps I could remember them.

Q.   Did you write any reports about this incident, sir?

A.   Yes.  We do have an authenticated police report.

Q.   And if I showed you the report, would that refresh your memory as to the communications devices you recovered?

A.   Yes.

MR. DOBBINS:  Your Honor, may I approach?

THE COURT:  You may.

MR. DOBBINS:  And Your Honor, while he's reviewing the report, I know you said you wanted to stop around one.  So if you want to let me know when we should stop ...

THE COURT:  I think we're going to need a little bit more time with this witness.  So would this be a good time for us to break for lunch?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  All right.  Then Ladies and Gentlemen, as you can see, it's five minutes after one.  Why don't we go ahead and take our one-hour recess.  I'll see you back here at 2:05.  Have a pleasant lunch.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury not present, 1:04 p.m.)

THE COURT:  Before we recess, Officer Almanza Vasquez, let me remind you you are testifying at this time.  So during the one-hour recess for lunch, you're not to discuss your anticipated testimony, the testimony of any individual, or any aspect of the case.  And I'll see you back here at 2:05.

Is there anything further we need to address?

MR. DOBBINS:  Nothing from the Government, Your Honor.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Okay.  Have a pleasant lunch.

I'll see you back here at 2:05.

THE WITNESS:  Okay Your Honor.

(Recess from 1:05 p.m. to 2:06 p.m.)

THE COURT:  All right.  Welcome back.

Let me acknowledge the presence of the Defendant.

Go ahead and have a seat.

Let's see if we have all of our jurors.

I hope everyone had a nice lunch.

(Pause in proceedings.)

COURT SECURITY OFFICER:  They're all here, Judge.

THE COURT:  Oh, wonderful.

All right.  Both sides ready to proceed?

MR. DOBBINS:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right, then.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 2:08 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

I trust that you had a pleasant lunch and ready to get back to work.

And we will continue.

MR. DOBBINS:  Thank you, Your Honor.

BY MR. DOBBINS:

Q.  Officer Almanza Vasquez, when we left off, you were reviewing your report to see if it would refresh your memory as to the types of communications devices you found in that QX80.

A.  Yes.

Q.  And having reviewed that report, did that refresh your memory as to what types of devices you found?

A.  Yes.

Q.  All right.  Let me come and just --

MR. DOBBINS:  May I approach, Your Honor?

THE COURT:  Yes, you may.

BY MR. DOBBINS:

Q.  Okay.  Officer Almanza Vasquez, what type of communications devices did you recover from that QX80?

A.  I found satellite communication devices, as well as cell phones.

Q.  And what did you do with the satellite cell phones and the -- I'm sorry -- the satellite phones and the cell phones that you seized from that QX80?

A.  They are placed under the authority of the Legal Investigative Police.

72

MR. DOBBINS:  I'm sorry.  Just so we can -- could you just repeat his last answer, just in case somebody couldn't hear you.

THE INTERPRETER:  "They are placed under the authority of the Legal Investigative Police."

BY MR. DOBBINS:

Q.  And what does that mean?  Do you take the phone somewhere specific?

A.  Yes.

Q.  Where do you take them?

A.  To the facilities of the Public Safety Secretary of the State of Yucatan.

Q.  And when you do that, do you do any searches of the phone?

A.  No.  I cannot search them.

Q.  And why can you not search them?

A.  Because in order to search a phone, I need the authorization from a judge because there might be personal communications in it.

Q.  Okay.  So the satellite cell phone -- satellite phone and the cell phones that you recovered, did you take them to the Ministry of Public Safety?

A.  Yes.

Q.  And did you document those -- did you document anything about those phones in your report?

A.  Yes.  I did document something on my report.

Q.   And what kind of information would you have documented when you turned -- on your report, when you turned these phones in to the Ministry of Public Safety?

A.   You write down the model, the type, the color, and the email, if it has it.

MR. DOBBINS:  Okay.  Your Honor, may I approach?

THE COURT:  You may.

MR. DOBBINS:  Turning on the mobile microphone.

BY MR. DOBBINS:

Q.   Officer Almanza Vasquez, showing you what's been marked as Government's Exhibit 3.  Do you recognize that item?

A.   Yes.

Q.   Okay.  And if it would help, you can remove the item from the bag, sir.

A.   Yes.

Q.   And what is that that you're holding in your hand?

A.   It's a cell phone.

Q.   Okay.  And is that the -- one of the cellular telephones you seized from the QX80 when you had the encounter with Javier Hernandez?

A.   Yes.

Q.   And how do you know that that's one of the phones that you seized from the QX80 with Javier Hernandez?

A.   Because of its characteristics.

Q.   And is there also a serial number or IMEI number on the

back of that phone?

A.   Yes.   It does have a serial number.

Q.   And did you compare that serial number from that item in your hand, the phone in your hand, to the one that you recorded in your report prior to coming to testify today?

A.   Well, it's a serial number, but I would have to check if it's the same serial number that's on the report.

Q.   Okay.   Did you look at that prior to coming to testify this afternoon or about -- did you check that phone against your report?

A.   Yes.   The number is looked at and it's documented in the report.

Q.   Okay.   So is it fair to say that that's one of the phones that you recovered from Javier Hernandez and the -- in the QX80 on November 21st of 2019?

A.   Yes.

     MR. DOBBINS:  Your Honor, at this time, I'd move Government's Exhibit 3 into evidence.

     THE COURT:  Is there any objection?

     MR. FEIGENBAUM:  No, Your Honor.

     THE COURT:  Without objection, admitted into evidence.

   (Government's Exhibit 3 received into evidence.)

     MR. DOBBINS:  And if I may approach to take the phone back.

     THE COURT:  Yes.  Of course.

75

MR. DOBBINS:  And if I may use the ELMO to just publish something about Government's Exhibit 3.

Okay.  I'm going to zoom out a little bit.

BY MR. DOBBINS:

Q.  Okay.  Showing you again Government's Exhibit 3 in evidence.  What is this we're looking at, for the record?

A.  A cell phone.

Q.  And taking off the back cover, which has a piece of tape on it.

There we go.

UNIDENTIFIED JUROR:  This screen is not working.

THE COURT:  Oh.  It's not working?

All right.  Are you able -- let me call IT.  And are you able to look at the other screen?

Do you mind?  Josue, let's call.

COURT SECURITY OFFICER:  It's up now.

THE COURT:  All right.  Thank you.

So is everyone's screen working?

Perfect.  Perfect.

All right.

BY MR. DOBBINS:

Q.  All right.  Officer Almanza Vasquez, I've removed the back cover and I've zoomed in on this white sticker on the back of the Samsung phone.  Do you see where it says:  "IMEI" on that sticker?

A.   Yes.  I can see it.

Q.   All right.  And could you read the IMEI number into the record, please.

A.   On the record?

Q.   Yes.  Just state it for the Members of the Jury, please.

A.   Okay.  353322/09/022638/3.

Q.   Thank you.

Now, once you took Government's Exhibit 3 into -- to turn it in to the Ministry of Public Safety, did you have anything to do with that phone ever again?

A.   No.  Once I take it there, my job is done.

Q.   Do you have any experience in searching -- or using equipment to search cellular phones?

A.   I don't understand the question.

Q.   If -- you talked about how you need an order from the judge before you can search a cell phone.

A.   Oh, yes.  I do not have knowledge regarding that.

Q.   Okay.  So -- but what I'm asking, sir, is:  Have you ever -- if you received an order from a judge to search a cell phone, would you do it yourself or are there other investigative police officers that would do the search of the phone?

A.   We have specialized people that do that kind of work if there is an order from the judge.

Q.   Okay.  And you're not one of those specialized people; is

that correct?

A.  Correct.

Q.  All right.  Let's talk a little bit more about Javier Hernandez.  Since this took place in November of 2019, do you remember exactly what Javier Hernandez looks like?

A.  No.

Q.  Okay.  Did you write down a description of Javier Hernandez when you wrote your report, though?

A.  Yes.

Q.  And do you recall what that description was?

A.  Yes.

Q.  Please tell the jury.

A.  According to the report we received, he was a person that wasn't tall, light-skinned color, gray hair, approximately 46 to 50 years old.

Q.  Anything about the individual's build?

A.  Stocky.

Q.  Okay.  And at that time, did you also escort Mr. Hernandez with you when you took those cell phones from the QX80?

A.  If I escorted him?

Q.  Did you take him somewhere with you?

A.  (No verbal response.)

Q.  Never mind.  I'll withdraw the question.

Let me ask this:  What else did you find inside the QX80 when you searched it?

78

A.   As I mentioned before, satellite communication devices, a notebook that had in it a driver's license type B, and an ID from Miami that I believe said:  "Global Entry."

Q.   Okay.  And that was in a -- in a notebook of some sort, did you say?

A.   Yes.

        MR. DOBBINS:  One moment, Your Honor.

        THE COURT:  Certainly.

    (Pause in proceedings.)

BY MR. DOBBINS:

Q.   Officer Almanza Vasquez, you stated that Mr. Hernandez told you that he had arrived on a green yacht.  Do you recall giving that answer?

A.   Yes.

Q.   So what did that mean to you?  What kind of vessel?

A.   Well, for me, a yacht is a recreational boat.

Q.   Okay.  I'm just asking because we talked about how there was a different word where it could mean pickup truck or van. So I wanted to make sure we clarified as to if it meant like a humongous boat or just a recreational boat?

A.   It's a recreational boat.  It's not small, but it's not huge either.

Q.   Okay.

        MR. DOBBINS:  No further questions, Your Honor.

        THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.   Good afternoon, Mr. Almanza.

A.   Good afternoon.

Q.   Welcome to Miami.

A.   Thank you.

Q.   Have you been here before?

A.   No.  This is the first time.

Q.   How do you like it?

A.   Well, I haven't had a chance to travel or to visit.

Q.   When you're talking about the events today that you're talking about, those were November 21st, November 22nd, 2019?

A.   The 21st.

Q.   Of November 2019?

A.   Yes.

Q.   And at that time, was the head of the Yucatan police force Luis Felipe Saiden Ojeda?

A.   Yes.

Q.   And he was the head of the Secretario de Seguridad de Yucatan?

A.   Yes.

Q.   The highest ranking police officer in Yucatan?

A.   Yes.

Q.   And he had been in that post for four different terms?

A.   Yes.

Q.   And is he still the head of the Yucatan police?

A.   Yes.  He still is.

Q.   So you said that you first encountered Javier Hernandez on the street?

A.   Yes.

Q.   So he was not stopped in a boat by the police?

A.   No.

Q.   And he was not near any boat when you confronted him?

A.   No.

Q.   But because he said he came on a boat, you immediately went to the marina to try to find the boat?

A.   No.  I did not take that action.

Q.   Did somebody in your police department go to the marina soon thereafter to see if it was there?

A.   It's my understanding that there was an operation in the area close to the marina, but I did not participate in it.

Q.   So would they be from your group of police officers that you worked with who went to the marina?

A.   As I said before, I know that there was an operation there that -- in which I did not participate, so I do not know about it.

Q.   Did you ever talk to any -- did you know any of the officers who went to the marina?

A.   By name or by sight, yes.

Q.   Did you ever talk to them about what they did at the

marina?

MR. DOBBINS: Objection. Calls for hearsay.

THE COURT: It calls for a yes or no response.

Overruled.

THE WITNESS: No. Because I didn't know about an operation taking place there.

BY MR. FEIGENBAUM:

Q. So you said that when you encountered Javier Hernandez that you asked for identification, correct?

A. Yes.

Q. And that he had a driver's license?

A. I asked him for an ID that would confirm his legal status in the country, which he did not show me.

Q. So you're saying he didn't have a passport?

A. He did not show it to me.

Q. Well, you searched the car that he was -- that you claim he was found next to, right?

A. Yes.

Q. And you found what's called a Global Entry Card.

A. Yes.

Q. Do you know what a Global Entry is?

A. At that time, I didn't know what that card was about.

Q. It's some kind of an American identification card?

A. It had something about Miami, so I believe so.

Q. Now, as a police officer in Yucatan for seven years, you've

82

probably seen American passports before.

A.   Yes.

Q.   Okay.   So if I showed you a copy of an American passport,
it might help -- help you be able to say whether it's an
American passport, right?

A.   Probably, yes.

Q.   Okay.   One moment.

     (Pause in proceedings.)

          MR. DOBBINS:   I'm the AUSA doing this examination,
sir.

          MR. FEIGENBAUM:   May I approach the witness, Your
Honor?

          THE COURT:   You may.

BY MR. FEIGENBAUM:

Q.   Officer Almanza, I'm going to show you what's been marked
for identification as Defense Exhibit Z, like Zeta.
Take a moment to look at that, please.

A.   Ready.

Q.   Looks like an American passport, correct?

A.   Yes.

Q.   And whose passport is that?

A.   It's under the name of Javier Hernandez.

          MR. FEIGENBAUM:   May I approach?

          THE COURT:   You may.

BY MR. FEIGENBAUM:

Q.   Would you look at that page of the passport and see if there's a Mexican entry stamp for November 20, 2019?

MR. DOBBINS:  Your Honor, I'd object to this.  The exhibit is not actually admitted into evidence.

THE COURT:  No.  It's not in evidence.

MR. DOBBINS:  And the attorney is --

THE COURT:  The objection is sustained.

BY MR. FEIGENBAUM:

Q.   Okay.  All right.  So -- okay -- I guess I can't ask any more about that.  Thank you.

Let me get to the next question.

You were telling the prosecutor that you found some communication equipment when you encountered Mr. Hernandez.

A.   Yes.

Q.   And the prosecutor showed you a cell phone, you identified it, and it became Government Exhibit 3, correct?

A.   Correct.

Q.   And you said you looked in the car and found a satellite phone?

A.   It wasn't one.  This were several.

Q.   Where are they?

A.   As I said, my job gets up to the legal department of the Ministry, and then they take charge.  So I do not know where they are.

Q. Well, how come you got the cell phone, but not the other phones?

A. Well, those cell phones, in truth, I didn't bring them.

Q. Did you bring any files with you when you came to this trial?

A. I only have the police report that was written down on that day.

Q. It's like six pages of writing?

A. Yes, approximately.

Q. And that's it. You didn't bring anything else?

A. No. I did not bring anything else.

Q. Didn't bring any photographs?

A. No.

Q. You don't have a photo of Javier Hernandez standing by that car, then, do you?

A. No.

Q. Did you give Javier Hernandez a property receipt for anything you took from him?

A. In Mexico, you provide a receipt when you are going to return their belongings. In this case, since they were going to be kept under the authority of the legal department, there was no receipt issued.

Q. No what issued?

THE INTERPRETER: No receipt issued.

BY MR. FEIGENBAUM:

Q. Okay. Now, the prosecutor asked you about preserving cell phone evidence, correct?

MR. DOBBINS: Objection. That was not asked.

THE COURT: Sustained. Rephrase.

BY MR. FEIGENBAUM:

Q. Okay. The prosecutor asked you if you did anything to the phone, and you said no, correct?

A. The prosecutor asked me if I had searched the phone, and I said no.

Q. Did anybody else do anything with the phone?

A. No. Because I was the responsible person until I turned the phone over to the legal department.

Q. Officer Almanza, you -- your job is to enforce the laws of Yucatan, correct?

A. That's correct.

Q. And those include criminal laws?

A. Yes. That's correct.

Q. And to enforce the criminal laws of Yucatan, you have to enforce the laws that are in the Yucatan Penal Code?

A. Yes. That is correct.

MR. FEIGENBAUM: One moment, Your Honor.

THE COURT: Certainly.

(Pause in proceedings.)

MR. FEIGENBAUM: May I approach, Your Honor?

THE COURT: You may.

BY MR. FEIGENBAUM:

Q. Officer Almanza, take a look at that document that's been placed in front of you marked for identification as Defense Exhibit K, I believe, and let me know if you recognize it.

MR. DOBBINS: Your Honor, I apologize, but the exhibit I was shown was marked, I believe, J, not K. So I just want to --

MR. FEIGENBAUM: Yes. I apologize. I should have looked. It's J.

MR. DOBBINS: I wanted to make sure it was the same document.

THE COURT: All right. So it's Exhibit J and not K.

MR. DOBBINS: Just maybe double-check, Mr. Feigenbaum, please.

MR. FEIGENBAUM: It is J.

Thank you.

THE COURT: All right.

THE WITNESS: And what would the attorney like me to do?

BY MR. FEIGENBAUM:

Q. I just want to know if you recognize the Yucatan State Penal Code.

A. You only want me to look at this first page, Counsel?

Q. You can look at all 380-some pages if you would like.

THE COURT: Is that what you want the witness to do for this time?

MR. FEIGENBAUM: Well, I think it's my only time I'll have.

THE COURT: No. I understand. In terms of looking at all the pages, because I think that's what he's doing.

MR. FEIGENBAUM: He can look. Your Honor, there's an index that has all the different chapters.

THE COURT: Perhaps we could maybe narrow the question with regard to his recognizing it.

MR. FEIGENBAUM: Yes.

BY MR. FEIGENBAUM:

Q. Does that appear to be the Yucatan State Penal Code?

A. Yes.

Q. Now, when you came here to testify, did you have any preparation with the prosecution in this case?

A. No.

(Pause in proceedings.)

MR. FEIGENBAUM: I'm just checking to see if I have anything else, Your Honor.

THE COURT: Certainly.

MR. FEIGENBAUM: I believe that's it. And I thank you, Officer Almanza, for coming today.

THE WITNESS: Thank you.

MR. DOBBINS: Redirect, Your Honor?

THE COURT:  Certainly.

REDIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Officer Almanza Vasquez, you were asked by Mr. Feigenbaum if you had done any prior preparation with the prosecutor on this case.  Do you recall that question?

A.  Yes.

Q.  Okay.  And you answered that you had not met for preparation with the prosecutor.  You recall that?

A.  Yes.

Q.  All right, sir.  But we met last night to talk to you about -- about your testimony here today and also to go over your report with you; isn't that correct, sir?

A.  Yes.

Q.  And we -- we also showed you the phone last night and again this morning, so you could check the serial number; isn't that correct, sir?

A.  Yes.

Q.  And in addition to that, didn't we also, several weeks ago, have a Zoom call where we again talked to you about your upcoming testimony and what was in your report?

A.  Yes.

Q.  Let's -- you still have Defense Exhibit J up there with you?  Do you still have Defense Exhibit J?

A.  Yes.

Q.  Is that -- is that a penal code from -- the Yucatan Penal Code from this year or from another year?

A.  Well, I would have to verify once more.  But according to to what I'm seeing, it's this year, because it says 28th of June of 2023.  That means it's this year.

Q.  Thank you.

Let me go ahead and take that back from you.

THE COURT:  You may.

MR. DOBBINS:  If I may approach again, Your Honor.

THE COURT:  You may.

BY MR. DOBBINS:

Q.  Mr. Feigenbaum asked you about the document in that photocopy.  Do you recall that line of questioning -- in Government -- sorry -- Defense Exhibit Z?

A.  Yes.  I remember the questions.

Q.  And looking at that document in Defense Exhibit Z, is today the first day that you have ever seen that?

A.  Yes.  This is the first time that I'm seeing it.

Q.  Back on November 21st of 2019, did Javier Hernandez provide you with that document?

A.  No.

Q.  And you testified that you searched that QX80, correct?

A.  Yes.

Q.  Did you find a passport for Javier Hernandez anywhere in that QX80?

A.   No.

Q.   Did you also search the person of Javier Hernandez?

A.   Yes.

Q.   And did that include his pockets?

A.   Well, it's a superficial search.  But just by touching the person, you're able to sense if there's things in the pockets.

Q.   Did you find a passport for Javier Hernandez when you did a search of his person?

A.   No.

Q.   And in fact, when you asked for that documentation from Javier Hernandez, he told you he didn't have it on him at that time; isn't that correct, sir?

        MR. FEIGENBAUM:  Objection.  Leading.

        THE COURT:  Sustained.

BY MR. DOBBINS:

Q.   What did Mr. Hernandez tell you when you asked for that documentation that showed he was legally in Mexico?

A.   That he didn't have any.

Q.   All right.  You were asked about the number of satellite phones that you seized from that QX80, along with Government's Exhibit 3.  Do you recall that line of questioning?

A.   Yes.

Q.   Did you bring Government's Exhibit 3 here to the United States with you when you came here to testify?

A.   No.

Q.  Do you know what happened to Government's Exhibit 3 and those satellite phones after you logged them in to the legal department?

A.  No.  I don't know.

Q.  Now, sir, you were asked on cross about recovering that Global Entry Card in the name of Javier Hernandez.  Do you recall that line of questioning?

A.  Yes.

Q.  Now, can you describe that.  Was that an actual card, or was it a photocopy, or was it something else?

A.  So it was like a credential, a plastic credential.  And on it, it said:  "Miami," as well as "Global E."  Well, the thing is, I don't know how to pronounce it right, but ...

Q.  Okay.  And based on your knowledge and training and experience, is that the same thing as a passport?

A.  No.  It's not the same thing.

Q.  And does that plastic card provide someone like Mr. Hernandez, who's not a citizen of Mexico, permission to be in Mexico?

A.  No.

MR. DOBBINS:  Your Honor, before I ask my next question, I think it might a good idea just to approach the bench.

THE COURT:  All right.  Come on forward.

(At sidebar on the record.)

MR. DOBBINS:  Judge, do you want me to hold this?

THE COURT:  Yeah.  You have to speak into it.

MR. DOBBINS:  Judge, I think Mr. Feigenbaum has opened the door here.  He's had him try to ID the Yucatan Code.  He's asked him questions about:  "Isn't it your responsibility to enforce the laws of the Yucatan Code?"  And my fear is that after this witness is gone he's later going to use that to argue that his client was not breaking any laws when he was encountered by the police.

I believe he's opened the door by going down that road and -- I mean, I don't know if he ever intends to introduce the actual 337 pages of the Yucatan Code.  But I believe he's setting it up so that he can argue to the jury that his client was legally in Mexico, doing nothing wrong, when he was encountered which Officer Almanza Vasquez.  And I think that's going to present a misrepresentation to the jury.  And I think so therefore he's opened the door, and I think I should be allowed to ask him now about the fact that Mr. Hernandez was arrested.

THE COURT:  Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes.  Do it.

THE COURT:  All right.  So there is no objection, and the Defendant acknowledges that by showing the witness Defendant's Exhibit J, the Yucatan State Penal Code, that that did open the door for purposes of any redirect?

MR. FEIGENBAUM:  No.  That's not the reason why I showed him the code.  The Government has other witnesses that it noticed that it's bringing, and the Code may be relevant for that purpose.  But based on the testimony of the witness, I think you've opened the door.

THE COURT:  Well, the question is whether the Defendant has opened the door to allow, on redirect, questioning with regard to Mr. Hernandez's arrest.

MR. FEIGENBAUM:  Only -- I can only agree to that if I could get some recross because that would be a new area that he's going into.

MR. DOBBINS:  I'm fine with that, as long as I can -- just so we're clear, it's going to be that he was arrested for dealing marijuana.  I mean, that's why he was arrested.

MR. FEIGENBAUM:  And Your Honor, respectfully, I would be allowed to recross on that?

THE COURT:  So there is no objection to, on redirect, Mr. Dobbins asking the witness with regard to the arrest and the basis of the arrest?

MR. FEIGENBAUM:  If I can recross on that issue.

THE COURT:  All right.  With the understanding that there would be an opportunity to recross, then I think it would be appropriate based on the Defendant's acknowledgment.

MR. FEIGENBAUM:  Yes.

MR. DOBBINS:  Does Your Honor wish me to just ask the

question and allow the recross and then maybe I'd get a redirect on that?  I just want to --

THE COURT:  We're not going to go back and forth. Let's see what the recross bears out.  And if there's something brought up on recross that would allow a re-redirect, then I'll consider it at the appropriate time.

MR. DOBBINS:  So I'll finish my redirect now, and not leave any questions for afterwards.  It would only be if something is brought up during his recross --

THE COURT:  All right.  Without any objection by the Defendant, you may inquire.

MR. DOBBINS:  Thank you, Your Honor.

(End of discussion at sidebar.)

BY MR. DOBBINS:

Q.  Officer Almanza Vasquez, when we talked about your upcoming testimony last night, did we talk about things that maybe you shouldn't be talking about unless you're directly asked?

A.  Okay.

Q.  Did we talk about that?

A.  Oh.  Yes.

Q.  Well, now I'm directly asking you, sir:  On the night of November -- I'm sorry -- the early-morning hours of November 21st, 2019, did you arrest Javier Hernandez?

A.  No.  What's your question?  What do you mean?

Q.  Sir, instead of this being an encounter, did you actually

arrest Mr. Hernandez on November 21st of 2019?

A.   Well, yes.  Yes.

Q.   And what did you arrest Mr. Hernandez for?

A.   Well, for the reason that he did not have a document that showed that he could be in the country legally, and he can be processed for that.

Q.   Was there also something else that he was doing that was what drew you out there that night in the first place?

A.   Yes.

Q.   And what was he doing that he was also arrested for?

A.   Well, according to a report that we had received, there were some people who were in the area who were under suspicion because there was some kind of drug activity going on.

Q.   And did you recover any drugs from either Mr. Hernandez or near his person when you approached him?

A.   Yes.

Q.   What kind of drugs did you recover?

A.   Marijuana.

Q.   And is that in violation of the Yucatan Penal Code, sir?

A.   Yes.

Q.   All right.  You were asked by Mr. Feigenbaum if Mr. Hernandez was stopped in a boat.  Do you recall that question?

A.   Yes.

Q.   And what was your answer?

A.   That -- no.

Q.   And you were also asked by Mr. Feigenbaum if Mr. Hernandez was even near a boat when you stopped him and later arrested him.  Do you recall that line of questioning?

A.   Yes.

Q.   And what was your answer?

A.   No.

Q.   And although Mr. Hernandez wasn't arrested on or near a boat, did he tell you about a boat when you stopped him and asked him questions?

A.   Yes.

Q.   And what did he tell you about a boat?  What did Mr. Hernandez tell you about a boat?

A.   That he had arrived in Mexico on a yacht, which was green in color.

Q.   Anything else?

A.   And that -- yes.  That -- yes, and that the boat didn't have registration, that he had left it in a marina, Akumal, in Progreso, and in the hands of a person called Neco.

Q.   So he told you the boat didn't have registration, and it was a green vessel, and he had left it at the Akumal dock in the hands of Neco?

A.   Yes.

          MR. DOBBINS:  One moment.

     (Pause in proceedings.)

BY MR. DOBBINS:

Q.   Did Mr. Hernandez tell you about when he arrived in Mexico into Progreso on that green vessel?

A.   No.  He didn't mention that.

        MR. DOBBINS:  Thank you, Your Honor.

        No further questions.

        THE COURT:  All right.  I'll permit a recross.

                    RECROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.   Good afternoon again, Officer Almanza.

A.   Good afternoon.

Q.   So the questions that the prosecutor just asked you about -- you said that Mr. Hernandez was arrested for marijuana.

A.   Well, in Mexico, having marijuana is considered an administrative sanction.  And also, if there is no document that can verify your legal status in the country, you have to process.

Q.   Okay.  So you have certain police procedures that you follow, like all police agencies follow, correct?

        MR. DOBBINS:  Objection as to form.  "All police agencies."

        THE COURT:  Rephrase.  Sustained.

BY MR. FEIGENBAUM:

Q.   Does Yucatan Police Agency have procedures for crime scenes

and arrests?

A.   Yes.

Q.   And one of the procedures would be to take photographs of the crime scene?

A.   Well, it depends.  Because one thing is an administrative offense and another one is a crime.

Q.   Okay.  But you arrested -- did you arrest Mr. Hernandez for a crime?

A.   Well, having a certain amount of marijuana may constitute an administrative offense, not a crime.

Q.   So there was no laboratory report done?

A.   I don't know.  Because, as I said before, my job is to give it to the legal department, and from then on I don't know.

Q.   Now, you mentioned somebody named Neco, correct?

A.   Yes.

Q.   That is Mario Alberto Enrique Lopez, correct?

A.   If I'm not mistaken, on my report, that name appears as such.

Q.   And you also mentioned the Marina Akumal.  A-K-U-M-A-L.

A.   Yes.

Q.   Mr. Lopez has a marina there that you have seen before?

MR. DOBBINS:  Your Honor, I'd object.  This is outside the scope of what was permitted in the recross.

THE COURT:  Sustained.

MR. FEIGENBAUM:  Okay.  Thank you very much, sir.

THE WITNESS:  You're welcome.

THE COURT:  All right.  Thank you.

Is the Officer excused?

MR. DOBBINS:  Yes, Your Honor.  Just one moment.

(Pause in proceedings.)

MR. DOBBINS:  Yes, Your Honor.  The witness is excused.  Thank you.

THE COURT:  As well, Mr. Feigenbaum, is the witness excused?

MR. FEIGENBAUM:  Yes.

THE COURT:  Thank you.

Thank you, sir.  You are excused.

(Witness excused.)

THE COURT:  And the Government's next witness, please.

MR. DOBBINS:  Yes, Your Honor.  The Government would call to the stand Police Officer -- Yucatan State Police Officer Juan Mendoza Moo.

THE WITNESS:  Your Honor, the witness would like to thank you and the jury for their attention.

THE COURT:  Thank you, sir.  Thank you, sir.

You are excused.

MR. FEIGENBAUM:  Your Honor, I had one matter I wanted to bring up sidebar.

THE COURT:  Yes.  Certainly.

Come on forward.

(At sidebar on the record.)

MR. FEIGENBAUM:  Judge, thank you.  It's very brief.

Since there's multiple witnesses that came here all together, I forgot to ask the Court and ask Mr. Dobbins if -- the witnesses should not discuss their testimony with witnesses who are pending to come in.

THE COURT:  I did -- the Rule was invoked.  So have you instructed your witnesses?

MR. DOBBINS:  We have.  We have an FBI agent who is our witness wrangler, for lack of a better term.  She's outside.  She takes the witness that testifies to a separate area, which is our grand jury rooms on the seventh floor. During lunch, we sequestered Officer Almanza Vasquez in a separate room, and they also know not to discuss their testimony even prior to coming in here.

MR. FEIGENBAUM:  Terrific.  Much appreciated.

THE COURT:  All right.

(End of discussion at sidebar.)

THE COURT:  All right.  Thank you for your patience, Ladies and Gentlemen.

Everyone is good?

All right, then.

UNIDENTIFIED JUROR:  I'm sorry.  Could we take a quick five-minute recess for a bathroom break?

THE COURT:  Oh.  All right, then.  Let's go ahead and

take a 10-minute recess.

UNIDENTIFIED JUROR:  Sorry.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 3:18 p.m.)

THE COURT:  All right.  We're on a 10-minute recess.

(Recess from 3:19 p.m. to 3:35 p.m.)

THE COURT:  All right.  Welcome back.

Let me acknowledge the presence of the Defendant.

Do we have -- is everybody ready to go?

Wonderful.

All right.  Both sides ready to continue?

MR. DOBBINS:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes.

THE COURT:  Let's bring the jury in.

(Before the Jury, 3:35 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone, except for the witness. If you'll remain standing, raise your right hand to be placed under oath.

OFFICER JUAN MENDOZA, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Could you please state your name and also spell it for the record.

THE WITNESS:  Juan Mendoza.

J-U-A-N M-E-N-D-O Z-A.

COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Good afternoon, Officer Mendoza.

A.  (Through Interpreter.)  Good afternoon.

Q.  Would you mind telling the jury where you're currently employed.

A.  I work for the State Investigative Police of the Department of Public Safety in the State of Yucatan, Mexico.

Q.  And what is your current rank, sir?

A.  Police third rank.

Q.  And how long have you been working for the police in the -- the State police in Yucatan?

A.  Five years.

Q.  And during that time, has it always been with the Yucatan State Police or did you have any other prior law enforcement experience?

A.  The State police.

Q.  And what are your duties and responsibilities as a police officer with the Yucatan State Police?

A.  Performing investigations, protect and serve the citizens.

Q.  And what -- where are you currently assigned?

A.  DC, the Central Intelligence Office.

Q.  Okay.  Prior to your time in the Central Intelligence

Office, specifically around the time of November of 2019, where were you assigned?

A.   Crimes against health and drug trafficking.

Q.   Okay.  When you say:  "Crimes against health," what kind of cases would you be working on?

A.   Drug sales.

Q.   Okay.  And what area of Yucatan State were you assigned or based out of?

A.   Merida, Yucatan, but we can be all over the state.

Q.   Okay.  Does that include the area of Progreso in Mexico?

A.   Yes.

Q.   And what kind of training did you receive to become a police officer?

A.   I went through the police academy.  And during the academy, I took different courses.

Q.   And do you have ongoing training or ongoing courses that you take, even though you've since left the academy?

A.   Yes.

Q.   I'd like to direct your attention at this time to approximately November 22nd, 2019.  In the early-morning hours, approximately one a.m., 1:30 a.m., were you working for the Yucatan State Police on that date and time?

A.   Yes.

Q.   And what were -- what was your assignment on that night or early morning?

A.   Surveillance and patrolling in the area of Yucalpeten.

Q.   And is Yucalpeten near Progreso?

A.   It's the same.  It's a neighborhood.

Q.   Okay.  Is Progreso a town or is it more like an area near Merida?

A.   It's a small city close to Merida.

Q.   Okay.  And so Yucalpeten is a neighborhood within the City of Progreso?

A.   Yes.

Q.   Okay.  Did you receive any information on that date and time to go and do any kind of investigation?

A.   We were patrolling the area because there has been a high number of stolen vessels and engines.

Q.   Okay.  So the area of Progreso, it's near Merida, but is it on the water?  Is it there on the water in Yucatan?

A.   It is a port.

Q.   Okay.  And are there also marinas and other docks that are located there?

A.   Yes.

Q.   Okay.  So what did you see when you were out there on patrol at that time on November 22nd of 2022 -- I'm sorry -- 2019?

A.   We saw a vehicle coming out, a blue pickup, that was transporting a green boat.  And the towing -- the boat towing did not have license plates.

Q.   Okay.  What was -- how was -- well, what kind of vehicle -- you said it was a blue pickup truck.  Do you recall what the make or model was?

A.   It's a Sierra GMC.

Q.   And you said it was towing a boat.  How was the boat being towed?

A.   The blue van was towing it.

Q.   Was the boat on something that the truck was towing?

A.   Yes.  It was on top of the platform of the tow.

Q.   And what was it that didn't have a license plate that you noticed?

A.   The towing boat or the towing vehicle.

Q.   Okay.  And where did you see the GMC Sierra leaving from?

A.   From a marina by the name of Akumal.

Q.   So what did you do when you saw this truck pulling the boat without a license plate?

A.   I got along the truck with the police lights on, and I stopped it, and I marked -- and I signaled for a stop -- for it to stop.

Q.   And as a person who conducts investigations for the Yucatan State Police, were you in uniform or in plainclothes that night?

A.   We were driving a unmarked car without any marks.  Our clothing was civilian, but we were using a vest and a hat that had the police badge on it.

Q.   And were you in a marked car or in an unmarked car?

A.   Unmarked.

Q.   So when you say you activated your lights, how did you do that?  Is the unmarked car equipped with any special equipment?

A.   The lights.  The police lights.

Q.   Were you alone or were you with a partner?

A.   With a partner.

Q.   And who was your partner?  What was your partner's name?

A.   Marcos Homa Balam.

Q.   Okay.  Did the GMC Sierra respond to your activation of your police lights?

A.   Yes.

Q.   What happened?

A.   It stopped.

Q.   Okay.

A.   We also stopped.  We got out of it and we approached the person that was driving.

Q.   Were you armed?

A.   Yes.

Q.   What kind of weapons did you have on you?

A.   A pistol.

Q.   Where did you go when you got out of the vehicle and approached the truck?

A.   On the driver's side.

Q.   Were you able to see how many people were inside the truck?

A.  One person.

Q.  Did you ask the driver of the vehicle to do anything?

A.  When we stopped, we explained that we were stopping it because they didn't have any license plate, but he was very aggressive and very upset.  It was explained to him that because of the license plate -- but he grabbed my colleague from the shirt and he hit him with a knee on his intimate parts.

Q.  Okay.  And this is -- your colleague is Officer Marcos -- Homa Balam, correct?

A.  Yes.

Q.  Did you go over to assist your partner in subduing this individual?

A.  Yes.

Q.  Were you able to get this individual under control?

A.  Yes.

Q.  All right.  Did you later learn this individual's name?

A.  Yes.  That's right.

Q.  And what was his name?

A.  Mario Alberto Enriquez [sic] Lopez.

Q.  Do you know if that individual has a nickname?

A.  No.

Q.  After you were able to get Mr. Enriquez Lopez under control, what did you do next?

A.  We requested to search him, to search his person.  Later

108

on, we were going to search the car and the boat.

Q. All right. And did you handcuff or restrain Mr. Enriquez Lopez at that time?

A. We had not handcuffed him yet.

Q. And why not?

A. Because he had calmed down somehow -- somewhat.

Q. Okay. And so did he provide you with consent to search the truck and the vessel?

A. Yes. Yes.

Q. Okay. What did you find when you searched the truck?

A. In the truck, we did not find anything.

Q. Before we get into what you found in the vessel, did you notice anything about the vessel that seemed unusual to you?

A. Well, mainly that it didn't have the proper documentation for the boat.

Q. When you say: "It didn't have the proper documentation," what do you mean? Did Mr. Enriquez Lopez not have the proper documentation or was there something on the boat that you were looking for?

A. To start, because -- before getting on it, it was just the documents.

Q. Okay. Did you ask Mr. Enriquez Lopez whose boat that was?

A. He told me it was his.

Q. Did you ask Mr. Enriquez Lopez for any documentation or paperwork for the boat?

A.   That's correct.  And he mentioned he did not have any.

Q.   What kind of paperwork were you asking him to provide you with?

A.   In that case, it would be -- in that case, it could be either the invoice for the boat or any kind of document that would be on his name to show that the boat was his.

Q.   So some sort of proof of ownership; is that correct?

A.   That's correct.

Q.   So at that point, did you also search the vessel?

A.   That's correct.  We searched the boat.

Q.   Okay.  One moment.

(Pause in proceedings.)

MR. DOBBINS:  Your Honor, may we have just a brief sidebar?

THE COURT:  All right.  Come on forward.

(At sidebar on the record.)

THE COURT:  Okay.  Let's proceed.  Perhaps you can ask Mr. Feigenbaum -- yes.

MR. DOBBINS:  So Judge, we are going to ask the witness that -- basically they search the vessel and they find some firearms on the vessel.  This is significant because when the FBI and HSI interviewed the Defendant, he also admitted to bringing over firearms to Neco on these boats.  And so it corroborates his confession to the agents as well that they found these firearms on this boat.

MR. FEIGENBAUM: Okay. Judge, for Mr. Dobbins, he made that proffer just now that he was going to ask that question. When you look at the report, the FBI extensive report of Javier Hernandez's interview -- and Ms. Klepach just showed me. She says it's on top of Page 4 -- that is not what the report says.

THE COURT: May I see it?

MR. FEIGENBAUM: Yes.

THE COURT: What does it exactly say?

MR. FEIGENBAUM: Could you show the Judge as you showed me the report top of Page 4.

THE COURT: "Hernandez stated he made at least $200,000 in cash." Okay. He stated: "Took Hernandez's hunting rifle and took it to Mexico."

A hunting rifle. All right. And did they find a hunting rifle?

MR. DOBBINS: They found several rifles on that boat.

THE COURT: A hunting rifle with a silencer?

MR. DOBBINS: I don't believe there was a silencer.

THE COURT: All right. So what is it that you're asking the Court at sidebar?

MR. FEIGENBAUM: He's saying that he wants this officer to say that on the boat that allegedly my client took to Mexico they found rifles or guns, but that's not what the report of the officer says. It says: "Hernandez stated Neco

took Hernandez's hunting rifle and took it to Mexico."  So Neco was the person who took it, I guess, on the flight from Miami to -- not on this boat.

THE COURT:  So what is it that you're seeking to do, Mr. Dobbins?  We have a jury waiting.

MR. DOBBINS:  Yeah.  We'll just withdraw.  We won't ask --

THE COURT:  All right.  Let's continue.

MR. DOBBINS:  We'll just avoid that issue.

(End of discussion at sidebar.)

THE COURT:  Thank you for your patience, Ladies and Gentlemen.

Let's continue.

(Pause in proceedings.)

BY MR. DOBBINS:

Q.  All right.  Officer Mendoza, what happened to Mr. Enriquez Lopez at that time?  Was he arrested or did you let him go?

A.  We arrested him.

Q.  And what did you arrest him for?

A.  Because of damages caused to my colleague.

Q.  Okay.

A.  For the harm caused to him.

Q.  And what happened to the blue GMC Sierra truck?

A.  It was transferred to the police lock -- lot.  The police lot.

Q.   Is that a place where seized vehicles or abandoned vehicles are taken to be held by the police?

A.   Yes.

MR. FEIGENBAUM:  Your Honor, could -- I didn't hear what the answer was to the question why Mr. Lopez was arrested.

MR. DOBBINS:  I'll ask again.

BY MR. DOBBINS:

Q.   Again, could you just state why Mr. Enriquez Lopez was arrested?

A.   It was because of the harm, or damage, or injuries caused to my colleague.

Q.   Okay.  So when he kneed Officer Homa Balam, that's why he was arrested?

A.   That's correct.

Q.   All right.  And what did you do with the vessel on the trailer?

A.   It stayed in the building or in the lot of the police department, the Department of Public Security.

MR. DOBBINS:  Okay.  Your Honor, if I may just have the ELMO just for the witness stand only, please.

THE COURT:  Certainly.

BY MR. DOBBINS:

Q.   All right.  I'm showing you Government's Exhibit 2 for identification.  Can you see that okay?

A.   Yes.

Q.  Do you recognize that photograph?

A.  Yes.

Q.  Who is that in the photograph?

A.  Mr. Enriquez Lopez, but in this photograph he looks younger or he is younger.

Q.  Okay.  So did he appear a little older when you arrested him back on November 22nd of 2019?

A.  Yes.

Q.  But other than that, is it a fair and accurate picture of Mr. Enriquez Lopez?

A.  Yes.

        MR. DOBBINS:  Your Honor, at this time, the Government would move Government's Exhibit 2 into evidence.

        MR. FEIGENBAUM:  No objection.

        THE COURT:  All right.  It is admitted into evidence.

    (Government's Exhibit 2 received into evidence.)

        MR. DOBBINS:  And Your Honor, if we may publish for the jury.

        THE COURT:  You may.

BY MR. DOBBINS:

Q.  Officer Mendoza, could you just again tell us who we're looking at in this photograph.

A.  Mr. Mario Alberto Enriquez Lopez.

        MR. DOBBINS:  And Your Honor, if I may approach.

        THE COURT:  You may.

BY MR. DOBBINS:

Q.   Sir, I'm showing you what's been marked as Government Exhibit 60.  Do you recognize that series of photographs?

A.   So this was the vessel that was being towed by that blue pickup truck.

Q.   And is that a fair and accurate depiction -- or are those photos a fair and accurate depiction of the vessel that you stopped that was being towed behind the blue pickup truck on November 22nd of 2019?

A.   Yes.

        MR. DOBBINS:  Your Honor, at this time, the Government would move Government's Exhibit 60 into evidence.

        THE COURT:  Any objection?

        MR. FEIGENBAUM:  No objection.

        THE COURT:  Admitted into evidence.

   (Government's Exhibit 60 received into evidence.)

        MR. DOBBINS:  If I may approach, just to retrieve the exhibits.

        THE COURT:  You may.

   (Pause in proceedings.)

BY MR. DOBBINS:

Q.   I'm just going to show you the first three photographs. And what is this we're looking at here in the first photograph of Government's Exhibit 60?

A.   So that was the vessel that we stopped that was with that

blue pickup truck.

Q.   Okay.  And again, what marina or dock was this blue pickup truck pulling the boat out of?

A.   It was called Marina Akumal.

Q.   Do you know how to spell that?

A.   A-K-U-M-A-L.

Q.   All right.  Showing you the second picture of Government's Exhibit 60.

What part of the boat are we looking at there, sir?

A.   It's the side of the boat.

Q.   Okay.  And the third picture in Government's Exhibit 60.

A.   It's the back of the very same boat.

Q.   Okay.  Now, going back to those first two pictures, when you stopped the boat -- or when you stopped the truck that was towing the boat, did you notice anything unusual about the boat itself?

A.   Yes.  So as you can appreciate, the color of the boat looks like it's been sandpapered.  So we could suppose that it's because it's going to be painted over.

Q.   Okay.  And what color is the boat that you saw here in these photos?

A.   It's green.

        MR. DOBBINS:  One moment, Your Honor.

    (Pause in proceedings.)

        MR. DOBBINS:  No further questions, Your Honor.  And

we'll tender the witness.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon, Officer Mendoza.

A.  Good afternoon.

Q.  Welcome to Miami.

A.  Thank you.

Q.  Have you ever been here before?

A.  No.

Q.  All right.  So in preparation for your testimony today, did you have any meetings with the prosecutors or agents on this case?

A.  Yes.

Q.  Okay.  When and how many times?

A.  Two times.

Q.  Okay.  And when was the last time?

A.  Today.

Q.  Okay.  Thank you.

I believe you mentioned to the prosecutor that you came upon a GMC truck towing a boat on a trailer about one a.m.?

A.  Well, it was a little bit after one, one o'clock.

Q.  How much after one o'clock in the morning?

A.  Between 30 and 40 minutes after.  I don't remember the exact time.

Q.   Okay.   Thank you.

And there were two other officers with you?

A.   No.   Only one.

Q.   Oh, that was Officer Marcos Homa Balam?

A.   It was Homa.   H-O-M-A.

Q.   And the person you learned was driving the truck with the boat on a trailer was Mario Alberto Enrique Lopez?

A.   Yes.   It's Enriquez Lopez.

Q.   All right.   And is Mr. Lopez the owner of the Marina Akumal?

A.   Well, that's something I could not tell you.

Q.   But you stopped the truck and the trailer at the Marina Akumal?

A.   No.   Exiting.   It was outside of the marina.

Q.   Leaving the marina?

A.   Yes.   They had already left the marina.

Q.   How many feet outside the marina did you stop the truck?

A.   Eighty to 100 meters.

Q.   Okay.   Did you take any photos of the truck and the trailer at the time this incident happened?

A.   Yes.

MR. FEIGENBAUM:   One moment.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   I'm going to show you what is -- Government's Exhibit 60, I

believe it is --

MR. FEIGENBAUM:  Sixty?

MR. DOBBINS:  Yes.  That's correct.

BY MR. FEIGENBAUM:

Q.  -- in evidence.  You didn't take that photo?

A.  No.

Q.  Because that photo's in the daytime.

A.  Uh-huh.

Q.  And I'm going to show you another exhibit or another page

of Exhibit 60, Government.  You didn't take that photo?

A.  No.

Q.  Do you have your photos that you took?

A.  No.

Q.  Who took those photos?

A.  I wouldn't be able to tell you who it was.

(Pause in proceedings.)

MR. FEIGENBAUM:  I have nothing else, Your Honor.

Thank you, sir.

THE COURT:  All right.  Any redirect?

MR. DOBBINS:  Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Officer Mendoza, you were asked if you knew who took these

photographs.  Do you recall that line of questioning?

A.  Yes.

119

Q. All right. And what was your answer?

A. I don't know who did.

Q. Do you recognize that area where the boat is and the trailer are located in those photographs?

A. So this is an area that belongs to the State police.

Q. Okay.

A. It's a building that belongs to the State police.

Q. Okay. So this is a lot next to that building? Because there's no building in the photograph.

A. So it's -- yes. It's like a lot. It's like a --

THE INTERPRETER: The interpreter would need a clarification.

MR. DOBBINS: Please.

THE WITNESS: So in this one, it's kind of like a road that goes in there. It's kind of like an accessway there.

BY MR. DOBBINS:

Q. Okay. But you recognize that area that the boat is in?

A. Yes.

Q. And is the -- even though these aren't the pictures you took, is the boat in the same condition as when you saw it on November 22nd of 2019?

MR. FEIGENBAUM: Objection. Leading.

THE COURT: Overruled.

THE WITNESS: That is correct.

BY MR. DOBBINS:

Q.   All right.   You were asked on cross how many meetings you had with myself as the prosecutor on this case.   Do you recall that line of questioning?

A.   Yes.

Q.   Okay.   Do you recall if there were any additional phone calls or video teleconference calls that we had?

A.   Yes.   Yes.   Videoconference.

Q.   And how many times did we do that?

A.   Once.

Q.   When did you get in from in Mexico?

A.   Two days -- 26th.

Q.   So you arrived yesterday; is that correct, sir?

A.   Yes.

Q.   You were asked on cross about how many feet or meters it was that you stopped the truck with the vessel after it had exited the Akumal dock.   Do you recall that line of questioning?

A.   Yes.

Q.   And could you just describe for the Members of the Jury what the area is -- what that area looks like around the Akumal dock, as far as, is there one road in, one road out, or are there multiple entrances and exits?

A.   So it's a road or a street that has -- it has limited entrances and exits.

Q.   And when you say you were out there -- directed to be on patrol in that area, did you position your car in any way or in any place around the Akumal dock?

A.   Well, we were patrolling.  We were always moving.  But since the vehicle we were in is unmarked, you can't tell that we're police.

Q.   And while you were doing that patrolling, that's when you saw the GMC Sierra and this vessel leaving the Akumal marina?

A.   That is correct.

Q.   When you saw it, were you traveling in the same direction as the truck and the vessel, or were you going in a different direction?

A.   I was going in the opposite direction, but then I passed it and I turned around to go back.

Q.   And is that when you were looking for whether or not the vehicle or the trailer had a license plate?

A.   Yes.

MR. DOBBINS:  Thank you, Your Honor.  No further questions.

(Pause in proceedings.)

MR. DOBBINS:  If we may excuse the witness, Your Honor.

THE COURT:  Yes.  My apologies.  I wanted to make sure I had the exhibit.

Mr. Feigenbaum, is the witness excused as well?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  Thank you, sir.

You are excused.

(Witness excused.)

THE COURT:  And the Government's next witness.

MS. KLEPACH:  Yes, Your Honor.

The United States calls Yucatan State Police Officer Angel Seca Matus.

(Pause in proceedings.)

THE COURT:  All right.  Officer Seca Matus, let me ask that you remain standing, raise your right hand, and the courtroom deputy will place you under oath.

OFFICER ANGEL ISAIAS SECA MATUS, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Would you please state your name and also spell it for the record.

THE WITNESS:  Angel Isaias Seca Matus.  The spelling is A-N-G-E-L, and I-S-A-I-A-S, and the surname is S-E-C-A and M-A-T-U-S.

COURTROOM DEPUTY:  Thank you.

MS. KLEPACH:  May I inquire?

THE COURT:  Yes.  You may proceed.

MS. KLEPACH:  Thank you.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.   Good afternoon, sir.

     Where do you work?

A.   I work for the Department of Public Safety in Yucatan.

Q.   And what is your position there?

A.   So currently, I am a State Investigative Police.

Q.   What does that entail?

A.   Well, in terms of investigation?

Q.   Yes.

A.   To gather all kinds of information in order to put that information into files.

Q.   You may continue.

A.   We also have other kinds of duties that have to do with investigations of any type.

Q.   Do you currently specialize in a particular type of investigation?

A.   Yes.

Q.   In what kind?

A.   So presently, I'm in the area of narcotics.

Q.   Have you held any other positions within the Yucatan State Police?

A.   Yes.

Q.   What other positions?

A.   So when I joined the police force, so I began as a

124

Preventive State Police.

Q.   What does that mean?

A.   So I did preventive-type work in the area.  It could be with emergency phone calls, for example, that kind of thing.

Q.   Okay.  And how long in total have you been with the Yucatan State Police?

A.   Approximately, seven years.

Q.   Did you have to receive any training to become a police officer?

A.   Yes.

Q.   Can you please describe that training.

A.   Well, first of all, you have to go into the police academy, and you start with police training.  And the initial education you get has to do with all of the duties that you're going to be assigned.  So -- such as being in person or having to go to a place and how to be able to interact with people who are having a crisis, so that you can resolve it and give them some kind of aid.

Q.   Do you have to have any sort of particular educational background to become a police officer?

A.   Well, that's correct.  Yes.

Q.   What educational requirements are there?

A.   Well, you have to take certain exams, and there's some kind of a program that's got to do with control and trust.  So it's a psychological exam, a psychometric and social exam as well.

So once you've completed and you have passed all of these exams, you can continue within the police academy.

MS. KLEPACH: One moment.

(Pause in proceedings.)

BY MS. KLEPACH:

Q. All right, sir. As part of your training with the police department, have you learned about how to preserve electronic evidence?

A. So at the time, any kind of evidence you come across you have to turn it over to the competent or the entity -- competent entity.

Q. What does that mean?

A. Well, in this regard, it depends on the job or the work that you're doing at the time. So if you are working as a Preventive State Police, you have to take the -- you have to take the item -- let's say this electronic item, for example, and you have to secure it and you have to wrap it up or -- and you have to give it to the authorities that's -- competent authorities.

Q. Who would the competent authorities be?

A. Well, in this case, it would be the Public Prosecutor's Office.

Q. Okay. So I'm going to direct your attention to on or about December 2nd of 2020. What was your position at the Yucatan State Police at that time?

A.   My position was Preventive State Police.

Q.   And on or about that day, December 2nd, 2020, were you working?

A.   That's correct.

Q.   What was your assignment that day?

A.   In the area of Avenue Prolongacion of Montejo.

Q.   And what were you patrolling for?

A.   Preventive duties, because it's an area where there are banks.

Q.   Where there are?

        THE INTERPRETER:   Banks.   Banks.

BY MS. KLEPACH:

Q.   Can you please clarify?   An area where there are what?

A.   It's a commercial area.

Q.   Okay.   Banks?

        THE INTERPRETER:   Yes.

BY MS. KLEPACH:

Q.   Were you in a marked patrol vehicle that day?

A.   That's correct.

Q.   And were you wearing a police uniform?

A.   Yes.

Q.   Okay.   Did there come a time that day when you arrested an individual you later learned to be named Jose Miguel Gonzalez Vidal?

A.   That's correct.

Q.   Can you please describe the circumstances that led to his arrest.

A.   Well, the circumstances that led to this arrest, while being in this bank or commercial area, I saw a vehicle, a Volkswagen vehicle, a red Vento Volkswagen without license plates.

Q.   What did you do after you saw the red Volkswagen without license plates?

A.   I asked of him to stay to the side, to stop to the side. But this person, at the beginning, did not abide by my direction.  So after he ignored, I asked him through the -- I asked him to pull over through the microphone -- so I'm mentioning that this circumstance occurred at the Avenue Prolongacion Montejo -- to stop at the Avenue Prolongacion de Montejo with -- with the street number 37.

Q.   And did the person stop?

A.   That's correct.

Q.   How many people were in the car?

A.   Two.

Q.   Which -- where was Jose Miguel Gonzalez Vidal seated?

A.   In the driver's seat.

Q.   After he pulled over, what happened next?

A.   I got out of my car and I approached the vehicle, also mentioning the reason that the stop was made, because he did not have a license plate.  So these people started telling us

to stop -- may I say it?  May I say the word, the insult?

Q.  Yes.  Please go ahead.

A.  To stop fucking them.

Q.  All right.  I'm going to show you what's in evidence as Government's Exhibit 1.  Is this the person that you had the encounter with that you just described?

A.  Yes.  That's the person.

Q.  Thank you.

All right.  So after he made that statement, what did you do next?

A.  I told him to calm down, this is a prevention measure, since that was the prevention measures that I was assigned in that area.  So at the same time, he got out of his vehicle. And while talking to him, his partner or the other person got out too.

Q.  Go ahead.  I'm sorry.

A.  So that other person got out of the car.  So at the same time, my colleague got out of his car too.

Q.  Okay.  Did there come a time that the individuals in that red Volkswagen attempted to offer you a bribe?

A.  That's correct.

Q.  Can you describe what happened at that time.

A.  At that time, this person -- both of them got out of their car.  They were behaving in an aggressive way and they managed to hit my colleague.  And his partner said that we should calm

129

down, that we can come to an arrangement, getting out of his pocket a bill of 500 Mexican pesos.

Q. What did you do then?

A. I told him that in this case he should not do this because he would be committing a crime.

Q. And how did the individuals in the red Volkswagen react?

A. In that case, they had already calmed down, the one that had hit my colleague. And I told them that for attacking my -- a colleague, I would have to do a search of their person.

Q. And did you search them?

A. With -- giving them -- notifying of the right to do it.

Q. Okay. And after they were notified of their rights, did you conduct a search of Jose Miguel Gonzalez Vidal?

A. That's correct. The back of the Vento car, you can say that that's the trunk of the vehicle, this same person took out of his bag his personal belongings.

Q. Okay. So he took out his personal belongings and showed them to you?

A. Yes. He put them on top of the trunk of his vehicle.

Q. What did those personal belongings include?

A. There were two cell phones, one of a Samsung brand and one with -- the one with the apple, an iPhone, a wallet, and several credit cards and bills.

Q. And with respect to the two cell phones, what did you do with them?

A.   Well, with the two cell phones, and after showing me his personal belongings, and after seeing that there was nothing illegal in them, his car was searched to make sure that there was nothing illegal in it.

Later on, I told him that because he had attacked a police -- a State police officer, and for trying to bribe a police officer, this could become an offense for bribery.  So I told him to turn off his cell phones and to put all his personal belongings in a bag.  So I took control of it.

Q.   When you say you took control of it, what did you do?

A.   Putting the personal belongings inside a bag, securing them.

Q.   And then where did you take them, if anywhere?

A.   We transferred the person -- we took the person to the Department of Public Safety.  And later on, in front of the public prosecutor, providing his personal belongings.

Q.   And were the personal belongings secure at the time that you turned them in to the Public Ministry prosecutor?

A.   Yes.  They were inside a bag.

MS. KLEPACH:  Your Honor, may I approach the witness?

THE COURT:  You may.

BY MS. KLEPACH:

Q.   Officer, I'm going to show you what has been premarked for identification as Government's Exhibits 19 and 28.  Do you recognize those cell phones?

A.   Yes.

Q.   What do you recognize them to be?

A.   The cell phones, the Samsung and the iPhone that had shattered glass.  But also, at the time, the covers were see-through.

Q.   Okay.  Are these the cell phones that you recovered from Jose Miguel Gonzalez Vidal on or about December 2nd of 2020?

A.   Yes.

Q.   Are those cell phones in the same or substantially the same condition that they were in when you recovered them?

A.   Yes.

MS. KLEPACH:  At this time, the United States offers Exhibits 19 and 28 into evidence.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  Admitted into evidence.

(Government's Exhibits 19 & 28 received into evidence.)

MS. KLEPACH:  One moment.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.   Officer, after you submitted the cell phones to the Public Ministry, did you do anything with them?

A.   No.

Q.   Were you ever asked to search or otherwise review those phones?

A.   At no point.

Q.   And so, at the time that you recovered them, before Jose Miguel Gonzalez Vidal turned them off, did you search them at all?

A.   No.

         MS. KLEPACH:  I have no further questions.

         THE COURT:  All right.  Cross-examination.

                        CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.   Good afternoon, Officer Seca Matus.

A.   Good afternoon.

Q.   Is it your first time in Miami?

A.   Yes.  It's nice.

Q.   Oh.  Thank you.  You also come from a very beautiful area.

A.   Yes.  Yucatan, it's very -- it's beautiful.

Q.   You were mentioning that you went to the police academy.

A.   That's correct.

Q.   And you learned different police techniques there.

A.   That's part of the police formation.

Q.   And you learn how to use lethal and non-lethal force?

A.   That's correct.

Q.   So lethal force would be using a firearm to subdue a danger -- dangerous person, if you were in danger yourself of substantially -- substantial bodily harm or death?

A.   A lethal weapon may end the life of any person.

Q.  So sometimes you could use a Taser, instead of a firearm?

A.  In Mexico, we're not authorized to use the Taser.  It's forbidden to use the Taser.

Q.  Have you ever seen a Taser before?

         MS. KLEPACH:  Judge, I'll object as to relevance.

         THE COURT:  Sustained.

         MR. FEIGENBAUM:  The objection was?

         MS. KLEPACH:  Relevance.

         MR. FEIGENBAUM:  He was talking about his training, so I'm going through his training.  She went through some of his training, he went to the academy, and some of the things he learned there.

         THE COURT:  The witness just stated that he's not able to use it.  You want to ask him about the use of a Taser?

         MR. FEIGENBAUM:  No.  I want to know if he's familiar with it.

         THE COURT:  All right.

BY MR. FEIGENBAUM:

Q.  Are you familiar with what a Taser is?

A.  No.

Q.  Okay.  You also mentioned that when -- I believe you said Jose Miguel Gonzalez Vidal offered you a bribe; is that correct?

A.  That's correct.

Q.  And you said that would be a violation of your Yucatan

criminal laws?

A. That's correct.

Q. In fact. You called it the crime of "cohecho," C-O-H-E --
no -- C-O-H-E-C-H-O.

A. That's correct.

Q. And that's part of the Yucatan Criminal Code?

A. That's part of giving a bribe to a public officer.

Q. It's like a crime under the Yucatan Criminal Code, correct?

A. Yes.

Q. Do you remember what chapter of the Yucatan Criminal Code
is coecho?

A. No. I don't remember.

Q. If you saw a document that was the Yucatan Criminal Code
for that crime, would that help you remember what it is?

A. Yes.

MR. FEIGENBAUM: May I ask if that binder is still on
the desk there?

MR. DOBBINS: No. You took it back and put it on your
desk.

MR. FEIGENBAUM: One moment.

(Pause in proceedings.)

MR. DOBBINS: Do you know what page you're going to
show him?

MR. FEIGENBAUM: Yeah.

MR. DOBBINS: Can we see it?

MR. FEIGENBAUM:  Page 128.

MR. DOBBINS:  Thank you.

MR. FEIGENBAUM:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. FEIGENBAUM:

Q.  I'm going to show you, Officer, what's been marked for identification as Defense Exhibit J.  And I have turned it to Page 128.  Does that refresh your recollection of what chapter bribery or coecho is?

A.  (No verbal response.)

Q.  I'm just asking for the chapter number.

A.  Number 2.

Q.  Does it say:  "Chapter Roman Numeral 8" there?

MS. KLEPACH:  Objection, Judge, again, counsel is reading from an exhibit that's not in evidence, or is attempting to introduce --

MR. FEIGENBAUM:  I'm trying to refresh his recollection.

THE COURT:  All right.  With regard to the Roman numeral, you may proceed.  Overruled.

THE WITNESS:  What I see is Chapter 2.

BY MR. FEIGENBAUM:

Q.  Okay.  Is there also a crime in Yucatan Criminal Code that's for extortion?

MS. KLEPACH:  Objection.  Relevance.

THE COURT:  Overruled.  If the witness knows.

THE WITNESS:  No.

BY MR. FEIGENBAUM:

Q.  There's no crime of extortion in the Yucatan Criminal Code?

A.  I don't know.

Q.  Could you look at Page 165, if that might refresh your recollection.

MS. KLEPACH:  Objection.  He said he doesn't know.

THE COURT:  Sustained.

MR. FEIGENBAUM:  Your Honor, I was just trying to refresh recollection.

THE COURT:  If you want to ask the predicate question, you may.  But at this point the objection is sustained.

BY MR. FEIGENBAUM:

Q.  If you saw a document that might help you remember or refresh your recollection whether there is a crime of extortion in the Yucatan Criminal Code, would that help you?

A.  Yes.

Q.  Could you turn to Page 165.

A.  Yeah.

Q.  So there is a crime of extortion in the Yucatan Criminal Code?

A.  165, right.

Q.  165.  The page is at the bottom.

A.  Oh.  You said page?

Q.   Yes.

A.   165.  Okay.

THE COURT:  Mr. Feigenbaum, it is five o'clock.  So just let the Court know when it might be a good time to break for the evening.

MR. FEIGENBAUM:  This is my last question.

THE COURT:  All right.  Certainly.

THE WITNESS:  327?

MR. FEIGENBAUM:  No.  Could you -- can I ask the interpreter to help him find Page 165?

THE COURT:  Page 165.

THE WITNESS:  165.

MR. FEIGENBAUM:  May I approach?

THE COURT:  Yes.  Of course.

BY MR. FEIGENBAUM:

Q.   So my question is:  Looking at Page 165 of the document you're looking at, is there a crime called "extortion" listed there?

MS. KLEPACH:  Objection.  It's not in evidence.

THE COURT:  That is correct.  The objection is sustained.

MR. FEIGENBAUM:  What was the objection for?

THE COURT:  That the exhibit is not in evidence, sir.

MR. FEIGENBAUM:  I'm just trying to refresh his recollection.

THE COURT:  With regard to extortion being a law?

MR. FEIGENBAUM:  Yeah.

THE COURT:  All right.  I'll permit it.  The objection is overruled.

Without reading from the document, just refer and you can answer yes or no, sir.

THE WITNESS:  Can you please repeat the question.

BY MR. FEIGENBAUM:

Q.  Looking at a document to help you refresh your recollection, do you recall now whether there is a crime of extortion in the Yucatan Penal Code?

A.  Yes, there is.

Q.  Thank you, sir.

MR. FEIGENBAUM:  No further questions, Your Honor.

THE COURT:  Is there any redirect?

MS. KLEPACH:  Just one question, Judge.

REDIRECT EXAMINATION

BY MS. KLEPACH:

Q.  Officer Seca Matus, do you have the Yucatan Penal Code memorized?

A.  No.

MS. KLEPACH:  No further questions.

THE COURT:  All right.  Is the witness excused?

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.

Thank you, sir.  You are excused.

(Witness excused.)

THE COURT:  All right.  Ladies and Gentlemen, as you can see it is five o'clock.  Recall that tomorrow will be a half a day.  So I would ask that you have lunch ahead of time and that you are here precisely at one o'clock p.m.  We will have a half a day from one to five.  And remember we cannot get started unless all of you are here.

Please remember, as you exit the courthouse, that you're not to discuss this case with anyone, nor permit anyone to speak with you.  Everything learned about the case is learned in this courtroom.

I would ask that you place your juror notebooks, if you have taken some notes, in the jury room.  And I'll see you tomorrow morning at one p.m.

Have a pleasant evening.

COURT SECURITY OFFICER:  All rise.

(Jury not present, 5:07 p.m.)

THE COURT:  All right.  Go ahead and have a seat for a moment.

We do have a full morning tomorrow.  So I would ask that you kindly move your items so that the attorneys and the litigants can use counsel table.

As well, tomorrow at one o'clock who will the Government be calling?

MS. KLEPACH:  Your Honor, the first witness is going to be FBI Special Agent Aaron Spielvogel, followed by FBI Task Force Officer Gabriel Rose, followed by FBI Digital Forensic Examiners Ricardo Soto and Arturo Ortega.  Time permitting, the following two witnesses would be Stephen Farlow and FBI Special Agent Christopher Adam Goodrich.

THE COURT:  All right.  Thank you.

Are there any issues that we need to address at this time?

MS. KLEPACH:  Not from the Government.

MR. FEIGENBAUM:  I don't believe so, Your Honor.

THE COURT:  Okay.  Let me give you the time that you need to move the items, and I'll see you here tomorrow afternoon at one p.m.

Have a pleasant evening.

MS. KLEPACH:  Thank you.

MR. FEIGENBAUM:  You too, Your Honor.

COURT SECURITY OFFICER:  All rise.

(Proceedings adjourned at 5:08 p.m.)

141

UNITED STATES OF AMERICA          )

ss:

SOUTHERN DISTRICT OF FLORIDA   )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 27th day of September, 2023, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 141.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 6th day of June, 2024.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov