IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1


UNITED STATES OF AMERICA,

      Plaintiff,                    September 28, 2023
                                  1:05 p.m.

      vs.

JAVIER HERNANDEZ,

      Defendant.                  Pages 1 THROUGH 158

_____


TRANSCRIPT OF TRIAL DAY 3
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE
And a Jury of  12



Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                      Brian Dobbins, AUSA
                      Arielle Klepach, AUSA
                      99 Northeast 4th Street
                      Miami, Florida 33132


FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                      PO BOX 545960
                      Surfside, Florida 33154-9998


COURT REPORTER:     Yvette Hernandez
                      U.S. District Court
                      400 North Miami Avenue, Room 10-2
                      Miami, Florida 33128
                      yvette_hernandez@flsd.uscourts.gov

2

**I N D E X**

Certificate..................................      158

**W  I  T  N  E  S  S**

**ON BEHALF OF THE GOVERNMENT:**                          PAGE
OFFICER GABRIEL ROSE
DIRECT EXAMINATION BY MR. DOBBINS                         10
CROSS-EXAMINATION BY MR. FEIGENBAUM                       17

SPECIAL AGENT AARON SPIELVOGEL
DIRECT EXAMINATION BY MS. KLEPACH                         19
CROSS-EXAMINATION BY MR. FEIGENBAUM                      116

**E X H I B I T S**

| GOVERNMENT'S EX. NO.: | OFFERED | ADMITTED |
|---|---|---|
| 37 | 16 | 16 |
| 109 | 43 | 43 |
| 110 | 43 | 43 |
| 108 | 61 | 62 |
| 95 | 104 | 104 |
| 107 | 104 | 104 |

(Call to order of the Court, 1:05 p.m.)

THE COURT: Good afternoon to everyone.

I apologize for the delay. I hope everyone is well and ready to get to work.

We can go ahead and call the case, and let's make sure we have all our jurors.

COURT SECURITY OFFICER: They're all here, Judge.

THE COURT: Do we have our witness here?

MS. KLEPACH: Yes, Your Honor.

MR. DOBBINS: You want us to bring him in?

THE COURT: Yes.

Thank you.

COURT SECURITY OFFICER: Let me just make sure they're ready.

THE COURT: Yes. Thank you.

COURTROOM DEPUTY: Calling Criminal Case Number 22-20557, United States of America v. Javier Hernandez.

Counsel, please state your appearances for the record.

MS. KLEPACH: Good afternoon, Your Honor. Arielle Klepach and Brian Dobbins for the United States, joined by Special Agent Sergio Francisco from the FBI.

THE COURT: Good afternoon.

MR. FEIGENBAUM: Good afternoon, Your Honor. Marty Feigenbaum on behalf of Javier Hernandez, who is present before the Court with the assistance of a Spanish interpreter.

THE COURT:  All right.  Good afternoon to each of you.

And I just want to make sure -- Mr. Hernandez, I've said it before, but if at any time the equipment stops working, or you're unable to hear the interpreter, if you'll let the Court know.  All right, sir?

THE DEFENDANT:  (Through Interpreter.) Okay.  Thank you.

THE COURT:  All right, then.

We had completed Officer Seca Matus, and the Government will be calling the next witness.  I just wanted to the make sure that the individual was here.

MR. FEIGENBAUM:  There was just one quick matter that I had contacted Mr. Dobbins about -- and Ms. Klepach -- this morning.

THE COURT:  Yes.  Of course.

MR. FEIGENBAUM:  My expert, Thomas Pullen, who would be, under Rule 615, allowed to sit in on some of their witnesses who are coming up today and tomorrow, he's not going to come.  It's going to save CJA some money and time.  So -- and he's not -- we're not asking for him to attend by audio or anything like that.  My question would be -- is, does the Court ever allow a witness, when he would come and testify, testify by Zoom, because he lives in Jacksonville?

THE COURT:  As long as there's no objection by the other side.  Is that what you're requesting, is that the expert

appear remotely by Zoom?

MR. FEIGENBAUM: Yes.

THE COURT: We can certainly accommodate that technologically. Is there any objection?

MS. KLEPACH: Judge, we would object, just because, based on the pretrial litigation in this case, it seems like this cell phone evidence is going to be something that is going to be greatly contested by the Defense. And so we think it's important that the jury see and hear the witness for themselves, rather than do it over teleconference.

THE COURT: But wouldn't the teleconferencing, and the inability to see the person in the courtroom, inure to the detriment of the Defendant? It's the Defendant's expert. What would be the reason why, if, in fact, the expert lives out of the district, why -- if the technology was available, why he could not testify via Zoom?

I mean, is there any issue with regard to the physical evidence that would be necessary for the individual to touch and look at, and -- I'm just trying to see what -- other than the fact that this has been a hard-fought litigation, and he's an expert, I'm not seeing any other reason why he couldn't appear remotely.

MS. KLEPACH: Judge, it's not that the Government is concerned in terms of the logistics. Certainly he can appear via Zoom. I think the problem is I don't know -- I don't know

what the Defense is seeking to elicit from him in terms of whether he would have to see the physical evidence or not, in terms of how his testimony would link up to being able to view and review the items that he plans to testify about.

And also, I do -- as the Court noted, it has been hard-fought litigation, and so I think there is some question as to the Eleventh Circuit's view on the veracity of having witnesses testify over videoconference, when -- other than the fact that he lives out of the district, it doesn't seem like there's a reason that he can't be here.  We've --

THE COURT:  I'm not following you on the Eleventh Circuit's position with regard to the veracity of witnesses. I've never seen case law that questions the veracity merely because one is appearing remotely.

MR. DOBBINS:  Judge, Brian Dobbins, on behalf of the United States.

Since this would be something where Mr. Pullen would be testifying as part of the Defense's case, if Your Honor would just give us an opportunity -- since we were just notified this morning via email, this is the first time we're sort of hearing about it, if we could at least have the opportunity to maybe brief it or think about it and research it tonight and get back --

THE COURT:  Yes.  Of course.

MR. DOBBINS:  I don't think we need to decide today.

I would also point out that one of our witnesses, Mr. Maytum, who is a victim of one of the boat thefts in this case, is very elderly.  And if -- you know, I would just want to know if Mr. Feigenbaum is willing to allow him to appear by Zoom.  I know that's a little different issue because it goes to the confrontation clause with the Defendant.  But that's something we can discuss after court today and get back to Your Honor tomorrow morning about.

THE COURT:  Well, I can't imagine that there would be any objection to that either.  So let me say that the Court certainly is willing to accommodate the parties to the extent that the witness is unavailable.  We certainly have screens for the jurors to view.

With regard to your right to confrontation issue, obviously that would need to be addressed.  And why don't I give you -- we don't need to decide today.  Mr. Pullen is not here of his own accord.  But in terms of when he's going to be called in -- with regard to this other victim, is that person on this list of individuals to be called today?

MR. DOBBINS:  Yes, Your Honor.  Mr. Maytum.  I believe he's --

THE COURT:  So this would be someone to be called tomorrow?

MR. DOBBINS:  No.  No.  He'd be next week.

THE COURT:  Oh.  All right.  Then we have a little bit

of time.

MR. FEIGENBAUM:  And last thing, Judge, because Mr. Pullen would fall under the 615 exception, I want to ask the Court's permission -- and I believe I also, in my earlier this morning email to Mr. Dobbins and Ms. Klepach, said I think he would have the right to review the transcripts of any of the witnesses who are his counter-expert witnesses for the Government because it's -- he has the right to be present.  So I don't think there would be any prohibition in me sending the transcript of the forensic digital experts for the Government to him in advance of his testimony.

THE COURT:  Well, to the extent any transcripts might be available -- it's not a right, but he certainly has the privilege to be here because he's an expert.  So in terms of reviewing items to prepare for his testimony, if they're available, of course he can review them.

MR. FEIGENBAUM:  Right.  Because any other witness, I don't think you can send them transcripts of what happened because that's letting them know what somebody else testified in trial, except that he's the exception.

MR. DOBBINS:  The Government doesn't oppose that.  I thought that what you were asking was if we were going to send him the transcripts.  And I believe you've ordered daily copy, so --

MR. FEIGENBAUM:  Yes.

MR. DOBBINS: We don't have any objection to that, Your Honor.

THE COURT: Okay. Certainly.

Anything else?

MR. DOBBINS: No, Your Honor.

THE COURT: All right. Let's bring in the jury.

COURT SECURITY OFFICER: All rise for the jury, please.

(Before the Jury, 1:13 p.m.)

THE COURT: Good afternoon, Ladies and Gentlemen.

Please be seated, everyone.

It is good to see you. Thank you for being so prompt.

The delay -- the small delay is my fault, and I apologize, but we are ready to get back to work.

On behalf of the Government, your next witness.

MR. DOBBINS: Yes, Your Honor.

The Government would call to the stand FBI Task Force Officer Gabriel Rose.

THE COURT: Hi. Good afternoon, sir.

(Pause in proceedings.)

OFFICER GABRIEL ROSE, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY: Thank you.

Would you please state your name and also spell it for the record.

THE WITNESS: Gabriel Rose. G-A-B-R-I-E-L. Last name

is Rose.  R-O-S-E.

COURTROOM DEPUTY:  Thank you.

THE WITNESS:  Yes, ma'am.

MR. DOBBINS:  May I inquire, Your Honor?

THE COURT:  Of course.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Good afternoon, Task Force Officer Rose.

A.  Yes, sir.

Q.  Can you tell the Members of the Jury where you're currently employed.

A.  I'm currently employed with the Lee County Sheriff's Office.

Q.  And how long have you been with the Lee County Sheriff's Office?

A.  Since March of 2012.

Q.  And what is your current rank with the Lee County Sheriff's Office?

A.  Lieutenant.

Q.  And what is your current assignment?

A.  Narcotics supervisor.

Q.  And what are your duties and responsibilities as a lieutenant in the Narcotics Unit at the Lee County Sheriff's Office.

A.  I supervise the sergeants and detectives within the unit,

the narcotics deals they supervise, and just everyday activities.

Q. Okay.  Are you familiar with the term "cross-designation"?

A. No, sir.

Q. Okay.  Are you currently assigned, in your role as a lieutenant with the Lee County Sheriff's Office, with any sort of task force?

A. Yes, sir.

Q. All right.  What task force are you assigned to?

A. The FBI.

Q. And does that task force have a specific name?

A. Yes.  The Safe Streets Task Force.

Q. And because you're part of that task force with the FBI, do you also have some sort of other title when you work with the FBI?

A. Task force officer.

Q. Okay.  And what does a task force officer do?

A. Investigates federal violations, along with state violations.

Q. And Lee County, just -- what's one of the major cities, I guess, over there in Lee County?

A. Fort Myers, Florida, Naples, Florida.

Q. And as a task force officer with that Safe Streets Task Force with the FBI, what's sort of the area that your task force works on?

A.  All over those counties.  So Lee, Collier, Charlotte.  I believe we touch Glades, Hendry County as well.

Q.  I'd like to direct your attention at this time to November 22nd of 2022.  Were you working as a task force officer with the FBI on that date?

A.  Yes, sir.

Q.  All right.  And were you tasked with anything to do from the Miami Field Division of the FBI on that date?

A.  Yes, sir.

Q.  And what was it that you were tasked with?

A.  So in the FBI, you will get leads from other offices.  A lead is an assistance you could say.  In this case, it was from Miami.  It was for an arrest warrant of an individual.  So this was sent to the Fort Myers's resident offices, where I was assigned out of at the time, and it was for an arrest warrant of an individual.  And the individual lived in Naples, Florida, which is in Collier County.

Q.  All right.  And what was that individual's name?

A.  His full name -- I believe his first name is Raymond.

Q.  Were you provided with the arrest warrant for that?

A.  Yes.

Q.  And was that for the arrest warrant for an individual named Ramon Reyes Aranda?

A.  Yes.

Q.  All right.  And directing your attention to the

13

early-morning hours of November 22nd of 2022, in the vicinity of 1761 20th Avenue Northeast, in Naples, Florida, were you and your team working in there that day to try to serve that arrest warrant?

A.   Yes, sir.

Q.   All right.  And why were you at that address?

A.   The individual had an arrest warrant.

Q.   Okay.  And is that where law enforcement believed that Ramon Reyes Aranda lived?

A.   Yes, sir.

Q.   All right.  And what time of morning were you there?

A.   Early morning.  It was before daybreak.

Q.   And what did you see when you went there to that area?

A.   Yes, sir.  So we knew Mr. Aranda drove a dump truck.  And dump truck drivers -- we knew that he would be out early in the morning.  That's why it was so early, before daybreak.  Upon arriving on scene, it was a little while later when the dump truck left the residence.

Q.   And when the dump truck left the residence, what did you and your team do?

A.   We conducted a traffic stop on that dump truck.

Q.   And who was driving the dump truck?

A.   Mr. Aranda.

Q.   And what did you do at that time?

A.   He was placed under arrest.

Q. All right. Now, when Mr. Aranda was placed under arrest, did you and the other agents talk to him in any way?

A. Yes.

Q. Did he speak English or Spanish?

A. His English is, I would say, broken English. But we did have the assistance of Sergio from the Miami office, who is fluent in Spanish.

Q. And would that be Special Agent Sergio Francisco from the FBI Miami Field Office?

A. Yes, sir.

Q. How did Special Agent Francisco assist in communicating with Mr. Aranda?

A. Telephonically.

Q. And did you request anything from Mr. Aranda to help with anything that was there on the scene?

A. Yes. Mr. Aranda -- once he was placed under arrest, he wanted his father to come get the dump truck to bring it back to the house, which we didn't have an issue with, and he advised that his phone was in the dump truck.

Q. Okay. And did someone retrieve that phone?

A. Yes, sir. I did.

Q. Okay. And what kind of phone was it, if you recall?

A. An iPhone.

Q. All right. And did Mr. -- to make that call -- did you let Mr. Aranda make that call or did you make the call for him?

A.   With his phone, he provided the PIN code, and then the phone call was made.

Q.   And did Mr. Aranda's father agree to come pick up the dump truck and also his personal property?

A.   Yes, sir.  He did.

Q.   And what did you do with Mr. Aranda's cell phone?

A.   It was turned over to Agent Francisco.

Q.   All right.

        MR. DOBBINS:  Your Honor, may I approach?

        THE COURT:  You may.

BY MR. DOBBINS:

Q.   All right.  Task Force Officer Rose, I've shown you what's been marked as Government's Exhibit 37 for identification.  Do you recognize that -- what's in that exhibit?

A.   Yes, sir.

Q.   All right.  What is that exhibit?

A.   The exhibit is the phone.

Q.   The phone from where?

A.   From that day, within the dump truck.

Q.   Okay.  And how do you recognize that phone?

A.   Via the -- on the back, there's a little white piece of tape, you could say, with numbers written on it.

Q.   Okay.  And is that the phone that was seized from Mr. Aranda at the time of his arrest on November 22nd of 2022?

A.   Yes, sir.

MR. DOBBINS: All right. Your Honor, at this time, I'd move Government's Exhibit 37 into evidence.

THE COURT: Is there any objection?

MR. FEIGENBAUM: No objection.

THE COURT: Admitted into evidence.

(Government's Exhibit 37 received into evidence.)

MR. DOBBINS: And if I may approach to retrieve the exhibit.

THE COURT: You may.

MR. DOBBINS: If I may just briefly publish it for the jury, Judge.

THE COURT: You may.

MR. DOBBINS: One moment, Your Honor.

(Pause in proceedings.)

BY MR. DOBBINS:

Q. Officer Rose, you said that you recognized the phone by this white tape where you have these numbers written on there. Was that white tape on there when you took the phone out of the dump truck?

A. No, sir.

Q. So are those numbers consistent with the numbers that you recall being given to you to open -- to unlock the phone?

A. Correct.

Q. All right. And also, I think we have a date there; is that correct?

A.   Correct.  And then, also, you can see the case number, the 245-C, as in Charlie.

MR. DOBBINS:  No further questions, Your Honor.

THE COURT:  All right.  Cross-examination.

MR. FEIGENBAUM:  I just have one question.

May I ask from here Your Honor?

THE COURT:  All right.  Certainly.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.   Good afternoon, sir.

A.   Sir, how are you?

Q.   Could you just repeat the date that you got that phone.

A.   I would have to get the report and look at it right on the report.

MR. FEIGENBAUM:  Just one second.  Maybe we can find that for you.

THE WITNESS:  Thank you.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   If you saw a report to help you recall which date it was, because there -- might have just been a little bit off on the date that was asked before, would -- that might help you to remember?

A.   Yes, sir.

MR. FEIGENBAUM:  May I approach, Your Honor?

THE COURT: You may.

THE WITNESS: Thank you, sir.

BY MR. FEIGENBAUM:

Q. Yes, sir. Do you know the date now?

A. November 18th, 2022.

Q. November 18th, 2022?

A. Yes, sir.

Q. Thank you very much.

MR. FEIGENBAUM: No further questions.

THE COURT: All right. Any redirect?

MR. DOBBINS: No, Your Honor.

THE COURT: All right. Thank you.

Is the witness excused?

MR. DOBBINS: Yes, Your Honor.

THE COURT: All right. Thank you, sir.

(Witness excused.)

THE COURT: And the Government's next witness.

MS. KLEPACH: The United States calls Special Agent Aaron Spielvogel.

THE COURT: All right.

(Pause in proceedings.)

THE COURT: Good afternoon.

THE WITNESS: Good afternoon.

THE COURT: Sir, if you'll remain standing, raise your right hand to be placed under oath.

SPECIAL AGENT AARON SPIELVOGEL, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY: Thank you. You can have a seat.

THE WITNESS: Thank you.

COURTROOM DEPUTY: Please state your name and also spell it for the record.

THE WITNESS: My name is Aaron Spielvogel.

Would you like me to spell that?

The last name is S-P-I-E-L-V-O-G-E-L.

COURTROOM DEPUTY: Thank you.

MS. KLEPACH: May I inquire?

THE COURT: You may.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Where do you work?

A. I work for the FBI.

Q. What is your position with the FBI?

A. My current position with the FBI is called a supervisory special agent, and I'm a program manager at the International Violent Crimes Unit at FBI Headquarters.

Q. How long have you been in that assignment?

A. In that assignment, I've been there just about one year.

Q. What are your duties and responsibilities as part of your current assignment?

A.  In my current assignment, my responsibilities are to oversee all international violent crime cases that relate to US citizens or US residents.

Q.  Prior to your current assignment, what was your position with the FBI?

A.  Prior to that, I was assigned to the Miami Field Office.  I worked in what we call our Transnational Organized Crime Squad, and I had been there for approximately seven years.

Q.  How is what you did in your previous position with the FBI Miami Field Office different than what you do now?

A.  There are some slight overlaps.  But in my time at the FBI field office, I was an investigator -- in more of an investigative capacity, where I led investigations into criminal organizations that were involved in all sorts of criminal activity related to racketeering, drug trafficking, stolen property, human smuggling, weapons trafficking, money laundering, everything that sort of ties into organized crime across borders.

    What I do now is I'm in less of an investigative capacity and more of a supervisory capacity, where I make sure that the cases that are worked that relate to kidnappings of US citizens overseas are handled appropriately.

Q.  Before you joined the FBI, what did you do?

A.  Before I joined the FBI, aside from academics, I was in the United States Navy.

Q.  How long were you in the Navy?

A.  One enlistment.  I served approximately four years.

Q.  As part of your time at FBI Miami, did you investigate an individual named Javier Hernandez?

A.  I did.

Q.  As part of that investigation, did you interview him?

A.  I did.

Q.  If you saw that person again, would you recognize him?

A.  Yes.

Q.  Do you see that person in court today?

A.  Yes, ma'am.  I do.

Q.  Can you please identify him by an article of clothing.

A.  Sure.  He's wearing a dark blue, long-sleeved shirt.

MS. KLEPACH:  Let the record reflect that the witness has identified the Defendant.

THE COURT:  It's noted.

BY MS. KLEPACH:

Q.  All right.  Can you describe the investigation into the criminal organization that led you to Mr. Hernandez.

A.  Yes.  I began the investigation back in 2016, as sort of targeting a criminal enterprise that has many facets to it. The origin of the investigation into this was regarding the smuggling of famous Cuban baseball players that were attempting to get to the United States.

Throughout that investigation, we had several years of

activity where we investigated different pieces of the organization, and we sort of kept building on it over time until we get to where we are today.

Q.   All right.  So let's just actually take a step back. Before you started your investigation into this criminal organization, had you investigated organized crime before?

A.   I have investigated organized crime on multiple occasions. This is one of the larger ones.  But yes, I've been involved in several organized crime investigations.

Q.   Can you talk about some of the processes that are involved in conducting an investigation like this one.

A.   Yes.  When conducting a -- sort of a long-term enterprise-style investigation, it's made up of several investigative techniques, as we'll call them.  Part of that requires conducting interviews of people.  And that could be victims that you have identified in your case.  That could be witnesses.  That could also be some of the defendants in your investigation that have cooperated.

     In addition to actually interviewing people, it involves working with foreign law enforcement partners.  Most of my responsibilities, as I said, have to stretch beyond the United States.  And they're usually crimes that happen between the United States and other countries.  Particularly, in my case, things that happen in Mexico and the Caribbean that connect to mostly the South Florida area.

So in addition to working with them and collecting evidence through the use of our treaties and agreements with other countries, we're also involved with writing search warrants, getting judges' approvals to collect additional evidence, such as evidence that might be on your cellular phone, for example, or locations of where you might have been based, or your cellular phone records.

And even to get to some of those steps, we also have to provide what they call subpoenas for business records. And so some of those business records that build these investigations would be through banks, or through cellular telephone companies, all in an effort to sort of compile all the data that you have and make sense of it, so that you can successfully target members of the criminal organizations.

Q. You mentioned targets. How do you develop targets in a case like this?

A. So it's sort of a -- and I don't want to oversimplify it by saying: "Follow the bouncing ball." But of some of it is -- some of them are more obvious, and some of them you don't learn about until you have gone through successful prosecutions of other elements of the enterprise.

For example, your case might start very small, and you don't realize what tentacles it has. So as you're going through the investigation, and you're investigating one potential subject, and then you get that subject to cooperate,

you might learn that there are these other people that exist in the organization.

Now, you don't rely solely on them telling you that, because there's some self-interest, of course.  So then we have to spend time collecting evidence, such as physical records, getting search warrants to weather through the property, to find documents to corroborate what that say.  And it's sort of an organic process over -- it takes many years.  But you eventually start putting all the pieces of the puzzle to get what we call like an enterprise style of an investigation.

Q.  Do you have to -- withdrawn.

Does that process require the prioritization of targets to some degree?

A.  Most of the time, yes.

In this particular enterprise that we were targeting, there's a large element of violence to it.  And what that means is that we don't have the capacity to focus on -- again, at risk of oversimplifying -- the white-collar side of the criminal organization, while there are people actively being hurt as a part of this criminal entity.

So our first priority is always, if we know there are people actively hurting people, we focus everything that we can on those first.  And eventually we're able to then start looking at the other entities that sort of feed into the machine.

Q. All right. So you talked a little bit about the beginning of this investigation, which involved the smuggling of famous Cuban baseball players.

A. Correct.

Q. When did that part of the investigation start?

A. That was in early 2016.

Q. And how did the investigation into these baseball players lead you to identify that there were other factions of the organization?

A. So when we first started investigating the smuggling of the Cuban baseball players -- again, like we talked about how an investigation -- a lot of it is based on interviews and then you follow up with them from there.

So as we were interviewing these baseball players, who were smuggled by boat out of Cuba to Mexico or to other countries, so that they could obtain their residency and eventually become United States baseball players in the major leagues, our interviews with them -- they shared information about what their journey was like to get here.

They were treated -- the baseball players, that is, were treated as a very valuable commodity. So they were not treated the same way as -- again, for lack of a better term, a traditional Cuban migrant that wasn't deemed to be as valuable on paper as the baseball players. They would describe for us what the journey was like by boat, who they came with, what the

conditions were like at sea, how their journey got started.

And in those interviews, we learned that those who were not the Cuban baseball players were brought on the same boats. Once they arrived to Mexico, they were initially housed together in these -- what we would call safehouses, where they were hidden from law enforcement in Mexico, and they would observe those who were not the baseball players being physically abused, watch their family members being extorted.

They themselves had their own relationships with the smuggling organization. But it was through those interviews that we learned that there was more than just the baseball players being smuggled. There was like an actual violent entity, an organized crime group behind this machine, and they were just one small piece of it.

Q. Were criminal charges eventually brought against the individuals that were responsible for the Cuban baseball part of what you have just described?

A. Yes. Those were -- the first round of charges that came about, were the -- related to the people who were actually smuggling the baseball players.

Q. What was the next stage of the investigation after that?

A. Now that we had learned that there was an element of violence, we wanted to pursue that, because we knew that people existed here in South Florida and elsewhere that were victims of the violence that was described to us by the baseball

players.

So we dedicated as much time and effort as we could to identify those people, so that we could relate them to the victims that -- as we tried to identify them, so that we could go after the people that were in charge of hurting them.  Most of them were in Mexico, and then there are relationships with their co-conspirators that live here in the United States.

Q.   About when did that part of the investigation really take off?

A.   So that took off -- we got caught up, unfortunately, with a lengthy trial in the case of the Cuban baseball players.  So once that resolved -- I want to say it was probably in 2000 -- late 2017, early 2018 is when we really started making headway into the organization that we were looking at.

Q.   What did that part of the investigation entail?

A.   So that part of the investigation -- in order to -- like we talked about, in order to identify who those people were that were the violent element of the organization, that was through months, years worth of interviewing, financial analysis, understanding how payments were made to members of the criminal organization, getting information from people that had cooperated in their cases and pled guilty for us, mixing the stories, the information, the statements that were given, then we would go out and we would subpoena records.

We would say:  "Okay.  You told me this happened.  Now let

me go find a bank record to show that it truly did happen," or: "You mentioned you were getting phone calls.  Let's serve subpoenas to companies and verify that, in fact, you were getting these phone calls coming from Mexico."  And you start overlaying all those levels -- layers of evidence, and it leads you to potential subjects, right, at this point.

So from there it turns into taking maybe a nickname that someone described with a bank record, and you start building that to an identity.  And then you can go back to people, and you could say, you know:  "You mentioned so and so.  Do you recognize anybody?"  And then you start having a face to a name to a transaction.

And this is not a fast process.  Unfortunately, it takes a long time.  We wish we could move faster.  But that's sort of how we get to identify targets generally.

Q.   Did there come a time that you learned about boat captains as a part of this organization?

A.   Yes.  We knew about the role of the boat captains in this since the beginning of the investigation.  All of the smuggling activities of the organization were mostly maritime, which means coming by boat.  As we learned about the roles of boat captains, how they sort of are a piece of this enterprise, we had interviewed people, we had charged people who participated as boat captains, and through -- not only through their statements to us explaining like why they did what they did,

how they did what they did, we learned that most of the boats that are used are stolen vessels because they don't want to get caught with a boat in their own name and make it that much easier.

So after several what we call interviews or debriefs of these people, as well as talking to victims who themselves were put on these boats, describing what style of boats they were, what it looked like, how many engines were on them, did they go fast, were they slow, did they look like they were homemade, or were they, you know, what we would call like a fishing vessel, we got a lot of information from not only cooperating defendants, but also from the victims themselves.

Q. Did you know the identities of these boat captains when you first learned that they were part of the organization?

A. No. We knew -- there have been nicknames -- some of the times when we'd ask people, particularly the victims on these boats, they might have overheard a possible nickname that at the time we would document, but it didn't make much sense at that time. You know, some things come full circle a year or two later, and you can eventually put a real name to anything.

But at that point, we just understood the role of the stolen boats. We understood the role of why these boats are used, how they're used, but we did not actually have right away names of boat captains.

Q. Did there come a time when you learned about the alteration

of HIN numbers on the vessels that were being taken or used by the organization?

A.   Yes.   So what -- a HIN number is very similar to a VIN number on your vehicle, a vehicle identification number.  It's a unique number that's assigned to your vehicle, not quite like a license plate.  So I don't mean to oversimply it, if you're familiar with this term, but it's just a number that references like your vehicle.  It's a serial number for your vehicle.  Boats have the same thing.  Instead of VIN, they call them a HIN, because a boat is called a hull, and so -- H-U-L-L -- and so that's the number that identifies a specific boat.

So in order to -- because these boats are stolen, they don't want to appear stolen because that causes attention from Coast Guard or other any sort of maritime law enforcement patrols, the organization has people in there who will do as best of a job they can to clone a real VIN number.  So if you were to stop this person --

THE COURT:  Ms. Klepach, if I can just ask the witness to just slow down a little bit.

THE WITNESS:  Apologize, Judge.

MS. KLEPACH:  Thank you, Judge.

THE WITNESS:  So -- forgive me.

The organization would have people whose job was to create what we call a cloned VIN number.  They would take a VIN number that looks real.  It might be a real number for somebody

else's vehicle or boat.  And it would be good enough to, at least at face value, show that this is a legitimate number, it had the right amount of characters, and they would put that on these stolen boats to sort of like evade detection by law enforcement, to make it less obvious.

BY MS. KLEPACH:

Q.  Were some of these vessels used to transport migrants?

A.  They were.  So through the investigation as well, we learned that there were several reasons why they would take vessels -- stolen vessels and bring them over to Mexico a lot of times.

So they had multiple purposes.  One of the purposes is smuggling people, right?  Again, we talked about how you can't do that with a boat in your own name.  So they would use it for smuggling humans.  They would also use it to be able to sell on what we would call like the black market.  You can take a lot less profit from a sale if you don't have to pay for the boat yourself.  So they would steal the vessels, and they would be able to sell them most of the time in Mexico and elsewhere.

Q.  Do you know what, if anything, the proceeds of those boat sales were used for?

A.  Sure.  The business of -- the overall business is very expensive for this criminal organization.  In order to operate in Mexico, there are larger criminal organizations, as the Mexican cartels.  And in order to operate in Mexico, you have

to pay them -- if you're not part of the cartel themselves, you have to pay them to be able to operate in their territory.  So the boat sales feed into the machine, because each migrant vessel costs the organization a certain dollar amount.  It's very expensive.

In addition, if there are corrupted police officers in the area, one of the ways to do that is through money.  So in order to sort of feed the -- for the organization to profit, there's multiple revenue streams that they have to do.  It's not just the profits made off of smuggling migrants.  It's also through their boat sales and other means.

Q.  All right.  I'm going to direct your attention to on or about November 21st of 2019.  Did there come a time that you were contacted by Mexican law enforcement regarding a vessel ending up in Mexico that was believed to be stolen from Florida?

A.  Yes.

Q.  Prior to being contacted by Mexican law enforcement, in November of 2019, had you been working with Mexican law enforcement regarding the investigation that you have been describing?

A.  Yes.  Approximately six months earlier, let's say around the summertime, I had spent approximately a month working in Mexico City at the US Embassy.  While I was there, I had made a trip to have a meeting with officers and other officials in the

Yucatan area of Mexico, which is the peninsula where you have Cancun, and Merida, and other cities like that.

The purpose of my meeting at that time with them was to let them know that we had been investigating this long-term investigation into groups that were down there that were not only stealing boats from Florida and bringing them over to Mexico, but also involved in the human smuggling and the kidnapping of other migrants that were operating in their area.

They, at that time, were also sharing information with us, and let us know that they had sort of a parallel investigation as well into some of the same targets and additional ones that we hadn't even known about at the time.

Through that sort of like sharing of information, they had provided us with names that we had known about, but we just didn't have a ton of information about yet.  It was kind of sort of a launchpad for both of our investigations.

So we, at that time, learned from them, just as if they were learning from us.

Q.  So when you were contacted in November of 2019, what, if anything, was the believed connection between that vessel and the investigation that you had going on at the time?

A.  So in November, when they contacted us to tell us about what they had just encountered, I was provided with a picture of a boat that -- from one of the police officers in Mexico, and a photo ID.  And at the time I can't recall if it was a

Florida driver's license or a passport, but it was some sort of a US document with a picture of Javier Hernandez, and then a picture of a boat.

And the point of that conversation or that call from the Mexican officer to me was:  "Do you know who this person is?  Is this one of your targets?"  And to follow up with that, he told us at the time he was -- the officer was not an expert in the stolen vessel world.  So he had asked us if we had any expertise in identifying that vessel that had been stolen.

The reason why he had to ask that is the vessel had appeared to be completely like primed, as if it used to be a shiny green color, and now you could tell it had been in the process of being repainted.  And they were just curious because they couldn't find any obvious identifying marks to see if it was like a vessel that had been reported stolen.

So we started working with them and explaining to them that -- obviously, as they knew, we were interested finding captains who were the ones bringing the boats over to Mexico.  We did not know anything at that time about Javier Hernandez, but it fit the model of what we were discussing in our earlier meetings, that:  "This is what we're looking at."

So we told them:  "We'll be there as soon as possible."  We got our approvals to travel to Mexico.  And we went to Merida, and I physically got to see the boat.  I took pictures of the boat, confirming the condition it was in, and it sort of like

kept going from there.

Q.   All right.  Let me take a step back for one second.  At the time that you received this call from Mexican law enforcement, was Mario Enrique Lopez an individual who was a target of the investigation?

A.   Yes.  Back in our initial meeting in the summer of 2019 with the Mexican law enforcement, they had informed us -- we had heard through earlier iterations of the investigation the name Neco.  It was a nickname.  And it was a nickname for a person named Mario Alberto Enriquez [sic] Lopez.

So we had always known him to be sort of a Mexican business owner that worked a lot of times directly with this like organized crime group.  So they knew that he was a target of ours.  And when we met with them, they had put together their own version of an analysis, saying that a lot of the boats that they find have come from Florida and his businesses.  And when I say:  "His businesses," he owns a marina and other businesses in Mexico.

Q.   Do you recall the name of that marina?

A.   Yes.  His marina is called Marina Akumal.  That's spelled A-K-U-M-A-L.

Q.   And was the vessel that the Mexican law enforcement officials called you about found at Neco's marina?

A.   So I was not the person who actually found the vessel at the marina.  We -- working with our foreign partners in Mexico,

they conducted a stop and found the vessel in the area of Neco's marino -- I'm sorry -- Neco's marina.

So when they contacted us to tell us this information, they started sharing like why they were calling us, what they found, and it was found in the area of Neco's marina.

Q. All right. So you traveled to Mexico. What happened when you got to Mexico?

A. When I got to Mexico, the Mexican officials took me to go see the boat. I was able to photograph the boat. One of the purposes of me traveling to Mexico and photographing the boat is because we had identified the victim of -- the boat owner, back in Florida. So we wanted to confirm that the boat that we see here in Mexico is the boat that had been reported stolen in the area of Naples, Florida, which had already been reported stolen to the police. There were bulletins circling around the Internet. There were Facebook groups, different things.

So we took the pictures of the boat, and we reached out to the police department who had initially taken the stolen boat report, and confirmed with the victim that, yes, this, in fact, was his boat. It was easily recognizable for him.

MS. KLEPACH: May I have the ELMO, please.

BY MS. KLEPACH:

Q. All right. I'm showing you what's in evidence as Government's 60. Do you recognize this?

A. Yes, ma'am.

Q.   What is this a photograph of?

A.   This is a photograph of the boat that was seized by the Mexican officials, and this is actually at their police headquarters station in the parking lot.

Q.   I'm going to flip through some of those photos.

A.   And so, what you'll see here is the color I was sort of describing.  It looks like a very dulled version of a green.

When paint is fresh and green, it's sort of a shiner coat. What you see here is an attempt to strip the paint, so that it can be repainted, usually for the purposes of masking what it originally looked like.

Q.   What are we looking at here?

A.   We're looking at the aft end of the boat, which refers to the back side of the boat.  And what you see are two outboard engines, made by Yamaha.  Each one of them is 300 horsepower.

MS. KLEPACH:  And for the record, this is Bates Stamp 177 of Exhibit 60.

BY MS. KLEPACH:

Q.   What are we looking at here?

A.   What you're looking at here is what we call like the area where the motor mount attach -- so this is where the engines themselves -- which you couldn't probably see in that other picture -- mount to the actual hull of the vessel.  And the interesting piece -- what you're looking at here is there's a rectangular box right next to the threaded bolt, if you can see

38

what I'm talking about.

Q.   Let me circle it.

A.   Am I able to circle it or --

Q.   There we go.

A.   So this area right here is where there would be a sticker placed from the manufacturer.  And on that sticker it would entail things like the serial number of the -- each engine has its own serial number.  So you would have that there.  You'd also have like the brand of the engine, the horsepower, and specific items listed about what that engine is.  And what you see here is that had been removed.

Q.   Okay.  So now let's go to Bates Stamp 178 of that same exhibit.  What are we looking at here?

A.   So this is not on the engine.  This is on the area where the electronic devices would be of the boat.  So in a boat you have different types of electronics.  You might have GPS devices.  You might have other instruments with screens on them.

     So what you're looking at here is just the electronic piece of the vessel with a sticker that just has a serial number of whatever that electronic piece is.

Q.   All right.  So is this a piece of identifying information for the boat itself?

A.   Not to my knowledge.  This more so relates to this piece of electronic equipment.

Q.   This is Page 179.  What are we looking at here?

A.   It comes in a little dark on my screen.  But what I'm seeing is like wiring harnesses.  Honestly, from this view, I can't quite see what parts its connecting.  But I can tell you that, as far as being a section of the boat that I would identify as being an identifying area of the vessel, this picture would not describe that.

Q.   This is Page 181.  Can you tell us what we're looking at here.

A.   So we had taken several pictures of different parts of this boat at the time.  One, they weren't all intended to show areas that had the serial numbers of the boat or not.  A lot of this was to bring back these photos to the owner and just confirm recognition of his vessel and the condition it might have been in when he had the vessel and things like that.  So that's probably -- that is the reason for some of these additional photos like this.

Q.   All right.  This is Page 183.  Can you tell us about this photo.

A.   Again, this is not an identifying serial number for the vessel or the engine.  This is a -- it looks to be another part.  A lot of parts have their own numbers printed on them from their manufacturers, and they're put together to make what we call the whole boat and the engine.  So not a unique number.

Q.   All right.  So what, if anything, else did you receive from

40

Mexican law enforcement when you went there in November of 2019 -- excuse me -- in December of 2019?

A. So when I showed up, as well as taking the pictures of the boat with them, they also provided me a few different phones that they recovered from their encounter with Mr. Hernandez.

Q. And let me take a step back. Do you recall when you traveled to Mexico?

A. It wasn't immediate. It was within the first two weeks. In order for us to travel internationally, we have to go through different levels of approval. So it wasn't immediately, but within a couple weeks, I believe, of early December.

Q. What kinds of phones did you receive?

A. So we received two cellular phones, as well as two -- what we call satellite phones. Satellite phones are similar to a cellular phone, except for they connect to a satellite. Most of the time, satellite phones are used for people that are going to be away from cell phone towers. For example, like out on the high seas, you're not going to connect to a T-Mobile tower. So like, you pay a little bit more money to connect to satellites. So we collected all those types of phones.

Q. All right. I'm going to show you --

MS. KLEPACH: Permission to approach the witness?

THE COURT: You may.

MS. KLEPACH: Thank you.

BY MS. KLEPACH:

Q.  I'm going show you what's in evidence as Government's Exhibit Number 3.  Do you recognize that?

A.  I do.

Q.  What is that?

A.  This is the phone I collected on my trip to Mexico, that was provided to me by the Mexican officials from their encounter with Mr. Hernandez.

Q.  Can you describe the state that the cell phone was in when it was given to you.

A.  Sure.  I'll hold it up for you.  So this evidence bag you see here is the FBI's evidence bag.  So this was not how it was received.  This is how we packaged it.  But what you'll see is a manila envelope.  So when we received it from Mexico, they had turned it over to me where the phone itself was within this small manila envelope, with a little bit of writing on the envelope.

Q.  Was the manila envelope sealed?

A.  I don't recall if it was actually taped or folded over, but it was just used and wrapped up to contain the phone when they handed it over to us.

Q.  And do you recall if the phone was on or off?

A.  It would have been off.

Q.  Were you given information by the Mexican law enforcement officials regarding certain information that may be found on

42

that phone?

A.   Yes.   It's my understanding that there were messages on the phone when they took it from Mr. Hernandez.

Q.   Do you know what kinds of messages?

A.   So not the content of the messages, just that there were messages on the phone that they thought we could probably benefit from in our investigation.

Q.   You mentioned satellite phones.   Can you describe how you received the satellite phones.

A.   Sure.   We received them in the same manner at the same time when we went over there.   The satellite phones were kept in a larger box.   I don't believe we brought the yellow boxes today, but they were kept in what we call a Pelican case.   It's a heavy-duty plastic case with some fat foam padding, and it was just like a carrying case for the satellite phones.

          MS. KLEPACH:   One moment.

     (Pause in proceedings.)

          MS. KLEPACH:   May I approach?

          THE COURT:   You may.

BY MS. KLEPACH:

Q.   All right.   I've just handed you what's been premarked for identification as Government's Exhibits 109 and 110.   Do you recognize those?

A.   I do.

Q.   What are they?

43

A.   These are the satellite phones I was describing, with a charger as well.

Q.   Are these in the same or substantially the same condition that they were when you received from Mexican law enforcement?

A.   Yes.   They were just within a box, but yes.

MS. KLEPACH:   At this time, the Government offers Exhibits 109 and 110 into evidence.

THE COURT:   Is there any objection?

MR. FEIGENBAUM:   No objection.

THE COURT:   Admitted into evidence.

(Government's Exhibits 109 & 110 received into evidence.)

BY MS. KLEPACH:

Q.   What did you do with these items once you received them?

A.   So once I received them, I was still in Mexico.   I eventually traveled back to Miami, to my field office.   And what we do with them at that point is we write a report and we turn it in to our evidence control room.   That's why you see these bags that are here.   I didn't travel with the bags, but these are the bags that we collect evidence in.   And when we submit them, they just get turned over in to evidence so that we can access them as needed later.

What I mean by that is we had plans to apply for a search warrant because we would like to see the contents in the phone. We thought they would be of use maybe to our investigation.

Q.   All right.   And is that the same procedure that you

44

followed with respect to Government's Exhibit 3, which is the cell phone?

A.   Oh, 1B107 -- yes.

Q.   What is 1B107?

A.   So I apologize.  1B107 is the cellular phone that I just had --

Q.   But what -- the number 1B107, what does that mean?

A.   Oh, I'm sorry.  1B107 refers to how the FBI catalogs our evidence.  We call them 1B numbers.  They always start -- if it's a piece of physical evidence, with one, the letter B.  And then, in your case, if it's the first item you collected, it would be 1B1.  This is 1B107.

Q.   All right.  So you talked about applying for a search warrant.  Did you actually do that?

A.   I did.

Q.   And did you obtain a search warrant?

A.   I did.

Q.   About when did you obtain the search warrant?

A.   We obtained the search warrant approximately late February to early March.  If I could view something to give you an exact date to refresh my memory, I would.  But I believe it was right around late February, early March of 2020.

    We seized the phones in the end of 2019, and we were able to get our search warrant in the beginning of 2020.

         MS. KLEPACH:  Okay.  One moment.

(Pause in proceedings.)

THE WITNESS:  As my memory serves, I believe it was February 27th or 28th of 2020.

BY MS. KLEPACH:

Q.  All right.  And after you obtained the search warrant, what did you do?

A.  So at that point, when we get authorization from a judge to have the search warrant to -- we are now authorized to start reviewing the phone for its contents.

So what that means is the FBI has software that we use called Cellebrite.  So we are able to plug the phone in to this software that we have, and it pulls as much data as it can at the time, depending on the software.  It will give us a report of what we hope is everything, but it's not always -- of all the contents in sort of a readable version of the phone.  So that includes usually messages, the phone contact list, if there's photographs, emails.  It pulls as much as it knows how to pull at that time.

Q.  And would reviewing a copy of the actual warrant refresh your memory as to the date that it was signed?

A.  Yes.  I believe that I was close to the date, but I'm not sure if it was the exact date.

MS. KLEPACH:  May I approach?

THE COURT:  You may.

THE WITNESS:  I was close.  February 26th of 2020.

BY MS. KLEPACH:

Q.  All right.  So let's back up.  We were talking about Cellebrite.  Did you perform an extraction of the device that's in evidence as Government's Exhibit Number 3?

A.  Yes, I did.

Q.  Were you able -- and did you review the data that was recovered as a result of that extraction?

A.  Yes.

Q.  Did you review that data?

A.  Did I review the data?  Yes.

Q.  Were you able to recover WhatsApp data?

A.  No.  WhatsApp -- there was a limitation at the time to recover all the data that was on -- and it -- without being too technical, certain phones are able to get certain information off of them, given the software we have access to at that time. As the software improves, we can likely get more information off of the phones as we're connecting to it.

At that time, the software we had access to, I was able to plug in the phone and get a version of the contents of the phone, but I was missing certain pieces.  That phone extraction that gives me the information that's on the phone was missing any WhatsApp messages.  WhatsApp being the texting and calling application that you can use.

That was important to me for a few reasons.  One, through

my investigation, many of the people that we had investigated in the past, they all rely, especially for international communications, on the WhatsApp application. It was also important to me because we knew from our conversations with the Mexican officials that we should have expected to see messages like that on their phone.

So once the extraction was competed, and I saw the report that was generated, it was missing that. I spoke to our forensic examiner experts at the office. We call them our CART Team. And they had said that a lot of times that software at that time wasn't going to be able to get everything off of it.

So there's a workaround. And what we do at that point is we have to just physically like take a camera -- I know it seems very simple -- and take pictures of the messages that we want because the report wouldn't generate that for us. So that's what we did.

Q. Okay. When you take photos of the chats in WhatsApp -- did that allow you to get all of the relevant information from those conversations?

A. No. You are limited when you have to browse WhatsApp manually on a phone, especially -- so let me backtrack a minute. We have to keep the phones in what we call airplane mode. And what that does is it doesn't allow the phone to connect to an actual signal that can download data anymore.

So a lot of times WhatsApp -- you'll see like, if there's

an image that two people sent to each other, but it was not one of the most recent ones, it might not have fully downloaded at the time.  So it would be like a blurry thumbnail or a very small image.  So you're limited on getting what you're looking for because it's not going to show up if you just are like looking at it on a phone.  If you were to connect that phone to the Internet, it would download older data on it and you would be able to pull that image up.

So we were missing that piece even by taking pictures.

Q.  So were you limited originally in the information that you had gotten from Mr. Hernandez's phone?

A.  Yes.  We were limited.  And I was told at that time -- when I asked our experts from CART for information as to what we could do, I was told at that time that we -- with the software we currently had, we weren't going to be able to get what I saw to exist on the phone, due to the version of the Cellebrite software that we had.

Q.  Was there a version available that would have assisted in obtaining additional data?

A.  Eventually, yes.  At the time, in our field office, we did not have -- and "we," I say the actual agent did not have access to that.

A time comes where we have a few licenses to have this enhanced version of this Cellebrite software.  They were not available to every FBI field office.  So what happens is a few

offices have this better version to connect your phones to, and you can get almost everything you would probably be looking for; however, our office did not have one at the time.

So the option was, once it did become available, is to submit your phone to -- Quantico I believe is where they had it at the time, and maybe a few other field offices.  But you were put in a lengthy waiting list because the most important cases, in terms -- I say:  "Important."  I mean if there's people actively being hurt or crimes against children, those are the phones that are going to be looked at first for realtime extractions.  Our phone would have had to be on a long waiting list until our field office got the better software.

Q.  And did the FBI Miami Field Office eventually get the better software?

A.  We did.

Q.  And is that called the Cellebrite Premium Software?

A.  It is.  Yes.

Q.  Were you eventually able to obtain the extraction that had all of the WhatsApp data using that premium software?

A.  Yes.

Q.  Did that take place on or about April of 2021?

A.  To give you exact date off memory, no.  But it would have been right around the date you're mentioning.

Q.  In the time you were waiting to receive that additional software, did you go back and take more photos of WhatsApp

chats or more photos of the phone?

A.   Yes.  Not just WhatsApp chats.  Another limitation of the software that can pull data off to create a nice, pretty report for us is that there are certain applications that are on phones that have their own databases behind them.

One of the things I recognized on Mr. Hernandez's phone was a phone application called Navionics.  Navionics, I'm familiar with because that's a maritime navigation app, where you can save routes and waypoints for any sort of your like nautical journeys.  So we had to document that just through manual photographs because we knew the report from Cellebrite wasn't going to show us that.

Q.   So between March or April of 2021 and April of 2022, can you discuss how your investigation into Mr. Hernandez progressed.

A.   Sure.  So once we had a chance to, like I said, meet with our Mexican officials, identify this first boat, apply for the search warrant that allowed us to review the contents of the phone, then we had enough information to start requesting authorization to collect more evidence.

And what do I mean by that?  There's a process that we can do, called a search warrant, in order to get what we call your cellular site locations.  So that requires us getting authorization from a judge.  And what we did is we took the known phone numbers that we had for Mr. Hernandez, and we

requested from the phone company that they give us the location data from his phone between the time period that we were requesting.

So we requested a period of time to know the location where Mr. Hernandez's phone was. And then they would provide that to us eventually, which would have all of his call detailed transactions. What I mean by that is every single time his phone is hitting to a tower, or some sort of a network connection, any time he makes a phone call, Googles something, the phone is collecting all that data. And that helps us, through our investigation, identify the location of Mr. Hernandez's phone during the time period requested.

So that was one of the steps that we took to relate that to the known boat thefts that we were investigating.

Q. And how were you able to link boat thefts -- particular boat thefts to the Defendant?

A. So once we had our first physical boat, and we saw the actual item, which was that the green boat you saw earlier, and then we had access to the phone, we started looking for patterns. So we had a basic understanding of how that event happened.

So when we applied for the search warrant to see his locations, we were also getting all of the -- a list of all of the different boats from the west coast of Florida police departments that we were starting to work with. That included,

but not limited to, the Naples Police Department, Marco Island, Collier County -- the areas on the southwest part of the Florida. So we asked them to provide us any stolen boats that they had that had been reported within a certain amount of years that met a criteria that we found to be what we were looking for.

And that was usually boats around the 28- to 40-foot range, boats that are capable of making a crossing in the open seas from the area of Florida into Mexico. It's usually going to be a boat that had two engines. So we were giving them a list to start filtering down for us, and they did that. They provided us a list of several different vessels. And in each of their reports, they had listed the rough date and time that these boats were reported stolen.

So what we did, we took the evidence that we had collected, which was the cellular site locations, and we overlaid that with the date and times of -- approximate dates and times of the boat thefts. And then we took it one step further, and we requested to get Mr. Hernandez's official travel records -- in and out of the country that is. And what we found is, on several occasions, we found the exact same pattern. The boat was reported stolen on a particular date -- Mr. Hernandez lived in the Miami area. And what we saw through the cell sites is his phone was pinging along the map if you were going from Miami towards the area of Naples or Marco Island. Right around

the date and time of the boat that had been reported stolen, we see no longer is there anymore cellular data for a short period of time for Mr. Hernandez's phone. Then we see nothing, except for a few messages that we had seen from his phone extraction, saying: "I'm in Mexico," or that his phone had connected to a tower in Mexico. So now we knew that Mr. Hernandez was in Mexico at that time.

The next time his phone starts showing any activity, from the information provided by the phone company, was once we see Mr. Hernandez had flown back from Mexico to the area of either Miami Airport or Fort Lauderdale Airport from either Cancun Airport or Merida.

And so what we now have is we have the date and time of a boat theft; we have the phone from Mr. Hernandez driving across the Everglades to those towns, stop getting any signal at that time; evidence showing that he's actually in Mexico at that time; his phone turns back on and we have a return flight into the United States, never with an outbound showing that he should be in Mexico. And what we did is we repeated that pattern on several different occasions.

Q. Did you also correspond that information to certain messages and other information that was on the phone?

A. Yes. So in the phone that we had, information from the Cellebrite report is also prior to several of these boat -- prior to several of these trips where he left Miami, he had

conversations with people on his phones describing or discussing the acquisition of extra fuel tanks.

It's a long run from -- on a boat from the west coast of Florida to Mexico.  You need a lot more fuel than what the boats could actually have on their own.  So they carry extra fuel tanks.  So there were several conversations with people in the Miami area that he needed to buy or pick up 15, 20, 30 different fuel tanks from them.  And they had conversations to make that transaction happen.

Then he had conversations with another co-conspirator, who lived closer to the area where the boats were actually taken from.  Some of those were that person sending him messages at night, being on some of these boats, asking Mr. Hernandez particular questions.  And then additional conversations with the recipient of these vessels in Mexico sharing weather maps and weather updates.  "Let them know I can't make it now" or "the seas are going to be too rough," or coordinating departures and arrivals for this lengthy maritime journey.

So we had all of these that were revealed in the phone extraction for Mr. Hernandez.

Q.  How long did all of this take?

A.  A very long time.  There are several reasons why this could take a long time.  One is there's a lot of data to go through. If you think about your own phone, how much information you probably have in there historically, how many people you've

spoken to -- not everybody in everybody's phone, even in criminal organizations, are of an illicit nature, right? Sometimes you have to order pizza.  Sometimes you talk to your family.  So there's a lot of data to go through to make sure what you're saying is relevant to your investigation.

And then we don't just rely on that one piece.  We then have to serve additional subpoenas.  We have to go talk to people.  There's many steps that, unfortunately, take a very long amount of time to accomplish that.

Q.  At the time that this piece of the investigation is going on, are you also still investigating the violent arm of this criminal organization?

A.  Yes.  At the same time that we're looking at this piece of the criminal organization, we are knee-deep in identifying people who are holding people hostage in Mexico, and extorting their families in the United States, and committing extreme acts of violence over there.  So our attention, naturally, would be to focus on that piece first, because we have to resolve that before we can focus on less threatening parts of the investigation.

So -- and as that part of the investigation goes -- as you can imagine, as we describe what steps and how long it takes to investigate the way we're investigating these boat thefts, you can only imagine how long it would take to identify victims of this violence and the kidnappings, and working with foreign

partners.  So it is a very drawn-out process, even to go after, you know, violent entities.

Q.  On or about December of 2020, did you travel to Mexico and receive cell phones that were identified as belonging to Jose Miguel Gonzalez Vidal?

A.  Yes.

          MS. KLEPACH:  Permission to approach?

          THE COURT:  You may.

BY MS. KLEPACH:

Q.  I'm going to show you what's in evidence as Government's Exhibits 19 and 28.

A.  Okay.

Q.  Do you recognize those?

A.  Yes.  Those are two phones that were seized off of Jose Miguel Gonzalez Vidal in Mexico.

Q.  Did you collect these phones and bring them back to the United States?

A.  I collected the phones once they were given to me in the United States.

Q.  And who were they given to you by?

A.  They were given to us by Mexican law enforcement.

Q.  Did you review the contents of those devices to see if there were any connections between Jose Miguel Gonzalez Vidal and the Defendant?

A.  We did; however, it was not immediate.  Just as we talked

about with the other phone for Mr. Hernandez, we had to go through the same process of applying for a search warrant, which requires us explaining to a judge all of our reasons why we believe there would be evidence in this phone.  So that in itself can take some time.  So we eventually received authorization to search those phones.

Again, at that point, other things can happen.  They can also stop you from being able to see the contents of those phones.  Sometimes the phones can be password-protected in a manner that our technology isn't able to break.  Also, things can get caught up in what we would call like a filter review.  If there's potential information on there that the agents would not be privy to, whether it be maybe conversations with a lawyer or different things, up to a judge to decide whether or not we have access to all the information.

So prior to us being able to see the phone, we have to sort of wall ourselves off from it, and it has to go through what could be a lengthy -- what was a lengthy process, until the phone was given to us, so that we could start using the evidence that we found in that phone to continue our investigation.

Q.   Were you eventually able to find communications between Jose Miguel Gonzalez Vidal and the Defendant?

A.   Yes.  So we had found communications from Mr. Hernandez and from Mr. Vidal on both phones.  We had phone -- in the 1B107,

which is the phone that belonged to Mr. Hernandez, we found his communications with Mr. Vidal -- with Jose Miguel Gonzalez Vidal. And then also, in those two phones that I just identified which belonged to Gonzalez Vidal, we identified conversations with him and Mr. Hernandez in his phones as well.

Q. How did you know that the conversations were between those two individuals?

A. So in the actual contents of the -- I'm sorry -- in the contact list -- at first, for Mr. Hernandez's phone, he did not have Jose Miguel saved by name in his contact list. He only had sort of a -- I don't know if the term is correct, but an emoji, which was a smiley face with sunglasses. That's how it appeared in his contact list. But through our understanding of what that phone number was, we knew that we were able to link that to Mr. Vidal.

On the other side, when we're reviewing the phone for Mr. Vidal, and to look at the conversations that he had with Mr. Hernandez, he actually did have Mr. Hernandez's name saved -- or partial. So Mr. Vidal saved Mr. Hernandez's name as "Javi Gordo Estafador." "Javi" being short for Javier. And it was also a known phone number that we had already identified for Mr. Hernandez.

Q. Do you speak Spanish?

A. I do.

Q. What does "Gordo Estafador" mean?

A.   So "Javi," again short for Javier.  "Gordo" is fat.
"Estafador" is swindler.

Q.   Did you then use that information when you spoke with Mr. Hernandez?

A.   I did.

Q.   Okay.  Taking one step back, does Jose Miguel Gonzalez Vidal have any aliases that are you're aware of?

A.   Yes.  So in addition to being called Jose Miguel Gonzalez Vidal, he is also, by himself and his associates, referred to him as "El Chupa."  I can spell that, if need be.

Q.   All right.  So now you mentioned at the beginning of your testimony that you interviewed the Defendant.

A.   I did.

Q.   Did that take place on or about April 18th of 2022?

A.   Yes.

Q.   When you went to interview the Defendant, did you approach him with a target letter?

A.   I did.

Q.   What is a target letter?

A.   So a target letter is something that -- not entirely decided by the FBI.  This is something that we work with our assistant United States attorneys -- thanks, Arielle.  So a target letter is identifying or notifying a potential defendant -- or at this point it would be a defendant -- that you are the subject of our investigation.  It's an opportunity

for him to get an attorney, so that we can attempt to resolve his case.

Sometimes we attempt to resolve cases before they have to be formally indicted. And it all depends on a bunch of scenarios that are out of the agents' purview. Most of that lies with the United States Attorney's Office.

But yes, that's essentially what a target letter is, is notifying them that you're the subject of an investigation and to get attorneys to contact the US Attorney's Office.

Q. Where did this conversation with the Defendant take place?

A. This took place in the first floor, sort of like common area, lobby area, of Mr. Hernandez's either condominium building or apartment building.

Q. Was he under arrest when you interviewed him?

A. No.

Q. Did you nevertheless read him his Miranda rights?

A. I did.

Q. When you approached the Defendant and spoke to him in April of 2022, did you present him with the evidence that you had against him?

A. I presented him with a very thorough representative sample of the evidence that we had against him. I prepared a document for him, to let him know that this was not something that just fell out of the sky, that we are very prepared. We wanted him to understand the sincerity of what was happening here.

So we don't always do this, but we made a determination in our investigative team that, let's just put our cards on the table, let's let him see everything, in hopes that he would understand it, and then we can have a more meaningful conversation with him about what was going to transpire.

Q. And was that in the format of a PowerPoint presentation?

A. It was.

MS. KLEPACH: May I approach?

THE COURT: You may.

BY MS. KLEPACH:

Q. All right. Agent Spielvogel, I've just shown you what's been marked for identification as Government's Exhibit 108. Do you recognize that?

A. I did.

Q. And what is that?

A. That is a copy of the PowerPoint presentation that I prepared to -- and I showed to Mr. Hernandez at his home.

Q. And did he speak with you about the contents of this PowerPoint presentation?

A. Yes. We went over every line thoroughly together.

Q. And is this a fair and accurate copy of that presentation that you presented to him on April 18th of 2022?

A. Yes.

MS. KLEPACH: At this time, the Government offers Exhibit 108 into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  All right.  Admitted into evidence.

(Government's Exhibit 108 received into evidence.)

BY MS. KLEPACH:

Q.  All right.  So what I want to do now is go through this presentation for you to explain it to us and tell us what the Defendant said about it.

A.  Okay.

MS. KLEPACH:  Okay.  So that's Bates Stamp Number -- Page 197.

BY MS. KLEPACH:

Q.  Can you tell us what we're looking at.

A.  Sure.  This is the first example of one of the stolen boat cases that I was presenting to Mr. Hernandez to show him all the evidence we had collected.

So what you're looking at here -- I titled it "The Stolen 29-Foot Southport."  Southport was the brand name of the boat that was stolen.  And I showed that this is the Naples Police Department report on the left.  It's just a screenshot of like the front page of their police report.  And in that, it has a date, a time, the officer name, and other details describing the stolen boat report.  And on the right, it's just like for reference.  It's a picture that I took of -- or a picture of the vessel.

Q. All right. And what, if anything, did the Defendant say to you with respect to the information relating to the Southport boat?

A. So -- well, this is only the first page of the information about the Southport. If you continue in a second to the follow-on pages, there's -- we -- there's a few pages that actually show all the evidence that we have related to -- or some of the evidence related to this Southport.

So what we showed him was -- sorry.

Q. Sorry. All right. So let's go methodically and start on the column on the left-hand side.

A. So even before this, what I told Mr. Hernandez was that we had prepared this document that's going to be showing him several occasions where the same thing would happen over and over again, and the type of evidence we collected, and that I wanted him to just see this with me, and we would -- so again, the first one is the Southport, and we start off by looking at communications.

So these -- what you're looking at here on the far left column are all from a Cellebrite report that was generated when we extracted Mr. Hernandez phone. These are his communications sending back and forth picture messages with his co-conspirator. You can see it's titled "Ramon Barco" in each one. So if you look at the -- we'll take the very first image right here. The title up on the top, where it says: "Ramon

Barco 1," that's the contact name for how Mr. Hernandez saved this person's name in his phone.  So each of these messages is with -- communication with Ramon Barco 1.

And as you see, there's a picture.  And that's a picture taken obviously in the nighttime, under darkness.  And what you'll see is a date and time at the very bottom of when this picture was sent from Ramon to Mr. Hernandez.  So all of these that you're seeing here are images from Ramon to Hernandez.

Q.  All right.  So all of the photographs on this page were sent from Ramon to Hernandez?

A.  Correct.  These are photographs taken of this 29-foot Southport in the middle of the night and that were sent to Mr. Hernandez.

Q.  And is that a boat that you later learned was named the *Luca Brasi*?

A.  It is.

THE COURT:  Ms. Klepach, just let us know when it might be a good time just to take a comfort break.

MS. KLEPACH:  Judge, I think now is a fine time.

THE COURT:  Okay.  Ladies and Gentlemen, let's go ahead and take a 10-minute recess.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury not present, 2:31 p.m.)

THE COURT:  We're on a 10-minute recess.

MS. KLEPACH:  Thank you.

(Recess from 2:31 p.m. to 2:43 p.m.)

THE COURT:  Welcome back.

COURT SECURITY OFFICER:  I'll make sure our jurors are here, Judge.

THE COURT:  Thank you.

(Pause in proceedings.)

COURT SECURITY OFFICER:  They're ready to go, Judge.

THE COURT:  Okay.  Both sides ready to continue?

MS. KLEPACH:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right, then.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 2:44 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

We'll continue with the direct examination.

BY MS. KLEPACH:

Q.  All right.  Agent Spielvogel, before the break, we were talking about these photographs that were exchanged between Ramon Barco 1 and the Defendant.  What does "barco" mean?

A.  Barco is a Spanish word for boat.

Q.  Okay.  And when were these messages sent?

Case 1:22-cr-20557-BB Document 241 Entered on FLSD Docket 06/08/2024 Page 66 of 158

66

A.   You'll notice at the very bottom of each of the little snippets that they are sent at October 25th, 2019, all of them.

Q.   Okay.  And did you later determine who was the owner of the number associated with the Ramon Barco 1 contact?

A.   Yes.

Q.   Who is that?

A.   The person's full name is Ramon Reyes Aranda.

Q.   What, if anything, did the Defendant say with respect to these messages?

A.   So as I was showing the Defendant these messages, he acknowledged that he was familiar with these photographs, that it was of no surprise to him that these photographs were there, and it was just a simple acknowledgment of he knew what they were.

Q.   Did he say anything with respect to what happened after these photographs were sent to him?

A.   Well, as we went through these photographs, you know, he was asked several questions about them, in addition to showing what we found, and he wanted to acknowledge that Ramon was the person who was taking these pictures and then sending them to him.  And if you'll see, going further, I believe it might be on the next slide, there's additional communication.

     Okay.  So what you're seeing here, we sort of have a triangle of a conversation.  You had -- on the slide you just saw, there was messages prior to the boat being taken, which

Ramon was sending Javier in the middle of the night, taking the pictures of the boat.  Then what you see here -- and that was on October 25th.  Then what you see here is approximately a month later, November, there is conversations with Neco, who we identified as Mario Alberto Enriquez Lopez, discussing when Javier would be leaving Florida to come to Mexico.  And there were several back-and-forth messages between them.

Q.  Okay.  And what did he say, if anything, about the relationship between himself, Mr. Reyes Aranda, and Neco?

A.  So the relationship that Mr. Hernandez told to us at that time was that Neco, who was the owner of Marina Akumal, he would put in sort of a wish list of different types of boats that he was looking for.  And that wish list was usually sent to Ramon.

Ramon lived on the west coast of Florida, in the area of Naples, Marco Island, all of those little towns.  And Ramon would identify the boats that Neco had been looking for.  And then he would contact -- well, he or they would both be able to contact Javier, who would be hired to take the boats over to Mexico.  Javier was a boat captain, knowledgeable in navigating from the United States into Mexico.

So that's sort of the relationship.  Neco picks them, Ramon identifies them, and then Javier is hired to bring them to Mexico.

Q.  At some point during this investigation, did you learn that

Neco had the Defendant listed as an employee at the Akumal marina?

A.   Yes.

Q.   How did you learn that?

A.   So in our meeting that we mentioned back in the summer of 2019, when the Mexicans were sharing whatever information they had related to our parallel investigation, they identified a letter that they had found on letterhead from Marina Akumal identifying not only Mr. Hernandez, but also other co-conspirators, some of them who would have already been indicted in other cases, as employees of the marina.

Q.   Okay.  Did the Defendant tell you anything else regarding Neco's preferences for the types of vessels that would be stolen?

A.   Yes.  So he mentioned that Neco preferred to have larger vessels, over -- I believe it was usually around like the 30- or 32-foot range or bigger is what he was looking for.

Q.   And during your investigation, were the vessels that you identified, in the way that you have described earlier, consistent with the requirements provided by Neco?

A.   Yes.  I believe the smallest one that we identified was 28 feet by brand name, but it actually -- a 28-foot boat is actually able to be up to around a 30-footer when you describe like the bracket and the engines off the back.  So it still met that criteria.

Q.   So what, if anything, did the Defendant say with respect to the messages that are on this page -- which, for the record, is Bates Stamp Number 199 of Exhibit 108.

A.   So when I showed him this, it was -- I explained to him like, obviously, where we got those.  And he understood that these were from his phone and that these were just discussing the weather and when he would possibly be able to leave. Because the conversation was talking about, basically:  "Is the climate okay?  Is it okay?  We're preparing to leave at the nighttime."

So it's coordination as to when they were expecting Javier to leave with the boat, so then Neco would know when the boat would be arriving.  And these messages are all in Spanish, but that's the general translation.

And then, towards the end, on the final picture, you see -- on this page, you see coordinates -- a screenshot of GPS coordinates that were saved in an app -- on a phone app that tells the location of where he is.

Q.   At any point, did the Defendant say he didn't send these messages?

A.   No.  He fully acknowledged the messages, and there was no dispute about what these were, when they were sent, why they were sent, was fully understanding of everything that was being discussed.

Q.   So now I'm showing you Page 200 of Exhibit 108.  Can you

tell us what we're looking at here.

A.   Sure.  In further effort to explain to Mr. Hernandez what we had found related to each of the boats that I was showing him this day, I showed him that on his phone I had also found pictures or downloads of that particular boat on his phone, to include -- on the far left picture, that's just a brochure that was saved of a Southport vessel, approximately the same size, being 30 feet.  And then the other pictures were saved as pictures that Mr. Hernandez had actually taken on the boat while out at sea.

What you see here in the second picture, from going left to right, is just a picture of the center console of the vessel, where you can see the color of the cushioning being brown, which was also helpful in identifying the boat that was actually stolen.

Going to the third picture, from left to right, you'll see a picture of the bow view, which is the front end of the boat, again, with that same tan/brown cushioning.

And then going to the fourth picture, you see all of those extra fuel tanks that I had described earlier that are required to take a vessel of that size from the Florida area into Mexico.

Q.   All right.  I'm just going to ask you to slow down a little bit.

A.   Apologize.

Q.   So how did you know that these photographs -- the three photographs on the right-hand side were taken by the user of the cell phone?

A.   When I reviewed Mr. Hernandez's cell phone, these were pictures that I had found on the phone, which the Cellebrite report can show you in the images section, just as if you were looking at your own phone and you have saved pictures.  So the phone itself is able -- based on the report, can tell the viewer where these pictures come from.

And the reason why that's important is sometimes pictures on your phone can be sent to you from you somebody else or sometimes they're the picture that you yourself took and then you might have sent them on.

Q.   What, if anything, did the Defendant say with regard to this slide?

A.   Zero surprise.  It was just an understanding that, yes, this was a boat that he took.

MS. KLEPACH:  All right.  Now, for the record, this is Page 201.

BY MS. KLEPACH:

Q.   Can you tell us what we're looking at here.

A.   Sure.  Earlier, I had mentioned that we applied for a search warrant to get the cellular location data for Mr. Hernandez's phone.  So what I put here on the left of this page is just a section of that data that related to the time

72

frame around when this particular boat was reported stolen.

So what I show here on the left is the actual data from the cell phone company.  And what I'm showing here on the right is my plotting of the points on a map that correspond to each of the data points you see on the left with the GPS data.

Q.  I'm going to move this a little bit over.  Can you explain the different plotting points that you were just talking about.

A.  Sure.  So if you're going to take a look at the left table -- I'm going to make a little mark.

Q.  Let me zoom out.

A.  Okay.

Q.  There we go.

A.  So let me explain all of the columns that you're seeing in this little table on the left.  So the far left column is the date and time that the data was captured for the cell phone. The second column is an associated rough address of where the data point hits, if the company was able to correlate that. The third column is a general area, getting a little bit broader to, let's say, the city.  For example, you see the top entry is Miami Beach.

The fourth column over is the first of the two required GPS coordinates to make for a plotted position.  So you have your north, your south, east, your west, your latitude, your longitude.  All of those come together to create a specific position on a map.

So the data that is provided by the cell phone company provides us an exact GPS location that relates to whenever Mr. Hernandez's phone is hitting off of a tower.  So those are what those next two columns are.

And then the fourth column shows us where that data comes from.  Mr. Hernandez's mobile subscriber was T-Mobile.  So that's the company that provided us this data.

Q.  Let me just stop you right there.  You mentioned the GPS coordinates.  To be clear, are those GPS coordinates of the exact location of the cell phone or of the cell tower where the cell phone was pinging off of?

A.  So these refer to the location of the cell phone as it relates to the tower.

Now, to clarify, this doesn't necessarily mean it's to the exact square feet of the location of the person.  There is a little degree of variance between that.  Not significant to be a different city or state altogether, but it's not enough to say:  "My two feet are standing right here."  So the tower tells it that it's very close to this location.

Q.  All right.  And so these blue dots that we see on the map on the right-hand side, are those the plots that correspond to the data that's in the table on the left?

A.  Correct.  So what you're seeing is -- if you look at the far right of the map, you'll see the area identified as Miami Beach.  That is a known address where Mr. Hernandez resides.

So when we go down the column of date and times in the table, we see that these earlier entries -- and I say "earlier" -- this is all over the course of one day.  It doesn't take multiple days to drive from Miami Beach over to Naples.  And you'll see that, as the data shows in the date and time of all of these points.

So they start in the area of Miami Beach.  And what you'll see, if you look at each of these blue little pinpoints that are placed on the map, you start in Miami Beach and you follow a typical highway route.  And you're making your way up, and you're going all the away across the state collecting data points as the phone is registering at different points.  Sometimes why there's not thousands of little data points as you cross the alleys because there's not really good reception when you go from Miami to Naples.  But you still do see the points in chronological order.

The last point you see is over in the vicinity of Naples, Florida.  And the date and time that that corresponds to is -- if you'll look at the table, all the way at the very bottom, above the second-to-last, in the black text, you're looking at November 20th, 2019, in Naples, with that GPS coordinate.  And that's the last time that T-Mobile had any record of Mr. Hernandez's phone hitting, until a later date when he's flying back into the United States.

What I mean by that is, if you look at the very last line,

that is not a data point provided by T-Mobile.  That is a travel record snippet -- a summary that we just put into this to show you that CBP provided us this data showing that Mr. Hernandez, on December 25th, had a flight from Merida, Mexico, which is where the boat was found, back to Miami.  And you'll notice that there's no outbound flight ever showing that Mr. Hernandez flew out of the United States to be into Mexico.

Q.  And what did the Defendant say when you confronted him with this information?

A.  So I first told the Defendant that he's going to see a few more examples of this same sort of evidence collection and analysis that we had, but that we had approximately 29 different times that we had found this exact same pattern of Mr. Hernandez leaving Miami, going to Naples, and then flights back to the United States with no outbound travel to Mexico.

Mr. Hernandez did not refute that.  Mr. Hernandez acknowledged that he remembers at least 20 occasions when he did take not only vessels, but vehicles -- vehicles over land routes and vessels over maritime routes to Mexico for Neco, Jose Miguel Gonzalez Vidal, and others.

Q.  Now I'm showing you Bates Stamp Page 202.  Can you walk us through that we're looking at here, please.

A.  Sure.  In the same pattern that we discussed the last boat, this is another stolen boat that was reported to the Naples Police Department.  This is just a bulletin that they put out.

It's not the complete report.  So I was just using this to show him that this is a stolen boat.  These are the basic date and time of the boat being reported stolen, a picture of the boat, so that we could refresh his memory as we get into the location data of Mr. Hernandez and communications of Mr. Hernandez on the following slides.

Q.   And what was the name of this boat?

A.   So this particular boat was believed to be called the *Ultimaytum* and you can see -- that's just the owner's name for the boat.  You can see in the paragraph to the left, it provides a rough date and time that the owners assessed it to be stolen, based on the information they provided to the police department, that is between July 17th, 2019 and July 19th of 2019 that the boat was stolen.

Q.   And what are we looking at here on Page 203?

A.   So we are looking at messages recovered from Mr. Hernandez's phone that detail conversations right around the date and time that that particular boat was stolen, again, sending weather maps to Neco, who, as we mentioned earlier, was the owner of the marina in Mexico.

This is a small screenshot of -- it's a thumbnail that was received.  And what that is is a weather map.  And then as we go down the left column of the chats, Neco is advising Javier that this weekend is clean, referring to the weather that he was showing him, meaning it's a safer time to travel at sea

from Florida to Mexico.

Javier is responding -- his messages are in the green and Neco's are in the blue. Javier responds: "Okay."

He goes further to say that the map -- they are talking about going from Florida to Holbox. So if you look at the very bottom message, Neco says: "Yes. But from Florida to Holbox, everything is calm," referring to the weather.

And then they continue to talk about it on the right column, where Javier tells him that his view of whatever software he's looking at to give him weather reporting talks about the wave height and the currents. So it's just a lot of back-and-forth conversation about: "Is this a good time to bring this boat or not," and that's the nature of these messages.

And if you'll look at the date and time, they're July 16th, 2019, the day before the boat is said to have been solen.

Q. What, if anything, did the Defendant say when you showed him these messages?

A. Again, this was another example that he completely understood and never, you know, refuted, and explained everything even down to the weather maps that we're looking at.

Q. What was your understanding of significance of Holbox?

A. Holbox is a -- it's a Mayan word. It's a tiny, little island, really close to the mainland of the Yucatan Peninsula of Mexico. And it's just a land -- a little, tiny island where

you could bring the boat to, that's close to the area of Cancun, Mexico and that whole peninsula.

Q. All right. Now, this is Bates Stamp Page 204. What's on this page?

A. This is exactly what I described in the last boat. What we did is we took a snippet of the returns that we received from the phone company to show Mr. Hernandez that we have reviewed his location data. And we saw that on July 17th, 2019, the same date that the boat was reported stolen, Mr. Hernandez leaves, again, you'll see the Miami Beach area where he resides, goes up the same route, makes his way over towards the west coast of Florida, where sort of like the final location datas are registering.

And then what we have, again, is his last phone registration with a cell phone tower in the United States is July 20th -- I'm sorry. It was July 18th, 2019. You'll see right here. And that's in the Naples -- I think -- can I remove the circle?

Q. Yes.

A. I'm sorry. Okay. So what I just highlighted is July 18th, 2019 in Naples. The next time that Mr. Hernandez's phone registers is right here. It somehow would have connected to -- before maybe being on a Wi-Fi or something, the next day in Mexico, it's showing it's hitting off of a Mexico tower. That's the same data that's still coming from T-Mobile.

Then there's no more registration of the phone, as far as T-Mobile can provide, because now he's in Mexico.  And then what we have again is, a couple days later, Mr. Hernandez starts being back in Miami.  As you can see, the bottom is colored in red to show he's now back in town.

Q.   The top of the PowerPoint slide says:  "Stolen Everglades." What does that refer to?

A.   Sure.  Everglades is the brand -- it's the make of -- the manufacturer of the boat that was called the *Ultimaytum* that you just saw on the picture beforehand.

So I've used this to reference a few of the boats that I wanted to show him.  So each one, I just made it obvious by the Everglades, or the Southport, or whatever brand it was.

Q.   All right.  Now, this is Bates Stamp Page 205.  Is this a stolen vessel flyer relating to another stolen vessel?

A.   Yes.  This is another stolen vessel bulletin that was from Naples Police Department.  The date of theft on this is -- I believe to be around, I believe, June 6th to June 10th.  And again, the manufacturer of this boat is Pursuit, like you see in the title.  And the "32-foot" is referring to the length of that particular model.

This boat was titled the *Ultimaytum* -- I'm sorry -- the *Reel Estate.*  That was the name of this boat that was given by the owner.

So what you see here are two things.  One is a B-O-L-O --

stands for "be-on-the-lookout" -- that people are circulating around Facebook. So it's just a little screenshot of that. And on the right is an insurance bulletin, looking for anybody to have information related to the theft of this boat, even offering reward of up to $30,000.

Q. All right. And then did you confront the Defendant with the cell phone locations that corresponded to the theft of that vessel?

A. I did. Once again, we repeated the same pattern. I showed Mr. Hernandez that -- if you look at the very top red -- red point, that shows, on June 6th, 2019, Mr. Hernandez leaves Miami Beach. Given the GPS coordinates, he makes a similar route up and across the state of Florida to the west coast, where all these little data points are registering. And you can show that it's right between June 6th, June 7th, overnight when he gets there, which is in the evening hours.

And then it ends -- which also, if you remember, on the slide before, right in the time that the boat was reported stolen is the time he arrives there. The last point of Mr. Hernandez being in Naples is June 7th, which is the window that he would have left.

And then the next time that the phone gets turned on, it's right here. It's hitting off of a Mexico tower. T-Mobile can't provide information beyond this point, but it shows that his phone is now hitting a tower in Mexico on June 12th.

And then what we have in the next line down just signifies that we have a record showing Mr. Hernandez returned on June 15th to Miami.

Q.  All right.  Now this is Bates Stamp Page 207.  What are we looking at here?

A.  This, once again, is another example that I brought to Mr. Hernandez's attention.  Again, this is a bulletin from a police report of a stolen vessel, this one being even larger.  This is a 39-foot -- Pursuit is the manufacturer of this boat.

This particular boat was not stolen in Naples, but this was reported stolen out of the area of Marco Island.  What you see on the left is sort of a screenshot of a front page of a police report.  And then what you see on the right side of picture is a -- it's a nighttime view, but it's one of the neighboring residents who had a camera that captured what was to be the name of this boat.  I believe it was called -- the *Mellow Yellow,* I think they named it.

And you can see it in the evening hours -- almost around midnight, on December 18th of 2018, you see the boat leaving the canal as it's making its way out to the open ocean.

Q.  All right.  And now, Page 208, are these the cell phone locations that correspond to the cell site data from around the time of the theft of the *Mellow Yellow?*

A.  Correct.  I showed him, once again, that as part of our search warrant we received his location data, and we used the

exact times -- dates and times around a known boat theft, being this boat.  And it shows, again, not only did he leave right around the exact same time as the boat was being stolen, but this time he's not taking it from Naples.  He's going down to Marco Island, which, again, if look on the map to the right, it actually shows his plots end at Marco Island specifically at the exact date and time that the boat was reported stolen and seen in the camera as making its way out the canal.

Then what you see at the very bottom here is the same pattern.  Mr. Hernandez does not have an outbound flight from the United States to Mexico.  CBP only has a record of him flying from CUN to MIA.  That stands for Cancun Airport code to MIA, being Miami International Airport, a few days later.

Q.  What did he say when you showed him this slide?

A.  Again, it was the same.  He didn't refute any of the information I was giving him, and he acknowledged everything, that he was fully aware.  And we had been talking in between each of these slides, that he, again, said that he knows that he's done this at least 20 times in his recollection and actually profited about $200,000 overall from each of these trips that he was hired to take.

And the number $200,000 comes from -- he says that he gets $10,000 per boat.  And the way that he's paid is divided between two of the co-conspirators that usually share.  So Jose Miguel Gonzalez Vidal would usually contribute 5,000 to him,

and Neco would also contribute 5,000 to him, totaling $10,000 per boat, which is how he told us that the number was about $200,000 he had received.

Q.  All right.  Now, let's go to Page 209.

What are we looking at here?

A.  So this is a slide that I also prepared and I brought to Mr. Hernandez's attention.  When we reviewed other -- this actually comes from the phone of Jose Miguel Gonzalez Vidal, which we just showed earlier.  When we reviewed Mr. Vidal's phone, we saw several images and documents that were saved into his phone.  Some of those documents I took screenshots of, so that I could show them to Mr. Hernandez.  The reason why I showed them to Mr. Hernandez is because Mr. Hernandez's name was used in some of these documents.

What you see in the picture is it's a 38-foot Fountain boat.  So the Fountain is the brand of the manufacturer.  And this particular boat has four different outboard engines on it. Why it was of interest to me as an investigator is I noticed on the paperwork that was used to bring a boat like this into Mexico -- sort of your importation paperwork that you would have to provide to any sort of officials over there -- you are providing the owner's name of the vessel, who the captain and crew would be on it, different -- if it was for the purposes of being brought over for sale, you would have sort of a bill of sale.

So each of those documents that you're seeing here are screenshots of those things, declarations to the Mexican Government that this boat is being brought over. And they use -- I'm sorry -- to the Marina Akumal right here. And "hailing," meaning departing, from the area of Key West, Florida.

And then the name of the crew -- they call it in Spanish -- you'll see "tripulante." And "capitan," that's -- "tripulante" is Spanish for a crew member. "Capitan" is the same in English and Spanish. It's the captain of the vessel.

And you'll notice here that it's a US citizen, nationality is American. The name is Javier Hernandez, and it provides a passport number for Mr. Hernandez.

The crew member is somebody who through our investigation we have identified is listed as a Cuban national with the name Maria Alejandra Gonzalez Carral, which is related to Jose Miguel Gonzalez Vidal. So we had shown Mr. Hernandez these documents to ask him why we would expect to see these on the phone.

Now, to these particular documents -- Mr. Hernandez did not recall being a part of this particular boat being brought over by him. All of the other ones that we showed he remembered very well.

Q. All right. Now let's talk about Page 210. What are we looking at here?

A.   So these are additional messages that I had saved that I had found on Mr. Hernandez's phone that I wanted to show him, so that he could acknowledge what we were looking at here.  So I titled this page "Passport Fraud Javier Messages Chupa."

Chupa is the nickname that we described for being a co-conspirator, Jose Miguel Gonzalez Vidal.  So these are messages between Javier and Jose Miguel.

Q.   And just to stop you there.  One follow-up.  Can you remind us who Chupa is in the criminal organization.

A.   So Chupa is a known leader of the larger criminal organization, who was based out of the Yucatan Peninsula in Mexico.

Q.   All right.  And what are -- generally speaking, what are they discussing in this conversation?

A.   So the general nature of what these conversations are is -- because what we talked about earlier, that Mr. Hernandez never flew to Mexico; never properly arrived in the country; in Mexico, he had no way of showing that he had legal status to be in the country.  When you or I would travel to Mexico, we would get a stamp on our passport showing that the Mexican Government recognizes us here, and we take our vacation or whatever we do in the country.

Mr. Hernandez would not be able to have that because he did not enter through a legal means into Mexico.  His concern was needing to be able to show that he had status in Mexico, in the

event that he was to be stopped by some sort of authority in Mexico.

So what they started describing here is -- Jose Miguel Gonzalez Vidal, which is El Chupa, he has several contacts within the Mexican Government, particularly Immigration, to provide stamps to his -- for sale to people that he knows that are interested in purchasing them. These are simply just the stamps that you can get if you're entering Mexico. He was offering a contact of his to Mr. Hernandez, if Mr. Hernandez paid, that he could get stamps to make it look that he was in Mexico legitimately, in case he ever got stopped.

So the messages are back and forth between Mr. Hernandez and El Chupa, saying: "This is the price for the stamp that gives you the six-month access to being in Mexico," sort of like the tourist visa stamp. And they have conversations about: "Do you just want the stamp or do you need something more official?" If you look at the bottom, Mr. Hernandez says: "No. I only need the stamp." The stamp only is a lower price.

Up above that, you know, Mr. Vidal is telling Mr. Hernandez that that it costs $500 to get that six-month permission to be in there that would actually show up in the Immigration system for Mexico. So there's back-and-forth conversation about what sort of purchase Mr. Hernandez should make to provide this illegal immigration record for Mexico.

They go further and -- let's see -- it returns from Spanish

87

to English here. Mr. Hernandez says, in this message right here: "Do I give them the passport and I pay them when they return it to me?" Because, like we said, it's the stamp, so they needed to actually stamp his passport.

Mr. Gonzalez Vidal responds to him by saying: "These people are trusted." They are -- "son de confianza," means like: "They are in our trust," literally translated.

Mr. Hernandez then says: "It's just that, like, I don't have the money. But maybe -- but Neco could give it to me." Neco being the Mexican national where they brought the boat to.

Next --

Q. And --

A. I'm sorry.

Q. Sorry. Go ahead.

A. So the next line down, it says -- Mr. Vidal is telling Mr. Hernandez: "Of course. Neco will give you the money so you can bring it back." "Si llegas pa Miami." "Pa" is slang -- is "para" or to get to Miami.

Going further, Mr. Hernandez says: "No. The money is already in Miami. I am carrying the money; therefore, I have to ask him for it."

So again, these are negotiations of how Mr. Hernandez could afford to pay for this stamp, whether one co-conspirator would give him the money for it or somebody else would take care of it. And then this particular message string ends with him

saying:  "Okay.  So we'll pay it there, and you have to bring him the money."

So again, just conversations about how this transaction will transpire.

Q.  All right.  And did he later admit that Neco paid $500 for him to get a Mexican entry stamp on his passport?

A.  Yes.  Yes.  When I interviewed Mr. Hernandez, he said it was Neco that was able to provide the money for the passport stamp.

Q.  Did he say anything else with respect to this slide?

A.  No.  Just -- it was acknowledged.

Q.  All right.  Now, Page 211, what are we looking at here?

A.  So again, this is a slide I prepared that documented some of the messages that Mr. Hernandez had with other associates. I titled this slide "Corruption Messages Found on Javier's Cell Phone."

Again, this was to show him that not only had we found stuff related on his phone to these boat thefts, also related to immigration-related issues, but also his involvement in corruption of public officials.

So what these are -- and I'll start just by generally explaining the back-and-forth messages.  The messages in green are from Mr. Hernandez, as they tell you at the top of each one:  "Javier Hernandez." The other person is on the other end of the conversation in blue.

The general nature of these conversations is somebody is talking to Mr. Hernandez about being able to get smuggled out of Cuba to Mexico.  Mr. Hernandez is responding in that: "Well, hold off right now.  We're not" -- he refers to himself as "we," like the group.  He says:  "We're not in a position right now to do that until we bring a truck to bribe a police official in Mexico.  Until then" -- like the guy has us like under his foot, basically.  There's no -- "We're not going to do any activity until we can get this bribe paid."

And then he goes further -- the other person, if you'll see right here, they're kind of making a mockery of it and laughing, saying:  "Oh, yes.  The bosses, there's always somebody in their pocket," referring to like law enforcement or some sort of an official.

And then, as we go on, they're basically saying that: "Yeah.  That's how things work with gifts."  He says:  "Let's look at the truck that we had to gift him."  So down here is: "Look at this truck that we had to give him as a gift."  That's this message right here.  There would have been an associated picture with that.  This is just a sample of the messages I'm showing Javier.

If we go to the right column, he says, in Javier's own words:  "Here, all of the people are about being bribed."  The word "suborno" is this word right here.  And that is roughly translated as a bribe.

And then, to clarify, the other person on the end of this conversation says:  "Oh, are you bribing people in Miami or just in Mexico?"  And Javier responds:  "No.  We're bribing people in Mexico."

And it keeps going.  They have a few more conversations about residency and an unknown person that they are referring to.  And then here is a sort of a slang, saying -- it says: "Aqui, con plata, camina el mono."  Roughly translated -- a literal translation is:  "Here, with money, the monkey walks." It's just a slang translation that they had.

Then it goes go further and they get a little bit more specific in this very last message.  And he says -- and Javier tells this person:  "Here, in Merida, we already have in our pockets the governor."  And "El Procurador General de la Policia," that is a title referring to like a head of a police entity.  And those are Javier's words as he's sending that message to this other person in this conversation.

Q.  And did he acknowledge sending these messages?

A.  He did.

Q.  What, if anything, else did he say about them?

A.  We actually reviewed the messages, why it worked -- I asked him follow-on questions in my actual interview with him, and -- as far as like what his participation was.

One of the things that we were interested in -- because at the time, we -- our investigation had a certain amount of

information, but there was always more that we were trying to expand.  So we didn't necessarily know at that time like how specific Mr. Hernandez's role was in the organization, beyond like evidence that we had collected.

So things that were curious to me was:  "Were you ever present -- were you the person that physically delivered this bribe, or this truck, or did you know that you were just the person who was helping part of the conspiracy to get him this truck?"

So we went through a back and forth.  And Mr. Hernandez had told me that, no, he's not the person that physically delivered to the police officer either money or this truck, but he was part of the people that did, and he knew it existed.

Q.  Did he identify which part in the chain he was?

A.  Yes.  So when it comes to this particular truck that they had described as having to bring to this officer, he tells us that he's provided back in Miami this truck.  And he's given -- I believe for this -- for the vehicles, it was somewhere -- he said between two to 3,000 dollars is his fee to be able to drive whatever truck was provided to him by another co-conspirator in Miami to drive it across the border into Mexico, into the area where they would be turning it over to whoever else was on the actual handoff piece to the Mexican official.  So that was his role, is bringing this property over there.

Q.  All right.  Did he identify the truck more specifically, like what kind of truck it was?

A.  Yes.  It was a Toyota.  It was a specific truck.  And at this time, since we already had access to his phone, we knew that -- I would need to see like details to give further explanation of the truck.  But he confirmed that he remembers it being a Toyota truck that they had to bring over for this person.

Q.  Did he specify to which person they were bringing the Toyota truck?

A.  Yes.  It was for some high-ranking police official.

Q.  Did he also identify other kinds of cars that he drove from the United States to Mexico?

A.  Yes.  There were other trucks and sport utility vehicles that he had brought over.  So he had acknowledged that he had done several -- a few to several vehicles.  Mostly, he was involved in bringing boats, but occasionally he was hired to do vehicles as well.

Q.  Did he specifically discuss bringing an Escalade?

A.  Yes.

Q.  Did he also discuss bringing a Chevy Silverado from the United States?

A.  I believe it was -- the ones that I recall from our conversation, there was a Toyota, an Escalade, a Chevrolet, and a Dodge, if I'm not mistaken.

Q.   All right.  Did he also tell you --

A.   And I apologize.  One more.  And an Infiniti.

Q.   And who was the Infiniti from?

A.   The Infiniti was -- so -- well, all of the vehicles that he had brought over were provided to him from other co-conspirators.  Some of them were from the mother of the Defendant Gonzalez Vidal, who lived in Mexico -- well, his mother also lived in the Miami area, and would provide money for -- on behalf of her son, bring the cars over to him, and also provide money so that he would have gas and whatever expenses for his travels.

Q.   And did Gonzalez Vidal's mother provide the Defendant with an Infiniti?

A.   Yes.

Q.   Okay.  What did he say about that?

A.   He said that the vehicle was brought over to him -- I believe it was where he was at his residence -- so that he could drive from his residence and take the Infiniti to Mexico -- which, that Infiniti was used as a vehicle that several people at the organization had been observed in while they were operating in Mexico.

Q.   Okay.  Now, this is Page 212.  What did he say about this page?

A.   So this is another activity that I brought up with Mr. Hernandez that we had recovered not only from his phone,

but from other evidence that we were showing him.  So again, we had talked about – we had showed him the boats that were stolen.  We had shown him messages about corruption, immigration-related fraud activities.  And then this activity was in relation to human smuggling, kidnapping, and extortion-type cases that we were aware of.

So what you're seeing here is a photo lineup on the left -- excuse me.  We call those six-pack lineups.  So we usually will show that to a potential witness, and to see if -- for example, if somebody starts talking about someone, and we want to confirm that we're both talking about the right person, we'll pause them, and we'll say:  "Do you recognize anybody in this series of lineups?"  The idea is that the lineups look fairly similar, so it's not completely obvious and they have to actually know who they're talking about.

So Mr. Hernandez, in this photo lineup, is pictured in picture three.  This particular photo lineup, I showed this to a victim who was held hostage --

Q.  Let's actually talk about the Google subscriber information.  Can you talk to us a little bit more about that.

A.  Oh, okay.  Sure.

So the Google subscriber information, you can see right here is -- there was a phone number through our investigation into a kidnapping/smuggling part of the organization, where multiple phone numbers were found through our subpoenas and

different records showing that there were several phone numbers from Mexico used to contact family members in the United States.  These were for the purpose of extortionate phone calls to collect money for their migrant family member who was trying to get to the United States.

Sometimes these phones were not just used over like a traditional phone call, but they were used either through like WhatsApp phone applications or there's another application called IMO.  So different ways of communicating.

So when we found all of the different numbers that we identified in relation to these extortion calls, we served subpoenas for them in relation to the company IMO.  That company -- and you can see that down here actually at the bottom it says:  "IMO identifier."  That phone number is a Mexican phone number that was used to contact the family member in Miami for extortionate purposes.

Q.  All right.  And just to follow up about this, when you confronted the Defendant with this information relating to the smuggling and the extortion, what did he tell you about his involvement in that part of the criminal organization?

A.  Sure.  So Mr. Hernandez says that he himself was not involved with smuggling the migrants out of Cuba into Mexico to the United States.

Mr. Hernandez's role in this was that he provided boats to Neco, who had the marina.  Once the boats get to Neco and the

marina, he knows the business relationship between Neco and Jose Miguel Gonzalez Vidal, who -- that was -- Vidal's business was the smuggling. So Vidal would borrow the boats from Neco or pay Neco to use the boats so that he could smuggle these people.

Mr. Hernandez had said himself that he had actually -- because I showed him that photo lineup of somebody identifying him of being at a house in Mexico where we knew migrants were, and that that migrant had identified him as seeing him at some point in time at one of the houses where she was held.

So again, Mr. Hernandez says, yes, he had visited these places and he had actually seen some of the migrants before, but that the migrants that he saw were the ones that had, you know, already paid or paid partially, and they were able to move around the compound where they were kept. He said he had never himself been aware that anybody was being tortured in these houses. But he was aware that the Vidal organization -- their business was to make these extortionate phone calls and scaring the migrants.

And when it comes to the women, that if they couldn't pay they would, you know, be put into strip clubs, and that the going rate was about $10,000 a migrant for the organization. So he --

Q. Let me stop you there and follow up about a couple things.

So to be clear, did Mr. Hernandez tell you that he knew how

much the organization charged to smuggle each migrant?

A.   Yes.

Q.   And did Mr. Hernandez tell you that he knew that the people walking around freely in the migrant house were the ones that had paid?

A.   Yes.

Q.   Okay.  And what did he tell you that he understood would happen to the people that didn't pay?

A.   He understood that the people that didn't pay would not be the ones that he would have been able to see walking around outside, and that their families would have been receiving these like threatening phone calls.  And if it was a woman, that they would be forced to work often in some sort of a strip club.

Q.   All right.  And to be clear, did he acknowledge that he was paid for his services by other members of this organization?

A.   Yes.  Most specifically, Neco and Vidal were the ones that were paying to bring them the boats.

Q.   All right.  Did there come a time when Mr. Hernandez told you that the boats he took were legitimate?

A.   It was never that they were legitimate.  So the way that the conversation started was me explaining to Mr. Hernandez the presentation of our evidence against him.

     Mr. Hernandez -- one of the things that we were hoping to -- let me explain, if you don't mind, like, the reason for

all of this. So we don't approach before we charge every potential defendant in a case. Sometimes when the FBI talks to you it's because we're there with an arrest warrant in hand. And usually that means it's six in the morning, we're knocking on a door, and you're just -- we have an order of arrest to take you in.

Other times, we make a decision as we are looking at an organization in its entirety: What do we think could benefit the investigation? And we have to make a decision: Is this person violent or non-violent? And maybe we approach him in a different manner prior to having an arrest warrant for him.

Well, we talked about the target letter earlier. One of the reasons why we give a target letter is we think -- it doesn't always turn out this way, but this person might be in a position to help themselves and help us. Doesn't mean that they are not going to be a charged defendant, but we made a calculated decision that maybe this person can help the investigation. So that's how we came to Mr. Hernandez's residence.

One of the things that we caution people in Mr. Hernandez's shoes is any time an FBI agent or law enforcement is confronting you with such weighted evidence like this, it's very normal for someone to want to start to either minimizing or lying. That's a natural instinct to want to protect themselves.

So as we're talking to Mr. Hernandez, showing him all the evidence we have, he starts to go down a path with us that: "Well, yeah, I did take all of these items, and all of this stuff did happen, but it was part of an insurance fraud scheme. The owners are actually the ones that knew about it, I was told.  So I wasn't stealing a boat," in his words.

At that point, we still considered Mr. Hernandez somebody who -- for the overall investigation, we thought he could be a valuable cooperator for us at this time.  And if people start lying to the FBI, right -- we document everything, the good and the bad.  We don't leave anything out.  And so we did not want to let him ruin his potential cooperation as a cooperating defendant in the case.

So we served him with a target letter, and say:  "Hey, like, I'm not your counsel.  I want you to -- we're going to get you set up with counsel through official processes.  Have your attorney contact the US Attorney's Office, so we can have this conversation clean and you don't ruin any possibilities of your potential cooperation in the future."

We viewed him as a -- you know, somebody that we might be able to work with prior to knocking on his door with an arrest warrant.

So when you asked the question:  "Did he say that these were legitimate," no, he never acknowledged that there was anything legitimate.  It was that he did not steal these boats,

that these boats would be reported stolen later, as it was told to him.

Q.   All right.  And so being given that information by Mr. Hernandez, did you investigate the veracity of the claim that this was related to some greater insurance fraud?

A.   Yes.  Thoroughly.  So what we did, we started interviewing all -- reinterviewing all of the victims of these boat theft cases that were reported to the Naples Police Department, Marco Island Police Department.  And as we met them in person, we -- just like we showed you what a photo lineup is, we also showed photo lineups to all of them.  And we asked each person like -- you know, like:  "Have you ever seen this person," or another co-conspirator that was involved in the activity.

And each time the answer was always no.  We would ask further questions, like:  "Have you been in conversation with anybody about wanting to have your boat stolen for the purposes of gaining some sort of an insurance claim benefit?"  And every time the answer was no.

We looked through records to see if any of Mr. Hernandez or Mr. Aranda's records in any way corresponded with or overlapped with their records.  And the answer was always no.

So we looked as thoroughly as we possibly could to show that there is no relationship between Mr. Hernandez and the other co-conspirators and these victims.

Q.   All right.  And at the time that you're conducting this

investigation to make sure that Mr. Hernandez's claims were not correct, was the case against Mr. Gonzalez Vidal and those other individuals going on?

A.   Yes.   That case had been going on in preparation for -- well, not only attempting to continue proactively working the investigation, but preparing for the trial of an additional seven defendants that had been continually getting delayed for different reasons, as we were in preparation for a very massive trial on multiple occasions.

Q.   So to be clear, was Mr. Hernandez charged after the commencement of the case against the Gonzalez Vidal defendants?

A.   Yes.

Q.   And was that due in part to your attempts to investigate his claims that the boat owners were in on the insurance fraud?

A.   Well, that and other -- there was -- we always attempt to continue collecting evidence if we can.   We try not to be just shortsighted.   So yes, there was multiple reasons why the investigation took longer.

Q.   All right.   You talked a little bit about six-pack photo lineups.   Did you show any to Mr. Hernandez?

A.   Yes.

Q.   Actually, let me back up for one moment.   Earlier, you talked about how you had interviewed different victims of the migrant smuggling.

A.   Correct.

Q.   Okay.  Was one of the victims that you interviewed named Esthalin Benitez Castillo?

A.   Yes.

Q.   All right.  I'm going show you what is in evidence as Government's Exhibit 105.  Is this a six-pack photo lineup that you showed Mr. Benitez Castillo?

A.   Yes.

Q.   Was there another FBI agent there with you when you showed him this lineup?

A.   Yes.

Q.   Okay.  And who did he identify in this six-pack photo lineup?

A.   So he identified the subject in Number 2 as El Niño.  And the way you can see that is we always have the witness, when they identify somebody -- is to put the date and the time.  We instruct them to put it in the box, so there's not a lot of mistake or room for error -- the name that they know them by. It might not be the actual name, but whatever they know that person by.  In this case, you'll see in the top it's titled "El Niño."  That was however that victim or witness knew this person to be.  And then we ask them to either like initial or sign or some sort of identifying mark that we can later use.

Underneath that, once -- to provide a witness for that, the agents will then sign it to show who we are and that we verify that that's who he identified.

Q.   All right.  So I've put a square around the signature that appears by the Number 5.  In this exhibit, whose signature that is that?

A.   So that's not the identifying witness's statement.  That is another agent's statement.  Like I said, we sign below wherever the box is, once it's already been identified by the witness.

In this particular instance, the other agent with me just mistakenly signed in a different box afterwards.  That other agent is not the person who was asked to identify the actual person in the photo lineup, though.

Q.   Earlier, you said it's the agent's statement.  Did you mean the agent's signature?

A.   I apologize.  Yeah.  Agent's signature.

Q.   Thank you.

All right.  So now let's talk about the six-pack photo lineups that you showed to Mr. Hernandez.

MS. KLEPACH:  May I approach?

THE COURT:  You may.

BY MS. KLEPACH:

Q.   All right.  Agent Spielvogel, I've just shown you what's been marked for identification as Government's Exhibits 95 and 107.  Do you recognize what I handed you?

A.   Yes.

Q.   What are they?

A.   Those are photo lineups that we mentioned earlier.  But

104

these particular lineups were photos that we presented to Mr. Hernandez, in an attempt to see if he could identify the people.

Q. Okay. And are these fair and accurate copies of the six-pack photo lineups that you presented to the Defendant?

A. Yes.

MS. KLEPACH: At this time, the Government offers Exhibits 95 and 107 into evidence.

THE COURT: Is there any objection?

MR. FEIGENBAUM: No, Your Honor.

THE COURT: All right. Admitted into evidence.

(Government's Exhibits 95 & 107 received into evidence.)

BY MS. KLEPACH:

Q. All right. Let's start with 95. What are we looking at here?

A. That is a photo lineup. Depicted in Number 5 is Jose Miguel Gonzalez Vidal, as we also refer to as El Chupa.

What you'll see here is Mr. Hernandez -- by his initials JH in that box, it shows that it's him that made the identification. And how he knows him is Jose Miguel -- or one of the ways he would know him. And then we had him put the date that he made this identification.

Below the box, after Mr. Hernandez makes the identification, myself and a partner at the time would sign it so that we could confirm that we witnessed that.

Q. All right. When you were talking to Mr. Hernandez about Gonzalez Vidal, did he identify the migrant smuggling house by name?

A. Yes. Well, Mr. Hernandez identified the migrant -- one of the migrant smuggling houses by name.

Q. Okay. And which one was that?

A. He referred to it as "La Finca."

Q. And what did he tell you his understanding of what happened at La Finca?

A. La Finca was -- the way Mr. Hernandez described the Finca was -- his understanding of La Finca was either owned or rented by a combination of Neco and Vidal, and that is a house where they were using to keep migrants that they had brought into Mexico while they were waiting to pay, so that they could bring them to the United States.

Q. All right. And so did he acknowledge the relationship between Jose Miguel Gonzalez Vidal and Neco?

A. Yes. Not only in that way, but in the fact that the boats that he would bring were to Neco, and that Vidal would use those boats with his organization to move them -- the migrants.

Q. Okay. Now I'm going to second page of Exhibit 95. What is this?

A. So that's another photo lineup that we showed Mr. Hernandez on the same date. And again, he identifies that person as El Niño, and he puts JH as his initials, also witnessed by my

partner and myself.

Q. What did he tell you about El Niño's involvement in the criminal organization?

A. He told us that El Niño worked for Gonzalez Vidal as one of his employees.

Q. All right. This is the third page of Exhibit 95. Who is this person?

A. So in Box Number 5, that's a picture of -- as Mr. Hernandez describes -- he spells it J-A-N-S-E, which would be Hanser. He pulls his initials, Javier Hernandez, JH, on the same date. And then, again, I witnessed the photo. And Number 5 is Hanser Sergio Ramos Valdes.

Q. And what did he tell you about Hanser's role in the organization?

A. Hanser was an employee of Vidal. And his primary role in the organization was to -- at the houses where the migrants were held, he was one of the people that was in charge of making not only the extortionate phone calls, but guarding the migrants.

Q. All right. Next page. Who is this?

A. So Number 5 is a photograph of Tomasito, also known as Tomas Valle Valdivia. Mr. Hernandez identifies him as Tomasito, which is a nickname for this gentleman. He puts initials, JH, on the same date and time, and again my signature below it as a witness.

Q.   What did he say about Tomasito's role in the organization?

A.   Tomasito's role in the organization is he was looked at as one of the top figureheads of the Cuban crime organization that operated in the area of like -- of that peninsula of Mexico. He said that he had only physically seen him in person on two occasions when they were both at Neco's marina with Neco.

Q.   Okay.  And this next one?

A.   So Number 5 is a picture of Neco, who we mentioned is Mario Alberto Enriquez Lopez, again identified by Javier Hernandez. He signed "JH," and I witnessed the signature on the same day.

Q.   Next page?

A.   So again, in Photograph Number 3, Mr. Hernandez identified by his initials the nickname of El Chimba on the same date as the interview, and again I witnessed below it.

Q.   All right.  Now I'm going to show you Exhibit 107.  Who is this in Photograph Number 4?

A.   Photograph Number 4 is -- Javier identifies him by placing his initials "JH" on the same date of the other pictures, and he identifies this gentleman as Ramon, who we know to be Ramon Reyes Aranda.

Q.   Okay.  And is that the person that you understood to be saved in Javier Hernandez's phone as Ramon Barco Uno?

A.   Correct.

Q.   What did he say about his relationship with Ramon?

A.   So the relationship was described between Neco, Javier, and

Ramon to be that Neco would contact Ramon to identify boats that were to be stolen.  Knowing that Ramon would not be the captain to take them, they would hire Javier to -- once the boat was ready to be stolen, Javier would come to pick up the boat and then navigate over the seas to Mexico.

Q.   Okay.  Did he also identify an individual named Roberto as part of this organization?

A.   Yes.

Q.   Can you tell us more about Roberto.

A.   Javier described Roberto to be a gentleman who -- his purpose for this organization and others was to create those -- we talked earlier about those hull numbers and VIN numbers. Well, this was the person that they would rely on to create these fake hull numbers, to clone them.  That was his trade, and the organization paid him to make these numbers for the vessels that they would bring over.

Q.   And did you observe conversations between Roberto and Mr. Hernandez in Mr. Hernandez's phone?

A.   Yes.

Q.   Was Roberto charged in another criminal case?

A.   He was.

Q.   Was Mr. Hernandez able to provide you with Roberto's phone number?

A.   He was.  At the time of our interview, when we were going through different things with Mr. Hernandez, when we came

across the subject of Roberto, Mr. Hernandez was able to provide us at that time with a phone number for Roberto.

Q. Okay. And to be clear, is that Roberto Marrero?

A. Yes.

Q. Did you ask Mr. Hernandez why he didn't report his visits to Mexico to Customs?

A. Yes. When I asked Mr. Hernandez why he didn't report his departures, he acknowledged that he knew that he was taking several canisters of fuel on board these vessels, which he said in his words that he knew that to be illegal to transport that kind of fuel on these boats. So he was afraid that if he had notified any of the US authorities that he was departing that he could be arrested because what he was doing would be considered illegal by having all that extra fuel on board.

Q. Did Mr. Hernandez also say anything about other boat captains in the organization, specifically an individual named Andy?

A. Oh. We didn't get into a deep conversation about Andy, but I do remember him being mentioned in our interview as another boat captain. I don't -- without seeing the report, I would have to ...

Q. All right. One moment.

    (Pause in proceedings.)

BY MS. KLEPACH:

Q. Would reviewing a copy of the report relating to this

110

interview refresh your memory as to what the Defendant said about Andy?

A. Yes.

MS. KLEPACH:  One moment.

(Pause in proceedings.)

MS. KLEPACH:  One moment.

(Pause in proceedings.)

MS. KLEPACH:  May I approach?

THE COURT:  You may.

BY MS. KLEPACH:

Q. Let me know when you've had a chance to review it.

A. I'm not sure if you're able to quickly point me to the page while I browse.

Q. One moment.

A. I found it.

Okay.  Yes.  So in reviewing, I remember we didn't get into too much detail, other than there was another boat captain that he knew by first name.  We didn't get any additional identifiers, but it was just in conversation a reference to another captain that worked for the organization.

Q. All right.  So it sounds like the two of you spoke about a lot of different topics.

A. We did.

Q. Was that information helpful to you?

A. Yes.

Q.   Okay.   Now I want to talk about the different iterations of this case that have been charged.

A.   Okay.

Q.   Are you familiar with the different iterations of this investigation that have been charged?

A.   Yes, ma'am.

Q.   Okay.  And can you talk a little bit about how many different cases there have been relating to this criminal organization.

A.   Yes.  And may I ask:  In what level detail are you looking for?

Q.   So was there an indictment related to the Cuban baseball players that you talked about at the beginning of your testimony?

A.   Okay.  Yeah.  So going back to the earlier iteration of the Cuban baseball players, there was not only indictments, but other charging documents we use, called informations, where it's -- so yes, beyond the indictment, we had multiple charging --

Q.   Right.  You mentioned Roberto Marrero.  Was he charged in a different criminal case?

A.   Correct.  Not in the baseball case we just referenced, but in a much more recent case he was charged, yes.

Q.   Okay.  What about Tomas Valdivia?  Was that --

A.   Yes.  You saw in a photo lineup just a little bit ago

112

identified by Mr. Hernandez as Tomasito.  That's Tomas Valdivia.  We also charged him.

Q.  Was he charged in a case separate from the Gonzalez Vidal Defendants?

A.  Yes.

Q.  Are there outstanding criminal -- withdrawn.

Are there outstanding targets of this investigation who have yet to be charged?

A.  Yes.

Q.  Has Neco been charged?

A.  No.

Q.  Between the time that the Gonzalez Vidal defendants were charged and Javier Hernandez was charged, did law enforcement obtain additional evidence against Javier Hernandez?

A.  Yes.

MS. KLEPACH:  One moment.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.  All right.  We're almost done.  I know you've been there for awhile.

A.  Okay.  It's fine.

Q.  We've talked a lot about the Defendant acknowledging certain things during his interview.  To be clear, did he admit to piloting these stolen boats from Naples to Mexico?

A.  Boats and cars.

Q. Boats and cars.

All right. So all of the boats that we just went through, where we talked about how he acknowledged these messages and acknowledged this information, did he actually admit to doing the things that you confronted him with?

A. Yes.

Q. Okay. We also talked a little bit about the passport fraud messages, and I want to go back to those for just a second.

All right. Can you remind us what day -- days -- were these messages exchanged?

A. Correct. So it shows on the bottom of each of those messages that it was on November 22nd of 2019.

Q. All right. And was the first message on November 21st of 2019?

A. Yes, ma'am. The first one is November 21st.

Q. What, if anything, happened on that day as it relates to this investigation?

A. If you recall, one of the first slides I presented was the theft of the 29-foot Southport. That was the date that that boat was taken to Mexico.

Q. Okay. And is that the vessel theft that led you to the identification of Mr. Hernandez as a target of this investigation?

A. Correct. Once our law enforcement partners in Mexico identified that they had actually encountered a physical boat,

called us down to take pictures, and then we sort started building the pattern going backward, which we showed you, where we found several other boats that met that same criteria, and built our investigation around that.

Q.  Okay.  Now let's go back to talking about the different iterations of this case.

We talked about how there were multiple targets and they weren't all charged together.  Can you speak to some of the reasons why that would be.

A.  Sure.  There are a lot of reasons why you choose how to charge.  It's not entirely up to the FBI.  It mostly resides with the US Attorney's Office.  And some of the decisions as a team, though, that we might make would be, if there's something that's actively happening right now, we can't necessarily wait for a few years to build that case.  We have to triage.

Some parts of the organization make more sense to charge at once.  And then, while we're still collecting additional evidence -- one of the things that we always caution is to -- we don't charge before we believe we're ready.  There's a difference between like understanding that people are involved in different things and preparing evidence that we consider sufficient proof to charge.

So for all of those reasons, you know, we have to resolve cases that are ongoing.  We have to make sure we've looked at all angles of the evidence we've collected and make sure we

have enough. And then, ultimately, once we finish collecting evidence for each time, we present our findings to the US Attorney's Office. We're essentially evidence collectors, and they make the determination if we have enough evidence they believe we can charge. And if so, how should we charge it and when is it feasible to charge.

Q. Once a case is charged, do you continue investigating?

A. Yes.

Q. Can that lead to what are called superseding indictments?

A. Yes. Oftentimes, in large criminal enterprise investigations, we do what we call supersede the indictment. What that means is we had, let's say our first indictment, which would be the original indictment charging the defendant -- once that's been charged, we continue to collect evidence, if possible. And once the US Attorney's Office believes that we now have sufficient evidence to charge again, we will do what we call a superseding indictment, which is basically version two of the initial indictment, and it usually means adding additional charges.

Q. Are you familiar with whether there were superseding indictments in the Gonzalez Vidal case?

A. Yes.

Q. Were there?

A. There were at least two.

Q. Are superseding indictments, in your experience, common in

organized crime cases?

A.  Very common.

MS. KLEPACH:  All right.  I have no further questions for this witness.

THE COURT:  All right.  How we doing, Ladies and gentlemen?  Are we ready to continue?

Okay.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon, Mr. Spielvogel.

A.  Good afternoon, sir.

Q.  How are you?

A.  I'm well.  Thank you.

Q.  A lot of information during your testimony.  I tried to write as fast as I could.  So let's see how it goes.

Were you the lead case agent in Mr. Hernandez's case?

A.  Yes.

Q.  Okay.  What does that mean?

A.  So I mean, I guess we'll say -- we'll use the term "lead" loosely.  We usually partner up in an investigation because there's a lot of material to collect, there's a lot of roles and responsibilities.

In your words, a lead agent would just mean that you're sort of wrangling it all together, working closely with the evidence collecting, making sure things are documented.  You're

just sort of like quarterbacking an investigation.

Q.   So you would be the person with the most knowledge, you could say, about Mr. Hernandez's case?

A.   In most aspects, yes.  Historically at least.

Q.   How much -- describe for the jury what is discovery material.

A.   What is discovery?

Q.   Yes.

A.   Discovery is a legal term that -- whenever we prepare for a trial, the defense gets to see the evidence that we plan to use in our case against the defendant.  So they get a copy of everything, so there's no surprises.

Q.   So you became aware of the discovery that was turned over in this case to Mr. Hernandez and his attorneys?

A.   So the discovery portion this prosecution, that lies in the office of -- the US Attorney's Office.  Once we collect the evidence, we work with them to provide them everything that we say that we have.  And then they, in turn, will take that, put it into their format for discovery, and ensure that they provide copies of that to the defense counsel.

Q.   So originally -- well, let me go in a different order. Would you say there were many, many gigabytes of discovery material turned over?

A.   Yes.

Q.   Okay.  How much is a gigabyte of information if it's

documents?

A.   I'm not really able to answer that question.  I mean, I just know that movies take up a lot of room on phones, like pictures.  To give you an -- I would never be able to give you an accurate answer of how many gigabytes documents would take. I apologize.

Q.   Okay.  No problem.

Could you say safely that there were thousands of pages of documents turned over?

A.   I -- I know that there were a lot of documents turned over. There were translations.  There were copies of phone extractions.

Q.   As part of your duties as the lead case agent, did you assign different jobs to different people who worked with you on this case?

A.   It's not a matter of assigning different jobs.  We sort of just all -- it's sort of organic.  We work together.  Different people can write different -- serve different subpoenas. People can go out and conduct interviews.  So there's no tasking in that sense.

Q.   Did you, though, organize how the case would be investigated?

A.   Most of it, yes.

Q.   Have you reviewed all of the important evidence in the case?

A. I believe I'm familiar with the majority of the evidence in the case that I collected.

Q. And how much of the evidence should other agents be familiar with, so that they have an understanding of what exactly you're saying about Mr. Hernandez?

MS. KLEPACH: Objection, Judge. I don't believe that's a proper question as to what other agents should do.

THE COURT: Sustained.

BY MR. FEIGENBAUM:

Q. Do other agents who worked on the Javier Hernandez case -- do they also become familiar with the main information about the case?

A. More than likely, they would. If they are a part of the investigation, they would have familiarity with pieces of evidence. But just to clarify, this has been a long-term investigation. Different agents have also worked on other assignments at different times in history on this investigation. So I wouldn't be able to tell you what agent knows what bit of information.

Q. Okay. Thank you.

Now, I believe from your testimony you can say that local law enforcement agencies were also involved, like out in Southwest Florida?

A. Yes.

Q. Okay. And the FBI, who you work for, shares information

120

with the local law enforcement, like Naples Police?

A. This -- the answer is yes. There's always a sharing relationship with the way we work with our partners. In this instance, we were the recipients of most of the information, rather than the providers. Because all of the police reports -- the boats were stolen from their territories, their areas. So they were kind enough to provide us with the information so that we could digest it.

Q. Okay. So if you learn about a stolen boat that ends up in Mexico, you're going to check with local law enforcement to see if it might be a boat that was reported stolen there?

A. Sure. And there's a few ways that that process happens. So if a boat is found -- to answer your question, if a boat is found in Mexico, and Mexican officials -- as in the case of the Southport that we talked about. They find a boat in Mexico. If it's someone we have a relationship with, they can contact us and ask us if this is a boat that we know to be stolen.

We, at that point, have the ability to look at vessels reported stolen in law enforcement databases and determine if we can tell if it's a stolen vessel or not. Sometimes they're so far changed and altered by the time that maybe they're not identifiable.

But yes, that's -- one way that we would try to do it is look with local law enforcement, check through law enforcement databases to see it matches a stolen boat.

121

Q.   Okay.  So in the case of the 29-foot Southport, the one that you have photographs of -- I think it's Government 60, if I remember correctly.

A.   Okay.

Q.   You took those pictures, correct?

A.   I took the pictures that were found -- that we showed when we went to Mexico, after it had already been seized and it was in the parking lot of Yucatan State Police headquarters.

Q.   And what day did you take those pictures?

A.   I'd have to look at the date on the photographs to refresh my memory.  I mean, I know that I received a call some time in late November, and then within a couple of weeks I was actually down there taking the pictures, early in December probably.

Q.   Well, do you recall in an application for a search warrant for, among other things, Mr. Hernandez's phone records that -- do you remember asking for a search warrant around November 20th of 2020?

A.   So the warrants to look into Mr. Hernandez's phones, the ones that I recall, we applied for a search warrant to search the physical phone that he had, which was shortly after we came back.  We then applied for a search warrant so that we could review his cellular location data.

     And in terms of search warrants, unless you can refresh my memory with any additional that you're referring to, those are the two that I recall.

Q.  Well, I think I could.

A.  Okay.

        MR. FEIGENBAUM:  So Your Honor, may I approach the witness?

        THE COURT:  You may.

        MR. FEIGENBAUM:  Let me get what I need.

        THE WITNESS:  Yes, sir.

        MS. KLEPACH:  Counselor, could we see that?

        MR. FEIGENBAUM:  Oh, yes.  Certainly.

    (Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.  You could look at, if you want to, Exhibit C.

A.  I don't have a copy of that, sir.  I apologize.

Q.  I'm going to get it for you.  She wants to first look at it.

A.  Sounds good.

Q.  You could look at Exhibit C.

        MS. KLEPACH:  All right.

        MR. FEIGENBAUM:  Okay.

    (Pause in proceedings.)

        THE WITNESS:  Do you want me to keep the entire binder up here, sir?

    (Court reporter interruption.)

BY MR. FEIGENBAUM:

Q.  Yeah.  You want to know where to turn?

123

A.   I just want to make sure I'm not looking at any material I'm not supposed to be looking at.

Q.   Yeah.  If you would just please turn to Tab C only.

A.   Okay.  I have Tab C opened, Defense Exhibit C.

Q.   Correct.  For identification.

A.   Okay.  I see the application cover page for the search warrant.

Q.   Right.  Do you see, by looking through it, I want to say by memory, Paragraph 54?  Why don't you see if on Page 54 that refreshes your recollection when you went to Mexico.

A.   I just remember what search warrant -- this is actually -- this is ...

Q.   If you look on the first page of it, it will say that -- there's a date of like November 17, 2020.

A.   Correct.  I was just trying to confirm if this is the cellular site location warrant or the phone warrant for ...

Q.   Right.  This is the second search warrant application you made, not the one to search it on February 26th.

A.   Okay.  You want me to turn to Paragraph 54?

Q.   Yeah.  I'm doing that by memory.  I hope it's right.

A.   Paragraph 54.  "On or about November 24"?

Q.   Yes.

A.   Would you like me to read it?

Q.   Yes.

            MS. KLEPACH:  Judge, this is not in evidence.

THE COURT: The objection is sustained.

MR. FEIGENBAUM: Understood.

BY MR. FEIGENBAUM:

Q. Does that refresh your recollection about when you went to Mexico after being notified by Mexican police that they had a boat there?

A. Yes. I see the paragraph.

Q. And now having refreshed your recollection with that Defense exhibit marked for identification, what day did you say under oath that you went to Mexico?

A. So it says here on or about November 24th, 2019 I went to Mexico.

Q. You made that application under oath?

A. Yes, sir.

Q. Okay. That's different from what you said earlier that you went in December?

A. Correct. I went in a couple weeks. It does appear that the date that I put down was in error, but I can confirm that I did go within a couple weeks after that. It wasn't on November 24th.

Q. Okay. So why did you put it in the application under oath?

A. It was a human error, sir. It wasn't any intent to avoid anything or to evade detection of any activity. It was an error. We received our phone calls from Mexico to inform us about that.

But no, I mean, one hundred percent we've been explaining that throughout the trial that it's always been within the next two-week period that we actually showed up in Mexico, and we have passport stamps and stuff to corroborate that.

Q. So your office got the call from Mexican police that they had a boat there on November 22, 2019?

A. On or about, right. Right. Within that one or two-day window.

Q. And when you actually got there, it was like two weeks later?

A. Correct.

Q. And you went to a police parking lot and you took pictures of a boat -- a boat -- two weeks after the police said that they had gotten it from Neco outside his marina?

A. Yes.

Q. Okay. You can close that.

A. Okay.

Q. So another thing about that boat. When did the owner of that boat -- or what was a 29-foot Southport brand boat -- when did that owner learn that his boat was in Mexico?

A. So --

MS. KLEPACH: Objection. Lack of personal knowledge.

THE COURT: If the witness knows. Overruled.

THE WITNESS: I won't be able to tell you. I know when I informed him that his boat was in Mexico. I know our

office contacted a detective that had taken his statement initially and let him know that we had located his boat in Mexico.  And one of the ways that we -- one of the reasons also why we did that is we wanted to confirm that it was the same boat.  So what I had done is I had showed the photographs of the boat, and the victim was able to confirm that:  "Hey, yes, that is my boat."  So ...

Q.  Okay.  Was that a couple of days after the Mexican police took possession of it?

A.  It was once we got down there -- actually, I apologize.  I can't recall if I would have made the call before I actually showed up there in person to see it.

So our initial -- the initial call we got was actually over a video chat with -- because the Mexicans were attempting to identify how we could specify what boat this actually is by looking for what we talked about earlier, being those hull identification numbers.  And I'm not an expert.  Each brand has their own way of putting numbers on places.  So I myself am not an expert in that.

So when they were trying identify -- give us an identifying number that we could corroborate with our stolen boat records, we did a lot of it over sort of like a FaceTime view and we were trying to figure out if we could identify it at that time.

I eventually showed up, like we said, in early December in person and take photographs.  So I can't tell you the exact

127

time I notified the detective that his boat was in Mexico.  It was either right before or right after.

Q.   Okay.  So do you know who FBI Agent Batista is?

A.   Yes.

Q.   Okay.  He went with you to Mexico, correct?

A.   Yes.

Q.   And he wrote a report that -- well, he wrote a report dated August 23, 2023, just about a month ago.  Do remember that report?

A.   Yes -- well, no.  I know that that was a month recently. But I don't -- I don't think I believe I've seen that report.

Q.   So that was four years about -- he wrote a report last month about something that happened four years before?

        MS. KLEPACH:  Objection.  The witness says he hasn't seen that report.

        THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   If you saw a copy of it, would that refresh your recollection?

        MS. KLEPACH:  Same objection.

        THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Okay.  Not refresh recollection.  Would a report from another FBI agent who worked with you help you understand and be able to answer this question?

MS. KLEPACH:  Is that a question?  Same objection.

THE COURT:  The witness has stated that he doesn't know.  Could you clarify what your question is.

MR. FEIGENBAUM:  I will, Judge.

BY MR. FEIGENBAUM:

Q.  Have you talked to Agent Batista recently?

A.  In conversation.  He's a friend.

Q.  Sir?

A.  Sure.  In conversation.  He's a friend of mine.

Q.  Okay.  When was the last time you talked to him?

A.  Couple days -- actually, he wished me happy birthday yesterday.

Q.  Oh.  Happy birthday also.

Did he mention that he had added a new report to the file in this case?

MS. KLEPACH:  Objection.  Calls for hearsay.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  No.  He did not mention that.

BY MR. FEIGENBAUM:

Q.  Okay.  Anyway, do you remember maybe it was like December 8 that you went there -- 2019 -- to Mexico to see the boat, and you took the pictures on December 9th, 2019, the next day?

A.  Okay.  That's fairly accurate.  Correct.

Q.  So here we are at December 9th, 2019.  Already by that time the Naples Police Department -- correct?  About the 29-foot

Southport?

A.   Okay.

Q.   Is that who was in charge of the 29-foot Southport?  It was the Naples Police Department?

A.   That, I believe, was their police department that took the initial theft report before the FBI ever got involved.

Q.   Anyway, word could get to the owner of that boat by that time early December 2019 that his boat was in Mexico, right?

MS. KLEPACH:  Objection.  Calls for speculation.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Did the owner of the boat learn, based on your investigation, that his boat was in Mexico by the first or second week in December of 2019?

A.   I do recall that it was soon -- soon after we identified it, we were in contact with the detective, yeah.  And then he was, in turn, in contact with his victim.  And I can't remember exactly the date.  It was a few years back now.  But yes, that was our process.  We made communication.  We wanted to confirm that what we were looking at is the boat.  We knew it was, but we just wanted to get verified by the owner that this is the boat, and he confirmed.

Q.   Did the owner get his boat back?

A.   I actually don't know what happened to the boat.  I don't know if it's been going -- if it's still in the police grounds

or not.  I haven't seen that part of what's been going on with it.

Q.  Anyway, so you were mentioning travel records that also were part of your investigation of Mr. Hernandez?

A.  Correct.

Q.  And those travel records you said involved no, like, outbound flight to Mexico, but returning to Miami on a flight from Mexico back to Miami?

A.  We calculated approximately like 25 to 29 times that there was no outbound, only inbound, correct.

Q.  All right.  And when -- based on the testimony of other witnesses, which is of record in this case already --

A.  Okay.

Q.  -- Mr. Hernandez was arrested in Mexico, right?

A.  I know that Mr. Hernandez was detained in Mexico, I believe, on two occasions.

Q.  Okay.  It's a matter of record in this case that one of the Mexican police officers said he was arrested because he couldn't show a lawful entry into Mexico --

MS. KLEPACH:  Objection.  Counsel is testifying.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  I'm sorry.  What was the question, though?

BY MR. FEIGENBAUM:

Q.  One of the Mexican police officers who came yesterday

131

testified that Mr. Hernandez was arrested because he couldn't prove lawful entry into Mexico.

A.   Okay.

Q.   Do you recall that as being part of the records that you reviewed in your investigation?

A.   Correct.  I --

MS. KLEPACH:  Objection, Judge.  This witness hasn't been in the courtroom, due to counsel's invocation of the Rule of Sequestration.

THE COURT:  Yes.  I think the question is with regard to the records.  The objection is overruled.  It's a proper question.

THE WITNESS:  I have reviewed -- oh.  I apologize.

MR. FEIGENBAUM:  What I said, Judge, was it's a matter of record in the case, which I thought I could refer to.

THE COURT:  Well, the question is whether this individual has that knowledge.  And Ms. Klepach is correct.  He was not in the courtroom.  So when you say:  "It's a matter of record," unless it's part of his record, then he wouldn't have any knowledge of it.

MR. FEIGENBAUM:  I understand, Judge.

BY MR. FEIGENBAUM:

Q.   Based on your review of the travel records of Mr. Hernandez, when did he -- when did Mr. Hernandez return to the United States after that arrest in November of 2019?

A.   So I know that we have a document.  I'd have to see it to give you an exact date, but it was not immediate.  After my interaction with Mexican law enforcement, I understood that Mr. Hernandez was not -- he did not immediately return to the United States on that last occasion.

Most of his records show there were fairly immediate returns, within a couple of days, a week or two max.  On this particular one, it was December -- mid-to-late December I think he returned.  And again, I'm going off of memory of reports we're talking about.  I was not here for the testimony.  But I believe he was under some sort of a judicial court order in Mexico.  I don't know if it was an ankle monitor or something like that.  It was a part of his arrest.  I wasn't in Mexico for his arrest.  But yes, I do recall that he came a few weeks later back into the United States.

Q.   And when you were in Mexico, I'm sure you asked the Mexican police officers:  "Where is Javier Hernandez?"

A.   I don't recall asking about Javier Hernandez.  I mean, in terms of -- I guess, what do you mean by that?

Q.   Well, let's think about it.  You went to Mexico December 8th, 2019 --

A.   Correct.

Q.   -- to get Mr. Hernandez's phone.

A.   Yes.

Q.   You did, right?

A.   Uh-huh.

Q.   So you would only do that if Mr. Hernandez was a suspect for some crime, right?

A.   Well -- so we learned through the Mexicans that he was a part of this organization that we had been investigating.  We had gone down there prior to that, in the summer of 2019, and it wasn't Mr. Hernandez at the time.  He was not yet formally on our radar.  It was Neco.  And the connection that brought us to -- we were always looking for additional members of the organization.  We knew that the roles existed, but we don't always have a name to the role, for example, whether you're the boat captain or you -- or the smuggler, or whatever your role is in the organization.  So we know that these are placeholders.

Once the Mexicans had told us in the summer that -- we knew that Neco was a higher up target for us.  Once they found Mr. Hernandez, they told us that the relationship was between Hernandez and Neco.  So now we said:  "Yes.  This is probably one of the boat captains we would be interested in."

So they really connected that first dot for us.  And then we said:  "Yes.  We would like whatever evidence you guys have collected," so that we can attempt to write a search warrant for it and build our investigation.

Q.   And for that reason, you traveled to Mexico December 8th, 2019?

A.   Yes.

Q.   You didn't make any attempt to interview Mr. Hernandez when you went to Mexico?

A.   No.

Q.   Based on your training and experience, don't federal agents try to meet with persons of interest who might want to offer information about what they've been doing?

A.   Timing is everything, sir.  We pick and choose when we approach witnesses and possible defendants.  A lot goes into deciding, even to the point where we ended up providing Mr. Hernandez a target letter at that point in time.  There are different things you have to consider when you approach somebody.  You can approach too soon, and you might cut off an evidence stream you could have collected.

Approach too late -- you know, there's a whole bunch of things that go into the consideration, when you, as a team, figure out when you should make an approach -- or if. Sometimes we just knock on your door with an arrest warrant. Sometimes we decide that you might be someone worth talking to. There's a whole bunch of strategy that would go into that.

Q.   So you, in fact, then made a strategy decision, I guess you call it, to wait from December of 2019, three-some years -- I think it's 45 months from that date to April 18th, 2022 -- to go and talk to Mr. Hernandez, correct?

A.   No.  I can clarify.  We mentioned earlier that,

unfortunately, there is -- we have to triage our investigation. And when we're investigating an organization that has several elements of violence into it, some that are actively happening, those things have to be looked at first.

It's not that we're not interested in -- as you've heard, we've charged multiple roles in this investigation over the years.  It's not that we don't think one is important and the other isn't.  It's just that you have to focus on people who are actively being hurt.  And then you have to make calculated decisions as to when, if, and how, and if you have enough evidence too.

I mean, there's a lot of times that we know members of an organization we believe to be involved in several criminal activities, but that doesn't mean we've been able to successfully prepare enough evidence that the US Attorney's Office believes we can charge.

Does that help answer your question?

Q.  Not really, honestly.

A.  Okay.

Q.  You started charging people in the Gonzalez Vidal case -- the first criminal complaint I believe was, I want to say, August of 2020.

A.  Yes.

Q.  So you already had identified the existence of the Gonzalez Vidal crimes, correct, by August of 2020?

A.   Not all of them, but one that was immediate for us.

Q.   Right.  And then the first indictment in that case came down in January of 2021, correct?

A.   I'd have to recall the exact date, but it would have been at a later time.  We were also -- to give a little context to that, this was during the global pandemic.  And international travel was restricted up until like the -- it had to meet a certain criteria that was -- I don't want to say life or death, but it was difficult to get any sort of approvals within our own chain of command.  Borders were even closed at that time, if you recall.

And I don't want to speak on behalf of the courts at that time, but I believe the grand juries, which is our mechanism that we use to indict cases, was not convening during those dates as well.  So there was a good stretch of time, sir, when we were not able to use certain processes.  We had to do criminal complaints at that time -- which, we usually reserve indictments for organizations like this.  But because people were actively being hurt, we had to do whatever we could to stop that.

And again, when you're working across borders during a global pandemic, and investigating an enormous criminal enterprise that requires several levels of authorizations for search warrants, it's not as easy as it sounds.

Q.   Well, I'm referring to more just informal contact, like you

137

made with Mr. Hernandez in April of 2022.

A.   Correct.

Q.   What I'm referring to is -- Mr. Hernandez, you just said, traveled back to the United States in December of 2019, correct?

A.   Yes.  I believe it was late December 2019.

Q.   And based on evidence that the Mexican police say he arrived there on a stolen boat, to your knowledge, has anybody from State of Florida law enforcement, like the Naples Police Department, ever contacted Mr. Hernandez regarding the theft of that boat?

A.   We adopted that part of the case.  I say: "Adopted."  We worked with our partners that we made in the Naples Police Department to understand that this was going to be part of a larger investigation.  And so what that means is that, unless it's a situation where somebody's being hurt, or -- we don't have to step in immediately.  Why is that?  Because we have to collect more evidence.  Just because we found one event, that doesn't even mean that we could prove yet if that event was related.  There's a lot of questions that are unanswered, and we have to answer those questions ourselves before we present it formally for charging.

     So with that -- again, we talked about why did we wait so long, why didn't the Naples Police Department approach him.  We sort of took the lead on that investigation with the Naples

Police Department.  So they knew that it wasn't -- they weren't going to like try to sideswipe the FBI's investigation.  They were going to work with us.

And between everything we already mentioned, our strategic decision, when, if, and how to make an approach to Javier, if that was the step we were going to take, coupled with the pandemic, multiple violent case indictments, it led us to when we were able to make that call.

Q.  Okay.  Well, you were talking about how you build a case against somebody by gathering information to see if one thing leads to another and so forth.  So let's get back to the 29-foot Southport that the Mexican police say Javier came on, that boat that you took a picture of two weeks later.  They didn't -- you understand that the Mexican police didn't find Javier Hernandez on that boat, correct?

A.  I read the report that they produced.  And correct, they did not find him on that boat.  I believe he provided information to them that led them to where the boat was at.

Q.  Okay.  And with your contact with the Mexican police that you were dealing with, they said that he was in Mexico because he couldn't prove that he lawfully entered the country, correct?

A.  No.  They didn't tell me he was in Mexico because he couldn't prove it.  He told us he was in Mexico because he brought a boat.

Q.   Okay.   But I think you said in your direct testimony, if I'm not mistaken, that there was no proof that Javier had entered Mexico legally at that time.

A.   Correct.   But that's not why he was in Mexico.   He was in Mexico because he brought a boat to Mexico.

Q.   Okay.   Just to clarify, did you testify earlier that there was no proof that Javier Hernandez had entered Mexico legally around November 20th, 2019?

A.   I believe what I said is that Javier had no legal status there and we had no outbound records of his travel.   He told me that he brought the vessel there and chose not to report it to any sort of like US Government authorities that he was departing, and that when he was there he didn't have legal status there.   And we even saw like some of the conversations that I referenced with Mr. Hernandez, which he affirmed that he was trying to figure out how to get a stamp paid for, so that he could show Mexican authorities that he did have status there.

Q.   Okay.   So getting back to my original question, when you build some story based on a foundation that is inaccurate, that is really a lie at its bottom.   You have a building that doesn't have a foundation, correct?

A.   I didn't build a story, sir.

        MS. KLEPACH:   Objection, Your Honor.

        THE COURT:   Sustained.

BY MR. FEIGENBAUM:

Q.   Okay.   So if there were proof that Javier Hernandez arrived in Mexico and reported to Mexican Border Control on November 20, 2019, the story that was built about him being in Mexico with -- and failing to report his entry to Mexican authorities would be the first block of something that was built that was a lie?

A.   I don't understand the question.

MS. KLEPACH:  Objection.

THE COURT:  If the witness understands the question. Overruled.

Do you understand the question, sir?

THE WITNESS:  I do not.  I don't understand the question.

BY MR. FEIGENBAUM:

Q.   Okay.  You testified -- I think you just said yes -- that your understanding was that Javier Hernandez had entered Mexico illegally because he didn't report to the Mexican authorities his arrival, correct?

A.   Correct.  When you or I would fly to Mexico, you would check in at an Immigration checkpoint, and you would get a passport stamped if you were not from there, if you were from the United States, and you would be permitted to enter their country through their means.

Q.   What requirements are there to enter Mexico by boat

legally?

A.   I can't speak to the Mexican law enforcement requirements.

Q.   Okay.  And is it your testimony that to leave the United States in a 29-foot pleasure craft you have to check in with Customs and Border Protection?

A.   No.  What I said earlier was that I actually am not an expert in our Customs and Immigration laws.  But what I did say is that when I asked Mr. Hernandez why we're seeing this pattern of travel, where he does not have an outbound, he says that he did not report his outbound departures to law enforcement because he was carrying extra fuel.  Which, in his own words, he said that was illegal.

To be honest with you, sir, like, I didn't state the laws of traveling with extra fuel to him.  He's one that provided his rationale at the time of my interview.

Q.   Well, let's talk about -- let's talk about what you say Mr. Hernandez told you -- and the other agent was Albert Ordonez?

A.   Yes, sir.

Q.   Okay.  So you didn't -- you didn't write that report of your interview with him.  It was Mr. Ordonez?

A.   Mr. Ordonez is the one that submitted the report.  I was his partner at the time of the interview, and read it and adopted it.

Q.   You adopted it as yours?

A.   Well, I'm very familiar with -- yes -- everything in there. I've reviewed that report multiple times.

Q.   Okay.  One moment.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   So it's pretty simple to understand.  The best way to preserve a conversation that somebody has with another person -- in this case, a law enforcement interview -- is to record it, correct?

A.   Sir, our policy in the FBI -- we are only expected to record conversations with defendants when they are in custody. So what that would usually mean is they've been brought back to our FBI station, our office, usually in handcuffs, and they would be detained.  And then we would have recording equipment to capture it.

When we interview anyone out -- that's not in custody, we are not required to record.

Q.   Well, what I'm just asking is:  The way to really know what you asked Mr. Hernandez, and what he answered, would be to have a recording of it?

A.   Yes.  I documented just the same, though, sir.

Q.   Well, can you give me a yes or no on this?  To know the precise words that were asked, and the precise answers that were given, would be to have an actual recording of those words.

A.   Sure.   That makes sense.

Q.   Okay.   So if you want to come into court and say these things that were asked and answered, the best way to do it for a jury would be to have a recording.

MS. KLEPACH:   Objection as to the best way.

THE COURT:   Sustained.   Rephrase, please.

BY MR. FEIGENBAUM:

Q.   Would it be more accurate to have the actual words asked and the answers recorded, rather than by memory?

A.   Well, it's not by memory, sir.   But you are correct in the sense that a recording would capture every word, every breath as well.   But it's not by memory when we write our reports, it's usually done within a few business days that we write the report, and notes would be taken and it would be very fresh because we --

Q.   When you take notes, you could put down anything you want.

A.   I swear to uphold the Constitution, sir, and I tell the truth.

Q.   Well, that affidavit from November 20th, more or less, 2020, when you said you went to Mexico with another agent on November 24, 2019, instead of some later date two weeks later, you swore to tell the truth in that affidavit, but you didn't do it.

A.   Sir, as I mentioned earlier, it was a human error.   I can't correct the past on that one.   But there was nothing material

there that we were using -- or I guess I won't speak further than that.  But yes, it was a mistake that I put on paper.

Q.  Well, it is material if you go there two weeks later and assume that it's the same boat that he came on.

A.  Well, I mentioned earlier that Mexican officials right away used a video chat with us, so that we could see as we were trying to help them identify where an identifying number for that vessel would be, because it was in no condition to be identified easily or specifically without seeing a serial number.

So we did see the vessel in condition -- in that same condition.  And when I showed up two weeks later, it was in the same condition that they showed me over our video chat when we were trying to find a serial number for the boat.

Q.  So there exists a video chat of the boat that you saw?

A.  No, sir.  It's -- if you were to use your phone for FaceTime, it doesn't record that encounter.  It's just a conversation you would have with somebody and it's realtime. And we didn't videotape or record our phone calls.

Q.  Was that turned over to the Defense in the discovery?

A.  There is no recording, sir.

Q.  Okay.  Now, when you went to Mr. Hernandez's residence, did you find out how long he had lived there?

A.  I don't recall.  I mean, I don't remember if it was in the report or not.  But I don't believe we focused on how long he

was at that particular residence.

Q.   In a background -- you do a background check for any suspect in a case, correct?

A.   Oh, sure.  No, we -- I was familiar with generally where Mr. Hernandez resided using our law enforcement databases and his driver's license.  The focus of my investigation was not how long he lived at his Miami Beach residence.

Q.   So when you went there, like three years or so after the events of 2019, was he living in the same place that was recorded when he got into Mexico in 2019?

A.   I believe he had a couple -- I believe there was more than one address over time that he lived in.  When we made our approach, obviously, we did our homework and found the best address for him based on law enforcement records and databases that are available to us.  And -- so yeah.

Q.   And when you went to his residence on April 18th, 2022, his wife and child were there?

A.   Correct.  Mr. Hernandez wasn't there.  We had knocked on the door to see if Mr. Hernandez was home.  He wasn't.  We had the pleasure of speaking with his wife -- who I believed to be his wife.  And she -- we told him [sic] who we were.  We left our phone number.  She said Mr. Hernandez wasn't home right now.  He was working.  I believe at the time he was driving deliveries for Amazon.

So we said:  "Okay.  It's important that we speak with

him," we were already in the area.  So she said that she would have him call us.  And Mr. Hernandez eventually did make contact with us.  He said he was getting off work later in the evening.  He was working a later shift.  I want to say it was very late.  It was nine, ten o'clock at night when he finished.  So we told him we'd be over there shortly, and we met him in the lobby area of his apartment.

And we try to separate our work from family.  So we talked with him in a private area of his building, and we began our conversation.

Q.  Okay.  And you didn't have a laptop computer with you at that time?

A.  I did not have a laptop with me at that time -- I apologize.  I don't believe I had a laptop with me at that time.  I know I showed him pictures.  But I apologize -- I really can't recall if I had a laptop or -- I can't recall.  It was some sort of -- some sort of -- I can't recall if I had a laptop, sir.

Q.  Okay.  No problem.

A.  Yeah.

Q.  So you and Mr. Ordonez go downstairs or stay downstairs for the interview?

A.  Correct.

Q.  And the interview lasts like 30 minutes?

A.  Probably a little longer than that.  I mean, we covered a

lot of material with Mr. Hernandez that night.

Q.   And did Agent Ordonez have a laptop with him?

A.   It's possible.  Again, I apologize.  I don't recall if we had a laptop.  It's not impossible that we didn't.  I just don't recall if we had a laptop at that time.

Q.   Can you use -- did you have your cell phone with you?

A.   Yes.

Q.   Can you record things on your cell phone?

A.   Sure.

Q.   Could you record the interview on your cell phone?

A.   I believe so.  Yes.

Q.   Why didn't you do that?

A.   I explained earlier it's not our policy to record out-of-custody interviews.  At this time, Mr. Hernandez was not under arrest.  He was not in our custody.  This was an attempt to see what information he would be willing to provide.  And again, the reason why we approached Mr. Hernandez is we made a decision that this is a possible person who could fill in the gaps for us, and we could benefit from his cooperation, as well as the overall investigation, which is why we provided a target letter to him, so that he can get the right counsel he needs, so that we can get the -- we can get him on track with our investigation.

Q.   And so the target letter goes out after you interviewed him?

A.   Correct.  Yeah.  We gave him the target letter there.

Q.   Okay.  Now, when you were interviewing him, who was taking notes?

A.   I believe it was Mr. Ordonez.  He's the one who authored the report.

Q.   And again, you could not confirm yourself whether Mr. Ordonez took down notes that were accurate that later became your report?

A.   Sir, the way that we publish reports, and the way we put reports out is we typically -- especially, if it's like an interview, we'll try to do them -- within a few business days, is the best practice.  That way it's still fresh in our memory.

     And I do remember, even to this day, without reading the report, much of the conversations that we had with Mr. Hernandez.

Q.   And I believe the prosecutor showed you a copy of your report to help you remember something?

A.   Yes, sir.

Q.   Do you still have it there?

A.   This is a copy of Mr. Ordonez's report from Homeland Security.

Q.   Okay.  And that's from April 18th, 2022?

A.   Yes, sir.

Q.   Okay.  There's nothing in there where Mr. Hernandez ever says he violated the law.

A.   Mr. Hernandez, towards the end of our interaction with him, started going down a path -- that's actually one of the main reasons why we advised him that, you know:  "Here's the target letter," to get an attorney, because typically when we pick someone in Mr. Hernandez's shoes at that time, we make a decision that -- again, not everybody gets an opportunity like Mr. Hernandez got at that time.  So when we did speak with him about giving the target letter, we wouldn't do that for everybody.  Like I said, some people just come in.  So ...

Q.   I understand.

A.   Yeah.

Q.   Now, have you ever had your deposition taken in any kind of a case?

A.   In the federal system, we don't usually use depositions.

Q.   I understand.  Have you ever had your deposition taken in a case?

A.   No, sir.

Q.   In a state case or a civil case?

A.   I've never been involved in any state or civil cases like that.

Q.   Okay.  Because in those cases, when a person is deposed, or their sworn statement is taken with a court reporter, before there's a final copy of it, the draft of it is provided to the witness, so they can see whether there are any errors in how it was taken down.

MS. KLEPACH:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Did you give Mr. Hernandez an opportunity to look at the draft report of your interview with him before using it for other purposes?

A.  No, sir.  That is not our practice.

Q.  Yeah.  I understand it's not your practice.  But does it seem fair to let the person see something that was not recorded --

MS. KLEPACH:  Objection as to the characterization.

THE COURT:  As to whether he thinks it's fair, sustained.

BY MR. FEIGENBAUM:

Q.  Okay.  In your work as an FBI agent, you become familiar with certain law violations, correct?

A.  Generally.  There's a lot of laws out there.  We sort of focus -- we leave the actual like legal expertise to our prosecutors.  But yes, you can become familiar.

Q.  Okay.  And for example, you were involved in the Gonzalez Vidal prosecution, right?

A.  The investigation of it, yes.

Q.  Yes.  And so some of the charges in the Gonzalez Vidal case are for extortion.

A.  Yes.  Those are some of them.

151

Q. And based on your work and training in the FBI, what is extortion?

A. Extortion -- I mean, without giving the reading from a legal book, it's when you're demanding -- almost like, if you think about it in terms of a ransom: "If you don't do this, I'll" -- and in the case of the Vidal case, they were sending threatening videos to family members where they were torturing their family members, and saying: "If you don't pay us, this is going to continue." So that was an extortionate phone call.

Q. Understood.

We don't have extortion in Mr. Hernandez's case, right?

A. We did not charge extortion in Mr. Hernandez's case.

Q. Okay. And how does -- you're familiar with the crime of bribery, because I know the FBI prosecutes, let's say, politicians for bribery, correct?

A. Sure.

Q. What is bribery?

A. Bribery is when you -- in terms of a public official, when you give them a gift when they're using their official capacity to provide favors to somebody that they shouldn't be able to do.

Q. So those two crimes are kind of like opposites. If it's a private person trying to get a government official, let's say even a police officer, to do something that that government official should not do, that would be bribery, right?

MS. KLEPACH:  Objection.  Calls for a legal conclusion.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Okay.  Are you familiar with a person who's the police chief in Merida, called -- his last name is Saiden, S-A-I-D-E-N?

MS. KLEPACH:  Objection.  Relevance.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  Am I familiar with him?

BY MR. FEIGENBAUM:

Q.  Do you know of that person, the police chief of Merida --

A.  Sure.  I can't give you his full name off the top of my head.  But I believe, yes, Saiden is one of the highest police officers in the State of Yucatan.

Q.  Have you ever met him?

A.  Yes.

Q.  Okay.  May I ask what the purpose of meeting was?

MS. KLEPACH:  Objection.  Relevance.

THE COURT:  Is it related to this case, sir?

THE WITNESS:  So -- yes.

THE COURT:  Sustained -- I'm sorry.  My apologies.  I meant the objection is overruled.  The witness may answer the question.

THE WITNESS:  Yes.  I had met with him.  Mr. Saiden

was not directly involved in the investigation.  But because he was the senior official -- or however they title them over there -- that authorized his agents or his officers to work with us on the Vidal case, that's why I met with him.  So ...

BY MR. FEIGENBAUM:

Q.  Okay.  Did you ever look into his background at all?

MS. KLEPACH:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  No, sir.

BY MR. FEIGENBAUM:

Q.  Okay.

MR. FEIGENBAUM:  Your Honor, I'm going to have a lot more.  I can't say exactly how much.  We're getting close to five o'clock.  This, for me, would be a good point to break.

THE COURT:  All right.  Why don't we break for the evening, and obviously we'll continue with the testimony tomorrow.

Ladies and Gentlemen, I appreciate your patience.  As you can see, it is almost five o'clock.  We will adjourn for the evening.

Please remember that you are not to discuss this case with anyone, nor permit anyone to speak with you.  Everything learned about the case is learned in this courtroom.  I would ask that you place your juror notebooks in the jury room.

Tomorrow will be a full day.  You can make

arrangements so that you are here right at nine a.m.  But I do want to advise you that our lunch period will be extended to an hour and a half, as opposed to an hour.  But it will be a full day, from nine to five.  All right?

Have a pleasant evening.  I'll see you tomorrow morning at nine a.m.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 4:56 p.m.)

THE COURT:  All right.  Go ahead and have a seat.

Agent Spielvogel, you are excused.  However, since you are on the witness stand, let me remind you, you're not to discuss your anticipated testimony, the testimony of any other individual, or any other aspect of the case.  All right?

THE WITNESS:  Yes.

THE COURT:  We'll see you tomorrow morning, right at nine a.m.

THE WITNESS:  Is that to include with the prosecutors?

THE COURT:  That's correct.  Because you are testifying.

THE WITNESS:  Okay.

THE COURT:  All right, sir.

Go ahead and have a seat.

If we can discuss tomorrow's schedule after Agent Spielvogel.  And just for purposes of timing, Mr. Feigenbaum, you stated that you had some time that you needed.  How much

time do you anticipate?

MR. FEIGENBAUM:  One more hour.

THE COURT:  Okay.  All right.  Then after Agent Spielvogel, who will the Government be calling?

(Pause in proceedings.)

MS. KLEPACH:  I'm sorry, Judge.  Agent Spielvogel took a little longer than anticipated.  So we're trying to figure out if we're going to switch around the order that we had originally planned.

THE COURT:  All right.

(Pause in proceedings.)

MR. DOBBINS:  Judge, this isn't necessarily the order, but this is the witnesses we anticipate we could call tomorrow. We have Ricardo -- FBI Forensic Examiner Ricardo Soto, FBI Forensic Examiner Arturo Ortega.  We have an Officer Stacey Walker, an Officer Ed Gullekson.  We have a CBP officer named Stephen Farlow, as well as we have a -- I've notified the marshals.  I need to verify with them this afternoon.  I have my assistant verifying that we may have Reynaldo Crespo Marquez, who is an inmate who may testify.

THE COURT:  All right.  Are there any issues with regard to this witness or any other witnesses that we can address at this time?

MR. FEIGENBAUM:  No, Your Honor.  Just if Mr. Dobbins would repeat.  Who is Stephen Farlow?

MR. DOBBINS:  He's a CBP officer with the introduction, I believe, of the travel records.

MR. FEIGENBAUM:  Thank you.

THE COURT:  All right.  Are there any issues that the Court can assist the parties with?

MR. FEIGENBAUM:  Not from the Defense, Your Honor.

THE COURT:  All right.  On behalf of the Government?

MR. DOBBINS:  Just one moment, Your Honor.

THE COURT:  Yes.  Of course.

MR. DOBBINS:  Nothing this evening, Your Honor.

THE COURT:  All right.  Well, let me emphasize that with regard to Mr. Pullen or any other witness that may want to appear by remote means, because that witness is unavailable, or otherwise there is an exceptional circumstance, I would ask that you confer and come to an agreement because on our part we would need to prepare with regard to a Zoom invite and make arrangements in terms of the time.

MR. DOBBINS:  Your Honor, if I may, just as to that -- I mean, I'm not a technological -- not great at the technology. So how would that work exactly?  I mean, would we have to -- would Mr. Pullen or another any other witness have to be -- they would have to -- I'm assuming the courtroom deputy would send out a Zoom invite.  They would then appear -- sort of like we did during the pandemic, where you would appear over Zoom; is that correct?

THE COURT:  That's correct.  And we would have -- I think we would probably use your laptops for purposes of your image appearing on the screen.  And then, obviously, there would be a requirement that the individual who sent the invite, the witness, also have audio and video.

MR. DOBBINS:  Okay.

THE COURT:  Okay.

All right.  So perhaps you can let the Court know tomorrow so that we can make any arrangements to the extent that that might affect us for next week.

MR. DOBBINS:  Certainly, Your Honor.  Thank you.

THE COURT:  All right.  Take the time that you need.

We are not going to be using the counsel table.  So you can keep the items here.  The courtroom will be locked.  And I'll see tomorrow morning at nine a.m.

MS. KLEPACH:  Thank you.

COURT SECURITY OFFICER:  All rise.

THE COURT:  Thank you.

(Proceedings adjourned at 5:01 p.m.)

UNITED STATES OF AMERICA       )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

                    C E R T I F I C A T E

          I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 28th day of September, 2023, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

          I further certify that this transcript contains pages 1 - 158.

          IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 6th day of June, 2024.


                         /s/Yvette Hernandez
                         Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
                         400 North Miami Avenue, 10-2
                         Miami, Florida 33128
                         (305) 523-5698
                         yvette_hernandez@flsd.uscourts.gov