IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1


UNITED STATES OF AMERICA,

   Plaintiff,       September 29, 2023
              9:03 a.m.

  vs.

JAVIER HERNANDEZ,

   Defendant.       Pages 1 THROUGH 176

_____


TRANSCRIPT OF TRIAL DAY 4
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE
And a Jury of  12



Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
        Brian Dobbins, AUSA
        Arielle Klepach, AUSA
        99 Northeast 4th Street
        Miami, Florida 33132


FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
        PO BOX 545960
        Surfside, Florida 33154-9998


COURT REPORTER:     Yvette Hernandez
        U.S. District Court
        400 North Miami Avenue, Room 10-2
        Miami, Florida 33128
        yvette_hernandez@flsd.uscourts.gov

**I N D E X**

Certificate.................................        176


**W I T N E S S**

**ON BEHALF OF THE GOVERNMENT:**                         PAGE
SPECIAL AGENT AARON SPIELVOGEL
CONTINUED CROSS-EXAMINATION BY MR. FEIGENBAUM            5
REDIRECT EXAMINATION BY MS. KLEPACH                     33

OFFICER ED GULLEKSON
DIRECT EXAMINATION BY MR. DOBBINS                       63
CROSS-EXAMINATION BY MR. FEIGENBAUM                     73

OFFICER STACEY WALKER
DIRECT EXAMINATION BY MS. KLEPACH                       75
CROSS-EXAMINATION BY MR. FEIGENBAUM                     84

REYNALDO CRESPO MARQUEZ
DIRECT EXAMINATION BY MR. DOBBINS                       98
CROSS-EXAMINATION BY MR. FEIGENBAUM                    150
REDIRECT EXAMINATION BY MR. DOBBINS                    161


**E X H I B I T S**

| GOVERNMENT'S EX. NO.: | OFFERED | ADMITTED |
|---|---|---|
| 58 | 79 | 79 |
| 61 | 82 | 82 |
| 69 | 107 | 107 |

(Call to order of the Court, 9:03 a.m.)

THE COURT: Hi. Good morning. Good morning to everyone.

I thought we're waiting on -- the last count was -- all right. One more.

Oh. So we have all 14?

Perfect.

All right. If we can call the case and then we can get started.

COURTROOM DEPUTY: 22, Criminal, 20557, Bloom, United States of America v. Javier Hernandez.

Counsel, please state your name for the record, beginning with the Government.

MS. KLEPACH: Good morning, Your Honor. Arielle Klepach and Brian Dobbins for the United States, joined by Special Agent Sergio Francisco.

THE COURT: Good morning.

MR. FEIGENBAUM: Good morning, Your Honor. Marty Feigenbaum on behalf of Javier Hernandez. He is present before the Court with the assistance of a Spanish interpreter.

THE COURT: All right. Good morning to each of you as well.

And go ahead and have a seat.

Mr. Hernandez, let me remind you that if at any time the equipment stops working, or you're unable to hear the

interpreter, if you'll let the Court know. All right, sir?

THE DEFENDANT: (Through Interpreter.) Okay.

THE COURT: Are there any issues we need to address before we bring the jury in and continue with the Government's case?

MS. KLEPACH: No, Your Honor.

MR. FEIGENBAUM: No, Your Honor.

THE COURT: All right, then. Let's bring the jury in.

COURT SECURITY OFFICER: All rise for the jury.

(Before the Jury, 9:05 a.m.)

THE COURT: All right. Good morning, Ladies and Gentlemen. It's good to see each of you.

Please be seated, everyone.

Thank you for being so prompt, and we are ready to get right back to work.

On behalf of the Government, if you'll call your next witness.

MR. FEIGENBAUM: Your Honor, I'm in the middle of cross-examination.

THE COURT: Oh. My apologies. Actually, I forgot we had taken some time with Agent Spielvogel.

And come on forward, Mr. Spielvogel. Let me remind you, sir, that you were previously placed under oath.

If you'll come forward.

(Pause in proceedings.)

THE COURT: And continuing with the cross-examination.

MR. FEIGENBAUM: Thank you, Your Honor.

CROSS-EXAMINATION [CONTINUED]

BY MR. FEIGENBAUM:

Q. Good morning again, Agent Spielvogel.

A. Good morning, sir.

Q. How you doing today?

A. Well. Thank you.

Q. Thank you.

All right. So yesterday you were telling the jury about some photos that you took, I believe it was December 9, 2019 -- a series of photos of the boat that the Mexican authorities had said they had taken possession of, correct?

A. Yes, sir.

Q. Now, you showed several photos of what you took, and then you showed a photo of something from Mr. Hernandez's camera, which you said he took of the boat?

A. There were -- well, we showed a few different photos, sir. We showed photos from Mr. Hernandez's phone that were sent to Mr. Hernandez from Mr. Ramon Reyes Aranda. We also showed photos that were taken on the boat that were while the boat was at sea from Mr. Hernandez.

Q. Okay. So I direct your attention to the photo that was taken at sea that came from Mr. Hernandez's phone.

A. Yes, sir.

Q.   And that was shown yesterday during your testimony, correct?

A.   Yes, sir.

Q.   So my question to you is:  When you took photos of the boat that was in the parking lot of the Mexican police in -- Merida, was it, or Progreso?

A.   It was in Merida.

Q.   Merida.  And that was 17 days after Mr. Hernandez had arrived?

A.   Approximately.

Q.   Right.  Because the date the Mexican police said was November 22, 2019.  You take 17 days and add it, you get to December 9, 2019, correct?

A.   I'll trust your math, sir.  Yes, sir.

Q.   Thank you.

     My question is:  When you went to take pictures of the boat, you did not take any pictures of the boat from being on the boat, for example, what the boat looked like with its seating arrangements?

A.   I don't recall exactly every single photo we took.  We took a few different photos of the boat.

Q.   Okay.  Were you the person that took the photos?

A.   No.  I believe it was my partner that would have taken the photos.  I was there at the exact place and time.

Q.   Okay.  Well, maybe the Government can -- if they ask you

any more questions, have photos of the ones that you and your other agent took.  But I didn't see among the photos provided to us that there were any photos taken with somebody, either you or -- I guess it was Mr. Batista --

A.   Correct.

Q.   -- on the boat itself, taking pictures of the deck, the seating and so forth.  But you don't recall right now?

A.   Not off the top of my head, sir.

Q.   Okay.

        MS. KLEPACH:  Counsel, would you like a copy of the photos?

        MR. FEIGENBAUM:  Sure.  Was it Exhibit 60?

        MS. KLEPACH:  That's right.  Let me just get you a copy.

BY MR. FEIGENBAUM:

Q.   The Government was kind enough to give me a copy of their Exhibit 60.  I'm going to look it through it real quick, and then I'm going to hand it up to you.

A.   Okay.

Q.   Or actually, why don't I go ahead and do that.  You're the witness.

        MR. FEIGENBAUM:  So may I approach, Your Honor?

        THE COURT:  Yes.  Of course.

     (Pause in proceedings.)

        THE WITNESS:  Okay.  I reviewed the photos.

BY MR. FEIGENBAUM:

Q.  Are there any photos taken by you or the other FBI agent on December 9th, 2019 showing the view of the boat from the deck?

A.  There are pictures that show the seating, not taken from on the deck.  But if you'll notice in some of the pictures you can see the center console, where the helm is.  That's the area where the captain would be driving.  And you'll notice the tan-colored seating and the layout of the console.

MR. FEIGENBAUM:  Okay.  May I approach and see those photos?

May I have the ELMO, please, Your Honor?

I believe this exhibit is in evidence.

THE COURT:  Is it 60?

MR. FEIGENBAUM:  So I believe --

THE COURT:  Sixty is in evidence.  So it may be shown to the jury.

MR. FEIGENBAUM:  Okay.

BY MR. FEIGENBAUM:

Q.  So Mr. Spielvogel, you handed me two photos of the set that you were given, correct?

A.  Yes, sir.

Q.  Government Exhibit 60?

A.  Yes, sir.

Q.  These are the photos -- all of the photos that you and Agent Batista took on December 9, 2019?

A. To my recollection yes, sir.

Q. Let's look at the first one.

MR. FEIGENBAUM: I don't know how to use it too good.

BY MR. FEIGENBAUM:

Q. Okay. So that's one of them, correct?

A. Yes, sir.

Q. I'm pushing it up here a little bit. We see the ground. Then we see -- so it's a view -- it's Government Exhibit, Bates Stamp -- Government Exhibit 60, Bates Stamp 00176.

That's not taken from the deck, correct?

A. Correct. That's taken from the ground.

Q. Right. So you just said that it showed the seating arrangement and everything on the deck.

A. Correct. It does. If you'll notice -- if you're looking from our view with the camera, you can see the tan -- the coloring isn't great through the video screens, but you'll notice there's a tan-colored seating where the captain could sit, with a chrome handle identifying where the rod holders or fishing poles would go right behind it. So you can see the tan.

Q. Is that the only -- well, that's all you got, right?

A. From this view, sir.

Q. Okay. Let's look at the other one that you said also shows the deck seating and other things on the deck. It's this one, correct?

A.   Correct.  Again, that shows -- that's another view that shows the center console with the tan-colored seating where the captain would sit.  And then if you'll notice above that, above as well -- different boats have or do not have this -- you'll notice that there are outriggers, which are these -- if I can mark the screen up here.  Those are also additional identifiers that -- for the fishing vessel itself.

Plus, a little bit to the left, you'll notice a radar that had been installed.  And then you'll notice the -- sort of like curtains, we'll call it.  Instead of a windshield, it's made out of some sort of like a clear canvass-type material.

So those are the identifying marks, in addition to the tan-colored seating that we're describing.

Q.   Okay.  Anything else on the deck, for the view of someone standing on the deck, is not in these photos?

A.   Not in this photo.  No, sir.

Q.   Okay.  Thank you.

MR. FEIGENBAUM:  You can turn off the ELMO, please.

BY MR. FEIGENBAUM:

Q.   Now, one of the things you asked Mr. Hernandez about when you went to see him on April 18, 2022 was about an email address that started out like "J Hernandez," something like that.  Do you recall?

A.   Correct.

Q.   And you wanted to know whether he used that email address,

right?

A.   Correct.

Q.   And he told you no?

A.   Correct.

Q.   Okay.  Now, just to make sure about crime scene basics, when you got to Mexico on December 8th, 2019, 16 days after Mr. Hernandez was arrested there, the Mexican police didn't have any photos of when they arrested -- you know, the scene of where he was arrested, correct?

A.   I do not have any photos of that.  I'm not sure what the Mexican arrest file would look like.

Q.   Do you believe you had an obligation to look at the Mexican arrest file?

A.   It's my understanding, after reading the report that was provided to me from the Mexicans, is the reason that Mr. Hernandez was arrested was not for the importation of this stolen vessel.

Q.   Okay.  So I just -- the question would be:  Did you believe you had an obligation to request a view of the Mexican police file for Mr. Hernandez?

          MS. KLEPACH:  Objection as to relevance.

          THE COURT:  Overruled.  I'll allow it.

          MR. FEIGENBAUM:  Just for the record, Brady v. Maryland.

          THE COURT:  I'm going to allow it.

MR. FEIGENBAUM:  Thank you, Your Honor.

THE WITNESS:  No.  What we asked for at the time we were there is the report pertaining to the stolen boat.  And they documented that for us and gave us their version of their police report, and I believe it mentioned just the report as to why they encountered and detained Mr. Hernandez, which was prior to them learning about where this boat was found.

MR. FEIGENBAUM:  Judge, just to keep things going, I would like to reserve a motion.

THE COURT:  All right.  Certainly.

BY MR. FEIGENBAUM:

Q.  So Mr. Spielvogel, regarding the arrest of Mario Alberto Enrique Lopez, known as Neco, which was more or less at the same time -- was it the same date, November 22, 2019?

A.  I believe it was either the same day or very soon after.

Q.  Okay.  So for that, did the Mexican police give you any photos of the crime scene; in other words, encountering what they claim was a truck towing a boat on a trailer without a license plate?

A.  No, sir.

Q.  Did you ask for it?

A.  I asked for a copy of their police report, and they were able to provide me what we were able to turn over to you.

Q.  All right.  And did you ask to see their file to know all the stuff they had collected regarding that alleged incident?

A.   Sure.  And that's actually why they gave us a copy of the report.  And that was the only information that we were able to receive from them.

Q.   Just -- the question is -- I'm sorry.  I don't want to be repetitive, but I have to be clear for the record.  Did you request a view of the Mexican police file regarding Neco's arrest?

A.   Yes.

Q.   And all you found was that report that was a written report by one of the officers?

A.   Correct.

Q.   Okay.  Now, yesterday you said that it took three and a half years, whatever it was, between learning about Mr. Hernandez allegedly driving a stolen boat to Yucatan, Mexico and actually bringing charges against him, which, to be clear for the record, were about five or six months after you met with him where he lives?

A.   The question is:  Did we bring formal charges against Mr. Hernandez five months after we interviewed him?

Q.   Yes, sir.

A.   I'd have to look at the date of the original Indictment.

Q.   Okay.  If you did have a chance to look at it, would that help you?

A.   Sure.  Yes, sir.

Q.   Okay.  Let me see.  To save time, I already put my binder

up there.  So you see that black binder that you have?

A.  Yes, sir.

MR. FEIGENBAUM:  Let me ask the Government.  Do you need to see -- I'm going to -- I'm just going to ask him if looking at the Indictment in this case refreshes his recollection about when it was brought.

MR. DOBBINS:  Could you just tell us what exhibit number, sir.

MR. FEIGENBAUM:  Yeah.

MR. DOBBINS:  Or exhibit letter.  I'm sorry.

MR. FEIGENBAUM:  Yeah.  Just one second.

It's an exhibit that I'm marking Defense V, like Victor, V, like Victor, two Vs.

BY MR. FEIGENBAUM:

Q.  And if you could turn to that in the tab.  That's Exhibit VV, marked for identification.

MS. KLEPACH:  I'm sorry, Counsel.  We did not receive a copy of what you marked as VV.  So may I just review what's in the binder?

MR. FEIGENBAUM:  Of course.  Here.  I got a copy you can look at right now.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.  Okay.  Mr. Spielvogel, looking at what's been marked for identification as VV, does that refresh your recollection about

when the charges were initially brought against Mr. Hernandez in this case we're here about today?

A.   One second, sir.

(Pause in proceedings.)

THE WITNESS:  Correct.  I see that it's stamped November 16th, 2022.  So correct, that would be approximately six months after our conversation with Mr. Hernandez.

BY MR. FEIGENBAUM:

Q.   Well, you said after your conversation with Mr. Hernandez. That was on April 18, 2022.

A.   Correct.

Q.   May, June, July, August, September, October -- almost a full seven months.

A.   Okay.  Yes.

Q.   There was no problem with convening a grand jury at that point in time in the Southern District of Florida, correct?

A.   I don't believe so.  I believe we were back in the grand jury.

Q.   And in fact, the grand jury had been returning indictments much earlier than that.  Do you recall?

MS. KLEPACH:  Objection as to relevance.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  I don't remember the exact date we returned to using the grand jury again, but that sounds correct.

BY MR. FEIGENBAUM:

Q.   Okay.  For example, do you remember when the first Indictment was brought in the Jose Miguel Gonzalez Vidal case?

A.   Not the exact date.

Q.   Okay.  So let me show the Government what's been marked as Defense Exhibit UU.  And yes, you can turn to it.  It's been marked UU Defense for identification.

A.   Okay.  I see it's stamped January 21, 2021.

Q.   Okay.  So January 21, 2021, that's almost -- well, let's say 11 months in 2021.  And then you just testified that the case against Mr. Hernandez was brought in November of 2022.  So that's -- 11 months and 11 months, that's 22 months.

So from the time that -- and just to be clear for the jury, for a grand jury to return an indictment they have to meet, correct?

A.   Correct.

Q.   And there have to be -- well, a grand jury has 23 people, right?

A.   Okay.

        MS. KLEPACH:  Objection.  Relevance.

        THE COURT:  Sustained.

        MS. KLEPACH:  Move to strike the answer and question.

        THE COURT:  It's not relevant to the inquiry.  You may continue.

BY MR. FEIGENBAUM:

Q. Grand jurors have to meet in person?

MS. KLEPACH: Objection. Relevance.

THE COURT: I'll allow that. Overruled.

THE WITNESS: It's my understanding, as an FBI agent, not as a prosecutor, that yes, they would be meeting in person.

BY MR. FEIGENBAUM:

Q. So based on refreshing your recollection when the first Gonzalez Vidal Indictment was brought, there was a length of time of 22 months between the initiation of the charges in Gonzalez Vidal and when you charged Mr. Hernandez?

A. Correct. As I was explaining earlier, the reason why -- for any length of time in between certain things as we were investigating this larger enterprise, the Gonzalez Vidal case was a separate piece of the organization. That case involved active violence and other members, and continually collecting evidence for crimes of like kidnapping, extortion, money laundering.

So there was still an ongoing in-depth investigation into that piece of it. And at that point we were already on a trial schedule that we were meeting those demands. So it's very normal, when you're investigating different pieces of the same organization, that things have to take a back-burner, for example, while you continue working on your deadlines.

Q. Talking about the individual known as Neco, he was the

marina owner of Marina Akumal, A-K-U-M-A-L?

A.   Yes, sir.

Q.   Did you ever investigate who Neco was?

A.   Yes, sir.

Q.   And how many boat slips did his marina have?

        MS. KLEPACH:  Objection.  Relevance.

        THE COURT:  Overruled.  I'll allow it.

        THE WITNESS:  I don't know.  I have no idea how many.
I understand it to be a fairly good-sized marina.

BY MR. FEIGENBAUM:

Q.   And in your investigation of him as a businessman, what
other businesses did he have?

A.   I understood that there were other businesses throughout
time.  I don't know exactly what other companies he had in his
name or not.  His businesses were in Mexico.  And a lot of the
records that we have to get from Mexico usually come through
treaty via MLAT to have anything official.

     You know, it's one thing to be able to Google information
about somebody, another thing to actually get their corporate
business records, which has to go through a much lengthier
process to give you an exact answer of every business that he
would have.

Q.   Yesterday, you mentioned that you had met the police chief
of Yucatan, whose name was Saiden, S-A-I-D-E-N, correct?

A.   Yes, sir.

Q.   And I can't remember.  Did you ever look into his past?

MS. KLEPACH:  Objection.  Relevance.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  No, sir.

BY MR. FEIGENBAUM:

Q.   Okay.  Well, I believe that part of your case against Mr. Hernandez, the way you described it, with a truck -- a Tundra -- Toyota Tundra truck -- you talked about that yesterday, didn't you?

A.   Yes, sir.

Q.   And you -- I believe you said it was used as a bribe to pay Police Chief Saiden?

A.   No, sir.

Q.   Okay.  Was there a particular person who was supposed to get that truck?

A.   We do not know who the actual intended recipient was. After reviewing Mr. Hernandez's messages with him, it was our understanding it was going to some higher-ranking police officer.  I believe in his own words in his messages, it was for a governor, or that they had a governor in their pocket, and also some other police chief or some higher official.

Q.   Okay.  So there was some reference to a police chief?

A.   I don't remember if it was a police chief.  But yes, sir, it was reference to -- they had a higher-ranking police authority in their pocket, is the way the message was.

20

Q.   Would it make sense, having that information as part of your investigation, to look into who were the high-ranking police officials there, especially the chief?

A.   That part, at that time, was not part of our investigation. There were several states in the Yucatan area -- or I'm sorry. not only in the Yucatan area, but just outside it -- that we knew this organization operated in.  One of them was the State of Quintana Roo.  The other is the State of Yucatan.  And then just to the slightly west of that is the area of Campeche.  So that started a whole new avenue -- you know, that would be a whole new avenue of potential investigation that we were not into at that moment.  We were focusing on Mr. Hernandez.

Q.   Okay.  Yeah.  I'm just focusing on Yucatan only.

A.   Okay.

Q.   Because Yucatan is where Progreso is, the port.

A.   Correct.

Q.   And where Neco has his marina.

A.   Yes, sir.

Q.   So with that in mind, you're saying you didn't do any investigation of Police Chief Saiden?

A.   No, sir.

Q.   Okay.  Did you become aware -- or I should say this:  Was it part of your investigation to use a confidential informant to try and obtain information from Neco?

          MS. KLEPACH:  Objection.  Relevance.

THE COURT: Overruled. I'll allow it.

THE WITNESS: You're asking if I used a confidential informant to contact Neco?

BY MR. FEIGENBAUM:

Q. No, I did not. My question is: Did you become aware in your investigation whether a confidential informant was used to try and obtain information from Neco?

A. No, sir. I've never used a confidential informant to get information from Neco.

Q. I didn't ask if it were you, sir. I just asked if you were aware of --

A. No, sir. The answer would be no.

Q. So for the record, because the question and answer have to be right like together --

A. Okay.

Q. -- you did not become aware at any time that a confidential informant was used, was employed by somebody, to try and obtain information from Neco?

A. Correct.

Q. Okay. Now, I believe you stated you were with the Navy before you became an agent for the FBI.

A. Yes, sir.

Q. Okay. What kind of service did you do?

A. So I was a qualified Navy diver. And I also -- prior to that, I worked on F-18s. Those are the fighter jets.

Q.   So you didn't work for the Coast Guard at any time?

A.   No, sir.

Q.   Didn't work for Customs and Border Protection?

A.   No, sir.

Q.   Did you testify yesterday -- and I may be confused, and I apologize in advance -- that when somebody leaves the United States in a boat that they have to check in with Customs and Border Protection before they leave US territorial waters?

A.   No, sir.  What I said yesterday, when I was asked that, is that I actually asked Mr. Hernandez, once I showed him the records that we had showing that he did not have any outbound records.  He told me that the reason why he did not have any outbound records, in his interpretation -- I actually don't know the requirement to report outbound -- he told us that he knew that he was having several extra fuel tanks on board, that he said was illegal, and that's why he didn't want to notify his outbound.  I have no knowledge of the law regarding outbound departure.

Q.   Okay.  So now --

        MR. FEIGENBAUM:  And I'm kind of getting maybe towards the end of my questions, Judge, just to let you know.

        THE COURT:  All right.

BY MR. FEIGENBAUM:

Q.   So yesterday, you were talking about information you recovered from Mr. Hernandez's cell phone.

A.  Yes, sir.

Q.  That's Government's Exhibit 1B107?

A.  That's the FBI's -- I believe it was a different exhibit number, but that's the FBI's evidence number.

Q.  Yes.  I apologize.

A.  Okay.

Q.  FBI Evidence Number 1B107?

A.  Yes, sir.

Q.  Okay.  So you mentioned how when you have a phone you can plug it into something that -- what makes a copy of it?

A.  In -- yes.  For lack of a better words, what it does is it extracts -- so there's a company that we use, and it's called Cellebrite.  Cellebrite is essentially a software that you can hook up a device to, particularly a cell phone, and it attempts to extract, I guess, a copy of whatever the data would be on the phone.  And then it turns it into some sort of a legible format that a human can read, instead of just ones and zeros and code.

Q.  So taking out the information from a cell phone, it's placed where, in like a laptop, for example -- one of your laptops?

A.  No.  So the process is:  You would connect the phone to this device.  The device processes this phone, and it makes a copy that would be stored on some sort of a hard drive or the desktop, wherever it would be saved in FBI evidence files.

From there, we can then generate reports for that.

So we can create that report in the form of a PDF document, which is a very lengthy printout of everything.  It can do a text version of that file in Excel, which would be missing the images, but it can spit out all the data for you, or you can use the Cellebrite reader that the company provides.  It's sort of an easier interface for -- as an investigator, you can click through and navigate what you're looking for a lot easier that way.  It's like a website almost that you can organize what you're looking for.

Q.  So the taking out of the information from the cell phone, that's not a search.  It's something -- the search happens later?

A.  So what we consider a search -- we're not allowed to take that step to plug in a phone to get the data off it until we get authorization from a judge which is approving our search warrant.  So that -- we consider the search once we're -- we wouldn't be able to plug in that phone to get that data until we're authorized.

Q.  But the search of the phone is done by Cellebrite software?

A.  Oh, that's one of the ways that you can conduct a search of a phone.

Q.  Did you use Cellebrite software for this phone?

A.  Yes.

Q.  Okay.  So you got permission on February 27th, 2020, with a

court order allowing you to run the Cellebrite program and search what was on that phone, right?

A.   Not just to run the Cellebrite program.  To search the phone.

Q.   Okay.  And the -- that court order expired March 10, 2020, which was 10 days later?

A.   Correct.  Usually -- unless there's extenuating circumstances, you usually have to do it within a period of 10 days.

Q.   Okay.  And then you testified that a newer version of Cellebrite came out -- I think it was -- whenever.  It doesn't matter.  You did another search of the phone on April 7, 2021, about 13 months later, using that newer version?

A.   Not another search.  It's -- we continued -- we considered that a continuation of the same search, as there was additional data we knew existed on the phone.  Because in addition to plugging it in the first time, we saw it did not spit out all the data that way.  So we were limited to taking manual pictures of the phone, which was also authorized in our search warrant.

So once a -- it's not as pretty of a picture that you see that way, when you have to take a bunch of pictures of the phone.  It's cleaner if it can come out in the form of a report generated by Cellebrite.  So once the new software became available, we knew that that was going to be the best way to

pull out everything in an easier report, one, to provide to you guys, and to us to read using the Cellebrite Premium Software, which was able to pull out significantly more of what we were looking for on the phone.

Q.  But you knew that you had to get another search warrant authorized by a court --

MS. KLEPACH:  Objection.  Calls for a legal conclusion and pretrial rulings.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Yesterday, you testified -- when you were on direct examination with the Government, you testified that you checked with your digital forensic analyst, and you found that they were very backed up.  I think those were your words.

A.  Regarding using Cellebrite Premium, at that time, it was only available at either headquarters or our Quantico facility. So they were backed up for Cellebrite Premium once it became available.

Q.  And you testified --

A.  To what, sir?

Q.  -- to my -- well, I'm getting there --

A.  Okay.

Q.  -- to my memory, that, for that reason, you did not seek -- you did not seek a second search warrant because you didn't want to have to wait for it and you went ahead and did it

anyway.

A. No, sir. I didn't say that. I --

MS. KLEPACH: Objection, Judge. That was not the testimony.

THE COURT: Sustained.

MR. FEIGENBAUM: Go ahead.

MS. KLEPACH: The objection was sustained.

MR. FEIGENBAUM: Oh, yeah. Yeah. Okay.

BY MR. FEIGENBAUM:

Q. So -- so what I'm trying to find out is: If you said that the analysts who could run the Cellebrite Premium were backed up, what did you mean by that?

A. Well, I meant that we have an option -- Cellebrite Premium was known to be able to -- to be able to extract a more comprehensive download of phones. At least that's what it was said it was able to do.

So when I said that they were backed up, I mean that the FBI -- and not only the FBI, but other law enforcement agencies submit their phones at times to the FBI because typically we might have greater resources for them. The backlog comes from not just -- they're not just there to serve my investigation's needs, but they're in the process of serving active cases, working violent crimes against children.

Unfortunately, there is -- we have to triage what phones get submitted. And there are people that are out there

28

actively being hurt, different things, so those phones do take priority before our phones.  And if you can imagine every FBI field office that collects phone evidence, in addition, their partners in local law enforcement, the partners that might be requesting the FBI to assist them, the backlog can get -- I want to say over a year at least, easy.  And I don't know the log.  I just know that it's a very insane amount of phones that are being dealt with first.

Q.  So is it your understanding, then, that once you got the original search warrant that was limited to 10 days -- why would the judge, back in February of 2020, limit it to 10 days, if you would have an open road to keep using newer and newer versions of Cellebrite to run --

MS. KLEPACH:  Objection.  Calls for a legal conclusion, lack of foundation, pretrial rulings.

THE COURT:  On the first ground, sustained.

Let's rephrase, and perhaps we can narrow the question.

BY MR. FEIGENBAUM:

Q.  Do you believe that that first search warrant had an end date where you could not search the phone anymore?

A.  Correct.  What we were doing was what we considered a continuation of the same search.  The phone had not been altered in any way.  It had been locked in airplane mode to preserve the condition that it was in at that time.

So what we consider a continuation of the same search is -- the data had not changed on the phone in any way. There was -- it's not as if Mr. Hernandez got his phone back, and then we collected it again, and then any new information he put on there we would be considering as our evidence from that search warrant. At that point, we would have definitely had to apply for an additional search warrant.

Q. Why does a search warrant have an end date? And the one you got, why did it have --

MS. KLEPACH: Objection.

THE COURT: If the witness knows with regard to the end date. Overruled.

BY MR. FEIGENBAUM:

Q. What did the end date of March 10, 2020 prevent you from doing on April 7, 2021?

A. So from an investigator's position on this, what I know end date to be is I'm authorized today to get a -- we'll give an example. If I'm authorized today to get a search warrant for one of your cell phones, and I have a period of 10 days to go out and collect it, if, within those 10 days, I have not started attempting to search your phone, at that point, I would have to go back and apply for an extension or some sort of an amended search warrant, because -- I don't know if the term -- forgive me. I'm not an attorney -- would have been stale by that initial search warrant standard. So we would be

requesting an additional length of time to collect the evidence.

Q.   Have you ever been involved in a case where you had a search warrant for somebody's house?

A.   Yes, sir.

Q.   And that search warrant, did it have an end date?

A.   Yes, sir.

MS. KLEPACH:  Objection.  Relevance.

THE COURT:  Overruled.

MR. FEIGENBAUM:  I can tie it up.

THE COURT:  I'm going to allow it.

BY MR. FEIGENBAUM:

Q.   And that meant that the date that you could go and search the premises, with a description of what you could do, would end on a certain date.  So you had to complete your search by a certain date?

A.   Correct.  And that goes to the explanation I was giving just a moment ago.  If I'm authorized a search warrant, and I'm given approximately 10 business days to do it, to go into one of your homes, let's say, there's a lot that can happen after 10 days that might be not be relevant to what I'm looking for, that I told the judge that I'm looking for within that period.

So there is a great chance that the evidence that I would find in your home could be significantly altered, and it would be considered stale, perhaps, after that 10-day period.  At

that point, if I wasn't able to get into your home, for whatever reason, within 10 days, I would apply to write a new search warrant, and ask the judge's permission, explaining those additional reasons.

Q. Okay. Let's build on your example. So if you went to a house on February 27, 2020, and you did a search, and you recovered certain things from the house, that was your first search, correct?

MS. KLEPACH: Objection. Calls for speculation.

MR. FEIGENBAUM: He just --

THE COURT: Overruled. I'll allow it.

THE WITNESS: Okay, sir. Yes.

BY MR. FEIGENBAUM:

Q. Correct?

A. Yes.

Q. Okay. So a year and a month later -- a year and a month later, there's something new on the technology market that you could go back into that house and use this new device to see if something you didn't discover in the house was there. My question is -- wait. My question is: Would you need to get a new search warrant to use that new device?

MS. KLEPACH: Objection. Calls for speculation.

THE COURT: Overruled. I'll allow it.

THE WITNESS: So as an agent, at that point in time, given those circumstances you described, yes, I would consider

32

it that.  And let me explain the reason why.  A phone, once we collect it, we can -- once it's in FBI custody, we maintain it in airplane made.  We consider that -- and again, I won't speak for the forensic community, but we consider that sort of like locked in time, if you will.  Right?  There should be nothing able to be altered on that phone.  It's not sending out messages anymore.  No one's putting new pictures on the phone.

When you go to a home a year later -- this home is out in the world -- there's many things that can happen to the home, even if it's an abandoned home that's been taped off. You know, evidence can wash away, if we're talking about certain DNA, or even different things.  I don't want to speak too specifically.  But a home is not locked inside of a vacuum in that sense.

Does that help -- does that answer your question, sir?

Q.  I hear your explanation.  Thank you.

A.  Okay.

MR. FEIGENBAUM:  Judge, I'd like to reserve a motion.

So I do appreciate you speaking with me, and I wish you a good day.

THE WITNESS:  Thank you, sir.  You too.

THE COURT:  All right.  Any redirect?

MS. KLEPACH:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. KLEPACH:

Q.   All right.   Good morning, Agent Spielvogel.

A.   Good morning, ma'am.

Q.   I'm going to remind you to please slow down.

A.   Yes, ma'am.   I apologize.

Q.   All right.   So I want to take you back to yesterday.   You were asked a series of questions regarding what you did when you went to Mexico to obtain Mr. Hernandez's cell phone, among other evidence.   Do you remember that line of questioning?

A.   Yes.

Q.   Okay.   You were asked about whether you attempted to interview Hernandez.   Do you remember that question?

A.   While I was in Mexico.   Yes, I remember being asked that.

Q.   Okay.   When you were in Mexico, in December of 2019, did you even know who Javier Hernandez was?

A.   No.

Q.   Was Javier Hernandez a target of your investigation in December of 2019?

A.   No.

Q.   Did you know anything about him at all at that point?

A.   No.

Q.   Did you have any evidence against him at that time?

A.   No.

Q.   To your knowledge, are there legal issues associated with

interviewing an individual that's in custody in another country?

A. I don't know their custody rules. But the way we would treat it as an agent -- and again, I'm not going to speak on behalf of the US Attorney's Office -- is I wouldn't speak with somebody in custody without -- if I knew they were represented or if they had the possibility of being represented.

Q. So you did not know whether you would have even been authorized to speak with him at that point, did you?

A. Correct.

Q. Fair to say that the evidence you had against Mr. Hernandez in April of 2022 was very different than the evidence that you had against him in December of 2019?

A. Correct.

Q. You were also asked a series of questions about whether the Naples Police Department attempted to interview Mr. Hernandez.

A. Correct.

Q. To your knowledge, was there any evidence that Mr. Hernandez was the person who stole that green vessel in December of 2019?

A. No -- well, pause. Let me rephrase that. In December of 2019 is when we learned that Mr. Hernandez was the person who stole that boat and brought it to -- or at that point brought it to Mexico. Our investigation is, at that point, just beginning.

Q. Is it fair to say that the evidence of Mr. Hernandez's theft of those vessels came primarily from his cell phone?

A. The majority of the evidence was derived from his cell phone that led us to our investigation.

Q. All right. And is it fair -- when did you obtain the bulk of that evidence?

A. When we went to -- well, off of Mr. Hernandez's cell phone?

Q. Correct.

A. Yeah. Only post-search warrant, when we were able to start reviewing what was on his phone.

Q. You were also asked about why Mexican officials arrested Mr. Hernandez.

A. Yes.

Q. Do you have any firsthand knowledge of why they arrested Mr. Hernandez?

A. Firsthand, no.

Q. You were also asked about whether Mr. Hernandez had a passport stamp that would have authorized his entry into Mexico. Do you remember that line of questioning?

A. Yes.

Q. Can you remind us about the messages regarding the passport stamp that you found in Mr. Hernandez's phone.

A. Yes. When I reviewed Mr. Hernandez's phone, right around the time he was getting to Mexico with that boat, there was conversations about paying money to somebody in the Mexican

Immigration, who would be able to give him a stamp, so that it could look like he was in Mexico legitimately.

Q.   Slow down.

A.   Yes, ma'am.

Q.   All right.  You were asked a series of questions about the Mexican -- or the Yucatan State Police Chief.  Do you remember those questions?

A.   Yes.

Q.   Remind us.  Did that Mexican police chief have any involvement in this case?

A.   No.

Q.   You were asked about your obligation to review the Mexican police case file.  Do you recall that?

A.   Yes.

Q.   All right.  Do you know what Mexican police procedures are in terms of photographing arrest scenes?

A.   No, ma'am.

Q.   Does the FBI always photograph the scene of an arrest?

A.   So we -- oh.  The scene of an arrest, no, we do not.

Q.   Okay.  You were also asked about whether you investigated the individual who was the recipient of the car that Mr. Hernandez drove from the United States to Mexico for the purpose of a bribe.  Do you remember that?

A.   Yes.

Q.   As part of your role at the FBI, do you investigate foreign

corruption?

A.   That's not my primary role, no.

Q.   Are there other units in the FBI that are dedicated to foreign corruption investigations?

A.   Yes.

Q.   All right.  We talked a lot about what it takes to conduct an investigation in another country.  Just for clarity, I believe that you said the phrase "MLAT" a couple of times.

A.   Correct.

Q.   What is an MLAT?

A.   An MLAT is an agreement.  It's part of a treaty between two countries.  For example, in the United States, if I needed to collect evidence that was obtained by either another agency or a local police department, we wouldn't have to use the MLAT process because it's all within the United States.  There's other ways we can certify that those records and reports written by them are authentic.

        When you're dealing with evidence collected in another country, there's a few more hurdles in place to get those.  We have to apply for what we call an MLAT.  And what that means is we would submit an application starting here locally, working with the United States Attorney's Office, spelling out specifically what it is that we're looking for, down to if there's a known police case number from that country, if there's a known witness, victim, or defendant name.  We list

all of this information out very specifically.

And then what we do with that is we turn it over to the US Embassy in that country.  Once it gets approved -- actually, I'm sorry.  Let me back up.  There's another layer.  We then have to submit it through the Department of Justice's Office of International Affairs here for review.

It then goes -- once it's reviewed at that level, it then goes to the Embassy, where we have attachés for the Department of Justice, as well as from the FBI, in the country where we're looking for their assistance.  Once it's translated and approved, that request is then sent over to our counterparts in that country.

As you imagine, what we just described already takes several months.  Once it finally arrives in that country, and they agree to provide us that information, they then have to verify that what we're asking for exists in their records.

At that point, once they locate the information, they agree to send it to us.  It then is sent back through the same process, because our department has to track everything that we receive from another country, just as if we track what we send out to other countries.

So eventually, we'll get that information back, and it will be copies of their reports or whatever it is that we requested.

Q.  All right.  So now I want to switch gears and talk about the search warrant.

A.   Okay.

Q.   You were asked about a typographical error regarding the date that you arrived in Mexico.

A.   Yes.

Q.   Do you recall that line of questioning?

A.   Yes, ma'am.

Q.   All right.  Just one moment, please.

     (Pause in proceedings.)

BY MS. KLEPACH:

Q.   Actually, let me take a step back.  Before we go there, I'm going to hand you -- withdrawn.

     Do you recall the date that the search warrant -- the date by which you had to execute the search warrant?

A.   I do not.

Q.   Would reviewing a copy of the warrant refresh your recollection?

A.   Yes, ma'am.

          MS. KLEPACH:  May I approach?

          THE COURT:  You may.

          MR. FEIGENBAUM:  Could I ask for clarification which search warrant she's talking about?

          THE COURT:  If you'll just show it to Mr. Feigenbaum, so there's no dispute.

     (Pause in proceedings.)

40

BY MS. KLEPACH:

Q.   Agent Spielvogel, does reviewing that document refresh your memory as to the date by which the search warrant needed to be executed?

A.   Yes.

Q.   And what date was that?

A.   "Not to" -- I'm sorry.  On or before March 10th, 2020.

Q.   So was that actually 14 days?

A.   Correct.  It says:  "Not to exceed 14 days" on the page.

Q.   Okay.  I just wanted to clarify that.

A.   Thank you.

        MS. KLEPACH:  One moment, please.

    (Pause in proceedings.)

BY MS. KLEPACH:

Q.   Okay.  We talked a lot about search warrants.  Is the search of a phone the same thing as the search of a house?

A.   No.

Q.   Is it fair to say that the search of a phone is executed when the phone is plugged into the Cellebrite -- well, withdrawn.

    Why is the search of a phone not the same as the search of a house?

A.   So I touched on it a little bit ago.  The search of a phone is using electronics.  It's digital.  It's something that we can control.

41

When you search a home, there is a lot more that goes on. There's more human interaction with the actual home itself. People are walking through a home. Depending on what you're looking for, what type of evidence, whether it be physical items you're trying to collect, or if you -- bodily fluids, or you name it -- there's a bunch of different things, atmosphere -- there's a lot that goes into it, depending on what you're trying to search for.

On a phone, it's -- you took a device. Other than physically looking at a phone, it's a lot less meaningful, rather than what's on the phone itself. So that's why we take the phone, then we preserve it, which is like we described. It's almost like putting it in a vacuum by putting it into airplane mode. And at that point we say that the phone is not really changeable at that point in time. So now we can start our review of it.

MS. KLEPACH: One moment.

(Pause in proceedings.)

BY MS. KLEPACH:

Q. So where does the phone go after the search warrant is executed?

A. So once we execute the search warrant -- and one of our initial attempts is to plug it into the Cellebrite machine -- we would put it, in between those times, in our evidence control room. It's in the custody of law enforcement. It's

not left out on the streets with strangers. It's in a protected environment that we control.

Q. Okay. In your experience, are there instances when you cannot access a cell phone within that two-week period?

A. Yes. Several times. Unfortunately, the technology that the government has access to is not as great as it might seem. And if a phone is password-protected in a way that the software that we're authorized to use cannot open up -- because we don't always get the password from the owners of the phone. So there are many times that these phones stay hooked up in an attempt to search them for -- it could be years until we can actually crack into the cell phone.

Q. All right. And does the language in the search warrant contemplate that sort of issue?

A. Yes.

Q. Are you authorized to continue attempting to look at the cell phone in an instance like that?

A. Yes.

MR. FEIGENBAUM: Judge, could I ask that that particular provision be identified?

THE COURT: The provision regarding the authorization?

MR. FEIGENBAUM: To do something after the warrant --

THE COURT: All right. Do you want to ask what type of -- specifically the authorization that allows the witness to continuing -- continue to attempt to look at the phone.

MR. FEIGENBAUM:  After the expiration of the search warrant.

MS. KLEPACH:  I'm sorry, Judge.  You want me to ask the witness --

THE COURT:  Mr. Feigenbaum just wanted clarification with regard to the authorization.  So rather than permit a recross, why don't you ask that on redirect.

MS. KLEPACH:  Understood, Judge.

BY MS. KLEPACH:

Q.  So Agent Spielvogel, can you speak a little bit more about that.  Where is the language in the search warrant affidavit that talks about that?

A.  So I would have to -- without speaking out of turn, I would have to see the exact document that you're referencing.

MS. KLEPACH:  One moment.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.  I'm going to direct your attention to Pages 11, 12, and 13 of the affidavit.  Would that refresh your memory as to that part of the search warrant?

A.  If I could see it -- yes -- please.

Q.  One moment.

(Pause in proceedings.)

THE WITNESS:  So I believe the section that you're referring to would be -- is at Paragraph B, "The Nature of the

Examination."

Q.   Sure.  But please do not read from it.  But does that refresh your memory as to the language in the search warrant contemplating how long it may take to access the contents of the device?

A.   Generally, yes.

Q.   Okay.  You talked on cross-examination about taking photographs of the cell phone.  Do you remember that?

A.   Yes.

Q.   During the times that you -- during the times that the cell phone was in the custody of the FBI, to your knowledge, was it ever taken out of airplane mode?

A.   No.

Q.   All right.  You were also asked a series of questions about the timing of the Indictment in this case.  Can you remind us whether there were other individuals in this criminal organization that were charged in different cases.

A.   Yes.

Q.   Okay.  Why is that?

A.   And I believe I touched on it a little bit yesterday, but a few different reasons.  One of them is we don't always have the evidence needed at the time to be able to charge.  We might be investigating still, and know that we are -- or assume that we're on the right path, but that doesn't mean that we're ready to bring charges.

45

Sometimes we have to bring charges sooner on others because there are people actively being harmed.  Sometimes we document what we're investigating, and then we'll get to it once we immediately go after what's sort of like the more critical investigation piece.

Also, the determination of when and how we do charge lies with the US Attorney's Office.  They make the ultimate decision as we continue to provide evidence.

Q.  Is it fair to say that certain facets of the investigation are more time sensitive than others?

A.  Yes.

Q.  You were also asked about the target letter.  Do you remember that?

A.  Yes.

Q.  I just want to clarify.  When was the target letter given to Mr. Hernandez?

A.  The date of my interview of Mr. Hernandez.

Q.  So you went to the interview with a target letter in hand?

A.  Yes.

Q.  And how did Mr. Hernandez respond to being given that target letter?

A.  Favorably.  The intention -- I'm very -- it doesn't matter who I speak with in this job, whether it be a potential defendant or a victim, I treat everybody the same.  I'm very transparent, and I'm as honest as I can be with them.  So hence

the reason for him getting to have a target letter, advising him that I am not his counsel, I'm an investigator, this letter is to tell you to get counsel because you are under investigation, so that he can have a more appropriate conversation with us, in hopes that he's represented in however that should be.

Q.   Did he indicate that he had a sense you would be coming to speak with him?

A.   Yes.   He had -- and I'll summarize, not verbatim.   But it was either somewhere to the tune of:   "I was wondering when you guys were going to come talk to me," or something along those lines.

          MS. KLEPACH:   One moment, please.

     (Pause in proceedings.)

BY MS. KLEPACH:

Q.   All right.   Agent Spielvogel, I believe you have the binder of Defense exhibits in front of you; is that right?

A.   Yes.

Q.   All right.   Can you please turn to Exhibit C, Paragraph 54.

A.   Yes.   Give me just a moment.

     (Pause in proceedings.)

BY MS. KLEPACH:

Q.   Now let's go back to the search warrant affidavit.   You were asked a series of questions about the day that you went to Mexico.   You remember that?

A.   I remember those questions.

Q.   Okay.  And I believe that you stated on cross-examination that you wrote in the affidavit that you traveled there on November 24th of 2019.

A.   Yes.

Q.   Okay.

A.   Could you remind me what paragraph it was.

Q.   Fifty-four.

A.   Okay.  Yes.  I see it.

Q.   Does the language of the affidavit say that you traveled on November 24th of 2019?

A.   No.  It say actually says:  "On or about."

Q.   Okay.  Is that language that you frequently use when you apply for search warrants?

A.   Yes.

Q.   Why?

A.   Because there are usually several different dates of activity that we're doing different events on.  So to just be extremely specific -- and sometimes unnecessarily -- we'll give a general range on or about.  And there's another reason as well.  Sometimes -- well, that's generally the reason why it's a flexible date range.

Q.   All right.  How many search warrants have you applied for in this case -- in this investigation?

A.   To give you an exact number, I don't know, but several.

Q.   Can you give an approximate number.

A.   Specifically pertaining to items directly for Mr. Hernandez?

Q.   No.  In the greater investigation.

A.   Oh.  Give me just a moment.

(Pause in proceedings.)

THE WITNESS:  Can I give a rough answer?

BY MS. KLEPACH:

Q.   Approximately.

A.   More than 10.

Q.   Okay.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.   All right.  Now let's talk about the interview of Mr. Hernandez.

A.   Okay.

Q.   Okay.  Can you walk us through the steps of your approach of Mr. Hernandez.

A.   When we actually physically met each other?

Q.   Yes.

A.   So the night that I went to meet Mr. Hernandez -- I think I explained that that day he wasn't home at the time -- started -- I encountered his wife and child.  They made arrangements to have Mr. Hernandez get in contact with us while we waited.  He was finishing a shift, I believe, as an Amazon

driver. He agreed to meet us --

Q. Slow down.

A. Okay. He agreed to meet with us at his condo building. We suggested that we do it in an area away from family, so that we can have a conversation.

We go to -- I believe it's the first floor, entrance floor of the building, sort of in a lobby area. But it was unoccupied, so it was a private conversation.

We get there; pleasant. There's -- there was nothing -- it was a very normal conversation. I let him know who we were, identified myself, and my partner identified himself. We told him that we had a lot of things to discuss with him that night, so it could take a little while. I had prepared sort of like a representative sample of evidence that I had with him. And again, the reason for doing that is so that he could kind of see the position he was in and give an opportunity to, like I said, help the investigation possibly, and possibly this is his first opportunity to cooperate and maybe start helping himself.

So we sat down. He said: "Okay." Because it was somebody, again, not in custody, we -- technically, by our procedures, we wouldn't we don't have to do this, but I did advise him of his Miranda rights. Usually, that's reserved for when you're in custody. But because of the situation that's going in with a target letter, we said: "In an abundance of caution, let's be very up front and just let him know where

we're going with this."

So we read his Miranda rights. He was obviously interested to hear what we had to say and talk with us. So he agreed.

Q. Let me stop you.

A. Okay.

Q. Are those the rights that inform Mr. Hernandez that he doesn't have to talk with you?

A. Yes.

Q. Okay. And he wanted to speak with you anyway?

A. Yes.

Q. At which point, did he say: "I was expecting you," or "I was wondering when you would come"?

A. I think that was actually at the very end. That was as we were like saying our goodbyes that evening. I don't remember exactly, but I believe it was sort of like as we were shaking hands and going our separate ways that night. But I don't want to hold myself to that time.

Q. Okay.

A. So after we had our Miranda conversation, and he agreed to talk with us, I told him that I had prepared this presentation for him, so that he -- whether he was willing to start talking right away or not, I still wanted him to see what it was that we had prepared.

So as you saw the other day, there was those slides. I went item by item, telling him what we thought we were seeing,

and to give like -- you know, acknowledge or not. And to our surprise, actually, like, yeah, it started off very easy. He was confirming everything that we were saying.

Q. Slow down.

A. Okay. So he was confirming all of the information that we were putting forth. There was no confusion. It was -- I don't know if -- I don't want to say he was impressed or surprised by the amount of information that we had at that point, but there was no refuting what we had. So --

Q. Why didn't you record it?

A. We don't record interviews that are non-custodial, meaning that you're not under arrest or in our custody. You're free to leave. It's voluntary. It's just not an FBI practice.

So towards the later part of the interview, when we're kind of having our moment where it's like: "All right. This is obviously very real," is when the conversation started going to what I would call someone minimizing. And that's, yes, they've been acknowledging everything they've been seeing, and saying: "Yes, that's true," but giving themselves a way out by saying: "But this was all arranged as an insurance fraud thing. I didn't steal these boats," right? "I took them. I made money off of them, but I was told that the owners where in on it and it was okay to do."

And you know, he acknowledged like how much he made off of it. So he provided additional evidence that we didn't even

have, in terms of -- we knew that there was a fee for his services, but he was able to give us the amount of money he made per boat, how his payments were made to him, and a few other points of interest that we did not have at that time.

So once he started going down the path of the insurance fraud sort of scheme is when I like to kind of call a time out with him, and that's when we present the target letter. And the reason for that is, is if he is able to be a cooperating defendant down the road, it hurts his ability to help himself if he starts lying to the FBI.

The reason for that is, is if he's ever in a position to have to testify against somebody else, he's already going to be viewed by potential jurors or anybody as a liar, and it does not help him and it does not help our case.

So the reason for giving him a target letter is so that he can have a private, confidential conversation with an attorney, who can advise him the position that he is actually in and have him in hopes to come forward to us and cooperate honestly.

So that's why we did that. And we do that actually with people who are already charged, people who are in jails that are cooperating. We tell them, like: "If you lie, you're going to continually get charged again. We don't want you to say anything that's going to help us or hurt us. It's just: Tell us the truth." And we step out and allow counsel to give them their guidance, and if -- you know, let the chips fall

53

where they may.

Does that answer your question, ma'am?

Q.   Yes.

A.   Okay.

Q.   You also were asked about the memorialization of the contents of this conversation.

A.   Regarding whether it was recorded or not?

Q.   Well, regarding the fact that there was a report written. Do you recall that?

A.   Oh.  Correct, yes.

Q.   Did you write that report?

A.   I did not write that report.

Q.   Okay.  Did you review the report?

A.   Yes.

Q.   Was the report drafted at or near the time that the interview took place?

A.   I believe so.  I would have to see the exact dates to confirm, but ...

Q.   Is it your practice to -- withdrawn.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.   So you mentioned that the interview was conducted with another law enforcement officer.

A.   Yes.

Q.   Okay.  How does that work?  Do both of you talk?  Does one

of you talk and one of you take notes?

A.   So only one of us will take notes.  And it's not that only one of us talks.  We both talk.  Sometimes one might take the lead in the conversation, but it's not an only -- we're not obligated to say only one of us can talk and the other has to just write.  That's not how it goes.

It's a lot of -- it's very, like, natural and organic.  It's a conversation, is how it's supposed to be.  But one person will be charged with the responsibility of the taking the notes.

Q.   And are the notes taken during the interview?

A.   Correct.  Yes.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.   Other than the FBI policy that you referenced with regard to recording non-custodial interviews, when you are talking to a target or a subject that is out of custody, are there other reasons not to record your conversations with those people?

A.   Let me make sure I understand the question.  Is there another reason why I wouldn't record a conversation with anybody that I'm interviewing out and about?

Q.   Let me clarify.  With respect to a target --

A.   Okay.

Q.   -- other than the FBI policy, is there another -- are there practical reasons why conversations like that are not recorded?

A.   Sure.   There could be, yes.

Q.   Okay.   What are some of those reasons?

A.   I mean, the area that we're in.   I don't know that I completely have an answer for you other than that at the moment.

Q.   So in your experience, does an individual's willingness to speak candidly with law enforcement -- is that affected by whether or not the conversation is recorded?

A.   Well, no -- I understand.   And I apologize.   So in certain situations, if we're talking -- especially if we're talking -- well, we could be talking about a victim as well -- people get uncomfortable if they're being recorded.   That's a very normal thing.   Whether -- not just a defendant or a potential defendant, but a lot of people change everything once they see a recording device on a table.

Q.   Okay.   You talked about victims.   Do you record your conversations with victims?

A.   No.

Q.   Other than custodial interviews, is it your practice or is it FBI policy to record any other kind of conversation that you're having with somebody as part of an investigation?

A.   Not to my knowledge.

Q.   Okay.   You also were asked about whether or not there were confidential sources that were used in this investigation.   Do you know whether there were or not?

A.  To my knowledge, there are not for this piece of the investigation.

MS. KLEPACH:  All right.  No further questions.

THE COURT:  All right.  Is the witness excused?

MS. KLEPACH:  Yes.

THE COURT:  Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes.

There's no recross, Your Honor?

THE COURT:  All right.  Thank you, Agent Spielvogel.

(Witness excused.)

THE COURT:  And Ladies and Gentlemen, let's go ahead and take a 10-minute recess.

COURT SECURITY OFFICER:  All rise.

(Jury not present, 10:20 a.m.)

THE COURT:  All right.  Thank you, sir.

And I'm not sure if you want to retrieve the documents that are before the witness.

MR. FEIGENBAUM:  Your Honor, if I could ask, who is the next witness?  I may leave it there for that reason.

THE COURT:  Yes.  Of course.  Your next witness?

MR. DOBBINS:  It's Police Officer Hans Ed Gullekson from Naples Police Department.

THE COURT:  Thank you, sir.

We're on a 10-minute recess.

(Recess from 10:21 a.m. to 10:35 a.m.)

THE COURT:  All right.  Welcome back.

Let me acknowledge the presence of the Defendant.

Are we ready to continue?

MR. FEIGENBAUM:  I have one matter, Your Honor.

THE COURT:  Yes, sir?

MR. FEIGENBAUM:  You may have recalled that I reserved twice motions.  I don't know when Your Honor would like to take those up.

THE COURT:  Could we take it up -- do we need to take it up at this moment?

MR. FEIGENBAUM:  As long as I'm preserving --

THE COURT:  Yes.  Of course.  Of course.

MR. FEIGENBAUM:  Of course.  Whenever Your Honor likes.

THE COURT:  Perhaps we can take it up at one of the next breaks.  I do want to remind you that close to 12 we're going to take an extended break for an hour and a half.  I'm wondering -- I don't want to break from that because I do have a matter with my team.

So might I suggest at some point this afternoon.  Did you want to at least -- you reserved.  Do you want to make the motion and then we can then proceed with any argument at a later time?

MR. FEIGENBAUM:  Right.  If you want me to announce what the motions are ...

THE COURT:  Yes.

MR. FEIGENBAUM:  One is a motion for a mistrial because this witness testified that he went to Mr. Hernandez's residence already with a target letter issued, but he still interviewed him.

My understanding is, if a person has been named a target, they get the right to have counsel before they're ever interviewed, because a target is already the stage in the proceedings that he's entitled to have an attorney present and know that before he's interviewed.  So if the agent gave this gentleman, Mr. Hernandez, a target letter, he should have never interviewed him.  He should have waited until counsel was appointed and then there would be a decision whether to have an interview after that.

THE COURT:  It's somewhat -- your motion was not made with regard to the target letter.  You made a motion -- you reserved a motion after the witness stated on cross-examination that he gave a report regarding his encounter with the Defendant.  And then you reserved at another point in time when he referenced a copy of the a police report that he said turned over to you.

MR. FEIGENBAUM:  Yes.  I have two other motions.

THE COURT:  Right.  Those were the two motions. You're making an additional motion now based on the fact that there was a target letter and Mr. Hernandez was not represented

by counsel?

MR. FEIGENBAUM:  Yes.  The agent testified about this interview yesterday --

THE COURT:  Was this the first time that the Defendant had been alerted to the fact that there was a target letter sent to Mr. Hernandez?

MR. FEIGENBAUM:  I'm not sure Your Honor's question.

THE COURT:  Is this the first time you were alerted that Mr. Hernandez was issued a target letter?

MR. FEIGENBAUM:  No.  I was appointed originally when he got a target letter.  I was the first -- I was like the second counsel that the Court appointed to represent him as a target, and he was a target for like five months.

THE COURT:  But yet, you're filing the motion for mistrial now?

MR. FEIGENBAUM:  I didn't know that they had given him a target letter back then.

THE COURT:  That's what I'm asking.  Did you know that a target letter was given to your client?

MR. FEIGENBAUM:  Yes.  But only -- I only learned today that the target letter was given to him when he was interviewed on April 18th, 2022.  My understanding was after that interview they sent him a target letter and then he was appointed counsel.  But they're saying the target letter had been issued at the time that they interviewed him.

60

THE COURT: Oh. All right. Then I would like a response to this motion for a mistrial.

And you've spoken with Mr. Hernandez, and he is in agreement that he's seeking a mistrial?

MR. FEIGENBAUM: That he's what?

THE COURT: That Mr. Hernandez is seeking a mistrial.

MR. FEIGENBAUM: Actually, I've not asked him.

THE COURT: Well, wouldn't that be appropriate, to speak with your client before we move for a mistrial?

MR. FEIGENBAUM: I should, Your Honor.

THE COURT: All right. So why don't we bring in the jury and then we can address any motions at the appropriate time. All right? Because at this point you haven't even spoken with Mr. Hernandez. So quite frankly, I think it's somewhat premature to move for a mistrial.

MR. FEIGENBAUM: I did tell him that I was going to make a motion for a mistrial. I didn't have a why, an explanation --

THE COURT: Yeah. That would be required.

All right. Let's bring in the jury.

COURT SECURITY OFFICER: Remain standing for the jury.

MS. KLEPACH: I'm sorry, Judge. Just before we bring the jury in, can we just alert you to one potential scheduling issue?

THE COURT: Hold on. Hold on.

Yes.  What's the issue?

MS. KLEPACH:  So we have two witnesses here that are available to testify now.  And originally the plan was to call Reynaldo Crespo Marquez as our next witness.  Apparently, despite having filed the paperwork, he wasn't brought over this morning.  We are told that he will be here in 10 minutes, which our next two witnesses will collectively take more than 10 minutes.  But we just wanted to alert the Court -- in the event that there is any issue with getting him here on time to start him after we're done with these next two witnesses, we just wanted to let you know that this has been going on.

THE COURT:  All right.  So is he at the FDC?

MS. KLEPACH:  Yes.  As far as -- well --

MR. DOBBINS:  Yes, Judge.  And we had submitted the paperwork, and we confirmed it.  I got a confirmation email from the marshals this morning that they had received the paperwork, and my understanding was he was going to be here.

We've been on the phone with the marshal's office.  I think he may actually be already over here at the Ferguson, and it's just a matter of getting him up here.  But we just wanted to let -- we weren't sure when the Court was going to adjourn for lunch.  We anticipate these next two witnesses will take approximately an hour combined, which would take us to almost 11:45.  So I wasn't sure when the Court -- and so we just wanted to make the Court aware, just in case he's not here.  We

62

also tried to get other witnesses, but they're en route.  So we're not a hundred percent sure they can be here by 11:45.

THE COURT:  All right.  Well, if you've been told that he's here, then there should be enough time to bring him into the holding cell here.  So let's see -- we'll take a break after the two witnesses, just to see where we are with Mr. Crespo Marquez.

MR. DOBBINS:  Thank you, Your Honor.

THE COURT:  All right.  Let's bring in the jury.

(Before the Jury, 10:41 a.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

And the Government's next witness.

MR. DOBBINS:  Your Honor, at this time, the Government would call to the stand Police Officer Gullekson from the Naples Police Department.

(Pause in proceedings.)

THE COURT:  All right. Good morning, sir.

If you'll remain standing, raise your right hand to be placed under oath.

OFFICER ED GULLEKSON, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Have a seat.

Would you please state your name and also spell it for

63

the record.

THE WITNESS:  My name is Officer Gullekson,
G-U-L-L-E-K-S-O-N, from the Naples Police Department.

COURTROOM DEPUTY:  Thank you.

THE COURT:  If I may have your first name, sir.

THE WITNESS:  First name is Ed.

THE COURT:  Thank you, sir.

MR. DOBBINS:  May I inquire, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Good morning, Officer Gullekson.

A.  Good morning.

Q.  Can you please tell the jury where you're currently employed.

A.  I'm employed at the Naples Police Department, in Naples, Florida.

Q.  And how long have you been with the Naples Police Department?

A.  For approximately 17 years.

Q.  Okay.  And what's your current rank?

A.  I'm a patrol officer.

Q.  And what kind of training did you undergo to become a police officer with the Naples Police Department?

A.  I went through a police academy here and then the field

training program at the department itself.

Q. And how long was the academy?

A. It was six months.

Q. Okay. Do you have any other prior law enforcement experience?

A. I was with the Collier County Sheriff's Office for two years prior to that.

Q. And what was your -- what was your rank there with the Collier County Sheriffs?

A. I was a patrol deputy.

Q. And did you also receive training and experience -- or training to become a deputy with the Collier County Sheriff's Office?

A. I did. Similar training.

Q. And what are your duties and responsibilities as a patrol officer with the Naples Police Department?

A. I'm in a patrol vehicle. I respond to dispatched calls, take reports, do traffic control and crime prevention.

Q. I'd like to direct your attention at this time to June 10th of 2019, at approximately 9:36 a.m. Were you working for the Naples Police Department on that date and time?

A. Yes, I was.

Q. All right. And as a patrol officer, when you're on patrol, what are you wearing?

A. I'm wearing the standard patrol uniform. It's similar to

this, but with short sleeves.

Q. And are you driving a marked or unmarked car?

A. A marked vehicle.

Q. Did there come a time on that date and around that time, 9:36 a.m., when you received a call or dispatch to go somewhere?

A. Yes, I did.

Q. All right. And do you recall what the call or dispatch -- what was the purpose of that call or dispatch?

A. I was dispatched to a community called Mariner's Cove for a missing or stolen vessel, a boat.

Q. Were you told who to ask for or who would be waiting for you when you got there?

A. We had -- the property manager, Mr. Sheehan, was there to meet me.

Q. I'm sorry. Could you just repeat the name.

A. Mr. Sheehan.

Q. All right. And can you describe -- you said you were asked to respond to this community called Mariner's Cove. Could you describe for the jury, who may not be familiar with Naples, what kind of a community is Mariner's Cove?

A. It's an older-build condo community with docks in the back that have privately-owned vessels for their community that lives there.

Q. And are you familiar with boats, sir?

A. Somewhat, yes.

Q. Okay. When you say these -- the condo has docks, could you just describe what you mean by that.

A. They vary in size, but most of them have lifts for the vessels. They can pull them up and down based on the weather conditions. They keep the privately-owned boats back in the back, behind the condos themselves.

Q. And do you recall off the top of your head what the address is for Mariner's Cove?

A. 305 Goodlette Road.

Q. Okay. Now, upon responding to that location, did you meet with Mr. Sheehan?

A. Yes, I did.

Q. And based on that conversation, what did you do next?

A. He took me back where the boat was supposed to have been kept. It's slip 18D, Delta. And the lift for the boat was in the down position at that time, which means the boat had been removed from the slip. Typically, they're kept in the up position when the boats are out of the water. So ...

Q. When you say: "Typically, they're kept in the up position," what do you mean by that?

A. If the boat's on them, they're up out of the water. The lifts are up like this. And if -- they've been lowered down if the boat's been taken off the slip, the dock -- the lift. Pardon me.

Q.   All right.   And did Mr. Sheehan advise you of when the last time he saw that boat was?

A.   Yes.   The call, I believe, was on a Monday.   He said the boat was last seen on the Thursday prior to that, and that they noticed it was missing on Friday.   So several -- couple days before.

Q.   Did Mr. Sheehan provide you with the name of the owner?

A.   Yes.

Q.   And the contact information?

A.   Correct.   The name of the owner was Mrs. Wiesner, and she was in Wisconsin.   They gave me her phone number.

Q.   And did you reach out and contact Ms. Wiesner?

A.   I did.

Q.   And based on your conversation with her, what did you do next?

A.   Well, she had told me that her boat should be there, that it was scheduled for removal due to the hurricane season, but she didn't believe that it had been removed for that yet.   And I contacted a marina called Hideaway Marina, which is where they take the boats from there for storage, and they did not have the boat there as well.   So I did follow that up for her, just to double-check at the marina.

Q.   And just so we're clear, did they give you a description and any other information about what type of vessel this was or what it was called and any identification?

A.   It was a 34-foot center console boat.  It had green and black stripes and two 300-horsepower Yamaha engines on the back.

Q.   Do you know if those were -- did she report that they were inboard or outboard engines?

A.   Outboard, white and gray-colored engines.

Q.   Did they provide you with any other documentation for the boat, what the hull identification --

A.   They gave me -- yeah.  They gave me the FL number, which is the hull number, sort of like a license plate for a vehicle.  I don't have that with me, but they did give me that to run the numbers to make sure -- to get the information off the boat for our dispatchers.

Q.   Did they also tell you what the boat's name was or what it was called?

A.   It was a reel -- something with a reel.  I can't recall.

Q.   Would there be something that would refresh your memory?

A.   My notes would probably refresh my memory.

          MR. DOBBINS:  Your Honor, if I may approach?

          THE COURT:  You may.

BY MR. DOBBINS:

Q.   Officer Gullekson, take your time and just take a look at that part of your report, and if that refreshes your memory as to the name of the boat --

A.   It did.

MR. DOBBINS:  If I may approach again, just to retrieve?

THE COURT:  You may.

THE WITNESS:  Thank you.

BY MR. DOBBINS:

Q.  Okay.  Having reviewed that report, do you remember the name of the boat?

A.  Yes.  It's *Reel Estate.*

Q.  And was "reel" spelled a specific way?

A.  Like a fishing reel, R-E-E-L.

Q.  So what did you do next after -- so you've contacted the marina --

A.  Uh-huh.

Q.  -- to make sure that they didn't have it for service or hurricane removal?

A.  Correct.  Correct.

Q.  So what did you do after that?

A.  When I spoke with the owner, she advised that she would press charges in the theft of her boat.  She had Mr. Sheehan fill out a sworn statement on her behalf because she was out of state.  I completed an offense report for a stolen vessel and submitted that to our Criminal Investigation Bureau.

Q.  And when you take a sworn statement from Mr. Sheehan, how do you do that on the scene?

A.  We have printed sworn statements with basically your

credentials at the top, the date, the time, and then a place for a narrative you write with your hand, handwritten.  And he signed it, and he would, I'm sure, have put in the sworn statement he's writing this on behalf of Mrs. Wiesner, who was willing to press charges on the theft of her vessel.  And then I signed it and he signs is.  And I'm a notary, so it goes into -- as a document -- as a legal document after this.

Q.  I see.  So the witness, or whoever is making the sworn statement, actually writes it out, and then you --

A.  Yeah.  And attest to it being true and we sign it.

Q.  Now, as a patrol officer, do you do any investigations in your time at Naples Police Department?

A.  Typically, we do not investigate.  Once we do a report, it's sent to our Criminal Investigations Bureau, with detectives who do follow-ups on the reports we write, and we typically go on to the next report or other duties as patrol officers.

Q.  But in this case, did you do just some preliminary walk around or look around to see certain things so you could note them in your report when you sent them to the investigative division?

A.  Correct.  Correct.

Q.  What would some of these things have been?

A.  The position of the lift was down, which was not typical, according to Mr. Sheehan.  I did not fingerprint the lift

because it had been raining.  So everything was wet at the time.  I did go over to Hideaway Marina in person.  I did call them, but they said boat wasn't there.  But I went in person to double-check and verify that the vessel was not in their possession, and it was not there.  That's all prior to writing the report.

Q.  Did you also ask Mr. Sheehan or look around the property to see if there were any -- potentially any surveillance cameras or security cameras that might have captured what had happened to the *Reel Estate* boat?

A.  I did.  And it's one of our procedures.  We do always check for surveillance cameras.  And this older building did not have cameras in the back by the marinas.  So ...

Q.  I believe you said just a couple minutes ago that you also didn't fingerprint the lift because it had been raining.  Is that something you would normally do?  Would you do the prints or would you call in like a crime scene unit, for lack of a better term?

A.  It depends on the type of crime and severity of the crime. If it's dry, and we can get prints off something, we usually will attempt to get them.  We do have a crime scene person, and she'll come out if we call her.  But one of us -- we are trained in how to do it ourselves, and I would have tried to get some off the lift if I could have.

Q.  Okay.  But because it was raining, based on your training

and experience, what did that tell you about your probability of recovering any usable latent fingerprints?

A.   They wouldn't -- you wouldn't be able to do it.  The way we do fingerprints is to put powder down and then use tape to pull off the fingerprints.  And if the surface is wet, you can't do it.

Q.   Also, did you take any photographs of the scene in any way?

A.   I did not.

Q.   And when you get a report of a stolen vessel, or even a stolen vehicle, is there anything else you do prior to -- prior to submitting it to the investigative division?

A.   We -- yeah, we have our dispatchers enter it into the system as stolen, so in the state of Florida and nationally it will be flagged.  If that boat shows up, or someone runs the numbers, it will come back as stolen.  Same with a vehicle.  So they do that; put it in as a stolen vessel.

Q.   So just so I'm clear, there's an information system that you relay this information to?

A.   There is.

Q.   And then there's a database that, if someone comes upon that vehicle --

A.   Correct.

Q.   -- and they can run those numbers and determine that it's --

A.   It would immediately flag it as stolen, correct.

73

MR. DOBBINS:  One moment, Your Honor.

THE COURT:  All right.

(Pause in proceedings.)

MR. DOBBINS:  No further questions.

Thank you, Your Honor.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good morning, Officer Gullekson.

A.  Morning.

Q.  How you doing today?

A.  Fine.  Thank you.

Q.  Good.

If I understand it correctly, would it be correct to say that the boat was stolen over some time during period of two days?

A.  Between Thursday and Monday.  So four days.

Q.  Four days.

A.  Correct.

Q.  The boat could have been stolen any time over a period of four days?

A.  Well, I was told by the property manager that it was missing on Friday, which would have been -- he saw it on Thursday.  On Friday, it wasn't there.  So that would be one day.

74

MR. FEIGENBAUM:  Okay.  Thank you.

THE COURT:  All right.  Any redirect?

MR. DOBBINS:  No, Your Honor.  Thank you.

THE COURT:  All right.  Thank you, Officer Gullekson.

Is Officer Gullekson excused?

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  And the Government's next witness.

MS. KLEPACH:  United States calls Officer Stacey Walker.

(Pause in proceedings.)

THE COURT:  Good morning, Officer.

THE WITNESS:  Good morning.

THE COURT:  If you'll remain standing, raise your right hand to be placed under oath.

OFFICER STACEY WALKER, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Could you please state your name and also spell it for the record.

THE WITNESS:  My name is Stacey Walker.  I'm a police officer for the City of Naples.

COURTROOM DEPUTY:  If you could also spell your name, for the record.

THE WITNESS:  S-T-A-C-E-Y.

MS. KLEPACH:  All right.  May I inquire?

THE COURT:  Yes.  Of course.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.  Good morning, sir.

A.  Good morning.

Q.  Where do you work?

A.  I work for the City of Naples Police Department.

Q.  How long have you worked there?

A.  A total of 23 years.

Q.  Okay.  And what is your position?

A.  I'm currently assigned to the Marine Unit.

Q.  What does that entail?

A.  Primarily, boating safety on the waterways in the city limits.

Q.  Okay.  Does that mean that you patrol on a boat?

A.  Yes, ma'am.

Q.  Do you also investigate boat thefts?

A.  Anything boat related we will respond to, yes.

Q.  Okay.  Prior to being a marine patrol officer, have you held any other positions within the Naples Police Department?

A.  I was a patrol officer there for many years.

Q.   And prior to that, did you have any other law enforcement experience?

A.   Yes, ma'am.  I was a state trooper for the State of Idaho, and also was a law enforcement officer in my hometown, where I began career, in Dayton, Tennessee.

Q.   I'm sorry.  Can you repeat the last part.  Was that Dayton, Tennessee?

A.   Yes, ma'am.

Q.   Thank you.

     What kinds of -- other than vessel thefts and waterway safety, what kinds of crimes or incidents do you investigate as part of the Marine Unit?

A.   Well, we will respond to such things as boating crashes, boating under the influence, basically anything waterway safety related is what we focus on.  Our goal is to just ensure that people remain as safe as possible out there.

Q.   All right.  I'm going to direct your attention to on or about July 19th of 2019.  Did you respond to the scene of a vessel theft that day?

A.   Yes, ma'am.

Q.   Do you recall the name of the vessel that was stolen?

A.   The name of the vessel was the *Ultimaytum.*

Q.   Can you please describe the circumstances that led you to respond to the scene of that vessel theft.

A.   Yes, ma'am.  It was about four p.m. in the afternoon.  I

responded to 1510 Chesapeake Avenue, after receiving a report of a stolen vessel.  When I got to the scene, I was met by a William Bloodworth.  Mr. Bloodworth was the home watch contractor for the property, keeping an eye on the property.

Q.  Were the people that owned that property -- do they live in Naples full-time?

A.  No.  At that time, they were in New York.

Q.  Okay.  And what was William Bloodworth's responsibility as far as you understood it?

A.  He was just to check on the various properties under his watch and make sure that all is well with each of them, things appear secure, and the property is where it's supposed to be.

Q.  What was your understanding of the last time the boat had been on the property?

A.  Two days prior, on the 17th.

Q.  Can you describe where the boat was kept.

A.  It was kept on a mechanical lift behind the property.

Q.  What was the state of the boat lift when you responded?

A.  When I arrived there, the boat lift was lowered into the water.  So it was in a position for a boat to either depart or return.

Q.  Had there been any indication that the lift had been tampered with?

A.  Not that I recall.

Q.  Did you verify whether anybody was authorized to take the

vessel from the residence?

A.   Yes, ma'am.   After speaking with Mr. Bloodworth initially, I spoke with the actual owner by phone, and he stated to me that no one had authorization to remove the vessel.

Q.   What did you do next?

A.   I got as much information as I could from Mr. Bloodworth. I also advised the owner that I would need a sworn statement from him, and I -- I would email those documents to him for completion and he would need to return them to me.

Q.   Did you do that?

A.   Yes.

Q.   And did you receive the documents back?

A.   Eventually, yes.   Not that day.

        MS. KLEPACH:   All right.   If I may have the HDMI for just the witness, please.

BY MS. KLEPACH:

Q.   Officer Walker, I'm going to show you what's been premarked for identification as Government's Exhibit 58.   Can you see that in front of you?

A.   Yes, ma'am.

Q.   Do you recognize that?

A.   Yes, I do.

Q.   What is that?

A.   Well, it's a map of the Port Royal -- or I'm sorry -- the Royal Harbor area, and specifically Chesapeake Avenue.

Q.   Is this a fair and accurate depiction of that area?

A.   Yes, ma'am.

MS. KLEPACH:  At this time, the Government offers Exhibit 58 into evidence.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  Admitted into evidence.

(Government's Exhibit 58 received into evidence.)

MS. KLEPACH:  May we publish?

THE COURT:  You may publish.

MS. KLEPACH:  Thank you.

BY MS. KLEPACH:

Q.   All right.  Officer Walker, can you show us where the residence that you responded to is located.

A.   Well, if you notice on the map here, there is a red balloon over the house in question, 1510 Chesapeake Avenue.  And the canal that runs right behind that house is where I responded to.

Q.   Does that canal lead out to open water?

A.   It does.  It leads out to Naples Bay, which connects to the Gulf of Mexico.

Q.   Did you canvass for video surveillance or do any other investigation when you responded to the scene of this vessel theft?

A.   No, ma'am.  I did not.

Q.   Why not?

A.   That is something that would be left to the assigned detective for the case.

Q.   Okay.  Did you observe any video surveillance cameras at this residence when you responded there?

A.   I do not recall observing any at that time.

Q.   Now I want to direct your attention to on or about November 23rd of 2019.  Did you respond to the scene of a vessel theft that day?

A.   Yes, ma'am.

Q.   Do you recall the name of the vessel that was stolen?

A.   If I recall correctly, it's the *Luca Brasi.*

Q.   And where was that vessel kept?

A.   It was kept at River Pointe Marina, in slip number 6.

Q.   Is River Pointe Marina a public marina?

A.   I believe you have to be a member there to dock your boat.

Q.   But do multiple people keep their boats at the River Pointe Marina?

A.   Yes, ma'am.

Q.   Do you know how that boat was kept prior to the theft?

A.   It's simply tied to the dock or secured to the dock in a slip.  So it's sitting in the water.  It's not on a lift.

Q.   Can you please describe the circumstances that led you to respond to River Pointe Marina that day.

A.   Yes.  We received a call of the theft of a vessel at the

River Pointe Marina.  Officer Jason Collins responded there ahead of me and made an initial contact.  And since it was a marine call, I responded by boat.  And when I reached that location, I spoke with the owner, Mr. Mauceli, I believe is his name, about the circumstances with the boat.

Q.  Did he indicate when he had last seen the boat?

A.  He'd seen it two weeks prior.  So it had been about 14 days since he had last been at the boat.

Q.  Were you able to verify whether anybody at the marina had moved the boat?

A.  That was something that he had been concerned about initially, that perhaps the marina personnel had relocated it for some reason.  Once he verified that that had not been the case, then he contacted the police department.

Q.  Did he indicate whether there was anybody else authorized to take the boat from the marina?

A.  He stated to me that no one had authorization to remove that boat.

Q.  Did you conduct any other investigation while you -- when you responded to the River Pointe Marina that day?

A.  Other than verifying that the slip was empty, no, ma'am, I did not.

Q.  Did you observe any video surveillance cameras at that marina?

A.  No, ma'am.

Q.  I'm going to show you what's been marked for identification as Government's Exhibit 61.

MS. KLEPACH:  If I could have the display for just the witness, please.

BY MS. KLEPACH:

Q.  All right.  Do you recognize that?

A.  Yes, ma'am.  I do.

Q.  What is that?

A.  That is a depiction of the River Pointe Marina.

Q.  Is this a fair and accurate depiction of that area?

A.  Yes, ma'am.

MS. KLEPACH:  At this time, the United States offers Exhibit 61 into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  Admitted into evidence.

(Government's Exhibit 61 received into evidence.)

MS. KLEPACH:  May we publish?

THE COURT:  You may.

MS. KLEPACH:  Thank you.

BY MS. KLEPACH:

Q.  Okay.  Officer Walker, is this the marina that you responded to?

A.  Yes, ma'am.

Q.  Can you indicate to the jury where the -- about where the

83

boat was supposed to be.

A.   Well, as you can see, River Point Drive runs --

Q.   You can draw on the screen.

A.   Oh, okay.   North and south.   River Pointe Marina is here. You can see the rows of boats here right directly next to where it says:  "801 River Point Drive."  I don't recall exactly which slip is number 6, but it would have been one of these slips here where you can see the boats sitting in the water.

Q.   Okay.  And does this waterway lead into the open ocean?

A.   Yes.  That is a branch of the Gordon River.  It leads out to Naples Bay, which in turn leads on out to the Gulf of Mexico.

Q.   All right.  Remind us, how long have you worked in Naples.

A.   Twenty-three years.

Q.   Have you responded to vessel thefts in the past?

A.   Yes.

Q.   Are you familiar with generally how people secure their vessels in Naples?

A.   Generally, yes.

Q.   Okay.  Can you tell us a little bit more about that.

A.   Well, some people take steps to secure their vessels with such means as motion-activated lights, or cameras, or some form of lock, but many people don't secure them at all.  I think Naples -- the environment there leads people to have a false sense of security.  So many of them are not secured in any way.

Q. When you say: "The environment," what do you mean by that?

A. It's a very low-crime area. And I think people feel in Naples it's safe, nothing's going to happen. But thefts can occur anywhere. I think that leads them to perhaps not take the steps that they ought to take.

Q. Are a lot of people who have homes in Naples second homeowners?

A. Yes.

Q. Just one more question with respect to the *Ultimaytum*. Do you recall the name of the boat owner?

A. Yes. It was Mr. Maytum. I believe the first name is Robert.

Q. All right. Thank you, sir.

        MS. KLEPACH: No further questions.

        THE WITNESS: Yes, ma'am.

        THE COURT: All right. Cross-examination.

                CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q. Good morning, Officer Walker.

A. Good morning, sir.

Q. How you doing?

A. Rather well. How are you?

Q. Good. Good. Thank you.

    Welcome to Miami.

A. Thank you.

Q. All right. So you first spoke about a vessel reported stolen called the *Ultimaytum*?

A. Yes, sir.

Q. Over the course of how many days could that boat have been stolen -- within how many days?

A. Well, the property watch person, Mr. Bloodworth, said he had last checked on it on the 17th. And when he returned on the 19th, it was gone. So there's potentially a two-day span there, a day and a half.

Q. Forty-eight hours?

A. Roughly.

Q. Now, I think you mentioned that as to that particular boat it was in the Royal Harbor area?

A. Royal Harbor. Yes, sir.

Q. And you said the lift was not tampered with, correct?

A. Not that I recall, sir.

Q. And I'm not familiar with boat lifts and so forth. Are they -- generally, do they have like a lock on them so somebody else can't use the lift?

A. Some do and some don't. A typical lift consists of a panel and a toggle switch, and flipping the toggle lowers or raises the boat out of the water. Some of them have a protective cover over them and others don't. I don't remember which type this particular individual had.

Q. You said there was no -- you yourself did not do any

canvassing of video evidence, correct?

A.   That's correct.

Q.   Do you know if the -- that would be the detectives who do that?

A.   Yes, sir.

Q.   What was the results of their canvassing for video surveillance?

A.   I don't recall, sir.

Q.   Let's move on to the next boat theft you investigated.  I believe you said your investigation started on November 23, 2019?

A.   Yes, sir.  I think so.

Q.   And that was for a boat called the *Luca Brasi*?

A.   Yes, sir.

Q.   We had a look at the River Pointe Marina a little while ago.  Does that marina have surveillance cameras?

A.   I don't know, sir.

Q.   And does it have a security guard?

A.   Not that I know of.

Q.   And over the course of how many days could that boat have been stolen?

A.   Well, the owner stated that he had last visited the boat two weeks prior to noticing the theft.  So we got a two-week period there.

Q.   So at any time during two weeks that boat could have been

stolen, according to the owner?

A.   According to the owner, yes, sir.

MR. FEIGENBAUM:  Yes.  Thank you very much, sir.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Any redirect?

MS. KLEPACH:  No, Your Honor.

THE COURT:  All right.  Thank you, Officer Walker.

Is Officer Waler excused?

MS. KLEPACH:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.

(Witness excused.)

THE COURT:  Would this be appropriate to just take a five-minute stretch break?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  All right.  Ladies and Gentlemen, let's take a five-minute stretch break, please.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 11:14 a.m.)

THE COURT:  All right.  Go ahead and have a seat.

Did you want the courtroom deputy to confirm if --

MR. DOBBINS:  Judge, my understanding from my agents was that he's here.

COURTROOM DEPUTY:  He is.  They're just waiting for another deputy so they can bring him up.

THE COURT: Okay. So why don't we just get confirmation that he's in this holding area.

COURTROOM DEPUTY: They're just waiting for another deputy to bring him up. But he's in a holding cell on the sixth floor.

THE COURT: All right. So let's just take a short stretch break, then.

MR. DOBBINS: Thank you, Your Honor.

THE COURT: Well, actually, while we're waiting, why don't we address -- because I don't want to let too much time -- five minutes.

All right. Would this be the appropriate time to proceed with, Mr. Feigenbaum, your motions?

MR. FEIGENBAUM: If you like, Your Honor.

THE COURT: Yeah. I think we want to address them sooner, rather than later.

MR. FEIGENBAUM: I actually have a written motion that I worked on recently.

THE COURT: Did you file it?

MR. FEIGENBAUM: I haven't been able to file it because I had to leave real early this morning. I do have a copy, and I will file it at my first opportunity, even during the lunch break, if I can --

THE COURT: So this motion for mistrial is not based on the testimony from Mr. Spielvogel. You were going to file

that before we began this morning?

MR. FEIGENBAUM: No, Your Honor. This is number two. I thought we -- number -- I have three matters that I wanted to bring up with the Court. The first was the fact that Agent Spielvogel said he already had a target letter when he went to visit Mr. Hernandez. I have not briefed that.

My understanding, though, over the years has been that if somebody has been identified as a target, then the agents are not supposed to go to that person, but rather that person needs to be notified they're a target and be advised that they have the right to seek counsel. This agent testified that he already had a target letter, and he still went and he interviewed the person without them having the opportunity to confer with counsel.

So that's -- I don't have that briefed. I will be glad to brief it for the Court, if the Court likes. But it's so recent that I couldn't deal with it, other than to use my experience over the years to believe that is a correct position.

THE COURT: All right. So that's the first motion.

What was the motion with regard to the mistrial? And I'm quite curious with regard to the motion that you typed up, you have in your hand, but you have not filed.

MR. FEIGENBAUM: Yes.

THE COURT: And I'm not certain what that relates to.

MR. FEIGENBAUM:  Okay.  That is titled -- and here's a copy for the Government, and I can pass a copy up to the Court.

THE COURT:  Well, I don't want to consider anything that has been written that hasn't been filed properly with the Court.  So is that a motion that should have been filed pursuant to this Court's order with regard to a motion deadline?

MR. FEIGENBAUM:  No.  It only arose during trial.

THE COURT:  So it arose yesterday?

MR. FEIGENBAUM:  Yeah.  Late yesterday, but it was confirmed today.

MS. KLEPACH:  Judge?

THE COURT:  So it arose yesterday?

MR. FEIGENBAUM:  Judge --

THE COURT:  I'm just trying -- I'm trying to understand.

All right.  So what is the motion?

MR. FEIGENBAUM:  It's a motion for reconsideration of your order denying the motion to suppress Hernandez's cell phone evidence.

THE COURT:  All right.  That's the second motion.

MR. FEIGENBAUM:  And the third, Your Honor, is, under Brady v. Maryland, my understanding is -- which arose only this morning during Agent Spielvogel's testimony -- that federal law enforcement officers have a duty to inquire with state police

agencies, with other police agencies involved in an investigation, whether they have any information about a case -- about Mr. Hernandez's case.

Agent Spielvogel, as I understood it, said today that he never asked the Mexican police agencies for their files, so he could review to see whether there would be any Brady material in them.  He said he only -- that he was satisfied with just getting a written report.  So to reserve the record, my job, Your Honor, is to try and enforce my client's rights as I understand them under the law, and I would be remiss in my duties if I didn't raise a Brady issue as to the Government's failure to inquire of a police agency whether they had a file that related to the prosecution of Mr. Hernandez.

THE COURT:  All right.  Is the Government in a position to respond?

MS. KLEPACH:  To some degree, Your Honor.  I will begin by saying that I have not researched, obviously, any of the things that Mr. Feigenbaum has raised.  But with respect to the motion for a mistrial, I'll just note that, in addition to saying that he approached the Defendant with a target letter, Agent Spielvogel also testified that he informed the Defendant of his Miranda Rights.

So I'm not sure if counsel's position is legally correct because I haven't researched it.  But even if it were, he was advised of his right to counsel, which he waived.  So I

don't believe that would be a basis for a mistrial, nor did Mr. Feigenbaum move to suppress that statement, having full well known as far as back as December of last year that this statement was made by his client.  Because that's when our first response to the standing discovery order went out, which contains the report of the interview with Mr. Hernandez.

THE COURT:  And that report was provided in discovery that reflects that Mr. Hernandez was specifically advised of his Miranda rights, and, in fact, waived them before he had a discussion with Agent Spielvogel?

MS. KLEPACH:  That's correct.

THE COURT:  All right.

MR. FEIGENBAUM:  Your Honor, that report doesn't say anything about a target letter.

THE COURT:  All right.  Why don't we do this --
because these three very specific motions, that Mr. Hernandez did not have the benefit of counsel when he was questioned --
and obviously the argument is that at that time he had received a target letter, and that's a basis for your motion for mistrial.  You're moving for reconsideration of the cell phone evidence, and certainly the Court would need to see whether the Court erred as a matter of law or there was additional information that was not otherwise known to the parties and raised by way of the motion to suppress.

And the third motion, that the federal agents have a

duty to inquire with state police agencies, and failed to inquire, would require on the Defendant's part some case law to present to the Court.

So these three motions have been made. They are preserved. Quite frankly, it's impossible for the Court to rule without the knowledge of the case law that you're relying upon. Even though it might be in that motion that you typed up, it has not been filed with the Court. And quite frankly, it's somewhat unfair to require the Government, unless they're prepared to, to respond to the motion.

So why don't we address that at the appropriate time. And to the extent that there's some case law for the Court to consider, why don't you file that with the Court.

MR. FEIGENBAUM: Judge, one last thing. I always try to maintain my credibility with the Court. I've been doing this for 30-some years. And I want the Court to know that these matters only arose during this trial. And the fact that the agent admitted that he was in a rush and he didn't want to get a second warrant or he didn't think he needed a second warrant, that all came out in this testimony.

So the motion for reconsideration is only being made -- which is an authorized motion. I've done the research on that. I'm not -- I did not ever want to raise anything for the Court by way of a request for relief, unless it actually happened now. But if I don't make those things now -- if I

file something when I have time to do it over the weekend or something, the Eleventh Circuit could say I didn't make a contemporaneous notice to the Court and the Government at the time those things arose. So I have to do them now.

THE COURT: Well, let me say, Mr. Feigenbaum, to the extent that this testimony was presented in court and it raised an issue for the first time that was not already known to the Defendant, then you certainly have preserved those motions.

MR. FEIGENBAUM: Thank you, Your Honor.

THE COURT: But I would be remiss if the Court were to state that it was ready to rule without having the benefit of the case law.

MR. FEIGENBAUM: I understand completely. And these things can wait, Your Honor, but I have to raise them now.

MS. KLEPACH: Judge, if I may, just with respect to the motion for reconsideration, all I will say is that I have an email from Mr. Feigenbaum on September 20th asking the Government's position on a motion for reconsideration of suppression of the cell phone evidence.

So although I have not read what he just handed me, I will note that this is a conversation that was had before the trial started, regarding a motion for reconsideration of suppression of the cell phone evidence.

THE COURT: Well, I think the parties would be in agreement that there was a waiver of these motions to the

extent that this information was already well-known to the parties.  But I'm obviously traveling under the representation, Mr. Feigenbaum, that what was presented at trial by way of the testimony of Agent Spielvogel was the first time that you were alerted to this information.

MR. FEIGENBAUM:  Your Honor, I had asked the Court for an evidentiary hearing on the motion to suppress, so that my expert could testify about that motion to suppress.  The Court did not provide -- it's okay -- the Court did not provide an evidentiary hearing, so that issue stopped.

Then during Spielvogel's testimony, it arose that he conducted a warrantless search because he basically was in a rush to do it and he couldn't wait.  So that's completely new information.  But he seemed to recognize that that wasn't authorized, and then he tried to backtrack.  But I don't want to take a lot of the Court's time right now.

THE COURT:  All right.  Well, let's see if we have the witness.  I'm not certain if it was communicated to you, Mr. Dobbins, or let me see if my courtroom deputy may know.

MR. FEIGENBAUM:  So just -- when Ms. Klepach says that I asked her about the motion back on September 20th, I didn't have this trial testimony.  So I'm not going to raise a motion for reconsideration, unless there's a good-faith basis with some facts.

THE COURT:  And once again, to the extent that this is

new information, then certainly you've preserved the motion that you have made.  Okay?

Is there a way to just call and see if the individual is here?

(Pause in proceedings.)

COURT SECURITY OFFICER:  Your Honor, they are in the elevator, coming.

THE COURT:  All right.  They are in the elevator, coming up.  Thank you.

(Pause in proceedings.)

THE COURT:  All right.  Good morning.

THE WITNESS:  Good morning.

THE COURT:  And we have interpreters for ...

MR. DOBBINS:  We do, Your Honor.  I just asked them to wait outside the well while the inmate was being brought in.

THE COURT:  All right.  We're going to need to bring in the jury.  So I just want to thank the deputy marshals.  And if we can just -- both sides ready to proceed?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  Okay.  Come on forward.  Let's make sure that you're set up.

Good morning.  Good to see each of you again.

And we have the realtime for you.

As soon as we move that chair, we can bring in the jury.

THE COURT:  Okay.  Let's bring in the jury, please.

COURT SECURITY OFFICER:  All rise for the jury.

(Before the Jury, 11:30 a.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated.

And the Government's next witness that is here.

MR. DOBBINS:  Yes, Your Honor.

At this time, the Government would call to the stand Mr. Reynaldo Crespo Marquez.

THE COURT:  Mr. Crespo Marquez, if you will stand, raise your right hand to be placed under oath.

REYNALDO CRESPO MARQUEZ, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Could you please state your name and also spell it for the record.

THE WITNESS:  (Through Interpreter.) Reynaldo Crespo Marquez.

COURTROOM DEPUTY:  Can you please spell it.

THE WITNESS:  R-E-Y-N-A-L-D-O C-R-E-S-P-O M-A-R-Q-U-E-Z.

COURTROOM DEPUTY:  Thank you.

MR. DOBBINS:  May I proceed, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q.  All right.  Good morning, Mr. Crespo Marquez.

A.  (Through Interpreter.) Good morning.

Q.  Sir, can you tell the jury how old you are.

A.  Forty-four years old.

Q.  And where were you born?

A.  Villa Clara, Cuba.

Q.  How far did you go in school?

A.  I'm a veterinarian.

Q.  Did you go to a university for that?

A.  Yes.

Q.  And how long did you live in Cuba?

A.  Until I was 24 years old.

Q.  What did you do when you were 24?

A.  I came here to the United States.

Q.  And how did you get here to the United States?

A.  Illegally, on a raft.

Q.  And what year was this, approximately?

A.  2003.

Q.  When you came here illegally in 2003, were you allowed to stay in the US?

A.  Yes.

Q.  And where did you live when you first came here to the US?

A.  Here, in Miami.

Q.   Were you given authorization to work in 2003?

A.   Yes.

Q.   And what kind of work did you do?

A.   I worked in construction at a welding shop, I installed impact windows, and I had a truck -- a garbage truck for debris and garbage.

Q.   And while you were here working those jobs, did you also do some illegal jobs?

A.   Yes.

Q.   Can you tell the jury what you did.

A.   I participated in illegal smuggling here in the US.

Q.   Smuggling of what, sir?

A.   Cubans.

Q.   How did you get involved into the business of smuggling Cubans into the US?

A.   In Cuba, I went through the military among the Coast Guard, the Cuban Coast Guard, the border guards.  And I had a certain knowledge, maritime knowledge, and how to drive a boat.

Q.   When you say you had certain knowledge, was it only about how to drive a boat or did you have other knowledge about the coastline of Cuba?

A.   Right.

Q.   And what was that knowledge, sir?

A.   Places, points where it could be easier to get into Cuba, places that didn't have that much of a surveillance.

100

Q.   Who first asked you to assist with smuggling Cubans out of Cuba and into the United States?

A.   A guy I knew by the name of Pompa.

Q.   And approximately what year was this?

A.   2007.

Q.   And what did Pompa ask you to do?

A.   To drive a boat.

Q.   And what was the purpose of you driving that boat?

A.   Bringing Cubans here to the US.

Q.   And did you do that for Pompa?

A.   Right.

Q.   Approximately, how many Cubans did you bring in that day?

A.   About 25.

Q.   Did you get paid for doing that?

A.   Yes.

Q.   How much?

A.   Sixty thousand dollars.

Q.   What did you do with that money?

A.   I bought a boat.

Q.   And why did you buy that boat?

A.   To continue doing the smuggling of people.

Q.   So again, in about 2007 or 2008, did you use your own boat that you had purchased to try to smuggle Cubans into the United States?

A.   I tried to.

Q. And what happened when you tried to?

A. In one of the operations, I was detained or intercepted by the US Coast Guard.

Q. And were you charged here in federal court?

A. Yes.

Q. And was that in approximately 2008?

A. Right.

Q. What were you charged with?

A. Conspiracy to smuggle aliens into the United States.

Q. And when you were charged with that crime, were you detained pending trial or were you allowed to post a bond so that you can remain living outside in your home in Miami?

A. I was on bond.

Q. And did you plead guilty in that case?

A. Yes.

Q. After you pled guilty, what did you do?

A. I didn't appear in court to receive a sentence, and I left for Mexico.

Q. So you fled the country and went to Mexico, instead of being sentenced on your alien smuggling; is that correct?

A. Correct.

Q. Now, where did you go when you went to Mexico?

A. At the beginning, I went to Merida, Yucatan. And later on, I went to Cancun, Quintana Roo.

Q. What did you do while you were there?

A. I participated in another operation with illegal Cubans, smuggling Cubans.

Q. The time that you got arrested and charged here in federal court back in '08, were you trying to bring those Cubans to Florida?

A. Yes.

Q. But when you say you went to Mexico and you participated in an operation to get Cubans out of Cuba, where did you take them? Did you take them to the United States or somewhere else?

A. No. To Cancun, Mexico.

Q. And why was the operation to take the Cubans from Cuba to Cancun?

A. Because there was a lot less surveillance than here.

Q. What kind of surveillance are you taking about?

A. We're talking about border control, the police force.

Q. And who did you do that smuggling operation for?

A. For a guy by the name of Nacho.

Q. And what was your role in that smuggling operation?

A. Driving the boat.

Q. And do you recall approximately how many Cubans you brought over on that smuggling operation to Cancun?

A. About 26.

Q. Did you stay in Mexico for very long?

A. No. About five or six months.

Q.   Where did you go after those five or six months?

A.   To Cuba.

Q.   And what happened when you went back to Cuba?

A.   In Cuba, at the beginning, I was accused or charged of coming back illegally into the country.  Two months later, they changed the indictment to smuggling people, and I was sentenced to 12 years' prison time.

Q.   And how much prison time did you serve in Cuba?

A.   Six years.  Half of it.

Q.   And when, approximately, did you -- were you released from prison in Cuba?

A.   In August 2015.

Q.   And how long did you stay in Cuba after that?

A.   Until December 2016.

Q.   And where did you go in December of 2016?

A.   I went to Mexico.

Q.   Where in Mexico?

A.   Merida, Yucatan.

Q.   And were you in Mexico legally or illegally?

A.   Legally.

Q.   And how were you there legally?

A.   I obtained a Mexican residence.

Q.   How did you do that, sir?

A.   Because I was an American resident.  And with the papers of being an American resident, it was -- I was able to get the

104

Mexican residency.

Q.  Why didn't you come back to the United States in Miami?

A.  Because I had a pending charge of smuggling illegal aliens.

Q.  That was that charge that you fled, instead of getting sentenced on?

A.  Right.

Q.  And where you are you living today, sir?

A.  At the Miami Federal Detention Center.

Q.  And why are you living in the Federal Detention Center?

A.  Because I was arrested in Mexico and I was brought here.

Q.  And when you were brought here, was that only for the 2008 conspiracy to commit alien smuggling charge?

A.  No.  They added new charges.

Q.  What were those new charges?

A.  At the beginning, they charged me with several charges, like conspiracy to smuggle aliens, conspiracy to kidnap, conspiracy of extortion, and others.  But I remember well the RICO charge and the conspiracy to smuggle aliens, which I accepted responsibility for.

Q.  Were you also charged with something for fleeing the Southern District of Florida on your 2008 case, instead of being sentenced?

A.  Right.

Q.  What were you charged with?

A.  Of not appearing in court.

Q.   What happened to you on your 2008 conspiracy to commit alien smuggling case?

A.   I went to help a boat that had Cubans that was left in the middle of the sea.  I went to assist them, to bring them fuel, water, and food.

Q.   But what I'm asking, sir, is what happened on the charge? Since you had pled guilty on that 2008 case, when you were brought back from Mexico, what happened to you as far as your sentence?

A.   Oh.  I was charged with 151 months on that charge, plus one month for not showing up in court, in a consecutive form.

Q.   So your total sentence for that case and the failure to appear was 152 months?

A.   Correct.

Q.   And then what happened on the new case you were talking about, where you were charged with conspiracy to smuggle aliens into the United States, conspiracy to kidnap, conspiracy for extortion, and RICO conspiracy?

A.   In that case, as I said, I accepted responsibility for the RICO charge and for smuggling aliens into the United States, and I'm waiting to be sentenced in that case.

Q.   Okay.

        MR. DOBBINS:  Your Honor, may I have the ELMO just for the witness, please?

        THE COURT:  Certainly.

(Pause in proceedings.)

BY MR. DOBBINS:

Q.   Mr. Crespo Marquez, do you -- are you able to read English?

A.   A little bit.

Q.   All right.  When you pled guilty or accepted responsibility, did you do so pursuant to a written Plea Agreement with the United States Attorney's Office?

A.   Correct.

Q.   Okay.  And how was that -- how did you understand that report?  Was it read to you or translated for you in Spanish or did you understand it in English?

A.   It was translated in Spanish.

Q.   I'm showing you Government's Exhibit 69 for identification. I'm showing you the first page, and I'm going to show you the last page.  Do you recognize Government's Exhibit 69, even though it's written in English?

A.   Yes.

Q.   What is Government's Exhibit 69?

A.   The Plea Agreement.

Q.   When you say:  "The Plea Agreement," is that the Plea Agreement for you?

A.   Correct.

Q.   All right.  And this is in the case in 2021 that you were charged with RICO conspiracy and all those other conspiracies, correct?

A.   Correct.

Q.   And did you go over this thoroughly with your attorney?

A.   Yes.

Q.   And after that, did you sign your name on this document?

A.   Correct.

Q.   Do you recognize your signature there on the bottom of Page 7 of Government's Exhibit 69?

A.   Yes.

        MR. DOBBINS:   Your Honor, at this time, the Government would move Government's Exhibit 69 into evidence.

        THE COURT:   Is there any objection?

        MR. FEIGENBAUM:   No, Your Honor.

        THE COURT:   Admitted into evidence.

     (Government's Exhibit 69 received into evidence.)

BY MR. DOBBINS:

Q.   So based on that Plea Agreement, what is your understanding of what you pled guilty to?

A.   I pled guilty to one RICO charge and one charge of smuggling aliens into the United States -- conspiracy to smuggle aliens.

Q.   And do you know what the maximum sentence you could have received at your sentencing that's coming up for the RICO charge?

A.   Yes.   Twenty years.

Q.   And what's the maximum sentence that you could receive on

that conspiracy to bring aliens into the United States?

A.   Five years.

Q.   And based on that Plea Agreement, what is the Government's recommendation that your sentence be on those two charges?

A.   A maximum of 25 years.

Q.   Was there another promise made to you about what the recommendation for your sentence would be in relation to that sentence of 152 months you received on the 2008 and 2009 cases?

A.   The Government is going to recommend that both sentences be served concurrently.

Q.   So does that mean that the max recommendation will be -- from the Government, that you will receive 25 years?

A.   Correct.

Q.   Did you also agree to waive you right to appeal your sentence?

A.   Correct.

Q.   And did you also agree to waive any appeal based on this sentence and this guilty plea having any effect on your immigration status here in the United States?

A.   Correct.

Q.   Is there any cooperation agreement in that Plea Agreement?

A.   No.

Q.   So was this a deal that you reached with the Government prior to coming in to court to testify today?

A.   Correct.

MR. DOBBINS:  Judge, I know it's getting close to noon, so just let me know whenever you want me to stop.

THE COURT:  Would this be an appropriate time to break?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  All right.  Then, Ladies and Gentlemen, we are going to take a lunch recess.  Recall it's a little extended.  So I'll see you back here at 1:30.

Have a pleasant lunch.  I'll see you back here at 1:30.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 11:58 a.m.)

THE COURT:  All right.  I'll see you back here at 1:30.  Have a pleasant lunch.

MR. DOBBINS:  Thank you, Your Honor.  You too.

(Recess from 11:58 a.m. to 1:30 p.m.)

THE COURT:  All right.  Welcome back.

I trust everyone had a pleasant lunch and ready to get back to work.

I just want to make sure that the witness is here.

MR. DOBBINS:  I hear something.

THE COURT:  Okay.  Thank you.

I just want to make sure we sit him down before the jury comes in.

(Pause in proceedings.)

THE COURT:  If I may ask the interpreters to come forward.

Thank you.

And once everyone is in place -- we have all our jurors?

All right.  We're ready to proceed.

(Before the Jury, 1:31 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

I trust you had a pleasant lunch and ready to get back to work.  And we'll continue with the direct examination of Mr. Crespo Marquez.

MR. DOBBINS:  May I proceed, Judge?

THE COURT:  You may.

BY MR. DOBBINS:

Q.  Mr. Crespo Marquez, before we broke for lunch, we were talking about the Plea Agreement you had with the Government.

A.  Correct.

Q.  And you testified that you pled guilty to the RICO conspiracy, and the alien smuggling conspiracy, and the agreement with the Government was that the Government was going to recommend a total of 25 years.

A.  Correct.

Q.  But before you pled guilty, you were facing a lot more than

25 years; isn't that correct, sir?

A.  Correct.

Q.  Please tell the jury what the maximum sentence you were facing on those charges -- especially the conspiracy to commit kidnapping and the kidnapping charges was?

A.  Life.

Q.  All right.  So was that plea to allow you to plead guilty and get a recommendation of 25 years contingent on any cooperation with the Government?

A.  No.

Q.  And why are you here today testifying?

A.  Because I'm hoping that the Government will file a motion on my behalf to reduce my sentence.

Q.  Okay.  What's your understanding of what you have to do for the Government to even consider filing a motion on your behalf?

A.  Well, first of all, not to lie, then not to incriminate anyone unnecessarily, and then to be able to show evidence to -- the circumstantial evidence to the Court in my case.

Q.  And are you required to testify if the Government asks you to?

A.  Can you repeat the question.

Q.  As part of your hope, are you also required to provide truthful testimony in court if the Government asks you to?

A.  Correct.

Q.  And what is your understanding of what will happen if you

cooperate and provide truthful testimony to the Government?

A.   Can you repeat the question, please.

Q.   Yes.   What is your understanding of what will happen if you provide truthful testimony and evidence when we request it?

A.   Well, the Government could make a recommendation when it comes to my sentencing.

Q.   So you say the Government could make a recommendation at your sentencing.   Does the Government have to make a recommendation at your sentencing?

A.   No.

Q.   Can you or your attorney force us to make a sentencing recommendation for you?

A.   No.

Q.   Even if the Government does make a recommendation for you, who ultimately decides what your sentence will be?

A.   The judge, Altonaga.

Q.   Is that the judge in your case?

A.   Correct.

Q.   If the Government files a motion or makes a recommendation on your behalf, does Judge Altonaga have to grant that motion?

A.   No.

Q.   Does Judge Altonaga have to grant the Government's request if there's a specific recommendation for a reduction?

A.   No.

Q.   And what is the requirement that the Government requires

you to do to try to earn substantial assistance by testifying here in court today?

A. To show you circumstantial evidence.

MR. DOBBINS: Is he saying: "Circumstantial evidence" or "corroborating"?

THE WITNESS: Of corroboration. That's correct.

BY MR. DOBBINS:

Q. All right. Let's go back to when you were released from prison from Cuba. How did you get over to Mexico?

A. I went to Mexico on a fast motorboat.

Q. And this is in 2016; is that correct?

A. December of 2016.

Q. And when you went back on a go-fast -- well, first off, what do you mean by that? What is a go-fast boat?

A. That I went to Mexico illegally.

Q. But what is a -- what is a fast boat?

A. So a go-fast boat, that would be just like a normal boat. That would be a boat that like fishermen might use, that it might have two or three engines and where the horsepower for each engine would be like 250 to 300.

Q. Would those be outboard engines or inboard engines?

A. It's outboard.

Q. And when you say you went back illegally, what do you mean by that, that you went back to Mexico illegally?

A. That I left Cuba illegally, and I was doing this on one of

these operations of alien smuggling.

Q.   Okay.   So when you left Cuba to go back to Mexico, who asked you to go on one of these operations?

A.   So first of all, I started this operation with a guy called Carlos.   And then, later on, I began to work with a group of people.   And in the group of people, that included Tomasito, Jose Miguel, Neco, Josvani, and Hanser, yes.

Q.   So let's start with the first one, the first trip with Carlos, where you went from Cuba back to Mexico.   What was your role in that operation?

A.   So I was the driver of the boat.

Q.   And did you get paid for that trip?

A.   Correct.

Q.   How much did you get paid?

A.   Around $20,000.

Q.   And once you returned to Mexico, where did you live?

A.   In Merida.   In Merida, Yucatan.

Q.   And you talked about -- you talked about then you started working for other people, such as -- I think you said Tomasito and started listing some names.   Do you remember that?

A.   Correct.

Q.   How did you get involved with Tomasito?

A.   Through people who knew him and also through people who knew that I had the qualifications to be able to operate or drive a boat.   So then I began to do these trips to -- from

Cuba.

Q.   Okay.  And what -- what role did Tomasito play in these trips?

A.   So he was the boss.  He was the boss who would provide us with the boats and also with provisions or supplies.  He was the one who organized it.

Q.   I think you also brought up the name Jose Miguel.

A.   Correct.

Q.   Who is Jose Miguel?

A.   So Jose Miguel is a guy also who lived also in Merida.  He was also involved with alien smuggling.

Q.   Did Jose Miguel have a nickname?

A.   El Chupa.

        MR. DOBBINS:  Your Honor, if I may have the ELMO please.

        THE COURT:  You may.

        MR. DOBBINS:  If I may have it for the jury.  I'm going to show Government's Exhibit 1 in evidence.

        Thank you.

BY MR. DOBBINS:

Q.   Showing Government's Exhibit 1 in evidence.  Do you recognize this photograph?

A.   Yes.

Q.   Who is it in that photograph?

A.   That's Jose Miguel.

Q.   What was Jose Miguel's role in the alien smuggling conspiracy?

A.   So Jose Miguel, also on occasions he would be one of the drivers doing these trips from Cuba.  So -- and when it was me who was doing the trips driving the boats to Cuba and back, he would stay on the land, and then he would be there when we arrived with the immigrants, and then that's when they were taken to a safehouse.

Q.   Okay.  You also talked about an individual -- I think you mentioned Neco.

A.   Correct.

Q.   And who is Neco?

A.   So Neco is the owner of a marina that is located in Puerto Progreso, in Merida, Yucatan.

Q.   Showing you Government's Exhibit 2 in evidence.  Do you recognize that photograph?

A.   Yes.

Q.   And who is it in that photograph?

A.   Neco.

Q.   What was Neco's role in the alien smuggling conspiracy?

A.   So Neco was the one who would allow us to use the marina. He provided the boats.  He facilitated the money, so that we could buy gasoline, so that we could do these activities that we were involved in.

Q.   Since you were the captain of the boat that would go from

Progreso or Merida to Cuba, what kind of boats would you use?

A.  Well, we mostly used a boat that had a tender of 36 feet, and it had three Yamaha engines 350 --

THE INTERPRETER:  I'm sorry.  Correction.  Three hundred.  The engines were 300.

BY MR. DOBBINS:

Q.  And what did you need to use those types of boats?

A.  Well, first of all, because it's a fast boat.  It can store a lot of fuel.  It's completely open, kind of like a fisherman's boat.  So that would allow for a certain number of people to be inside the boat.

Q.  And just so I'm clear, because I think I heard something a little different, did you say that this type of boat is a Contender -- it's called a Contender?

A.  Oh.  It's that make.  Yeah.  It's that make of boat.

THE INTERPRETER:  The interpreter heard:  "Tender."

MR. DOBBINS:  No problem.

BY MR. DOBBINS:

Q.  And how long does a trip like that take?

A.  Well, it depends on the sea conditions, you know, how the wind is blowing, how -- the level of the tide.  But approximately 24 to 36 hours.

Q.  And because it's an open boat, approximately how many people can you fit on that boat?

A.  Twenty and 30 comfortably.

Q.  You said:  "Comfortably."  Where are these 20 to 30 people sitting?

A.  Well, it's open.  They can sit on the floor.

Q.  And because it's open, it's also exposed to the weather conditions, right?

A.  Correct.

Q.  Also, water from the sea as you travel?

A.  Correct.

Q.  And when you would make these trips, would you provide these Cuban migrants with life jackets?

A.  Correct.

Q.  Did you always provide them with life jackets, sir?

A.  Well, if I didn't give them to them, I had them on the boat.

Q.  And how many -- approximately how many trips did you make for the group that you were working with that included Tomasito, Jose Miguel, also known as Chupa, and Neco?

A.  I don't remember, but there were many.  There were several.

Q.  When you say:  "Several," would you say more than 10?

A.  (In English.)  Yes.

    (Through Interpreter.)  Yes.

Q.  Now, how much would you get paid for each trip?

A.  Depended on the amount of people who were coming.  It depended on the payment, because there were different rates for the different people.  So it varied.

Q.   Okay.  What do you mean there were different rates for different people?  What does that mean?

A.   Because with these people you would have to speak to them previously.  You would also to speak to their family previously, and you would have to come to a payment agreement, which would -- could vary between five thousand and ten thousand dollars.

Q.   And who would be the person that would speak to these migrants and/or their families?

A.   Well, there were many.  There were many.  It could be anyone who formed part of that organization.

Q.   Did that include you?  Did you speak to the potential migrants or their families?

A.   Correct.

Q.   Did that include Jose Miguel?

A.   Correct.

Q.   Who provided your group with the boats to use, these Contenders, to go down to Cuba and bring back the Cuban migrants?

A.   That was Neco's boat.

Q.   So you said that your group, or members of your group including you, would talk to the migrants or their families prior to the trip about the fee.

A.   Correct.

Q.   Would the migrants have the money when you picked them up

in Cuba?

A.   No.

Q.   Would they have any money?

A.   No.

Q.   But you would still take them from Cuba to Progreso, right?

A.   Correct.

Q.   And what would happen to the migrants when you arrived at Progreso?

A.   So the migrants would be dropped off at a beach that was uninhabited, and then they were placed in vans, and then they were taken to the safehouses.

Q.   Okay.  Did any of these safehouses have a name or a nickname?

A.   Well, one of them was known as the Finca.

Q.   And who provided these houses for you and your group to use as safehouses?

A.   So La Finca -- the owner of La Finca was this guy called Luisito.  And the other house, a house in Montes de Ame, was a house that was rented.

Q.   What would happen to the migrants when they got to these safehouses?

A.   So when they got there, at first they could take a shower. They changed their clothes.  They were given food.  And after that, they were asked to provide phone numbers of family members or relatives.  And then, these people, relatives,

family members, were called in order to talk to them about the payment that was due.

Q.   And who would make these phone calls to the family members?

A.   It could be any member of the group.

Q.   And what would you and your members of your group tell the family members?

A.   We would tell them that we already had their relative here. We would put the phone to them, so that they could confirm that indeed the person was there.  And then, from there, we would come to an agreement to see where -- in which way or when we would get the payment.

Q.   How would you and your group get paid from the migrants' families?

A.   Mostly, the families would pay here in Miami.  They would do bank transfers, Western Union transfers.  And on other occasions, a relative or a friend would go and bring the money in cash.

Q.   Who would -- if they were going to wire transfer the money or do a bank transfer, who would the migrant's families wire transfer the money to?

A.   To the person that we would mention, either because that person would do a favor for us or -- or that was going to receive the money.

Q.   And if the migrants' families were going to pay the money here in Miami, since you were in Mexico, how would that work?

122

A.   The money here in Miami, when it was paid in cash, it mostly stayed here somewhere safe, with someone trustworthy, to use it in payments or things that were needed here in the US.

Q.   What kind of things would you need here in the US?

A.   Here, occasionally, there was a need to pay boats that were stolen, in order to take them there, outboard engines that were purchased here illegally, and other maritime equipment that was needed.

Q.   What would happen if the migrant's family members didn't have the money to pay?

A.   At the beginning, when they didn't have the money to pay, they were verbally threatened, and occasionally they would be punished physically.

Q.   When you say they would be verbally threatened, who is it that would be threatened?

A.   The family was threatened that the relative would be hurt -- harmed.

Q.   And didn't that happen quite a bit, sir?

A.   Yes.

Q.   And what would you and your group do to the migrants if the threat wasn't enough to get the family to pay?

A.   We would -- we would -- we would do physical punishment. Sometimes they were beaten up with a wooden board or with a Taser gun.

Q.   When that happened, did you and your group make them strip

down so they weren't wearing clothes?

A. Occasionally.

Q. And when you did the physical punishment of beating them with wooden boards and shocking them with Tasers, would you record that, or take pictures, or do something that you could send other people?

A. We would send it to relatives to see that we were not playing.

Q. You would send what to the relatives?

A. Photos or videos when they were being beaten up or being Tasered.

Q. And when the Cuban migrants couldn't -- their families couldn't pay the fee, were they free to leave the house, the safehouse?

A. They were kept there until they paid.

Q. Where were they kept within the safehouse?

A. In rooms.

Q. And just generally, approximately, how many migrants would be kept in a room?

A. It depended on the number of migrants that had not paid. Could be between five to 10.

Q. And not only were they not allowed to leave the safehouse, were they allowed to leave even that room?

A. Correct.

Q. The question was: Were they allowed to leave the room?

124

A.   No.

Q.   So your group included Tomasito, Luis Miguel, and -- I'm sorry -- Jose Miguel, and Neco.  Were there other people that were part of this group?

A.   Yes.

Q.   Showing you what's been admitted into evidence as Government's Exhibit 101.  Do you recognize the individual in that photograph?

A.   Yes.

Q.   Who is that?

A.   Hanser.

Q.   And what was Hanser's role -- excuse me -- in the organization?

A.   Mainly, he would take care of the guys or of the people that were in the safety house -- safehouse.

Q.   Showing you Government's Exhibit 102 in evidence.  Do you recognize that individual?

A.   Yes.

Q.   And who is that?

A.   Josvani.

Q.   And what was Josvani's role in the organization?

A.   To watch the people in the house.

Q.   And showing you Government's Exhibit 103 in evidence.  Do you recognize that photograph?

A.   Yes.

125

Q.   And who is it that's in that photograph?

A.   Tonito.

Q.   And what was Tonito's role in the organization?

A.   He was also watching the people in the house.

THE INTERPRETER:  Interpreter's correction.  "Guarding the people."

MR. DOBBINS:  Guarding the people.

Thank you.

BY MR. DOBBINS:

Q.   Can you describe for the Members of the Jury what the Finca looked like.

A.   The Finca is a big place, surrounded by a wall with two and a half meters high, with a big door at the entrance, where there was no -- you couldn't see into the inside.  Inside, there was a big house, plus two smaller homes, or smaller houses, smaller ones.  It had a swimming pool.  It had a bar. It had like a tiki hut to make parties, to have parties.

Q.   That sounds wonderful.  Were the migrants allowed to go out and use the swimming pool and the bar?

A.   Those that had paid, yes.

Q.   Now, the ones that didn't pay, there were other safehouses that you would use, correct?

A.   Occasionally.

Q.   Did you have some nicknames for some of those other safehouses?

A.   Yes.

Q.   What was it?

A.   Some were called "calabozo."  The other one was the house that was in Monte de Ame that I mentioned before.

Q.   Well, "calabozo" -- since that's a Spanish word, I believe that could mean dungeon or prison, right?

A.   Similar.

Q.   And that's where you took the migrants whose families couldn't pay?

A.   Correct.

Q.   And was anybody allowed to leave the calabozo before their family members had paid?

A.   No.

Q.   So you and your group -- let me ask it this way:  Other than Neco, what nationality were the other members of your group?

A.   Cubans.

Q.   And what would happen when the family members were able to pay?  What would happen to the migrants?

A.   Migrants, after they paid, were taken to the border with the United States, where they would surrender to the Immigration authorities.

Q.   And how did they get -- withdrawn.

     Merida is located in the Yucatan Peninsula?

A.   Right.

Q. So how would your group get the migrants from the Yucatan Peninsula to the border with the United States?

A. There were people who were in charge of that part.

Q. Okay. And do you know generally what part of Mexico or what part of the border with the United States the migrants would be taken to?

A. Mostly, it was Reynosa.

Q. Now, because you were a Cuban alien smuggling group, did that cause some issues with other groups in Mexico?

A. Correct.

Q. And what kind of groups were they?

A. We had to pay what's called dues to the cartel that was working in that area at that moment. And where the migrants were taken to the airport, we had to pay extra for each migrant taken to the airport.

Q. When you say: "For the migrants taken to the airport," what migrants were taken -- is that different than migrants being taken to the border near Reynosa?

A. It was the same -- they were the same, except that it depended whether they were taken by air or by land, depending on the circumstances of the moment -- or the arrangements they had.

Q. You said your group had to pay a tax to the cartel operating near Merida. How much was that tax?

A. Ten thousand dollars per trip.

128

Q. And because your group was also an alien smuggling group in Merida, were you -- was your group violating the laws of Mexico by bringing in all these Cuban migrants?

A. Correct.

Q. So what steps would your group take to avoid getting in trouble with the Mexican law enforcement?

A. Payments were made to the Mexican authorities. They were given -- provided gifts, and things like that, in order to be able to operate freely.

Q. Who was the contact that would pay this money to the Mexican law enforcement and provide them with these gifts?

A. Neco is the one who had the contact with the authorities.

Q. Did your group, which included Neco, do any other things to make money besides smuggling aliens into the United States?

A. Yes.

Q. What other kinds of criminal activity were you -- was your group engaged in?

A. We would sell boats that had been stolen, that had been brought from the United States to Mexico, the sale of cars that were brought from here to there, the sale of engines, boat engines, and machinery that the boats needed.

Q. And who in your group was responsible for deciding what types of boats or -- and boat engines might be needed that your group could sell in Mexico?

A. Mainly, Neco.

Q.   And who did Neco use to steal the boats in the United States?

A.   Boats here were stolen by a guy by the name of Ramoncito in the Naples area, and would use Javier to take it to Mexico.

Q.   And do you know Javier's name?

A.   Javier.

Q.   Sir, I want you take a look around the court today, and I want you to tell me if you see Javier in the courtroom.

A.   Yes.

Q.   Could you please identify him and point out -- and describe some clothing that he's wearing, please.

A.   He has a long-sleeved shirt, violet, and he's using glasses.

MR. DOBBINS:  Your Honor, let the record reflect that the witness has identified the Defendant.

THE COURT:  It's noted.

BY MR. DOBBINS:

Q.   How did you come to learn about this part of the enterprise where Ramoncito would steal the boat and Javier would bring it over?

A.   Well, initially, Ramoncito had already seen some boats and he was looking for buyers in Mexico, so that the boats would be taken to Mexico.  So initially, he got in touch with Neco, but he was asking a very high price.  So Neco told Jose Miguel that since they were all Cubans he should reduce the price -- the

price of the boats.

Once they came to an agreement, there was a person necessary to take it.  So we started looking to who would be interested in doing this.  And Javier was contacted because a cousin of his knows Jose Miguel's wife back from Cuba.  So that's when the guy said that his cousin might be interested. He gave us the telephone, we got in touch with him, and he accepted.

Q.  And when was the first time you met Javier in person?

A.  The fist time I saw Javier was on December 24th, 2017, at the Holbox Island, in Quintana Roo, Mexico.  Holbox is a tourist island that's approximately 130 nautical miles -- 130 nautical miles from the Progreso port.  One hundred thirty miles is about a little over 240 miles.

So I was the one in charge to see him, to welcome him, to give him the -- more fuel for the gas that he needed, and from there to take him to the Port of Progreso in Merida.

Q.  Sir, December 24th, 2017 is a very specific date.  Why do you remember that date so well?

A.  It's my birthday.

Q.  Do you recall what kind of boat Javier was driving when you met him off the island of Holbox?

A.  Yes.

Q.  What kind of boat was it?

A.  It was a white Grady-White model, with two engines 300,

Yamaha.

Q.  Is that a boat that is appropriate for smuggling Cubans to Mexico?

A.  No.

Q.  So when Javier came and brought the Grady-White to Progreso, where did you take him?

A.  We went straight to Neco's marina.  I remember that Neco welcomed me with a cake because it was my birthday.  So we stayed there for a while.  It was already late at night.  And I believe that Javier went to a hotel, and the next day he was paid for bringing the boat.

Q.  Do you know how much Javier was getting paid for driving the stolen boats over from Florida?

A.  Ten thousand dollars.

Q.  Do you know how Javier would return to the United States?

A.  By air.

Q.  Now, when Javier would bring these boats over, would Ramoncito also get paid?

A.  Right.

Q.  And how would Ramoncito be paid?

A.  Ramoncito was paid here in Miami.  It was money that Neco had saved here.  It was money that sometimes was collected from the relatives here.

Q.  Now, since this was for your group, was it only Neco who paid Javier and Ramoncito or did somebody else also provide

payment to them?

A.   Jose Miguel or I could have paid him at some point, but it was always Neco -- the money always came from Neco.

Q.   Approximately, how many times do you recall Javier bringing stolen boats over from Florida?

A.   Between 10 to 12 times.

Q.   Now, on each of these times --

MR. DOBBINS:  Oh, are we switching?

(Pause in proceedings.)

BY MR. DOBBINS:

Q.   On each of these times that you recall, since the boats were stolen, would your group have to do something so that these boats could appear legal in Mexico?

A.   Correct.

Q.   What would your group have to do?

A.   So we would have to proceed to -- okay.  Well, after the boats were now in Mexico, we would -- we would get in touch with another man who was here in the United States, a person by the name of Ramon.  He would ask that person, that man, to give us titles, registrations, the VIN number, and all of the paperwork that was cloned with respect to being similar to other boats like these boats that we were stealing.

So once we had all of that documentation there, we went to the pertinent authorities.  And we'd already had sort of like friendships set up with some of these authorities, so it was

all kind of like arranged.  So -- and that way we were able to get what's known in Mexico as a temporary import license.  And that was given to you for a period of 10 years, where now the boat was completely legal in that country.

Q.  Since you were doing these forged documents here in the United States, would anything have to happen to either parts of the vessel, or parts of the vessel's engines, so that they matched those forged documents?

A.  So we had to change all of the numbers on the boat and all of the numbers on the engine.  So they would be changed, and we would replace them with the ones that were sent to us from the United States, so that when the Mexican authorities would enter those numbers in their system, it wouldn't appear that those boats or those engines had been stolen.

Q.  You stated that you recall Javier bringing over approximately 10 to 12 stolen boats.  Do you recall what types of boats those were, other than the Grady-White?

A.  So apart from the Grady-White, the next one that he brought over was a Boston Whaler, 38 feet, with three Yamaha engines 300.  After that, he brought over a Yellowfin, 36 feet, with three Yamaha engines 300.  After that, he brought over a Jupiter, 34 feet, with three Yamaha engines 300.

So that's, as far as I can remember, the chronological order.  Because, all of those boats, I actually went to that island, Holbox, and I was there when the boats came in.  After

that, he had learned the route that he should take to get to Progreso. So then he would just continue on his own, and it wasn't necessary for me to meet him at some point during his trip.

He also brought with him two --

THE INTERPRETER: One moment. The interpreter would like the witness to say that again phonetically for the interpreter.

THE WITNESS: He also brought two other boats called Pursuit, 32 feet, with two Yamaha engines 300. He also brought an Escada of 30 feet. I remember in December of 2018 he brought a Pursuit 38 feet, with a triple -- with a triple Yamaha 300 -- no. I'm sorry -- 350.

(In English.) 350.

(Through Interpreter.) And some other ones, but I can't remember them right now.

BY MR. DOBBINS:

Q. Now, would all of those boats be stolen -- I mean -- sorry -- would all of those boats be sold or would you do other things with those boats when you received them?

A. They were sold. They were used for personal use. Neco also used them to give them as gifts to his friends.

Q. What kind of friends was Neco giving them to as gifts?

A. Well, we could say to the attorney general, to the chief of the federal police. Basically, you know, important people.

Q.   And when you say these were gifts, were these like birthday presents?

A.   No.

Q.   What do you mean when you say they were gifts?

A.   Well, they were gifts.  I mean, in the sense that you would say, you know, quote/unquote, basically waiting for favors from these people.

Q.   So, sir, are you saying that Neco would give these vessels to high-ranking people in the Mexican Government in hopes of receiving favors from them?

A.   Yes.

Q.   Now, you're an experienced captain of vessels, right?

A.   Correct.

Q.   So a trip from the Naples area of Florida to Holbox or Progreso, how long would that trip take?

A.   So the sea is not -- how would we say -- like an interstate highway, where we know if a trip is going to be 300 miles, and if we can travel at 70 miles an hour, then maybe we can get there in five hours.  So the sea doesn't behave like that.  The sea depends on the conditions that exist at the time, on the wind velocity, among other factors.  But it always took about, say, 24 hours.

Q.   And for vessels like the Pursuit, the Grady-White, the Jupiter, would those vessels hold enough fuel to make that journey?

A.   Yes.   The -- yeah.   Basically, the vessels could contain all of the fuel that was needed to make the trip.

Q.   That first vessel, the Grady-White, when you had to go meet Javier at Holbox Island, did you have to bring anything with you?

A.   I had to take fuel for him.

Q.   Is that because he needed the fuel?

A.   Because remember, since these boats are stolen, you can't, when you leave with the boat, go and fill up at a gas station to fill the boat up.   So they quickly would fill up, you know, because they would be in a hurry, so much fuel that they could fit in the gas tank.   But it was never sufficient.   Because from the area of Naples to Holbox, it's more than 300 nautical miles, which means that a boat would need approximately more than 400 gallons of gasoline, which, in tanks of 10 to 15 gallons each, that's a lot.   It's a big quantity.   They didn't have the time, nor the space, to be able to put all of those tanks holding gasoline on the boat.

Q.   When you say:   "They didn't have the time," who are you talking about?

A.   Ramoncito and Javier.

THE COURT:   Mr. Dobbins, just let me know when it might be a good time to give the jurors a break.

MR. DOBBINS:   We could take a break, Judge, now, if you would like.

THE COURT:  All right.

All right.  Let's go ahead and take a 10-minute recess.

COURT SECURITY OFFICER:  All rise for the jury.

THE COURT:  We're on a 10-minute recess.

(Recess from 2:51 p.m. to 3:03 p.m.)

THE COURT:  All right.  Welcome back.

Are we ready to continue?

On behalf of the Government, are we ready to continue?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  If we could see if we have all our jurors.

I really want to thank this team of interpreters.

MR. FEIGENBAUM:  Your Honor, I'm looking for my lapel microphone.

THE COURT:  I'm hearing you, but I am wondering -- did you put it back here, Mr. Feigenbaum?

MR. FEIGENBAUM:  No.  I would have left it on the table here earlier, when I had a lunch break.

THE COURT:  I see four here.  Is there an extra one that -- because Mr. Dobbins has one, so you would think that --

MR. FEIGENBAUM:  I know I left it here during lunch.

THE COURT:  Well, we can certainly give you another

one to use.

MR. FEIGENBAUM:  Yeah.  I mean, I really don't need it right now for anything.  So ...

THE COURT:  All right.  Let's bring the jury in.

(Before the Jury, 3:05 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, and we'll continue with the direct examination.

BY MR. DOBBINS:

Q.  All right.  Mr. Crespo Marquez, when we left off, we were talking about the fuel and why you would have to bring gas to meet Javier when he got to Holbox Island.  I believe you said that they would fill up the tank as much as they could, but they might not -- because the boat was stolen, so they couldn't stop at another gas station.  Were they filling up the tanks on the boat or are there additional tanks that you're saying that they would fill up before they would leave Florida?

A.  In order for the gasoline that was on the boat -- in order for it to be sufficient for them -- or to be able to make that journey all the way from Florida, they had to take with them extra tanks of gasoline.  Because, like I mentioned to you, this was a very long journey, and those boats happen to use up a lot of fuel.

Q.  Okay.  What kind of extra tanks would they -- would Javier

be using?

A.   It would be mostly 15-gallon tanks.

Q.   And how would Ramoncito find these boats?

A.   So Ramoncito was -- or he actually happens to live close to that area, that area of Naples, the Naples Bay, where these boats were located.  So initially he would -- what he would do was start patrolling that area, or looking around in that area, until he could find boats that had the necessary features or characteristics.  That's to say the boats had to be boats that were of a certain brand name of like of high value.  They had to have two or more engines, Yamaha, which had to have 250 to 350 horsepower, and they had to be a length of 30 feet or longer.

Q.   And how would Ramoncito be paid?

A.   So Ramoncito received his money here in the United States.

Q.   From whom?

A.   Well, based -- mostly, this money was money that was connected to or related to the alien smuggling.  So Neco happened to have people here, or workers here, that would hold it for him, and he would order them to give the amount that was due to the person.

Q.   And would Jose Miguel also have people here in the US?

A.   Could be.

Q.   And where would Javier receive his money?

A.   So initially, Javier received his money in Mexico.  Because

the $10,000 that he was charging -- you're allowed to travel with $10,000.  And he would receive that money in cash.

Q.  You say initially that's how he received it.  Did there come a time when he received money in another way?

A.  Yes.  So subsequently, or after that, he began to gain Neco's trust and he therefore became kind of like a storage or a person that could hold things for him or like be a bank for him.

And so, then, those cases, the money that he was owed, he could collect it or get it right away, and then he would be the person in charge of giving Ramoncito his share or part of the money that was owed to him.

Q.  Now, you said that in addition to selling the boats your group would sell boat engines and other parts of boats.  Was Javier involved in that aspect of the group?

A.  Yes.

Q.  What was his role in that?

A.  So once he gained Neco's trust, and like I already mentioned to you, he already had money that he kept here, and he was the person in charge of paying the people who were stealing the engines and Neco would tell him who they were.

Q.  Is that what you meant by Javier acting as one of the banks for Neco?

A.  Correct.

Q.  Would some of the vessels that Javier brought over be

141

stripped down just for parts or were they always sold complete to the other people in Mexico?

A. So the boats were sold all of the time in a complete fashion. Like I mentioned before, these were large boats, and they had high value to them. On occasions, what was done, if there were two or three vessels that were at the marina at the same time, what they did was they would switch out or change engines from one vessel to another, to vary or change on occasion the color or the horsepower of the engine; in other words, to kind of like -- not -- so the person wouldn't know that that had been done, to set you off on another course; in other words, throw you off.

So for example, the Grady-White, so it had -- it was white in color, but it had two Yamaha engines that were 300, but that were gray. So if there happened to be another boat that had engines that were either white or black, they would exchange engines from one boat to another, to kind of disguise or camouflage, to make it confusing. Because for example, if they had stolen a Grady-White boat that was white in color, but it had gray engines, and in the marina there happens to be a Grady-White boat, which is white in color, but the engines are black, people would think that these are different boats.

Because, many times, Neco also had many enemies in that area, and they were looking for, here in the United States, reports about boats that had been stolen that were similar to

the ones that were -- that could be found in the marina, and they would try to somehow harm him.  So they would do that type of camouflage or disguise, so that when a person comes in and looks at it, it looks to that person like it was a different boat, not the boat that was stolen here.

Q.  Okay.  How did your group receive the engines in -- in other parts in Mexico, if Javier wasn't bringing them over?

A.  So for -- with respect to engines, so Neco initially had a contact, a person who would take the engines by -- through an airline, you know, flights.  And other times they would be shipped out, they would be sent from ships or boats from here by sea, and he'd already made arrangements in Customs for them to come through.

Q.  Okay.  I think in your testimony you had said earlier something about -- well, we've talked a lot about boats.  Did your group also receive stolen vehicles?

A.  Correct.

Q.  Why was your group receiving stolen vehicles?

A.  Well, stolen cars were also cars of high value.  They were used for personal use, they were sold, and they were also used as gifts.

Q.  Are these the same types of gifts that you were talking about earlier to government officials and police members?

A.  Correct.

Q.  Who would bring these stolen vehicles to your group in

Mexico?

A.   Javier would take them.

Q.   Was Javier the only one?

A.   Yes.

Q.   How would that work?  Please tell the Members of the Jury how your group would go from wanting a certain vehicle to Javier bringing you a stolen vehicle.

A.   So there was a man here called El Viejo.  His name is Ramon.  So in our way of talking, he would change the VIN number.  So he would clone these cars.  He would send us photographs.  He would tell us the cars that he had available, the price.  And then, if he came to an agreement, Javier was the one in charge of bringing them.

Q.   All right.  So just so we're clear, Ramon Viejo, is that a different person than Ramoncito who was stealing the boats?

A.   Correct.

Q.   And you say he would clone the cars and change the VINs.  What do you mean by that?

A.   Exactly that.  He would change the VIN numbers on the screen, the chassis, wherever there's a numbering within the car.  He would get a title, and a -- a forged title and registration that would correspond with the numbers that he had entered for the car.

          MR. FEIGENBAUM:  Your Honor, could the witness state who he's talking about, about these operations that --

THE COURT:  Certainly.  You want some clarification?

All right.  Mr. Dobbins?

BY MR. DOBBINS:

Q.  Who is it that you're talking about that would get these forged registrations and forged titles?

A.  Ramon, El Viejo.

Q.  Okay.  How many vehicles do you recall Javier bringing to you in Mexico, approximately?

A.  Between six to seven or maybe more.

Q.  Do you remember what kind of vehicles Javier would drive to your group in Mexico?

A.  I remember that the first car he brought was a white Camaro, because, that one, he himself brought it to me at the Monte de Ame house.  I remember that I was at that house.

Later on, he brought an Infiniti QX80, dark pearled color. He brought another white Infiniti QX80, a Cadillac Escalade, a Ford van, another Chevrolet, and others that I don't remember.

Q.  Do you recall if Javier brought any kind of pickup trucks?

A.  There were two, two that I remember.

Q.  Was that the Ford and the Chevrolet that you talked about?

A.  Yes.  One blue and one red.

Q.  Now, how much would Javier be paid for taking these trips?

A.  Between three to four thousand dollars, plus expenses.

Q.  Who would pay Javier?

A.  Jose Miguel, me, Neco.

145

Q.   Well, similar to the voyage from the Naples area of Florida to Progreso, it's not a short journey from Florida to Merida, is it, by car?

A.   It's long.  It would take two days or more.

Q.   Did Jose Gonzalez or any other members -- I'm sorry -- Jose Miguel, or any other members of your group, provide Javier with money prior to him embarking on that journey?

A.   Not that I remember.

Q.   Okay.  When Javier would come over to Mexico, where would he stay?

A.   He would stay at hotels, at one of Neco's houses, occasionally at my house.

Q.   Did Javier ever visit the Finca?

A.   Yes.

Q.   Why was Javier at the Finca?

A.   Because as I said, the Finca is a comfortable, nice place, has a pool, has a bar, and that's where we would spend most of our time.  Whenever he went, he would meet with us.

Q.   He would meet with you where?

A.   At the Finca.

Q.   Did Javier know about the alien smuggling that your group was doing?

A.   Yes.

Q.   How do you know that?

A.   Because he would see, and he knew about the things we were

talking about in front of him. Occasionally, he would pick up money here from the relatives for one of the trips.

Q. Did Javier participate in discussions with you and other members of your group where you talked about the stolen vessels or the stolen vehicles?

A. Yes.

Q. And during those conversations, do you remember what kind of things Javier would be saying?

A. I remember that once, when he was talking with me, he told me that he had spoken with Ramoncito, and he had agreed so that Ramoncito and him would share in half the money because he was doing the hardest part and the most dangerous, which was taking the boats from the houses all the way to Mexico. Because Ramoncito was charging $30,000 at the beginning for each boat, and he was getting 10,000 for taking them. And later he wanted to get -- to charge 20/20, so that they would go in halfs.

Q. So when you say -- when you kept saying "he" was making only 10,000 for taking the boats, are you referring to Javier?

A. Right.

Q. Based on your conversations with Javier, did it appear that Javier was always looking to make more money?

MR. FEIGENBAUM: I haven't been objecting, but the prosecutor's leading the witness.

THE COURT: Sustained. Rephrase.

BY MR. DOBBINS:

Q.   Did Javier tell you and other members of the group other things about Ramoncito and/or the frequency with which these boat trips were occurring?

A.   Occasionally, when he was taking two months or more, when he wasn't bringing any boats, he himself would mention that Ramoncito hadn't found any, or that the ones he had seen, the houses were occupied and they were not empty, or that they had surveillance cameras, things like that.  That would happen when it would take him two months or more in bringing a boat.

Q.   This was Javier telling you this or Ramoncito?

A.   Javier was the one saying this.

Q.   And why would Javier be telling you that there was a problem if the houses were occupied or if there were security cameras around there?

A.   Because that was the reason why they couldn't steal the boats, because there was control over it.

          MR. DOBBINS:  One moment, Your Honor.

     (Pause in proceedings.)

BY MR. DOBBINS:

Q.   Now, did there come a time when something happened to Javier and Neco in Mexico?

A.   Can you repeat the question.

Q.   Sure.  Did there come a time when something happened with -- that happened to Neco and Javier in Mexico?

148

A.   Correct.

Q.   What happened?

A.   That had to do with -- directly with the two of them. That, I remember, happened in December 2019.  Javier, at the same time, brought another stolen boat.  But as I said, Neco had already had enemies or competition within the same area. And it seemed that number one was -- that the number one -- the boss within the Mexican police in Yucatan was informed, and that person ordered -- that person ordered -- had a search warrant for the marina that was owned by Neco.

Javier was arrested.  The police showed up at Neco's marina.  They took the last boat that Javier had brought in. It had recently arrived the night before.  The police confiscated it.  They showed up in Neco's marina.  They confiscated a lot of money that was in cash, and I believe that Neco was detained for a day or two.  But Javier, I believe, was detained for over a week, when was able to go out on bond and he returned here to the US.  That was in December -- from what I remember, December 2019.

Q.   And how did you find out about that incident?

A.   Neco -- well, at that time, I was already living in Cancun. But initially, when Javi was arrested -- because Neco called him like that, Javi -- he called me, kind of complaining, saying that he had already told him not to be walking around, that he would just bring the boat and leave the marina, not to

149

stay there, because he knew that people were watching him.

Q.   So was Neco upset about that?

A.   Neco was upset with him because he would tell me:  "I already told him.  I'm tired of telling him not to show up in the marina.  Just bring the boat and leave."

Q.   Neco was saying he was tired of telling whom?

A.   Javier.

Q.   Now, was your group also aware of how to create -- or knew somebody to -- let me ask it this way:  If Javier is coming in with these stolen boats, was he going and checking with Mexican Immigration when he arrived?

A.   No.

Q.   Was he supposed to be doing that, so he could fly out and fly back to the United States?

A.   That, in Mexico, is not necessary.

Q.   Did your group know people that could provide an entry stamp on a passport?

A.   In fact, there was a person who did that to his passport. He would be paying around a hundred or $150 -- I don't remember -- and would stamp the entry stamp in the passport. That's why there was no problem when he was leaving.

Q.   And when you say they would be paid a hundred to $150, that in US dollars or in Mexican pesos?

A.   American, US dollars.

          MR. DOBBINS:  No further questions, Your Honor.  I

tender the witness.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon, Mr. Crespo Marquez.

A.  Good afternoon.

MR. FEIGENBAUM:  Your Honor, could I take my exhibit binder up, because I'll probably refer to it?

THE COURT:  Yes.  Of course.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.  Well, I have some things to ask you that relate to what the prosecutor asked you, but first I want to ask if you have ever lied in a federal court before.

A.  No.

Q.  Okay.  So you had a federal case here in Miami back in 2008, correct?

A.  Correct.

Q.  And that was Case Number 08-10076, Criminal, Judge Kevin Michael Moore.  Remember?

A.  Correct.

Q.  So I want to ask you to turn to -- well, before you do that, do you remember asking the Court in that 2008 case for you to be let out on bond, rather than be detained?

A.  Correct.

Q.   And that case was for human smuggling, correct?

A.   Correct.

Q.   So I ask you to turn to Tab N, like niño, in the book that I just left there.  Take a moment to look at it, and let me know if you recognize it.

A.   I don't read English.

Q.   Okay.  Well, does it look like bond papers?

A.   Looks like.

Q.   How much was your bond, so that you would not be locked up while your 2008 case was pending?

A.   Fifty thousand dollars.

Q.   And once the judge gave you a bond, you promised that you would come back to court.  You made that promise, correct?

A.   I don't remember.

Q.   Did you think you had to come back to court after agreeing -- that if you put up a $50,000 bond you would have to come back to court, that was a promise?

A.   It was a duty.

Q.   Right.  So when you told the Court:  "Give me a $50,000 bond, and I'll come back," you lied to the Court.

A.   No.

Q.   Did you come back to the court?

A.   Yes.

Q.   When?

A.   I was on bond.  I appeared in court several other times.  I

admitted responsibility for the case.

Q.  Did you go to your sentencing hearing, when it was set, in that case?

A.  No.

Q.  What did you do?

A.  I went to Mexico.

Q.  So you broke your promise to the Court.

A.  I don't remember having promised that to the Judge.

Q.  So you thought you could plead guilty and just leave for another country and not receive a sentence?  You thought that was okay because you paid for a $50,000 bond?

A.  No.

Q.  You knew that you had lied, that you would come to -- everything that you had to come to in that case.

A.  (No verbal response.)

Q.  Yes or no?

A.  (No verbal response.)

THE COURT:  Sir, did you understand the question?

THE WITNESS:  Can you repeat the question, please.

BY MR. FEIGENBAUM:

Q.  When you got a bond, you promised to come to every court proceeding in Case Number 08-10076, Criminal, Moore, correct?

A.  I knew that my duty was to return for every court date.

Q.  Okay.  Let's move on.

So then, when you didn't go to your sentencing, but rather

fled to Mexico, you were charged in another case here in the Southern District of Florida, Case Number 09-10018, also a criminal case with Judge Moore.  And that case was because you had become a fugitive, correct?

A.  Correct.

Q.  So I want you to look at the tab that's marked Q, please.

A.  (Witness complies.)

Q.  Do you recognize those documents?

A.  Yes.

Q.  That was -- those documents -- are they your judgments in those two cases, the 2008 and the 2009 federal cases here?

A.  Well, I don't read English perfectly, but it appears to be so.

Q.  And you got sentenced back then -- well, no.  You didn't get sentenced back then.  How long were you a fugitive before you got sentenced in those two cases, how many years?

A.  Eleven years.

Q.  So after fleeing Miami, so you would not receive a prison sentence in the 2008 case, 11 years passed before you got sentenced for them, correct?

A.  Correct.

Q.  And that's because by then, 11 years later, you had a new case, the case that you just pled guilty to maybe a couple of weeks ago.

A.  Correct.

Q.   And in that case -- well, first, in the 2008/2009 cases, you received a total sentence of 152 months?

A.   Correct.

Q.   So that's about 12 years, right?

A.   With eight months.

Q.   And in the case that you just pled guilty to, with Judge Altonaga here, one floor up, you have a Plea Agreement where the Government is going to recommend no more than 25 years, correct?

A.   Correct.

Q.   So if you add what you already were sentenced to in the 2008/2009 cases, plus your 2021 case, that's -- could be around 37 years, right?

A.   Correct.

Q.   When you add 37 years to the 44 years that you have now, it's like a life sentence.

A.   Similar.

Q.   But you made a deal with the Government just a few days ago.  And as you testified, in that deal, the Government is going to recommend that your 12-year sentence be run concurrently with your potential 25-year sentence, correct?

A.   Correct.

Q.   And furthermore, you might get some time off for being here today and saying stuff about Javier Hernandez, right?

A.   It could be.

Q. Do you know the name Jose Carlos Martinez Alfonso?

A. I don't remember that name.

Q. Let's see if this helps you. He's 33 years old. He was a mathematics professor in Cuba. He left Cuba in May of 2018 and was smuggled to Mexico, and he ended up with you and Gonzalez Vidal, and he didn't pay all the money he owed you and Gonzalez Vidal.

MR. DOBBINS: Objection.

Is there a question?

MR. FEIGENBAUM: Yes. He didn't pay all the money.

THE COURT: Are you asking him if that -- you've given some information. Why don't you then ask if that's refreshing his recollection. He stated he didn't remember the name.

MR. FEIGENBAUM: Okay. I'm sorry, Your Honor. You're right, Mr. Dobbins.

BY MR. DOBBINS:

Q. Does that help you remember who he is?

A. Well, not exactly.

Q. Well, do you remember on any occasion that somebody who was a mathematics professor in Cuba, who ended up at one of your facilities near Merida, Yucatan, because he couldn't pay his fee, he was beaten with a paddle and shocked with a Taser in his private parts?

MR. DOBBINS: Objection. That's an incorrect statement of the evidence.

THE COURT:  Overruled.  If the witness knows.

THE WITNESS:  (No verbal response.)

MR. FEIGENBAUM:  I'm going to withdraw the question.
I consulted with Mr. Dobbins.

BY MR. FEIGENBAUM:

Q.  The same question, but not with the Taser shock, just the beating -- a beating on his rear end.

A.  Well, that happened to several -- that happened to several people.  I don't remember exactly what their names were or what their last names were.

Q.  And you participated in those beatings, correct?

A.  On occasions.

Q.  You and Gonzalez Vidal?

A.  Also.

Q.  And your nickname is El Niño, right?

A.  Correct.

Q.  Now, just not too long ago, do you remember having a meeting with some of the people at the prosecution table after you decided to plead guilty and cooperate?

A.  Yes.

Q.  And do you recall if that was September 6th of this -- of this year, September 6th, 2023?

A.  Could be.

Q.  And present at that meeting with you was FBI Agent Spielvogel.  Do you remember?

Case 1:22-cr-20557-BB   Document 242   Entered on FLSD Docket 06/08/2024   Page 157 of 176

157

A.   I'm really bad with names.

Q.   Okay.  And another FBI agent, Sergio Francisco?

A.   Could be.

Q.   And the two prosecutors sitting at that table?

A.   Yes.

Q.   And there were other people too; your own defense attorney?

A.   Correct.

Q.   And you talked about many things?

A.   Correct.

Q.   And one of the things you talked about was the Grady-White boat -- brand Grady-White boat that was taken to -- from Florida to Mexico on your birthday.  You remember when it arrived because it was your birthday, correct?

A.   Correct.

Q.   And that was December 24, 2017?

A.   Correct.

Q.   And you told the prosecutors that Javier Hernandez had driven that boat there?

A.   Correct.

Q.   And you also told them that you and Gonzalez Vidal had negotiated to purchase the boat from Ramoncito on behalf of Neco, correct?

A.   Correct.

Q.   And you needed somebody to drive the boat to Mexico?

A.   Correct.

Q.   So Ramoncito is Ramon Reyes Aranda, correct?

A.   I think so.

Q.   So by the time you needed Javier Hernandez, or somebody to drive the boat there, that boat had already been the subject of a purchase negotiation between Ramoncito and you and Gonzalez Vidal, right?

A.   Correct.

Q.   You also told the prosecutors that Mr. Hernandez -- let's call him Javier -- Javier never used the word "stolen boats," never talked about stolen boats, right?

A.   He did talk about that on occasions.

Q.   Well, that's not what you told the prosecutors, from what I'm reading here in the interview.  The question is:  You assumed that he thought the boats were stolen, right?

A.   Of course.

Q.   Now, you talked about the chief of police in Yucatan, Merida.  And is it right that his name is Luis Felipe Saiden Ojeda?

A.   Well, he's known as Saiden.

Q.   And he's a very powerful man, correct?

A.   Yes.

Q.   People are afraid of him?

A.   Yes.

Q.   And he's been accused of being mixed up with narco traffickers?

A.   I don't have knowledge about that.

Q.   Is he associated with being corrupt?

A.   I don't know.

Q.   When you said that he's very powerful, what do you mean by that?

A.   Well, he is the chief of all of the police, as far as I understand, for the City of Merida and Yucatan.

Q.   You also told the prosecutors that one of the things you were involved in to make a profit was to find people -- you want me to -- I was trying to cut up the sentence.  Let me start over.

          MR. FEIGENBAUM:  I'll say a little bit, you could translate, and then I'll finish.

BY MR. FEIGENBAUM:

Q.   You also told the prosecutors that there was another way to make some money, and that was to find people who couldn't pay for their boats, correct?

A.   Correct.

Q.   Then your group would offer to take the boats from them, so that they could claim their boats were stolen?

A.   Correct.

Q.   And you also told the prosecutors that Javier never was the captain for any of those boats.

A.   Repeat the question.

Q.   You told the prosecutors, when you had the meeting with

them, that Javier never was the captain taking any of those boats.

A. For which boats?

Q. The ones where the owners couldn't pay for them and they wanted to make insurance claims.

A. I told them that was another variant that could be applied. And as far as I know, Javier never participated in any of that.

Q. Do you know who is El Cangrejo?

A. Not personally.

Q. Who is El Cangrejo?

A. So Cangrejo is Raul Castro's grandson. Raul Castro is Fidel Castro's brother. All Cubans know who the Castro family is. We know the Castro family.

Q. And you were considered to be the right-hand man for Gonzalez Vidal?

A. Could be.

Q. And Gonzalez Vidal is known as Chupa?

A. Yes.

Q. And you wanted to send a boat to Raul Castro's grandson?

A. As far as I know, no. As far as I know, no.

Q. Well, did you tell the prosecutors, on September 6th, a few weeks ago, that there was a conversation between Gonzalez Vidal and Raul Castro's grandson about sending a boat to him in Cuba?

A. I don't remember.

Q. Now, the person known as Neco, you used to go to his marina

and you know him well?

A.   Yes.

Q.   And he is a businessman who has several businesses?

A.   Correct.

Q.   The marina can accommodate maybe about 50 boats?

A.   Could be.

Q.   And Neco also owns bars and restaurants?

A.   Well, I don't remember exactly about the bars and the restaurants.

Q.   Does Neco do his own manual labor or does he have employees who do that hand labor?

A.   He's got employees for everything.

Q.   He doesn't do stuff like drive boats on trailers?

A.   No.

          MR. FEIGENBAUM:  Thank you.  Appreciate you.

          No further questions.

          THE COURT:  All right.

          Any redirect?

          MR. DOBBINS:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. DOBBINS:

Q.   Mr. Crespo Marquez, we'll start with that last question.
Did you spend every waking minute of your time with Neco when you were in Mexico?

A.   No.

Q.   So isn't it possible that there are times where he would drive a boat attached to a trailer?

MR. FEIGENBAUM:  Objection.  Calls for speculation.

THE COURT:  If the witness knows.  Overruled.

THE WITNESS:  Not that I know of.  He may have done it, but I don't know.

BY MR. DOBBINS:

Q.   Okay.  Let's -- you were asked on cross about being the right-hand man of Chupa, Jose Miguel.  You recall that line of questioning?

A.   Yes.  I remember the question.

Q.   And what does that mean to you?

A.   That we were good friends, that we hang out together, that we were close, that we would share ideas about business, that we trusted each other.  We would consult with each other.

Q.   And was Jose Miguel the boss of your group?

A.   We could say yes.

Q.   Was there anybody higher that Jose Miguel had to answer to?

A.   Yes.

Q.   Who was that?

A.   He had to report to Tomasito.  He had to report to Neco.

Q.   Who was responsible for paying the tax to the Mexican cartels?

A.   Tomasito was in charge of that, with his younger brother.

Q.   You were asked on cross about that Grady-White boat, the

first boat.  Do you recall that line of questioning?

A.  Yes.

Q.  You were asked on cross that this was the result of a business negotiation.  Do you recall that line of questioning?

A.  Yes.

Q.  And was this a legal business negotiation or an illegal business negotiation?

A.  Illegal.

Q.  Why was it illegal?

A.  Because we all knew that the boat was stolen.

Q.  And later, when Javier was telling you that Ramon was taking too long to find new boats because the owners were home or there were security cameras, why was that such an issue?

A.  Because he was taking time in bringing more boats.

Q.  And could he bring more boats if the owners were present or there were security cameras there?

A.  No.

Q.  Why not?

A.  Because they were stolen.  You cannot steal a boat, I believe, if the owners are in the house.  That implies that you have to get -- go get with a car, with a certain amount of fuel tanks, transport those on top of the boat.  That takes several minutes, enough for the owners to call the police, the 911.

Q.  You were asked on cross about the other variant where legitimate owners would commit insurance fraud and let your

group take the boat so they could report it stolen.  Do you recall that line of questioning?

A.  Yes.

Q.  And based on your knowledge, did Javier ever participate in those boats?

MR. FEIGENBAUM:  Objection.  Asked and answered.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  Not that I know of.

BY MR. DOBBINS:

Q.  So the only boats that you know that Javier brought over to Mexico -- the only boats that you knew that Javier brought over to Mexico, were those part of an insurance fraud or something else?

A.  They were stolen.

Q.  And based on your conversations with Javier, did Javier know that they were stolen?

A.  Correct.

Q.  Let's go back to that legitimate transaction between Neco, you, Jose Miguel, and Ramoncito for that Grady-White.  Do you know how much a Grady-White sells for?

A.  That boat is valued at more than $200,000 here.

Q.  So would $30,000, or even $40,000, enable you or Neco to buy that Grady-White that Javier brought over?

A.  Correct.

Q.  Why would it allow you to buy that Grady-White, if it was

more than $200,000, and you only had 40?

A. Because it was a stolen boat.

Q. Do you recall -- you stated that Jose Miguel answered to Tomasito and his younger brother. I don't think I caught -- what was Tomasito's younger brother's name?

A. The brother is called "El Menor." His name is Ricardo, if I'm not mistaken.

Q. I'm sorry. What was it? I didn't catch it.

THE INTERPRETER: Ricardo.

MR. DOBBINS: Okay.

BY MR. DOBBINS:

Q. You were asked why everyone was scared of the chief of police of the State of Yucatan. Do you recall that line of questioning?

A. Correct.

Q. Why were you concerned about the chief of police in Yucatan?

A. Because the chief of police in Yucatan is a very high-ranking officer, very respected, and Neco didn't count with half of him within his circle -- he wasn't friends of his, within his circle.

Q. Would that be the kind of friend that Neco could then give these gifts to for favors?

A. Yes.

Q. And what were you guys doing in Yucatan? Were you doing

something legal or illegal?

A.   Illegal.

Q.   Would the police be a concern for you if you're committing crimes in Mexico?

A.   Of course.

Q.   You were asked about -- you were asked about the beatings and the Tasers that you were using on these migrants if their families couldn't pay.  You recall that line of questioning?

A.   Yes.

Q.   You didn't really even care what the names of the migrants were, right?

A.   No.

Q.   Now, you were asked on cross about your Plea Agreement.

          MR. DOBBINS:  If I may have the ELMO, please.

          COURTROOM DEPUTY:  Is it for everybody to see?

          MR. DOBBINS:  Yes.  I'm sorry.  Yes.  This is in evidence.

BY MR. DOBBINS:

Q.   I'm showing you Government's Exhibit 69 in evidence.  Do you recall when we went over this at the beginning of your testimony?

A.   Yes.

Q.   I just want to show you -- when did you sign that document, sir?

A.   August 27th.

Q. Of this year?

A. Right.

Q. So that was more than a few days ago, right?

A. Well, today is -- over a month ago or more.

Q. And you took your plea at the beginning of September; isn't that correct, sir?

A. Right.

Q. And did you have to admit in open court to Judge Altonaga the things that you had done?

A. Correct.

Q. Did that include the -- the physical abuse, the beatings, and the electrocution that the migrants would sometimes suffer in your group's hands?

A. Correct.

Q. You were asked on cross about the Government's recommendation for your sentence. Do you recall that line of questioning?

A. Correct.

Q. And you were asked on cross that the Government was only going to recommend 25 years for you. Do you recall that line of questioning?

A. Correct.

Q. Sir, what's the maximum sentence you can receive on that RICO charge that you pled guilty to?

A. Twenty years.

168

Q.   And what's the maximum sentence you can receive on the conspiracy to commit alien smuggling, which you also pled guilty to?

A.   Five years.

Q.   So when the Government has agreed to recommend 25 years at your sentencing, that's the maximum that you could have received for those two counts; is that correct?

A.   Correct.

Q.   Now, you were asked on cross that you're hoping to receive an additional benefit by providing information to the Government.  Do you recall that line of questioning?

A.   Yes.

Q.   And you were specifically asked on cross that you were hoping to receive a benefit because you were providing information against Javier.  Do you recall that line of questioning?

A.   Yes.

Q.   But has the Government only asked you about Javier?

A.   No.

Q.   You've told us about a lot of people, right?

A.   Correct.

Q.   Are all of those people arrested?

A.   No.

Q.   And what's the requirement for you to do to try to earn any kind of sentence reduction in your case?

A.   Give information -- I keep forgetting that word -- circumstantial, concrete, and correct.

Q.   Okay.  Let's take that one by one, because I don't know if I understood all that.  But give -- what do you mean by "give substantial information"?

A.   Information that interests the prosecutor to solve cases, and that will bring arrests or -- in some cases, and lead to these arrests.

Q.   And are you allowed to leave anybody out?

A.   I cannot protect anybody.

Q.   Are you allowed to tell us things about people that weren't involved?

A.   I cannot lie.

Q.   And what happens if the Government finds out that you lied?

A.   If the Government finds out that I have lied, I would lose all opportunity that the Government would file a motion in my favor, and could add a charge of perjury to the other charges that I already have.

Q.   And the perjury would be because you're under oath here today; isn't that right?

A.   Correct.

Q.   And when we did -- when the Government did this plea deal with you, was that contingent on any cooperation?

A.   No.

Q.   Do you know if Jose Miguel was arrested in your case?

A.   Yes.

MR. DOBBINS:  One moment, Your Honor.

THE COURT:  All right.

(Pause in proceedings.)

BY MR. DOBBINS:

Q.   You were asked on cross about what you said to -- when we met with you back on September 6th.  Do you recall that line of questioning?

A.   Correct.

Q.   And do you recall what the instructions were about what you were going to tell us at that time?

A.   Correct.

Q.   What were those instructions?

A.   The instructions were not to lie, to tell the truth always, not to protect anybody, and not to incriminate anybody unfairly.

MR. DOBBINS:  One moment, Judge.

(Pause in proceedings.)

BY MR. DOBBINS:

Q.   When you say:  "Not to incriminate unfairly," does that mean not to incriminate falsely?

A.   Not to give false information to the Government.

Q.   And again, can you force us to file any motion on your behalf, sir?

A.   No.

Q.  Can you appeal your sentence?

A.  No.

MR. DOBBINS:  No further questions, Your Honor.  Thank you.

THE COURT:  All right.

Is Mr. Crespo Marquez excused?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  On behalf of the Defendant, is he excused?

MR. FEIGENBAUM:  Yes.

THE COURT:  Thank you, sir.

(Witness excused.)

THE COURT:  All right.  Ladies and Gentlemen, it is late at this hour -- I think we can take the gentleman.

(Pause in proceedings.)

THE COURT:  Ladies and Gentlemen, we will adjourn for the evening.  Certainly we will pick up next week.

Let me go through the schedule with you for next week. It has been modified to some extent, and I want to make sure that you have the times and the dates.  Monday, October 2nd, we will start not at nine o'clock, but at ten o'clock.  So that will be from ten to five p.m.  We'll take appropriate breaks and our lunch break as well.

On October 3rd -- and let me say, for Monday morning, we may not break precisely at twelve o'clock, since we're coming at ten, instead of nine, but we will take a one-hour

recess lunch break at the appropriate time.

On Tuesday, October 3rd, it will be a full day, from nine to five; however, we will take a lunch break at 1:30, so that I can handle some matters in the courtroom.  But it will be a full day.

On Wednesday, it will be a full day, from nine to five.  We will not be in session on Thursday, October 5th.  And on Friday, October 6th, we will start a little bit later, at 10:30, but it will be a full day, until five o'clock p.m.

Please remember, as you exit the courthouse, that you are not to discuss this case with anyone, nor permit anyone to speak with you.  Everything learned about the case is learned in this courtroom.

I would ask that you place your juror notebooks in the jury room, which will remain locked.  And I will see you Monday morning, October 2nd, at ten o'clock a.m.

Have a nice weekend.  We'll see you at that time.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 4:46 p.m.)

THE COURT:  All right.  Let me thank the interpreters.  Have a nice weekend.

If you'll have a seat.  And let's discuss next week.

In terms of the three pending motions, Mr. Feigenbaum, as the Court stated, if you'll file any support and case law, along with a motion and memorandum at some point, so the Court

can properly address it.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  Do we have any issues with witnesses on Monday?

MS. KLEPACH:  No, Judge.  I'm happy to provide the names, whenever the Court's ready.

THE COURT:  All right.  Thank you.

MS. KLEPACH:  It's going to be Officer Josh Farris, Bart Drake, John Wiesner, William Sheehan, Jim Johnson, Ricardo Soto, Arturo Ortega.  And then the next up, if -- time permitting, would be Stephen Farlow.

THE COURT:  Have we made a decision with regard to any witnesses appearing remotely?

MR. DOBBINS:  Judge, I spoke with Mr. Feigenbaum today, and he told me that he was going to actually have Mr. Pullen appear in person, and no longer needed him to appear by Zoom.  I still asked him if it would be okay -- you know, obviously he needed to talk to his client, so I don't know what the answer is.  But we have one witness, Mr. Maytum, who is a very elderly gentleman living in Upstate New York, and has mobility issues, and we asked if he would be permitted to testify by Zoom.  I just -- I don't know what the answer was from Mr. Feigenbaum.

MR. FEIGENBAUM:  Oh, absolutely.  No objection at all.

THE COURT:  All right.  When would that be,

Mr. Dobbins?  Perhaps you can just let me know on Monday.  I know that Ms. Klepach did not announce that.

MR. DOBBINS:  We were waiting to see what the Court's ruling was, so that we could then ask him what would be a good time and also to get a good email address, so the courtroom deputy could send the invite.

THE COURT:  Okay.

MR. FEIGENBAUM:  So Your Honor, I don't need any advance notice from the Government -- like the two days I had requested for Mr. Pullen for the Government's witnesses that are the digital experts, but I do need the two-day's notice when Mr. Pullen's presence here would be necessary.

THE COURT:  Of course.

Can we provide that, Mr. Dobbins and Ms. Klepach?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  Okay.  The courtroom deputy -- is there an issue?

Hold on one moment.

(Pause in proceedings.)

THE COURT:  All right.  We may have to modify Tuesday, given some other criminal matters, but we can take that up on Monday morning.  Okay?

All right.  Is there anything further?

MS. KLEPACH:  Yes, Judge.  The only thing we wanted to bring up was, in light of the potential government shutdown,

the parties didn't know if there was anything that we should be aware of with regard to the Court's schedule or anything we could potentially anticipate in the event that that happens.

THE COURT:  We've been advised by the Clerk of Courts that there are sufficient funds for us to operate until October 13th.  So I anticipate that, even given a government shutdown -- I don't know with your particular issues -- and you would need to let the Court know by making an appropriate filing to notify the Court.  But in terms of the courtroom being open, we will be open and it will be business as usual.

MS. KLEPACH:  Thank you.

We're not aware of any issues that would arise.  But certainly if something should come up, we will let you know.

THE COURT:  Okay.  We'll hope something happens before October 13th.

Have a wonderful weekend.  I'll see you on Monday morning at ten a.m.  We'll open the courtroom early for each of you.  You don't need to move your items and the courtroom will remain locked.

MR. FEIGENBAUM:  Terrific.  Thank you.

MS. KLEPACH:  Thank you.

MR. DOBBINS:  Thank you, Your Honor.

(Proceedings adjourned at 4:51 p.m.)

176

UNITED STATES OF AMERICA        )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 29th day of September, 2023, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 176.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 6th day of June, 2024.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov