IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1

UNITED STATES OF AMERICA,

     Plaintiff,                  October 2nd, 2023
                                   10:41 a.m.

     vs.

JAVIER HERNANDEZ,

     Defendant.               Pages 1 THROUGH 192

_____

TRANSCRIPT OF TRIAL DAY 5
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE
And a Jury of  12

Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                      Brian Dobbins, AUSA
                      Arielle Klepach, AUSA
                      99 Northeast 4th Street
                      Miami, Florida 33132

FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                      PO BOX 545960
                      Surfside, Florida 33154-9998

COURT REPORTER:     Yvette Hernandez
                      U.S. District Court
                      400 North Miami Avenue, Room 10-2
                      Miami, Florida 33128
                      yvette_hernandez@flsd.uscourts.gov

2

**I N D E X**

Certificate.................................... 192

**W I T N E S S**

**ON BEHALF OF THE GOVERNMENT:**                              PAGE
OFFICER JOSHUA FERRIS
DIRECT EXAMINATION BY MS. KLEPACH                              9
CROSS-EXAMINATION BY MR. FEIGENBAUM                           19

BART DRAKE
DIRECT EXAMINATION BY MS. KLEPACH                             21
CROSS-EXAMINATION BY MR. FEIGENBAUM                           26
REDIRECT EXAMINATION BY MS. KLEPACH                           28

WILLIAM SHEEHAN
DIRECT EXAMINATION BY MR. DOBBINS                             32
CROSS-EXAMINATION BY MR. FEIGENBAUM                           37
REDIRECT EXAMINATION BY MR. DOBBINS                           38

JOHN WIESNER
DIRECT EXAMINATION BY MR. DOBBINS                             40
CROSS-EXAMINATION BY MR. FEIGENBAUM                           50
REDIRECT EXAMINATION BY MR. DOBBINS                           52

JAMES JOHNSON
DIRECT EXAMINATION BY MS. KLEPACH                             56
CROSS-EXAMINATION BY MR. FEIGENBAUM                           61
REDIRECT EXAMINATION BY MS. KLEPACH                           63

RICARDO SOTO
DIRECT EXAMINATION BY MS. KLEPACH                             66
CROSS-EXAMINATION BY MR. FEIGENBAUM                           93
REDIRECT EXAMINATION BY MS. KLEPACH                          104

ARTURO ORTEGA
DIRECT EXAMINATION BY MS. KLEPACH                            116
CROSS-EXAMINATION BY MR. FEIGENBAUM                          121
REDIRECT EXAMINATION BY MS. KLEPACH                          121

OFFICER STEPHEN FARLOW
DIRECT EXAMINATION BY MS. KLEPACH                            123
CROSS-EXAMINATION BY MR. FEIGENBAUM                          143
REDIRECT EXAMINATION BY MS. KLEPACH                          152

CHRISTOPHER ADAM GOODRICH
DIRECT EXAMINATION BY MS. KLEPACH                            159
CROSS-EXAMINATION BY MR. FEIGENBAUM                          179

**E X H I B I T S**

| GOVERNMENT'S EX. NO.: | OFFERED | ADMITTED |
|---|---|---|
| 54 | 13 | 13 |
| 56 | 17 | 17 |
| 53A-53G | 24 | 24 |
| 57 | 46 | 46 |
| 112 | 49 | 49 |
| 7 | 79 | 80 |
| 11 | 79 | 80 |
| 114 | 79 | 80 |
| 7A-7D | 80 | 80 |
| 11A | 80 | 80 |
| 114A | 80 | 80 |
| 66 | 128 | 128 |
| 62-64 | 159 | 159 |
| 65 | 164 | 164 |

(Call to order of the Court, 10:41 a.m.)

THE COURT: Ms. Klepach, I'm sorry to hear about the loss of your grandmother.

MS. KLEPACH: Thank you, Judge.

COURT SECURITY OFFICER: Let me make sure they're all ready, Judge.

THE COURT: Okay. I do believe we have all of our judges [sic], but I would like to address -- there were two motions that were filed yesterday. So I would like to address those motions. As well, Ms. Klepach, given the loss of your grandmother, what you would like to do by way of a schedule and what you're suggesting?

MS. KLEPACH: Thank you.

THE COURT: Can we address that issue.

MS. KLEPACH: Yes, Judge. So we had spoken with Your Honor's courtroom deputy. Tomorrow is the day that I anticipate posing the greatest conflict. So the Government's preference would be if we could adjourn tomorrow and then proceed on Wednesday as scheduled, although we have made -- we have arrangements made, and we've tried to work out the schedule so that Mr. Dobbins can proceed in my absence for the day tomorrow.

THE COURT: So what do you prefer? Do you want to suggest that we not be in session tomorrow or that we continue with Mr. Dobbins representing the Government?

MS. KLEPACH:  Judge, my preference would be to take tomorrow off and then proceed on Wednesday.

THE COURT:  Mr. Feigenbaum, does Mr. Hernandez have any objection?

MR. FEIGENBAUM:  He does not.  I spoke to him specifically about that, and we do not have an objection to the -- Ms. Klepach's request.

THE COURT:  All right.

MS. KLEPACH:  Appreciate it.

THE COURT:  Do you believe that we would be able to finish the case by the third week, October 11th?

MR. DOBBINS:  Judge, I think we're actually moving pretty well with our witnesses.  We still have two cooperating defendants to testify and Special Agent Francisco, who are going to be lengthy witnesses, but I think we're still -- prior to learning of the news this morning, I was anticipating that the Government would probably be able to rest on Friday.  So if we end up taking tomorrow off, I think we'd definitely be able to rest by Tuesday of next week.

THE COURT:  All right.  Then I don't believe that there's any need to advise the jury of the reason why we're not going to be in session.  I'll just let them know that tomorrow we will not be in session.

MS. KLEPACH:  Thank you, Judge.

THE COURT:  Of course.

There are two motions. One, I'm not certain that the Government has an objection to, Docket Entry 158, the Defendant's motion to allow Mr. Pullen to testify out of turn on October 10th. Is there any objection?

MR. DOBBINS: None from the Government, Judge. And as I stated earlier, I'm hopeful that we'll be wrapping up our case in chief. So he could actually maybe not even need to do it that way, but we have no objection to that.

THE COURT: All right. That motion is granted.

And the second motion, of course, is the Defendant's motion for reconsideration of this Court's order denying its motion to suppress Mr. Hernandez's cell phone evidence. That's Docket Entry 157.

I have had an opportunity to review the Government's response and the Defendant's reply, and I don't believe that there is a question with regard to the facts. The facts are the same facts that were presented to the Court by way of the motion to suppress that was originally filed, and I don't believe that the Court has failed to follow the applicable law. So there is not a basis for reconsideration.

But let me bring up the point that, while Mr. Hernandez has not identified any intervening change in the controlling law, with regard to the argument that there was a subsequent search of the phone on April 7th, 2021, while that was originally raised in Mr. Hernandez's reply -- and that was

the reason why, when this Court entered its order, it found that there was no Fourth Amendment violation because there was no challenge to the actual search warrant itself -- let me say that even if there was a violation by Officer Spielvogel, or any other officer that was involved with the second extraction on April of 2021, I do believe that even applying the Fourth Amendment that the good-faith exception to the exclusionary rule would apply.  And the Court certainly is following the law from the Eleventh Circuit in United States v. Brito-Arroyo, 2021, Westlaw 3661200.

And as such, the motion for reconsideration is denied. But even were the Court to consider the merits of that motion addressing the second search, and that is the extraction of the additional cell phone evidence, I believe the good faith exception applies.

Is there anything further we need to address before we bring the jury in?

MR. FEIGENBAUM:  Not from the Defense.

MS. KLEPACH:  Not from the Government.  Thank you, Judge.

THE COURT:  All right.  And do we have the witness?

MS. KLEPACH:  Yes, Your Honor.

The United States calls Police Officer Josh Ferris.

THE COURT:  All right.  Then let's bring the jury in, and if we can have the gentleman close at hand so we can bring

him forward.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 10:48 a.m.)

THE COURT:  All right.  Good morning, Ladies and Gentlemen.

Please be seated, everyone.

It is good to see you on this very rainy day.  I do want to advise you that we are ready to get right back to work. However, with regard to this week's schedule, it is unanticipated -- and my apologies, but we are not going to be in session tomorrow.  Tomorrow will be a free day for you.  We will pick up again on Wednesday, and that will be a full day from nine to five.

But I have been assured that the schedule that I have given to you -- that is that we anticipate that the case should be in your hands for your deliberation, discussion, and vote by October 11th.  So we are still on the same schedule, even without being in session tomorrow.  Okay?

All right.  So at this point in time, the Government's going to continue with its case.  And the Government's next witness.

MS. KLEPACH:  Thank you, Your Honor.

The United States calls Police Officer Joshua Ferris.

THE COURT:  Good morning, Officer.

THE WITNESS:  Good morning.

THE COURT:  Officer Ferris, let me ask that you remain standing, raise your right hand to be placed under oath.

OFFICER JOSHUA FERRIS, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Would you please state your name and also spell it for the record.

THE WITNESS:  Joshua Ferris.  J-O-S-H-U-A F-E-R-R-I-S.

COURTROOM DEPUTY:  Thank you.

MS. KLEPACH:  All right.  May I inquire?

THE COURT:  Yes.  Of course.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.  Good morning, sir.

A.  Good morning.

Q.  Where do you work?

A.  Marco Island Police Department, City of Marco Island.

Q.  And what is your position there?

A.  Uniformed police officer, assigned to the Marine Patrol.

Q.  How long have you been with the Marco Island Police Department?

A.  Just over 11 and a half years.

Q.  And how long have you been with the Marine Patrol Unit?

A.  Close to eight -- almost nine years.

Q.  What does being a part of the Marine Patrol Unit entail?

A.   Daily marine patrol on a uniformed police stickered boat, handling boat crashes, boat thefts, resource violations, anything like that.

Q.   All right.  I'm going to direct your attention to December 21st of 2018.  Did you respond to a report of a stolen vessel at 647 Bimini Avenue?

A.   Yes.

Q.   Can you please describe the circumstances that led you to respond that the location.

A.   I was called by Collier County dispatch roughly around 10 a.m. that morning, after the boat at 647 was reported missing. It was reported by a neighbor that lived at 648.  And on my way there, I contacted the owner of the vessel to verify if anyone had permission or anything to take that, and proceeded to investigate the call once I arrived at 647 Bimini.

Q.   And was the boat called the *Mellow Yellow*?

A.   That's correct.

Q.   Did you verify whether anybody had authority to take the vessel from that location?

A.   I did.

Q.   And did anybody have authority to do so?

A.   According to the owner of the vessel, no.

Q.   Where had the vessel been taken from?

A.   The boat lift behind the house at 647 Bimini.

Q.   What did the boat lift look like when you got there?

A.   The boat lift was fully extended into the water, and the bunks to the lift were sitting on the sea floor.

Q.   Did you observe the switch on the boat lift?

A.   Yeah.  So the electrical component that moves the boat lift up and down was open.

Q.   Did it appear to have been tampered with?

A.   Yes.

Q.   What do you mean by that?

A.   Normally, these boxes are closed to seal from weather and other things like that.  And the door to the boat -- the electrical component of the boat switch was left open.  In normal circumstances, that would not be the case.

Q.   After you verified that nobody had authority to remove the boat from the residence, what did you do next?

A.   I continued to canvass the area, talk to neighbors, see if I can get some video footage from any of the surrounding locations.

Q.   And were you able to obtain video surveillance?

A.   I was able to locate a few addresses that had video footage.  I personally did not obtain the footage.  A detective followed up to do that.

Q.   Was there any surveillance at the residence where the boat was reported missing from?

A.   There was not.

        MS. KLEPACH:  May I have the HDMI for just the

witness, please.

COURTROOM DEPUTY:  HDMI or ...

MS. KLEPACH:  The HDMI.

Thank you.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.  Officer Ferris, did you take photographs when you responded to that location?

A.  I did.

MS. KLEPACH:  Permission to approach the witness?

THE COURT:  You may.

BY MS. KLEPACH:

Q.  I'm going to show you what's been marked for identification as Government's Exhibit 54.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.  Officer Ferris, do you recognize those photos?

A.  I do.

Q.  What are they?

A.  Those are all photos -- all but one of those photos, I took with my department-issued camera.

Q.  Do those photos fairly and accurately depict the way that the boat lift and dock appeared when you responded to 647 Bimini Avenue on December 21st, 2018?

A.  Yes, they do.

MS. KLEPACH:  At this time, the United States offers Government's Exhibit 54 into evidence.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  Admitted into evidence.

(Government's Exhibit 54 received into evidence.)

MS. KLEPACH:  May I have the ELMO?

Thank you.

May I publish?

THE COURT:  You may.

And Ladies and Gentlemen, just raise your hand if your screen is not working.

All right.  Thank you.

BY MS. KLEPACH:

Q.  All right.  Officer Ferris, I'm going to have you walk us through these different photographs, so can you tell us what we're looking at here.  This is the first page of Exhibit 54.

A.  Right.  So you're looking at the boat lift that the *Mellow Yellow* vessel resided at, and to the left there would be the house and the backyard.

Q.  Can you just circle which boat lift it is on your screen.

A.  Okay.  So you want me to circle the boat lift?

Q.  Yes.

A.  (Witness complies.)

Q.  Thank you.

Now turning to the second page.

A.   The same thing from a different angle.

Q.   Third page?

A.   This is the boat lift after I raised it out of the water.

Q.   Fourth page?

A.   This is the same photo of the boat lift before I raised it out of the water.

Q.   What is this?

A.   This is the boat that -- this picture I obtained from the owner.  And this was the boat before it was taken.

Q.   The sixth page?

A.   At the bottom of this picture, what you see is -- partially, you see the boat lift in the water.  And the other part is the shore power cord, which would normally be attached to the boat.

Q.   All right.  And you mentioned that you observed the boat lift switch appear to be open?

A.   Correct.

Q.   Is that depicted in this photograph?

A.   I cannot see it in this photo.  The pylon there is a little dark.

Q.   Is that better?

A.   Yes.  Okay.  So yes, it does.  The GEM remote box there about halfway up the pylon is open.

Q.   Can you circle for that for us.

A.   (Witness complies.)

Q.   Thank you.

All right.  And what is this?

A.   This is a power switch that would be a power cutoff for that GEM remote box that I just circled, and that is open there.

Q.   Is this the same portion of the boat lift that you described would generally be closed?

A.   Yes.

Q.   All right.  Next page?

A.   This is another angle of the power cord that's on the deck there, and part of the boat lift in the water.

Q.   What is this?

A.   This is the shore power cord that we just looked at, just a closer view of it.  That yellow cord on the bottom there normally would be attached to the boat while it was sitting on the lift.

Q.   Why did you photograph this?

A.   Because it -- to me, it showed that the power cord had been removed from the boat and placed on the dock.

Q.   All right.  And what are we looking at here?

A.   This is 647 Bimini Avenue from across the canal, and the white boat is at that address.  And the other side of the dock, the right side of the dock, is where the *Mellow Yellow* used to be sitting.

Q. Okay. So can you just circle where the *Mellow Yellow* would normally have been.

A. Yes.

(Witness complies.)

Q. Thank you.

A. All right. In your time -- withdrawn.

Q. What did you do after you canvassed the area for surveillance and took photographs?

A. I contacted the owners during that time, and followed up by receiving a sworn statement from the owner of the boat.

Q. Who was the owner of the boat?

A. The Teteris family, Laura Teteris.

Q. As far as you were aware, did they live in that house full-time?

A. They did not.

Q. Is that common in Marco Island, second-home owners?

A. Yes.

Q. Can you speak generally about the way that individuals secure their boats in Marco Island to the extent that you're familiar with that.

A. Yeah. On a general basis, just like you saw, there's a lot of boats that are kept on boat lifts, just like that, with power modules that allow them to take the boat up and down. It's very rare that I see security measures beyond a simple padlock that secured a power source to the boat.

Q.   And did this boat lift have a padlock?

A.   Not that I could tell, because everything was open when I got there.  So ...

Q.   All right.

All right.  Officer Ferris, I'm going to show you what's been marked for identification as Government's Exhibit 56.

MS. KLEPACH:  If I may approach the witness.

THE COURT:  You may.

BY MS. KLEPACH:

Q.   Officer, do you recognize Government's Exhibit 56 for identification?

A.   I do.

Q.   What is it?

A.   That's a map of 1474 Firwood Court, identified by -- that's where we got the video from.

Q.   All right.  And is that a fair and accurate depiction of the area surrounding 1474 Firwood Court?

A.   Yes.

MS. KLEPACH:  At this time, the United States offers Exhibit 56 into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 56 received into evidence.)

MS. KLEPACH:  All right.

BY MS. KLEPACH:

Q.   So you mentioned that 1474 Firwood Court is the area where -- or rather, is the residence where surveillance was obtained.  Can you just circle that for the jury.

A.   (Witness complies.)

Q.   How far is that from 647 Bimini Avenue?

A.   It's less than a block away, to the east of where 647 Bimini Avenue is.

Q.   All right.  And does the waterway at 1474 Firwood Court lead into the open ocean?

A.   Yes.

Q.   Can you show us where.

A.   If you're coming from 1474 Firwood here, you would go out the canal and over.

Q.   And which way is 647 Bimini?

A.   You can come from 14 this way.

Q.   All right.

A.   And that is the only way out for 647 Bimini.

     (Pause in proceedings.)

BY MS. KLEPACH:

Q.   You mentioned that as part of your role at the Marine Patrol Unit that you investigate vessel thefts; is that correct?

A.   Correct.

Q.   In 2018, was -- how many vessel thefts, approximately, were

there in that area relative to other periods of time?

A.   Five.

Q.   Okay.   And is that more or less than what you had usually seen?

A.   More.

Q.   All right.   What, if anything, did the Marco Island Police Department do to try to curb the increase in vessel thefts?

A.   We identified target vessels and target areas, and we put notice out to every single resident on the island, the best we could, via letters in the mail, social media, things like that, on security measures and what type of boat might fit the boats that were being stolen.

Q.   Was there -- what kind of boat would have fit?

A.   30-plus-foot, twin and triple engines, 300-plus horsepower, and specifically Yamaha motors.

        MS. KLEPACH:   All right.   No further questions.

        THE COURT:   Cross-examination.

                    CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.   Good morning, Officer Ferris.

A.   Good morning.

Q.   Welcome to Miami.

A.   Thank you.

Q.   So I just have a couple of questions -- maybe just one. For the investigation of the boat known as the *Mellow Yellow,*

that you have talked about today, what was the date range for the theft of that boat?

A.   The last time that it was seen, prior to it being gone from the lift, I believe was on December 19th, the morning of December 19th, to the time it was taken.

Q.   And the date it was reported stolen?

A.   Be December 21st.

Q.   So a two-day range?

A.   Yes.

Q.   Thank you, sir.

MR. FEIGENBAUM:  I have no further questions.

THE COURT:  All right.  Any redirect?

MS. KLEPACH:  No, Your Honor.

THE COURT:  All right.  Thank you.

Is Officer Ferris excused?

MS. KLEPACH:  Yes.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  Thank you, Officer.  You are excused.

(Witness excused.)

THE COURT:  The Government's next witness.

THE WITNESS:  Thank you.

MS. KLEPACH:  The United States calls Bart Drake.

(Pause in proceedings.)

THE COURT:  Hi.  Good morning, sir.

THE WITNESS: Good morning.

THE COURT: Mr. Drake, let me ask that you remain standing, raise your right hand to be placed under oath.

BART DRAKE, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY: Thank you.

You can have a seat.

Would you please state your name and also spell it for the record.

THE WITNESS: Name and what?

COURTROOM DEPUTY: Would you please state your name.

THE WITNESS: Bart J. Drake.

THE COURT: Could you also spell your name for the record.

THE WITNESS: B-A-R-T D-R-A-K-E.

COURTROOM DEPUTY: Thank you.

MS. KLEPACH: May I inquire?

THE COURT: Yes. Of course.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q. Good morning, sir.

A. Good morning.

Q. Where do you work?

A. I'm self-employed. Marco Builders, Inc. is the primary business.

Q. And what does your business do?

A.   Primarily construction.

Q.   Okay.  How long have you -- well, where do you live?

A.   Marco Island, Florida, Collier County.

Q.   How long have you lived there?

A.   Thirty-six years.

Q.   How long have you owned your business?

A.   Twenty-five.

Q.   Okay.  What are some of your duties and responsibilities as part of your business?

A.   Primarily, we do remodeling, but we do some new construction.

Q.   Okay.  Is one of the homes that you were involved in constructing 1474 Firwood Court?

A.   It is.

Q.   When did you build that home?

A.   I started that in 2014, finished in 2016.  And then one of my businesses did property management there until 2001.

Q.   I'm just going to ask you to slow down a touch.

     Thank you.

     All right.  And who were the owners of that home?

A.   At the time of the incident, it was Tony Martin.

Q.   Okay.  I'm going to direct your attention to on or about December 21st of 2018.  Did you become aware of a vessel theft at 647 Bimini Avenue?

A.   Yes.  I approached by the Marco Island PD and asked to

check our DVR for any activity from the cameras.

Q.   Were you able to ascertain any activity from the video surveillance?

A.   We did.  We found a vessel going by at the time in question, and I recorded it to a thumb drive.

Q.   All right.  Were there minute angles to that surveillance?

A.   Yeah.  The property had probably six different cameras, so there was different views.  I don't know that there was different views of the vessel, but there was different views of the property.

MS. KLEPACH:  All right.  May I approach the witness?

THE COURT:  You may.

BY MS. KLEPACH:

Q.   Mr. Drake, I'm going to show you what's been marked for identification as Government's Exhibits 53A through 53G.

A.   Yes.

Q.   Mr. Drake, do you recognize that disk?

A.   I do.

Q.   How do you recognize it?

A.   It's got my initials on it, and I viewed it earlier.

Q.   And what is on this disk?

A.   Different camera angles of 1474 Firwood Court.

Q.   And does this disk contain a fair and accurate copy of that video surveillance?

A.   It does.

MS. KLEPACH:  At this time, the United States offers Exhibits 53A through G into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibits 53A through 53G received into evidence.)

MS. KLEPACH:  May we publish?

THE COURT:  You may.

MS. KLEPACH:  And can we have the HDMI, please.

Thank you.

BY MS. KLEPACH:

Q.  Okay.  So let's start with 53A.  Can you just tell us what angle we are looking at here.

A.  That is a fixed mounted camera above the front door of the residence.

Q.  Okay.  53B, please.

A.  That is the left side of the lanai at the pool deck, with the hurricane shutters in the closed position.

Q.  What is a lanai?

A.  The pool deck.

Q.  Now, let's go to 53C.  What is this?

A.  That is an upstairs balcony with the hurricane shutter closed.

Q.  And 53D?

A.   That is the driveway.

Q.   All right.  53E?

A.   That is the right side of the front yard.

Q.   Okay 53F?

A.   That is the pool deck and the dock.

Q.   Okay.  Finally, 53G.

          MS. KLEPACH:  Can we please fast-forward to the one minute and 35 second mark.

     (Video played, no sound.)

BY MS. KLEPACH:

Q.   What does 53G show us?

A.   That shows us the dock and the waterway.

Q.   And this is the one minute and 35-second mark.  What are we looking at here?

A.   That is a vessel moving west to east in the Bimini Waterway.

Q.   All right.  And is this -- this surveillance footage that you were told to download as relevant to this investigation?

A.   Yes.

          MS. KLEPACH:  Thank you.

BY MS. KLEPACH:

Q.   All right.  Mr. Drake, I'm going to show you what is in evidence as Government's Exhibit 56.

          MS. KLEPACH:  If I may have the ELMO, please.

BY MS. KLEPACH:

Q.   So you can draw on that screen in front of you.

Can you please show the jury the direction of travel for that vessel, based on the surveillance that you reviewed.

A.   (Witness complies.)

Q.   All right.  Are you familiar with the waterway that the vessel was approaching?

A.   Yes, I am.

Q.   What is it called?

A.   Bimini.  Bimini Waterway.

Q.   All right.  And the end of that waterway, where does that lead out to?

A.   That leads out to the Marco River.

Q.   And do you know where the Marco River leads?

A.   You can go north or south.  It leads to the Gulf of Mexico.

MS. KLEPACH:  Thank you, sir.

No further questions.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.   Good morning, Mr. Drake.

A.   Good morning.

Q.   How are you?

A.   Good.  How are you?

Q.   So those videos went pretty fast for me.

MR. FEIGENBAUM:  Could I ask the Government, please, to put back the one -- I believe it was at the time 23:18, which I guess would be like 11:18 at night, on December 18, 2018.  That's the one where the boat goes by, I believe.

MS. KLEPACH:  Yes.

(Video played, no sound.)

MS. KLEPACH:  Let me know if you want me to stop it, Counselor.

MR. FEIGENBAUM:  Well, I would like to see when the boat goes by.  You can just fast-forward it there, if you know where it's at.

MS. KLEPACH:  Five more seconds.

MR. FEIGENBAUM:  Could you stop it right there.

(Video stopped.)

BY MR. FEIGENBAUM:

Q.  Mr. Drake, question is:  Is this boat traveling at this point -- at this point, with the lights on?

A.  I would say, no.

Q.  Those aren't lights that are --

A.  I don't believe so.  I believe that's a reflection, just like we're seeing off the water and off the lawn chairs in different places.

MR. FEIGENBAUM:  Could you back that up and just play that again.

(Video played, no sound.)

BY MR. FEIGENBAUM:

Q.   As you see it travels further, you see lights on, including looks like inside the cabin, correct?

A.   Not in my experience, no.  Running lights on a vessel are red and green, not white, for the bow and port and starboard. The only white light you would have would be an anchor light or a stern light, which would have been on the transom, not high on the hard top.

Q.   This is a black and white video?

A.   Agreed.  But you would still have right and left lights that would have been down low on -- below the rail or -- there would have been lights right and left, not just a light on the bow, you know, on the hard top.  You're not going to have -- I mean, that's -- the navigational lights would have been right and left.

MR. FEIGENBAUM:  Thank you, sir.  No further questions.

THE COURT:  All right.  Any redirect?

MS. KLEPACH:  Briefly, Judge.

REDIRECT EXAMINATION

BY MS. KLEPACH:

Q.   All right.  Mr. Drake, that went a little fast for me now. So I'm going to play it and again, and I'm going to pause it when you can see the boat coming through the waterway.

A.  You might note that I'm a hundred-ton master Coast Guard captain.  So I have a little bit of input on this.

(Video played, no sound.)

BY MS. KLEPACH:

Q.  Wonderful.  So let's just stop it right there.  Can you explain what you were saying to Defense counsel with regard to the boats on -- the lights on either side of the boat.

A.  Yeah.  So navigationally, you have to have a red light and a green light right and left, so that it is very obvious to another vessel whether you're approaching them or going away from them.  So those lights would be either here -- can I draw on this?

Q.  Yes.

A.  Okay.  Either here and here, or here and here.

It would not -- even if you had -- even if you had a -- you wouldn't have this light here.

Q.  All right.  So let me just stop you for one second.  When you said:  "Here and here," let the record reflect that the witness has drawn over the side of the boat, towards the front, not on the center console.  Is that an accurate description of --

A.  Correct.  Yes.  The red and green light would have to be clearly apart from each other, as far apart as possible, so it would be clear to another vessel whether you're coming or going.  So typically, on a boat with a hard top, and a boat

this size, it would be on the front corner of this fiberglass top.  You would have one on the starboard and one on the port.

Q.  Okay.  And so, why is it, based on this surveillance, that you do not believe the white circle we're seeing at the top of the center console is a light?

A.  It could potentially be a light, but it's not running lights.  It's not the lights that, by maritime law, you have to have on to run that boat in the dark.  So could you have had a light up there?  I mean, on that vessel, there would be no reason for that light to just be on top of that hard top.  It serves no purpose.  If you had what we call a Sprinter light -- would be here shooting down to the cockpit -- that would make sense.  But a light just up on top of there, unless it was a spotlight that was designed to look out in front of you, there would be no reason to have a lone a light on top of that hard top.

Q.  All right.  So let's continue playing the video.

    (Video played, no sound.)

BY MS. KLEPACH:

Q.  As the boat travels through the waterway, does that white -- I'm going to call it the white light, but does that white light on the top of the boat change at all?

A.  Earlier, it was basically a circle and now it's going to a square.  And if you look -- if you back up just a little bit, you'll see that the radar ray ahead of that is also reflecting

about the same amount of light as the circle in question.

Q.  All right.  And what does that lead you to --

A.  It's a reflection off of the lighting on the house and the infrared from the cameras.

Q.  All right.

A.  You can see the radar ray ahead of that circle, and it's reflecting about the same.  I would say that it's a satellite TV or some kind of satellite equipment.

Q.  You mentioned that you were in the Coast Guard?

A.  I'm a hundred-ton master Coast Guard captain.  It's not the Coast Guard.  It's a captain's license.

Q.  All right.  And what does -- what did you have to -- what, if any, training did you have to receive to get that license?

A.  Well, thousands of hours on a vessel.  A hundred-ton dictates a larger vessel.  It's one of the highest civilian licenses there is.

MS. KLEPACH:  All right.  No further questions.

THE COURT:  All right.  Is Mr. Drake excused?

MS. KLEPACH:  Yes.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  Thank you, Mr. Drake.  You are excused.

(Witness excused.)

THE COURT:  The Government's next witness.

MR. DOBBINS:  The Government would call to the stand

Mr. William Sheehan.

(Pause in proceedings.)

THE COURT: Good morning, Mr. Sheehan. If you'll step forward, sir.

Mr. Sheehan, let me ask that you remain standing, raise your right hand to be placed under oath, sir.

WILLIAM SHEEHAN, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY: Thank you.

THE COURT: Go ahead and have seat., sir.

COURTROOM DEPUTY: Could you please state your name and also spell it for the record.

THE WITNESS: William Sheehan, W-I-L-L-I-A-M S-H-E-E-H-A-N.

COURTROOM DEPUTY: Thank you.

MR. DOBBINS: May I inquire, Your Honor?

THE COURT: Yes. Of course.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q. Good morning, Mr. Sheehan.

A. Good morning.

Q. Mr. Sheehan, could you tell the Members of the Jury what city and county you currently in.

A. Naples, Florida, Collier County.

Q. And how long have you lived in Collier County?

A. Going on 45 years.

Q.   And are you currently employed, sir?

A.   Yes, I am.

Q.   What's your employment?

A.   I work for Southwest Property Management Company at Mariner's Cove Condominium.

Q.   And what are your duties and responsibilities as a property manager at Mariner's Cove Minimum?

A.   I take care of anything that the people need to get taken care of.  They have questions about stuff all the time.  I do light maintenance around there, and I deal with all the subs that come in and do work in the apartments and on the property, and make sure everything gets done.

Q.   When you say you deal with all the subs, what do you mean by that?  What are subs?

A.   Like subcontractors that come in and work, and like the lawn people, the pool people, and anybody that's doing a project there, you know, on the property.

Q.   Now, sir, can you describe for the Members of the Jury what the Mariner's Cove Condominium complex looks like.

A.   It's basically three buildings right in that semicircle on the Gordon River, and they're four stories.  There's 84 apartments.  There's 28 in each one.

Q.   And as the property manager, are you familiar with the owners of all the condominiums that are in that complex?

A.   Yes, I am.

34

Q.   How would you describe the type of resident or owner of those condominiums?

A.   The majority of them, it's a second home for them.  They all live up north, and they come down and spend the winter there, or rent them out in the winter and then they'll come before season or after season for a short period of time.

Q.   Now, you said the condominium complex is on the Gordon River.  Are there any -- is there anything attached or part of the property where an owner could store, say, a vessel or a boat of any kind?

A.   Yeah.  We have 80 docks there that are on the shoreline that the people own.

Q.   And is that all part of the condominium complex?

A.   Yes.  Yes, they are.

Q.   Now, these 80 docks, are they just slips, marina slips where someone ties up their boat, or do they have other devices that are used for the vessels?

A.   Some have boat lifts, where they can lift their boat out of the water, you know, so it doesn't get barnacles on it.  And others who don't have boats, they don't have a lift and they're vacant.

Q.   All right.  I'd like to direct your attention at this time to June 10th of 2019, in the morning hours.  Did something happen where the police were called to Mariner's Cove to talk to you on that date?

35

A.   It didn't happen on that date, but I had a renter come to me and say they thought a boat was missing.  They noticed it looking out their window, and it had been missing for a few days.  So I went down on the dock and looked at that slip, and there was a boat missing.

Q.   And do you know who the owners of the boat slip and that vessel were?

A.   Yes, I do.

Q.   Where were their names?

A.   John and Lisa Wiesner.

Q.   And were they living at Mariner's Cove Condo when this happened in June of 2019?

A.   No, they weren't.

Q.   Okay.  Do you know where they live, approximately?

A.   They live in Wisconsin somewhere.

Q.   Now, as the property manager, and the fact that you know these owners, do you have some contact list or some way to reach out to the owners if you need to get ahold of them?

A.   Yes, I do.

Q.   And what is that?  Is it just a phone list?

A.   Yeah.  It's a phone list.  And people call me all the time, and I call them when -- you know, when something is going on or something.

Q.   Did you go out to the boat slip where this -- where the Wiesners' boat was supposed to be?

A.   Yes.

Q.   Did the Wiesners' boat slip have a lift?

A.   Yes, it did.

Q.   And did you observe anything about that boat lift?

A.   It was down in the water and the boat wasn't there.

Q.   So what did you do next?

A.   I called the Wiesners and asked them if their boat was supposed to be missing, and they said no.  And I said:  "Well, it's not here," and they asked me to call the police.  I said: "No.  You have to do that because you've got all the pertinent information about the boat."  I said:  "I don't even know what kind of boat you had." And so they called the police.

Q.   All right.  And did the police come and talk to you?

A.   Yes, they did.  And I showed them where it was and filled out the report.

Q.   Now, did you also provide the police with the Wiesners' contact information?

A.   I can't remember.

Q.   Okay.

A.   I must -- I probably did.

Q.   Now, how old would you say this complex is, this condominium complex?

A.   It was built in 1979.

Q.   Does it have any security features at that condominium complex?

A.   No, it doesn't.

Q.   What about security or video cameras around the buildings?

A.   No.  There's none at all.

Q.   Around the docks, the 80 docks where the residents or the owners keep their vessels?

A.   No.

     MR. DOBBINS:  All right.  One moment.

     (Pause in proceedings.)

     MR. DOBBINS:  No further questions.  I tender the witness.

     THE COURT:  Cross-examination.

                      CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.   Good morning, Mr. Sheehan.

A.   Good morning.

Q.   How you doing?

A.   Good.

Q.   Great.  So I just want to make sure -- I believe you testified that the boat had been missing for a few days.

A.   That's what these people had told me that were renting down there.  They said they thought it was missing since the previous week.

Q.   Could you give me the dates that would cover that period when the boat was missing.

A.   I filled out the police report, I think, on the 10th of

June. I think they said that they -- I think I had seen it -- I'm pretty sure I had been on that dock the previous Monday and probably the previous Thursday, and the boat was there then. So it was probably between that Thursday and Monday when the people came up to me.

Q. So the date range for the boat being missing could be Thursday, Friday, Saturday, Sunday, and Monday?

A. Right.

Q. That's five days?

A. Yes.

Q. All right, sir. Thank you.

MR. FEIGENBAUM: I don't have any further questions.

THE COURT: All right. Any redirect?

MR. DOBBINS: Yes, Your Honor. Just briefly.

REDIRECT EXAMINATION

BY MR. DOBBINS:

Q. Mr. Sheehan, are you out at that property every day of the week?

A. Monday through Friday.

Q. Okay. And so when you say you thought you saw it on that Thursday prior to the 10th, let me ask you this: With 84 units, that sounds like a lot of different properties and things to keep track of. Do you check everybody's boat slip every day?

A. What I do is I walk the docks -- not every day, but I'll do

39

it like two or three times a week.  And I don't check everybody's slip or anything.  I just check to make sure there isn't like a broken water line or something like that needs to be taken care of.

Q.  Something you might have to fix?

A.  Right.  That's basically what I do.

Q.  And so would that be the last time you would have done that walk, would have been that Thursday of that week?

A.  I'm pretty sure I had done it a couple of times.  I know I had been out there that Monday, and I know I did it another time after that, but I don't know exactly what date.  I thought it was like Thursday or Wednesday.

MR. DOBBINS:  No further questions, Your Honor.  Thank you.

THE COURT:  Is Mr. Sheehan excused?

MR. DOBBINS:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Thank you, Mr. Sheehan.  You are excused, sir.

(Witness excused.)

THE COURT:  And the Government's next witness?

THE WITNESS:  Thank you.

MR. DOBBINS:  Your Honor, at this time, the Government would call to the stand Mr. John Wiesner.

(Pause in proceedings.)

THE COURT:  Good morning, Mr. Wiesner.

THE WITNESS:  Morning.

THE COURT:  Sir, let me ask that you remain standing, raise your right hand to be placed under oath.

JOHN WIESNER, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

THE COURT:  Go ahead and have a seat.

COURTROOM DEPUTY:  Could you please state your name and also spell it for the record.

THE WITNESS:  John Wiesner.  W-I-E-S-N-E-R.

COURTROOM DEPUTY:  Thank you.

MR. DOBBINS:  May I inquire, Your Honor?

THE COURT:  Yes.  Of course.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Good morning, Mr. Wiesner.

A.  Good morning.

Q.  Mr. Wiesner, can you tell us how old you are.

A.  Sixty-six.

Q.  And what city and state do you live in?

A.  Oconomowoc, Wisconsin.

Q.  And where is that in the area of Wisconsin?

A.  In between Milwaukee and Madison, about halfway.

Q.  How long have you lived there?

A.  The current -- my whole life in Wisconsin.  But in

41

Oconomowoc, 19 years.

Q.   And are you currently employed?

A.   Yes.  I own a business.  I do real estate management, and I manage our own properties.

Q.   And is the real estate you manage -- is that solely in Wisconsin or is it somewhere else?

A.   It's in Wisconsin, but we also own three condos in Florida.

Q.   What city do you own those condos in?

A.   Naples, Florida.

Q.   And where are those condos located?

A.   Mariner's Cove Condominiums, on Goodlette Road.

Q.   Do you use any of those condominiums as a second home?

A.   Yes, I do.

Q.   And what do you do with the other two condos?

A.   My children use them once in a while, and I'll rent them out in the prime periods, which is January, February, March.

Q.   Generally, what portion of the year do you live in that second home?

A.   I'm usually there for a few weeks in November and December, and then most of the time January, February, March.

Q.   Now, when you purchased the condo that you reside in part-time -- when you purchased the condo, did it come with any amenities?

A.   Yeah.  They each come with a boat slip at our association.

Q.   And do you use that boat slip that's associated with the

condominium that you --

A.   Yes, I do.

Q.   Does that boat slip have any special equipment or mechanical devices?

A.   It has a lift to keep the boat out of the water, because it's salt water and it would ruin the bottom.  So it's a lift that raises it above the water level about three feet.

Q.   And how does that lift operate?  Can you tell the Members of the Jury how that works.

A.   There's a system that's right next to it that's got two motors on each side of the lift, and you open up a little box that's locked, then you push either up or down to make the boat move up or down.

Q.   I'd like to direct your attention to 2019.  Had you -- did you own a vessel that you were storing or keeping at that boat dock at your unit in Mariner's Cove?

A.   Yes.  I owned a Pursuit boat that I kept at Mariner's Cove.

Q.   And what is a Pursuit boat?

A.   It's basically a fishing/entertaining boat, and it's 32 feet long, and it had two 300 Yamahas on the back of it.

Q.   Do you recall what horsepower those engines were?

A.   Three hundred horse each.

Q.   Did you give a name to that vessel?

A.   Yes.  *Reel Estate*, spelled R-E-E-L, and then estate.

Q.   And when you purchased -- let me ask you this:  Did you

purchase that vessel from a dealership or from another individual?

A.   No.  From Walker's Marine in 2018.

Q.   I'm sorry?

A.   Walker's Marine in 2018.

Q.   And where is Walker's Marine located?

A.   It's actually down the river, about a quarter mile from us to the north.

Q.   And when you would use the *Reel Estate,* where would you take that vessel?

A.   We would take it out into the Gulf of Mexico.  We would take it to Marco Island.  We'd take it out fishing on the Gulf.

Q.   And can you access the Gulf of Mexico from your boat dock?

A.   Yes.

Q.   Or do you have to put it in a trailer or something?

A.   No.  No.  The Gordon River is where we're on -- Mariner's Cove is on, which goes out to the Gordon Pass, which then goes out to the Gulf of Mexico.

Q.   When you purchased the boat from Walker's Marine, how many sets of keys did you receive?

A.   Two sets.

Q.   And where did you keep those keys?

A.   In my condo.

Q.   What would happen to the boat when -- well, let me ask you this:  Are you married, sir?

A.   Yes, I am.

Q.   What would happen to the boat when you and your wife would leave to go back to Wisconsin?

A.   We would end up storing it, usually from sometime in June to the end of October, at Walker's Marine, which is right down the river.

Q.   And what would you do with the keys to the vessel while you were going up to Wisconsin?

A.   We always put them in the unit.  There was a special place we had them put.

Q.   And when you purchased that vessel, the *Reel Estate,* this 32-foot Pursuit, did you have it insured?

A.   Yes, we did.

Q.   All right.  Do you recall which insurance company?

A.   Sure.  GEICO Insurance.

Q.   Now, how long did you have the *Reel Estate* vessel, sir?

A.   Only like five -- five to six months.

Q.   What happened after six months?

A.   It was stolen the beginning of June of '19.

Q.   Do you recall when you returned to Wisconsin in 2019?

A.   In end of April, approximately.  We usually came back in April.  So it would be middle to the end of April.

Q.   And again, what would you do with the boat before June?

A.   We'd come -- we left it on our lift in front of Mariner's Cove.

Q.   Did your boat lift have any panel that would -- was the panel on the boat lift exposed or was it covered in some way?

A.   The panel on the -- okay.  It was in a box.

Q.   And did you use anything that would lock that box?

A.   A Master Lock.

Q.   Is that like a padlock?

A.   Right.

Q.   Directing your attention to around June 10th of 2019, were you contacted by somebody from Mariner's Cove?

A.   Yes.  I was contacted by Bill Sheehan, our manager there, and he told me that my boat was not there.

Q.   So what did you do at that point?

A.   I told him to call the police.

Q.   And were the police eventually called?

A.   Yes.  That -- right away.

Q.   All right. Did there come a time when you came back down to Naples to take a look and see what had happened and inspect the rest of your property?

A.   Yeah.  Within 10 days after that, I recall I came down, because GEICO wanted to meet me there and do their investigation.

Q.   What was the condition of your -- of the condo?

A.   The condo was fine.  No one came in the condo.

Q.   There was no break-in or forced entry?

A.   No.

Q.  Were you able to locate the two sets of keys --

A.  Yeah.  They were in the same spot from when I left.

MR. DOBBINS:  Your Honor, may I approach?

THE COURT:  You may.

BY MR. DOBBINS:

Q.  Mr. Wiesner, I'm showing you what's been marked as Government's Exhibit 57 for identification.  Do you recognize that document?

A.  Yes.  That's Mariner's Cove right to the right, and my boat slip is actually 18D there, right in front.

Q.  Okay.  Is that a Google Earth satellite map for that --

A.  Yes.

Q.  -- for your residence down there?

A.  Yes, it is.

Q.  And is that a fair and accurate satellite image of what Mariner's Cove and the surrounding area kind of looks like?

A.  Oh, yes.

MR. DOBBINS:  Your Honor, at this time, I'd move Government's Exhibit 57 into evidence.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 57 received into evidence.)

MR. DOBBINS:  If I may publish for the jury, Judge.

THE COURT:  You may.

MR. DOBBINS:  If we may use the ELMO.  I'm sorry.

BY MR. DOBBINS:

Q.  All right.  Let me clear these markings.  I'm going to zoom in a little bit here, sir.

There we go.

Okay.  Can you just -- what was the address -- or the street that the condos are located on?

A.  Goodlette Road South.

Q.  And can you just -- you can actually -- it's like a Monday Night Football telestrator.  You can actually mark on the screen, and it will indicate something there.  So if you could just mark that and where your building is, where your unit was.

A.  Our building is right here, and then our unit is on the corner.

Q.  So that would be, for the record, the upper unit of Mariner's Cove.

Now -- and it's not really that obvious, but what is this sort of black area here to the right of where you just marked Mariner's Cove?

A.  That's the front lawn.

Q.  Okay.  And putting my pen here, what is this area here?

A.  That's the water.  That's the river.

Q.  Okay.  And these little -- they look like --

A.  Boat slips.

Q.  And do you recall where approximately your boat slip was?

A.  Right here.

MR. DOBBINS:  I'm going to change the color because --
if I can -- I don't know if I can.

BY MR. DOBBINS:

Q.  I'm not sure I can see where exactly you marked there.

A.  Oh.

Q.  Maybe make a bigger circle.

A.  (Witness complies.)

Q.  Okay.  So I'm going to move my pen here to the last -- what appears to be a boat, right before -- looks like just maybe above where the pool --

A.  Right.

Q.  Is that a swimming pool there?

A.  Right.

Q.  And that was your boat slip where the *Reel Estate* was held?

A.  Yes, it was.

    (Pause in proceedings.)

MR. DOBBINS:  Your Honor, may I approach again?

THE COURT:  You may.

BY MR. DOBBINS:

Q.  Mr. Wiesner, I'm showing you what's been marked as Government's Exhibit 112 for identification.  Do you recognize that series of photographs?

A.  Yes, I do.

Q.  And what are those pictures of?

A.   The right top one is my slip with the boat in it.  The left is my boat in front of -- looks like Bayfront.  And the other is pictures of my two engines.

Q.   And is that a fair and accurate depiction of what the *Reel Estate* looked like before it was stolen from you?

A.   Yes.

MR. DOBBINS:  May I approach just to take the exhibit?

THE COURT:  You may.

MR. DOBBINS:  At this time, the Government would move to admit Government's Exhibit 112 into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 112 received into evidence.)

MR. DOBBINS:  If I may publish, Your Honor.

THE COURT:  You may.

BY MR. DOBBINS:

Q.   All right.  I know you briefly talked about it, but the jury couldn't see it when you were describing it.  So what is this photograph here on the left?

A.   A photograph of my boat.

Q.   And what about right here?

A.   That's my lift and my boat, and that's a photograph of the engines.

Q.   Did you end up filing a claim with GEICO?

A. Yes, I did.

Q. And what was the result of you filing that claim?

A. I filed a claim, and they paid me, and I bought the same exact boat.

Q. Why did you buy the same exact boat?

A. Because I loved it.

Q. Sir, when you went away to Wisconsin in late April of 2019, did you give anybody authorization or permission to use your boat?

A. No.

Q. Did you give anybody authorization or permission to take your boat off that boat lift?

A. No, I did not.

Q. And did you give anybody authorization or permission to take your boat and take it away from you?

A. I never would, because I'm the only one that ever drove it.

MR. DOBBINS: No further questions, Your Honor.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q. Good morning, sir.

A. Morning.

Q. I believe Mr. Sheehan, who was the property manager there -- is that correct?

A. Yes.

Q.   And he testified -- I think his words were that there were no security features at Mariner's Cove.

A.   As far as cameras, you mean?

Q.   I'm sorry?

A.   As far as cameras or ...

Q.   Yeah.  I think he was probably referring to whether there was surveillance --

A.   Not that I know of.

Q.   Okay.  So just to be clear, as far as you know, at that time when your boat was reported missing, there were no surveillance cameras on the boat slips?

A.   Not that I know of.  No.

Q.   And these boats are pretty expensive boats?

A.   Yeah.  They vary in sizes throughout the whole complex.

Q.   Did you ever question why the -- well, let me start over.
     Is there like a homeowners association?

A.   Yes.

Q.   And did the homeowners association at some time consider whether it would be good to have surveillance cameras?

A.   Yeah.  After this boat got stolen.

Q.   I understand.

A.   Before that, no, that I know of.

Q.   Was there a security guard patrol on duty 24 hours a day?

A.   No.

Q.   All right.  And you first learned about the boat not being

there on June 10, 2019?

A.   Correct.

          MR. FEIGENBAUM:  All right.  Thank you very much.

          THE COURT:  Thank you.

          Any redirect?

          MR. DOBBINS:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. DOBBINS:

Q.   Mr. Wiesner, you were asked a lot about the security

features at Mariner's Cove.  Do you recall that line of

questioning?

A.   Yes.

Q.   Just curious.  How long had you and your wife been

living -- or have a second home there at Mariner's Cove?

A.   2010.

Q.   So would that be approximately nine years when this event

happened?

A.   Yes.

Q.   And what did you think of the area?  Did it seem

dangerous --

A.   No.  I loved the area, and it all seemed really safe.

That's why we ended up buying there.  And I never expected

something like that to happen.

Q.   Were there any incidents, in your time from 2010 until this

boat was stolen in 2019, that would have caused you to feel

like you needed to bring something up to the homeowners association about security, or security guards, or security cameras?

A.   Not security guards.  There was minor things that happened, but nothing like this.

Q.   Such as what?

A.   There was some gauges stolen out of one of the boats at one point.

Q.   Any --

A.   But I never heard of a boat getting stolen.

Q.   So that was the first time that had happened, to your knowledge?

A.   To my knowledge, yeah.

Q.   And that's because people that live in Mariner's Cove feel it's a pretty secure and safe area?

A.   I think people feel all of Naples is pretty secure and safe.

            MR. DOBBINS:  Nothing further, Your Honor.  Thank you.

            THE COURT:  All right.  Is Mr. Wiesner excused?

            MR. DOBBINS:  Yes, Your Honor.

            THE COURT:  Thank you, sir.

            Mr. Feigenbaum?

            MR. FEIGENBAUM:  Yes, Your Honor.

            THE COURT:  All right.  You are excused, sir.

        (Witness excused.)

THE COURT:  Ladies and Gentlemen, let's go ahead and take a 10-minute stretch break.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury not present, 11:54 a.m.)

THE COURT:  All right.  Before we take our recess, go ahead and have a seat.

Who will be the Government's next witness?

MS. KLEPACH:  It will be Jim Johnson, Your Honor.

THE COURT:  All right.  And do you anticipate that the witnesses that you advised the Court of on Friday will take us through the day?

MS. KLEPACH:  Yes, Judge.  I don't remember where I left off, but I do think the afternoon session is going to be Ricardo Soto, Arturo Ortega, and then, if time permits, Stephen Farlow.

THE COURT:  All right.  And how long do you anticipate this next witness to be?

MS. KLEPACH:  Short.  Probably 20 minutes.

THE COURT:  And following that witness, I'm just trying to figure out -- I told the jury that the lunch was going to be a little delayed, but --

MS. KLEPACH:  The following witness will certainly go over past lunch.

THE COURT:  Okay.

55

All right.  Then why don't we take up the next witness, and then we'll take our one-hour recess for lunch.

I'll see you back here in 10 minutes.

MS. KLEPACH:  Thank you.

MR. DOBBINS:  Thank you, Judge.

COURT SECURITY OFFICER:  All rise.

(Recess from 11:56 a.m. to 12:07 p.m.)

THE COURT:  All right.  Welcome back.

Let's see if our jury is ready to come back in.

COURT SECURITY OFFICER:  I'm going to make sure that they're ready, Judge.

(Pause in proceedings.)

COURT SECURITY OFFICER:  They're all ready.  We have one in the restroom, Judge.

THE COURT:  Oh.  All right.  So let's wait until that individual is ready.

(Pause in proceedings.)

COURT SECURITY OFFICER:  All right.  They're all ready to go.

THE COURT:  Okay.  All right.  Let's bring in the jury.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 12:09 p.m.)

THE COURT:  All right.  Welcome back, Ladies and

56

Gentlemen.

Please be seated, everyone.

And the Government's next witness.

MS. KLEPACH:  Yes, Your Honor.

The United States calls Jim Johnson.

(Pause in proceedings.)

THE COURT:  Hi.  Good afternoon, Mr. Johnson.

Mr. Johnson, if you'll remain standing, raise your right hand to be placed under oath.

JAMES JOHNSON, GOVERNMENT WITNESS, SWORN

THE COURT:  Please be seated, sir.

Once you're fully seated, if you will state your name, spelling your first and last name, please.

THE WITNESS:  James Johnson.  J-A-M-E-S J-O-H-N-S-O-N.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.  Good afternoon, sir.

Where do you work?

A.  Yamaha Motor Corporation.

Q.  What do you do there?

A.  I'm currently the national field service manager for marine.

Q.  What does that mean?

A.  I have field staff that help dealers with watercraft.

Q.  I'm just going to ask you to slow down a bit.

A.   Okay.

Q.   Thank you.

What are your duties and responsibilities?

A.   Basically, just oversee my staff, make sure they're taken care of, what they need, handle various different things, a bit of a lot of things.

Q.   And can you explain again what your staff does.

A.   They basically -- they call on our dealers.  They go around their assigned territories.  They go around and just walk in and see if they can help them with warranties, troubleshooting, customer-related issues, ordering parts.

Q.   As part of your role at Yamaha, are you familiar with the way that the engines work?

A.   Yes.

Q.   Okay.  What other positions have you held at Yamaha?

A.   I actually started as a field rep.  I was a phone tech, did technical coordination, which is information to the factory.  I've done -- been manager over a couple different groups, and then currently this one for almost two years.

Q.   How does Yamaha keep track of its engines?

A.   We have a database system.  The dealers use what we call a Yamaha Marine Business System.  That's how they track who owns and do a warranty.

Q.   Do the engines have serial numbers?

A.   Every one.

Q.   And do the engines have to be registered?

A.   Yes.

Q.   How?

A.   The dealer would register them on the Yamaha Marine Business System.  They go in, put in the customer's information.  And then, once we receive that, we send them a warranty card.

Q.   And when you say:  "The dealer," is that the dealer for the boats that the engines are on or another kind of dealer?

A.   A Yamaha dealer.

Q.   And are the engines associated with particular vessels in your system?

A.   Yes.  We tie them to the boat that they belong on, unless they're under a certain horsepower.

Q.   Do you know how the keys to the engines work?

A.   Yes.

Q.   Can you tell us how.

A.   So basically, when the boat's built, the builder installs a key switch, which is just a random -- it's the same part number, but random keys, and they --

Q.   I'm sorry.  It's the same?

A.   It's -- the part number they order for the switch is all the same, but they're random in as what key is actually in the switches.

Q.   Okay.  Does that mean that there are -- that there is one

type of key that can be used for multiple different engines?

A.   No.

Q.   All right.   So can you explain that in more detail.

A.   So there's five different series of keys.   So depending on what series it is.   And then, under that series, there's a certain amount of keys under each series, usually around 12.   Some have 20 different key numbers in the series.

Q.   All right.   But a key is not unique to a particular single engine; is that correct?

A.   No.

Q.   You talked about the series for keys.   Can you talk a little bit more about how those series are defined.

A.   We have 300, 400, 700, 800.   These are different series of numbers which correlates to the key itself.

Q.   Okay.   Are 821 and 827 numbers of key series that Yamaha has issued?

A.   Yes.

Q.   How can a person figure out the key series that is assigned to particular Yamaha engines?

A.   You would have to -- unless you have one to match it to -- there's a number on the key.   If not, you have to remove the key switch from the dash and look at the number on the barrel.

Q.   All right.   Let's take a step back.   The dash of what?

A.   Oh.   The dash of the boat.   So the key switches are normally mounted in some type of either console or dash area of

a boat. You would have to undo the nut and then remove it from the back side. And on the key, the switch itself, there's a flat spot and there's -- the number right there tells you what key belongs to it.

Q. Do you know what it would entail to be able to disassemble the key switch like you've just described and identify the key series for the engine on a boat?

A. Depends on the vessel. Some it may take you five minutes. Some may take you 30 minutes.

Q. But physically speaking, what would something like that entail?

A. I'm not sure what you're asking.

Q. All right. So let's say that you're on a boat that has a particular type of Yamaha engine, and you wanted to figure out the series assigned to that engine. What would have to do?

A. I would have to remove the nut from the key switch and get to the back side of the dash and pull it out.

Q. Okay. And where would the information be maintained?

A. It's -- there's a -- the key switch is round, but it's got two flat spots down the side that goes through the dash, and it's on the flat side.

Q. Okay. Can a person then acquire the series of key that would match a boat?

A. If they had that number, they could get with their local Yamaha dealer and order that particular key number.

Q.   Can you identify what series the engine is associated with just by looking at the engine itself?

A.   No.

Q.   Can you do that by looking at the boat ignition?

A.   No.

Q.   Is the only place to obtain a particular series of Yamaha keys from a dealer?

A.   Yes.

Q.   Do you know whether certain key series can be resold or copied?

A.   Yeah.  You could definitely copy them.

         MS. KLEPACH:  Okay.  One moment.

      (Pause in proceedings.)

         MS. KLEPACH:  No further questions.

         THE COURT:  All right.  Cross-examination.

                     CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.   Good afternoon, Mr. Johnson.

A.   Hello.

Q.   You have the last name of a different competitor in marine engines, correct?

A.   Yes, sir.

Q.   Okay.  Which are better, Johnson or Yamaha?

A.   Well, Johnson's no longer around, so I think we survived.

Q.   Okay.  I wouldn't know.

All right.  So I'm trying to understand this.  If you don't have the key to the engines, to be able to find out what key you need, you would have to remove the key switch?

A.  Yes.

Q.  And you said that could take five to 30 minutes?

A.  Depending on the boat, yes.

Q.  And then, once you have -- what do you then get that allows you to order the key?

A.  There's a number on it.  It's a three-digit number -- 321, 821, 827.  There's various numbers, but there's a three-digit number.  And then the number crosses to a part number in our system.

Q.  Okay.  And I believe you said that you then would have to order that from a dealer?

A.  Yes.  We only sell directly to dealers.

Q.  Okay.  And when you order it from the dealer, does a dealer then have a approximate delivery time for the replacement key?

A.  Depending on the orders -- when they place the order.  But we try two-day turn around.

Q.  About two days?

A.  Yeah.

Q.  Okay.  So if you remove the key switch at some time, you just don't walk into the dealer and get the key?

A.  I can't answer that, because I don't know inventory levels of a dealer.

Q.  Understood.  But it would have to be during the business hours of the dealer?

A.  Yes.

Q.  And I believe you said the key could not be copied?

A.  Oh.  It can be.

Q.  It can be copied, but then you would have to have the key?

A.  Yes.

Q.  I understand.

All right.  Thank you very much.

THE COURT:  Thank you.

Any redirect?

MS. KLEPACH:  Just a few questions, Your Honor.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MS. KLEPACH:

Q.  Mr. Johnson, on cross-examination, you were asked about the availability of keys at particular dealers.  Do you remember that question?

A.  Yes.

Q.  All right.  And you said that you can't know whether or not a person could immediately get a key because it depends on the inventory that a particular dealer has; is that right?

A.  Yes.

Q.  So if a dealer were to have the engine key available to them, could a person immediately receive a replacement key for

their Yamaha engine?

A.   Yes.

            MS. KLEPACH:  Okay.  No further questions.

            THE COURT:  All right.  Is Mr. Johnson excused?

            MS. KLEPACH:  Yes, Your Honor.

            THE COURT:  On behalf of the Defendant?

            MR. FEIGENBAUM:  Yes, Your Honor.

            THE COURT:  All right.  Thank you, sir.

            THE WITNESS:  Thank you.

      (Witness excused.)

            THE COURT:  Ladies and Gentlemen, at this point in time, we will take our one-hour recess for lunch.  If you'll note that it is about 12:25.  So I'll see you back here at 1:25.

            Have a pleasant lunch.

            COURT SECURITY OFFICER:  All rise for the jury, please.

      (Jury not present, 12:22 p.m.)

            THE COURT:  Anything that we need to address?

            MS. KLEPACH:  Not from the Government.  Thank you, Judge.

            MR. FEIGENBAUM:  No, Your Honor.

            THE COURT:  All right.  Once again, my condolences. And I'll see everyone back here at 1:25.

            MS. KLEPACH:  Thank you, Your Honor.

THE COURT:  Have a pleasant lunch.

(Recess from 12:23 p.m. to 1:26 p.m.)

COURT SECURITY OFFICER:  They are all ready to go, Judge.

THE COURT:  All right.  If the parties will just let me know when you're ready to proceed.  All the jurors are here.

MR. DOBBINS:  I think we're just getting our exhibits for the next witness, Your Honor.

THE COURT:  Of course.

Mr. Feigenbaum, did we correct -- did you have an issue with the computer?

MR. FEIGENBAUM:  Not yet, Judge, but I don't need it this afternoon.  So if we could have a tech person come at the end of the day, that would be great.

THE COURT:  Of course.

(Pause in proceedings.)

THE COURT:  Both sides ready to proceed?

MR. DOBBINS:  Yes, Your Honor.

Thank you.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

Let's bring the jurors in.

COURT SECURITY OFFICER:  All rise for the jury, please.

66

(Before the Jury, 1:28 p.m.)

THE COURT:  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

It's good to see each of you.  I trust you had a pleasant lunch and ready to get back to work.

And if the Government will call its next witness, please.

MS. KLEPACH:  Yes, Your Honor.

The Government calls Ricardo Soto.

(Pause in proceedings.)

THE COURT:  All right.  Good afternoon.

Mr. Soto, if I can ask that you remain standing, raise your right hand to be placed under oath.

THE WITNESS:  Yes, Your Honor.

RICARDO SOTO, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Have a seat.

Could you please state your name and also spell it for the record.

THE WITNESS:  Sure.  Ricardo Soto.  R-I-C-A-R-D-O S-O-T-O.

COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.  Good afternoon, sir.

A.   Good afternoon.

Q.   Where do you work?

A.   I work with the FBI in the Miami Division.

Q.   What do you do for the FBI?

A.   I'm a digital forensic examiner for the FBI.

Q.   What does that mean?

A.   As a digital forensic examiner, my duties include the acquisition and preservation and processing of digital evidence, such as computers, laptops, mobile phones, and tablets.  We extract that information, we process it, and then give it to the investigative team for review.

I'm also tasked with mentoring other junior examiners in our division.

Q.   How long have you been in that position?

A.   About 23 years.

Q.   Have you received any training in extracting and analyzing electronic evidence?

A.   Yes.

Q.   Can you please describe that training for the jury.

A.   Sure.  I have received commercial training, training provided by the FBI, that includes forensic software, such as Cellebrite, GrayKey, Axiom, Magnet Forensics, EnCase, X-Ways.

Q.   Did you have to pass any sort of proficiency test in order to become a digital forensic examiner?

A.   We had to take several courses to get certified.  And as

part of our requirement, we do have annual proficiency testing, yes.

Q.   Are you current with your proficiency testing requirement?

A.   Yes.

Q.   How often do you have to be tested?

A.   The tests are annual, once a year.

Q.   Have you ever been qualified as an expert in digital forensics in state or federal court?

A.   Yes.

Q.   About how many times?

A.   About four times.

Q.   Have you ever been denied expert qualification?

A.   No.

MS. KLEPACH:   At this time, the United States offers the witness, or tenders the witness as an expert in digital forensics.

MR. FEIGENBAUM:   No objection to that, Your Honor.

THE COURT:   All right.   You may continue.

MS. KLEPACH:   Thank you.

BY MS. KLEPACH:

Q.   Mr. Soto, let's talk about the preservation of electronic evidence.   When the FBI receives a mobile device, do they take steps to preserve the evidence that might be on the device?

A.   Yes.

Q.   Okay.   Can you talk about what some of those steps are.

A.   Sure.  One of the first things that we try to do is put the phone in airplane mode, because we want to disconnect it from the cellular network to try and avoid any transmissions coming into and from the device.  If we can get into the device, if it's not PIN locked, then we also try and turn the device off.  That way, we can make sure there's no more transmissions coming to the device.

Q.   If the phone is PIN locked, does that change?

A.   If the phone was PIN locked, yes, in the sense that we can use a Faraday bag to try and -- and that's like a little bag that will actually stop all of the communications coming in and out of the phone.  And the reason why we do that is because we take that back to the lab, and we have forensic software that we can use to try and find out what the PIN is with a pattern code on the device.

Q.   Okay.  You mentioned a Faraday bag.  What is that?

A.   A Faraday bag is -- it looks like a little bag.  And the way it's designed, the material, it actually stops radio transmissions or cellular network transmissions coming to the phone or going out.  That way, if the phone -- we're not able to put it into airplane mode -- we want to stop anything from coming in, for example, like a command, or anything going out.

Q.   What's the difference between a phone that is PIN locked versus one that is not PIN locked, in terms of the way that law enforcement tries to preserve the data on the device?

A.   If the phone is not PIN locked, and we can put it in airplane mode, in addition, because we want to preserve the evidence, we'll turn the device off.

Q.   Okay.  What does taking a mobile device off of the network do?

A.   That severs the connection between the device and the cellular network.

Q.   How does that affect the integrity of the data that might be on the device?

A.   I'm sorry.  I didn't hear your question.

Q.   How does putting the device in airplane mode affect the integrity of the data that may be on it?

A.   Well, the idea of putting it in airplane mode, as I mentioned, was the preservation of evidence.  Right?  We want to avoid any communications coming in or any communications coming out.

Q.   As far as you're aware, are there any requirements about when to put a device in airplane mode?

A.   The best practice is, as soon as you can put it in airplane mode, to do that, to sever it from the network.

Q.   To your knowledge, are there any requirements about when you would do that?

A.   I'm not sure about requirements, but best practice would be, yes, to preserve -- that would be one of the items that we do to preserve the evidence.

Q.   I'd now like to talk about the different ways that law enforcement can analyze cell phones in criminal cases.   What is the process for extracting data from a cellular phone?

A.   Okay.   We take the cellular phone and we connect it to a examination station using our forensic software.   If the device is turned off, we have to turn it on so that the software can communicate with the device.

The software communicates with the device.   Depending on the type of device, the operating system, and other factors, we can extract -- we can obtain different types of extractions from the device.   We extract that data from the device.   It's parsed like one big file.   And we use forensic software, for example, Cellebrite Physical Analyzer, to parse that information into human readable format, and we create a report, and we provide that to our investigative team for review.

Q.   Okay.   So you mentioned Cellebrite Physical Analyzer.   What is that?

A.   That's a commercial tool used throughout the forensic community that's designed to parse the extractions that you can obtain from mobile devices.

Q.   Okay.   How is that different than the first step of the extraction that you just described, plugging the phone into whatever software -- the software that you're using to take the information off of the device?

A.   It's just a different forensic software to do the actual

extraction. For example I'd use, for example, Cellebrite Premium. And what that does -- that can connect to the device. And depending on the device, and like I mentioned, the OS and other factors, you can extract the data from that device.

Q. Right. But does Cellebrite Physical Analyzer assist in reading the data?

A. Physical Analyzer just parses the data.

Q. Okay.

A. Puts it in human readable format.

Q. Right. As opposed to -- what other format would it be in before that?

A. It's just one big file.

Q. Okay. When an extraction is conducted of a cellular phone, what kind of information is pulled off of the device?

A. Depending on the type of extraction, we could get call logs, contact information, calendar information, deleted files, MMS messages, and data from other third-party applications.

Q. Does the Cellebrite program change the data that is present on a device?

A. No.

Q. How do you know?

A. It's a tool that's used, like I said, throughout the forensic community. And that's what it's designed for. It's designed just to extract the data that it's able to access from the device.

Q.   Does a Cellebrite extraction always capture all of the data on a device?

A.   No.

Q.   Why not?

A.   As I mentioned before, it would depend on factors, to include the phone, the operating system, maybe -- for example, there's three types, right -- an Advanced Logical, which would get your text messages, your calendar events, and stuff like that; your Full File System, which may be able to extract deleted files; and then a full physical, which is actually a copy of the entire memory module, which you'll get all the data, which provides more data, and it allows you to recover SQLite databases and other data, much more information.

Q.   Okay.  So let's break that down a little bit.

A.   Sure.

Q.   You mentioned that there are different kinds of extractions that you can do.

A.   Yes.

Q.   Right?  Does the kind of extraction you're doing affect what information you get back?

A.   Yes.

Q.   Okay.  Depending on the kind of extraction, does the program always capture application data?

A.   It depends on the extraction.

Q.   Okay.  So I want to talk about WhatsApp, for example.

A.   Okay.

Q.   Does the Cellebrite program always capture all data that is on a -- that is captured within the WhatsApp application?

A.   If you get a physical extraction, which is the full -- the best extraction we can get, yes, it would capture the databases where WhatsApp stores its data.  We could recover that.

Q.   All right.  But are there certain kinds of extractions that don't get all of that?

A.   An Advanced Logical may pull messages, but we're not going to get the databases.  So you wouldn't see the conversations, attachments that are being sent, or voice mails.

Q.   All right.  You also mentioned deleted files.  First of all, does the Cellebrite program delete data that is otherwise present on a device?

A.   No.

Q.   How do you know that?

A.   The Cellebrite -- for example, the Cellebrite Premium Software is designed to extract the data from the device.  And the Cellebrite Physical Analyzer data is designed to parse that information.

Q.   What about when an individual deletes data on an electronic device?  Will Cellebrite indicate if that was done?

A.   If it finds deleted files, yes.

Q.   So what are some of the things that would affect whether it finds it in the files?

A.   Once again, the type of extraction that we would find, and if the data is still present on the device when we did the extraction.

Q.   What are some of the things that would affect whether the data is still on the device when -- the deleted data is still on the device when it's extracted?

A.   So WhatsApp, for example, uses a database called SQLite. And the SQLite database contains that information.  Right? It's -- this is done behind the scenes when using our phone. We get a message.  We delete the message, and for the user the message is no longer there.  It no longer exists.

What happens in the background is, within that database, that file gets marked for deletion, and that information goes to another database called a WAL file, which is called a write-ahead log file.  And that change, that deletion, goes into a little file.  And at some point in time, when the developer decided it's going to commit that deletion to a database, it goes and it does that.  Once it deletes it there, if it deletes from there and deletes it from the WAL, and we can't carve it, then we no longer are able to recover those deleted files.

Q.   So is it fair to say that when information is deleted off of a device is somehow dependent on developer settings?

A.   As far as the SQLite database and the WAL database, yes. But that's not the only way.  Yes.

Q. Okay. Would an extraction always capture all of the deleted files from a phone?

A. Well, like I said, depending on the extraction. It can delete it -- for example, a physical extraction would get all the data from the memory module. If the data is there, and it can parse it, then yes, it can recover the data if it's still there.

Q. Right. But is it always all going to be present on the device, all of the deleted data?

A. No.

Q. Okay. Will the program notify the analyst conducting the extraction whether there was an error in extracting the data?

A. Yes.

Q. What happens then?

A. At that point, we initiate the exam to do another extraction to get a correct extraction.

Q. Can the data on a phone extraction be searched or narrowed down?

A. Yes.

Q. How?

A. Once the information is extracted from the device, and we parse the information with Physical Analyzer, we create an examination report that has all the items that were extracted from the phone, and we can provide that to the investigator. And that would include your text messages, call logs, calendar

events.

Q. Okay. You mentioned a couple of times that the information is provided to the investigator. With -- as part of your role as a digital forensic examiner, are you part of the investigative team?

A. As far as processing the devices and providing the report, yes. As far as going through the report, no.

Q. All right. Do you know anything about the facts of cases that you work on?

A. Most of the time, no.

Q. Can a cell phone extraction produce any kind of evidence of the person who used the device?

A. It could contain account information that could show who was using the device or the name that the device was registered to.

Q. When you say: "Account information," what do you mean?

A. Account information can be -- for example, when we set up our phones -- for example, on iPhones, you put in your Apple ID, so that we can connect to your Apple account. And you put your name, so sometimes it will say: "Ricardo's iPhone," for example, on the device.

Q. Okay. And as a forensic examiner, do you actually conduct searches for relevant evidence on a device?

A. Not normally, no.

Q. As it relates to this case, did you conduct three different

cell phone extractions?

A. Yes.

MS. KLEPACH: Just a moment.

(Pause in proceedings.)

MS. KLEPACH: Permission to approach the witness?

THE COURT: You may.

BY MS. KLEPACH:

Q. All right. Mr. Soto, I've just handed you what is in evidence as Government's Exhibit 3. Do you recognize that cell phone?

A. Yes.

Q. Is this one of the cell phones that you extracted?

A. Yes, it is.

Q. I've also handed you Government's Exhibit 4 for identification. Do you recognize that?

A. Yes.

Q. What is contained on that disk?

A. This is the examination report for the cell phone marked as Exhibit 3.

Q. And is all of the data that was downloaded or extracted from Government's Exhibit 3 contained on Government's Exhibit 4?

A. The examination report from the device is contained on this, yes.

Q. All right. Now I'm going to direct your attention to what

79

has been marked for identification as Government's Exhibits 7, 11, and 114.

MS. KLEPACH: If I could please have the HDMI.

BY MS. KLEPACH:

Q. You have 114 in front of you. And then we're going to put 7 and 11 up on the screen.

All right. Let's start with Government's Exhibit Number 7. Do you recognize that?

A. Yes.

Q. Is this an excerpt of the data that was extracted from Government's Exhibit Number 3?

A. Yes.

Q. Now let's turn to Government's Exhibit Number 11. Is this also an excerpt of the information that was extracted from Government's Exhibit Number 3?

A. Yes.

Q. Okay. And finally, 114. Is that also an excerpt of the information extracted from Government's Exhibit 3?

A. Yes.

MS. KLEPACH: At this time, the United States offers Exhibits 7, 11, and 114 into evidence.

MR. FEIGENBAUM: Your Honor, I'd just like to renew the objections we made earlier regarding this specific type of evidence.

THE COURT: All right. Certainly. And that objection

is preserved.

Anything further?

MR. FEIGENBAUM:  No, Your Honor.  Just that.  Thank you.

THE COURT:  Okay.  It's certainly preserved.

Seven, 11, and 14 admitted into evidence.

(Government's Exhibits 7, 11, 114 received into evidence.)

MS. KLEPACH:  And Your Honor, at this time, the Government would also offer 7A through D, 11A, and 114A, pursuant to stipulation by the parties.

THE COURT:  Pursuant to stipulation, they are admitted.

(Government's Exhibits 7A-D, 11A and 114A received into evidence.)

MS. KLEPACH:  Thank you.

BY MS. KLEPACH:

Q.  Okay.  Now I want to show you -- withdrawn.

Was Government's Exhibit 3 the cell phone associated with Javier Hernandez?

A.  Yes.

Q.  Did you also conduct extractions for cellular phones that were associated with Jose Miguel Gonzalez Vidal?

A.  Yes.

Q.  All right.  Just a moment, please.

(Pause in proceedings.)

81

MS. KLEPACH:  Permission to approach?

THE COURT:  You may.

BY MS. KLEPACH:

Q.  All right.  Agent Soto -- excuse me -- Mr. Soto, I've just handed you what is in evidence as Government's Exhibits 19 and 28, as well as Exhibits 20 and 29 for identification.

As to Government's Exhibit 19, do you recognize that?

A.  Yes.

Q.  What is it?

A.  This is one of the cell phones that I processed.

Q.  Okay.  And is the information that you processed from that cell phone contained on Government's Exhibit 20?

A.  Yes.

Q.  Is Government's Exhibit 20 -- does that contain a fair and accurate copy of the extraction report from Government's Exhibit 19?

A.  Yes.  It contains the examination report.

Q.  All right.  And now let's turn to Government's Exhibit 28.

Do you recognize that cell phone?

A.  Yes.

Q.  Is that another cell phone that you extracted as part of your work in this case?

A.  Yes.

Q.  And what is Government's Exhibit 29?

A.  Twenty-nine is the examination report for this cell phone.

Q.   Is that a fair and accurate copy of the information that was contained on Government's Exhibit 28?

A.   Yes.

Q.   All right.  So now let's go back to talking about Government's Exhibit Number 3, FBI Evidence Number 1B107.  As part of your involvement in this case, did you review some of the data that was on that device?

A.   Yes.

Q.   And before we get into what was found on the phone, I want to talk about the search of the cell phone.  When did you receive it?

A.   I received the device around April, I think, 6 or 7 of 2021.

Q.   Did you conduct an extraction using the Cellebrite Premium Software?

A.   Yes.

Q.   Okay.  Had an extraction already been completed using a different software?

A.   Yes.

Q.   Okay.  In April of 2021, who was licensed to use that Cellebrite Premium Software -- excuse me -- who was authorized to conduct extractions using that Cellebrite Premium Software?

A.   In our lab, at the time, it was -- two examiners and myself were authorized to use it.

Q.   All right.

83

MS. KLEPACH:  Just a moment.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.  All right.  Earlier, we talked about all the different kinds of Cellebrite softwares that there are.  What kind of information would somebody get from a Cellebrite Premium extraction that you wouldn't be getting from other kinds of extractions?

A.  From the Cellebrite Premium extraction, I was able to obtain a physical extraction, which is a copy of the memory module from beginning to end.

Q.  Is that the one that you previously described as the best one?

A.  Yes.

Q.  Okay.

A.  The most thorough.

Q.  The most thorough.  Got it.

All right.  Was that software available to everybody at that time?

A.  When I did the extraction?

Q.  Yes.

A.  Yes.  Yes.

Q.  All right.  And before that?

A.  Before that, we had a limited amount of devices.  So we would have to put in a request and have it shipped somewhere

else, to an office that actually had the Premium at that time to get that processed.

Q.   Okay.  All right.  What was the kind of extraction that was conducted on that device prior to the Cellebrite Premium extraction?

A.   There was an Advanced Logical extraction and a File System Extraction.

Q.   Okay.  And at that time, did that software have the capability of capturing WhatsApp data?

A.   At that time, no.

Q.   Okay.  So what was the FBI's procedure with respect to a situation like that, when you knew you wouldn't be able to get all of the information off of a device?

A.   If a device is supported with another software, like, for example, Cellebrite Premium, we try and process a device with that software.

Q.   All right.  But if the software was not available, how would an investigator, if you're familiar, go about getting information from WhatsApp?

A.   In that case, they would have to physically scroll through the device and take pictures.

Q.   Okay.  And was that consistent with the FBI's policies regarding collection of electronic evidence at the time?

A.   If that was the only way to obtain the evidence, yeah. There were tools for that, yes.

85

Q.   Okay.   Would taking photographs of certain information, such as WhatsApp on a device, require turning the phone on?

A.   Yes.

Q.   I believe that at some point you mentioned that a cell phone is considered a live device.

A.   Yes.

Q.   Okay.   What did you mean by that?

A.   In order to interact with the cell phone, do an extraction, or to do anything with it, we have to turn the device on, which means it's a live system at that point.   There's software running the operating system, operating system functions that are running in the background.   That's something that happens when you're using a live device.

Q.   Okay.   Operating systems running in the background.   What does that mean in terms of the information that you get when you extract a device, a mobile device?

A.   Well, as you conduct the extraction, right, you know, there's a possibility that some data could change because of the functions of the operating system.   If there's stuff that's -- for example, maybe calendar events, if you have cache data, which is temporary storage, sometimes some of the applications will keep that and at some point in time they delete that information.   That's not something that we control. That's something that's done in the background with the operating system.

Q.   Okay.  So is it fair to say that there are functions on a cell phone that can cause changes to the information on it?

A.   Yes.

Q.   That are part of the way the phone works?

A.   Yes.

Q.   Okay.  Now, we've talked about taking a phone off the network in order to preserve the evidence that is on the device.  Does the best practice of taking a cell phone off of the network have anything to do with whether the device gets turned on and off once it's off the network?

A.   In my experience, when a device is put in airplane mode, and we turn it back on, the device is the still in airplane mode.

Q.   Okay.  Is there any best practice that you're aware of guiding law enforcement to refrain from turning a cell phone on and off?

A.   If you -- if you're going to process the device or try and conduct an extraction, or look at the device, you have to turn it on.  It's not like computer hard drives that you can pull out a hard drive and look at it.

Q.   Okay.  Would turning a phone on and off cause new data to be written on the device?

A.   It could affect time stamps on the device, yes.

Q.   And would that happen regardless of whether or not the phone is on the network?

A.   Yes.

Q.   All right.  Now, let's say that you powered on a cell phone, and you clicked through certain photographs on the phone.  Could that affect the data that you receive when you do an extraction?

A.   Yes.

Q.   How?

A.   When you click on a picture, normally, on your phone you see a small picture, what we call a thumbnail.  If you click on that picture, you see the full-sized image.  That could create a cache file in the device, which is a temporary file that is created because we were actually looking at that photograph at that moment.

Q.   Okay.  What is a cache file?

A.   Cache file is a temporary storage on the device.  It stores different types of information, depending on the application.  And once it doesn't need it anymore, at a certain point in time, it gets deleted from the device.

Q.   We talked a little bit about this, but do cell phones also have settings that cause data to be automatically deleted off the phone?

A.   You could, yes.

Q.   Can you talk a little bit more about those settings.

A.   Sure.  Let's see.  Messages.  For example, on an iPhone -- on your iMessages, you could have that set so when you delete

88

your messages it goes to a little trash can.  And you could have the trash can delete it immediately, you can delete it manually yourself, or you can have it set to delete at 30 days, for example.  And then at 30 days, it's emptied out.

Q.  And what about some of the developer settings that we talked about earlier?  How could that affect when items get completely wiped from a phone?

A.  That had to do with the SQLite databases.  So a lot of the applications on the phone use SQLite databases; really light, it's very fast, it makes for a great user experience.  So when you delete information from there, you're in WhatsApp, and there's a contact you don't want to have anymore contact with, you just delete them.

As I mentioned, that goes to temporary storage area. Right?  And at some point in time, depending on how the developer created the software in the program.  It's going to go into the database and say:  "Okay.  I'm going to get rid of this contact."  And so the contact is deleted and that file is deleted from that temporary storage.

Q.  Would turning a phone on and off affect law enforcement's ability to view and recover deleted files?

A.  No.

Q.  What if the files are set to be deleted from the SQLite database?

A.  Once again, if the files have already been deleted from the

SQLite database and the WAL file, they are no longer recovered because they're no longer on the device.

Q.   Right.  But let's say that you have a cell phone that's off, and then you turn a cell phone on, and the developer set the software to delete after a certain period of time.

A.   Yes.

Q.   Would that affect law enforcement's ability to recover and review deleted items?

A.   Those deleted items, yes.

Q.   Can you explain that a little bit more.

A.   As I mentioned before, so we delete the information, it gets deleted from the SQLite database, goes to the WAL file. The WAL file commits it to the SQLite database, and then it gets deleted from the WAL file and from the SQLite database.

If it's not there, we can't extract it then.  If there's no data, we can't extract it.

Q.   How does turning a phone on and off affect that?

A.   Well, we don't know when the developers had the action -- that set up.  So you can turn the phone on five or six, seven, eight times, and maybe on the seventh time is when the database inside is like:  "All right.  This is where it's going to get deleted now," because it's time, it's within a certain timeframe or a certain boundary.

Q.   Okay.  Now I want to talk about backdated messages.  Would it be possible for somebody to add backdated information onto a

cell phone?

A.   I'm not currently aware of technology that could do that, but it very well may exist.  There would more than likely be indicators if that were to happen, though.

Q.   Okay.  What kind of indicators?

A.   So let's say, for example, you sent five messages, and you backdate those messages.  Maybe when you see them in your conversation list, you'll see them commingled.  Right?  But the way the SQLite database works is, when you have messages come in, it gives them a number, what's called a primary key, and it's in sequential order.  So if you have 10 messages, one through 10, and let's say number five is deleted, it's not going to reuse the number.  So any messages that are added, regardless of the date, would show up at the bottom of the list.  And let's say that would be 11, 12, 13, 14, 15, for example.  So you would see that they came in after those particular messages.

Q.   So you would expect to see indications of backdated messages when you conduct an extraction?

A.   You would see it when you look at the database.

Q.   Other than a remote wipe, how could the data on a cell phone be altered after its seizure by law enforcement?

A.   If someone went in the device and intentionally deleted messages.

Q.   Can somebody go into a cell phone and change the dates on

preexisting data and chats that you're aware of?

A.   It would take sophisticated software to do that, and that would leave traces of what's being done.

Q.   Based on your review of the information on Government's Exhibit Number 3, did you see any indication of anything like that?

A.   Of evidence being put on the device by someone, no.

Q.   Now, in the case of Government Exhibit Number 3, were you able to ascertain whether the cell phone was password-protected?

A.   There was no password on the device.

Q.   So if a cell phone is powered off -- withdrawn.

     What is considered the best practice with respect to preserving electronic evidence on a cell phone that is not password-protected?

A.   If it's not password-protected, and we can get back into the device, we put it in airplane mode to sever the connection, and we turn it off.

Q.   So is it consistent with the FBI's policies and procedures to power a phone on and off in that circumstance, when trying to review it for evidence?

A.   Yes.

Q.   Are you aware of any guidelines that limit the number of times that a cell phone can be powered on and off while it's in FBI custody?

A. No.

Q. Did you come across any evidence that the cell phone, Government's Exhibit 3, was taken in and out of airplane mode while it was in law enforcement custody?

A. Not that I could see, no.

Q. Did you come across any evidence that law enforcement planted any evidence onto Government's Exhibit Number 3?

A. No.

Q. In your review of Government's Exhibit 3, did you come across any evidence that law enforcement deleted evidence off of the device?

A. No.

Q. And in fact, when you review the contents of a cell phone extraction, can you see when the data was deleted?

A. I think there was a couple items that -- no, not the day that it was deleted. The date of conversation. So that data wasn't there, the actual date of deletion.

Q. Can you see who deleted it?

A. No.

Q. In the past, have you come across circumstances when a cell phone user has deleted incriminating evidence from a device?

A. Yes.

Q. And how were you able to determine that?

A. In that particular instance, I have two cell phones, and I can see the conversation between the two individuals. And on

one of the devices, most of those messages were actually missing from that device, and the other conversations with other people were still on the device.

Q.  And on the device that had the missing evidence, was there any indication that the messages had been deleted?

A.  I'm trying to remember the case.  I don't remember if we recovered those messages or not.  I'm sorry.

MS. KLEPACH:  All right.  One moment.

(Pause in proceedings.)

MS. KLEPACH:  No further questions.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon, Mr. Soto.

A.  Good afternoon.

Q.  How are you today?

A.  I'm doing well.  Yourself?

Q.  Good.  Thanks.

Let's talk in general about the idea of searching a cell phone.  Okay?

A.  Yes.

Q.  It's similar to searching a house, because you go inside private property, correct?

MS. KLEPACH:  Objection to the characterization.

Counsel is testifying.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  I'm sorry.  Could you repeat the question.

BY MR. FEIGENBAUM:

Q.  Okay.  Let's start this way:  As you understand it, being trained in cell phone forensics, a cell phone is private property, correct?

A.  Yes.

Q.  And your understanding in your training is that when you have private property you have to have a search warrant to go into it, correct?

MS. KLEPACH:  Objection.  Calls for a legal conclusion.

MR. FEIGENBAUM:  He talked about --

THE COURT:  If the witness knows.  Overruled.

THE WITNESS:  Yes.

BY MR. FEIGENBAUM:

Q.  And so part of your work is you want to make sure you have a search warrant before you search a phone?

A.  Yes.

Q.  So when you have a search warrant to search a cell phone, you're looking for the contents of the cell phone, correct?

A.  If that's the request on the search warrant, yes.

Q.  Well, the purpose of doing what you called an extraction is to find out what are the contents of the cell phone.

A.   Yes.   To extract the data, yes.

Q.   Just like in a house, if you have a search warrant for a house, you want to see what the contents of the house are, right?

A.   Yes.

Q.   And when you receive a cell phone like you did, Exhibit Number 3, you made sure you had a search warrant, correct?

A.   Yes.

Q.   Okay.   That search warrant was from February 26th, 2020, right?

A.   That sounds about right, yes.

Q.   When you received the -- let me ask it this way:   Did you actually yourself receive the cell phone, the physical cell phone, Exhibit Number 3, or did you receive a copy of it?

A.   I received the physical device when I processed it.

Q.   Okay.   So you took out or extracted the contents of the physical phone using a Cellebrite extraction tool?

A.   Yes.

Q.   So when you moved it -- and where did you put it when you took it out?

A.   When the data was copied, I provided it to another examiner that did the parsing and processed the report.

Q.   Okay.   Do you give it to that other examiner as a flash drive or how did you give it to him?

A.   In our lab, we have what we call a storage area network.

So I copy the data to that storage area network, and then he receives it, verifies it, and then proceeds to work with it.

Q.  So receiving a copy -- another examiner receiving a copy of what was inside the phone, that's not the search itself?

MS. KLEPACH:  Objection.  Calls for a legal conclusion.

THE COURT:  Overruled.  I'll allow that.

THE WITNESS:  I'm sorry.  Could you please repeat the question.

BY MR. FEIGENBAUM:

Q.  Okay.  So you have got the phone.  You hook up the Cellebrite thing --

A.  Yes.

Q.  -- and it takes out the contents and you can put it somewhere else, the contents?

A.  Yes.

Q.  That's not a search.  The moving it from the phone to somewhere else itself is not a search.  It's making a copy and putting the copy somewhere else, correct?

A.  Not entirely.  So if I may explain.  So when we get a request to process a phone or digital media, I get a request and I get the legal authority.  Right?  And once I have the legal authority, that's what gives me the authorization to conduct the extraction on the phone.

Q.  No.  I understand.  But my question is a little bit

different.

A. Okay.

Q. When it's in the phone, it's in point A, correct?

A. Yes.

Q. And those contents, when they're put somewhere else, that's point B, correct?

A. Yes.

Q. The transfer from point A to point B is not a search that gives you a list of the contents. It's just moving the contents from A to destination B?

A. I'm sorry. I'm -- with the legalities -- when I do the extraction, for me, that's executing the search warrant.

Q. Okay.

A. I may be confused.

Q. Let me try again.

A. Sure.

Q. Has a report been generated of the contents of the phone when it goes physically from point A to point B? Or once it gets to point B, then a software program is run to find out what the contents are?

A. Yes.

Q. Correct. So the physical moving of the contents from the phone to the destination is not yet the search. The search occurs when, at point B, the Cellebrite software is run, generating an intrusion or a search of the contents, finding

out what the contents are?

A.   No.  I didn't understand the question.  I'm sorry.  Can you rephrase that question.  I'm really sorry.

Q.   Let's say I'm standing here, and I'm you, and I've got the phone and I take out all the stuff.  And I walk over here to the examiner, and I say:  "Here, you, Ms. Examiner at point B, here's the contents," no search had occurred by you walking from over here to over there.  Examiner at destination B is actually going to do the search by running the software?

A.   Again, so the examiner is going to parse the data to provide it so they can search the data, correct.

Q.   So the search is when the software is run, correct?

A.   For the extraction, yes.

Q.   Okay.  The search warrants that you say you always verify to be able to do a search using the software, they have an expiration date, don't they?

A.   No.

Q.   Have you looked at a search warrant to see if it says:  "Search warrant signed on a certain date, search must be completed by another date"?

A.   No.  What I've seen is that the search warrant is signed, and then it has to be commenced usually within 14 data days of issuing the search warrant.

Q.   Okay.  Has to be commenced?

A.   Started, yes.

Q.   All right.  Can you start the search after those 14 days?

A.   After the date that's stipulated, no.

Q.   Right.  So if the search is run within the time that you're allowed to by a judge, and then a year later you want to do another search -- a year later, you want to do another search, you can't commence that other search after the first date expired?

MS. KLEPACH:  Objection.  Calls for a legal conclusion.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Are there certain rules that are like the Golden Rule to make sure that when you search a cell phone what you're getting is accurate information?

A.   When you extract -- when the data is extracted from the device, the software creates what we call a hash file, kind of like a digital fingerprint, to kind of verify the data on the device.

Q.   Okay.  Well, let me mention some rules, and you tell me if they're kind of like Golden Rules to make sure a cell phone is properly searched.  Okay?

A.   Sure.

Q.   Rule number one:  "Evidence on the phone must not change after it's seized," after it's taken into law enforcement possession.

A.   That's a reference to best practices, more precisely, to what we call dead box forensics.

Q.   Well, do you agree that the evidence on the phone must not changed after the police take it into custody?

A.   Okay.  Yes.

Q.   "All procedures done must be documented to preserve the chain of custody."

A.   Yes.

Q.   Did you, in this case, as to Exhibit 3, Mr. Hernandez's phone -- did you review documents for the entire chain of custody after the phone was seized?

A.   I saw the chain of custody, and I signed the chain of custody when I took the phone out of our evidence container to process it.

Q.   On that chain of custody, who does it say first had possession of Mr. Hernandez's phone?

A.   I don't remember off the chain of custody.  But my understanding would have been Special Agent Spielvogel initially collected that device.

Q.   And where did Agent Spielvogel get the phone from?  From whom did he get the phone?

A.   I don't know.

Q.   So if your chain of custody that you have documents -- say Agent Spielvogel was the first person to take possession of Mr. Hernandez's phone, and you found out later that somebody

else had possession of it, would that change your opinion?

A.   I'm sorry?

MS. KLEPACH:  Objection.  Calls for speculation.

THE COURT:  If the witness knows.  Overruled.

BY MR. FEIGENBAUM:

Q.   Do you know whether Mexican police had that phone for a few days before they gave it to Agent Spielvogel?

A.   It's my understanding that they seized the device.

Q.   Okay.  And do you have the chain of custody documents from the Mexican police?

A.   I don't work with those chain of custodies.  We have our chain of custody from when the FBI is in possession of the device.

Q.   Do you agree that all state and federal police agencies have certain rules and procedures for preserving the integrity of cell phone evidence?

A.   Each agency would have their best practices and guidelines for computer forensics, yes.

Q.   And do you agree that the US Department of Justice -- you work for the US Department of Justice?

A.   Yes.

Q.   In the FBI?

A.   Yes.

Q.   And do you agree that the Department of Justice has "Forensic Examination of Digital Evidence, a Guide for Law

Enforcement," that dictates how you should handle evidence?

A. Yes.

Q. And one of the principles in that guide is that: "Digital evidence, by its very nature, is fragile and can be altered, damaged, or destroyed by improper handling or examination."

Do you agree with that?

A. Yes.

Q. And are you familiar with the Reasonable Computer Forensic Laboratory Protocols from the FBI?

A. Yes.

Q. And do you agree with this protocol: "When handling mobile phones, there are good reasons for leaving the device on or powering it off. First, leave the phone on when you want to block signals and you place the device in airplane mode or seal it in a Faraday bag, and process the phone within 24 hours because the battery will drain and turn the phone off"?

A. That's part of the best practices, yes.

In addition that, we also have portable batteries to keep the phone on, so it doesn't die on it us within 24 hours.

Q. And: "Power the phone off when you want to preserve evidence."

A. Yes.

Q. Additionally, do you agree that to safeguard the evidence, you seal the phone in an evidence bag and submit it for examination?

A.   Yes.

Q.   And you don't browse.  In other words, law enforcement takes possession of someone else's cell phone, they shouldn't be browsing the phone, correct?

A.   The phone should be placed in airplane mode and then submitted for processing, correct.

Q.   Do you agree that scrolling through a suspect's mobile phone may alter evidence, while preserving evidence is the key?

A.   Yes.

Q.   Are you familiar with the Cellebrite -- the company that makes this software, are you familiar with a white paper that they issued about how to treat cell phone evidence?

A.   I have not read that document.

Q.   Do you have any evidence of what was done with Mr. Hernandez's phone while it was in the possession of Mexican police?

A.   No.

Q.   Do you know how many days the -- Mr. Hernandez's cell phone was in the possession of Mexican police before Agent Spielvogel was able to take possession of it?

A.   I believe they had it November, I think, 20 or 21, and Special Agent Spielvogel would have gotten it maybe December 7 or 8th, 2019.

Q.   So a couple of weeks at least?

A.   Yes.

Q.  Finally, let's talk about the contents of the phone being overwritten by someone doing things they shouldn't be doing after they seized the phone from someone else.  So my question is:  The contents of the phone at the time of seizure -- can there be information on it that is overridden by improper handling of the phone after seizure?

A.  Yes.  Even just having the device on can make changes, yes.

MR. FEIGENBAUM:  Okay.  Thank you very much for your answers, sir.

THE WITNESS:  Thank you.

THE COURT:  Any redirect?

MS. KLEPACH:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. KLEPACH:

Q.  All right.  Mr. Soto, the first series of questions that you were asked were whether you need a search warrant to search a cell phone.  Do you recall that?

A.  Yes.

Q.  Do you always need a search warrant to search a cell phone?

A.  Yes, or other legal authority.

Q.  What other kind of legal authority could that be?

A.  A consent to search phone as well could work.

Q.  So you don't always need a search warrant to search a cell phone?

A.  We need legal authority.

105

Q. Right.

Okay. You were also asked about whether searching a cell phone is like searching a house. Do you remember that?

A. Yes.

Q. Are you a special agent?

A. No.

Q. Have you ever searched a house before?

A. No.

Q. Okay. So do you know whether searching a cell phone is like searching a house?

A. No.

Q. Okay. You were asked about a couple of, quote/unquote, Golden Rules for making sure that a cell phone is properly searched. Do you remember that?

A. Yes.

Q. Okay. One thing you were asked is whether you agree with the proposition that evidence on a mobile device must not change. Do you remember that?

A. Yes.

Q. You started to answer something relating to dead box forensics?

A. Yes.

Q. All right. What were you trying to say at that point?

A. Within computer forensics best practices, we want to preserve the evidence and not write to it. So when you're

reading this type of information -- for example, on a computer, you can take the hard drive out, put it behind what we call a write blocker so nothing writes data to the device.  You can extract the data and process it with forensic tools.  The computer is off.  We've basically taken the hard drive all out of the computer.

In a cell phone, or a mobile device or tablet, you can't pull the memory because it's actually soldered on the motherboard within the device.  So the only way to acquire that would be to actually turn on the device so the forensic software can send commands to the phone to extract the data.

Q.  Okay.  So this concept of the data on a phone -- excuse me -- the data on a device must not change, is that something that applies to cell phones or is that something that applies to computers?

A.  That applies more to computers because cell phones are in a constant state of change because they're powered on.

Q.  All right.  And is that something that is avoidable?

A.  Don't turn on the phone?  But you wouldn't be able to extract the data from the device.

Q.  Right.

You were also asked about procedures for chain of custody. Okay.  Are you familiar with Mexican law enforcement's procedures for documenting chain of custody?

A.  No.

Q.   Do you know if Mexican law enforcement even has procedures for documenting chain of custody?

A.   No.

Q.   Is it fair to say that the only chain of custody procedures that you're familiar are those relating to your role as a digital forensic examiner with the FBI?

A.   Yes.

Q.   Do you know if Mexican law enforcement has best practices with regard to taking a device off the network?

A.   I don't know.

Q.   Is it possible that Mexican law enforcement procedures differ from those of the digital forensic community in the United States?

A.   It's possible.  But again, I don't know.

Q.   You were also asked about whether it is the best practice to turn in a phone for extraction within 24 hours.  Based on your experience, is that always possible?

A.   No.

Q.   Why not?

A.   It depends on where the search took place.  Let's say, for example, the search took place up in West Palm Beach, at one o'clock in the morning, and they weren't able to bring it down to our evidence control room to have us process it.  It would still go through the process of chain of custody, getting sealed up, getting prepared to be placed in our evidence

108

control room.

Q.   All right.   And is that assuming that you already have legal authority to search the phone?

A.   Whoever executed that search warrant would have legal authority to -- a search warrant, and they would have seized that device.

Q.   Okay.   So let's back up.   Let's say that somebody is arrested, and a cell phone is taken from them pursuant to their arrest, and there's no search warrant.   In that scenario, would it be possible to extract the cell phone within 24 hours?

A.   Not without legal authority, no.

Q.   Right.   And in your experience, can obtaining legal authority to search that cell phone take more than 24 hours?

A.   It could.   Yes.

Q.   Could it take weeks?

A.   It depends.   It could.   Yes.

Q.   Does that mean that the evidence that you get off of that cell phone is somehow unreliable?

A.   No.

Q.   Does that mean that the cell phone -- withdrawn.

     You were also asked about whether scrolling through a device may alter the evidence.   Do you remember that?

A.   Yes.

Q.   Okay.   Based on the circumstances that we've described, is it possible -- it always possible for law enforcement not to

scroll through a device in order to get the evidence that is needed?

A.   Not always possible.

Q.   Okay.  Why not?

A.   If it's a new application -- or depending on the version of the application, we can't extract that data or that information from the device, the case agent may have to scroll through the device and take pictures to preserve that evidence.

Q.   Does that mean that the reliability of the remainder of the evidence on the phone is somehow less?

A.   No.

Q.   Does that mean that somehow information was deleted off of the device because of something law enforcement did?

A.   There could be items deleted in the sense that the operating system is running, and we talked about the cache files and the database getting updated while the device is still powered on.

Q.   But is that something that is within the control of law enforcement?

A.   Not the operating systems operations, no.

Q.   You were also asked about how many days the phone was in Mexican law enforcement custody before the FBI took possession of it.  Do you remember that?

A.   Yes.

Q.   Okay.  Despite the fact that there were several weeks

between the date of seizure by Mexican law enforcement and the date that the FBI received the cell phone, did you observe any evidence of deletion by law enforcement?

A.  No.

Q.  Did you observe any evidence of tampering by law enforcement?

A.  No.

Q.  Did you observe any evidence of law enforcement or anyone else placing new information on the device?

MR. FEIGENBAUM:  Judge, I would just ask, when the question is law enforcement, which law enforcement is she asking about.

THE COURT:  If you can narrow it.  Thank you.

BY MS. KLEPACH:

Q.  All right.  So let's go back.

In the extraction that you reviewed, did you observe any evidence that Mexican law enforcement deleted any evidence from the device?

A.  No.

Q.  Did you observe any evidence that the FBI deleted any evidence off of the device?

A.  No.

Q.  Did you observe any evidence that Mexican law enforcement tampered with the device?

A.  No.

Q.   Did you observe any evidence that the FBI tampered with the device?

A.   No.

Q.   Did you observe any evidence that Mexican law enforcement backdated messages on the device?

A.   No.

Q.   Did you observe any evidence that the FBI backdated messages on the device?

A.   No.

Q.   Finally, you were asked a series of questions regarding whether the contents on a cell phone can be overridden.  Is that a function -- or can that be a function of the settings set by the developers?

A.   Yes.

Q.   Is that something that is within the control of law enforcement?

A.   Not the operating system functions, no.

Q.   Okay.  One moment.

     (Pause in proceedings.)

BY MS. KLEPACH:

Q.   I asked you a series of questions about how you know that there hasn't been any deletion, or tampering, or placing of backdated messages on the phone.  How do you know?

A.   As far as the backdated messages, I'm sure we talked about that, where if someone were to put messages on the phone and

try and backdate them, the way the SQLite database works, it keeps sequential order of all the messages.  So if you have messages one through 10, and you try to insert messages between two, three, and four, for example, you -- if you change the dates on the device, when you go and look in the database, you will see the numbers wouldn't go in between.  They would actually be sequential, and you would have messages before, 11, 12, 13, 14, and 15.  They would show down at the bottom because the SQLite databases don't use that primary key.

Q.  So to be clear, items 2, 3, and 4 would still -- would not be present on the device, even if somebody added new messages backdating them; is that right?

A.  If they added messages to the device, and they were in the device, they would still show up in the database.  Just where they would show up, that would look odd.

Q.  Right.

And did you observe any indication of that on Government's Exhibit Number 3?

A.  No.

Q.  Now, with respect to the evidence of -- or lack of evidence of tampering, can you speak a little bit more about how you know that law enforcement didn't do anything to tamper with the device, or what you didn't see?

A.  Okay.  I didn't see those type of anomalies that we mentioned with backdating messages.

Q. Okay. And what about with respect to deletion? Was there any evidence that either Mexican law enforcement or the FBI deleted evidence from the device?

A. There are items deleted from the device. I think there were some conversations. But they don't have -- I didn't see a deleted date or time on those.

Q. Okay. So there's no way to know?

A. Not from what I saw.

MR. FEIGENBAUM: Your Honor, I haven't been objecting, but she's been leading the witness.

THE COURT: Sustained.

BY MS. KLEPACH:

Q. All right. Can you talk a little bit more about what you saw with respect to the deleted items on the phone.

A. Within the deleted items, I think there were -- trying to remember -- maybe there were text messages or instant messages, and they have a date -- start and end date for the conversation. And then the rest of them, besides those three, don't have a date or time stamp for when the conversation started or ended. It didn't retain the metadata. Sometimes we don't get that metadata and it does not show me the date when it was deleted.

Q. Is it possible that the user of the cell phone deleted those items?

MR. FEIGENBAUM: Judge, calls for speculation. Is

something possible --

THE COURT:  Sustained.  Sustained.

BY MS. KLEPACH:

Q.  Was there any indication of who deleted the items from the device?

A.  No.

(Pause in proceedings.)

MS. KLEPACH:  No further questions.

THE COURT:  All right.  Is Mr. Soto excused?

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  Thank you, sir.

You are excused.

(Witness excused.)

THE COURT:  How we doing, Ladies and Gentlemen?  Do we need a break or are we ready to continue?

If you need a break, just raise your hand.

Okay.  Let's go ahead and take a 10-minute recess.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury not present, 2:35 p.m.)

THE COURT:  Okay.  We're on a 10-minute recess.

(Recess from 2:35 p.m. to 2:49 p.m.)

THE COURT:  All right.  Welcome back.

Both sides ready to proceed?

MS. KLEPACH:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  Okay.

COURT SECURITY OFFICER:  Let me make sure that they are ready, Judge.

THE COURT:  Okay.

(Pause in proceedings.)

COURT SECURITY OFFICER:  They're ready, Judge.

THE COURT:  Okay.  Let's bring them in.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 2:50 p.m.)

THE COURT:  And welcome back, Ladies and Gentlemen.

And please be seated, everyone.

And the Government's next witness.

MS. KLEPACH:  The United States calls Arturo Ortega.

(Pause in proceedings.)

THE COURT:  Hi.  Good afternoon, sir.

Mr. Ortega, let me ask that you remain standing, raise your right hand to be placed under oath.

ARTURO ORTEGA, GOVERNMENT WITNESS, SWORN

THE COURT:  Please be seated, sir.

Once you're fully seated, if you will state your full name, spelling your first and last name, please.

THE WITNESS:  My name is Arturo Ortega.  First name A-R-T-U-R-O.  Last name O-R-T-E-G-A.

MS. KLEPACH:  May I inquire?

THE COURT:  Yes.  Of course.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.  Good afternoon, sir.  How are you?

A.  Good.  And you?

Q.  Good.  Thank you.

Where do you work?

A.  I work at the Federal Bureau of Investigation as a digital forensic examiner.

Q.  What does that entail?

A.  I am tasked with preserving, extracting, and processing digital evidence and providing those results to the investigative team.

Q.  How long have you been employed as a digital forensic examiner with the FBI?

A.  About a year and three quarters.

Q.  Okay.  What did you do before that?

A.  Before that, I was an anesthesia technician.

Q.  What is your educational background?

A.  My degree is in -- a bachelor's of science.

Q.  In what?

A.  In biological sciences.

Q.  When you first joined the FBI, in order to become a digital forensic examiner, did you have to go through any training?

A.  Yes.

Q.  What kind of training is that?

A.  A variety of training.  But pertaining to this, it would be a class for specifically mobile devices.

Q.  And did you have to receive any certification --

A.  Yes.

Q.  -- in order to extract mobile devices?

A.  Yes.

Q.  What certification is that?

A.  It's called the Mobile Program.

Q.  And do you have to be -- do you have to engage in any sort of proficiency testing in order to continue your work as a digital forensic examiner?

A.  Yes.

Q.  What proficiency testing is that?

A.  It's a yearly proficiency exam that they give you to either extract or image any digital evidence to keep your currency with the certification.

Q.  And are you current with that requirement?

A.  Yes.

Q.  Are you still engaged in any sort of training with the FBI?

A.  Yes.

Q.  What sort of training is that?

A.   As far as, more or less, moot court or Capstone, meaning I have not finished the full training yet, but I'm on board to finish it.

Q.   All right.  And are you currently certified to extract mobile devices?

A.   Yes, I am.

Q.   Have you ever testified before?

A.   Yes, I have.

Q.   Have you ever been qualified as an expert in state or federal court?

A.   Yes, I have.

Q.   Have you ever been denied expert qualification?

A.   No, I have not.

        MS. KLEPACH:  At this time, the United States moves to qualify Mr. Ortega as an expert in digital forensics.

        MR. FEIGENBAUM:  No objection, Your Honor.

        THE COURT:  All right, then.

BY MS. KLEPACH:

Q.   All right.  Mr. Ortega, as it pertains to this case, did you conduct the extraction of a cellular device?

A.   Yes, I did.

Q.   Do you recall what kind of cellular device that was?

A.   I believe it was an iPhone 13.

Q.   Okay.  Can you describe how you conducted that extraction.

A.   I was provided that device by the case agent.  The device

was already in airplane mode.  I used the extraction through GrayKey.  It gave me a Full File System, and it was processed through Cellebrite, and I generated a report for the case agent.

Q.   What is GrayKey?

A.   GrayKey?  It's a commercial tool that we use to extract cell phones.

Q.   Okay.  And after you performed the extraction, did you save the data or did you save the extraction?

A.   Yes.  We make a master copy.

Q.   Okay.  And how did you do that?  What is a master copy?

A.   A master copy is -- once we get the extraction initially, we make a master copy and give it to our Evidence, in case we ever have to go back to the original.  We never work off the original.

Q.   Okay.  And was that master copy stored in some way?

A.   Correct.  In our Evidence Department.

Q.   Was it sealed?

A.   Yes.

Q.   Okay.  Did the cell phone that you extracted belong to Ramon Reyes Aranda?

A.   The owner name indicated by the tool -- correct, the owner name was Ramon Reyes.

Q.   Okay.

          MS. KLEPACH:  Permission to approach the witness?

THE WITNESS:  You may.

BY MS. KLEPACH:

Q.  All right.  Mr. Soto [sic], I've just handed you what is in evidence as Government's Exhibit 38, and what has been marked for identification as Government's Exhibit 39.  Do you have that in front of you?

A.  Yes, I do.

Q.  Okay.  Do you recognize Government's Exhibit 38?

A.  You gave me two different exhibits.

Q.  All right.  With respect to the cell phone.

A.  Correct.  To the cell phone, that is Exhibit 37.

Q.  Excuse me.  Thirty-seven.  Do you recognize 37?

A.  Yes, I do.

Q.  What is that?

A.  That is an iPhone 13 that I extracted.

Q.  Is that the cell phone that you extracted in the manner that you just described?

A.  Yes.

Q.  Okay.  Now, what is Government's Exhibit 38?

A.  It is the master copy that I made off the original --

Q.  Okay.

A.  -- device.

Q.  And does that hard drive contain all of the data that you extracted from Government's Exhibit 37?

A.  Correct.

MS. KLEPACH:  No further questions.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon, Mr. Ortega.

A.  Good afternoon.

Q.  How are you, sir?

A.  Good.  And yourself?

Q.  Good.  Thanks.

So the phone that you were involved with was relating to a person named Ramon Reyes?

A.  The owner name indicated by the tool, correct, indicated Ramon Reyes as the owner name.

Q.  Okay.  And did you have any involvement at all with any cell phone from Javier Hernandez?

A.  No, I did not.

Q.  Okay.  Okay.  I think that's it.  Thank you, sir.

THE COURT:  Any redirect?

MS. KLEPACH:  Just a couple questions, Your Honor.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MS. KLEPACH:

Q.  In addition to creating the hard drive that's in front of you, did you upload the information in any way for investigators to review?

A.    Yeah.

MR. FEIGENBAUM:  Your Honor, beyond the scope.

THE COURT:  Sustained.

MS. KLEPACH:  All right.  No further questions.

THE COURT:  All right.  Is Mr. Ortega excused?

MS. KLEPACH:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right, then.  Thank you, sir.  You are excused.

(Witness excused.)

THE COURT:  And the Government's next witness.

MS. KLEPACH:  Yes, Your Honor.

The United States calls Stephen Farlow.

Your Honor, we're just checking to see if the witness was outside.  He was parking about 10 minutes ago.  So he should be here.

THE COURT:  All right.  Certainly.

(Pause in proceedings.)

MS. KLEPACH:  He's in the elevator, Your Honor.  He should be here in a minute.

THE COURT:  Of course.

(Pause in proceedings.)

MS. KLEPACH:  Your Honor, may I retrieve the exhibits that were left with the witness?

THE COURT:  Yes.  Thank you.

MS. KLEPACH:  Thank you.

(Pause in proceedings.)

MS. KLEPACH:  Our apologies, Your Honor.

THE COURT:  All right.  Good afternoon, sir.

THE WITNESS:  Good afternoon.

THE COURT:  Mr. Farlow?

THE WITNESS:  Yes.

THE COURT:  Mr. Farlow, if you'll come forward.

Let me ask that you remain standing, raise your right hand to be placed under oath.

OFFICER STEPHEN FARLOW, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Have a seat.

Would you please state your name and also spell it for the record.

THE WITNESS:  Stephen Farlow.  S-T-E-P-H-E-N.  Last name, F-A-R-L-O-W.

COURTROOM DEPUTY:  Thank you.

MS. KLEPACH:  May I inquire?

THE COURT:  Yes.  Of course.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  Where do you work?

A.   US Customs and Border Protection.

Q.   What do you do there?

A.   I'm an officer assigned to the Miami Sea Port, and I'm also a task force officer with Homeland Security Investigations.

Q.   Okay.  How long have you worked with Customs and Border Protection?

A.   Twenty-one years.

Q.   How long have you been a task force officer with Homeland Security Investigations?

A.   About eight months.

Q.   What does that entail?

A.   I work with Homeland Security in their investigations, assisting in any other needs, as far as our -- accesses to our databases to assist in their investigations, also providing assistance as far as the surveillance and stake-outs and stuff of sorts.

Q.   How does that differ from your duties and responsibilities as a CBP officer?

A.   As a CBP officer, my main duties were inspections -- inspection work, arrivals and departures of passengers, and vessels coming and departing from -- arriving and departing from the United States.

Q.   When you say:  "Inspections," inspections of what?

A.   People's persons, cargo, basically, anyone arriving on a cruise ship, departing on a cruise ship, any kind of cargo

125

entering in the US, exiting the US, containers.  My last assignment was vehicles.  I did outbound vehicle enforcement, inspecting vehicles outbound to various countries around the world.

Q.  Okay.  What does that entail, inspecting outbound vehicles?

A.  We have a automated export system, where, when you export a vehicle, you enter data into the system.  That's usually done by a broker or a freight forwarder, when you want to export your vehicle to another country to be sold.  And they enter the data into the AES system.  It will capture the USPPI, which is the United States Principal Party of Interest, where the person is currently in possession of the vehicle.  That information is entered, name, date, addresses, phone numbers.  And the ultimate consignee is in there, which is the person that's going to receive the vehicle in the other country; name, date, phone numbers, addresses for that person.

As well, at the Port of Miami -- this is not true for other ports, but at our port we receive ownership documents as well in that same system electronically, and that could entail a title, bill of sale, certificate of destructions, any kind of ownership documents that pertain to that vehicle to indicate who the appropriate owner is to that vehicle at the time and who it's going to be assigned to in the country it's departing.

Q.  How long did you do outbound vehicle enforcement?

A.  Approximately, four years.  I'm still currently doing

126

investigations with stolen vehicles and vehicles that are fraudulently obtained and sorts. So I currently still investigate those vehicles.

Q. Okay. So now let's switch gears and talk about the recordkeeping practices of Customs and Border Protection. Are you familiar with those?

A. Yes.

Q. Does Customs and Border Protection keep a record of all inbound and outbound travel from the United States?

A. Yes.

Q. Okay. Sorry. Go ahead.

A. It's captured in the -- we call it an ADIS system, Arrival and Departure Information System. So any kind of travels are captured in the system when you enter or exit the country, whether it be a cruise ship, airline, or border crossing.

Q. Okay. What sort of information is gathered and kept in those records?

A. The subject's biographical information, name, date of birth, the documents that they used to enter and exit the country, passports, visas. It could be -- if they're a visitor, it would be a B1/B2 visa.

So it just depends if they're a citizen, a legal permanent resident -- but any of that information, the travel document that's used to travel in and out of the US, they are captured in the system, as well as any inspections that are done on an

individual, if they go in for a secondary inspection. And all the information that was gathered from that secondary inspection would be inside the system as well.

Q. Earlier, you used the word "subject." Is this information maintained for all people traveling in and out of the United States or just particular people?

A. Every single person. It doesn't pertain to any specific person. So every single person that travels -- legally travels inside and outside the country is captured in the system.

Q. Okay. So does that mean that CBP keeps a record any time -- or every time anyone enters and exits the country?

A. Yes, ma'am.

Q. You also mentioned the term "secondary inspection." What is that?

A. If a person is selected for a secondary inspection, based on information or something that catches the officer's eye, a subject can be sent for a secondary inspection, where they do a thorough inspection of the luggage, his person, and ask any kind of questions that they may want to ask pertaining to that individual.

Q. All right. Is that information that you just described kept in the regular course of CBP's business?

A. Yes.

Q. Okay. Is it the regular course of business for CBP to make and keep the records that you just described?

A.   Yes.

Q.   Are those records made at or near the time of the recorded transaction?

A.   Yes.

Q.   And are the entries in these records made by a person who is under a business duty to do so accurately?

A.   Yes.

MS. KLEPACH:   Permission to approach the witness?

THE COURT:   You may.

BY MS. KLEPACH:

Q.   All right.  Officer Farlow, I just handed you what's been marked for identification as Government's Exhibit 66.  Do you recognize those records?

A.   Yes.

Q.   Okay.  Are those the travel records pertaining to Javier Hernandez?

A.   Yes.

Q.   And are the records in Government's Exhibit 66 kept and maintained in the manner that you just described?

A.   Yes.

MS. KLEPACH:   At this time, the Government offers Exhibit 66 into evidence.

MR. FEIGENBAUM:   No objection, Your Honor.

THE COURT:   Without objection, admitted into evidence.

(Government's Exhibit 66 received into evidence.)

129

MS. KLEPACH:  All right.  May we publish?

THE COURT:  You may.

BY MS. KLEPACH:

Q.  All right.  Officer Farlow, I'm going to have you walk us through the information that's contained in these records.

A.  Okay.

Q.  So the first couple of columns, self-explanatory.  I'm circling the column that reads:  "Doc type."  What does that mean?

A.  The document that was presented for the arrival or departure from the United States.  So it could be a passport.  In this case, the "P" would indicate a passport.

Q.  And what does the "IG" --

A.  I believe at some point he had a Global Entry Card of some type, and that's what he used at that -- on that date.

Q.  All right.  And what does the document number refer to?

A.  The document number is the number assigned to that government-issued document.

Q.  So for example, for the passport, would it be the passport number?

A.  Yes.

Q.  Okay.  Now, the Date/Time column, what does that refer to?

A.  The date and time that the information was captured and the encounter of the person was entered into the system.

Q.  Got it.  So that does not refer to, for example, the date

130

and time of the flight or other journey that the person took?

A.  No.  Because the flight could have landed, and it takes time to gather their belongings and luggage.  So at the time they presented their self to the CBP officer for inspection, that's the time that it's captured.

Q.  Okay.  And what does "Carrier Code" refer to?

A.  The carrier code is the assigned number to a particular airline.  In this instance -- so "AA" would probably mean American Airlines.  "YX," I believe is Republic.  But their carrier code is assigned to the particular carrier, and to indicate which airline is responsible for transporting the passenger.

Q.  All right.  And what is the carrier number?

A.  That would be the flight number.

Q.  Okay.  What does "I/O" indicate?

A.  That would be "I" for inbound, and "O" would be outbound.  So arrival is inbound.  Outbound is departure from the US.

Q.  What does the site refer to?

A.  The site where the inspection occurred.

Q.  All right.  Now let's go to the column "INSP."  What does that stand for?

A.  That would be the inspection column, but it doesn't necessarily mean there was a secondary inspection.  It just means -- I'm sorry.  The inspection -- that's the inspect -- well, it used to be called inspectors.  But that would be the

officer's information there, who did the -- the inspection.

Q. All right. And so certain of these columns read: "Global Entry Kiosk."

A. Yes. Customs and Border Protection now has a kiosk where you enter your passport and it captures the information. It does a facial recognition of your face, and it matches it with the biographical information on the passport and determines whether you can proceed or not. And that particular inspection was done at one of those kiosks for the Global Entry.

Q. All right. So does that mean there would not necessarily be a particular officer assigned?

A. Right. Unless he went to secondary inspection, that would be his final inspection and he would proceed.

Q. And do you know what these -- the redacted rows refer to?

A. That would be the officer's name.

Q. Okay. Now, what about "Type," the following column after inspection?

A. That's APIS. So that's a passenger information system. The airlines kind of enter their data, and it transmits through us. So that would be -- the APIS would be an airline transmitting their information to us, and it's captured. And the "Pedestrian" would be where he crossed at the border.

Q. All right. So does "Pedestrian" mean that the individual crossed the border on foot, as opposed to on an airplane?

A. Right.

132

Q.  And these last two columns over here?

A.  That would be the arrival location and the departure location, and they all have codes of where they come from.  CUN is Cancun.  MIA is Miami.

Q.  So let me just move ahead to Page 4 of this document.  So it looks like there's a legend here at the bottom.  With respect to the first set --

A.  Uh-huh.

Q.  -- of information, "LOC," what information is contained in this legend?

A.  Those are the codes for the airport.  Whether it be foreign or domestic, they have a code.

Q.  Okay.  And then what about "Site Code"?

A.  Site Code would be the actual location of the -- the crossing or arrival of the --

Q.  Okay.  Now let's go back to Page 1.  So here we see, under "Status," some of the columns indicate on board and others indicate -- excuse me -- some of the rows indicate on board and some indicate not on board.  Can you talk about how CBP knows whether a person has gotten on board, in this case, the airplane?

A.  Again, the airline will transmit their data for the passenger, whether he boarded or did not board the aircraft, and it's transmitted to us.

Q.  All right.  And so is that information gathered by the

airline and then transmitted to CBP?

A.   Yes.

Q.   All right.   And is the information contained in these records -- from what date to what date is the information on these records?

A.   For these three or four pages?

Q.   Yes.

A.   It starts sometime in 2016 and goes to 2019, looks like December of 2019.

Q.   Okay.   Now I just want to talk about a couple of different entries.   Let's start with that first row.   Does that information reflect an inbound flight on December 25th of 2019?

A.   Yes.

Q.   Okay.   And where did the -- where did Mr. Hernandez depart from and arrive in?

A.   Departed Cancun and arrived in Miami.

Q.   Okay.   Now let's talk about the entry that is dated October 17th of 2019.   What does this mean in terms of where Mr. Hernandez would have entered?

A.   We'd have to refer to the legend for site code L238.   But if my recollection is correct, it's Hidalgo.

Q.   One moment.

     (Pause in proceedings.)

BY MS. KLEPACH:

Q.   There we go.

Case 1:22-cr-20557-BB   Document 243   Entered on FLSD Docket 06/08/2024   Page 134 of 192

134

Okay.  Does that help?

A.   Yes.  Site code L238 is Hidalgo International Bridge.

Q.   Where is that?

A.   In Texas.

Q.   Is that the border with Mexico?

A.   Yes.

Q.   And how did Mr. Hernandez enter the country?

A.   It appears he walked across.  A pedestrian.

Q.   Okay.  Did you observe any indication, from your review of these records, that there was any travel beyond US/Mexico travel?

A.   I believe there was one to Colombia in 2016.

Q.   And other than the 2016 travel to Colombia, were there any other countries that Mr. Hernandez returned from?

A.   To my recollection, no.

Q.   Okay.  Now, we started off by talking a little bit about your experience in vessel -- excuse me -- in vehicle exportation requirements.  Do you remember that?

A.   Yes.

Q.   Okay.  So now can you walk us through what the requirements are in order to export a vehicle from outside -- from inside of the United States to outside of the United States?

A.   Are we referring to a vehicle that's going for sale or just entering and crossing -- crossing and possibly coming back.

Q.   Let's talk about both.

A.   When a vehicle crosses the border outbound, usually there's no inspection.  They just -- they proceed to their country of -- whether it be driving through Mexico or Canada borders, no inspection is usually done on outbound vehicles, unless it's a secondary inspection, but I do believe they capture the license plate.

Q.   What about for the exportation of vehicles?

A.   For exportation, usually, if you're going to export a vehicle, you will get a freight forward and have the vehicle presented to CBP through Automatic Export System, AES.  And like I said, the documents will be attached to that -- we call it a filing.  And then the information's captured, who the USPPI is, the owner of the vehicle, and the person that's going to receive the vehicle, and the country it's going to.

Q.   Okay.  So let me just stop you right there.  So in order to export a vehicle from the United States to outside of the United States, does the individual who is conducting that exportation need to conduct a filing with CBP?

A.   Yes.

Q.   Okay.  And what information is required to be contained within that filing?

A.   In the filing, you'll have the -- usually, who is the owner of the vehicle on the title you'll have as the USPPI.  So the last person to have any contact with the vehicle or is in possession of the vehicle will be in the filing, name, phone

number, address, and where it's going to.  The ultimate destination will be entered in there as well, who is receiving the vehicle, whether it be a company or a person, name and telephone number.  As well, there are going to be documents attached, ownership documents of the vehicle.

Q.   What kind of ownership documents?

A.   It could be a title, a certificate of destruction, a certificate of origin.

Q.   Is there a particular kind of document that is required or is it any document that shows a legitimate transfer from one person to another?

A.   It has to be an official document that's issued by a state, whether it be a title, certificate of destruction.  Bill of sales only usually apply to other types of vehicles, like a lawnmower or motorcycle, something that doesn't require it to be -- have a title in a state -- an ATV, sort of.  They won't have a title.  They'll have maybe a bill of sale or certificate of origin.  They won't, say, have a title.

But any kind of vehicle that is registered and operates on a roadway will have some kind of ownership documents that's a title, or if it's an operable salvage title, a certificate of destruction, if they bought it in an auction, or something like that.

Q.   And how do those documents have to be submitted to CBP?

A.   Here in Miami, we collect them electronically.  A freight

forwarder will scan them and send them to our document imaging system, and they will be transmitted to us, and we view them on the same AES filing.

Q. What is a freight forwarder?

A. A freight forwarder is somebody that transports merchandise to another country for our purposes, as for Customs, and assists the process of getting that merchandise from our country to another country or back into the country inbound or outbound.

Q. All right. And do the documents for this exportation have to be presented any period of time prior to its exportation?

A. It must be presented 72 hours for a vehicle before it exits the country, so it gives us the time to review the documents and verify its legitimacy.

Q. Why does CBP have these export requirements?

A. In order to determine whether this vehicle is legitimate and was obtained in a legitimate fashion.

Q. All right. So we're talking about legitimacy. Do you know whether or not vehicles that are exported have to have VIN numbers?

A. Yes.

Q. Okay. They do?

A. They do.

Q. All right. Is that a requirement of CBP or of the Department of Transportation?

A.   Well, the Department of Transportation regulates the VIN aspect of the vehicles.  But all vehicles must have a VIN -- a 17-character VIN assigned to the vehicle and follow certain patterns of how the VIN enters -- all the characters in the VIN mean something.

Q.   All right.  And are those requirements -- and those are requirements that are set by the Department of Transportation or by CBP?

A.   Department of Transportation.

Q.   All right.  And then how is the CBP requirement with respect to exportation different than the Department of Transportation requirement just to have a VIN?

A.   So we'll take the information that's given to us concerning the vehicle, the VIN number, and we will verify in our databases that we have access to -- if everything matches to the VIN and to verify that it is legitimate.

Q.   So to be clear, is the VIN one of the ways that CBP can figure out whether or not a vehicle is being legitimately exported?

A.   Yes.

Q.   Can a vehicle be legally exported without the documentation that you just described?

A.   Not legally.

Q.   Okay.  As part of your involvement in this case, were you asked to review whether there were any exportation records

associated with a Toyota Tundra that beared VIN number 5T as in Tom, F as in Frank, B as in boy, W5, F as in Frank, 10JX769479?

A.   Yes.

Q.   Were there any exportation records that were associated with the exportation of that Toyota Tundra?

A.   No.

        MS. KLEPACH:  One moment.

    (Pause in proceedings.)

        MS. KLEPACH:  One moment.

    (Pause in proceedings.)

BY MS. KLEPACH:

Q.   Okay.  So we talked about -- thank you -- some of the requirements for -- well, we talked about the records that CBP maintains with respect to inbound and outbound travel.  What about sea voyages?

A.   They are captured as well, yes.

Q.   Okay.  Which kind of sea voyages are captured?

A.   Voyages -- commercial vessels, cargo vessels.  Any vessel that's transporting passengers or goods from one country to another is transmitted to CBP.

Q.   What about private vessels?

A.   Private vessels usually proceed outbound without inspection or reporting.

Q.   Why?

A.   I can't answer that, other than that's not part of CBP's

requirements.

Q.  So to be clear, it's not part of CBP's requirements to have an individual notify the agency that they are leaving the country?

A.  Correct.

Q.  Okay.  And in what circumstance would they be required to do that?

A.  Only if it's a vessel, again, transporting passengers or cargo for a fee.

Q.  Okay.  So we talked a little bit about Global Entry as well.  You mentioned that the person has to scan their passport in order to enter the United States through a Global Entry kiosk.  Do you remember that?

A.  Yes.

Q.  Do individuals who are part of the Global Entry Program also have another document that's assigned to them?

A.  A passport.

Q.  Would they also have a Global Entry Card?

A.  Yes.

Q.  Can you talk about a little bit about what somebody needs to do in order to get a Global Entry Card.

A.  You have to fill out the appropriate paperwork, submit it to CBP.  They will decide whether you're a candidate to receive the Global Entry Card, and they will ask for an interview, and you will conduct an interview with CBP to finalize the approval

of the Global Entry Card.

Q.   Okay.

        MS. KLEPACH:   Just a moment.

    (Pause in proceedings.)

BY MS. KLEPACH:

Q.   So now let's talk about a couple of the particular entries on Mr. Hernandez's travel records.

    All right.   So I've just underlined the second entry on the fourth page.   Can you tell us -- or walk us through the information reflected in that entry.

A.   Are we talking about December 26th, 2017?

Q.   Yes.   I'm sorry.   That was not the most artful underlining.

    Go ahead.

A.   Okay.   Yes.   Looks -- appears to -- Mr. Hernandez arrived to the Port of Miami and -- departed Cancun and arrived in Miami, yes, on December 26th, 2017, on AA158.

Q.   And based on what you're seeing in these records, was there any corresponding outbound flight or record?

A.   No.

Q.   So now let's talk about the entry dated 12/24/18.

A.   Okay.

Q.   Walk us through that one.

A.   Mr. Hernandez arrived in Miami from Cancun on December 24th, 2018, on American Airlines Flight 1157, and he presented himself for inspection at the Global Entry kiosk.

Q.   All right.   Now let's go to 2019.   Can you walk us through the first entry on this page.

A.   June 15th, 2019?   Is that one that you're referring to?

Q.   Yes.

A.   Yes.   Mr. Hernandez arrived from Cancun into Miami on June 15th, 2019, on American Airlines Flight Number 1132, and went to the global kiosk and presented himself for inspection.

Q.   Do you see any corresponding outbound travel relating to that flight?

A.   No.

Q.   Now let's look at the last entry on this page, July 21st, 2019.   Can you walk us through that one.

A.   Yes.   Mr. Hernandez arrived in Fort Lauderdale from Cancun on June 21st, 2019, on Flight NK710, and he presented himself for inspection at the Global Entry kiosk.

Q.   Based on your review of these records, was there any corresponding outbound flight?

A.   (No verbal response.)

Q.   Let me know if you can see that.

A.   No, there is not.

Q.   Okay.

     (Pause in proceedings.)

          MS. KLEPACH:   All right.   Just one moment.

     (Pause in proceedings.)

BY MS. KLEPACH:

Q. I forgot to ask you -- on 12/24/2018, we talked about the inbound flight from Cancun to Miami. Was there a corresponding outbound flight for this entry?

A. No. It doesn't appear.

Q. All right. So with respect to the entry on 12/3/2018, was Mr. Hernandez on board that flight?

A. No. He was not on board.

MS. KLEPACH: I have no further questions.

THE COURT: Cross-examination.

MR. FEIGENBAUM: One moment, Your Honor. I'll be right there.

THE COURT: All right.

(Pause in proceedings.)

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q. Good afternoon, Mr. Farlow.

A. Good afternoon.

Q. How are we doing today?

A. Good.

Q. So the first thing I want to ask you is: The records that the prosecutor showed you, those kind of records are kept for everybody?

A. Yes.

Q. It wasn't that Mr. Hernandez was targeted when those

records were generated, correct?

A. That is correct.

Q. And you also mentioned that there's one entry where Mr. Hernandez walked across the border from Mexico to the United States.

A. Yes.

Q. And he was a US citizen at the time?

A. Yes.

Q. And he presented his Global Entry Card?

A. Yes.

Q. Okay.

MR. FEIGENBAUM: Before I forget, can I have -- do you have the records on the computer or ...

MS. KLEPACH: Here you go.

BY MR. FEIGENBAUM:

Q. So I just got to try to figure this out. Do you remember whether the -- I think there's like four pages of these travel records that your agency collected. Do you remember if there's any departures by air from Miami to Mexico?

A. I believe there was a few.

Q. Okay. Just tell me when you find one. I'll go through all four pages. I don't know where to find it myself. You know, like if this page -- if there's any departures by air to Mexico, let me know. If not, I'll go to the next page.

A. Yes. We have 10/1/2019. October 1st there is an outbound

to Cancun from Miami.

Q.   Which line is that?

A.   It will be -- one, two, three, four, five -- the sixth one down from the top.  It's in the "O/I" column, which is in the middle of the page.

Q.   Okay.

A.   So that was 10/1/2019.

Q.   So where there's an "O," that's an outbound flight?

A.   Yes.

Q.   That first page, there's -- one, two, three, four -- five outbound airline flights?

A.   There is.  But he's not on board of -- one, two -- three of them.

Q.   Okay.

A.   He is on board on October 1st, and on the bottom of the page on 7/21/2019.

Q.   Okay.  Let me go to Page 2.  Any on here?

A.   Yes.  4/1/2019, he flew into -- I believe MID is Merida, Mexico.

Q.   Merida?

A.   Merida, yeah.

Q.   Okay.  All right.

A.   I don't know if there's -- I didn't see -- there is in the -- yeah.  Another one on 3/1.

Q.   All righty.  How about here?

A.   I see none.

Q.   Okay.

A.   There is one on the bottom to Medellin, Colombia on 2/19/2016.

Q.   All right.  Do you know if Mr. Hernandez's wife is from there?

A.   I do not.

Q.   Okay.  Now, I think you mentioned that if someone drives a vehicle from the United States into Mexico there's no -- I don't know how you described it.  There's no like stopping that person.  Let's say they are in Texas, and they drive a vehicle on into Mexico, there's no -- what did you call it -- no inspection?

A.   There's no direct inspection.  And if an officer chooses to pull a vehicle over and do an inspection, they can.  But it's not mandatory that it's stopped.

Q.   And is there an inspection on the Mexican side?

A.   Yes.  When they enter Mexico, the Mexican authorities will do their inspection.

Q.   Right.  And one of the things the Mexican authorities would do -- would try to see if the vehicle is stolen when it's entering Mexico?

A.   I can't attest to that.

        MS. KLEPACH:  Objection.  Calls for speculation.

        THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   So from the United States' point of view, driving a vehicle, a motor vehicle, from the United States into Mexico is okay?

A.   Yes.

Q.   Now, there was some talk you had about freight forwarders. Freight forwarders are companies that take care of the paperwork to send merchandise from the United States to another country, correct?

A.   Yes.

Q.   So if you were going to ship a vehicle to Mexico by boat, let's say, you would use a freight forwarder?

A.   Yes.

Q.   Or if you -- I guess if people have the money, they could send a vehicle from the United States to Europe by airplane -- cargo airplane, they would use a freight forwarder?

A.   Yes.

Q.   So when the prosecutor was asking you about filling out paperwork and making certain declarations, and that kind of stuff, that's when somebody is sending a vehicle either by boat or by airline to another country?

A.   Correct.

Q.   Not when they're driving it themselves?

A.   Correct.  Unless they indicate it is for sale and they present documents to us.

Q.   Understood.

Now, I can't remember exactly what the prosecutor asked you about the Toyota Tundra, but there were some questions about that?

A.   Yes, there was.

Q.   That Toyota Tundra was not reported stolen, was it?

A.   It was not.

Q.   Okay.  And if someone travels by boat, not a commercial -- like a cruise ship line, and goes to Mexico, there would be no record of them leaving the United States -- like a pleasure craft.  And if they went to Merida, or Cancun, or some resort area in Yucatan, the fact that there's no exit from the United States' record for that particular voyage, but there is a flight coming back, because the person leaves the boat there, like -- let me ask it this way:  Are you aware that some people travel by pleasure craft to Mexico and then at some point fly back to the United States?

A.   I would say it is possible.

Q.   Okay.  So when they fly back, but there's no corresponding exit by aircraft or by airline, there's nothing wrong with that?

A.   I would assume the Mexican authorities would have their inspection or immigration process for whoever enters their country.  But for our purposes, we do not document the outbound.

Q.   All right.  So you're a federal law enforcement officer?

A.   Yes.

Q.   And you are tasked with enforcing US laws?

A.   Yes.

Q.   That includes US statutes or the formal law in which Congress passes, correct?

A.   Yes.

Q.   And you're also tasked with enforcing the Code of Federal Regulations, which are regulations that are generated after the regular statute is passed, correct?

A.   Yes.

Q.   Okay.  So the prosecutor was asking you about some things that you enforce, including travel in and out of the United States by vessel, and I have a question for you.  Are -- I think you already answered it, but I just wanted to have it as part of the record.  There are certain vessels, when they leave the United States, that they are required to have a clearance, which is a form that's filled out, correct?

A.   Yes.

Q.   Okay.  And the ones that have to have the clearance are vessels -- vessels that are foreign -- all foreign vessels departing for another port or place -- oh, no.

     Let me read this:  "Unless specifically excepted by law, the following vessels must obtain clearance from CBP, Customs and Border Protection, departing from a port or place in the

United States.

"All vessels departing for a foreign port or place.

"Number one, all foreign vessels departing" --

MS. KLEPACH:  Objection, Judge.  Counsel is reading from something that's not in evidence.

THE COURT:  Sustained.

MR. FEIGENBAUM:  Let me do it this way, Your Honor -- I understand.

BY MR. FEIGENBAUM:

Q.  May I hand you a -- would you be familiar with something called --

MR. FEIGENBAUM:  Let me give it to him first, and then he can identify it, I think, so I don't get an objection.

(Pause in proceedings.)

MR. FEIGENBAUM:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. FEIGENBAUM:

Q.  I handed you an exhibit marked for identification only.  Could you tell us what the identification exhibit number is.

A.  I see two Xs at the bottom.  Is that what you're referring to?

Q.  Yes.  So Defense Exhibit for identification only XX.  And is this one of the Code of Federal Regulations which are part of the laws that you are familiar with?

A.  I'm not familiar with this law, but I see it here in front

of me.

Q.   Okay.  Do you see where it says:  "The following vessels" -- at the bottom of the page -- "are not required to clear"?

MS. KLEPACH:  Objection, Judge.  The witness has said he's not familiar with that provision of the law.

THE COURT:  Sustained.

MR. FEIGENBAUM:  Okay.  I understand.

BY MR. FEIGENBAUM:

Q.   Earlier, you testified, though, that leaving the United States on a pleasure craft did not require clearance, correct?

A.   Right.

Q.   Okay.  You can set that down.

Let me see if I have any other questions for you -- and I appreciate your patience.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   I think that's it.  I appreciate your responding to my questions, and I wish you a good day.

A.   Thank you.

THE COURT:  All right.  Any redirect?

MS. KLEPACH:  Yes, Your Honor.  One moment.

(Pause in proceedings.)

REDIRECT EXAMINATION

BY MS. KLEPACH:

Q.  All right.  Just a couple more questions, Mr. Farlow.  You were asked about flights with corresponding outbound travel.  And I believe you were starting to say something about Mr. Hernandez not being on board for many of these corresponding outbound flights.  Do you recall that?

A.  Yes.

Q.  Can you just walk us through the different flights for which he was not on board.

A.  For outbound travels?

Q.  Yes.

A.  That will be 9/1/2019, not on board.  That's toward the middle of the page.  On 8/26/2019, not on board.  8/26 -- yeah.

And again, there was another flight.  So there was two separate flights on the same day he didn't board that were apparently booked.

Q.  And then what about on 12/25/2019?

A.  Yes.  12/25/2019.  But that's an inbound flight.

Q.  All right.  Now let's go to Page 2 of Government's Exhibit 66.  Can you walk us through the flights for which he was not on board.

A.  There's an inbound flight he's not on board, 1/9/2019, and 12/3/2018.

MR. FEIGENBAUM:  Your Honor, could we ask for a

clarification of what that means.

THE COURT:  Certainly.  Do you want to just ask the witness to explain?

MS. KLEPACH:  Yes.

BY MS. KLEPACH:

Q.  Mr. Farlow, can you please explain what it means when these records say that the individual was not on board.

A.  The individual did not board the aircraft and fly either in or out on that aircraft on that date and time.

Q.  And remind us:  How do we know that?

A.  It says:  "Not on board," and that's transmitted by the airlines.

MR. FEIGENBAUM:  If permitted, could I ask, is that because there was a reservation and no boarding afterwards?

THE COURT:  All right.  Why don't you give the Court the legal basis for the objection?  Do you need further clarification?  Because we're not going to go back and forth. This is redirect.

MR. FEIGENBAUM:  Vague and ambiguous.

THE COURT:  All right.  So why don't we, if we could -- Ms. Klepach, if you could ask the witness to clarify.

MS. KLEPACH:  Yes, Your Honor.

BY MS. KLEPACH:

Q.  So can you explain that.  What if somebody -- what would trigger an entry that reflects the person is not on board?

Would it be an airline reservation or something else?

A.   Yeah.   I mean, they booked a flight and they didn't show up to board the aircraft at the terminal.   They didn't board to fly.

Q.   All right.   So the flight would have had -- would have to have been booked in order for there to be an entry in this log showing that the person was not on board?

A.   Yes.

Q.   Now we're on the third page.   Looks like there's only one entry here that reflects that Mr. Hernandez was not on board. What day was that?

A.   3/3/2018.

Q.   All right.   And then, finally, on Page 4.

A.   That would be 1/26/2018, not on board.

Q.   Thank you.

All right.   So you were asked whether or not the Toyota Tundra that you testified about was reported stolen.   Did you investigate anything relating to that Toyota Tundra as part of your involvement in this case?

A.   Yes.

Q.   What did you learn?

A.   I learned that VIN number is owned by someone, I believe, in Mississippi, currently registered in the state and has been for some time.   It was originally owned by someone else and then it was sold.   And that vehicle never left the country, and

it was never in Mr. Hernandez's possession.

Q. Okay. So as part of your role with CBP investigating or assisting in the regulation of vehicle exportation, have you become familiar with cloned VINs?

A. Yes.

Q. Can you talk a little bit more about what it means to clone a VIN.

A. A person would get a VIN number that is a good VIN that's on a vehicle, take that VIN number and attempt to register it in -- normally in another state. If you did it in the same state, they would probably capture the discrepancy. But if you do it in another state and register it, it usually will not get flagged.

Q. So does that mean that a person who owns a vehicle would be notified if their VIN was cloned?

A. They -- more than likely not, unless something occurred with the VIN, an accident, or attempting an export, or a law enforcement encounter or something like that, and they would be able to, in some instances, realize there's some kind of duplicate VIN.

Q. Are you familiar with instances in which a vehicle owner would not be informed that their VIN has been cloned?

A. Not normally. In some instances, insurance is going to catch it, or the state, or someone normally is going to capture it at some point. I'm not saying at what point. It could be

years.  But normally, you know, all the reporting -- like for instance, CARFAX.  If you ran a CARFAX on the vehicle, you would see there's some kind of discrepancies with the ownership in Mississippi and what occurred here in Florida.

Q.  Can somebody clone a VIN without stealing the car that's actually associated with that VIN?

A.  Yeah.  They would just have to get the VIN number itself, and then present some kind of document to either a dealer or the DMV to obtain a document.  But normally, that document would be fraudulent because there's no way to legally obtain a document to properly register the vehicle, if it's already owned by someone else.

Q.  All right.  You were also asked about whether there are any reporting requirements for leaving the country on a pleasure craft.  Do you remember that?

A.  Yes.

Q.  Is it legal to leave the country with a stolen boat?

A.  No.

(Pause in proceedings.)

MR. FEIGENBAUM:  By the way, Judge, objection. Assumes facts not in evidence.

THE COURT:  I'm sustaining the objection.

BY MS. KLEPACH:

Q.  All right.  Mr. Farlow, you were also asked a series of questions about whether it's legal to drive a car from the US

to another country.  Do you remember that line of questioning?

A.  Yes.

Q.  And then, at some point, you said something about there being an exception to when somebody could legally drive from the US to another country in a car.  You remember that?

A.  I believe it was if you knew the vehicle was going to be for sale ahead of time.

Q.  All right.  So can you elaborate on that?  If you knew the vehicle was going to be for sale ahead of time, what would you have to do?

A.  The same requirements as you would with any vehicle that's going to be exported and sold overseas, which would be to present the information to CBP and file a document -- file the appropriate documents, and filing an AES would have to be completed, and we would have to review it, and it would have to be the same 72 hours for us to inspect the vehicle.

Q.  All right.  And does that requirement apply only to freight forwarders?

A.  Which requirement?

Q.  The requirement to fill out all of these reporting forms.

Let me ask it a different way.  If an individual is driving a vehicle from the United States to another country, with the intention to sell it, is that person bound by the reporting requirements that you have been describing during your testimony?

A.   Yes.  Normally, the vehicle, in my experience, would get trucked over or flown over to the other country.  I mean, in most instances, it wouldn't be driven, but it is possible, and --

Q.   But if it is driven, do the same requirements apply?

A.   Yes.

MS. KLEPACH:  No further questions.

THE COURT:  All right.  Is Mr. Farlow excused?

MS. KLEPACH:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Judge.

THE COURT:  All right thank you, sir.

(Witness excused.)

THE COURT:  Ladies and Gentlemen, are we ready to continue?

All right.  The government's next witness, please.

MS. KLEPACH:  The United States calls Special Agent Christopher Adam Goodrich.

(Pause in proceedings.)

THE COURT:  All right.  Good afternoon.

Sir, if you'll step forward, remain standing, raise your right hand to be placed under oath.

SPECIAL AGENT CHRISTOPHER ADAM GOODRICH, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

You can have a seat.

Could you please state your name and also spell it for the record.

THE WITNESS:  My name is Christopher Goodrich. G-O-O-D-R-I-C-H.

COURTROOM DEPUTY:  Thank you.

MS. KLEPACH:  May I inquire?

THE COURT:  You may.

MS. KLEPACH:  And Judge, actually, before I begin, at this time, the United States offers into evidence Exhibits 62 through 64, pursuant to Rule 902(11).  I don't believe there's any objection.

MR. FEIGENBAUM:  No objection.

THE COURT:  All right.  Admitted into evidence.

(Government's Exhibits 62 through 64 received into evidence.)

MS. KLEPACH:  Thank you.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.  All right.  Good afternoon, sir.

A.  Good afternoon.

Q.  Where are you employed?

A.  With the FBI.

Q.  What do you do at the FBI?

A.  I'm currently assigned as a Cellular Analysis Survey Team member or a CAST Team member.  I'm a special agent with the

FBI.  So currently assigned to the CAST Team.

Q.  What is the CAST Team?

A.  It's a group of specialized -- specially trained agencies that are specialized in historical cell site analysis.

Q.  Did you have to go through a training and certification process to become a member of the CAST Team?

A.  I did.  It was pretty extensive.  It consisted of 18 months of training.  I have over 400 -- or I'm sorry -- 300 hours of formalized training, and I've analyzed numerous records over the years.

Q.  So what were you trained on in order to become a CAST agent?

A.  So it's a multistep process.  It consisted of CAST basic, which is like a weeklong training course, where we learn what phone records are and essentially how to map them.  We learn the basics.  Then that's followed by an advanced course.

From there, we go very deep into each of the phone carriers, AT&T, T-Mobile, and Verizon.  And when I went through, there was Sprint as well.  So each day we broke down each of the carriers, what was important about each one of the carriers.  And then we had a homework assignment at night.  We turned that in, and it is graded by our peers.

And if you pass that, you go on to an FTX course.  It's a three-day course where we essentially find phones.  So they give you a fugitive.  You're working one on one with an

instructor.  And if you can find the phone, find the person, then you can advance to the certification course.

The certification course was -- it's two phases.  The first phase is very academic.  You have 40 hours -- yeah, 40 hours of radio frequency theory training from professors at the Florida Institute of Technology, then a week of training from the actual carriers themselves.  So people -- engineers, legal process people from T-Mobile, Verizon, and AT&T come in and give us firsthand training on their networks.

Get through that, and then you go to the next two weeks where you're given one case.  You work it from start to finish, and you have a moot court, where you are grilled by your peers and in a courtroom setting.  It's probably the most difficult thing I've done ever done academically.  And I got through that, I certified, and then I've been working records ever since.

My first two years, I was in a part-time capacity, but I pretty much worked phones full-time.  Then, in December, I became what's called a national asset.  So I'm one of, I think, between 12 and 16 people in the FBI that do this full-time.  So I'm assigned to headquarters up in Washington, DC, but I sit down here in Miami.

I pretty much deal with all of Florida and the international stuff of Latin America.  So I've worked cases from -- anywhere from bank robbery, kidnapping, international

kidnapping, drug trafficking, human trafficking. You name it, I've pretty much worked. A lot of homicide cases as well. So ...

Q. All right. And when you say you have worked it, what does that mean?

A. So basically that essentially means I'm provided phone records. So I'm provided what's called call detail records. These are records that are kept in the normal course of business by the phone carriers. It's essentially a time, a date, who is calling who, and most importantly what tower and site of the tower that they are using. And from that, I can generally map a general approximate location. So I can't really exactly give you precisely where a phone is, but I can give you a general region. And I'll explain more of that a little later when we start looking at my maps.

Q. All right. A few more general questions about CAST. What agencies can request CAST services?

A. I've worked with numerous agencies, state, local, tribal, federal agencies, international partners. I've worked numerous international cases as well.

Q. Have you ever been an instructor for or provided training on cell phone analysis?

A. I provide training pretty frequently. I would say once a month. I've trained in lots of locations throughout the United States, as well as international partners.

Q.   Have you ever conducted an analysis where a person suspected of a crime has been eliminated as a result of your findings?

A.   I have.  I've been provided numerous records, where I'm the guy saying:  "Hey, this guy was -- he was in a different location from where the crime occurred.  Whoever this phone number belongs to, they could not have committed the crime," and therefore eliminated him as suspect.  I've used it both in cases where I was a case agent and cases where people are just providing me a record, and I have no knowledge of anything related to the phone other than those records.

So -- and my unit has also -- my unit, not necessarily me -- my unit has used this stuff to actually get people out of jail that were once convicted and therefore exonerated.

Q.   Have you ever testified before?

A.   I have.  I think this is -- if I'm not mistaken, I believe this is my fifteenth time.  I've been deemed a certified expert in the Southern District of Florida.  I've also testified in numerous state courts down here.

Q.   Have you ever been denied expert qualification?

A.   I have not.

MS. KLEPACH:  At this time, the United States tenders the witness as an expert in historical cell site analysis.

MR. FEIGENBAUM:  No objection, Your Honor.

THE COURT:  All right, then.

BY MS. KLEPACH:

Q.   Okay.   So your work is complicated.   Did you prepare a PowerPoint presentation in anticipation of your testimony in this case?

A.   Yes, ma'am.

Q.   What is that PowerPoint based off of?

A.   It was based off of call detail records that were provided to me by the case agent.

     (Pause in proceedings.)

          MS. KLEPACH:   May I approach the witness?

          THE COURT:   You may.

          THE WITNESS:   Yes, ma'am.   That's my report.

BY MS. KLEPACH:

Q.   All right.   Agent Goodrich, I just showed you Government's Exhibit 65 for identification.   Is that a fair and accurate copy of the PowerPoint presentation that you prepared in anticipation of your testimony in this case?

A.   Yes, ma'am.

          MS. KLEPACH:   At this time, the United States offers Exhibit 65 into evidence.

          MR. FEIGENBAUM:   No objection, Your Honor.

          THE COURT:   Admitted into evidence.

     (Government's Exhibit 65 received into evidence.)

BY MS. KLEPACH:

Q.   Okay.   So before we get into the substance of the

historical cell site analysis in this case, I actually want to show you what's in evidence as Government's Exhibit 63.  What are we looking at here?

A.   These are subscriber records for phone number ending in 4619.  They're provided by T-Mobile.  So subscriber records are just -- they contain subscriber details, account details, basically, who the phone is associated to or is paying the bill.

Q.   And is this 4619 number the same number for which you plotted the historical cell site data?

A.   Yes, ma'am.

Q.   Who is the phone number subscribed to?

A.   Javier Hernandez.

Q.   I also want to show you Government's Exhibit 64 in evidence.  What is this?

A.   These appear -- appears to be a business certification by Verizon.  And -- apologize.  This is very -- it's blurry on my end.

Q.   Yeah.  One second, please.

A.   So Verizon records just -- they come in a standard Excel spreadsheet.  So their subscriber information comes in Excel.  So it's not as pretty as T-Mobile's when it's printed out.  So ...

Q.   All right.  Is this subscriber information for a phone number associated with Ramon Aranda?

A.   Yes, ma'am.

Q.   All right.  And can you just walk us through the information that's contained in this information.

A.   It's going to be phone number ending in 5434.  There's Aranda, Ramon.  Going to be an address of 5248 32nd Ave. Southwest in Naples.

     (Pause in proceedings.)

BY MS. KLEPACH:

Q.   Okay.  So let's talk more generally about cell phones.  I'm going to turn to Page 3 of your report.

A.   So this is just our methodology.  So essentially, I take call detail records, I compare them to the tower list.  So phone companies, they know where every single tower and every single element or antenna is on their network.  They need to maintain those lists for general practice.  They want to know where it is, if it needs to be maintenanced or a lease needs to be renewed on their tower, et cetera.  So they keep these tower lists for us.

     I then compare it to the call detail record.  The call detail record, as I spoke earlier, is a time, date, who's calling who, and the location of the tower, and the site of the tower that's being used.  So with that information, I take the location of the tower or that they're -- during that call, and I compare it to the tower list.  And from that I can basically put a dot on a map and a direction that that energy is facing.

And from there, I can give you a general approximate location.

I can't tell you if the individual is in a certain building or sometimes I can't even tell if they are on a certain street. But I can tell that they're sometimes on a city block. And with that, you can generally conclude that -- direction of travel, if an individual is traveling from the east coast of Florida to west coast of Florida. If a certain crime happened at a location, I can look on a map, and I look at the records, and I can tell was he using a cell phone tower during that time. So near or in the vicinity of that crime location.

Q. All right. So how does a cell phone tower work exactly?

A. So this picture on the left, that's just a stock picture of your typical cell phone tower I'm sure everybody's seen. Cell phone towers are divided into three sectors to provide 360-degree coverage.

Now, one tower will be in one location, the other tower will be at another, and they'll have overlapping -- they will overlap. Their sectors will overlap, so that when you go from -- when you walk from one sector to another, you don't drop a call. If they didn't overlap, if that signal -- the radio frequency didn't overlap, you would drop calls. So because of that, all of South Florida, all through Alligator Alley, all through Naples, has overlapping cell -- cellular coverage. So if you start on a phone call from one tower, you can end on another, and you can do it unobstructed, you can

communicate.  So -- and that's basically how towers work.

So ...

Q.  How does a cell phone pick which cell site or which tower to use?

A.  So your cell phones are constantly scanning the radio frequency environment, if you will.  So your phone in your pocket right now, it's going through, it's determining which tower is going to provide the clearest, strongest signal.

Now, when you attempt to place a call, when you press send, it's going to choose the tower and sector that's providing that clearest, strongest signal.  Typically, that's the closest tower to the phone, but not always.  There are times where a mountain could be in your way, or a rather large building, and you're by a window, and the tower is, you know, a quarter of a mile away and it has good line of site.  So -- but generally, it's the closest tower it's going to select.

Now, after that, the phone -- the network takes over.  So your phone is essentially driving the bus and connects to that tower, and that's what gets logged in the call detail record.  After that, the network can take over.  It can put you on different cell towers as it sees fit, but you still have to have general coverage to the phone.

Q.  All right.  And what factors can impact cell site coverage?

A.  Like I said, mountains can, you know, factor in.  If you're in a basement, that can cause problems.  Elevators, those cause

problems. But what you see in the call detail records, and what I look at, there was an established connection. So that got documented in the call detail record. So there wasn't any problems with the phone or the records that I observed.

Q. In terms of cell service, is it fair to say that cell phone providers attempt to provide the best coverage that they can?

A. They do. They're multibillion-dollar companies. If you kept dropping your phone, what would you do? You'd just move to -- or I'm sorry -- dropping your phone call. You would just move to one of the other carriers. You would go -- if you're on T-Mobile, you'd just go to Verizon. If they are not providing the best optimal experience for the customer, then you're just going to move to another carrier.

Q. I believe you touched on this a little bit, but are there instances where tower coverage can overlap?

A. There are. They're actually designed to overlap. We don't have cords attached to our phones and we're not walking around. We have to have that constant communication with radio frequency, and the only way to establish that is by overlap.

Q. All right. I'm on Page 5 of your report. Earlier --

A. These are just examples. This is what it looks like -- what a call detail record looks like. As you see, working from left to right on your screen, you have the date; you'll have the time; you'll have the duration -- that duration in seconds; you'll have your call type; you have your call direction. So

that's outgoing or incoming; the calling number; the called number; the IMSI, that's like a subscriber; serial number; the IMEI, that's the equipment, so the actual phone, its serial number.

And then from -- after the IMEI to the end there, that's the stuff I'm most concerned with.  That's the tower number, the sector ID, the azimuth, and the lat/long of the actual tower.  So they give you -- T-Mobile provides you with the lat/long of the tower, and then they give you the azimuth that this antenna is pointing.

And from there, I go 60 degrees one way and 60 degrees the other way to depict that on the map.  And if you go to the previous slide, you can see how I'm going to display that on a map in the bottom left there in green.

So from there, I'm provided the center line of that -- of this -- provided the center line.  I go 60 degrees one way, 60 degrees the other.  I have to be able to display this on a map.  And that's how we do -- the actual lines, the site lines, are not indicative of any type of coverage area.  That's just something for your eye to establish which direction that antenna is facing.

Q.  All right.  And are data records different than call detail records?

A.  Yes.  We've been provided, in this case, a set of data records.  So your phone -- as I spoke of call detail records,

that's who's calling who with your regular phone calls.  Right?  Well, data records are records that are generated if your phone is establishing some type of Internet connection.

So with Apple users, if it's Apple to Apple, and you're doing blue-bubble texting, this is -- data records or data sessions is how that record is kept.

What's different about data is that I don't see any type of who is calling who.  I can't even tell what type of network activity is being used.  So I can't tell if it's WhatsApp.  I can't tell if you're watching Netflix.  I can't tell if you're communicating with another Apple device.  All I can tell is they put a time stamp with it, and like the others they provide you with a tower and a sector, and I use the tower list to derive what tower and what sector that is.

Q.  All right.  So let's talk about your analysis in this case.  I'm turning to Page 6 of your report.

Okay.  Can you walk us through what you're looking at here.

A.  Yes, ma'am.  This is a map of South Florida.  It's a map of analysis of phone number ending in 4619, from December 18th, 2018, from 7:01 p.m. to 9:56 p.m., in which we see at 7:01 -- this phone was down here in North Miami Beach at 7:01.  At 8:45, it's along Alligator Alley.  And then, at 8:56, it's down here in Marco Island.

Q.  Okay.

A.  So that's -- it's essentially showing movement from the

east coast of Florida to the west coast of Florida, specifically the Naples and Marco Island area.

Q. How do you know that the cell phone is moving?

A. Because it's operating in a manner consistent with travel. So there's time -- there's a time separation from 7:01 p.m. to 8:45 p.m. there in the middle of Alligator Alley.

So I can only -- with these phone call records, I can only plot something on the map when the phone is being used in this sense. So if he's not placing phone calls at this time, I can't -- you know, I don't have anything. However, he placed a call at 7:01 and 8:45 -- or received -- placed or received a phone call. There was network activity at 7:01, 8:45, 9:35, 9:36, and 9:56.

Q. And what -- I'm sorry. Go ahead.

A. And since they are spaced out and separated, that's indicative of travel to me.

Q. What is the last cell site activity for the 4619 number on December 18th of 2018?

A. I believe it's the 9:56 p.m. network activity down in Marco Island.

Q. All right. So the one that you circled on the leftmost part of the slide?

A. Yes, ma'am.

Q. Now, let's talk about December 19th of 2018, on Page 7. What are we looking at here?

A.   Now, we're looking at -- on December 19th, we're looking at a map of activity for phone number ending in 4619.  On December 19th, at 12:23 p.m., there was a voice call to a phone number -- so with these -- my system isn't recognizing the Mexican -- Mexico-based phone numbers.  So you'll see them displayed as 999 because they add an extra digit to their numbers.  So my system's used to US-based phone numbers.  It's kind of a glitch in the system.  We're working to get it taken out.

But that 999 number is actually a Mexico-based number.  He placed or receives an incoming call from it on December 19th, at 12:23 a.m.  So 12:23, in the early-morning hours.  And that phone is in and around Marco Island.

Q.   All right.  And is that the last network activity that you see on December 19th of 2018?

A.   I believe so, ma'am.  But I'd have to look at my next slide to be able to confirm that.

Yes, ma'am.  That was the last -- the last time I observed the phone on the US network, or on a network that I can map, was on December 19th, that previous slide.

Q.   Okay.  So let's talk about the US-based network.

Are you able to plot cell site data from -- in other countries?

A.   So T-Mobile provides us records -- they do not have access to the Mexican-based records that that phone would roam on when

over in Mexico.  So T-Mobile didn't provide cell tower locations of where that phone was roaming.

I did see on the -- on the data sessions that there was activity.  It's just there were no -- there was no cell site or tower locations associated with that.  And in my training and experience, that means the phone was roaming on another network, and I didn't have any records provided to me from Mexico.

Now, the phone could have roamed anywhere, in Mexico -- any foreign carrier it could have roamed on that generate those stalled records, but I had nothing I could map.  So ...

Q.  All right.  My next question is:  When you say it's roaming off the network, is that consistent with the cell phone being out of the country?

A.  Yes, ma'am.

Q.  So now let's talk about December 24th.

A.  December 24th, at 2:43 p.m., I observed that there was a phone call.  This is the first phone call I observed, and it was at the Miami International Airport.

Q.  When you say it was the first phone call you observed, what do you mean by that?

A.  It's the first phone call that was mappable.  So ...

Q.  Is that --

A.  It's the first cell site that was used.  Possibly, there was a data session prior to, but phone calls are what we use

that shows that the phone was active.

Q.   So to be clear, between December 19th of 2018 and December 24th of December 2018, have we looked at the last mappable data and then the first mappable data on these two slides?

A.   Yes, ma'am.  This was the first mappable phone call that there was on the 24th.

Q.   Okay.  And this is consistent with the phone being where?

A.   At Miami International Airport.

Q.   Now let's talk about slide number 9.  What are we looking at here?

A.   Similar to what we looked at before, there is three cell sites being utilized in time.  So starting at 8:35, the phone is in and around the Miami area, North Miami Beach area.  At 9:22 p.m., it looks like it's at the start of Alligator Alley.  And then, at 10:03 and 10:05, the phone is in the general area towards the end of Alligator Alley, as if it's heading towards the Naples Marco Island area.

Q.   All right.  And when you say that not all calls are displayed for demonstrative purposes, what does that mean?

A.   There are calls in between.  If there's a lot of activity -- this slide is to represent that there's travel from east to west.  If I put everything that was in there, it would take away from the slide.  There was just -- I believe there were numerous calls in between point A and point B, so I had to

remove them just for clarity for you guys.

Q.   Okay.   And now slide number 10?

A.   This is -- this shows on June 15th 2019, at 10:39 a.m., first mappable network activity on the network.

Q.   So between June 6th and June 15th of 2019, was there any mappable data?

A.   No, ma'am.

Q.   And is that consistent with the device not being on the network, like you described earlier?

A.   Yes, ma'am.   It's consistent with it roaming off the network.

Q.   Okay.   Now let's talk about Page 11.   On July 17th of 2019, where is the cell phone with the 4619 number?

A.   It's in North Miami Beach on July 17th, 2019, at 8:05 p.m.

Q.   All right.   And then what about at 10:58 p.m?

A.   At 10:58 p.m., on July 17th, there was a data session that was initiated, and it was in and around the Naples area.

Q.   Okay.   And when you say -- was this the last mappable network activity until July 21st of 2019?

A.   Yes, ma'am.

Q.   And again, is that consistent with the phone being out of the country?

A.   Yes, ma'am.

Q.   Now let's go to Page 13.

A.   On July 21st, 2019, at 7:16 p.m., the phone comes back on

the network.  I observed an incoming text message at 7:16 p.m.

Q.  And about where was the phone?

A.  It was in and around the -- in the vicinity of the Fort Lauderdale International Airport.

Q.  All right.  Now let's go to Page 14.  What are we looking at here?

A.  So this is just indicative of -- I had to show travel from Miami to the Mexico border.  So along the way, the travel started on October 16th, 2019, at 8:12 a.m.  I then observed the phone at -- last phone call at 11:40 a.m. on October 17th in and around Corpus Christi, Texas.  I later observed data sessions that put the phone at the Mexico border.  I believe that's in the next slide.

So those red dots that are in between are cell site activity.  I had to take a lot of stuff out because the phone was consistently being used.  Those are just -- those red dots were just points in time where there was cellular activity, just to show you essentially the route that he was taking.

Q.  Okay.  So you mentioned the next slide.  What are we looking at here?

A.  I observed a data session on October 7th, 2019, at 1:48 p.m., so near the Mexico border.  And this was consistent with travel by vehicle, what I looked at.  It was pretty spot on with somebody that was driving.

Q.  What makes you say that?

A.   Because they were going too fast to be running, or riding a bicycle, or taking the public transportation.  And when you're flying in an airplane, you typically lose contact with the cellular network.  So it couldn't have been flying that route.  So it was travel by vehicle.  I believe a long time ago I actually Googled the route to see how long it would take, and I think this was consistent.

Q.   All right.  And by the way, the remainder -- the other slides that we've been talking about, is that also consistent with vehicle travel -- the remainder of the cell site records we've been talking about during this time?

A.   Yes, ma'am.  Yes, ma'am.

Q.   And what makes you say that?

A.   Just the time of it.  So for him to run to Naples, that would take a while.  I'm pretty in shape.  That would take me a long time.  So yeah.

Q.   All right.  Now let's go to Page 16.  What are we looking at here?

A.   So this is, again, travel from North Miami Beach, starting at 6 -- on November 18th, 2019.  Starting at 6:41, 6:42, there were two voice calls in North Miami Beach.  And then at 11:12 p.m., there is calls in Naples.

Q.   Okay.  And what about any -- are there intervening records during this time?

A.   I can't recall.  I imagine there's data sessions that were

generated that I chose not to -- for clarity or demonstrative purposes here, but I don't believe there were any phone calls in between.

Q.   Okay.  Now, Page 17, what does this slide show us?

A.   It's a data session that was generated.  Started at 11:19, on November 19th, 2019, at 2:07 a.m.  It's in and around the Naples area.

Q.   Okay.  And then it says here that that is the last mappable record for that date?

A.   Yes, ma'am.

Q.   All right.  And was the information that you observed later on consistent with the cell phone being out of the country?

A.   Yes, ma'am.  It appeared to be roaming on another network.

MS. KLEPACH:  All right.  I have no further questions.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.   Good afternoon, Mr. Goodrich.

A.   Good afternoon.

Q.   How are you today, sir?

A.   I'm all right.

Q.   Good.

It's kind of sophisticated for me to try to understand this stuff.  But basically what you do is you plot location of a cell phone -- plot location of cell phone information from the

activity on the phone, right?

A. Yes, sir.

Q. Okay.

A. Essentially.

Q. So you're looking like where is the cell phone at a particular time?

A. I'm looking where -- which tower the phone is connecting to during a certain point in time. Yes, sir.

Q. Okay. So actually, the phone itself can be at a certain distance from that tower?

A. Yes, sir. I can't -- I can't tell where a phone is. This is not precise. This is a very general approximate location. I also can't put a phone in a person's hand. If somebody is using the phone -- somebody else is using the phone, I can't put that phone in their hand. So ...

Q. I heard one time that a cell phone tower can be as far away as like 20 or 25 miles and still pick up a signal.

A. It can pick up a signal, yeah. That's correct. But a usable signal, the signal that the phone is going to connect to -- as we discussed, it's going to connect to the clearest, strongest signal, and that's typically the closest.

And in an urban environment like we have here in South Florida or in North Miami Beach, there's cell phone towers all over the place. There's cell phone towers that cover just a small building. There's cell phone towers that cover a parking

lot.

I would expect the tower out on Alligator Alley, that one, to discovery a large distance.  But as we got closer to Miami Beach or we get closer to Naples, that range that those towers are going to cover, it's going to shrink drastically.  So their coverage is only to about 70 percent, give or take, to the adjoining cell phone tower.  Because we want overlapping coverage, but you don't want that coverage to be so large that it interferes with all the other radio frequencies in the area because then we'll have scrambled calls, if you will -- or not scrambled, but just you'll have terrible interference with the phone.

So they are designed the way they are designed, and they have very nice overlapping coverage down in South Florida.  So ...

Q.   All right.  This is what's called -- your PowerPoint was "Historical Cell Site Analysis"?

A.   Yes, sir.

Q.   And does that mean that there's only a single point of reference for plotting?

A.   I apologize.  I don't -- I don't understand your question, sir.

Q.   Okay.  Well, let me ask you this:  You were saying it's not precise when it's giving a location; is that correct?

A.   It's not precise.  And as I've said earlier, this is

general approximate location.  So I'll tell you that the phone was in North Miami Beach.  The phone was not in Orlando.  It was not in Jacksonville.  The phone was in North Miami Beach, and it conducted travel towards Naples.  And you can -- the records indicate such.

If you're in Naples, you're not connecting to a cell phone tower in North Miami Beach.  You're going to connect to a phone that's in Naples.

Q.  And of course the location, which is not a precise location, doesn't tell you whether the presence of that phone -- or whoever had control of it was at that location for a legitimate or wrong purpose?

A.  No.  I generally have no idea what the purpose of the user of the phone was, just that the user was using a phone in the areas that I indicated.  So ...

Q.  Yes, sir.  Thank you so much.

MR. FEIGENBAUM:  And no further questions.

THE COURT:  All right.  Any redirect?

MS. KLEPACH:  No, Your Honor.

THE COURT:  All right, then.

Is Special Agent Goodrich excused?

MS. KLEPACH:  Yes.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.

You are excused.

(Witness excused.)

THE COURT:  Would this be a good time to adjourn for the evening?

MS. KLEPACH:  Yes, Your Honor.  The Government has no further witnesses today, unfortunately.

THE COURT:  All right, then.

Ladies and Gentlemen, recall that we will not be in session tomorrow.  Let's look to Wednesday, which will be a full day.  We will start right at nine o'clock in the morning.

Please do remember that, as you exit and enjoy your day tomorrow, that you are not to discuss this case anyone, nor permit anyone to speak with you.  Everything learned about the case is learned in the courtroom.

I would ask that you place your juror notebooks in the jury room, and I will see you Wednesday morning at nine a.m.

Have a pleasant evening.

COURT SECURITY OFFICER:  All rise.

(Jury not present, 4:47 p.m.)

THE COURT:  All right.  Go ahead and have a seat for just a moment.

And on Wednesday morning, if we can have a lineup of the witnesses the Government seeks to bring in to testify.

MR. DOBBINS:  Yes, Your Honor.

So we do have -- we have been in contact with our -- the elderly witness, Mr. Maytum, in Upstate New York.  He would

be available to testify in the morning via Zoom, if possible. We also have -- we would be calling Ramon Reyes Aranda, and we also have Special Agent Sergio Francisco.  And we may be calling Mr. -- Professor Rosen as well.

THE COURT:  All right.  Then if we can send a Zoom link for Wednesday morning --

COURTROOM DEPUTY:  Yes.

THE COURT:  -- for the witness.

And are there any considerations that we need with regard to any of the other witnesses?

MR. DOBBINS:  I don't believe so, Your Honor.  We have two other out-of-state witnesses -- I mean -- sorry -- out-of-district witnesses that owned these boats.  They both need to come in on Friday.  Mr. Teteris is an OB/GYN, I believe, who was unable, because of surgeries and deliveries that he had scheduled, to come down earlier this week.  So we have him set for Friday.

THE COURT:  Are these witnesses coming in to identify the boat and stating that they gave no consent for the removal of the boat?

MR. DOBBINS:  That's correct, Your Honor.

THE COURT:  Mr. Feigenbaum, would there be any objection why these -- I'm just wondering why these witnesses would have to travel, if they're out of the district, to come to give testimony that, it appears based on the other

testimony -- the property manager and the owner took less than 10 minutes.

MR. FEIGENBAUM:  I'm -- I would have always been glad to stipulate to all of these things.

MR. DOBBINS:  Well, I believe the problem is, Judge, that the -- I mean, the jury should see these witnesses because, based on the statement and conversations with Mr. Feigenbaum, it appears that there is -- could be some defense that the owners were in on this, and that this was insurance fraud and so forth.  So it is important.

Now, if the Court would like us to set up some sort of Zoom link with Dr. Teteris, we're happy to try to do that, instead of bringing him all the way down.  But I would have to check with him to see if he's available on Wednesday to do that as well.  I'm sure he'd be happy to not travel.

And same thing with Mr. Mauceli, who is over in -- he lives over in Naples.  So it is not quite as much of a hardship.  But so -- however Your Honor wishes to do it, but we do believe it is important for the jury to see these witnesses and have them testify, and not just a mere stipulation, because based on the statement that was introduced by Special Agent Spielvogel, and in conversations, there appears that there's some issue as to whether these boats were freely given to Mr. Hernandez to pilot over to the Gulf of Mexico.

MR. FEIGENBAUM:  First of all, Judge, let's look at

the actual record in the trial.  Government witness Crespo Marquez testified that one of the things that the Gonzalez Vidal defendants did was to find boat owners who wanted to make fraudulent insurance claims, and they were targets and willing participants with the Gonzalez Vidal people to have their boats taken.  And Mr. Crespo Marquez also testified that Mr. Hernandez never drove any of those insurance fraud boats.  That's a matter of record in this case.

THE COURT:  All right.  Well, why don't we -- because we're getting somewhat sidetracked.  I mean, the evidence is the evidence, and the testimony obviously is the evidence.  However, this is separate and apart from witnesses who are out of the district that would like to be made available, whether it's remote means, certainly a stipulation that's between the parties.  But if both parties don't agree, then I guess the next question is:  With regard to this other witness, is there any objection to permitting him by remote means through Zoom?

MR. FEIGENBAUM:  No objection, whatsoever.

THE COURT:  All right.  Then why don't you see when this witness is available.  Liz will send a Zoom link to everyone.  I would -- and I'm sure that she's going to have a discussion with you, because we are going to need to make sure that there's a linkup through your devices as well.  And if this individual is not available until Friday, then perhaps he can be presented by Zoom on Friday with the same link.  Okay?

MR. DOBBINS:  Thank you, Judge.

THE COURT:  Is there anything else?

MR. FEIGENBAUM:  Yes.  Just one thing.  Elizabeth was kind enough to try to get me -- make sure my laptop worked with the system.  It didn't.

THE COURT:  Oh, yes.  Josue, could you call IT and see if they could come in to help Mr. Feigenbaum.

Yes.  Let's make sure that we do that for you.

MR. FEIGENBAUM:  Thank you so much.

THE COURT:  Okay.  Of course.

All right.  Take the time that you need to leave the courtroom, and I'll see everyone on Wednesday.

MR. DOBBINS:  Judge, just -- I'm sorry.  Just one more thing.  I think there was a motion in limine by the Government for a ruling to admit co-conspirator statements through other -- because obviously we have Jose Miguel Gonzalez Vidal's phone, where there are other conversations where they're discussing the overall conspiracy, as well as this Defendant's role in it.

So we had filed that motion in limine.  I believe the Court had held the -- either the motion -- I can't remember if you held it in abeyance or denied it without prejudice for us to renew that motion.

Given --

THE COURT:  I think it was deferred because the Court

didn't have enough information.

MR. DOBBINS: Right.

THE COURT: So did -- do you want to provide a proffer now or --

MR. FEIGENBAUM: Probably, if they have a limited set of the things they intend to introduce that fall under that, I'll take a look at it and I'll try to agree with them if I can. But if the Government can define those documents for me, I'll be glad to look at them.

MS. KLEPACH: Judge, I can happily highlight which conversations we are seeking to introduce, but they were already marked, listed on the exhibit list, and copies were provided for Mr. Feigenbaum.

Our position, at this point, is that in light of the evidence that's come out during the trial, specifically the testimony of Reynaldo Crespo Marquez as to the existence of the conspiracy, that we have shown that Mario Alberto Enrique Lopez, a/k/a Neco, and Gonzalez Vidal were members of the conspiracy, along with Mr. Hernandez, and therefore that the statements between the two of them, as well as the other statements laid out in the Government's motion in limine, should be admitted as co-conspirator statements.

MR. FEIGENBAUM: And how are the -- how is the Government going to have them entered in evidence, under what -- I'm not saying that right. Is the Government saying

that these are already exhibits that are part of the exhibit binders?

MS. KLEPACH:  Yes.  These are chats, reports of conversations from the cell phone, the 1B126 and 27 cell phone, which we are seeking to admit through the testimony of Agent Francisco, copies of which were provided at the beginning of the trial.

MR. FEIGENBAUM:  Okay.  I would say this:  I think the Government has fewer than 115 exhibits.  So I will look at all of those, and I will give the Government an answer, and I will give serious consideration that the Government is entitled to have those admitted.

THE COURT:  Okay.  Certainly.

MS. KLEPACH:  And just one thing for clarity, Judge. In our motion in limine, we had asked also to admit emails from Neco to Linea Peninsula.  At this stage, because Mr. Reyes Aranda has pled guilty, we are not going to be seeking to introduce those anymore.

MR. FEIGENBAUM:  That's a -- well, I'll address that. I don't have to take the Court's time for that.  That's kind of a completely separate bundle of stuff, but -- because all of that that she's talking about, Linea Peninsula and Mr. Reyes, was something that happened like in 2022, and there's absolutely no evidence that Mr. Hernandez was involved in that shipping of a vehicle by boat or something --

190

THE COURT:  That doesn't appear to be an issue at this time.

All right.  So Mr. Feigenbaum, you'll review those documents and let the Court know?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  Okay.  Is there anything else that we need to address tonight?

MS. KLEPACH:  No, Your Honor.

MR. FEIGENBAUM:  I should remain here until the tech comes?

THE COURT:  Josue, did we get a response?  Are they on their way?

MR. GUERRA:  They're working on it, Judge.

THE COURT:  Okay.  If you don't mind.

MR. FEIGENBAUM:  No.  No.

THE COURT:  And then they'll come up and assist you.

MR. FEIGENBAUM:  Regarding removing anything from the courtroom ...

THE COURT:  No.  We plan to be in session tomorrow [sic].  So you can keep your items here, and we'll just be working in chambers.  So you don't need to remove anything.

MR. FEIGENBAUM:  Okay.  There will be no like open court tomorrow?

THE COURT:  No, I don't think -- just make sure that Liz didn't schedule anything.  I don't -- nope.  So you can

keep the items here, and the courtroom will remain locked.

Okay.  Have a pleasant evening.

MS. KLEPACH:  Thank you, Your Honor.

COURT SECURITY OFFICER:  All rise.

(Proceedings concluded at 4:57 p.m.)

UNITED STATES OF AMERICA        )

ss:

SOUTHERN DISTRICT OF FLORIDA   )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 2nd day of October, 2023, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 192.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 6th day of June, 2024.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov