IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF FLORIDA
                            MIAMI DIVISION
                     CASE NO. 1:22-cr-20557-BB-1


UNITED STATES OF AMERICA,

           Plaintiff,                        October 4, 2023
                                             9:00 a.m.
       vs.

JAVIER HERNANDEZ,

           Defendant.                        Pages 1 THROUGH 159

_____


                    TRANSCRIPT OF TRIAL DAY 6
                 BEFORE THE HONORABLE BETH BLOOM
                  UNITED STATES DISTRICT JUDGE
                        And a Jury of  12



Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                    Brian Dobbins, AUSA
                    Arielle Klepach, AUSA
                    99 Northeast 4th Street
                    Miami, Florida 33132


FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                    PO BOX 545960
                    Surfside, Florida 33154-9998


COURT REPORTER:     Yvette Hernandez
                    U.S. District Court
                    400 North Miami Avenue, Room 10-2
                    Miami, Florida 33128
                    yvette_hernandez@flsd.uscourts.gov

**I N D E X**

Certificate.....................................        159


                     **W I T N E S S**

**ON BEHALF OF THE GOVERNMENT:**                         PAGE
ROBERT MAYTUM
DIRECT EXAMINATION BY MR. DOBBINS                          8
CROSS-EXAMINATION BY MR. FEIGENBAUM                       15
REDIRECT EXAMINATION BY MR. DOBBINS                       18

RAMON REYES ARANDA
DIRECT EXAMINATION BY MR. DOBBINS                         20
CROSS-EXAMINATION BY MR. FEIGENBAUM                      137


                     **E X H I B I T S**
**GOVERNMENT'S EX. NO.:**                      OFFERED   ADMITTED
 113                                             10         11
 111                                             24         24
  43                                             80         80
  43A                                            80         80
  55                                             93         93
  59                                             97         97

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-

(Call to order of the Court, 9:00 a.m.)

THE COURT:  All right.  Good morning to everyone.

MS. KLEPACH:  Good morning.

THE COURT:  Okay.  We already have the witness ready to go on Zoom.  Wonderful.

Let's go ahead and call the case and then we'll address any issues.

COURTROOM DEPUTY:  Calling Case Number 22, Criminal, 20557, the United States v. Javier Hernandez.

Counsel, please state your appearances, beginning with the Government.

MS. KLEPACH:  Good morning, Your Honor.  Arielle Klepach and Brian Dobbins for the United States, with Special Agent Sergio Francisco from the FBI.

THE COURT:  All right.  Good morning.

MR. FEIGENBAUM:  Good morning, Your Honor.  Marty Feigenbaum on behalf of Javier Hernandez.  He is present before the Court with the assistance of a Spanish interpreter.

THE COURT:  All right.  Good morning to each of you.

Go ahead and have a seat.

As I understand, our first witness is going to appear remotely by Zoom, and he is present.

This is Robert Maytum.  Is that the Government's next witness?

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  All right.  Before Elias from our wonderful IT department leaves, I just want to make sure that we have all of the screens that are working where the jurors are able to see this.

IT DEPARTMENT:  They're going to come in?

THE COURT:  They're going to come in.  But right at that moment the testimony will begin.  So Elias, do you mind just checking on those screens?

And Mr. Feigenbaum, did we resolve your issue?

MR. FEIGENBAUM:  No, but I spoke with Elias on the technical thing.  He is so kind to come at the lunch break -- the beginning of the lunch break -- probably take just a couple minutes -- to make sure I can actually connect, if that's okay with Your Honor.

THE COURT:  Yes.  Of course.  But right now you're able to see the screen and see the witness?

MR. FEIGENBAUM:  Yes, Your Honor.  That's just for something else at the beginning of the lunch break.

THE COURT:  Of course.

Okay.  Now we're just waiting for our jurors.

Are there any issues that we need to address before we bring the jury in?

MR. DOBBINS:  Your Honor, maybe if we could just do a technical check with Mr. Maytum.  I know he is on the screen. I just want to maybe hear -- I know his son is with him, and

maybe we could just do a check to make sure that he can hear us, and that also his volume or our volume for his -- when he speaks, we can hear him clearly in the courtroom.

THE COURT: Okay. Let's go ahead and do that now.

Mr. Maytum, are you able to hear me and did you hear Mr. Dobbins?

THE WITNESS: Yes, I did.

THE COURT: All right. And Mr. Feigenbaum, do you want to speak and let's make sure.

MR. FEIGENBAUM: Yes. Good morning, Mr. Maytum.

THE WITNESS: Good morning.

THE COURT: Were you able to hear Mr. Feigenbaum? Okay.

MR. FEIGENBAUM: Your Honor, what time do we start tomorrow?

THE COURT: Tomorrow we're not in session.

MR. FEIGENBAUM: I mean, Friday.

THE COURT: Friday is a 10:30 to five. We have some matters here in the courtroom beginning at nine.

COURT SECURITY OFFICER: We're missing two.

THE COURT: Oh. We're still missing two jurors.

All right. Anything further that we can address at this time?

MR. DOBBINS: Judge, since we are on Zoom, and the screen needs to capture us, I'm assuming it's okay to proceed

with the questioning from a seated position?

THE COURT: Yes. Of course. And that would also include any objections that need to be made. There's no need to stand up.

MR. FEIGENBAUM: Thank you, Your Honor.

(Pause in proceedings.)

COURT SECURITY OFFICER: We're still waiting on one.

THE COURT: One. Okay.

(Pause in proceedings.)

THE COURT: Do we know which one it is, so perhaps Iris could call?

COURT SECURITY OFFICER: Yeah.

She's already calling.

THE COURT: Okay. Perfect.

(Pause in proceedings.)

COURT SECURITY OFFICER: They're all here.

THE COURT: Okay. Thank you.

All right. All the jurors are present.

Both sides ready to proceed?

MS. KLEPACH: Yes, Your Honor.

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: Let's bring in the jury.

COURT SECURITY OFFICER: All rise for the jury, please.

(Before the Jury, 9:07 a.m.)

THE COURT:  All right.  Good morning, Ladies and Gentlemen.

It's good to see each of you.  I hope you had a pleasant day yesterday and ready to get back to work.

Please be seated, everyone.  We are ready to continue.

And the Government's next witness, by agreement, is going to appear remotely.  And each of you should be able to see on your screens the next witness who will be called.

On behalf of the Government?

MR. DOBBINS:  Yes.  Good morning, Your Honor.

We would call to the stand Mr. Robert Maytum.

THE WITNESS:  Yes.

THE COURT:  All right.  Mr. Maytum, I'm going to ask that you raise your right hand to be placed under oath, sir.

ROBERT ARTHUR MAYTUM, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Please state your name and spell it.

THE WITNESS:  Okay.  Robert Arthur Maytum.

UNIDENTIFIED SPEAKER:  Now you need to spell it.

THE WITNESS:  R-O-B-E-R-T, Arthur, and Maytum, M-A-Y-T-U-M.

THE COURT:  Mr. Dobbins?

MR. DOBBINS:  May I proceed, Your Honor?

THE COURT:  You may.

MR. DOBBINS:  Thank you.

8

DIRECT EXAMINATION

BY MR. DOBBINS:

Q.   Mr. Maytum, good morning, sir.

A.   Good morning.

Q.   Mr. Maytum, you could put your right hand down, sir.

Sir, could you tell the jury how old you are.

A.   I'm 86 years old.

Q.   And where do you currently live?

A.   I am a resident of Florida, but I currently have another home in Western New York, and I'm there now.

Q.   Okay.  Could you tell the Members of the Jury what county of Western New York you live in?

A.   Chautauqua.

Q.   And as a permanent resident of Florida, where is your house or apartment that you live in -- what town in Florida?

A.   Naples, Florida.

Q.   And when did you move to Naples, Florida?

A.   Forty years ago.  I don't remember the exact date that I was there, but it's 40 years ago.

Q.   Okay.  Are you currently employed or are you retired, sir?

A.   Beg your pardon?

Q.   Are you currently working or are you retired?

A.   No.  I'm retired.

Q.   And what did you do before you retired?

A.   I was president and executive officer of Dunkirk & Fredonia

9

Communications Company.

Q.   And what kind of residence do you live in in Naples?  Is it a condominium, is it a house, an apartment?

A.   It is a home.

Q.   Okay.

A.   A house.

Q.   I'm sorry?

A.   It's a house in ...

Q.   Okay.  Is that house on a waterway of some sort?

A.   Yes, it is.

Q.   What kind of waterway?

A.   It's a canal off Naples Bay.

Q.   And does that canal provide you access to Naples Bay and ultimately the Gulf of Mexico?

A.   Yes.

Q.   Do you have any kind of dock or boat slip at your house in Naples?

A.   Yes.

Q.   And did that dock or boat slip have any special equipment for storing a boat?

A.   Yes -- no -- yes.  I'm sorry.

Q.   What kind of equipment, sir?

A.   A lift and a -- I guess that's about it, a lift.

Q.   And how does one operate the lift at your house, sir?

A.   Through a switch on the dock.

10

Q.  Sir, I'd like to direct your attention to 2019.  Did you own a boat that you stored on -- at that dock at your house in Naples?

A.  Yes.

Q.  What kind of boat was it, sir?

A.  It was a 29-and-a-half-foot Everglades center console.

Q.  And did that -- did you give that boat a name, sir?

A.  Yes.

Q.  What was the name, sir?

A.  *Ultimaytum.*

Q.  Okay.  Now, did something happen to your boat -- directing your attention to around July 19th of 2019.  Did you learn that something had happened to your boat?

A.  Yes.

Q.  And what was it that had happened, sir?

A.  It wasn't there anymore.  It was gone.

Q.  Okay.  Mr. Maytum, I'm going to show you a couple of pictures now.

MR. DOBBINS:  Mr. Feigenbaum, Government's Exhibit 113 -- do you have any objection to that being admitted into evidence?

MR. FEIGENBAUM:  No objection.

MR. DOBBINS:  Your Honor, without objection, the Government would move Government's Exhibit 113 into evidence.

THE COURT:  Admitted into evidence.

(Government's Exhibit 113 received into evidence.)

BY MR. DOBBINS:

Q. All right. Mr. Maytum, I'm going to share my screen with you, so you can see. This is a couple of pictures.

So I'm going to show them all to you first, and then you tell me if you recognize this vessel.

A. Yes, I do.

Q. Let me just go ahead and show you 4 and Photograph 5 at the bottom.

Okay, sir. And what is this vessel that we're looking at here in these photographs? Whose boat is this?

A. That is our boat.

Q. And if you look down -- I know it's a little smaller, so I'm going to try to zoom in a little bit, which might make it a little pixilated -- do you see this picture, sir, that we're looking at here?

A. Yes.

Q. Where is -- where is this -- in this photograph, where is your boat, the *Ultimaytum*, at in this picture?

A. It is our home in Florida, and that is the dock.

Q. Is that a picture of the *Ultimaytum* up on a boat lift?

A. Yes, it is.

Q. Okay. Now, how much -- or let me rephrase. You say that you have a second home in Western New York. Generally speaking, what time or what months do you spend in Florida?

A.   Six months, from November to May, roughly.

Q.   Okay.

A.   Depending on the day.

Q.   Sure.  And when you go back to New York, do you have -- do you employ some sort of caretaker or other person to keep an eye on your property in Naples?

A.   Yes.

Q.   Back in 2019, who was that person?

A.   Charlie Bloodworth.

Q.   Okay.  And with the -- with the boat, did you have -- what would you do with the keys when you weren't living at your house in Naples?

A.   He would have a key to the boat because he physically took care of the boat.

Q.   And when you say:  "He physically took care of the boat," what kind of things would he do, sir?

A.   Every two weeks he cleaned it, made sure that it was kept up to par.

Q.   And would he be able to do something with it during, say, hurricane season, if there was a hurricane approaching?

A.   Yes.

Q.   What was that?

A.   He would try to secure it as best he could.

Q.   Okay.  How long had you owned this boat, the *Ultimaytum*, in 2019, if you recall?

A.  Eight years.

Q.  Now, on or about July 19th of 2019, who let you know that the boat was missing?

A.  Mr. Bloodworth.

Q.  And what did you do at that point?

A.  I was in New York, and I think I just said:  "I don't know why it's missing."

Q.  And did you give anybody permission or authority to take the *Ultimaytum*, other than Mr. Bloodworth?

A.  No.

Q.  And did you call the police in Naples?

A.  I did, yes.

Q.  All right.  And did you file a police report for this?

A.  Yes, I did.

Q.  At the time that you owned the boat, was the boat insured, sir?

A.  Yes.

Q.  And did you file an insurance claim, since the boat was stolen?

A.  Yes, sir.  I did.

Q.  And did you receive a payout for that?

A.  Yes.

Q.  All right.  And what did you use that money for?

A.  Toward the purchase of another boat, when the available -- the boat was available to purchase, the new one.

Q.   Okay.  So let me ask you, since we're still looking at the picture of your dock:  At the time that you owned the *Ultimaytum*, did you have any security features on the -- either the boat, or the dock, or your house in Naples?

A.   No.

Q.   Since the *Ultimaytum* has been taken -- was taken in 2019, have you added any security features to your home, the dock, or the new vessel that you purchased?

A.   Yes, I have.

Q.   What kind of security features, sir?

A.   Cameras, motion cameras, trackers on the engines, and the electric inside the home -- okay.  We have it inside our home --

Q.   Is that the --

A.   -- that we could shut it on and off with.

Q.   Okay.  So is that the electricity that activates the boat lift you can shut on and off?

A.   Yes.

Q.   And prior to your boat being taken in July of 2019, had you had any problems with anything going -- anything with your boat as far as people tampering with it or trying to use it or anything like that?

A.   No.

     MR. DOBBINS:  One moment, sir.

     (Pause in proceedings.)

MR. DOBBINS:  Your Honor, I have no further questions for Mr. Maytum.  I would pass the witness to Mr. Feigenbaum.

THE COURT:  All right.  Cross-examination.

MR. FEIGENBAUM:  Thank you.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good morning, Mr. Maytum.

A.  Good morning.

Q.  How are you doing today, sir?

A.  I'm fine.

Q.  All right.  I believe you said that you first learned the boat was missing on July 19, 2019?

A.  Yes.

Q.  And let me then ask you:  That missing boat was reported by Mr. Bloodworth?

A.  No.  It was reported by me -- oh, he reported it to me.  He said:  "Where is the boat?"  I said:  "I don't know.  It's supposed to be where you are."

Q.  Okay.  He was -- I think you called him a caretaker for the boat in your absence?

A.  Yes.

Q.  He cleaned it and took care of it?

A.  That's right.

Q.  How often did he go to do those things to your residence?

A.  Every two weeks.

16

Q.  All right.  So I guess what you're saying is during those two weeks, before he went there, the boat could have been taken without permission?

A.  Yes.

Q.  All right.  Could I have the Government put up photos -- first Photo Number 2 that they showed you, Mr. Maytum.

MR. FEIGENBAUM:  One moment.

(Pause in proceedings.)

MR. DOBBINS:  I'm sorry.  Which photo?

MR. FEIGENBAUM:  Number 2.

MR. DOBBINS:  Government's Exhibit 2?

MR. FEIGENBAUM:  It's Government's Exhibit Number 113, I think you said Slide Number 2.

MR. DOBBINS:  Oh.  Okay.

(Pause in proceedings.)

MR. DOBBINS:  Got to scroll up.

MR. FEIGENBAUM:  I think that's Number 5.

MR. DOBBINS:  It is.  I have to scroll up, sir.

(Pause in proceedings.)

MR. DOBBINS:  Is that the one you wanted?

MR. FEIGENBAUM:  Yes.

Thank you, Mr. Dobbins.

BY MR. FEIGENBAUM:

Q.  So Mr. Maytum, on this --

MR. FEIGENBAUM:  If you could just make it a tiny bit

smaller.

BY MR. FEIGENBAUM:

Q.   All righty.  So Mr. Maytum, we're looking at one of the photos of your boat right now, correct?

A.   Yes.

Q.   So that seems to be Government Exhibit 113, Slide Number 2. On the roof, is there a light that's attached to the roof?

A.   Yes.

Q.   Okay.  What do they call that, a running light?

A.   Yes.

Q.   All right.  And it's a white light?

A.   Yes.

Q.   Okay.

        MR. FEIGENBAUM:  Let's go to Slide Number 3, if I could ask the Government.

     (Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   Okay.  So this is another photo of your boat, Mr. Maytum?

A.   Yeah.

Q.   And in the front, there's a couple of lights on the -- I think it's called the bow of the boat.

A.   Yes.

Q.   All right, sir.  So there's like maybe two lights right there?

A.   Yes.

Q.   Thank you.

You also stated that you left the keys to the boat with the caretaker, Mr. Bloodworth; is that correct?

A.   Yes.

Q.   All right, sir.

I don't have any other questions.  Thank you very much for your time.

THE COURT:  All right.  Any redirect?

MR. DOBBINS:  Yes, Your Honor.  Briefly.

REDIRECT EXAMINATION

BY MR. DOBBINS:

Q.   Mr. Maytum, let me go back to that second picture.

A.   Yes.

Q.   At the top of the boat, you stated that there's a white light on the top of the center console; is that right?

A.   Yes.

Q.   Is that what you would consider your running lights or is that a different type of light?

A.   It's a running light.

Q.   Okay.

A.   Anchor light, basically, also.

Q.   What does that mean, sir?

A.   If you were anchored after dark out in the water, fishing or whatnot, it would keep the boat lighted up all the way around.

Q. So you could see where the anchor was and the surrounding water around your vessel?

A. Right.

Q. And then you were shown the second -- this third picture. Excuse me. And what color are the running lights on the -- I believe it's the bow of the boat, sir?

A. Red and green.

Q. Is there a light on top of the bow of the boat, where the -- I guess -- what is this here that we're looking at? Do you see my -- this cross that I'm moving around here?

A. Yes. That's an anchor.

Q. All right. Is there a light right here where the anchor is?

A. Yes. I believe so, right around the same place.

Q. Okay. And do the lights have to be turned on by the operator or do they automatically come on when you operate the boat, if you know?

A. By the operator.

MR. DOBBINS: Thank you, Your Honor.

No further questions.

THE COURT: All right. Is Mr. Maytum excused?

MR. DOBBINS: Yes, Your Honor, from the Government.

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: Thank you, Mr. Maytum.

THE WITNESS: Thank you.

THE COURT:  Have a nice day, sir.

(Witness excused.)

THE COURT:  And the Government's next witness.

MS. KLEPACH:  United States calls Ramon Reyes Aranda.

(Pause in proceedings.)

THE COURT:  Good morning, Mr. Aranda.

Let me ask you that you remain standing, raise your right hand to be placed under oath.

RAMON REYES ARANDA, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Can you please state your full name and spell it for the record.

THE INTERPRETER:  Just give me a minute.

THE COURT:  Go ahead and be seated.

If the interpreters will just let me know when you're ready to proceed, and then the gentleman can just state his name and spell it for the record.

(Pause in proceedings.)

THE WITNESS:  Ramon Reyes Aranda.  Aranda.

R-A-M-O-N R-E-I-E-S [sic].

MR. DOBBINS:  May I proceed, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Good morning, Mr. Aranda.

A.  (Through Interpreter.) Good morning.

Q.  Sir, please tell the jury how old you are.

A.  Thirty-seven years old.

Q.  And where were you born?

A.  Isla De La Juventud, Cuba.

Q.  How far did you go in school?

A.  University.

Q.  And what did you study at university?

A.  Dentistry.

Q.  When did you come to the United States?

A.  May 1st, 2014.

Q.  And how did you get to the United States?

A.  Through the border with Mexico.

Q.  And what city and state do you currently live in?

A.  Naples, Florida.

Q.  And how long have you lived in Naples, Florida?

A.  Eight years and nine months.

Q.  Are you currently employed, sir?

A.  Yes.

Q.  And what kind of work do you do?

A.  I am a dump truck driver.

Q.  Have you also done any other kind of legal work?

A.  Yes.  I work at an electricity company.

Q.  And what do you do for them?

A.  I'm an electrician assistant.

Q.  Now, in addition to your work as a dump truck driver and as

an electrician, were you also doing some illegal activities?

A.  Yes.

Q.  And what kind of things were those?

A.  Stealing boats.

Q.  And sir, were you charged here in this federal court with a couple of crimes related to your activities in stealing boats?

A.  Yes.

Q.  Do you recall what you were charged with?

A.  Transporting illegal stolen boats and money laundering.

Q.  And were those charges both conspiracies to do those things?

A.  Yes.

Q.  Do you know what the maximum sentence you were facing on the conspiracy to transport stolen boats was?

A.  Five years in prison.

Q.  And what was the maximum sentence you were facing for the conspiracy to commit money laundering?

A.  Twenty years in prison.

Q.  Who else were you charged with when you were charged in that case, sir?

A.  With Javier Hernandez.

Q.  And do you know who Javier Hernandez is?

A.  Yes.

Q.  Do you see Javier Hernandez in the courtroom today?

A.  Yes.

Q.   Could you please point him out and describe something he's wearing for the jury.

A.   A purple shirt.

MR. DOBBINS:   Your Honor, let the record reflect that the witness has identified the Defendant.

THE COURT:   It's noted.

BY MR. DOBBINS:

Q.   Sir, did you plead guilty in your case?

A.   Yes.

Q.   What charge or charges did you plead guilty to?

A.   (In English.)   Money laundering.

Q.   Did you do so pursuant to a written Plea Agreement?

A.   Yes.

(Pause in proceedings.)

MR. DOBBINS:   Your Honor, if I may approach the witness?

THE COURT:   You may.

BY MR. DOBBINS:

Q.   Mr. Reyes Aranda, I'm showing you a six-page document that's marked as Government's Exhibit 111 for identification. Do you recognize that document?

A.   Yes.

Q.   And what is that document?

A.   It's the Plea Agreement when I pled guilty to the charge.

Q.   And on the last page -- well, withdrawn.

Do you read English, sir?

A.   No.

Q.   And is that document in English?

A.   Yes.

Q.   How was that document translated for you before you pled guilty?

A.   My attorney translated it for me.

Q.   And did you understand everything that was in that document?

A.   Yes.

Q.   And on the last page of that document, did you sign the Plea Agreement?

A.   Yes.

MR. DOBBINS:  Your Honor, at this time, I would move Government's Exhibit 111 into evidence.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 111 received into evidence.)

MR. DOBBINS:  And if I may just approach to retrieve the document from the witness.

THE COURT:  You may.

MR. DOBBINS:  And if I may publish for the jury.

THE COURT:  You may.

BY MR. DOBBINS:

Q.   Sir, I'm going to direct your attention just again to the last page of Government's Exhibit 111.  What date did you sign this Plea Agreement?

A.   9/26/23.

Q.   And sir, you stated that you pled guilty to the conspiracy to commit money laundering.  What did the Government agree to do as to the conspiracy to transport stolen vessels in exchange for your plea?

A.   A reduction in my sentencing.

Q.   Did the Government, in this Plea Agreement, agree to give you a reduction in your sentence?

A.   No.

Q.   Okay.  What happens to Count -- well, let me ask you this, sir:  Have you been sentenced yet?

A.   No.

Q.   What is the Government going to do as to Count 2 of the Indictment when you're sentenced?

A.   Ask the Judge for a sentence reduction.

Q.   Okay.  Let's talk a little bit about that.  Is there a cooperation agreement in this Plea Agreement?

A.   Yes.

Q.   Sir, is there anything in this Plea Agreement that details your cooperation with the Government?

A.   (No verbal response.)

26

Q. Would you like some time to read it?

A. Yes.

MR. FEIGENBAUM: Judge, I would object because I think he said earlier -- the witness -- that he doesn't read or speak English.

THE COURT: Do you want the interpreter to assist? How would you like Mr. Aranda to read it?

MR. DOBBINS: I think maybe the way to do it, Judge, would be for me to go through it paragraph by paragraph, and that way the interpreter could interpret it for him.

THE COURT: All right. The objection is noted. It's sustained.

BY MR. DOBBINS:

Q. Mr. Reyes Aranda, directing your attention to Paragraph 1, it states that: "The Defendant agrees to plead guilty to Count 5 of the Superseding Indictment, which charges the Defendant with possession with conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h)."

Do you understand that, sir?

A. Yes.

Q. And is that the count that you pled guilty to in your Indictment?

A. Yes.

Q. Okay. Now, Paragraph 2 states that the office agrees to seek dismissal of Count 2 of the Superseding Indictment as to

you after sentencing.

A.   Yes.

Q.   Do you understand that, sir?

A.   Yes.

Q.   So the Government has agreed to dismiss the conspiracy to transport stolen vessels after your sentencing?

A.   Yes.

Q.   All right.  Paragraph 3 states that:  "The Defendant is aware that the sentence will be imposed by the Court after considering the Federal Sentencing Guidelines and Policy Statements, hereinafter Sentencing Guidelines.

"The Defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court, relying in part on the results of a presentence investigation by the Court's Probation office, which investigation will commence after the guilty plea has been entered.

"The Defendant is also aware that under certain circumstances the Court may depart from the advisory sentencing guideline range that it has computed and may raise or lower that advisory sentence under the sentencing guidelines."

        MR. DOBBINS:  You may want to go ahead and translate that part, since it goes to the next page.

        THE INTERPRETER:  Yes.

BY MR. DOBBINS:

Q. "The Defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence. The Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence.

"Knowing these facts, the Defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in Paragraph 1, and that the Defendant may not withdraw the plea solely as a result of the sentence imposed."

A. Yes.

Q. Do you understand that paragraph, sir?

A. Yes.

Q. So based on that paragraph, sitting here today, do you know what your sentence will be?

A. No.

Q. Paragraph 4: "The Defendant also understands and acknowledges that, as to Count 5 of the Indictment, the Court may impose a statutory maximum term of up to 20 years' imprisonment. The Court may also impose a term of up to three years' supervised release.

"In addition to a term of imprisonment and supervised release, the Court may impose a fine of $250,000 or twice the amount of funds laundered, whichever is greater."

A.   Yes.

Q.   Do you understand that paragraph, sir?

A.   Yes.

Q.   All right.  Paragraph 5 states that:  "The Defendant further understands and acknowledges that, in addition to any sentence imposed under Paragraph 3 of this agreement, a special assessment in the amount of $100 will be imposed on the Defendant.  The Defendant agrees that any special assessment imposed shall be paid at the time of sentencing."

A.   Yes.

Q.   Did you understand that paragraph, sir?

A.   Yes.

Q.   All right.  Paragraph 6 states that:  "The Office of the United States Attorney for the Southern District of Florida, hereinafter Office, reserves the right to inform the Court and the Probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the Defendant and the Defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendation contained in this agreement, the Office reserves the right -- further reserves the right to make any

recommendation as to the quality and quantity of punishment."

Do you understand that paragraph, sir?

A.  Yes.

Q.  Paragraph 7 states that:  "The United States agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the Defendant's offense, pursuant to Section 3E1.1A of the Sentencing Guidelines, based upon the Defendant's recognition and affirmative and timely acceptance of personal responsibility.

"If at the time of sentencing the Defendant's offense level is determined to be 16 or greater, the Government will make a motion requesting an additional one-level decrease pursuant to Section 3E1.1, sub (B) of the Sentencing Guidelines, stating that the Defendant has assisted authorities in the investigation or prosecution of his own misconduct, by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate the resources efficiently.

"The United States, however, will not be required to make this motion and these recommendations if the Defendant, one, fails or refuses to make a full, accurate, and complete disclosure to the Probation office of the circumstances surrounding the relevant offense conduct; two, is found to have

misrepresented facts to the Government prior to entering into this Plea Agreement; or three, commits any misconduct after entering into this Plea Agreement, including, but not limited to, committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official."

Do you understand that paragraph, sir?

A. Yes.

Q. Paragraph 8 states that: "The United States and the Defendant agree that, although not binding on the Probation office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed: Loss amount. In assessing the Defendant's relevant conduct, the amount of loss involved in the offense, for purposes of Section 2B1.1 of the Sentencing Guidelines, was at least 1.5 million and less than $3.5 million."

A. Yes.

Q. Do you understand that paragraph, sir?

A. Yes.

Q. Paragraph 9: "The Defendant also agrees that the Defendant shall assist the Office in all proceedings, whether administrative or judicial, involving the forfeiture to the United States of all rights, title, and interest, regardless of their nature or form, in all assets, including real and personal property, cash, and other monetary instruments,

wherever located, which the Defendant or others, to his knowledge, have accumulated as a result of illegal activities.

"Such assistance will involve an agreement on Defendant's part to the entry of an order enjoining the transfer or encumbrance of assets which may be identified as being subject to forfeiture.

"Additionally, Defendant agrees to identify as being subject to forfeiture, including, but not limited to, those specific real and personal properties set forth in the forfeiture counts of the Indictment, all such assets, and to assist in the transfer of such property to the United States by delivery to this office, upon the Office's request, all necessary and appropriate documentation with respect to said assets, including consents to forfeiture, quitclaim deeds, and any and all other documents necessary to deliver good and marketable title to said property."

A.   Yes.

Q.   Do you understand that paragraph, sir?

A.   Yes.

Q.   Paragraph 10:  "The Defendant further agrees to forfeit to the United States voluntarily and immediately all of his right, title, and interest to any and all property, assets, and/or their substitutes, which are subject to forfeiture, pursuant to Title 18, United States Code, Section 982(a)(1).  That property includes any property, real or personal, involved in the

offense and any property traceable to such property."

Did you understand that paragraph, sir?

A.   Yes.

Q.   Paragraph 11:  "Defendant recognizes that pleading guilty may have consequences with respect to the Defendant's immigration status if the Defendant is not a citizen of the United States.  Under federal law, a broad range of crimes are removable offenses, including the offense to which Defendant is pleading guilty.  Based on your plea to this offense, removal is presumptively mandatory.  Removal and other immigration consequences are the subject of a separate proceeding, however, and Defendant understands that no one, including the Defendant's attorney or the Court, can predict to a certainty the effect of a defendant's conviction on the Defendant's immigration status.  Defendant nevertheless affirms that the Defendant wants to plead guilty, regardless of any immigration consequences that the Defendant's plea may entail, even if the consequence is the Defendant's automatic removal from the United States."

MR. DOBBINS:  That's a typo there.  So I just went to the next sentence.

THE INTERPRETER:  Okay.  I didn't ...

BY MR. DOBBINS:

Q.   Do you understand that paragraph, sir?

A.   Yes, sir.

Q.   Paragraph 12 states that:  "The Defendant is aware that the sentence has not yet been determined by the Court.  The Defendant also is aware that any estimate of the probable sentencing range or sentence that Defendant may receive, whether that estimate comes from the Defendant's attorney, the Government, or the Probation office is a prediction, not a promise, and is not binding on the Government, the Probation office, or the Court.

"The Defendant understands further that any recommendation that the Government makes to this Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court, and the Court may disregard the recommendation in its entirety.

"The Defendant understands and acknowledges, as previously acknowledged in Paragraph 3 above, that the Defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the Defendant, the Government, or a recommendation made jointly by both the Defendant and the Government."

Did you understand that paragraph, sir?

A.   Yes, sir.

Q.   And finally, Paragraph 13 states:  "This is the entire agreement and understanding between the United States and the Defendant.  There are no other agreements, promises, representations, or understandings."

35

Do you understand that paragraph, sir?

A. Yes, sir.

Q. Now, separate from that Plea Agreement, what are you hoping will happen as a result of your testimony here today?

A. A reduction in my sentence.

Q. And what is your understanding of what the prosecution has to do for the Judge to consider whether or not to give you a reduction in your sentence?

A. Well, to speak to the Judge to see if the Judge can give me a reduction in the sentence.

Q. And what do you have to do to try to earn that potential sentence reduction?

A. To speak the truth, to speak the truth about the facts.

Q. Can you or your attorney force the Government to file a motion to request that the Judge give you a sentence reduction?

A. No, sir.

Q. Can you or your attorney force the Government to make any specific recommendation as to a sentence reduction?

A. No, sir.

Q. Even if the Government does file a motion to request a sentencing reduction, does the Judge have to grant such a motion?

A. No, sir.

Q. And does the Judge -- if the Judge chooses to grant the motion for a sentencing reduction, does the Judge have to go

with the Government's recommendation for a sentence reduction?

A.   No, sir.

Q.   Does the Judge have to grant you or your defense attorney's request for the amount if the Government files that motion?

THE INTERPRETER:  One second.  Repeat.

THE WITNESS:  No, sir.

BY MR. DOBBINS:

Q.   Who ultimately decides what your sentence will be?

A.   The Judge, sir.

Q.   And who ultimately decides whether you will receive a sentence reduction in this case?

A.   The Judge does, sir.

Q.   Okay.  Let's talk about how you got involved with stealing boats.  Please tell the jury approximately when and how you started stealing boats.

A.   So I started in 2017, and it had to do with a vessel called Grady-White.

Q.   Who did you first meet to start stealing boats?

A.   So to this guy -- they used to call him El Gordo, and he lived in Lehigh Acres.

THE INTERPRETER:  Or phonetically High Acres.

BY MR. DOBBINS:

Q.   Lehigh Acres?

A.   Yes.  Lehigh Acres.

Q.   Is that near Naples, Florida?

37

A.   Yes.

Q.   How did you meet Gordo?

MR. FEIGENBAUM:  Judge, excuse me one second.  I'm going to object.  Vague and ambiguous.  He's using a nickname that could be confusing.

THE COURT:  All right.  Let's clarify who that individual is.

THE WITNESS:  So this is a guy who lived in Lehigh.

BY MR. DOBBINS:

Q.   And is this El Gordo that lived in Lehigh Acres -- is that the person you knew as Javier Hernandez?

A.   No.

MR. DOBBINS:  Good enough?

MR. FEIGENBAUM:  Yes.  Thank you.

MR. DOBBINS:  You're welcome.

BY MR. DOBBINS:

Q.   Did you know El Gordo's real name?

A.   No.  Everyone called him that.  Everyone called him that, El Gordo.

Q.   And how did you meet El Gordo?

A.   So I had to go and take him some money in Lehigh, and I spoke to him there.  And he said:  "If you want to earn money," that he had a friend, he knew a friend, and that this friend could pay him for -- and that this friend could pay him for anything that had to do with boats.

Q. Why did you have to pay El Gordo money?

A. No. I went to take him a hundred dollars, which my cousin had given me to -- because he happened to be a friend of his, because this guy had come out of prison and he needed money.

Q. Which guy had just come out of prison?

A. The guy. The guy they call El Gordo.

Q. When El Gordo told you that he had a friend who could take -- help you make some money, did he tell you that friend's name?

A. He told me that this was a friend of his, and that the name was El Neco.

Q. And did he tell you where El Neco lived?

A. In Mexico.

Q. Okay. And in 2017, what was it that El Neco was asking El Gordo to do or send?

A. A -- two GPA with two propellers.

Q. Was that GPA or GPS?

A. No. It's the GPS of a boat.

Q. And what would you and El Gordo do to find these GPS -- GPSs for the boats and the propellers?

A. So we went to look for them in this -- well, it's a place where they store or keep boats. And then we took -- we removed them. And then the following day we sent them to this man, this guy called El Neco.

Q. And when you say it was a place where they stored boats,

39

was this a boat dealership, a warehouse, or something on the water?

A.   No.  It's like a boatyard, a yard where they store boats.

Q.   And is the yard dry or is it in the water?

A.   Dry.  Dry.

Q.   Okay.  And where was this boatyard?

A.   It was in Lehigh.

Q.   Lehigh Acres?

A.   Yes.  Lehigh Acres.

Q.   How did you and El Gordo send the GPS devices or the propellers to El Neco?

A.   Through DHL.

Q.   And who would send those items to El Neco?

A.   Well, I sent them.

Q.   And why did you send them?

A.   Because he told me to send them in my name.

Q.   Who told you to send them in your name?

A.   Neco.

Q.   And do you recall what area of Mexico you would send these devices and propellers via DHL?

A.   Merida.

Q.   And how much would you be paid for doing this?

A.   So for that time, I was paid $800.

     (In English.)  Yeah.

Q.   What about El Gordo?  How much was he paid?

A.   (Through Interpreter.)  Well, I don't know that part,
because that would be different to my part of it.

Q.   How were you paid?

A.   Through Western Union.

Q.   And who was it that was paying you?

A.   It was Neco.

Q.   On or about 2018, did Neco decide that he wanted something
besides just the propellers or GPS devices from these boats?

A.   Yes.

Q.   And what was Neco asking for?

A.   He wanted vessels.

Q.   Did Neco tell you what kind of vessels he wanted?

A.   He wanted vessels that were in a good condition and that
were -- had Yamaha engines.

Q.   And why did Neco want a vessel with Yamaha engines?

A.   Because he said that this was the best type of engine to be
able to sell it in the Mexican market.

Q.   Was there any size requirement for the boat?

A.   It had to be longer than 28 feet.  Yes.

Q.   And how were you communicating with Neco?

A.   Well, because Gordo, that guy, had given me his telephone
number.

Q.   And so were you using any specific app on your phone to
communicate with Neco?

A.   WhatsApp.

Q.   Did there come a time when you ever met Neco in person?

A.   Yes.  Once, when he came here.

Q.   And do you recall approximately when that was?

A.   I don't know the specific date, but I do know that he came here.

MR. DOBBINS:  Judge, I don't know what time you wanted to take the morning break, but if now is a good time --

THE COURT:  Yes.  Let's go ahead and take a 10-minute recess, Ladies and Gentlemen.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury not present, 10:26 a.m.)

THE COURT:  Are there issues to address?

MR. DOBBINS:  Just maybe instruct if the witness needs to use the restroom maybe use the floor above us, just so he doesn't accidentally interact with the jurors.

THE COURT:  Well, the jurors are remaining back here.

MR. DOBBINS:  I've seen some of the jurors out there during the bathroom breaks, Judge.  So I just think maybe it's a good idea, just because I don't want to talk to the witness.

THE COURT:  Of course.  Of course.

And let me make sure you understand, Mr. Aranda, you're not to have any contact with any of the jurors, and it might be preferable to use the restroom downstairs.

We'll see you back in about 10 to 15 minutes.  I know

42

we need to give some time.

(Recess from 10:27 a.m. to 10:38 a.m.)

THE COURT:  All right.  Welcome back.

Just be seated for just a moment.

I know we're waiting for Mr. Aranda.

One of the jurors inquired of Officer Campbell, our wonderful court security officer, whether the witness had been sworn.

Certainly I remember that Iris did swear in the witness.  But to the extent that the juror inquired, would there be any objection to the Court acknowledging that one of the jurors had asked the court security officer that question, and to remind them that, yes, Mr.  Aranda was placed under oath?

MR. DOBBINS:  No objection from the Government, Judge.

MR. FEIGENBAUM:  No objection.

THE COURT:  Okay.  We just need Mr. Aranda.

(Pause in proceedings.)

COURT SECURITY OFFICER:  They're all ready, Judge.

THE COURT:  Okay.  Both sides ready to continue?

MR. DOBBINS:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right, then.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 10:40 a.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated.

During the break, one of you asked the court security officer, Officer Campbell, whether the witness, Mr. Aranda, had been placed under oath.  And in response to that inquiry, yes, Iris Alexander, who is our wonderful courtroom deputy, did place Mr. Aranda under oath.

All right.  So why don't we continue with the direct examination.

MR. DOBBINS:  Thank you, Your Honor.

BY MR. DOBBINS:

Q.  Mr. Reyes Aranda, before the break, we were talking about the time that you met Neco.  Was that here in the United States or somewhere else?

A.  Here in the United States.

MR. DOBBINS:  And if I may have the Government laptop display, please.

BY MR. DOBBINS:

Q.  I'd like to show you Government's Exhibit 2 received in evidence.

MR. DOBBINS:  Can everybody see okay?

BY MR. DOBBINS:

Q.  Mr. Reyes Aranda, do you recognize the individual in that

photograph?

A. Yes, sir.

Q. And who is that?

A. That's Neco.

Q. Does Neco look a little different today or the last time you saw him versus this picture?

A. Yes. He is different.

Q. And how so?

A. The eyes, the haircut, and the mouth looks slightly different.

Q. Is this a picture of him younger than when you met him?

A. Yes.

Q. So after Neco asked you and El Gordo to find a boat that met those specifications that you talked about earlier, what did you and Gordo do?

A. I went to see a boat that was close to Naples. There, I looked for the key number, and I sent Neco a picture of the boat.

Q. Okay. Do you recall what type of boat this was?

A. A Grady-White.

Q. And just for the Members of the Jury who have never had a Grady-White or been on a Grady-White, what kind of boat is a Grady-White?

A. It's a big boat with two 300 Yamaha engines.

Q. You say it's a big boat. Approximately, how long would you

say it is?

A.   Twenty-eight or 29 feet.

Q.   And you said that you found this boat near Naples.  Where near Naples did you find this boat?

A.   Close to a restaurant by the name of Pinchers.

Q.   Was the boat in that boatyard you talked about earlier or was it somewhere else?

A.   No.  It was in the back, behind a condominium, where they set them on top of the water.

Q.   When you:  "They set them on top of the water," does that mean they were up on like lifts?

A.   Yes.  Like a lift.

Q.   And did you know who owned that Grady-White?

A.   No.

Q.   You said a little earlier that you went on board the boat to look at the -- I think you said the ignition.  Why did you do that?

A.   Because on the ignition you can find -- on the switch, you can find the number, the key number, in order to start the boat.

Q.   And do you know how many digits that key number is?

A.   It has three numbers.

Q.   And what did you do with those three numbers?

A.   With those three numbers, you go to a marina and you buy the key.

Q.   And how do you do that?  What do you tell the marina when you go to give them those numbers?

A.   I say that I need a key with those numbers.  And then with the key -- they give you a key, and you go and you try it on the switch to see if it goes into that boat.

Q.   Okay.  You said the Grady-White had two Yamaha engines.  Do you recall the horsepower for the engines?

A.   Yes.  Two Yamaha engines, each one 300.

Q.   And when you went to look for the number to get those three digits for the key, how did you -- how did you find that on the ignition?

A.   Because you remove the switch and you look on the side, and it has the three numbers there.

Q.   How do you remove the ignition switch?

A.   It has a plastic screw.  You unscrew it.  You unscrew it and you remove -- you pull down the switch.

Q.   And did the marina you went to give you the keys for that Grady-White?

A.   Yes.

Q.   Did they know -- did the marina know why you wanted the keys for that Grady-White?

A.   No.

Q.   And was this a different marina than the area where the Grady-White was being kept?

A.   The marina where I purchased the key?

Q.   Yes.

A.   Yes.  It's different.  It was here in Miami.

Q.   Where did you go in Miami to find this marina?

A.   It's here.  It's an area close to Downtown here.  It's an area where -- it's a marina where they sell propellers, transmissions.  They sell spare parts for engines.

Q.   Did you tell that marina that it was -- those were keys for a boat that you owned, that you needed to replace?

A.   Yes.

Q.   How many keys did they give you?

A.   Just one.

Q.   And how did you send the photos of that Grady-White to Neco?

A.   By WhatsApp.

Q.   Once you did that, what did Neco tell you?

A.   That yes, that he was interested in the boat, that he was looking for a person to bring it.

Q.   How much did you and El Gordo want to charge Neco for that boat?

A.   Twenty thousand dollars.

Q.   And did there come a time where Neco had you talk to somebody else that was in Mexico to negotiate that deal?

A.   Yes.

Q.   Who is that person?

A.   A guy by the name of Chupa.

Q.   And do you know Chupa's real name?

A.   Jose Miguel.

Q.   And what nationality is Neco?

A.   Mexican.

Q.   And were you able to tell what nationally Jose Miguel or Chupa was?

A.   Cuban.

Q.   Why did Neco introduce you to Chupa?

A.   Because since he spoke his Mexican dialect like that, and we couldn't understand each other, he told me to come to an agreement with him so that we could understand each other better.

Q.   Who was going to make the payments for the Grady-White to you and El Gordo?

A.   Jose Miguel was the one who was going to pay me.

Q.   Now, you stated that Neco said they were going to find a captain for the Grady-White.

A.   Yes.

Q.   What did that mean?

A.   That he was going to look for a person to drive the boat from Naples to Mexico.

Q.   And when you say you -- I think you said a little bit earlier you came to an agreement with him about the fee for the boat.  Who was it that you came to an agreement with?

A.   With Jose Miguel, who would in turn mention it to Neco.

Q. Were you later introduced to somebody who was going pilot or captain that Grady-White to Merida, Mexico?

A. Jose Miguel gave me Javier's number, so that I would get in touch with him, who was going to be the one taking it there.

Q. And how did you communicate with Javier?

A. By phone.

Q. And when you say: "Javier," what was Javier's name?

A. Javier Hernandez.

Q. All right. Is that the person you pointed out a little earlier in the courtroom?

A. Yes.

Q. So after Jose Miguel gave you the Defendant Javier Hernandez's phone number, what did you do?

A. I called him, and we made an agreement -- came to an agreement.

Q. When you say: "Him," who did you call?

A. Javier Hernandez.

Q. When you say you came to an agreement, what kind of agreement did you come to?

A. So we came to an agreement to pick it up and bring it to Naples.

Q. Pick what up and bring what to Naples?

A. I was going to pick him up, take him to Naples to pick up the boat to take it to Mexico.

Q. What -- where did you come to pick up Javier Hernandez?

A.   To his apartment, the lower level -- he lives in a condo, a building in Miami Beach.

Q.   When you picked up the keys for the boat from the marina here in Miami, was Javier Hernandez or anybody else with you?

A.   No.  I went by myself.

Q.   Was that the same trip from Naples that you picked up Javier Hernandez or was it a different trip?

A.   A different trip.

Q.   Did Jose Miguel, or Chupa, provide you with any additional instructions about preparations for stealing the boat?

A.   Yes.  He told me to look for it, to check it out, and to send him pictures of how much fuel it had.

Q.   Why did Chupa want to know how much fuel was in the boat?

A.   To know how much fuel had to be purchased.

Q.   Okay.  So what did you do about the fuel situation in that Grady-White?

A.   I went to look for the containers, which are containers that have chlorine, so they had to be cleaned.  And after being cleaned and dried, then I could pour the gasoline in them.

Q.   And why are you using containers that have chlorine in them?

A.   Because these are the plastic containers that were purchased.  They had chlorine.  They had to be washed and dried.  And once full, they would be put onto the boat.  And during the trip, whatever fuel was needed, it was poured into

it.

Q.   And why wouldn't you just purchase portable gas tanks or containers?

A.   Because they are too many and that's why we needed plastic containers.  With 20 of them is enough.  If they were smaller than that, it wouldn't be -- if they were smaller, they wouldn't be any use.  They needed to be 15 gallons or more.

Q.   Where did you get this gasoline to fill these containers?

A.   At any gas station that would be close by, we would fill them up.  Then we would keep them -- store them in a place for whenever the boat would be sent.  And then we would get the boat close to where the containers were and we would put the containers on the boat.

Q.   Do you recall how many gallons these containers would hold?

A.   Fifteen gallons each container.

Q.   Did Javier Hernandez tell you anything about the fuel requirements for the trip?

A.   No.  That was Chupa.

Q.   Now, on the -- for the Grady-White, did you come over and pick up Javier Hernandez?

A.   Yes.

Q.   And just generally, what time of day was this that you picked him up?

A.   It was in the afternoon, around five o'clock in the afternoon.

Q.   And was there anybody else in the car with you besides you and Javier Hernandez?

A.   No.  Just the two of us.

Q.   And where did you go after you picked him up from his apartment in Miami Beach?

A.   Towards Naples.

Q.   Did you guys talk about anything on the ride over from Miami Beach to Naples?

A.   We spoke just normal, like personal things.

Q.   Okay.  When you got to Naples, what did you do?

A.   We already had the fuel close by to where the boat was.  So I went to look for the boat.  I lowered it.  We got the fuel onto the boat, and then Javier left for Mexico with the boat.

Q.   And approximately what time of day was this when you did this?

A.   Nine o'clock at night or nine or ten at night.

Q.   And what did you do that at that time?

A.   Because at that time there was no one there.

Q.   Once you put the boat in the water, and put the fuel tanks on, what happened next?

A.   He started the boat, and he left through the Naples Bay all the way outside.

Q.   And where did you go?

A.   I stayed on the seashore and I went home.

Q.   How did you get home?

A. I left my car parked on the corner close to the beach. I walked all the way along the beach, and then I got -- and then I left for home.

Q. What did you tell Javier Hernandez about that boat?

A. That that boat -- he knew that it was stolen.

Q. How did he know it was stolen?

A. Because we were getting it at night on the back of the marina.

Q. And why was that important?

A. Because he knew what was being done.

MR. FEIGENBAUM: Objection, Your Honor.

He's calling for speculation of what Mr. Hernandez supposedly knew.

THE COURT: To that question and answer, sustained.

BY MR. DOBBINS:

Q. Why was it important that you take the boat from the marina at night?

MR. FEIGENBAUM: Objection, Your Honor.

Mischaracterizes his prior testimony. The question just was: "Why did you take the boat to the marina?"

THE COURT: But this is a different question. "Why was it important that you take it at night?"

The objection is overruled. I'll permit the question.

MR. FEIGENBAUM: I thought he said: "Take the boat to the marina," but maybe I'm wrong.

54

MR. DOBBINS: I don't believe I said that.

THE COURT: "From the marina at night" was the precise question.

You may continue.

BY MR. DOBBINS:

Q. You may answer the question. Why was it important that you take the boat from the marina at night?

A. Because at that time there was no one. That area was in construction. No one would pass by at night, and it was easier to take the boat then.

Q. After Javier Hernandez took the Grady-White, did you later hear from Neco or Chupa about that boat?

A. Yes.

Q. Who did you hear from?

A. From Chupa and Neco. From both.

Q. Okay. What did they tell you about the Grady-White?

A. That they were painting it, kind of changing it.

Q. Okay. Did they tell you why they were doing that?

A. They were painting it, kind of transforming it, in order to sell it later on.

Q. Did they tell you that -- how the boat had gotten to Mexico?

A. Yes. They went to pick up Javier at an island -- at an island called Holbox.

Q. And did they tell you how Javier -- was Javier staying in

55

Mexico or did he go somewhere else?

A. That he was going to stay there for a couple of days and then come back.

Q. And did they tell you how Javier was going to come back?

A. By plane.

Q. Did you get your money for that stolen Grady-White?

A. Supposedly, Jose Miguel was going to pay me for it. And he didn't pay me, so that's when Neco send me the money.

Q. And how did Neco send you the money?

A. He had people here who needed to send the money. They were usually relatives of people who -- these were people who had relatives in Mexico, people who were living there, and they had relatives here. So he would send them -- so he would give them the money there, and I would get the money here.

Q. And when you say: "Here," where would you have to go to get the money?

A. To Miami.

Q. How did you know who to meet to pick up the money?

A. Because Neco would give me a number. He would say: "That person is going to call you," or then I would call that person. And then I would get in touch and -- to pick up the money.

Q. Was that the only boat you stole for Chupa and Neco?

A. No.

Q. How many other boats did you steal for Chupa and Neco?

A. Twenty-two boats.

Q.   And who were you primarily dealing with as far as requesting the boats?

A.   With Neco.  Later on, it was only with Neco.

Q.   What kind of boat was Neco requesting?

A.   Boats that would be in good condition and that would have Yamaha engines.

Q.   Was El Gordo involved in these additional 21 or 22 boats?

A.   No.

Q.   Why not?

A.   Because he got scared from the first boat.

Q.   What do you mean he got scared?

A.   He got scared that things would go wrong, and that the police would catch him, since he had already been in prison.

Q.   What would you do to try to find these boats that Neco wanted?

A.   I would go by and see homes where there would be no people in them, and that would be close to canals that would have a -- that would communicate to the sea.

Q.   And why would there be homes that people weren't living in with boats?

A.   To do a good job.

Q.   No.  What I'm asking is -- you said you would look for houses with boats where nobody was home or lived there.  Why would nobody be living in a home with a boat?

A.   Because sometimes these were the homes that were closed

where the owners were up north.

Q. Okay. When you were saying that El Gordo got scared because he was --

MR. DOBBINS: I'm sorry. I'll wait till the ...

(Pause in proceedings.)

BY MR. DOBBINS:

Q. When you said that El Gordo got scared because he had already done time in prison, do you know what El Gordo had served time in prison for?

A. I think it was for the very same thing. It had to do with stealing boats.

Q. So out of these 22 boats, do you remember what types of boats you stole?

A. Well, yes. The majority of them were Pursuits, Grady-White, a Yellowfin, and an Everglades.

Q. So take us through -- since you would be looking for homeowners who lived up north, was there a certain time -- withdrawn.

Take us through what you would do to prepare to steal these boats.

A. Well, I would first go and see where the boats were. I would take photographs of them. I would send the photographs to Neco. And then, if Neco was interested in the vessel, then he would tell me, you know, what it is that I had to do.

Q. And when you were looking for these vessels, were you only

58

looking in Naples or were you looking in other places?

A. Yes. In Naples, Marco Island, Fort Myers, Bonita.

Q. Is that Bonita Springs?

A. Bonita Springs, yes.

Q. And in addition to seeing if the people who lived in these -- well, withdrawn.

Was it only houses with docks that you were looking at or were you looking at other places with boats?

A. Yeah. Also in marinas, if there was boats parked there or stationed there in marinas.

Q. And in addition to finding out -- or trying to see if people were home, were you looking to see if there were any other security features around the boat?

A. Yeah, that there weren't any cameras.

Q. What would you have done if you saw that there were security cameras around a boat?

A. No. No. If we saw -- you know, if there was any kind of cameras, security cameras, then that boat would be ruled out.

Q. What about if somebody was living in a house or in a condo nearby?

A. No. If someone was living in a house, we wouldn't do any of that either.

Q. What about if there was a security guard at a marina? Would that impact your decision on whether to take the boat?

A. Yes. I mean, if there was any kind of a guard, if there

was any kind of security or security guard, no, then we wouldn't -- we wouldn't -- we wouldn't take that boat.

Q.   But generally, in your experience, were there lots of security guards that you had to worry about?

A.   So actually, in that area -- that area, the marinas in Naples, it's -- generally, there aren't that kind of thing, the security guards.

Q.   And what about security cameras?

A.   No.  If there was any kind of cameras, we wouldn't do anything with that either, any kind of security cameras. Because sometimes cameras, you know, they have sensors, and we -- you know, that could trigger like the police being called.  So we wouldn't do anything like that.

Q.   So once you sent some pictures to Neco, and he agreed he wanted to purchase that boat from you, what was your fee?

A.   He told me that he would pay me, for boats that had two engines, 20,000.  And if the boat had three engines, then the fee was 30,000.

Q.   And once Neco approved -- or told you that he wanted a boat, what would you do next?

A.   Well, yeah.  Then I had to send the money to Javier for gas and also to be able to purchase the key.

Q.   Why would you send the money to Javier to purchase gas?

A.   No.  I didn't send it to Javier.  It was Neco who sent it to Javier.

Q.   Okay.  And why was Neco sending money to Javier to purchase gas, and not you?

A.   Because he knew about this marina where you could buy the key and also the containers as well.

Q.   How would Javier get the information about the keys?

A.   Because I would inspect that area where the switch is.  I would look for the numbers there.  And then I would give him the numbers.  And then, with those numbers, he would buy the key.

Q.   So after the Grady-White, which was the first boat, did you ever go and get the keys for those other 21 boats?

A.   No.

Q.   Who got the keys for the other 21 boats?

A.   Javier.

Q.   Would you have to provide other information to Javier, in addition to the key numbers, about the boats that you were going to steal?

A.   No.  Just the number of the key and -- so that he could -- and once he had the key, then you could open -- you know, start the boat to see how much gasoline the boat had in the gas tank.

Q.   Okay.  Prior to having the key, would you be able to tell how much gas was in the boat?

A.   No.

Q.   So I want you to take me through this step by step.  You would go to these boats to look for the key number.

61

A.   Yes.

Q.   And you had to do something to the switch to find that key number?

A.   Yeah.  You had to kind of loosen it and then you had to look at the numbers.

Q.   And then who would you send the key number to?

A.   To Javier.

Q.   And then what would Javier do once he had the key?

A.   So he would buy the key, and then he would come and he would leave me the key with the containers.  Yes.

Q.   How did Javier know how many containers to bring?

A.   So the number -- it was always 20 containers that had to be brought.  And if an additional container was needed, then 10 extra containers.

Q.   So after Javier came over and gave you the key and the 20 containers, what would you do next?

A.   Then I would fill up the containers, and then I would go to the vessel to check to see how much gasoline the vessel had in it.

Q.   What would you do with the containers that you had just filled up?

A.   I hid them.

Q.   Where did you hide them?

A.   So in this kind of shrub area that was close by to where the boat would be leaving from.

Q.   Would Javier go back to Miami or would he be with you while this was happening with the fuel?

MR. FEIGENBAUM:  Objection, Your Honor.

On which occasion?  It's vague and ambiguous.

THE COURT:  All right.  If you want to narrow the question.  Sustained.

BY MR. DOBBINS:

Q.   You're talking about a pattern of how these boats were stolen.  Generally speaking, would Javier be with you or would he go back to Miami, Miami Beach area?

A.   He would go back to Miami.

Q.   So after you checked the fuel level with the key, what would you do next?

A.   So then I would come to an agreement with Javier.  I would tell him that everything was ready.  And then they would check, you know, the weather, time to see when this boat could leave.

Q.   Who was checking the weather?

A.   Javier and Neco.

Q.   When you say you would come to on agreement with Javier, what did you mean by that?

A.   Well, we would have to come to an agreement to agree on when the weather was good so that the boat could depart.

Q.   When you and Javier agreed that Javier was -- that the weather was good for Javier to take the boat, how would he get back to Naples?

63

A.   Well, sometimes in an Uber or a friend would bring him there.

THE COURT:  One of the jurors -- do we need to take a recess?

UNIDENTIFIED JUROR:  Just for like two seconds.

THE COURT:  Yes.  Of course.

Let's go ahead and take a five-minute recess.

Of course.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury not present, 11:30 a.m.)

THE COURT:  We're on a short recess.

(Recess from 11:31 a.m. to 11:40 a.m.)

THE COURT:  Both sides ready to continue?

MR. DOBBINS:  Yes, Your Honor.

What time did you want us to stop for lunch?

THE COURT:  Maybe about 12:15.

Is that all right?

THE COURT:  All right.  Let's bring the jury back in.

(Before the Jury, 11:40 a.m.)

THE COURT:  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

How we doing?  Okay?

All right.  Wonderful.

Let's continue with the direct examination.

BY MR. DOBBINS:

Q.   Now, after Javier would be brought over by either an Uber or a friend, what would you do next with these -- the target boat?

A.   Well, then we would go and we would get it.  We would lower it.  We would take it to the area where we were going to put the containers onto the boat.  And then we would give it to Javier so that he could take it to Mexico.

Q.   And when you said:  "We would go and take the boat and load it," who is "we"?

A.   Javier and I.

Q.   And generally speaking, what time of day was this that you would do these -- you would go take these boats?

A.   It was at nighttime.

Q.   Was there ever a time you took one during the day?

A.   No.

Q.   You talked a little bit earlier about sending photos to Neco of the boat.  What kind of things did Neco want pictures of?

A.   Well, the -- the engines and also the inside of the boat, to see what kind of condition the boat was in, as well as the exterior or outside of the boat.

Q.   Was there anything in particular on the exterior of the boat that Neco wanted you to send him?

A.   No.  It was usually the engines and also the number -- the

series number of the boat.

Q.   When you say:  "The series number of the boat," you did something with your hand.  What were you -- why were you doing that with your hand?

A.   So on the -- on the part of the boat -- on the right side of the boat, there are some numbers.  A photograph was taken of those numbers, and that photograph was sent to him.

Q.   Do you know what those numbers are called?

A.   They were called VIN numbers.

THE INTERPRETER:  That's what he said:  "VIN numbers."

BY MR. DOBBINS:

Q.   Were there any specific numbers on the engines that Neco would also want?

A.   Well, sometimes he did.  He wanted the number of the engine, the series number of the engine.

Q.   Now, when Javier Hernandez would drop off the key, would he wait around to see how much fuel was in the boat?

A.   No.

Q.   Would you relay any information to Javier Hernandez about how much fuel was in the boat?

A.   I would send him a photograph of the screen, the screen where you can see the fuel level of the boat.

Q.   And when you sent Javier Hernandez the photo of the screen level -- I'm sorry -- the fuel level -- how would you do that?

A.   So I would open the switch.  I would wait for the screen to

light up, you know, the boat screen to light up.  I would take a photograph of that, and that's it.

Q.   And how would you send that photograph to Javier Hernandez?

A.   Through WhatsApp.

Q.   Now, you talked a little bit earlier that Javier would wait for the weather to be right before you would both take the boat.

A.   Yes.

Q.   Generally speaking, were the boats taken or stolen right away or did sometimes it have to wait for a bit?

A.   So if the weather conditions were good, then they would be taken on those days.  But if the weather conditions were not good -- so if the weather conditions were not good, then it would be necessary to wait for the weather conditions to get better or clear up.

Q.   And how long could that take?

A.   That could be a week.  It could be four days waiting for the weather conditions to change.

Q.   Now, you testified a little earlier that you started dealing just directly with Neco again for these boats.

A.   Yes.

Q.   Why weren't you dealing with Chupa anymore?

A.   Well, because in the first business deal that we did, he did not want to pay me.

Q.   Did you ever meet Chupa in person?

A.   No.

Q.   Did you ever learn about another boat that Chupa and Javier Hernandez were involved in?

A.   Well, Chupa asked him for a boat.  I think it was a boat that was going to be coming out of Miami.

MR. FEIGENBAUM:  Objection.  Hearsay.

MR. DOBBINS:  Co-conspirator statement, Judge.  And if you let me get to the question about how he learned this, it will be an admission.

THE COURT:  All right.  With regard to the co-conspirator statement, which is an exception, the objection is overruled.

BY MR. DOBBINS:

Q.   Who did Chupa ask to take this boat out of Miami?

A.   Javier.

Q.   And was this boat legally purchased or was it stolen?

MR. FEIGENBAUM:  Objection.  Lack of foundation, hearsay.

THE COURT:  If the witness knows.  Overruled.

THE WITNESS:  As far as I know, I'm not certain whether it had been stolen or whether it had been -- or if it had been given to him.

BY MR. DOBBINS:

Q.   Okay.  Who told you about this boat?

A.   Javier.

68

Q.   How would you get paid your money for these other 21 vessels that were stolen?

A.   (In English.)  Cash.

Q.   And how would you receive your cash?

A.   (Through Interpreter.)  So if there was someone here in Miami who had the money, and who had a family or relative who lived in Mexico, Neco would give the money to that family member or relative in Mexico, and then -- or a friend, and then it would be given to me here.

Q.   Were there other ways that you received the money for the stolen boats?

A.   No.

Q.   Did there come a time when Neco would send money through another person to pay you for the boats?

A.   Well, sometimes, on occasion, through Javier, he would send me part of the money.

Q.   Who would send you part of the money?

A.   Neco would give it to Javier, and then Javier would give it to me.

Q.   Where would Javier receive that money from Neco?

A.   In Mexico.

Q.   Please tell the jury how it was that you met Neco when he came to the United States.

A.   Well, he called me.  He told me that he was going to be staying in a hotel here in Miami Beach, that he was going to be

spending a couple of days here, and we agreed that we would meet each other. This was on a Saturday.

So we sat down and we began to have a conversation, and we had lunch. And we were there until -- we were there -- it was around noontime, and then, until I returned to Naples.

Q. Was anybody present at that meeting?

A. It was me, him, and Javier.

Q. And what did the three of you talk about?

A. Well, we talked about the boats.

Q. What did you say about the boats?

A. So apparently, he had requests. He had requests for these boats, the same types of boats. And he mentioned how boats that had 300 were better than -- so boats that had three engines were better, better deals or better than boats with two engines.

Q. And who is this "he" that was saying this?

A. Neco.

Q. What else were you discussing?

A. So that's what we talked about there, about that stuff, you know, that stuff, like about the boats. And then, when he said that, I actually thought that it was going to be a longer kind of conversation. So we stayed there, we had lunch, and then I left.

(Pause in proceedings.)

MR. DOBBINS: All right. Ready?

THE INTERPRETER:  Yes.  Thank you.

MR. DOBBINS:  All right.

BY MR. DOBBINS:

Q.  Now, you talked a little bit about the Grady-White, how you learned that that boat was being -- I think you said transformed.

A.  Yes.

Q.  And why were they transforming the Grady-White?

A.  So it wouldn't be recognized, they would put a different painting and they would also paint the engines.

Q.  And did you learn -- was that only for the Grady-White boat or was that for the other 21 boats that were stolen?

A.  Probably that they did it for the other boats, but I do know that they did it for the first one.

Q.  Did you later learn what they would do after they transformed the boat so it was no longer recognizable?

A.  No.

Q.  Do you know what Neco would do with the boats after Javier brought them to him?

MR. FEIGENBAUM:  Objection.  Asked and answered.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  They would paint them and then look for a buyer that would be interested in it.

BY MR. DOBBINS:

Q.  Now, did Neco ever put you in touch with anybody by the

name of Viejo?

A. Yes.

Q. Do you know Viejo's real name?

A. Robertico.

Q. Is that just his first name or a nickname of his first name?

A. Well, that's his name. Everyone knows him as Robertico or Roberto, but Robertico.

Q. Why did Neco put you in touch with Robertico?

A. So that I would go and pick up an envelope.

Q. And what was in that envelope?

A. I don't know, because it was sealed.

Q. What did you do with that envelope?

A. I gave it to Javier, so that whenever he would get to Mexico he would give it to Chupa or Neco. I don't know which one of the two.

Q. Do you know what Robertico did for Neco?

A. Give him papers for the boat.

Q. What kind of papers for the boats?

A. Kind of legalize them, from what I know. That's all I know.

Q. What do you mean by "legalize"?

A. Yes. To give him the papers, so that once they could get to Mexico they could have those papers.

Q. For the boats that you and Javier Hernandez stole?

MR. FEIGENBAUM:  Objection, Your Honor.  Leading the witness.

THE COURT:  Sustained.  Rephrase, please.

BY MR. DOBBINS:

Q.  What boats were these papers for, sir?

A.  They gave me the envelope on one occasion.  Later on, he would find a way to get them to Neco.  Later on, he didn't give me any other envelope for me to give to Javier.  It was only just one envelope.

Q.  Okay.  But what boat, if you recall, was that for?

A.  I don't remember.

Q.  Even though you don't remember the specific type of boat, was it a boat that you, Javier, and Neco had discussed about taking?

MR. FEIGENBAUM:  Objection.  Leading.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  Probably it was that.

BY MR. DOBBINS:

Q.  Now, do you recall the last boat that you stole with Javier Hernandez?

A.  Yes.

Q.  What kind of boat was that, if you recall?

A.  A green boat with two engines, 300 Yamaha engines.

Q.  You say:  "300."  Is that 300-horsepower?

A.  Three-hundred-horsepower each engine.

Q. And did you and Javier -- withdrawn.

Did Javier end up taking that boat to Neco in Mexico?

A. Yes.

Q. What did you learn happened to Javier, Neco, and that boat once it arrived in Mexico?

A. On the second or third day of having taken that boat, the Mexican police had arrested Javier and Neco.

Q. Did you ever work with Javier after that?

A. No.

Q. Why not?

A. Because there had been a disagreement between Javier and Neco, and from then on there was no one to take the boat.

Q. Did you continue working with Neco after that point?

A. No.

Q. Did there come a time in May or June of 2020 that you were involved in another type of boat?

A. Yes.

Q. What type of boat was that?

A. A Cobia.

Q. And did you buy that boat legally or did you obtain it some other way?

A. I obtained it in the same way I obtained the others.

Q. Which is how?

A. I went and stole it in Bonita Springs.

Q. And what did you do with that boat, the Cobia?

A.   Robertico made be the papers.  First, I spoke with Neco for him to speak with Robertico.  And then Robertico got me the papers, and I legalized the boat.

Q.   When you say Robertico got you the papers so you could legalize the boat, what do you mean by that?

A.   He gave me a title that supposedly it was legal with in the boat's numbers.

Q.   Well, since you knew you had stolen the boat, was that title a legal title for that -- for the Cobia?

A.   That was the title he made for me.  It was a title that was supposedly legal.  And I went and registered it at the DMV, and after that the boat came out with a Florida registration.

Q.   So the title that Robertico made for you, was that a legitimate document or did he create a fraudulent title so you could register it with DMV?

A.   Yes, he did.  He created a fraudulent title.

Q.   And when -- did Robertico need some names of some people for the title other than your name?

A.   Yes.  Of a friend of mine.

Q.   So was the boat registered in your name?

A.   No.

Q.   And then what did you do with the boat?

A.   I used it for about two and a half years, and then I sold it to Neco.

Q.   How much did you sell it for?

A.   I sold it -- I went and sold it to him for $75,000.

Q.   How did Neco pay you?

A.   First, he made me a payment of 20,000 through a guy by the name of Gabriel through the Chase Bank.

Q.   And how else did you get your money?

A.   (In English.)  Cash.

(Through Interpreter.)  But he paid me only up to $55,000.

Q.   So does Neco still owe you money?

A.   Twenty thousand dollars.

Q.   And how much did you have to pay Robertico for the fraudulent title for the Cobia?

A.   First $3,000 and then 5,000.

Q.   How did you get the boat to Neco?

A.   Neco sent a guy to my home.  He picked up the boat, and they took it over from Panama -- through Panama City through Customs.

Q.   Panama City, Florida?

A.   Yes.

Q.   Did you provide the person that came over for Neco with the title?

A.   The title and the trailer's registration.

Q.   When you said you got the additional money in cash, other than the 20,000 you got from Gabriel, how did you get that money?

A.   It was sent to me in parts.

Q.   And how did you receive parts of the money?

A.   People here, just as the other payments had been made to me.

Q.   And how did you know to contact those people?

A.   Because Neco would give them my phone number, and he would give me the person's phone number.

Q.   Do you recall what your old phone number was?

A.   Yes.

Q.   Can you tell the Members of the Jury what it was.

A.   (In English.)  239.

     (Through Interpreter.)  (239)300-5434.

Q.   And I say that was an old phone because was that phone taken from you at some point?

A.   Yes.

Q.   When was that phone taken?

A.   On November 18th of last year.

     MR. DOBBINS:  Your Honor, if I may have the ELMO briefly --

     THE COURT:  Certainly.

     MR. DOBBINS:  -- to publish again and show the witness Government's Exhibit 37 in evidence.

BY MR. DOBBINS:

Q.   Do you recognize Government's Exhibit 37?

A.   Yes.  It's my phone number -- my phone.

     MR. DOBBINS:  Judge, I believe it's 12:15, so I don't

know if you wanted to break.

THE COURT: Yes. This might be a good time.

Ladies and Gentlemen, let's go ahead and take a one-hour recess for lunch. I'll see you back here at 1:15.

Have a pleasant lunch.

COURT SECURITY OFFICER: All rise for the jury, please.

(Jury not present, 12:15 p.m.)

THE COURT: Okay. Have a pleasant lunch.

See you back here at 1:15.

Thank you.

(Recess from 12:15 p.m. to 1:14 p.m.)

THE COURT: All right. Welcome back.

Let me acknowledge the presence of the Defendant.

Do we have Mr. Aranda outside?

Yeah. Let's bring him in. And why don't we wait for Ms. Klepach.

Okay. Mr. Aranda, if you'll come forward.

And let me know when Ms. Klepach is here.

And just for a matter of housekeeping, we will not be using the courtroom tomorrow, but we will be using it on Friday morning. So I just ask at the end of the day if you don't mind moving your items so the tables can be used.

(Pause in proceedings.)

THE COURT: Go ahead and have a seat.

If we could just wait for Ms. Klepach.

MR. FEIGENBAUM: Judge, may I ask a question about where to put our stuff at the end of the day? Because you won't be using the courtroom tomorrow, can we leave stuff in the attorney's room?

THE COURT: Yes. Of course.

MR. FEIGENBAUM: And they'll be locked?

THE COURT: Yes.

MR. FEIGENBAUM: Very well.

Thank you.

THE COURT: Let's make sure we have all of our jurors.

All ready to go?

Okay. Both sides ready to proceed?

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: On behalf of the Government?

MR. DOBBINS: Yes, Your Honor. We were just -- sorry. We were hooking up our laptops, but we'll be ready if you give us just a few minutes.

THE COURT: Yes. Of course.

(Pause in proceedings.)

MR. DOBBINS: Okay. We're ready, Judge. Thank you.

THE COURT: Bring in the jury.

COURT SECURITY OFFICER: All rise for the jury, please.

(Before the Jury, 1:17 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated.

I trust that you had a pleasant lunch and ready to get back to work.

And we'll continue with the direct examination.

MR. DOBBINS:  Your Honor, may I have the ELMO to start, please?

THE COURT:  Yes.  Of course.

BY MR. DOBBINS:

Q.  So Mr. Reyes Aranda, when we left when we broke for lunch, we were talking about this cell phone.  Do you recall that?

A.  Yes.

Q.  And when was this cell phone taken off of you?

A.  November 18th, 2022.

Q.  And who took it off of you?

A.  The officer that arrested me.

Q.  Okay.  Was that the arrest for this case?

A.  Yes.

Q.  Were you later provided with downloaded chats from this cell phone?

A.  Yes.

MR. DOBBINS:  Your Honor, if I may have the Government's laptop for the witness only, please.

BY MR. DOBBINS:

Q. Mr. Reyes Aranda, do you see what's been marked as Government's Exhibits 43 and 43A on your computer screen?

A. Yes.

Q. And do you recognize -- if you look in that box on the -- at the upper half of the page, do you recognize that phone number that starts with 1-239?

A. Yes.

Q. And whose number is that?

A. Mine.

Q. All right. And do you recognize the number below it that starts with 52?

A. Yes.

Q. And whose phone number is that?

A. Neco.

Q. And sir, is Government's Exhibit 43 a fair and accurate representation of the chats that you had between yourself and Neco on your cell phone when it was seized from you?

A. Yes.

MR. DOBBINS: Your Honor, at this time, the Government would move Government's Exhibits 43 and 43A into evidence.

THE COURT: Any objection?

MR. FEIGENBAUM: No, Your Honor.

THE COURT: Admitted into evidence.

(Government's Exhibits 43 and 43A received into evidence.)

MR. DOBBINS:  If we may publish for the jury.

THE COURT:  You may.

BY MR. DOBBINS:

Q.  All right.  So we've raised the box on Government's Exhibit 43.  And what is the phone number that you were using before you were arrested?

A.  (239)300-5434.

Q.  Okay.  And what was the phone number that Neco -- you were using to contact Neco?

A.  The 5434.

Q.  I'm sorry.  What number was Neco using that you were talking to?

MR. DOBBINS:  Hang on one moment.

THE COURT:  Would you like a cough drop?  Would that help?

Just let me know if you need to take a break.

UNIDENTIFIED JUROR:  Just to like clean myself, if I can.

THE COURT:  All right.  Take the time that you need.

UNIDENTIFIED JUROR:  Can --

THE COURT:  Yes.  Ladies and Gentlemen, let's -- we're all going to take a five-minute recess.

All right.  Take the time that you need.

And if we can let that juror out first.  Thank you.

COURT SECURITY OFFICER:  All rise for the jury,

please.

(Jury not present, 1:23 p.m.)

THE COURT:  Okay.  We're on a five-minute recess.

(Recess from 1:23 p.m. to 1:29 p.m.)

THE COURT:  Ready to go?

COURT SECURITY OFFICER:  Ready to go.

THE COURT:  All right.  So let's -- all right.  Back on the record.  Apparently, the juror is okay.  She just had some coughing spells.  So we'll certainly just accommodate her needs.

All right.  Both sides ready to continue?

MR. FEIGENBAUM:  Yes, Your Honor.

MS. KLEPACH:  Yes, Your Honor.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 1:30 p.m.)

THE COURT:  All right.  Welcome back.

And please just let us know if we need to take another break.  We can certainly do so.  All right?

All right.  Go ahead and have a seat.

And we'll continue with the direct examination.

BY MR. DOBBINS:

Q.  Mr. Reyes Aranda, what phone number was Neco using when you would have these chats with him?

A.  The one that ends in 5331.

Q. Oh, okay. I thought you said: "Noventa."

THE INTERPRETER: From the interpreter: "The one that ends in 5331."

MR. DOBBINS: Oh, thank you.

Okay. Sorry. My apologies.

BY MR. DOBBINS:

Q. And what did you have Neco saved in your contacts as?

A. NN2.

Q. And why did you have him at NN2?

A. Because he had another one that he would also use to call me. And that's why I had him -- this is the one he told me to use, and I kept it as NN2.

MR. DOBBINS: If we can close that box, and just go to the first message.

BY MR. DOBBINS:

Q. Sir, what was the -- do you see what the date was on that message in the lower right-hand corner?

A. Yes.

Q. What's that date?

A. July 31st, 2022.

Q. Okay. Was that the first day you ever talked to Neco?

A. No.

Q. What happened to the messages in your phone over time after you stopped dealing with Javier back in 2019?

A. I deleted them.

Q.   And why do you do that?

A.   Because -- since I wasn't communicating with him, there was no reason to have those conversations on my phone.

MR. DOBBINS:   If we could close that, please, and go to the next page.

BY MR. DOBBINS:

Q.   These green boxes, do they represent your communications to Neco or do they represent Neco's communications to you?

A.   In this ones, I think it's me.  Let me see.

Those are messages that I sent to Neco.

Q.   Okay.  And were you sending him some pictures in these two messages?

A.   Yes.

Q.   Okay.

MR. DOBBINS:   If we could close that and go to the first picture in the attachment.

BY MR. DOBBINS:

Q.   Why were you sending Neco a picture of this document, sir?

A.   This is when I wanted to sell him my boat, and he asked me to send him a picture of the boat and the paperwork.

Q.   Okay.  And what is this document we're looking at here?

A.   This is the registration, the title for the boat.

Q.   Okay.  And you said this was your boat.  How did you get this boat?

A.   This is the boat that I got back in Bonita, the Cobia.

85

Q.   Right.   The Cobia in Bonita Springs, how did you get that boat?  Did you buy it?  Did you pay for it?

A.   No.   This is the one that I took and I got the papers with Robertico.

Q.   All right.   When you say you took it, did you steal it, sir?

A.   Yes.

Q.   All right.   If we go to the next page, this is the next photo you sent.  What is this a picture of?

A.   Well, we were in the patio of my home, and he asked he to send him photographs of the boat.  He wanted to see the conditions in which the boat was.

Q.   So what part of the boat are we looking at -- or the Cobia are we looking at here?

A.   This is the central console.

Q.   If we go to the next page, did you send an additional -- some additional pictures to Neco of that Cobia?

A.   Yeah.  All the ones that you see here.

Q.   Okay.  And we'll just go to the first picture you sent there.  What part of the Cobia are we looking at here in that first picture?

A.   The front of the boat.

Q.   And the next picture, what part of the Cobia are we looking at?

A.   The seats, the rudder, and the GPS.

Q. Okay. You had stated that you were sitting in the patio taking the pictures of this boat when you were talking to Neco. You said: "We." Who is the "we" that was sitting in the patio?

A. No. I was sitting. I was sitting on my own at the patio. It's just a way of talking.

Q. Okay.

MR. DOBBINS: And let's go ahead and just go to the next page, please.

BY MR. DOBBINS:

Q. And did you send some additional photos here of the Cobia?

A. Yes, all of these photos that are messages.

MR. DOBBINS: If we can skip ahead another two pages, please after these photos.

BY MR. DOBBINS:

Q. Did you take some pictures also of the engines to show Neco?

A. Yes.

MR. DOBBINS: And if we could go to the second picture in this attachment.

BY MR. DOBBINS:

Q. And what is this a photo of, sir?

A. These are the two engines. He asked me for photographs of the two engines.

Q. Okay. And if we could -- now, what did you do with this

vessel ultimately?

A.   I sold it to Neco.

Q.   And is this the one -- when we talked earlier -- how did you get this to Neco?

A.   It was a guy that Neco sent to the house, and it was sent through Panama City.

Q.   Do you know how the boat was sent from Panama City to Mexico?

A.   No.  I don't know that part.

Q.   Okay.

MR. DOBBINS:  If we could move forward, then, to -- I think it's Bates Stamp 1795 -- sorry -- 1796.

(Pause in proceedings.)

MR. DOBBINS:  One more.

There you go.

BY MR. DOBBINS:

Q.   At some point, if we look at this date on this top message here, what is the date that this message was sent to you?

A.   27th of September 2022.  Yes.

Q.   And who was sending you these messages?

A.   Neco.

Q.   And why was he sending you these photographs?

A.   So that I could see the boat, that I could see that they were out fishing.

Q.   And was this the -- had you already sent the Cobia with

Neco's friend via Panama City?

A.   Yes.   Correct.

Q.   All right.   So if we could go ahead and just scroll down to the first photo.   What is this a picture of that we're looking here?

A.   Well, that was the very same day.   That was the very same day that they were out fishing.   That's where they were.

Q.   And in what boat are they in?

A.   In the Cobia, the Cobia that I sent them.

Q.   And do you recognize Neco in one of those pictures?

A.   Yes.

Q.   Where is he?

A.   He's the one who is on the left side.   He is wearing glasses on top of a hat.

Q.   Okay.   When you say:  "Glasses," do you mean sunglasses or do you mean eyeglasses?

A.   Yes.   Sunglasses.

        MR. DOBBINS:   If we could just go to the next picture.

BY MR. DOBBINS:

Q.   And again, what boat is this?

A.   This is the very same boat, the Cobia.

Q.   Okay.

        MR. DOBBINS:   If we could pull up Government's Exhibit 112 in evidence, please.

        If I may have the ELMO, please.

BY MR. DOBBINS:

Q. Showing you Government's Exhibit 112 in evidence. Do you recognize that vessel?

A. Yes.

Q. And how do you recognize that vessel?

A. So that was the Pursuit that was in Naples that was sent over to Mexico to Neco.

Q. Okay. And how was that boat sent to Neco?

A. With Javier.

Q. How did Javier get it there?

A. So it was the very same procedure that we used before, where we would put all the containers and we would put all the containers into the boat to make sure it had gasoline, and then he would take it from Naples to Mexico.

Q. So is this one of the 22 boats that you talked about stealing for Neco with Javier Hernandez?

MR. FEIGENBAUM: Judge, objection. Leading the witness.

THE COURT: Sustained. Rephrase.

BY MR. DOBBINS:

Q. When you talked about the 22 boats that you stole with Javier Hernandez for Neco, was this a different boat or was it included in that boat -- those 22?

A. It is a boat that is included in the 22 boats.

Q. Okay. Do you remember exactly when you stole it?

A. I don't remember exactly.

Q. Do you remember where you stole it from?

A. Yes.

Q. Where was that?

A. So it's at a building that is close to a restaurant in Naples.

Q. What kind of building, residential, commercial, what?

A. Residential.

Q. And you see the picture in the upper, right corner?

A. Yes.

Q. Is that the boat lift that the boat was on when the boat was stolen?

A. Yes.

(Pause in proceedings.)

BY MR. DOBBINS:

Q. Now I'd like to show you Government's Exhibit 113 in evidence, and this is going to be a series of pictures. This is the first picture. This is the second picture -- I'm sorry. This is the third picture. This is the fourth picture, and this is the fifth picture. Do you recognize those photographs?

A. Yes.

Q. How do you recognize those photographs?

A. Because that was also a boat that was sent to Neco. That boat is included among the 22 boats.

Q. What kind of boat was that?

91

A. It's an Everglades with two 300s.

Q. When you say: "Two 300s," what do you mean by that?

A. Two Yamaha engines 300.

Q. Three hundred-horsepower?

A. Yes. Each one has 300-horsepower.

Q. Now, sitting here today, do you remember the exact date that you stole that boat?

A. No. I don't remember.

Q. Do you remember where you stole that boat from, though?

A. Yes.

Q. Where was it?

A. Okay. So it was a house that was closed. The house was in Naples, and it was close to the water.

Q. Okay. Looking at this last picture in that sequence, do you recognize where that boat is?

A. Yes. It's on a canal. And behind that, there's like a mangrove -- mangroves, but it connects from the canal to the Naples Bay.

Q. And is that boat in the water or is it on something?

A. So it's up, kind of like the other one was, but resting, and then it can be lowered down to the water.

Q. And who helped you steal this boat?

A. Well, I lowered it there together with Javier, we put the containers onto the boat, and then we took the boat out.

Q. And was anybody home when you took this boat?

A.   No.

Q.   What time of day was it when you and Javier took this boat?

A.   It was around ten o'clock at night.

Q.   And were there any security systems that you had to worry about when you and Javier took this boat?

A.   No, because actually from the street you could go into where the boat was.

Q.   What do you mean by that?

A.   So that if you're coming from the street, there's no kind of a fence or anything.  So there's no kind of fence, nothing like that, that would prevent you from going in there to get the boat.

Q.   Okay.  And just going back to 112 again.  What time of day did you and Javier take this boat?

A.   This would be about 12 midnight.

Q.   And were there any security guards or security systems that you had to worry about when you and Javier took this boat?

A.   No, sir.

         MR. DOBBINS:  If we may have the Government's computer monitor, but for the witness only, please.  The Government's computer monitor, but only for the witness, please.

BY MR. DOBBINS:

Q.   All right.  I'd like to show you Government's Exhibit 55 for identification.  I'm going to show you a sequence of photographs again.

That's the first one.  There's the second one.  And there's the third one.  Do you recognize those photographs?

A.  Yes.

Q.  And what are these pictures of?

A.  So that is a Pursuit boat.  It has three engines, each with 350.  Yes.

Q.  Okay.  And how do you recognize these photographs of this boat?

A.  Because we sent that boat to Neco from Marco Island.

Q.  When you say:  "We sent that boat."  Who is the "we"?

A.  Javier and I.

Q.  Okay.  Are those fair and accurate pictures of what the boat looked like when you and Javier took that boat?

A.  Yes, sir.

MR. DOBBINS:  Your Honor, at this time, the Government would move Government's Exhibit 55 into evidence, please.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 55 received into evidence.)

MR. DOBBINS:  If we may publish it for the jury.

THE COURT:  You may.

BY MR. DOBBINS:

Q.  Again, sir, what kind of boat are we looking at here?

A.  A Pursuit, which has three Yamaha engines, each 350.

Q. All right. Let's go ahead and move to the second page. And what angle of the boat are we looking at here?

A. We're looking at the back of the boat -- the back and side of the boat.

Q. Okay. Can you see some of the engines there, sir?

A. No.

Q. Okay. You don't see the Yamaha engines on the back of the boat?

A. Yes. What you can't see are the numbers.

Q. Oh.

MR. DOBBINS: All right. Let's scroll down to the next one, please.

BY MR. DOBBINS:

Q. From what angle of the vessel are we looking at here?

A. So that is the front part of the boat, where you can see also the cabin.

Q. Okay. Now, do you recall sitting here today exactly when you and Javier Hernandez took that boat?

A. No. I don't remember.

Q. Do you recall from where you took that boat?

A. Marco Island in Naples.

Q. Is Marco Island its own town or is it part of Naples, if you know?

A. Well, I mean, I say Naples because it's very close by to Naples.

Q.   Okay.   Now, what -- approximately what time -- or if you know, what time of day did you and Javier Hernandez steal this boat?

A.   It was around 10:30 at night.

Q.   And was this boat up in the air, like it is in these pictures, or was it already in the water when the two of you stole it?

A.   It was lifted.

Q.   Okay.   How did you get it down into the water?

A.   So I went over to this control -- there's a control over there -- and then I was able to lower it.

Q.   And did you have to worry about any security guard or security cameras at this house when you went to steal the boat?

A.   No.   There were no security cameras and nor was there any security guard.

          MR. DOBBINS:  If I may have it just for the -- the Government's computer for just the witness only again, please.

          COURT REPORTER:  Your mic's off again.

          MR. DOBBINS:  I don't think it's working.

          THE COURT:  We have a -- we should have another one for you.

          MR. DOBBINS:  I have one from Ms. Klepach.

          Thank you.

          THE COURT:  Okay.

BY MR. DOBBINS:

Q. Mr. Reyes Aranda, showing you Government's Exhibit 59 for identification. This is a sequence of photographs here as well.

MR. DOBBINS: So if we can scroll through it, please.

BY MR. DOBBINS:

Q. Sir, do you recognize those photographs?

A. Yes. Yes, sir.

Q. What is depicted in those photographs?

A. It's a boat which has two 300 engines.

Q. Okay. And how do you recognize that boat?

A. Because that was the last boat that was sent.

Q. When you say it was the last boat that was sent, what do you mean by that?

A. That that was the last boat, the last of the 22 boats that were sent to Neco. This was the very last boat sent to Neco.

Q. And how do you know that?

A. Because this was the green boat that had letters in white.

Q. And what happened when this boat -- what happened after this boat was sent over to Neco?

A. So that boat, when it arrived in Mexico, three days thereafter, the police seized that boat and they arrested Neco and Javier. Yes.

Q. Okay. Are these pictures a fair and accurate depiction of that last boat that you and Javier sole?

A.  Yes, correct.

MR. DOBBINS:  Your Honor, at this time, the Government would move Government's Exhibit 59 into evidence.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 59 received into evidence.)

MR. DOBBINS:  If we may publish it for the jury.

THE COURT:  You may.

BY MR. DOBBINS:

Q.  Okay.  So sitting here today, do you remember approximately when you and Javier stole this boat?

A.  I don't remember perfectly.

Q.  Do you have an approximation?

A.  It would be around the middle of the year.  The year would be 2019, I think.

Q.  Okay.  We'll get to that in a second.

MR. DOBBINS:  Let's scroll down a little bit to the next picture, please.

BY MR. DOBBINS:

Q.  You said it had -- you remember this vessel partially because of some white writing on it.  What was the white writing you were talking about?

A.  Well, these ones right here that say:  *"Luca Brasi."*

Q.  Okay.  Was it the name in particular or just the style of

the letters?

A.   Well, it was the style and the way the letters are written there in white.

Q.   Okay.  Now, do you recall where you stole this boat from?

A.   So it was from a marina, where all the boats were in the water, close to that same restaurant, that restaurant Pinchers.

Q.   Okay.

     MR. DOBBINS:  Let's go ahead and show the third photo, please.

     And the fourth.

     And the fifth, please.

BY MR. DOBBINS:

Q.   And when you -- you and Javier took -- stole the boat from the marina, was it in the water or up on a lift of some sort?

A.   It was resting on the water.

Q.   Okay.  And around what time of day would you and Javier have taken this boat?

A.   It was about ten o'clock at night.

Q.   And when you and Javier took this boat --

     MR. DOBBINS:  I'm sorry.  Are you switching?

     (Pause in proceedings.)

BY MR. DOBBINS:

Q.   And when you and Javier took this boat, did you have to deal with any security guard or security cameras at that marina?

A.   No, sir.

Q.   And for these four boats we've shown you, did you follow the same pattern that you described earlier this morning about how you would find the boat, take pictures, send it to Neco, and then find out the key numbers on these boats?

A.   Yes, sir.

MR. DOBBINS:  If I may have the computer monitor for the witness only, please.  And if we could show Government's Exhibits 7 and 7A for identification.

I'm sorry.  I think a juror ...

UNIDENTIFIED JUROR:  Really quick.  I don't know if it's just me, but on our screen it's really dark.

THE COURT:  Oh, is it?

Look at it now.

UNIDENTIFIED JUROR:  The boat didn't look green, to me anyway.

MR. DOBBINS:  Can we go back to ...

THE COURT:  Yeah.  Let's go -- can you look at the other screen.  Is it different from the other screen?

Let's -- if you were to compare the two screens, is yours darker?

UNIDENTIFIED JUROR:  Because up there, it looks a little bit better to me.

THE COURT:  But is everyone's screen the same, it just is a little bit darker?

I'm wondering if we can just control the brightness.

UNIDENTIFIED JUROR: I think this one is just an angle of how the picture was taken. On the other ones, it's good. Like there, it looks great.

THE COURT: So just to get some clarity, are all of the screens the same?

UNIDENTIFIED JUROR: These are green. Over there, on that angle, I see a green. But here, to me, it's black. It could just be me.

THE COURT: Well, actually, I think -- yeah, in terms of the color. But are you able to see the image?

UNIDENTIFIED JUROR: Yeah. Yeah, I could see it. But color wise, to me, here it looks black, but over there it looks green. Like on that screen that I see over there, it looks green to me.

THE COURT: Well, but -- perhaps, just to assist the jurors, since we don't have anyone in the gallery, could we take one of those screens and just angle it toward the jurors. That would be helpful.

UNIDENTIFIED JUROR: Sorry.

THE COURT: No. There's nothing to apologize -- I want to make sure that you're seeing the exhibits as they are published.

Okay. Let's continue.

MR. DOBBINS: Okay. We will just -- for the sake of

the jury, we'll scroll back through 59, just so they can take one more look at it, if that's okay.

Okay. So now if we can go to the monitor for just the witness only, please, and if we could pull up 7 and 7A for identification.

Oh, you're right. I apologize. I think we can actually publish this to the jury. Seven and 7A are already in evidence, Your Honor.

MR. FEIGENBAUM: Well, Judge, just one thing is that, for the record, let me renew the earlier objection based on the filing the parties made earlier.

THE COURT: And Mr. Feigenbaum, with regard to that issue, you certainly have a continuing objection.

MR. FEIGENBAUM: Thank you, Your Honor.

THE COURT: Of course.

BY MR. DOBBINS:

Q. All right. So Mr. Reyes Aranda, showing Government's Exhibits 7 and 7A. Let's look at just the top part of 7. Do you recognize that phone number, the first phone number at the top, the one next to the picture of the tiger?

A. Yes. That's my number, my WhatsApp number.

Q. Okay. And what about the phone number below it? Do you recognize that person's phone number?

A. Yes. It's Javier's.

MR. DOBBINS: And if we could go to the first message,

please, or the first box, the first green box there and highlight that, please.

Thank you.

BY MR. DOBBINS:

Q. Okay. What is the date of this first communication via WhatsApp?

A. November 11th, 2018.

Q. Okay. And who sent this communication?

A. Here, I think it's Javier's number.

Q. Okay. And where it says it's on outgoing call, would you and Javier send only texts via WhatsApp or would you also do other things via WhatsApp?

A. No. We would send photos or sometimes we would call through WhatsApp.

MR. DOBBINS: If we could go to the next box, which I believe is a blue box, and open that up.

BY MR. DOBBINS:

Q. Looking at that blue box, who is calling -- making this call in the blue box?

A. That's my phone number in my WhatsApp.

Q. Okay. And what is the date of this communication?

A. 12/24/2018.

Q. Okay.

MR. DOBBINS: Now if we could scroll down a little bit.

If we could just stop there, please.

(Interruption.)

THE COURT:  Ah.  I forgot to advise.  2:20.

It's only going to take a few moments.

Maybe a little bit more than a few moments.

MR. DOBBINS:  Sorry, Judge.

THE COURT:  Okay.  That was the test of the emergency system.

Let me see how long it's going to be.

(Pause in proceedings.)

THE COURT:  I think that should be it, but I think it's working.

All right -- oh.  Maybe not.

I'm looking for how long this would last, and -- for approximately 30 minutes.

MR. DOBBINS:  We'll just do our best, Judge.

THE COURT:  Thank you.

All right.  Let's continue.  And if it gets to the point where it's distracting, we can take a recess.

MR. DOBBINS:  Okay.

BY MR. DOBBINS:

Q.  Prior to -- well, let me go back.  Who referred you to Javier and who gave you his phone number?

A.  Jose Miguel, El Chupa.

Q.  And prior to Chupa giving you Javier's phone number, did

you know Javier Hernandez?

A.   No, sir.

Q.   And was there -- what was the purpose of all these calls that started in December of 2018?

A.   These were made to steal the boats from Naples to Mexico -- to send them to Mexico.

MR. DOBBINS:  All right.  I think we can move ahead to Page 36, please.

BY MR. DOBBINS:

Q.   Okay.  Let's start with the green text box there.  It's dated, I believe, June 19th of 2019.

MR. DOBBINS:  And is it possible to just enlarge the English version too?

BY MR. DOBBINS:

Q.   Okay.  So knowing you read Spanish, sir, when you see that message on June 19th of 2019, what is it that is being stated in that message?

A.   To look at the back of the Everglades to see which one of the two photographs it was.

Q.   Okay.  And remind the jury again what an Everglades is.

A.   An Everglades is a boat that has two engines, 300 Yamaha.

Q.   Okay.  And is that a type of boat that you and Javier stole to send to Neco?

A.   Yes, sir.

MR. DOBBINS:  If we could scroll down to Number 37 --

Page 37.

BY MR. DOBBINS:

Q.  And just so we're clear, whenever see the green boxes, who is sending that communication?

We can enlarge it, if you want.

A.  If you can enlarge it, please.  That number, where it says: "From," it's Javier's.

Q.  Okay.  So are the green boxes Javier's communications to you?

A.  Yes.

Q.  And who is sending the blue communications?

A.  That's me.

Q.  Okay.  So what is the date on this start box, where Javier is stating:  "Hola"?

A.  6/20 -- June 6, 2019 -- I'm sorry.  June 20th, 2019.

Q.  Okay.  And a little later on that day, what do you respond to Javier?

A.  I was working at an electricity company, and I was on top of a roof at that time.  I saw his missed call, and I sent him two messages.

Q.  Okay.

MR. DOBBINS:  If we could go to the next page, Page 38, please. And we'll start with that first green text box.

All right.  I was going to have him read -- just put the date in.

Sorry.

BY MR. DOBBINS:

Q.   What is the date of that first message on Page 38?

A.   June 20th, 2019.

Q.   Okay.  And what did Javier -- what communication did Javier send you there in that text box?

A.   He was asking me if the tanks that were stored were already clean.

Q.   Okay.  What did that message mean?

A.   If the containers that should have fuel were already clean from the chlorine.

Q.   And why was that important?  Why did the tanks need to be cleaned out from the chlorine?

A.   Because if you poured gasoline where there was chlorine, there would be -- there would be like a white powder.  It would get contaminated, and then it would cause problems during the trip.

Q.   Okay.  Would the gasoline be usable at that point?

A.   It would be used, but it would cause trouble on the trip for that boat.

Q.   Okay.  Since this message is talking about the tanks, what is -- what is being planned here during these communications?

A.   To fill the plastic containers, the 15-gallon containers, to look for a boat.  Usually, when we already had the containers, we had already seen a boat once.

MR. FEIGENBAUM: Excuse me one second.

Just a clarification -- maybe I misheard -- did the witness say that what was being planned was to steal the containers for the gasoline?

THE COURT: Did you want some clarification --

MR. FEIGENBAUM: Yes, please.

THE COURT: -- by way of Mr. Dobbins asking a clarifying question?

All right. Mr. Dobbins?

MR. FEIGENBAUM: Yeah. I thought Mr. Dobbins asked what was being planned, and the witness said --

THE COURT: All right. Why don't we clarify.

BY MR. DOBBINS:

Q. Did the tanks need to be stolen?

A. No.

Q. Okay. What was being planned to be stolen here?

A. It was the boat.

Q. Okay. Now, before Mr. Feigenbaum asked for clarification, you said if the tanks were there, and had been cleaned, that usually meant you had already seen the boat. What do you mean by that?

A. That if a boat had been seen -- if the boat had been seen in order to send it to Mexico, the containers would be brought in, would be cleaned, would be filled with gasoline, and then, once the weather was good, the plan was to take the boat to

Mexico.

Q. And when Javier is saying that the tanks are there and being cleaned already, what does that mean that the next step is that's going to happen?

A. The next step after the containers are cleaned are to be filled with fuel.

Q. And did Javier or you send anybody to get these tanks?

A. No.

Q. Okay. Would Javier sent somebody to bring the tanks to you?

A. No.

Q. Okay. Now, it doesn't say there where the tanks are located. So how do you know where the tanks are?

A. Because the containers were stored in the patio of my home.

Q. Okay.

A. Those containers were for the last boat that ended up -- or that got there.

Q. Okay. So let's move down now to the next green box, dated June 21st of 2019. What did Javier send you here?

A. This is something that came out in YouTube about Chupa's arrest.

Q. Why did Javier send you a link to information about Chupa's arrest?

A. So that I would see that he had been arrested.

Q. All right.

MR. DOBBINS: I think we can move ahead now to Page 40, please.

BY MR. DOBBINS:

Q. And if we look at the first green box, what did Javier send you with this message?

A. A voice message.

Q. Okay.

MR. DOBBINS: And is it possible to show the date on the ...

BY MR. DOBBINS:

Q. And what was the date that this message was sent to you?

A. June 24th, 2019.

Q. Okay.

MR. DOBBINS: One moment.

Can we go ahead and play the message.

We also have it in a transcript form in a box on the right.

MR. FEIGENBAUM: Judge, just for the record, are these different portions, like the audio and so forth -- are they covered by your recognition of the continuing objection?

THE COURT: Yes. Of course.

MR. FEIGENBAUM: Thank you.

MR. DOBBINS: And I believe the audio on this, Your Honor, is Government's Exhibit 7B, which is also in evidence.

That's not the recording.

THE COURT:  Are you seeking to introduce the audio right now?  The court reporter is just asking whether -- because it's part of the evidence, whether she needs to take down the actual statements made within the audio.

MR. DOBBINS:  It's in Spanish, so I would say no.  And we have a transcript in Government's Exhibit 7A of the -- it's very brief.

(Pause in proceedings.)

MR. FEIGENBAUM:  While that's being looked for, Your Honor, may we have the date of this audio?

THE COURT:  Exhibit 7.

MR. DOBBINS:  It was 7A, and I believe I read the date into the record, sir.

MR. FEIGENBAUM:  Right.  Could you just repeat it, please.

MR. DOBBINS:  Well, we've lost the screen for a second.  But as soon as we pull it back up, we'll reread it.

MS. KLEPACH:  I think it was June 24th.

MR. DOBBINS:  June 24th, 2019.  It's Page 40 of the Government's Exhibit 7A.  I believe it's the first green box.

THE COURT:  Thank you.

(Pause in proceedings.)

(Audio played.)

MR. DOBBINS:  One moment.

(Pause in proceedings.)

MR. DOBBINS:  All right.  If we could just double-check to make sure that we have the Government's computer, please.

There we go.

BY MR. DOBBINS:

Q.  All right.  Sir, after listening to that brief note -- voice note, what was it that Javier was asking you?

A.  To send him my home address for him to get to my house.

Q.  Okay.  And why was Javier coming to your house?

A.  He would bring me the containers.

Q.  Okay.

MR. DOBBINS:  If we could go down to the last blue box there, also on June 24th, 2019.

BY MR. DOBBINS:

Q.  What did you respond Mr. Hernandez?

A.  That his phone was turned off because the calls would go straight to the mailbox.

Q.  Okay.

MR. DOBBINS:  If we could go to the next page, please.

And if we could just open up those top three blue boxes.

BY MR. DOBBINS:

Q.  And what was it that you were sending him -- these texts via WhatsApp on June 24th?

A.  That he had no signal.  I was asking him on what part of

112

Naples he was. And the last message is my home address.

Q. Okay. All right. Now, the next message from Mr. Hernandez is a green voicebox. We're just going to show you the translation, which also has the Spanish transcription there.

What was it that Mr. Hernandez was asking you on that voice note?

A. That he was at the Walmart and that he didn't realize when he had put it on flight mode.

Q. Okay.

MR. DOBBINS: If we could just go to the next page, please.

BY MR. DOBBINS:

Q. And the first blue box there, also June 24th, what did you tell Mr. Hernandez there?

A. That -- okay, that it was fine.

Q. Okay. Now, moving a little bit down to the first -- I'm sorry -- not to the first, but to the second green -- the third green box. What day is this message sent to you?

A. 6/27 -- June 27th, 2019.

Q. Okay. So this is after -- couple days after the other -- those other messages where Mr. Hernandez was trying to reach you?

A. Yes.

Q. So back on June 24th, 2019, did Mr. Hernandez stop by your house?

A.   Yes.  To drop off the containers.

Q.   Okay.

MR. DOBBINS:  Let's go ahead and move down to that last voice note there.

Sorry.  Let's skip that.

Let's go to Page 46, please.

BY MR. DOBBINS:

Q.   That first green box, what date is Mr. Hernandez telling you:  "Hello"?

A.   That's the 1st -- yes.  It's the 1st of July, 2019.

Q.   Okay.

MR. DOBBINS:  And if we could go to the next page.

BY MR. DOBBINS:

Q.   What date is that that Mr. Hernandez is telling you: "Hello"?

A.   July 3rd, 2019.

Q.   Okay.

MR. DOBBINS:  If we can go down to, I believe, the next page -- I'm sorry.  Let's just go ahead and go to Page 50.

BY MR. DOBBINS:

Q.   Okay.  So this first green box, what date is this message sent to you?

A.   It was on July 10th, 2019.

Q.   Okay.  And what is this that Mr. Hernandez has sent to you?

A.   His home address.

Q.   Okay.   Why was Mr. Hernandez sending you his home address?

A.   So that I would go get my money.

Q.   What money was that?

A.   From the sale of a boat.

Q.   The sale of a boat to whom?

A.   Oh.   That was for Neco.   Yes.

Q.   Would this have been one of the boats that you and Javier had stolen?

MR. FEIGENBAUM:   Judge, I just object to leading or supplying the answer.

THE COURT:   Overruled.   I'll allow it.

THE WITNESS:   Yes.

BY MR. DOBBINS:

Q.   And why did Javier have your money?

A.   Because Neco, on occasion, would give it to him, so that when he would return he could give it to me.

Q.   Okay.

MR. DOBBINS:   Let's go ahead and scroll down.

I think the next page we want is 51.

Let's look at that one, please.   The last blue box on the bottom of the page, please.

BY MR. DOBBINS:

Q.   Also, on July 10th of 2019, what was the message you sent to Mr. Hernandez after you tried to call him a couple times?

A.   That he was taking too long.

Q.  Taking too long for what?

A.  Well, in order to come where I was -- and I don't remember specifically if it was that I went to his house, and that when I got to his house he didn't happen to be there, and then I had to wait for him.

Q.  Okay.

MR. DOBBINS:  If we could close that, please, and go to Page 53.

BY MR. DOBBINS:

Q.  I just want to show you these two green text boxes that Mr. Hernandez sends you on July 10th of 2019.  What were these images of?

A.  These were images of the weather.  There was an application where you could check the weather.

Q.  And why was Mr. Hernandez sending you these pictures of the weather?

A.  So that I could see what the weather was like.

MR. FEIGENBAUM:  Your Honor, would it be possible to take a comfort break right now?

THE COURT:  Yes.  Of course.

Ladies and Gentlemen, let's go ahead and take a 10-minute recess.

COURT SECURITY OFFICER:  All rise.

(Jury not present, 2:49 p.m.)

THE COURT:  Okay.  We're on a 10-minute recess.

(Recess from 2:49 p.m. to 3:06 p.m.)

THE COURT:  All right.  Both sides ready to continue?

MR. DOBBINS:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  We have all of jurors?

COURT SECURITY OFFICER:  I think so.

THE COURT:  All right.  We can bring them in.

Thank you.

COURT SECURITY OFFICER:  All rise for the jury.

(Before the Jury, 3:06 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

And we'll continue with the direct examination.

MR. DOBBINS:  Thank you, Your Honor.

BY MR. DOBBINS:

Q.  Mr. Reyes Aranda, we were talking about these weather maps that Mr. Hernandez was sending you.  Why was Mr. Hernandez sending you weather maps?

A.  So that I could see what the weather conditions were like.

Q.  Why did you need to see what the weather conditions were like?

A.  So -- because I would need to know if the weather was bad, that I could not send a boat from Naples to Mexico under bad weather conditions.

Q.   Okay.  And who would actually be driving the boat from Naples to Mexico?

A.   Javier.

MR. DOBBINS:  All right.  Let's continue scrolling down to, I believe it's Page 56.

I'm sorry.  I think I may have meant 56 on the marked pages.

I think this is still Page 54.  I apologize.

I see.

All right.  Let's move ahead then to Page 71, please.

I'm sorry.  I was right. Fifty-six.  The page is marked 56, but it's not the exhibit page number.

BY MR. DOBBINS:

Q.   What are you sending --

MR. DOBBINS:  If we could look at the date for that top blue box, please.

THE WITNESS:  7/13 of 2019.

BY MR. DOBBINS:

Q.   Okay.  What attachments are you sending to Mr. Hernandez on that date?

A.   A boat that was in the patio of -- the boat that was on a patio of a house.

Q.   Okay.

MR. DOBBINS:  And let's scroll down, just so that we can see the actual photos, please.

BY MR. DOBBINS:

Q.   When you say:  "Patio," sir, is that -- what do you mean by that?

A.   The back part of a house.

Q.   Okay.  Why were you sending Mr. Hernandez pictures of this boat?

A.   Because he would ask me to look for boats, to take photographs of boats, to send him the photographs, and to see which one of those photographs was the most convenient one for him.

Q.   The most convenient one for whom?

A.   For Neco.

Q.   Did you and Mr. Hernandez end up taking this boat?

A.   No.

     MR. DOBBINS:  All right.  Let's move ahead, please, at this time, to Page 71.

     Okay.  I'm sorry.  We're looking for page -- I'm sorry -- the exhibit number.

BY MR. DOBBINS:

Q.   Okay.  If we could look at this date on this first green box here.

A.   July 19th, 2019.

Q.   And what did Mr. Hernandez tell you here on this date?

A.   He asked if I'm still working, because he thought that I had already left work.

Q.  Okay.

MR. DOBBINS:  And if you could go to the blue box, please.  Let's see the blue boxes.

BY MR. DOBBINS:

Q.  What did you tell him in response?

A.  So that -- no, that I didn't -- hadn't finished working, and that I didn't want to talk in front of a partner who worked with me at the electricity company.

Q.  Why didn't you want to talk to Javier Hernandez in front of your coworker?

A.  Well, because the topic that we were talking about had to do with these vessels, and I didn't want anyone to know about what we were talking about.

Q.  Okay.

MR. DOBBINS:  Could you go to the -- go to the next page, please.

If we could go to that second blue box and then the first green box.

BY MR. DOBBINS:

Q.  If we look at the date, what are the dates of these conversations?

A.  The 7th -- well, July 21st of 2019.

Q.  And what were you asking Mr. Hernandez here?

A.  At what time was he going to arrive in -- okay.  What time was he going to arrive in Naples.

Q.   Okay.  And what was his response?

A.   Around seven o'clock at night.

Q.   Okay.

     MR. DOBBINS:  If we could -- okay.  If we could move to the next page, please.

BY MR. DOBBINS:

Q.   What is this -- what is that that you're asking Mr. Hernandez here?

A.   I'm asking him if he has bought a ticket yet to return to the United States from Mexico.

Q.   Okay.

     MR. DOBBINS:  And if we go to the next three blue boxes, please.

BY MR. DOBBINS:

Q.   And what are you telling Mr. Hernandez here?

A.   That he should give me enough advance warning, so that I could send a friend over -- so that I could send a friend over to pick up the money, because I was wearing a uniform, and -- I was in Fort Myers, and I didn't have enough time to go back to Miami, to go to Miami.

Q.   And what money was Mr. Hernandez bringing for you?

A.   Well, supposedly it was $10,000 that Neco was sending me with him.

Q.   Okay.

A.   Yes.

Q.   And what was that $10,000 from?

A.   It was payment for a boat that had been sent.

Q.   Okay.

MR. DOBBINS:   Let's move on to the green box where Mr. Hernandez responds.

BY MR. DOBBINS:

Q.   And what did he tell you?

A.   He said:   "Let me arrive in the airport, and then I'll tell you what time I'm going to arrive in Fort Lauderdale."

Q.   Okay.

MR. DOBBINS:   If we could move ahead to -- let's go ahead and go to Page 76.

Okay.   I'm sorry.   Let's keep going down.

There we go.   Page 77, sorry, which is Exhibit Page Number 69.

BY MR. DOBBINS:

Q.   Did Mr. Hernandez start sending you pictures of another type, besides boats or weather maps?

A.   No.   That's a photograph of a -- again, could either be a pickup truck, or a van, station wagon.

Q.   Okay.   Why was Mr. Hernandez sending you pictures of -- is this a pickup truck?

A.   Yes.   It is a pickup truck.

Q.   Okay.   And why was Mr. Hernandez sending you pictures of a pickup truck?

122

A.   Because he had mentioned that he wanted to buy a pickup truck, and he wanted to sell me that pickup truck.  And he sent me the pictures, so that I could look at the photographs and see if I liked it.

Q.   Did you ultimately end up buying a pickup truck from Mr. Hernandez?

A.   No.

Q.   Did Mr. Hernandez ever tell you about other vehicles that he would take and drive to Neco?

A.   Yes.

Q.   What did Mr. Hernandez tell you about that?

A.   So on occasions, I would call him, and he would say: "Well, not right now," because he was driving a car something over to Mexico to Neco.

Q.   Do you know anything about where Mr. Hernandez got those vehicles?

A.   No.

        MR. DOBBINS:  Let's move ahead now to Page 92, please.

        All right.  Let's look at that blue unit and that green unit there, please.

BY MR. DOBBINS:

Q.   What is the date on these communications, sir?

A.   8/7 of 2019.

Q.   Okay.  So on August 7th of 2019, you text the numbers: "827." Why were you texting that to Mr. Hernandez?

A.   So that was the key number for the boat.

Q.   And what is Mr. Hernandez responding there?

A.   He's asking me if I had taken a photograph of the boat.

Q.   Okay.

MR. DOBBINS:   All right.   Let's scroll down one page, please.

BY MR. DOBBINS:

Q.   And what do you send him in response to that text message?

A.   The photographs of the boat.   Yes.   The photographs of the boat.   The photographs that were taken of the boat.

Q.   Okay.

MR. DOBBINS:   Let's go ahead and scroll down, so we can show the pictures that were the enlarged parts of the attachments.

Let's go ahead and keep scrolling.

BY MR. DOBBINS:

Q.   What are we looking at here, sir, when we see these pictures?

A.   Well, the seats, the rudder, the console, and the engines.

Q.   Okay.   And again, why are you sending those to Mr. Hernandez?

A.   Because he always asked me for photographs.   He wanted to see or know what condition the boat was in.

Q.   Mr. Hernandez did?

A.   Mr. Hernandez, yes, and also Neco.   Both of them did.

Q. Do you recall what kind of boat that was that we were just looking at?

A. That is a Jupiter with two Yamaha 300 engines.

Q. And looking at this first green text box after you sent those pictures from Mr. Hernandez, what is he asking you here?

A. Well, he has a question. He's asking me if the key number is 827 or is it 821.

Q. Okay. And why is he asking you for the key number?

A. So that he can buy it over here in Miami.

Q. So he can buy what over here in Miami?

A. The key, so he can start the boat.

Q. Okay.

MR. DOBBINS: Moving on, please. Let's just keep scrolling down.

I think we can go ahead and move ahead to 106, please.

BY MR. DOBBINS:

Q. This first green box from Mr. Hernandez, what is the date and what's he saying to you here?

A. The date's 8/12 of 2019, and that in the afternoon he'll go over there, he'll go to Naples.

Q. Okay.

MR. DOBBINS: All right. Let's open up the green box and then the blue box below it.

BY MR. DOBBINS:

Q. Okay. What's the date of this conversation?

A.   8/15/2019.

Q.   And what is Mr. Hernandez asking you and what do you respond?

A.   "Tell me how things are going."

"Everything's going well.  I'm going today."

Q.   Where were you going to go?

A.   To go and see a boat.

Q.   Okay.

MR. DOBBINS:  All right.  Let's continue moving down, please.  I think with this next page with the pictures it's going to be 110, maybe 109, but it's marked for the text page as 87.

BY MR. DOBBINS:

Q.   What are these attachments you're sending to Mr. Hernandez?

A.   So the top one is the screen.  It's the screen that shows the fuel level of the boat.

Q.   Okay.  What about the middle one in the bottom?

A.   So this is the electrical panel for the boat.

Q.   And what's the bottom one?

A.   So that's kind of similar.  It's also the panel of the -- the electric panel for the boat, and it also shows the cables and the battery.

Q.   Okay.  And why are you sending these pictures to Mr. Hernandez?

A.   Well, he would ask me for those on occasions because he

wanted to see them.

Q.   Why did he want to see these photographs of these items on the boat?

A.   Well, he liked to see them.  He liked himself to see them to check them himself.

Q.   Okay.

MR. DOBBINS:  Let's keep scrolling down, please.

If we could highlight the two green boxes, please.

BY MR. DOBBINS:

Q.   What is it that Mr. Hernandez is asking you here?

A.   The boat's model.

Q.   Okay.  And what about the next text box?

A.   Whether it was 29 or 27 feet.

MR. DOBBINS:  Let's scroll down, please.

BY MR. DOBBINS:

Q.   Then, after you make that call, what does Mr. Hernandez respond?

A.   This message that it was 31 feet.

Q.   Okay.

MR. DOBBINS:  Let's continue scrolling down, please.

Let's go ahead and move ahead to 143, please.

All right.  And let's start with that second blue box.

BY MR. DOBBINS:

Q.   What's our date here, sir?

A.   9/26/2019.

127

Q.   And what are you asking Mr. Hernandez?

A.   I was asking him how things were going.

Q.   Okay.  And what was his response?

A.   Whether he was working.

Q.   Okay.  Was he asking you if you were working or is he saying he was working?

A.   No.  If I was working.

        MR. DOBBINS:  Okay.  Let's go to the next page, please.

BY MR. DOBBINS:

Q.   What did you ask him there?

A.   I was asking him what had happened, whether it was something urgent.

Q.   Okay.

        MR. DOBBINS:  We can go ahead and scroll to the next page, please.

        There we go.

BY MR. DOBBINS:

Q.   You sent him two pictures on this date.  Could you tell us the day and what are these pictures of.

A.   10/9/2019.

Q.   And what are these pictures of?

A.   A boat that was in the back part of a house.

Q.   Okay.  Did you end up taking this boat?

A.   No, not that boat.

Q.   Do you remember why not?

A.   It was a Contender, and it was not sent.

Q.   It was not what?

        THE INTERPRETER:  Was not sent.

        MR. DOBBINS:  Not sent.

        Okay.  All right.  If we could go to 154, please.

BY MR. DOBBINS:

Q.   What's the date here when this message was sent?

A.   10/16/2019.

Q.   Okay.  And what's the --

        MR. DOBBINS:  If we could go back to the pages, so you could see.

BY MR. DOBBINS:

Q.   What are these attachments that you're sending Mr. Hernandez?

A.   A boat.

Q.   Okay.  Why are you sending pictures of this boat?

A.   Because whenever I took pictures, him and Neco would ask me to send them the pictures.

Q.   Okay.

        MR. DOBBINS:  Let's continue scrolling down, please, so they can see the pictures.

        If we stop there.

BY MR. DOBBINS:

Q.   Now, on -- what's the date on this text box?

A.   His home address.

Q.   What's the date, sir?

A.   10/21/2019.

Q.   Okay.  And why is Mr. Hernandez giving you his home address again?

A.   Whenever he gave me his address, it was either to look for a key or to get money.

Q.   Okay.

MR. DOBBINS:  Let's keep going.

BY MR. DOBBINS:

Q.   On this next page, you sent again some more pictures.  And what are these pictures of?

A.   Can you amplify them a little bit.

Q.   Sure.

A.   That's the back, where the battery charges go, the engine controls.  And the other one, I don't remember.

Q.   Okay.  We can scroll down and maybe you can see it enlarged there.

Does that help you --

A.   This is a current converter for -- a current converter for the electricity in one of the boats.

Q.   Okay.

MR. DOBBINS:  Let's go to the next page, please.

BY MR. DOBBINS:

Q.   We have more photos that you're sending?

A.   (No verbal response.)

Q.   Do you recall what this is?

A.   Yes.  That's the bag where the batteries are and the current converter.

MR. FEIGENBAUM:  Your Honor, I need to just step outside for one minute.

THE COURT:  Well, then why don't we just take a short recess.  All right?

MR. FEIGENBAUM:  Okay.

THE COURT:  All right.  Let's go ahead and take a 10-minute recess.

COURT SECURITY OFFICER:  All rise.

(Jury not present, 3:40 p.m.)

THE COURT:  Okay.  We're on a 10-minute recess.

(Recess from 3:40 p.m. to 3:53 p.m.)

THE COURT:  All right.  Welcome back.

MR. FEIGENBAUM:  Thank you, Judge, for that.

THE COURT:  Yes.  Of course.

Are we ready to continue?

MR. FEIGENBAUM:  Yes, Judge.

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  All right.  Let's bring the jury back in.

COURT SECURITY OFFICER:  All rise for the jury.

(Before the Jury, 3:54 p.m.)

THE COURT:  All right.  Welcome back, Ladies and

Gentlemen.

Please be seated.

And we'll continue with the direct examination.

MR. DOBBINS:  Thank you, Your Honor.

BY MR. DOBBINS:

Q.  Mr. Reyes Aranda, we left off on Page 117.  We were looking at these pictures, and if we could scroll down so that you could just see them.  What are these pictures of?

A.  They are photographs of a current converter, the last photographs that were sent.

Q.  Okay.

MR. DOBBINS:  And let's go down to the next page, which is going to be -- on the text page, it's Page 118.

BY MR. DOBBINS:

Q.  Again, what's the date on these images that you're texting to Mr. Hernandez?

A.  10/25/2019.

Q.  Okay.  And let's take a look at these images.

What are you sending him pictures of?

A.  The last boat that was sent to Mexico.

Q.  Okay.  Now, since you're sending him these pictures on October 25th, 2019, have you and Mr. Hernandez stolen the boat yet at this point?

A.  That day, no.

Q.  Okay.  And how do you recognize these pictures to be the

last boat that you and Mr. Hernandez stole together?

A.   Because I don't -- I can't forget that it's a green boat with the letters in white, and it said:   *"Luca Brasi."*

Q.   Okay.   And was that the same boat we showed in Government's Exhibit 59 earlier this afternoon?

A.   Yes.   Correct.

Q.   Okay.

        MR. DOBBINS:   Let's keep going, please.

BY MR. DOBBINS:

Q.   And I want to talk about this last photograph here --

        MR. DOBBINS:   I'm sorry.   I apologize.   Keep scrolling down to the next attachment, also sent on October 25th, 2019.

BY MR. DOBBINS:

Q.   What is that a picture of?

A.   This is the lower part of the seat in the back of the boat.

Q.   Okay.

        MR. DOBBINS:   And to the next page, please.

BY MR. DOBBINS:

Q.   Let's start with the first messages there from Mr. Hernandez, also on October 25th, 2019.   What did he ask you there?

A.   Whether the boat said the feet or the length it had.

Q.   Okay.

        MR. DOBBINS:   Let's go ahead and move on to -- I think it's Number 184 -- Page 184.   Let's start with that top blue

box.

BY MR. DOBBINS:

Q.  What date was the date here?

A.  11/18/2019.

Q.  All right.  And what are you asking Mr. Hernandez?

A.  I'm asking him how is he doing.

Q.  Okay.

MR. DOBBINS:  If we could move on to a little bit lower there.

BY MR. DOBBINS:

Q.  Also on November 18th, you sent him a photograph.  What is that a picture of?

A.  I was working at a home, and I sent him a photograph of how it looked.

Q.  Okay.

A.  So that you could see the sea.

Q.  Okay.

MR. DOBBINS:  And let's go down to the next page, please, after the photograph.

BY MR. DOBBINS:

Q.  Mr. Hernandez sends you some attachments here.  Do you recall what these are?

A.  That was to see whether the boat coincided with the model, the boat's model.

Q.  Okay.

134

MR. DOBBINS: All right. Let's go to the next page, please.

BY MR. DOBBINS:

Q. And Mr. Hernandez then sends you a follow-up text after he sends you those diagrams, and what is he asking you here?

A. To see whether he had checked the holes on the site to see whether -- whether he had reviewed the site to see whether there was a log jam.

Q. Okay.

MR. DOBBINS: And let's go to the ...

BY MR. DOBBINS:

Q. Did you say: "Log jam," or did you say something else, sir?

A. (No verbal response.)

Q. Did you say: "LoJack"?

A. Whether there was a LoJack, or a tracker, or like a GPS.

Q. So he had asked you to check the holes in the boat for a tracker device; is that right?

A. Yes. They were checking it out to see whether it was a LoJack, and he sends me the photos to see which of the two photos could be -- which of the two photographs would be the model, and to see which of those two models the boat could be.

Q. Okay.

MR. DOBBINS: Let's go to the next page, please.

BY MR. DOBBINS:

Q.   And what's the date on that green box at the top?

A.   11/19/2019.

Q.   Okay.  And what is Mr. Hernandez asking you there?

A.   Where was I.

Q.   Okay.

        MR. DOBBINS:  And let's go down to the next page.

        If we could go all the way to the end.

BY MR. DOBBINS:

Q.   What's the last communication you have there?

A.   11/23/2019.

Q.   Okay.  And what are you asking Mr. Hernandez there?

A.   Like:  "Javi, what's up?  How are you doing?"

Q.   Had you heard from Mr. Hernandez at this point for a bit?

A.   No.  I had written to him.  He didn't answer.  And a few days later, I found out through Neco that he had been arrested.

Q.   Who had been arrested?

A.   Javier and -- both of them.

        MR. DOBBINS:  If I may the ELMO, please.

        Yes, for the jury.  It is Government's Exhibit 114 and 114A, which are in evidence.

BY MR. DOBBINS:

Q.   I'm going to zoom out, sir.

     Okay.  Now showing you Government's Exhibit 114.  Where it says:  "Participants" there at the top, whose phone number is

that?

A.   That's mine.

Q.   Okay.  And this is an instant message from you.  What's the date?

A.   3/24/19.

Q.   Okay.  And what is this message to Mr. Hernandez?

A.   Because Neco had sent me some money with him, and I was calling him.  Neco told me to call him.  That he had sent me some money with him and for me to pick it up.

Q.   Okay.  And why were you picking up the money from Mr. -- I'm sorry.  Where did this money -- what was this money from?

A.   From some boat that had been sent.

Q.   Okay.  So Mr. Hernandez had your fee from Neco?

A.   That was paid independently from what I got paid.

Q.   Why would Neco send the money with Mr. Hernandez?

A.   He would take advantage that he was coming here, and he would send part of the money that he had to pay me with him.

Q.   You testified earlier that sometimes other people would hold money for Neco here in the United States.

A.   Yes.

Q.   Did Javier Hernandez ever hold money for Neco here in the United States?

A.   I don't know about that part.

Q.   Okay.  Did you know that Chupa, Neco, and others over there in Mexico were involved in more than just selling stolen boats?

MR. FEIGENBAUM:  Your Honor, leading the witness.

THE COURT:  Sustained.  Rephrase.

BY MR. DOBBINS:

Q.  Did there come a time when Chupa told you about other crimes that they were committing over in Mexico?

A.  No.

Q.  All right.  Instead of paying you for that first boat -- did Chupa offer to do anything for you or a family member instead of paying you?

A.  No.

Q.  Okay.

MR. DOBBINS:  Your Honor, I have no further questions.

Tender the witness.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon, Mr. Reyes.

A.  Good afternoon.

Q.  How are you doing?

A.  Good.

Q.  I've never spoken to you before, correct?

A.  No.

Q.  First time we're having a conversation?

A.  Yes.

Q.  I just want to ask you one thing before I forget.  You

showed a -- or were asked to talk about -- I think it was a WhatsApp chat where you were giving your address to Mr. Hernandez because he wanted to know where you lived, right?

A.  Yes.

Q.  And I wrote down that date as being June 24, 2019, where Mr. Hernandez said:  "Send me the location of your house," because he was in Naples.  Remember that?

A.  Yes.

Q.  Well, I believe earlier, at kind of the beginning of your testimony -- it's been many hours, but I believe at the beginning of your testimony you said you first started having any communications with Mr. Hernandez -- when was that?  What month and year?

A.  In 2018.

Q.  Do you remember which month?

A.  Not exactly.  I couldn't tell you.

Q.  Okay.  So if we go to 2018, and then we look at this message of practically the end of June, which would be seven months in 2019 -- more than seven months -- Mr. Hernandez doesn't have your home address, correct?

A.  Can you repeat the question.

Q.  Okay.  So for about seven months that you said you were dealing with Mr. Hernandez, he didn't have your home address and needed to ask for it almost in July of 2019.

A.  Because I had recently moved to that address.

139

Q.   Did you buy a house?

A.   In January of 2019.

Q.   Okay.  So still for January 2019 to June 24, 2019, Mr. Hernandez didn't have your new home address?

A.   He didn't have it.

Q.   And you were supposed to have been doing illegal business with him regarding boats from the end of 2018 to the end of 2019, correct?

A.   Yes.

Q.   And in fact, if I remember your testimony correct, that everything that you allegedly did with Mr. Hernandez, that Mr. Hernandez knew was illegal, happened within one year?

A.   Yes.

Q.   Now, you were a codefendant, meaning, you were another defendant in this case up until recently, correct?

A.   Yes.

Q.   And you first became a defendant in this case -- that only has two people, correct?

A.   Yes.

Q.   And you became a codefendant, I believe it was on December 2nd, 2022?

A.   That was when I was arrested, wasn't it?

Q.   Well, let's just say around the beginning of December of 2022 you became a defendant in this case.

A.   Yes.

140

Q. And you came to court on December 19 -- I'm sorry -- on September 19 -- just a few weeks ago, you came to court on September 19 in this courtroom, with Judge Bloom, do you remember, for a pretrial conference?

A. Yes.

Q. And you told the Court, through your attorney, that you were ready for trial?

MR. DOBBINS: Objection.

THE COURT: And the basis?

MR. DOBBINS: Relevance.

THE COURT: Overruled. I'll allow it.

THE WITNESS: Yes.

BY MR. FEIGENBAUM:

Q. Okay. And so trial was going to start, and did start, one week later, on September 26th, 2023, correct?

A. Yes.

Q. But the Saturday before, on September 23, just not too many days ago, you decided to have a meeting with the prosecutors and agents -- some of them, anyway -- in this case, right?

A. Yes.

Q. And present at that Saturday meeting -- the Saturday before this trial started, how long did you meet with the prosecution team?

A. Around three hours.

Q. And present was Mr. Dobbins, one of the prosecutors?

141

A.   Yes.

Q.   And also FBI Agent Sergio Francisco, also seated at the prosecution table?

A.   Yes.

Q.   And you sat around for three hours, and you told them that you wanted to not go forward with trial, but rather try to get the best deal possible, correct?

A.   Yes.

Q.   And during that meeting you had with them, on Saturday, September 23, there came a point when you lied, correct?

A.   Yes.  That's correct.

Q.   So here you are across the street at the prosecutor's office, a few days before trial starts, trying to get the best deal you could, and you had promised them to tell the truth, but you lied to them on a very, very important issue, and got caught, correct?

A.   So I started saying something -- saying something that was incorrect, and then I retracted and I began to tell all of the truth.

Q.   But you only began to tell the truth after you got caught by them?

A.   So they asked me where I had bought the boat, and I said no, I hadn't bought the boat.  And then I said I had stole the boat in Bonita Springs.

Q.   Okay.  We're going to get in a minute.  But what you were

trying to do by your lies was to protect somebody who you did not want to be implicated in boat thefts.

A.  No.

Q.  No what?

A.  No.  That I didn't want to protect anyone, just that simply I had said that I had bought it in Tampa.  Then I retracted and I told the officer that I hadn't bought it in Tampa, that I had stolen it in Bonita Springs.

Q.  And you changed your story once the FBI agent told you that your story was a lie, that you had not bought the boat from a Cuban male in Tampa, correct?

A.  No.  It wasn't like that.

Q.  Was what?

        THE INTERPRETER:  "No.  It wasn't like that."

BY MR. FEIGENBAUM:

Q.  Okay.  So you stole the boat, but you told them that you had bought the boat before you changed your story?

A.  So -- because the officer asked me:  "This boat, you bought in Tampa from whom?"  And then, that's when I said:  "No.  I didn't buy this boat from anyone.  I stole this boat in Bonita Springs."

Q.  You first told them -- this is just a few days ago, when you're preparing with them, on a Saturday before the trial started, to testify against Javier Hernandez, correct?

A.  Yes.

Q.   And you told them -- as you were, for three hours, telling the prosecutor and the agents -- as you were telling them stuff over three hours, there came a point when you said around May or June of 2020 you bought a Cobia boat, which we've seen pictures of, from a Cuban male in Tampa.  Lie, correct?

A.   Yes.

Q.   Okay.  And that you had found the listing online and went to Tampa with cash on hand.  Lie, correct?

A.   Yes.

Q.   And you also told them, just a few days ago, that the seller gave you a Kentucky registration paperwork that expired in December.  That was a lie.

A.   No.  That was true.  That, I had said when I had -- that when I got the boat, the boat had -- was -- had been given to me with paperwork from Kentucky, the registration.  But it wasn't like that.  That's when I told the officer -- that's when I told the officer no, that I had not bought that boat, that I had stolen that boat in Bonita Springs.

Q.   So FBI Francisco, sitting at the table over there, said -- interrupted you and said that the Kentucky paperwork had the name of Julio Soto Yorka, that name on it, correct?

A.   Yes.

Q.   And who is Julio Soto Yorka?

A.   A friend of mine.

Q.   So what you did, just a few days ago, was tell a series of

lies to the Government to protect somebody you did not want to have a legal problem, correct?

A. Well, the thing is that the boat -- the paperwork -- the paperwork was in his name. What I wanted to tell the officer was that -- that I had put it in his name, but he didn't have anything at all to do with this problem.

Q. That Cobia boat, you stole by yourself?

A. Alone, yes. Alone, yes.

Q. And you wanted to keep it for yourself?

A. Yes. For me.

Q. You stole it from a marina behind a building?

A. Correct.

Q. You scouted out the boat that you found you wanted to steal?

A. Well, I just simply saw it and I liked it.

Q. And then you went and got the engine key serial number?

A. Yes.

Q. And you went to Miami to buy the engine key from a marina?

A. Yes.

Q. And you had been to that marina in Miami before to get engine keys?

A. Just for the first boat.

Q. Now, you were talking about -- at the very beginning of your testimony many hours ago, you were talking about -- in what year did you meet a person you knew as El Gordo, but it

was not Javier Hernandez? It was someone else that you had met called El Gordo. When did you first meet El Gordo?

A. I met him when he got out of prison, which was at the end of 2017.

Q. And you met him through your cousin?

A. Yes. He went to take him a hundred dollars. He had just come out of prison.

Q. Okay. And your cousin lived, at that time, in Cancun, Mexico?

A. No. Chetumal, Mexico.

Q. Is that in the State of Yucatan?

A. It also belongs to that whole area of Cancun.

Q. So your cousin -- in the name of that town in Yucatan, introduced you to El Gordo in 2017?

A. No. No. No. I met him here in the United States.

Q. I understand. What I meant by "introduced" is connected you to him.

A. Yes.

Q. And your cousin -- what's your cousin's name?

A. Edilberto Paez Rey.

Q. And your cousin, who lived in Mexico at the time -- does he still live there?

A. Yes. He still lives there.

Q. He wanted you, as you say, to give El Gordo a hundred dollars?

A.   Yes.

Q.   Because El Gordo had just left prison and needed some help?

A.   Yes.  He had no money.

Q.   What prison was El Gordo in?

A.   I think he was in prison in Fort Myers.

Q.   For stealing boats, correct?

A.   Yes.

Q.   And El -- and you asked El Gordo:  "Can you help me" -- you asked him:  "Can you help me make some money some way," right?

A.   Yes.  Because when I gave him the money, I asked him if he knew of any business or a deal that could be done.  And he said he knew of a friend he had in Mexico, and that you could do business with this friend.

Q.   So El Gordo and you started working together to send stuff to Mexico?

A.   We only worked together once, and that was when we had to go and look for two GPSs for a boat because Neco needed these two GPSs for a boat.

Q.   And you jumped over a fence somewhere and stole those parts?

A.   Yes.  Correct.

Q.   Do you still stay in touch with El Gordo?

A.   No.

Q.   When was the last time you ever had any contact with El Gordo?

A.   At the end of 2017.

Q.   Did you tell the prosecutors and the agents a couple of weeks ago that you started working together -- you and El Gordo -- stealing boat parts?

A.   Yes.  Because it was two -- it was two GPSs and two propellers that Neco needed in order to put together a boat.

Q.   Are you denying under oath today that after that theft, the initial theft that you said was the only one -- that you continued -- are you denying that you continued to work with El Gordo to steal boat parts?

A.   Yes.  Because he didn't go with me.

Q.   And you also told them that -- you also told the prosecution team that El Gordo always met you at a gas station or a public area, never at his house, correct?

A.   Yes.  Correct.

Q.   And in 2018 -- not 2017, like you said -- you told the prosecution that Neco told El Gordo that he wanted boats to start making big money, correct?

A.   No.  It was in 2017.

Q.   So if you said something that was different than what the Government took down in its notes, the Government would be wrong, not you?

A.   It was in 2017, because in 2018 that's when I started with Javier to send boats to Neco.

Q.   And you told the Government, in your meeting a couple of

148

weeks ago, that El Gordo and you scouted out a potential boat to be stolen, correct?

A. Yes.

Q. So when you just said a minute ago that after stealing a GPS and something else -- boat part with El Gordo, you had no further illegal activities with El Gordo -- isn't that what you just said a few minutes ago?

A. Yes. I no longer had any dealings with him after we sold the GPS. And I checked the boat, and he wanted to come with me, but he got scared and he left. He didn't participate in this boat.

Q. But you found the boat together near the Pinchers restaurant in Naples?

A. No. I saw it.

Q. Now, all the time that you knew El Gordo, did you ever know his name?

A. No.

Q. Well, you were involved with El Gordo for some illegal stuff for a while, and you never bothered to find out what his name was?

A. Well, actually, it was about three months that I hung around with him, and he never said his name. And everybody would refer to him as El Gordo, El Gordo, El Gordo.

Q. Now, at the beginning of your testimony with the prosecutor, you were talking about deciding to plead guilty.

You remember?

A.   Yes.

Q.   And the only other defendant was Javier Hernandez, right?

A.   Yes.

Q.   He's overweight.  Let's be honest.

A.   Yes.

Q.   And he's not in the greatest of physical shape, correct?

        MR. DOBBINS:  Objection.  Relevance.

        MR. FEIGENBAUM:  I'll tie it up, Your Honor.

        THE COURT:  All right.  I'll allow it.

        You may continue.

        THE WITNESS:  What do you mean when you say:
"Physical"?

BY MR. FEIGENBAUM:

Q.   For things like heavy lifting.

A.   Well, I was the one who would put the tanks into the boat,
and on occasion he would help me.

Q.   Well, you know he had a hernia operation?  You knew that,
correct?

        MR. DOBBINS:  Objection.

        THE COURT:  Sustained.

        MR. DOBBINS:  Objection.

BY MR. FEIGENBAUM:

Q.   How much does a 15-gallon tank, like the ones we saw, I
guess, in a photo so far -- how much do those weigh?

150

A.  I've never weighed it.

Q.  I believe you testified that you and he loaded those 15-gallon fuel-filled containers onto a boat or more than one boat.  Is that what you testified in this case?

A.  Yes.

Q.  Now, you had the meeting on September 23 with the prosecutor and agents a couple of weeks ago, and then you pled guilty.  When did you plead guilty?

A.  So when we came here to the Court.  I think it was the week before last.

Q.  So the trial was going to start --

A.  I think it was on the 26th.

Q.  Okay.  That would be September 26th, last week?

A.  Yes.

Q.  And you did that right before the trial started?

A.  Yes.

Q.  And the prosecutor talked to you about the deal that you had made with the Government to plead guilty and not go to trial, correct?

A.  Yes.

Q.  And you understood that by pleading guilty and cooperating, as they say, you could have a chance to get a reduction of the sentence that you were facing.

A.  Yes.

Q.  Because you were charged in two counts, correct?

A. Yes.

Q. One was a conspiracy to transport stolen vessels in international commerce, correct?

A. Yes, sir.

Q. That one was Count 2, if you remember.

A. Charge 2 was money laundering.

Q. Well, that's okay. Actually, it's Count 5, money laundering. That's the count, money laundering, that you pled guilty to?

A. Yes.

Q. And that has a potential sentence up to 20 years prison, correct?

A. Yes.

Q. So to try and avoid the potential maximum sentence of 20 years, you need the Government to help you try and get a sentence reduction, right?

A. Yes.

Q. Did you have an understanding of something called the sentencing guidelines, Federal Sentencing Guidelines?

A. Yes.

Q. What was your understanding of the Federal Sentencing Guidelines?

A. That if I tell the truth, and I cooperate, I will get a reduction in my sentence.

Q. With -- if you tell the truth, you could get a reduction in

your sentence.  That was your understanding?

A.  Yes.

Q.  But you went ahead anyway and told the Government a lie, when you had your three-hour interview a few days before trial was supposed to start?

A.  No.  No.

Q.  If you have prior convictions in criminal cases, does that impact your sentencing guidelines?

A.  I don't know.

Q.  Well, I don't think the prosecutor asked you this.  So let me ask you this:  Before this case that we're here about today, did you have any criminal cases?

A.  Yes.  I did have a trespass charge of looking for fuel behind an orange grove.

Q.  And you didn't have permission to be in that orange grove?

A.  No.

Q.  Well, it was really something more than just trespassing on somebody else's property, correct?

        MR. DOBBINS:  Objection, Your Honor.  It's a mischaracterization of the conviction on this case.

        THE COURT:  Sustained. Rephrase, please.

BY MR. FEIGENBAUM:

Q.  Were you also charged not only with trespassing, but theft of fuel?

        MR. DOBBINS:  Objection, Your Honor.

153

Relevance.  It's not an impeachable --

MR. FEIGENBAUM:  It is because -- I can tell you why, Judge, if you want to go sidebar.

THE COURT:  With regard to the charging document?

MR. FEIGENBAUM:  Yeah.

THE COURT:  The objection is overruled.  You're permitted to ask that question.  You'll have an opportunity to redirect.

BY MR. FEIGENBAUM:

Q.  You were charged with theft of fuel?

A.  Yes.

Q.  So it wasn't just trespassing?

A.  That was the charge, trespassing, and I got a one-and-a-half-year probation.

Q.  You were caught stealing diesel fuel at that location, correct?

MR. DOBBINS:  Objection, Your Honor.  This is improper impeachment.

MR. FEIGENBAUM:  Judge --

THE COURT:  With regard to the nature of the offense?

MR. FEIGENBAUM:  Yes.  It's a crime of dishonesty.  So even though it may be a misdemeanor, it's still admissible for impeachment.

MR. DOBBINS:  Except he was convicted of trespass, which is not a crime of dishonesty.

THE COURT:  Sustained.  You may continue.

BY MR. FEIGENBAUM:

Q.  Why did you go to the orange grove, to do what?

MR. DOBBINS:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  May I ask if you were caught with any item --

MR. DOBBINS:  Objection.  Relevance.

THE COURT:  With regard to the underlying offense, sustained.

BY MR. FEIGENBAUM:

Q.  Regarding the Cobia boat that you stole, you kept that boat for how many years?

A.  Two and a half years.  Two years and eight months.

Q.  And you kept it at your house?

A.  In my house.

Q.  And you also kept containers of fuel that you used to fill up stolen boats to send to Mexico?

A.  No.  No.  I don't understand the question.

Q.  Well, you kept the Cobia at your house for a couple of years?

A.  Yes.

Q.  And you stole that boat?

A.  Yes.

Q.  I thought you had testified earlier that you also kept fuel

containers at your house that you would use to fuel stolen boats.

A.   That was done with Neco and Javier.  After that, when I had my Cobia, it was just to go around, to go fishing, to go around the island.

Q.   Was it explained to you that in the case -- this case that you pled guilty to, that if you had used your house to facilitate the commission of any crime, that that property, your house, might have to be forfeited or could be forfeited?

A.   Well, the thing is that at my house it was done only once. Everything else was done somewhere else.

Q.   Thank you.

        MR. FEIGENBAUM:  Your Honor, are you planning on breaking at 5:00 p.m?

        THE COURT:  Yes.

        MR. FEIGENBAUM:  Okay.  This would be a good place to stop.

        THE COURT:  All right, then.

        Then, Ladies and Gentlemen, at this point in time, we will recess for the evening.  Recall that we will not be in session tomorrow.  We will pick up on Friday, and I will see you here at 10:30.  It will be a full day, but we'll start a little bit later, at 10:30.

        Have a pleasant evening and a pleasant day tomorrow.

        Please remember that you are not to discuss this case

with anyone, nor permit anyone to speak with you.  Everything learned about the case is learned in the courtroom.

I would ask that you place your juror notebooks in the jury room.  The jury room will remain locked.  And I'll see you on Friday morning at 10:30.

Have a nice evening.

COURT SECURITY OFFICER:  All rise.

(Jury not present, 4:59 p.m.)

THE COURT:  All right.

Mr. Aranda, we will see you on Friday morning at 10:30.  Please remember, sir, that since you are testifying you're not to discuss your anticipated testimony, the testimony of any individual, or any aspect of the case.  And I will see you back here at 10:30 on Friday.

Are there any issues that we need to address this evening?

MS. KLEPACH:  Not from the Government, Your Honor.

MR. FEIGENBAUM:  Your Honor, if Elias, the technical guy, could just come back for five minutes, I think we can resolve it.

THE COURT:  Iris, could you see if Elias is still here?  I know that they usually leave right about now, but let's see.  If Elias isn't here, is it something perhaps I can ask him to come in earlier on Friday morning to assist?

MR. FEIGENBAUM:  For sure.

THE COURT:  Okay.  All right, then.  Let's see --
perhaps he's here.

I understand that we're going to continue with
Mr. Aranda.  But following that testimony, who does the
Government anticipate it will be calling on Friday?

MS. KLEPACH:  On Friday, we anticipate Robert Mauceli,
and then John Teteris via Zoom.

THE COURT:  And there is no objection to that --
Mr. Teteris?

MR. FEIGENBAUM:  Not at all, Your Honor.

THE COURT:  All right.

MS. KLEPACH:  Then it would be Professor Keith Rosenn,
Roberto Marrero, and time permitting, Sergio Francisco.

THE COURT:  All right.  Now, given that we're starting
a little bit later, because I have some matters in the morning,
do you believe that it is possible that the Government will
conclude its case by Friday?

MR. DOBBINS:  I was initially hopeful, Your Honor, but
my direct took a lot longer today than I had hoped.  So I think
we will be close to resting on Friday, but probably Monday
morning at this point -- I'm sorry -- Tuesday morning, seeing
as Monday is a holiday.

THE COURT:  Oh, that's -- okay.  So we have Tuesday
and Wednesday.

All right.  Well, let's see how far we get on Friday.

I certainly don't want to give mixed messages to the jury, because I did advise them that I thought the schedule that we've given -- that is that we would have the case in their hands on the 11th, which is next Wednesday -- is a reasonable estimate.  So let's see where we are on Friday.

Okay.  Have a pleasant evening.  Have a nice day tomorrow.  And I'll see -- all right.  Elias isn't here.  I'm sorry, Mr. Feigenbaum.  But we're going to be in session beginning at nine o'clock.  So Liz will be here.  So if you could just let Liz know what time you want her to have Elias here to help you, and we'll ask him to be here for you.

MR. FEIGENBAUM:  Will do.  Thank you.

THE COURT:  Okay.  Have a nice day tomorrow, and I'll see you on Friday.  We'll start at 10:30.

MS. KLEPACH:  Thank you.

COURT SECURITY OFFICER:  All rise.

(Proceedings adjourned at 5:03 p.m.)

UNITED STATES OF AMERICA          )

ss:

SOUTHERN DISTRICT OF FLORIDA   )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 4th day of October, 2023, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 159.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 6th day of June, 2024.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov