IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1


UNITED STATES OF AMERICA,

        Plaintiff,                  October 6, 2023
                                 10:52 a.m.
        vs.

JAVIER HERNANDEZ,

        Defendant.                Pages 1 THROUGH 132

_____

TRANSCRIPT OF TRIAL DAY 7
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE
And a Jury of  12



Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                    Brian Dobbins, AUSA
                    Arielle Klepach, AUSA
                    99 Northeast 4th Street
                    Miami, Florida 33132


FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                    PO BOX 545960
                    Surfside, Florida 33154-9998


COURT REPORTER:     Yvette Hernandez
                    U.S. District Court
                    400 North Miami Avenue, Room 10-2
                    Miami, Florida 33128
                    yvette_hernandez@flsd.uscourts.gov

**I N D E X**

Certificate.................................. 132

**W I T N E S S**

**ON BEHALF OF THE GOVERNMENT:**                              PAGE
RAMON REYES ARANDA
CONTINUED CROSS-EXAMINATION BY MR. FEIGENBAUM                   5
REDIRECT EXAMINATION BY MR. DOBBINS                            35

JOHN TETERIS (via Zoom)
DIRECT EXAMINATION BY MS. KLEPACH                              45

ROBERT MAUCELI
DIRECT EXAMINATION BY MS. KLEPACH                              51

PROFESSOR KEITH ROSENN
DIRECT EXAMINATION BY MR. DOBBINS                              59
VOIR DIRE BY MR. FEIGENBAUM                                    65
CONTINUED DIRECT EXAMINATION BY MR. DOBBINS                    67
CROSS-EXAMINATION BY MR. FEIGENBAUM                            74
REDIRECT EXAMINATION BY MR. DOBBINS                            83

ROBERT MARRERO CISNEROS
DIRECT EXAMINATION BY MS. KLEPACH                              88

**E X H I B I T S**

**GOVERNMENT'S EX. NO.:**                          OFFERED   ADMITTED
  70                                                93         93

(Call to order of the Court, 10:52 a.m.)

THE COURT:  All right.  It's good to see everyone.  I hope everyone had a nice day.

Elias, are we fixing Mr. Feigenbaum's -- perfect.

MR. FEIGENBAUM:  Yes, Your Honor.  He just was starting to help me right now.

THE COURT:  Yeah.  Not a problem.

MR. FEIGENBAUM:  If you want to take one or two minutes.

THE COURT:  All right.  And we have all of our jurors ready to go?

MR. FEIGENBAUM:  Or would you rather do it at noontime?

THE COURT:  No.  Let's go -- well, I don't want to lose Elias.  So Elias, why don't we ...

And then, do we have the witness?

MS. KLEPACH:  Yes, Your Honor.  He's here.

THE COURT:  Yeah.  We can put him back on the stand, since we're in the middle of the cross-examination.

(Pause in proceedings.)

THE COURT:  Elias, are we all set with Mr. Feigenbaum?

IT DEPARTMENT:  Not yet.

THE COURT:  How much time do you think you need?

IT DEPARTMENT:  Five minutes.

THE COURT:  Five minutes?

Do you think you could come back -- that maybe we could just let you know when we're taking the one hour, if it only takes five minutes.  And then during that -- I don't want to mess up your lunch, but we're going to take a one-hour recess probably about one o'clock or so.

IT DEPARTMENT:  Let me know.

THE COURT:  All right.  So Mr. Feigenbaum, Elias is going to come back.  You don't need it for the cross-examination, right?

MR. FEIGENBAUM:  Correct.  I believe the Government asked him if he could help them.

IT DEPARTMENT:  Yeah.  That's why I needed five minutes.

THE COURT:  Oh, so you needed to do -- yeah.  Only because we're running late -- my fault -- so I want to get back.

Okay.  Both sides ready to proceed?

Let me acknowledge the presence of the Defendant.

MS. KLEPACH:  Yes, Your Honor.

DEFENSE ATTORNEY:  Yes, Your Honor.

(Before the Jury, 11:01 a.m.)

THE COURT:  All right.  Good morning, Ladies and Gentlemen.

Please be seated, everyone.

I apologize for the delay.  The fault was all mine.

We had a proceeding that went a little bit longer than anticipated, but we are ready to get right back to to work.

With the assistance of the interpreter, Mr. Aranda, let me remind you, you were previously placed under oath.

And if you'll recall, on Wednesday, we were in the middle of the cross-examination.

So Mr. Feigenbaum?

MR. FEIGENBAUM:  Yeah.  Thank you, Your Honor.

CROSS-EXAMINATION [CONTINUED]

BY MR. FEIGENBAUM:

Q.  Good morning, Mr. Reyes.

A.  (In English.)  Good morning.

Q.  How you doing today?

A.  (Through Interpreter.)  Good.  Good.

Q.  Let me ask you -- we didn't have court yesterday.  Did you go back to Naples yesterday?

A.  Yes, sir.

Q.  Okay.  Have you talked to anybody about the case since we adjourned on Wednesday?

A.  No, sir.

Q.  Okay.  Would you agree with me that there's many different Hispanic cultures; Cuban, Colombian, Argentinian?

A.  Yes, sir.

Q.  And each culture has different words that are used to describe different things?

6

A.  Yes, sir.

Q.  Okay.  And would you consider the form of Spanish that you speak to be Cuban Spanish?

A.  Yes, sir.

Q.  Now, we were talking about boats on Wednesday, both with -- when the prosecutor asked you questions and I asked you questions.

A.  Yes, sir.

Q.  And those boats, they have nice features?

A.  Yes, sir.

Q.  They have at least one bathroom?

A.  Yes.  It does have a bathroom.

Q.  And a place to put fishing poles?

A.  Yes, sir.

Q.  And places where you can store stuff, so it doesn't fly off during a trip?

A.  I don't know about that part.

Q.  Well, do they have -- do those boats have like little compartments?

A.  Yes, sir.

Q.  What you call in Spanish "huecos"?  H-U-E-C-O-S.

A.  No.  That's on the bathroom, from what I know.

Q.  Okay.  But are you disagreeing with me that the word huecos, if you want to put something -- store it in a place, it can be in a feature called a hueco?

A.   Well, it depends on the place where it is.

Q.   Okay.  Thank you.

And in Cuban Spanish, the common word for children's toys is "jugetes"?  J-U-G-E-T-E-S?

A.   Well, no.  Jugetes is regarding children, but it is not jugetes.

Q.   No.  The toys that children play with, in Cuban Spanish, is referred to as jugetes?

A.   Yes.  That's how it's called in Cuban Spanish, jugetes.

Q.   Now, you testified that you arrived in the United States in 2014?

A.   Yes, sir.

Q.   And you crossed the border from Mexico into Texas for your entering into the United States?

A.   No.  I crossed on the border with Texas using the Cuban Act -- the Cuban Adjustment Act.

Q.   What -- okay.

And you were allowed to stay in the United States under that law?

A.   Yes, sir.

Q.   And after a period of time, did you obtain a green card?

A.   Yes, sir.

Q.   Are you a US citizen?

A.   Yes, sir.

Q.   When did you become a US citizen?

A.   May 6th, 2020.

Q.   Okay.  Thank you.

You stated, when the prosecutor asked you questions, that you started --

A.   2021.

(In English.) 2021.

Q.   Okay.  Thank you.

When the prosecutor asked you questions, you told him about a gentleman named El Gordo?

A.   Yes, sir.

Q.   That's not Javier Hernandez sitting over there?

A.   No, sir.

Q.   And that person that you knew as El Gordo, that started in 2017?

A.   Yes.  I met him in 2017.

Q.   And you spoke about his knowledge of theft of things related to boats?

A.   He explained to me that in order to make money he had a friend who lived in Mexico, and sending him compartments of boats to Mexico, you could make money.

Q.   What are compartments of boats?

A.   GPS and propellers.

Q.   Okay.  And in fact, after he went with you, the day that you stole a GPS and propellers, you then went together on another scouting mission?

A. No.

Q. I think you testified that El Gordo went with you when you were scouting out a Grady-White brand boat.

A. No. No, sir.

Q. Did you testify on Wednesday that you only worked with El Gordo like three months?

A. Relatively, yes.

Q. What does that mean?

A. That I don't know if it was approximately three months. I don't have the exact count.

Q. Didn't you testify that Neco wanted to have things of more value, rather than just a spare parts?

A. Yes, sir.

Q. And you went to look for boats that you could steal?

A. Yes, sir.

Q. And the first time that you went to look for a boat, that Gordo and you were still working together?

A. No, sir.

Q. He didn't want to go with you because he was worried about going back to prison, right?

A. Yes, sir.

Q. So the period of time that you had an association with El Gordo ended by the time you went to look for the Grady-White?

A. No. I simply went to look for it. I went to look for it. And when I saw it, I already had Neco's phone that Gordo had

given to me and I was already in direct contact with Neco.

Q.  So after you found the Grady-White, you dealt directly with Neco?

A.  Yes, sir.

Q.  And that had to be after three months that you had first met El Gordo?

A.  What do you mean?

Q.  Okay.  You met El Gordo in 2017.  You just said that.

A.  Yes, sir.

Q.  You ended your relationship with El Gordo in about three months.  You said that.

A.  Yes, sir.

Q.  So if you found the Grady-White that you were going to steal, that had to be latest -- let me ask it differently.

If you had no more relationship with El Gordo three months after you met him, and you met him, let's say, the last day of December, 2017, you were not dealing with El Gordo in April/May of 2018?

A.  Yes.  That's correct.

Q.  And you stole that Grady-White pretty soon -- well, strike that.

You stole the Grady-White, then, sometime April/May of 2018?

A.  I don't know exactly that time.

Q.  How many days after you first found the Grady-White did you

steal it?

A.   Months went by.

Q.   So you found the Grady-White, and it was there for months before you ever actually stole it?

A.   The Grady-White was seen, photographs were exchanged.  And during the time that they decided on it -- because there was no one to take it to Mexico.

Q.   Now, how did your cousin in -- you had a cousin who lived in Chetumal, I believe you said on Wednesday?

A.   Yes.

Q.   Which is an area of the municipality of Cancun?

A.   Yes.

Q.   What was your cousin's name?

A.   Edilberto Paez Reyes.

Q.   And how does Mr. Paez Reyes, your cousin -- how did he know El Gordo?

A.   That part, I do not know.

Q.   And why was your cousin living in Yucatan back then?

A.   He lives there.  He's a Mexican citizen.

Q.   Doing what?

A.   He works there at a newspaper, working for a man who works for a newspaper.

Q.   Now, you testified quite a bit about keys for Yamaha marine engines, correct?

A.   Yes.  Correct.

12

Q.   And you learned how to obtain a serial number for Yamaha engine keys?

A.   Yes, sir.

Q.   And the man known as El Gordo taught you that?

A.   Yes.

Q.   So when you found out what keys were needed for that Grady-White boat, you went yourself to a marina to get the keys?

A.   Yes, sir.

Q.   And you came to Miami to do that?

A.   Yes, sir.

Q.   How many keys did you get on that trip to Miami?

A.   Just one, sir.

Q.   Did that work for both engines?

A.   Yes.  One key opens the switch for both engines.

Q.   And once you had the keys -- you had the keys, you stole the boat?

A.   Yes, sir.

Q.   And you can steal boats by yourself, can't you?

A.   With the help of Mr. Javier.

Q.   Well, sir, didn't you testify on Wednesday that you stole a Cobia boat that you later sold to Neco?

A.   Yes, sir.

Q.   And you testified under oath that you did that by yourself.

A.   Yes, sir.

Q. So now you tell the jury a different story, that when you stole boats you had to have Javier --

MR. DOBBINS: Objection. Mischaracterization of the witness's testimony.

THE COURT: Sustained. Rephrase, please.

BY MR. FEIGENBAUM:

Q. Okay. I'm going to ask you the same question I did before again. You are capable of stealing boats by yourself?

A. As opposed to this Cobia boat, here, there was no need to fill a container of fuel.

Q. But the actual taking of the boat, the Cobia that you got caught in a lie for, and --

MR. DOBBINS: Objection as to mischaracterization again. "Caught in a lie."

THE COURT: Sustained. Rephrase.

MR. FEIGENBAUM: Okay. Let me lay a foundation.

BY MR. FEIGENBAUM:

Q. Do you remember on Wednesday when I began asking you questions -- me?

A. Yes, sir.

Q. And you admitted that when you met with the Government prosecutors and agents on September 23rd of this year --

A. Yes, sir.

Q. -- that instead of stealing that Cobia brand boat you had found it online and went and paid cash for it.

A.   I explained that I had started saying that, and right away I retracted it and I explained to the officer that I had stolen that boat in Bonita Springs.

Q.   You only retracted what you said before because you were confronted with paperwork that revealed the truth.

A.   No, sir.  It wasn't like that.

Q.   Did you begin telling them a lie about how you got the Cobia?

        MR. DOBBINS:  Objection.  Asked and answered.

        THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Now, you began dealing with Neco as a result of knowing El Gordo, the friend of your cousin, right?

A.   Yes, sir.

Q.   And then Neco introduced you to a person with the nickname Chupa?

A.   He didn't introduce me to him.  He gave me his number so that I would communicate with him.

Q.   And you spoke to the person known as Chupa on the telephone?

A.   Yes, sir.

Q.   And Chupa's real name is Jose Miguel Gonzalez Vidal?

A.   Yes, sir.

Q.   And I believe you testified that Chupa helped you to understand the Spanish that Neco was speaking.

15

A.   Yes, sir.

Q.   So are you telling us that when the Mexican national nicknamed Neco spoke Spanish, you could not understand it?

A.   I did understand.  But he speaks with a Mexican dialect, and sometimes he would use different words than the words that we Cubans use.

Q.   Well, you spoke extensively on Wednesday about dealing -- dealings you had with Neco.

A.   Yes, sir.

Q.   Every time that you spoke with Neco, did you have someone who spoke Cuban Spanish assist you with understanding Neco?

A.   No, sir.

Q.   Okay.  And Chupa -- we'll just call him Chupa from now on -- he was the one who was going to pay you for you sending the boat to Mexico?

A.   With the Grady-White, he was going to pay me for it, and he never did.

Q.   And at that time, there was no person to drive the boat to Mexico, correct?

A.   At that time, no.

Q.   So basically what happened was you stole the boat and then a captain needed to be hired to take the boat?

A.   No.  The boat wasn't stolen until a captain was found.

Q.   Well, if a captain gets to where you have the boat, which you have testified you're able to steal yourself, then the

captain doesn't necessarily know that the boat is stolen.

MR. DOBBINS: Objection, Your Honor. Is this a hypothetical question or is he asking specifically if the Defendant knew?

THE COURT: Sustained. Rephrase, please.

MR. FEIGENBAUM: Okay.

BY MR. FEIGENBAUM:

Q. When the captain comes to drive the boat away, the captain needs to have certain -- a certain paper when it's from Florida to Mexico?

MR. DOBBINS: Your Honor, again, I would object. Is this a hypothetical question or is he asking about a specific individual?

MR. FEIGENBAUM: I could ask it differently, Judge.

THE COURT: Yeah. Maybe directed toward Mr. Aranda. Sustained.

MR. FEIGENBAUM: I will ask it differently.

BY MR. FEIGENBAUM:

Q. You had a boat, the one you stole, Cobia, that you used for a couple of years here in Florida, right?

A. Yes, sir.

Q. And you needed to have a registration from Florida, just like we need a car registration for our cars?

A. Yes, sir.

Q. So when you take a boat out on the water from Florida, if

you're stopped, you need to have a vessel registration from Florida?

A.  Yes, sir.

Q.  So when a captain came to take any of the boats that went to Mexico, you would give that captain the Florida registration that would allow him to drive it on the waters out of Florida?

MR. DOBBINS:  Objection, Your Honor, as to a hypothetical captain.

THE COURT:  Rephrase.  Sustained.

MR. FEIGENBAUM:  Okay.

BY MR. FEIGENBAUM:

Q.  You claim that you gave Javier Hernandez not just one, but several, boats to drive to Mexico, correct?

A.  Yes, sir.

Q.  And each time you say he came to drive away a boat, you gave him a Florida registration for that boat?

A.  No, sir.

Q.  So you're saying that he was willing to drive a boat out of a Florida area with no registration?

A.  Yes, sir.

Q.  Let me ask you this:  I believe you testified on Wednesday that you stole 21 or 22 boats, correct?

A.  Yes, sir.

Q.  And I think you testified that each time Javier Hernandez got you the keys.

A. Except for the first time. But all the other times he was the one who provided the keys.

MR. FEIGENBAUM: Could we have -- I believe this is a Government exhibit admitted into evidence, probably would be Government's Exhibit 7 and 7A. Could we have that up -- is that in evidence?

MR. DOBBINS: It is, sir.

THE COURT: Yes.

MR. FEIGENBAUM: Could we please have that up on the screens.

MS. KLEPACH: Is there a particular page?

MR. FEIGENBAUM: Yes. Page -- let's start with Page 76.

MR. DOBBINS: Mr. Feigenbaum, you got to remember that there are attachments that are added. So are you referring to Page 76 of the exhibit or Page 76 of the chats which are marked?

MR. FEIGENBAUM: Of the chats, I believe it is.

(Pause in proceedings.)

MR. FEIGENBAUM: Okay. Okay.

So can you make it just a little bit bigger, please. Slightly. Not too much.

BY MR. FEIGENBAUM:

Q. So you remember the prosecutor looking at this series of chats with you on Wednesday?

A.  Yes, sir.

Q.  And at the top left, in blue, that's you giving information, right?

A.  Yes, sir.

Q.  That's a key series for a Yamaha marine engine?

A.  Yes.  That is the key number that I sent him, so that he can go and buy it.

Q.  And that was on August 7th, 2019?

A.  Yes, sir.

Q.  Okay.

MR. FEIGENBAUM:  Let's, if you could, please, Government, scroll down a little bit as we move.

Let's go page by page, if we can have the whole page on there.  So let's go back to 76 and have the whole page on there, and let's see if there's anything else.

BY MR. FEIGENBAUM:

Q.  And Mr. Hernandez -- is that him in green?

A.  Yes, sir.

Q.  And he tells you:  "You didn't take pictures of the unit"?

A.  Yes, sir.

Q.  Okay.

MR. FEIGENBAUM:  Let's continue scrolling down a little bit.

Let's stop there.

20

BY MR. FEIGENBAUM:

Q.  So these photos -- you're sending photos of a boat in blue?

A.  Yes, sir.

Q.  On Page 77 of Government Exhibit 7, what brand boat is this -- brand boat?

A.  A Jupiter.  Yes, sir.

Q.  And I don't recall you mentioning a Jupiter brand boat when you testified for many hours on Wednesday.

A.  But that boat was not sent.

Q.  Oh, so that boat was not a stolen boat sent to Mexico?

A.  No, sir.

Q.  Okay.

        MR. FEIGENBAUM:  Let's go --

BY MR. FEIGENBAUM:

Q.  Well, we could make this a little shorter.  I don't have a perfect memory, so I may be wrong.  On your message exchanges with Javier Hernandez, are there 20 or 21 messages you sent him with Yamaha boat engine serial numbers?

A.  Well -- so messages were sent, photographs were sent.  On occasions, you could see two or three boats on a given night.  And the photograph that was of most interest to Neco was sent, and then a decision would be made on which of the boats was to be sent to Mexico.

Q.  The question is:  In the chats you had with Javier Hernandez, apart from the engine serial numbers of a

Jupiter-brand boat that was never stolen or sent to Mexico, show me where in your messages with Javier Hernandez you ever provided him other Yamaha motor serial numbers -- and I could be wrong.

MR. DOBBINS: Your Honor, I would object to that question because he says: "Show me where." The witness does not have the exhibit up there with him, in front of him. It's an electronic exhibit. So --

THE COURT: All right. With regard to: "Show me where I'm wrong," the exhibit is now in front of the witness. So certainly the witness can review and you can ask questions with regard to the exhibit.

MR. FEIGENBAUM: Yes, Your Honor.

BY MR. FEIGENBAUM:

Q. You have the exhibit in front of you, correct?

A. Well, these are some photographs that are there on his telephone.

Q. Did you ever send messages like this to Javier Hernandez about any other boat's engine key serial number, except the Jupiter?

THE INTERPRETER: I'm sorry. From the interpreter, the microphone has died.

THE COURT: Okay.

THE INTERPRETER: Shall the interpreter repeat the question?

MR. FEIGENBAUM:  If the question would be read back, that would be great.

(Question read back by Interpreter.)

THE WITNESS:  Yes.  They were sent.

BY MR. FEIGENBAUM:

Q.  Do you have them that you can locate them for us on your messages between you and Mr. Hernandez?

A.  No, sir.

Q.  You testified on Wednesday that you would go to these vessels to find out how much fuel they had in them.

A.  Yes, sir.

Q.  And to make that trip to Mexico from Southwest Florida, extra fuel would have to be taken on board?

A.  Yes, sir.

Q.  And I believe you said that you would hide containers filled with gasoline for the boat in shrubbery?

A.  Yes, sir.

Q.  And was there always a shrubbery area near the boats that were being taken to Mexico?

A.  Well, an area that was close to where the vessel was.  The vessel that would be leaving was looked for, and the containers were placed there, and the boat was taken to that area.  The containers were loaded onto the boat, and then the boat would depart from there to Mexico.

Q.  You also talked about checking the weather conditions,

23

correct?

A.   Well, that was something that Neco would do, and Javier.

Q.   Now, you know about boats because you know how to drive boats?

A.   Well, at that time, I didn't know how to drive a boat.

Q.   Well, didn't you try one time yourself to drive a boat to Mexico?

A.   No, sir.

Q.   You started out, and you left the Florida Coast, but got scared?

         MR. DOBBINS:  Objection.  Asked and answered.

         THE COURT:  I'll allow it.  Overruled at this point.

         THE WITNESS:  No, sir.

BY MR. FEIGENBAUM:

Q.   You had a boat, the one you stole for yourself originally, the Cobia, for two and a half years, correct?

A.   Yes, sir.

Q.   And you drove it around in the waters off of Naples?

A.   Yes, sir.

Q.   And you took your family out for trips on the boat?

A.   No.  We just went to this little, tiny island that's very close to Naples.

Q.   And you wanted to make sure, when you did that, especially if you took your family, that the weather was going to be okay?

A.   Well, it's not the same thing just to be driving around

24

here than to be driving and leaving -- than to be driving and leaving the Gulf of Mexico.

Q. Well, as somebody -- well, as somebody who knows about boats in a limited fashion, as you say, there's nothing illegal about wanting to check out what the future weather conditions are on a trip from Florida to Mexico.

MR. DOBBINS: Objection. Calls for a legal conclusion.

THE COURT: Sustained.

BY MR. FEIGENBAUM:

Q. Would it be reasonable for somebody making a trip, knowing what you know about boats, to want to know how the weather is going to be --

MR. DOBBINS: Objection to form.

MR. FEIGENBAUM: I haven't finished the question.

MR. DOBBINS: "Would it be reasonable?"

MR. FEIGENBAUM: Okay.

THE COURT: Let's rephrase.

BY MR. FEIGENBAUM:

Q. Checking the weather conditions for a boat trip --

MR. DOBBINS: Is that a question?

BY MR. FEIGENBAUM:

Q. -- is something --

MR. FEIGENBAUM: I'm finishing --

BY MR. FEIGENBAUM:

Q.  -- is something someone driving a boat likes to know, from your experience with boats?

MR. DOBBINS:  Objection.  Calls for an opinion and has not been laid as a proper platform here.

THE COURT:  Sustained.

MR. FEIGENBAUM:  I'll move on.

BY MR. FEIGENBAUM:

Q.  You were asked on Wednesday:  "Do you know what Neco would do with the boats after Javier brought them to him?"

Remember the prosecutor asking you that question?

A.  Yes, sir.

Q.  And you stated that Neco would paint them and then look for a buyer that would be interested in the boat, correct?

A.  Yes, sir.

Q.  Well, actually, you said they would paint them and look for a buyer.

A.  Well, I'm telling you what he did.

Q.  Okay.  Thank you.

Now, you eventually met someone who you knew as Robertico, remember?

A.  Yes, sir.

Q.  And it was Neco who put you in touch with Robertico?

A.  Yes, sir.

Q.  And you testified that Robertico knew how to create

26

paperwork for vehicles and boats?

A. Well, I don't know about for vehicles. But for boats, yes.

Q. And one time you went to pick up an envelope from Robertico that was sealed.

A. Yes, sir.

Q. So you don't know what was inside that envelope?

A. No, sir.

Q. And you gave that envelope to Javier Hernandez?

A. Yes. Neco told me to give it to him.

Q. And that's all that you knew about that envelope?

A. Yes, sir.

MR. FEIGENBAUM: Your Honor, just to program things correctly, at what time did Your Honor want to take a lunch break today?

THE COURT: Well, since we started late, about one o'clock.

MR. FEIGENBAUM: Okay.

BY MR. FEIGENBAUM:

Q. I noticed a lot of questions from the prosecutor on Wednesday -- for example, a question like the prosecutor asking you: "Now, do you recall the last boat that you stole with Javier Hernandez?"

Remember when he asked you that question?

A. Yes, sir.

Q. He didn't ask you what was the last boat that Javier drove

to Mexico, did he?

MR. DOBBINS:  Relevance.

THE COURT:  Overruled.

MR. FEIGENBAUM:  I'll phrase it different.

THE COURT:  You may continue.

BY MR. FEIGENBAUM:

Q.  So the question included these words:  "The last boat that you stole with Javier Hernandez."

Do you remember the question that way?

A.  Yes, sir.

Q.  And so it's you saying that you stole that last boat with Javier Hernandez, words that just come out of your mouth stating you stole it with Javier Hernandez, correct?

MR. DOBBINS:  Objection as to form.

THE COURT:  Sustained.  Rephrase, please.

BY MR. FEIGENBAUM:

Q.  Talking about the last boat, that was some time in November of 2019?

A.  It could be, sir.

Q.  That was a brand called Southport?

A.  I remember it as a green boat, with white letters, that said:  "Luca Brasi."

Q.  So that was your testimony.  And my question is:  Your testimony is that, the stealing of the boat you did with Javier Hernandez, not that he was just taking a boat to Mexico?

A.   We would take it.  We would take it out of the marina, and we would take it all the way to where the containers with fuel were at.  From there, the containers were loaded onto the boat and then he would take the boat all the way to Mexico.

Q.   You testified -- I just want to confirm this -- that you never worked with Javier Hernandez after November 18, 2019?

A.   That's correct.

Q.   When you testified about the Cobia brand boat that you stole and kept for two and a half years, you asked somebody named Roberto Marrero to give you fake documentation?

A.   To get me or to make the documents for that boat.

Q.   And that included a fraudulent title to show ownership of the boat?

A.   Yes, sir.

Q.   And you didn't ask for the title to be in your name, but in someone else's name?

A.   Yes, sir.

Q.   And that other person was your childhood friend?

A.   Yes, sir.

Q.   So for your theft of the boat, and your use of the boat for two and a half years, you were willing to create paperwork using a childhood friend to avoid detection for you?

A.   I simply asked for him to put his name on the boat.  He had no knowledge of anything related to the boat.

Q.   But it was to help you not get in trouble.

A.   I did it because the one that was always connected with the stealing of a boat was me.

Q.   And then after you had that boat for your own use for about two and a half years, you wanted to sell it to Neco?

A.   I was in financial problems.  So I contacted Neco, and I told him that I wanted to sell the boat.

Q.   And what month and year was this, more or less?

A.   It was exactly in the year 2022.  And if I'm not mistaken, it was around September or October when that boat was sold.

Q.   And you testified a moment ago that the last time you had any dealings at all with Javier Hernandez was November 18, 2019?

A.   Yes.  Correct.

Q.   How much did you sell the Cobia to Neco for?

A.   I sold it to him for $75,000.  He only paid me 55.

Q.   Does Neco still owe you money?

A.   Yes.

     (Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   Talking about the last boat that you called the *Luca Brasi* --

          MR. FEIGENBAUM:  And let's see if we look at Government's Exhibit 59, please.

     (Pause in proceedings.)

          MS. KLEPACH:  It's loading.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.  Is that the *Luca Brasi* you've been referring to?

A.  Yes, sir.

Q.  The prosecutor asked you on Wednesday:  "So sitting here today, do you remember when you and Javier stole this boat?" And you answered:  "I don't remember perfectly."  Remember that?

A.  No.  That wasn't like that.

Q.  No?  Did you happen to say the approximate date for that theft was the middle of the year?

A.  Yes, sir.  Because I didn't remember exactly what month of the year it was.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.  You also testified about looking for Javier when he came back from Mexico one time because he had money for you from Neco?

A.  So Neco called me and he told me that he had sent me some money -- part of my money with Javier.

Q.  Money that Neco owed you?

A.  Yes, sir.

Q.  Do you remember when that was?

A.  I don't remember exactly when that was.

Q.  And then you testified when the prosecutor showed you a

picture of a pickup truck.

A.  Yes, the photograph.  But with respect to what?

Q.  Well, did Javier ever send you some photos of a pickup truck he was wanting to know if you wanted to buy?

A.  Yes, sir.

Q.  You didn't want to buy it?

A.  No, sir.

Q.  Why not?

A.  Because he wanted to sell me the truck for $6,500, and it had too many miles as opposed to the money.

Q.  Okay.  Makes sense.

When we want to talk about certain boats, I believe on Wednesday you mentioned the following brands:  Yellowfin.  Was that one of them?

A.  Yes, sir.

Q.  Another was Pursuit?

A.  Yes, sir.

Q.  Everglades?

A.  Yes, sir.

Q.  Southport?

A.  That brand, I don't -- not that brand.

Q.  The *Luca Brasi,* what brand of manufacturer was that?

A.  It did not have it on the hull.

Q.  Just to be clear, there's a difference between the company that makes the boat and the name that the owner puts on the

boat.

A.   I remember that boat because it was a green boat with the white lettering, that said *"Luca Brasi."*

(Pause in proceedings.)

MR. FEIGENBAUM:  I'm just trying to see, Judge, how close I am to getting finished.

THE COURT:  Certainly.

BY MR. FEIGENBAUM:

Q.   You were asked by the prosecutor on Wednesday:  "Did there come a time when Chupa told you about other crimes that they were committing over in Mexico?"

Remember that question?

A.   No.  Chupa never told me -- other than the boats, he never told me what else he did.

Q.   Thank you.

MR. FEIGENBAUM:  All right.  Let's see.  I might almost be done.

UNIDENTIFIED JUROR:  Are you guys hearing a buzzing sound, too?  I think that's a horn for the cruises.

THE COURT:  Oh.  All right.  Thank you.

UNIDENTIFIED JUROR:  At least that's what it sounds like.  I keep hearing it too, and I'm like ...

THE COURT:  Thank you.

MR. FEIGENBAUM:  Just one moment, Your Honor.

Just one last question.

THE COURT:  All right, sir.

BY MR. FEIGENBAUM:

Q.  On that *Luca Brasi* boat, in the back part, where the number of the boat is --

THE COURT:  Hold on one second.  Let's -- and I apologize, Mr. Feigenbaum.  I know you have one more question, but let's go ahead and take a 10-minute recess, so we can address this issue.  Okay?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  We're on a 10-minute recess.

(Recess from 12:19 p.m. to 12:31 p.m.)

THE COURT:  Let me acknowledge the presence of the Defendant.

Are we ready to continue?

MS. KLEPACH:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  Okay.  Apologize for that interruption.  I just want to make sure we have an accurate record.

Okay.  Let's bring in the jury.

COURT SECURITY OFFICER:  All rise for the jury.

(Before the Jury, 12:31 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

I apologize for the interruption.  We're ready to continue with the cross-examination.

MR. FEIGENBAUM:  Thank you, Your Honor.

BY MR. FEIGENBAUM:

Q.  Hello again.

Your cousin Paez Reyes, who lives in Mexico, wanted you to give $100 to El Gordo -- the person you knew as El Gordo?

A.  Yes, sir.

Q.  And you did that?

A.  Yes, sir.

Q.  And El Gordo had come out of prison, then, for boat theft?

MR. DOBBINS:  Objection.  Asked and answered, Judge.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Why did your cousin Paez Reyes decide to live in Mexico and not the United States?

MR. DOBBINS:  Objection as to relevance, Your Honor.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  My cousin lives there in Mexico since we came here.  When we came from Cuba, he stayed living in Mexico.

BY MR. FEIGENBAUM:

Q.  Let me show you one of the pages from Government Exhibit 59 of that last boat you testified about, the *Luca Brasi.*  That's the one you've been testifying about, called the *Luca Brasi*?

A.  Yes.

Q.  Do you see at the rear of the boat, in large white letters, "Southport"?

A.   Yes.  I do see those letters there.

Q.   Thank you.

        MR. FEIGENBAUM:  Your Honor, I don't have any further questions.

        Thank you, Mr. Reyes.

        THE COURT:  Any redirect?

        THE WITNESS:  You're welcome.

        MR. DOBBINS:  Yes, Your Honor.  Briefly.

                    REDIRECT EXAMINATION

BY MR. DOBBINS:

Q.   Good afternoon, Mr. Aranda.

A.   Good afternoon.

Q.   You were asked a lot by Mr. Feigenbaum about a meeting that you had with the agents and the prosecutors and your attorney, where we talked about what had happened -- or your role in this case.  Do you recall that line of questioning?

A.   Yes, sir.

Q.   And that meeting with your attorney, and the agents, and the prosecutor, did that happen before or after you pled guilty?

A.   That was before.

Q.   And you were asked a lot about this -- by Mr. Feigenbaum about a lie during that meeting.  Do you recall that?

A.   Yes, sir.

Q.   And how long did it take you to correct that for the agents

and the prosecution?

A. Nothing.

Q. Was it pretty much right away?

A. Yes.

Q. Okay. You were asked by Mr. Feigenbaum about how you had stolen that Cobia boat by yourself. Do you recall that line of questioning?

A. Yes, sir.

Q. And when you stole that Cobia boat, was that before, during, or after you had stopped working with Javier Hernandez?

A. After of having worked with Javier Hernandez.

Q. You were asked on cross by Mr. Feigenbaum if you knew how to drive a boat over to Mexico from Naples.

A. Yes, sir.

Q. And did you ever learn how to drive a boat from Naples to Mexico?

A. No, sir.

Q. You were asked a lot about dates with Mr. Feigenbaum. Do you recall that line of questioning?

A. Yes, sir.

Q. And approximately what years were you working with Javier Hernandez to steal these boats and send them to Neco?

MR. FEIGENBAUM: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: It was from 2018 to the end of 2019.

BY MR. DOBBINS:

Q.   And did you keep some sort of diary of every time you and Javier Hernandez stole a boat?

A.   No, sir.

Q.   So sitting here today, do you remember the exact dates of every boat that you and Javier Hernandez stole to send to Neco?

A.   No, sir.

Q.   You were asked by Mr. Feigenbaum, on Government's Exhibit 7 and 7A, if you could point out where you had sent serial numbers to Mr. Hernandez.  Do you recall that line of questioning?

A.   No.

Q.   Okay.  In addition to the WhatsApp text chats, were you communicating with Javier Hernandez in a different way over WhatsApp?

A.   By regular calls and WhatsApp.

Q.   Okay.  And during these regular calls and WhatsApp calls, did you also talk to Javier Hernandez about these boats, keys, key numbers, and when to take the boats?

        MR. FEIGENBAUM:  Objection.  Leading.

        THE COURT:  Sustained.  Rephrase.

BY MR. DOBBINS:

Q.   What did you talk about with Javier Hernandez while you were having these regular phone calls and WhatsApp phone calls?

A.   We would decide which boat would be sent, sometimes to

decide to buy the key number, the one that was needed,

depending on the boat that was going to be sent.

Q.   Okay.   Now, were you provided with any of the trial

exhibits to study before your testimony here on Wednesday or

today?

A.   If I was given the exhibits?

Q.   Right.   Government's Exhibit 7 and 7A, which you were asked

questions about, did you take that home, did you study it

before you came in to testify?

A.   No, sir.

Q.   You were asked questions about Cuban dialect versus Neco's

Mexican dialect.   Do you recall that line of questioning?

A.   Yes, sir.

Q.   And did you later -- well, let me ask this:   After that

first boat, the Grady-White, you testified that you started

communicating only with Neco; is that correct?

A.   Yes, sir.

Q.   And after the Grady-White, were you able to understand what

Neco was telling you?

A.   Yes.   Because this is what happened:   When he puts Chupa to

get in touch with me, Chupa and I had an argument.   So after

that argument, I told him that it was only him and I that

should talk, and he should talk to me slowly.

Q.   Okay.   Now, you were asked about the time that Javier

Hernandez brought you money for -- from Neco to give to you.

Do you recall that line of questioning?

A. Yes, sir.

Q. And you were asked if you recalled the date, and you said you didn't know the exact date. Do you recall that?

A. Yes, sir.

Q. Showing you Government's Exhibit 114 --

MR. DOBBINS: If I may have the ELMO, please.

BY MR. DOBBINS:

Q. Showing you Government's Exhibit 114 and 114A. Do you recognize that text message?

A. Yes, sir.

Q. What was that text message about?

A. So I'm writing to Javier so that he would give me something, because Neco had sent money with him, and it was $10,000.

Q. All right. And what was the date on that text message, sir?

A. 3/24/2019.

MR. DOBBINS: I'm sorry. Could we have that just published for the jury, please. I don't think it was displayed.

THE COURT: Yes. It's in evidence. If you'll publish that, please.

MR. DOBBINS: And if I may have, at this time, the Government's laptop for 7 and 7A that's in evidence.

BY MR. DOBBINS:

Q. You were asked about the Cuban word for toys. Do you recall that line of questioning?

A. Yes, sir.

Q. You see the text from Government's Exhibit 7 and 7A that's here? I believe this is Page 189.

MS. KLEPACH: 187.

BY MR. DOBBINS:

Q. I'm sorry. 187 of the exhibit?

A. Yes, sir.

BY MR. DOBBINS:

Q. Is Javier Hernandez asking you in this text message for children's toys?

A. No, sir.

Q. What was he asking you about?

MR. FEIGENBAUM: Objection, Your Honor. No foundation.

THE COURT: Overruled.

THE WITNESS: So he's telling me there to check -- he's asking me there to look inside holes or inside a cavity to see if there's any kind of locater in the cavities.

BY MR. DOBBINS:

Q. What kind of a locater, sir?

A. Well, it's some kind of device that you place on boats, so that that device will tell you where the boat is actually at,

the location of the boat.

Q. Is that like a GPS device, sir?

MR. FEIGENBAUM: Objection, Your Honor. Asking a series of leading questions.

THE COURT: Sustained.

BY MR. DOBBINS:

Q. Now, you were asked on Wednesday about your Plea Agreement and why you're testifying here today. Do you recall that line of questioning?

A. Yes, sir.

Q. And what are you hoping to receive by testifying in this case?

A. A reduction in my sentence.

Q. And who ultimately decides whether you receive a reduction in your sentence?

A. The Judge, sir.

Q. And what happens if you lie under oath in front of this jury?

A. Well, I could be charged with lying, with telling a false statement.

MR. FEIGENBAUM: Objection, Your Honor. Vouching for the witness -- improper vouching for the witness.

THE COURT: Overruled. I'll permit it.

BY MR. DOBBINS:

Q. And what happens, sir, to any chance of a sentence

reduction if you're caught lying here in court today?

A.   Well, I won't get my reduction in my sentence.

MR. DOBBINS:  No further questions, Your Honor.

Thank you.

THE COURT:  All right.  Ladies and Gentlemen -- it's a little early -- thank you.

Is the witness excused?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.  You are excused.

(Witness excused.)

THE COURT:  Why don't we go ahead and take our lunch break now.  As we can see, it's 10 to one and I'll see you back here at 10 to two.

Have a pleasant lunch break.

COURT SECURITY OFFICER:  All rise.

(Jury not present, 12:52 p.m.)

THE COURT:  Just for purposes of scheduling, is the next witness live?

MR. DOBBINS:  We were hoping to do a Zoom witness next, Judge.  He's very brief.  It's Dr. Teteris.  So I think if we maybe came maybe five minutes before the jury was told to report, we could maybe set that up and have him testify.  We

also have two other live witnesses here.

THE COURT: We're using the same Zoom link as before, Liz?

COURTROOM DEPUTY: Yes.

THE COURT: Okay. All right, then. I'll see you back here at 10 to two. Have a nice lunch.

MS. KLEPACH: Thank you.

MR. DOBBINS: Thank you, Judge.

(Recess from 12:53 p.m. to 2:05 p.m.)

THE COURT: My apologies for the delay.

I trust everyone had a nice lunch and ready to get back to work.

MR. DOBBINS: Yes, Your Honor.

THE COURT: All right. We have our witness by Zoom, so we're ready to bring in the jury?

MS. KLEPACH: Yes.

THE COURT: Okay. And Mr. Feigenbaum?

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: All right, then.

(Before the Jury, 2:05 p.m.)

THE COURT: All right. Welcome back, Ladies and Gentlemen.

Please be seated.

And if the Government will call its next witness.

MS. KLEPACH: Yes, Your Honor. The United States

44

calls John Teteris.

THE COURT:  All right.  And this gentleman, by agreement, is appearing remotely via Zoom.

Ladies and Gentlemen, just let me know -- if your screen is not working, just raise your hand.

MS. KLEPACH:  May I inquire?

THE COURT:  Yes.  We just need to make sure we unmute him.

All right.  Good afternoon, Mr. Teteris.

THE WITNESS:  There we go.  We should have it now.

THE COURT:  All right.  Good afternoon, sir.

If you will raise your right hand to be placed under oath, please.

JOHN TETERIS, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Would you please state your name and also spell it for the record.

THE WITNESS:  John Teteris.  T-E-T-E-R-I-S.

COURTROOM DEPUTY:  Thank you.

MS. KLEPACH:  May I proceed?

THE COURT:  Are we bringing in Mr. Feigenbaum?  I'm not certain why his screen isn't ...

MR. FEIGENBAUM:  Well, Your Honor, last time, there was a little like iPad or something that the Court provided that got us in there, some kind of a device that was set up

here before when we had the other Zoom.

THE COURT:  Liz, did we have another device over there?  Mr. Feigenbaum needs to appear.

If we can do that for Mr. Feigenbaum before we proceed.

(Pause in proceedings.)

THE COURT:  Liz, does the screen operate on a horizontal, just so that we're able to capture call of Mr. Feigenbaum?

All right.  There we go.

Thank you.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.  All right.  Good afternoon, sir.  Can you hear me all right?

A.  I sure can.

Q.  Great.  What do you do for work?

A.  Physician.

Q.  What kind of physician are you?

A.  OB/GYN.

Q.  Where do you live?

A.  Columbus, Ohio.

Q.  How long have you lived there?

A.  My whole life, essentially.

Q.  At some point in the past, did you own a second home in

Marco Island, Florida?

A. Yes.

Q. From when to when did you own that home?

A. I believe -- I believe we bought it in 2009 and sold it in May of this year.

Q. And did you have a boat when you lived in Marco Island?

A. Yes.

Q. What kind of boat was that?

A. Pursuit OS 385.  I also have a 23-foot center console down there.

Q. All right.  With respect to the Pursuit, what was the name of the boat?

A. The *Mellow Yellow*.

Q. How would you store the boat?

A. On the lift behind my home.

Q. Was the lift secured?

A. I mean, it was -- yes.  I mean, it was secured.  It wasn't always locked, but it was -- yes.  I mean, it was -- no one ever touched it.

Q. All right.  Did there come a time that you learned that your boat, the *Mellow Yellow*, was no longer on the boat lift behind your home?

A. Yes.

Q. And was your home in Marco Island located at 647 Bimini Avenue?

A.   That's correct.

Q.   So I'm going to direct your attention to on or about December 21st of 2018.  Is that about when you were informed that your boat was missing?

A.   Yes.

Q.   Can you please describe for the jury what happened at that time.

A.   My wife got a phone call from our neighbor across the street, asking us if we had had the boat serviced because they had noticed that it wasn't on the lift.  My wife wasn't really sure the answer, didn't know if maybe I had had it serviced, so she called me.  I was at work, and I hadn't had any service done on it.  So that's how we learned that it was gone.

Q.   All right.  And speaking of people servicing the boat --

THE INTERPRETER:  Your Honor, from the interpreter, the interpreter apologizes profusely for interrupting.  We are having an interpretation issue.  The Defendant has signaled me that he cannot hear.  May we take a moment?

THE COURT:  Let's take a pause from the proceedings, please.

(Pause in proceedings.)

THE INTERPRETER:  Thank you, Your Honor, for your indulgence.  We're good to go.

THE COURT:  Thank you.

BY MS. KLEPACH:

Q. All right. So we were talking about whether or not you had anybody who was responsible for regular maintenance on your boat. Did you?

A. No.

Q. And who was responsible, if anyone, for keeping an eye out on your boat when you were not in Marco Island?

A. Well, there was no one who had official delegated responsibility. Our neighbors across the street were pretty attentive to what was going on in the neighborhood, and would let us know if we needed to know anything.

Q. What were their names?

A. Chris and Sharon Keagle.

Q. Did you have a video surveillance system at your home?

A. No.

Q. After you were -- after you received the phone call from your neighbors, what did you do next?

A. Called the police.

Q. Okay. And what happened after that?

A. Talked with the police officer from the Marco Island Police Department, and brought him up to speed on what had happened, and he took it from there.

Q. Where did you keep the keys to your boat?

A. In our home.

Q. And did there come a time that you returned to Marco Island

49

after your boat was missing?

A.   Yes.

Q.   Were the keys still in your house?

A.   Yes.

Q.   And was your house locked when you returned?

A.   Yes.  Yes.

Q.   Did you give anybody permission or authority to take your boat?

A.   No.

Q.   Sir, I'm going to show you what is in evidence as Government's Exhibit Number 55.  Can you see this okay?

A.   I sure can.

Q.   All right.  Let's start on Page 1 of Exhibit 55.  What are we looking at here?

A.   My boat on the lift.

Q.   Is this how you generally stored your boat?

A.   Yes.

Q.   And what about this photo?

A.   Same thing, different view.

Q.   And the last photo?

A.   Again, it's the same thing, just a different view.

          MS. KLEPACH:  I have no further questions for this witness.

          THE COURT:  All right.  Any cross-examination?

          MR. FEIGENBAUM:  No cross-examination.

50

THE COURT:  All right, then.

Thank you, Mr. Teteris.

You are excused.

THE WITNESS:  Thank you very much.

THE COURT:  All right.  Take good care.

THE WITNESS:  You too.

(Witness excused.)

THE COURT:  All right.  And the Government's next witness.

MS. KLEPACH:  The United States calls Robert Mauceli.

(Pause in proceedings.)

THE COURT:  Good afternoon, sir.

Sir, if you'll remain standing, raise your right hand to be placed under oath.

ROBERT MAUCELI, GOVERNMENT, WITNESS, SWORN

COURTROOM DEPUTY:  Would you please state your name and also spell it for the record.

THE WITNESS:  Rob Mauceli.

COURTROOM DEPUTY:  How did you spell your name, sir?

THE WITNESS:  R-O-B and M-A-U-C-E-L-I.

COURTROOM DEPUTY:  Thank you.

MS. KLEPACH:  May I inquire?

THE COURT:  Of course.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q.  Good afternoon, sir.

A.  Hello.

Q.  Where do you live?

A.  Naples, Florida.

Q.  How long have you lived there?

A.  Since 2008.

Q.  What do you do for work?

A.  I'm a Realtor.

Q.  Have you been a Realtor the entire time that you have lived in Naples?

A.  Yes.

Q.  I'm going to direct your attention to on or about 2019. Did you own a boat named the *Luca Brasi*?

A.  Yes.

Q.  How long did you have that boat?

A.  Since about 2014, 2015.

Q.  How did you store your boat?

A.  I had it at a marina.

Q.  What was the name of the marina?

A.  River Pointe Marina.

Q.  And where at the River Pointe Marina did you store the boat?

A.  It was in a slip.  I think it was Slip Number 6.  It was in

the water.

Q.   All right.  Do you know if that marina had any surveillance footage?

A.   No, they did not.

Q.   Do you know if the marina had any other sort of security?

A.   No.

Q.   You don't know or it did not?

A.   I really didn't know at the time, but I found out when I started to look for my boat.

Q.   That -- you found out what?

A.   That they really didn't have any good surveillance.

Q.   Okay.  So how would you keep an eye out on your boat?

A.   My office was really close to where the boat was on the water.  And driving down the road, I would be able to look over and see my boat in its slip.

Q.   How often did you use the boat?

A.   Once, usually -- I would try for twice a month, but depending on how busy I was with work ...

Q.   And how often would you drive by the marina to check out if your boat --

A.   Sometimes it would be daily.  And other times, you know, it could be few days before I drove down that road, where I would be able to put my eyes on it.

Q.   All right.  I'm going to direct your attention to on or about November 23rd of 2019.  Did you come to realize that your

boat was missing from the slip?

A.   Yes.

Q.   Can you describe for the jury what happened at that time.

A.   I was in the car.  I was on my way to go do a house showing during the workday.  And I looked over to where my boat is normally stored, and it was just not there at all.  At first, I was like, oh, that's kind of weird.  But then I realized that it was gone, and I stopped and pulled around and went to inspect.

Q.   Did you have anybody who was responsible for doing regular maintenance on your boat?

A.   Not really.  I mean, no, there wasn't.

Q.   And during that time, November 23rd of 2019, had you given anybody permission or authority to use or take your boat?

A.   No.

Q.   Okay.  So what did you do after you realized your boat was missing?

A.   Well, I went down to the dock.  And you know, I was looking around to see if maybe somebody moved it over to another slip or something.  And then I realized that it wasn't there.  I started asking some other people around, and they said they hadn't seen it.  And so I immediately called the police to make a police report.

Q.   Do you recall how long it had been since the last time you had seen the boat?

A.   Well, I had used it a week or so prior, and that was really the last time that I knew that the boat was there.

Q.   Where did you keep the keys to the boat?

A.   At home.

Q.   And did you have the key to your boat at home when it went missing?

A.   Yes.

Q.   Did there come a time that you contacted the police?

A.   Yes.  Within 10 minutes of realizing that the boat was gone from its slip.

Q.   And what happened after that?

A.   They came and we did a police report.

Q.   Okay.  Did there come a time that you learned your boat was recovered in Mexico?

A.   Yes.  I mean, I -- you know, at first, I spent a lot of time trying to figure out where the boat could be.  I was calling the police a lot and just trying to get an update and find out what was going on.  And then eventually a PD at Naples called me, and he sent me an email that had four pictures of my boat, and he wanted me to verify that it was my boat, and you know, tell me how I was verifying that it was my boat.  And I sent him an email with pictures of me on the boat, with my family and the boat, and just kind of pointed out things that made it a standout.

Q.   All right.  About how long after you realized your boat was

missing did you have that communication with the law enforcement officer?

A.   It was quite a few weeks after the theft.  I don't know the exact amount of time.

MS. KLEPACH:  All right.  If I could please have Government Exhibit 61 in evidence.

One moment.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.   All right, sir.  Is this where you store your boat?

A.   Yes.

Q.   Do you recall where in the marina it was stored?

A.   Yes.

Q.   Can you circle that for the jury.

A.   Just touch the screen?

Q.   Yes.

MS. KLEPACH:  Okay.  Now if we could have Exhibit 59, please.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.   All right.  Are these the photographs of your boat that you provided to law enforcement?

A.   Yes.

MS. KLEPACH:  Could we scroll down.

All right.  And if we could now go to Exhibit 60.

BY MS. KLEPACH:

Q.  All right.  So are these the photographs that law enforcement sent you of your boat after it had been stolen?

A.  Yes.

Q.  Okay.  So how were you able to identify that this was your boat?

A.  Well, it's bottom-painted.  And then also on the --

Q.  I'm sorry.  Did you say it's bottom-painted?

A.  Yeah.  It's painted to be able to sit in the water.  So the same color boat, with the same bottom paint.  But then the real thing is that the T-top for that is a custom-made T-top that was welded.  And so all those metal bars aren't what's naturally on a Southport boat.  That was custom-made.

Q.  All right.  Can you just circle what you mean when you were referring to the T-top.

A.  (Witness complies.)

Q.  All right.  And so is that a feature that you installed?

A.  Yes.

Q.  Okay.

MS. KLEPACH:  Now let's go to the second page.

BY MS. KLEPACH:

Q.  Was there anything about this photo that permitted you to identify this as your boat?

A.  Yes.  You can see that the Isinglass, which is this here --

57

that was custom made by me.  As well as the upholstery work, I actually sewed it myself, and that's on the boat as well.  You can see it.

MS. KLEPACH:  All right.  Now, let's go to the third page.

BY MS. KLEPACH:

Q.  Anything from this rear view that was significant to -- or that was unique to your boat?

A.  Yeah.  I mean, you can see the outriggers.  You can see the upholstery as well.  It's brown.

MS. KLEPACH:  Finally, let's go Exhibit 7, Page 170, please.

BY MS. KLEPACH:

Q.  All right, sir.  Is this your boat?

A.  Yes.

MS. KLEPACH:  Can we scroll down, please.

THE WITNESS:  On the picture?

MS. KLEPACH:  There we go.

BY MS. KLEPACH:

Q.  All right.  Is that your boat?

A.  Yes.  That's my boat.  That's at the dock.

Q.  Okay.  How do you know that that's at the dock?

A.  Because that's where it's tied up, and you can see the cushions that I put in on the wall of it.

Q.  Okay.

MS. KLEPACH:  And let's go to the next page, please.

BY MS. KLEPACH:

Q.  All right.  And is that your boat?

A.  Yes.

Q.  How do you know?

A.  It has a company that I started -- there's a sticker from my company on the dashboard there.

Q.  Can you circle that for us.

A.  (Witness complies.)

And this is my phone holder right there.

MS. KLEPACH:  All right.  One moment.

(Pause in proceedings.)

MS. KLEPACH:  I have no further questions for this witness.

THE COURT:  All right.  Cross-examination.

MR. FEIGENBAUM:  No questions.

THE COURT:  All right.  Thank you, Mr. Mauceli.

You are excused.

MS. KLEPACH:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  And the Government's next witness.

MR. DOBBINS:  Your Honor, the Government would call to the stand Professor Keith Rosenn.

(Pause in proceedings.)

COURT SECURITY OFFICER:  Right this way, sir.

THE COURT:  Hi.  Good afternoon, Professor.

THE WITNESS:  Good afternoon.

THE COURT:  Professor, if you'll remain standing -- certainly you can place your items down -- raise your right hand to be placed under oath.

PROFESSOR KEITH ROSENN, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

You can have a seat.

THE COURT:  Go ahead and be seated, sir.

COURTROOM DEPUTY:  Would you please state your name and also spell it for the record.

THE WITNESS:  I'm sorry.  Did you say state my name for the record?

Keith Rosenn.

COURTROOM DEPUTY:  Can you please spell it.

THE WITNESS:  R-O-S-E-N-N.

COURTROOM DEPUTY:  Thank you.

MR. DOBBINS:  May I inquire, Your Honor?

THE COURT:  Yes.  Of course.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Good afternoon, Professor Rosenn.

Sir, where are you currently employed?

A.  I am a Professor of Law Emeritus at the University of Miami Law School.

Q.   What does that mean, to be a professor emeritus?

A.   It means I am retired, but I have an office.  And I had a secretary until very recently, who got a promotion, and I'm ...

Q.   When did you retire as a professor?

A.   I retired in 2016.

Q.   And prior to that, how long had you been a professor at the University of Miami School of Law?

A.   I began teaching -- I began as a professor at the University of Miami Law School officially in 1979, but I spent the year -- that year in Rio de Janeiro, with a Brazilian law firm, on my sabbatical.  And in order to move me to Miami, Miami purchased by sabbatical from Ohio State University, where I had been a tenured full professor.

Q.   And how long had you been a tenured full professor at The Ohio State University?

A.   I began teaching there in 1965.  So I'd been there for 14 years.  But I started as an assistant professor, I think it was six years before I became a full professor.  So I was a full professor for eight years at Ohio State before I moved to Miami.

Q.   Okay.  What -- what bars are you admitted to?  What state bars are you admitted to, sir?

A.   I was originally admitted to the bar of the state of Pennsylvania.  And then, when I moved to Miami, I became a member of the Florida Bar.

Q. And where did you go to law school?

A. I graduated from Yale Law School.

Q. Do you have any other graduate degrees?

A. No.

Q. Okay. Prior to becoming a professor -- or an assistant professor, at The Ohio State University, did you also do any legal practice before you joined?

A. I practiced law in Pennsylvania.

Q. Doing what kind of work, sir?

A. A little bit of everything. I was in court the second day I was admitted to the bar.

Q. Okay.

A. Wrong courtroom, but I was nevertheless in court.

Q. Understood.

What did you teach at The Ohio State University?

A. I taught constitutional law, criminal law, Latin American law, and comparative law.

Q. And can you tell the Members of the Jury what that means. What is comparative law? What kind of class is that?

A. Basically, it is a class comparing the law of civil law countries, such as France, Germany, or Latin America, with the law of the United States, England, Canada, Australia.

Q. Okay. And what were -- what was your -- what did you teach when you were the professor at the University of Miami?

A. I taught constitutional law, Latin American law, and a

62

course in doing business in Latin America, a seminar in law and inflation.

Q.  Okay.  Did you develop any areas of expertise as a professor while either at The Ohio State University or at the University of Miami?

A.  Yes.  I -- starting in 1976, I began consulting on Latin American law.  That was soon after a book on law and development in Latin American was published.  And then I was on a plane six or seven times a year to Miami for consulting work. And eventually, the New York law firm that hired me asked me: "What is a Latin American law specialist doing in Columbus, Ohio?"  I thought about that for a year and then moved to Miami.

Q.  Okay.  And what kind of work did you do as a consultant for -- in Latin American law?

A.  A little bit of everything, actually.  Some criminal law cases, but mostly civil law cases involving international transactions.

Q.  Okay.  You talked about a book that you -- did you author that book that you said that was published?

A.  I coauthored a book with the late Kenneth Karst of UCLA on law and development in Latin America.

Q.  And have you been published on other occasions, sir?

A.  Oh.  I've published I think five books and more than 40 law review articles on Latin American law.

Q.   And have you ever worked as an expert in the area of Latin American law prior to coming to court today?

A.   Yes.  I've been involved, I think, probably more than 200 cases dealing with Latin America -- with Latin American law.

Q.   And what kind of -- were you -- when you were employed in those areas, were you working as an expert consulting on those cases?

A.   Yes.  Those are just cases where I actually submitted something to a court.  There were other cases where people consulted me, and the cases settled before litigation or never reached litigation.

Q.   You stated that the approximately 200 cases where you submitted something to the court -- what kind of things would you submit to the court?

A.   There would be an affidavit or a declaration on the law of a Latin American country with respect to a particular matter, or it would be a deposition, or it would be actual testimony in court.

Q.   And in those cases, were you qualified as an expert in the area of Latin American law?

A.   Yes, I was.

Q.   Was there a time in the last four years that you have testified as an expert in the area of Latin American law?

A.   Yes.  Although I think it was just once.

Q.   Okay.  Do you recall if that was state court or federal

64

court?

A.   I did not actually get into court.  It was done by teleconference, and it was a deposition on Argentine law.  But I do not remember at the moment whether it was state or federal court.

Q.   Have you either submitted declarations or affidavits as an expert or testified as an expert in federal court before?

A.   Yes, I have.

Q.   Have you ever not been qualified as an expert -- as an expert witness?

A.   Not really.  Although there was one case I recall in Judge Hoover's court, federal court here in Miami, where I was called to testify as an expert on Latin American law, and it was a jury case.  And the judge said:  "Before you can testify to the jury, I want to hear your testimony."  So I testified to the judge, and after -- about an hour after I testified, the judge called me into his chambers and said:  "I can't allow you testify to the jury."  And I said:  "Why not?"  And he said: "As a necessary predicate for your testimony, the defendant has to testify, and the defendant refuses to waive his privilege against self-incrimination and testify.  So therefore, you can't testify."  That was the only time I recall that I was not able to testify.

Q.   All right.

        MR. DOBBINS:  Your Honor, at this time, I would tender

Professor Rosenn as an expert in the area of Latin American law.

MR. FEIGENBAUM:  Judge, I'd like to voir dire a little bit.

THE COURT:  Certainly.

VOIR DIRE

BY MR. FEIGENBAUM:

Q.  Good afternoon, Professor Rosenn.

A.  Good afternoon.

Q.  My name is Marty Feigenbaum.  I'm the Defense attorney on this case.  How are you?

A.  Good, thank you.

And you?

Q.  Great.

You were at Ohio State as a law professor for more than six years, I think you said?

A.  Fourteen years.

Q.  Fourteen years.  And University of Miami, how long have you been associated?

A.  Since 1970 -- 1980.

Q.  Okay.  And you know the big rivalry between Ohio State and the University of Miami?

A.  Yes.  Yes.

Q.  Are you leaning either way particularly?

A.  For a while, I used to lean towards Ohio State, then I

leaned more towards Miami, and now I've just stopped watching football games.

Q. Okay. The prosecutor tendered you as an expert on Latin American law, correct?

A. Correct.

Q. But we're here specifically regarding criminal law in the state of Yucatan, Mexico. Is that your understanding?

A. Yes.

Q. And have you become familiar with the state criminal law in Yucatan?

A. Yes. I looked at the criminal code, and I was specifically asked to testify about an area of the criminal law of Yucatan that I have been over many times with respect to other Latin American countries, such as Ecuador and Bolivia.

In fact, as it happens, when Mr. Vazquez called me up and asked me to testify about this case, I was working on a case for the US government involving virtually the identical code provision in Ecuador.

Q. Okay. And so did you stake steps to familiarize yourself with the State Penal Code of Yucatan, Mexico?

A. Yes, I did.

Q. Okay.

MR. FEIGENBAUM: See if I had anything else.

BY MR. FEIGENBAUM:

Q. In the 200 cases that you mentioned you had testified or

submitted an affidavit or declaration as an expert witness, have any been in regard to criminal cases in the State of Yucatan?

A. No.

MR. FEIGENBAUM: Okay. Your Honor, I do not object to Professor Rosenn testifying as an expert.

THE COURT: All right. Then let us continue with the direct examination.

DIRECT EXAMINATION [CONTINUED]

BY MR. DOBBINS:

Q. Professor Rosenn, you stated that you became familiar with the Yucatan Penal Code. Can you tell us if there is a statute in the Yucatan Penal Code that addresses bribery of a public official?

A. Yes, there is.

Q. And can you tell the Members of the Jury what that statute is and what it describes.

A. The Spanish term is "cohecho." C-O-H-E-C-H-O. And in the penal code of Yucatan, it is set out in Article 262 Bis, B-I-S, which is just a subsection of Article 262.

And cohecho is translated into English as bribery. It's not the only term in Spanish for bribery, and "suborno" is the more common term. But when you're dealing with bribery of a public official, the Spanish term "cohecho" is what's used in the criminal codes.

And what this statute provides is that a public servant, who, by himself or through an intermediary, unlawfully requests or receives for himself, or for any other person, any money or benefit, or accepts a promise to perform, or refrain from performing, an act that is appropriate to his functions, position, or commission, commits the crime of bribery.

And then it goes on to say that anyone who directly or indirectly, by himself or through an intermediary, gives, promises, or offers money, or any other good or service, or any other gift to a public service to do or not to do something lawful or unlawful related to his functions, also commits the crime of bribery.

So it's -- covers both active bribery and the briber and the bribee.  Bribery is one of those crimes where you need two persons.  And this covers anyone who bribes a public servant or a public servant who accepts a bribe.

Q.   And did you follow up by reviewing what the -- how a public servant is defined in the Yucatan State Penal Code?

A.   Yes.  The statute refers you, in Article 247, where it introduces crimes for acts of corruption.

Article 247 of the code says:  "For purposes of this code, a public servant shall be deemed to be persons contemplated in Article 97 of the Constitution of the State of Yucatan."

So I then looked at Article 97 of the Constitution of the State of Yucatan, and this provision says:  "For the purposes

of the responsibilities or" -- "responsibilities" really means "liabilities" in this context -- "for purposes of the liabilities referred to in this title, the representatives of popular election, the members of the judicial branch of the state, the officials and employees, and in general any person who holds a job, position, or commission of any nature in the state congress or in the state or municipal public administration, as well as public servants of the organization to which this Constitution grants autonomy."

So that is a very general provision that covers public administration in the State of Yucatan and ties in with the penal code.

Q.   Based on your opinion, would that cover, say, a governor of the State of Yucatan?

A.   Definitely.

Q.   Would it cover -- would it be your opinion that it covered any mayor or other elected official in a city within the State of Yucatan?

A.   Yes.

Q.   And what about police officers or higher-ranking police officers, such as a police chief in the State of Yucatan?

A.   Definitely.

Q.   Now, are you also familiar with the money laundering statute for the United States that's enumerated in Title 18, United States Code, Section 1956?

A.   I've looked at it several times.

Q.   Okay.  And as part of your experience as an expert witness, have you had to form professional opinions on whether certain criminal offenses in Latin American countries, such as Mexico, would qualify as specified unlawful activities that are the basis for a money laundering charge?

A.   I have not done it specifically with respect to Mexico.  I have done it with the same crime of cohecho with other Latin American countries, however.

Q.   Okay.

A.   This is the first time that I have been asked to do so with respect to Mexico.

MR. FEIGENBAUM:  Judge, request a sidebar.

THE COURT:  All right.  Come on forward.

(At sidebar on the record.)

MR. FEIGENBAUM:  Your Honor, I requested the sidebar because in the expert disclosure which the Government provided, it did speak about Mr. -- or Professor Rosenn talking about these Mexican crimes of bribery.  He never mentioned -- the Government never mentions in the expert disclosure anything about connecting that to US Criminal Code Money Laundering.

MR. DOBBINS:  I believe the report was that --

THE COURT:  Well, let's see what the report says.

When you say:  "I believe the report" -- did it include that he was going to testify with regard to any federal

statute here in the United States?

MR. DOBBINS:  Said they would violate the laws of Mexico.

THE COURT:  Violate the laws of Mexico?

MR. DOBBINS:  Right.

THE COURT:  So you were asking him about this law in reference to whether it would violate the law in Mexico?

MR. DOBBINS:  That's correct.

THE COURT:  Okay.  And is that the limit on what you're asking?

MR. DOBBINS:  I think that the report also stated that this was the basis for which is in the Indictment as an SUA, which is under --

(Court reporter interruption.)

MR. DOBBINS:  Sorry.  Under 1956.

THE COURT:  All right.  "Would violate the laws of Mexico."

MR. DOBBINS:  Right.

THE COURT:  Okay.  So why are you asking him about US law?

MR. DOBBINS:  Well, I think he can testify that it is a -- it is an enumerated offense that's listed in 1956.

THE COURT:  Well, why would that be helpful to the jury, and why would that be fair to the Defendant, when you didn't list it as start part of the statement of opinions?

He's specifically being called regarding: "A person subject to Mexican law, who offers compensation and material benefit to Mexican and foreign officials, in exchange for violation of their official duties, or otherwise engages in bribery would violate the laws of Mexico." So now you're asking him about the money laundering laws in the United States.

MR. DOBBINS: Well -- but in the Indictment -- in the Superseding Indictment, it says: "An offense against Mexico," which is a specified unlawful activity.

THE COURT: So you can ask him about the offense in Mexico, which is what he's being called for. But Mr. Feigenbaum is rightfully objecting that you're asking him about American law, and to that extent it's not within the scope of his expert testimony.

MR. DOBBINS: Understood.

THE COURT: Okay. Let's continue.

(End of discussion at sidebar.)

(Pause in proceedings.)

BY MR. DOBBINS:

Q. Okay, sir. So we were talking about the crime of cohecho. And is that offense -- when you talked about somebody that was going to be subject to that statute, who could that include?

A. It would include any public official, or civil servant, or public servant, as they define it in the statute, who accepts a

bribe, or someone who offers a bribe to a public servant.

Q. And if that person was not a citizen of Mexico, the person that was offering the bribe, is it your professional opinion that they would still be subject to that Mexican law?

A. If they committed the crime in Mexico.

Q. And so is the crime of cohecho, in your professional opinion --

A. Oh. I'm sorry. I think it would be even broader if -- but I did not specifically -- I -- I did not contemplate the situation of committing the crime outside of Mexico when I researched this subject, because I was under the assumption that, if bribery occurred, it occurred in Mexico, in Yucatan.

Q. Okay. And if the bribery or if the act occurred in the State of Yucatan, would that give the Mexican government jurisdiction over that crime?

A. It would give -- yeah. It would -- Mexico is like the United States, in the sense that it has a federal system. And so you've got federal crimes and you've got state crimes. And they -- the district -- the Federal District in Mexico, like the District of Columbia, has got its own system.

And -- but the criminal provisions on cohecho are very, very similar. But you've got a legal system for each state, and you've got the federal legal system and the federal district all having their own legal system.

Q. Now, you said that the federal came of cohecho is very

similar.  Is there a distinction between who is covered by the crime of cohecho for the federal law?

A.  Yeah.  The federal law covers public servants of the federal government, whereas the State Code of Yucatan covers bribery with respect to public servants of the State of Yucatan.

Q.  So as we were talking about the governor of the State of Yucatan, or a mayor, or a police chief of a city within the State of Yucatan, which penal code would cover that crime, if there was a crime of cohecho being committed?

A.  That of the State of Yucatan.

        MR. DOBBINS:  One moment, Your Honor.

        THE COURT:  Certainly.

        MR. DOBBINS:  No further questions, Your Honor.  I pass the witness.

        THE COURT:  All right.  Cross-examination.

                    CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon again, Professor Rosenn.

A.  Good afternoon.

        MR. FEIGENBAUM:  Your Honor, I'd like to approach to have the witness identify, if he can, an exhibit.

        THE COURT:  All right.  Certainly.

        Can you just let the Government know which exhibit you're going to be showing him.

MR. FEIGENBAUM:  Yes.  For identification, J and K.

(Pause in proceedings.)

MR. FEIGENBAUM:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. FEIGENBAUM:

Q.  Professor, take all the time you need.  Let's start with taking a look at what's been marked for identification Defense Exhibit J.

A.  Yes.

Q.  Have you had a chance to look at what's been marked as Defense Exhibit J?

A.  Yes.

Q.  Do you recognize it?

A.  Yes.

Q.  Do you believe it to be a true and correct copy of that document?

A.  Well, it looks very much like the copy of the code that I have seen.

Q.  That you mentioned earlier you had reviewed?

A.  Yes.  Yes.  And that I brought along with me.  Although this seems a lot thicker, for some reason.  But maybe -- oh.  I know why.  It's not printed on both sides.

MR. FEIGENBAUM:  Your Honor, am I allowed to ask him if he recognizes what it is, to state it for the record?

THE COURT:  Well, it should be identified.  It's just

not in evidence.  He can't read from it, but certainly he can identify it.

BY MR. FEIGENBAUM:

Q.  Based on your review of that document, what do you conclude it is a copy of?

A.  It is a copy of the Penal Code of the State of Yucatan.

Q.  And is that the same code that you used to extract your law on bribery?

A.  Yes.

Q.  Okay.  Take a look, if you will, at what's been marked as Defense Exhibit K.

A.  Yes.

Q.  Does it appear to be a true and accurate copy of another -- of another provision of the Yucatan Penal Code?

A.  Looks to me -- 327 Extortion, yes.

Q.  And also --

A.  Although it's -- yes.

Q.  Okay.  And also as part of Exhibit K, do you recognize the other statute that is extracted there?

A.  Yes.

Q.  What is it?

A.  Article 262 Bis, Bribery.

Q.  The same one you testified about --

A.  Yes.

Q.  Let me ask the question again.  The same one you testified

about -- the same provision of the Yucatan Penal Code you testified about that the Government presented to you?

A.  Yes.

Q.  Okay.  So you've described for the jury what the crime of bribery is in Yucatan, correct?

A.  Yes.

Q.  And in so many words, it's when an individual offers something of value to a public official in exchange for that government official's influence to favor the person offering the bribe?

A.  Yeah.  Although it's a little broader than that.  And it also would cover bribery that let's say would be done by a corporation.  It's not just restricted to an individual.

Q.  Okay.  And if the item of value is offered by an individual to a police official, that police official is a government official for purposes of that bribery statute?

A.  Yes.

Q.  Okay.  Now, in the Yucatan Criminal Code, is there a crime called extortion?

A.  Yes, there is.

Q.  And tell the jury what extortion is.

A.  Extortion is when someone who has no right to do so requires another to give up something, or do something, or stop doing something, and obtains a profit for himself in the process.  That's the crime.

Q. All right. So it would be a fair statement that the crime of extortion in the Yucatan would include if a government official threatened death, serious bodily harm, destruction of property, or some bad consequence if the citizen -- not the official, like a police official, didn't agree to give something to the public official making that threat?

A. Yes.

Q. Okay. Let me say it probably a little better. You're testifying as an expert, so I can give you hypothetical questions, correct?

A. Yes.

Q. Police official, let's say chief of police of Yucatan, goes to a businessman, and he says: "If you don't give me what I want, some property of value, you may have some physical problem, like disappear, or serious bodily harm, or problems running your business," that would be extortion, correct?

A. Yes.

Q. And so in that case it's the public official who is committing the criminal act, correct?

A. Yes.

Q. So really, bribery and extortion are kind of opposites. Bribery is when the individual or private citizen says to a public official, let's say a police chief: "I want to give you this vehicle, this car. And in exchange, I want you to not bother me in what I'm doing, which would be illegal." That

would be bribery, correct?

A.   No.   They're not really opposite kinds of things.   As a matter of fact, one of the interesting things about Mexico is that the police are frequently the victims of extortion.   They are very often threatened by the cartels with the choice: Either take the bribe or the bullet.   That's the way the police are very frequently extorted in Mexico.   They're confronted with a choice:   Either take the bribe or take the bullet.

The bribery statute is ambidextrous.   It includes the active party and the passive party; the party offering the bribe and the party taking the bribe.   But the cohecho statute, the bribery statute, is written so that it applies only in a situation where the bribe is offered to a public official.   The extortion statute is not so limited.   And not every bribe is an extortion, but obviously there's an overlap in certain situations.

Q.   If I understand you --

A.   In other words, if a cartel member comes to a policeman and says:   "Either you take the bribe or I put a bullet through your head," if, in that situation, the person -- the policeman takes the bribe, he clearly is not only in the bribe situation, but he's also the victim of extortion.

Q.   I understand.   Thank you.

So going back over this, if a businessman offered the chief of police in Yucatan, the State of Yucatan, something of value,

like a car, for the police chief to look the other way for illegal activity, that would be a bribe, correct?

A. Correct.

Q. Okay. If the police chief came to that businessman, to his business, and said: "I want you to give me something as chief of police or you're going to have a problem with your business or yourself. You could disappear, you could be seriously hurt, or your business could be shut down," even though it's a public official, like a chief of police, that still is the crime of extortion that the police chief is committing?

A. Yes. But it's also the crime of bribery.

Q. The crime of bribery that the chief of police is committing against the businessman?

A. He's soliciting a bribe.

Q. No. I didn't present the hypothetical that way. A businessman is in his business, minding his own business. Police chief comes by. He says: "This is a nice business. I'm the chief of police for all of Yucatan. I would like you to give me something so that you're safe and your business is safe." At that point in time, there's no bribe being offered by the businessman. The police --

A. No. But there is a -- the police chief is requesting something of value from the businessman. That fits fairly within the bribery statute. The bribery statute says, whether directly or indirectly illegally requests or receives for

himself any money or benefit for any act typical of his functions that are inherent in his employment, position, or commission.

So the businessman is really being requested to offer something of value to the police chief. That is cohecho under the statute. Also -- it's also a form of extortion. But the two overlap, and he could be charged with either crime or both crimes.

Q. The businessman could be charged with extortion?

A. No. No. No. The police chief.

Q. Okay. So let's go back to you saying that the businessman could be still committing bribery --

A. No. No. The -- the police chief would be -- could be charged under the bribery statute or the extortion statute. That's what I was saying.

Q. I understand now. So the businessman is then the victim, not the criminal?

A. Certainly not the criminal. He's certainly the victim with respect to the extortion. But the -- but literally, he falls within the framework of the bribery statute, as somebody who offers something of value to a public official for the public official to do something or fail to do something lawful related to his functions.

There will be an argument about whether it's lawful or not with respect to the functions. Obviously, making him disappear

is not going to be lawful. If the businessman, however, is in violation of some statute in the State of Yucatan, then it becomes another story. So I'm not sure exactly what the parameters of your hypothet are.

Q. Okay. Let me narrow it down. I'm a businessman. I have -- let's say I have a marina in Yucatan. I'm sitting there, minding my own business, and the police chief shows up with some of his men. Police chief walks in, says: "That's a really nice marina. You got places for 50 boats here. You know, everybody's got to eat here in Yucatan. So I want you to give me this vehicle or you just might disappear one day, be seriously harmed physically, or your business could be shut down. You do that, and I won't -- I'll make sure that you and your business is safe."

Are you saying that the businessman, by not wanting to disappear or be killed, harmed, or have his business closed, is committing bribery to save himself and his business?

A. No. No.

Q. Okay. I misunderstood.

A. Yeah. I misunderstood your question.

Q. All right, sir.

MR. FEIGENBAUM: Let me see if I have anything else.

I don't.

Thank you very much.

THE COURT: All right. Any redirect?

MR. DOBBINS:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Processor Rosenn, you were talking about how the cohecho statute is ambidextrous.  Can you just explain that again, please.

A.  It includes the public servant who is accepting the bribe, and it covers the person, or corporation, or legal entity that's offering the bribe.

Q.  Okay.  So is Article 262 Bis broken up into different sections?

A.  Yes.

Q.  And what does that first section of Article 262 Bis cover? Who is that covering?

A.  That covers the public official who accepts any benefit, or money, or promise, or something of value to -- in relation to carrying out his employment or functions.

Q.  And is it just if they accept it, or is it a crime if they do -- if the public official does something else?

A.  It's -- you don't have to accept it.  You have to request it, or accept it, or receive it.  There's -- I know a very famous case coming out of Bolivia that I submitted something on, where a judge agreed to take a bribe and receive a portion of the damages that he was awarding that would be received after the judgment was paid.

84

The judgment was never paid because it was eventually -- they refused to enforce it in the United States as being the result of bribery.  So the judge never got his commission, but he accepted a bribe.

Q.  Okay.  So under Mr. Feigenbaum's hypothetical about the police chief threatening the marina owner and requesting some good or service that was of value, that would be covered under Section 1 of Article 262 Bis?

A.  Yes.

Q.  And then, Article 2 -- I'm sorry.  Not Article 2.  Section 2 of Article 262 Bis, what person or individual or business does that cover?

A.  That covers anyone who directly or indirectly gives or promises or offers money or anything of value to a public servant, so that he does or fails to do something lawful related to his functions.

Q.  Okay.  And you testified about how that could be a problem. So in that case, let's talk about the marina owner.  If the marina owner is doing something illegal at the marina, and then offers something of value to the police chief, is now the marina owner covered by Section 2 of Article 262 Bis?

A.  Yes.

Q.  You also testified -- you were asked by Mr. Feigenbaum about this hypothetical where the police chief is threatening the business owner -- we'll just keep it with the marina owner

for the hypothetical -- and you said it could be a problem for the marina owner or business owner if the business owner or marina owner was doing something illegal. Then they could also be covered in bribery, even if they had been threatened, by still giving that bribe. Do you recall that?

A. Yeah.

Q. So if a marina owner is, say, doing something illegal at the marina, such as importing stolen boats, or smuggling Cubans into Mexico, even if the police chief threatened that marina owner, and the marina owner provided something of value, would that marina owner still be considered under the cohecho statute under Section 2?

A. Yes.

MR. DOBBINS: No further questions, Your Honor.

Thank you.

THE COURT: All right. Is Professor Rosenn excused?

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: Mr. Dobbins?

MR. DOBBINS: Yes, Your Honor.

THE COURT: All right. Thank you, Professor. You are excused.

(Witness excused.)

THE COURT: And we're going to take a recess.

Ladies and Gentlemen, let's take a 10-minute recess.

COURT SECURITY OFFICER: All rise for the jury.

(Jury not present, 3:24 p.m.)

THE COURT: All right. Before we break, I was actually advised by Liz -- is your next witness in custody?

MS. KLEPACH: Yes, Your Honor.

THE COURT: All right. So where is -- he's back here?

All right. Then let's go ahead and take a 10-minute recess.

MS. KLEPACH: Thank you.

THE COURT: Thank you, sir.

(Recess from 3:25 p.m. to 3:37 p.m.)

THE COURT: All right. I think we could probably -- oh, let me wait for Mr. -- oh, here's Mr. Feigenbaum.

All right. We have everyone here.

Let me acknowledge the presence of the Defendant.

I think we might want to bring in the individual, who is here.

What's the name of your next witness?

MS. KLEPACH: It's Roberto Marrero Cisneros.

THE COURT: Cisneros. All right.

And that's the gentleman that's back there?

Maybe we can bring him in, so we can set up the marshal.

Go ahead and have a seat. We're just going to take a few moments.

(Pause in proceedings.)

THE COURT:  All right.  Good afternoon.

If we can bring the gentleman over to the witness stand, and then we'll get set up.

Does Mr. Cisneros need the assistance of the interpreter?

THE INTERPRETER:  I'm sorry, Your Honor?

THE COURT:  I didn't know if he needed the assistance.

THE INTERPRETER:  Yes.  Yes.

THE COURT:  All right.  Once the jury comes in, then we'll ask the gentleman to stand.

Is Mr. Cisneros's hands un -- okay.  Perfect.

THE INTERPRETER:  Oh, no.  He's not -- his hands are not handcuffed behind his back.

THE COURT:  Okay.  Good.

All right.  As soon as the jurors are back, we can bring them in and we can continue.

(Pause in proceedings.)

COURT SECURITY OFFICER:  All rise for the jury.

(Before the Jury, 3:40 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

And Mr. Cisneros, if I may ask, with the assistance of the interpreter, if you'll stand, raise your right hand to be placed under oath, sir.

ROBERTO MARRERO CISNEROS, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY: Thank you.

Would you please state your name and also spell it for the record.

THE WITNESS: (Through Interpreter.) Roberto Marrero Cisneros. Roberto, R-O-B-E-R-T-O, Marrero, M-A-R-R-E-R-O, Cisneros, C-I-S-N-E-R-O-S.

MS. KLEPACH: May I inquire?

THE COURT: Yes. Of course.

DIRECT EXAMINATION

BY MS. KLEPACH:

Q. Good afternoon, sir.

A. Good afternoon.

Q. How old are you?

A. Sixty-six.

Q. Where were you born?

A. Cuba.

Q. When did you first come to the United States?

A. 1989.

Q. Did you come here legally?

A. Yes.

Q. How did you get here?

A. I came as a political refugee.

Q. When you first came to the United States, where did you live?

A.   In Hialeah.

Q.   From the time that you came to the United States in 1989, have you always lived in the Miami area?

A.   Yes.

Q.   Do you have any children?

A.   I have three.

Q.   How old are they?

A.   Twenty-five, 33, and 38.

Q.   How far did you go in school?

A.   I finished high school, and I completed two years of mechanical engineering.

Q.   Was that in Cuba?

A.   Yes.

Q.   What kinds of jobs have you held in the past?

A.   So I worked in a company called Cobre Dispatch.  It was a company that would take packets and so forth to banks.  I also worked making signs.  I also worked painting paintings.  And I also worked fishing.  I worked as a fisherman.

Q.   Okay.  You mentioned that you worked doing paintings.  Did you have any training as an artist?

A.   Yes.  When I was in Cuba in the Army, I went to an art school.

Q.   Where do you currently live?

A.   Well, here in the prison.

Q.   Why is that?

A.   Because I committed a crime.

Q.   What crime were you convicted of?

A.   Conspiracy.

Q.   Conspiracy to do what?

A.   For making false stickers for outboard engines for boats, for false identification of vehicles, and for making false identification for boats.

Q.   Okay.  When you were first charged in federal court, do you remember what you were charged with?

A.   Credit card fraud.

Q.   Let me rephrase.  In 2022, when you were first charged in federal court, how many counts were you charged with?

A.   Three counts.

Q.   What were they?

A.   The first was conspiracy to make parts of stolen VINs for stolen cars, and also to make numbers for stolen boats.

Q.   With respect to that count, do you recall the maximum penalty that you were facing?

A.   Five years.

Q.   Were you charged with any other counts?

A.   Yes.

Q.   With what else?

A.   And well, with Count Number 4, and it had to do with exporting stolen parts -- stolen vessel parts to Mexico.

Q.   Do you recall the maximum amount of time you were facing

for that count?

A.   Ten years.

Q.   Okay.  Were you charged with any other counts?

A.   Yes.  Number nine.

Q.   And what did that count charge you with?

A.   Smuggling of boats parts to Mexico.

Q.   Do you recall the maximum amount of time that you were facing on that count?

A.   Ten years.

Q.   Which judge was that case pending in front of?

A.   Judge Robert Scola.

Q.   So not the judge presiding over this case?

A.   No.

Q.   How did you plead in that case?

A.   Guilty.

Q.   Did you enter into a Plea Agreement with the Government?

A.   Yes.

Q.   As of today's date, have you been sentenced?

A.   Yes.

Q.   Were you sentenced by Judge Scola?

A.   Yes.

Q.   What was your sentence?

A.   Five years.

Q.   What was the maximum amount of time that you could have received for all of the crimes that you were charged with under

92

the Indictment?

A. Twenty-five years.

Q. And what was the maximum amount of time that you could have received pursuant to your Plea Agreement?

A. Five years.

Q. Is it your hope that your testimony and cooperation with the Government will be considered at some point for a possible sentencing reduction?

A. Yes.

MS. KLEPACH: All right. If I may have the Government's laptop for just the witness, please.

BY MS. KLEPACH:

Q. Sir, you testified that you entered into a written Plea Agreement with the Government. I'm going to show you what has been marked for identification as Government's Exhibit Number 70.

MS. KLEPACH: There we go.

BY MS. KLEPACH:

Q. All right. Sir, do you recognize this document?

A. Yes.

Q. How do you recognize it?

A. Because of my signature. I signed it -- and my initials.

Q. All right. Is this the Plea Agreement that you entered into with the Government?

A. Yes.

93

Q.   Okay.  Now, you don't speak English.  Was this document translated for you before you signed it?

A.   Yes.

Q.   Did you understand it before you signed it?

A.   Yes.

        MS. KLEPACH:  Now let's go to the last page, please.

BY MS. KLEPACH:

Q.   Is that your signature on Page 8 of this document?

A.   Yes.

        MS. KLEPACH:  At this time, the United States offers Exhibit 70 into evidence.

        THE COURT:  Is there any --

        MR. FEIGENBAUM:  No objection.

        THE COURT:  All right.  Admitted into evidence.

    (Government's Exhibit 70 received into evidence.)

BY MS. KLEPACH:

Q.   All right.  As part of this Plea Agreement, did you agree to cooperate with the Government?

A.   Yes.

Q.   What is your understanding of what your cooperation agreement is with the Government?

A.   To tell the truth.

        MS. KLEPACH:  Can we go to Page 4, please.

BY MS. KLEPACH:

Q.   All right.  And when you say:  "Tell the truth," tell the

truth where?

A.   Well, of everything, of everything that I'm being charged with, and of everything that I know about.

Q.   All right.  And is it your understanding that if you are to cooperate in any court or grand jury proceeding that the cooperation agreement requires you to tell the truth?

A.   Yes.

Q.   If you provide truthful testimony and substantial assistance, are you guaranteed to receive a sentencing reduction?

A.   No.

Q.   What is your understanding of who is ultimately responsible for deciding whether you receive a sentencing reduction?

A.   Only Your Honor, the Judge.

Q.   Is there anything in your Plea Agreement that says the US Attorney's Office must file a motion for a sentencing reduction on your behalf?

A.   No.

Q.   Is there anything in this Plea Agreement that says that the Judge must give you a sentencing reduction?

A.   No.

Q.   And who do you understand makes the decision if your sentence gets reduced by even one day?

A.   Your Honor, or the Judge.

Q.   Okay.  Do you understand that your testimony is under oath,

and that if you fail to tell the truth you could be prosecuted for additional crimes and lose the benefit of cooperation?

A.   Yes.

Q.   Prior to testifying today, apart from the offense from which you are currently serving your sentence, how many times have you been convicted of a felony?

A.   In 2001, in 2013 -- in 2012, and now.

Q.   Were you also convicted of a felony in 2015?

A.   Yes.

Q.   All right.  So let's go one by one.  In 2001, what were you convicted of?

A.   Credit card fraud.

Q.   And was that in state or federal court?

A.   Federal.

Q.   What was your sentence?

A.   Thirty-three months.

Q.   Okay.  And then, in 2013, what felony were you convicted of?

A.   Stolen cars with altered identifications.

Q.   And when you say:  "Altered identifications," what do you mean?

A.   I mean that the VIN number for the car was changed.

Q.   Okay.  And in 2015, what were you convicted of?

A.   I was convicted of a stolen car.

Q.   All right.

A.   A felony.

Q.   At the time that you committed the offense for which you are currently serving your sentence, were you on probation?

A.   Yes.

Q.   Are you aware if there are any other pending cases against you, other than that for which you're serving your sentence?

A.   Yes.

Q.   Okay.  And where is that case pending out of?

A.   In Tampa.

Q.   What does that case relate to?

A.   So it has to do with alteration -- well, it has to do with a conspiracy, a conspiracy to alter VIN numbers on stolen cars.

Q.   Okay.  So now let's talk about your involvement in this case.  Do you know an individual named Javier Hernandez?

A.   Yes.

Q.   How do you know him?

A.   So because this Juan Miguel -- no.  I mean, Jose Miguel Gonzalez, also known as Chupa, gave Javier my phone number so that Javier would call me.

Q.   Call you to do what?

A.   So that Javier would take him or bring to him a stolen car with the VIN number that had been changed.

Q.   Were you responsible for altering the VIN numbers?

A.   Yes.

Q.   Okay.  So let's talk a little bit about that.  What is a

VIN number?

A. It's the identification number assigned to a car.

Q. Okay. How long have you been making fake VIN numbers?

A. Years. I don't remember exactly how many, but it's been years.

Q. Okay. Are you familiar with where a VIN number can be found on a car?

A. Yes.

Q. Where?

A. So on the front windshield, on the door, underneath the hood of the car. I mean, it's different in the sense that not all cars have the VIN numbers in the same places.

Q. When you say: "It's different," what does it depend on?

A. Well, it depends on the model or brand name of the car.

Q. All right. And as part of your involvement in making fake VINs, did you also install the VINs on stolen cars?

A. Well, many times yes, and many times no.

Q. So let's talk about how you even make a fake VIN.

A. Okay. So you take the original VIN number of a car -- you actually have to take it off, but very, very carefully. You place it or stick it onto a piece of white paper. You have to magnify it four times its original size on a copier -- on a photocopier. You use the original numbers, and you move them around from here to there in order to come up with a new number.

Q. When you say: "You move them around," what do you mean?

A. So you make several copies, and you use an X-ACTO Knife to cut them. You stick them on top of the other numbers to make up the new number that you want to create.

Q. Okay. How did you learn how to do this?

A. Because I was a very inquisitive person. I was an artist and I learned it.

Q. Where would you get the new number for the stolen cars?

A. Sometimes you could find it through CARFAX with -- for a similar car. You would look for the number. Sometimes the number would be changed, and you would check if that number existed, and that's it. That's the number that was used.

Q. All right. And then on what material would you make the fake VIN number?

A. I used first -- for that template, I would use PVC sheets. Then I would print them in a big size, four, or three, or two times bigger. It all depended. Then I would correct with a ruler, with a marker, and with a knife, and I would perfect that distortion that would give you the number. And once it was done, I would reduce it to the original size and I would print it onto a permanent vinyl sheet.

Q. You do this all by hand?

A. Yes. But once I would do that mold, I would use it -- I would use it for the same type -- for another one in the same type.

Q.   How much did you charge for a fake VIN?

A.   It depended on the car, whether it had many or few.  It could be from 500 up to a thousand dollars.

Q.   Did you also make fake HIN numbers?

A.   Yes.

Q.   And what is a HIN?

A.   It's the identification number for a boat.

Q.   Where is a HIN found on a boat?

A.   In the rear part of the boat.

Q.   Okay.  And what material is a HIN made out of?

A.   Some come in a plastic sheet.

THE INTERPRETER:  Interpreter correction:  "In a metal sheet."

THE WITNESS:  And some others were embedded in the back -- in the rear part of the boat.

BY MS. KLEPACH:

Q.   I think you said the word:  "Fiberglass."  Did I miss that?

A.   They would use fiberglass when they were embedded in the boat.

Q.   Okay.  And how would you make a fake HIN number?

A.   Sometimes the person who wanted me to do that would send it to me.  Some of the times, instead of CARFAX, I would go to BoatFax, where you find all the boat registrations, or sometimes just one number would be changed.

Q.   Okay.  And then, physically speaking, how would you make

the fake HIN number?

A.   How did I make it?  I would look for an aluminum plate.  I would put the numbers using a -- a tool.

Q.   I'm sorry.  I can't hear you.  A tool?

A.   A forging tool.  I would make like a template.  Then I would put fiberglass, and a number would come out upside down, that, once you put it on it, it would come out correct.

Q.   Okay.  How much would you charge for a fake HIN numbers?

A.   It depended.  If it was only one, 500, a thousand, a thousand five hundred, it all depended.

Q.   As it related to your relationship with Javier Hernandez and Chupa, did you install the fake HIN numbers?

A.   No.  Normally, they were sent to Mexico.

Q.   Okay.  How were they sent to Mexico?

A.   By FedEx.

Q.   All right.  And did you also make fake engine serial numbers?

A.   Yes.

Q.   How did you do that?

A.   Basically, the same process.  I would amplify it up to 20 times because it was smaller.  I would print it on a PVC sheet.  I would correct all the imperfections, and I would reduce it, and I already had the template.

Q.   Okay.  Generally speaking, are you familiar with who could legally create a VIN or a HIN number?

A.   Legally?

Q.   Yes.

A.   Only the factory.

Q.   Okay.  Do you have any license to create VINs or HIN numbers?

A.   No.  Only the factory has a license to do that.

Q.   Okay.  So now I want to go back.  We were talking about Chupa and Javier Hernandez.  Can you explain to the jury how you first met Chupa.

A.   Through a man by the name of Tomasito, who gave him my number, so that I would solve for him this kind of issue.

Q.   Were you doing illegal work for Tomasito?

A.   Illegal.

Q.   Illegal work?

A.   Yes.

Q.   What were you doing for him?

A.   I did stickers for engines, outboard engines, and HINs for boats.

Q.   Okay.  Who is Tomasito?

A.   Tomasito is a Cuban man that lives in Mexico, that used to bring people from Cuba to Mexico.

Q.   And how did you first get connected with him?

A.   One of my friends by the name of Remegio Valdez, that lived in Mexico and mentioned to Tomasito that I could do that.

Q.   Okay.  And then so how did you help -- withdrawn.

When did your friend Remegio Valdez first introduce you to Tomasito?

A.   I don't remember.  Many years ago.

Q.   Okay.  And how long did you make fake outboard engine stickers for Tomasito?

A.   Years.

Q.   Can you approximate how many years?

A.   Three years, two years.

Q.   How long has it been since you were in communication with Tomasito?

A.   Since about 2019 or 2018 that I haven't spoken with Tomasito.

Q.   And when did he introduce you to Chupa?

A.   '17, '18, around that time.  I don't remember exactly.

Q.   How long were you doing work for Chupa?

A.   Maybe for a year or two.

Q.   And what did you do for Chupa?

A.   Papers for three boats and for about four cars.

Q.   And when you say you made papers for the boats and the cars, what kind of papers are you talking about?

A.   For example, for the cars, I only did the VINs.  But for the boats, you needed a forged registration, a forged title, and it would be sent.

Q.   Okay.  So with respect to the fake registration documents, how did you create those?

A.   Normally, they would send it to me to put this -- such a number.  And many times, as I said before, one would be looked into BoatFax or a similar boat that would be around.

Q.   Do you know what Chupa was using the boats and the cars for?

A.   Sometimes he would use them to bring people from Cuba, or sometimes they would sell it to another person.

Q.   Okay.  And is that true of the cars as well?

A.   Yes.

Q.   Okay.  In your dealings with Chupa, Tomasito, Javier Hernandez, did you use any nicknames?

A.   Yes.  They would call me Robertico or El Viejo.

         MS. KLEPACH:  Can we get a translation of what "El Viejo" means.

         THE WITNESS:  (In English.)  Old man.

         THE INTERPRETER:  Old man.

BY MS. KLEPACH:

Q.   Okay.  So you mentioned that Chupa introduced you to Javier Hernandez.  When was that?

A.   (Through Interpreter.)  Around that same date, the '17, '18, '19.  I don't remember exactly.

Q.   And why did he introduce you to Javier Hernandez?

A.   Because Javier -- or Chupa wanted that Javier would transport the cars to Mexico.

Q.   Were you told anything about what, if anything, Javier

would do with boats?

A.   Well, they would tell me that Javier was driving boats to Mexico.

Q.   And so when did you first speak with Javier?

A.   More or less around those years, but that was the first time I sent a car to Chupa.

Q.   Okay.  And around when was that?

A.   '18 -- between '17 and '19.  I don't know exactly.

Q.   Okay.  You mentioned that it was the -- around the first time that you sent a car to Chupa.  Do you remember what kind of car that was?

A.   An Infiniti QX80.

Q.   And how was Javier Hernandez involved in the moving of that QX80?

A.   I would find a temporary plate through a dealer that was real.  I would put it behind the car, in the rear of the car, so that Javier could cross the United States without any problems.

Q.   And how do you know that he did that?

A.   Because we talked about that.  "This is for Chupa and you're going to take it."

Q.   Okay.  In your dealings -- well, let me take a step back. How long did you have dealings with Javier Hernandez?

A.   At the beginning of '18, '17, not that much.  But in 2019, we would speak in a more constant way.

Q.  Did your contact with him end in or around 2019?

A.  I don't remember exactly.

Q.  During the time that you dealt with him, did you ever meet in person?

A.  Many times.

Q.  If you saw him again, would you recognize him?

A.  Yes.

Q.  Do you see him in court today?

A.  Yes.  He's sitting there with a blue shirt.

MS. KLEPACH:  Let the record reflect that the witness has identified the Defendant.

THE COURT:  It's noted.

BY MS. KLEPACH:

Q.  Did there come a time when you also worked with Ramon Reyes Aranda?

A.  Yes.

Q.  What work did you do with him?

A.  I did stickers for engines two or three times.  And I helped him with a boat, a Cobia.  I gave him the identification that he had to place.  And I helped him to get it -- to get it registered, like a registration.

Q.  Okay.  Do you know if Javier Hernandez and Ramon Reyes Aranda worked together to steal boats?

A.  Javier would always tell me that he was going to see Ramoncito, that he had to take a boat to Mexico.  He told me on

two or three occasions.  I wasn't there, but he told me.

Q.  Okay.  Did you ever have conversations with Javier Hernandez relating to the creation of fake HIN numbers for those boats that he said he was going to take to Mexico?

MR. FEIGENBAUM:  Objection.  Leading.

THE COURT:  Sustained.

BY MS. KLEPACH:

Q.  All right.  You mentioned that Javier told you he was going to work with Ramoncito to take boats to Mexico; is that right?

A.  On occasion, he told me that.

Q.  Were you involved with any activity relating to those boats?

A.  Just with the one -- the -- Ramoncito's.

Q.  Did you make any fake HIN numbers for the boats that Javier Hernandez drove to Mexico?

MR. FEIGENBAUM:  Objection.  Assumes facts not evidence.

THE COURT:  Overruled.

THE WITNESS:  I sent some fake HINs.  It's possible that they could have been for those boats.

BY MS. KLEPACH:

Q.  Do you know whether the boats that Javier Hernandez would drive to Mexico were stolen?

MR. FEIGENBAUM:  Objection.  Lack of foundation.

THE COURT:  Overruled.

MR. FEIGENBAUM:  Personal knowledge.

THE COURT:  If the witness knows.  Overruled.

THE WITNESS:  Yes.  I didn't see it physically, but he told me so.

BY MS. KLEPACH:

Q.  Okay.  Do you know how the fake HIN numbers that you created for these boats were used?

A.  They are registered in Mexico, and they turned them into Mexican.

Q.  How do you know that?

A.  Well, I've heard several people.  And I think that if they're looking for those things there, it's to register them. Otherwise, that would stay the same.  They wouldn't be touched.

MR. FEIGENBAUM:  Objection.  Hearsay.

THE COURT:  Sustained as to the last part.  Let's establish the personal knowledge, please.

BY MS. KLEPACH:

Q.  All right.  So let's take a step back.  Once you created the fake HIN numbers, what would you do with them?

A.  I would send it.  I would send it to Mexico.

Q.  Do you know how they would get installed?

A.  No.

Q.  Okay.  Do you know how the HIN numbers would be used?

A.  Yes.  They were used to register them in a different country.

Q.   Okay.  How do you know that?

A.   Because, for example, I was told:  "I have a Contender.  I need a new identification."  And I would ask:  "Okay.  What are you going to do with it?"  I didn't ask that often, but whenever I asked:  "To register here in Mexico."

Q.   Who did you have that conversation with?

A.   With Javier, with Chupa, with Tomasito, with some other people, with Remegio also.

Q.   But you had that conversation -- one of the people that you had those conversations with was Javier Hernandez?

        MR. FEIGENBAUM:  Objection, Your Honor.  Leading.

        THE COURT:  Overruled.

        THE WITNESS:  Javier didn't register any boats.

        THE COURT:  Is that somebody's phone?

        All right.  Let's continue.

        If the witness will restate his answer.

        THE WITNESS:  We would talk about that, about registering.  But from my understanding, even he himself would tell me that he wasn't the owner of the boat.

BY MS. KLEPACH:

Q.   Okay.  Did you have any text message conversations --

        MR. FEIGENBAUM:  Your Honor, just for the record, because of the little interruption we had, the witness also answered something about registering, and I understood the sentence to say something.  I don't know if you want me to

repeat it. There was a question about who registered the boats, and he said he didn't understand it that --

THE COURT: Okay. All right. So are you asking Ms. Klepach to ask a clarifying question or do you want to wait for cross-examination?

MR. FEIGENBAUM: I would ask a clarifying question real quick.

THE COURT: Well, Ms. Klepach is directing the witness. So Ms. Klepach, if you would like to ask a clarifying question.

MS. KLEPACH: Sure. So -- thank you, Judge.

BY MS. KLEPACH:

Q. I believe you said -- well, you tell me. Who would register the boats in Mexico?

A. I don't know about that part. That was among Mexicans.

Q. All right. Did you have any text message conversations with Javier Hernandez?

A. Yes. Several.

Q. Okay. I'm going to show you what's in evidence as Government's Exhibits 11 and 11A.

MS. KLEPACH: Okay. Can we zoom in on the top box.

BY MS. KLEPACH:

Q. All right. Is this number ending in 1747 your number?

A. Yes.

Q. Okay. And who is this a conversation with?

A.   With Javier Hernandez.

Q.   Okay.  Have you had a chance to review this document previously?

A.   Yes.  I looked at those conversations.

Q.   Okay.  Do these documents reflect several phone calls coming in and out?

A.   Yes.

MS. KLEPACH:  Okay.  So can we please go to Page 52.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.   Okay.  So let's focus on that bottom green bubble.  When was this message sent?

A.   In 2019.

Q.   Just one second.  Do you recall the date or do you see the date there on the message?

A.   Yes.  I see it.

Q.   Okay.  Can you read the date into the record, please.

A.   9/19/2019.

Q.   And who sent this message?

A.   He, to me.

MS. KLEPACH:  Let's go to Page 56, please.

(Pause in proceedings.)

BY MS. KLEPACH:

Q.   Okay.  So now I want to direct your attention to the first message on the top of Page 56.  Can you tell us what we're

111

looking at here.

A.   A driving license.

Q.   Okay.  Can you explain to the jury -- well, let me take a step back.  Who sent this photo of a driver's license?

A.   Javier Hernandez.

Q.   Can you explain to the jury why Javier Hernandez would send you a photo of a driver's license.

A.   So that on the license plate -- on the temporary plate, for a car that would go to Mexico, a stolen car, it would have his name, so that the name would agree, in case the police -- in case the police would stop it.

          MS. KLEPACH:  Okay.  We can exit out of that.

          Scroll down.

          Can we go to Page 59, please.

BY MS. KLEPACH:

Q.   Okay.  And now let's focus on the last bubble of Page 59. Do you know what this is?

A.   You can't see it very well, but it seems to me like it's a Mexican driver's license.

Q.   Okay.  Who sent this photo?

A.   Javier Hernandez.

Q.   When did he send it?

A.   9/26 of 2019.

Q.   Okay.

          MS. KLEPACH:  Can we scroll drown and keep going to

112

Page 61.

    There we go.

BY MS. KLEPACH:

Q. And then, that first bubble on Page 61, what is that?

A. I think it's the same license.

Q. Who sent that photo?

A. Javier Hernandez.

Q. When did he send it?

A. 9/26/2019.

Q. And why would Javier Hernandez send you a photograph of a Mexican driver's license?

A. So it would be for the paper for a boat or a car -- I don't remember -- would be in that person's name.

    MS. KLEPACH: Okay. Now, let's go to Page 63, please -- I'm sorry -- 64.

BY MS. KLEPACH:

Q. All right. And that second green bubble, what are we looking at here?

A. A Florida driver's license.

Q. Do you know whose driver's license that is?

A. Well, it's kind of distorted, but it seems to me like it's his.

Q. When did he send this message?

A. 9/29/2019.

Q. Okay.

MS. KLEPACH:  Let's keep scrolling down, please.

BY MS. KLEPACH:

Q.  All right.  So before we get to what's on Page 67, why did Javier Hernandez send you a photograph of his license?

A.  For a temporary license plate.

Q.  Do you recall for what kind of car?

A.  Well -- oh.  It could have been for an Infiniti.  It could have been for a Dodge or for a Toyota.

Q.  Okay.  So I believe that you previously testified about an Infiniti that you created fake documents for.  Do you recall that?

A.  Yes.

Q.  All right.  Did you also create false documents for a Dodge?

A.  Yes.

Q.  And did you also create fake documents for a Toyota?

A.  Yes.

Q.  Okay.

MS. KLEPACH:  Now let's please zoom in on the first bubble on Page 67.

BY MS. KLEPACH:

Q.  What are we looking at here?

A.  That's a Toyota.

Q.  How do you know that?

A.  Well, because I'm a professional, and I can tell -- when a

car starts with a certain number or letter at the beginning, I know what kind of car it is.

Q. All right. Let me ask a clarifying question before we go there. You said that this message is a Toyota?

A. Yes.

Q. What is it for a Toyota?

A. It's to create a number based on the original numbers that come from the factory.

Q. Is this a VIN number for a Toyota that we're looking at?

A. Yes.

Q. Okay. So now can you please explain to the jury how you know that this is a VIN number for a Toyota.

A. So I've spent years making VINs for cars. And for example, when the VIN number begins with the number five -- well, 5T -- in other words, the T follows the five, it's a Toyota. It means it's a Toyota.

Q. All right. And when did Javier Hernandez send this message to you?

A. 9/30 of 2019.

Q. And what did you do with this information?

A. So this number here -- well, there's two situations. Perhaps it's for me to use this number to replace the VIN of this one or to -- or to use it for the temporary license plate, so it would match the temporary license plate.

MS. KLEPACH: Okay. So let's exit out of this and

zoom in on the next message, please.

BY MS. KLEPACH:

Q.   Okay.   Can you read that message into the record, please.

A.   This is the Toyota with my license.

Q.   Okay.   What is the relationship between Javier Hernandez's driver's license and the VIN number for the Toyota?

A.   It's for the license plate.   It's for the temporary license plate, so that it can go in his name.

Q.   Okay.   Did you eventually create the fake VIN for this Toyota?

A.   Yes.

Q.   Did you install the fake VIN on this Toyota?

A.   Yes.

Q.   Do you recall what the Toyota looked like?

A.   So it was a Toyota that had four doors, it was white, and the interior of the Toyota was red.

Q.   Do you know what Javier Hernandez was going to do with the Toyota?

A.   Well, he was going to take it to Mexico.

Q.   How do you know that?

A.   Well, that's because -- that's why the temporary license plate was made.

Q.   Do you know if the car was stolen?

A.   Yes.

Q.   How do you know that the car was stolen?

A.   Because I checked the VIN number, and it appeared to be stolen.

Q.   Okay.  Do you know what Javier Hernandez was going to do with the Toyota one he took it to Mexico?

A.   Yes.  He was driving it for another person, for a Mexican.

Q.   Do you know for who?

A.   For Neco.

Q.   How do you know that?

A.   Because I had previously spoken to Neco, and he told me that Javier was going to take him the Toyota.

        MS. KLEPACH:  Let's go to Page 69, please.

BY MS. KLEPACH:

Q.   What are the photographs that we're looking at on this page?

A.   That's a Dodge.

Q.   How do you know it's a Dodge?

A.   Because it starts with 1C.

Q.   And are those first two identifying characters unique to Dodges?

A.   Yes.

Q.   Okay.  And then what was the photo of the driver's license for?

A.   It was for the same situation, for a license plate.

Q.   Okay.  And it looks like there is a message that accompanies that driver's license.  Can you please read that

into the record.

A. "This is the Dodge with this license."

MS. KLEPACH:   Can we go to Page 72, please.

BY MS. KLEPACH:

Q. All right.  First message on the page is a photo of another driver's license.  What was this for?

A. I don't remember exactly, but it's the same thing.  It's why the license was used, for that reason.

MS. KLEPACH:   All right.  Let's go to Page 76, please.

BY MS. KLEPACH:

Q. Okay.  Now, the second green bubble on this page, what are we looking at here?

A. So this is a bar code with a sticker, which the chassis of the Dodge has.

Q. What is the chassis of the Dodge?

A. It's the framework of the car.  It's like, you know, where the wheels go and all of that.

Q. Okay.  And it looks like this photo also came with a message.  Can you please read the message into the record.

A. "Remember this decal for the Dodge."

Q. When did Mr. Hernandez send that message?

A. 10/2 of 2019.

Q. What would you do with that bar code?

A. Well, the car's identification number was also on that as well.

118

Q.   Okay.   Is that the same identification number as a VIN or a different kind of identification number?

A.   No.   It's the same as the VIN.

         MS. KLEPACH:   Can we go to Page 78, please.

BY MS. KLEPACH:

Q.   All right.   So the second green bubble on this page, what did Javier Hernandez tell you?

A.   He's saying:   "I'm now in my house."

Q.   Do you remember why he was telling you that?

A.   Well, it was usually because he wanted me to take something -- it was usually because he wanted me to take him something, like, for example, a sticker, for example, for that Dodge.   You know, he's trying to tell me:   "Look, I'm here now. So bring it over to me."

Q.   All right.   And when you would make these fake documents for Javier Hernandez, would you normally take them to him?

A.   Well, sometimes no.   A lot of times we would meet up in Kendall or in Hialeah.   I hardly ever took them.   I mean, sometimes I did.

Q.   Okay.

         MS. KLEPACH:   Let's go to Page 79 -- actually, sorry. Let's stop at Page 70 -- I'm sorry -- 79.   I'm getting all turned around.

         All right.   The first message on Page 79.

BY MS. KLEPACH:

Q. All right. What is that an address for?

A. Well, that was his home address.

Q. Okay.

MS. KLEPACH: Now could we go to Page 84, please, and the first message on that page.

BY MS. KLEPACH:

Q. When was this message sent?

A. 10/5 of 2019.

Q. Can you read the message, please.

A. "Tell me if he or she answered."

Q. Okay. Do you remember what he was talking about?

A. He was talking about -- he was talking about the lady who would get the license plate, whether or not she had answered.

Q. Okay. Who is the lady that would get the license plate?

A. A lady by the name of Fanny. She worked at a dealership on 27th Avenue Northwest and 87th Street.

Q. Did you introduce her to Javier Hernandez?

A. Not directly. I only told him what the lady's name was.

Q. Okay. And what did she do?

A. She would make temporary license plates and would sell them.

Q. Were these fraudulent temporary license plates?

A. Well, actually, no, because the number that was put on the car existed. And that is -- well, that is an application which

is directly with the motor vehicle.

Q.   What do you mean by that:  "It's directly with the motor vehicle"?

A.   With the central office where you register vehicles.  If the number does not exist, if the VIN does not exist, the system won't accept.

Q.   All right.  Can you explain again how it is that Fanny would register these temporary license plates.

A.   So she worked at a dealer or dealership.  And for example, you would say:  "Find me -- here's the number of the car and here's the number of the license.  I need a license plate for 30 days."  Yes.

Q.   All right.  Do you know why Javier Hernandez needed this temporary license plate?

A.   Well, so that he could make that journey so he could travel in that car.

Q.   In which car?

A.   Any car.  In any car.  In any car that he might have to take.  Well, I mean, there's a license plate for each car.

        MS. KLEPACH:  All right.  So now let's keep going to Page 85.

BY MS. KLEPACH:

Q.   So then you send a phone number.  Whose phone number was that?

A.   I don't remember exactly.  It might have been the phone

121

number belonging to the lady who does the license plates, but I really don't remember exactly.

Q.   All right.  And how did Mr. Hernandez respond to you sending him that phone number?

A.   "From you, on your behalf?"

Q.   And what did that mean?

A.   It's like if I go to see a person, and I ask the person: "I'm going on behalf of you."

Q.   All right.  And how did you respond?

A.   "Yes."

        MS. KLEPACH:  Okay.  Let's keep going, please.

BY MS. KLEPACH:

Q.   All right.  Then what's the next thing that Mr. Hernandez asks you?

A.   "El Viejo or Roberto?"  Yes.

Q.   Okay.  Meaning what?

A.   Well, my nickname.

Q.   All right.  And then how did you respond?

A.   "Old man."

Q.   Why did you say that?

A.   Well, to not say my name.

Q.   And why did he need to know whether to refer to you as the old man or Roberto?

A.   Well, nobody really knew my name.  Everybody would call me El Viejo.

MS. KLEPACH:  So let's scroll down.

BY MS. KLEPACH:

Q.  All right.  Then what's the next thing he asks you?

A.  "What is the person's name?"

Q.  And how did you respond?

A.  "Fanny."

Q.  All right.  And how did Fanny know you?

A.  Through a friend called Reynel, who was a friend of hers.

Q.  Did Fanny know you as Roberto or as El Viejo?

A.  I never saw Fanny.  Reynel would tell me that I should say that I'm El Viejo.

Q.  All right.  And so -- withdrawn.

MS. KLEPACH:  Let's go to Page 89.

THE COURT:  Ms. Klepach, just let us know when it might be a good time to end for the day.

MS. KLEPACH:  Actually, I think this might be a good time.

THE COURT:  All right.  Then, Ladies and Gentlemen, as you can see, it is five o'clock, and it is Friday, and we are going to adjourn for the weekend.  Monday is legal holiday, so we will not be in session.  But Tuesday we will begin right at nine o'clock, and Tuesday and Wednesday will be full days.  I know that we will start right away with the continuation of the testimony.  And of course, we'll take our breaks for comfort and for lunch.

Please remember that, as you leave the courthouse, you're not to discuss this case with anyone, nor permit anyone to speak with you.  Everything learned about the case is learned in this courtroom.  I would ask that you place your juror notebooks on the table in the jury room, which will remain locked.

Please do remember that we cannot get started unless everyone is present.

So have a wonderful holiday weekend.  I'll see you Tuesday morning at nine a.m.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 5:02 p.m.)

THE COURT:  All right.  And let me thank the deputy marshal.  We can return Mr. Marrero Cisneros on Tuesday morning at nine a.m.  Thank you.

Go ahead and have a seat.  If we could just discuss scheduling.

MR. FEIGENBAUM:  Was the witness instructed about his --

THE COURT:  Mr. Marrero Cisneros, with the assistance of the interpreter -- thank you, Mr. Feigenbaum -- sir, since you are on the witness stand, you're not to discuss your anticipated testimony with any individual.  You're not to discuss any aspect of the case.  And we will see you obviously here on Tuesday morning at nine a.m.  All right, sir?

Thank you, sir.

All right.  With regard to scheduling, following Mr. Marrero Cisneros's testimony, can the Government advise the additional witnesses that will be called.

MS. KLEPACH:  Yes, Judge.  Our last witness is going to be Special Agent Sergio Francisco.

THE COURT:  All right.  And anticipating that you have more direct, obviously, Mr. Feigenbaum, you have your cross, how much time do you think you're going to need for these two witnesses?

MS. KLEPACH:  Judge, I think I have about 20 more minutes on direct with Mr. Marrero Cisneros.  And then ...

MR. DOBBINS:  Special Agent Francisco is going to take a little bit longer.  I anticipate probably at least 90 minutes on his direct to maybe even two hours, just because there's a lot of evidence he's admitting.

THE COURT:  All right, then.

Do you anticipate that that will take us through the entire day?

MR. DOBBINS:  Well, I know that Mr. Feigenbaum also wanted his expert Mr. Pullen to potentially testify --

THE COURT:  No.  I'm speaking of the Government's case.  And then I know that Mr. Feigenbaum obviously would need to speak with Mr. Hernandez.  Although I think you have already made a decision, Mr. Feigenbaum, that you will be calling in an

expert, Mr. Pullen.

MR. FEIGENBAUM: Yes. If you're ready for my witnesses --

THE COURT: Yeah. That's what -- I'm trying to get a schedule. I know that one of the witnesses we were taking out of turn; is that correct?

MR. FEIGENBAUM: Yes. Mr. Pullen is scheduled, per Your Honor's kind offer to let him come and testify first thing on Tuesday. So he will be traveling down for that. I don't anticipate being longer than maybe 45 minutes to one hour with him.

THE COURT: All right. So I actually need to let the marshal know if Mr. -- if we're going to take a witness out of turn. And I do recall the Court did grant that motion.

So Mr. Pullen will be on Tuesday, as agreed to by the parties. So I will advise the jury that we're going to take Mr. Pullen out of turn in the Government's case, correct, Mr. Feigenbaum?

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: Correct, Ms. Klepach or Mr. Dobbins?

MR. DOBBINS: Well, Judge, I thought we agreed that he could testify on Tuesday. I don't know if there was an agreement that he needed to testify first thing on Tuesday morning. So I'm not sure why we would need to delay the inmate, who is currently on the stand, from testifying.

So I think there's certainly plenty of time for Mr. Pullen to testify on Tuesday after that.  I'm not sure where we got that Mr. Pullen was testifying exactly at nine a.m. first thing.

THE COURT:  Well:  "Testify out of turn, if necessary, as the first witness."  So can you be specific, Mr. Feigenbaum? Why is it that Mr. Pullen would need to be the first witness if we're in the middle of another witness?

MR. FEIGENBAUM:  Not necessary.

Here's the suggestion --

THE COURT:  Oh, okay.

MR. FEIGENBAUM:  -- if the Government represents that they have 30 minutes maximum more with Mr. Marrero, I don't think I would be more than an hour.  So that would put us at 10:30, eleven o'clock.  That's fine.  Mr. Pullen just has additional commitments for other days of the week.  But I can't get to four o'clock in the afternoon, and Mr. Pullen --

THE COURT:  Of course.

MR. FEIGENBAUM:  But it sounds like we would be ready for him at least by lunch.  I mean --

THE COURT:  Okay.  Well, let's have him here by ten o'clock.

MR. FEIGENBAUM:  Yes.

THE COURT:  So this way there aren't any gaps in time.

MR. FEIGENBAUM:  We don't have to have him first.

We'll finish with Mr. Marrero first.

THE COURT: All right. Well -- or we're gonna -- yeah. We're going to continue with Mr. Marrero Cisneros. And then, at that point in time, we'll call Mr. Pullen out of turn, and then we'll go back to the special agent, Francisco.

Okay. All right. I know this is somewhat premature, Mr. Feigenbaum, but I do need to ask just for purposes of the scheduling and the charge conference: Have you had a conversation with Mr. Hernandez and do you anticipate calling any other witnesses other than Mr. Pullen?

MR. FEIGENBAUM: Yes. My other expert is Daniel Riemer. I've made all my disclosures a long time ago about that. I anticipate he would be no more than an hour and a half on direct, maybe less. Maybe an hour, but --

THE COURT: All right.

All right. Well, I guess I'm trying to determine: Are we going to be done by Tuesday -- I mean, by Wednesday. Sorry.

MR. FEIGENBAUM: Well, that's possible. I would say there's a good possibility that Mr. Hernandez will be testifying.

THE COURT: All right. Then I may -- I may -- Liz, on Tuesday, maybe ask the jurors about their schedule for Thursday, to the extent that we need that day.

COURTROOM DEPUTY: Thursday?

THE COURT:  We have Tuesday and Wednesday.

All right.  Well, let's see how far -- how far we go. I do need to let you know that Thursday evening I'm traveling out of the district.  And I can't -- I can probably delay my flight, but I have to be there at some point.  So I'm just letting you know to that extent -- let's see where we are, and then we'll address scheduling.

Okay.  Are there any issues that the Court can assist the parties with?

MS. KLEPACH:  Judge, I just wanted to raise one -- two issues in advance of Mr. Pullen's testimony.

I do anticipate filing a motion shortly to limit the scope of the expert's testimony with respect to anything having to do with the second Cellebrite extraction of the phone.  It's come up multiple times during the trial, during the cross of Agent Spielvogel.  And despite the Court's ruling on the -- on both the motion to suppress and the motion for reconsideration, counsel brought up this topic again during cross-examination of Mr. Soto.

And because this expert is not properly qualified to be testifying about issues of law, namely, whether the second search -- or the Cellebrite extraction was a search under the meaning of the Fourth Amendment, et cetera, the Government will be moving to limit his ability to testify in that regard.

THE COURT:  Well, is there any objection to that?

129

MR. FEIGENBAUM:  Well, this is the first time I'm hearing this.

THE COURT:  Yeah.  Why don't you confer.  And to the extent that you can somewhat define -- and I think that Mr. Pullen's report or the disclosure would certainly give you those parameters.  But to the extent that you can clarify the scope of Mr. Pullen's testimony, then it may not be necessary to file that motion with the Court.

MR. FEIGENBAUM:  Right.  Quite honestly, in candor to the Court, I think Ms. Klepach is on the right track.  But I can't exclude other parts of his testimony that would not fall within that legal objection she has.  So I think we can probably work it out.

THE COURT:  Okay.  And with regard to any special instructions, I have the instructions that were provided to the Court that I have been working on.  If there are any special instructions, I would require that those instructions be provided to the Court at some point before Tuesday, so that I can work on them, look at the law, and then we can have a charge conference on either late Tuesday or Wednesday.

MS. KLEPACH:  Judge -- sorry.  Go ahead.

MR. FEIGENBAUM:  Judge -- I'm sorry.

Okay.  Well, I would say just in regard to that, Your Honor, I will do the best I can.  But there may occur something during the final evidentiary portion of the trial that would

justify an additional jury instruction or two.

THE COURT:  Of course.  And obviously, if there are additional instructions that are unanticipated, but necessary to give to the jury, I understand.  I just -- at this point, if there are any -- I only have one set of jury instructions and a Verdict Form.  And I'm not certain if there's any objections or any additional instructions that I should be made aware of.

MR. FEIGENBAUM:  I will get on that before Tuesday.

THE COURT:  Okay.  Anything else?

MS. KLEPACH:  And we do have some special instructions that we'll be submitting for the Court's consideration.  So we will try to get that to the Court over the weekend.

THE COURT:  Thank you.

Why don't we -- could we set a deadline of, say, Tuesday -- Tuesday at noon, so this way at least I'll have afternoon to work on them.

MS. KLEPACH:  Yes, Your Honor.

And the last thing is with respect to the co-conspirator statements.  I believe last we brought up this issue Mr. Feigenbaum was going to let us know whether there were any objections to admission of the co-conspirators' statements defined in the Government's motion in limine, and we've yet to hear back about that.

I think that the tail end of Mr. Marrero Cisneros's testimony is going to get into some of that.  And so I just

131

wanted to revisit that with the Court to the extent that factual findings need to be made before that evidence is admitted.

THE COURT:  Mr. Feigenbaum?

MR. FEIGENBAUM:  Well, I actually thought that the Government has gone ahead during the trial and presented co-conspirators' statements to the jury.  So I'm not sure what is left that they are saying hasn't been allowed in.

THE COURT:  Well, perhaps you can -- when you're conferring on the scope of Mr. Pullen's testimony, perhaps you can confer on, Ms. Klepach, what you're seeking to elicit from Mr. Marrero Cisneros.

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  Okay?

MR. FEIGENBAUM:  Yes.

THE COURT:  Anything further?

MS. KLEPACH:  Not from the Government.  Thank you.

MR. FEIGENBAUM:  Can't think of anything right now, Your Honor.

THE COURT:  All right.  Have a nice holiday weekend.

You may leave your items here.  We are going to lock the courtroom, and I'll see you on Tuesday morning at nine a.m.

MR. FEIGENBAUM:  Have a good weekend, Your Honor.

THE COURT:  You as well.

(Proceedings adjourned at 5:14 p.m.)

UNITED STATES OF AMERICA        )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 6th day of October, 2023, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 132.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 6th day of June, 2024.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov