1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1


UNITED STATES OF AMERICA,

       Plaintiff,                  October 10, 2023
                               9:01 a.m.
      vs.

JAVIER HERNANDEZ,

       Defendant.                Pages 1 THROUGH 204

_____


TRANSCRIPT OF TRIAL DAY 8
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE
And a Jury of  12



Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                        Brian Dobbins, AUSA
                        Arielle Klepach, AUSA
                        99 Northeast 4th Street
                        Miami, Florida 33132


FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                        PO BOX 545960
                        Surfside, Florida 33154-9998


COURT REPORTER:     Yvette Hernandez
                        U.S. District Court
                        400 North Miami Avenue, Room 10-2
                        Miami, Florida 33128
                        yvette_hernandez@flsd.uscourts.gov

**I N D E X**

Certificate ................................   204

**W  I  T  N  E  S  S**

**ON BEHALF OF THE GOVERNMENT:**                              PAGE
ROBERTO MARRERO CISNEROS
CONTINUED DIRECT EXAMINATION BY MS. KLEPACH              6
CROSS-EXAMINATION BY MR. FEIGENBAUM                     23
REDIRECT EXAMINATION BY MS. KLEPACH                     38

**ON BEHALF OF THE DEFENDANT:**
(out of turn)
THOMAS PULLEN
DIRECT EXAMINATION BY MR. FEIGENBAUM                    46
VOIR DIRE BY MS. KLEPACH                                56
CONTINUED DIRECT EXAMINATION BY MR. FEIGENBAUM          59
CROSS-EXAMINATION BY MS. KLEPACH                        73
REDIRECT EXAMINATION BY MR. FEIGENBAUM                  96

**ON BEHALF OF THE GOVERNMENT:**
SPECIAL AGENT SERGIO FRANCISCO
DIRECT EXAMINATION BY MR. DOBBINS                      103

**E X H I B I T S**

| GOVERNMENT'S EX. NO.: | OFFERED | ADMITTED |
|---|---|---|
| 24 | 19 | 19 |
| 24A | 19 | 19 |
| 18 | 114 | 114 |
| 16 | 120 | 121 |
| 15 | 124 | 124 |
| 13 | 124 | 124 |
| 12 | 124 | 124 |
| 14 | 124 | 124 |
| 17 | 124 | 124 |
| 5 | 139 | 139 |
| 5A | 139 | 139 |
| 5B | 142 | 142 |
| 5C | 142 | 142 |
| 5D | 142 | 142 |
| 100 | 143 | 143 |
| 75 | 167 | 168 |
| 72 | 170 | 171 |
| 73 | 170 | 171 |
| 74 | 170 | 171 |
| 97 | 185 | 186 |
| 6 | 190 | 190 |
| 6A | 190 | 190 |

(Call to order of the Court, 9:01 a.m.)

THE COURT:  Let me acknowledge the presence of the Defendant with the assistance of the interpreters.  And I thank the interpreters for being here.

We are waiting for the witness, and we are waiting for two jurors.  So go ahead and have a seat.

Are there any issues that the Court can address with the parties?

MS. KLEPACH:  Not on behalf of the Government, Your Honor.

MR. FEIGENBAUM:  Not on behalf of the Defendant, Your Honor.

THE COURT:  All right, then.

I've asked the courtroom deputy to certainly wait for all the jurors, and then to inquire, number one, if they are willing to stay today until six p.m. and tomorrow until six p.m., to the extent that that may assist us in not having to return on Monday.  To the extent that -- and let me also state that we are -- cannot be in session on Thursday and Friday.  I am out of the district.

On Monday, I've also asked the courtroom deputy to inquire if the jurors are able to return to the extent we haven't finished the case or they need additional time for their deliberations.  So those are the two questions that will be asked of the jurors.

MR. FEIGENBAUM:  Judge, while we have these moments, I just, first of all, want to thank you for signing an order allowing the -- my two experts to bring their laptops into the courthouse.  So thank you for that.

And the other thing is I have Mr. Pullen -- one of my experts, who, as we talked with the Government and Your Honor last week -- after Mr. Marrero completes all of his testimony, then Your Honor said you would be able to have him taken out of turn.

THE COURT:  Yes.  That's correct.

As soon as we're done with this witness, who is in custody -- and hopefully he's coming out soon -- then Mr. Pullen will be called out of turn, and I'll advise the jurors.

(Pause in proceedings.)

THE COURT:  Okay.  How we doing?  We have all 14?

COURTROOM DEPUTY:  No.  We have 13 out of 14.  One is fifteen minutes away.  She got stuck behind something.

Second thing, as far as about what we discussed till six o'clock, I have everybody except one who says she cannot do that.

THE COURT:  All right.  Then we don't.

All right.  And the third?

COURTROOM DEPUTY:  And they are not -- they don't even want to think about next week.  But ...

THE COURT:  All right.  So they are not able to make a decision at this time?

COURTROOM DEPUTY:  About six o'clock, like I said, everybody's on board, except for one.  And then, until next week, they're all kind of --

THE COURT:  Is that individual able to stay until 5:30?

COURTROOM DEPUTY:  I could confirm and see if she could stay until 5:30.

THE COURT:  All right.  So you said 15 minutes.  And could you tell us what juror that is.

COURTROOM DEPUTY:  That is Juror Number 4, which is Ireti Ojomo.

THE COURT:  All right.  Well, that's a member of the ...

COURTROOM DEPUTY:  And who was saying that they can't stay is number 14.

THE COURT:  All right.  At this point, given that the juror is on her way, then I would suggest that we wait, rather than addressing the striking of a juror.  And let's see how far we can go today in getting the witnesses on and off.

MR. FEIGENBAUM:  Your Honor, may I then go see whether Mr. Pullen has arrived and make sure that he understands not to enter the courtroom?

THE COURT:  Certainly.

(Pause in proceedings.)

COURTROOM DEPUTY:  Regarding the juror that you asked if they can stay until 5:30, nope.

THE COURT:  All right.  I don't really know what we do with this case, but let's see.

COURTROOM DEPUTY:  But they are on notice as far as coming back on Monday.

THE COURT:  Yeah.  All right.

(Pause in proceedings.)

THE COURT:  Both sides ready to proceed?

Let's bring in the jury.

(Before the Jury, 9:43 a.m.)

THE COURT:  All right.  Good morning, Ladies and Gentlemen.

Please be seated, everyone.

I hope that you had a pleasant weekend and ready to get back to work.  And we will continue with the testimony of Mr. Marrero Cisneros.

MS. KLEPACH:  Thank you, Your Honor.

DIRECT EXAMINATION [CONTINUED]

BY MS. KLEPACH:

Q.  Good morning, sir.

A.  (Through Interpreter.)  Good morning.

Q.  So I want to just reorient us to some of what we were talking about at the end of last week.

MS. KLEPACH:  If we could have the display, please.

Thank you.

BY MS. KLEPACH:

Q.  So we're putting up on the screen Government's 11 and 11A, in evidence.

Okay.  So --

MS. KLEPACH:  Let's go to the next page, please, 87.

BY MS. KLEPACH:

Q.  All right.  So last we spoke, we were talking about a person named Fanny.  Can you remind us who Fanny is.

A.  Fanny is a woman who worked at a dealer who would get the temporary license plates.

Q.  Do you know how she would get them?

A.  She had a dealer.

Q.  All right.  And as a result of her relationship with that dealer, do you know what she was able to do?

A.  She would enter the car number, the new car number.  It would come out in the system as approved, and the license plate would be printed.

Q.  Okay.  So when you say:  "She had a relationship with the dealer," is that a car dealership or something else?

A.  Yes.  A car dealership.

Q.  Okay.  And when you say she would create the new number, what do you mean by that?

A.  I would give her the vehicle number.  She would enter it

into the system -- she worked at the dealer -- and then it would come out as either approved or not approved.

Q. And were these VIN numbers that you gave her cloned or false?

A. Sometimes they could be cloned, but most of them were false.

Q. Okay. And remind us, how would you come up with the fake VIN numbers?

A. When it was a clone, you would look at it in CARFAX. When it was false, you would start looking for a number until it was accepted and it would approve it.

Q. Accepted by who?

A. The Motor Vehicle System.

Q. And how would you know whether the number was accepted or not?

A. Because first you would put it -- you would enter it in the CARFAX. If the CARFAX would give you the history or zero records, it meant that the number was good.

Q. Okay. So in these messages, I believe you testified on Friday that you were introducing Mr. Hernandez to Fanny. Can you explain to us why you were doing that.

A. Because he needed a temporary license plate. So I spoke with Fanny, and he went to pick it up.

Q. Who did he pick it up from?

A. Mr. Hernandez went to pick it up from Fanny.

9

Q.  Do you recall what type of car Mr. Hernandez was searching for the -- or was looking to obtain the fake registration for?

A.  It could have been for a Toyota, a Dodge, an Infiniti.  I don't remember exactly.

Q.  Okay.  We also talked a little bit about fake registration documents.  Did you create those fake registration documents for Javier Hernandez?

A.  The documents, the registration for him, would not come fake for those cars.  For the cars, no.

Q.  When you say it wouldn't come fake, what does that mean?

A.  Because the registration was given by the person who gave you the license plate.

Q.  Were the cars -- explain that.  Who would give the registration?

A.  The license plate goes together with the registration.

Q.  All right.  And is this something that would always come from Fanny or from someone else?

A.  No.  It would come from other persons that he himself also knew.

Q.  Okay.  Were these documents created here in the United States or somewhere else?

A.  In the United States.

Q.  And do you know how they would be used in Mexico?

A.  No.  That was all only in order to get to the border with the United States.

Q.   Okay.  What was the purpose of having these registration documents and the significance of using them at the border?

A.   In order to get from Miami all the way to the border, in case the police would stop you, everything would look correct.

Q.   Okay.

MS. KLEPACH:  So now let's go to Page 9, please, of Exhibit 11 and 11A.

Okay.  Can we just zoom in on the first image.

BY MS. KLEPACH:

Q.   What is this?

A.   This is a temporary license plate.

Q.   And who sent this message?

A.   I sent it to him.

Q.   Do you remember what vehicle this was for?

A.   If you could amplify it here, I could maybe look at it.

MS. KLEPACH:  Can we go to the ...

Can we go to the next page, actually.

THE WITNESS:  For a Toyota.

BY MS. KLEPACH:

Q.   All right.  We talked a little bit about that Toyota the other day.  Can you remind us what involvement you had with the creation of the fake documents for that Toyota.

A.   I did the false VINs, VIN numbers, and I installed it in the Toyota.

Q.   What did the Toyota look like?

A.   White and red interior.

Q.   And do you know where Javier Hernandez took that Toyota?

A.   To Mexico.

MS. KLEPACH:  Can we go to Page 99, please.

Can we zoom in on that last message.

BY MS. KLEPACH:

Q.   All right.  Who sent this?

A.   He did.

Q.   Okay.

MS. KLEPACH:  Now let's go to Page 100, please.

BY MS. KLEPACH:

Q.   What are we looking at here?

A.   A driver's license.  It looks like it's from Mexico, but I can't tell exactly.

MS. KLEPACH:  Let's exit out of the bubble, please.

All right.  Now let's go to the third message on that page.

BY MS. KLEPACH:

Q.   What is this number?

A.   This is a number for a boat that Javier wanted to be done for him, and he told me to look for this number.

Q.   Okay.

A.   It looks a lot like this number.

Q.   When you say he wanted to make it for him, what does that mean?

12

A. This is a boat. So this was to create a HIN to put a number on the hull. And I would do it on a fiberglass or metal sheet, and I would give it so -- for them -- for him to do it.

Q. All right. And what was the significance of the Mexican driver's license?

A. There are two reasons. One was, once they went through the border -- well, the license -- there was another license plate to be used with that driver's license. And the other reason was to make those false documents for a boat with that driver's license, using the false numbers.

Q. Okay.

MS. KLEPACH: Let's scroll down, please. And just for the record, this is Page 101 of Exhibit 11.

BY MS. KLEPACH:

Q. You testified earlier that you were -- you couldn't see exactly where the license plate was from. Is this -- does this help you?

A. Yes. It's from Mexico.

MS. KLEPACH: Let's go to Page 103, please.

Okay. So let's go to the last message on that page.

BY MS. KLEPACH:

Q. Who sent this message?

A. Javier.

Q. And do you recall what he is asking you here?

A. I don't know exactly. Could have been a temporary license

13

plate or paper for a boat. It was for something related to those things.

Q. When you say: "Those things," what are you talking about?

A. Cars or boats.

Q. Okay. What about cars or boats?

A. The registration, the license plate for him in order to be able to travel or if he had to do something on a car. I don't remember exactly, but it was -- it was something for one of those two things.

MS. KLEPACH: All right. So now let's go to Page 104.

BY MS. KLEPACH:

Q. All right. Who sent that message?

A. He did.

MS. KLEPACH: And for the record, we're talking about the last message on Page 104.

BY MS. KLEPACH:

Q. Does this help refresh your memory as to what the previous message was about?

A. Yes.

Q. What was it about?

A. For me to give him the license plate for the Toyota.

Q. Okay. And when you say: "The license plate," is that the temporary tag we were talking about earlier or another type of license plate?

A. No. The temporary license plate.

MS. KLEPACH: Now let's go to 105, please.

BY MS. KLEPACH:

Q. Okay. This is the second message on Page 105. What is this?

A. This is a CARFAX report.

Q. Why did you send this to him?

A. For him to see that the number existed.

Q. The VIN number or another kind of number?

A. The VIN number.

Q. Okay.

MS. KLEPACH: Can we go to 106, please, and 107.

BY MS. KLEPACH:

Q. All right. And what are we looking at now on Page 107?

A. It's also the CARFAX, but I can't tell.

Q. Okay. It looks like this is pretty blurry. How is it that you can tell that this is a CARFAX report?

A. By the format.

MS. KLEPACH: Let's go to Page 108, please.

BY MS. KLEPACH:

Q. All right. Do you recall what you sent him in this message?

A. This has to do with CARFAX or a BoatFax. I don't -- I can't tell.

Q. Okay. So how does Mr. Hernandez respond to you sending him that?

15

A.   Like saying:  "That thing works, that information works."

Q.   Meaning the information contained in the report you sent him?

A.   Yes.

Q.   Okay.

MS. KLEPACH:  Let's go to 111, please.

BY MS. KLEPACH:

Q.   Okay.  Now, the message time stamped 10/14/2019, 9:33:31, can you tell what he's asking you in this conversation.

A.   If he's asking me how it's going, it means that I wasn't done with the work.  So how was I doing with the job.

Q.   Okay.  Did you ever hang out with Mr. Hernandez socially?

A.   No.

Q.   Did you ever communicate with him about anything other than your illegal business?

A.   No.  We didn't socialize much.

MS. KLEPACH:  Let's go to Page 119, please.

BY MS. KLEPACH:

Q.   Okay.  What are we looking at in the first message on this page?

A.   It's blurry, but from the format I can tell that it's an Infiniti.

Q.   What for an Infiniti?

A.   The sticker on the door, the VIN numbers.

Q.   Does that mean the VIN number that's on the door?

16

A.  Yes.  Correct.

Q.  What about this photo allows you to know that it's an Infiniti?

A.  I've done this many times.  I practically know it by heart.

Q.  Okay.

MS. KLEPACH:  Let's go to Page 130, please.

BY MS. KLEPACH:

Q.  Okay.  And what is Mr. Hernandez telling you in this message?

A.  "Hi.  Answer me."

Q.  Okay.  Do you recall what, if anything, you spoke about around that time?

A.  I don't remember.  But I know that I wasn't answering the phone, and that's why he called.

MS. KLEPACH:  Let's go to Page 132, please.

Let's go to actually 133.

BY MS. KLEPACH:

Q.  All right.  What are we looking at here?

A.  We're looking at a Mexican registration.  I can't see the full number.

Q.  Do you recall -- sorry.  Go ahead.

A.  It looks like a Toyota Tundra 2018.

Q.  How do you know that it's for a Toyota Tundra?

A.  First by the VIN number, and then underneath it says so, under "Brand" and "Model."

Q.   Is this the same Toyota Tundra for which you created the false temporary license plate in the earlier messages?

A.   I can't see the end of the number, but -- I can't see -- I'm not sure.

Q.   Okay.

MS. KLEPACH:   Let's go to the -- Page 132, please.

Sorry.   Page 134.

And now 135.

BY MS. KLEPACH:

Q.   Okay.   Now, we're looking at what appears to be the full VIN number.   Does this help refresh your memory as to whether it's the same Toyota?

A.   No.   It's not the same Toyota because the previous Toyota ends in 79.

Q.   All right.

MS. KLEPACH:   So now let's go to Page 146.

Actually, I'm sorry.   Let's go back up one second.

BY MS. KLEPACH:

Q.   Okay.   Now we're on Page 137.   What are we looking at here?

A.   A VIN for an Infiniti.   I think it's the one that looked blurry.

Q.   Okay.   Meaning the one from the previous message?

A.   Yes.   It could be because it's the same format, although I didn't see the VIN number before.

Q.   Okay.   How do you know that the person you were speaking

with in these messages is Javier Hernandez?

A.   Because that's the way he would always answer me.   And when he spoke on the phone, it was his voice.

Q.   Did you meet him in person several times?

A.   Many times.

Q.   Okay.   And was the person who you spoke to on the phone -- have the same voice as the person that you spoke to in person?

A.   Yes.

Q.   Is that the same person sitting in court today?

A.   Yes.

        MS. KLEPACH:   Go to Page 146, please.

        All right -- 141.   Excuse me.

BY MS. KLEPACH:

Q.   Is this consistent with the pattern of phone calls between you and Javier Hernandez that you just described?

A.   Yes.

Q.   Okay.

        MS. KLEPACH:   Now if I could have the display for just the witness, please.

BY MS. KLEPACH:

Q.   Mr. Marrero, I'm going to show you what has been marked for identification as Government's Exhibits 24 and 24A.   Do you recognize this?

A.   I know that it's a message, but I don't recognize it.

Q.   All right.   Was one of your -- withdrawn.

19

Did you have conversations with an individual named Jose Miguel Gonzalez Vidal or Chupa?

A.   Yes.   Yes.

Q.   Okay.   And do you recognize -- what would he call you?

A.   Robert.   Robert.   But that's him.   Because he was the only one who would call me "my brother."

Q.   So do you recognize this as the conversations between you and Chupa?

A.   Yes.

Q.   Okay.   And is this a fair and accurate copy of those conversations?

A.   Yes.

MS. KLEPACH:   At this time, the United States offers Exhibits 24 and 24A into evidence.

THE COURT:   Is there any objection?

MR. FEIGENBAUM:   No, Your Honor.

THE COURT:   Admitted into evidence.

(Government's Exhibits 24 & 24A received into evidence.)

MS. KLEPACH:   Okay.   Let's scroll down to Page 2.

Okay.   Stop there.

Thank you.

BY MS. KLEPACH:

Q.   All right.   So let's talk about the third message on this page.   What are we looking at here?

A.   Information that he's sending me about a Sea Ray 2003,

42 feet.

Q.   What is a Sea Ray?

A.   A boat.

Q.   And why was he sending you this information?

A.   For me to get a VIN for that boat.

MR. FEIGENBAUM:  Your Honor, could the prosecutor and witness clarify who that exchange is between.

THE COURT:  Who the "he" is?

Ms. Klepach?

MS. KLEPACH:  Sure.

BY MS. KLEPACH:

Q.   And just to be clear, when you say:  "He," who are you talking about?

A.   Javier wanted a Sea Ray.  I don't know if that was the conversation, but he sent me information for me to get information about a Sea Ray.

Q.   All right.  Is this a conversation between you and Chupa?

A.   I'm not sure if it was with Javier or with Chupa.

Q.   Okay.

MS. KLEPACH:  Let's scroll up to Page 1.

BY MS. KLEPACH:

Q.   Okay.  Does this first message on this page refresh your memory as to who this conversation was with?

A.   Yes.  Chupa would always write to me like this, with the zero Robert or "my brother" --

Q.   Okay.  So this is a conversation with Chupa?

A.   Yes.

Q.   Okay.

        MS. KLEPACH:  So now let's go back to Page 2.

BY MS. KLEPACH:

Q.   Why was Chupa sending you information regarding a Sea Ray?

A.   So that I would create a VIN for a boat they had.

Q.   Okay.  What -- did you eventually create the HIN number for the Sea Ray?

A.   Yes.

Q.   Okay.  Did you ever create a VIN or HIN number for the true purchaser of a car or boat?

        MR. FEIGENBAUM:  Objection, Your Honor.  Lack of foundation.

        THE COURT:  Overruled.

        THE WITNESS:  Can you repeat the question.

BY MS. KLEPACH:

Q.   Sure.  So let's start with cars.  Did you ever create a VIN number for the real purchaser of a car?

A.   Yes.

Q.   All right.  What is -- let me back up.

     Earlier, you spoke about whether the factory is -- who is authorized to create a VIN number for a car?

A.   The factory.

Q.   Okay.  So you are -- are you authorized to create a VIN

number for a car?

A.   No.   No.   I didn't understand your question.   It's only the factory that can create a true VIN number.

Q.   So why did you create VIN numbers for people?

A.   Because they were usually stolen cars.   They had the original VIN number assigned to them by the factory.   They appeared as though they were stolen cars, and that number had to be changed so that they wouldn't appear as stolen cars.

Q.   Is that true of the VIN numbers that you created for the Defendant?

A.   Yes.

Q.   Now let's talk about boats.   Who is authorized to create a HIN number for a boat?

A.   Only the factory.

Q.   Are you authorized to create HIN numbers for boats?

A.   No.

Q.   Why do you create HIN numbers then?

A.   Because these were fake numbers.   It was fraud.

Q.   Okay.   And is it -- were the boats stolen, to your knowledge?

A.   Yes.

Q.   Is that true of the HIN numbers that you created for the Defendant?

A.   Yes.

        (Pause in proceedings.)

MS. KLEPACH:  I have no further questions for this witness.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good morning, Mr. Marrero.

A.  Good morning.

Q.  How are you doing today?

A.  I'm well.  Thank you.

Q.  I think -- let me just go over a couple of things that you first talked about.

A.  Okay.

Q.  I think you said that you wanted to make some fake documents for a Toyota Tundra?

A.  I created false documents.

Q.  For a Toyota Tundra?

A.  For a Toyota Tundra.

Q.  And I think you said because Javier Hernandez was going to drive it to Mexico?

A.  Yes.

Q.  And I think you said to be able to drive from the United States into Mexico you would have to have those documents?

A.  A temporary license plate and registration.

Q.  So do you know whether Javier Hernandez registered that Toyota Tundra in his own name?

A. Javier only put his name on the temporary license plate.

Q. But that goes into the Florida motor vehicle records, even though you register it as a temporary tag, correct?

A. Yes. Yes. The car doesn't have to be in his name if it's a temporary license plate.

Q. But he did register it in his own name, correct?

A. He registered the temporary license plate.

Q. In his own name?

A. Yes. His own name.

Q. So that's part of the official records of the State of Florida, right?

A. Yes.

Q. And that was the same VIN number you created -- well, let me say it different. Was the VIN number you created to try to avoid detection for a stolen vehicle?

A. Yes.

Q. That would be the reason why somebody would want to have you create a VIN number?

A. Yes.

Q. So if the vehicle wasn't stolen, you wouldn't need to make a fake VIN number for someone.

A. Well, not exactly. Because it could be a person who doesn't want to pay for the car for insurance purposes. They change the number and they take it to another place, like Mexico.

Q.  But that person, by putting it in his name, leaves an official record with the State of Florida.

A.  If the temporary license plate is under a dealership, it stays in the record.  If it's a temporary license plate that people make up over there, it doesn't appear in the record because it is fake.

Q.  But if, in fact, the records of Florida reflect Javier Hernandez registering that Toyota Tundra in his name, the record exists with him tied to that vehicle?

A.  Okay.  So if the dealership who gives the license plate out makes it fake -- to be fake, and says that it's real, there is no registration.

THE INTERPRETER:  Correction:  "There is no record."

BY MR. FEIGENBAUM:

Q.  Do you know, as to that Toyota Tundra, whether Mr. Javier Hernandez, in his name, registered that Toyota Tundra?

A.  So Mr. Javier Hernandez sent his license so that I could find him a license plate.  So I spoke to the person in the dealership --

MR. FEIGENBAUM:  Objection.  Hearsay.

THE COURT:  All right.  At this point, sustained, with regard to what was said by the person at the dealership.

BY MR. FEIGENBAUM:

Q.  Here's the question -- let me interrupt you, Mr. Marrero.  It's a yes or no question.  The registration, although a 30-day

temporary tag, was registered with the official records of the State of Florida in his name, yes or no?

A.  I'm not sure what the dealership did.

Q.  So you don't know the answer, in other words?

A.  I do know that I sent for that license plate to be registered, but I have no control over the dealership or over the motor vehicle department.

Q.  Are you able to answer this simple question:  Did Javier Hernandez register the Toyota Tundra in his name and it appeared in the official records of the State of Florida?

MS. KLEPACH:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Okay.  Mr. Marrero -- well, the other day when you first testified, you were asked by the prosecutor if you had been convicted of a felony before.

A.  Yes.

Q.  And you said you had been convicted in 2001 for credit card fraud.

A.  Correct.

Q.  And that was in federal court?

A.  Correct.

Q.  And I think you said you got 33 months' prison?

A.  Yes.

Q.  And then you had additional convictions in the years --

27

let's see.  What was the next year of conviction?  Was it like 2005?

A.  Yes.

Q.  And 2013?

A.  Correct.

Q.  2012?

A.  Yes.  Correct.

Q.  2015?

A.  Yes, but I don't remember very much.  But yes, I think so.

Q.  So when you testified originally last week, it was like five or six felony convictions?

MS. KLEPACH:  Objection, Judge.  I don't believe that was the testimony.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Isn't it true that just between the years 2010 and 2014, in a space of four years, you had 19 felony convictions?

MS. KLEPACH:  Objection.  That was not the testimony.

MR. FEIGENBAUM:  I'm asking the question.

THE COURT:  I'll allow the question to be asked.

THE WITNESS:  No.

BY MR. FEIGENBAUM:

Q.  If you saw a document, do you think that might help you remember?

A.  Okay.

MR. FEIGENBAUM:  May I approach the witness, Your Honor?

THE COURT:  You may.

MR. FEIGENBAUM:  I'm going to approach --

THE COURT:  All right.  You may approach without a commentary.

BY MR. FEIGENBAUM:

Q.  Let me know when you've had a chance to look at that.

A.  These are counts for the same felony.  So for example, there's one here that's 2014, 2014, 2014.  So it's all related to the same charge.  Same thing here:  2010, 2010, 2010.  These are the charges that they list when they arrest you.

MR. DOBBINS:  So you showed him a different page than the one you --

MR. FEIGENBAUM:  No.  I just don't want to have to take it back.

MR. DOBBINS:  Because we don't have 2014, and he's saying 2014.

MR. FEIGENBAUM:  Yeah.  I understand.

MR. DOBBINS:  So could we see the page that you showed him?

MR. FEIGENBAUM:  Same thing.

BY MR. FEIGENBAUM:

Q.  Mr. Marrero, is there something on the document that -- because you just testified it's the same thing.  But do you see

where there are different case numbers?

A.  Yes.  But for example, this one here is 2010, 2010, 2010. I don't think that I've committed that many wrongdoings, that many felonies.  Sometimes I've been arrested and they've given me 10 charges -- charges.  Okay.  For example, here there's one that has to do with an engine.  Here's one that -- where there's a number of a car.

MS. KLEPACH:  Judge --

THE WITNESS:  Basically, that same range of days.

MS. KLEPACH:  -- I'm going to object.  The question was whether or not the document refreshes the witness's recollection, and now we're testifying about the contents --

THE COURT:  That's correct.  There's no need to recount what's on the document.

Do you need the question asked again, sir?

THE WITNESS:  Yes.

BY MR. FEIGENBAUM:

Q.  Does that document help you remember different cases and different charges for which you were convicted between the years 2010 and 2014?

A.  Well, many of these charges, yes.  But many of these charges were thrown out.

MR. FEIGENBAUM:  I'll move on, Your Honor.

THE COURT:  All right.

BY MR. FEIGENBAUM:

Q. Now, you had, in 2022, another federal case?

A. I haven't been presented with charges for that federal case, except for this one -- oh. Well, yes, except for the case that has to do with outboard engines, of sending parts to Mexico, where I received a sentence for five years.

Q. Okay. Just to be clear for the jury, you're in prison right now having been sentenced in May of this year in a different federal case. You're not in Javier Hernandez's case, correct?

A. Correct.

Q. And you agreed to come over to this case to be a witness, right?

A. Correct.

Q. And that's to try to help you get your five years reduced -- five years of prison reduced to less time?

A. Correct.

Q. And your judge in that other federal case, the one that you're in prison for now, is Judge Robert Scola?

A. Correct.

Q. So were the prosecutors in this case the same prosecutors in your Judge Scola case?

A. No.

Q. So you mentioned that the prosecutors can make a motion to reduce your sentence in Judge Scola's case. Will that be the

prosecutors in this case you're here about today or prosecutors in your Judge Scola case?

A.   I don't know.

Q.   Now, in your federal case that you're doing the five years of prison, there was an amount of money that you agreed was the amount for stolen boat engines sent to another country from the United States, correct?

A.   Correct.

Q.   Do you remember how much that amount of stolen boat engines you agreed to plead guilty to -- what the amount was?

A.   I remember 11 million.

Q.   Eleven million dollars?

A.   Yes.  I'm not that sure.  But yes, I think that it was that.

Q.   I'm sorry.  Just to be clear.  Eleven million?

A.   Eleven million.

Q.   You went over the Plea Agreement with the prosecutor when she asked you questions last week.  Remember?

A.   Correct.

Q.   And she asked you whether you understood that there were no guarantees that you would get a sentence reduction?

A.   Yes.

Q.   But if you came to this court and testified against Javier Hernandez, you had the possibility of getting a sentence reduction?

A.   Yes.

Q.   And how many defendants were in your federal case for which you're doing five years prison?

A.   There are several people.  I don't remember exactly how many.

Q.   That case was like from last year, though, right?

A.   Correct.

Q.   And you don't remember how many codefendants you had?

A.   Well, from what I remember, there's Carlos.  I can't remember his last name; Monica, don't remember her last name; Carlos's wife; and Osmani Valdivia.

Q.   All those other people pled guilty too?

A.   Yes.

Q.   So you couldn't testify against them because they pled guilty?

A.   Correct.

Q.   And then you were shown, a little while ago, a chat message with someone known as Chupa, Jose Miguel Gonzalez Vidal, correct?

A.   Correct.

Q.   And in his federal case, a different federal case, everybody pled guilty also, correct?

A.   I don't know.  I'm not sure.

Q.   And in this case, Javier Hernandez's case, the codefendant Ramon Reyes Aranda, he pled guilty, right?

33

A.   I don't know.

Q.   So the only person that you can testify against to try to get a sentence reduction is Javier Hernandez?

A.   Javier Hernandez and Ramon Aranda.

Q.   Have you been asked to testify against Ramon Reyes Aranda?

A.   No.

Q.   And you stated several times that you have to do certain things to be able to get a sentence reduction.

A.   What?  I didn't understand the question.

Q.   Okay.  When the prosecutor was asking you questions last week about what you have to do to get a judge to approve a sentence reduction, she asked you several times ...

        THE INTERPRETER:  Go ahead.

BY MR. FEIGENBAUM:

Q.   That you only have to come here and tell the truth?

A.   Correct.

Q.   But the truth can be whatever you want the truth to be, unless there's something independent that could show you're telling the truth?

        MS. KLEPACH:  Objection.

        THE COURT:  And the basis for the objection?

        MS. KLEPACH:  Counsel's testifying.

        THE COURT:  Overruled.  I'll allow it at this point.

        THE WITNESS:  I'm only telling the truth.

34

BY MR. FEIGENBAUM:

Q.   And how does anybody verify what you say is the truth, unless there's something separate that shows it?

A.   You could see the messages that I was talking to him with respect to the deals I've done with him, and I'm sure I did those deals with him.

Q.   Because you say those messages mean a certain thing.

A.   Because I had meetings with him in person, and I handed the fraudulent documents in person.

Q.   When was the last time before you testified last week that you met with the prosecution team about your testimony here?

A.   I don't remember exactly.  About two weeks ago.  I don't know.

Q.   This is --

        MR. FEIGENBAUM:  I'm trying to see if I'm almost done Your Honor.

        THE COURT:  Of course.

BY MR. FEIGENBAUM:

Q.   Mr. Marrero, I don't get to come back up here and ask you any more questions after I finish.  Do you understand?

A.   Okay.

Q.   That's the rules of examination of witnesses.

A.   Okay.

Q.   So let me ask you this:  Do you remember being interviewed by federal agents back on October 3, 2019?

A.   Yes.   I'm not sure.   I don't have the dates, but ...

Q.   And October 3, 2019, that interview with federal agents, related to what subjects?

MS. KLEPACH:   Objection.   Relevance.

THE COURT:   Sustained.   Let's sharpen the question, please.

BY MR. FEIGENBAUM:

Q.   Did that interview with federal agents on October 3, 2019 relate to stolen boats?

A.   They spoke to me about everything.   They weren't federal agents.   They were the prosecutors.

Q.   Okay.   So October 3, 2019, that interview was right around the time that you say you were creating false documents for a Toyota Tundra that Mr. Hernandez drove to Mexico, correct?

A.   Correct.

Q.   And during that interview with agents, you spoke about different people, such as Tomas, right?

A.   Correct.

Q.   Sasha, Aumaury -- several people?

A.   Yes.

Q.   And you were giving the federal prosecutors information about what you knew about people engaged in that activity?

A.   Regarding Tomas and other people that they asked me about, yes.

Q.   You never once mentioned Javier Hernandez.

A.  I did mention Javier Hernandez.

Q.  Doesn't show up in the report.

        MS. KLEPACH:  Objection.  Lack of foundation.

        THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  In your phone, you had contacts, people that you called your contacts.

A.  Yes.

Q.  Tell me if these people were in your contacts.  Kako?

        MS. KLEPACH:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Javier Hernandez was not listed in your contacts?

A.  I did not have the name as Javier Hernandez.

Q.  Okay.  I want to ask you about this:  You actually -- you were working as a paid FBI informant for a while, correct?

A.  Correct.

Q.  And that was between June 2019 and September 2020?

A.  Let me think.

    Yes.  Yes.

Q.  And you weren't just a citizen wanting to help prevent crimes, correct?

A.  What?

Q.  Okay.  You wanted to be paid for working as an informant.

A.  I really wasn't expecting for the FBI to pay me anything.

Q.   And you got paid $11,944.

A.   Yes.

Q.   But that all ended when the FBI said you were violating the rules of being a confidential informant, correct?

A.   No.  When they paid me the $11,000, I worked with the FBI regarding a case of corrupt policemen in Miami, and later there was nothing.  With them, I never violated any rules.

        MR. FEIGENBAUM:  One moment, Your Honor.

        THE COURT:  All right.  Certainly.

     (Pause in proceedings.)

        THE COURT:  Are we ready to continue?

BY MR. FEIGENBAUM:

Q.   Let's just put it this way:  You were deactivated, as they say, as a confidential informant.

A.   Yes.  I finished my job and that's it.

Q.   Now, in the year 2022, you created some fake documents for Ramon Reyes Aranda?

A.   Yes.

Q.   Regarding a Cobia boat?

A.   Yes.

        MR. FEIGENBAUM:  All right.  Let me see if I'm just about done, Your Honor.

        THE COURT:  All right.  Certainly.

     (Pause in proceedings.)

        MR. FEIGENBAUM:  Thank you.

I believe that's it, Mr. Marrero.

THE COURT:  All right.

MR. FEIGENBAUM:  Thank you for your testimony.

THE COURT:  All right.  Any redirect?

MS. KLEPACH:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. KLEPACH:

Q.  All right.  Mr. Marrero, you were asked a series of questions regarding what documents are part of the official State of Florida records.  Do you remember that line of questioning?

A.  Yes.

Q.  Okay.  Do you know whether the fake VIN or cloned VIN numbers that you create are also part of the Florida DMV records?

A.  Yes.

Q.  Meaning they are?

A.  If it's a clone, it's part of the records.

Q.  So if somebody receives a cloned or a fake VIN number from you, they can register that number with the DMV just the same as they would any other car; is that right?

A.  Yes.

Q.  Okay.  You were asked a series of questions about your prior felony convictions, and you were handed a document.  Do you remember that?

A.   Correct.

Q.   Had you ever seen that document before?

A.   Never.

Q.   Do you know what it is?

A.   It's some charges that are mentioned there, but I don't see --

Q.   Does it have your name on it?

A.   No.

Q.   All right.  And do you know where that came from?

A.   Not really.

Q.   Okay.

        THE INTERPRETER:  From the interpreter, the interpreter missed saying:  "There's no explanation."

        MS. KLEPACH:  Thank you.

BY MS. KLEPACH:

Q.   Okay.  You were also asked about your 2022 federal case and the other people that were in the conspiracy.  Do you remember that?

A.   Correct.

Q.   You were also asked about the amount of money that was attributable to the stolen boat engines, and you testified that that was approximately $11 million.  Do you remember that?

A.   Correct.

Q.   Is that the money attributable to the entire conspiracy?

A.   In my case, yes.

Q.   Right.   So -- and how many people were you charged with?

A.   With five people.

Q.   Okay.   So when you say:  "Attributable to the entire conspiracy," is that all five of those people?

A.   Yes.   All of them.

Q.   Okay.   You were also asked about whether you -- whether your Plea Agreement required you to come here to testify against Javier Hernandez.   Do you remember that?

A.   No.

Q.   You don't remember being asked whether the Plea Agreement required you to testify against Javier Hernandez?

A.   No.

Q.   Okay.   Well, let's talk about what your Plea Agreement required with respect to cooperation.   Does your Plea Agreement require you to testify or cooperate in any investigation that you are asked about?

A.   Yes.

Q.   Does that include any grand jury proceeding?

A.   Yes.

Q.   Does that include any trial that you have information about?

A.   Yes.

Q.   Does the name Javier Hernandez appear anywhere in your Plea Agreement?

A.   No.

Q.   Okay.   And so your Plea Agreement would require you to cooperate -- assuming that you had information about these people, it would require you to cooperate against Chupa?

A.   No.

Q.   Let me ask it a different way.   Your -- is it fair to say that your Plea Agreement requires you to testify about anybody that you have information about?

A.   Correct.

Q.   So if you had information about Chupa, you would have to testify about Chupa; is that right?

A.   Correct.

Q.   Is the same true about Ramon Reyes Aranda?

A.   Correct.

Q.   Is the same true about El Niño?

A.   I don't know the Niño.

Q.   Right.

     Okay.   You were also asked about when we met to speak about your testimony.

A.   Yes.

Q.   Do you recall that we met last week?

A.   Correct.

Q.   Okay.   You were also asked about an interview with law enforcement that took place in October 2019.   Do you remember that?

A.   Yes.

Q.   Okay.  And in that interview, you gave information about a lot of different people, right?

A.   Correct.

Q.   Did that include people that are not Javier Hernandez?

A.   Correct.

Q.   You were also asked about whether you had Javier Hernandez saved as a contact in your phone?

A.   I didn't have his name, but I had his phone number.

        MS. KLEPACH:  One moment.

    (Pause in proceedings.)

BY MS. KLEPACH:

Q.   Let's go back to talking about your Plea Agreement.  If you had information about Neco, would the Plea Agreement require you to give that information?

A.   Yes.

Q.   Okay.

    (Pause in proceedings.)

BY MS. KLEPACH:

Q.   All right.  The case to which you pled guilty, the 2022 case, do you recall when the charged conduct in that case began?

A.   I don't remember.

Q.   Would reviewing a copy of the Indictment refresh your memory?

A.   Yes.

MS. KLEPACH: One moment.

(Pause in proceedings.)

MS. KLEPACH: May I approach?

THE COURT: You may.

THE WITNESS: It says here: "June 2018." There's another date here from 2015.

BY MS. KLEPACH:

Q. All right. So does that refresh your memory as to when the criminal conduct in the Indictment that you pled guilty to began?

A. Since 2015.

Q. Actually, let me grab that back from you.

MS. KLEPACH: One moment.

(Pause in proceedings.)

BY MS. KLEPACH:

Q. All right. And when did the conduct charged in that case end?

A. When I was arrested, I think.

Q. All right. Based on your review of the Indictment, do you recall when the charged conduct ended?

A. In 2019.

Q. Okay.

MS. KLEPACH: I have no further questions.

THE COURT: All right. Is Mr. Marrero Cisneros excused?

44

MS. KLEPACH:  Yes.

THE COURT:  Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.

You are excused.

(Witness excused.)

THE COURT:  And Ladies and Gentlemen, let's go ahead and take a 10-minute recess.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury not present, 11:15 a.m.)

THE COURT:  Okay.  Thank you, sir.

We're on a 10-minute recess.

(Recess from 11:15 a.m. to 11:27 a.m.)

THE COURT:  All right.  Welcome back.

Are we ready to continue?

MS. KLEPACH:  Yes, Your Honor.

MR. FEIGENBAUM:  Judge, just one thing.  I have to make sure that I'm on the Internet and everything is working okay.

THE COURT:  Okay.  And Mr. Pullen is here?

MR. FEIGENBAUM:  Yes, he is.

THE COURT:  All right, then.

MR. FEIGENBAUM:  Do you want him to come already in?

THE COURT:  No.  No.  If you'll call him and he can

45

come forward.

(Pause in proceedings.)

THE COURT:  Mr. Feigenbaum, just let me know when you're ready to proceed, sir.

MR. FEIGENBAUM:  Will do.

(Pause in proceedings.)

MR. FEIGENBAUM:  Ready, Your Honor.

THE COURT:  All right.  Let's bring in the jury.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 11:28 a.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

To accommodate one of the Defendant's witnesses -- we are still in obviously in the Government's case, but we are taking this witness out of turn due to his schedule.

So Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes, Your Honor.

The Defense calls Thomas Pullen.

THE COURT:  Thank you, sir.

MR. FEIGENBAUM:  May I go get him?

THE COURT:  Yes -- is this Mr. Pullen?

Good morning, Mr. Pullen.  If you'll step forward please.

THOMAS PULLEN, DEFENSE WITNESS, SWORN

COURTROOM DEPUTY: Thank you.

Have a seat.

Would you please state your name and also spell it for the record.

THE WITNESS: Thomas Pullen. P-U-L-L-E-N.

COURTROOM DEPUTY: Thank you.

DIRECT EXAMINATION

BY MR. FEIGENBAUM:

Q. Good morning, Mr. Pullen.

A. Good morning.

Q. Let me first ask you: Where do you live?

A. I live in Amelia Island, Florida.

Q. And could you tell us where that is more specifically.

A. Sure. It's about an hour north of Jacksonville. It's as far north in Florida as you can get and not be in Georgia.

Q. All right. And what is your line of work?

A. I do computer and mobile forensics. I'm a computer and mobile forensic analyst.

Q. Have you generated a curriculum vitae or resume that lists your background and qualifications?

A. I have.

MR. FEIGENBAUM: Your Honor, may I retrieve an exhibit for him to review?

THE COURT: Yes. Certainly.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   Take a moment to look at what has been marked for identification as Defense Exhibit Y, please.

A.   Okay.

Q.   Do you recognize that document?

A.   Yes, I do.

Q.   And can you tell us what that document is.

A.   It's my CV.

Q.   All right.  And does it accurately reflect your education, background, and professional work?

A.   Yes, it does.

Q.   Okay.

         MR. FEIGENBAUM:  Your Honor, I move the CV of Mr. Pullen into evidence.

         THE COURT:  And the exhibit number, sir?

         MR. FEIGENBAUM:  Y, Your Honor.

         THE COURT:  Is there any objection?

         MS. KLEPACH:  Yes, Your Honor.

         First of all, it's hearsay.  And second of all, if I could -- it's bolstering.

         THE COURT:  All right.  So the Government is objecting on the grounds of hearsay to the resume, as opposed to --

         MS. KLEPACH:  And also bolstering.

         MR. FEIGENBAUM:  Well, Your Honor, it's --

THE COURT:  I think it might expedite the qualifications of this witness.  So to the extent that the resume may be submitted, is that the sole objection -- is on grounds of hearsay?

MS. KLEPACH:  Judge, also, if we're looking at the copy that the Government received of Exhibit Y, it contains a copy of Mr. Pullen's report, the unredacted report, which is not consistent with the conversations we had with counsel regarding this issue over the weekend.  There are a series of other objections.  I can elaborate --

THE COURT:  All right.  Well, if, in fact, it does not include merely the qualifications, then the objection is sustained.

Why don't we continue with the --

MR. FEIGENBAUM:  Your Honor, I need to correct what she said.  We are only working here in court with the redacted version.  We agreed about what the --

THE COURT:  Can you show that to Ms. Klepach, so she can see what it is that you're seeking to admit into evidence.

MR. FEIGENBAUM:  For sure, Your Honor.

And I provided a copy of the redacted report to the Government days ago.

MS. KLEPACH:  Well, a couple of things, Judge.

What I was just handed was a copy of the redacted report that -- I don't even know if it includes the CV.  The CV

doesn't seem to be attached to this.

Moreover, we informed Mr. Feigenbaum we would be objecting to the introduction of this report for a variety of reasons, one of which is that it contains multiple levels of hearsay, that it is bolstering, and we don't think that -- no foundation has been laid for the admission of this report.

THE COURT: I agree with regard to the report itself. I thought we were just talking about a curriculum vitae. To the extent that the CV attaches a report, the objection is sustained. Let's continue.

MR. FEIGENBAUM: Right. I -- just for the record, Your Honor, I had not yet reached the point where I was going to ask for the redacted report to be admitted.

MS. KLEPACH: But this is --

THE COURT: This is what you're -- I just asked you, Mr. Feigenbaum, to show Ms. Klepach what it was that you're seeking to admit into evidence. You just showed it, and it does include that. So that -- let's continue. The objection is sustained.

MR. FEIGENBAUM: Yeah.

BY MR. FEIGENBAUM:

Q. All right. Mr. Pullen, tell us about your education after high school.

A. I went to Syracuse University. I have a bachelor's from Syracuse. I did two years in a study abroad program in Madrid.

I graduated with a bachelor's in philosophy. In 2000, I went to the University of Miami School of Law. I graduated with a Juris Doctor in 2004 from UM. And since then, I've done additional trainings and certifications, but that's the main educational background.

Q. When you say you graduated from the University of Miami with a Juris Doctor, is that a law degree?

A. It is.

Q. And that was after you completed your undergraduate degree at Syracuse?

A. Correct.

Q. Okay. Now, tell me, just in summary form, what is your area of work.

A. I mostly work with attorneys examining cell phones and computers. I examine the data on a cell phone and the data on a computer. I do things like find deleted text messages, find where someone was on a certain day or time. I recover deleted items off a computer. I prepare reports based on the contents of the cell phone or the computer. And that's basically that. It's a forensic examination of the phone or the computer.

Q. And how long have you been doing this type of work?

A. I've been doing computer and mobile forensic analysis for 12 years. And I've been doing information technology, meaning just technology in general, for about 23 years.

Q. All right. And can you give us some of your professional

training that you have gone through.

A.   Sure.

Q.   Which -- if you could also tell us about any certifications and affiliations you have.

A.   All right.  I was certified by Magnet Forensics.  I did a course that they gave called IEF Essentials Training, and that's a weeklong course with an exam at the end.  They are a -- Magnet Forensics is a vendor or manufacturer of some of the most popular computer and mobile forensic software.

I did a training with a company called Guidance Software that -- they're one of the first computer forensic software companies.  They made a product called EnCase, E-N-C-A-S-E.  And I did something called the Training Passport, which means you can take multiple courses from them online.  And of those courses, I took the foundational computer forensics courses, which are computer forensics one and two.  And these are graded courses.  There's an exam at the end that you either pass or fail, and I passed it.

I attended a conference in 2015, called Techno Security and Forensics Investigation Conference.  And this is where a bunch of companies and also government agencies, the FBI, Secret Service, and companies that make software go and they give training workshops.  So for a week I took different workshops.  Cellebrite was there.  They're a large -- it's an Israeli company that makes a popular product to examine cell phones,

and I did trainings with Cellebrite and other companies.

I'm a registered Apple developer, which means that I get access to software before it's released to the public, so I can see how it works and how to analyze it before it's released.

I'm a Microsoft certified professional, which means I had to take a series of courses and exams with Microsoft to show that I know how Microsoft's server works, how the Internet works, how networking works, and things like that.  And that's the list of my certifications and qualifications.

Q.  All right.  Do you have any foreign language training as well?

A.  Yes.  I'm certified by the Spanish government.  There's a branch of the Spanish Government called Instituto Cervantes, and I'm certified DELE A2, fluent in Spanish.  That was part of a petition for Spanish citizenship.

Q.  All right.  Have you ever done work for the State of Florida and federal cases?

A.  Yes.

Q.  Could you give us a representative example of some of them and what you did in those cases.

A.  Yes, I can.  I've worked on many -- dozens and dozens of federal and state cases.  Let me find a good starting point.

In a case called Florida v. Quirrigantt -- that's Q-U-I-R-R-I-G-A-N-T-T -- I analyzed cell phone evidence in a murder case in Florida.  I was certified as an expert in

computer and mobile forensics by Ellen Venzer -- Circuit Court Judge Ellen Venzer, prior to testifying as an expert witness.

In that case, it was about someone who was posting things to Facebook. And at issue was who was posting them. And so by tracing the Facebook business records and the IP address involved, I was able to reach an opinion on that case and share it with the jury.

Q. In that case, where you qualified as an expert in those areas?

A. I was.

Q. And were those areas in the category of digital forensics?

A. Mobile forensics and Facebook as well, yes.

Q. All right. How about another case that you worked on?

A. Here's another state case: Marcelo Cordero v. F-I-A. In this case, I was certified as an expert in computer forensics by Circuit Court Judge Antonio Marin. And the case was about someone using their phone to post defamatory information about a company that he used to work for. And it was -- the case involved trying to track down who was responsible for sending emails from his phone.

Q. What type of work did you have to do for that one?

A. I had to analyze a lot of IP address information, a lot of business records, and to look at, you know, phone records and things like that. And I was able to identify the person, and there was a multimillion dollar judgment against him.

54

Q.  Were you qualified as an expert in those areas by that state court judge?

A.  Correct.  Yes.

Q.  All right.  Let's have another example, please.

A.  Okay.  United States v. Leon Roberts.  I examined four cell phone Cellebrite reports and IEF reports.  This was a sex-trafficking case brought by the FBI.  I testified at trial. I was certified as an expert in computer forensics by Judge James Cohn for the Southern District of Florida.

And that was a case that involved analyzing how Android phones synchronize data.  It involved a pretty heavy use of Cellebrite and digging into the Cellebrite report, which, again, that's a mobile forensics software.

Q.  All right.  Would you give us a fourth case, please.

A.  Sure.

Q.  Is there one called Cabrera?

A.  United States v. Ulysses Cabrera.  In this case -- it was a federal case.  It was a RICO case, which means there were many defendants.  There were 24 defendants.  And I -- it was a drug-trafficking and money laundering case brought by the ATF. And I analyzed more than 24 Cellebrite reports, 24 phones.  I was -- I testified at a evidentiary hearing about Cellebrite and -- about Cellebrite and how text messaging works in Cellebrite.  I was qualified as an expert in computer and mobile forensics by United States District Court Judge Cecilia

55

Altonaga.

Q.  All right.  Would you like to give one more as a representative sample.

A.  Yes.  Well, I'm working on one now, actually, which is United States v. Kevin Abarca.  In this, there are 17 mobile phones.  It's a Hobbs Act robbery case, involving money laundering, firearms, and racketeering.  And there are 17 mobile phones, and -- that I have to analyze the Cellebrite reports for.

Q.  All right, sir.  Thank you.

Have you had an opportunity, per the Court's authorization, to review the testimony of two Government experts, Messers Soto and Ortega, in this case?

A.  Yes, I have.

Q.  And having reviewed their testimony, are you qualified to testify about the matters they testified to in this case?

A.  Yes.

Q.  All right.

MR. FEIGENBAUM:  Your Honor, based on those qualifications, I move for the Court to certify Mr. Pullen as an expert witness in the areas of Cellebrite phone review and analysis and digital forensics in general relating to cell phones.

THE COURT:  Cellebrite phone review and analysis and digital forensics in general?

MR. FEIGENBAUM:  Yes, Your Honor.

MS. KLEPACH:  Brief voir dire, Judge?

THE COURT:  Certainly.

                        VOIR DIRE

BY MS. KLEPACH:

Q.  Mr. Pullen, good morning.

A.  Good morning.

Q.  Have you ever been denied expert qualification?

A.  No, I have not.

Q.  All right.  As part of your job, are you familiar with Federal Rule of Criminal Procedure 16 as it relates to expert witnesses?

A.  I'm not sure what 16 is.

Q.  It's the rule that governs the disclosure of expert witnesses.

A.  Okay.

Q.  Are you familiar with that?

A.  Somewhat.

Q.  Did you sign a disclosure in this case that pertains to your testimony?

A.  I don't think I did.

MR. FEIGENBAUM:  Your Honor, he did sign a disclosure. We made a disclosure and he signed it, and it's in -- part of the record.

THE COURT:  All right.  So the witness did, in fact,

sign that?

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  All right, then.

THE WITNESS:  Oh.

BY MS. KLEPACH:

Q.  All right.

A.  Sorry.

Q.  And as part of that disclosure, you were required to disclose your opinions?

MR. FEIGENBAUM:  Objection, Your Honor.  We already raised that issue with the Government a long time ago, and never heard back from them.

THE COURT:  With regard to the question, I think the question is proper.  The objection is overruled.

Do you understand the question?

THE WITNESS:  Do I remember signing it was the question?

BY MS. KLEPACH:

Q.  No.  The question was whether or not your expert disclosure needed to contain the bases for your opinions.

A.  I don't remember the wording of it offhand.

MR. FEIGENBAUM:  Judge, I object and request a sidebar.

THE COURT:  And bring forward what it is that is the issue.

MS. KLEPACH:  Yes, Your Honor.

(At sidebar on the record.)

THE COURT:  Grab one of the microphones, please.

MS. KLEPACH:  So I'll just get to the purpose of the questioning, which is that the rules require the witness to disclose all of the prior cases which he's testified in in the last four years, and I don't believe that the notice complies with that.

We learned -- or realized, rather, yesterday afternoon that there is a case that the witness testified in last year that was not listed.  The only reason I learned of that information is because I happen to have reached out to a colleague in DC, who happened to have crossed Mr. Pullen in that case.  That was not listed on his CV.  And so we don't believe his notice is in compliance with Rule 16.

THE COURT:  So what's the issue?  Are you seeking to exclude his opinion because he didn't disclose the last case that he testified in that you have knowledge of, that you can cross-examine him?  What's the issue?

MS. KLEPACH:  Your Honor, I don't believe the notice -- that he properly disclosed what he was supposed to disclose under Rule 16, and I believe the remedy would be the exclusion of the testimony.

THE COURT:  Because he failed to disclose the last case that he testified in?

MS. KLEPACH:  I don't know if it was the last case or not.  I just --

THE COURT:  Well, you're aware of the case.  Wasn't the case last year?

MS. KLEPACH:  It was last year, in 2022.

THE COURT:  Okay.

MR. FEIGENBAUM:  Judge, this is really not a proper way, in the middle of a witness's testimony, to bring this up now.  This witness was disclosed months ago.

THE COURT:  I agree.  I don't need to hear any more in terms of Rule 16 and the compliance.  You certainly have the right to cross-examine this witness with regard to his testimony in that case, but we're taking precious time away from the jury, and the objection is overruled.

MS. KLEPACH:  All right, Judge.

(End of discussion at sidebar.)

DIRECT EXAMINATION [CONTINUED]

BY MR. FEIGENBAUM:

Q.  Okay.  Let's continue.

A.  Yes, sir.

Q.  Let me ask you, Mr. Pullen --

MR. FEIGENBAUM:  By the way, Judge, let me just renew a request to certify Mr. Pullen to testify in the areas that were covered by Government experts Soto and Ortega.

THE COURT:  Ms. Klepach, did you complete your voir

dire of this witness?

MS. KLEPACH: Yes, Your Honor.

THE COURT: All right. Does the Government have an objection?

MS. KLEPACH: No, Your Honor.

THE COURT: All right. Then let's continue.

BY MR. FEIGENBAUM:

Q. Mr. Pullen, are you being paid for the work you've done in this case?

A. I will be. I haven't yet been paid. But yes, I will be paid my hourly rate.

Q. Okay. And what is that hourly rate?

A. One hundred fifty dollars an hour.

Q. And who is going to pay you for your work in this case?

A. The United States Courts.

Q. Okay. Tell the jury about that program.

A. Okay. There's a program under what's called the CJA, the Criminal Justice Act, and it allows counsel to be retained -- appointed to represent defendants. And counsel can hire experts to help with the case in whatever field the expert is needed in. And so I'm an expert in the area of computer and mobile forensics, and I help out in a criminal case as needed in those areas.

Q. This rate of $150 per hour, is that as much as you could have charged per hour?

A.   No.   Currently, I could charge up to $250 hour, but I didn't opt to.

Q.   All right.   So you're charging a hundred dollars less than you really could under the CJA program?

A.   That's right.

Q.   All right.   What about your travel expenses and where you're staying?   Because you said you came down from, let's say, the Jacksonville area.

A.   Correct.   I have the option -- the ability to have my travel expenses paid for, but I chose to stay with a friend and sleep on their sofa.   I'm a taxpayer also.

Q.   Let me ask you:   What matters did you review?   What type of materials did you review in this case?

A.   Somewhat extensive discovery.   I reviewed -- let me just pull it up here -- multiple phones mostly.   I have a list of names, but I reviewed Cellebrite reports, which were the mobile phone reports, for many of the codefendants.   I also reviewed some audio/video, some location data, call detail records, mostly things related to the phones in the case.

Q.   And I believe you testified that you have never been denied qualification as an expert witness?

A.   Correct.   I've always been found to be an expert.

Q.   Okay.   Now, did there come a point in time, after reviewing the materials that were provided, that you generated a report?

A.   Yes.

Q.  And the report is a redacted report, meaning that there's portions that are relevant to your testimony today; is that right?

MS. KLEPACH:  Objection.  Leading.

THE COURT:  Overruled at this point.  I'll allow it. You may continue.

BY MR. FEIGENBAUM:

Q.  Are you working with what's called a redacted report?

A.  Yes, I am.

Q.  And the reason for the redaction -- does that relate to portions that are relevant for this trial?

A.  Correct.  Portions that are not relevant have been excluded.

Q.  Okay.  Let's have you take a look at that report, which has been marked for identification as Exhibit Y, because it's the same exhibit number as your CV or resume.  Do you have a copy of the redacted report before you?

A.  I do.

Q.  All right.  And do you recognize it as being your redacted report?

A.  I do.

MR. FEIGENBAUM:  Your Honor, I move the redacted report as part of Exhibit Y into evidence.

MS. KLEPACH:  Same objection previously made, Your Honor.  I don't think that the admission of the report is

proper.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Mr. Pullen, as I ask you some questions, please feel free to refer to the report for your answers and comments.  In the redacted report, do you list some of the -- or do you list what are the protocols that law enforcement should follow when they come into possession or seize a suspect's phone?

A.  Right.  Correct.

Q.  Could you tell the jury what those procedures are, according to at least one law enforcement agency.

A.  Yes.  So let's take, for example, the FBI.  When the FBI takes somebody's phone, the requirements are -- and I'm taking this from a job description that they posted for a digital forensic examiner -- they identify, inventory, and preserve the digital evidence without altering the original data.  They extract data, being careful not to change what's already on the phone.  Because if they change what's on the phone, the data has essentially been tampered with, and it's no longer representative of how it was when they seized it.

So for example, the FBI has a law enforcement bulletin called "Conducting a Digital Forensics Capability Study."  And they say, for example:  "Don't browse.  Scrolling through a suspect's mobile may alter evidence, and preserving evidence is key."

So that's the gist of it.  There are different schools of thought slightly on how to best approach analyzing a mobile phone forensically, but all of them agree that the main point is to extract the data while changing it as little as possible. It must be preserved in as pristine and original state as it was when it was found.

Q.  All right.  Do you have an understanding whether -- when the phone was originally seized, what law enforcement officials seized Mr. Hernandez's phone?

A.  Yes.  It's my understanding, from reviewing documents provided in discovery in this case, that it was seized by Mexican law enforcement.

Q.  All right.  Do you have a date about when it was seized?

A.  About one o'clock in the morning on November 22nd, 2019.

Q.  And do you have an understanding when the FBI finally was able to have that phone in its possession?

A.  It was some weeks later.

Q.  All right.

A.  Maybe two weeks later.  Something like that.

Q.  Now, in your review of -- tell us how you reviewed the discovery material relating to Mr. Hernandez's phone.  What did you actually do?

A.  Well, it's provided originally in what's called a Cellebrite UFDR, which is a report format.  And they provide Cellebrite Reader, which is the program itself, like -- so that

people that don't have the Cellebrite software can open that document.

And it's basically a digital copy of what's on the phone. You can browse through it.  You could isolate it by subject area.  You could see, for example, what's called analyzed data. You can see text messages.  You can see a timeline.  You can see photos, videos.  It breaks it apart kind of by subject to make it easy to review.

So I reviewed it first in the native Cellebrite report format.  And then I used my own software.  I have a copy of Oxygen Forensic Detective.  And I imported the UFDR Cellebrite report into the other software program, because it often will give different results.  Even reading the same file, Oxygen can pull out sometimes data that Cellebrite doesn't and vice versa. So it's good, I think, to use various software programs and compare them.

Q.   In reviewing the discovery or the evidence turned over to us, did you find any use of Mr. Hernandez's phone while it was in Mexican police custody?

A.   Yes.  So in looking at the phone, what you see is almost every few seconds there's activity on the phone, which is normal for a mobile phone.  Mobile phones these days are on the, you know, cellular data network, and they're always sending and receiving data.  Even if you're not sending an email or using it, it's always talking to the network.

And if you look at the cell phone, you can see every few seconds a new event, new event, new event, new event.  Then all of a sudden, in the early-morning hours of November 22nd, 2019, there's a gap.  There's no other gap on the phone, but there's a gap of several hours.  So I assume -- and that coincides with a report that says that's when the phone was seized.  So I assume that that's when the phone was seized, and possibly either turned off or placed into airplane mode, but more likely turned off.  But there's a gap of several hours.

And then -- which I found to be odd -- it starts up again, the activity.  And it starts up again for about -- on the network, it starts up for like the next five days.  So it receives text messages.  It receives 319 files in the time that it's in the custody of Mexican law enforcement.  And I say that because you can see, for example, someone using the Internet browser.  They used Chrome.  They go to the PayPal website.  There's other files that are created on the phone that are consistent with being on the network.  There's text messages in WhatsApp that come in.  You know:  "Hey, where are you?  Where are you," things like this.

And then, all of a sudden, it stops after five days.  And then you see some other activity, much later, going on for like the next, say, year and a half at different times.  And that's more consistent with someone just turning the phone on.  So I believe that's when the FBI had it and they were extracting

data from it and things like that.  That's not being put on the network and that's not necessarily, you know, harmful.  But the phone is being turned on and off later.

But what's very harmful is, the week that it's in the custody of the Mexican law enforcement, it was left connected to the network.  So that data, you know, was continued to be sent and received from the phone, was not preserved.

Q.  Are you saying that the standards and protocols that United States law enforcement agencies used was not being followed in Mexico?

MS. KLEPACH:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Was the law enforcement protocols used by federal and state agencies --

A.  Right.

Q.  -- in the United States -- were those protocols being followed in Mexico?

A.  They were not.  I've worked every year on many cases, for the last 12 years with FBI, DEA, Coast Guard, Secret Service, Homeland Security, police agencies.  And I've never seen anybody seize a phone and leave it connected to the network and sending and receiving data for a week, while it just sat there in their custody.  I've never seen that before.

The policy would be to immediately place it in airplane

mode or put it in a Faraday bag, which is a little bag that blocks signals so that it can't communicate with the network. And the worst-case scenario would be, you know, you take somebody's phone and they remotely wipe it while it's in your custody because it's sitting on the Internet. And you could just go to like iCloud, if it's an iPhone, and say: "Wipe my phone." And now, you know, the next thing they go to look at the phone and it's been erased.

So no agency that I've ever worked with would do that, would just leave it on the Internet, because you just don't know what's -- you don't know what's going to happen to the evidence. You have to preserve the evidence as it is. So the other -- so they didn't follow, you know, the main rule of computer and mobile forensics, which is preserve the evidence, don't change the evidence. They allowed the evidence to change.

And the other thing that, to my knowledge, they didn't follow is usually when you take a piece of evidence into custody, when you seize it, you document it. You say: "On this date and this time, I seized the device, and here's what we did with it. We put it in this Faraday bag. We put it in the locker. Here's the locker number we put it in. And when this detective took it out on this day, he gave it to" -- you know, some kind of chain of custody, some documentation; what did you guys do with the evidence. But in this case, I'm not

able to find in the discovery any records of what exactly was done with it.

When I saw the activity on the phone after the data seizure from PayPal, I'm wondering: "Wait. Why is someone using Chrome to go to PayPal?" I don't know the answer. I don't know the answer to any of what was done to the phone, other than what the phone says, because there's no -- just, there's no documentation saying what they did with the phone.

So lack of preservation and lack of documentation are the two things that they didn't follow, to my knowledge.

Q. If the phone, while in police custody -- Mexican police custody, as you testified, is left on and can receive information from the network, how can that impact the data on the phone at the time of seizure?

A. Okay. So the worst-case scenario would be that the owner of the phone, or someone with access to their credentials or something, erases the entire phone. That would probably be the worst-case scenario. But even if that doesn't happen, just by having the phone on, and text -- and I know it was on because you can see text messages coming in and voice mails coming in, you know, missed calls and stuff like that. So we know it was on the network.

One harm from that is this -- well, we could talk specifically about this phone. Cellebrite was able to recover 18 deleted messages from the messaging called app called

WhatsApp.  It got 18 recovered.  And there were thousands of WhatsApp messages, but we were only able to recover 18.

Now, to recover messages, it looks in -- in part, it looks in a part of the database that's used to store the messages called the cache.  And in the cache you can see bits and pieces of data, and there's some -- there's another file, called the Write-Ahead Logging file, the WAL file.  And there's some interplay between these two files.  But essentially, if you delete something on a phone, specifically in WhatsApp, it doesn't immediately necessarily delete it.  But -- so you may be able to run software and recover that deleted text message. You can get it back often.

However, the more you use a device -- and this applies to computers as well -- the more you use a device, the likelihood of you recovering a deleted item from that device is going down and down and down.  And the reason for that is that new files are being saved to the device.  Well, where are they being saved?  They're being saved often in the area where there used to be a file that you deleted.  So as the new thing comes in, it may sit on top -- it may be written over of where that other thing used to be.

So we would have been able to recover messages that we may not have been able to recover because new messages are coming and overwriting the cache.  You know, the data on the phone is being changed.  Just like if you had like a -- I don't know,

like back in the day, a cassette tape, and you had a song, and you recorded another song on top it, and another song on top of that, it's really hard to go back and see the original thing if you're recording on top of it.

So the fact that it was left on -- that's why government agencies in the United States don't allow a phone that they seize to be on the Internet or the cellular network. That's why they don't allow that, is because they want to preserve the evidence. That wasn't done in this case.

Q. All right. Having reviewed the testimony that the Government expert Mr. Soto gave, did you have an opportunity to see whether you have any difference of opinion about anything that he testified about?

A. Yes. The biggest difference essentially was that -- is it special agent, I believe -- Special Agent Soto testified that there was no tampering with the phone. He testified that law enforcement -- and then he specified, American law enforcement, the FBI, or Mexican law enforcement -- didn't tamper with the phone. But to me the wording was chosen carefully. I don't believe that anyone necessarily purposefully left it on the network just with the goal of overwriting information and tampering with the evidence, you know, changing the evidence. I feel it was negligently left on the network. It was negligently preserved. And in so doing, inadvertently tampered with.

I don't believe the agents, you know, snuck in and, you know, planted evidence on it, and things like this, or deleted things on purpose, but it was not preserved properly.  So I feel it was negligently left on the Internet, and the leaving of it on the Internet was the tampering.  You know, it's the fact of leaving it connected to the network that changed data on it.

Q.   All right.  Is there an issue of what's called overwriting?

A.   Yes.

Q.   Overwriting initial data at the time of seizure?

A.   Yes.

Q.   What is that?

A.   Well, there are temporary either folders -- or in this case actually a temporary space in a database, which is used to optimize the performance of it, called a cache.  C-A-C-H-E. And in the case of WhatsApp and other SQLite databases, to speed up the performance of it, it will reference areas of -- like a working area of the database, like having a scratchpad or something like this.

And when messages come in, they're written to the cache. And if you were to freeze the phone right there, you would be preserving it.  But if you allow the phone to keep being used, if you're sending and receiving more messages, or even just leaving it on the network, like in this case, and messages are coming in, the cache is changing.  That cache is being changed

by new messages coming in.  They're being written to that cache.

So it's an open question:  What was the cache like before it was left on the network for five days?  What was the phone like at the time of seizure?  And the truth is that we'll never know exactly what it was like.  But for sure the cache had changed.  There's really no dispute about that.  The database -- the WhatsApp database changed just for the fact that new messages were received.  So we know that the cache had to have changed.

MR. FEIGENBAUM:  Thank you, Mr. Pullen.

Your Honor, no further questions.

THE COURT:  All right.  Cross-examination.

Actually -- yes.  Let's go with -- so we can get the witness on and off.  And Ladies and Gentlemen, let's begin or commence the cross-examination.

MS. KLEPACH:  Judge, just so I can time myself, should I plan to go until one, if that's how long it takes, or do you want me to stop at a certain point for lunch?

THE COURT:  I think you'll let me know when it might be a good time, and let's say about 12:40, 12:45.

MS. KLEPACH:  Okay.

CROSS-EXAMINATION

BY MS. KLEPACH:

Q.  All right.  Good afternoon, sir.

A.  Good afternoon.

Q.  So you testified on direct examination that part of the information you relied on in generating your report were bulletins and other documents published by law enforcement agencies; is that right?

A.  Those are sources of information that I used to write the report, yes.

Q.  Okay.  So you relied on those -- on those sources of information; is that right?

A.  Yes.

Q.  And one of these sources of information that you relied on is a document called "Forensic Examination, Digital Evidence, Guide Law Enforcement"?

A.  Yes.

Q.  Is it true that that document was written in 2004?

A.  That may be true.  I don't have the date in this report.

Q.  All right.  Well, would reviewing a copy of that document refresh your memory?

A.  Yes.  I have a redacted version.

Q.  You have a redacted version?

A.  Uh-huh.

Q.  Does the redacted version say that it was written in 2004?

A.  Give me one second, please.

    I'm not seeing a date.  You're saying "Forensic Examination of Digital Evidence, a Guide for Law Enforcement"?

Q.  Footnote 1 of your report.

A.  I'm not seeing a date here.  If you have one, I'll review it.  Sure.

Q.  Okay.  Sure.  Let's come back to that.

All right.  Another source of information that you relied on was an article called "Conducting a Digital Forensics Capability Study"; is that right?

A.  Yes.  That's correct.

Q.  All right.  And isn't it true that that document specifically says that if certain information cannot be obtained from a cell phone scrolling through the cell phone is permissible?

A.  Yes.

Q.  All right.  You also testified regarding the principle that law enforcement is not to change the evidence on a device from the time of seizure.

A.  I'm sorry.  Say the first part of the question, please -- of the sentence.

Q.  Sure.  So is it your testimony that law enforcement is not to change the evidence on an electronic device from the time of seizure?

A.  What I testified was that that's the goal and that it should be changed as little as possible.  That's slightly different than saying it must not ever be changed, because just by turning it on, technically, you may be changing it, in the

sense that there may be boot log files and things like this being created.

Q.   Right.

A.   But I'm saying substantially change.  It's an aspirational goal, like don't change the messages on it, things like this, yes, correct.

Q.   Okay.  But that's not what you said in your report.

A.   That it should be changed as little as possible?

Q.   Isn't it true that your report says:  "Do not change the evidence from the time of seizure"?

A.   I mean, there's more to -- it doesn't just say that, no. It doesn't say:  "Don't change the evidence."  That's one of the canons of mobile forensics, and it's a goal that should be -- that's what we're aiming for.  We may not be ever able to perfectly meet it, but that's the goal.  Yes, that's the goal.

Q.   Okay.  I understand that.  But I'm looking at Page 2 of your redacted report.

A.   Uh-huh.

Q.   Which does not say that that is the aspirational goal.

A.   Page 2 of the report says:  "The evidence should be" --

Q.   I'm just going to ask you just not to read from the report. The question is this:  Isn't it true that you testified on direct examination that law enforcement is not to change the evidence on a device?

A.   I didn't say those words exactly, no.  I didn't say law

enforcement is not to change it. I said that -- on direct examination, I said that the evidence should not be changed, and that that is a goal that they should have as much as possible, as much as humanly possible. That's what's meant to be done, yes.

Q. All right. So you would agree with me, then, when I say that a cell phone is what's considered to be a live device?

A. If it's turned on, yes.

Q. Okay. And in order to extract a cell phone, you have to turn it on?

A. Usually. There actually is a method called JTAG Chip-Off, where you can actually just extract data off the chip directly without turning the phone on. But usually the phone is turned on and it's extracted with software.

Q. All right. So to use the Cellebrite software, do you have to turn on a phone in order to extract it?

A. To examine the phone part. You can examine the SIM part without turning the phone on.

Q. Sir, just yes or no. In order to extract the data off of a phone, do you have to turn it on?

A. I'm sorry. But it's not a yes or no question because the phone has a SIM card, may have an SD card --

Q. Well, I'm not talking about the data on a SIM card. I'm talking about the data from the device.

A. Okay. The data on the phone itself has to be turned on --

the phone has to be turned on in order to extract it using Cellebrite.

Q.   So yes?

A.   Yes.

Q.   So in that case, you would agree with me that a cell phone is a live device?

A.   That's one way of phrasing it, I suppose.  If the phone is on, yes, you could call it a live device, as opposed to a computer dead box, yes.

Q.   Correct.  So you are familiar with the phrase "dead-box forensics"?

A.   Yes.

Q.   A cell phone -- the preservation of evidence on a cell phone is not the same as the preservation of evidence on a laptop?

A.   Correct.  It is not the same.

Q.   And that's because a cell phone is a live device?

A.   That's one of the reasons.

Q.   And in many instances, you cannot extract data from a cell phone without turning it on?

A.   That's true.

Q.   And sometimes it's necessary to scroll through a device in order to obtain evidence from it?

A.   Sometimes it's necessary.

Q.   So we talked a lot about what may have happened when the

cell phone was in Mexico.  Do you recall that?

A.  Yes.

Q.  Is it fair to say that you don't know exactly when the cell phone was seized in Mexico?

A.  That's fair.

Q.  You're not familiar with Mexican law enforcement's standard operating procedures for preserving electronic evidence?

A.  I'm not.  I don't know if they have any.

Q.  You're not familiar with Mexican law enforcement's practices for documenting chain of custody?

A.  I'm not.

Q.  You don't know what Mexican law enforcement did when they took the cell phone into their custody?

A.  All I know is what the phone tells me.  So I don't know what they did exactly, but I know what the phone says happened on it.

Q.  But you know that at some point law enforcement in Mexico put the phone on airplane mode?

A.  Yes.

Q.  You just don't know when that was?

A.  Correct.

Q.  And there's no way for you to know whether these new items that you speak of came onto the phone before Mexican law enforcement put it in airplane mode?

A.  Well, what I know about it is:  From screenshots that they

80

took, I can see that it's in airplane mode, and I can see that the time is very early in the morning, like two in the morning, three in the morning, something like that. I don't know what day it was.

Q. Okay. So let me back up. We're talking about the screenshots from Mexican law enforcement?

A. Yeah.

Q. Those screenshots did not have a time stamp on them, correct?

A. They do have a time stamp. They just don't have a date.

Q. Is the time stamp contained on the actual screenshot from the cell phone?

A. Yes.

Q. But they don't have a date on them?

A. They don't have a date.

Q. All right. So you don't know whether Mexican law enforcement put the phone in airplane mode before those screenshots -- well, withdrawn.

You do not know when that -- that new information came onto the device relative to when it was put on airplane mode?

A. Correct. I just know it couldn't have happened when it was in airplane mode, but I don't know at what point --

Q. So it's possible that Mexican law enforcement placed the phone on airplane mode before those screenshots were taken?

A. They must have because it's in airplane mode at the time.

81

Yeah.

Q.  Okay.  You also testified about deleted messages.

A.  Yes.

Q.  Is it true that you have no way of knowing who deleted those messages?

A.  That's correct.

Q.  Is it true that Javier Hernandez could have deleted those messages?

A.  But do you mean the 18 messages that were recovered?

Q.  Yes.

A.  Yes.  It's true.

Q.  Or any -- what about the messages that were not recovered? Is it true that Javier Hernandez could have deleted those?

A.  Yes.

Q.  You also talked about overwriting data.  Would you agree with me that the overwriting of data is something that is oftentimes set to occur by developer settings?

A.  It can be.

Q.  Okay.  So the fact that data may have been overwritten from the device is something that is not in the control of law enforcement, correct?

A.  That's not true.  It is in the control of law enforcement, and that's why typically they leave the phone off, put it in airplane mode, things like that, to avoid data being overwritten.

Q.   Well, would you agree with me that law enforcement has no way of knowing when the developer sets data to be overwritten?

A.   I suspect the FBI knows when WhatsApp will overwrite data, but it is true --

Q.   You suspect or you know?

A.   Suspect.

Q.   Okay.  So you don't know?

A.   Correct.

Q.   All right.  So you talked about 180 new items on the phone; is that right?

A.   Where did you get the number from, please?

Q.   From your report -- excuse me.  190.

A.   Yes.

Q.   Okay.  Is it true that there were over 42,000 data items on that device?

A.   Yes.

Q.   Is it true that there was no evidence that any of the data on the device prior to Mr. Hernandez's arrest was altered?

A.   Yes.

Q.   These deleted messages that you spoke of, you don't know what they said?

A.   Correct.

Q.   You don't know who deleted them?

A.   Correct.

Q.   You don't know when they were deleted?

83

A. Correct -- well, I have a caveat on that last one. We typically know a range. For example, a message -- because the numbering is sequential. Let's say you have message number 1 starts on January 1st. And then you have a gap and then message number two is like January 31st. Well, you know that the gap is in between those two times, but you don't know exactly when they were deleted. So at most we have a range.

Q. Right. So I just want to clarify that. Let's say that the -- if it's between -- let's say it's number 2. Okay. And number 2 is January 15th.

A. Uh-huh.

Q. That means that that item was on the phone on January 15th?

A. Right.

Q. That does not mean that the item was deleted on January 15th?

A. Right.

Q. Right. So you do not know when the items were deleted?

A. We don't know for sure exactly when something was deleted, especially if it's not recoverable.

Q. Right.

So let's go back to the evidence that was recovered from this phone. Was there any evidence that -- I'm just giving you a moment. Are you okay?

A. Do you want me to reference it or I'll just -- I'll hear the question first.

Q.   Sure.  So for example, there are a series of text messages that took place in October of 2019.  Is there any evidence that those messages from October 2019 were planted on the phone?

A.   I wouldn't say so, no.

Q.   Was there any evidence that those messages from October 2019 were altered by law enforcement?

A.   No.

Q.   Let's take it even further.  What about November 2019? There are a series of messages from November of 2019.  Did you see any indication that law enforcement planted those items on the phone?

A.   No.

Q.   Did you see any indication that anything nefarious happened with those items?

A.   No.

Q.   What about the photographs on the phone?  Is there any -- did you see any indication that the items that were recovered from the phone were planted there by law enforcement?

A.   No.

Q.   You talked about texts and voice notes coming in after Mr. Hernandez was arrested.  But to be clear, we don't know exactly what time Mr. Hernandez was arrested?

A.   I have a document that I reviewed to prepare for this case that -- it says something along the lines of between one and two a.m. on the morning of November 22nd, 2019.

Q.  Okay.

A.  But I don't know which minute.

Q.  Right.

A.  That's just what the document says.

Q.  Right.  Right.  And you don't know exactly what time the phone was taken from his person?

A.  I don't.

Q.  And you don't know where that phone was taken?

A.  I don't.

Q.  Okay.  And you don't know whether the phone died?

A.  Correct.

Q.  So that five-day gap that you were talking about, when there was nothing coming in and out of the phone --

A.  I'm sorry.  The five-day period was when things were coming into the phone.  It's a several-hour gap when nothing was on the phone.

Q.  Okay.  So you don't know if the phone was dead during that point in time?

A.  That's correct.

Q.  Okay.  So when you say that the phone was taken in and out of airplane mode, you don't know that?

A.  Well, if your point is that I don't know when it was placed in airplane mode, I'll concede that.  That's true.  I don't know when it was placed in airplane mode.

Q.  But we're talking about this time gap where you say that

there was no data coming in and then data came in after that --

A.   That's true.

Q.   -- right?

A.   Yes.

Q.   So that gap in time that we're talking about, you don't know whether the phone was dead, right?

A.   That's correct.

Q.   So it's possible that the phone could have died?

A.   (No verbal response.)

Q.   Yes?

A.   Yes.

Q.   And then law enforcement turned the phone back on?

A.   Correct.

Q.   And then placed it in airplane mode?

A.   Well, they had to have placed in airplane mode five days later because there's five days of incoming messages.

Q.   All right.  Well, it's possible that the phone could have died in that interim period?

A.   Yes.

Q.   You don't know whether any of that data over the course of those five days has any evidentiary bearing in this case, do you?

A.   I don't.

Q.   All right.  So now I want to talk about your expert disclosure in this case.

A.  Okay.

Q.  And if you need a copy, just let me know.  I'll hand it up to you.

A.  I don't have a copy here that I know of.

Q.  Okay.  All right.  So I'm going to hand it up to you.

MS. KLEPACH:  May I approach?

THE COURT:  You may.

BY MS. KLEPACH:

Q.  Let me know when you've had a minute to look at it.

A.  Okay.  I've looked at it.

Q.  Great.

So do you recall signing that document and confirming its accuracy?

A.  I do now.  Yes.

Q.  So sounds like you've testified in a lot of different cases?

A.  I've testified in several, yes.

Q.  And you have been working as an expert for years it seems?

A.  Yes.

Q.  Well, you've testified it's been years.

A.  Correct.

Q.  Okay.  Are you familiar with the disclosure requirements that come along with being an expert that testifies in court?

A.  Yes.

Q.  Are you aware that those requirements include disclosing

your publications in the last 10 years?

A.   Yes.

Q.   They also include disclosing any case where you testified as an expert at trial in the last four years.

A.   Yes.

Q.   And they also include cases where you've testified as an expert in the last four years -- excuse me -- in a deposition in the last four years.

A.   Okay.

Q.   Well, are you familiar with that?

A.   Yes.

Q.   Okay.  So did you read that document before you signed it?

A.   Yes.

Q.   Did you verify that it's accurate?

A.   Yes.

Q.   And you understand that that's an important document?

A.   Yes.

Q.   Because the litigants rely on that document --

A.   Uh-huh.  Yes.

Q.   -- in preparing for trial.  Do you understand that?

A.   Yes.  I understand that.

Q.   Okay.  You testified on direct examination that you were deemed an expert in the case of United States v. Leon?

A.   Roberts.  Correct.

Q.   Okay.  You listed several other cases on your CV where you

were deemed an expert.

A.   Yes.

Q.   Okay.  You did not list United States v. Jose Santero; is that right?

A.   On what?  Listed on what, on my CV or ...

Q.   Both.

A.   That could be true.

Q.   All right.  So take a moment and review the expert disclosure.

A.   Uh-huh.

Q.   In fact, that document doesn't have any trial testimony listed on it?

A.   That's correct.

Q.   That's correct?

A.   Yes.

Q.   And your CV does not include the case of the United States v. Jose Santero?

A.   Well, the CV just says:  "Representative work."  It's not a list of every case I've worked on ever.

Q.   I understand that.  But the rules require you to disclose every case where you've been certified as an expert in the last four years.

A.   All right.

Q.   And that document didn't include that case.

A.   Okay.

Q.   And this is your CV dated from the year 2023, right?

A.   Yes.

Q.   And that case, you testified in March of 2022?

A.   Right.  Sounds about right.

Q.   So for over a year you failed to list that case on your updated CV?

A.   Okay.

Q.   Have you ever been hired or worked as a witness for the State of Florida or for the Government?

A.   No.

         MS. KLEPACH:  One moment.

     (Pause in proceedings.)

         MS. KLEPACH:  Your Honor, if I could have the display for just the witness, please.

BY MS. KLEPACH:

Q.   So now I want to backtrack and go to some of the questions I asked you at the beginning of your testimony regarding the report from 2009 -- or excuse me -- 2004.  Do you remember that line of questioning?

A.   Yes.

Q.   It's one of the --

A.   Okay.

Q.   -- articles that you relied on in the preparation of your report?

A.   I see it says:  "Date published April 2004," yes.

91

Q.   Did iPhones exist in 2004?

A.   I believe they had -- they were just coming out at that time.

Q.   Okay.  So did iPhones -- but with Internet capability? Did --

A.   Oh, iPhones always had Internet capability, yeah.

Q.   Okay.  Did WhatsApp exist in 2004?

A.   I don't know what year WhatsApp was introduced.  I don't think so.

Q.   Okay.

        MS. KLEPACH:  One moment.

     (Pause in proceedings.)

BY MS. KLEPACH:

Q.   Okay.  One of the principles for which you relied on that article is the Department of Justice's practices for the preservation of digital forensic evidence; is that right?

A.   Yes.

Q.   Is it fair to say that the practices for the preservation of digital evidence have changed since 2004?

A.   I wouldn't really agree with that statement.  The basic principles for collecting digital evidence don't change.  Some more very specific things, like best practices, may change, but the principles don't change.

Q.   You weren't doing this in 2004, though, right?

A.   Correct.

Q.   In 2004, you were still in law school?

A.   That's right.

Q.   Okay.  So when did you start doing computer forensic work?

A.   In -- I can tell you exactly the year -- 2011.

Q.   Okay.  So you actually don't know whether, between 2004 and 2011, the principles changed?

A.   That's a statement I wouldn't agree with.  Just because I wasn't networking in the field, doesn't mean that principles -- if I know that principles change.  I would say that the -- based on my understanding of the field, I can -- just like we just looked at something from 2004 a second ago, I can look up information from the past.  And my understanding is that the principles themselves haven't changed.  But as new technologies evolve, for example, new applications, best practices may change.

Q.   Right.

A.   But that's not the same as the principle.  The principle of preserve the evidence, don't change it, disconnect the phone from the network, that hasn't changed.

Q.   Fair enough.  So I want to talk more about some of the things that you said came into the phone during that five-day period.

A.   All right.

Q.   Is it -- is it true that there were no outgoing communications by the user of the cell phone during that

five-day period?

A. Well, remembering that we don't really know who the user was, it's true that there were no outbound messages from that time. That's correct, yes.

Q. Okay. So no outbound messages by anyone who would have been on that device?

A. Right.

Q. Are you familiar with UTC?

A. Yes.

Q. So you testified regarding some access to PayPal that happened on November 22nd of 2019?

A. Correct.

Q. Did you account for the time difference between UTC and UTC minus six when you considered the entry on that -- that data entry?

A. Yes.

Q. You did?

A. Yes.

Q. Would you agree with me that it's possible for the cache to delete evidence while the device is offline?

A. Yes. If it's so programmed.

Q. Right. So all of these things that you say were deleted, that could have happened whether or not law enforcement placed the device in airplane mode?

A. I don't want to speculate.

Q.  But you just agreed with me that the cache can delete items while the device is offline.

A.  It's possible.  It's potentially possible.  But I don't know what the case was.

Q.  Right.  Because you don't know whether anybody did anything to cause the deletion of this purported evidence from the device?

A.  That part is not true.  We do know what was done.  When it was left on the network, that caused deletion of things from the cache.  That caused overwriting of things from the cache.

Q.  But you don't know when it was taken off the network?

A.  That's correct.

Q.  And if it's possible for the cache to delete items while the device is offline, then isn't it possible that the items were deleted when the phone was in airplane mode?

A.  It's possible, but what you're talking about is something like a developer option where if the phone has been on or it's launched up to a certain number of times or something like that.  The chances of hitting just that trigger, like a day after the phone is seized, I would say they're very, very low.

What I mean is if you recycle the phone several times or you upgrade it, or things like this, that may trigger that kind of event.  But we're not talking about -- let me phrase this carefully.  While it's true that a developer may set certain rules for overwriting the cache or things like that, it's not

true that that means just at random they happen all the time.

Q.   But in this case you haven't testified that it was random and happened all the time.

A.   No.

Q.   Right.  So the answer to my question whether it's possible for the items to be deleted when the phone is offline is yes?

A.   I would say it's possible, yes.

Q.   Okay.  So now I want to go back to talking about what was on the device.

A.   Uh-huh.

Q.   You reviewed the text messages on the device?

A.   Yes.

Q.   Okay.  You reviewed the photographs?

A.   Yes.

Q.   You reviewed the location data?

A.   Correct.

Q.   And you didn't see any evidence that law enforcement placed those items on the device?

A.   That's correct.

Q.   You didn't see any evidence that law enforcement deleted anything of evidentiary value from the device?

A.   Correct.

Q.   You didn't see any indication that those text messages were somehow placed there by anyone other than the person using the phone?

A.  Correct.

Q.  The same is true for the photos?

A.  Yes.

Q.  The same is true for the location data?

A.  Right.

Q.  The same is true for the call logs?

A.  Yes.

Q.  The same is true for the contact information?

A.  Yes.

(Pause in proceedings.)

MS. KLEPACH:  No further questions.

THE COURT:  All right.  Any redirect?

MR. FEIGENBAUM:  Yes.  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. FEIGENBAUM:

Q.  Hello again, Mr. Pullen.

A.  Hello.

Q.  You may recall that when I did my direct examination I wasn't asking you about any planted messages or putting stuff or taking stuff off the phone to change what was on the phone at time of seizure.  Remember?

A.  Correct.  That's not in my report.

Q.  The questions about whether law enforcement planted evidence or did something with the evidence, those all came from the prosecutor?

A.   Correct.

Q.   What I asked you about was simply whether -- when the phone was seized by Mexican police, whether it was preserved in the condition that Mexican police received it.

A.   Correct.  That was the question.  And the answer is no, it was not.

Q.   So my questions were about whether you saw -- after seizure of the phone by Mexican police, whether there was any use of the phone by Mexican police that did not follow generally accepted preservation protocols.

A.   Yes.

Q.   Okay.  What activity did you see after the Mexican police took possession of the phone that happened on the phone?

A.   Okay.  I just looked at it in Cellebrite, and I count 319 events that happened while I believe it was specifically in the custody of Mexican law enforcement and before it got to the FBI.

And the reason I say that is because these are things that required it to be on the network.  And I don't believe that -- knowing their procedures, I don't believe the FBI would have left this phone on the Internet.

So what are some of those things?  Somebody used Chrome to go to PayPal and to log into a PayPal account.  There were incoming WhatsApp messages from people, saying things like, you know -- am I allowed to say what type of message?

Q.   Sure.

A.   Like:  "Where are you?  Why don't you answer?  What's going on?"  Things like that.

There were some voice mails.  There were some missed calls. And there was a browsing activity.  And then some of the apps, like basically Google Account, things like Google Account information, chrome browser was used to browse various websites.

So there's sort of random -- not random, but there's many different like small uses of the phone.  In particular, it looks like it was just sitting there receiving messages, with the exception of Chrome.  Someone was actively browsing using the Chrome browser.

Q.   And just to wrap up, by those uses of the phone, for those purposes, how did it affect the precise state of the phone it was in at the time of seizure?

A.   It changed data on the phone, and for sure it changed the cache of -- at a minimum, WhatsApp.  Potentially other caches as well, but at a minimum it would have changed the cache and made the recovery of text messages that previously could have been recovered -- would have made them irrecoverable.

Q.   Okay.  Last thing I think I have here is when the prosecutor first started asking you questions, she, to me, didn't clarify Mexican possession of the phone -- of Mr. Hernandez's phone, and FBI possession of the phone.  Here's

my question, she said:  "Well, the phone had to be turned on so the Cellebrite software could run and generate a report."  Do you recall her asking you that?

A.  I do.

Q.  Okay.  For that, yes, the phone had to be turned on; is that right?

A.  Yes.

Q.  And is that type of necessity to turn the phone on by the FBI to run the Cellebrite software different than activity with the phone during the time of the Mexican possession for a couple of weeks?

A.  Yes.  That's why -- when I said I counted I believe it was 319 items in the custody of Mexican law enforcement, that's when it was on the network.  It was on the Internet.  It was on the mobile data network.  I didn't even address, because I don't think it's relevant, all the files that were created on the phone and all the time stamps that were created --

MS. KLEPACH:  Objection.  He just said he doesn't believe it's relevant.

THE COURT:  It's sustained.  Rephrase.

THE WITNESS:  Okay.  I'll rephrase the statement.

THE COURT:  Well, why don't we ask another question that might narrow it.

BY MR. FEIGENBAUM:

Q.  Just in a nutshell, during the time the phone was in

Mexican law enforcement possession, summarize what activity there was.

A.   The phone was, according to the reports that I read in this case, seized in the early morning of November 22nd, 2019. There are screenshots that were taken at like two and three in the morning on an unknown day, where the phone was in airplane mode.  But then for around five days, the phone received messages.

So the reason why I thought it must have been placed in airplane mode, then taken out of airplane mode, is because otherwise you would have to believe that it wasn't in airplane mode for five days while it just got new messages.  And then after five days of sitting on someone's desk, they went into the office at two in the morning and placed it in airplane mode and took screenshots of it.  Because it was taken in the middle of the night, it made me think that must have happened when it first was seized because it was seized in the middle of the night.  It was seized at like one, 1:30 in the morning, something like that.  So the screenshots make it look like it was -- because the time is the middle of the night.  It's like two a.m. when the screenshots were taken.

So anyway, it was apparently placed in airplane mode very early in the morning because that's what the time says.  But then it, for five days, received messages.  So if it is true that it was seized, placed in airplane mode, screenshots were

taken, and then it received messages for five days, that means it was taken out of airplane mode.

The alternate would be they didn't even think about preserving the data until five days had gone by, and then they placed it in airplane mode, for some reason, in the middle of the night after five days.

So during those five days, it's just a phone. It received all kinds of stuff, missed calls, voice mails, you know, passive things coming into it. And then the active things were that somebody was using the Chrome browser on the phone to go to PayPal and other websites. That's the uses that you see on the phone.

And then, after that time, all the network-enabled stuff, like messages, stops. And you see other things like for the next like year and a half. And that's when it was in the custody of the FBI. You don't see new messages coming in. You don't see missed calls. You just see stuff created locally on the phone that don't affect the integrity of the WhatsApp messaging.

Q. Thank you very much, Mr. Pullen.

MR. FEIGENBAUM: Nothing further.

THE COURT: All right. Is Mr. Pullen excused?

MR. FEIGENBAUM: Yes, Your Honor.

MS. KLEPACH: Yes, Your Honor.

THE COURT: All right. Thank you, sir. You are

excused.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  And Ladies and Gentlemen, as you can see it's 10 to one.  So we will take a one-hour recess for lunch and I'll see you back here at 10 to two.  Have a pleasant lunch break.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 12:50 p.m.)

THE COURT:  Is there anything we need to address?

MS. KLEPACH:  No, Your Honor.

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  All right.  Have a pleasant lunch.

I'll see you back here at 10 to two.

MR. FEIGENBAUM:  Thanks.

(Recess from 12:50 p.m. to 1:52 p.m.)

THE COURT:  All right.  Welcome back.

I hope everyone had a pleasant lunch.

Let's see if we have all of our jurors.

And we have our next witness ready to go?

MR. DOBBINS:  Yes, Your Honor.

(Pause in proceedings.)

COURT SECURITY OFFICER:  They're all here.

THE COURT:  Okay.  Let's bring them in.

COURT SECURITY OFFICER:  All rise for the jury,

please.

(Before the Jury, 1:54 p.m.)

THE COURT:  All right.  Welcome back.

Please be seated, everyone.

I trust that you had a pleasant lunch and ready to get back to work.

And if the Government will call its next witness, please.

MR. DOBBINS:  Your Honor, at this time, the Government calls to the stand Special Agent Sergio Francisco of the Federal Bureau of Investigation.

THE COURT:  All right.  Thank you.

SPECIAL AGENT SERGIO FRANCISCO, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Please have a seat.

Please state your name and spell it for the record.

THE WITNESS:  Sergio Francisco.

S-E-R-G-I-O F-R-A-N-C-I-S-C-O.

MR. DOBBINS:  May I inquire, Your Honor?

THE COURT:  Yes.  Of course.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q.  Good afternoon, Special Agent Francisco.

A.  Good afternoon.

Q.  Please tell the Members of the Jury where you're currently employed.

A.   I'm currently employed at the Federal Bureau of Investigation, FBI Miami Division.

Q.   And how long have you been employed with the FBI?

A.   I've been employed with the FBI for approximately three and a half years.

Q.   What is your current job title at the FBI?

A.   Special Agent Criminal Investigator.

Q.   And what does that mean?

A.   We do all kinds of criminal investigations -- different aspects of criminal investigations.  Anywhere where there's a US federal crime, we investigate those crimes.

Q.   Did you receive any training in -- to become a special agent with the FBI?

A.   Yes.  We go through the FBI academy in Quantico, which is approximately five or six months.

Q.   And where are you currently assigned within the Miami Field Division?

A.   I'm currently assigned to our TOC West Squad.  That's Transnational Organized Crime Squad with a focus on the Western Hemisphere.  So any crimes that touch the Western Hemisphere, essentially Central and South America.

Q.   And what are some of your duties and responsibilities as a special agent in that division?

A.   We investigate mainly anything that has to do with, again, transnational organized crime.  So it has to be some kind of

organized crime links. We investigate all kinds of stuff, from human smuggling, to narcotics smuggling, to hostage taking, money laundering, and several other things along those lines.

Q. And what does that mean, when you say it's transnational organized crime?

A. That just means that those are crimes that happen in the US, but originate or in some kind of fashion touch these countries in the Central or South America in the Western Hemisphere of the world.

Q. Now, prior to joining the FBI, did you have any prior law enforcement experience?

A. Yes. I worked for US Customs and Border Protection, CBP, for approximately 13 years.

Q. And where were you stationed for CBP?

A. I was initially stationed in Central California on the Southwest border, and then most of my career was stationed down here in Miami, Florida.

Q. And what kind of training did you receive to become a CBP officer?

A. So I completed -- as part of CBP, I actually completed two police academies, one to become a Border Patrol agent. That was approximately four months long, in Artesia, New Mexico. And the other one was in Glynco, Georgia for another five months.

Q. Now, I'd like to direct your attention to about halfway

through 2022.  Were you working for the FBI as a special agent around that time period?

A.  Yes.

Q.  All right.  Did you become familiar with the case against individuals starting with Jose Miguel Gonzalez Vidal?

A.  Correct.

Q.  How did you become familiar with that case?

A.  So around mid-year of 2022, the agent that was assigned primarily to that case for Mr. Gonzalez Vidal, a/k/a Chupa, he was transitioning to another field office or to Washington, DC to a supervisory role.  So I was the -- one of the agents that got handed down the case.

And the way that works is -- at least in our agency, is when agents transfer or move to another division, or even to a different squad or groups, those cases don't necessarily go with them.  They just get transferred to somebody else in the squad.  So that's what happened on this case.  The agent that previously had this case assigned to him, Agent Spielvogel, he transitioned over to Washington, DC.  And me and one of my other coworkers were kind of the ones that took over this investigation.

Q.  Okay.  And when you say:  "Took over the investigation," what was your role in the investigation at that point?

A.  So at that point the Gonzalez Vidal trial, which had six defendants, which we've heard of -- excuse me -- they were all

already in jail here in Downtown Miami at the Federal Detention Center, and we were kind of preparing to go to trial on that case.  And we were also in the midst of starting the indictments for Mr. Javier Hernandez and Ramon Reyes Aranda.

Q.  Okay.  And what was your role as far as the preparation of the indictments for Mr. Javier Hernandez and Ramon Reyes Aranda?

A.  So part of my role on that was helping prepare the evidence, or reviewing the evidence that was mostly already collected on that case, to present to the US Attorney's Office, in relation to the involvement of Mr. Javier Hernandez and Ramon Reyes Aranda.  Primarily, the involvement revolved around stolen vessels of the Naples, Florida, Southwest Florida area.

Q.  Okay.  And so what kind of evidence were you collecting and preparing to present to the US Attorney's Office at that time?

A.  So we had lots of evidence on this case, starting with some digital evidence, phones.  We had approximately three phones, I want to say, one of them which was taken from Mr. Javier Hernandez, and two phones which belonged to Mr. Gonzalez Vidal, Chupa.  That was a lot of evidence in and of itself on those three phones.

We also had a lot of subpoenas -- grand jury subpoenas for telephone records, subscriber information.  There was warrant information for historical cell site data, which is the data on the -- the carriers in this case.  I believe it was T-Mobile --

108

T-Mobile -- the data for the users, which towers they had hit during a specific period of time.  There was interviews from boat owners.  There was police reports from the referenced stolen vessels.

And I'm sure I'm missing a few other things.  But there was a lot, especially for me taking over the case and reviewing all this data.

Q.  Okay.  And as part of your duties as one of the case agents, would you submit some of this information to other members of the FBI to do analysis or prepare reports?

A.  Yes.  Some of this data, especially the digital stuff, right, most of the times, the phones, they're extracted by our CART analysts.  I forgot what the terminology is.  But basically they are digital forensic experts, and this is what they do.

We also have personnel who assist with the CAST analysis, cell-site-analysis-something team.  They help us analyze those historical cell sites that we receive from the providers, the cell phone carriers.

You have evidence folks that help us kind of maintain our evidence in place as we turn it over.  But yes, we do have a lot of resources that help us out.

Q.  All right.  And who were some of the CART -- FBI CART examiners who looked at the cell phones in this case?

A.   In this case, we have Ricardo Soto and Arturo Ortega --

Q.   Okay.

A.   -- that assisted with the devices on this case.

Q.   And on -- you said on the CAST for the cell site, who was the FBI CAST cell site examiner that you sent that information to?

A.   Christopher Adam Goodrich.

Q.   Did you also -- once you received the information back from CAST for the cell site data, did you review that information and then present it to the US Attorney's Office?

A.   Correct.  Yes.  We reviewed that data.  And basically, in preparation for the first set of indictments for Mr. Hernandez and Mr. Ramon Reyes Aranda, we were looking specifically at four vessels that we were adding in the Indictment, that were stolen between December of 2018, I want to say, through November of 2019.

So we matched up those four boats and the respective dates with the police reports that we obtained from the Naples and Marco Island police departments, along with the cell site analysis, which kind of showed the telephone attached to Mr. Hernandez traveling from Miami to the Southwest Florida area around those dates that these boats were stolen.

Q.   And what about the -- what kind of information did you receive back from the FBI CART examiners on the cell phones, the two cell phones belonging to Jose Miguel Gonzalez and the one belonging to Javier Hernandez?

A.   So we received back from them a digital report, and it usually comes in the form of a Cellebrite extraction. Cellebrite is the program that digital forensic experts, or in some case even us as agents, can use to extract the data from these devices.  In this case, the data was extracted by the digital forensic experts.  And what I got or what we received back was a -- basically, a readable format of the data that's extracted from these devices.

Q.   Do you have to use any specific software to read that data?

A.   No.  Once it's turned over to us, it usually comes with like a readable Cellebrite program, where we just click on that and it opens up.

Q.   And so once you received that information back from the CART examiners, what, if anything, did you do with that information to try to gather evidence in this case?

A.   So at that point, basically, it's just kind of reviewing the phone.  As I'm sure you all know from -- I'm sure everyone here has some kind of smart phone.  There might be some flip phones left around.  But there's a lot of data that's in these phones, right, from messages to photos, videos, messaging applications.

     So basically my job at that point was just kind of review all those different tabs in a form.  And the way we get this format in a Cellebrite Reader, it's just a bunch of tabs, right?  Each tab is broken down into messages, emails, user

accounts, gallery.  Whatever different tab you could think of of your phone, that tab kind of pops up on the Cellebrite Reader.  So it's basically just reviewing all of that.

And at that point we had some knowledge of -- based on the Gonzalez Vidal trial and that investigation, there was a lot of names, phone numbers, and information that we already kind of knew.  And it was just kind of matching it up to what we were looking at.

Q.  All right.

MR. DOBBINS:  So let me have the ELMO, please.

BY MR. DOBBINS:

Q.  I'm going to show you what's already been admitted into evidence as Government's Exhibit 3.  Let me zoom out.

Do you recognize that cell phone?

A.  Yes.  That's going to be what we have internally marked in the FBI as Evidence Number 1B107, which is the cell phone that was attributed to Mr. Hernandez.

Q.  Okay.  And based on that, this was the phone that was submitted to CART for analysis?

A.  Correct.

MR. DOBBINS:  And if I may have it just for the witness only, please.

BY MR. DOBBINS:

Q.  Showing you Government's Exhibit 4 for identification.  Do you recognize that item?

A.   Yes.   That would be an SD card where the CART person that extracted the device would have stored their copy of the master report of that extraction for Mr. Hernandez's phone.

Q.   Okay.   Now, once you get this scan -- SanDisk card, what do you do with the information that's on that?

A.   So with the actual physical card, we don't do much.   The CART folks -- you typically like to maintain the master copy untouched.   So we usually copy -- make a copy of that into our laptops or through our internal systems, so that we can work off of that Cellebrite report and be able to open it up and search that Cellebrite report, essentially searching whatever data they extracted from that phone.

Q.   And once you look at that report, are you then able to do searches and also generate additional reports that can be used to collect relevant information or other evidence that's on that cell phone?

A.   Yes.   So from within that Cellebrite Reader -- there's a lot of functions and tabs in there.   You could literally just click line item by line item, or it also has a searchable function where, if you know -- for example, if you want to search the name Chupa, you would enter "Chupa."   And anything on that phone that says Chupa will bring you up -- right up to it, and will say the source whatever you searched came from, whether it be from a message or the gallery.   And then you could then go to that and see the entire contents of it.   Off

113

of that you can generate reports.

So in this example, if I wanted -- if I found the chat with Chupa, and I click "generate report" on that chat, it would generate a PDF for me that will kind of show the Cellebrite logo, and then it would show the content of that chat as I'm seeing it on that Cellebrite Reader.

Q. Okay.

MR. DOBBINS: So if we may have the Government's laptop for the witness only, please.

BY MR. DOBBINS:

Q. Showing you what's been marked as Government's Exhibit 18 for identification. Do you recognize this exhibit?

A. Yes. This is a -- the home screen for Cellebrite for phone 1B107, Mr. Hernandez's phone.

Q. Okay. And did you create Government's Exhibit 18?

A. Yes.

Q. And why did you create Government's Exhibit 18?

A. This is basically a screenshot that I took from Cellebrite. And I created it in order to be able to show what my process is when we're looking at this and how I generate my reports.

Q. Okay. Is this a fair and accurate demonstration of what you did when you searched the Cellebrite extraction for Government's Exhibit 3, which is Javier Hernandez's phone?

A. Correct. Yes.

MR. DOBBINS: Your Honor, at this time, I would move

Government's Exhibit 18 into evidence.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 18 received into evidence.)

MR. DOBBINS:  And if we may publish for the jury, please.

THE COURT:  You may.

BY MR. DOBBINS:

Q.  All right.  Special Agent Francisco, why don't you just walk us through what we're looking at here on this first page.

A.  So on this first page you'll see the Cellebrite logo on the top left there.  This is basically what it looks like.  In various parts, it will show the FBI evidence number, in this case, 1B107.  You could see it in multiple spots there.  That's how I know that that's the phone that I'm looking at.

And on the bottom right here, you'll see several tabs, as I was talking about earlier, with chats, contacts, and there's a few other -- several tabs in there.

Q.  And as an investigator, what are some of the tabs that would be of interest to you for this case or any other case?

MR. FEIGENBAUM:  Your Honor, just one thing.  I didn't object based on the Court's prior rulings.  I just wanted to put that in the record.

THE COURT:  Oh.  For -- to preserve it?

115

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  Yes.  Of course.

MR. FEIGENBAUM:  Thank you.

THE COURT:  It's noted.

MR. FEIGENBAUM:  Thank you.

BY MR. DOBBINS:

Q.  So Special Agent Francisco, just what are some of the tabs that would have been of interest to you as an investigator in this case?

A.  So a lot of tabs are usually of interest.  You know, I could go anywhere.  In this case specifically we're looking at the contacts, the chats, the user accounts.  There's a separate tab for messages.  And basically, the difference between chats and messages, it usually breaks it down between some kind of application, like WhatsApp or like the native messages.  There will be one with gallery and photos, videos, web history.

Q.  And you said:  "WhatsApp or native messages."  What do you mean by native messages?

A.  So native messages is what we usually just know as the message, right?  On iPhones, I believe it's like an iMessage, or on Android if you just click on your message application, that's a native message, versus a message that you sent through some other third-party application, like WhatsApp and several others out there.

Q.  All right.

MR. DOBBINS:  Let's go to the next screen, please.

BY MR. DOBBINS:

Q.  Okay.  What's this screen telling us that you did?

A.  So what we're seeing here is basically just a scroll of this section here.  It's new tabs that you couldn't see on the previous screen.  Basically, there's a drop-down here where you could browse through all these different tabs on the bottom right.  You could see here credit cards that were stored on the device, device locations, downloads, emails, installed applications, device events, and there's a few more tabs as we keep scrolling through this.

Q.  Okay.  So let's go ahead and go to the third page, please.

A.  Again, we're seeing more tabs, instant messages, search items, user accounts, bookmarks, web history.  All that stuff is on there -- passwords that were stored on the device.

Q.  Okay.  And the next page?

A.  Again, we're just seeing new tabs as well.  That small corner -- that bottom, right corner only shows a limited amount of tabs.  As you scroll through them, that's what we're continuing to see.

Q.  Okay.

MR. DOBBINS:  And then let's go to the next page, please.

THE WITNESS:  Same thing.  We're just looking at new tabs.  There's images, videos, documents, and others.

BY MR. DOBBINS:

Q.   All right.  And is this all using the Cellebrite Reader that you said was provided with the extraction?

A.   Correct.  This is all off of that same Cellebrite Reader.

Q.   All right.

MR. DOBBINS:  Let's go to the next page.

BY MR. DOBBINS:

Q.   What is this we're looking at here?

A.   So this is what you see in -- for example, you click on that -- those tabs we were talking about earlier on the bottom, right corner.  For example, I clicked on chats in this instance, and this is what comes up.  It's that tab on the top right.  And then it shows you all the chats that are on the phone or that were extracted on the phone.

And as you could see by the various items here, you could sort by start time, last activity, by participants, and there's a search tab where you could type in anything you want to search, and it will find it through all those chats.

Q.   Okay.  And so does it also give you the participants there, so you can try to search that to see if there's any chats that you're interested in?

A.   Right.  It will show you a summary here of the participants on those chats.  And then, from there, you could either click on it and it will bring you to that chat, or in this case you could search for "Ramon," and it will search the phone for

anything else with that name.

Q. All right.

MR. DOBBINS: Let's go ahead and go to the next page, please.

BY MR. DOBBINS:

Q. And what is this we're looking at, this screen?

A. And what we're looking at here -- I clicked on this one chat, for example, and then it populates a summary on the right-hand side of that chat that you can scroll through in and out.

Q. Okay. Is that sort of like a preview of a report that you could generate?

A. Correct.

Q. All right.

MR. DOBBINS: Let's go to the next page, please.

BY MR. DOBBINS:

Q. And what is that we're looking at here?

A. This will be the Image tab. So from that home screen we were looking at earlier, if you click on "Images," it will bring you up here and it will kind of show you all the images on the phone. And again, it allows you to scroll through them.

Q. Okay.

MR. DOBBINS: Let's go to the next page, please.

BY MR. DOBBINS:

Q. What is this we're looking at here?

A.   This, again, just shows you a summary.  I clicked on that, highlighted the blue tab of that photo that looks like a VIN number, and then it gives you like a preview on the right-hand side there.

Q.   And the next page, if we can, please.  Is this a similar page to that last page --

A.   Very similar, just a different example.

Q.   Okay.  And what are these -- what is this category that we're looking at here in these pictures?

A.   So we're looking at Images, and you can tell that by the top tab there that says it's 14,760.  That just means there's that many images on there.

Q.   Okay.

         MR. DOBBINS:  And the next page, please.

         All right.  Let's keep going.

         And one more, I believe.

         Nope.  That's it.

         Okay.  Good.

         All right.  So now if I may have, again, just for the witness only, the Government's laptop, please.

BY MR. DOBBINS:

Q.   So based on that, did you ultimately use that software to generate reports that would collect certain items of evidence for presentation to the US Attorney's Office and ultimately for trial?

A.   Yes.

Q.   Okay.  And what kind of reports did you generate?

A.   So I generated a report off of that same Cellebrite report. There's one that's called a Device Report that basically gives you a summary of that phone or that device.  In this case, it will show you the IMEI numbers, the phone number, some of the dates and other relevant information, mostly technical data from the extraction.

Q.   Okay.  Showing you what's been marked for identification as Government's Exhibit 16.  Do you recognize that exhibit?

A.   Yes.  That will be the Cellebrite Device Report that I generated from Mr. Hernandez's Cellebrite extraction.

Q.   All right.  And is that a fair and accurate replica of the information that was generated by that Cellebrite report for device information?

A.   Yes.

MR. DOBBINS:  Your Honor, at this time, the Government would move to admit Government's Exhibit 16 into evidence.

THE COURT:  Is there any objection?

MR. FEIGENBAUM:  Your Honor, based on the previous rulings of the Court, no objection at this point, but I want to preserve my prior objections.

THE COURT:  Certainly.  And I'll give you a continuing objection.

MR. FEIGENBAUM:  Thank you, Your Honor.

THE COURT:  Okay.

(Government's Exhibit 16 received into evidence.)

MR. DOBBINS:  And if we may publish for the jury, please.

Okay.  Could we maybe enlarge some of this here, where we start with -- let's go with the Physical 2 Device.

BY MR. DOBBINS:

Q.  What kind of information are we looking at here, Special Agent Francisco?

A.  So again, a lot of technical details on this.  But you'll see the device model.  That's a Samsung -- I guess, the number, the technical number for that Galaxy model phone, the IMEI for the phone, an Android ID, a lot of technical stuff.  Again, the fingerprint for the Android device, the Bluetooth device name that it had, Bluetooth address, MAC address, and a bunch of other technical stuff.  It shows us the current phone number assigned to the SIM at the time of the extraction.

Q.  And if I can ask, what is the importance of the -- on the second row, you marked the device info, IMEI, and IMEI is also listed further down.  What's the significance of that?

A.  So the IMEI, as I understand it, is pretty unique to a device.  And in this case the phone number that we have here ending 4619 is what we've associated to Mr. Hernandez.

Q.  Okay.  And we've highlighted that as well.

The current SIM phone number, could you just read that

again for the record please.

A.  SIM phone number is 1(786)370-4619.  And "1" would be the country code for the US.

Q.  Okay.

MR. DOBBINS:  All right.  If I may have just for the witness only, please.

If we could pull up Government's Exhibit 15 for identification.

BY MR. DOBBINS:

Q.  Do you recognize this exhibit?

A.  Yes.  This would be a Cellebrite report that I generated for the user accounts on Mr. Hernandez's phone.

Q.  Okay.

MR. DOBBINS:  And if we could pull up Government's Exhibit 13, please.

BY MR. DOBBINS:

Q.  Do you recognize Government's Exhibit 13 -- what's been marked as Government's Exhibit 13 for identification?

A.  Yes.  This would be another report that I generated off Mr. Hernandez's phone, which contains the locations generated by that Cellebrite extraction.

Q.  Is that cell site location information or something else?

A.  This is not cell site location.  This is just location that's captured by the phone, and it captures that in various ways as I understand it.

Q.  Okay.

MR. DOBBINS:  If we may show Government's Exhibit 12 for identification, please.

BY MR. DOBBINS:

Q.  Do you recognize Government's Exhibit 12 for identification?

A.  Yes.  This would be another Cellebrite report that I generated off of Mr. Hernandez's phone, showing the contacts.

Q.  Okay.

MR. DOBBINS:  And what about -- if we could show Government's Exhibit 14, please.

BY MR. DOBBINS:

Q.  Do you recognize what Government's Exhibit 14 marked for identification is?

A.  Yes.  This would be another report that I generated off Mr. Hernandez's phone, showing the call log.

MR. DOBBINS:  And then, finally, if we could show Government's Exhibit 17 for identification, please.

BY MR. DOBBINS:

Q.  Do you recognize what is there in front of you as Government's Exhibit 17?

A.  Yes.  This is, again, another report that I generated off of Mr. Hernandez's phone, showing the searched items on his device.

Q.  When you say:  "Searched items," what kind of searches?

A.   This is anything -- in this case, it was an Android, so most likely something he looked up on the Internet, anything he would have searched or someone on that phone would have searched.

Q.   All right.  Did you prepare all of those reports, Government's Exhibits 16, 15, 13, 12, 14, and 17 in the same manner you described for, I believe it was Government's Exhibit 18?

A.   Correct.

Q.   Okay.

MR. DOBBINS:  Your Honor, at this time, I would move Government's Exhibits -- I believe 16 is already in evidence -- Government's Exhibits 15, 13, 12, 14, and 17 into evidence at this time.

THE COURT:  Any objection?

MR. FEIGENBAUM:  The continuing one, Your Honor.

THE COURT:  All right.  With the continuing objection, admitted into evidence.

(Government's Exhibits 15, 13, 12, 14 & 17 received into evidence.)

MR. DOBBINS:  All right.  So let's go back to Government's Exhibit 15, please.  And if we may publish for the jury, please.

BY MR. DOBBINS:

Q.   Okay.  So again, what is this we're looking at here?

A.   So we're looking at the report I generated off of Cellebrite for the user accounts associated with this device. And what it's showing us here zoomed in is a log-in or an account where someone used the email -- the user of this phone would have used the email javitin73@yahoo.com.

Q.   And so this report, when you're looking at it on Cellebrite, and it says:  "User Accounts," what kind of accounts are we looking at on the cell phone generally?

A.   So if we could zoom out of that, there's all types of accounts.  But generally we'll see email accounts, right?  On Androids, we typically need a Gmail account to be able to use the phone.  And iPhones we typically need some kind of iTunes email or account to be able to log in.  But any application that one will have on the smart phone will typically show on here, like Facebook, TikTok in this case, you know, any bank applications, anything -- any apps that one would have installed on their phone, this will show up in this User Account Report.

Q.   Okay.

        MR. DOBBINS:  So on Government's Exhibit 15, if we could focus on row 7, please.

BY MR. DOBBINS:

Q.   What was the account that -- that that cell phone for Mr. Hernandez had a user account for?

A.   So we're looking at an account for CARFAX.  And you could

tell that because it's carfax.com.mycarfax, and it would have been that username, that email, javitin73@yahoo.com.

Q.  One of the first accounts we saw was for the email account, that Yahoo.com email account?

A.  Correct.  The same email.

MR. DOBBINS:  If we could then go to the next page and focus on row 14, please.

BY MR. DOBBINS:

Q.  All right.  What is the app, or application, or program that Mr. Hernandez's phone had a user account for here?

A.  What we're looking at here is WhatsApp, and the username was again the same mobile number that we read out earlier ending in 4619.

Q.  Okay.

MR. DOBBINS:  And if we could now go to row 25, which I believe is going to be on Page 3.

BY MR. DOBBINS:

Q.  All right.  What was the application or program that Mr. Hernandez's cell phone had in row 25?

A.  So here we're looking at applications from Western Union. You can tell by the website there, westernunion.com, again, with the same email address associated to it.

Q.  Okay.

MR. DOBBINS:  And if we can now go to row number 39.

BY MR. DOBBINS:

Q.  And what was the program or application that Mr. Hernandez had on his phone in row 39?

A.  So what we're looking at here is a Mexican hotel loyalty membership program called City Premios.  You could see that by the citypremios.com.mx.  Again, it's the same email address associated with the other accounts.

MR. DOBBINS:  And finally, if we could go to number 85 -- row 85, please.

BY MR. DOBBINS:

Q.  And what was the application or program that Mr. Hernandez's cell phone had in this -- in row 85?

A.  So what we're looking at here is Facebook, and the account number is under Javier Hernandez, with the user -- the Facebook user ID 1172929976.  And again, the same email address that we've talked about before.

Q.  Okay.

MR. DOBBINS:  All right.  If we could then turn to Government's Exhibit 13, please -- 13 in evidence.

And if we could just highlight maybe rows 1 and 2.

BY MR. DOBBINS:

Q.  All right.  So walk us through these two rows, if you wouldn't mind.  What is it that we're looking at here that Cellebrite has generated?

A.  So what we're looking at here is GPS locations under the

Position tab.  And again, not too familiar with the terminology of that, but I want to say it's like latitude and longitude. And those are in a format where you could plug into Google Maps and that will translate to an actual location on Google Maps. And in some cases, it will associate it -- as the number 2 here, that associates this lat/long with this address in Miami Beach.  And vice versa, the one on top associates it -- it won't show you here, but if you plug those numbers on top there in a map, I believe those came back to somewhere near Progreso, Mexico.

Q.  All right.  And what about row 2, when you have those coordinates there?

A.  So the coordinates in row 2 there come back to 7441 Wayne Avenue, Miami Beach, which is the address associated to Mr. Hernandez.

Q.  And are these -- rows 1 and 2, are they the most recent entries in the GPS or the latitude and longitude entries there?

A.  Yes.  I believe they go in chronological order reverse.

Q.  Okay.

        MR. DOBBINS:  So if we could go out of that and scroll down to the last page, please.

        All right.  And if we could just start with 294 and 295, please.

BY MR. DOBBINS:

Q.  And just what are the dates here on these two?

A.   We're looking at July 9th, 2014 as the last date for these GPS locations.

Q.   All right.  So rows 1 and 2 would be the most recent, and rows 295 and 294 would be the eldest entries there on that device?

A.   Correct.

Q.   All right.

      MR. DOBBINS:  Now if we could go to Government's Exhibit 12, I believe.

BY MR. DOBBINS:

Q.   All right.  What are we looking at here?

A.   So we're looking at the contacts report generated from Cellebrite off of Mr. Javier's phone.

Q.   Okay.  And let's start with that first one.  Just ...

A.   Here it's just showing a -- some kind of contacts saved on their Facebook with -- under the account number of 1172929976.

Q.   Okay.  And does this go on for numerous pages?

A.   Yes.  There's 1,321 contacts.

      MR. DOBBINS:  All right.  Let's go to Government's Exhibit 14, please.

BY MR. DOBBINS:

Q.   Now, on Government's Exhibit 14, what are we looking at here?

A.   This will be a call log from Mr. Hernandez's phone, showing 6,748 entries.

Q.   Okay.  And why is something like that of interest to you in your investigation?

A.   Well, for one, it shows the -- that the parties involved or potentially involved in the investigation were actually communicating with each other.  You'll see the Status column here, that duration, that will actually show you what happened with that call, whether it was missed, whether it was answered.  And if it was answered, it will show you the duration, meaning how long that person spoke for.  And obviously the time stamp on that column there will show you the date that these calls happened.  And then obviously on the left there, where it says: "Party" -- parties is pretty self-explanatory.  It shows the "from" and the "to."

Q.   So this first one --

          MR. DOBBINS:  Let's go ahead and just do the whole row, please.

BY MR. DOBBINS:

Q.   And just walk us through each column here.  So we've got number 1.  What's the -- what are the parties here?  Who is the call coming from?

A.   So the call's coming in from a (786)557-9694 number, that's saved under the name Ray, that's coming in to Mr. Hernandez's phone 4619.  And you could tell this by the "from" and the "to," and it also says:  "Incoming," and it shows the time stamp.  This would be the latest activity on the call log for

this device.  And it shows it's a missed call from Ray to Mr. Hernandez, on 11/24/19, at 11:39 p.m. UTC time.

Q.   And what does "UTC time" mean?

A.   UTC basically is a time zone.  Just like we have down here in Florida, Eastern Standard Time, EST, UTC is another time zone.  And I believe the difference from us, from where we're at, Eastern Standard Time is about minus four or minus five hours, depending on daylight savings time.  And in this case, the relevance to our investigation comparing it to events in Mexico, the difference is approximately six hours to the Yucatan area of Mexico.

Q.   Now, this missed call came in at 11:24 -- I'm sorry -- November 24th, 2019.  Had something significant happened to Mr. Hernandez prior to November 24th of 2019 that he was unable to answer this call?

A.   Yes.  So Mr. Hernandez was arrested on or about November 22nd, 2019 by Mexican law enforcement.

Q.   And what had happened to his phone?

A.   And his phone went into the possession of Mexican law enforcement after his arrest.

Q.   Okay.

       MR. DOBBINS:   All right.  If we could just highlight the call log again.

BY MR. DOBBINS:

Q.   Is this -- are there numerous entries here in this exhibit?

A.   Yes.   There's five showing on this page here, and they were all missed calls ranging from 11/22/19 up until 11/24/2019 -- all missed calls.

Q.   Directing your attention to the top above all the columns and rows.  It says:  "Call log," and it provides a number there.  What does that entry mean?

A.   I'm sorry.  Can you repeat that.

Q.   Yes.

A.   Oh.  I see.  I understand.

That's 6,748 entries.  Just like we're seeing on this page five of them, 6,748 just means there's another 600 -- 6,747 items just like that.

Q.   Okay.

MR. DOBBINS:  All right.  If we could now go to Government's Exhibit 17 in evidence, please.

BY MR. DOBBINS:

Q.   Okay.  What is it that we're looking at here in this report that you generated?

A.   So we're looking at searched items here.  There are 24 of them on this report.

Q.   Okay.  And again, this is searched items through what?

A.   It's going to be from the device.  Most likely -- and you can see here it says:  "Chrome."  That's Google Chrome, which is the Internet browser for Android devices.

Q.   Okay.

MR. DOBBINS:  If we could remove that.

BY MR. DOBBINS:

Q.  Okay.  Now, are these entries in Spanish or English?

A.  These are in Spanish.

Q.  All right.  I'd like to direct your attention to Entry Number -- Numbers 8 and 9. And what was the search that was going on here?

A.  So on November 12th of 2019, the search was:  "Cubano preso en España for INTERPOL," which translated to:  "Cuban arrested in Spain by INTERPOL."

Q.  And based on your knowledge of the investigation, was there somebody within the investigation that was arrested in Spain around this time?

A.  Yes.  And part of the Gonzalez Vidal trial.  I believe it was actually Mr. Gonzalez Vidal who was arrested in Spain because he had a red alert by INTERPOL.

Q.  And do you know -- what was Mr. Gonzalez Vidal's nickname in this case?

A.  Chupa.

MR. DOBBINS:  If we could scroll down, please, to the next page.

BY MR. DOBBINS:

Q.  All right.  Showing you number 12, row 12.  What are we looking at here on row 12?  What is the search?

A.  We're looking at a search done on October 7th, 2019, and I

believe there was similar one a few lines down. And the search is: "Donde esta los VIN number una Toyota Tundra 2017," which basically translates to: "Where are the VIN numbers for a Toyota Tundra, a 2017 Toyota Tundra?"

Q. Okay. And I think there's -- if we go to number 14 and 15, please. What were these searches for in 14 and 15?

A. And we're looking at searches here on October 25th, 2019 and October 16th, 2019 for EdgeWater boats and Everglades, 295, which probably means an Everglades boat of 29 feet in length.

Q. Okay. And during course of your investigation, did we learn of an Everglades boat that was stolen in the Naples area?

A. Yes. One of the boats that was stolen was an Everglades.

Q. Do you remember which one?

A. I do not. I want to say it was the *Ultimaytum,* but I'm not certain at this point.

Q. Okay.

MR. DOBBINS: If we could close that one up, please.

And if we go to 16, please.

BY MR. DOBBINS:

Q. What is this a search for?

A. On November 22nd, 2019, this was a search for a Hotel ibis in Merida. And this is relevant to us because there's a conversation between Gonzalez Vidal and Mr. Hernandez, where they discuss meeting someone who was going to arrange to have Mr. Hernandez's passport stamped by Mexican Immigration, as to

show that he came legally into the country, and the agreed meet location was at a Hotel ibis in Merida or ibis Hotel.

MR. FEIGENBAUM:  Objection.  Hearsay, Your Honor.

THE COURT:  The objection is overruled.

BY MR. DOBBINS:

Q.  And the date there, November 22nd, 2019, at 1:24 a.m., UTC time, if this was, for instance, searched in Mexico, about how many hours behind would that be?

A.  It would have been approximately six hours.

Q.  Okay.  So would that have still been on November 22nd or would that have been on November 21st?

A.  It would have been on the 21st, at approximately seven p.m.

Q.  Okay.

MR. DOBBINS:  If we could go -- close that up, please. And if we could go to 18 and 19.

BY MR. DOBBINS:

Q.  What are the searches here that we're looking at?

A.  So we're looking at searches here on October 16th, 2019 for a:  "Llave electronica de motores Yamaha outboard," "Electronic keys for Yamaha outboard engines."

Q.  All right.

MR. DOBBINS:  And if we could close that up, and let's highlight 20 and and 21, please.

BY MR. DOBBINS:

Q.  What are the searches here?  What's the search in row 20 of

this phone?

A.   So we're looking at a search on October 31st, 2019 for a "Persuit" -- which should be "Pursuit" -- 268, 2018.  And that will be the manufacturer of a boat, Pursuit.  268 would be the model, which typically would be 26 feet, and 2018 would be the model year.

Q.   Okay.  And what about row 21, please?

A.   In row 21, we're looking at a search on October 16th, 2019, and this one's in English, for a plastic key for a Yamaha outboard.

Q.   Okay.

        MR. DOBBINS:  And if we could close that up and go to row 22, please.

BY MR. DOBBINS:

Q.   And what is the search here in row 22?

A.   Again, we're looking at a search, this one on October 31st, 2019, for a Pursuit 26 -- 265, which would be a 26-footer.

Q.   And during the course of the investigation, did you learn of any vessels stolen from either Naples or Marco Island that you were Pursuit-style vessels?

A.   Yes.  There were two boats, I believe, that were Pursuit models or makes.  And right now I can't remember which one -- off the top of my head, which ones were the Pursuit, but I want to say there were two Pursuits.

Q.   All right.

MR. DOBBINS:  Now let's go to Government's Exhibit 23 -- I'm sorry.  Not Government's Exhibit 23 -- row 23 of Government's Exhibit 17, please.

BY MR. DOBBINS:

Q.  All right.  What's the search on -- in row 23?

A.  We're looking at a search item, on November 21st, 2019, for a Southport 27 boat, 2007.  Southport would be the make of a boat, 27 being the size and feet, and 2007 the model year.

Q.  And during the course of the investigation, was a Southport boat or vessel important in the investigation in any way?

A.  Yes.  So the last boat on the Indictment, the *Luca Brasi,* was a Southport.

Q.  Okay.

MR. DOBBINS:  And finally, if we can check out row 24, which is at the top of Page 3 of Government's Exhibit 17.

BY MR. DOBBINS:

Q.  All right.  What was this search for?  Government's Exhibit -- I'm sorry -- row 24 of Government's Exhibit 17?

A.  We're looking at a search on October 10th, 2019 for a Toyota Tundra 2018 VIN location.

Q.  And we'll get to it later on, but did there come a time when a Toyota Tundra -- a 2018 Toyota Tundra became important in your investigation?

A.  Yes.  There was a time where there was a 2018 Toyota Tundra that Mr. Hernandez was involved with around the dates of

October of 2019.

Q.   Now, we saw in that -- in Government's Exhibit 18, the different ways you could preview the chats.  Were chats done -- or were chat reports pulled for different parties that were important in the investigation?

A.   Yes -- excuse me.  There were several chats that were exported from Mr. Hernandez's phone.

MR. DOBBINS:  All right.  And if I may have for the witness only, please.

BY MR. DOBBINS:

Q.   Showing you Government's Exhibit 5 for identification.  Do you recognize Government's Exhibit 5?

A.   Yes.  This is a Cellebrite report, generated off of Mr. Hernandez's phone, showing a instant message conversation between Mr. Hernandez and Neco.

Q.   All right.  And showing you Government's Exhibit 5A.

MR. DOBBINS:  If we could, side by side, please.

BY MR. DOBBINS:

Q.   And do you see Government's Exhibit 5A?

A.   Yes.  This would be the translated version of that chat.

Q.   All right.  And are these the reports that you generated and reviewed that were done between -- that were conducted between an individual named "Neco Neco" and Mr. Hernandez's phone in order for preparing for the Indictment in this case, as well as trial?

A.   Correct.

MR. DOBBINS:   All right.   Your Honor, at this time, I would move Government's Exhibits 5 and 5A into evidence.

THE COURT:   Any objection?

MR. FEIGENBAUM:   Yes, Judge.   I'm not sure how you want me to say it each time.   It goes back to our prior litigation in this matter.

THE COURT:   Why don't I ask:   Other than the preserved objection?

MR. FEIGENBAUM:   Thank you, Judge.

THE COURT:   All right.

Admitted into evidence.

(Government's Exhibits 5 & 5A received into evidence.)

MR. DOBBINS:   All right.   So let's highlight the participants, please.

BY MR. DOBBINS:

Q.   And let's start with the one on the bottom, the one with the picture of the man holding the boy in the pool.   What is -- what is the phone number associated with the WhatsApp chat there?

A.   (786)370-4619.

Q.   And whose phone is that?

A.   That's Mr. Hernandez's phone.

Q.   Okay.   And do you recognize the individual in that picture?

A.   Yes.   The gentleman -- the adult in that picture is

Mr. Hernandez.

Q.  All right.  And if we could go with the top -- top participant there.  Who is that -- well, first off, what country code is that phone number for?

A.  The 52 would be the country code for Mexico.

Q.  Okay.  And what about -- did there come a time during the investigation that you became familiar with an individual that had a nickname Neco?

A.  Yes.  Neco -- that's his nickname.  And I believe his full name is Mario Alberto Enriquez [sic] Lopez.  I'm not exactly sure right now of the correct name.  But yes, Neco.

Q.  Okay.  And what did the investigation learn about Mr. Enriquez Lopez?

A.  So Neco was involved with Gonzalez Vidal and his associates down in Mexico.  Basically, he was a business partner for the organization.  He was involved in many phases of the crimes they were committing down in Mexico, from being a facilitator for the boats they were using to smuggle the Cubans from Cuba to Mexico, from providing financial support, providing houses, also known as the safe houses where is they kept the migrants, and several other aspects.  And we also knew that Neco owned a marina down in the Progreso area of Yucatan, Mexico.

Q.  All right.

MR. DOBBINS:  Now if we could cut back just a moment.

All right.  Let's highlight that first one -- first

entry, since it's in English in both exhibits.

BY MR. DOBBINS:

Q.   What is the information that's showing in this green chat bubble here that you're able to learn from the Cellebrite extraction?

A.   So this shows a outgoing WhatsApp call.  So a call that was made from within the WhatsApp application from Mr. Hernandez, the user of the 4619 number, that went out to the person saved as Neco Neco on November 10th, 2018.

Q.   Okay.  And within the WhatsApp -- within the WhatsApp -- within the WhatsApp information, with the application, can you also send -- do other things besides call somebody?

A.   Yes.  You can make calls within the application.  You could send messages, like regular, you know, what would be a text message.  You send audio files.  You could do the equivalent of like a FaceTime call, which would be a video call.  You could share files, documents, videos.  Any sort of items that you have on your device, it could be shared through this chat.

Q.   Okay.  So when you reviewed this, did you learn that there were any audio or video files that were attached to this chat?

A.   Yes.  There were some audio files that were exchanged in between the two parties.

Q.   Okay.  And were those included in this exhibit as Exhibits 5B, C, and D for the actual content of the audio and video?

A.   Correct.

MR. DOBBINS:  Your Honor, at this time, the Government would move Government's 5B, C, and 5D into evidence.

THE COURT:  Other than the preserved objections, any further?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  All right.  Then admitted into evidence.

(Government's Exhibits 5B, 5C & 5D received into evidence.)

BY MR. DOBBINS:

Q.  Okay.  So let's now -- in addition, if someone were to send photos, where would those -- would those have come across within the body of the -- of these green and blue bubbles that we're about to see?

A.  Yes.  The photos will typically show on there as some kind of attachment.  It will have a file name.  And sometimes in Cellebrite you could see it as a thumbnail.  It's a very small picture.  Sometimes you could it see as a bigger file.  But yes, you would see it clearly, and it will show who sent it in the chat.

Q.  Okay.  So in addition to including the thumbnail here on Exhibits 5 and 5A, were you able to do an extraction of those -- excuse me -- thumbnails and/or photographs to do a separate report in addition to these two?

A.  Yes.  So the photos would have been attached to that report that got generated in a separate file.

MR. DOBBINS:  All right.  If I may have for the

witness only, please.

BY MR. DOBBINS:

Q.   Showing you Government's Exhibit 100, please, for identification.  Do you recognize Government's Exhibit 100?

A.   Yes.  This is another -- a Cellebrite report generated from Mr. Hernandez's phone.

Q.   Okay.  And what is within this report?

A.   It looks like images that were attached or downloaded from the phone.

Q.   Okay.

     MR. DOBBINS:  Your Honor, at this time, I would move Government's Exhibit 100 into evidence, please.

     THE COURT:  Other than the preserved objections, any further?

     MR. FEIGENBAUM:  No, Your Honor.

     THE COURT:  Admitted into evidence.

   (Government's Exhibit 100 received into evidence.)

     MR. DOBBINS:  All right.  So let's just publish, if we may, for the jury, Government's Exhibit 100.

     All right.  And if we could just scroll down a page, please.

BY MR. DOBBINS:

Q.   So what were we able to do with those thumbnails that were in the first page of Government's Exhibit 100?

A.   So we were able to extract those thumbnails to have them in

144

a -- what looks like a better format and size.  And in this case, we're seeing what looks to be some kind of weather forecast showing the Gulf of Mexico there between Florida and the Yucatan Peninsula of Mexico.

Q.  All right.

MR. DOBBINS:  So let's go back to 5 and 5A, please. And if we could go to Page 42, please.

We may actually want to go up one more page, I believe, 41.

MS. KLEPACH:  Up?

MR. DOBBINS:  Yeah.  Forty-one.  I'm sorry.

BY MR. DOBBINS:

Q.  Okay.  Let's start with the second green bubble.  So when it's a green bubble, what does that indicate -- who does that indicate is sending the message?

A.  So this is indicating it's an outbound message or outgoing for Mr. Hernandez's phone, the 4619 number.

Q.  Okay.  And again, to whom?

A.  This one's going again to Neco Neco.

Q.  Okay.  And just this first one is dated what?

A.  This is July 6th, 2019.

Q.  Okay.  And the message is pretty basic.  What is it?

A.  "Hola."  "Hello."

Q.  Now, if we scroll down to 42, what is it -- let's go to that first blue box there.  What is it that we're looking at

here?

A.   So we're looking at an inbound message from Neco to Mr. Hernandez.  It's kind of blurry, but it appears to be some kind of weather map or some kind of map.

Q.   Okay.  And let's go to the next blue message from --

A.   And then he follows on by saying:  "Ya esta por Mississippi."  "It's by Mississippi."

Q.   The English translation says what now?

A.   Correct.  "It's already over Mississippi."

Q.   And if we go to -- sorry.  What's the date on that?

A.   That's July 10th, 2019.

Q.   And the next message from Mr. Hernandez's cell phone please?

A.   It says:  "That's the one I was telling you about."

Q.   Okay.

        MR. DOBBINS:  All right.  Let's scroll down to the next text bubble.

        THE WITNESS:  And the next one, Neco is saying:  "It already crossed Florida" or "It went over Florida."

BY MR. DOBBINS:

Q.   Okay.  And again, what's the date?

A.   July 10th, 2019.

Q.   All right.

        MR. DOBBINS:  And let's go ahead and go to the first green box on that page, please.

THE WITNESS:  Again, on July 10th, 2019, Mr. Hernandez is sending a message, saying:  "Yes, but it will be going over the Gulf."

BY MR. DOBBINS:

Q.  Okay.  And the next message from the Neco Neco phone?

A.  And again, on the same date, Neco is saying:  "Yes.  But it will touch land today."

Q.  All right.

MR. DOBBINS:  Let's go to the next page, please -- the next page of chats.

BY MR. DOBBINS:

Q.  All right.  Who is sending these two images?

A.  So these two images are coming from Mr. Hernandez's phone, same date, July 10th, 2019.

Q.  Okay.  And with the first image -- well, what are the images --

A.  Again, they look distorted, but they seem to be some kind of weather image, some map.

Q.  And what does it say with the -- in the first message?

A.  "These winds are for tomorrow."

Q.  All right.

MR. DOBBINS:  Okay.  If we could go to the next page, please, the next page of texts.

BY MR. DOBBINS:

Q.  All right.  What's this first image a picture of?

147

A.   And then the same thing.   The first image by Mr. Hernandez appears to be some kind of weather map.   Then it's accompanied by a text that says:   "These are the ones for Friday."

Q.   Okay.

MR. DOBBINS:   Let's move on to the next page, please -- the next page of chats.

BY MR. DOBBINS:

Q.   Okay.   What does the Neco Neco phone send in response on July 16th of 2019?

A.   He responds by saying:   "It's clean for the week."

Q.   Okay.   And what is -- what are the two responses from --

A.   And Mr. Hernandez responds -- apologies -- Mr. Javier responds by saying:   "Okay," and then he says:   "This is the rain and ocean movements map."

Q.   All right.   Okay.   And then what is the Neco Neco phone's response right after that?

A.   And then the response says:   "But take a look.   From Florida to Holbox, it's quiet."

Q.   Okay.   And during the course of the investigation, did you learn the significance of Holbox Island?

A.   Yes.   Holbox Island -- it's an island off the coast of Yucatan, Mexico, and it's -- it was basically the meeting location where Mr. Hernandez was taking these stolen boats to from the southwest area of Florida.

Q.   Okay.

MR. DOBBINS:  All right.  Let's close those out.

Go to the next page of chats, please.

BY MR. DOBBINS:

Q.  What was the Hernandez phone response?

A.  The response was saying:  "Yes, but the thing about the rain and wind."

Q.  Okay.  And the next response from the Neco Neco phone?

A.  And the Neco response by saying:  "But they are not strong."

Q.  Okay.  And then the next response from the Hernandez phone?

A.  And then Mr. Hernandez replies by saying:  "I have a .6-meter waves at the Gulf with the current almost in our favor."

Q.  Okay.

MR. DOBBINS:  All right.  Let's go ahead and scroll down a little bit further, please.

BY MR. DOBBINS:

Q.  All right.  What do we have here in these -- in that first chat?  What was being sent?

A.  So we have a message from Mr. Hernandez, again, another -- what looks like a weather map, some kind of map, and he's saying:  "Look at the direction of the waves."  Neco replies by saying:  "This is good."  And then Mr. Hernandez follows on -- again, this is all on July 16th, 2019 -- by saying:  "Okay. Tomorrow at night we leave."

Q.   And did something significant happen during the investigation or that you learned about that happened around the time of July -- mid-July, mid-to-early, late July of 2019?

A.   Yes.  Either the *Reel Estate* or the *Ultimaytum*, one of those two vessels -- I can't recall right now which one -- was stolen around mid-July of 2019.

Q.   Okay.

MR. DOBBINS:  All right.  Let's now go to Page 56, please.

BY MR. DOBBINS:

Q.   Okay.  So looking at this, what is this first -- this first message here that we're looking at here on July 22nd, 2019?

A.   So we're looking at a message from Mr. Hernandez to Neco, where he's saying:  "Hello.  The glass for the Pursuit, that was working."

Q.   Okay.  And again, what is a Pursuit?

A.   So Pursuit is a make of a boat.  And in this case there was at least one Pursuit that was stolen.

Q.   Okay.

MR. DOBBINS:  All right.  Let's move on to the next one, please.

THE WITNESS:  So the next one, again, from Mr. Hernandez, on July 22nd, he says:  "Esa esta por el tubo. Lo que necesito es el VIN number."

This one's -- the translation here is very little.

But basically, what he's saying in Spanish is:  "This one's through the pipe.  I need the VIN number."  And what that means when -- in Cuban terminology, if you would, when something is through the pipe, they refer to something that was stolen.  It comes in through the pipe as stolen.  They do whatever they need to do to, quote/unquote, clean it, and it comes out of the pipe as a clean product.  In this case, we're talking about boats, hence, the VIN numbers.  So they're talking potentially a Pursuit that's been through the pipe, which means it was stolen and now it's good to go, it's clean.

MR. FEIGENBAUM:  Judge, I object.  That would be speculation about what somebody else was thinking.

THE COURT:  The objection is overruled.  You'll have an opportunity to cross-examine.

THE WITNESS:  I may expand on that, if you wish.

BY MR. DOBBINS:

Q.  Let me hold up.  First, let me ask you:  What's your original nationality?

A.  I was born in Cuba.

Q.  All right.  And when did you come to the United States?

A.  About the age of 10.

Q.  Okay.  Are you fluent in Spanish?

A.  Yes.

Q.  All right.  And in addition, do you also -- based on your training and experience, and your experience as a Spanish

151

speaker, do Cuban people speak Spanish differently than, say, people from Colombia or Venezuela?

A.  Yes.  There are very different dialects among the Latin American communities.

Q.  So are you familiar with the Cuban dialects?

A.  Yes.

MR. DOBBINS:  Let's move on to the next page, please.

BY MR. DOBBINS:

Q.  Okay.  So this is going to be, I believe, Government's Exhibit 5B.  If you look at Number 2, the second green chat, what was this message?

A.  So this was an audio message sent from Mr. Hernandez to Neco on July 22nd, 2019, and it says:  "I already picked that up, your crystal thing, the tiara.  Tell them that if they have no tiara, they should tell us."

Q.  Was that conversation in Spanish or English?

A.  That was in Spanish.

Q.  And is that why we have the Spanish translation side by side with the English translation there?

A.  Correct.  The left box will reflect what was actually said in Spanish in the audio message, and the box on the right would be the translated text.

Q.  Okay. All right.  Let's move on, please.  Let's scroll down to, I guess, this next page.  What is this we're looking at here in this attachment?

A.   So again, this was a little blurry, but it looks like a message on October 1st, 2019, and there appears to be some kind of vehicle report or something.  You could kind of see the shape of a vehicle here.

Q.   Okay.

MR. DOBBINS:  Now let's keep scrolling down, please. Let's go to that first green message after the -- I'm sorry.

BY MR. DOBBINS:

Q.   Who sent this message?

A.   So this is a message from Mr. Hernandez to Neco, on August 1st, 2019.  And in this message, he says:  "This is the number for the Toyota, so you can do the paperwork for it."

Q.   All right.

MR. DOBBINS:  Let's close that, and let's go to --

BY MR. DOBBINS:

Q.   Now, if you notice, the other three green chat boxes say: "Outgoing Call."  Based on the Cellebrite technology, was the FBI able to extract what those communications were?

A.   No, not the contents of those communications.

Q.   All right.

MR. DOBBINS:  Let's move on to the next page, please. And actually, let's go ahead and go to Page 56.

BY MR. DOBBINS:

Q.   Okay.  Let's start with the first green chat box there, sent by the Hernandez phone on August 5th of 2019.

A.  So this is a message on August 5th, 2019 from Mr. Hernandez to Neco, where he's sharing what looks like a contact for roberticonuevo1, with a phone number of (786)286-1747.

Q.  And based on your participation in the investigation, did we learn who Robertico Nuevo was?

A.  Yes.  Robertico Nuevo refers to Mr. Robert -- Roberto Marrero Cisneros, also known as El Viejo.

Q.  And did we recognize that phone number as well?

A.  Yes.  That phone was attributed to Mr. Marrero Cisneros.

Q.  Okay.

MR. DOBBINS:  Let's close that, and let's go to the next two attachments.

THE WITNESS:  So those are photos that were forwarded by Neco to Mr. Javier.

BY MR. DOBBINS:

Q.  Okay.  And what are they -- what are the actual attachments?

A.  And they appear to be some kind of Mexican documentation, potentially vehicle registration.  I think there's a photo later on that will show that better.

Q.  Okay.

MR. DOBBINS:  Let's go ahead and go to the next series of chats.

BY MR. DOBBINS:

Q.  All right.  So what's the first chat -- after those two

things are sent by the Neco Neco phone, what's the first response from the Hernandez phone?

A.  So on August 6th, 2019, Mr. Hernandez tells Neco:  "Now we wait for that partner of yours."

Q.  If we go to the last message there on that page.

A.  And then he follows -- this is on August 8th, 2019. Mr. Hernandez tells Neco:  "The man says tomorrow morning."

Q.  All right.  Now we're going to skip ahead to Page 70 of Government's Exhibit 5 and 5A.  And what is the date on this first message from the -- that was sent from the Hernandez phone on Page 70, which is -- in the exhibit is Page 61, but the total pages with the attached thumbnails is 70.

A.  August 12th, 2019.

Q.  Okay.  And what is the image that we're looking at here?

A.  It's kind of blurry.  Looks like some kind of decal. Through our investigation and interviews and debriefs, I learned that that was a decal for a vehicle.  And as you can see, in the next message there, it says:  "This is for an Infiniti."

Q.  Okay.

        MR. DOBBINS:  If we could scroll down.

        All right.  Let's move ahead to Page 76, please.

BY MR. DOBBINS:

Q.  All right.  We start with the obligatory hello, but we'll go to Page 77, the first green box from the Hernandez phone,

please.

A.   So on August 24th, 2019, Mr. Hernandez tells Neco:  "He says that he'll give it to me later.  He already has it."

Q.   Okay.  And what are the two responses that the Neco Neco phone sends?

A.   And Neco replies by saying:  "Okay.  I already knew it."

     MR. DOBBINS:  Okay.  If we can go down another page, please.

BY MR. DOBBINS:

Q.   And what's the date on these messages sent from the Hernandez phone?

A.   August 25th, 2019.

Q.   And I know the photos are blurry, but what do they appear to be?

A.   I can't make that out, and I don't remember what they were.

Q.   Okay.  And later, on August 25th, what does Neco -- the Neco phone send a text about?

A.   So Neco, later on, on 8/25/19, asks if the name is okay.  And Mr. Hernandez replies by saying:  "Hello.  How are you?"

Q.   All right.

     MR. DOBBINS:  All right.  Let's scroll ahead to Page 86, please.

BY MR. DOBBINS:

Q.   Okay.  We've got three text bubbles there from the Hernandez phone.  Can you just tell us what they say.

A.   Yes.  So on September 4th, 2019, Mr. Hernandez shares a number with Neco for Rob, a number (786)665-1952.  And shortly after shares another number listed as "roberticonuevo1," number (786)286-1747.  And Mr. Hernandez follows with a message that says:  "Call him at this one."

Q.   Okay.

        MR. DOBBINS:  Now let's go to Page 118.

    (Pause in proceedings.)

        MR. DOBBINS:  All right.  Maybe -- no.  No.  118 was good.

BY MR. DOBBINS:

Q.   Okay.  What's this first --

        MR. DOBBINS:  One moment.

    (Pause in proceedings.)

        THE COURT:  Okay.  Should we take a little bit of a break?

        All right.  Let's go ahead and take a comfort break --

        COURT SECURITY OFFICER:  All rise.

        THE COURT:  -- for 10 minutes, please.

    (Jury not present, 3:21 p.m.)

        THE COURT:  Okay.  We're on a 10-minute recess.

    (Recess from 3:21 p.m. to 3:42 p.m.)

        THE COURT:  All right.

        COURT SECURITY OFFICER:  Please remain standing for the jury.

THE COURT: See if they're all ready.

Thank you.

(Before the Jury, 3:42 p.m.)

THE COURT: All right. Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

And we'll continue with the direct examination.

MR. DOBBINS: Thank you, Your Honor.

BY MR. DOBBINS:

Q. Special Agent Francisco, when we left off, we were talking about the different vessels that were stolen that you located during your investigation here. Do you recall a vessel by the name of the *Mellow Yellow*?

A. Yes, I do.

Q. And where did you learn that the *Mellow Yellow* was stolen out of?

A. The *Mellow Yellow* was stolen out of Marco Island.

Q. All right. Do you know, sitting there, off the top of your head, approximately what date that occurred?

A. I want to say December of 2018.

Q. Is there something that would refresh your memory?

A. Yes.

MR. DOBBINS: Your Honor, if I may approach?

THE COURT: Yes.

BY MR. DOBBINS:

Q.   Please review that document.  And after you're done, let me know if it's refreshed your memory as to the approximate date of the theft and also what type of vessel the *Mellow Yellow* was.

A.   (Witness complies.)

     Okay.

Q.   Does that refresh your memory?

A.   Yes, it does.

          MR. DOBBINS:   Let me come get that from you.

BY MR. DOBBINS:

Q.   All right.  After having reviewed that and having your memory refreshed, approximately what was the date that the *Mellow Yellow* was stolen?

A.   It was on or about December 18th, 2018.

Q.   All right.  And do you recall what type of vessel the *Mellow Yellow* is?

A.   That was a Pursuit.

Q.   We also talked about some other boats.  Does the name the *Reel Estate* mean anything to you?

A.   Yes.  The *Reel Estate* was one of the vessels that was stolen out of the Naples area.

Q.   All right.  And is there a document -- well, sitting here today, do you recall -- do you recall the date -- approximate date that that was stolen?

A.   Not exactly.

Q.   All right.

A.   Might have been July 2019 maybe.

Q.   Is there a document that would refresh your memory?

A.   Yes.

MR. DOBBINS:  Your Honor, may I approach?

THE COURT:  You may.

BY MR. DOBBINS:

Q.   Please review that document, and let me know if after reviewing that that refreshes your memory of the approximate date of the theft of the *Reel Estate* and what type of vessel it was.

A.   (Witness complies.)

So that was around June 6th, 2019, and that was another Pursuit boat.

Q.   And what about the vessel by the name of the *Ultimaytum*?

A.   The *Ultimaytum*, I would need something to refresh my memory again as to the date.

Q.   Do you recall what type of vessel that was?

A.   I think that might have been Everglades.

Q.   All right.

MR. DOBBINS:  Your Honor, may I approach?

THE COURT:  You may.

BY MR. DOBBINS:

Q.   Please review that document and let me know if it helps

refresh your memory as to the approximate date of the theft of the *Ultimaytum* and what type of vessel it was.

A.   (Witness complies.)

That was around July 17th, 2019, and that was an Everglades.

Q.   So earlier, when we were talking about those messages from July 16th, where the Hernandez phone says:  "We'll leave tomorrow night," does that coincide with any of the vessel thefts that we just talked about?

A.   Yes.  We just talked about that date of July 17th, where one of the vessels was stolen.

Q.   Okay.  All right.  So now we're at Page 119 of the Exhibit 5A and 5.  What's going on here in these three chats, the first three chats on the page?

A.   So on these chats here, on November [sic] 9th, 2019, Mr. Hernandez shared a location with Neco, and he follows by saying:  "This last one is where I'm at."  And Neco responds by sending back the coordinates on September 9th of 2019.  And those coordinates that Neco sent, I believe, came back -- I plugged them into Google Maps and came back to a location in Miami.

Q.   Okay.  So based on the coordinates that the Neco phone sent, you plugged those in and those were coordinates here in Miami-Dade County?

A.   Correct.

MR. DOBBINS:  Okay.  If we could scroll down another page.

BY MR. DOBBINS:

Q.  Now, if we look again at the first blue text box, what's the date here?  I'm sorry.  We kind of cut it off.

A.  That's September 1st -- September 10th, 2019.

Q.  All right.  And what is the Neco phone sending here?

A.  Again, another lat/long GPS location.

Q.  Okay.

MR. DOBBINS:  And let's scroll down another page, please, to the next text box.

And let's keep going.

Okay.  Let's move ahead now to Page 146, please.

And I think we might want to go up one page higher.  I apologize.

No.  No.  Sorry.  We'll stay there.

BY MR. DOBBINS:

Q.  What's the first blue text box there from Neco, and what's the date?

A.  On September 16th, 2019, Neco asks Mr. Hernandez:  "What number should I call him at?"

Q.  Okay.  And what's the response from the Hernandez phone?

A.  The response from Mr. Hernandez again is the number for Robertico Nuevo, ending in 1747.

Q.  And again, who do we know has that number and is known as

Robertico Nuevo?

A.   The person associated to that name and number is Mr. Roberto Marrero Cisneros.

Q.   Okay.  All right.  Let's go -- are there additional things that the Hernandez phone sends right after -- right after the relaying of Mr. Marrero Cisneros's phone?

A.   On September 18th, 2019, Mr. Hernandez sends what looks again like a picture of a weather -- some kind of weather map to Neco.

Q.   Okay.

MR. DOBBINS:  And let's scroll down to the next text box.

BY MR. DOBBINS:

Q.   And again, what are we seeing from the Hernandez phone here?

A.   Same thing.  Weather maps and followed by -- attached to a text that says -- the first one on top says:  "Viernes," Friday.  And then the bottom one says:  "Sabado," which would be Saturday.

MR. DOBBINS:  Okay.  Let's scroll down again to the next text box.

BY MR. DOBBINS:

Q.   And what's the first text message there from the Neco phone?

A.   So Neco asks:  "What do you think or how do you see it?"

Q.   Okay.  And what's the response from the Hernandez phone?

A.   Mr. Hernandez replies by saying:  "They're supposed to be one-and-a-half-meter-tall waves until Wednesday next week and there are no improvements."

MR. DOBBINS:  Okay.  Let's scroll down to the next text page, please.

BY MR. DOBBINS:

Q.   Okay.  What is this first text message that the Hernandez phone sends to the Neco phone?

A.   So Mr. Hernandez sends this message on September 23rd, 2019, and it lists what -- what appears to be a HIN number for a vessel that reads:  "RJDR0196H819."

Q.   And what, if anything, did you do with that information?

A.   So we ran that HIN number, the hull identification number, in various law enforcement databases.  And that number came back as being attached to an Everglades boat owned by a -- Ricky Lee Anderson, I believe was his name, a gentleman that lived in Fort Lauderdale, Florida.

We proceeded to contact Mr. Anderson and asked him if he owned -- well, motor vehicle records showed that this Everglades boat was registered to Mr. Ricky Anderson.  I contacted Mr. Anderson and asked him:  "Hey, do you still own this Everglades that's registered here in Florida with such and such FL," the registration number.  And he says:  "Yes.  I do own that boat, and I still have that boat."

Basically, he had owned that Everglades since he bought it from the marina.  I believe it was a year or two previous to that, and he still had that boat.  And at the time I contacted him -- I want to say this was probably sometime last year.  I don't recall exactly.  But when I contacted him, it would have been no later than mid last year of 2022.  He still had that boat, and he sent me pictures.  As a matter of fact, he was in the Bahamas with his boat.  He sent me pictures of his boat showing this same HIN number attached to his boat and to the registration to the boat which beared his name.

Q.  And what was that boat registered to?  What was that HIN -- what kind of boat vessel?

A.  It was an Everglades.

Q.  And what kind of vessel was the *Ultimaytum* that was stolen in or around July 17th of 2019?

A.  The *Ultimaytum* was an Everglades.

        MR. DOBBINS:  All right.  Let's continue on.

BY MR. DOBBINS:

Q.  And what's the response from the Neco phone and then the reply from the Hernandez phone?

A.  So Neco replies to that HIN number by saying:  "What is that," and Mr. Hernandez replies by saying:  "That's the number for the Everglades."

Q.  Okay.

        MR. DOBBINS:  Let's go to the next page.

BY MR. DOBBINS:

Q.   And what's the follow-up reply from the Hernandez phone?

A.   And then Mr. Hernandez replies by saying:  "I only got one from 2019."

Q.   All right.

          MR. DOBBINS:  Let's move on.

          So we're now going to go to Page 166, please.

BY MR. DOBBINS:

Q.   All right.  Let's start with the date of this -- this text from the Hernandez phone.

A.   So on September 30th, 2019, Mr. Hernandez sends a -- the picture of a VIN number, a vehicle identification number, to Neco.

Q.   Okay.

          MR. DOBBINS:  And let's go to the -- well, if we could go back to that.

BY MR. DOBBINS:

Q.   What is the -- can you read the VIN there that was sent.

A.   I think I could see it better on that top picture, if we can scroll back up.  It's something along the lines of 5 tango, foxtrot, bravo -- I can't make out the other ones, but foxtrot 10JX769479.

          MR. DOBBINS:  Let's pull up exhibit 100.

          If we could scroll down to September 30th.

          I think it's right.

(Pause in proceedings.)

MR. DOBBINS: That's good. We'll leave it there.

BY MR. DOBBINS:

Q. Let's go back to 5A and 5. Based on that, were you able to run that VIN number?

A. Yes. So we did -- similar to what we did with the Everglades boat, we plugged in that VIN number into various law enforcement databases, and we were able to determine that that VIN number was associated to a 2018 Toyota Tundra, and it had been sold and was currently registered out of Mississippi.

So I actually went to the dealership that sold this Toyota Tundra with this 9479 VIN number. We served the dealership with subpoenas, and in their response they provided us documentation which shows that this Toyota Tundra bearing this VIN number was sold twice, one as a brand-new vehicle to someone in the Mississippi area. It was subsequently traded in and resold to a second owner also in the Mississippi area. And we subsequently visited the owner that owned the vehicle at the time. And this was -- again, I don't recall the time. But it would have been -- I want to say it was the beginning of this year. And I was able to see that Toyota Tundra myself, bearing the VIN number that's on this photograph here as the original vehicle. And the owners told me same thing basically that the subpoena returns indicated, that they had purchased this Toyota Tundra from Chuck Hutton Toyota in Mississippi.

Q.  Okay.

MR. DOBBINS:  So if I can pull up for the witness only, please, Government's Exhibit 75.

BY MR. DOBBINS:

Q.  Do you recognize this series of photographs?

A.  Yes, I do.

Q.  And what are these photographs of?

A.  This is the Toyota in the owner's residence in Mississippi.

Q.  And who took these photographs?

A.  I did.

Q.  Are these fair and accurate photographs of the Toyota Tundra with that VIN number that you found in Mississippi?

A.  Yes.

MR. DOBBINS:  Your Honor, at this time, the Government would move to admit Government's Exhibit 75 into evidence.

THE COURT:  Other than the preserved objection, any further objection?

MR. FEIGENBAUM:  Actually, this is a different area, so no objection at all.

THE COURT:  All right, then.

MR. FEIGENBAUM:  Let me just ask:  This was one that the agent took himself, right?

MR. DOBBINS:  Yes.

MR. FEIGENBAUM:  So no objection at all, Your Honor.

THE COURT:  All right.  Admitted into evidence.

(Government's Exhibit 75 received into evidence.)

MR. DOBBINS:  If we display -- publish for the jury, please.

BY MR. DOBBINS:

Q.  All right.  What's the first photograph we're looking at here in Government's Exhibit 75?

A.  So this is the Toyota Tundra 2018 -- silver Toyota Tundra, bearing that VIN number ending in 9479.

Q.  Okay.

MR. DOBBINS:  And if we could go to the next photo, please.

THE WITNESS:  This is the VIN number as seen on the front windshield of the vehicle.  And you can read the full number there, 5TFBW5F10JX769479.

BY MR. DOBBINS:

Q.  Okay.  All right.  And is this the VIN number for that Toyota Tundra that you located in Mississippi?

A.  Correct.  I just wanted to clarify for the record it was either Mississippi or Tennessee.  I know the dealership was on the border of both states.  And I think the Jeters, who were the owners of the vehicle, lived on one or the other.

Q.  Okay.  Did you -- did you obtain the -- through a grand jury subpoena, did you obtain the records for this vehicle from the dealership that had sold it?

A.  Yes, we did.

Q.  All right.

MR. DOBBINS:  If I could have just for the witness only, please.

BY MR. DOBBINS:

Q.  Like to show you Government's Exhibits 72, 73, and 74 for identification.

(Pause in proceedings.)

THE WITNESS:  It's up.

BY MR. DOBBINS:

Q.  All right.  Do you recognize those exhibits?

A.  Yes.  I see Exhibit 73 and 74 as the subpoena returns that we received from Chuck Hutton Toyota in Memphis, Tennessee.

Q.  And showing you --

MR. DOBBINS:  If I may approach, Your Honor?

THE COURT:  You may.

BY MR. DOBBINS:

Q.  Do you recognize Government's Exhibit 72?

A.  Yes.  That was also part of the subpoena return from Chuck Hutton Toyota.

MR. DOBBINS:  Your Honor, at this time, the Government would move to admit Government's Exhibits 72, 73, and 74 pursuant to Federal Rule of Evidence 902(11).

THE COURT:  Any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Each admitted into evidence.

(Government's Exhibits 72, 73 & 74 received into evidence.)

MR. DOBBINS:  If I may just retrieve Government's Exhibit 72.

If I may have the ELMO, please.

BY MR. DOBBINS:

Q.  Okay.  Showing Government's Exhibit 72 in evidence.  What is this a record for?

A.  So this is a subpoena return from Chuck Hutton Toyota, in Memphis, Tennessee, regarding the Toyota Tundra with the 9479 VIN number.

Q.  Okay.  And could you just read that full VIN number in for the record, please.

A.  Yes.  It's 5TFBW5F10JX769479.

Q.  Okay.  Is that the same VIN number that you saw on the photographs when you took the picture in Mississippi?

A.  Correct.

Q.  All right.  And who was this car first sold to?

A.  So this car was first sold as brand new out of the dealership to a Thomas Woon Lee out of Byhalia, Mississippi.

Q.  And what kind of a vehicle was it?

A.  It was a 2018 Toyota Tundra silver.

MR. DOBBINS:  Now if we could go back to the Government's laptop, please.

BY MR. DOBBINS:

Q.  Let's start with 73.  What is this showing, this first

page?

A.   This is showing the purchase agreement between Oscar Jeter III, purchasing the vehicle on May 15th, 2021, from Chuck Hutton Toyota, the same Tundra.

Q.   All right.  And where did Mr. Jeter live, what town and state?

A.   Mr. Jeter lived in Hernando, Mississippi.

Q.   And when you found the Toyota Tundra in 2022, who was the owner at that time?

A.   Mr. Jeter.

Q.   And again, what's the VIN number there for the -- what type of vehicle and what's the VIN number, please?

A.   2018, Toyota Tundra with the same VIN number, 5TFBW5F10JX769479.

Q.   Okay.  And then what's Government's Exhibit 74?

A.   Seventy-Four is part of the same subpoena returns, which shows the vehicle being serviced at Chuck Hutton Toyota from the time it was purchased by the first owner, Mr. Lee, all the inspections and services that were done at that dealership.

Q.   Okay.  So at the time that you went and interviewed Mr. Jeter, were there any other owners besides the original owner Mr. Woon Lee and Mr. Jeter?

A.   No.  They were the only two owners registered with the State of Mississippi, and that Chuck Hutton Toyota had in their records as being the two previous purchasers of the vehicle.

MR. DOBBINS:  Let's go back to Government's Exhibit 5 and 5A.  I'm sorry.  It was page -- we were at 166.

Let's continue to scroll down.

BY MR. DOBBINS:

Q.  What other images are being sent from the Hernandez phone at this time?

A.  So on September 30th, 2019, there are also photos of the interior of what looks like a pickup truck, a red interior.

MR. DOBBINS:  Let's keep scrolling.

BY MR. DOBBINS:

Q.  And what are these?  On Page 173, what are the photos of here?

A.  These are photos on September 30th, 2019, sent by Mr. Hernandez, of a white Toyota Tundra.

Q.  And what is this -- this last one here we're looking at, and again on September 30th, 2019?

A.  It looks to be some kind of decal, like the ones we see on the door panels of a vehicle.

Q.  Okay.  And are you familiar with what those decals in the door panels generally show?

A.  Yeah.  Overall, it typically shows the vehicle VIN number, along with the tire size, tire pressure, and other things.

Q.  Does it also have the VIN number generally?

A.  Correct.

Q.  Okay.

MR. DOBBINS:  All right.  Let's now move on to Page 184 -- sorry.  It's going to be -- yes, Page 185.

BY MR. DOBBINS:

Q.  What does this message here, sent on October 1st from the Hernandez phone, say?

A.  So Mr. Hernandez is saying:  "I'm already in Cancun, leaving for Merida."

Q.  Okay.

MR. DOBBINS:  Now let's move on to Page 187, please.

BY MR. DOBBINS:

Q.  All right.  So let's go to the second message there, and what's the -- sent from the Hernandez phone -- what's the date?

A.  The date is October 9th, 2019, and Mr. Hernandez is saying:  "Neco, the trip went out the window.  The equipment was not there where it was supposed to be.  I'll call you tomorrow."

Q.  Okay.

MR. DOBBINS:  So let's close out of that.

BY MR. DOBBINS:

Q.  And now let's -- what's the last text message there that's sent by the Hernandez phone?

A.  On October 9th, 2019, Mr. Hernandez sends a message to Neco saying:  "Toyota Tundra, white in color, double cabin, XP, which is the biggest one, 4-by-4, V8 5.7."

Q.  Okay.

MR. DOBBINS:  Let's go to the next page, please.

BY MR. DOBBINS:

Q.   And what's the date on this text?

A.   October 9th, 2019.  And Mr. Hernandez was saying to Neco: "Remember the address of the transmission guy for the tiara."

          MR. DOBBINS:  Let's keep scrolling down, please.

BY MR. DOBBINS:

Q.   And what's the -- let's go with that October 9th -- the last blue box, please.

A.   Neco was telling Mr. Hernandez:  "Send me the VIN where we can see it in full."

Q.   Okay.

          MR. DOBBINS:  Let's go to the next page, please.

BY MR. DOBBINS:

Q.   All right.  So we have the Hernandez phone sending a message with an attachment, but then there's also a follow-up message there.  So let's go ahead and read the second one.

A.   Right.  So on October 9th, 2019, Mr. Hernandez replies to Neco with a VIN number, the VIN number we previously talked about, and it reads:  "5TFBW5F10JX769479."

Q.   And that's the same number for the VIN for that silver Toyota Tundra that we showed from the records from Government's Exhibits 72 through 74?

A.   Correct.

Q.   Let's keep scrolling down to the next message.

A.   All right.  On 10/9/19, Mr. Hernandez tells Neco:  "2018,

because the VIN is for a 2018."

Q.   Okay.

MR. DOBBINS:   All right.   What we want to do now is go ahead and move ahead to Page 205.

BY MR. DOBBINS:

Q.   All right.   Let's look at this first green box from the Hernandez phone.   What's the date on this communication?

A.   October 9th, 2019.

Q.   Okay.   And what's the Hernandez phone saying there?

A.   Mr. Hernandez is sending a message to Neco saying:   "Spent 900 on a satellite, which had already a one-year contract and 600 minutes, and 1,200 on the parts from the warehouse."

Q.   And let's go to the next message there.

A.   And on the same date, October 9th, Mr. Hernandez says: "The total is 2,100 for the money."

MR. DOBBINS:   Okay.   Let's go ahead and scroll down to the next page.

Let's go with the second green box, please.

THE WITNESS:   On October 9th, 2019, Mr. Hernandez asks:   "When will the tags for the Toyota be ready?"

MR. DOBBINS:   Okay.   Now if we could go to Page 210, please.

BY MR. DOBBINS:

Q.   All right.   Let's start -- let's start with that first blue box at the top of the page.   What's the text message that the

Neco phone is sending to the Hernandez phone?

A.   So on October 11th, 2019, Neco sends a photograph of a Mexican ID or driver's license to Mr. Hernandez.

Mr. Hernandez --

Q.   All right.

A.   You want me to continue with all the bubbles?

Q.   Yeah.   What's the response from the Hernandez phone?

A.   And Mr. Hernandez replies by saying:   "What is this," to which Neco replies:   "It's so that Robertico can do the paperwork for the Everglades."   And then Neco also asks:   "Do you have the VIN," or tells him:   "You have the VIN."

Q.   Okay.

MR. DOBBINS:   Let's go ahead and go to the next page, please.

THE WITNESS:   So this is October 11th, 2019. Mr. Hernandez replies by saying:   "I gave it to you already."

BY MR. DOBBINS:

Q.   All right.

A.   And then Neco replies by saying:   "Yes.   But so I can give it to Robert."

Q.   And what is the reply from the --

A.   And Mr. Hernandez replies by saying:   "Did you put the number in the Everglades already?"

Q.   What's the response?

A.   And then the response from Neco is:   "No.   Because

Robertico is doing the template."

Q.  All right.

        MR. DOBBINS:  Let's go down another page.

BY MR. DOBBINS:

Q.  And what's this forwarded message in the blue?

A.  So Neco was forwarding a message with the same HIN number RJDR0196H819 that we previously saw in the chat.

Q.  Is that the Everglades boat that you contacted somebody to confirm whether or not they still owned that boat?

A.  Correct.

Q.  And who was that person again?

A.  That was -- Ricky Lee Anderson, I believe was his name.

        MR. DOBBINS:  Now, if we can, let's pull up Government's Exhibit 11, Page 98, in evidence.  And maybe leave up Government's Exhibit 5, please.

BY MR. DOBBINS:

Q.  Okay.  Government's 11, if you recall, was the evidence of the chats between the Hernandez phone and Mr. Marrero Cisneros, who testified earlier today.  Just going -- let's start with that bottom message there.  What is it that the Hernandez phone sent to the Robertico Nuevo phone on or about October 11th, 2019, which would be after that other message from the Neco phone?

A.  If you could zoom out of that real quick.  I think that might be a forward.  Yeah.  So the message was actually

forwarded from Mr. Hernandez to Robertico Nuevo, and it's that same Everglades number we've been talking about, the 819.

Q. Okay.

A. And just before that, you see that same Mexican ID as well.

Q. All right.

MR. DOBBINS: So let's go to the top of that page on Government's Exhibit 11.

No. No. No.

Yeah. Just pull it up.

BY MR. DOBBINS:

Q. And what day was this that this was sent from the Hernandez cell phone to Mr. Marrero Cisneros's phone?

A. So on October 11th, 2019, it goes from Mr. Hernandez to Mr. Marrero Cisneros.

Q. Okay.

MR. DOBBINS: And maybe scroll down. I think maybe there's a photo. Should be after -- on Government's Exhibit 11.

And we can scroll down here.

BY MR. DOBBINS:

Q. So the photo of this Mexican identification card, or driver's license, whatever it is, was sent from the Neco phone to the Hernandez phone, and then subsequently sent from the Hernandez phone to the Marrero Cisneros phone?

A. Yes. Let me make that clear. Because it should be a

little confusing.  So Neco sends this to Mr. Hernandez and tells him it's for the Everglades, along with the VIN that they discussed.  And then Mr. Hernandez forwards it to Robertico, Mr. Marrero Cisneros.

Q.  All right.

MR. DOBBINS:  And now if we could pull up Government's Exhibit 7A, Page 152, please.  Government's Exhibit 7A that's in evidence.

Maybe scroll up.  Sorry.

Can you scroll up a little bit higher, please.

All right.  We will come back to that one.

So let's pull up 5A to go with 5 on the left, please.

Okay.  So what we want to do now is go to Page 223, please.

BY MR. DOBBINS:

Q.  All right.  Let's start with the date and that first blue bubble there.

A.  October 23rd, 2019, Neco forwards a message to Mr. Hernandez with what appears to be a decal for an Infiniti vehicle.  If you zoom out, you can kind of see the logo for Infiniti on the bottom, right corner of that decal.

Q.  Okay.

MR. DOBBINS:  And let's go to the next, I believe, text message from the Neco phone.

THE WITNESS:  And then Neco follows that message by

saying:  "According to -- I think this is from the Infiniti."

MR. DOBBINS:  Okay.  And let's scroll down to the picture, please.  I think we can ...

BY MR. DOBBINS:

Q.  And what is -- that thumbnail that was up on the previous page, with the enlarged photo here, what is this a picture of?

A.  This is a -- what appears to be a decal for some kind of Infiniti vehicle.  You can see the logo for Infiniti down here.

Q.  All right.  And do you see a VIN number there?

A.  Yes.  The VIN number is on the right-hand side here.

Q.  Okay.

MR. DOBBINS:  If we could pull up Government Exhibit 11, again, Page 119.

BY MR. DOBBINS:

Q.  What day is this sent from the Hernandez phone to the Marrero Cisneros phone?

A.  This is sent on October 23rd of 2019.  And again, if you could zoom out, I think it shows that it's a forwarded message from Mr. Hernandez's phone to Robertico, Mr. Marrero Cisneros.

Q.  Okay.

MR. DOBBINS:  And if we scroll down to the next page on 11, I think we can see the exhibit.

Okay.  That one didn't come out quite as clear.

So now let's move -- let's pull back up Government's Exhibit 5A on the right, and let's go to Page 226.

BY MR. DOBBINS:

Q.   Okay.   Starting with those top two boxes there.

A.   So on October 30th, 2019, Neco sends the name and an address for a DHL:  "Emiliano Zapata Norte Prolongacion Paseo, Number 396 Local 4 y 5."  "Emiliano" seems to be some kind of address.  Yeah.  It's followed by:  "Zapata Norte Merida, Yucatan."  And then right after that he says:  "On behalf of Felipe Delgado Romero."

MR. DOBBINS:  And now if we can go to Page 229, please.

BY MR. DOBBINS:

Q.   And let's start with the first green message there from the Hernandez phone.

A.   So on October --

Q.   What's the date and time --

A.   On October 31st, 2019, Mr. Hernandez sends a HIN number, a hull identification number for a vessel to Neco, that reads:  "SSUC2694B818."

Q.   Okay.  And let's go to the next green message from --

A.   On the same date, October 31st, Mr. Hernandez sends another message to Neco says:  "Persuit 238 2018."

Q.   Okay.

MR. DOBBINS:  And let's scroll down a little bit.

BY MR. DOBBINS:

Q.   And what's -- what are the responses from the Neco phone?

A.   Neco replies, on that same date of October 31st:  "I'll confirm now."  And then he says:  "My mistake.  It's a Pursuit 260, main dashboard," or center console.

Q.   Okay.  And what's the response from the Hernandez phone?

A.   And then Mr. Hernandez replies by saying:  "I knew 23 was odd."

Q.   And if we go down one more, I believe.  And what is the Hernandez phone sending there?

A.   I can't really tell.  It's some kind of bar code on that second document.

Q.   Okay.  Did -- when Cellebrite pulled these photos, was it able to get all of the photos or sometimes just other types of the image?

A.   Yeah.  Sometimes Cellebrite is not able to extract the full image.  So it will extract what's called a thumbnail, which basically is a small version of the photograph, and that's why sometimes we can't really see it any bigger.

Q.   And what happens when we try to make it bigger?

A.   It just zooms out and it becomes more blurry, so you can't see any details on it.

Q.   All right.

     MR. DOBBINS:  Let's now go to 239, please.

BY MR. DOBBINS:

Q.   And what's the date here?

A.   November 8th, 2019.

Q. Okay. And who sent this message or what phone sent this message?

A. On the top right there, the green one from Mr. Hernandez's phone to Neco.

Q. Okay. And what's the --

MR. DOBBINS: If we could scroll down to the image below.

THE WITNESS: So that appears to be some kind of ledger that Mr. Hernandez sent. And some of the writing is hard to read. But you could see there on the second line is "piezas," which is parts, and "envio," which is shipping, "motor de agua," which is water pump. "Motor" would be an engine. "Satelital" most likely refers to a satellite phone -- and something else. But everything has some kind of price associated to it.

Q. Okay.

MR. DOBBINS: And if we could go back up one.

BY MR. DOBBINS:

Q. What's -- again, it looks like the Neco phone is forwarding an image there --

A. Yes.

Q. -- on -- on November 8th?

A. Yes. On November 8th, we see what looks like the same image we've been looking at of the decal for an Infiniti vehicle sitting on some kind of table or something.

Q.  All right.

MR. DOBBINS:  Let's move ahead to Page 243, please.

BY MR. DOBBINS:

Q.  All right.  And what is this an image of that we're looking -- here, from the blue on the top?

A.  So it's a forwarded message that's coming in from Neco to Mr. Hernandez's phone, and it's for a Western Union receipt that went from Mr. Felipe Javier Delgado to Mr. Hernandez for $1,000.  That's the same name that we saw in the chat above with the DHL instructions.

Q.  Okay.  And when you say we saw that above in the DHL instructions --

MR. DOBBINS:  Can we just pull one of them back to 226, please.

Okay.  And the second bubble.

Sorry.  The second blue bubble, please.

BY MR. DOBBINS:

Q.  All right.  So that was the name -- what was the name given there?

A.  Felipe Delgado Romero.

MR. FEIGENBAUM:  Your Honor, could I just ask a clarification?  I can't remember whether the agent testified to the receipt on the left of the screen.

THE COURT:  Do you want to clarify that, Mr. Dobbins?

MR. DOBBINS:  Sure.

185

BY MR. DOBBINS:

Q. We were showing Page 245. What was -- that was an image that the Neco phone had sent to the Hernandez phone. And now we've gone back because there's a reference of the person who sent the money on the left. And who was that person?

A. Correct. The message from Neco was a photo of the receipt, the Western Union receipt we're seeing here, that's coming from -- that's showing the money was sent from Mr. Felipe Delgado Romero to Javier Hernandez. And Felipe Delgado Romero is the name we see in the message from October 30th, when Neco provides the DHL instructions to Mr. Hernandez.

MR. FEIGENBAUM: Could we just have a clarification whether the amounts are in Mexican pesos or US dollars.

THE WITNESS: I think it says: "One thousand US dollars."

THE COURT: All right.

MR. FEIGENBAUM: Thank you.

BY MR. DOBBINS:

Q. And did we end up getting the records for Western Union in the name of Mr. Javier Hernandez?

A. Yes. We got grand jury subpoena returns showing the same transaction.

MR. DOBBINS: Your Honor, at this time, the Government would move into evidence Government's Exhibit 97.

THE COURT: Any objection?

MR. FEIGENBAUM:  What is that one?

THE COURT:  Ninety-seven.

MR. DOBBINS:  Western Union records.

MR. FEIGENBAUM:  That's fine.

THE COURT:  Admitted into evidence.

(Government's Exhibit 97 received into evidence.)

(Pause in proceedings.)

BY MR. DOBBINS:

Q.  And did we see this name in the Western Union records where Mr. Hernandez was a payee?

A.  Yes.  Same name.  Felipe Javier Delgado Romero.

Q.  Now, this is not the same transaction that was in that receipt, correct?

A.  No.  I believe the dates and the amounts are different.

MR. DOBBINS:  Okay.  All right.  Let's go back to 5 -- 5 and 5A.  We're going to be looking at Page 265.

BY MR. DOBBINS:

Q.  All right.  Let's look at the dates here for the "Hello" message sent from the Hernandez phone, please.

A.  We're looking at November 18th, 2019.

Q.  Okay.  And let's go to that next green bubble.  What is it that Mr. Hernandez's phone communicated to the Neco phone?

A.  On November 18th, 2019, Mr. Hernandez is saying:  "How is everything over there?"

Q.  Okay.

MR. DOBBINS:  Let's go to the next page.

BY MR. DOBBINS:

Q.  Okay.  And let's start with the blue response from the Neco phone.

A.  So these will all be on November 18th, 2019.  Neco replies by saying:  "Everything is well.  Everything is all right."

Q.  And what is the response from the Hernandez phone?

A.  Mr. Hernandez replies by saying:  "How's the weather over there," or "How's the weather?"

Q.  And then what are the next two messages from the --

A.  And Neco replies by saying:  "Weren't you leaving today?"

And the second message says:  "Well" or "good."

MR. DOBBINS:  Let's go ahead and go to the next page, please.

BY MR. DOBBINS:

Q.  And what's that first response from the Hernandez phone?

A.  Again, this is all on November 18th, 2019, and Mr. Hernandez's response is:  "Yes.  We're on it."  And he follows up by saying:  "How's the weather over there?"

Q.  Okay.

MR. DOBBINS:  And let's go to the next page.

BY MR. DOBBINS:

Q.  Let's start with the second green text bubble.

A.  So on November 19th, 2019, Mr. Hernandez tells Neco: "Well, we are preparing to leave tonight."

Q.   Okay.

MR. DOBBINS:   And let's go to the next page -- oh. I'm sorry.   Let's go up one.

I'm sorry.   We should talk about that last blue bubble on that last page.

BY MR. DOBBINS:

Q.   What does Neco respond after the Hernandez phone states: "We're preparing to leave tonight"?

A.   Neco replies by saying:   "Let me know."

Q.   And what does -- let's go with the -- what does Neco instruct -- what does the Neco phone instruct the Hernandez phone to do in that last text bubble on the bottom of the page?

A.   Neco tells him to send him a WhatsApp.

Q.   Okay.

MR. DOBBINS:   Let's keep scrolling down to the next page, please.

BY MR. DOBBINS:

Q.   Okay.   And what is the response there at the top of the page from the Hernandez phone?

A.   On 11/19/2019, Mr. Hernandez replies by saying:   "Okay. We'll send you a WhatsApp when we leave."

Q.   Okay.

MR. DOBBINS:   All right.   Let's go to the next page, please.

BY MR. DOBBINS:

Q. And what's the date here?

A. November 19th, 2019. And Mr. Hernandez, sending a message to Neco, says: "I'm on my way."

Q. Okay. And what significant event was occurring around this time in November -- around this time November 19th-ish in the investigation?

A. This was around the date that the *Luca Brasi* was stolen from the Naples area.

Q. All right. So those were the chats with the Neco phone.

MR. DOBBINS: Let's now move ahead and go to Government's Exhibit 6 for identification, please. If we may just have it for the witness.

BY MR. DOBBINS:

Q. Do you recognize Government's Exhibit 6 and 6A?

A. Yes. These are Facebook conversations between Mr. Javier Hernandez and a Yisel Castro Del Llano.

Q. And are these the chats between these two phones that you pulled -- WhatsApp chats that you pulled as part of one of the reports that you made?

A. These were conversations extracted from Facebook out of one of the reports that I generated from Cellebrite, yes.

Q. Sorry. And is this a fair and accurate depiction of the chats that you pulled from the Hernandez phone, which is Government's Exhibit 3, from that Cellebrite extraction?

A.  Correct.

MR. DOBBINS:  Your Honor, at this time, I'd move Government's Exhibits 6 and 6A into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  I think this goes to the -- this one goes to the continuing objection, Your Honor.

THE COURT:  All right.  Other than the continuing objection, is there any further objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibits 6 & 6A received into evidence.)

BY MR. DOBBINS:

Q.  All right.  So let's focus on this chat.

MR. DOBBINS:  Let's just start with the -- actually just go with the participants, please.

BY MR. DOBBINS:

Q.  All right.  And we're looking at -- what's the Facebook ID number there for the Javier Hernandez portion of the chat?

A.  So we're looking at the Facebook user ID number for Mr. Javier Hernandez 1172929976.

Q.  Okay.  And did we see that also in the exhibit where we had pulled the user accounts, that Facebook number?

A.  Yes.  And that's just the same user ID that was in the report.

Q.  So let's start with the first communication there.  And

191

what is it that this Yisel Castro Del Llano's Facebook account communicates?

A.   So on July 17th, 2019, Ms. Castro Del Llano is saying:  "I will say that because my son got sick in Cuba and also they did not grant asylum there in Spain.  What do you think?"

Q.   All right.

MR. DOBBINS:  Let's go down to Page 4, please.

BY MR. DOBBINS:

Q.   Let's start with that second green text bubble there, and what's the date?

A.   August 21st, 2019.

Q.   And what is it that the Hernandez Facebook account is communicating?

A.   Mr. Hernandez is saying:  "Hello, Yisel.  How are things?"

Q.   And let's go to the next one there, where we started with October 2nd.

A.   On October 2nd, 2019, Mr. Hernandez writes:  "Loca" or "Crazy, how are you?"

Q.   Okay.  And what's the response in the blue at the bottom of that page?

A.   And the response is:  "Good, Papi.  Thank God."

Q.   Okay.

MR. DOBBINS:  Let's go to Page 5.

BY MR. DOBBINS:

Q.   Now we see the first text messages -- or the first Facebook

message from the Yisel phone -- or the Yisel Facebook account?

A.   On October 2nd, 2019, Yisel writes:   "Working and waiting for things to improve.  Ha, ha, ha."

Q.   Okay.  And what's the -- what's the response there from the Javier Hernandez Facebook account?

A.   Mr. Hernandez's response is:  "How's the border?"

Q.   And the reply from the Yisel Facebook account?

A.   Yisel's response is:  "What do you think?"

Q.   Okay.  And what does the Javier Hernandez Facebook respond?

A.   The response by Mr. Hernandez is:  "Things are crazy, but we have to keep going."

Q.   All right.  Let's move on to the next page.  Let's start with that top message from the Hernandez Facebook account.

A.   On October 2nd, 2019, Mr. Hernandez writes:  "They're turning back after the courts."

Q.   And the response from the Yisel?

A.   Response from Ms. Yisel is:  "Yes.  You enter and then two days later they send you back."

Q.   Okay.  And then what's the response there from the Hernandez Facebook account?

A.   Mr. Hernandez replies:  "But they do take you to court, don't they?"

Q.   Okay.  And the reply from -- the three replies from the Yisel Facebook account?

A.   So Yisel replies by saying:  "Yes.  Up to three times.  But

if you don't cooperate, they send almost everyone to Cuba the first time. They don't leave it for the third time you enter. That's when they take you to court. But you know, they set the dates for every two or three months, like this."

Q. Okay.

MR. DOBBINS: Let's go on ahead to Page 7, I believe.

BY MR. DOBBINS:

Q. All right. What's that response from the Javier Hernandez Facebook account?

A. On October 2nd, 2019, Mr. Hernandez writes: "Candela," or "Fire, I'm going to Mexico around mid-month to take a car that belongs to the chief of police and head of almost everything in Merida. Let's see if after I give him that car he loosens up the reins for us here in Yucatan and I can find you something better for the papers."

Q. Okay. And what date was this message sent?

A. October 2nd, 2019.

Q. All right. Now let's go to the next green message from the Javier Hernandez Facebook account, please.

A. So on the next message, same date, October 2nd, 2019. Mr. Hernandez writes: "Let's wait until I bring him that truck. And then we'll see about that."

MR. DOBBINS: Okay. Let's go to the next page, please.

BY MR. DOBBINS:

Q.   And let's start with that first green message from the Javier Hernandez Facebook account.

A.   On the same date, October 2nd, 2019, Mr. Hernandez writes: "Yes.  But the men who had to give it to us had been doing that for months, but I already have it stored away in Miami, waiting for the plates, to bring it back."

Q.   Okay.  And then let's go with the last blue message there from the Yisel account.

A.   On October 2nd, 2019, Ms. Yisel writes:  "Leo is crazy for doing it illegally, Pipo, until he gets to Miami.  But I'm really scared, and then grabbing the papers there is complicated."

Q.   Okay.

        MR. DOBBINS:  Let's go to the next page.

BY MR. DOBBINS:

Q.   The first response there from the Hernandez Facebook?

A.   On October 2nd, 2019, Mr. Hernandez writes:  "It's because of that fucking truck that man has us stuck here and he almost doesn't let us work, but now we're going to give it to him so that he loosens up."

Q.   And if we could go to the response from the Yisel phone -- or the Yisel Facebook account.

A.   And the same date, October 2nd, Yisel replies by saying: "Yes.  You always have to have the bosses in your pocket.  Ha,

ha, ha."

Q.  And now the next response from the Javier Hernandez?

A.  And Mr. Hernandez replies by saying:  "That's right. They're all so rotten here."

Q.  Okay.  Then the further response there from -- sorry -- from the green boxes, please.

A.  So Mr. Hernandez follows up by saying -- on the same date, October 2nd, he goes:  "Yes, but mija, here the sweetening is done with gifts."  And he follows that message by saying: "Look at this truck we had to give him."

MR. DOBBINS:  Let's go ahead and go to Page 10.

BY MR. DOBBINS:

Q.  Now, there were attachments here.  Was the Cellebrite able to recover those attachments?

A.  I believe we were not able to recover attachments from there.  It says:  "Empty file."

MR. DOBBINS:  Let's go to Page 11, please.

BY MR. DOBBINS:

Q.  And then if you go to that first text message there from the -- or Facebook message from the -- Javier Hernandez, what does he say there?

A.  On October 2nd, 2019, Mr. Hernandez is saying:  "This is what is used to sweeten the deal here.  Ha, ha, ha."

Q.  Okay.

MR. DOBBINS:  If we go to the next page, Page 12,

please.

BY MR. DOBBINS:

Q.   What's the first message -- Facebook message that the Hernandez Facebook account sends there?

A.   So Mr. Hernandez, same thing.  On October 2nd, 2019, he replies by saying:  "These people are into bribery."

"Aqui esta gente son de soborno."

Q.   Okay.  And then the response from the Yisel Facebook?

A.   And the response from Ms. Yisel is:  "But there in Miami they allow themselves to be bribed or are you talking to me about Mexico?"  And Mr. Hernandez replies by saying:  "Mexico."

Q.   Okay.

MR. DOBBINS:  Let's go ahead and go to Page 13.

BY MR. DOBBINS:

Q.   Now I think we have a literal translation here.  On the first Yisel Facebook message, what is she saying there?

A.   She's -- Ms. Yisel, October 2nd, 2019, she asked:  "Y El Niño?"  The literal translation here was:  "And the boy?"

Q.   Okay.  Now -- I'm sorry.  It sounded like you said 2018.  Is that the date you just gave?

A.   October 2nd, 2019 is the date stamp.

Q.   Okay.  Let's go to the next Yisel -- well, did we learn during the investigation -- was there anybody nicknamed El Niño in the investigation?

A.   Yes.  Mr. Reynaldo Crespo Marquez.

Q.   Now, what's the next message from Yisel, the next blue message there.

A.   So Yisel says:  "I said this already.  These Mexicans are not stupid at all."  And then she follows by saying:  "Yes. Yes.  Well, can you go to the US yet or not?"

Q.   Okay.  And what is the Javier Hernandez Facebook response?

A.   And then the response from Mr. Hernandez is:  "Oh, mija. You have no idea about how difficult it is for us."

         MR. DOBBINS:  Let's go to Page 14, please.

BY MR. DOBBINS:

Q.   What's the follow-up response from the Javier Hernandez Facebook account?

A.   So Mr. Hernandez replies by saying:  "Aqui, con plata, camina el mono."

     "Here, money talks."  But the actual translation -- the full translation from that Spanish is that:  "Here, with money, the monkey walks."

         MR. DOBBINS:  Let's go to the next page, please, Page 15.

BY MR. DOBBINS:

Q.   And let's see -- what's the response there from the Javier Hernandez Facebook account, please?

A.   Again, on October 2nd, 2019, Mr. Hernandez replies by saying:  "Here, in Merida, we already have the Governor, the Attorney General, and now the police chief eating out of our

hands."

Q.  Okay.

        MR. DOBBINS:  And let's go ahead and go to Page 16.

        All right.  Let's go to Page 17.

BY MR. DOBBINS:

Q.  And what's the first text Facebook message there from Yisel

at the top?

A.  On October 2nd, 2019, Yisel writes:  "And there, in Merida,

do the jobs pay well or is it like here?"

Q.  Okay.

        MR. DOBBINS:  Let's scroll down to Page 18.

BY MR. DOBBINS:

Q.  And what's that first message from Javier Hernandez?

A.  So on October 2nd, 2019, Mr. Hernandez writes:  "But let me

see if we can figure out the papers here.  We'll see what can

be done."

        MR. DOBBINS:  Okay.  Your Honor, I notice it's five

o'clock.  I don't know if you want me to stop or --

        THE COURT:  Is this a good time to stop?

        MR. DOBBINS:  It would be a good time to stop.

        THE COURT:  All right.  Then, Ladies and Gentlemen, we

are going to adjourn for the evening.  Tomorrow will be a full

day, and I will hope to see each of you.  Please be mindful

that we cannot get started unless all of you are here.  So

please make arrangements so that you can come right in the

courtroom at nine a.m. tomorrow morning.

Please remember that as we adjourn you are not to discuss this case with anyone, nor permit anyone to speak with you. Everything learned about the case is learned within this courtroom.

Have a pleasant evening. I'll see you tomorrow morning at nine a.m.

COURT SECURITY OFFICER: All rise.

(Jury not present, 5:01 p.m.)

THE COURT: All right. Thank you, Special Agent Francisco.

Please remember that, since you are on the witness stand, you're not to discuss your testimony, or anticipated testimony, or any aspect of the case. And I'll see you tomorrow morning at nine a.m.

THE WITNESS: Yes, ma'am. Thank you.

THE COURT: And Mr. Dobbins, how much more do you believe we have on the direct examination?

MR. DOBBINS: We've gone through the heaviest of the phone exhibits. I believe we have one or two more that are a little lengthy, but I think I should be able to have it finished in around an hour.

THE COURT: All right.

MR. DOBBINS: At the latest.

THE COURT: Do you anticipate, Mr. Feigenbaum, how

much time you need for the cross?

MR. FEIGENBAUM:  I believe Mr. Dobbins just mentioned you would have one more hour?

MR. DOBBINS:  Approximately, yeah.

MR. FEIGENBAUM:  I would guestimate between one and one and a half hours.

THE COURT:  All right.  And then, following that -- have you spoken with Mr. Hernandez?  I believe -- am I correct that that's the last Government witness?

MR. DOBBINS:  Yes, Your Honor.  We'll be resting.

THE COURT:  All right.  And the Government will rest. So that we don't have breaks in time -- and obviously I will speak with Mr. Hernandez about his constitutional right.  I just don't know at this point if you are planning on -- I think you had said you were going to call another witness, Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes.  In fact, he has been waiting outside, just in case we needed him today, Mr. Dan Riemer.  And he'll be back tomorrow morning.  Probably an hour, hour and a half on direct.

THE COURT:  All right.  And then, obviously, I will speak with Mr. Hernandez in terms of his decision.  It's unlikely that we will conclude by tomorrow.  That appears to be the case, unless you tell me otherwise.

MR. FEIGENBAUM:  Well, Your Honor, in candor to the

Court and also to the Government, I alerted them earlier and at various times, not just today, that it's highly probable that Mr. Hernandez will testify.  I didn't want the Government to be caught off guard, nor the Court.  So I can't say a hundred percent, but very close to, so that everybody can be prepared and schedule appropriately.

THE COURT:  All right.  Then I think maybe -- Iris, I'm not sure if Liz spoke with the jurors about -- I think tomorrow morning, before they come in, we'll most likely need to let them know to adjust their schedule for Monday.

All right.  Then we will not be in session on Thursday and Friday, and we'll pick up on Monday, October 16th.

Okay.  Are there any issues that the Court can assist with parties with?

MR. DOBBINS:  Judge, do you anticipate doing -- obviously, we have the Rule 29 arguments, but do you anticipate doing the jury instruction conference, then, tomorrow afternoon, depending on when we break or ...

THE COURT:  Well, I can't do it until after everybody's rested their respective cases.

MR. DOBBINS:  I see.

THE COURT:  So it's a little premature.  I already have the instructions.  So it's not going to take long for the Court to rule on what's been proposed this weekend.

MR. FEIGENBAUM:  Your Honor, I also filed --

THE COURT:  Yes.  The first and the second.  I have both of those.

MR. DOBBINS:  And then the only other thing I was going to -- just a housekeeping matter, is I know Special Agent Sergio Francisco is testifying, but he's also our custodian of our physical exhibits.  So we would need him just to come back in to -- at some point to pack up.  We have another FBI agent that's also working with him that can take custody of --

THE COURT:  Yes.  Of course.  And the courtroom will remain locked.  So you certainly can leave your items here.

Are there any issues that Court can address for the parties?

MR. DOBBINS:  Nothing else from the Government, Judge.

THE COURT:  On behalf of the Defendant?

MR. FEIGENBAUM:  I don't believe so, Your Honor.

THE COURT:  All right.  Let's see how far we get.

And Liz, just so I'm clear, the jurors know about Monday being a possibility?

COURTROOM DEPUTY:  Yes.

THE COURT:  Okay.  And they can come?

COURTROOM DEPUTY:  They will be here.

THE COURT:  All right, then.  But we don't have an issue with someone going out of town?

COURTROOM DEPUTY:  Not for Monday.

THE COURT:  Do we know specifically what day?

COURTROOM DEPUTY:  Are we going past Monday?

THE COURT:  No.  I mean, obviously, I need to give them the time that they need to deliberate.  So to that extent --

COURTROOM DEPUTY:  Monday they are good.  If they need another day, then they will need to know that.  But as far as Monday, they're good.  I just need letters for some for work.

THE COURT:  All right, then.  If there's nothing further, have a pleasant evening and I'll see you tomorrow morning at nine a.m.

COURT SECURITY OFFICER:  All rise.

(Proceedings adjourned at 5:06 p.m.)

UNITED STATES OF AMERICA        )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 10th day of October, 2023, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 204.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 6th day of June, 2024.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov