IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1

UNITED STATES OF AMERICA,

    Plaintiff,               October 11, 2023
                         9:02 a.m.
    vs.

JAVIER HERNANDEZ,

    Defendant.              Pages 1 THROUGH 222

_____

TRANSCRIPT OF TRIAL DAY 9
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE
And a Jury of  12

Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                   Brian Dobbins, AUSA
                   Arielle Klepach, AUSA
                   99 Northeast 4th Street
                   Miami, Florida 33132

FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                   PO BOX 545960
                   Surfside, Florida 33154-9998

COURT REPORTER:     Yvette Hernandez
                   U.S. District Court
                   400 North Miami Avenue, Room 10-2
                   Miami, Florida 33128
                   yvette_hernandez@flsd.uscourts.gov

2

# I N D E X

Certificate ................................... 222
Government rests .............................. 169

## W I T N E S S

**ON BEHALF OF THE GOVERNMENT:**                                    PAGE
SPECIAL AGENT SERGIO FRANCISCO
CONTINUED DIRECT EXAMINATION BY MR. DOBBINS                           4
CROSS-EXAMINATION BY MR. FEIGENBAUM                                 111
REDIRECT EXAMINATION BY MR. DOBBINS                                 158


**ON BEHALF OF THE DEFENDANT:**
DANIEL P. RIEMER
DIRECT EXAMINATION BY MR. FEIGENBAUM                                170
VOIR DIRE BY MR. DOBBINS                                            184
CONTINUED DIRECT EXAMINATION BY MR. FEIGENBAUM                      188
CROSS-EXAMINATION BY MR. DOBBINS                                    213

## E X H I B I T S

| GOVERNMENT'S EX. NO.: | OFFERED | ADMITTED |
| --- | --- | --- |
| 68A | 8 | 8 |
| 68B | 8 | 8 |
| 68C | 8 | 8 |
| 68D | 8 | 8 |
| 8 | 17 | 17 |
| 8A | 17 | 17 |
| 8B-8Z5 | 21 | 21 |
| 17A | 40 | 40 |
| 9A-9D | 46 | 46 |
| 26 | 73 | 73 |
| 27 | 73 | 73 |
| 22 | 75 | 75 |
| 23 | 75 | 75 |
| 22A | 76 | 77 |
| 22B | 76 | 77 |
| 23 | 80 | 81 |
| 36 | 84 | 84 |
| 34 | 84 | 84 |
| 35 | 85 | 85 |
| 30 | 85 | 86 |
| 31 | 86 | 87 |
| 32 | 87 | 88 |
| 33 | 87 | 88 |
| 31A | 91 | 92 |
| 30A | 93 | 94 |
| 76 | 97 | 97 |
| 96 | 97 | 97 |

(Call to order of the Court, 9:02 a.m.)

THE COURT:  All right.  Good morning to everyone.

How is everyone this morning?

MS. KLEPACH:  Great.  Thank you.

THE COURT:  Any issues we need to address?

MS. KLEPACH:  Not on behalf of the Government.

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  All right.  Then, Special Agent Francisco, why don't you come on up.  And hopefully we have all our jurors and we are ready to continue.

(Pause in proceedings.)

THE COURT:  And once again, Mr. Hernandez, if at any time the equipment stops working, or you're unable to hear the interpreter, if you'll let the Court know.  All right, sir?

THE DEFENDANT:  (Through Interpreter.)  Okay.

COURT SECURITY OFFICER:  We're waiting on one, Judge.

THE COURT:  All right.

All right.  Well, go ahead and have a seat, and we will just wait until the juror joins us.

(Pause in proceedings.)

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 9:07 a.m.)

THE COURT:  All right.  Good morning, Ladies and Gentlemen.

Please be seated, everyone.

It is good to see you. Thank you for being so prompt.

And we are ready to get right back to work. And we are on the direct examination of Special Agent Francisco.

Mr. Dobbins, whenever you're ready.

MR. DOBBINS: Thank you, Your Honor.

DIRECT EXAMINATION [CONTINUED]

BY MR. DOBBINS:

Q. Good morning again, Special Agent Francisco.

A. Good morning.

Q. So yesterday, we were talking about this Toyota Tundra that had that VIN that started, I believe, in five -- with the number 5TF.

A. Correct.

Q. And you testified that you had gone to Mississippi to locate the actual truck that has that VIN from the manufacturer?

A. Correct.

Q. Okay.

MR. DOBBINS: If I could just start again with Government's Exhibit 5A, Page 166.

And if we could have -- in evidence -- and could we have the Government's laptop, please.

BY MR. DOBBINS:

Q. Okay. And what I've done is -- what we're pulling up is

Government's Exhibit 11A, Page 67 to start.

So Government's 5A on the left, that first attachment, what was that that was sent from the Hernandez phone to the Neco phone?

A.   So on September 30th, Mr. Hernandez sends Neco the image of a VIN number that starts with the 5T and ends in 9479.  That was at 5:04 p.m. UTC time.

Q.   And if we can look over to the right.  This is Government's Exhibit 11A.  Who are the parties in this chat?

A.   So in this chat we're looking at Mr. Hernandez and Robertico Nuevo, who we know to be Mr. Marrero Cisneros.

Q.   Okay.  And what's the date on this date?

A.   The date on this chat is September 30th, 2019.

Q.   Okay.  And it lists that there was an attachment sent on that date?

A.   Correct.

Q.   And who sent this attachment?

A.   The attachment came from the 4619 number, Mr. Hernandez's number.

Q.   Okay.

MR. DOBBINS:  And if we could just scroll down to the next page to show the attachment.

BY MR. DOBBINS:

Q.   And is that the -- do you recognize that thumbnail, I guess, that's enlarged?

6

A.   Yes.   It's blurry, but you can kind of make out the numbers and see it's the same image that's on the left there on a message that went from Mr. Hernandez to Neco on September 30th. The VIN number ends in the 9479.

Q.   And yesterday we were talking about --

        MR. DOBBINS:   Thank you.

        If I could also have Government's Exhibit 97 in evidence, please.

BY MR. DOBBINS:

Q.   Yesterday, we were talking about the Western Union receipts or records that you received.   Do you recall that?

A.   Yes, I do.

Q.   Now, in addition to Javier Hernandez receiving money, did we receive records showing that he had sent money via Western Union as well?

A.   Yes, we did.

Q.   All right.

        MR. DOBBINS:   And if we could start just all the way over to the left, please.

BY MR. DOBBINS:

Q.   Okay.   So where -- that fourth column over, where it says: "S Name," what is that indicating there in the records?

A.   So that would be the sender.   Also shows on the bottom. These are all transactions that were sent, in this case, by Mr. Javier Hernandez.

Q. Okay.

MR. DOBBINS: And if we could scroll back over to the right, please, to column W.

BY MR. DOBBINS:

Q. What is that -- that column indicating?

A. That's going to be the payee name, I believe. It has the "P" in front of it, which means it's the person that the payment was addressed to.

Q. Okay. Now, if I could just focus your attention on row 15 and row 16. Does it appear that Mr. Hernandez sent some money to some individuals related to this investigation?

A. Yes. Those two transactions show the payee as Mr. Jose Miguel Gonzalez Vidal, who we know to be El Chupa, and Mr. Reynaldo Crespo Marquez, who we know to be El Niño, both codefendants in the Gonzalez Vidal case.

Q. Okay. And just -- what's the amount that it says there on the column V?

A. That will be $880 -- US dollars, and 1,500 US dollars.

Q. Okay. Now I wanted to go with -- did -- when you were collecting the evidence in this case, did we also subpoena some records from American Airlines?

A. Yes, we did.

Q. Okay. And for whose travel did he subpoena those records?

A. I believe we subpoenaed them for Mr. Hernandez. That might have been it. Might have been someone else. But I know for

sure we subpoenaed records for Mr. Hernandez from American Airlines.

(Pause in proceedings.)

MR. DOBBINS:  If we could have --

BY MR. DOBBINS:

Q.  Well, let me start by saying this:  Did we receive the returns from American Airlines with a business certification for that?

A.  Yes, we did.

MR. DOBBINS:  All right.  Your Honor, at this time, the Government would move to admit Government's Exhibit 68A, 68B, 68C, and 68D, pursuant to Federal Rule of Evidence 902(11).

THE COURT:  Any objection?

MR. FEIGENBAUM:  No.  That's fine, Judge.

THE COURT:  Admitted into evidence.

(Government's Exhibits 68A, 68B, 68C & 68D received into evidence.)

MR. DOBBINS:  All right.  If we could just start with 68A.

BY MR. DOBBINS:

Q.  What does this indicate, this first page here in Government's Exhibit 68A?

A.  So this is a -- what's called a PNR, Passenger Name Reservation, from American Airlines.  Top left here will show

you the record locator number.  That's what we all get when we book a flight.  That's the unique number that's attached to your itinerary.  And it shows you the passenger information to be for Mr. Javier Hernandez, flight number, flight data, December 26th, 2017.  And it shows a departure from Cancun -- CUN is the airport code for Cancun -- arriving to MIA, which is the airport code for Miami International Airport, and it shows the departure and arrival times.

Q.  Okay.  So what was the date of travel here on this first page?

A.  Date of travel is December 26th, 2017.

Q.  Okay.

MR. DOBBINS:  And if we could go ahead and scroll to the second page, please -- I'm sorry -- the third page.

MR. FEIGENBAUM:  Your Honor, we're not getting that on our screen here.

THE COURT:  Oh.  Are you receiving -- is there anything on the screen or is it --

MR. FEIGENBAUM:  It's just blank for us right here.

THE COURT:  Oh, okay.

MR. FEIGENBAUM:  Now, maybe -- I mean, I've got my laptop plugged in, but I wouldn't be connected to this.

THE COURT:  Josue, maybe just -- do you mind just making sure it's even on.  And then maybe if we can call IT.

Mr. Feigenbaum, how about the other screen that's

10

closer to Mr. Hernandez?  Is that screen working?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Hmm.  But the screen is working over here -- over here.  There's a third screen on the counsel table.

MR. FEIGENBAUM:  Yes, it is, Your Honor.

THE COURT:  Hmm.  I'm just wondering if it might have somehow been disconnected.

Josue, are we able to -- I don't know how much give we have to take that screen and place it over there until IT comes in.

MR. FEIGENBAUM:  Your Honor, if you would like to save time, I could move with Mr. Hernandez over there.

THE COURT:  If you don't mind, until we have somebody coming in to fix those two screens.

MR. FEIGENBAUM:  Sure.

THE COURT:  And Ladies and Gentlemen, is everybody's else screen working?

Okay.  All right.  That would be helpful.

MR. FEIGENBAUM:  No problem, Judge.

(Pause in proceedings.)

THE COURT:  Whenever you're ready, Mr. Dobbins.

MR. DOBBINS:  Mr. Feigenbaum, are you ready?

MR. FEIGENBAUM:  Yes.  Thank you, Mr. Dobbins.

MR. DOBBINS:  No problem.

BY MR. DOBBINS:

Q. All right. So let's look at this third page. What's this flight that was booked here?

A. Looks like another flight on January 29th, 2019 from Cancun to Miami.

Q. Okay. All right.

MR. DOBBINS: So if we could pull up -- let's go back to Government's -- the first page, please.

BY MR. DOBBINS:

Q. All right. So this flight was for what date again?

A. December 26th, 2017.

Q. Okay.

MR. DOBBINS: And if we could pull up Government's Exhibit 66 in evidence, and go to the last page, please.

BY MR. DOBBINS:

Q. Do you see that travel date for that American Airlines flight in Mr. Hernandez's CBP records?

A. Yes. We're looking at the flight here on 12/26/17, and it's showing that he was on board from Cancun to MIA, on board American Airlines Flight 158.

Q. And was there any corresponding outbound flight when that ticket was purchased, according to those American Airline records?

A. No. According to these CBP records, the only other official record that CBP has for Mr. Hernandez, it's a second

inbound flight on March 2nd, 2016.

MR. DOBBINS:  Let's go back to Government's Exhibit 68A, please.

And now if we could go to the third page.

BY MR. DOBBINS:

Q.  And what was the date, again, on that flight?

A.  January 29th, 2019.

Q.  And what was the flight number of that flight that was purchased?

A.  American Airlines 1285.

MR. DOBBINS:  If we could go back to 66, please, and go to the second page.

BY MR. DOBBINS:

Q.  Now, does that indicate that Mr. Hernandez took that flight?

A.  Yes.  On 1/29/19 here, showing inbound flight on AA1285. It shows he was a passenger, and he came in by using -- he was inspected as a Global Entry kiosk.

MR. DOBBINS:  Now if we could pull up Government's Exhibit 68B, please.

BY MR. DOBBINS:

Q.  Okay.  Looking at this part of the record, what is the date of the flight that was purchased and what was the flight number?

A.  We're looking at December 24th, 2018, on American Airlines

13

1157, from Cancun to Miami.

Q. Okay. And looking again at the Customs and Border Patrol records at Government's Exhibit 66, do we see that entry?

A. Yes. We see it here on 12/24/18, inbound flight from Cancun to Miami, AA1157. It shows that he was on board, and once again he was inspected at a Global Entry kiosk at MIA airport.

Q. And did something significant happen in late December of 2018 that the investigation learned about?

A. Yes. The *Mellow Yellow* vessel was stolen on or about December 18th of 2018, a few days before this flight.

Q. All right.

MR. DOBBINS: Now if we could go to Government's Exhibit 66 -- I'm sorry -- 68C in evidence.

BY MR. DOBBINS:

Q. What is the -- what do the records indicate that -- the flight that was purchased by Mr. Hernandez from American Airlines on this date?

A. We're looking at a flight from Cancun to Miami on June 15th, 2019, aboard American Airlines 1132.

Q. Okay. And moving over to Government's Exhibit 66 in evidence, the CBP records, what did we find -- was that flight reflected in those records?

A. Yes. We see the same flight AA1132, on June 15th, 2019, from Cancun to Miami. And it shows Mr. Hernandez as a

passenger, once again inspected by a Global Entry kiosk.

Q.   Okay.  And did something significant happen during the investigation that you learned about as far as any stolen vessels or stolen vehicles in this case?

A.   Yes.  I believe it was -- the *Ultimaytum* vessel was stolen on or about July 7th, I believe, 2019.

Q.   Okay.

THE COURT:  Mr. Dobbins, I apologize.

Thank you so much.

And Mr. Feigenbaum, your screens are working now.  So you and Mr. Hernandez, if you want to --

MR. FEIGENBAUM:  Great.  Thanks, Judge.

THE COURT:  Of course.

(Pause in proceedings.)

BY MR. DOBBINS:

Q.   Now, Special Agent Francisco, I think you said that the -- you said that the *Ultimaytum* was stolen sometime in July; is that right?

A.   Yes.  If I could correct that.  Around June, the vessel that was stolen was the *Reel Estate*, which was stolen around June 7th, 2019.

Q.   Okay.  And the -- the date of the flight and the date that the CBP records indicate that Mr. Hernandez reentered the US from Mexico at Miami International Airport, is what date?

A.   June 15th, 2019.

Q. All right.

MR. DOBBINS: And if we could go to the first page of -- well, let me just do this. Let's go to Government's Exhibit 68D, as in David, in evidence.

BY MR. DOBBINS:

Q. All right. And what does the American Airlines record reflect the flight that was purchased for Mr. Hernandez on this -- at this occasion?

A. We're looking at a flight from Cancun to Miami, on December 25th, 2019, aboard American Airlines 1132.

Q. Okay.

MR. DOBBINS: And if we could go to the first page of the CBP records in Government's Exhibit 66.

BY MR. DOBBINS:

Q. Is there any record that reflects that that flight -- Mr. Hernandez was on that flight from Cancun to Miami?

A. Yes. The first one on top there that shows on board on 12/25/2019 shows him coming inbound from Cancun to Miami aboard American Airlines 1132.

Q. Okay. Now, what was -- was there any significance in the investigation that happened in either -- late November of 2019 that you learned about?

A. Yes. The *Luca Brasi* was stolen from the Naples area on or about November 21st, 2019. And Mr. Hernandez was subsequently encountered by Mexican law enforcement in Mexico, and so was

the *Luca Brasi.*

Q.   All right.   Now, when that arrest occurred of Mr. Hernandez in -- well, withdrawn.

Going back to Government's Exhibit 3, Mr. Hernandez's phone, did we do any extractions between Mr. Hernandez and Jose Miguel Gonzalez Vidal?

A.   Can you repeat the question.

Q.   Sure.   So yesterday we focused mainly on Government's Exhibit 3, which was the phone seized from Mr. Hernandez in Mexico.   And part of that was we focused on the chats between -- the WhatsApp chats between the Neco Neco phone and the phone seized from Mr. Hernandez.

A.   Correct.

Q.   Did we do an extraction -- did you also generate any reports about any chats between the individual known as Chupa, or Jose Miguel Gonzalez Vidal, and Mr. Hernandez from that phone?

A.   Yes.   There are some chats in Mr. Hernandez's phone in there as well.

MR. DOBBINS:   If we may have the computer for the witness only, please.

BY MR. DOBBINS:

Q.   All right.   Showing you Government's Exhibit 8 and 8A for identification.   Do you recognize those exhibits?

A.   Yes.   Those are Cellebrite reports that I generated, with a

Partners between Mr. Hernandez, the 4619 number, and the -- I believe that WhatsApp number was the number associated to Mr. Gonzalez Vidal, also known as El Chupa.

Q. Okay. And what is Government's Exhibit 8A compared to Government's Exhibit 8?

A. 8A is going to be the Spanish translations. Eight is the report as I generated it from the Cellebrite extraction.

Q. Is that a fair and accurate copy of what you had generated when you did that report as you described yesterday with the Cellebrite software?

A. Yes.

MR. DOBBINS: All right. Your Honor, at this time, the Government would move into evidence Government's Exhibits 8 and 8A.

MR. FEIGENBAUM: Your Honor, could you just put into place, like you did yesterday, a continuing objection?

THE COURT: Yes, of course. And the Court will grant you a continuing objection with regard to this -- the Cellebrite issue. And any further objections?

MR. FEIGENBAUM: No, Your Honor.

THE COURT: All right. Admitted into evidence.

(Government's Exhibits 8 & 8A received into evidence.)

MR. DOBBINS: All right. If we may publish for the jury, please.

All right. So let's go with the participants -- if we

18

could enlarge those, please.

BY MR. DOBBINS:

Q. All right. So who's the participant at the bottom? We'll start with the one with the man holding the child in the pool.

A. So it's going to be Mr. Hernandez. That (786)370-4619 number is the number associated to him, and the adult in the photo there is Mr. Hernandez.

Q. Okay. And what's the phone number up there associated with the other participant?

A. So that phone number +34-60360-5403 is the number associated to Mr. Gonzalez Vidal. That 34 is the country code for Spain, I believe.

Q. And based on the investigation, where was Mr. Gonzalez Vidal arrested?

A. Mr. Gonzalez Vidal had ties to Spain. He was arrested at some point in Spain by INTERPOL.

Q. And that was on the case that he was charged with down here, the RICO case?

A. I don't recall exactly what the charges were for that INTERPOL notice, but they might have been related.

Q. All right. So we're going to start on Page 4, please. And let's look at the date of that first green bubble.

A. The date is November 21st, 2019.

Q. All right. And who's the sender of this WhatsApp text message?

A.   The sender is Mr. Hernandez, the 4619 number.

Q.   Okay.  And what is the -- what is the -- what is Mr. Hernandez or the Hernandez phone asking the other phone, the Spanish number?

A.   Mr. Hernandez is asking Gonzalez Vidal, Chupa:  "How much does the passport man charge?"

MR. DOBBINS:  And let's go to the second blue text. The second one, please.

BY MR. DOBBINS:

Q.   And what is the response from the Spanish phone number?

A.   The response from Chupa is:  "Five hundred, and they give you the visa for six months and they put the stamp.  And if they put you in the system, they are the migration people themselves."

Q.   And what's the response there from the Hernandez phone?

A.   And Mr. Hernandez replies by saying:  "Five hundred what?"

MR. DOBBINS:  Okay.  Let's go to Page 5.

BY MR. DOBBINS:

Q.   All right.  And what is the next series of messages from the Spanish phone number?

A.   So the next series of messages there from Chupa, dated November 22nd, 2019 -- there are several messages.  He proceeds by saying:  "Dollars."  He asks:  "What are you going to do?"

And then he says:  "Everything has gone up.  People are marking up prices.  Now it's 2,500."

MR. DOBBINS:  Let's go ahead and go to Page 6.

BY MR. DOBBINS:

Q.   What is the response from the Hernandez phone?

A.   Mr. Hernandez replies by saying:  "But why do I want a six-month visa?"

Q.   And can we highlight what the date is here and the time.

A.   That's November 22nd, 2019 at 12:16 a.m. UTC time.

Q.   Now, again, with the UTC time, how far ahead would that be from Eastern Standard Time?

A.   Well, from Eastern Standard Time, it would be approximately four hours.  From the Yucatan area of Mexico, it would be minus six hours, approximately.

Q.   And where did we know that Mr. Hernandez was located around this time in -- November 21st and the 22nd of 2019?

A.   We know that on this date -- or on or about this date Mr. Hernandez was in Mexico, as he was encountered by Mexican law enforcement.

Q.   Okay.  All right.  So the first message says:  "But why do I want a six-month visa," and what's the second response there?

A.   Mr. Hernandez replies to that same message by saying:  "Only the stamp."

Q.   Okay.

MR. DOBBINS:  And if we could go to the last bubble there, with the blue one.

THE WITNESS:  That's going to be a response from Chupa

in the form of an audio message.

BY MR. DOBBINS:

Q.   Okay.   And were there a number of these messages embedded in the WhatsApp chats that you were able to generate from this report?

A.   Yes.

Q.   Okay.   And do we have those recordings as well?

A.   We do.   They're all in Spanish.

MR. DOBBINS:   All right.   Your Honor, at this time, I would move to admit Government's Exhibits 8A -- I'm sorry -- 8B through 8Z5 into evidence.

THE COURT:   Any objection?

MR. FEIGENBAUM:   No, Your Honor.   If you would just -- if you could phrase it the way we did yesterday.

THE COURT:   Yes.   Other than the continuing objection, any further objection?

MR. FEIGENBAUM:   No, Your Honor.

THE COURT:   All right.   Admitted into evidence.

(Government's Exhibits 8B through 8Z5 received into evidence.)

BY MR. DOBBINS:

Q.   Now, were they recordings in Spanish or English?

A.   Spanish.

Q.   All right.   And so did we do translations of these, for lack of a better term, voice notes that were embedded in

these -- in this chat?

A.   Yes.  Translations were done for those voice messages.

Q.   All right.

MR. DOBBINS:  So if we could go ahead and move on to the next page, please.

BY MR. DOBBINS:

Q.   All right.  So what is it that the person using the Spanish cell phone states here in that voice chat?

A.   So what's here is the written-out portion of that audio message.  The left column is going to be the original message as it came in Spanish, and on the right-hand side is the translation.  So I'll read the translated portion.

And Chupa tells Mr. Hernandez in this message the following:  "Let me explain it to you.  You need the visa because when you get into the country -- when you get into the country, they give you a visa for 180 days, which is six months.  It's a paper they give you, which has a stamp.  I think it's like a green paper.  Well, I don't remember.  It depends on the color they are using now.  It's a paper they give you, which is a permit for you to stay 180 days in the country.  They give you that paper when you get through Immigration.  Do you understand?

"They are going to give you that paper together with the stamp.  They are going to put it in your passport when you get in.  Do you get it?  That paper, when you go back, prevents you

from paying the fine because they always do that.  They charge a fine at the airport.  Do you understand?

     "When you don't have the paper, they charge you a fine. It's the airline itself that charges it to you.  Do you get it? With that, you hand them the paper and that's all.  Everything is fine.  You give the paper to the airline, and that's it. You don't have to pay a fine at the airport."

MR. FEIGENBAUM:  Could we have the exhibit number and page number on that, please.

MR. DOBBINS:  Yes.  It's going to be Government's Exhibit 8.  And it should be in 8A as well, and it's Page 7.

MR. FEIGENBAUM:  Thank you.

MR. DOBBINS:  You're welcome.

All right.  Let's move on.

BY MR. DOBBINS:

Q.  So what is the response from the Javier Hernandez phone there?

A.  So Mr. Hernandez replies with another audio message.

Q.  Okay.  And what was that translated to?

A.  That was translated to the following:  "Yes, but I don't pay.  I never pay.  On the contrary, if you don't have the paper, you have to go back to the entrance point so that they can give it to you.  Because I once asked them what would happen if I lost that paper.  They told me:  'If you don't have the paper, you have to go back to the entrance point, so that

24

they -- so they give you the paper again.' But yes, I know what you are saying.  I know what you are saying."

Q.   Okay.

          MR. DOBBINS:  And if we go back to Page 8.

BY MR. DOBBINS:

Q.   And we have two responses from the Spanish phone.  Can we go ahead and read the first one.

A.   Yeah.  So the first one there, that's labeled the file name that ends in WA0013, it says the following, from Mr. Gonzalez Vidal, a/k/a Chupa:  "Mate, those are the complicated people, and those are the people who work there, you know, the knotty people" -- I think that was supposed to be "naughty."

     "Do you understand?  It's them.  And that's what I've always done.  You know?  And they rose the prices.  They rose my prices.  That's what everyone there is paying now.  Imagine. Everything -- everything is more expensive in life."

Q.   Okay.  And if we close that one and we look at the next -- which is WA0014.

A.   In that one, Mr. Gonzalez Vidal says the following:  "They prepare that shit, the stamp, everything, mate, as if you had came in.  They put you came in.  That's it.  Everything is legal because that's registered there at the airport.  You can pass through Immigration or wherever you want to.

     "No, the other guy put any stamp there, a stamp he had taken from Immigration, bro.  That guy, a lot of people were

caught at the airport with that guy -- with that guy at the airport.  What a shame."

Q.  All right.

MR. DOBBINS:  And let's move on to Page 9, please -- I'm sorry.  I guess this is Page 12.  It's Page 8 on the exhibit.

BY MR. DOBBINS:

Q.  Are there a couple of responses from the Hernandez phone?

A.  Yes.  There are two responses from Mr. Hernandez, the file dated -- or that ends in WA0015, which states the following: "And does the guy work during the morning or the afternoon?  What do I have to do in order to see him?  Because -- so that I go tomorrow to Cancun and he puts my stamp."

Q.  Okay.  And the second message that was sent and marked as WA0016?

A.  Mr. Hernandez then says:  "I can go there, up to there.  They are going to tell me I have to wait for two days in order to see him, in order to give him the passport?  How does that work?  At what time can I see him?  What can I do in order to see him?  Do you get it?  I can be there in order to see him.  I don't know."

Q.  All right.

MR. DOBBINS:  Let's continue to the next page, please.

BY MR. DOBBINS:

Q.  All right.  We have some more voice notes from the Spanish

phone here.  And a response message from the Hernandez phone.
Can you start with the Spanish phone voice note that's WA0017,
please.

A.  All right.  So the message that ends in WA0017 says the
following:  "Look -- look, you're a lucky person.  You have
never had problems with anything related to the shit that guy
was putting in your passport.  But you could have had problems,
because sometimes -- sometimes you are lucky in life.  You are
lucky, but there's a limit.  Because that guy put an old stamp
from Immigration from 200 -- 2000-ish, from the year 2010, just
like that.  Check your stamps in order to see from what year
they are.  From the year 2010, I heard some people exploited
and the guy is completely messed up."

Q.  Okay.  And then the message ending in WA0018.

A.  Mr. Gonzalez Vidal replies or follows that message by
saying:  "Hey, pay attention.  Go there now.  What's the time
there?"

Q.  Okay.  And what's the response from the Hernandez phone?

A.  Message ending in 0019, Mr. Hernandez says:  "Six in the
afternoon.  I would be arriving there at night.  I'm asking
you:  If I go there tomorrow, what would I have to do?  How can
I see him?"

Q.  Okay.  So he says in that message:  "Six in the afternoon."

        MR. DOBBINS:  So can we just go back to the time stamp
on that message.

BY MR. DOBBINS:

Q.   What's our time there?

A.   So the time there -- it's showing the date of November 22nd, 2019, at 12:26 a.m. UTC time.

Q.   Okay.  And according to the changeover, how far ahead is it from the time in the Yucatan Peninsula in either Cancun or Merida?

A.   So the time in the Yucatan Peninsula would have been minus six hours from that.  So it would have been approximately 6:26 p.m. on November 21st.

Q.   All right.  Let's move ahead to the next page of the chats, which is -- it's marked as Page 10 on the actual exhibit, but with the attachments it's Page 19.  We have three messages from the Spanish phone here.  Can we start with the first one.

A.   So all these three messages are dated November 22nd, 2019, and they are all incoming from Mr. Gonzalez Vidal.  The first one, ending in 020, says the following:  "Listen to me.  Listen to me.  You are not in Progreso.  You are in Merida.  Merida.  In order to do -- in order to do something, grab your passport, and I'm going to give you an address now.  You send it to that address.  They send it today.  And tomorrow, when you arrive, it's ready.  Because otherwise, you are going to get there tomorrow, but it's not going to be ready until the following day.  It takes one day for them to do it."

Q.   Okay.  And let's go to the next message, which ends in

WA0021.

A. "They have to take it to the airport and they have to put the stamp on it there. So the passport can't leave the airport until they don't have the appointments for the people. That's why we do it from one to the other. Because they take that, they put the stamp, they put it in the system, everything's legal. So they don't give it to you until the following day. Did you get it?"

Q. All right. And then we go to the third message, which ends in WA0022.

A. "That's why I'm telling you that I'm going to give you an address now. You send it. And tomorrow, when you get there, the passport will be ready. Do you understand?"

Q. Okay.

MR. DOBBINS: And now if we could go to the next page of the chats, which is marked as Page 11 on the exhibits, but with the attachments it's Page 23.

BY MR. DOBBINS:

Q. And we have a response from the Hernandez phone and then two responses from the Spanish phone. And so let's start with the first chat -- or the first attachment, which is WA0024.

A. Mr. Hernandez says the following: "Oh, the address to send it to the airport to Cancun? Sending a passport like that sounds dangerous."

Q. Okay. And then let's go to the next chat from the Spanish

phone, which is ending in WA0023.

A.   Mr. Gonzalez Vidal then says the following:  "You pay it there, and they hand it to them tomorrow.  You pay there and they hand it there in Cancun tomorrow before 12 p.m.  Go to DHL and pick up and choose the most expensive service.  It's not worth a shit.  It's like a document.  It's not worth anything.  And you tell them:  'Hey, hand this in tomorrow before 12 p.m.,' so they hand it to them tomorrow before 12 p.m."

Q.   Okay.  And then the last one at WA0025.

A.   "Mate, what do you mean by dangerous?  I've always sent all the documents like that and everything, bro.  How do you think I send the stuff?  They send it to you.  They have to hand it to them personally.  They have to sign the packet, buddy.  You are crazy.  That's part of DHL.  It's something serious, DHL, FedEx.  The other one that's super fast is Estafeta.  That one's superfast as well.  I send everything through them, brother, documents, passports.  I send everything through them, bro.  They are serious, brother.  It's a United States company.  What do you think that is?"

Q.   Okay.

     MR. DOBBINS:  Let's go down to the next page, which is going to be Page 12, but will be Page 27 of the exhibit.

BY MR. DOBBINS:

Q.   And let's just focus on this first attachment that the Hernandez phone sends.

A.   So the file ending in 0026, Mr. Hernandez says:  "I'm here in Progreso now."

Q.   Okay.

        MR. DOBBINS:  And I think we can skip ahead to Page 13 of the exhibit -- there you go.  Page 30 of the -- with the attachments.

Q.   So we have a message here sent ending in WA0028.  And what does the Hernandez phone say here?

A.   So that file ending in 028, Mr. Hernandez says the following:  "I don't have time now.  It's six-something here now.  It's 6:25.  I have to get to Merida, find the post office, and send that.  I don't have time now.  Do you get it?"

Q.   Okay.  And then the Spanish phone -- Mr. Gonzalez Vidal sends a text response.

A.   Yes.  Mr. Gonzalez Vidal replies by saying:  "Okay.  Go tomorrow early."

Q.   Okay.  And what is Mr. Hernandez's reply?

A.   Mr. Hernandez replies -- in file 0029, says the following:  "What if I go tomorrow and arrive there before 12 p.m.?  What do you think?  Tomorrow, and I have to wait for -- for them to send it to me on Sunday, right?  I don't know."

Q.   Okay.

        MR. DOBBINS:  And let's go to the next page, which is marked as Page 14 on the exhibit, but it is Page 33 with the attachments.

BY MR. DOBBINS:

Q. We have a message from the Spanish phone, ending in WA0030. And what does that message say?

A. "No. I'm telling you that you should try to get there as early as possible, as it may come out fast. Do you understand? Because maybe -- I don't know. You know how these things are. The sooner you give it to them, the faster it's going to be ready. They told me they give it to you from one day to the other. But I'm scared that if you give it to them late tomorrow they might tell you: 'No, it doesn't count as of today,' and they'll get it tomorrow and it will be ready the other day, the following one. Do you get it?

"I want to prevent them from telling us that. Give it to them the sooner you can, so that they have it ready for the day after tomorrow. Do you understand?"

Q. Okay. And let's go to the next voice message from Mr. Hernandez.

A. File ending in 0031 says the following, from Mr. Hernandez: "Send me the address, then, in order to see, so that I can send it tomorrow. No. Forget about it. This is going to be for -- if I send it tomorrow -- Friday. They take it on Saturday. They'll surely give it to me on Sunday."

Q. Okay. And then, if we go to the next page, we have a series of WhatsApp text messages. What's the first one from Mr. Gonzalez Vidal?

A.   So Mr. Gonzalez Vidal says:  "Go to the ibis Hotel."

Q.   Okay.  And what's the next one from the Spanish phone?

A.   Mr. Gonzalez Vidal follows that by saying:  "They're going to see you there."

Q.   All right.  And what's the response from the Hernandez phone?

A.   Mr. Hernandez replies by saying:  "Who?"

Q.   And what was the reply from the Spanish phone?

A.   "The stamp people, so that you give them the passport."

Q.   All right.  Next page, Page 16, what's the response from the Hernandez phone?

A.   "Do I give them the passport and pay?  When do I get it back?"

Q.   Okay.  And what are the responses from the Spanish phone?

A.   Gonzalez Vidal, in a series of two messages, says the following:  "Those people are trustworthy.  They will tell you."

Q.   Okay.  And the -- bless you -- the response from the Hernandez phone, please?

A.   And Mr. Hernandez replies by saying:  "The thing is, I don't have the money.  I'm asking you so that Neco can give it to me."

Q.   Okay.

         MR. DOBBINS:  If we go to the next page, Page 17.

BY MR. DOBBINS:

Q.   And what is the response from the Spanish phone there?

A.   In that message on 11/22/2019 from Gonzalez Vidal, he says: "Yes.  Neco will surely give you money to take to Miami."

Q.   Okay.  And what is the response there from the Hernandez phone?

A.   Mr. Hernandez replies by saying:  "No.  The money is already in Miami.  I'm not taking money with me, so I have to ask him."

Q.   During the course of the investigation, what did you learn about how the organization would send their payments to -- for Mr. Hernandez and Mr. Ramon Reyes Aranda for their fees?

A.   So through the investigation, we learned various methods that Mr. Gonzalez Vidal, Neco, and those that were involved with the organization would send payment to Mr. Javier Hernandez and Ramon Reyes Aranda as to the payment for their services.  These services being stealing the boats and transporting them over to Mexico.  They would send the money in various ways, but most commonly they would send the money in cash.  And one of the ways that they sent it was through Mr. Javier, upon his return flight.  Once he delivered to the boats to Mexico, on his flight back, he would bring some cash with him.

Q.   And were there other ways that the investigation learned that the organization had money already here in South Florida

34

that could be used to pay off debts to people such as Mr. Hernandez or Mr. Reyes Aranda?

A. Yes. So one of the other methods in which they operated was they would collect money from people in the US. For example, the Cuban migrants that were smuggled from Mexico -- from Cuba to Mexico, and subsequently to the US, their families were all -- most of them were located here in the US. So when it was time for those families to pay the smuggling fees for their family members, they would pay someone here in the US that Neco, or Gonzalez Vidal, or any of them, would put them in touch with.

You know, once: "Hey, your family member is here. You need to pay so that they can continue their journey," they would put that family member, many of whom who were located in the South Florida area -- they would put that family member in touch with someone that Neco, Gonzalez Vidal, or anyone would know, and they would pick up the money from those family members.

That money was then kept by whoever picked it up. Someone who obviously Neco, Gonzalez Vidal, and them, sort of trusted to hold onto money for them. And as they needed that money, Neco, Gonzalez Vidal, and them, would just ask of those people -- essentially, they worked as a bank. They basically held the cash. And when they needed to pay somebody out, someone like Mr. Hernandez or Mr. Reyes Aranda, they would just

reach back out to that person:  "Hey, remember those $20,000 you picked up for me last month?  Can you meet up with such and such and give them 15, 20," whatever the amounts that they needed to pay were.

MR. FEIGENBAUM:  Your Honor, just an objection, hearsay.

THE COURT:  Noted.  Overruled.

BY MR. DOBBINS:

Q.  All right.  Let's move on to the -- I believe we stopped with that Javier Hernandez response.  So lets move to the response to that, the third bubble from the Spanish phone, please.

A.  Mr. Gonzalez Vidal then replies by saying:  "Okay.  You pay him there.  Of course you have to bring him the money."

Q.  All right.  And then there's another voice note from Gonzalez Vidal, which is ending in WA0032.  What does that message say?

A.  That message says the following:  "But I think Nego" -- I think that's supposed to be "Neco," based on previous messages.  "I think Neco is going to need the money in Miami, as he told me he needed money in Miami.  If you're heading to Miami, take money.  You always need money there.  Besides, he said that to me not long ago.  He told me he needed money in Miami a few days ago.  I know he needs money in Miami.  Profit from the trip."

Q.   Okay.

      MR. DOBBINS:   Let's go to the next page of the chats, which is Page 18, but Page 40 with the attachments and translations.

BY MR. DOBBINS:

Q.   Let's start with that second bubble from the Hernandez phone.  What's the text message there say?

A.   Again, this is still on November 22nd, 2019.  Mr. Hernandez says the following:  "Do I send only the passport without the money or how do I do it?"

Q.   Okay.  And the Spanish phone sends a brief voice note ending in WA033.  What is the translation for that message?

A.   "Javi, no.  You have to give him the money with the passport.  The money with the passport."

Q.   All right.  And then we go to Page 19, which is Page 42 with the attachments, and we start with the first voice notice sent by the Hernandez phone, ending in -- sorry -- WA0034. What is that translation?

A.   "I'm going to.  So do I have to put the money in the -- in the DHL envelope as well?"

Q.   Okay.  If we go to the response from the Spanish phone, the voice note ending in WA0035, what's that translation?

A.   "No, mate.  You can't send money through DHL.  How do you think that you can send money through that?  Are you crazy?"

Q.   Okay.  And that last message ending in WA0036?

37

A.  "Well, I don't know whether you can send money through that.  To be honest, I can't tell you."

Q.  Now if we go to Page 20, which is going to be Page 46 if you include the attachments, we have a voice note from Mr. Hernandez ending in WA0037.

A.  All right.  Mr. Hernandez then says:  "If I send them the passport through DHL, how would I give them the money too?"

Q.  All right.  And what's the response from the Spanish phone, ending in WA0038?

A.  The response from Mr. Gonzalez Vidal is the following:  "Man, it would be better for you to go there, and you do that brother.  Go over there to avoid the DHL trouble, all that shit.  It would be better if you go there and you hand it yourself there.  Do you understand?

"Yes, wherever you want, wherever you want, wherever you are, in the Downtown area, you tell me:  'Hey, I'm going to be there.' I suggested Live because it's a very safe and very quiet hotel, and you don't have to leave the hotel to do anything.  You have everything there.  You have everything on Live, and it's cheap.  You have everything there.  Inside Live, you have a Walmart inside it, Superama.

"Inside Live, you have an Italian registrant right there.  You have another restaurant in there as well.  And it's in the Downtown area.  Look for it on the Internet.  It's awesome.  You don't have to get out of it for anything.  I'm telling you.

That's why I suggested that one.  It's cheap.  If you are lucky, I think the night costs 800 pesos.  It's cheap.  Eight hundred, 1,000 pesos maximum, per night.  You book it through the Internet through Booking.  Right there, you hand that in and you stay inside the hotel waiting for them to give you that shit.  You don't have to get out of there.

"I'm telling you.  With the situation Cancun is in, you can't be getting out a lot.  You have everything right there in that hotel.  That's why I suggested that one."

Q.  Okay.

MR. DOBBINS:  And then if we could go to the next text message, please.

THE COURT:  Mr. Dobbins, I apologize.  We're going to need to take a comfort break.

No, there's not a problem.  Let's go ahead and take our 10-minute recess.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury not present, 10:04 a.m.)

THE COURT:  All right.  We're on a 10-minute recess.

(Recess from 10:05 a.m. to 10:16 a.m.)

THE COURT:  All right.

MR. DOBBINS:  Judge, before we bring the jury out --

THE COURT:  Yes.

MR. DOBBINS:  -- Ms. Klepach is having some pain.

She -- we went upstairs to use the restroom upstairs.  And she's on the phone with her doctor.  I just wanted to let you know where she is.

THE COURT:  Yes.  Of course.

MR. DOBBINS:  I don't know if you maybe want to give her five minutes.

THE COURT:  Yes.

MR. DOBBINS:  But if not, I mean, I can continue on.

THE COURT:  No.  No.  No.  Let's wait.  Of course.

MR. DOBBINS:  Thank you, Your Honor.

(Pause in proceedings.)

THE COURT:  Mr. Klepach, how are you doing?

MS. KLEPACH:  I'm okay.  Thank you, Judge.

THE COURT:  Are you certain?

MS. KLEPACH:  Yes.  I'm fine.  Thank you.

THE COURT:  A hundred percent?

MS. KLEPACH:  Yes.  I spoke to the doctor.  The doctor said I can wait to go later today.

THE COURT:  All right.  Of course we'll wait for Mr. Feigenbaum, and then we can proceed.

If you need to leave, it's fine.

MS. KLEPACH:  Okay.  Thank you.

(Pause in proceedings.)

THE COURT:  Mr. Dobbins, do you know, is Mr. Feigenbaum right outside?

MR. DOBBINS:  I'll check.

MS. KLEPACH:  I just saw him walk out.  So he should be right there.

(Pause in proceedings.)

THE COURT:  All right.  There he is.

All right.  Both sides ready to proceed?

MR. DOBBINS:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.  I just have a witness.  He'll be waiting in the --

THE COURT:  All right.  Let's bring in the jury.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 10:19 a.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated.

And we'll continue with the direct examination.

MR. DOBBINS:  Thank you, Your Honor.

BY MR. DOBBINS:

Q.  Special Agent Francisco, we were finishing up with -- we finished up with that voice note from Gonzalez Vidal, WA0038. If we could just look at the next message that the Spanish phone sends, which is a text message via WhatsApp.  What is that that's provided there?

A.  So Mr. Gonzalez Vidal sends the address for Hotel ibis in

Cancun Centro, followed by the address, phone number, and what appears to be a Google Maps link to the hotel.

Q. Now, yesterday we talked about Government's Exhibit 17 in evidence, which is the chats -- I'm sorry -- the search history that Cellebrite was able to extract from the phone.

MR. DOBBINS: If we could pull up Government's Exhibit 16, please -- I'm sorry -- 17.

BY MR. DOBBINS:

Q. Okay. And this was in Spanish, I believe; is that correct?

A. Correct.

Q. Now, did we also do an English translation of Government's Exhibit 17?

A. Yes, we did.

MR. DOBBINS: Your Honor, at this time, I would move into evidence Government's Exhibit 17A.

THE COURT: Is there any objection?

MR. FEIGENBAUM: Your Honor, I believe this probably falls under that ...

THE COURT: With the exception of the continuing objection, any further objections?

MR. FEIGENBAUM: No, Your Honor.

THE COURT: Admitted into evidence.

(Government's Exhibit 17A received into evidence.)

MR. DOBBINS: All right. Let's publish Government's Exhibit 17A. If we could look at Entry Number 10, please.

BY MR. DOBBINS:

Q.  And what was the search that was done there that was extracted from the Hernandez cell phone?

A.  On November 22nd, 2019, Mr. Hernandez searched for a DHL Merida.

Q.  Okay.  And again, that's the UTC time.  So what date would it have actually been in Cancun when that search occurred?

A.  Correct.  So that shows 12:48 a.m. UTC time, so that would have been November 21st, at approximately 6:48 p.m.

Q.  All right.

        MR. DOBBINS:  And if we could go to Page 2 and look at the entry for Number 16, please.

BY MR. DOBBINS:

Q.  What is that search?

A.  We're looking at a search for ibis Merida Hotel that was done on 11/22nd/19, 1:24 a.m. UTC time.

        MR. DOBBINS:  Okay.  All right.  If we could go back to Government's Exhibit 8 and 8A, please.  And I believe we were on Page 43, if I'm not mistaken.  Let's scroll down, please.

        Okay.  Let's go to the next page of chats, which is going to be Page 21, which is Page 49 with the attachments.

BY MR. DOBBINS:

Q.  We have a WhatsApp text message from the Spanish phone, which is translated to what?

A.   So on 11/22/19, following that message that we just saw with the hotel address, Mr. Gonzalez Vidal follows that message by saying:  "That's it."

Q.   Okay.  And then there's a final -- there's another voice note attachment from the Spanish phone, ending in WA0039.

MR. DOBBINS:  And if we could pull up that translation, please.

BY MR. DOBBINS:

Q.   And what was that voice message translated to?

A.   That was translated to:  "Javi, I'm going to go to bed now, mate.  I'm going to go to sleep because it's two a.m. here, you know?  Let me know what you're going to do, so that I can talk to those people when I wake up.  Do you understand?

"Let me know what you are going to be doing, whether you are going to go, whether -- what you are going to do, so that I can tell them.  Did you hear me?

"All right, buddy.  We'll talk tomorrow then.  I'm going to go to bed.  It's two a.m. here."

Q.   All right.  Now, after that, is there a series of voice notes and images sent by the Spanish phone?

A.   Yes.  There's several messages from Gonzalez Vidal.

Q.   All right.  And are there any follow-up responses from the Hernandez phone?

A.   No.  I believe there were no responses from Mr. Hernandez's phone.

Q.   Okay.

MR. DOBBINS:  So if we could scroll down to the page which is marked as 24 on the exhibit.

It's going to be Page 50 -- I'm sorry -- 58.

BY MR. DOBBINS:

Q.   And we see a series of WhatsApp messages from the -- and missed calls from the Hernandez -- I'm sorry -- the Spanish phone.  Let's look at that one at the bottom there, at the very bottom.

MR. DOBBINS:  If we could get the date and time and what the -- what he's saying there.

THE WITNESS:  So that last message from Mr. Gonzalez Vidal is at -- shows on November 22nd, 2019, at 8:34 p.m. UTC time, which would have been approximately two p.m. on November 22nd Yucatan local time, and the message from Mr. Gonzalez Vidal says:  "Call me."

MR. DOBBINS:  Okay.  Let's go ahead and scroll down to that last page, Page 25, please.

BY MR. DOBBINS:

Q.   And those last two -- two messages from the Spanish phone, please.

A.   So on 11/22/2019, at approximately 9:41 p.m. UTC time, Mr. Gonzalez Vidal writes two messages that say the following: "Javi, answer me.  You have me worried."

Q.   Okay.

45

A.   And I think it should be noted that the Spanish translation doesn't quite capture what the Spanish -- the plural in the Spanish message.  It says:  "You guys," "me tienen," as in more than one person, "You have me worried."

MR. DOBBINS:  Now, if we could for the witness only please pull up Government's Exhibits 9A and 9B, as in boy.

BY MR. DOBBINS:

Q.   Do you recognize these exhibits, Special Agent Francisco?

A.   Yes.  This is a Cellebrite extraction that I generated based on a conversation with someone saved as Mantanques or "Tank Man."

Q.   And are these fair and accurate chats that you pulled from the report from the extraction of Mr. Hernandez's phone Government's Exhibit 3?

A.   Yes.  Can we scroll down, just so I can verify the number, since it's only showing me the one number for Mantanques on there.

Can I see the next blue bubble, please.

Okay.  Yeah.  I recognize.  It's just for some reason this report generated the same phone number on both of those bubbles there.  But it was a report that I generated off of Mr. Hernandez's phone, what we have in FBI evidence as 1B107.

Q.   Okay.  And if I could now show you Government's Exhibit 9C and 9D, as in David, for identification.  Do you recognize this series of chats?

A.   Yes.   It's another Cellebrite report that I generated from Mr. Hernandez phone off a conversation with Mantanques or Tank Man.

Q.   Okay.

MR. DOBBINS:   Your Honor, at this time the Government would move Government's Exhibit 9A, 9B, 9C, and 9D into evidence.

THE COURT:   With the exception of the preserved objections, any further objections?

MR. FEIGENBAUM:   No, Your Honor.

THE COURT:   Admitted into evidence.

(Government's Exhibits 9A through 9D received into evidence.)

MR. DOBBINS:   Okay.   So if we may publish for the jury.   Let's go back to 9A and 9B, please.

BY MR. DOBBINS:

Q.   Okay.   So what is the number that is going to be the blue boxes?

A.   So the number that's in blue boxes would be the number assigned in Mr. Javier's phone or saved as Mantanques, with a +1(305)896-7656.

Q.   Okay.   And what did you say that name -- that nickname translated?

A.   So that translates to -- in English, to "The Tank Man."

Q.   Okay.   And if we could just look at those first couple

messages.

A.   So on June 16th, June 16th, 2018, Tank Man or Mantanques sends a series of messages to Mr. Hernandez, and all we captured at the beginning is he's saying something along the lines of:  "Blue, yes.  Yes.  How many?  Okay."

Q.   Okay.

MR. DOBBINS:  And if we can scroll down to Page 2, please.  And if we could look at one -- the first message and the third message.

Bless you.

THE COURT:  Thank you.

THE WITNESS:  So that first message in green, which would have been sent by Mr. Hernandez to Mantanques or Tank Man, is saying:  "So finally, when will you have that?"

BY MR. DOBBINS:

Q.   Okay.  And then the third message?

A.   The third message, again, dated July 17th, 2018, Mr. Hernandez writes:  "Do you have the tanks there or at your mom's house in Hialeah?"

Q.   Did the investigation learn who this individual was?

A.   Yes.  Through our investigation, we determined that Mantanques was the supplier for tanks that Mr. Javier and Mr. Ramon Reyes Aranda were using to bring the extra fuel on the vessels for the journey from the Southwest Florida area to Mexico.

48

Q.   Okay.   So let's focus now on Government's Exhibits 9C and 9D in evidence, please.

MR. DOBBINS:   And again, if we could just pull the participants up on the left on Government's Exhibit 9C, please.

BY MR. DOBBINS:

Q.   And what's the phone number associated with 9C and 9D?

A.   That's that +1(305)896-7656, again, saved as Mantanques or Tank Man.

Q.   Okay.

MR. DOBBINS:   If we could go to Page 77, please.

Okay.   Let's start with the messages there from the green bubbles on the two bottom, dated there -- if we could highlight those.

BY MR. DOBBINS:

Q.   What are those -- who were those sent from, what phone are they sent from and what do they say?

A.   Sorry.   Can we scroll through one of them because those don't match up, the translation and the pages on the left there.   The time is 3:29 p.m.   That's more like it.

Q.   Sorry.   Are we off a page on this?

Okay.   Does it appear that these are duplicated messages?

A.   Yes.

Q.   So let's just go with the third one there on 76.

A.   All right.   So Mr. Hernandez writes to Mantanques.   On June 23rd, 2019, he writes:   "Hello, partner.   How are you?"

Q.   Okay.

MR. DOBBINS:   And let's scroll to the next page, please, Page 77.

BY MR. DOBBINS:

Q.   Okay.  And what's the response from the Mantanques --

A.   So Mantanques replies by saying:  "Fine.  And you?"

Q.   And then what's the response there from the Hernandez phone?

A.   And Mr. Hernandez replies by saying:  "All good.  I need 10 tanks tomorrow."

MR. DOBBINS:   Let's keep going down one page, Page 78, please.

BY MR. DOBBINS:

Q.   All right.  What's the first response there from the Mantanques phone?

A.   Mantanques replies by saying:  "At mom's house."

Q.   Okay.  And what's the next reply there, the third bubble?

A.   And Mantanques follows up by saying:  "After 12."

Q.   Okay.

MR. DOBBINS:   If we can go ahead and go to the next page.

BY MR. DOBBINS:

Q.   And what is the Hernandez phone's response?

A.   And Mr. Hernandez replies -- on June 23rd, 2019, says:  "Okay.  I'll be there tomorrow."

Q.  Okay.

MR. DOBBINS:  And let's scroll down to the next page, please.

BY MR. DOBBINS:

Q.  And what's the question there from the Mantanques bubble?

A.  Mantanques asks:  "What time are you coming by?"

Q.  Okay.  And what's the response from the Hernandez phone?

A.  Mr. Hernandez replies by saying:  "2:30."

Q.  And then, if we go to the third bubble on the next page, there's a question mark sent by Mantanques.  What date is that sent?

A.  That question mark was sent on June 24th, 2019.

MR. DOBBINS:  And if we can go to the next page, please.

BY MR. DOBBINS:

Q.  What is the Hernandez response there?

A.  Mr. Hernandez replies on 6/24/19 by saying:  "I'm getting there."

Q.  Okay.

MR. DOBBINS:  And one more page, please.

That's it.

Let's move on to Page 101, please.

BY MR. DOBBINS:

Q.  Let's start with this WhatsApp chat, the first one.  The first bubble from the Mantanques, what's the date and the time

on that, please?

A.   So on November 21st, 2019, at 4:52 p.m. UTC time, Mantanques asks Mr. Hernandez:   "Brother, have you not needed any more tanks?"

Q.   And what's the reply from the Hernandez phone?

A.   And then Mr. Hernandez replies by saying:   "Yes.  I need some."

Q.   Okay.

       MR. DOBBINS:   Can we go to the next page, please.

BY MR. DOBBINS:

Q.   And what's the next message from the Hernandez phone?

A.   Mr. Hernandez is telling -- or asking Mantanques if he has some, by saying:   "You got it?"

Q.   And what's the reply from the Mantanques phone?

A.   And Mantanques replies by saying:   "Yes.  I have plenty."

Q.   Okay.

       MR. DOBBINS:   And the next page, please.

BY MR. DOBBINS:

Q.   And what's the next question that the Mantanques phone asks there at the top?

A.   Mantanques asks Mr. Hernandez:   "How many do you need" or "How many do you want?"

Q.   And what's the reply from the Hernandez phone?

A.   In the reply from Mr. Hernandez, on November 21st, 2019, at 4:53 p.m. UTC time, he says the following:   "I need 30.  I'm in

Mexico now.  I'll be back on Monday."

Q.  Okay.

MR. DOBBINS:  Let's continue to the next page, please.

BY MR. DOBBINS:

Q.  And what does the Mantanques phone respond?

A.  Mantanques responds by saying:  "Okay.  You can pick them up on Tuesday or Wednesday morning because on Thursday they start on the fence for the house, and I need the tanks out of there."

Q.  Okay.

MR. DOBBINS:  And let's go to the next page, please.

And the next page after that, please.

BY MR. DOBBINS:

Q.  Okay.  And what's the -- what's the date of this message, and who's sending it, and what's the question being asked?

A.  So there's an incoming message from Mantanques to Mr. Hernandez, and he's asking:  "My brother, when can you pick up the 30 tanks," and that was on November 26th, 2019, at 4:31 a.m. UTC time.

Q.  Okay.

MR. DOBBINS:  All right.  Now, if we could move ahead to -- I just want to show Government's Exhibit 14.

MR. FEIGENBAUM:  What was that -- if I could ask, what was that last page number?

MR. DOBBINS:  Sure.  It was Government's Exhibit 9C

and 9D, and it was Page 106.

MR. FEIGENBAUM:  Thank you.

MR. DOBBINS:  You're welcome.

MS. KLEPACH:  Fourteen?

MR. DOBBINS:  Yes, please.

BY MR. DOBBINS:

Q.  Okay.  This is what we admitted yesterday in evidence. What is this exhibit here, Special Agent Francisco?

A.  This is the Cellebrite report showing the call log from Mr. Hernandez's phone.

Q.  And is this the call log of all the calls or only using a certain app?

A.  I want to say that this call log shows everything from traditional calls through calls that came in through an app, such as WhatsApp.

Q.  Okay.  If it's a call that's indicated by via WhatsApp, would that be indicated somewhere here on this chart?

A.  Yes.  It will say it.  In multiple locations, it will show source info here as WhatsApp.  And then "WhatsApp" will follow the number on the left column, where it says "Parties."

Q.  Okay.  And if you go where it says "Parties," underneath the "Parties," where it gives the numbers, it also gives direction.  What does that mean?

A.  This is showing who made the call and to who.  So in this case, it shows the call was initiated from this (786)557-9694

54

number, who appears in Mr. Hernandez's phone as Ray.  And the call was placed to Mr. Hernandez's phone, with the phone number (786)370-4619.

Q.  Okay.  And if we look at the date on Entry Number 1, what is that date?

A.  The date is November 24th, 2019, 11:39 p.m. UTC time.

Q.  Okay.  And what significant event in the investigation had occurred before November 24th of 2019?

A.  Mr. Hernandez was arrested by Mexican law enforcement on or about November 22nd, 2019.

Q.  And if we go to the next entry, what's the date on that?

A.  The date on that next missed call is November 23rd, 2019, 3:22 p.m. UTC time.

Q.  Okay.  And so does it appear that that these entries are in reverse chronological order, that they are descending or going backwards in time?

A.  Correct.  The most recent call is listed as number one there, and then it goes down in reverse chronological order.

Q.  Okay.

        MR. DOBBINS:  So if we go to Page 480, please.

BY MR. DOBBINS:

Q.  And if we start with row 4301 and 4300, what is -- what are the dates of these two calls?

A.  The dates for these two calls are June 6th, 2019 and June 6th, 2019.

55

Q.   Okay.  And row 4301, who is the recipient -- well, let me ask this:  Who are -- who are the participants in the call, and does the call connect, and what kind of call is it?

A.   So these are both WhatsApp calls that were made outgoing from Mr. Hernandez's phone.  You can see that in the "From" tab on both lines.  It goes from the 1(786)370-4619 number, which is Mr. Hernandez.  The first one there in row 4300 is going outbound to (786)286-1747, who Mr. Hernandez has saved in his phone as roberticonuevo1.  And it shows that the call was not answered, which means the person on the other end, in this case, Robertico Nuevo, who we know to be Mr. Marrero Cisneros, did not answer that call.

     And then the second call went out to Neco Neco.  That's what is -- that number saved under Mr. Hernandez's phone with the phone number of country code 52, 1-99-9947-5331.  And again, it shows as not answered on June 6th, 2019.

Q.   Okay.

          MR. DOBBINS:  And if we could go up to the next page, which is Page 479.  And looking at 4291, 4290, and 4289 there, please.

BY MR. DOBBINS:

Q.   Again, what's the -- let's start with 4291, what's the date on that call?

A.   So the dates for all three of those calls is June 6th, 2019.

Q.   Okay.  And 4291, who -- is that an outgoing call or incoming call?

A.   So there's an outgoing call from Mr. Hernandez's 4619 number to Robertico Nuevo.  And again, here it shows you the direction, outgoing.  And it shows as not answered, again, a WhatsApp call.

Q.   All right.  What about row 4290?

A.   Row 4290 shows an outgoing call to Ramon Barco 1, with the phone number of (239)300-5434, who we know to be Mr. Ramon Reyes Aranda.  And it shows, again, a WhatsApp call that was answered, and it listed approximately a minute and eight seconds.

Q.   Okay.  And let's go to row 4289.

A.   And again, 4289, we have an outgoing call again to Robertico Nuevo on WhatsApp that was not answered.

Q.   Okay.

MR. DOBBINS:  If we could close that and scroll up to the next page.  We can just show row 4288, please.

BY MR. DOBBINS:

Q.   And what's the date on this call, and who were the parties?

A.   The date on this call is June 6th, 2019, and it was an outgoing call to Robertico Nuevo, the 1747 number.  And it shows that this call was answered, and it lasted three seconds.

Q.   Okay.

MR. DOBBINS:  Let's move at this time to Page 472.

57

And if we could -- sorry.  Go down one more page to 473.
Pardon me.

BY MR. DOBBINS:

Q.  And if we could just go through starting at 4239 -- just walk us through from 4239 to the top of the page, what's our call sequence here?

A.  I have from 4239 up.  All right.  So starting from the bottom up, in chronological order, we're seeing outbound -- or incoming call from Mr. Ramon Reyes Aranda, saved as Ramon Barco 1, to Mr. Hernandez, via WhatsApp.  It shows a missed call.  A few seconds later, the same call comes in again from Mr. Aranda, and it's missed again.  And a minute later we see the same call from Ramon Barco 1 to Mr. Hernandez, all missed calls by Mr. Hernandez.

Q.  Okay.  And then 4236, these are all missed calls.  Who is sending these calls?

A.  These are all missed calls to Mr. Hernandez's phone from Ramon Barco Uno -- Ramon Barco 1, so Mr. Ramon Reyes Aranda.  And these are all on June 7th, 2019.

Q.  Okay.  And if we go with 4233 and 43 -- 4232, again, these are missed calls.  Who is sending these calls?

A.  Same thing.  They are missed calls from Mr. Ramon Reyes Aranda.  It appears this time he tried WhatsApp and he tried via regular phone calling Mr. Hernandez, which he did not answer.

Q.  Okay.

MR. DOBBINS:  If we scroll up to Page 472.  And we're looking at -- let's go ahead and just go to 4230.

BY MR. DOBBINS:

Q.  What does that call record indicate?

A.  So we're looking at an outgoing call from Mr. Hernandez's 4619 number to Mr. Reyes Aranda via WhatsApp.  And it looks like they spoke for approximately 37 seconds.  This was on June 7th, 2019, at 1:25 a.m. UTC time.

Q.  Okay.  And if we could go to -- if we could scroll up to the top of the page, 4224.

A.  Again, we're looking at a incoming call from Mr. Ramon Reyes Aranda to Mr. Hernandez's phone via WhatsApp, and it looks like they spoke for approximately 46 seconds on June 7th, 2019.

Q.  Okay.  And since this, again, is UTC time, is this actually June 7th, 2019 or is it June 6th, 2019?

A.  This would have been June 6th, 2019, at approximately 10:20 p.m.

Q.  Okay.

MR. DOBBINS:  And if we could go to the next page, Page 471.

BY MR. DOBBINS:

Q.  And from 4223 to 4217, are the participants the same in all of those calls?

A.   Yes.   We have Ramon Barco 1, Mr. Reyes Aranda.

Q.   Okay.   And going by that, again, is this still at on or around June -- the end of June 6th, based on the UTC time?

A.   Yes.   It starts at 2:35 a.m. on the 7th of June.   And then transitions to around 3:15 -- 3:14 and then 3:24 a.m. of June 7th, which would have been the previous night, June 6th, at approximately 11:24 p.m. now.

Q.   All right.

        MR. DOBBINS:   And if I may have the ELMO, please.

BY MR. DOBBINS:

Q.   Did you also receive the cell site information from Special Agent Adam Goodrich of the FBI CAST Team when you were conducting your analysis of this investigation?

A.   Yes.

        MR. DOBBINS:   Your Honor, showing Government's Exhibit 65 in evidence, Page 9.

BY MR. DOBBINS:

Q.   Zooming out, what did -- what did those cell sites reflect that the Javier Hernandez phone was doing on June 6th, 2019 between 8:35 p.m. and 10:05 p.m.?

A.   So these are all already -- Mr. Goodrich converted these UTC times to local Eastern Standard Times.   So the times we're looking at here are actual times that correspond to our time zones here in South Florida, in the Southwest Florida area. And it's showing Mr. Hernandez's phone hitting off of cell

towers starting on June 6th around 8:35 p.m., and then as he travels north and then west through I75, with a -- the last cell site activity from his phone being at 10:05 p.m. on June 6th, 2019.

Q. All right. And was there some significant event that occurred on or around June 6th or June 7th of 2019?

A. This is when the *Reel Estate* vessel, I believe, was stolen out of the Naples area.

Q. All right.

MR. DOBBINS: If we could go back to the Government's computer, please.

Now, if we could move ahead to Page 367, please.

BY MR. DOBBINS:

Q. Looking at row 3269, what is the date of that call and who are the parties?

A. The date is July 17th, 2019, and this is an outgoing call from Mr. Hernandez to Robertico Nuevo, who, again, we know to be as Mr. Marrero Cisneros.

Q. And was this call answered?

A. No.

MR. DOBBINS: Let's move up to the next page, and we'll go to rows 3266 through 3262, please.

BY MR. DOBBINS:

Q. Start with 3266, please.

A. Yeah. So starting from the bottom, we're seeing an

incoming call from Mr. Reyes Aranda to Mr. Hernandez. Looks like they spoke via WhatsApp for approximately 53 seconds.

Shortly after that --

Q. Let's go to 3264, please.

A. Approximately three hours later, July 17th, 8:48 p.m. UTC time, Mr. Reyes Aranda calls Mr. Hernandez again, and they speak for approximately 39 seconds via WhatsApp.

Q. Okay. And 3263?

A. And then there's an outgoing call at 9:45 p.m. UTC, on July 17th, from Mr. Hernandez to Neco Neco via WhatsApp, which was not answered.

Q. And 3262?

A. And approximately 30 seconds later, Mr. Hernandez gets a call from Neco Neco, on July 17th, 2019, and it looks like they spoke for approximately two minutes and 12 seconds.

Q. Okay.

MR. DOBBINS: If we could scroll up to the next page, please.

BY MR. DOBBINS:

Q. All right. Let's start with 3256 and 3255, please.

A. All right. So starting at the bottom here, we have an outgoing call from Mr. Hernandez to Mr. Reyes Aranda, on July 17th, 2019, at 11:44 p.m. UTC time. Looks like Mr. Aranda did not answer that call.

Q. And what about 3255?

A.   Could you scroll up, please.  So this looks like Mr. Ramon Reyes Aranda then calls back Mr. Hernandez on July 17th, 2019, at 11:48 p.m., via WhatsApp, and it looks like they spoke for approximately two minutes and 25 seconds.

Q.   Okay.  And again, since this is UTC time, approximately what time is this in Eastern Standard Time?

A.   In this example, on July 17th, of 11:48 p.m. UTC, that would have been approximately 5:48 p.m. Eastern Standard Time -- correct -- correction.  I'm thinking Yucatan time. Local would have been minus four, so 7:48 p.m.

Q.   Okay.  Let's start with the top three rows, 3248 through 3250, please.

A.   So we're looking at an incoming call down here on July 18th, 12:47 a.m., from Mr. Ramon Reyes Aranda to Javier Hernandez, and it looks like they spoke for approximately 30 seconds via WhatsApp.

Q.   Okay.  And 3249?

A.   And then, approximately an hour and a half, two hours later, again, Mr. Reyes Aranda calls Mr. Hernandez, and they speak for approximately a minute and 39 seconds via WhatsApp.

Q.   All right.  And 3248, please.

A.   Approximately an hour after that, on July 18th, 3:02 a.m. UTC time, which would have been July 17th, approximately 11 p.m., Mr. Hernandez, once again, gets a call from Mr. Reyes Aranda, and they speak for 17 seconds via WhatsApp.

MR. DOBBINS: All right. And if I may switch it back over to the ELMO, please.

BY MR. DOBBINS:

Q. Showing you Government's Exhibit 65 in evidence, Pages 11 and then 12. We'll start with 11.

Where did the cell site data indicate that the Javier Hernandez phone was on July 17th, 2019, at approximately 8:05 p.m.?

A. So again, we're looking at the times that have already been converted from UTC to local Eastern Standard Time. So on July 17th, 2019, Mr. Hernandez's phone was pinging around the area of Surfside, Normandy Isle Beach, North Miami Beach area.

Q. Okay. And Page 12 of Government's Exhibit 65 indicates -- where does that indicate that the Hernandez cell phone was -- what tower was it pinging off of at around 10:58 p.m. on July 17th 2019?

A. So on July 17th, 2019, at approximately 10:58 p.m., Mr. Hernandez's cell phone is pinging off of I75, on the west coast of Florida, near Naples. You could see that by the Naples tabs and Golden Gate marks there on the map.

Q. And based on the investigation, was there a significant event that occurred on or around July 17th and July 18th of 2019?

A. Yes. The vessel the *Ultimaytum* was stolen from the Naples area in or about those dates.

64

MR. DOBBINS:  If we may return to the Government computer, please.  And if we could go to Page -- Page 103, please.  And we're going to start with rows 874 through 871, please.

BY MR. DOBBINS:

Q.  Let's start with 874.  What did -- what does that indicate -- what does that call record indicate was occurring there?

A.  So starting on October 16th, 2019, Mr. Hernandez placed a call to Neco via WhatsApp, 10/16/19, at 2:45 p.m.  And it shows that that call was rejected or declined by Neco.

Q.  All right.  And 873?

A.  And two minutes later, approximately 2:47 p.m. UTC time, there's an outgoing call, looks like via traditional phone, not WhatsApp, and it was answered and they spoke for three seconds.

Q.  Okay.  And if we could go to the other two, 871 and 872. Are those the same parties that we talked about, Neco and the Hernandez phone?

A.  Yes.  So approximately two, three minutes later, there are two more outgoing calls from Mr. Hernandez to Neco via WhatsApp, and it looks like they spoke briefly for about five seconds.

MR. DOBBINS:  All right.  Let's move up to Page 102, please.

All right.  If we can start with 865, please.  I guess

you can go ahead and highlight 863 through 865.

BY MR. DOBBINS:

Q.   And who is that -- 865, what does that row indicate was the call record?

A.   So on October 16th, 2019, approximately 5:29 p.m. UTC time, there's an incoming call from Robertico Nuevo, who is Mr. Marrero, to Javier Hernandez, and they speak for approximately a minute and 43 seconds via WhatsApp.

Q.   And what do the next two calls indicate that the parties are, in 864 and 863?

A.   On that same date, Mr. Hernandez gets a missed call from Neco.  And shortly after, a few seconds later, Mr. Hernandez returns the call to Neco and they speak for approximately 37 seconds.

MR. DOBBINS:  Okay.  Let's go ahead and move up another page, please.  And let's -- I'm sorry.  Let's go ahead and go up to Page 100.  Let's go with 844 to 842.

BY MR. DOBBINS:

Q.   And are the parties in these three call log entries the same?

A.   Yes.  That would be Mr. Neco.

Q.   Okay.  And what's the -- what's the date on these entries?

A.   That will be October 17th, 2019.

Q.   And based on the UTC time, is it still October 17th, 2019 in the United States?

66

A.   Yes.

Q.   Okay.

          MR. DOBBINS:   And if we could move up to look at entries 835 through 833, please.

BY MR. DOBBINS:

Q.   And are the parties in these three call log entries, 835 through 833 -- are they the same individuals?

A.   Yes.   That would still be Neco.

Q.   And what are the dates on those contacts?

A.   October 17th, 2019, between 11:06 p.m. and 11:19 p.m. UTC time.

Q.   All right.   Now, was something of significance happening -- did the investigation learn of an event that occurred of significance on or about October 16th through October 17th of 2019?

A.   Yes.   On or about October 17th was when we believe Mr. Hernandez drove the stolen Toyota Tundra from Florida over to Texas, through the Southwest border, and crossed over to Mexico with it.

          MR. DOBBINS:   And if I may have the ELMO again, please.

BY MR. DOBBINS:

Q.   Showing you Government's Exhibit 65, Page 14.   What did that -- what did the cell site data indicate was occurring with Mr. Hernandez's phone on -- between October 16th, 2019, at

8:12 a.m., to October 17th, 2019 at 11:40 a.m.?

A.   So we can see here, from October 16th, 2019, in the morning hours around eight a.m., you see very briefly just some dots, because there's a lot of cell site data that he would have -- he would have hit a lot of towers on that drive.  So you only see so many bubbles.

But basically, you see the first one on the 16th.  And then approximately 24, 26 hours later, you see a cell site hit near Corpus Christi, Nuevo Laredo border area in Texas.

Q.   All right.  Showing you Page 15 of that same exhibit. Where does it indicate the general location of Mr. Hernandez's phone on October 17th, 2019 at 1:48 p.m.?

A.   So the general location of Mr. Hernandez's phone would have been anywhere within this -- this angle here, close to the Mexico US border.

Q.   Okay.

MR. DOBBINS:  If we may go back just to the Government's computer, please.  And if we could move up to Page 13, please.  And we're going to look at -- starting with rows 111 and 110.

BY MR. DOBBINS:

Q.   Who are the parties in this call log entry?

A.   So we're looking at incoming calls on November 18th, 2019, 10:24 and 10:48 p.m. UTC time.  These are both incoming calls from Mr. Ramon Reyes Aranda, who, again, is saved as Ramon

Barco 1 in Mr. Hernandez's phone.  And it looks like they spoke for 27 seconds, and another call for two minutes and three seconds via WhatsApp.

Q.   Okay.

MR. DOBBINS:  And let's now go to rows 106 through 104.

BY MR. DOBBINS:

Q.   And who are the parties in these three entries?

A.   Again, we're looking at phone calls between Mr. Reyes Aranda and Mr. Hernandez, all on November 19th, 2019.  The first one's an incoming call from Mr. Reyes Aranda to Mr. Hernandez, a second incoming call, and then an outgoing call to Mr. Reyes Aranda.

Q.   Okay.

MR. DOBBINS:  And now if we could scroll up to Page 12.

BY MR. DOBBINS:

Q.   And we're going to look at 10 -- well, I guess we'll just look at this whole page.  Are the participants the same as we've been discussing, between Mr. Ramon Reyes Aranda and the Javier Hernandez phone?

A.   Yes.  They're all calls between Mr. Reyes Aranda and Mr. Hernandez.

Q.   Okay.  And what's the date on this entry in Number 97?

A.   Number 97 would be November 19th, 2019, at 3:55 a.m. UTC

time.

Q.   Okay.  And so as this -- in Eastern Standard Time, we would be on November 18th or would be November 19th?

A.   So Eastern Standard Time -- this call here on line 97, would be November 18th, 2019, at approximately 11:55 p.m.

Q.   Okay.

MR. DOBBINS:  Let's go ahead and move up one last page.  And let's just look at the top two entries, 90 and 89, please.

BY MR. DOBBINS:

Q.   And what are those calls there?

A.   We're looking at two incoming calls from Mr. Reyes Aranda to Mr. Hernandez.  The first one at the bottom here, on November 19th, 5:27 a.m. UTC time, and respectively 5:51 a.m. UTC time, which would have been still on November 19th, but at one a.m., 1:27, and 1:51, respectively, Eastern Standard Time.

Q.   Now, did the investigation learn of something -- that was significant that occurred on or around November 19th or November 20th of 2019?

A.   Yes.  The vessel named the *Luca Brasi* was stolen from the Naples area on or about November 19th, 2019.

Q.   Okay.

MR. DOBBINS:  And if I could have the ELMO again, please.

BY MR. DOBBINS:

Q.   Going back to Government's Exhibit 65.   Showing you Page 67 -- I'm sorry -- Page 16.   Excuse me.

What did the cell site data indicate that the Hernandez cell phone was doing between November -- on November 18th, 2019 between 6:41 p.m. and 11:12 p.m.

A.   So we see here, again, these times have been converted to Eastern Standard Times.   And on November 18th 2019, 6:41 p.m., approximately, you see a cell site tower -- cell phone tower hit near the east coast of Florida there, South Florida.   And then, approximately five hours later, you see a cell phone tower hit on November 18th, 2019, approximately 11:12 p.m., near the Naples area.

Q.   Okay.   And going to Page 17 of Government's Exhibit 65, what did that -- what did the cell site data indicate about Mr. Hernandez's cell phone on November 19th, 2019 at approximately 2:07 a.m.?

A.   So approximately 2:07 a.m., you see the last cell phone tower hit here, which indicates that the cell phone tower would have pinged somewhere in this area here, in the Naples area.

Q.   All right.   Now, in addition to Mr. Hernandez's phone being seized by the Mexican police, did the FBI obtain some cell phones from other individuals that were related to this investigation?

A.   Yes.   We obtained two phones that belonged to Mr. Gonzalez

Vidal, a/k/a Chupa.

Q.   Okay.  And on the ELMO, showing you Government's Exhibit 19.  Do you recognize that exhibit?

A.   Yes.

Q.   It's in evidence.

A.   Yes.  That would be what we have under FBI Evidence Number either 1B126 or 1B127.

Q.   Okay.  Now I'll show you Government's Exhibit 28 in evidence.

A.   Same thing.  That number, Exhibit 28, would be FBI Evidence Item 1B127.

Q.   All right.  And so what does that mean that Government's Exhibit 19 is?

A.   So that would make this 1B126.

Q.   Okay.  And whose phones were these?

A.   These were Mr. Gonzalez Vidal's phones.

Q.   Okay.  Now showing you what's been marked for identification as Government's Exhibit 20 and Government's Exhibit 29.  Do you recognize those exhibits?

A.   Yes.  These are the Cellebrite extractions that were done by our CART Team for each respective phone.

Q.   Okay.  So let's start with Government's Exhibit 20.  Did you do the same thing that you talked about with Mr. Hernandez's phone, which was Government's Exhibit 3, with this extraction to do searches and generate reports?

A.   Yes.  I received the Cellebrite extraction from the CART Team, and I generated Cellebrite reports, PDF reports, for the chats for those and any other items of interest we found in that phone.

Q.   Okay.  And what about with Government's Exhibit 29?  Did you do that with the -- with the -- with that extraction?

A.   Yes.  Did the same for both of them.

Q.   All right.  So let's start with Government's Exhibit 20 for identification.

        MR. DOBBINS:  If we could go to -- for the witness only, please, if we could have the Government's computer.

        If we could pull up Government's Exhibit 27 for identification, please.

        I'm sorry 16.  I apologize -- no.

        Yeah.  Okay.

        Let's go -- I'm sorry -- 27 is the one I wanted. Apologize.

BY MR. DOBBINS:

Q.   Do you recognize this exhibit, sir?

A.   Yes.  This is a Cellebrite Extraction Report that I generated of the user accounts for one of Mr. Gonzalez Vidal's phones.

Q.   Okay.

        MR. DOBBINS:  And if we can pull up Government's Exhibit 26 side by side with that, please.

73

BY MR. DOBBINS:

Q.  All right.  Does that -- do you recognize Government's Exhibit 26 for identification?

A.  Yes.  This is the Cellebrite PDF report that I generated for the device information for one of Mr. Gonzalez Vidal's phones.

Q.  Okay.  And did you follow that same procedure, which you used -- that you showed us yesterday with the -- those exhibits about how you would thumb through the chats and create reports?

A.  Correct.  Yes.  I usually do it the same way for all of the devices that I work with.

Q.  All right.

MR. DOBBINS:  Your Honor, at this time, I'd like to move Government's Exhibits 26 and 27 into evidence.

THE COURT:  With the exception of the preserved objection, any further objections?

MR. FEIGENBAUM:  Actually, I don't think this one is covered by that one, but still no.

THE COURT:  Okay.  All right.  Then admitted into evidence.

MR. DOBBINS:  These are different phones.

(Government's Exhibits 26 & 27 received into evidence.)

BY MR. DOBBINS:

Q.  Okay.  So let's just look at Government's Exhibit 26, please.  And we can see we have the IMEI and all that.  Can you

just sort of walk us through what we're looking at here on this first page.

A.   Yes.   Again, we're looking mostly at technical information for the device.   And it just kind of breaks down all the technical stuff, where you see the IMEI for the device, the MAC address, Android ID, activation times, Bluetooth MAC addresses, the factory number.

Q.   Okay.

A.   The Bluetooth device name.

Q.   All right.   So now let's go over to the user accounts, which was Government's Exhibit 27 in evidence.   And let's start with just that first one.

A.   Yeah.   So that first account there, it's some kind of Android account that used the email elchupi1987@gmail.com. Again, this phone belonged to Mr. Gonzalez Vidal, whose a/k/a is El Chupa.

Q.   And the second row, Number 2?

A.   Number 2 shows an account number, country code 52, which I believe is Mexico, and the number is 1-99-9140-5478.

Q.   All right.   And if we could look at row 9, please.

A.   We're looking at some kind of Airbnb account with the username J-M-G-L-E-Z, which we attributed to Mr. Gonzalez Vidal, whose full name is Jose Miguel Gonzalez Vidal.

Q.   Okay.   All right.   Did you also create some chats from this phone?   Showing you --

MR. DOBBINS:  If we may have it for the witness only.

BY MR. DOBBINS:

Q.  -- Government's Exhibit 22 and 23, please.

All right.  Do you recognize Government's Exhibit's 22 and 23?

A.  Yes.  Exhibit 22 is a chat between Mr. Gonzalez Vidal and a contact that he has saved as "Javi El Gordito Estafador."

Q.  And what is Government's Exhibit 23?

A.  And 23 is a chat -- looks like a Facebook chat between the user J-M-G-L-E-Z that we just saw in the other report with Mr. Hernandez via Facebook.  These are both reports that I generated off of the Cellebrite extractions.

Q.  Okay.

MR. DOBBINS:  Your Honor, at this time, the Government would move to admit Government's Exhibits 22 and 23 into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibits 22 & 23 received into evidence.)

MR. DOBBINS:  And if we may publish, and let's just start with Government's Exhibit 22, please.

BY MR. DOBBINS:

Q.  Now, this is -- if we could pull it up -- the phone number for the individual at the top, what's the listed name there?

A.   So the listed name on there -- this contact is saved by Mr. Gonzalez Vidal as "Javi Gordito Estafador," which translates to "Javi, the Little Fat Swindler" or "Little Fat Con Artist."  And it has a name attributed as 1(786)589-0366.

Q.   Okay.  And when you look up top there, it says:  "Start Time" and "Last Activity."  What's the start time, and the date for the start time, and the date for the last activity on this, please?

A.   So we're looking at start time of October 28th, 2020, and the last activity is November 1st, 2020.

Q.   Okay.  Now, did this chat also include a voice note?

A.   I believe so.

Q.   Okay.  And was this -- were the other text messages, if there are any -- are they in Spanish or English?

A.   Everything was in Spanish.

Q.   All right.  So was that translated to create a different exhibit for the jury?

A.   Yes.  That was translated in a similar manner as the previous ones.

        MR. DOBBINS:  Your Honor, at this time, I'd move Government's Exhibits 21A and 21B into evidence.

        THE COURT:  Any objection?

        MR. FEIGENBAUM:  No, Your Honor.

        THE COURT:  Admitted into evidence.

        MR. DOBBINS:  I apologize, Judge.  I said:  "21A and

B."  I meant 22A and B.  My apologies.  That was my mistake.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Okay.  Admitted into evidence.

(Government's Exhibits 22A & 22B received into evidence.)

MR. DOBBINS:  All right.  If we could pull up 22A to do a side by side, please.

(Pause in proceedings.)

MR. DOBBINS:  Okay.  Let's switch back over to the ELMO, please.

BY MR. DOBBINS:

Q.  All right.  So this is the English version.  Showing you Page 1.  Now, in this exhibit, when we have the green bubble -- whose phone is speaking in the green bubble in this exhibit?

A.  So in the green bubble is going to be a message from Mr. Gonzalez Vidal, who shows there as the "From" and the owner.

Could you make that little less blurry, please.

Q.  Is that better?

A.  Yes.  Thank you.

Q.  Okay.  We'll go to Page 2.  And we'll start with this third bubble down.  It's green.

A.  All right.

Q.  What -- who sends the message and what is the translated communication there?

A. So on October 28th, 2020, Mr. Gonzalez Vidal sends a message to Javi Gordito Estafador, where he says the following: "Brother, I don't understand what the mystery of yours is."

Q. Okay. Now, the number here, because this is October 28th of 2020, is (786)589-0366. Did the investigation later learn whose cell phone number that was?

A. Yes. So we -- after Mr. Hernandez's phone was seized by Mexican law enforcement in 2019, and eventually turned over the FBI, it appeared that Mr. Hernandez got a new member, this (786)589-0366, which he verified through his Facebook account.

Part of our investigation, we served search warrants to Facebook for Mr. Hernandez's Facebook account, which we saw earlier in one of the conversations. And in that Facebook account, he uses this number ending in 0366. And Facebook tells us that he verified that number, meaning it was like one of those like two-step authenticators, where he received a message from Facebook to that number and he confirmed that this was indeed his number.

Q. Okay. So let's go ahead and go to Page 3. I'll start with the top two bubbles here. What's the date and what is the Gonzalez Vidal phone sending -- what messages are they sending?

A. So on October 28th, 2020, Mr. Gonzalez Vidal sends a message to Mr. Hernandez, saying: "Instead of calling me, you do that." And he follows with a second message that says: "You, instead of calling anyone, had to call me."

Q.   All right.  Let's move the document up.  This is Page 3, for the third message here.

A.   Again, on October 28th, 2020, Mr. Gonzalez Vidal follows up with a message that says the following:  "I'm just telling you that the child has behaved well so far and hasn't spoken anything, but he can still spill the beans."

Q.   Okay.  Was there a significant event that had occurred prior to October 28th of 2020 in the investigation?

A.   Yes.  One of the co-conspirators in the Gonzalez Vidal trial, Mr. Reynaldo Crespo Marquez, who is also known as El Niño, had been arrested and brought over to the United States.

Q.   And at the time, had Mr. Gonzalez Vidal been arrested?

A.   No.  He had not been arrested yet.  That's why he's sending these messages.

Q.   And let's show this top bubble.  I know there's a little bit of a glare there, so maybe that will help.

     What's the date of this message and what did Mr. Gonzalez Vidal's phone send to the new Javier Hernandez phone?

A.   On October 28th, 2020, Mr. Gonzalez Vidal sends a message to Mr. Hernandez, saying:  "You call Neco, you call everyone, and you don't tell me."

Q.   Okay.  And then this last voice note that is sent?

A.   And then, on November 1st, 2020, Mr. Gonzalez Vidal sends a voice note to Mr. Hernandez, which is -- what it appears to be -- something he recorded with his phone -- to be a jail call

from the Federal Detention Center, and the message says the following: "Reynaldo, an inmate at a federal prison. This call is being recorded and is subject to monitoring. Hang up to decline the call or accept dial -- or to accept, dial 5 now. If you wish to block any future calls of this nature, dial 7 now. To decline this call, hang up."

Q. And where was Mr. Reynaldo Crespo Marquez being held at this time?

A. At the Federal Detention Center, across the street from this building.

Q. All right.

MR. DOBBINS: If we may go back to the Government's computer. I think we can pull up Government's Exhibit 23.

BY MR. DOBBINS:

Q. And again, that -- was that Facebook chat report that you generated -- was that in English or Spanish?

A. This Facebook report was in Spanish.

Q. Okay. So did we do an English translation that we can do side by side for the jury?

A. Yes. We did one in the very similar manner as the previous one.

MR. DOBBINS: Your Honor, at this time, the Government would move Government's Exhibit 23A into evidence.

THE COURT: Any objection?

MR. FEIGENBAUM: No, Your Honor.

THE COURT: Admitted into evidence.

(Government's Exhibit 23A received into evidence.)

BY MR. DOBBINS:

Q. All right. So showing you --

MR. DOBBINS: One moment.

(Pause in proceedings.)

BY MR. DOBBINS:

Q. Okay. Looking back here, what are the participants that are listed in this Exhibit 23 and 23A?

A. So we're looking at a Facebook conversation between the owner of this device, which is Mr. Gonzalez Vidal. We could see here that username we talked about earlier J-M-G-L-E-Z, and Mr. Javier Hernandez with the Facebook user ID of 1172929976.

Q. Okay. Have we seen that Facebook account 1172929976 before?

A. Yes. We saw that account number in the Cellebrite report of Mr. Hernandez's user accounts and also in the Facebook search warrant returns.

Q. Okay. And when you say: "The Javier Hernandez user accounts," that was from Government's Exhibit 3, the cell phone that was seized in Mexico?

A. Correct.

Q. Okay.

MR. DOBBINS: If I may have just the ELMO just briefly.

BY MR. DOBBINS:

Q.  Showing you Government's Exhibit 15, Page 11, row 85.

There we go.

Is that the Facebook account from the user accounts that was seized from the Javier -- the seized Javier Hernandez cell phone in Mexico?

A.  Yes.  It's the same Facebook ID 1172929976.

Q.  Okay.

MR. DOBBINS:  If we may go back to the Government's computer, please.

BY MR. DOBBINS:

Q.  All right.  So we go with -- let's go with that -- so now we have that first bubble, where it says:  "You greeted Javier."  Underneath there, it says:  "Empty file."  What does that mean?

A.  This just means there would have been an attachment there. I think this is kind of like one of those emojis that they sent through the Facebook Messenger saying hello or something along those lines.  But basically that empty files means if it was some emoji or some other attachment.  We just don't have it.

Q.  What's the first Facebook message text that's there, dated 12/28/2019?

A.  So on that day, Mr. Gonzalez Vidal sends a message to Mr. Hernandez, saying the following:  "My brother, what's up? What is the scheme that you-all have going on?  I'm trying to

get ahold of you because I need the global or satellite and the locator.  I don't know your problem with Neco.  I have nothing to do with that.  Answer me, because I'm waiting on that."

Q.  And again, towards the end of November of 2019, what had happened in Mexico that was significant to the investigation?

A.  Both Mr. Hernandez and Neco were encountered and arrested by Mexican law enforcement.

Q.  Okay.

MR. DOBBINS:  Let's go to the second page, please.

(Pause in proceedings.)

MR. DOBBINS:  All right.  So let's go to -- I apologize.  There is no second page to that one.

BY MR. DOBBINS:

Q.  So let's go to -- back to -- we showed you Government's Exhibits 29 and 28, which were the other cell phone, 1B127.  Did you generate a report doing that -- if I may show you Government's Exhibit 36 for identification.

MR. DOBBINS:  For the witness only, please.

BY MR. DOBBINS:

Q.  Do you recognize Government's Exhibit 36?

A.  Yes.  That is the -- a screenshot of the Cellebrite screen for one of Mr. Gonzalez Vidal's phones, FBI Evidence Item Number 1B127.

Q.  Okay.  And is this the screenshots that you did when you conducted your searches of these -- of the extraction?

A.  Yes.

MR. DOBBINS:  Your Honor, at this time, we move Government's Exhibit 36 into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 36 received into evidence.)

MR. DOBBINS:  And if we way pull up Government's Exhibit 34 for the witness only, please, for identification.

BY MR. DOBBINS:

Q.  Do you recognize Government's Exhibit 34?

A.  Yes.  This would have been the Cellebrite Device Report that I generated off of Mr. Gonzalez Vidal's other phone.

Q.  Okay.  And is this the -- what you were able to generate from that extraction, which was Government's Exhibit 29 for identification?

A.  Correct.

MR. DOBBINS:  Your Honor, at this time, I'd move Government's Exhibit 34 into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No.  No objection.

THE COURT:  Admitted into evidence.

(Government's Exhibit 34 received into evidence.)

MR. DOBBINS:  At this time, I'd move Government's Exhibit 35 -- I'm sorry.  I'd like to show the witness only

Government's Exhibit 35 for identification.

BY MR. DOBBINS:

Q.   Do you recognize Government's Exhibit 35?

A.   Yes.  This is the Cellebrite report that I generated for the user accounts off of Mr. Gonzalez Vidal's second phone.

Q.   Okay.  And is this the same -- same way you did it with the extraction from Government's Exhibit 29?

A.   Correct.

         MR. DOBBINS:  Your Honor, at this time, I move Government's Exhibit 35 into evidence.

         THE COURT:  Any objection?

         MR. FEIGENBAUM:  No.  That's fine, Judge.

         THE COURT:  Admitted into evidence.

    (Government's Exhibit 35 received into evidence.)

         MR. DOBBINS:  And now showing the witness only Government's Exhibit 30 and -- 30, please.

BY MR. DOBBINS:

Q.   Do you recognize this exhibit, Government's Exhibit 30?

A.   Yes.  This is the Cellebrite report that I generated, again, off of Mr. Gonzalez Vidal's second phone of a conversation with Mr. Hernandez.

Q.   Okay.

         MR. DOBBINS:  Your Honor, at this time, I'd move Government's Exhibit 30 into evidence.

         THE COURT:  Any objection?

86

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 30 received into evidence.)

MR. DOBBINS:  And then if we could show the witness only Government's Exhibit 31, please.

BY MR. DOBBINS:

Q.   Do you recognize Government's Exhibit 31?

A.   Yes.  This is another Cellebrite report that I generated off of Mr. Gonzalez Vidal's second phone of a conversation with Neco.

Q.   Okay.  And is this the report generated from the extraction, Government's Exhibit 29?

A.   Yes.

MR. DOBBINS:  Your Honor, I'd move Government's Exhibit 31 into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  Just to clarify, you said -- if Mr. Dobbins could clarify.  That's between Gonzalez Vidal and Neco -- oh.  Sorry, Your Honor.  Sorry about that.

(Pause in proceedings.)

THE COURT:  All right.  We're addressing Exhibit 31.

Is there any objection?

MR. FEIGENBAUM:  I was just going to ask a clarification.  If Mr. Dobbins could tell us whether that's between Gonzalez Vidal and Neco.

MR. DOBBINS:  It is.

MR. FEIGENBAUM:  And does it reflect the whole back-and-forth with him for that conversation?

MR. DOBBINS:  Yes.  Whatever brief messages there are there.

MR. FEIGENBAUM:  No objection.

THE COURT:  Admitted into evidence.

(Government's Exhibit 31 received into evidence.)

MR. DOBBINS:  All right.  And then we could go to, finally, Government's Exhibit -- I'm sorry.  Not finally -- Government's Exhibit 32 and Government's Exhibit 33.  If we could maybe just pull those up side by side.

BY MR. DOBBINS:

Q.  Do you recognize Government's Exhibit 32?

A.  Yes.  That's another report that I generated off of Mr. Gonzalez Vidal's second phone.

Q.  Okay.  And what is that report?

A.  It's a report of contacts that I had tagged for -- to generate the report.

Q.  All right.  And what about Government's Exhibit 33?

A.  And 33 is another report that I generated off of Mr. Gonzalez Vidal's second phone, with images that I tagged to extract out of that report.

MR. DOBBINS:  Your Honor, at this time, the Government would move Government's Exhibits 32 and 33 into evidence as

88

well.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  All right.  Admitted into evidence.

(Government's Exhibit 32 & 33 received into evidence.)

MR. DOBBINS:  All right.  So if we may go back to Government's Exhibit 34, and we may publish for the jury.

(Pause in proceedings.)

BY MR. DOBBINS:

Q.  Okay.  Again, just -- what are we looking at here in Government's Exhibit 34?

A.  We're looking at the Cellebrite-generated report that I created from one of Mr. Gonzalez Vidal's phones.  And this is going to be the device information, which, again, is a lot of technical data.  As you can see, IMEI; Bluetooth address; the model number; the second IMEI, when they have them; Apple ID device name that was given to the phone, those sort of things.

Q.  And what is the first Apple ID listed there?

A.  The first Apple ID there is jmglez1987@yahoo.com.  So similar, if not the same username that we saw in the other device or in the other conversations.

Q.  Okay.

MR. DOBBINS:  If we could move to Government's Exhibit 35, please, in evidence.

BY MR. DOBBINS:

Q.   And what is it we're looking at here?  What is Government's Exhibit 35?

A.   So we're looking at the Cellebrite report that I generated off of Mr. Gonzalez Vidal's second phone for the user accounts. So we're seeing a sample here, a Facebook user account with the user ID of elchupi1987@gmail, a Gmail account with the username of jglezp1987@gmail, and so on.

Q.   Okay.

MR. DOBBINS:  If we can then move to Government's Exhibit 32, please.

BY MR. DOBBINS:

Q.   And again, what is in this exhibit?

A.   So we're looking at a Cellebrite report that I generated from Mr. Gonzalez Vidal's second device of contacts.

Q.   Okay.

MR. DOBBINS:  And if we could scroll down, I believe it's to Page -- Page 4, I think.

BY MR. DOBBINS:

Q.   Who -- who are some of the contacts that we're seeing here?

A.   So we're seeing several contacts in -- Contact Number 10 is Neco 2; Number 11, Neco Nuevo, which means "Neco New"; and again, Neco Nuevo on Number 12 there.

Q.   All right.  And the phone numbers in Contact 11 and Contact 12, what are those area codes -- the country codes -- excuse

90

me.

A.   Five two is the country code on both of those numbers, which, again, is Mexico.

Q.   Okay.

          MR. DOBBINS:  Let's keep scrolling down, please.

          Let's go to the next page, please.

BY MR. DOBBINS:

Q.   And again, who are the contacts we're looking at here?

A.   We're looking at -- again, at Neco, and Neco, different number.

Q.   Okay.

          MR. DOBBINS:  And if we could go to the next page, please.

          All right.  Let's go to Government's Exhibit 31, please.

BY MR. DOBBINS:

Q.   Okay.  Who are the participants in this WhatsApp chat?

A.   So we're looking at a chat between Neco, with the 52-1-99-9947-5331 number, and Mr. Gonzalez Vidal.  The green box would be an outgoing message from Mr. Gonzalez Vidal.

Q.   Okay.

          MR. DOBBINS:  And let's scroll down to the next page, please.

BY MR. DOBBINS:

Q.   Now, where it says there:  "Scrambled," what does that

mean?

A.   So you'll see "scrambled," and it's accompanied by -- it's hard to tell, but it's a small circle with a red X.  And what that means is most likely those messages were deleted from WhatsApp, but Cellebrite was able to extract some part of those messages.  And what happens a lot of times is when Cellebrite recovers these messages, whatever contents was in there, WhatsApp is supposed to be a -- or it's an encrypted application.  And what it does is -- I don't know the technicalities behind it, but what it does is it scrambles the words so that the message doesn't make sense.

So we'll see some messages shortly here where the sentence doesn't really make sense because the words are literally scrambled.

Q.   Okay.

MR. DOBBINS:  Now, let's go to the next page, please.

And if we could go ahead and --

BY MR. DOBBINS:

Q.   Did we have Spanish translations for this one?

A.   We do, submitted similar as the other ones.

MR. DOBBINS:  Your Honor, at this time, I'd move Government's Exhibit 31A into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 31A received into evidence.)

MR. DOBBINS:  All right.  Now if we could put that up side by side.

(Pause in proceedings.)

MR. DOBBINS:  Okay.  If we could go to Page 4, please.

BY MR. DOBBINS:

Q.  And what's that first message there from -- in the green bubble from Mr. Gonzalez Vidal?

A.  So on October 13th, 2020, Mr. Gonzalez Vidal sends a message to Neco saying:  "It's me, Jose."

Q.  And what's the response?

A.  Neco replies by saying:  "What's up?"

Q.  Okay.  And is there another message from the Neco phone two days later?

A.  Yes.  On October 15th, 2020, Neco replies -- again, this is where you can see that it's scrambled because the order in which the words are in, or the numbers, don't necessarily make sense, but you can kind of make out they are different quantities.  The message, as it reads, says the following:  "2,300 to Javi.  And for $700, Joan Ramoncito, Jr., 8,500 is going to give 5,500 from the merchandise."

Q.  Okay.

MR. DOBBINS:  Let's go to the next page.

BY MR. DOBBINS:

Q.  And what's the response there from the Gonzalez Vidal

phone?

A.   So on 10/15, Mr. Gonzalez Vidal replies by saying:  "Okay. Are you at the marina?"  And Neco shortly answers by saying: "On my way there."

Q.   Okay.

MR. DOBBINS:  And if we go to Page 7, please.

BY MR. DOBBINS:

Q.   That second bubble, what's the message there from the Gonzalez Vidal phone?

A.   On 10/16/2020, Gonzalez Vidal sends a message to Neco saying -- again, it's scrambled, but it says the following as it is:  "There, Joan, the money delivered."

Q.   Okay.

MR. DOBBINS:  If we could now pull up Government's Exhibit 30 in evidence.

BY MR. DOBBINS:

Q.   Again, who is the participants here in this one?

A.   Here we're looking at a WhatsApp conversation between Gonzalez Vidal and Mr. Hernandez, who's saved in Gonzalez Vidal as Javi El Gordito Estafador, with that 0366 number.

Q.   Okay.  Do we also have this message translated into English?

A.   Yes.

MR. DOBBINS:  All right.  Your Honor, at this time, I'd move Government's Exhibit 30A, the English translations,

into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Government's Exhibit 30A received into evidence.)

MR. DOBBINS:  If we may put 30A up side by side.

(Pause in proceedings.)

BY MR. DOBBINS:

Q.  Okay.  And again, we recognize that phone number ending in 0366 as belonging to whom?

A.  Mr. Hernandez, his new number.

Q.  Okay.  And if we can go with -- we have the first two messages there on that first page.

A.  So on October 7th, 2020, Mr. Gonzalez Vidal sends a message to Mr. Hernandez saying:  "Javi," and subsequently:  "What's up?"

Q.  Okay.  And on Page 2, what's the message there, that first message?

A.  On that same date, October 7th, 2020, Gonzalez Vidal sends a message to Mr. Hernandez saying:  "Send me Roberto's number."

Q.  Okay.  And then if we go just to the last page of the document, Page 3, is there a response the there from Mr. Hernandez's phone?

A.  Yes.  Mr. Hernandez replies, on October 8th, something along the lines of:  "Surely.  No answer."  And then something

along the lines of:  "We'll call tomorrow."

Q.  Okay.

MR. DOBBINS:  Now if we could pull up Government's Exhibit 33 in evidence, please.

BY MR. DOBBINS:

Q.  And what is Government's Exhibit 33?

A.  So 33 is the Cellebrite report that I generated off of two specific images from Mr. Gonzalez Vidal's second phone.

Q.  Okay.

MR. DOBBINS:  And let's scroll down, so we can see the actual pictures.

BY MR. DOBBINS:

Q.  All right.  What does this indicate -- this first photo, what is this we're looking at here?

A.  So this looks like a screenshot that was taken off of a cell phone or some kind of mobile device that shows a wire transfer.  It says:  "Transferencia exitosa," which means "successful transfer," on September 11th, 2020, for a total of 2,700 US dollars, that went to Mr. Javier Hernandez at a BanCoppel Bank.

Q.  Okay.

MR. DOBBINS:  And if we could go to the next page, the next photo.

BY MR. DOBBINS:

Q.  And what does that photograph indicate there?

A.   This is another transaction, on September 17th of 2020, for $2,500, to Mr. Javier Hernandez.

Q.   Okay.

MR. DOBBINS:   Let's -- if we may have the computer for the witness only.

BY MR. DOBBINS:

Q.   I'd like to show you Government's Exhibit 76 for identification, please.

MR. DOBBINS:   And also, if we could go ahead and pull up Government's Exhibit 97 for identification, please.

BY MR. DOBBINS:

Q.   Do you recognize these two exhibits?

A.   Yes.  Exhibit 76 is a copy of the certified records we received from the Florida Department of Highway Safety and Motor Vehicles for a vehicle history for Mr. Hernandez, specifically relating to a 2018 Toyota Tundra.  And Exhibit 96 is part of those same returns, which shows a copy of Mr. Hernandez's driver's license.

Q.   Okay.

MR. DOBBINS:   Your Honor --

BY MR. DOBBINS:

Q.   Are these the certified DAVID records from the State of Florida Department of Highway Safety and Motor Vehicles that were obtained during the investigation?

A.   Yes.

MR. DOBBINS:  Your Honor, at this time, I'd move Government's Exhibits 76 and 96 into evidence.

THE COURT:  Any objection?

MR. FEIGENBAUM:  That's fine, Judge.

THE COURT:  All right.  Admitted into evidence.

(Government's Exhibits 76 & 96 received into evidence.)

MR. DOBBINS:  If we may publish to the jury, please.

THE COURT:  You may.

BY MR. DOBBINS:

Q.  Let's start with Government's Exhibit 96, which is on the right-hand side.  Just -- what kind of information is presented here for Mr. Hernandez?

A.  So we're looking at the -- what the Department of Highway Safety and Motor Vehicles has for Mr. Hernandez's driver's license.  It shows his name; the driver's license number; the picture that's on his most current driver's license; his home address, which says 7441 Wayne Avenue, Apartment 80, in Miami Beach; date of birth of July 12th, 1973; issue and expiration date; citizenship status; country of birth; race; and his signature.

MR. DOBBINS:  And if we could scroll down a little bit on 96, please.

BY MR. DOBBINS:

Q.  All right.  And is this also just the address history here?

A.  Correct.  This is just showing his current address and

whatever previous address that he had associated to him, and the dates that they were changed.

MR. DOBBINS:  And scroll down some more, please.

Keep going until that is -- is that the end?

BY MR. DOBBINS:

Q.  All right.  So that's basically the driver's license history for Mr. Hernandez.

Let's turn now to Government's Exhibit 76.  What is this specific record that was obtained from the Florida Department of Highway Safety and Motor Vehicles?

A.  So in this record, we're looking at a vehicle that had a temporary plate registered under the name of Mr. Javier Hernandez.  I'll walk you through it here on the Vehicle Detail, starting on top.  It shows that it was a 2018 Toyota, with a VIN number of 5TFBW5F10JX769479.  And if you can recall, this is the same VIN we saw in the messages earlier that I identified as being owned by someone in Mississippi, and that I took the picture of the original truck in the homeowner's garage.

Continuing here, it shows the color of the vehicle, the type of vehicle that it is.  Again, it's showing it's a temporary registration, and it's showing the license plate number and telling us it's a template, and it's showing the effective date and the expiration date.  And again, Mr. Hernandez's name and his driver's license.

Q.   Okay.  And what was the start date of the temporary tag?

A.   October 3rd, 2019.

Q.   And what was the expiration date of that temporary tag, since it's only about 30 days?

A.   November 1st, 2019.

Q.   Okay.

        MR. DOBBINS:  And if we can scroll down a little bit.

        Let's go ahead and go to the next page.

BY MR. DOBBINS:

Q.   All right.  Now, after this, if we keep going, there is additional -- or earlier entries --

        MR. DOBBINS:  Let's go down one more page, please.

BY MR. DOBBINS:

Q.   All right.  So do the records reflect that this temporary tag was ever converted into a -- an actual registration for this vehicle?

A.   No.  And I believe if we keep scrolling on this page, we will see that the same temp tag, the same temporary tag was issued under a second person's name in Florida.

Q.   Okay.

        MR. DOBBINS:  Let's keep scrolling.

BY MR. DOBBINS:

Q.   Okay.  So we have a new temporary registration there?

A.   Right there.

        MR. DOBBINS:  Let's go up one page, please, to Page

08.

BY MR. DOBBINS:

Q. All right. Now, what's the temp tag that was issued here?

A. Can we go down because I think it was actually the same number on the temp tag that was issued for the gentleman, Jorge -- the individual with the name of Jorge David Hernandez Azor.

Can we scroll down one more page. I think that will show the same temp tag.

Can we try one more.

All right. Well -- well, basically -- maybe I'm remembering incorrectly, but you can see here the same license -- or the same VIN number that ends in 9479 that we've been talking about was issued at least one or two other temporary license plates.

Q. Okay. Let's start with the first one. What's that date there?

A. We see the effective date of March 11th, 2019.

Q. And was the -- was an annual registration ever issued for that plate or for that vehicle under this individual's name?

A. No. All it had was, again, a temporary plate.

Q. Okay.

MR. DOBBINS: Let's keep moving up.

Go ahead another page, please.

And one more page.

BY MR. DOBBINS:

Q.   All right.   Now, when was this temporary tag issued for that Toyota Tundra with that VIN?

A.   Yes.   So you see here again the same VIN number ending in 9479 was issued a temporary tag about a month later, April 16th, 2019, with a different license plate number.   And again, it was another temporary tag.

Q.   Okay.   And then we go back to -- the other one was issued in Mr. Hernandez's name October 3rd of 2019, right?

A.   Correct.

Q.   All right.   And all this time, based on your investigation, was that Toyota Tundra that's actually associated with that VIN number owned out in Mississippi?

A.   Correct.   The Toyota number that bears that VIN number -- and again, there's only -- it can only be one VIN which is assigned and manufactured by the manufacturer.   That VIN number ending in 9479 has always belonged to that Toyota Tundra that was sold as new and resold in Mississippi and Tennessee.

Q.   And is that the VIN number that we saw yesterday that was texted between the Neco phone and Mr. Hernandez's 4719 number, as well as Mr. Hernandez's 4719 number and the Robertico Nuevo number for Mr. Marrero Cisneros?

A.   Correct.   That's the same number that they were exchanging.

        THE COURT:   Mr. Dobbins, just let me know when it might be a good time to break for lunch.

MR. DOBBINS:  We can break now, Your Honor.

THE COURT:  All right.  Ladies and Gentlemen, as you can see, it's close to 12:15.  I'll see you back here at 1:15.

Have a pleasant lunch.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury not present, 12:14 p.m.)

THE COURT:  All right.  Just for scheduling purposes, how much longer do you think, Mr. Dobbins, you have with the --

MR. DOBBINS:  I actually think I'm finished, Judge.  I just have to ask my partner.  I maybe have one or two questions after lunch, but that will be it.

THE COURT:  All right.  And Mr. Feigenbaum, do you have an anticipated time of how much you need for cross-examination?

MR. FEIGENBAUM:  Yes, Your Honor.

Two to three hours.

THE COURT:  All right.  So you think that might take us through the day?  I know you have your witness here.

MR. FEIGENBAUM:  Yes, Your Honor.

I'm just going to ask everyone -- ask Your Honor and the Government -- it's Mr. Riemer, the maritime investigator. He did come yesterday afternoon because I didn't want any gaps for the Court, came today also about 10:30, 11:00.  I was wondering would Your Honor think it prudent to consider taking

him out of turn today?

THE COURT:  Well, how much time is needed for this witness?

MR. FEIGENBAUM:  For --

THE COURT:  Mr. Riemer, yes.

MR. FEIGENBAUM:  Probably, on direct, two hours.

How about this?  I don't want to really interrupt the Government's presentation.  May I just inquire of Mr. Riemer if he's okay for Monday?

THE COURT:  I just want to caution everyone.  We were using Monday as -- to the extent that we needed it based on additional testimony, that being obviously Mr. Hernandez.

I want to make sure -- I thought yesterday that we were going to be able to get through the special agent and Mr. Riemer.  And it appears that that is not possible, given the amount of time you're giving me.

MR. FEIGENBAUM:  Well, what happened, Your Honor, yesterday, I believe Mr. Dobbins estimated he needed another hour this morning, and it's taken three hours.  And so when you look at the total hours for the last Government witness, the most important one, the case agent, I think he's testified six to seven hours.  So even taking half of what the Government did -- actually, less than half of what the Government did, that puts me at the two hours --

THE COURT:  Yes.  I understand.  My concern is I think

we had at least one juror that, while Monday worked, I don't know if Tuesday works.  So I'd hate to have to declare a mistrial when we've come this far.  So let's see where we are in terms of Tuesday, why don't you see about Mr. Riemer, and I'll see you on the other side of lunch.  Okay?

MR. FEIGENBAUM:  Yes, Your Honor.

MS. KLEPACH:  Thank you.

COURT SECURITY OFFICER:  All rise.

(Recess from 12:16 p.m. to 1:14 p.m.)

THE COURT:  All right.  Welcome back.

Special Agent Francisco, if you'll come forward.

Both sides ready to proceed?

COURT SECURITY OFFICER:  Let me make sure we have all our jurors, Judge.

MS. KLEPACH:  Yes, Your Honor.

MR. FEIGENBAUM:  Judge, just one matter, if you wanted to address it real quickly before.

THE COURT:  Yes, sir.  All right.

MR. FEIGENBAUM:  Would be the scheduling as to my witness Mr. Riemer, who is outside.

THE COURT:  Yes.

MR. FEIGENBAUM:  Well, I was just going to say, I mean, I guess the Government -- this is the Government's last witness.  I have a couple of hours of cross.  They'll probably have a fairly lengthy redirect.  That will put us at -- I don't

know.  Sometimes the judges, rather than entertain the Rule 29 and other matters at that point -- I don't know what Your Honor would be doing.  Let's say we're at -- let's say we finish with this particular witness at four o'clock, then what would Your Honor's -- would you want the Defense case to start at that point or --

THE COURT:  Yes.

MR. FEIGENBAUM:  Okay.  So I should tell Mr. Riemer to wait then?

THE COURT:  Yes.

MR. FEIGENBAUM:  May I tell him now?

THE COURT:  Yes.

MR. FEIGENBAUM:  Thank you.

(Pause in proceedings.)

THE COURT:  Well, perhaps we can work toward having the witness come on and off today, as well as the Government's witness.

So to that extent, Mr. Feigenbaum, rather than taking time away from the jury with regard to your Rule 29 motion, why don't -- perhaps you could make it to preserve it, and then we could address argument when the jury leaves.  Would that be appropriate?

MR. FEIGENBAUM:  Yes.  You want me to do that after they formally rest?

THE COURT:  After they formally rest.  And I just want

to make sure -- I'll have a separate colloquy with Mr. Hernandez, but let me make sure.  Mr. Hernandez, as you know, the Government bears the sole burden of proving all the elements of these five counts.  You have no burden.  You understand that, sir?

THE DEFENDANT:  (Through Interpreter.)  I do.

THE COURT:  However, you have already called Mr. Pullen, and it's my understanding that Mr. Riemer will be called as well.  And I just want to make sure that -- once the Government rests, at that point in time, Mr. Feigenbaum will properly make a motion.  The Court will certainly reserve on that motion, will hear argument at another time, but then at that point in time Mr. Feigenbaum would then move to call Mr. Riemer as a witness in your case.  That's by your agreement, sir?

THE DEFENDANT:  Yes.

THE COURT:  And at the appropriate time, we'll take a break so I can speak directly to you, Mr. Hernandez, with regard to your constitutional right as well not to testify, and whether you have made a decision to testify in this matter, but it is somewhat premature.  But I do want to make sure that you understand that the Government has the sole burden.  You have no burden, although it's clear that you have agreed, and Mr. Feigenbaum has called forward witnesses, certainly Mr. Pullen and now will be calling Mr. Riemer.  And you have

agreed to that; is that correct, sir?

THE DEFENDANT:  Correct.

THE COURT:  All right, then.

(Pause in proceedings.)

MR. DOBBINS:  Your Honor, while we're waiting, I just wanted to verify -- my colleague said that she didn't think -- but I just want to make sure -- was Government's Exhibit 22B, as in boy, admitted?

THE COURT:  22E?

MR. DOBBINS:  B as in boy.

THE COURT:  Oh, B.  Yes.  22B is -- actually, it's 21B, not 22B.  You want to introduce it at this time?

MR. DOBBINS:  Yes, Your Honor.

(Government's Exhibit 22B previously admitted into evidence.)

(Pause in proceedings.)

THE COURT:  All right.  The courtroom deputy did ask the jurors whether they would be willing to stay Monday and Tuesday.  It's obvious that we may run into that day.  And I have a letter:  "Judge Bloom, my name is Vickie Murphy.  I'm Juror Number 9.  I am the nursery curator at Montgomery Botanical Center.  We deal with wild collectic conservation palms and" -- something -- "from around the world.  I requested an agricultural exception.  It was denied.

"I have plant material coming from in three different

108

countries. Those plants are not replaceable. We won't get a second chance. Yet, there are other people that can handle this material; however, no one else at MBC has my 20-plus years of expertise. Like everyone else, we are short-staffed. Please consider making an alternate juror, so I may return to work.

"Thank you for your consideration, Vickie Murphy."

Does that mean she doesn't want to continue now? I'm not sure what this is given in response to. Liz, could you tell us? And is this an alternate juror?

COURTROOM DEPUTY: She is not an alternate juror. From my understanding, she doesn't -- she cannot go past Tuesday. Meaning, if it's for deliberations that go past that, she will not be able to because she has people coming from other countries, flying, in and she also is flying out.

THE COURT: All right. So this mentions nothing about Tuesday. But this is in response to your request as to whether they were --

COURTROOM DEPUTY: Yes.

THE COURT: And are the other jurors able to stay Monday and Tuesday?

COURTROOM DEPUTY: Yes. Yes.

THE COURT: All right. Well, let's see how far we go. And perhaps, given that -- maybe this will be a Court exhibit. But at this point, there's no reason for the Court to take any

action based on this note. If there was anticipation that we might extend further than Tuesday, but given that it's been an extensive -- and quite frankly, Mr. Feigenbaum -- Mr. Dobbins, Mr. Feigenbaum was accurate. You did state you had about an hour. So here we are now, you know, past lunch, and I don't -- I don't know where you are with this testimony. Maybe we can get to where we need to go and let's get this case to the jury at some point.

All right. Let's bring in the jury.

COURT SECURITY OFFICER: All rise for the jury, please.

(Before the Jury, 1:23 p.m.)

THE COURT: All right. Welcome back, Ladies and Gentlemen.

Please be seated.

And we'll continue with the direct examination.

MR. DOBBINS: Yes, Your Honor.

Before we broke, I had marked as identification and moved to admit Government's Exhibits 21A and B. But then I believe I corrected myself. So it should be 22, 22A and 22B were the exhibits that we wanted to admit.

THE COURT: Any objection?

MR. FEIGENBAUM: No, Your Honor.

THE COURT: Admitted into evidence.

(Government's Exhibits 22, 22A & 22B previously received

into evidence.)

BY MR. DOBBINS:

Q.   All right.   Special Agent Francisco, I was just showing you again Government's Exhibit 76, and along with Government's Exhibit 11, and Government's Exhibit 100.   Government's Exhibit 76 was the car registration.

MR. DOBBINS:   If we could pull that up for that license plate.

BY MR. DOBBINS:

Q.   Okay.   And what was the license plate number there?

A.   The temporary license plate was CNL8758.

Q.   Okay.   And going to Government's Exhibit 100 in evidence, Page 68, which was the photographs that were extracted from the Javier Hernandez phone.   What is that a picture of?

A.   That's an actual printed paper plate with the same numbers, CNL8758.

Q.   Okay.   And then going to Government's Exhibit 11, which were the chat -- WhatsApp chat extractions for -- for Mr. Hernandez's phone, who was the -- who is the sender of this item?

A.   This is an incoming message from Robertico Nuevo, who we know as Mr. Marrero Cisneros -- sent a paper registration or photo of that same tag number to Mr. Hernandez's phone.

MR. DOBBINS:   Thank you, Your Honor.

No further questions.   Pass the witness.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon, Mr. Francisco.  How are you?

A.  Good afternoon.  I'm good.

Q.  Some preliminary questions.  I believe you said in your direct testimony that you've been an FBI agent for about three and a half years now?

A.  Correct.

Q.  At the time that the events that have been talked about in this trial, events from 2018 and 2019, you were not yet an FBI agent?

A.  Correct.

Q.  And also, you did not work on either the Gonzalez Vidal case, the Marrero case, that he talked about that he had in federal court recently, and this case -- you didn't originally work on any of those cases?

A.  That's correct.

Q.  Okay.  So I believe you came into this case when the case agent, Spielvogel, was going to take a new position in Washington?

A.  Correct.

Q.  And what was the month and year for that?

A.  I don't recall exactly, but it would have been sometime 2022, maybe around August, give or take.

112

Q. Okay. And so, the Indictment, the Amended Indictment that we're on here about in this case, was from March 23, 2023?

A. You're referring to the Superseding Indictment?

Q. Yes.

A. Yes. I believe so.

Q. Okay. And prior to that, there was -- the original Indictment, if I'm not mistaken, was from November of 2022?

A. That sounds right.

Q. So for at least several months, you worked on the developing of charges against Mr. Hernandez for the original Indictment?

A. I worked on analyzing the evidence that there was on the case, yes.

Q. Were you part of the decision-making process -- maybe I should say: Did you have input into what charges initially were brought against Mr. Hernandez?

MR. DOBBINS: Objection. Relevance.

THE COURT: Sustained.

BY MR. FEIGENBAUM:

Q. Did you provide the prosecutors in this case with information that they then used to make the initial charges against Mr. Hernandez?

A. Yes.

Q. Okay. And the initial charges in November of 2022 were just two charges -- two counts, as they call them, in an

Indictment?

A.   I believe it was two counts.  I don't recall.

Q.   Well, did there come a time in March, specifically on March 23 of 2023, when additional charges were added?

A.   Correct.  That was on the Superseding Indictment.

Q.   And there were three additional charges added?

A.   Either two or three, something along those lines.

Q.   And when the draft of the original Indictment was made, before it was filed, did you have a chance to look at it and confer with the prosecutors for accuracy?

        MR. DOBBINS:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Input about allegations of fact, allegations --

        MR. DOBBINS:  Object --

        THE COURT:  I'm sorry?  What's the basis of the objection?

        MR. DOBBINS:  I was going to say relevance.  I wasn't sure if he was finished, so I stopped.

        THE COURT:  Let me hear the question.

BY MR. FEIGENBAUM:

Q.   The facts that you presented to the prosecutors who drafted the Indictment, you and your team were the ones who gave those to the prosecutors because you were the investigators, right?

A.   Correct.  That's how it always works.

Q.   Okay.  So then, what the prosecutors wrote up for the initial charges, the two charges, were based on results of your investigation?

          MR. DOBBINS:  Objection.  Calls for speculation.

          THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Did there come a point in time when you ever reviewed the original Indictment?

          MR. DOBBINS:  Objection.  Relevance.

          THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   We're here on the Superseding Indictment from March 23, 2023.  You agree?

A.   Yes.

Q.   And you've seen it before?

A.   Yes.

Q.   And you think it's -- you're fine with it being correctly drafted?

          MR. DOBBINS:  Objection, Your Honor.  Relevance.

          THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Can I ask it this way:  Do you disagree with any allegations in the Superseding Indictment?

          MR. DOBBINS:  Objection, Your Honor.  Relevance.

          THE COURT:  Sustained.

115

BY MR. FEIGENBAUM:

Q.   The Superseding Indictment, based on information you provided the prosecutors, alleges that Mr. Hernandez stole four boats and -- stole four boats, along with Mr. Reyes, correct?

A.   That's correct.

Q.   And that he transported a stolen boat to Mexico?

A.   The -- I believe the literal charges say:  "Conspiracy to transport stolen vessels."

Q.   Okay.  And that he, according to the allegations against him, was the person who transported the boats?

A.   Correct.

Q.   I notice from -- now, just generally, when you took over being the lead case agent, what did you have to do to familiarize yourself with the case that Former Lead Agent Spielvogel had developed?

A.   Well, I had to review all of the evidence on the case, most of which has been presented in court over the past three weeks here.

Q.   Over the past?

A.   Three weeks.

Q.   Okay.  And another -- you have like a co-case agent in this case?

A.   Yes.

Q.   And is that Agent Freddy Tomas Batista?

A.   He is an agent on my squad, but he wasn't necessarily the

co-case or the second --

Q. Okay.  Are you familiar with a memo that he made on August 23 of this year, just a couple of months ago?

MR. DOBBINS:  Objection.  Calls for hearsay.

THE COURT:  Overruled.

THE WITNESS:  You would have to be more specific about a memo.

BY MR. FEIGENBAUM:

Q. Yes, sir.  One dated August 23, 2023, regarding a visit by two FBI agents to Merida on November 20 -- I'm sorry -- on December 8, 2019.

A. What else is in this memo?  You're being very vague. Doesn't help me, sir.

Q. If I showed you a document to help refresh your recollection, might that help?

A. Yes, sir.

MR. FEIGENBAUM:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. FEIGENBAUM:

Q. Has that writing helped refresh your recollection?

A. Yes.

Q. So my question is:  It's true that just a couple of months ago, August 23, 2023, a member of your team, Agent Batista, wrote a memo about the visit he had with Agent Spielvogel back on December 8, 2019?

MR. DOBBINS:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Do you know whether Agent Spielvogel and Agent Batista went to Merida, Yucatan on December 8, 2019, as part of its -- as part of your investigation?

A.  I do know that they went to Merida around that time in 2019, after the *Luca Brasi* was encountered by Mexican law enforcement.

Q.  In fact, you were in trial when Agent Spielvogel testified, right?

A.  Correct.

Q.  And he mentioned that he and Agent Batista arrived to Merida on that date and he took pictures of a boat during that visit?

MR. DOBBINS:  Objection.  Calls for hearsay.

THE COURT:  Overruled.  I'll allow it.

BY MR. FEIGENBAUM:

Q.  Were you present in court when Agent Spielvogel testified to that?

A.  I was here when he was talking about the boat and him and Agent Batista's trip to Mexico and taking photos.

Q.  Okay.  My question is:  Why did, four years later, this memo go into the file in this case?

A.  If I had to speculate to that, it would be because --

MR. DOBBINS:  Objection.  If he's going to speculate, then I would move to strike the --

THE COURT:  Yeah.  You don't need to speculate.  If you know.

THE WITNESS:  I would say if that -- this 302 -- what the FBI calls a 302, not a memo, which is a report of investigation -- went in on this date, it's because those pictures or the happenings of that trip weren't otherwise documented in our case management system.  But I believe that this 302, or this report, came with some attachments, with some emails, showing the dates from their trip.

BY MR. FEIGENBAUM:

Q.  Now, you were asked a lot of questions yesterday and today about how you investigated matters in this case, correct?

A.  Correct.

Q.  And by your experience and training, one of the most important aspects is to take photographs of important crime scene evidence, right?

A.  That's a very general statement, because a crime scene could be defined in very different ways.  So I'm not sure what you mean which by "a crime scene."

Q.  Okay.  So did you have meetings with the Mexican police officials, who had some involvement in matters related to this case?

A.  I met with the Mexican officials involved in this case

119

telephonically a few months ago, in preparation for their trips here.

Q.   Did you ever go to Mexico yourself to look into any matters related to this case?

A.   No.

Q.   After Agent Spielvogel and Batista went to Mexico regarding matters in this case, December 8 and December 9, 2019, did anybody else from the FBI go to Mexico to follow up about anything that became part of matters in this case?

A.   I don't -- I don't believe so.

Q.   Now, there was, I believe, questions to you relating to Mr. Hernandez being arrested by Mexican police, correct?

A.   Correct.

Q.   And at that time, his cell phone was seized by the Mexican police.

A.   Okay.

Q.   And the testimony in this case so far indicates that that was soon after midnight on November 22, 2019.

A.   Yes.  I believe that's correct.

Q.   All right.  And one of the Mexican police officials who came here testified about him being involved in the case -- in the arrest of Mr. Hernandez, right?

A.   Right.

Q.   And I believe on cross-examination that police officer said that Mr. Hernandez was charged with a civil infraction that

related to a personal use amount of marijuana; is that right?

MR. DOBBINS:  Objection, Your Honor.

THE COURT:  And the basis?

MR. DOBBINS:  I can approach, if you want, Your Honor, but that's not an accurate statement of the facts here.

MR. FEIGENBAUM:  I believe that was the trial testimony of that officer.

THE COURT:  All right.  I'll permit the question with regard -- since the witness was there.  Overruled.

BY MR. FEIGENBAUM:

Q.  Correct?

A.  The Mexican officers testified to something along those lines, but I don't recall exactly what was said.

Q.  Yet, with your contact with the Mexican police officers who came to this trial, you reviewed with them what evidence they had in their possession that related to Mr. Hernandez, correct?

A.  Yes.  We reviewed the police reports that they wrote up.

Q.  How about any photographs?

A.  I don't believe there was any photographs.

Q.  How about any other documents?

A.  All I remember reviewing with them is the police reports, the Mexican police reports.

Q.  And one of the officers testified about him arresting the person known as Neco, Mario Alberto Enrique Lopez, correct?

A.  Correct.

Q.   And he said that he arrested Neco driving a pickup truck, towing a trailer that didn't have a license plate out of Neco's marina; is that right?

A.   I remember him saying something along those lines.

Q.   And were there any photographs that the Mexican police produced in regard to that incident?

A.   I don't believe so.

Q.   Were there any other documents that related to that incident?

A.   We have their police reports.

Q.   Okay.  That's it?

A.   I believe that's it.

Q.   No photographs of a boat on a trailer that was being pulled by a truck he allegedly was driving, correct?

A.   All we have is the police reports.

Q.   Before I forget, did you testify that you were the member of your team who took photographs of the Toyota Tundra?

A.   Correct.

Q.   And did you do that at the house of the current owner of it?

A.   Correct.

Q.   And it was silver color?

A.   I believe it was silver, yes.

Q.   That Tundra was never stolen, correct?

A.   The one sitting in the garage of Mr. Jeter and Ms. Jeter,

that was not stolen.

Q. I think earlier you testified that Mr. Hernandez was involved with a stolen Toyota Tundra.

A. Correct.

Q. Are you saying the one you just said was never stolen was the one that was stolen?

A. That's not what I said.

Q. Okay.

A. Would you like me to elaborate?

Q. Yes.

A. Okay. That Toyota Tundra -- what I said in my testimony, we got the VIN number from the chats from Mr. Hernandez's phone. We ran that VIN number in law enforcement databases, and it came back to that Toyota.

All right. And what that shows is what is typical of cloning by people who steal vehicles and/or boats. And that VIN was also shared with Robertico Nuevo, which is Mr. Marrero Cisneros, who is the person that's known to be the fabricator of these fraudulent VIN numbers.

So what I said in my testimony was we followed that VIN number that they were sharing in those chats, and we were able to figure out that they used that VIN number to clone what would have been this stolen Tundra. There's no need to clone a vehicle or manufacture a VIN if that vehicle is not stolen.

Q. Among the evidence, there's no papers that I have seen -- I

could have missed it, because there's so many -- of a -- of another stolen Tundra.

A.   We're talking about one stolen Tundra.  There's the actual Tundra that was stolen, which was the one on the photographs in Mr. Hernandez's phone with the red interior that was parked outside a home.  Right?  That's a stolen tundra.

The VIN number that they used to have Mr. Marrero Cisneros duplicate the VIN came back to a legitimate Toyota Tundra, which was purchased and owned out of Mississippi.  So we're talking about two different vehicles.

Q.   Okay.  Again, I could be wrong.  I don't believe you've produced evidence of another stolen Tundra, not the one that Mr. Jeter still has.  Am I wrong?

A.   I never said Mr. Jeter's Tundra was stolen.

Q.   No.  No.  That's what I'm saying.  You're saying that Mr. Hernandez was driving a Tundra that was not the Tundra that is, as you say, the original Tundra with a certain VIN number, correct?

A.   Correct.

Q.   Okay.  What I haven't seen -- but I have thousands of pages of documents -- I don't recall seeing a document saying that the Tundra Mr. Hernandez drove was a stolen vehicle.

A.   We were not able to identify the original VIN of that Tundra.  Because, again, we never saw that Tundra with the red interior in person.  All we saw was the documentation that was

shared between Mr. Hernandez, Mr. Marrero Cisneros, and Neco, which was the information to create a fraudulent VIN and documents for that Tundra.

Q. So when you told the jury, and other Government witnesses have told the jury that Mr. Hernandez was driving a stolen Tundra, you're speculating that that vehicle was stolen?

A. There's no other reason, based on my training and experience, that someone would have to generate a duplicate or a fraudulent VIN for a vehicle, otherwise -- if it wasn't stolen.

Q. Okay. But you have to guess that, right?

A. It's an educated guess, based on my training and experience, and based on the other evidence in this case where they were doing the exact same things with the vessels, which we were able to actually backtrack.

Q. Is it right to accuse somebody based on a general principle that doesn't apply to him?

        MR. DOBBINS: Objection. Badgering.

        THE COURT: Sustained.

BY MR. FEIGENBAUM:

Q. Did there come a point in time when Gonzalez Vidal, Chupa, was stopped by Mexican police and arrested?

A. Yes.

Q. And at that time, were any items seized from him?

A. Yes. I believe there was two cell phones seized from him.

Q.   The two cell phones that you have talked about in this trial?

A.   Correct.

Q.   Mr. Hernandez never had those phones because they were seized from Mr. Gonzalez Vidal by Mexican police.

A.   I'm not sure I understand your question.

Q.   The two phones that you have talked about here, and went over with the prosecutor, they were seized from Mr. Gonzalez Vidal himself?

A.   Correct.

Q.   I want to go back to dates about the Gonzalez Vidal case and the Javier Hernandez case.

     Based on your studying the case, after you took it over, you learned that there was already a criminal complaint or it's a -- it's a charging document that precedes an indictment; is that right?

A.   In regards to who or what?

Q.   Okay.  Well, let me ask it this way:  Did you ever work at all on the Gonzalez Vidal case?

A.   Nothing.  Nothing pre-Indictment, no.

Q.   So I understand -- I don't think you were an FBI agent pre-Indictment, correct?

A.   Correct.

Q.   What I'm asking is:  As you took over as the case agent in the Hernandez case, this case, did you familiarize yourself

with things that had happened in the Gonzalez Vidal case?

A.   Overall, yes.

Q.   Because -- I ask you this because I believe in the Government's opening statement, putting Mr. Hernandez's picture up with the other people in the Gonzalez Vidal case, you're presenting the case as if Javier Hernandez is part of that, correct?

A.   Well, Mr. Javier Hernandez was working with Gonzalez Vidal and his co-conspirators.

Q.   Okay.  So if that's true, back in the summer, late summer of 2020, when the Gonzalez Vidal case that had seven defendants -- in the late summer of 2020, that's already like nine months after Mr. Hernandez went with what the Government alleges was a stolen boat -- Government alleges was a stolen boat, and you had -- the FBI had his cell phone -- Mr. Hernandez's cell phone by December 9, 2019 -- if what you say is true, you had everything you needed to charge Mr. Hernandez along with Gonzalez Vidal and the other people in that case, but you didn't do it, correct?

          MR. DOBBINS:  Objection.  Compound question.

          THE COURT:  Do you understand the question?

          THE WITNESS:  I believe there's multiple parts in there.  So if you could break it down for me.

BY MR. FEIGENBAUM:

Q.   You didn't charge Javier Hernandez in the Gonzalez Vidal

case?

A.   No.

Q.   The last events of -- for Javier Hernandez that have been talked about here were -- ended basically in November 2019, correct?

A.   Correct.

Q.   And then, nine months later, the FBI and the Government bring formal charges against Gonzalez Vidal and six other people in a case?

A.   Correct.

Q.   By that time, the FBI had already extracted, using Cellebrite, all the information from the Hernandez cell phone, correct?

A.   Well, just because we obtained the phone in November of 2019, and extracted it in that time period, doesn't mean that we had the time to completely analyze all the data. Because as you've said yourself, there's a lot of information.

Q.   Okay.  So the first Indictment in Gonzalez Vidal -- doing this by memory -- was January 2021, correct?

A.   I'm not sure about those dates, but it could be right.

Q.   And then there was a -- in Gonzalez Vidal, there was a Superseding Indictment in -- on May 27th of 2021, correct?

A.   Again, I don't remember, but it could be right.

Q.   And then there was a third Indictment on February 9, 2023 in Gonzalez Vidal?

A.  Correct.

Q.  And during 2020, 2021, 2022, and part of 2023, more than three years, you don't charge Javier Hernandez with Gonzalez Vidal, in that case, even though you come to court now and say he was part of them.

MR. DOBBINS:  Objection as to form.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Now, there's been a lot of testimony, in the Government's case that we're still in, about the individual called Neco, correct?

A.  Correct.

Q.  And to be able to give the information that the jury may want to consider, you had to look into who was Neco.

A.  Correct.

Q.  And you learned that he was a fairly wealthy businessman, right?

A.  Correct.

Q.  And that he not only had a marina, but the marina could accommodate around 50 boats, right?

A.  I'm not sure how many boats it accommodated, but it's a fairly big marina as I understand it.

Q.  And also that he owned at least one -- I think more -- tortilla factories.

A.  I know vaguely that he owned some restaurants.  I don't

129

know what kind of restaurants.

Q.   Okay.  So you looked into what were his businesses, correct?

A.   I'm generally aware of who Neco is and what he was involved with.

Q.   Okay.  I'm just asking about the businesses.  What businesses did he have?

A.   I didn't personally look into any businesses that he had.

Q.   Well, since Neco seems to be, according to the Government's presentation, a central figure in the crimes alleged, shouldn't you have looked very closely at who he was, including businesses that he had?

          MR. DOBBINS:  Objection.  Relevance.

          THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Well, what did you find out about Neco?  Because he seems to be a central figure in things that are being presented.

A.   What we found out about Neco was that he was a business owner, with a lot of influence and power in the Yucatan area, and that he was a facilitator and he worked along with Gonzalez Vidal and co-conspirators.

Q.   Okay.  And you've heard the name in this trial of an individual named Luis Felipe Saiden Ojeda.  You know that name?

A.   I -- vaguely.

Q.   What do you remember about him?

A.   I honestly remember you bringing that name up in court.

Q.   Okay.  Part of your testimony was -- and it might have been another Government witness, but part of your testimony was what you called corruption messages.  Were they part of a cell phone record?

A.   The only thing I've testified in regards to that is -- was the message on Mr. Hernandez's phone, a Facebook message with Ms. Yisel, where he was talking about bribing Mexican officials with a truck.

Q.   Okay.  Were the words "police chief" part of one of those messages?

A.   I don't remember exactly, but something along those lines.  He said something about the governor and somebody high in power.

Q.   Okay.  Well, did you -- that being something that you are accusing Mr. Hernandez of doing, did you do any investigation to find out who those people are?

A.   No.

Q.   Wouldn't that be an important part of the investigation, to know whether these alleged bribes relate to certain people and who they are?

A.   Not necessarily.

Q.   So you take a message that's -- a WhatsApp message, was it?

A.   I believe this was a Facebook message.

Q.   Facebook message.  It says something -- the governor,

somebody else, the police chief, and you didn't bother to find out who they are and their relationships with others, correct?

A.  Correct.

Q.  Do you know anything about Police Chief Luis Felipe Saiden Ojeda?

A.  No.

Q.  Now, part of the -- tell the jury what it is when we talk about discovery material.

MR. DOBBINS:  Objection.  Relevance.

MR. FEIGENBAUM:  I'll rephrase.

THE COURT:  Yeah.  Let's rephrase.  Sustained.

BY MR. FEIGENBAUM:

Q.  As part of the Government's obligation in a criminal case, in a federal criminal case, you turn over to Defense counsel what you call discovery, correct?

A.  Correct.

Q.  And it's an obligation you have to turn over material that you believe relates to your investigation and charges, correct?

MR. DOBBINS:  Objection, Your Honor.

THE COURT:  And the basis?

MR. DOBBINS:  One is relevance, and two, it's causing -- calls for the witness to speculate, because the witness -- it calls for a legal conclusion.

THE COURT:  It does.  Sustained.  Rephrase, please.

BY MR. FEIGENBAUM:

Q.   Do you provide the prosecutors with discovery that is for turning over to the Defense?

A.   Yes.  We turn over -- any evidence or information we collect in our case, we turn it over to the prosecutor, so they could then turn it over to the Defense.

Q.   And you also are obligated to turn over any evidence that might be favorable to the Defense.  Is that your understanding?

MR. DOBBINS:  Objection, Your Honor.  Again, form.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Now, from what I gather in this trial, your position as lead agent is that Neco was involved in crimes that have been charged in this case; is that right?

A.   Correct.

Q.   And if so -- well, let me withdraw that question.  I'll get to it in a second.

You were introducing yourself yesterday, mentioning that you work on what's known as transnational crime cases; is that right?

A.   Transnational organized crime.  Yes.

Q.   Right.  Transnational organized crime; in other words, organized crime that involves illegal activity between two or more countries; is that right?

A.   Between persons and where the crime originates or touches

other countries in the Western Hemisphere.  Yes.

Q.  So you've been having some training and experience in transnational criminal organizations, right?

A.  Correct.

Q.  And as part of your training and experience, you had to learn about a concept known as extradition, correct?

A.  Correct.

Q.  And tells us that extradition is.

A.  Extradition is, in general, the process of bringing a subject or a person that has an arrest warrant or some kind of charges in the US, extraditing them, bringing them from whichever country they are located to the US.

Q.  And you had to become familiar with whether there was an extradition treaty between the United States and Mexico, correct?

A.  Somewhat general.  That part of it is a little bit way above my pay grade.

Q.  Okay.  But you know that the United States can seek the extradition of a Mexican national to the United States to face criminal charges here, right?

A.  In general.  I know it's a very lengthy process.

Q.  Okay.  Well, a lengthy process.  If Neco, as you say, was kind of the hub of criminal activity, and it's been, say, four years or so since your team gathered facts to charge people in Gonzalez Vidal, still, the Government has not sought the

134

extradition of Neco as a co-conspirator in any of the cases that relate to activity in Mexico, right?

A. Well, in order to seek extradition, there first has to be charges.

Q. Okay. But you consider Neco to be a co-conspirator in the Gonzalez Vidal case, and even in this case, right?

A. He is involved with the parties named, yes.

Q. Okay. Why haven't -- if that's true, why haven't you sought to bring him to the United States to face charges, as others have had to do?

MR. DOBBINS: Objection. Relevance.

THE COURT: Sustained.

BY MR. FEIGENBAUM:

Q. When you identify somebody involved in criminal activity that impacts the United States, and you have a basis to charge him, you seek that person's extradition, correct?

MR. DOBBINS: Objection. Relevance.

THE COURT: Sustained.

MR. FEIGENBAUM: Judge, can I -- I don't want to make a standing objection, but I would like to argue that.

THE COURT: The objection on grounds of relevance is sustained, Mr. Feigenbaum. You may continue.

BY MR. FEIGENBAUM:

Q. Is it your contention that Neco engaged in the stolen boat trade?

135

A.   Yes.

Q.   In the stolen boat trade that relates to this case?

A.   Yes.

Q.   Can I ask, then, why you haven't charged him in this case?

          MR. DOBBINS:   Objection.   Relevance and calls for a legal conclusion.

          THE COURT:   Sustained.

BY MR. FEIGENBAUM:

Q.   You heard testimony from the only other codefendant this case had, who pled guilty, Ramon Reyes Aranda, correct?

A.   Correct.

Q.   In fact, you interviewed him like three days before this trial started, correct?

A.   Correct.

Q.   And he pled guilty the same day the jury was picked in this case, correct?

A.   I believe so.

Q.   And he told you about his cousin who lived in Cancun, right?

A.   Yes.

Q.   Did you ever look into who his cousin was in Cancun and what he does?

A.   Yes.

Q.   Okay.

A.   His cousin -- I believe his name is Edilberto Paez Reyes.

We had actually learned of his cousin before Mr. Reyes Aranda told us about it.  As I'm sure -- if you're looking at my report, it will show that in an agent note.  Because we found some documents with his name on Mr. Reyes Aranda's phone when we did the Cellebrite extraction.  And I was able to look up his name and see that he had some outstanding warrants from, I believe, 2010, or something along those lines, out of Tampa, for something related to the transport of stolen property or something along those lines.

Q.  And when did you learn that?

A.  On my review of Mr. Reyes Aranda's phone after we arrested him.

Q.  So like in December of 2022?

A.  I think the arrest happened around December.  I don't know when I completed the review of his phone.

Q.  Did you ever generate any document for the Defense that gave that information about the cousin?

A.  I'm pretty sure in one of my reports it shows the name, and I believe there's a criminal history report somewhere.

Q.  Was it turned over to the Defense?

MR. DOBBINS:  Objection, Your Honor.  Calls for speculation.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Outstanding warrants from Tampa, still outstanding to this

day?

MR. DOBBINS:  Objection, Your Honor.  Relevance.

MR. FEIGENBAUM:  Judge, I find it highly relevant.

THE COURT:  All right.  I'll allow it.  Overruled.

THE WITNESS:  That's what an outstanding warrant is, yes.

BY MR. FEIGENBAUM:

Q.  Now, even though you're not a prosecutor, as a law enforcement agent, you have to be familiar with the laws that you enforce, correct?

A.  Correct.

Q.  So you do receive some training in the law, so that you know whether a person's activity falls within a criminal law, correct?

A.  Correct.

Q.  And you know that just knowing somebody is not a crime. There has to be more, right?

A.  Correct.

Q.  And that even associating with people is not a crime, right?

MR. DOBBINS:  Objection, Your Honor.  Calls for a legal conclusion.

THE WITNESS:  Correct.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Okay.   You conduct criminal investigations?

A.   Yes.

Q.   And if you find through your investigation that someone you suspected of engaging in criminal activity merely associated with, knew, or even knew what others might be doing, but did not voluntarily join in and participate in that activity, then that person would not be someone you would charge in a crime?

          MR. DOBBINS:  Objection.  Hypothetical.  Calls for speculation.

          THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   In this case, were you involved in deciding which witnesses the Government would present in this trial?

A.   I was somewhat involved, because I had the knowledge of who the witnesses would be.

Q.   Okay.  And were you involved in the decision to have as trial witnesses, first, Crespo Marquez?

A.   That's not my decision to make.

Q.   Okay.  Well, let me ask it this way:  In this trial, we had the following witnesses, among others -- we had Reynaldo Crespo Marquez; Ramon Reyes Aranda, the former codefendant in this case; and the last witness, not too long ago, Roberto Marrero Cisneros, correct?

A.   Correct.

Q.  And those are the three witnesses that you have who claim to have personal knowledge about what Javier Hernandez did, right?

MR. DOBBINS:  Objection.  Calls for comment on other testimony.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Did you rely on what Crespo Marquez told you in relation to Javier Hernandez?

MR. DOBBINS:  Objection, Your Honor.  Calls for speculation and calls for a legal conclusion.

THE COURT:  On the second ground, sustained.

BY MR. FEIGENBAUM:

Q.  The Government showed you a lot of messages.  Most of them, I believe, are WhatsApp, others were Facebook Messenger.  And as they came up, and Party A said something, and then Party B said something, you interpreted yourself what those messages meant, correct?

A.  I don't understand the question.

Q.  Okay.  Do you recall, during your direct examination yesterday and today, that you were shown on the screen different messages that came out of cell phone extractions?

A.  Yes.  There's been a lot of that.

Q.  A lot of that.  A lot.  And as somebody said something in one of those messages, you were asked to comment on it,

correct?

A.   There was also a lot of that.  Can you give me something specific?

Q.   Not right now.  Maybe in a little while.  We'll see.

You were asked to comment?  That's the question.

A.   I was asked to comment on a lot of things.

Q.   Okay.  But that's the way you view what was said, not necessarily what was in the mind of the person who said it, correct?

A.   That's a very general comment.  If you can give me a specific example of a chat.

Q.   Do you know what a person meant every time one of their messages showed up?

A.   I can read what the message says, and I can corroborate that with all the other evidence on the case.

Q.   Well, that's different, if you have something independent that might help explain why somebody said it.  But how about those cases where there's nothing except those words, and you say it means X.  That's because you say it means X, right?

MR. DOBBINS:  Objection, Your Honor. Mischaracterizing the witness's testimony.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   There was a point -- I think it was yesterday -- when you were asked to review, for your testimony here in the trial,

exchanges between Yisel Castro and Mr. Hernandez. Remember?

A. Correct.

Q. Do you know who Yisel is?

A. I do not.

Q. Wouldn't that have been important to try to find out before you applied your own interpretation what those conversations meant?

MR. DOBBINS: Objection. Compound question.

THE COURT: Sustained. Rephrase, please.

BY MR. FEIGENBAUM:

Q. As one of the sets of conversations you believed was incriminating against Mr. Hernandez, wouldn't it be prudent and fair to find out who Yisel is?

MR. DOBBINS: Objection. Calls for characterization. "Fair."

THE COURT: Sustained. Rephrase.

BY MR. FEIGENBAUM:

Q. You never looked into who Yisel was, right?

A. No.

Q. You don't know that Yisel is Mr. Hernandez's cousin?

MR. DOBBINS: Objection, Your Honor. Calls for speculation.

THE COURT: The witness has stated he doesn't know. Sustained.

BY MR. FEIGENBAUM:

Q.   Well, I notice -- you looked into Mr. Hernandez's background, right?

A.   Generally, yes.

Q.   And you found out he was married, right?

          MR. DOBBINS:  Objection, Your Honor.  Relevance.

          THE COURT:  I'll allow it.  Overruled at this point.

          THE WITNESS:  Not necessarily.

BY MR. FEIGENBAUM:

Q.   You didn't find that out, right?

A.   No.

Q.   You didn't find out that he has a son with his wife?

          MR. DOBBINS:  Objection.  Relevance.

          MR. FEIGENBAUM:  I'll tie it up, Judge.

          THE COURT:  Sustained.

          MR. FEIGENBAUM:  I can tie it up.

          THE COURT:  Well, he's already stated he doesn't.

BY MR. FEIGENBAUM:

Q.   Okay.  You made a comment on words you saw, when Yisel said in one of those messages -- now, I'm specific as to a message -- when Yisel said -- I'll say it in Spanish, and then I'll repeat it in English -- "Como esta el niño," words like that --

          MR. DOBBINS:  Objection, Your Honor.

BY MR. FEIGENBAUM:

Q.   You remember that?

THE COURT:   Sustained.

BY MR. FEIGENBAUM:

Q.   Do you remember Yisel mentioning:  "How is el niño?"

A.   Yes.

Q.   And you said -- you were asked by the prosecutor at that point:  "Do you recall, Special Agent Francisco, if there is someone related to this case known as El Niño?"  And you said: "Yes.  Crespo Marquez."  Isn't that what you said?

A.   Correct.

Q.   And you don't know whether Mr. Hernandez's cousin Yisel was asking about his own son?

A.   That was not the question that I was asked by the prosecutor.

(Pause in proceedings.)

MR. FEIGENBAUM:   One moment, Your Honor.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   You remember -- going back to the interview that you had in preparing Ramon Reyes for his trial testimony -- that that there came a point in time when he lied to you and Mr. Dobbins, and maybe a couple of other agents who were present on September 23, a Saturday morning, getting ready for trial the next week?  Remember?

A.   I do.

Q.   And that Ramon Reyes told you that he had bought a Cobia pleasure craft through an online advertisement from a Cuban male in Tampa, right?

A.   Correct.

Q.   And you presented -- at that point, on September 23, just a few weeks ago, you presented Mr. Reyes with paperwork that showed what he had just told all of you was false, right?

A.   I didn't present him with paperwork.  But I did tell him that the Cobia paperwork had a name on it, and so it was impossible that what he was telling me was true at that point.

Q.   So it was you who confronted him with information that showed he had been lying during that trial preparation interview, correct?

A.   Correct.

Q.   But he came to trial and he said:  "Well, I started out say something and I corrected myself."  That was also false, what he just said at trial?

        MR. DOBBINS:  Objection.  Calls to comment on another's testimony.

        THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   And Mr. Reyes, the former codefendant in this case, admitted to you at that trial preparation conference that he had stolen the Cobia boat in the -- from the area that he lives

in in Southwest Florida, right?

A.   Correct.

Q.   And that he stole it himself without need for anybody else to help him, right?

A.   Correct.

Q.   And that he used it for his own purposes to take him and his family around for two and a half years, right?

A.   Correct.

Q.   And then he wanted to sell it for $75,000 to Neco, correct?

A.   Right.

Q.   So the point is that Mr. Reyes, under oath, said that he was capable of stealing boats alone, right?

        MR. DOBBINS:   Objection.   Calls for comment on another witness's testimony.

        THE COURT:   Sustained.

BY MR. FEIGENBAUM:

Q.   You learned during your investigation of the Gonzalez Vidal group, that other case also in this courthouse with Judge Altonaga -- you learned that Chupa and Crespo Marquez used drugs themselves, correct?

A.   Correct.

Q.   In fact, that came out by one of the first two witnesses that the Government presented in this trial, so long ago it seems like, who said that when Chupa and Crespo Marquez showed up at a house where he had been taken after arriving from Cuba

in Mexico, that those two walked in smoking marijuana, right?

A.   I believe the --

MR. DOBBINS:  Objection.  Calls for comment on another witness's testimony.

THE COURT:  Sustained.  If the witness has personal knowledge, you may certainly ask him.

MR. FEIGENBAUM:  I think he's already answered the question, Your Honor.  I'll move along.

THE COURT:  All right, then.

BY MR. FEIGENBAUM:

Q.   You also testified about -- here, looking at WhatsApp or Facebook messages that had to do with Mr. Hernandez either receiving VIN numbers -- could be an image, maybe just written out -- or sending VIN numbers, right?

A.   Correct.

Q.   But isn't it true that when you buy certain kinds of boat parts, to get the right boat part, you have to have the VIN number, correct?

A.   I don't know that.  I don't buy boat parts.

Q.   Okay.  So you don't know the answer to that question?

A.   I do not.

Q.   And if the sending and receiving of VIN numbers relating to boats has to do with being able to get the right part from a boat parts dealer, there would be nothing illegal about that, right?

147

MS. KLEPACH:  Objection.  Calls for speculation and a legal conclusion.

THE COURT:  Sustained.

BY MR. DOBBINS:

Q.  And you testified about a couple of Western Union payments that Mr. Hernandez sent on August 8, 2018, one for $880, and the other for $1,500.  Remember testifying about that?

A.  Yes.  I believe one was to Mr. Crespo Marquez and the other one to Mr. Gonzalez Vidal.

Q.  Okay.  What was the purpose of sending those amounts, $880 and $1,500?

A.  I do not know.

Q.  So you put it on the screen, talk about it, but you don't really know why those two payments were sent?

A.  I do not know what those two payments were sent for.

Q.  So as we sit here today, it could be for a totally legitimate reason, right?

MR. DOBBINS:  Objection.  Asked and answered and calls for speculation.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Regarding the travel records that you went over pretty extensively regarding Mr. Hernandez's travel -- you remember that?

A.  Yes.

Q.  The mere fact of travel doesn't -- is not evidence of the commission of any crime in this case, correct?

MR. DOBBINS:  Objection, Your Honor.  Calls for a legal conclusion.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  The mere fact of travel, no.  By itself, no.

BY MR. FEIGENBAUM:

Q.  Okay.  And there was something in your testimony -- I think it might have been today -- of -- it was pretty lengthy -- some exchanges of messages between Gonzalez Vidal and Javier Hernandez around the time of November 22, 2019, regarding people who Gonzalez Vidal knew who could obtain passport -- I don't know what they call them -- passport documents or things related to a passport in Mexico, right?

A.  Yes.  They were talking about passport stamps, Immigration stamps on a passport.

Q.  Well, I think there was mention in those messages of getting a visa for six months, right?

A.  Right.

Q.  And one of Mr. Hernandez's responses was:  "Why would I need a visa for six months," right?

A.  Correct.

Q.  You don't even know from those messages whether that back and forth with Mr. Hernandez, about somebody who Gonzalez Vidal

knew, was relating to Hernandez himself?

A. I know that, based on the messages, Mr. Hernandez was trying to get to meet this person so he could have a stamp in a passport.

Q. Well, think about that. Those messages were -- my recollection is November 22 -- 21 or 22 -- 2019, right?

A. Right.

Q. But Mr. Hernandez was arrested by the Mexican police at that time, like early-morning hours of November 22, correct?

A. I believe the -- we looked at the dates on those messages, and we determined that they might have been, based on the UTC time conversion, of the night of the 21st.

Q. Okay. Okay. And once Mr. Hernandez was arrested -- a few hours later, correct?

A. What's the question?

Q. Okay. Once Mr. Hernandez was arrested a few hours later, he was in custody for weeks in a Mexican jail, right?

A. According to the Mexican law enforcement, yes.

Q. And according to the travel records, which is one of your exhibits, Mr. Hernandez didn't come back to Miami until December 25, 2019, like a month later, correct?

A. Correct.

Q. So he went from a Mexican jail to -- maybe was out for a few days, and then flew back to the United States about a month after he had that conversation with Gonzalez Vidal, right?

A.   I don't know what happened in between the arrest and the flight back, but what I do know is that he flew back --

Q.   Well, in your conversations with Mexican police investigating this case, did you understand that when they took him to jail that he didn't have access to his passport during his incarceration in a Mexican jail?

          MR. DOBBINS:  Objection.  Calls for hearsay.

          MR. FEIGENBAUM:  No.  That's actually not hearsay.

          THE COURT:  Whether the witness knows.  Overruled. You may answer the question.

BY MR. FEIGENBAUM:

Q.   Do you know?

A.   I do not know that.

Q.   Okay.

          MR. FEIGENBAUM:  Judge, at what time would Your Honor like a take a comfort break?  I'm okay to go, but I'm --

          THE COURT:  All right.  Ladies and Gentlemen, would this be a good time?

          All right.  Let's go ahead and take a 10-minute recess.

          COURT SECURITY OFFICER:  All rise for the jury, please.

     (Jury not present, 2:34 p.m.)

          THE COURT:  Okay.  We're on a 10-minute recess.

     (Recess from 2:34 p.m. to 2:49 p.m.)

151

THE COURT:  All right.  Welcome back.

Ready to continue?

(Pause in proceedings.)

COURT SECURITY OFFICER:  They are ready.

THE COURT:  Okay.  Both sides ready to continue?

MS. KLEPACH:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Before the Jury, 2:49 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

And continuing with the cross-examination.

MR. FEIGENBAUM:  Thank you, Your Honor.

BY MR. FEIGENBAUM:

Q.  Agent Francisco, remember you had some testimony a little while ago with the Government about messages between Mr. Hernandez and a person known as Man De Los Tanques?

A.  Yes.  Mantanques.

Q.  Okay.  And your understanding was that Mr. Hernandez would acquire fuel containers to take on boat trips?

A.  He would obtain containers that he would then use to put extra fuel to take on the trips.

Q.   Okay.  And have you looked into whether there was anything illegal about acquiring those fuel containers?

A.   I believe there's some kind of state violation for carrying extra fuel on unauthorized containers, but nothing that I'm aware of as a federal law.

Q.   And nothing about taking containers like that on boats?

A.   Again, I'm not aware of any federal law that references taking containers on a boat.

Q.   Also, I believe you testified at times about the cell phone analysis that one of your agents did -- let me be clear -- cell phone tower locations and times?

A.   Yes.  You're referring to cell site analysis?

Q.   Yes, sir.

A.   Correct.

Q.   And the -- I understood your reason for making that presentation was to try and associate Mr. Hernandez with being in the area during periods when several boats were stolen, right?

A.   So I did not make that presentation.  But yes, the presentation that was made by the CAST, Cellular Analysis Survey Team -- I'm not exactly sure what it stands for.  But the purpose of analyzing that data from the search warrant was to be able to corroborate that with all the other evidence we have in relation to the stolen boats.

Q.   All right.  And you remember the testimony of your cell

site expert -- I believe his name was Adam Goodrich; is that right?

A.   Correct.

Q.   And he wrapped up his testimony saying that it's not a precise location technology, correct?

MR. DOBBINS:  Objection.  Calling for a comment on another witness's testimony.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Have you been trained at all in cell site analysis?

A.   Very vaguely.

Q.   What?

A.   Very vaguely.

Q.   Okay.  Is it your understanding that if you get a cell site hit at a certain location that means the person is right there?

A.   My understanding is the hits bounce off of a cell phone tower.  And my understanding is that the -- through the warrant returns, that the subscriber in this case -- I believe it was T-Mobile -- provides us -- they could tell which section of the tower hit, which will place the cell phone in a general direction in a 360 degrees environment of where that phone would generally be.

Q.   But it still can be, according to your expert, miles away from the site where it registers, correct?

MR. DOBBINS:  Objection.  Calls for comment on another

witness's testimony.

THE COURT:  Sustained.

MR. FEIGENBAUM:  May I just make this objection for the record, Your Honor?

THE COURT:  Certainly.  When you say:  "The objection" -- let's ask another question, and let's see where we go with the next question.

BY MR. FEIGENBAUM:

Q.  As part of the evidence you collected, you wanted to show a location of Javier Hernandez on certain dates and times, right?

A.  We were able to show a general location through those cell site returns, yes.

Q.  A general location; is that right?

A.  Correct.

Q.  Okay.  It's not the same precision that a GPS has, which will pretty much have a point of reference where the person really is, correct?

A.  Depends on what you mean by a GPS.

Q.  Are there GPS devices that give the exact location of a person?

A.  There are GPS devices that provide the exact location of that device.

Q.  Okay.  But in this case, we're talking about cell phone tower location technology.

A.  The cell site location provides a location for a cell phone

tower and a general location where the cell phone would be at the time that the cell phone -- the tower hit happened.

Q. All right. And it's also part of the record in this case that owners of boats provided information during a period of time between which, beginning and end, the boat could have been stolen, right?

A. Correct.

Q. I think the shortest period was 24 hours, correct?

A. I don't recall precisely. But yes, they all had some period of time.

Q. Right. And the longest one I think was the fourth boat, the *Luca Brasi,* which the owner I believe stated could have been during a two-week period, right?

MR. DOBBINS: Objection. Calls for comment on another witness's testimony.

THE COURT: If the witness knows. Overruled.

THE WITNESS: I don't recall what the specific timelines were.

BY MR. FEIGENBAUM:

Q. There was a point where you testified about something on the cell phone extraction that looked like a list of charges that was written on just like scrap paper, where there was -- it said: "Send $700 to Javi," and $5,500, I think it was -- something about merchandise. Do you remember that?

A. If you're referring to -- there was a photo of a scrap

piece of paper that had some handwritten notes, that I described to be what appeared to be some kind of ledger for prices and corresponding items next to it.

Q. Okay. Were those for boat parts?

A. I don't remember.

Q. And then, I believe you testified that there was -- in 2020, the year 2020, there were two different transactions, I believe you testified about. It was kind of towards the end before I got up here. Seven hundred dollars to Javi, was that one of them?

A. I don't recall if you're talking about the screenshots, or the bank transactions, or the Western Union receipts.

Q. No. The one that has like a Mexican bank name?

A. Yes. I believe -- if you're talking about the two photos that appear to be screenshots that were taken off Mr. Gonzalez Vidal's phone, there were two transactions from what appeared to be a Mexican account to Javier Hernandez, with some kind of Mexican account, it looked like.

Q. Did you ever investigate whether Javier Hernandez, sitting here, ever had a Mexican bank account?

A. I believe somewhere in the investigation, before I got there, we had requested records through what we call an MLAT, a Mutual Legal Assistance Treaty, which is the diplomatic way of requesting official records from another country. But I don't recall personally reviewing those records to see if

157

Mr. Hernandez had a bank account in Mexico.

Q.   Okay, sir.  As part of the evidence given to the Defense, do you recall when a -- some person unidentified made a recorded call to Neco, and it was on -- looks like it was on October 28th, 2019 -- October 28th, 2019 -- do you remember that being part of materials that you reviewed in this case?

A.   You have to be a little more specific with these recorded calls.

Q.   Right.  It was one person -- would it help you if you saw the document?

A.   Maybe.

MR. FEIGENBAUM:  Okay.  Let me show it to the Government.

(Pause in proceedings.)

MR. FEIGENBAUM:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. FEIGENBAUM:

Q.   Did that help you remember whether you've seen it before?

A.   I don't recall seeing that before, and it doesn't have any markings on where it was pulled from.

Q.   Does it have a number at the bottom, which would indicate that it was part of the Government's materials that it turned over to the Defense?

A.   I believe that stamp at the bottom is the signature of when it's turned over to Defense.

Q.   It's like a Government production number?

A.   I believe.  I'm not sure.

Q.   Okay.

(Pause in proceedings.)

MR. FEIGENBAUM:  Just going through my last materials, Your Honor, to see if I can wrap up.

THE COURT:  Of course.

(Pause in proceedings.)

MR. FEIGENBAUM:  Well, sir, I want to thank you for your time.

THE WITNESS:  Thank you.

THE COURT:  Any redirect?

MR. DOBBINS:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. DOBBINS:

Q.   All right.  Good afternoon again, Special Agent Francisco.

A.   Afternoon.

Q.   All right.  Just have a couple questions.  Let's talk about that -- you were asked on cross a lot about the chat with -- the Facebook chat, I believe it was with a Yisel -- a woman by the name of Yisel.

A.   Correct.

Q.   Actually, withdrawn.

Let's go to -- you were asked about the chat with Chupa, also known as Jose Miguel Gonzalez Vidal -- and asked about the

159

time stamps on those conversations.  Do you recall that line of questioning?

A.  Correct.

MR. DOBBINS:  May I have the ELMO, please.

BY MR. DOBBINS:

Q.  Showing you Government's Exhibit 8 in evidence.  Do you recognize this exhibit?

A.  Yes.  This is the chat between Mr. Hernandez and Mr. Gonzalez Vidal, country code of Spain, 34.

Q.  All right.  And this is the one where we went through all the voice notes where they were talking about getting the passport stamp and other things, correct?

A.  Correct.

Q.  All right.  Now turning to Page 20 of that exhibit, and that green bubble at the top, what was the date and time of that communication?

A.  The date and time was November 22nd, 2019, at 2:02 a.m. UTC, which would have been approximately eight p.m. on the 21st.  And an indicator of that is the file name, which is usually given in the format of the year, month, and day for those audio recordings.  And you can see there that the name of the file starts with 2019, 11/21, because when it was generated by the sender -- in this case, Mr. Hernandez -- in the local time there, it was still November 21st.

Q.  Okay.  I'm going to clear it.

Let's just go to the next page of chats.  Is there any chat response on WhatsApp from Mr. Hernandez's phone at that time?

A.  No.  Everything here is still in blue, which shows it's an incoming message from Mr. Gonzalez Vidal.

Q.  Okay.  Then we get past all the attachments.

MR. DOBBINS:  Let's go to Page 23 of the exhibit.

BY MR. DOBBINS:

Q.  Is there any indication here that there are chats between -- I'm sorry -- from the Hernandez cell phone?

A.  No.  They are all, again, still incoming from Mr. Gonzalez Vidal.

Q.  All right.  Then we get past the attachments.  Page 24, were there any messages from the Hernandez cell phone on this page?

A.  We're still only seeing incoming messages from Gonzalez Vidal's number.

Q.  All right.  And finally, Page 25.

A.  Same thing.  We're still seeing the blue messages, all from the Gonzalez Vidal number.

Q.  All right.  So is that last message from the Hernandez cell phone -- the one on Page 20, which is the day we talked about, which would have been November 21st, at approximately eight p.m.?

A.  Correct.  That's the last outgoing message by Mr. Hernandez.

Q.   And when did you understand that Mr. Hernandez was arrested by the Mexican police in November?

A.   On or about November 22nd, in the morning hours, early-morning hours.

Q.   You were asked on cross about the cell towers for -- that you testified during your direct.  Do you recall that line of questioning?

A.   Yes.

Q.   And specifically, you were asked:  Wouldn't it be better to have a GPS device with some of the locations?

A.   Correct.

Q.   All right.  Now, showing you Government's Exhibit 13 in evidence.  I'll zoom out.  What was this exhibit that you created from the Cellebrite extraction?

A.   This was the Cellebrite Extraction Report that I generated off of Mr. Hernandez's phone, showing the GPS locations that were stored on the device.

Q.   Okay.  And does it go in reverse chronological order?

A.   Yes.  So the latest one is November 22nd, at 4:40 a.m. UTC time, and then it goes down in reverse order.

Q.   Okay.  So I am going to flip to -- here we go.  I'm going to flip to Page 25 of Government's Exhibit 13.  I'll zoom in.

     I'd like to direct your attention to row 261 -- bless you.  What's the date on row 261 for that GPS coordinate?

A.   July 28th, 2019.

162

Q.   Okay.  And now looking at row 262, just below it, what's the date on that row entry for that GPS coordinate?

A.   January 27th, 2019.

Q.   Okay.  So are there any coordinates that the extraction was able to pull of GPS from between January 27th, 2019 and July 28th of 2019?

A.   No.  It doesn't appear so.

Q.   And then, if we go down to row 263, what's the date on that one?

A.   October 17th, 2018.

Q.   All right.  So do we have any GPS coordinates for the phone from October 17th of 2018 and -- until January 27th of 2019?

A.   No.

Q.   And do you recall when the *Mellow Yellow* was stolen, approximately?

A.   The *Mellow Yellow* was stolen around December 18th of 2018, I want to say, out of Marco Island.

Q.   Okay.  So do we have any GPS coordinates for that date?

A.   No.

Q.   All right.  And what about the *Reel Estate*?  Do you recall when the *Reel Estate* was stolen, approximately?

A.   I believe the *Reel Estate* was stolen around June 6th, 2019.

Q.   Okay.  And so based on this -- this exhibit, do we have any GPS coordinates for that date?

A.   No.

163

Q.   And what about the Everglades boat that was owned by Mr. Maytum, the *Ultimaytum*, when approximately was that stolen?

A.   I want to say July 17th, 2019.

Q.   All right.  And would there be any GPS coordinates listed here that would cover those dates?

A.   No.

Q.   And so is that why part of the investigation was to obtain -- or to try to get a warrant for cell site or cellular tower information for the Hernandez cell phone?

A.   Yes.  In part.

Q.   Okay.  You were asked on cross about this debrief that you conducted with Mr. Reyes Aranda prior to his pleading guilty, and specifically about a lie that he told you.  Do you recall that line of questioning?

A.   Yes, I do.

Q.   Can you just tell the jury how that -- that occurred, and what happened, and how long it took before Mr. Reyes Aranda told the truth, I guess, about the Cobia.

A.   Yes.  So that interview -- we spoke for a while.  I want to say approximately about three hours.  And we kind of just went in order about how he initially got involved with the boats and all that -- all those kind of dealings.

Eventually, we got to sometime around, I want to say, mid or late 2020, after Mr. Reyes Aranda had already stopped dealing with Neco and Mr. Hernandez, and he starts talking

about a Cobia boat, which we already knew through our investigation that he had stolen.  And he starts telling us that he purchased this boat in Tampa, and he got some paperwork from Kentucky.  And right then and there, I stopped him, and I told him:  "Hey, we have the paperwork from Kentucky, which was some fraudulent paperwork, and it has your friend's name on it, so it wouldn't make sense."  And he immediately like bowed his head, and said:  "Yeah.  You're right.  That's my mistake.  I don't even know why I'm lying at this point," and then he went back and told us how he stole the boat from Bonita Springs.

Q.  All right.  Let's talk about -- you were asked a lot of questions about Neco, and charging Neco, and extraditing Neco. Do you recall that line of questioning?

A.  Yes.

Q.  Is this investigation currently open or closed?

A.  Still open.

Q.  So what does that mean when an investigation is still open?

A.  It just means that it's not over.  Just because someone was charged doesn't mean that the investigation was over.

Q.  All right.  So when you say:  "It's not over," does that mean that the investigation into this group of individuals that included Neco continues?

A.  Correct.

Q.  You were asked a lot about -- Mr. Feigenbaum kept referring to it as the case against Gonzalez Vidal and Crespo Marquez,

and then there was the case against Javier Hernandez.  Based on the FBI, are these separate investigations or are they a single investigation?

A.  They are all being worked out of the same case file under the FBI system.

Q.  So you were asked about -- a lot on cross about if you considered Neco, for instance, to be a member of this group.  Do you recall that line of questioning?

A.  Yes.

Q.  Based on your investigation, do you consider Neco to be a part of this organized crime group?

A.  Yes.

Q.  What about Jose Miguel Gonzalez Vidal?

A.  Yes.

Q.  What about Reynaldo Crespo Marquez?

A.  Yes.

Q.  What about Ramon Reyes Aranda?

A.  Yes.

Q.  And what about Javier Hernandez?

A.  Yes.

Q.  Okay.  You were asked on cross a lot about the Toyota Tundra.  Do you recall that line of questioning?

A.  Yes.

Q.  You were asked specifically about:  Where is the paperwork that shows that that Toyota Tundra was stolen that was in those

chats?  Do you recall that?

A.  Correct.

Q.  All right.  And first off, what color was the Toyota Tundra that was in those chats?

A.  The Tundra on the chats was a white Toyota Tundra with red interior.

(Pause in proceedings.)

MR. DOBBINS:  Could we have the Government computer.

I'm sorry.  Seventy-six.

BY MR. DOBBINS:

Q.  Okay.  And the registration for this temporary tag with that VIN number, what does it indicate that the color of the truck was?

A.  White.

Q.  Okay.  Now, when you went to meet with the Jeters, after you received the business records from the Toyota dealership in Memphis, Tennessee, what did you learn that the actual color of that Toyota truck was with that specific VIN?

A.  The Jeter's truck that beared the legitimate VIN number ending 9479 was silver.

Q.  Now, why weren't you able to determine what the VIN number for that white Toyota in those pictures was?

A.  Because, for one, they never shared an actual photo of that VIN number.  And two, given the fact that they cloned this vehicle, they would have removed all the original markings or

VIN numbers from that vehicle.

MR. FEIGENBAUM:  Objection Your, Honor.  Calls for speculation.

THE COURT:  On the second ground, sustained.

BY MR. DOBBINS:

Q.  Was there any way for you to determine what the VIN number -- the actual VIN number for that white Toyota was?

A.  No.

Q.  And based on the evidence that was collected in this case, what happened to that white Toyota?

A.  Based on all the evidence, we determined that Mr. Hernandez drove that Toyota to Mexico.

Q.  And so now is there any way we're going to find out what the actual VIN number of that white Toyota is?

A.  Definitely not.

MR. DOBBINS:  One moment, Your Honor.

THE COURT:  All right.

(Pause in proceedings.)

BY MR. DOBBINS:

Q.  You were asked a lot on cross about, you know, you talking about that Toyota Tundra being stolen.  Do you recall that line of questioning?

A.  Yes.

Q.  All right.  Now -- and you were also asked on cross about being familiar with federal laws.  Do you recall that line of

questioning?

A. Correct.

Q. Okay. Now, the question is: With respect to that Toyota Tundra, what is it that Mr. Hernandez is charged with? Is it with possessing a stolen vehicle or is it with something else?

A. I believe Mr. Hernandez is being charged with regards to this Toyota Tundra to something along the lines -- I don't know exactly what the wording is, but something along the lines to illegal exportation of a vehicle.

Q. Okay. And does that also include -- would you like to see the Indictment? Would that refresh your memory?

A. Sure.

(Pause in proceedings.)

BY MR. DOBBINS:

Q. Just please review that, and maybe also Count 4, and let me know when you're done.

A. (Witness complies.)

Q. Having reviewed that document, does that refresh your memory as to the charges specifically towards that Toyota Tundra?

A. Yes.

Q. All right. And please explain it to us.

A. So Count 3 refers to the trafficking of motor vehicles with altered VIN numbers, including exportation -- can I look at it again.

Q.   Just to move on, what's Number 4?

A.   And then, Number 4 is the trafficking of stolen vehicles.

Q.   Okay.  And so, Count 3, does that include if the vehicle identification number is altered?

A.   Correct.  Yes.

MR. DOBBINS:  No further questions, Your Honor.  Thank you.

THE COURT:  All right.  Thank you, Agent Francisco.

You are excused, sir.

(Witness excused.)

THE COURT:  And the Government's next witness.

MR. DOBBINS:  Your Honor, at this time, the Government rests.

THE COURT:  All right.  On behalf of the Defendant?

MR. FEIGENBAUM:  Your Honor, I'd like to make a motion at this time.  May I?

THE COURT:  Yes, of course.  And for purposes of addressing the next witness that is outside, that motion is preserved and we can address it at the appropriate time.

MR. FEIGENBAUM:  Your Honor, on behalf Javier Hernandez, I move, pursuant to Federal Rule of Criminal Procedure 29, for a judgment of acquittal as to each count in the Superseding Indictment.

THE COURT:  All right.  And Mr. Feigenbaum, that motion is preserved and we can address it at the appropriate

time.

MR. FEIGENBAUM:  All right.

THE COURT:  So the Court will reserve ruling with regard to your motion.  And if the Defendant will call its first witness -- actually, the next witness, since, recall, Ladies and Gentlemen, we did take Mr. Pullen out of turn.

MR. FEIGENBAUM:  Your Honor, the Defense calls Daniel P. Riemer.

May I go retrieve him?

THE COURT:  Yes.  Of course.

(Pause in proceedings.)

MR. FEIGENBAUM:  He's coming right in.

THE COURT:  All right.

(Pause in proceedings.)

THE COURT:  All right.  Good afternoon, sir.

COURT SECURITY OFFICER:  Right this way, sir.

THE COURT:  Mr. Riemer, if you'll remain standing, raise your right hand to be placed under oath.

DANIEL P. RIEMER, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Please have a seat.

Please state your name and spell it.

THE WITNESS:  My name is Daniel Riemer.  R-I-E-M-E-R.

DIRECT EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon, Mr. Riemer.

How are you doing?

A.   Good.

Q.   Please tell the jury where you live.

A.   I live in West Palm Beach, Florida.

Q.   All right.  And where are you from originally?

A.   Well, I was born in a city outside Detroit, Warren, Michigan.  And when I was 11 years old, my parents moved to Boca Raton, and I've lived in Florida ever since.

Q.   All right.  So how many years more or less have you lived in Florida?

A.   I'm going to give away my age.  Fifty-three years, I've been living in Florida.

Q.   Okay.

MR. FEIGENBAUM:  Your Honor, let me retrieve an exhibit book, and that way we can save some time.

THE COURT:  Of course.

(Pause in proceedings.)

MR. FEIGENBAUM:  May I approach the witness?

THE COURT:  You may.

BY MR. FEIGENBAUM:

Q.   Mr. Riemer, from time to time, we may refer to some of the exhibits, so I've left that there for you.  But I first would like to go over your background.  So please tell the jury about your education after high school.

A.   Well, after high school, I didn't immediately go to

college.  I got my college degree in 1991 from Nova, which was Nova Southeastern University then, in Davie.  I have a bachelor's degree in business.

Q.  All right.  And do you have any experience in law enforcement?

A.  Yes.  I worked for the Palm Beach County Sheriff's Office for 10 years, from 1981 to 1991.

Q.  All right.  During those 10 years, could you please tell the jury what types of assignments you had.

A.  I started out -- after the training academy, I went to the -- I went to the road patrol and worked pushing a green and white and answering calls and patrolling neighborhoods.  I did that for two years.

And then I went into the Sheriff's Office Marine Unit, which basically involves patrolling the waterways of Palm Beach County and the ocean, doing both drug and human smuggling interdiction, search and rescue, regular patrols to enforce boating laws, and that type of thing.

Q.  Did you have any law enforcement experience regarding investigating thefts?

A.  Yes.  After my four years in the Marine Unit, I finished out my last four years basically as a detective.  I worked out of the south end of the county as a property detective, which basically a property detective, as opposed to like a crime-against-person detective, we work thefts, fraud,

particularly, anything where -- involves property, whereas a persons detective works batteries, homicides, rapes, that type of thing.

Q.   Were any of the thefts that you investigated as a Palm Beach County detective -- did they involve boats or vessels?

A.   Yes.

Q.   Tell us about the type of investigation -- what would be involved in the investigation of a boat theft.

A.   Well, typically, what -- we would gather the information from the client or from the victim, the alleged victim.  And we would take that information and do several things with it. We'd look at where the boat was taken, what avenues of investigation would we have, should we conduct a canvass along the waterway of people that might have seen or obtained any video during that process.

     Now, mind you, when I did it, it was in the 1980s.  Video wasn't as prolific as it is today, as far as surveillance and people having video outside of their home and that type of thing.

     In addition, we would share with other agencies descriptions of the boats.  We would work -- some people that we knew were criminals that were involved in boat thefts, we would look at them, that type of thing.

Q.   All right.  In your time as -- in law enforcement for Palm Beach County, were there ever times that you worked with

174

federal law enforcement agencies as well?

A.   Yes.  At one point in time, we had received a certification, or -- I don't know how you would call it -- like a blessing from the US Customs.  It was -- George HW Bush was the president, and he was big on intercepting people that were coming into the United States illegally, either with immigrants or with narcotics.

So he had set up -- on all the condominiums across the southeast of Florida, a radar system.  And Customs, right down here in Miami, had an office with these large screens, and they could track every boat that came across from the Bahamas or into territorial waters both federal and state.  So on our boat, we had a transponder.  So the Customs people that are sitting watching these screens knew where we were in the ocean at any given time, and they would vector us into a boat that was incoming.

And typically, in smuggling -- and it's true today in the cases that I have worked as a private investigator -- if you turn on a blue light in the middle of the ocean, you kill the rest of the day, because you can't just advertise that you're out there because somebody else might be doing the same thing, and they would be noticed.  So we would come up on those boats in the dark, no running lights, no nothing, and then have a flashlight and a badge and try to get them to stop.  And most of the time they did stop, and we would search the boat, which

175

we could legally do under Customs authority.

And we either made some arrests, or there was one incident where it was quite obviously that there was several dozen Haitians aboard a boat, and we had taken control of that until the Coast Guard could come and assist us.

Q.  So as I understand it, you did look into -- or you did investigative work as a law enforcement officer regarding human smuggling cases?

A.  Yes.

Q.  And how about narcotics cases?

A.  Yes.  At that time, it was mostly marijuana and cocaine.

Q.  All right.  As to other law enforcement experience, did you also investigate cases that involved burglaries and fraud?

A.  Yes.  My four years as detective, I did work a lot of burglary cases.  Actually, I had a sergeant who didn't like me so much, so he gave me all the cases that had no leads.  And one of my biggest cases was to infiltrate or to get the head guy of The Dinner Set Gang to cooperate with me, and we ended up solving several burglaries and recovered thousands of dollars worth of jewelry.

Q.  Did you ever investigate homicide cases?

A.  My -- part of my time as a property detective, I worked like a two p.m. to ten p.m. shift, just in case there was something going on at the south end of the county.  So during that time, if a homicide that came out that that happened to be

in Boca Raton, or Delray, or Boynton, I would respond as a first responder, so to speak, as a detective.  I mean, obviously, the uniformed guys were there.  But then, as a detective, I would take control of the scene until the crime against persons people could arrive.

Q.  Regarding crime scene that you just mentioned, what is involved in a crime scene investigation?

A.  Well, first off, you got to secure the scene.  And it could be a house, it could be a field, it could be an automobile, it could be a vessel, but you need to control that scene.  And then, the first thing that usually happens is a crime scene detective that works in conjunction with us comes in and he photographs and documents all the evidence.

Q.  All right.  After your -- well, let me ask you:  While you still worked as a law enforcement officer for Palm Beach County, were there times when you had to testify in court?

A.  Yes.

Q.  Do you recall approximately how many times, rough number, you were called on during those 10 years to testify in court?

A.  I can only give you a good guestimate of about over 50 cases.

Q.  All right.  What has been your employment after you left law enforcement?

A.  After I left law enforcement, I did -- I did a couple different jobs.  I always had my real estate license and

broker's license since 1984, and always sold real estate on the side. When I left the sheriff's office, I got a job working for a security guard company as vice president. They had a lot of the major country club communities in Palm Beach County under their contract. So I kind of headed up that.

It went hand and hand with my job as a burglary detective at the time. So that lasted about a year, and I sold some real estate. And in 1996, I opened up my own private investigation company. And I been doing that now -- in January, it will be 28 years.

Q. So just to be clear, you are a currently licensed Florida private investigator?

A. That's correct.

Q. Do you hold any honors in your work as a private investigator?

A. Honors? I don't --

Q. Well, maybe that's the wrong word. Do you -- are you in any organizations of private investigators?

A. Yes. I belong to the Florida Association of Licensed Investigators for several years. For the last two years, I've been president of that organization. It consists of about 800 members throughout the state of Florida.

Q. And at times do you represent the Florida private investigators in any efforts regarding legislation in Tallahassee that might be considered?

A.   Yes.  Part of our -- the main components of this association is -- one is training and promoting training and professionalism.  The other is to handle the legislative issues that come up.  We're always fighting against, you know, public records being curtailed and available to people like us that need it to investigate.

And also, back when they eliminated sales tax for like attorneys and service people, they grouped the private investigators in with alarm companies who sell a product.  We don't sell a product.  We sell a service.  But we still paid sales tax up until this year, July.  Governor DeSantis signed a bill that eliminated us from having to pay or collect sales tax from our clients.

Q.   In your work as a private investigator, have you been called on to testify in depositions or court in State of Florida cases?

A.   Yes.

Q.   Please tell us about some of that work.

A.   Well, some of it's ongoing.  I mean, currently, I work a lot of homicides.  I testify in bond hearings and motion hearings, that type of thing.  I've testified in some trials, in lesser-type crimes, some burglaries, some drug cases, some DUI cases, that type of thing.

Q.   All right.  Let me ask you about this area.  Are you familiar with the operation of watercraft, pleasure vessels,

179

for example?

A.   Yes.

Q.   Please tell the jury what your experience is regarding boats.

A.   Well, I've always had -- you know, growing up in Florida, we always had an interest in boats.  When I was like 16, 17 years old, I worked as a maintenance guy at a apartment complex.  The owner had a boat.  So he took me out and we started boating.  I think after I got married in 1981, we bought a boat shortly thereafter.  I've had several boats over a period of 30 years.  Currently, I'm shopping for a new boat.  I just sold my boat in April of last year.

Q.   Did you ever obtain a license to operate certain sized boats?

A.   Yes.  I had a hundred-ton commercial master license through the United States Coast Guard.  So I'm a licensed boat captain.  Currently, my license actually expired and I'm in the process of renewing it.  There's a whole process to go through, but I got a year grace period where I can reapply.  So that's what I'm doing as we speak.

Q.   That particular license you mentioned, what does it allow you to do in terms of size and -- tonnage, I guess it's called, of boats?

A.   It's a hundred-ton license, which means -- it's not really the weight of the vessel.  It's how much the vessel is capable

180

of carrying.  So basically, it would include anything up to and about like a 70-foot boat.  So like a 70-foot sport fisherman or something like that.  I'm allowed to take unlimited passengers, as the boat capacity allows.

So there's several different licenses.  You can get a six-pack, which basically is six passengers maximum.  And you can go out on boats, on an inspected vessel by the Coast Guard. I was allowed to operate boats that can take more people.  And in turn, you're inspected by the Coast Guard.

Q.  All right.  And just tell me again, how many years have you been involved in operating and maintaining boats?

A.  I'd say close to 40, 41 years.

Q.  Has that experience with boats included taking a boat to another country and returning?

A.  Yes.  I mean, I've been back and forth to the Bahamas a couple of -- several times.

Q.  And did those trips give you the understanding of what is required upon leaving the United States and upon returning to the United States?

A.  Yes.

Q.  All right.  Have you ever testified in federal court about marine or maritime issues?

A.  Yes, I have.

Q.  Do you recall how many times?

A.  Well, it's actually three times.  The first one, I can't

remember, and the last two that I did actually were with you.

Q.   That's right.  And those were, as I recall, in the summer of 2017?

A.   That's correct.

Q.   All right.  And I offered you to -- I offered you as an expert in certain marine and maritime issues.  Did the judge in the first case, which was actually United States v. Valencia -- did the federal judge in that case qualify you as an expert witness in marine and maritime issues?

A.   Yes.

Q.   And did you testify in that case?

A.   Yes, I did.

Q.   And another case called United States v. Palacios Solis, also in the summer of 2017, before the Honorable Kevin Michael Moore, Federal Judge, were you offered to be certified as an expert witness for that trial?

A.   Yes, I was.

Q.   And did Judge Moore qualify you as an expert?

A.   Yes.

Q.   And did you testify in that case?

A.   Yes, I did.

Q.   Did some of those issues, as you recall, involve the operation of boats on the high seas?

A.   Yes, it did.

Q.   All right.  Have you also had training and experience,

182

either when you were a law enforcement official or thereafter, regarding what are known as VIN numbers for motor vehicles?

A.  Yes.

Q.  And for watercraft, HIN numbers, did you become familiar with those?

A.  Yes.  Hull identification numbers.

Q.  And did those issues come up during your time when you were a law enforcement officer?

A.  Yes.  Most definitely.

Q.  All right.  Have you become familiar in the area of boating regarding having extra fuel aboard in containers?

A.  Yes.

Q.  Have you become familiar, in your law enforcement or private investigator work, with methods of determining whether a vehicle or a boat has been reported stolen?

A.  Yes.

Q.  In this particular case, are you being compensated?

A.  Yes, I am.

Q.  What are your rates?

A.  Well, the rates are -- are dictated by the federal courts. And as an investigator, I'm compensated at $85 an hour.  As an expert in marine maritime activities, I'm compensated at $125 an hour.

Q.  And who pays your rates?

A.  It's paid by the United States Government, through the

federal court system here.

Q.   And were you approved to -- by the court system, to serve working on this case for Mr. Hernandez?

A.   Yes.

Q.   All right.  Is that under a program called the Criminal Justice Act?

A.   Yes, it is.

Q.   Have you ever not been qualified as an expert witness in federal court when offered?

A.   No.

MR. FEIGENBAUM:  All right.  Your Honor, I would like to -- let me just get to the right part here.  I'm asking the Court to certify Mr. Riemer as an expert witness in matters related to law enforcement investigations of thefts, marine issues, crime scene investigation and handling, witness and suspect interviews, smuggling crimes, burglary, theft, and fraud investigations.  And I believe those are the areas that I wish to inquire with him in his capacity as an expert witness.

THE COURT:  You're seeking to have him declared as an expert in each of these areas?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  On behalf of the Government?

MR. DOBBINS:  Your Honor, may I voir dire a little bit?

THE COURT:  You may.

VOIR DIRE

BY MR. DOBBINS:

Q.   Good afternoon, Mr. Riemer.

A.   Good afternoon.

Q.   Just so I'm clear, you've testified three times as an expert witness in federal court; is that correct?

A.   That's correct.

Q.   And all three times were -- you were qualified as an expert in maritime and vessel issues on the high seas?

A.   That's correct.

Q.   So -- and when you've testified in state court, have you been qualified as an expert?

A.   I've not testified in state court regarding maritime cases.

Q.   Have you testified in state court as an expert in any capacity?

A.   I had one case where I was deemed an expert in DUIs.

Q.   In DUIs.  And how long ago was that, sir, if you recall, approximately?

A.   It's got to be five to seven years ago.

Q.   So you've never been qualified as an expert in any court in law enforcement investigation of thefts, correct?

A.   That was my profession for many years.  So --

Q.   I understand that.  I'm just asking if you have been qualified as an expert in any court as an expert in that category.

A.   No.

Q.   And you have never been qualified in any court as an expert in crime scene investigation; is that correct?

A.   No.

Q.   And you've never been qualified as an expert in witness and suspect interrogation, correct?

A.   Not in court, no.

Q.   Okay.

A.   But those skills I use during course of my business.

Q.   I understand as your time as both a private investigator now, and also back when you were a law enforcement officer or deputy with the sheriff's department, but I'm asking if you were qualified as an expert in court.

A.   Not as an expert in court, no.

Q.   And you were also never -- you've also never been qualified as an expert before in the area of smuggling crimes, human smuggling or other smuggling, correct?

A.   Well, that was part of the cases that I was in federal court, yes.

Q.   Right.  The other three cases in federal court were all drug cases, smuggling cases on the high seas, correct?

A.   That's correct.

Q.   But never human smuggling?

A.   No.

Q.   You've never been qualified as an expert in that, right?

A.   (No verbal response.)

Q.   All right.  And you've never been qualified before in any court as an expert in burglary, theft, and fraud investigation, correct?

A.   No.

MR. DOBBINS:  Your Honor, I would just object as to all the different categories.  I don't have an objection as to marine issues.  But I think -- based on the testimony here, I don't think that we could qualify him as an expert in the other categories that Mr. Feigenbaum wishes.

THE COURT:  Well, Mr. Feigenbaum, did we want to limit it to marine and maritime issues, which is relevant to the issues before the Court?

MR. FEIGENBAUM:  Well, let me respond to what Mr. Dobbins said.  Let me ask a question.

BY MR. FEIGENBAUM:

Q.   Have you ever been offered as an expert -- offered as an expert in those other areas and been not accepted by the Court?

A.   No.

Q.   So although you were qualified twice or three times as an expert in maritime issues, because you were offered, no judge ever had to consider, until today, these other areas to qualify you as an expert; is that right?

A.   Yeah.  Well, the maritime issues involve navigation.  It involved types of boats.  It involved weights of boats.  It

involved, you know, the pattern of smuggling, all that stuff. So it's all-inclusive.

Q.   Right.

MR. FEIGENBAUM:  So Judge, what the situation is, is that he was never like offered and denied by a court to testify in these other areas.  And based on his training and experience -- his training and experience is something that is not commonly known to a juror and therefore it could be anything.  If you were an auto mechanic, and had specialized knowledge in certain areas, that could make you be able to offer opinions as an expert witness.

And so he -- we laid the foundation for boat theft, crime scene investigation, and all those other areas.  He has extensive experience -- I think 40-years-something -- that he said both as a law enforcement official and a private investigator in each of those areas, and definitely, as we take the position, qualifies to be able to testify -- testify about those areas.

THE COURT:  All right.  The Government has had a sufficient amount of time to voir dire this individual as to Mr. Reimer's qualifications.  And I believe that, for purposes of his testimony, certainly he can opine and he can render opinions, and it will be the jury that will assess the weight to be given to those opinions, given the nature of his background and experience.  So you may continue.

MR. FEIGENBAUM:  Thank you, Your Honor.

DIRECT EXAMINATION [CONTINUED]

BY MR. FEIGENBAUM:

Q.  Mr. Riemer, I wanted to start off by asking you a couple of things that you investigated related to this case.

Did there come a time when you were asked to investigate whether a Toyota Tundra, with VIN number 5T like Thomas, F like Frank, B like Bahamas, W like Washington, 5F like Frank, 10JX769479, a Toyota Tundra from 2018, had ever being reported stolen?

A.  Yes.

Q.  And tell us what you did to make that determination.

A.  I have the ability to -- I have realtime access to most Department of Motor Vehicle offices in the United States, particularly Florida.  And in this case, we had some limited information from Missouri also.

MR. FEIGENBAUM:  One moment, please.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.  Sorry, Mr. Riemer.  Could you repeat what steps you took to find out whether that Toyota Tundra from 2018, with that registration -- or VIN number, rather, had ever been reported stolen?

A.  Yes.

Q.  And what did you learn?

A.   There was no record of this vehicle ever been reported stolen.

Q.   And how current is the report that you obtained?

A.   I had done a search right around September 13th of 2023.

Q.   And did you secure a document that confirmed your findings that the Toyota Tundra just described was never reported stolen?

A.   That is correct.

Q.   Do you have a copy of that document in front of you?

A.   I don't believe so.

Q.   Okay.

        MR. FEIGENBAUM:   May I approach Your Honor?

        THE COURT:   You may.

BY MR. FEIGENBAUM:

Q.   Please take a look at that and see if you recognize that document.

A.   Yes, I do.  And I recall this document.  I actually pulled -- it was a National Title History on this VIN number that you had stated.  And actually the same report -- it was August 31st, 2023 when I ran it -- it states that that VIN number identified as a 2018 Toyota Tundra --

        MR. DOBBINS:   Judge, I would object.  I think the question was:  "Do you recognize the document," and we're now testifying as to what's on the document.

        THE COURT:   Sustained.  That's correct.

BY MR. FEIGENBAUM:

Q. Just let us know if you recognize the document.

A. Yes.

Q. And is it an accurate copy of the document that you obtained?

A. Yes.

Q. All right.

MR. FEIGENBAUM: One moment.

(Pause in proceedings.)

MR. FEIGENBAUM: Your Honor, the Defense moves Defense Exhibit WW, National Title History, 2018 Toyota Tundra, into evidence.

THE COURT: Is there any objection?

MR. DOBBINS: Yes, Your Honor. It's hearsay.

THE COURT: Is there a certification that accompanies the document?

BY MR. FEIGENBAUM:

Q. Well, let me ask it this way: Mr. Riemer, you said you have authorization to obtain this document?

A. Yes. I have realtime access to the Division of Motor Vehicles.

Q. And what -- does everybody have that same permission to do that?

A. No.

Q. Tell us why you're able to access that National Title

History.

A.   Well, I'm able to do that based on the fact that I'm a private investigator and that I have a purpose or a reason to search for that particular VIN number or tag.

Q.   And is that considered a -- an accurate title history of a vehicle?

A.   Yes.

Q.   And do law enforcement agencies rely on such a document?

A.   Yes.

        MR. FEIGENBAUM:  Your Honor, you know, the Government can say it's hearsay, but it is --

        THE COURT:  Where would be the exception?  Is this from a database?  Is there a certification that the Court can look to that would allow its introduction?

        MR. FEIGENBAUM:  I'll ask, Your Honor.

BY MR. FEIGENBAUM:

Q.   Do you access a database?

A.   Yes, I do.

Q.   And who maintains that database?

A.   In this particular case, it was Auto Data Direct.

Q.   Okay.  And is that stated on the document itself?

A.   Yes, it is.

Q.   All right.

        MR. FEIGENBAUM:  Again, renew the request to admit it.

        MR. DOBBINS:  Same objection, Your Honor.

THE COURT: And the exception would be?

MR. FEIGENBAUM: Under the Rules of Evidence, if a document --

THE COURT: Could you be specific in terms of what the Court should look to that would support that.

MR. FEIGENBAUM: I'd have to go get the exact rule, but it's the catchall rule for something that is really beyond question and is inherently reliable. It's not a specific evidence number, but when all of the factors that make it something that a reasonable person would rely on --

THE COURT: If it's a business record, do you have the certification that the Court would look to with regard to this search?

MR. FEIGENBAUM: It's not a business record, Your Honor. It's a database that law enforcement and private investigators can access to obtain accurate records about registrations and title history.

THE COURT: I don't think the residual exception applies here. The objection would be sustained.

BY MR. FEIGENBAUM:

Q. Did you find any evidence in your investigation that the Toyota Tundra 2018, with that VIN number, was ever reported stolen?

A. No. It was never reported stolen.

Q. Okay. All right. We can go to the next matter.

Regarding your boating training and experience, the issue came up about 15-gallon containers being taken on pleasure craft as extra fuel. Do you remember coming across that in the discovery materials?

A. Yes.

Q. And did you recall seeing any photographs of one or more boats in this case which had extra fuel containers on deck?

A. Yes.

Q. And based on your training and experience, was there any violation of law by having those particular containers on the deck of a boat?

A. Not in this particular circumstance, no.

Q. All right. Let me ask you about your work as a private investigator in this case. Looking into the thefts alleged in the Superseding Indictment, did you conduct investigations as to each of those four boats?

A. Yes, I did.

Q. Okay. And did you gather information to make an investigation of the reported thefts?

A. Can you repeat the question.

Q. Yes. Let me ask it this way: What kinds of things did you do -- let's talk about the first one. The first theft, I believe, was reported -- I'm going by the ones that are in the charges in this case -- in December of 2018. So if you need to refer to something, please do. And tell us about the

investigation that you conducted regarding the first theft -- I think it was at the end of 2018.

MR. DOBBINS:  Your Honor, I would just object to:  "If you need to refer to something, please do."  Is there something that Mr. Feigenbaum is showing the witness or ...

MR. FEIGENBAUM:  Right.

BY MR. FEIGENBAUM:

Q.  Did you develop --

THE COURT:  Sustained.  Let's see whether something would refresh his recollection, please.

BY MR. FEIGENBAUM:

Q.  All right.  Could you take a look at what's been marked for identification as -- in the Defense Exhibit binder, I believe it's Defense Exhibit U.

A.  Okay.

MR. DOBBINS:  Judge, if I may see the document, please.

MR. FEIGENBAUM:  Yeah.  We provided all those Defense exhibits to the Government quite a while ago.

THE COURT:  The binder contains the same exhibits that you have, correct, Mr. Dobbins?

MR. DOBBINS:  So what happened was Mr. Feigenbaum provided us with some exhibits.  He has since updated his exhibit list.  He has not provided us with the additional exhibits.  In addition, that last document he showed me, there

was two copies of same document.  One was marked W and one was marked WW.

W is a map.  And WW, which we were not provided with up until this time -- so I would just like to make sure I am seeing the same document that Mr. Feigenbaum provided in the past --

THE COURT:  All right.  If you want to come forward. The attorneys can come forward.  Let's just make sure that's the Exhibit U that was provided to the Government.

MR. FEIGENBAUM:  Right.  Just to clarify for the record, Your Honor, just as the Government has been updating and giving me exhibits during trial, almost every one was provided a while back to the Government, way through Exhibits U V, W, and X, which I'm going to go over with Mr. Riemer.  So --

THE COURT:  I understand.

MR. DOBBINS:  What's the other one you want me to look at?

MR. FEIGENBAUM:  They're going to be U, V, W, and X.

THE COURT:  And while the attorneys are doing that, how is everyone doing?  Okay?

Ready to continue?

Do you need to take a -- all right.  Let's go ahead and take a 10-minute recess.

MR. FEIGENBAUM:  Thank you, Your Honor.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 4:08 p.m.)

THE COURT:  All right.  We're on a 10-minute recess.

(Recess from 4:09 p.m. to 4:25 p.m.)

THE COURT:  All right.  Welcome back.

All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

And we'll continue with the direct examination of Mr. Riemer.

MR. FEIGENBAUM:  Thank you, Your Honor.

BY MR. FEIGENBAUM:

Q.  Mr. Riemer, I'm going to ask you a question about the fourth boat listed in the Superseding Indictment, the *Luca Brasi*.  So my first question is:  Did you do any investigation whether the *Luca Brasi* was reported stolen?

A.  Yes.

Q.  Okay.  And were there police reports where the owner said he reported the boat stolen?

A.  Yes.

Q.  And did you do any further investigation to see whether the boat is reported stolen?

A.  Yes.

Q.  What did you do?

A.  I checked the database again.  There's a -- when a boat is stolen, in Florida in particular, it's entered by law enforcement into the FCIC, which is the Florida Crime

Information computer, and it in turn goes into the National Crime Information computer, NCIC.

So that's just basically a program that when a police officer runs your tag, or runs a boat registration, or runs a HIN number or a VIN number, they can get a hit if the vehicle or vessel is stolen.

Q.   All right.  So how current is the information that you found on the database regarding the -- whether the *Luca Brasi* is reported stolen?

A.   Well, it's still listed as stolen as of earlier this week.

Q.   Okay.  Earlier this week, October 2023?

MR. DOBBINS:  Objection.

THE WITNESS:  Yes.  October --

THE COURT:  I'm sorry.  What is the basis?

MR. DOBBINS:  Leading.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   What is the date to check --

A.   I checked the Florida Crime Information computer, FCIC, on October 9th, 2023, and the boat is still showing up as stolen.

Q.   Based on your training and experience, what did that mean to you?

A.   That the boat was never recovered.  Once a boat or a vehicle is recovered, the information is taken out of that crime computer.

Q.  And how did that -- how did that coincide with other information you had reviewed in this case?

A.  Well, we looked at the initial reports that were provided in the discovery, and there was indication that this boat was possibly recovered in Mexico.

Q.  Okay.  The fact that you found that it's still reported stolen as of October 9th, 2023, do you have an opinion what that means?

A.  Yes.

MR. DOBBINS:  Objection as to an opinion as to what this means that it's still in the database.

MR. FEIGENBAUM:  Okay.  I'll rephrase.

THE COURT:  Thank you.

BY MR. FEIGENBAUM:

Q.  Did you review any documents or photographs to try and determine why there is current status of stolen for the *Luca Brasi* in this Florida Crime Information computer?

A.  Yes.  You had requested me to review all the reports and such, and the photographs that were provided to you from the prosecutor.  And that was, in turn, given to me to review.

During the course of my review, I noticed some variances of what they had claimed -- that that boat that was actually taken, or I should say that was actually seized in Mexico -- that that was the boat, the *Luca Brasi*.

Q.  Okay.  What things did you review regarding that inquiry?

A.  Well, we looked at, again, the police reports that were provided by the Naples Police Department.  In addition, we looked at the photographs that were presented here as document -- or as exhibits, in regards to the boat prior to the theft, what the owner, I assume, provided, and also the photographs of the boat in Mexico that was seized.

Q.  First as to the police report, was that from Naples Police Department?

A.  Yes, it was.

Q.  And did it have information on there that identified anything that you could compare to the photos the FBI took in Mexico?

A.  Yes.

Q.  Tell us what it was.

A.  Well, there are several things that I noticed.  The report itself had listed quite in depth some unique qualities or characteristics of the *Luca Brasi.*  And just at first glance on the -- comparing the photographs from the owner and the photographs from Mexico, I noticed that the boats were definitely similar, and they were both assumed to be Southport boats.  We did -- they had a similar color, which is a popular color scheme for Southport boats.  There was -- on the owner's photographs, the radio box that's up on the T-top --

Q.  One second.  Before I pull up the photos, let me direct your question.  Was there information the owner reported about

the serial numbers of the engines?

A.   Yes.

Q.   And you got that information from the Naples police report?

A.   Yes.

Q.   Okay.

A.   It appears -- it appears that this report was written about the time that they had the vessel in Mexico -- that the authorities had in possession in Mexico.  And in the report, it lists both serial numbers for the 2016 F300 outboard motors, the Yamaha motors that were on the *Luca Brasi*.

Q.   Could you read those into the record, please, the serial numbers for those two engines?

A.   Yes.  6CEX1024273.  The second one was 6CFX1008466.

Q.   All right.  I'm going to now show you Government Exhibit 60 in evidence, one of the pages from that multi-page Government exhibit --

        MR. FEIGENBAUM:  Could I have the ELMO, please.

BY MR. FEIGENBAUM:

Q.   So this is Government Exhibit 60 in evidence.

A.   That's correct.

Q.   Yes?

A.   Yes.

Q.   Could you please tell the jury what we have in this page from Government Exhibit 60.

A.   It appears to be the -- part of the outboard engine that

was on -- one of the engines that was on the boat in Mexico.

Q.   And does this -- is that an engine serial number?

A.   It appears to be, yes.

Q.   And how does that compare to the engine serial number that the owner of the *Luca Brasi* reported to the Naples Police?

A.   It's not the same.   Neither vessel has that serial number.

Q.   All right.   Did you do any other comparisons of the owner's boat photos with the photos that the FBI took on December 9, 2019?

A.   Yes.

Q.   Please tell us about that, and ask me to refer to any photo either from the Government exhibit or from the owner photos whenever you'd like.

A.   Well, on the Mexico photos, there is a picture of the boat from the transom, from the rear of the boat, that shows the engines and the T-top from the rear.

Q.   All right.   Let me get that for you.

This is Government Exhibit -- also 60.   Government Exhibit 60.

Is this the one you want me to put up?

A.   Yes.   And there's a similar picture in the owner's photographs of the *Luca Brasi* on a trailer --

Q.   Okay.

A.   -- with --

Q.   Tell me -- do you want me to take that off and then put the

owner's photo up there now?

A.   Well, maybe the owner's photo we can talk about first, and then put this one back up.

Q.   Okay.  This is from Government Exhibit 59 in evidence, a photo of the rear of the owner's *Luca Brasi.*  Tell us about that.

A.   Couple things I notice that the name -- if you look at the boat on the top of the picture, that canvas and white aluminum work, that's called a T-top -- what we commonly refer to as a T-top.  And up there is a radio box.  That typically is up there because it keeps -- it's protected from any kind of water or ocean spray or whatever.  And you can see on that photo there's the name *Luca Brasi.*

There's a couple other things on this photo I wanted to point out.  There's a flag on the port side of the boat, on the -- it would be the left side -- your left side.  It's an American flag.  And on the starboard side, or the right side of the transom, there's an Italian flag.

So if you want to go to the other photo in Mexico ...

Q.   Let me pull that up there.

Are those the two flags in this photo that you're looking at?

A.   Yes.

Q.   All right.  Now you asked me to go to the photo of the boat that was recovered in Mexico?

A.   Yes.

Q.   All right.  Going back to Government Exhibit 60.

A.   Okay.  On this picture, you can see noticeably absent from this photograph is the name *Luca Brasi* up on the radio box, up top in the center of the photograph.  And then, on the left side, you see a white spot on the transom where it should be green, where on the other photograph that we looked at it had a flag, an American flag.  And on the right side, the starboard side of the transom, it's absent of an Italian flag, and there's no damage to that transom to indicate that somebody had taken that flag off.

Q.   All right.  Anything else that you noticed in your --

A.   Not in this photograph.

Q.   Okay.

A.   If we could go to the bow pictures.  That's the front of the boat.

Q.   For the owner or for -- in Mexico?

A.   Well, you can do the owner first, if you'd like.

Q.   Okay.  When you say:  "Bow" --

A.   The -- well, you're not really going to have a picture of the bow.  I don't think it's -- there's one on the trailer, and it's a little clearer than this one.

Q.   Okay.  Let me make that a little ...

A.   You can just -- yeah.  Okay.  It's a little hard to see here, but on the left side of the photograph, near the front of

the boat, the bow of the boat, you see a chrome anchor hanging off of that boat.  In addition, you see the name *Luca Brasi* and Southport.  I want to point out the colors, the green, then there's like a white stripe, and then there's another stripe of green, then white, and then the black, which is commonly what they call bottom paint.  That's to keep barnacles from growing on a boat that sits in the water.  So those are the things I wanted you take note of.

Now, if you go to the bow shot of the Mexico ...

So on this photo, it shows that there is no anchor in the front.  There's obviously a place where the anchor might have went, but it's not there.  Also, this picture might not show it as clear as I'd like, but on the right side of the picture you'll notice that the boat has a real like shady white or, you know, it looks like it's been sanded down or the nice clean shiny boat that we saw in the other picture is not -- this boat's not clean and shiny.

But yet, on the left side of the picture, you can see that that side of the boat has not been tampered with.  And my point of pointing that out is that these are the only photographs we got from the boat in Mexico.  Obviously, if the person or investigator that took these photographs would have done a complete job, you would have seen what was on the port side or left side of the boat --

MR. DOBBINS:  Your Honor, I'd object to the

characterization there.  I think the witness is testifying about a photograph --

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Okay.  Sir, anything else that you noticed in comparing the owner's photos of the *Luca Brasi* with the photos taken in Mexico on or about December 9, 2019?

A.  Well, as an investigator, in determining if this vessel is indeed the same as the *Luca Brasi,* I would have done a thorough inspection of the boat, including photographing it.  That was not done.

The owner happened to put in several things in the police report that made his boat unique.  He named where all the speakers were in his boat.  He named the brand of entertainment center he had.  He had autopilot on there.  He had a Garmin chart plotter, GPS chart plotter with a serial number, and everything listed in the police report.  He also had a fish finder and a radar -- Garmin radar on the boat.

So if you look at boat like this, and you say:  "Okay.  It looked real nice, and now it doesn't look so nice," and it might be because somebody was trying to strip it or take it apart or whatever, you would still -- even if you removed the electronics and stuff -- you would still have holes in the console that are of worth because all these electronics that are listed in the police report, you can easily Google their

manual, and they have a template -- these are all aftermarket products.  So there's a template that you could gather that would give you the exact measurements of what those holes should be or -- and try to match them up or not.

In addition there was two outriggers, which -- on the side view of the boat, you can see it.  They are two long poles basically that come off of the top, the T-top of the boat.  And basically what you do is -- they are in close -- you know, within the parameters of the boat, when you're in close, you know, close to shore or in your coastal or some waterway inside.  Once you get on the ocean, these typically spread out so you could run fishing lines and they would be wider than your actual boat.

I say all that to say this:  The police report states the owner states that --

MR. DOBBINS:  Objection.  Referring to hearsay at this point.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Okay.  I guess I would ask it this way:  Was there a discrepancy in what the owner reported, the condition of the boat, with the photos that you reviewed that were taken in Mexico?

MR. DOBBINS:  Again, I'd object.  It calls for hearsay.

MR. FEIGENBAUM:  It's just comparing two --

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  Okay.  I'm going to look for an exact wording here.  The owner writes --

MR. DOBBINS:  Objection.  Calls --

THE COURT:  Sustained.  The question calls for a yes or no response.

BY MR. FEIGENBAUM:

Q.  Yeah.  Listen to the question.  It would be:  Comparing photos -- of the owner's photos of his boat, with the photos the FBI took in Mexico, did you notice any additional difference in those two physical pieces of evidence, the two different sets of photos, regarding any equipment?

A.  I didn't notice any difference in the photos.  But I noticed -- I didn't notice any difference in the photos of the *Luca Brasi* that the owner provided and the boat in Mexico.

Q.  Regarding the outriggers?

A.  Regarding the outriggers.

Q.  Okay.

A.  But I can explain that.

Q.  Sure.

A.  In the police report --

MR. DOBBINS:  Objection.  Going into hearsay.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Okay.  Let's go over what you just said to recap.  You found a discrepancy in the -- did you find a discrepancy in the engine serial numbers?

A.   Yes.

Q.   Between the boat of -- the *Luca Brasi* --

MR. DOBBINS:  Objection.  Leading.

THE COURT:  Overruled.

BY MR. FEIGENBAUM:

Q.   Did you find a discrepancy in the engine serial numbers of the owner's *Luca Brasi* engines and the serial numbers on the boat photographs in Mexico?

A.   Yes, I did.

Q.   Did you find a difference in the rear section of the boat, according to an owner's photo showing two flags and the photo of that same area of the boat in Mexico?

MR. DOBBINS:  Objection.  Asked and answered and leading.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  Yes, I did notice a difference.

BY MR. FEIGENBAUM:

Q.   Okay.  Is it depicted in this photo from Government's Exhibit 60?

A.   Yes.

Q.   And that difference being?

A.   That it appears that on the starboard side, or the right side of the transom, there is no damage, where there's damage on the other side where they removed a flag, and there's no indication that there was any flag on the starboard side.

Q.   Okay.  And anything else that you mentioned comparing the photos of the two boats?

A.   No.  Other than the anchor issue and the radio box not having the name on there.

Q.   The owner's photo of the side of his boat that said *Luca Brasi,* how is that name affixed to the side of the boat?

A.   I don't know what this boat -- it could be one of two things.  One, it could have been hand painted on there by a professional that does it.  But more commonly here in United States what happens is you have a printer, somebody that does printing -- and there's people that just do it for boat names -- and you can order it, and it's lined of like a vinyl lettering that they custom make, and then they send to you, that you can remove the -- the wax paper off the back and affix it to the boat -- to the sides of the boat or wherever you want to put it.

Q.   Okay.  I believe you mentioned that it appeared the boat in Mexico had one side that had been -- what did you call it?  Not sanded down, but something else.

A.   Well, it looks -- it looks to be roughed up.  I mean, typically, a boat will have what they -- it's called a gel

coat.  It's a fiberglass boat.  So what happens is the finishing product is a coat of what they call a gel coat, which makes that shine.  And obviously half of this boat didn't have the shine in Mexico, and the other half did appear to have the shine.

Q.  The boat in Mexico -- the side that appears to have the shine, based on your training and experience, would it also carry a decal or vinyl name of the boat on that side of the boat as well?

A.  Yes.  If this boat was the *Luca Brasi,* it would have the same writing or lettering that was in the owner's pictures.

Q.  And did the FBI, in the set of photos that you reviewed, take a photograph of the still shiny side of the boat?

A.  No.

Q.  All right.  Let me --

        MR. FEIGENBAUM:  How late are we going to go today Your Honor?

        THE COURT:  Till five o'clock.

BY MR. FEIGENBAUM:

Q.  Okay.  Did you investigate the other three boats that were listed in the Superseding Indictment?

A.  Yes, I did.

Q.  Pick whichever one you would like to take next, and tell us in summary form what your findings were.

A.  Well, the first one, Exhibit U, was a boat called the

*Mellow Yellow*.  And basically, what I reviewed is what the police had done in this investigation, what was provided to us by the prosecutor in this investigation -- in this case.

MR. DOBBINS:  Judge, I'm sorry.  Is the witness reading something or is he ...

THE WITNESS:  I have the same exhibit you have.

MR. FEIGENBAUM:  That's a Defense exhibit.

MR. DOBBINS:  It's not in evidence.

MR. FEIGENBAUM:  No.  It's marked for ID, Defense Exhibit U.

THE COURT:  It appears to be some notes.  So are you referring the witness to an exhibit?

MR. FEIGENBAUM:  Well, all I'm asking is:  Did he conduct an investigation --

THE COURT:  The objection is sustained if the witness is reading from something, unless it is identified.

MR. DOBBINS:  Thank you, Your Honor.

MR. FEIGENBAUM:  Oh, okay.

BY MR. FEIGENBAUM:

Q.  Did you put together a series of documents to -- that you used to reach any conclusions about the -- what was it -- *Mellow Yellow*, you just said?

A.  Yes.

Q.  Okay.  Just tell us about the results of your investigation.

A.   The boat was reported leaving -- was videotaped leaving through an inlet out to the open sea, and that was at a given time.  And that given time, also in the exhibit, shows cell phone pings from Mr. Hernandez's phone.  And at the time the boat was leaving the inlet, Mr. Hernandez's phone was pinging in Miami Beach.

Q.   All right.

A.   The other little odds that I saw was the paperwork that they used to -- what they call a BOLO or be-on-the-lookout-type thing that they pass off to other law enforcement agencies, it listed the *Mellow Yellow* as a 39-foot boat.  It indeed was only a 36-foot boat.  That's what the registration says.  That's what the police report says.

Q.   Okay.  Tell us about the next boat that you looked into.

A.   The next boat was a Pursuit.  Same thing, with twin 300 Yamahas.  Again, the time of the theft was reported between June 6th, 2019, at 10 a.m., and June 7th, 2019, at 10 a.m.

During this period, again, the prosecution exhibits show that Mr. Hernandez's phone was pinging and he was at -- on Alligator Alley at two o'clock in the morning on the 7th.  Prior to that, he wasn't -- wasn't in Naples at all, according to their --

Q.   And then the final boat.  Give us a summary of your findings on that one.

A.   The final boat is an Everglades boat -- 2011, 28-foot

Everglades.  Again, during time frame where this boat was allegedly taken, Mr. Hernandez's phone pinged at Alligator Alley and I75, which is, you know, quite a distance from where the boat was taken.

There was video that the Naples Police Department had retrieved from a boat ramp, where people pull their boat out on a trailer.  And that video, they had secured, and it was not legible to identify that this was the boat, or who was the occupants or people around that boat at the time the video was taken.

Q.  All right.

MR. FEIGENBAUM:  Your Honor, I don't think I have anything further for Mr. Riemer.  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  All right.  We have a few minutes.  Do you want to begin a cross-examination?

MR. DOBBINS:  Sure, Judge.

CROSS-EXAMINATION

BY MR. DOBBINS:

Q.  Good afternoon again, Mr. Riemer.

Do you still have the Defense binder there?

A.  Yes, I do.

Q.  Do you need that or can I take that back, sir?

A.  You can take it.

Q.  All right.

MR. DOBBINS:  If I may approach, Your Honor?

THE WITNESS:  Depending on what you ask.

BY MR. DOBBINS:

Q.  Of course.

Well, I guess the question is:  Do you feel like you're going to need to refer to your notes a lot?  Because, if so, I'll just leave it up there.  It's okay.

A.  No.  That's fine.  I mean, I have notes.  But you got to understand, I've been working this case since November of last years.  So there is thousands and thousands of pages that I reviewed.  So just like you come up to the stand with notes, I have notes of the things that I've done.

Q.  Completely understand, sir.  That's why I said, if you're going need to refer to them on a frequent basis, I'm happy to leave that up there.

A.  Okay.  No.  That's fine.

Q.  Okay.  I wanted to talk to you, sir, about -- so since you're an expert in the area of -- I just want to make sure. You've been qualified as an expert in law enforcement investigation of thefts, correct?

A.  Yes.

Q.  And now you've also been qualified in the area of burglary and theft investigations, correct?

A.  Correct.

Q.  So let's talk a little bit about that.  Based on your

time -- I know you said that you had a sergeant who was a little hard on you and gave you some cases that didn't have any leads, I believe is how you put it.

A.   That's correct.

Q.   Okay.  And what does that mean, just in case Members of the Jury don't know what a lead is, sir?

A.   Well, typically, you need -- you know, like similar to these thefts of these boats.  Nobody was around, nobody saw it happen, when it happened, at the exact time.  So you got to kind of think outside of the box.  And that's what investigators do, is you either talk to neighbors, you search for video, you know, you spread the word to other law enforcement.  Maybe they have somebody they arrested or somebody that they're looking at for whatever the theft was, and you compare notes, that type of thing.

Q.   Okay.  So would you say -- would it be fair to say, in your expert opinion, that burglaries are -- there's a good portion of them that go unsolved?

A.   Absolutely.

Q.   And same thing with auto theft.  Would that be correct, sir?

A.   Yes.

Q.   And same thing with a boat theft or vessel theft, right?

A.   That's correct.

Q.   All right.  And certainly, sir, as an expert in burglary

theft and fraud investigations, you're familiar with the term "chop shop," right?

A. Yes.

Q. All right. And just explain to the jury what a chop shop is.

A. A chop shop is where they take a boat, or an automobile, or a truck, or whatever, and they bring it in to their shop and they either strip it of its parts, or rearrange parts with other vehicles, or somehow make it look different than what was originally taken for the purpose of disguising that it was taken.

Q. Right. Exactly. So the point is: They don't want to be caught with the car that was -- or the vessel that was stolen, so they alter it in some way so that it appears to be something different, correct?

A. That's correct.

Q. And there's a number of different methods for doing that, correct?

A. Yes.

Q. That would include filing down the serial numbers or VIN numbers on a vehicle?

A. That's correct.

Q. That would also include filing down or removing the serial numbers on, say, a boat engine?

A. Yes.

Q.   That would also include changing the paint job of a vessel or a car?

A.   Yes.

Q.   And that would also include if, like for the instance of a vessel, where there's, you know -- well, let me ask you this: Generally speaking, these pleasure vessels -- or even, I guess, all vessels -- are they required in some way to be named by the owner or is that just an option that they take?

A.   No.  In Florida here itself, you have to have a boat that's -- well, actually, it's a federal thing.  If you want to document your vessel -- the difference is, in Florida, we have FL numbers.  That's a registration.  I equate it to like a car tag, except the difference between a car tag is that FL number stays with the boat.  So it's always -- the boat always has that same FL number as long as it's in use or currently registered.

Q.   And is that FL number -- is that different than the hull identification number or is it the same thing?

A.   Yes -- no.  It's different.  The hull identification number I would equate to like the VIN number on the windshield of your car.  Like up in the front corner by the driver's side, you see that little number, that's a VIN number.  And they have it located throughout various parts throughout the vehicle.

On a vessel, it's regulated by United States Government that it be placed on the right, rear transom of the boat or the

218

starboard side.

Q. And so, for instance, one of the things, if a chop shop or somebody was trying to alter the appearance of the boat, they would want to remove or change that hull identification number, correct?

A. Yeah. It's not all that easy. But they could, yes.

Q. If they knew how to do it, they could do it, right?

A. Well, some of the hull numbers are placed -- it's like an inverse mold. Like, when they're making the hull, and they're doing the coats of the fiberglass and everything in a gel coat, while it's still wet, they place an imprint in that gel, so the HIN number is actually part of it.

In some boats, they just take couple of rivets and put a little aluminum plate on there.

Q. Okay. But it's possible to do. And that's why, if somebody wanted to alter the appearance of the boat, they would do so, right?

A. Yes.

Q. And because Florida has a special requirement, they would also want to remove that FL number, right?

A. Well, the FL number is unique to that boat, yes.

Q. Right. So that FL number could -- even if they had changed the hull identification number, that FL number could still identify that boat as the stolen boat, right?

A. Yes.

219

Q.   So they would want to remove that, right?

A.   Yes.

Q.   Okay.

THE COURT:  Would this be a good time?

MR. DOBBINS:  You want me to stop, Your Honor?

THE COURT:  Yes.  Thank you, Mr. Dobbins.

And certainly, Mr. Riemer, we will see you back here on Monday.

Ladies and Gentlemen, as you know, we had the best of intentions.  We are going to require -- I am going to require that you return on Monday.  Reserve Tuesday.  Monday, we anticipate the case will be in your hands.

We will not be in session tomorrow or Friday.  So you do have those days to yourself.  I understand Liz Gariazzo has made arrangements for those of you that did need a letter for your employer.  Please let us know if you need anything else.  Otherwise, I will see you -- I understand Monday is someone's birthday.  So Happy Birthday.

And we will start at ten o'clock.  We have some matters in the morning at nine.  So we'll see you here at ten o'clock on Monday morning.  And that will obviously be Monday, October 16th, at 10 a.m.  Please be in the jury room ready to come into the courtroom right at 10 a.m.

Have a pleasant rest of the week and weekend.

Please remember, as you exit and we adjourn, you're

not to discuss this case with anyone, nor permit anyone to speak with you.  Everything learned about the case is learned in the courtroom.

Please take your juror notebooks and place them in the jury room.  The jury room will remain locked.

Have a nice rest of the week and weekend.  I'll see you Monday at ten o'clock.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 5:04 p.m.)

THE COURT:  All right.  Mr. Riemer, we will see you on Monday morning.

Now, please do remember, since you are on the witness stand, that you're not to discuss your testimony, your anticipated testimony, or any aspect of the case.

Have a pleasant weekend, and I'll see you Monday morning at 10 a.m.

THE WITNESS:  You too.

THE COURT:  All right.  Go ahead and have a seat.

Are there matters to address at this time?

I do want to advise you that Monday morning, from nine until ten o'clock, we will need the use of counsel tables for two matters.  So I would just ask if you can place your items aside.  Of course, you can use the conference rooms, and those are available for you.

Are there any matters that we need to address at this

time?

MR. DOBBINS: Nothing from the Government. Thank you, Your Honor.

MR. FEIGENBAUM: Nothing here, Your Honor.

THE COURT: All right. Then have a pleasant rest of the week and weekend. I'll see you Monday morning at 10 a.m.

MR. FEIGENBAUM: You too, Your Honor.

MR. DOBBINS: Thank you, Judge.

COURT SECURITY OFFICER: All rise.

(Proceedings adjourned at 5:05 p.m.)

UNITED STATES OF AMERICA        )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 11th day of October, 2023, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 222.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 6th day of June, 2024.


/s/Yvette Hernandez
_____
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov