1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1

UNITED STATES OF AMERICA,

     Plaintiff,                   October 16, 2023
                              10:05 a.m.
     vs.

JAVIER HERNANDEZ,

     Defendant.             Pages 1 THROUGH 185

_____

TRANSCRIPT OF TRIAL DAY 10
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE
And a Jury of  12

Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                    Brian Dobbins, AUSA
                    Arielle Klepach, AUSA
                    99 Northeast 4th Street
                    Miami, Florida 33132

FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                    PO BOX 545960
                    Surfside, Florida 33154-9998

COURT REPORTER:     Yvette Hernandez
                    U.S. District Court
                    400 North Miami Avenue, Room 10-2
                    Miami, Florida 33128
                    yvette_hernandez@flsd.uscourts.gov

**I N D E X**

Certificate ...................................                185

**W I T N E S S**

**ON BEHALF OF THE DEFENDANT:**

DANIEL P. RIEMER
CONTINUED CROSS-EXAMINATION BY MR. DOBBINS                       4
REDIRECT EXAMINATION BY MR. FEIGENBAUM                          97

JAVIER HERNANDEZ
DIRECT EXAMINATION BY MR. FEIGENBAUM                           143

**E X H I B I T S**

| DEFENDANT'S EX. NO.: | OFFERED | ADMITTED |
|---|---|---|
| LL | 158 | 158 |
| CC | 160 | 160 |
| MM | 170 | 170 |

(Call to order of the Court, 10:05 a.m.)

THE COURT:  All right.  On the record.

Good morning to everyone.

We are waiting for one juror.  Are there any issues that we need to address this morning?

MS. KLEPACH:  Not from the Government, Your Honor.

MR. FEIGENBAUM:  Not right now, Your Honor.

THE COURT:  Mr. Feigenbaum, do we have Mr. Riemer?

MR. FEIGENBAUM:  Yes.  He is out there.

THE COURT:  If you want to just have him come and sit on the stand, since we were still in the middle of direct examination [sic].

MR. FEIGENBAUM:  Have him come in now?

THE COURT:  Yes.  Thank you.

Hold on one second.  Don't bring them in yet.

(Pause in proceedings.)

THE COURT:  Good morning, Mr. Riemer, if you want to come on over here.

THE WITNESS:  Good morning.

(Pause in proceedings.)

THE COURT:  Both sides ready to proceed?

MR. DOBBINS:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Let's bring in the jury.

(Before the Jury, 10:24 a.m.)

4

THE COURT: All right. Good morning, Ladies and Gentlemen.

Please be seated, everyone.

I know Happy Birthday to one of you. I hope you're having a wonderful morning. Thank you for being here.

We are ready to get back to work. Recall that we were in the middle of the testimony of Mr. Riemer.

And Mr. Riemer, let me remind you, you were previously placed under oath. And let's continue.

CROSS-EXAMINATION [CONTINUED]

BY MR. DOBBINS:

Q. Good morning, Mr. Riemer.

A. Good morning.

Q. When we left on Wednesday, we were talking about chop shops. Do you remember my questions about that before we left?

A. Yes.

Q. Okay. So we were talking about the fact that chop shops was -- specifically to vehicles, they would try to -- one of the methods they use, based on your training, experience, and expertise, is they would try to change the appearance of the car; is that correct?

A. Yes.

Q. All right. And they would also try to change the VINs, the vehicle identification numbers?

A. Yes.

5

Q. And they might also try to change the paint job?

A. That's correct.

Q. And they might also -- let me ask you this:  Are you familiar with the term cloning of VINs?

A. No, not really.

Q. Based on your training and experience, one of the reasons that a chop shop would try to change the appearance of the car would be so that they could use the car, correct?

A. Use it or sell it, yes.

Q. Or sell it.  Okay.

And to do that, they would need to make the car look legitimate, correct?

A. Yes.

Q. Because -- since you were on patrol for a while -- I believe you called it pushing a green and white -- that means you drove a marked patrol car when you were with Palm Beach County Sheriff's Department?

A. That's correct.

Q. Okay.  So one of the things you would do, if you ever pulled somebody over, is you would run the license plate, right?

A. That's correct.

Q. And you would run the driver's license and registration of the -- driver's license of the driver, correct?

A. That's correct.

Q. And you would run the registration of the vehicle as well?

A. Yes.

Q. Okay. And the reason you do that is you want to know if there's any outstanding warrants for the driver, right?

A. Correct.

Q. And you want to make sure that vehicle is current with its registration?

A. Yes.

Q. And you want to make sure that the license plate and the registration match that vehicle?

A. That's correct.

Q. And you also obviously are trying to see if there's any outstanding tickets or anything like that attached to that vehicle as well, right?

A. Yes.

Q. Okay. So for car thieves, once they've stolen a vehicle, to make it look legitimate, one of the ways they would do that is to try to get a license plate for that vehicle, that specific vehicle -- let's say it's a Toyota Tundra -- would that be, correct?

A. Yes.

Q. And they could do that -- one of the ways is they would forge or clone a VIN of another Toyota Tundra, so that they could say that's the -- that's the current Toyota Tundra, when they registered it with, say, the Florida Department of Motor

Vehicles?

A.  If you're trying to acquire a license tag, you're saying?

Q.  Yeah.  Let's say -- well, let me ask you this:  Chop shops, a lot of times, for vehicles especially, they also double as auto mechanics, garages, things like that, right?

A.  Yes.

Q.  Because they have ready the equipment to work on the vehicle there, and it wouldn't necessarily arouse suspicion from law enforcement, right?

A.  Correct.

Q.  And sometimes these car theft rings have an in with, say, somebody at like a less-than-reputable dealership, car dealership, right?

A.  It's possible.  Yes.

Q.  And so the car dealership would register the car under the new VIN and get a temporary tag for that vehicle, right?

A.  A dealer tag.  That could happen, yes.

Q.  And that would make that Toyota Tundra now appear -- let's say, for example, that the Toyota Tundra is in -- was stolen here in Miami.  There's a matching Toyota Tundra, same year, same type of model, looks similar, in North Carolina.  And it's registered in North Carolina, but they would get the VIN number from that Toyota in North Carolina and then clone it and put that VIN number on the Toyota Tundra here in Miami, and then register it with the Florida Department of Motor Vehicles

through that less-than-reputable dealership.

A.   Is it possible?  Is that what you're asking me?

Q.   Yeah.  That would be one way to do it, right?

A.   Well, yeah.  I mean, if you knew which -- you would have to go to North Carolina and find a vehicle that matched it, yes.

Q.   Right.  Or you could do some sort of record search on some sort of North Carolina databases, if you had access to it, right?

A.   Yeah.  But databases like that are usually reserved for law enforcement, and, you know, DMV people and private investigators.

Q.   What about CARFAX?  CARFAX isn't reserved for --

A.   CARFAX?  You can look on that, yes.

Q.   You can look up any VIN number, right, in CARFAX?

A.   Yes.

Q.   Okay.  Now let's talk about chop shops for boats, if you will.  Kind of the same concept, right?  You would try to disguise the boat so it didn't appear to be the boat that had just been stolen and was probably reported as stolen, right?

A.   I've never seen it.  But I imagine it could happen, yes.

Q.   Okay.  Well, when you dealt with vessel thefts, you never dealt with anybody trying to alter the appearance of a boat that they had just stolen?

A.   No.

Q.   Oh, okay.

9

All right.  Well, one way to do that, though, would be to change the paint job, right?

A.   You could, yes.

Q.   And we've talked about changing the hull identification number, which would be difficult to do, but it's possible to do?

A.   That's correct.

Q.   Right.  And you also were saying that based on -- in Florida, there's a specific requirement that you have to get an FL number for your boat, as well, that you have to paint it on your boat right?

A.   It's a registration, yes.

Q.   So similar -- like your license plate for the boat, I guess, if you will?

A.   That's correct.

Q.   Not to oversimply it.

Okay.  And so, obviously, if you had stolen a boat that was going to be reported stolen to the police, you'd want to change that number or take that number off, right?

A.   Yes.

Q.   Okay.  And you would probably want to remove any markings, or stickers, or other items that would make that boat readily identifiable, as the boat that had just been stolen, wouldn't you?

A.   Yes.

10

Q.  Okay.  All right.  We were talking about, I believe --
remember on direct you said you had a sergeant that was kind of
tough on you, and he would give you cases with not a lot of
leads, or no leads, that you had to work?

A.  That's correct.

Q.  All right.  And -- but now, as an investigator, there are
many things you would try to look for that would be -- you
would consider good evidence to try to determine who had
stolen, let's say, a vessel.  Would that be correct?

A.  Yes.

Q.  All right.  And so some of those things would be if, for
instance, you could get a hold of a suspect's cellular phone,
right?

A.  Well, you have to develop a suspect first.  So --

Q.  Okay.  Well, let's say in an unrelated investigation
somebody's arrested, their cell phone's seized, and you're able
to develop the probable cause to get a search warrant, and you
get a search warrant for that phone, and there's discussions on
that phone about stealing boats.  Would that be good evidence
in your case?

A.  It would.

Q.  Right.  And you would also -- if there was -- if there was,
say, chats that indicated planning of stealing vessels that
ended up -- well, let me say this:  If you found chats on those
phones that indicated that vessels -- there was planning

towards stealing vessels, that would be good evidence for your case, right?

A.   Yes.

Q.   And you could then use that evidence to try to backtrack to see if those vessels that they're talking about were actually stolen, right?

A.   Yes.

Q.   Okay.  And especially if you had, say, photographs of the vessels that they were going to steal.  That would be pretty good evidence for your case, right?

A.   Yes.

Q.   Especially if it later turned out that that vessel in the photograph had been stolen, right?

A.   That's correct.

Q.   Okay.  And same thing with vehicles, right --

A.   Absolutely.

Q.   -- if they're posting pictures of vehicles, and those vehicles later turn out to be stolen, right?

A.   Yeah.

Q.   And similarly, if they are sending chat messages with VIN numbers, and talking about making new registrations and getting temporary license plates, that would be good evidence for your case as well, correct?

A.   It would be suspect, yes.

Q.   And with vessels, because you're an expert in maritime and

boating -- I probably phrased that incorrectly.  I'm sure it was a little bit more broad -- but you're familiar with the fact that the keys for a lot of these vessels -- pleasure vessels, especially ones with the Yamaha engines -- the keys are not necessarily unique to that individual boat, right?

A.  No.  That's true for all outboard motors.

Q.  Right.  So there's a way that thieves can try to figure out what the code is, so that they can get a replica set of keys to basically steal the boat, right?

A.  Yes.

Q.  And that way they don't have to break into somebody's house or apartment and try to find the keys.  They can just go on the boat -- if they know how to do it, they can find that code and they can go to a marina or a dealership and try to get a replica set of keys?

A.  That's correct.

Q.  Okay.  So if you had evidence in these phones where they're discussing the key codes for certain types of vessels, that would be important evidence for your investigation as well, right?

A.  Yes.

Q.  Okay.  And it would also be good evidence for you, once you had all this information now, to try to place somebody at the scene or within the vicinity of where the theft occurred?  Wouldn't that be a good practice?

A. Well, the best practice would be to put them somehow in contact with the boat or the stolen vehicle.

Q. Right. And one way to do that is if you can show they were in the vicinity at or around the time that the vessel was stolen, right?

A. That's speculative at best. I mean, there's many boats stolen in the state of Florida at any given time.

Q. Now, sir, you're familiar with cellular towers and how they work with cell phones, correct?

A. Yes.

Q. Okay. And you know that law enforcement routinely now uses cell towers to try to see the general vicinity of where the phone is, correct?

A. Yes. It is a general vicinity, yes.

Q. Right. And so that's a good way to try to at least narrow down and see if that suspect was in the vicinity of where the boat was stolen at or around the time that the boat was stolen, right?

A. Yes.

Q. Okay. Now -- so if you had cell towers that indicated, for instance, that the Defendant in this case was in the vicinity of the boats that were stolen, at or around the time that they were stolen, that would be pretty good evidence in your case?

A. No. It just shows that he's there. I mean, a vicinity is a vague area.

Q.   But if you could show that he was in the vicinity, and then there were the conversations on the chats that indicated they were going to steal a certain vessel, that would be pretty good corroboration, right?

A.   If that was so, yes.

Q.   Okay.  Now let's talk about your testimony on Wednesday. And before we get started, I believe you stated that you're paid by the CJA panel for your investigation in this case; is that correct?

A.   Yes.

Q.   All right.  And that's funded by the United States Court System, correct?

A.   Yes, it is.

Q.   All right.  But to be -- to be selected for a specific case, a defense attorney has to request you and apply for that, right?

A.   That's correct.

Q.   All right.  In this case, Mr. Feigenbaum requested you to work on Mr. Hernandez's case?

A.   Yes.

Q.   And he had to put in an application that the courts could approve so that you could get paid your fees while you did the review?

A.   Yes.

Q.   And you've worked with Mr. Feigenbaum before.  I believe

you testified twice as an expert in the cases that he worked?

A.  Yes.

Q.  Okay.  All right.  So let's talk a little bit about your testimony on Wednesday about the theft -- let's start with the *Mellow Yellow*.  Would that be okay?

A.  Okay.

Q.  All right.  And if you need to refer to your notes, I can get you that binder again.  It's up to you.

A.  I have copies here.

Q.  Okay.  So just let me know if you need to refer to them, please.

Okay.  So you testified on Wednesday that you had investigated the theft of the *Mellow Yellow*.  And to do that, you reviewed the Naples police report, correct?

A.  Yes.

Q.  And based upon the Naples Police Department's initial reporting, the boat was believed to be taken the evening of December 18th of 2018, correct?

A.  That's correct.

Q.  And in addition the Naples -- I'm sorry.  This is Marco Island PD, not Naples PD.  I apologize.  This is Marco Island Police Department?

A.  Yes.  You're right.  I'm sorry.

Q.  No.  No.  It's my fault.

Okay.  So the Marco Island Police Department also did a

16

canvass of the neighbors, and they found a vessel -- I'm sorry -- a neighbor with a video camera system that captured what appeared to be the *Mellow Yellow* leaving?

A.  Going out to sea, yes.

Q.  Right.  Well, it's basically a canal that it's heading out towards the exit to go to the sea, right?

A.  I don't know the exact location, but I got a date and time.

Q.  Okay.  And that was December 18th, 2018, at approximately 11:17 or 11:18 p.m.?

A.  That's correct.

Q.  So military time, that would be 2318 minutes?

A.  Yes.

Q.  Because military time, we just subtract 12, right?

A.  (No verbal response.)

Q.  All right.  You testified on Wednesday that the cell site data for Mr. Hernandez's cell phone showed that his phone was pinging in Miami Beach at the time of the video.  Do you recall that?

A.  Yes.

Q.  All right.  So that would be around 11:18 or 2318 hours?

A.  Yes.

Q.  Okay.  Now, you stated that you reviewed records for that part of the investigation with specifics to the cell sites.  Do you recall that?

A.  Yes.  It was part of the discovery.

Q.   Okay.  So when you reviewed the cell site data, did you review the actual returns from T-Mobile on the cell site warrant or did you -- well, let me ask you that.  Did you review the returns from T-Mobile for the cell site warrant?

A.   No, I did not.

Q.   So did you only review the portions of a PowerPoint that were provided to Mr. Hernandez and Defense counsel?

A.   That's what I looked at, yes.

      MR. DOBBINS:  Your Honor, if I may have the ELMO, please.

      THE COURT:  Certainly.

BY MR. DOBBINS:

Q.   So I'm showing you Government's Exhibit 108 in evidence. We're going to start with --

A.   This is not the boat we're talking about or is this a new one?

Q.   No.  No.  You're correct, but it's all part of Government's Exhibit 108.  Because I know your markings -- you would have markings on yours and personal notes on yours.

A.   Right.

Q.   So I wanted to start with the -- I just wanted to show you the exhibit number first.

A.   Oh, okay.

Q.   Okay.  And then within that is this exhibit, correct?

A.   Yes.

Q.   All right.  That's something you reviewed, right?

A.   Yes.

Q.   That's part of where you get the information, in addition to the police reports about the video?

A.   That's correct.

Q.   And then we have here -- and I'll zoom in because I know it's kind of small.

All right.  And I think if we look in that top left-hand corner there, the first date is December 18th of 2018, at 2151 hours, and it gives a latitude and longitude, right?

A.   That's correct.

Q.   And these are the cell phone records you reviewed?

A.   Yes.

Q.   I mean, these are the cell phone records you reviewed for the *Mellow Yellow*, which is the boat stolen on or about December 18th of 2018?

A.   Yes.

Q.   Now, before we get to the cell phone records themselves, you would agree, though, sir, that, although according to these they are delayed, the general trend is that the phone belonging to Mr. Hernandez is moving from the South Florida, Miami Beach area over towards Naples and Marco Island, correct?

A.   That's correct.

Q.   It just appears that, according to this last one here, 12/19/2018, at 5:55 a.m., that that's when it's in -- that's

around the time that it's in Marco Island -- or that's the ending time that it's in Marco Island?

A.   Yeah.   It pinged around South Collier Boulevard.

Q.   Okay.   So, sir, would it be helpful -- would you consider it helpful in your investigation if you did review the cell site return records from T-Mobile?

A.   Not unless they're different from what you provided here.

Q.   Okay.

MR. DOBBINS:   Well, if we could have the Government's computer, and if we could pull up Government's Exhibit 62.

If we could scroll to the top, please.

BY MR. DOBBINS:

Q.   So this is Government's Exhibit 62 in evidence.   I'd just like to start with the last sentence there --

MR. DOBBINS:   And we may have to move the thing over.

Okay.   Or we could zoom out.

BY MR. DOBBINS:

Q.   Do you see that last sentence there, sir?

A.   The last sentence on the --

Q.   Where it says:   "Request, Submission, Response," and then it gives a couple of sentences, and then there's a last sentence.   It says:   "The records are."

A.   Yes.

Q.   "Records produced are."   Do you see that?

A.   Yes.

20

Q.  And that sentence says that the records produced are in UTC time; is that correct, sir?

A.  That's correct.

Q.  And "UTC" stands for Universal Time Coordinated; isn't that right?

A.  Yes.

Q.  Right.  And that basically used to be what we called Greenwich Mean Time back in the day, right?

A.  Yes.

Q.  And so Greenwich Mean Times over in -- I believe it's Greenwich, England, which is, I believe, the Prime Meridian, if I'm not mistaken, right?

A.  That's correct.

Q.  Right.  So that's like the zero of longitude?

A.  I'm not aware of what longitude it is, but that's the Greenwich Mean Time line.

Q.  Wait.  You know what longitude --

A.  Yes.  Yes.

Q.  So Greenwich Mean Time, or UTC time, is actually several hours ahead of Eastern Standard Time, right?

A.  That's correct.

Q.  Okay.  So for instance, it would be five hours ahead of Eastern Standard Time in the wintertime, right?

A.  Eastern Standard Time would be ahead, or Greenwich Mean Time would be ahead?

Q.   No.   Greenwich Mean Time, or UTC time, would be five hours ahead of Eastern Standard Time in the winter.

A.   Okay.   I believe so, yes.

Q.   And during daylight savings time in the summer, since we leap forward, right, or spring forward, that would be four hours -- Greenwich Mean Time, UTC time, would be four hours ahead in the summertime, right?

A.   Yes.

Q.   Okay.   So I would like to start with --

MR. DOBBINS:   If we could go to row 544 on this exhibit, please.

BY MR. DOBBINS:

Q.   So I've highlighted row 44 -- sorry -- 544, on Government's Exhibit 62.   Do you see that?

A.   Yes, I do.

Q.   All right.  And if you look at column E, right, column E gives a date and time?

A.   That's correct.

Q.   And that date is December 18th of 2018, right?

A.   Yes.

Q.   At 2151 and 25 seconds, which is basically 9:25 UTC time, right?

A.   That's correct.

Q.   And if you look back at Government's Exhibit 108, or the exhibit you were using, which is what you researched, that's

the first row on your exhibit, right?

A.   That's correct.

Q.   So actually it wasn't taken into account on what you had as UTC.  But now that you know that's UTC time, the time of that first ping is not at 2100 hours, but it's actually five hours less, right?

MR. FEIGENBAUM:  Your Honor, I just want to request a clarification.  When Mr. Dobbins said:  "That's not on your exhibit," do you mean the Government's exhibit that was provided?

THE COURT:  Maybe we can be specific with regard to the exhibit.

Thank you.

MR. DOBBINS:  Sure.

BY MR. DOBBINS:

Q.   Government's Exhibit 108, which you used to estimate whether the Hernandez cell phone was in the area of where the *Mellow Yellow* was stolen at the time doesn't account for the UTC.  It just lists a time.  It didn't say:  "Hey, this is in UTC time," right?

A.   That's correct.  It just listed the hours and the minutes.

Q.   Right.  But now that you know it's in UTC time, it would actually not be at 2100 hours and 51 minutes.  It would be at 16 hours and 51 minutes, right?

A.   Correct.

Q.   And that would be actually at 4:51 p.m.?

A.   Yes.

Q.   Right.  And so if you went down each row here -- and we can do that if you would like -- but each of these rows from 544 through 610 basically lists the same cell sites that you had in Government's Exhibit 108, correct?

A.   Yes.

Q.   Okay.  And as we scroll down from 544, and let's stop at maybe 575, based on that, the cell site records indicate that the phone -- Mr. Hernandez's phone had now moved from Miami Beach and was now hitting off a tower at 3405 Landfill Road in Naples, Florida at -- on December 19th, 2018.  But that's still UTC time, and that was 2:07 a.m. UTC time.  But if you subtract the five hours, I believe that takes you down to 10:07 p.m., correct, on December 18th?

A.   Yes.

Q.   Okay.  So now, at approximately 10:07 p.m., on December 18th, the Hernandez cell phone is now in the area of Naples, Florida.  Would that be an accurate statement?

A.   Yeah.  On this -- in this spreadsheet it is, yes.

Q.   Well, this is the same spreadsheet you're looking at.  It's just the one you had in Government's Exhibit 108 didn't say: "Hey, by the way, this is UTC time," right?

A.   Well, I don't have that particular entry on here.

Q.   Oh, okay.

A.   If you give me a minute, I'll look to make sure.

(Pause in proceedings.)

THE WITNESS:  Okay.  I -- well, yeah, I have it.

BY MR. DOBBINS:

Q.   You found it?

A.   Yeah.  Thank you.

Q.   It's a lot of entries on Government's Exhibit 108, right?

A.   Yeah, it's very small print.  I can see it.

Q.   Would you prefer me to --

A.   No.  I got it.  I can see it.

Q.   Because I can zoom in on the ELMO, if that would make it easier.

A.   It's fine.

Q.   So now, at approximately 10:07 p.m., that cell phone is in the vicinity of Naples, right, because that's hitting off of that Naples cell tower?

A.   Yes.

Q.   And if we could go down to -- let me clear -- I feel like there's some markings on here.

MR. DOBBINS:  If we could go down to -- hang on -- 587, please.

BY MR. DOBBINS:

Q.   587 lists the time, in column E, as December 19th, 2018, at approximately 2:52 a.m.  But again, this is Greenwich Mean Time, UTC time.  So now this would be December 18th, 2018, at

25

approximately 10:52 p.m., correct?

A.   Yes.

Q.   And that cell tower is located on 740 Bald Eagle Drive on Marco Island?

A.   That's correct.

Q.   So that information puts Mr. Hernandez's cell phone on Marco Island at approximately 10:52 p.m. on December 18th?

A.   Yes.

Q.   And then there's going to be a couple more.  We have several more there where it's on Marco Island.  Do you see that?

A.   Yes.

Q.   Okay.

          MR. DOBBINS:  Let's go ahead and go down to Government's Exhibit -- let's just go to the next row, 588, please.

BY MR. DOBBINS:

Q.   So now we have 2018 -- it's December 19th, 2:56 a.m. UTC time, but which is really December 18th, 2018, 10:56 p.m. Eastern Standard Time, right?

A.   That's correct.

Q.   So that puts -- and again the cell tower --Sorry?

A.   Five hour -- okay.  Five hours behind would put it 9:56.

Q.   Maybe my math's off.  Hold on.  So 2:56, 1:56, 12:56, 11:56 -- you're right.  9:56.

26

9:56 p.m., it puts it at -- Mr. Hernandez's cell phone at Marco Island, 740 Bald Eagle Drive, that same cell tower, correct?

A.  That's correct.

MR. DOBBINS:  Let's go down to 589, please.

BY MR. DOBBINS:

Q.  So now, this column -- row 589, column E states that the time is again December 19th, 2018, at 3:07 a.m., which now means that it's December 18th, 2018, at approximately 10:07 p.m., again, on Marco Island, right?

A.  That's correct.

Q.  Okay.  And the next row, 590, indicates that December 19th, 2018, at 3:22 a.m. UTC time -- it indicates that it's December 18th, 2018, at 10:37 p.m., at that same cell tower in Marco Island?

A.  Yes.

Q.  Okay.

MR. DOBBINS:  And then 591, please.

BY MR. DOBBINS:

Q.  And then column E indicates that now it's December 19th, 2018, 3:37 a.m. UTC time, which converts to December 19th, 2018, at 10:37 p.m. Eastern Standard Time, again, hitting off of the Marco Island cell tower, right?

A.  That's correct.

Q.  Okay.

MR. DOBBINS:  And then 592.

BY MR. DOBBINS:

Q.  Okay.  Now we have December 19th, 2018, at 3:52 a.m. UTC time, which converts to December 18th, 2018, at 10:52 p.m., again, hitting off of the Marco Island Bald Eagle Drive cell tower?

A.  That's correct.

Q.  And now we skip ahead -- so just so we're clear, that video, right, was at approximately 11:17 p.m. or 11:18, 2318?

A.  Yes.  11:07.

Q.  I'm sorry.  Did you say 11:07?

A.  You're looking at 592?

Q.  Right.  Yes.  That's when it ends, right, the data ends?

A.  Oh, okay.

Q.  You're looking in column F?

A.  Yeah.

Q.  Okay.  So that's when it ends.  And that takes you to 11:07 p.m. on December 18th, right?

A.  Correct.

Q.  In Marco Island?

A.  Yes.

Q.  Bald Eagle Drive cell tower, right?

A.  That's correct.

Q.  And the vessel -- the video showed that the *Mellow Yellow* was leaving that canal at approximately 11:17 p.m. or

11:18 p.m. on December 18th, right?

A.   I don't have any knowledge of that.  The report just states the vessel was seen going out to sea.

Q.   Right.  But you were basing your testimony on Wednesday about when the vessel went out to sea, right?

A.   I understand that.  But there was no description in the police report as to where the vessel in the video was taken.

Q.   But sir, on Wednesday, you based the fact that the cell sites didn't show Mr. Hernandez's cell phone in Marco Island till after that video was taken as some sort of evidence.

A.   Well, whoever created these documents didn't put UTC time on them.

Q.   I understand.  But now that you have seen it, you realize now that, of course, the cell sites put Mr. Hernandez's cell phone on Marco Island at or around the time that video was taken, right?

A.   On Marco Island, yes.

Q.   Okay.  And would it surprise you to know that 740 Bald Eagle Drive is only a mile or so -- a couple miles from Bimini Avenue where that video was taken?

A.   If that's what you say.  I didn't know where the -- where it was taken from.

Q.   Okay.  Well, you reviewed the report that showed where they got the video from.

A.   The report that we were given was all redacted with the

addresses.

Q. Okay. Fair enough.

Have you been to Marco Island?

A. Yes. Probably 40 years ago.

Q. Okay. I mean, it's not like a huge island, right?

A. No.

Q. Okay. All right. So now, did you review Special Agent Adam Goodrich's -- from the FBI, his plotting of the call detail records for his cell site analysis before your testimony today?

A. Yes.

Q. Okay. So -- let me grab ...

MR. DOBBINS: If I could get Government's Exhibit 65, please.

(Pause in proceedings.)

THE COURT: Mr. Dobbins?

BY MR. DOBBINS:

Q. So did you review this document, sir, Government's Exhibit 65, before you testified?

A. No. I did not.

Q. Okay.

MR. DOBBINS: If we could go to -- back to Government's Exhibit 62, please, the data.

Now, if we go down to -- if we continue down to 610, please.

30

BY MR. DOBBINS:

Q.  So that last row on column E indicates that on December 19th, 2018, at approximately 5:55 a.m. UTC time, that that -- which converts to 12:55 a.m., December 19th, 2018 -- I'm sorry -- December 19th, 2018, indicates, again, that it's hitting off of -- Hernandez's cell phone is hitting off a Marco Island cell phone tower?

A.  That's correct.

Q.  And then, basically, that's the last information we have for a while?

A.  Okay.

Q.  Right?

        MR. DOBBINS:  Okay.  One moment.

    (Pause in proceedings.)

        MR. DOBBINS:  So if we could go to Government's Exhibit 65 in evidence.

            If we could go to the next page, please.

            Sorry.  Scroll down to the first map.

            Here we go.

BY MR. DOBBINS:

Q.  Okay.  So this was a cell phone analysis done by Special Agent Goodrich on -- for the call detail records from December 18th of 2018, converted to Eastern Standard Time.  But it indicates that approximately 7:01 p.m. the cell phone was hitting off of a cell tower in the Miami Beach area, which was

consistent with the other -- the data records we were just looking at, right?

A.   If you say so, yes.

Q.   Okay.  And then that the phone proceeds to cross I75, commonly known as Alligator Alley, until it gets to Marco Island, where it hits off a tower in Marco Island at approximately 9:56 p.m., on December 18th, 2018, on the bottom one on the left?

A.   That's what it shows, yes.

Q.   And that's consistent with the records that we just went through too, right, which shows that up until 11:07 p.m. that that cell phone was hitting off of a cell phone tower in Marco Island, right?

A.   Yes.

Q.   Okay.  So this exhibit would be consistent with the other call detail records we were just looking at, which you had plotted based on Government's Exhibit 108, right, with the exception now the time's been adjusted to take into account UTC time?

A.   Yes.

Q.   And I'm sorry.  The call detail records are different than the data records that you were reviewing.  So I can show you those, if you need to see those.

A.   I'm at a loss as to what you're telling me here.  Does this coincide with the exhibit you just -- we just looked at with

32

the cell phone records from T-Mobile?

Q.  Right.  One's data --

MR. DOBBINS:  If we could pull up the call detail records in Government's Exhibit 62, please.

BY MR. DOBBINS:

Q.  So again, these are call detail records with cell tower information for calls that are in UTC time for that 4619 cell phone, right?

A.  Okay.

Q.  Okay.  And if we go to Government's Exhibit 286, I believe -- or 286 -- that indicates that on December 19th, 2018, at approximately 12:01 UTC time, that -- and 42 seconds, that there was a call -- an incoming call to that 4619 number, right?

A.  That's correct.

Q.  Okay.  And if we go back to Government's Exhibit 65, if you look at the box on the right, on December 18th, 2018, there's a call -- incoming call to the 4619 cell phone -- Mr. Hernandez's cell phone at 7:01 and -- 7:01 p.m. and 42 seconds, which matches what we just saw, right?

A.  Yes.

Q.  Okay.  You didn't review those, so let's not dwell on it.

A.  That's -- I mean, I'd looked at it three, four times before.

Q.  Sure.  Sure.  And it appears you didn't review the call

detail records.  You were reviewing the data records which were provided in Government's Exhibit 108 --

A.  Right.

Q.  -- which didn't specify whether they were call detail records or data records, right?

A.  That's correct.

Q.  But now --

MR. DOBBINS:  If we could just go back to Government's Exhibit 108 -- if we can just get back the ELMO, please.

BY MR. DOBBINS:

Q.  So now what we have, sir, right, is based on the fact that we now know this is UTC time, and we have to subtract five hours because UTC is five hours ahead, now the cell site cell tower records indicate that Mr. Hernandez's cell phone was hitting off of a Marco Island cell phone tower at approximately as late as 11:07 p.m. on December 18th of 2018, right?

A.  Yes.

Q.  All right.  Let's move ahead to the theft of the *Reel Estate*.  You reviewed the police reports for that, I believe.  Correct, sir?

A.  What real estate are you talking about?

Q.  I'm sorry.  There was a vessel known as the *Reel Estate* stolen from Naples between June 6th, 2019, at ten a.m., and June 7th, 2019, at ten a.m. I believe you testified about it on Wednesday.

A.   Yes.

Q.   Owned by the Wiesners?

A.   Yes.

Q.   Okay.  I believe it was Defense Exhibit V, if that will help you find your notes.

A.   Yes.  I got it.

Q.   Okay.  So basically, you testified that based on the police reports, you know, the vessel was stolen from Naples.  It was their boat slip at their condominium complex, correct?

A.   That's correct.

Q.   Known as Mariner's Cove?

A.   Yes.

Q.   It's 305 Goodlette Road?

A.   Yes.

Q.   Okay.  And the report said that the vessel was stolen between June 6th, 2019, at ten a.m., and June 7th, 2019, at ten a.m; is that right?

A.   Yes.

Q.   And basically, in your experience, theft of -- a lot of times, thefts can be part of a crime -- what we would call a crime of opportunity.  Would that be correct, sir?

A.   Could be, yes.

Q.   Right.  And so, for instance, if you're an experienced boat thief, one of the things you would try to do, right, is you would try to steal the boat without getting caught while you're

doing it, right?

A.   Absolutely.

Q.   So one of the methods might be to steal the vessel at night, right?

A.   That's correct.

Q.   Especially in a condo complex when maybe everybody's asleep?

A.   Yes.

Q.   And you would look for places that didn't have video cameras?

A.   You could, yes.

Q.   Right.  If you were smart, you would try, right?

A.   Absolutely.

Q.   Because you wouldn't want to get caught on video, right?

A.   That's right.

Q.   And another thing you might know is -- if you know the area well enough, you might even know that certain condominiums are inhabited or owned by what we call snowbirds, right?

A.   Yes.

Q.   And those are people who live up north and they come down generally speaking in the wintertime, and then in the summertime they return back to their native states.

A.   That's correct.

Q.   Such as Michigan, where you're from originally?

A.   Yes.

Q.  Right.

Now, in this case, on Wednesday, you testified again that, again, the cell site or cell tower information didn't match when the time was that the *Reel Estate* was supposedly stolen. Do you recall that?

A.  That's correct.  I didn't have the information whether it was UTC time.  So ...

Q.  Exactly.  So let's go through it now that we know, because obviously we just want to get things right.

MR. DOBBINS:  So if we look at Government's Exhibit 62, the data spreadsheet cell tower, please.  And if I could have the Government's laptop.  I'm sorry.

Now, if we could go to row 11314, please.

BY MR. DOBBINS:

Q.  All right.  So Government's Exhibit 62, the data cell tower records, shows that -- if you look in column -- row 11314, and the column E, where it starts -- the data started hitting off the cell tower, it's June 6th of 2019, at approximately 11:50 p.m.  But again, this is UTC crime, correct?

A.  Yes.

Q.  And now it's the summertime, so we're in daylight savings time.  So we're actually only four hours behind Greenwich Mean Time in the summer, right?

A.  That's correct.

Q.  All right.  So instead of 11:50 p.m., this is really

7:50 p.m. Eastern Standard Time, right?

A. That's correct.

Q. And at that time the cell tower it's hitting off of is in the Miami Beach area, correct?

A. Yes.

Q. All right. And now if we look at -- let's see --

MR. DOBBINS: Let's go ahead and go to four columns down. Let's start with 11318.

BY MR. DOBBINS:

Q. So now we look at the cell site data. This date is -- in column E, it starts on June 7th, 2019, at 2:07 a.m., again, UTC time, so we need to subtract four hours. And correct me if my math's off again. So this time I think I'm right. It's 10:07 p.m. Eastern Standard Time, correct?

A. Correct.

Q. All right. And if we look at that cell tower, it's now hitting off of 5000 34th Avenue Southeast in Naples, correct?

A. That's correct.

Q. So now we're at 10:07 p.m., and -- we're at 10:07 p.m., and now Mr. Hernandez's cell phone is hitting off towers in Naples, right?

A. Yes.

MR. DOBBINS: And let's go ahead and go down to the next row, please.

I'm sorry. Let's go down to 11320, please.

BY MR. DOBBINS:

Q. All right. So now we're looking at row 11320, column E, June 7th, 2019, at 2:24 a.m., which is UTC time. So we're at June 6th, 2019, at 10:24 p.m., correct?

A. Yes.

Q. And we're still hitting off of -- it's a different cell tower, but we're still hitting off of a cell tower in Naples, right?

A. Yes.

Q. And we hit on that for another two times after that, right?

A. Same place, yes.

Q. Okay.

MR. DOBBINS: So if we go down to 11323 -- row 11323, please.

BY MR. DOBBINS:

Q. And so now we go and we're seeing that it's now June 7th, 2019, at approximately 2:40 a.m. UTC time. So now we're still at June 6th, 2019, 10:40 Eastern Standard Time, correct?

A. Yes.

Q. And now we're hitting off of another cell tower hire in the Naples area, right?

A. That's correct.

Q. Okay.

MR. DOBBINS: And why don't we keep scrolling down to

the -- 11325.

BY MR. DOBBINS:

Q. And here, row 11325, it's -- column E is June 7th, 2019, at 2:52 a.m. UTC time, which is converted to June 6th, 2019, at 10:52 p.m., and it's hitting off of 821 5th Avenue South in Naples, Florida, correct?

A. Yes.

Q. And so I think that covers most of the cell sites, but we're hitting either 34th Avenue -- 5000 34th Avenue Southeast, 3405 Landfill Road, 5860 Crews Road, 821 5th Avenue South. And then I believe we have -- I'm sorry -- one more. So let's go to 11326, where we hit off of -- this is June 7th, 2019, at 2:55 a.m. UTC time, which is converted to June 6th, 2019, at 10:55 p.m. And it's hitting off of the -- in Eastern Standard Time -- and it's hitting off the cell tower at 2000 Davis Boulevard in Naples, right?

A. That's correct.

Q. And it continues to hit off of those for a while.

MR. DOBBINS: So we can go down to 11340, I believe it is -- I'm sorry -- 11350.

BY MR. DOBBINS:

Q. So it goes on for a while here, right?

A. That's correct.

Q. All hitting off of Naples cell towers, right?

A. Yes.

Q.   And then we have a couple of Marco Island ones hitting off there too, right?

A.   That's correct.

Q.   And then, finally, we finish off with 11350, which is dated June 7th, 2019, at 7:59 a.m., which is June 7th, 2019, at 3:50 -- I'm sorry -- 3:59 a.m.   Again, hitting off of a cell tower in Naples, right?

A.   Yes.

Q.   And then it kind of goes dead for a while here again, right?

A.   Yes.

Q.   Okay.   So now that we know that the UTC time needs to be applied, and that the boat was stolen -- the *Reel Estate* vessel, which was a Pursuit, was stolen between June 6th, 2019, at ten a.m., and June 7th, 2019, at ten a.m., that would put Mr. Hernandez's cell phone in the Naples area around the evening hours -- late-evening hours and early-morning hours of those two dates, correct?

A.   That's correct.

Q.   All right.   And when you plotted out the cell tower -- because you were provided -- I mean, 108 gave you the latitude and longitude for these times, right?

A.   Yes.

Q.   So did you plot them out?   It may not have given you the address, but did you plot them out -- the lat/long, for

41

instance, for the time that it was hitting off of the cell tower at 2000 Davis Boulevard?

A.   I don't have the address on this.  So I'd have to --

Q.   Sure.  Let me ask it this way:  Were some of the plots within two miles of the Mariner's Cove condominium complex?

A.   Yes.

Q.   Okay.  Thank you, sir.  Let's move on.

THE COURT:  Just let us know when it might be a good time to give a 10-minute recess.

MR. DOBBINS:  We can take one now, Judge, if you would like.

THE COURT:  Okay.  Ladies and Gentlemen, let's take a 10 minute recess.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 11:23 a.m.)

THE COURT:  Okay.  We're on a 10-minute recess.

(Recess from 11:23 a.m. to 11:36 a.m.)

THE COURT:  All right.  Both sides ready to proceed?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  Okay.  We can bring in the jury.

Thank you.

(Before the Jury, 11:36 a.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

We'll continue with the cross-examination.

MR. DOBBINS:  Thank you, Your Honor.

BY MR. DOBBINS:

Q.  Good morning again, Mr. Riemer.

A.  Good morning.

Q.  So when we left off, just so we're clear, as far as the *Mellow Yellow* that was stolen on or about December 18th of 2018, now that you've had an opportunity to review the times that you were provided, but with the knowledge now that they are UTC times, would it be fair to say that your testimony is that now Mr. Hernandez's cell phone was in the Marco Island area at or around the time that the *Mellow Yellow* was stolen?

A.  That's correct.

Q.  Okay.  And similarly, as to the Pursuit that was known as the *Reel Estate* -- R-E-E-L *Estate* -- owned by the Wiesners and stolen in Naples between June 6th of 2019 and June 7th of 2019 -- now that we've had a chance to go over the cell site data with the added knowledge that it's UTC time, would it be fair to say that that now puts Mr. Hernandez's phone in the Naples area at or around the time that the *Reel Estate* must have been stolen?

A.  That's correct.

Q.  Okay.  Thank you.

Now let's move on to the *Ultimaytum*.  This was -- you testified on Wednesday about a theft of a vessel known as an

Everglades model, I believe it is.

A. Yes.

Q. This is Defense W, if it helps you refer to --

A. Yes.

Q. Okay. And the Everglades was named the *Ultimaytum*, and was owned by an individual named Robert Maytum; is that correct?

A. That's correct.

Q. Okay. And based on your testimony on Wednesday, you reviewed the Naples Police Department report?

A. Yes.

Q. Or multiple reports, right?

A. Yes.

Q. And that boat was reported to have been stolen sometime between July 17th, 2019 -- between noon of that day and July 19th of 2019, at around four p.m. of that day when it was discovered?

A. That's correct.

Q. And it was a boat slip at a private house, right?

A. I believe so, yes.

Q. Okay. And again, you testified on Wednesday that Mr. Hernandez's cell phone wasn't in the area. It was pinging somewhere off of Alligator Alley, but not during that time period where the theft could have occurred. Do you recall that?

A. I did.

Q. And again, you were using cell sites provided in Government's Exhibit 108, which did not inform you, I guess, that it was UTC time, correct?

A. That's correct.

Q. So again, since this is summertime, we would actually have to subtract four hours from the cell site times and dates to make sure that we're all on the same page in Eastern Standard Time, right?

A. Yes.

Q. Okay.

MR. DOBBINS: So if we could open up Government's Exhibit 62, the data cell sites. And if we can start with row 14517, please.

BY MR. DOBBINS:

Q. Okay. So looking at row 14517, at the column E, which lists the starting date is July 17th, 2019, at approximately 11:55 p.m. -- but that's UTC time. So now we have to reduce it to -- or subtract four hours. So it's actually July 17th, 2019, at 7:55 p.m. Would that be correct, sir?

A. That's correct.

Q. Okay. And at that time, the Hernandez cell phone is hitting off of a cell tower located in Miami Beach. Would that be correct?

A. Yes.

Q. And if we go to two rows down, to 14519, if we go to the

column E, now that says that this is July 18th of 2019, at approximately 1:23 a.m. UTC time, which we would have to convert to Eastern Standard Time.  So it would really be July 17th still, of 2019, and we would be -- nine?  Would that be correct?  9:23 p.m.?

A.  Four hours.  It would be -- yes.

Q.  9:23 p.m.

Okay.  And this time now --

A.  Oh.  I'm sorry.

Q.  I'm sorry?

A.  Four hours would be seven p.m.

Q.  From 1:23 a.m.?

A.  Oh.  The line that's highlighted here, it says --

Q.  7/18 of --

A.  Oh, okay.  I'm sorry.  I'm looking at the wrong numbers.  You're right.

Q.  I think they give it in like British time or whatever, where they give you the year, month, and the day.

A.  Yes.  I see it.

Q.  But just make sure my math's correct.  That would be approximately 9:23 p.m.?

A.  Yes.  Yes.

Q.  And now Mr. Hernandez's cell phone is hitting off of a cell tower off of I75.  It says:  "E," which is eastbound, in or around the area of Immokalee, Florida; is that correct?

A.   Yes.

Q.   Okay.

        MR. DOBBINS:   And if we could go to the next row, 14520.

        Actually, let's go two more down, please.

        Actually, let's skip ahead.   We'll go to 14525, please.

BY MR. DOBBINS:

Q.   Okay.   So now we're at -- in column E, it says: "July 18th, 2019," and it's still 1:58 a.m. UTC time.   So it's really July 17th, 2019, at approximately 9:58 p.m.   Would that be correct, sir?

A.   Yes.

Q.   And again, it's hitting off of a cell tower in the Immokalee area, right?

A.   That's correct.

Q.   And it continues to hit off of some cell towers in Immokalee for the next couple entries, right?

A.   That's correct.

Q.   Okay.

        MR. DOBBINS:   And then if we go down to 14536, please.

BY MR. DOBBINS:

Q.   Okay.   So now we're at July 18th, 2019, at approximately 2:28 a.m.   Again, UTC time, so this is really July 17th, 2019, at approximately 10:28 p.m.   Would that be correct, sir?

A.   That's correct.

Q.   And now it's hitting off a cell site tower in Naples,
Florida, right?

A.   Yes.

Q.   And then the next entry, 14537, is the -- the time is
one -- I'm sorry.  July 18th of 2019, at 2:33 a.m. UTC time.
So it's really July 17th, 2019, at 10:33 p.m., and it's hitting
off of a cell tower, again, in Naples, Florida, right?

A.   That's correct.

Q.   Okay.

          MR. DOBBINS:  And if we go down to 14539.

BY MR. DOBBINS:

Q.   Now, we see that the cell phone is hitting -- the entry in
E is July 18th, at 2:43 a.m. -- of 2019.  But it's UTC time, so
we're still on July 17th of 2019, at 10:43 p.m., correct?

A.   That's correct.

Q.   And it's still hitting off of a cell phone tower in the
Naples area?

A.   Yes.

Q.   And there's one more entry where it hits off of a cell
tower in Naples, which is approximately 15 minutes later,
right?

A.   That's correct.

Q.   Okay.  And so we're still at approximately -- we're still
on July 17th of 2019, at 10:58 p.m., and it's hitting off of a

Naples area cell tower?

A. Yes.

Q. Okay. And so, now, you know, obviously, look, with this one, we have a wider window of when the boat was last seen and when it was reported stolen, right?

A. Yes. It's a matter of roughly two days.

Q. Right. But this puts -- this information puts Mr. Hernandez's cell phone in the Naples area on the evening of July 17th of 2019, which is after it was last seen at the Maytums' residence?

A. That's correct.

Q. So now that you know the UTC factor, and you apply it now, would it be safe to say we would correct your testimony to say this would put Mr. Hernandez's cell phone in the Naples area within the time frame of when the *Ultimaytum* Everglades boat was stolen?

A. Yes. That's correct.

Q. Okay. Now, in addition to the cell site data, did you also review some messages that were exchanged from the Hernandez cell phone and an individual that went by the name of Neco Neco?

A. Yes.

Q. All right. And when you reviewed those messages, those messages indicated that the two were talking about the weather in the Gulf of Mexico, right?

49

A.   That's correct.

Q.   And they were talking about if the Gulf was going to be calm, what the weather conditions were like, and if the weather was going to be clear.  Would that be safe to say?

A.   Yes.

Q.   Okay.  And then, on July 16th of 2019, at approximately 5:09 p.m. UTC time -- so again, that's July 16th of 2019, at 1:09 p.m. Eastern Standard Time, the Hernandez phone sent a text to the Neco Neco phone saying:  "Okay.  Tomorrow night we're going to go out," right?

A.   Yes.

Q.   All right.  And so, of course, the next night, the "tomorrow night," would have been July 17th of 2019, right?

A.   That's correct.

Q.   And that's when we have the cell site data putting Mr. Hernandez in the Naples area at or around the time that the Everglades vessel could have been stolen?

A.   That's correct.

Q.   Okay.  All right.  So I wanted to talk to you a little bit about the Toyota Tundra.  You also testified about that on Wednesday.  Do you recall that line of questioning?

A.   Yes, I do.

Q.   Okay.  You were asked specifically if you had run a VIN number in a database to see if it had been -- ever been reported stolen?

50

A.   That's correct.

Q.   All right.  And I just want to make sure I state the VIN number correctly.  So if I misspeak, please let me know.  But it was 5T as in Tom, F as in Frank, B as in boy, W as in W, five, F as in Frank, 10JX769479.  Would that be correct, sir?

A.   I'm looking for it.

Q.   Okay.  I apologize.

A.   Okay.  Go ahead one more time with the VIN.

Q.   5TFB, as in boy, W5F10JX769479.

A.   That's correct.

Q.   That's correct.  Okay.

Now, you said you ran that in a database, and that VIN number specifically has never been reported stolen, right?

A.   That's correct.

Q.   Okay.  Did you research the ownership records for that VIN number?

A.   Yes, I did.

Q.   All right.  And did you determine that that VIN number belonged to a silver Toyota Tundra that was sold out of a dealership in Memphis, Tennessee?

A.   Yes.

          MR. DOBBINS:  One moment.

     (Pause in proceedings.)

BY MR. DOBBINS:

Q.   Okay.  And did you ever review the dealership business

records that were obtained for that Toyota Tundra, the silver sky metal Toyota Tundra?

A. No.

Q. Okay. But when you did the research, did you see that one of the owners was an individual who purchased it new was an individual by the name of Thomas Woon, W-O-O-N, Lee, two last names, who lived in Byhalia, Mississippi?

A. That's correct.

Q. Okay. And he purchased that in, I believe, December of 2018, right?

A. I have the title as -- the original title date as January 14th, 2019.

Q. 2019?

A. Yes.

Q. Okay. So that could have been --

A. Yeah. I mean, he's got to apply for the title. So there's a time delay from the date of sale to the time title's issued.

Q. Right. So that would be consistent with a 30-day lag in actually obtaining the title after you've had the temporary tag and everything, right?

A. Yes.

Q. Okay. And then, did you later learn that that silver Toyota Tundra was later owned or purchased by an individual by the name of Oscar Alberto Jeter, in Hernando, Mississippi, back in, I believe it was May of 2021?

A.   Yes.

     (Pause in proceedings.)

BY MR. DOBBINS:

Q.   I'm sorry.  I don't know if you actually answered the question or --

A.   Yes.  I got May -- I got the purchase date of May 5th, 2022.

Q.   '22?

A.   Yes.

Q.   Oh, okay.  But those are the only two owners listed for that silver Toyota Tundra, right?

A.   No.

Q.   Okay.  Who else?

A.   My search showed that Jorge David Hernandez Azor had acquired a tag for this vehicle back in March 11th, 2019.  And then he acquired a second -- well, let me back up.  This tag, based on my knowledge -- previous knowledge of tags, is a temporary tag, what we call a dealer tag or a temporary tag.  And then he had one reissued -- because a dealer tag's only good for 30 days.  So then he had to reissue another dealer tag on 4/16/2019, which went through May 15th, 2019.

Q.   Okay.

A.   And then I show in October 3rd, 2019 that Javier Hernandez had acquired a dealer tag in his name for this same vehicle again October 3rd, 2019.

53

Q. Right.

MR. DOBBINS: And so if we could have the ELMO, please.

BY MR. DOBBINS:

Q. I believe these are the records you're referring to, correct?

A. Yeah. Similar, yes.

Q. I'll flip through them for you, if you want.

A. No. That's fine. It's the same. I get mine from the Division of Highway Safety and Motor Vehicles also.

Q. So now, what did that indicate the color of the Toyota Tundra truck was?

A. On this one, it says white.

Q. Okay. And the temporary tag was the CNL8758; is that correct?

A. 8758, correct.

Q. And that was an expiration date -- I think it was issued maybe on the 2nd or 3rd of October, and expiration date of November 1st, 2019?

A. That's correct.

Q. Okay. Let's look at the next one here.

This one gives -- this is the May 15th of 2019 that you were talking about with the -- I think his last name was Azor, you said?

A. Yes.

Q.   Okay.  And again, what's the color listed for the vehicle?

A.   White.

Q.   Here's the one from March of 2019.  Again, I believe it was Mr. Azor, right?

A.   Yes.

Q.   These are all temporary tags?

A.   Yes.

Q.   That the dealer issues, right?

A.   Dealer-issued tags, yes.

Q.   And again, the vessel -- I'm sorry -- the vessel -- the vehicle color is listed as what?

A.   White.

Q.   All right.  And there was no permanent registration for that white Toyota Tundra in the State of Florida, right?

A.   No.

Q.   And if I showed you Government's Exhibit 72, which are the certified records from the dealership Chuck Hutton Toyota, LLC, in Memphis, Tennessee -- which has that same VIN number, right? This is the original purchase, Mr. Woon Lee?

A.   That's correct.

Q.   Okay.  And what is the listed there for the Toyota?

A.   Silver sky metal.

Q.   Showing you pictures -- Government's Exhibit 75.  Here's the VIN number.  I know there's a little bit of a glare there, so I'm going to zoom in a little bit for you.

A.   Yeah.  I can see it.

Q.   That's the correct VIN number, right, that we've been talking about?

A.   Yes.

Q.   Okay.  And the truck is still, as it says in the original sale papers, right?  It's silver sky metal?

A.   Still silver, still Toyota.

Q.   So sir, based on your training and experience, if you saw -- let me just show you Government's Exhibit 73.  It's got Mr. Jeter purchasing it on May 15th of 2021, right?

A.   That's correct.

Q.   And it's still listed as silver sky metal?

A.   Yes.

Q.   So if you saw a Toyota Tundra that was sold out of a Memphis dealership, and it's listed at sky metal silver, and then later, in 2019, you see three temp tags issued for a white Toyota Tundra with the same VIN, wouldn't that, as a trained investigator, cause you had to be somewhat suspicious?

A.   Well, it's odd, yes.

Q.   You would want to go and check out that Toyota Tundra in Mississippi to see if it was the same one that was listed on that car dealership, the temp tag, right?

A.   Yes.  I would be interested in seeing the white one also.

Q.   Did you review Mr. Hernandez's cell phone chats with Neco and another individual by the name of Roberto Cisneros Marrero?

A.   Not to my knowledge, no.

Q.   I'd like to show you Government's Exhibit 5A, Page 166, please.

        MR. DOBBINS:   If we could have the Government's computer, please.

BY MR. DOBBINS:

Q.   Okay.   Sir, I'm showing you Page 166.   It's marked as 115 on the exhibit, but that's because we've added the thumbnails, so it extends the exhibit.   So this is really Page 166.   Do you see that VIN number that the Hernandez phone texted to the Neco Neco phone?

A.   I see a VIN number, the one phone number -- well, I see "Neco Neco" at the end of it, yes.

Q.   Okay.   And it's the 4619 number, which we know belongs to Mr. Hernandez, right?

A.   Yes.

Q.   Okay.   And that's the same VIN that we've been looking at in these documents, right?

A.   That's correct.

Q.   And if you look down to the next page -- and I think we can actually scroll down a page to show -- that appears to be the interior of the vehicle, right?

A.   Of a vehicle.   I don't know which one.

Q.   Sure.   I understand.   But it appears to be the interior of a vehicle?

A.   Yes.

Q.   What color is that interior?

A.   Red.

Q.   Okay.  Let's scroll down.  And these next two pictures appear to be interior of a vehicle, right?

A.   Yes.

Q.   And what's the color?

A.   Appears to be red.

Q.   Okay.  If we keep scrolling down -- and maybe I should give the date as well.  So this is -- sorry -- September 30th of 2019, right?  So this was before that Toyota Tundra -- the white Toyota Tundra has been registered in the -- with the temporary tag from the dealer, right, because that was October 2nd?

A.   I believe so -- no.  One was -- one was registered March of 2019, one was in April of 2019, and then a third temporary tag was October 3rd, 2019.

Q.   Okay.  So the other two temporary tags, the ones that were in Mr. Azor's name, those expired by -- the last one was May.  So that one would have expired in June, because it's only good for 30 days, right?

A.   That's correct.

Q.   And it was never re-registered between that June date -- in the Florida database, it wasn't re-registered from that June date until Mr. Hernandez gets it registered in his name with

58

the temp tag on October 3rd of 2019, correct?

A.   That's correct.

Q.   So what color does this truck appear to be, sir?

A.   This particular Toyota is white.

Q.   Okay.

        MR. DOBBINS:   Let's continue to scroll down.

        Okay.   If we could open up Government's Exhibit 100,
and I believe it's towards the end.

BY MR. DOBBINS:

Q.   So Government's Exhibit 100 is the photos from -- some of
the photos from Mr. Hernandez's cell phone.   Have you reviewed
these by any chance?

A.   No, I have not.

Q.   So while we're scrolling up -- oh, perfect.   While we were
scrolling up, we saw some pictures of some vessels at night.
Did you see those photos?

A.   Yes.   I saw them here on the screen, yes.

Q.   And as a trained investigator, if you suspected someone of
participating in a stolen vessel ring, and when you had their
phone you were able to pull these vessels that were taken at
night, that would give some significance to those pictures,
right?

A.   I'm not certain those vessels -- the pictures indicate that
that vessel was stolen.   So ...

Q.   Right.   You would try to follow up on it, right?

59

A. Absolutely.

Q. You would say: "Hey, let me check out and see if that vessel was ever reported stolen," right?

A. Right.

Q. Okay. Let's go back to the picture at hand here, which is Government's Exhibit 100. What's the tag number on that, sir?

A. CNL8758.

Q. And that's the temporary tag that was issued for the white Toyota Tundra, in Mr. Hernandez's name, in the Florida Department of Motor Vehicles database, correct?

A. That's correct.

Q. All right. So as a trained investigator, and knowing what you know about the cloning of VINs, wouldn't the fact that we're talking about two different trucks raise some suspicions for you, sir?

A. Well, while you're taking photographs, I would have taken a photograph of this vehicle's VIN number to see if it was matching -- or registration -- or the tag number or not.

Q. Well, this is from Mr. Hernandez's phone, sir.

A. Okay.

Q. Based on you training and experience, is it common for -- if they're going to clone the VIN from, say, a perfectly legitimate Toyota Tundra in Mississippi to add to this white car, are they also going to start taking pictures of the actual VIN for this white Toyota Tundra?

A.   I don't know if they changed the VIN or what.   There's no evidence here of if any VIN or it was changed.

Q.   Well, we have two different trucks, right?   We have a white one and we have a silver metallic sky.

A.   I understand that.   But what happens is -- so he had a -- he had a dealer tag with the same VIN number as the Mississippi Toyota.   That's all we have at this point.   I don't know what this Toyota is.   I don't know whether it was stolen.   I don't know whether the VIN number was altered, nothing.

Q.   Right.   But it would certainly pique your interest and you would probably want to investigate that, right?

A.   It should have been investigated, yes.

Q.   Okay.   And if someone was going to alter the VIN, say, of that white Toyota truck -- because as an expert I'm allowed to ask you some hypotheticals here.   Okay?

If someone were to alter that VIN and add that VIN -- make stickers so that the VIN appeared to be the VIN from that Mississippi Toyota Tundra, they would then be able, if they had an in with the dealership, to get a temporary tag issued for that truck, right?

A.   Yeah.

Q.   Okay.   And the actual VIN -- that silver Toyota Tundra would never be reported stolen because their owners have no idea that the VIN would have been cloned, right?

A.   That's correct.

61

Q.  And if the white Toyota Tundra was the one that was stolen, somebody may have reported that one stolen.  But because they gave the actual VIN, and everybody's looking for this VIN that we have that's cloned on it, this one would still be able to pass for Mr. Hernandez to take possession of it and drive it anywhere he wanted for at least 30 days, right?

A.  That's correct.

Q.  And you did not review the -- I'm sorry.  Just so we're clear, you did not review the text messages between Mr. Marrero Cisneros -- Roberto Marrero Cisneros and Mr. Hernandez, right?

A.  No.

Q.  Based on your training and experience, is a private civilian allowed to create VIN numbers to put onto motor vehicles?

A.  No.

Q.  Right.  That would be required either by the factory, correct --

A.  That's correct.

Q.  -- or sometimes, let's say a salvage or something, you'd have to make an application to the state to try to get some sort of permission to get a VIN number?

A.  I'm not exactly sure how the salvage works.  It's with a damaged vehicle.  And you know, whether they use the original VIN number or not, I'm not certain.

Q.  Okay.  But you know that primarily it's the factory, the

manufacturer, that has to --

A.   The VIN number -- the factory VIN number is a primary identification of the vehicle, yes.

Q.   And that's important, based on your training and experience, because that allows the police to potentially identify a stolen vehicle, right?

A.   That's correct.

Q.   So now, again, when you're doing a road stop, like when you were on patrol, you wouldn't necessarily run a VIN, unless you had some other suspicion, right?

A.   Typically, the first thing you do on a traffic stop is run the tag number.  Sometimes tag numbers come back stolen.  Sometimes they don't.  If there's any suspicion, you check the registration versus the VIN number, yes.

Q.   And additionally, though, you might check the registration at -- which would have the VIN and the license plate number.  And if they matched, you'd be good to go, right?

A.   That's correct.

Q.   You would need some other indicia of theft to make you look even further to try to check out the one on the windshield or the door?

A.   Well, typically, you would look at the one on the windshield, if you had some reason to believe it was a stolen vehicle.  But if you got a registration in hand with a tag number, and it matches the description, you could just check

it, and, you know, they're on their way.

Q. If it's just a regular traffic stop, where you don't have any indicia that the car's been stolen, you're just running the tag and the registration and the person's driver's license?

A. Yeah. That's a non-criminal traffic violation that you'd stop them for, yes.

Q. So if this white Toyota Tundra pickup truck had a cloned VIN from the truck in Mississippi, Mr. Hernandez could have been driving this thing around for the 30 days of the temporary tag, right?

A. Theoretically, yes.

Q. Let's move on now to the *Luca Brasi*, which I believe will be Defense Exhibit X in your notes.

A. Okay.

Q. All right. Now, the *Luca Brasi,* we have a much wider time window when it could have been stolen here, right?

A. That's correct.

Q. So it's, I think, initially reported stolen on -- was it the 23rd of November of 2019?

A. Yes.

Q. And I believe in the reports that you -- I'm sorry -- you reviewed the Naples Police reports?

A. That's correct.

Q. And in preparing for your testimony here at trial, right?

A. Yes.

64

Q.   And I believe it was that the owner had reported it stolen -- or he had last seen it approximately two weeks prior or something to that effect?

A.   November 9th, 2019.

Q.   So we have a pretty wide window here, correct?

A.   That's correct.

Q.   All right.  However, in addition to your -- in addition -- you were provided with that same cell site data that you have been provided on those other three vessels, right?

A.   I'm checking.

     Yes.

Q.   Okay.  And I don't think you actually testified about -- probably because the window is so wide, I don't think you testified on Wednesday about -- anything about the cell site data for Mr. Hernandez's cell phone within that window of the boat, specifically November 19th -- November 18th through November 19th of 2019.

A.   That's correct.

Q.   Okay.  When you reviewed that cell site data -- and we don't need to get, I guess, into specifics, but again, it's UTC, right?

A.   Right.

Q.   But when you reviewed it, because you weren't looking at specific times, that appears to show the Hernandez cell phone moving, on or about November 18th of 2019, ultimately into the

Naples area around November 20th of 2019, at approximately -- I guess it would have been 1605 UTC time, which would be about 11:05 a.m. because we're in the wintertime.  So I think we have to subtract five hours there.

A.  Yes.  That's correct.

Q.  All right.  So we saw that Mr. Hernandez's phone, yet again, is traveling from the Miami Beach area towards Naples, and is in the Naples area within the window of when the *Luca Brasi* was stolen, right?

A.  That's correct.

Q.  Now, in addition to that, though, you also did review some documents that included chats with an individual by the name of -- or the phone contact is Neco Neco; isn't that right, sir?

A.  Yes.

Q.  Okay.  And those chats basically were again talking about the weather and the state of the Gulf of Mexico, whether it would be calm or if it was -- you know, rough -- rough seas, right?

A.  They do talk about the weather, yes.

Q.  All right.  And then, in addition, the Hernandez phone basically says, at one point, like:  "Hey, I'm going to let you know.  We're planning to leave tonight," right?  You reviewed that chat, right?

A.  I don't see it.  But it's all in Spanish.

Q.  Okay.  I'm sorry.  I was looking at your notes.  So I

thought you had translated it.  So I apologize.

A.   Yeah.  I have the notes.  But I don't see where it says:
"We're leaving tonight."

Q.   Okay.

MR. DOBBINS:  If we could pull up Government's
Exhibit 5A in evidence, please.

THE WITNESS:  Okay I see it.

MR. DOBBINS:  And if we could go to --

BY MR. DOBBINS:

Q.   It might be easier if I just show you the translated copy,
sir.

A.   Okay.

MR. DOBBINS:  So let's go to November -- I believe
it's 19th, 2019.  I think that's going to be towards the end.

I can tell you the page number.  Hang on.

Let's go 265.  Page 265.

BY MR. DOBBINS:

Q.   Okay.  So if we start here, now we're on Page 266, but you
see like, you know, the Hernandez phone, which is in green, the
4619 is asking:  "What's the weather like?"  This is, again, on
November 18th of 2019.  But it's UTC time, so it's still
November 18th, but it's about 6:59 p.m., five hours'
difference.

A.   Okay.

Q.   And the response is:  "Weren't you leaving today?"

You see those chats, correct, sir?

A.   Yes, I do.

Q.   Okay.  And then we see the response from the Hernandez phone:  "Yeah.  We're on it."  And the response from the Neco Neco phone saying:  "The weather is still nice," right?

A.   Yes.

Q.   And this is kind of consistent with those messages you saw, that you reviewed on the other --

A.   Yes.  Yes.

Q.   And then, if you look at that third box, it says:  "Well, we are" -- and this is the English translation, I should add. It says:  "Well, we are getting ready to leave tonight." That's sent from the Hernandez phone on November 19th, 2019, at 12 a.m. UTC time.  So this would really still be November 18th, 2019, at seven p.m.

A.   That's correct.

Q.   Okay.  And then it says:  "Let me know."

MR. DOBBINS:  Can we scroll down to another page.

BY MR. DOBBINS:

Q.   And basically, they're saying like:  "I'll text you when I'm leaving if you're awake.  Ha, ha, ha," that kind of stuff, right?

A.   Yes.

Q.   And that's consistent with the messages you saw --

A.   That's correct, yes.

Q.   Okay.   So those indicate that, at least on November 18th, the Hernandez phone is telling the Neco Neco phone that: "We're going to leave tomorrow night," which would have been actually like November 19th, right?

A.   That's correct.

Q.   And based on the cell sites that you reviewed, even without the UTC time, that indicated that the Hernandez cell phone went from the Miami Beach area to the Naples area on November 19th of 2019, right?

A.   Yes.

Q.   Okay.   And that's still within the window of when the Southport boat, known as the *Luca Brasi*, could have been stolen, right?

A.   Yes.

Q.   Okay.   Now, in addition to the cell sites -- or the cell -- chat messages between Neco Neco and Mr. Hernandez's phone, you also reviewed some chats between Mr. Hernandez's phone and an individual by the name of Ramon Barco 1 in the contacts, correct?

A.   Yes.

Q.   All right.   And those actually were sent back in October-- late October -- I believe October 25th of 2019; isn't that correct, sir?

A.   Yes.

Q.   Okay.

MR. DOBBINS:  If we could go to Government's Exhibit 7A -- 7A in evidence.

This is, again, that translated version, and we have the photos.

If we could scroll down a bit, please.  It's probably going to be towards the end, but it will be October 25th.

I think we need to go down to -- I think it was Page -- October 25th.  Sorry.  October two five.

BY MR. DOBBINS:

Q.  Okay.  So before we get started here, this is Page 161. The chats that you reviewed from -- were basically all from the Ramon Barco 1 phone, right, towards -- to Mr. Hernandez's cell phone, correct?

A.  That's correct.

Q.  And so when we scroll through these attachments here -- because this is -- you looked at them as thumbnails.  But it's basically kind of the same, right?  These basically appear to be boat engine parts, right?

A.  Boat parts, yes.

MR. DOBBINS:  Okay.  Let's keep scrolling down.

BY MR. DOBBINS:

Q.  And what is this?  Are you familiar with what this is?

A.  Looks like some kind of -- it could be a battery charger. It's not real clear on the screen.

Q.  Yeah.  The pictures are thumbnails, so they're not -- when

you enlarge them, they're not great.  But let's keep scrolling down.

     Okay.  Let's start with the second picture.  This is a picture that was sent to Mr. Hernandez's phone, right?  The second one, the one that starts with "South" on it?

A.   Yeah.

Q.   Right.  And the one above it appears to have, in cursive -- it looks like you can see the writing on the side of the boat, maybe of the name of a boat, with a B, and then it looks like possibly could be *Brasi*, right?

A.   That's correct.

Q.   All right.  And so these were sent on October 25th, from Ramon Barco 1 to Mr. Hernandez's phone.  And of course, we looked -- on Wednesday, you were shown the pictures --

          MR. DOBBINS:  If I can have the Government's ELMO --

BY MR. DOBBINS:

Q.   These were the owner's pictures of the *Luca Brasi* that was stolen, right?

A.   Yes.

Q.   Okay.  And that's not the best one, and there's a glare.  I apologize.  This paper is a little shiny and is not conducive for the ELMO.  But this appears to be a dark -- the boat's dark green, right?

A.   That's correct.

Q.   And it has *"Luca Brasi"* in cursive on the side, right?

A.   That's correct.

Q.   And then you've got the word "Southport," which is the manufacturer of the boat, right?

A.   That's correct.

Q.   And these are some of the same photos -- we saw smaller versions of the boat, but these are some of the same photos we saw that Ramon Barco 1 was sending to Mr. Hernandez's cell phone, correct?

A.   Yes.

Q.   And based on your training and experience, that would be certainly of interest to you to investigate, based on the fact that less than a month later the *Luca Brasi* is stolen, right?

A.   Absolutely.

Q.   Now, in those text messages, you also see certain components of the center console, right, of the *Luca Brasi*?

A.   Yes.

Q.   And you've got some of those same photos of what appear to be the battery charger and some other instruments on that vessel, right?

A.   Yes.

Q.   So now let's go to Government's Exhibit 60, which is the vessel that was recovered in Mexico.  Now, similar to -- we were talking about --

        MR. DOBBINS:  If we could have the Government's laptop, please.

BY MR. DOBBINS:

Q.   Now, we were talking about the chop shops for vehicles. And you said a common practice for chop shops is that they also double as like legitimate garages, or mechanics, or auto body shops, so that they can do the altering of stolen vehicles under the cover of being a legitimate business, right?

A.   That's correct.

Q.   And similarly, certainly marinas -- if somebody owned a type of marina or dry dock, they could also be a chop shop for vessels, right?

A.   Hypothetically, yes.

Q.   Right.  Because similar to the auto body shop or the mechanic shop, they have the tools, the equipment, and they can alter vessels as they see fit.  Because people would also bring their vessels there to be altered, right?

A.   Be repaired, correct.

        MR. DOBBINS:  I'm sorry, Judge.  Are you looking at me to get me to stop or -- when did you want to stop for lunch?

        THE COURT:  About 10 minutes.  But let me know when it might be a good time because we did start a little late.

        MR. DOBBINS:  Thank you, Your Honor.

BY MR. DOBBINS:

Q.   All right.  So let's show you Government's Exhibit 60 in evidence.  And I just want to make sure I understand your testimony correctly, sir.  You said on Wednesday that --

MR. DOBBINS: If we could go to the next page.

BY MR. DOBBINS:

Q. You said on Wednesday that this is not the same boat because it's been sanded down on the left side?

A. No. I said I could not say beyond a reasonable doubt that this is the same boat because the photographs don't prove what it is.

Q. I see. Would you say, though, that if this were the *Luca Brasi*, the fact that it's been sanded down at least on one side, that would be consistent with it being altered pursuant to like, say, a vessel chop shop, right?

A. This boat was altered on the left side, yes.

Q. Right. It was also altered by the fact that the anchor was removed, right?

A. That's correct.

Q. And you said there was the name *Luca Brasi* on the side there, and that's no longer there, right?

A. On the radio box, yes.

Q. Okay.

A. And on the side.

Q. And on the side?

A. On this side, right.

Q. And I understand. Because you don't have a picture of the other side, right?

A. I wish I had a picture of the other side.

Q.  Certainly.  But -- and you said the radio box --

MR. DOBBINS:  Can we scroll down one picture, please.

BY MR. DOBBINS:

Q.  I believe the radio box you're referring to -- could you just draw a circle around that, where you were saying that the *"Luca Brasi"* was?

A.  (Witness complies.)

Q.  So would it be fair to say, because the circle -- and I understand it's difficult to draw a tight circle.

A.  Yeah.  I got big fingers.

Q.  That's okay.  But it's basically like the underside or there's a box there?

Oh.  Perfect.  Thank you.

A.  There.  You want me to recircle it?

Q.  Yeah.  Let me clear it and then you can recircle it.  Okay?

A.  (Witness complies.)

Q.  Perfect.

And so, again, if somebody was operating a chop shop at this marina in Mexico, one of the things they would want to do is try to remove any identifying markings on this vessel, correct?

A.  Yes.

Q.  Okay.  Now, if I could go to -- now, similar to -- now, it's not the same as a hull identification number, but Yamaha engines, probably like other engine manufacturers as well --

but Yamaha specifically, they have Yamaha serial number stickers that are on these engines, right?

A. They have serial numbers on stickers, yes.

Q. And they're on the engine, right?

A. They're on the engine, yes.

Q. They are unique to that engine, correct?

A. Well, the stickers match the serial number that's engraved on the motor somewhere, yes.

Q. Okay. And Yamaha is responsible for putting that serial number on there, right?

A. Yes. There's a little bar code after it -- just to fill in the blanks here, on that white sticker, there's a little bar code, and it's very accessible to a mechanic or somebody that's working on the vessel. That documents what repairs were done on this serial number. It all has to do with keeping track of warranty information and that type of thing.

Q. Okay. And it's also a way for -- because vessel theft is not the only thing that happens sometimes with boats. Sometimes people steal just the outboard engines, right?

A. Oh, yes. It's very frequent.

Q. And because those serial numbers are unique, another thing to try to evade detection, they have to sometimes try to change the serial numbers, right?

A. That's correct.

Q. Right. And one of the ways to do that is to file off the

engraved part of the engine number, right?

A.   Yes.

Q.   And another way would be to, if they could, take off the decal that had the engine number, right?

A.   Yes.

Q.   And another thing would be to also -- if you had the ability to, if you could create a sticker of another engine number to put on there, you could try to do that, right?

A.   Very creative, but yes.

Q.   Okay.

MR. DOBBINS:  If we could go to -- scroll down, please.

And I believe -- okay.  Let's stop here.

BY MR. DOBBINS:

Q.   Do you know what we're looking at here, sir?

A.   I believe that's the arm that attaches the motor onto the boat itself.

Q.   Right.  I believe the technical term might be the clamp bracket.  Does that sound right?

A.   Clamp bracket can be used, yes.

Q.   Do you see that rectangular portion that's sort of recessed in the metal of the clamp bracket?

A.   Yes.

Q.   Isn't it true, sir, that that's where the serial number sticker for a Yamaha engine would be?

A.   Yes.  The sticker, yes.

Q.   And in this case, the sticker has been removed?

A.   Absolutely.

Q.   Which -- that's consistent with -- in your training and experience, a stolen vessel, right?

A.   Yes.  Or stolen motor per se.

Q.   Or a stolen motor.  Sure.

And another thing that could happen, if you had a stolen vessel, right, if you were in a marina chop shop, and you had access to other engines, you could also be replacing engines, so that the boat doesn't appear to be the same boat that's stolen as well, right?

A.   Yes.

Q.   Okay.

MR. DOBBINS:  Scroll down a little bit more, please.

BY MR. DOBBINS:

Q.   Okay.  Now, this sticker -- this is just part of the center console in the vessel, right?  This is called a 6Y9 gauge. Would that be correct?

A.   It's not in the console of the vessel, no.  This is somewhere located on the motor.

Q.   Okay.  But this would not be the engine serial number, right?

A.   I believe the 6Y983710113 is the serial number, yes.

Q.   This isn't -- you know what a 6Y9 gauge is, sir?

A. Pardon?

Q. Do you know what a 6Y9 gauge is?

A. No, I don't.

Q. Okay.

MR. DOBBINS: All right. Let's keep scrolling down.

BY MR. DOBBINS:

Q. All right. Now, if you look in the center of that photograph, sir, there appears to be a discoloration or a scrape of some sort. Do you recognize that?

A. I see it. I don't recognize it.

Q. Are you familiar that Yamaha engines have a sticker that they also put in the -- somewhere on the engine block that also has the last seven digits of the serial number for the Yamaha engine?

A. Yes.

Q. And those last seven digits are really all you need. So even if somebody took off the sticker on the clamp bracket, if you still had that, you could identify, based on the serial number, if it was there, right?

A. Yes.

Q. So this is something else that -- if you were trying to disguise or hide the fact that this was a stolen vessel, you would want to remove this, correct?

A. Yes. The picture is not certain whether it's even on a motor. I don't know what that's on.

Q.  Okay.

        MR. DOBBINS:  Let's keep scrolling down.

BY MR. DOBBINS:

Q.  When we zoomed out, did that make it more clear or less clear?

A.  Well, yeah.  I can't say at this point.

Q.  Okay.

        MR. DOBBINS:  Let's go down to the next page, please.

BY MR. DOBBINS:

Q.  This is a little bit more of a closeup view there.  Does that appear that something's been scraped at least off of that metallic part?

A.  Yes.  Yes.

Q.  And if that was where the seven-digit sticker would be, that would be another place where it would have been removed, correct?

A.  Possibly, yes.

Q.  Okay.

        MR. DOBBINS:  And let's go down to the next page.

        All right -- yes, please.

BY MR. DOBBINS:

Q.  So this page, sir, I think you testified on Wednesday that this is an engine serial number.  Do you recall that testimony, sir?

A.  Yes.

Q.   And are you sure about that?

A.   Am I certain that this is a VIN serial number?  I didn't run the serial number to find out what it belongs to, nor do I have that capability, nor does the photograph show the complete serial number.

Q.   Okay.

MR. DOBBINS:  So let's back out little bit, please.

BY MR. DOBBINS:

Q.   Now, this is a -- part of the Yamaha engine, correct?

A.   I don't know.  From what I see here, I can't identify it as being a Yamaha engine.

Q.   Okay.  So then why did you think it was the engine serial number, if you don't know that it's part of the engine?

A.   The engine -- the serial number matches the pattern of a Yamaha engine.  This photograph -- to investigate this properly, I would have a series of photographs of the boat, the motor, smaller version of the motor, bring me down to this photograph you're showing me.  That would give me a better idea of what's going on here.

Q.   I think a couple -- I think maybe the next picture down we have the picture of the number, which is really easier to read because there's a little glare.

MR. DOBBINS:  Maybe one more.

One more.  Sorry.

There you go.

Case 1:22-cr-20557-BB  Document 248  Entered on FLSD Docket 06/08/2024  Page 81 of 185

81

BY MR. DOBBINS:

Q. Does that help you see the number more completely? Because there was some glare, I think, in the other photo, right?

A. Yeah.

Q. But the reason I want to go back to the other picture, if we could, is because there's a brand name on that part, isn't there, sir?

A. There is.

Q. It's Mikuni, correct?

A. That's correct.

Q. And Mikuni makes a number of parts for engines, right?

A. I believe so.

Q. They make carburetors, right?

A. Uh-huh.

Q. Make fuel injectors, right?

A. I believe so, yes.

Q. And so, Mikuni -- this part -- specific part, sir, isn't this the throttle body of the engine that we're looking at here on the Yamaha?

A. I really couldn't tell you. I'm not a mechanic.

Q. Well, let me ask you this: Mikuni makes the parts before Yamaha assembles the engines, correct?

A. Yes.

Q. So Mikuni wouldn't have any information as to what the serial number of the engines is going to be before they

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698

manufacture the part, right?

A. That's correct.

Q. So in fact, this number is, in fact, a part number, along with a batch number; isn't that correct, sir?

A. I have no idea. This could have been attached or it could have been inscribed in there by Yamaha after the fact. I'm not certain what number it is or if it's a serial number.

Q. Did you talk to Yamaha about the specific part or part number?

A. No.

Q. Okay. And you said you didn't run this number to investigate it?

A. No. I have no capabilities of running motor serial numbers.

Q. Well, you certainly could call Yamaha, right?

A. They're not going to give me that information for obvious reasons. Anybody could call and get serial numbers. It's proprietary information. They don't give out --

Q. Well, hold on, sir. You work for Mr. Feigenbaum in this case, correct?

A. That's correct.

Q. And he has subpoena power, right?

A. That's correct.

Q. So he could have subpoenaed the information for this Mikuni part to find out if this is an engine serial number, correct?

A.   Theoretically, probably, yes.

MR. DOBBINS:  Your Honor, this might be a good time to take a lunch break.

THE COURT:  All right.  Ladies and Gentlemen, as you can see, it's 12:40.  We'll take a one-hour recess for lunch.

Have a pleasant lunch.  I'll see you back here at 1:40.

COURT SECURITY OFFICER:  All rise.

(Jury not present, 12:43 p.m.)

THE COURT:  All right.  Before we recess for lunch, I only advised the jury of today.  So how much longer do we have, Mr. Dobbins, of this cross-examination?

MR. DOBBINS:  Not much longer, Judge.  I think maybe 15 minutes.

THE COURT:  And with regard to the redirect?

MR. FEIGENBAUM:  Well, it's been two and a half hours of cross.  So I would say one to one and a half hours.

THE COURT:  I just want to emphasize again that we have one of the jurors that is leaving on Wednesday, cannot be here on Wednesday.  I have not even advised them of tomorrow.  So following this gentleman -- we'll see you back here at 1:40, sir --

THE WITNESS:  Thank you.

THE COURT:  -- who is the Defendant's next witness?

MR. FEIGENBAUM:  Mr. Hernandez.

84

THE COURT:  All right.  Let me colloquy Mr. Hernandez, so we don't need to take a break following Mr. Riemer.

Mr. Hernandez, as you know -- and go ahead and have a seat -- as you know, the Government carries the sole burden of proving all the elements of these five counts contained within the Indictment.  You have no burden.  However, it is my understanding that you have made a decision to call two witnesses to the stand to testify, and that is fine.  That's a decision that you have already made, and I have inquired with regard to that decision.

However, with regard to your testimony, Mr. Hernandez, let me advise you specifically that you have a constitutional right not to testify.  And whether you choose to testify, you can certainly consult with Mr. Feigenbaum, but in the end the decision needs to be yours.

Have you made a decision whether you will be testifying in this matter, Mr. Hernandez?

THE DEFENDANT:  (Through Interpreter.) Yes, Your Honor.

THE COURT:  And what is your decision, sir?

THE DEFENDANT:  I will testify.

THE COURT:  And has anyone forced you or threatened you to make that decision?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Are you making that decision on your own

free will, sir?

THE DEFENDANT:  Correct.

THE COURT:  And Mr. Hernandez, if at any time you change your mind, and you decide not to testify, then it is incumbent upon you to advise Mr. Feigenbaum.  Because after Mr. Riemer testifies, I will then ask the Defendant to call his next witness.  And Mr. Feigenbaum will call you, unless you specifically advise that you don't want to testify.  Is that understood, sir?

THE DEFENDANT:  I understand.

THE COURT:  And do you have any questions, Mr. Hernandez?

THE DEFENDANT:  No, Your Honor.

THE COURT:  All right.  Then I will ask the courtroom deputy if she can ask the jurors whether they are able to come to court tomorrow.  I'm not certain what our schedule is tomorrow morning.

All right.  Hopefully, the jurors will be available for tomorrow.  We will need to take a lunch recess at about five to noon, since I do have a matter at noon.  And then we also have a calendar call at one.  So our lunch recess will be from five to twelve, until about 1:15.  All right.  Just -- that's the only change that we would need to make for tomorrow's schedule.  But let's see if the jurors are available tomorrow.

Okay.  I'll see you back here at 1:40.

COURT SECURITY OFFICER:  All rise.

(Recess from 12:46 p.m. to 1:41 p.m.)

THE COURT:  All right.  Welcome back.

I hope everyone had a nice lunch.

Can we check and make sure our jurors are back with us.

(Pause in proceedings.)

THE COURT:  Is it possible to see maybe if it changed?

Thank you.

(Pause in proceedings.)

THE COURT:  Do we have all of our jurors?

COURTROOM DEPUTY:  Yeah.  And everyone is good for tomorrow.

THE COURT:  All right.  The courtroom deputy has advised that the jurors are available tomorrow.  So we will plan tomorrow from nine to five, given the time that we'll take for lunch, which is five to noon, and then pick back up at 1:15.

Okay.  Both sides ready to continue?

MS. KLEPACH:  Yes, Your Honor.

THE COURT:  On behalf of the Defendant?  Ready to continue, Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

(Before the Jury, 1:47 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

I trust everyone had a pleasant lunch, and ready to get back to work.

And we'll continue with the cross-examination.

MR. DOBBINS:  Yes, Your Honor.

Thank you.

BY MR. DOBBINS:

Q.  Good afternoon, Mr. Riemer.

A.  Good afternoon.

Q.  All right.  When we left off, we were talking about Government's Exhibit 60 in evidence.

MR. DOBBINS:  May I have the ELMO, please?

BY MR. DOBBINS:

Q.  Now, sir, your testimony on Wednesday was that you recognize this to be a part of the Yamaha engine, and you testified that this was a serial number for a Yamaha engine number; is that correct?

A.  I testified that it appeared to be a serial number.  I didn't say that this part was part of a Yamaha, but it's obviously a serial number to a boat motor.

Q.  Okay.  So the Mikuni is part of the boat motor?

A.  Yeah.

Q.  But you're not sure what part that is?

A.   I'm not sure what part that is.

Q.   And you're not sure if that's the serial number for the boat motor or the serial number for the part, right?

A.   Well, no.

Q.   No, you're not sure that it's --

A.   The digits and the characterization of the letters and numbers are characteristic with a Yamaha serial number.

Q.   So you believe that to be a Yamaha serial number, sir?

A.   Could possibly be.  I can't say that it isn't.  I can't say that it is.  There's not enough evidence here in these photographs for me to make a definite statement.

Q.   What I'm trying to get at, sir, on Wednesday, you said it was the engine serial number or it appeared to be.  Now I'm asking you:  "Are you sure," and you're saying you can't say one way or the other; is that correct?

A.   I'm saying it appears to be a serial number.  I cannot say to what vessel or if it's what it is.

Q.   Okay.  So it's not -- and you're certain that's not a part number, right?

A.   I go back to my original -- what I just said, that the numbers and letters -- how they're positioned in this string are characteristic with a Yamaha serial number.

Q.   Okay.  Now, on Wednesday, you testified that that boat in Government's Exhibit 60 was not the *Luca Brasi*; is that correct?

A.   Yes -- well, I said I was not certain that it wasn't the *Luca Brasi.*

Q.   Okay.  And the reason you can't confirm whether it's the *Luca Brasi* or not is partly because you don't have enough pictures to tell, right?

A.   That's correct.

Q.   And also partly because the identifying marks of the *Luca Brasi*, from the pictures that you can see, have been removed, right?

A.   Allegedly, yes.

Q.   Well, they are not there, right?  There's no --

A.   There's no lettering on the sides of the boat -- on the left side of the boat.  The right side, I don't know.  I don't have a picture.

Q.   Right.  But there's no identifying markings on the parts --

A.   That's correct.

Q.   That would include the Florida number, the FL number, right?

A.   That's correct.

Q.   That would include the name, the *Luca Brasi,* correct?

A.   That's correct.

Q.   And that would include the rear of the boat -- or I'm sorry -- the side of the boat, which is also where it says: "Southport"?

A.   The brand name of the vessel, yes.

Q. And then, the same thing with the rear of the vessel. You can't tell whether there was an American flag there on the left, because there's nothing there. It appears to be potentially something of a rectangular shape was scraped off or --

A. That's correct.

Q. Right? And then you can't see on the right side whether there's a flag there, or anything there, because that's where the Italian flag would have been, right?

A. Yes.

Q. Okay. Now, you testified on Wednesday that the *Luca Brasi* is still in the NCIC reported as stolen?

A. In the FCIC, yes.

Q. All right. The FCIC is the Florida --

A. Crime Information computer.

Q. And that's linked to the NCIC, which is the national one?

A. Yes. Only law enforcement has access to the NCIC.

Q. But isn't it true, sir, that for that to be removed from the FCIC or NCIC, the law enforcement agency that reported it initially has to be the one to submit another report to have it removed, correct?

A. Typically, that's how it works, yes.

Q. Right. But -- so in this case, obviously, the Naples Police Department hasn't done that yet, right?

A. Apparently not, no.

91

Q. But you did review their reports, correct?

A. Yes, I did.

Q. And they consider the investigation closed, correct?

A. They -- I believe it's -- let me just refresh my memory.

Q. And this is Defense Exhibit X that you're looking at, your notes?

A. It says:  "This case will be closed pending further information."

Q. Okay.  So it will be closed, right?

A. No.  It's pending -- it's closing pending further information.  There is no further information.  So technically I see it as still open.

Q. Okay.  But certainly, in your time as road patrol and as a detective, you've seen it where things that have been recovered, for whatever reason, have not been removed from reports or NCIC, FCIC.  That happens, right?

A. No.  It's poor police work, especially when it's entered into a state and national database.  It's very important that you take that information out.

Q. Well, let me ask you something, sir.  Do foreign police officials have the ability to have that removed from FCIC or --

A. No.

Q. So if the Mexican police are the ones that recovered it, and they kept the boat over there, would that boat have been taken out of NCIC?

A.   Not by Naples PD, because they don't have proof that this is the *Luca Brasi.*

Q.   Right.

Okay.  You testified on Wednesday about fuel on boats, right?  Do you recall that line of questioning?

A.   Yes.

Q.   Now, in addition to the cell site information you were provided, that showed that the Hernandez phone was in the Naples area within the window that the *Luca Brasi* was stolen, you were also provided with those chats, which had -- from Ramon Barco 1, which had the pictures of the *Luca Brasi* on October 25th, right?

A.   Yes.

Q.   And you also had -- that Ramon Barco 1 had sent to the Hernandez phone, right?

A.   Yes.

Q.   And you also had the conversation chats between the Hernandez phone and the Neco Neco phone?

A.   Yes.

Q.   Where they were talking about weather on the Gulf and sea conditions on the Gulf, right?

A.   Yes.

Q.   And also that -- whether or not -- when they would be leaving, which turned out to be on or around, I believe, July of -- July 19th, I believe it was, right?

A.   If that's what you say, yes.

Q.   Okay.   But in addition to that, you were also provided with photos and images that were recovered from the Hernandez phone, right?

A.   Yes.

Q.   So these are the Ramon Barco Southport images, right?

A.   Yes.

Q.   Okay.   We talked about those.

These are the Neco messages that you reviewed, right?

A.   Yes.

Q.   All right.   We talked about those.

And then you also had these pictures inside the Hernandez phone, right?

A.   That's what it's labeled as, yes.

Q.   And you reviewed those photos as well, right?

A.   Yes.

Q.   And so, the one on the left is like a -- looks like maybe an owner's manual or something, or a description of the Southport 30 FE, right?

A.   That's correct.

Q.   And then we have pictures from the center console with what appears to be a brown seat, as well as -- I guess, is that the -- I'm not a -- I'm not an expert in boats.   But the front, is that called the aft or the bow?

A.   Well, on the third photo is a picture of the bow, the

interior bow area.

Q. And that's the front of the boat, right?

A. That's correct.

Q. Okay. And then that fourth picture is fuel containers?

A. Yes. Yes.

Q. And obviously, if you're making a trip from Naples to the Yucatan Peninsula, you would need a lot of fuel to make that trip, correct?

A. You need fuel, yes.

Q. You need extra fuel, right?

A. More than likely, yes.

Q. Because it's not like in the middle of the Gulf you can --

A. No. I understand what you're saying, yes.

Q. Okay. Now, you testified that those fuel containers, there's no -- they're not in violation of any law, right?

A. That's correct.

Q. Okay. And that's because those are authorized fuel containers that conform to federal regulations, right?

A. That, I have no knowledge of.

Q. Okay. So why do you say -- are you aware of the Florida Statute that -- Chapter 327.66, that talks about carrying gasoline on vessels?

A. Not off the top of my head, no.

Q. Okay. So you're not aware of a statute that makes it -- says that: "A person shall not possess or operate any vessel

that has been equipped with tanks, bladders, drums, or other containers designed or intended to hold gasoline, or install or maintain such containers in a vessel, if such containers do not confirm to federal regulations or have not been approved by the United States Coast Guard by inspection or special permit"?

A.   Is that the state statute you're reading?

Q.   Yes, sir.

A.   Okay.

Q.   Does that sound familiar?

A.   Yeah, it does.

Q.   Okay.  So you are familiar with it?

A.   I am.

Q.   Okay.

A.   I don't know if these containers are federally approved or not by the picture.

Q.   Oh, okay.  So they are not like a brand of --

A.   No.  These are containers that are commonly used by people going offshore or going out of the country.  And I say that because you'll see it frequently in the Bahamas.

Q.   Okay.  And -- but the containers, according to the Florida statute at least, need to be approved by either federal regulation or by a special approval by the Coast Guard, right?

A.   The containers, yes.  But I can't see if these are or are not.

Q.   Right.  So they could be in violation or they could not be

in violation?

MR. FEIGENBAUM:  Your Honor, there's a lack of foundation with this line of questions.  The prosecutor hasn't established whether these conform or not.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat the question.

BY MR. DOBBINS:

Q.  Yes.  So you can't say, sitting here, one way or the other whether these fuel containers are in compliance with the Florida statute, correct?

A.  No.

Q.  Okay.  And if somebody was to take, say, large detergent containers or other containers that have like, say, chlorine, those wouldn't be containers that one would use to store boat fuel, right?

A.  I don't know what kind of containers those are that contain soap or chlorine.  I'd have to see them.

Q.  Okay.  But if somebody -- if there were chats in Mr. Hernandez's phone where they were talking about cleaning out the tanks, so they could get rid of the chlorine, that would be an issue, right?  Those tanks wouldn't be in compliance with --

A.  I have no idea, unless I saw the tanks.

Q.  Okay.  Have you ever seen, during your time as a mariner, any, like, laundry detergent tanks or other -- like, pool

chlorine tanks used as fuel containers?

A. No.

Q. And again, with these pictures of what appears to be a -- would it be fair to say this appears to be a Southport vessel that we're looking at in these pictures?

A. Probably so, yes.

Q. Okay. And again, based on your training and experience, if you were investigating the theft of a Southport vessel, this would be important information and evidence for you, right?

A. Absolutely.

MR. DOBBINS: One moment, Your Honor.

THE COURT: Certainly.

(Pause in proceedings.)

MR. DOBBINS: No further questions, Your Honor.

Thank you.

THE COURT: All right. Any redirect?

MR. FEIGENBAUM: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. FEIGENBAUM:

Q. Good afternoon, Mr. Riemer.

A. Good afternoon.

Q. Let me get my little microphone.

How you doing today?

A. Doing well.

Q. All right. I want to start off with the questions that the

prosecutor asked you about cell phones, because I believe most of the initial part of his cross-examination today related to cell phones.  So one of the overall questions is -- because he spent a lot of time on if a cell phone is in the area of a tower that pings the call -- does the cell phone register -- when somebody uses a phone, does a cell phone tower record the conversation?

A.   No.

Q.   So is there any way to tell why the call was made?

A.   No.

Q.   The fact that a person has a cell phone that's in the vicinity of a boat that is allegedly stolen is not evidence that the person who made a call was involved in the theft of a boat; is that right?

A.   That's correct.

Q.   Or even knew that the boat was stolen?

A.   That's correct.

Q.   So even if you had a cell phone pinging, as they say, off a cell phone tower right by where a boat was, at the same time that a person arrived where the boat was, is that proof that the person who arrives right then when that cell phone registers -- that that person knew the boat was stolen?

A.   No.

Q.   Or even if it's at the moment the boat leaves that the cell phone registers right there, that the person, first, was

involved in a theft?

A.   No.   In addition to that, there's several cell phones pinging at the same time.   So --

Q.   Right.   So my question is:   Somebody drives up to where a boat is, that he is going to drive away, and he makes a call to anybody -- so you've got -- even if -- we know from the cell phone expert that he could actually be at a distance from that point.   But even right there, is that any proof that the person was involved in stealing the boat?

A.   No.

Q.   Or that he knew the boat might be stolen?

A.   No.

Q.   So all of those records and all that time that the prosecutor spent with you looking at T-Mobile records, is that proof that Javier Hernandez, with that phone, knew any boat was stolen?

        MR. DOBBINS:   Objection.   Leading.

        THE COURT:   Sustained.   Rephrase.

BY MR. FEIGENBAUM:

Q.   Well -- okay.   The fact that a person makes a phone call where a boat is, at any time, is that evidence -- you, as an investigator -- the person was involved in a theft?

A.   No.

Q.   Or that he knew about the theft?

A.   No.

Q.   Now, the Government also showed you -- I think it was their Exhibit 108.   Was 108 the cell phone analysis of Mr. Goodrich?

MR. DOBBINS:   65.

BY MR. FEIGENBAUM:

Q.   Okay.   So the prosecutor spent some time showing you Government's Exhibit 65, Mr. Adam Goodrich's cell phone historical analysis.   Remember?

A.   Yes.

Q.   And that Government expert, I believe you testified, put times associated with cell phone calls?

A.   That's correct.

Q.   But that Government expert did not state whether it was the local time or some kind of universal time?

MR. DOBBINS:   Objection.   Asking to comment on another's testimony there.

MR. FEIGENBAUM:   Okay.   I'll re-ask, Judge.

THE COURT:   All right, then.

BY MR. FEIGENBAUM:

Q.   The Government expert provided a cell phone historical analysis; is that right?

A.   Yes.

Q.   Government Exhibit 65.   Recall?

A.   Yes.

Q.   But the prosecutor, when he started asking you questions said:   "Well, you know, Mr. Riemer, that's not really the time

it was."  Remember that?

A.  Yes, I do.

Q.  But what the Government gave us as its expert's exhibit, the expert's historical analysis, did it give you the right time?

MR. DOBBINS:  Objection.  This is a mischaracterization of Government's Exhibit 65.

THE COURT:  Overruled.

THE WITNESS:  It gave me a time that I took at face value.

BY MR. FEIGENBAUM:

Q.  Right.  Did you feel it was okay to rely on that Government expert's representation about those times of day?

MR. DOBBINS:  Judge, I'm going to object, and I'd ask to approach at this time.

THE COURT:  Why don't you rephrase, so that there's no need for a sidebar.

MR. FEIGENBAUM:  Okay.

BY MR. FEIGENBAUM:

Q.  Government Exhibit 65, Historical Cell Phone Analysis, from Government expert Adam Goodrich.  Remember being shown that on cross-examination?

A.  Yes.

Q.  The times that were given, did you rely on them?

MR. DOBBINS:  Objection, Your Honor.  And I think

102

there's a confusion here that could be cleared up with a quick sidebar.

MR. FEIGENBAUM:  Okay.  I'll ask it a different way.

THE COURT:  All right, then.

BY MR. FEIGENBAUM:

Q.  Did the prosecutor say:  "Mr. Riemer, this time that you took from our own expert's exhibit, those are not the real times that the cell phone was pinging off a cell tower"?

MR. DOBBINS:  Objection, Your Honor.  That's a mischaracterization.  It was 108 that we were referring to, not Government Exhibit 65 that we were referring to.  You're saying it's 65.  We did not show him 65 and say that you have the wrong times.

THE COURT:  All right.  Let's refer to the exact exhibit number, so it's helpful to the jury.

MR. FEIGENBAUM:  Is Exhibit 108 T-Mobile?

MR. DOBBINS:  108.  It's right here.  It's the PowerPoint that Special Agent Spielvogel showed your client, not an expert, and that was what your witness was relying on.

MR. FEIGENBAUM:  Okay.

MR. DOBBINS:  Not 65.  When I showed 65, your witness said:  "I've never seen that before," right?

MR. FEIGENBAUM:  All right.

THE COURT:  All right.  Let's continue with the redirect.

MR. FEIGENBAUM:  What is the T-Mobile number?

MR. DOBBINS:  62.

MR. FEIGENBAUM:  Okay.

MR. DOBBINS:  Those are the records.

BY MR. FEIGENBAUM:

Q.  Okay.  What I'm trying to get at is:  Government 108 was -- let me show you what he showed you.  It would be part of -- it's a multipage -- Government's Exhibit 108.  And remember when the prosecutor showed you this?

MR. FEIGENBAUM:  Could I have the ELMO, please.

BY MR. FEIGENBAUM:

Q.  On cross-examination, did the prosecutor show you pages like this?

A.  Yes.

Q.  Okay.  And this one too?

A.  That's correct.

Q.  All right.  And was that -- these pages, was it something the Government prepared?

A.  It appears so, yes.

Q.  And when you did your investigation in this case, did you, in good faith, take it at face value?

MR. DOBBINS:  Objection, Your Honor, to the characterization "in good faith."

THE COURT:  All right.  Face value.  Let's rephrase.

BY MR. FEIGENBAUM:

Q.  Did you take it at face value?

A.  I did take it at face value, and I also considered the times in Cancun in the time zone -- that that might be included in Central Time Zone.  So I did look at time zones.  But I assumed, because there was no indication that it was Uniform Time Code, that it was nothing more than Eastern Standard Time.

Q.  And then, also, when he was asking you questions, Mr. Dobbins brought up T-Mobile records, very extensive T-Mobile records.  Remember?

A.  Yes.

Q.  And he said these times compared to the times that were in the other Government exhibit are different because of the time zone adjustment you have to make; is that right?

        MR. DOBBINS:  Your Honor, objection.  Leading.

        THE COURT:  Sustained.  Rephrase.

BY MR. FEIGENBAUM:

Q.  Did he -- did the prosecutor try to show that your conclusions may have been off because when you look at the T-Mobile records they were different than the other Government exhibit?

        MR. DOBBINS:  I'm going to object to leading, Your Honor.

        THE COURT:  I'll allow it.  You may continue.

        THE WITNESS:  The hours were in military time.  I

assumed -- most law enforcement uses military time -- that this was military time Eastern Standard Time.  It was not until I saw the document from T-Mobile, and the prosecutor pointed out UTC, that I realized that it was a different area code or different time zone.

Q.  So two -- is it a fair statement, then, that there were two different Government exhibits providing two different sets of data on this issue?

MR. DOBBINS:  Objection.  Mischaracterization.

THE COURT:  Sustained.  Rephrase.

BY MR. FEIGENBAUM:

Q.  The T-Mobile records, did they conflict with the times put on the other Government exhibit?

MR. DOBBINS:  Objection.  Mischaracterization.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Was -- comparing the two, was there a difference between the two Government exhibits as to dates and times?

A.  Yes.  The T-Mobile had the UTC code, and the Government -- documents prepared by the Government had no indication of what time zone they were in.

Q.  Thank you.

I want to ask you about -- because the prosecutor did, I want to ask you about what things you did in each of the four boat investigations, the four boats listed in the charging

document in this case.  Just give us an overview, let's say, as to the *Mellow Yellow*, the 37-foot Pursuit.  What things did you do when you investigated that boat theft?

A.  Well, first off, I read the police report from Marco Island Police Department.  I looked at it for accuracy and compared it with the coupling exhibits that were provided to me prepared by the FBI, and there were some inaccuracies in the report itself.  Might have been scrivener's errors.  I don't know.  But like the BOLO states that the *Mellow Yellow* was a 39-foot boat, when indeed the registration stated it was a 36-foot boat.  That's a big difference.

I also looked at the completeness of the report.  It states that they had video, but didn't state where they obtained that video from or how many other addresses they had checked for video.  Typically, when -- if -- when I was a cop, or if I even as a private investigator --

MR. DOBBINS:  Your Honor, I'm going to object.  This is a run-on answer.  It was asked -- the question was:  "What did you do?"

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Okay.  Just tell us the different things you did in looking into the theft of the *Mellow Yellow.*

A.  So I pointed out what was not done in the report, i.e., canvassing and documenting the canvass as to where you went and

what you did.

Q.   What is the canvassing?  What does that mean?

A.   That's knocking on people's doors, looking at commercial establishments along the waterway where it's alleged that this boat was taken out to an open sea, the Gulf of Mexico.

Q.   Well, what type of places would you, having been qualified as an expert in theft, and boat theft in particular investigation -- in a canvass, as you described it, where would you have gone to try and recover video?

MR. DOBBINS:  Objection.  Outside the scope of the cross-examination.

MR. FEIGENBAUM:  He covered every boat one by one.

THE COURT:  I'll allow it.  I'll allow it.

THE WITNESS:  I would have started with the residences because they are the first -- let me back up.  The video is obtained very prolifically.  In this day and age, everybody has video.  So typically, home video systems don't have the capacity of a commercial system.  So my first step, to avoid any possible evidence being overwritten, I would contact all the residents along that waterway.  They are wealthy.  It's a wealthy neighborhood.  They got deep-water lots.  I'm sure most of them probably had video.

The other thing would be -- secondarily, would be the commercial establishments, the hotels, the marinas, public facilities type of thing, where they typically have 60, 90 days

worth of memory in their system, and then you could also capture video.

Q.   Based on your review of the investigation the local police did for the *Mellow Yellow*, were these steps taken?

A.   No.

MR. FEIGENBAUM:   Was the *Mellow Yellow* -- I don't recall right now -- was it the one where there was a video of the boat moving out?

Okay.

BY MR. FEIGENBAUM:

Q.   So do you recall the video of the boat in this one particular case traveling along a route, apparently on its way out to sea?

A.   I did not see the video.  I did read the report.  And the report did state that the *Mellow Yellow* was seen traveling out to sea.  Didn't give a location, but it did say traveling out to sea.

Q.   Okay.  It did not give a location in the police report?

A.   Of where the video was taken from, no.

Q.   And did you look into -- from the address where the boat was stolen, did you look into what types of establishments would have been on the route out to sea?

A.   Yes, I did.

Q.   Let us know.

A.   Well, this particular one, it was mostly residential

communities.  You can follow a track right from where the house was, down through the Southwest, that eventually leads out to the Gulf of Mexico.

Q.  All right.  Based upon your training and experience in this area of crime investigation, did you reach any conclusions about the thoroughness of the investigation for this theft?

MR. DOBBINS:  Objection, Your Honor.  Outside the scope of cross.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Let me ask you about the next boat.  I believe it's called the *Reel Estate*, 32-foot Pursuit brand boat.  Tell us what you looked into regarding this investigation.

A.  Again, this one -- there were some errors in the BOLO prepared -- states that it was a 32-foot boat.  The registration says it's a 34-foot boat.  The report stated there were no surveillance cameras.  There was really no investigation.  The report says that the boat was taken from what is -- what we talked about, the Mariner's Cove, which is a condominium association, where they have boat slips on their waters -- on the edge of their property by water.

The detective stated -- in one sentence, stated that he didn't find any video of boat thefts or boats leaving the area. He stated that he did -- or he didn't do any canvass.  There was -- on that particular boat, it passed a couple commercial

establishments.  There was another boat condominium-type facility and there was also a Hyatt that it would have had to pass by.

Q.  A Hyatt hotel?

A.  A Hyatt hotel, yes, resort.

Q.  Based on your training and experience, do those hotels of -- like a major brand like Hyatt, do they have video surveillance cameras running?

A.  Yes.

Q.  Going back to the video surveillance at an unknown location for the *Mellow Yellow,* if a video surveillance is in black and white -- I know this may sound kind of silly, but if the video surveillance is in black and white, will the green and red running lights on a boat show up as black and white?

        MR. DOBBINS:  Objection, Your Honor.

        THE COURT:  Sustained.

        MR. FEIGENBAUM:  Could I ask the basis for that objection?

        MR. DOBBINS:  Leading and calls for speculation.

        MR. FEIGENBAUM:  I'll rephrase.

        THE COURT:  Thank you.

BY MR. FEIGENBAUM:

Q.  Do pleasure boats, like the ones mentioned in this trial -- do they have green -- do they have lights of different colors at the front of the boat?

MR. DOBBINS:  Objection.  Leading.  Outside the scope of cross.

THE COURT:  If the witness knows the colors of the lights on the boat.

THE WITNESS:  Yes.  Typically, all boats have what they call navigation lights, of which, on the bow or the bow area or near the front of the boat, they have a green light on the starboard side, which, if you're looking out the front of the boat would be on your right, and a red light on the port side, which, again, looking at the front of the boat, would be your left side.

BY MR. FEIGENBAUM:

Q.  Have you ever seen black and white video surveillance of boats traveling on canals?

A.  Yes.

Q.  And if it's black and white surveillance, what color, if any, do the lights show up as?

A.  They don't.  It's just a varying degree of gray, white, and black.

Q.  Thank you.

All right.  Anything else about that second boat, the Pursuit called the *Reel Estate*?

A.  No.

Q.  All right.  Let's go to the next one that has the name *Ultimaytum,* a 28-foot Everglades.  Tell us what you looked into

for that boat theft.

A.   I looked at primarily the same thing, where the boat was located at the time of the theft, and what avenues of investigation, as far as video cameras, could be done in regards to that boat.

In the report, it did state that they had retrieved the video from the bay view boat ramp, and that they were unable to decipher this boat or any individuals on the boat.  And -- but it neglected to say what other attempts they have made to get any kind of video evidence.  It also stated that -- well, there was a quotation in the report that --

MR. DOBBINS:  Judge, I'm going to object.  This appears now that the witness is reading from certain documents that are not in evidence.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Just tell us what else you looked into.

A.   Yeah.  I mean, it states in the report that more than likely this is an interstate boat theft, and that was the end of it, no further investigation.

Q.   All right.  Let's then go to the fourth boat that's part of this case, the one called the *Luca Brasi*, the Southport brand boat.  Now, did you -- tell us what you did investigating that particular case.

A.   The same thing.  I read the police reports.  I looked at

where this boat was located.  I also looked at potential investigation, as far as any video.  I looked at the GPS points that were provided in the FBI's little data sheet that they gave.  And also noted that -- in the report, that there might be a vessel matching that description found in Mexico.

Q.  All right.  Was there any -- did you find anything about owner purchase of the boat?

A.  Yes.

Q.  Please tell us.

A.  The owner -- excuse me -- the owner -- the boat was a 2007 Southport 28-foot.  The owner purchased the boat on December 4th, 2014, for a sales price of $25,000.  He's estimated --

MR. DOBBINS:  Objection, Your Honor.  This is -- now we're reading again from --

THE COURT:  Sustained.

MR. FEIGENBAUM:  The objection was he was --

THE COURT:  He was reading.

MR. FEIGENBAUM:  Oh, okay.

BY MR. FEIGENBAUM:

Q.  Without reading from --

A.  Okay.

Q.  Yeah.

A.  The boat was registered --

MR. DOBBINS:  Objection.  Calls for hearsay at this

point.

THE COURT:  Sustained.

MR. FEIGENBAUM:  Let me just say for the record that if he's --

THE COURT:  Why don't you lay a predicate as to what he's relying upon.

BY MR. FEIGENBAUM:

Q.  When a person purchases a boat, are there sales and title documents?

A.  Yes.

Q.  Were you able to look into what were the sale and title documents?

A.  I looked into the registration of the vessel.

Q.  Okay.  And as part of your investigation as to the registration, was there a sales price?

A.  Yes, there is.

Q.  What was the sales price?

MR. DOBBINS:  Objection.  Calls for hearsay and improper predicate.

THE COURT:  Is this a document that has been admitted into evidence or there's been a predicate laid with regard to this witness's knowledge of these documents?

BY MR. FEIGENBAUM:

Q.  What do you do to try to find --

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.   Okay.   Let me ask it this way:   What do you do to try to find sales and registration documents?

A.   I have a database that's connected with the DMV in the State of Florida.   I also have another database that I can access various states throughout the United States.

Q.   And is this an acceptable way, based on your investigation and training -- based upon your training and experience for thefts for motor vehicles and for vessels, how law enforcement and private investigators find out this information?

A.   Yes.

Q.   Okay.   In utilizing those investigative techniques, were you able to find out how much Mr. Mauceli, the owner of the *Luca Brasi,* paid for the boat?

         MR. DOBBINS:   Your Honor, I'd object again based on hearsay.

         THE COURT:   Sustained.

BY MR. FEIGENBAUM:

Q.   All right.   Mr. Dobbins showed you Government Exhibit 18. I don't think it's up here, but I'm going to put it up on the ELMO.   I have a copy.   It's -- but first let me show it to him.

     (Pause in proceedings.)

         MR. FEIGENBAUM:   Okay.   I'm going to ask the Government to put up on the screen Government Exhibit 018 in evidence already.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   And specifically, Page 10, Item 6252 --

MR. FEIGENBAUM:  That's not -- 6252 -- let me get a little more specific.  14760.  It's the fourth picture.  I mean -- no.  You went too far.

Let me point it out to you.  Stop right there.  It's in this bottom row, the third from the left.

MS. KLEPACH:  That's not part of this exhibit, counselor.

MR. FEIGENBAUM:  It's what?

MS. KLEPACH:  That's not a part of this exhibit.

I can zoom in, if you would like.

MR. FEIGENBAUM:  Say that again.

MS. KLEPACH:  If you would like me to zoom in on that part, I can.

MR. FEIGENBAUM:  Zoom in on it?  You cannot?

MS. KLEPACH:  This?  This is what you want?

MR. FEIGENBAUM:  Yes.

THE COURT:  All right.  Thank you.

MR. FEIGENBAUM:  But I actually want you to show -- okay.  Can you make it a little clearer.

MS. KLEPACH:  No.  That's how it comes out.

MR. FEIGENBAUM:  You can't make it smaller?

I mean, in other words, put it in the right pane

that's big, just like the other ones in the series of photos.

MS. KLEPACH:  This is a photo.  I can't ...

(Pause in proceedings.)

MR. DOBBINS:  Well, actually, I would object because this is outside the scope of cross.  You're trying to admit a new exhibit that has not been questioned, and the Government will not have a chance to cross-examine.

MR. FEIGENBAUM:  Your Honor, this exhibit is a download from the phone, and the entire exhibit is in evidence.

THE COURT:  This exhibit is in evidence?

MR. FEIGENBAUM:  Yeah.  It's Government's Exhibit 018.

THE COURT:  All right.  You can refer to an exhibit in evidence.  Let me hear the question.

MR. FEIGENBAUM:  I want to show this photo from this exhibit on the ELMO.

THE COURT:  Okay.  What's -- it's in evidence.  So you may show it.  What's the question?

MR. FEIGENBAUM:  I'm going to put it up and then I'm going to ask a question.

MR. DOBBINS:  Judge, I think he's marked another picture.  It's the same picture, but he's enlarged it, and he's marked it as Defense Exhibit DDD.

THE COURT:  All right.  Let's use --

MR. FEIGENBAUM:  I'd like to come sidebar, Your Honor.

THE COURT:  We don't need to come sidebar.  Let's get

through the redirect.  Let's use the exhibit that's in evidence, and let's put it on the ELMO.

MR. FEIGENBAUM:  Thank you.

This has been marked.

THE COURT:  It doesn't need to be marked.  It's in evidence.  So what's the exhibit number?

MR. FEIGENBAUM:  I haven't put a -- it's Government Exhibit 018, but it's double marked Defense Exhibit Triple D.

THE COURT:  Well, why don't we show Government's Exhibit 108 [sic], which is in evidence?

MR. FEIGENBAUM:  Well, they say they can't put it up, like I obtained it right from their own exhibit --

THE COURT:  Well, we can put it up and then we can zoom in on the exhibit.

MR. FEIGENBAUM:  I want to show other parts of it.

THE COURT:  Well, when you say:  "Other parts," it's one exhibit.  So --

MS. KLEPACH:  Respectfully, Judge, I think that counsel is confused.  I don't believe that what counsel is holding and seeking to put up on the ELMO is in evidence.  I have enlarged the portion that he wishes to ask about from what is in evidence.

THE COURT:  Is it the same photo of the boat?

MR. FEIGENBAUM:  Yes, Your Honor.

Do you agree that when the photo was taken -- was this

because it's part of the series?

MR. DOBBINS:  We can enlarge the exhibit.

THE COURT:  All right.  Let's continue, and you may certainly show the exhibit that's in evidence.

MR. FEIGENBAUM:  Could you put the other photo back on first, the one that has the containers on it.

BY MR. FEIGENBAUM:

Q.  Mr. Riemer, can you see the large photo on the right side, Government Exhibit 018, of the containers?

A.  Yes.

Q.  Tell us the date those photos were taken.

A.  11/20/2019.

Q.  Do you recall whether the Government said this was on the boat that Javier Hernandez was driving?

MR. DOBBINS:  Objection.  Mischaracterization of the cross-examination.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  I don't recall it.  I know he showed me this picture, yes.  He didn't --

BY MR. FEIGENBAUM:

Q.  Does this photo -- the dates on it, correspond to the dates the Government has stated Javier Hernandez drove the *Luca Brasi* to Mexico?

MR. DOBBINS:  Objection.  Leading.

THE COURT:  Sustained.  Rephrase, please.

BY MR. FEIGENBAUM:

Q.   Do you recognize anything by the dates on this photo that you're looking at, Government Exhibit 018 -- if it corresponds to anything you've learned about the allegations against Javier Hernandez regarding the *Luca Brasi*?

A.   Yeah.  The date that -- the time is off.  Well, the time -- yeah, the time is off.

Q.   Okay.  Is the time frame of November 20th, 2019 -- does it relate to when the *Luca Brasi* was reported stolen?

          MR. DOBBINS:  Objection.  Leading.

BY MR. FEIGENBAUM:

Q.   The chats that Mr. Dobbins showed you regarding when Javier Hernandez was leaving with the boat to go to Mexico --

          MR. DOBBINS:  Objection.  Leading.

          THE COURT:  Sustained.

          Do you want to ask what the November 20th, 2019 date relates to?

BY MR. FEIGENBAUM:

Q.   Is it in the time frame of the theft of the *Luca Brasi*?

A.   Yes.

          MR. FEIGENBAUM:  Okay.  Now, the Government, I believe, gave me permission to now show a closeup of another frame of their exhibit, which everybody should be able to see is the third from the left on the bottom.  I'm going to put it on the ELMO, if I could --

MR. DOBBINS:  Judge, I would object to this exhibit.

THE COURT:  All right.  This exhibit is part of Exhibit 108, correct?

MR. DOBBINS:  It's 18.  He keeps saying 018.  He's referring to --

THE COURT:  Oh, it's 18.

All right.  Government's Exhibit 18.  Let's go ahead.

MR. DOBBINS:  Eighteen.

THE COURT:  That's a blowup of the small photograph of the boat.  You may continue.

MR. DOBBINS:  It doesn't appear to be a blowup, Judge.  It appears that it's some other part of the Cellebrite extraction that is not part of Government's Exhibit 18.

MR. FEIGENBAUM:  I'm just putting the picture of the thing itself.

May I proceed, Judge?

THE COURT:  You may.

MR. FEIGENBAUM:  Thank you.

BY MR. FEIGENBAUM:

Q.  The Government -- Mr. Riemer, here's the question:  Is this boat apparently -- does it appear to be on the open ocean?

A.  Yes.

MR. DOBBINS:  Objection.  Leading.

THE COURT:  Overruled.  I'll allow it.

THE WITNESS:  It appears to be on open water, yes.

BY MR. FEIGENBAUM:

Q.  Based upon the date of the other photos in this series, does it appear this photo was taken on November 20th, 2019?

MR. DOBBINS:  Objection.  Leading.  Lack of foundation for the witness's knowledge on this.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  What date -- if this is part of the series of the other three photos, does this appear the photo was taken --

MR. DOBBINS:  Objection.  No foundation.  That's not part of the --

THE COURT:  Sustained.

MR. FEIGENBAUM:  Okay.  Your Honor, I'd like a sidebar, please.

THE COURT:  There's no need for a sidebar.  If there's a date on this photo, you can reference the date on the photo for the witness, who did not take the photograph, but let's continue.

MR. FEIGENBAUM:  All right.  Well, I have a date --

THE COURT:  All right.

MR. FEIGENBAUM:  -- that they won't let me show, that is this exact picture with the date and time.

THE COURT:  Is there any information as to when this photo was taken, Mr. Dobbins?

MR. FEIGENBAUM:  And I've got it right here, Judge.

And it's reliable --

THE COURT:  Let me just ask -- it's the Government's exhibit.  It was introduced into evidence without objection. Is there a date when that was taken?

MR. DOBBINS:  Judge, that Exhibit 18 is just photos of the extraction itself that -- the reports that were generated by Special Agent Francisco, that -- that photo did not have a date mark that I see anywhere in Government's Exhibit 18.  So I'm not sure where that photo is coming from with that extraction time or whatever.  So that's why we're objecting, because it's not part of Government's Exhibit 18.

MR. FEIGENBAUM:  Judge, I'd really like a side bar because --

THE COURT:  There's no need for a sidebar.  It's either reflected in the information that's been provided or it's not.  If Exhibit 18 does not have a date, and if this witness did not take the photograph, the witness would be speculating as to when this photograph was taken.  So let's move on.

BY MR. FEIGENBAUM:

Q.  In this photo, Mr. Riemer, is there anything written on the radio box?

A.  No.

Q.  Let me show you --

MR. FEIGENBAUM:  Could I have 59, please.

BY MR. FEIGENBAUM:

Q.   Mr. Riemer, I'm showing you what is admitted into evidence as Government's Exhibit 59, and it's admitted as being photos from the owner of the *Luca Brasi*, Robert Mauceli.  Do you see this photo?

A.   Yes, I do.

Q.   Can you tell the jury, is there any name of the boat embedded on the radio box.

A.   Yes.  On the aft end of the radio box, it shows what appears to be *"Luca Brasi*."

Q.   So the prosecutor told you, or asked you, if a boat gets to a chop shop, a marine chop shop, to take the parts off the boat, do things to it to resell the parts -- remember those questions?

A.   Yes.

Q.   Or change the appearance of the boat?

A.   That's correct.

Q.   Since you're an expert, qualified, assuming that this photo was taken along with others, on November 20th, 2019, would that have been before the boat got to Mexico, according to the evidence in this case?

A.   I don't believe they're one and the same photos.  This photo is looking at the bow end of the radio box and not the end that would have the writing.

Q.   Okay.

A.   In other words, this is a photograph from the front of the boat looking to the back.  The previous photograph you showed me was from the back of the boat looking frontward.

Q.   Okay.  Let me show you this.  The prosecutor went over with you that you were not able to see a sticker with the serial number on the boat that was in Mexico; is that right?

A.   Yes.

Q.   Okay.  And the other day when you were testifying, you were going through comparisons that you made for potential differences comparing the photos in Mexico and the photos the owner gave; is that right?

A.   Yes.

Q.   Okay.  So one of the comparisons you made, that the prosecutor asked you about today, was the flag on the left side of the back and an Italian flag on the right side of the back of the boat.

A.   Correct.

Q.   Is that right?

A.   Yes.

Q.   And then -- I'm not sure if we have it up here.  I think we do.  Maybe -- yes.  Let me get to that particular photo.

     Okay.  So here we have -- looking to the left of the boat -- the prosecutor asked you about this today -- where the American flag is on the owner's photo, does it look like it's been removed, if this were the same boat?

A.   There was something removed on the left side of the picture, yes.

Q.   Okay.

A.   Also, the radio box -- this is a proper photograph equal to the one that had the *"Luca Brasi"* on it, and this one does not have *"Luca Brasi"* on it.

Q.   All right.  So even though the other photo did not show from the right angle whether there was a *"Luca Brasi,"* you know, decal or emblem on it, this one from the Mexican authorities does not have it from the right angle that it should be?

A.   That's correct.

Q.   Okay.  And based on your review of material in this case, is it a fair statement that the Mexican authorities seized what they claim was the green boat that Javier Hernandez came on a short time after he was arrested?

         MR. DOBBINS:  Objection.  Leading.

         THE COURT:  Sustained.  Rephrase.

BY MR. FEIGENBAUM:

Q.   Okay.  Do you recall whether any material you reviewed gave you any conclusions about when the Mexican authorities seized the green boat, if you know?

A.   Yes.  There was -- it states in the police report that there were two arrests made, and there was also information provided to me in a separate report, Mexican police report,

that -- that Javier Hernandez was not at this location at the time.

Q.  Okay.  All right.  So based upon your knowledge of boats, your experience, the fact that there is no evidence on the right side of the back of the boat of the removal of an Italian flag, can you tell us -- can you reach a conclusion?

A.  The conclusion I can reach is that there is no -- I can tell you this is a Southport boat.  I can tell you with -- that it -- I cannot with certainty say this was the *Luca Brasi.*

Q.  Okay.  If there had been an equivalent flag -- an Italian flag on the right side, based upon your training and experience, would it lead to the type of removal evidence that you see on the left side of the back of the boat?

        MR. DOBBINS:  Objection.  Leading.

        THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  What type of evidence would there be on the right side of the boat, if there had been a removal of the Italian flag?

        MR. DOBBINS:  Objection.  Calls for speculation.

        THE COURT:  Sustained.

        MR. FEIGENBAUM:  The foundation is, Your Honor, that he testified that there would be this kind of evidence on the left side from the removal of the flag.  I'm simply asking: Would there be similar evidence on the right side --

        THE COURT:  Yes.  I understand what you asked.  The

objection is sustained.

BY MR. FEIGENBAUM:

Q.   All right.  You had mentioned something about an anchor comparison as well.  Please tell us.

A.   On the photographs -- in the *Luca Brasi* owner's photos, it shows an anchor that is mounted or connected to the boat through the front bow of the boat.  In the photograph in Mexico, there is no anchor.  It's vacant.  It's an empty hole at that location.

Q.   Okay.  Let me go to another area now.  Let me ask you about the 2018 Tundra -- Toyota Tundra truck.  You were asked a number of questions about it, and a bunch of questions about the fact that several people registered a white Toyota Tundra with the same VIN number as the silver gray one from Mississippi; is that right?

A.   That's correct.

Q.   Okay.  When somebody registers a vehicle in their name in the state of Florida, is that part of the -- does that become part of the official records of the State of Florida?

A.   Yes.

Q.   Okay.  And if somebody registers a Toyota Tundra, with their name, their address, and other identifying information, does that leave a trail that law enforcement can then go find that person?

A.   Yes.

Q.   Okay.   So in this case -- just to be clear for the record, was that VIN number for the Toyota Tundra, 2018 -- was that vehicle ever reported stolen?

A.   No, it wasn't.

Q.   All right.   And have you seen, in your review of the evidence in this case, any evidence that a white 2018 Toyota Tundra was stolen?

A.   No.

Q.   When you go out on the water with a boat, like any of these 28-foot to 37-foot boats -- when you leave the state of Florida -- well, first let's just go with the territorial waters of Florida, to operate a boat on the waterways within the territorial limits of Florida, what does the operator have to have in terms of documentation?

MR. DOBBINS:   Objection.   Outside the scope of cross.

THE COURT:   Overruled.   I'll allow it.

THE WITNESS:   They have to have registration for the boat.

BY MR. FEIGENBAUM:

Q.   Okay.   And if they go beyond the territorial limits, if they go -- let's say you want to leave for the Bahamas, what documentation does the operator have to have?

A.   The same documentation.   There's two limits.   One is a three-mile limit on the coast of Florida -- on the east coast of Florida.   There's a six-mile or -- six-mile limit, I

believe, in the Gulf of Mexico, and then a 12-mile federal limit.  So when you're talking about traveling into international waters, you need proper registration, documented registration of the vessel.

Q.  Of the State of Florida?

A.  Of whatever state the vessel's registered in.

Q.  Okay.  Now, the prosecutor also asked you about chats where Mr. Hernandez and others had communications about the weather, what were the weather conditions.  You recall those questions?

A.  Yes.

Q.  Based on your training and experience in law enforcement and boating, is there anything violating the law by simply looking at the weather reports?

MR. DOBBINS:  Objection.  Calls for a legal conclusion.

THE COURT:  If the witness knows.  I'll allow that.

THE WITNESS:  Is there -- just repeat the last --

BY MR. FEIGENBAUM:

Q.  Yeah.  Is there anything -- based on you being a law enforcement officer formally, and being knowledgable in boating --

A.  Right.

Q.  -- looking at information about weather conditions, is there anything illegal about doing that?

A.  Absolutely not.  In fact, it's encouraged.  Because as you

131

know, weather changes quite quickly here, and it's for the safety of the boat and the passengers, et cetera.

Q.   All right.   And did you learn -- I think you already testified that you learned that Mr. Hernandez was arrested in Mexico after he arrived on a boat; is that right?

MR. DOBBINS:   Objection.   Leading.

THE WITNESS:   Yes.

THE COURT:   Overruled.   I'll allow that.

THE WITNESS:   Yes.

BY MR. FEIGENBAUM:

Q.   Okay.   And did you learn that he returned at some point in time to the United States?

A.   Yes.   He did.

Q.   Okay.   Do you recall approximately how much later he returned after that arrival in Mexico?

MR. DOBBINS:   Objection.   Outside the scope of cross-examination, Your Honor.

THE COURT:   Overruled.   I'll allow it.

MR. FEIGENBAUM:   I can tie it up.

THE WITNESS:   I know, like, he had returned back to United States on the 25th of December, and the boat was reportedly stolen between the 9th and the 23rd of November.

BY MR. FEIGENBAUM:

Q.   Okay.   Based on your review of material in your investigation of what you were assigned in this case, is there

any indication that any State of Florida police agency, such as Naples or Marco Island, ever contacted Javier Hernandez to see if he would submit to an interview about any boat thefts in Florida?

A.   No.

MR. DOBBINS:  Objection.  Leading and relevance.

THE COURT:  The objection on the second ground is sustained.

BY MR. FEIGENBAUM:

Q.   Based on your review of material, did any -- did the police agency of Marco Island attempt to contact Mr. Hernandez about any boat thefts?

MR. DOBBINS:  Objection.  Leading and relevance.

THE COURT:  With regard to that -- what he reviewed overruled.  I'll allow that.

THE WITNESS:  No.

BY MR. FEIGENBAUM:

Q.   Specifically as to the *Luca Brasi* theft that was reported, from the time of return of Mr. Hernandez to South Florida, did Naples Police Department ever contact him, if you know?

A.   There is -- there is no indication of that in their police reports.

Q.   Is there any other information, in the ensuing years of 2020, 2021, 2022, that any attempt was made by either Naples Police or Marco Island Police to contact Mr. Hernandez?

MR. DOBBINS:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.  Based on your review of the evidence in this case, was there any evidence of the theft of any vehicles?

A.  No.

MR. FEIGENBAUM:  Your Honor, at what time were you going to take any afternoon comfort break?

THE COURT:  How much more time do you need, sir?

MR. FEIGENBAUM:  Maybe another half hour or so.  But I'm willing to keep on going right now.  It's no problem.

THE COURT:  All right.  Ladies and Gentlemen, why don't we take a 10-minute comfort break.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury not present, 3:01 p.m.)

THE COURT:  We're on a 10-minute recess.

(Recess from 3:01 p.m. to 3:14 p.m.)

THE COURT:  All right.  Welcome back.  I've asked Liz to see if the jurors will be willing to stay a little bit later tonight.

Is everybody willing to stay later as well?

MR. DOBBINS:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes.

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  Yvette?

All right, then.

MR. DOBBINS:  Judge, there's something I believe we need to put on the record before we bring out the jury.  And it pertains to the witness that's on the stand, so I don't know if you need him to step out.

THE COURT:  All right.  Sir, if you'll step outside.

(Witness exits the courtroom.)

THE COURT:  Yes, Mr. Dobbins?

MR. DOBBINS:  So Judge, you know, during cross, I asked Mr. Riemer if he had -- when he was testifying on Wednesday about the cell sites, and that the Defendant was nowhere near because the cell sites didn't match up.  I asked him if he reviewed the cell site returns from the search warrant.  He said, no, he had not.  And I left it at that because what Mr. Feigenbaum decides to share with his expert is really none of the Government's concern.

However, Mr. Feigenbaum gets up now on redirect and says:  "Was it reasonable for you to rely on what the Government provided?"  Those cell site returns from that search warrant were in the very first discovery production, Your Honor, on December 12th of 2022.  So for Mr. Feigenbaum to try to go that route and make it seem as if the Government somehow did not provide him with the accurate cell site reports that had the fact that those times were in UTC, I think, gives a

misrepresentation to the jury that I would ask Mr. Feigenbaum to correct.  Because -- you know, I'm not going to get into what he shares with his expert, what discovery he's provided him.  Obviously, there's been quite a bit of discovery that his expert hasn't looked at.  But you know, that's not really the Government's business.

But I don't think it's fair for Mr. Feigenbaum to say to the jury that it was okay -- because the Government provided this one document that didn't say UTC time, and was it fair for you to rely on it, or, you know, should you have been relying on that.

MR. FEIGENBAUM:  It's very simple, Your Honor. Mr. Riemer was not offered as a cell site expert.  I didn't have a cell site expert.

THE COURT:  But that's somewhat beside the point, because he testified on cross-examination that he didn't review the information.  But in your redirect, it made it appear as if that information was not provided to him.  So --

MR. FEIGENBAUM:  No.  I -- may I just say something, Your Honor?  I don't think I ever said that that -- that he was not given that information, that -- my examination was that he received the Government cell site analysis and he relied on it when he came to certain conclusions.  I don't see anything wrong with that.

THE COURT:  But that's not what he said.  He said he

didn't rely on that information.

MR. FEIGENBAUM:  No.  He relied on the information on the Cell Site Historical Analysis.  He did not review anything else.  And I didn't offer him to give any opinions about any cell site thing.  That was not his area of expertise for which I offered or nor was he qualified.

MR. DOBBINS:  You had him qualified as an expert in investigations.  And on Wednesday you specifically asked him what were problems with the investigation.  And on all four boats -- I'm sorry -- all three boats, with the exception of the *Luca Brasi*, he testified that the cell site data showed that the Defendant was nowhere near Naples at the time that the boats would have been stolen, which is why I crossed him on it.

Moreover, for you to say -- you're conflating again. You keep conflating Goodrich's cell site report, which was not what he was shown.  What was shown was -- you gave him, apparently, Government's Exhibit 108, which is not a cell site analysis.  It is a PowerPoint that the agent, Spielvogel, who testified, when he prepared it, so he could talk to your client and get him to make at the statements times, he showed him that.

Whether you chose to show him the -- you clearly didn't show him the PowerPoint created by Special Agent Goodrich because when I asked him about it he said he hadn't seen it, and therefore I stopped asking him about Government's

Exhibit 65.

So now we're stuck with -- you're up here saying: "You relied on this expert analysis," which, that's not what it is, number one. It's just a -- basically a cut and paste of the records, and doesn't say UTC time. And the fact that you didn't give him the cell site warrant returns with the actual records that shows that this is UTC time is not certainly the Government's fault. And for you to sort of convey this impression to the jury that you have been -- that Mr. Reimer's been sandbagged, and that's why he provided mistaken testimony on Wednesday, I think is wrong. I think that's not an accurate assessment of what happened.

THE COURT: All right. Well, it appears to be a clarification between what Mr. Riemer reviewed, whether it was an exhibit -- and I thought it wasn't 108. I thought it was Exhibit 18. Is it 18 or 108?

MR. FEIGENBAUM: No. Eighteen is a different thing completely.

THE COURT: All right. Exhibit 108 versus Exhibit 65. And perhaps just clarify what it was that he reviewed on your redirect. All right?

And how we doing with the jurors?

They are not willing to stay?

All right. Then let's -- are we ready to continue? Let's get moving.

MR. FEIGENBAUM:  Okay.

THE COURT:  All right.  Let's bring out the jurors.

All right.  If we could bring Mr. Riemer in.

COURT SECURITY OFFICER:  All rise for the jury.

(Before the Jury, 3:20 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Thank you for your patience.

Please be seated, everyone.

And we'll continue with the redirect examination.

MR. FEIGENBAUM:  Your Honor, may I approach with an exhibit?

THE COURT:  Yes.  If you can just identify the exhibit for --

MR. FEIGENBAUM:  Yes, Your Honor.  For the record, it is Government's Exhibit 108.

THE COURT:  All right.

BY MR. FEIGENBAUM:

Q.  Let me know when you have had a chance to look at it.

A.  Okay.

Q.  Do you recognize Government Exhibit 108?

A.  Yes.

Q.  Was that an exhibit that you used as part of your investigation in this case?

A.  Yes.

Q.   Was that the exhibit that you testified about before, upon which you obtained information about cell phone location?

A.   Yes.

Q.   All right.  So you did not -- is it correct that you did not rely on the Cell Phone Historical Analysis prepared by Government expert Adam Goodrich?  Just to clarify for the record, you didn't use the Government's expert Adam Goodrich's Historical Cell Site Analysis when you looked at this issue?

A.   No.  I just looked at these exhibits.

Q.   Okay.  And did you use the T-Mobile records when you were looking at this issue?

A.   No.  I saw the T-Mobile records first time today.

Q.   Were you asked by me in the defense to give any opinions about cell tower technology or cell tower issues?

A.   I mean -- by you or --

Q.   Let me ask it this way:  I offered you as an expert in law enforcement investigations and maritime issues.  Do you recall?

A.   Yes.

Q.   I did not offer you as a cell phone tower technology expert; is that right?

A.   That's correct.

Q.   Okay.

     (Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   All right.  Just to clarify the record, were you

provided -- did I provide you T-Mobile records in this case?

A.   No.

Q.   Okay.   Now, let me ask you about the investigative techniques that law enforcement does when they go to view evidence.   My question is:   Regarding the FBI agents who went to Yucatan to view the green boat on December 8 and December 9, 2019, did you have a chance to review the photos that were taken?

A.   Yes.

Q.   And tell us about what you found regarding the scope of the photos taken.

MR. DOBBINS:   Objection, Your Honor.   This has been asked and answered, and it's outside the scope of cross-examination.

MR. FEIGENBAUM:   I don't think so, Your Honor.

THE COURT:   Let's narrow the question, please. Overruled at this point.

BY MR. FEIGENBAUM:

Q.   Do you understand the question?

A.   Yes.

Q.   Okay.   Regarding the scope of the photos that were taken, tell us what your opinion is.

A.   My opinion is that the photographs in documenting this boat as, quote/unquote, evidence is not complete.   There are photographs that are not -- that have not been taken or not

been presented to me that would further help in an investigation, or an examination, or a determination of what boat this actually is.

Q.   Okay.  Be more specific about what photos.

A.   Well, there's no photo of the left side of the boat, which I would commonly call the port.  I know if you're not a boater it's confusing -- but the left side of the boat.  You can see that there was no sanding done from the bow picture.  So that's one thing.

And the other thing is the interior of the boat, nothing was photographed as far as the cockpit, where the captain would stand that there's usually equipment.  Actually, in the *Luca Brasi* report, it shows a number of different things, auto pilot, sonar, or radar, depth finders, GPS plotters, entertainment system.  None of that was photographed -- or the absence of it was photographed.  The cockpit itself was not photographed.

Q.   Okay.  Last thing then, looking at this picture one more time, Government Exhibit 60 in evidence -- looking at the boat, when you refer to one side of the boat being sanded, and how would you describe the other side of the boat?

A.   I'm sorry.  Now that I'm looking at picture, the port side is the sanded side of the boat.  So the starboard side, the right side of the boat, which happens to be on the left side of this picture, does not appear to be sanded.  It appears to be

intact.

Q.   And?

A.   And there could be evidence on there that there was -- that the *Luca Brasi* name was on there, or the name was removed.  And because of the time period from when it was removed, there might be a shadow effect on the port -- on the starboard side of the boat that would show indication whether this was the *Luca Brasi* or not.  All that stuff was omitted.  So I cannot for certain say that this boat is one and the same as the one that was stolen in Naples.

Q.   Thank you, sir.

        MR. FEIGENBAUM:  Nothing further, Your Honor.

        THE COURT:  All right.  Is the witness excused?

        MR. FEIGENBAUM:  Yes, Your Honor.

        MR. DOBBINS:  Yes, Your Honor.

        THE COURT:  All right.

        All right.  Thank you, sir.  You are excused.

    (Witness excused.)

        THE COURT:  And the Defendant's next witness.

        MR. FEIGENBAUM:  Your Honor, the Defense calls Javier Hernandez.

        THE COURT:  All right, then.

        Do we have a second chair for the ...

        Yes.  Thank you.

    (Pause in proceedings.)

THE COURT:  Let me know when you're ready to proceed.

Yeah.  We have a second one.  Thank you.

THE INTERPRETER:  We're set, Your Honor.

THE COURT:  Mr. Hernandez, if you'll remain standing, raise your right hand to be placed under oath.

JAVIER HERNANDEZ, DEFENDANT, SWORN

COURTROOM DEPUTY:  Thank you.

You can have a seat.

Would you please state your name and also spell it for the record.

THE WITNESS:  (Through Interpreter.)  My name is Javier Hernandez.  J-A-V-I-E-R H-E-R-N-A-N-D-E Z.

COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MR. FEIGENBAUM:

Q.  Good afternoon, Javier Hernandez.  How are you?

A.  (No verbal response.)

Q.  Do you speak some English?

A.  Little.

Q.  Do you feel more comfortable speaking in the Spanish language?

A.  Yes.  Above all, in anything legal.

Q.  Okay.  Tell us your age, please.

A.  I'm 50 years old.

Q.  And where were you born?

A.   In Havana, Cuba.

Q.   How do you know me?

A.   Well, you know, after the FBI interviewed me, they said -- well, they called me one day at the house, and they told me that I was going to need an attorney, and they were going to find me one through the government.

Well, then --

Q.   Just one thing --

A.   Then --

THE INTERPRETER:  Thank you.

THE WITNESS:  Then I came here to the Court with the two officers that were originally in the investigation, and they brought me here with the US attorney so that we could go before the judge to seek an attorney.

BY MR. FEIGENBAUM:

Q.   Okay.  Just try to say one or two sentences, so it's not too long for the interpreter to translate.  Okay?

A.   Okay.

Q.   Did there come a point in time when you left Cuba and came to the United States?

A.   Correct.

Q.   Could you tell us the year.

A.   In the year 2005.

Q.   All right.  And how did you arrive in the United States?

A.   Through the ocean, in a makeshift boat.

Q.   All right.  Were there other people who went with you on that journey?

A.   There were 37 of us in -- aboard that vessel.

Q.   And where did the boat arrive?

A.   To Islamorada.

Q.   Now, when you arrived in Islamorada in 2005, what happened next?

A.   Well, when we got there to Islamorada, we walked for about two hours.  And there, we waited for a person who did us a favor to call the police.

Q.   All right.  And were you allowed to stay in the United States?

A.   At that time, yes, because there was the law of wet-foot/dry-foot for Cubans.

Q.   Did you have any relatives here?

A.   A cousin.  A cousin.

Q.   And did you stay with her?

A.   The first two or three years, I remained there living with her.

Q.   All right. Did you, at some point after arriving in the United States, begin to work here?

A.   Ten days after I arrived, I started working at a warehouse for tiles, for floor tiles.

Q.   Tell us what kind of a job you had there.

A.   Well, I would do everything because I was the only worker

at the warehouse.

Q.   What kinds of things?

A.   I received the containers that brought the exports, and I got the deliveries with the materials, and then I would make the deliveries to the customers.

Q.   All right.  Did you have another employment after that?

A.   I had several jobs after that.  I had worked as a valet parking person at the Beach, and then I started working at Miami International Airport.

Q.   And at Miami International Airport, what did you do?

A.   I worked as pulling cargo at the warehouse for Avianca Cargo.

Q.   And how long did you work there?

A.   I worked there from 2007 until 2014.

Q.   About seven years?

A.   Correct.

Q.   All right.  Are you married?

A.   Correct.

Q.   Tell the jury.

A.   I am married, and I have two children.

Q.   All right.  What is your wife's name?

A.   My wife's name is Isabel Christina Maya.

Q.   And you said you have two children?

         MS. KLEPACH:  Judge, I'm going to object to this line of questioning as to its relevance.

147

THE COURT:  Some background is appropriate.  But perhaps after we get past the children, maybe we'll end the background.

BY MR. FEIGENBAUM:

Q.  Okay.

A.  I have my first son that I had in Cuba, he's the eldest, and then the smaller one that I had with my wife.

Q.  After working at Avianca for seven years, did you have additional jobs?

A.  I worked as a Uber, Lyft driver.

Q.  Are those two different companies?

A.  Correct.

Q.  And any other employment after that?

A.  After that, I worked for Amazon Packages.  And then after that I started this business with boat parts.

Q.  Okay.  Do you work now?  Do you have a job now?

A.  Yes.  I currently work -- first, I worked with Amazon Packages, and now I work with a company called LaserShip.

Q.  And what is that job?

A.  I deliver packages in a ZIP code, which is my ZIP code. And so I have to deliver packages to that ZIP code every day.

Q.  How many days a week do you work doing that?

A.  Six days a week.  And starting this month we begin working seven days a week until -- until the beginning of the year.

Q.  All right.  I want to ask you about your formal education.

What is your highest level of education that you had?  Was it in Cuba?

A.  Yes.

Q.  Where was it?

A.  At the Cujae Mechanical Engineering.

Q.  Could you spell that for us.

A.  C-U-J-A-E.

Q.  What kind of study did you have there?

A.  Mechanical engineering.

Q.  All right.  And did you earn a degree?

A.  Yes.

Q.  What did you do after you got your degree, what kind of work?

A.  Then, after that, I started studying medicine.  And I made it up to second, third year of medical studies.  And then I started working for a Panamanian company for electronics.

Q.  All right.  And how long did you work in that Panamanian company?

A.  Two years.

Q.  Was that in Cuba?

A.  Yes.

Q.  All right.  Any other work in Cuba?

A.  I worked for what we call Tiendas Universo.  And there, I performed studies and I oversaw the work in several cities in the country.

Q. Do you have any training in mechanical things?

A. In diesel mechanics.

Q. Tell us about that.

A. First, I went to engineering school. Then I went to mechanic school. So during the entire training for engineering, I worked or I studied at a heavy machinery workshop in Cuba.

Q. All right. After you came to the United States, did you become a citizen?

A. Correct.

Q. What was the process and how long did it take?

A. I started the process about five and a half years after having been in the US, and I did it right away in a very short while.

Q. Have -- oh. Have you ever been back to Cuba after you emigrated to the United States?

A. I didn't go to Cuba after I arrived in the United States. It was not till five years later when I was able to go to Cuba. I went around three -- three or four times.

Q. Why did you go?

A. The first time, to see my family, whom I had not seen for five years. And then the second and other times I went to solve family problems, like my marriage certificate, and to solve some problems with my son who lived there.

Q. All right. When you went back to Cuba those three times,

150

how did you travel?

A.   Through the airport, in airlines.

Q.   Tell us about whether you have any family -- close family
here in the United States.

A.   At this time, almost all.  Most of my family, except for my
mom who lives in Spain.

Q.   All right.  Let's talk about something else now.  Did there
come a time when you learned about boats?

A.   Yes.

Q.   Please tell us.

A.   Well, in Cuba, there was one year where I dedicated myself
to driving.  And my uncle worked for a boat that belonged to
the government.  So he taught me the first steps of driving a
boat and guiding a boat.  And when I arrived in this country,
my cousin's husband had a boat, and we would go out almost
every weekend to fish and just navigate.

Q.   Did you learn how to drive a boat?

A.   Correct.

Q.   Where did you first learn how to drive a boat?

A.   In Cuba.

Q.   All right.  And when you got to the United States, did you
continue to drive boats?

A.   Correct.

Q.   Tell us in a little more detail what type of boats you
drove over here.

A.  My cousin had a Scarab, 22 feet.

THE INTERPRETER:  Oh.  Thirty-two.  I'm sorry.  Correction.  Thirty-two feet.

THE WITNESS:  And he had many friends who had boats, and many times in the weekends we would go out and they would have me drive so they could be drinking.

BY MR. FEIGENBAUM:

Q.  Did you ever -- so over how many years here in the United States did you have experience with driving boats since you arrived in 2005?

A.  Mostly almost since 2005.  On the weekends we would go out.

Q.  All right.  Did you ever drive a boat and get any compensation for it here in the United States?

A.  Yes.

Q.  Could you tell us.

A.  The first time was a time when they called me so that I would drive the singer David Bisbal.  And on other occasions, people who have called me so that I could take them fishing.

Q.  Okay.  Regarding your being a driver for Uber and Lyft, how did that go?

MS. KLEPACH:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. FEIGENBAUM:

Q.  Did you make sufficient income from Uber and Lyft to pay all of your bills?

A.   At first, when Uber and Lyft began, yes.

Q.   Did you notice any changes in your work for those two companies?

A.   Yes.   Towards the end there, when I was working with them, lots of problems began to develop.   It coincided with all the Venezuelan emigration that either there was too many drivers or there was little acceptance of many of the drivers.

Q.   The Venezuelans who came, they were fleeing a bad regime other there, right?

          MS. KLEPACH:   Objection.   Relevance.   Leading.

          THE COURT:   Sustained.

BY MR. FEIGENBAUM:

Q.   Being a Cuban refugee, did you have an understanding of the situation of Venezuelans coming here?

          MS. KLEPACH:   Objection.   Relevance.

          THE COURT:   Sustained.

BY MR. FEIGENBAUM:

Q.   Understanding what you're saying, though, the work became more crowded as more refugees came from another country?

          MS. KLEPACH:   Objection.   Leading.

          THE COURT:   Sustained.   Rephrase, please.

BY MR. FEIGENBAUM:

Q.   When you started being a driver for Uber and Lyft, was it the same amount of people doing that job as time went on?

A.   There were many more people, and it became difficult -- and

it became more difficult to be able to get rides through the platform.

Q.   Did there come a time when you were offered a job to drive a boat from here to Mexico?

A.   Correct.

Q.   Please tell the jury about that.

A.   A person called me to ask me if I wanted to go on a trip. I said I didn't know him, who was he.  So he identified himself as being a family -- a relative of some friends of mine in Cuba that I had known for a very long time.

So then I asked him:  "Well, how is that going to be?  What kind of a business is it," whether it was some sort of legal or illegal question.  Because if it was illegal, I wasn't going to do it.

MS. KLEPACH:  Your Honor, I'm going to object as to hearsay.

THE COURT:  Sustained.

MR. FEIGENBAUM:  Okay.  She's objecting to what he's testifying about as hearsay?

THE COURT:  Yes.  That's correct.

MR. FEIGENBAUM:  Okay.

BY MR. FEIGENBAUM:

Q.   All right.  The name of the person who was trying to find out if you could drive a boat to Mexico, who was that?

A.   It was Jose Miguel.

Q. Last name?

A. Jose Miguel Vidal. Gonzalez Vidal.

Q. All right. Did you know him before that telephone call?

A. No. Never.

Q. And what did you do before agreeing to anything after that phone call?

A. I verified if, in reality, it was him and who had sent him.

Q. And what did you do to try and find out?

A. I called my cousin, who knows his mother-in-law, and we called his mother-in-law.

Q. Did you -- were you satisfied that -- after making those calls that you just said, were you satisfied to go to the next stage with Mr. Vidal?

A. Yes. After I asked everything and I made sure that it was legal, and there was no illegality, then yes.

Q. What happened next?

A. Then I asked him for a guarantee of $1,000, and they transferred it. And then the next day they sent someone to pick me up at my house to go to Naples.

Q. What happened next?

A. When I arrived in Naples, I arrived at a house where the boat was already, and then I requested the documents for the boat. They gave them to me, and I departed navigating.

Q. All right. Did you go by yourself or with someone else?

A. One of them picked me up, and that was Ramoncito.

Q.  No.  What I mean is on the boat.  At some point in time, did you leave Florida on that boat?

A.  Correct.

Q.  Did anybody else go with you on the boat?

A.  Ramoncito went with me up to where we got to the ocean.

Q.  Okay.  And when you got to the ocean, what did Ramoncito do?

A.  He jumped out there near the beach, and then I continued on my way to Mexico.

Q.  Okay.  When you say:  "Ramoncito," is that Ramon Reyes Aranda, the person who came to testify in this case?

A.  Correct.

Q.  Tell the jury about that first drive of a boat from Southwest Florida to Mexico.  Just describe what the trip is like.

A.  That trip -- since I had never done that trip, I went bordering the entire peninsula up until Key West.

There, since I had done that trip, which was a little bit long, I had to refuel in Key West and continue on my way to -- they told me, to Holbox.

Q.  What is Holbox?

A.  Holbox is a touristic island in Mexico, and it belongs to the province of Quintana Roo, and they have there some hotels and gas stations for boats.

Q.  Did you say there are hotels there?

A.   Correct.

Q.   How far off the coast of Mexico is it?

A.   No, not very far.  Because what takes people -- connecting people to the island is a ferry boat because it's not really connected to the archipelago.

Q.   When you got to Holbox, did you refuel the vessel?

A.   Jose Miguel was waiting there for me, and they refueled the boat again.

Q.   Had you ever met him before?

A.   No.  Never.

Q.   From Holbox, where did you go next?

A.   When I got to Holbox, we got to the pump with the fuel and we refueled the boat.  And then we went for another four hours to Progreso, Yucatan.

Q.   Okay.

          MR. FEIGENBAUM:  Your Honor, may I retrieve an exhibit?

          THE COURT:  Yes.  Of course.

     (Pause in proceedings.)

          MR. FEIGENBAUM:  I'm going to give the Government the numbers of those exhibits now, Your Honor.

     (Pause in proceedings.)

          MR. FEIGENBAUM:  All right.  Your Honor, may I approach?

          THE COURT:  Yes.  Of course.

BY MR. FEIGENBAUM:

Q.   I will tell you which exhibit I'll be referring to in a moment, okay, Mr. Hernandez?

     (Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   Could you take a look at Exhibit LL, please.

A.   Okay.

     (Pause in proceedings.)

     MR. FEIGENBAUM:  I'm going to use the -- Mr. Dobbins's suggestion to use the ELMO.  I think he's right that it's easier to do it that way.

          May I approach again?

          THE COURT:  You may.

     (Pause in proceedings.)

     MR. FEIGENBAUM:  Okay.  Let's have the ELMO just for the witness only.  Let me know when I can go ahead and put it up there.

          COURTROOM DEPUTY:  Go ahead.

BY MR. FEIGENBAUM:

Q.   All right.  Mr. Hernandez, take a look at what's been marked as Defendant's Exhibit LL, and let me know if you recognize it.

A.   (In English.)  Yes.

Q.   What is it?

A.   (Through Interpreter.)  This is a map where you can see a

part of Florida, Cuba, and the Yucatan Peninsula.

MR. FEIGENBAUM:  Your Honor, I move Exhibit LL into evidence.

THE COURT:  Is there any objection?

MS. KLEPACH:  No, Your Honor.

THE COURT:  Admitted into evidence.

(Defendant's Exhibit LL received into evidence.)

BY MR. FEIGENBAUM:

Q.  So -- let me get it a little bit bigger.  There we go.

Okay.  Mr. Hernandez, when you mentioned Holbox, which -- is that on the map near Cancun?

A.  Correct.

Q.  And then could you point out to the jury --

MR. FEIGENBAUM:  Is he able to do that on the screen with the --

BY MR. FEIGENBAUM:

Q.  I believe you can use your finger and you can make a circle around different places I ask you about.  Could you point out first Holbox.

A.  (Witness complies.)

Q.  Okay.  And same for Cancun.

A.  (Witness complies.)

Q.  How about Progreso, the Port of Progreso.

A.  (Witness complies.)

Q.  Okay.  So there's been some testimony about these different

places during the trial, and the city of Merida, which is near Progreso; is that right?

A.  Yes.

Q.  So when you continued on to Progreso --

MR. FEIGENBAUM:  Can you take off those circles now, so we can see better.

BY MR. FEIGENBAUM:

Q.  So you said -- about how long did it take to take the boat from Holbox to Progreso?

A.  Four hours.

Q.  All right.  This is your first trip that you have driven a boat to Mexico; is that right?

A.  Correct.

Q.  When you arrived in Progreso, where did you go?

A.  First we went to the captain ship in the port.  There, they checked us out.  And then we went to the marina.

Q.  Okay.  Just one second.  You said:  "The captain ship." What is that?

A.  That's -- when you enter a boat, you have to show documentation to prove your entry into Mexico.

MR. FEIGENBAUM:  Could I have the ELMO for the witness only, please.

BY MR. FEIGENBAUM:

Q.  Do you see --

MR. FEIGENBAUM:  For the witness only.

160

BY MR. FEIGENBAUM:

Q.   -- what's been marked as Defendant's Exhibit CC, like Carlos Carlos?

A.   Yes.

Q.   Do you recognize it?

A.   Correct.

Q.   What is it?

A.   It's the captain's ship.  In English, it would be the harbormaster, but it's the captain's ship of the Port of Progreso.

Q.   All right.  And what is done there when you arrive?

A.   To show the documents, the passport, and the boat's documents, and to indicate that we are going to enter there, Mexico.

         MR. FEIGENBAUM:  Your Honor, I offer Defense Exhibit CC into evidence.

         THE COURT:  Is there any objection?

         MS. KLEPACH:  No.

         THE COURT:  Admitted into evidence.

      (Defendant's Exhibit CC received into evidence.)

         MR. FEIGENBAUM:  Permission to publish to the jury?

         THE COURT:  You may.

BY MR. FEIGENBAUM:

Q.   All right.  After you reported at the capitania of the Port of Progreso, what did you do next?

A.  From there, I went to the marine in Akumal.

Q.  All right.  You said:  "The Marina Akumal"?

A.  Correct.

Q.  A-K-U-M-A-L?

A.  Correct.

Q.  Why did you go there?

A.  Because that's the port that I had to get to, that Jose Miguel took me to.

Q.  All right.  And when you arrived at that marina, what happened?

A.  Nothing.  I sort of parked the boat, stationed the boat. And then I picked up my bag with clothes and they took me to a hotel.

Q.  All right.  Who paid you for taking that boat from Florida to Progreso to the marina?

A.  The one who was going to pay for that was the owner of the marina, Neco.  But the money, Jose Miguel took it to me.

Q.  Describe the marina for the jury.

A.  It's a pretty large marina, more than 50 boats, with a ramp to be able to bring the boats out.  Also, there were boats out on the water.  And at that time, a house was being built right on the marina, that belongs to the owner.

Q.  Are there any other business activities at the marina besides having the dock space for the boats?

A.  Well, there was a huge hut where there was a project for a

restaurant that would be built in the future.  But in the meantime, they had restrooms in there.  You could go to those restrooms, and meals were served there as well.

Q.  All right.  How much were you paid, the best you can remember, for taking that first boat to Mexico?

A.  A total of $10,000.

Q.  Tell us about the journey itself.  What does it involve when you leave the coast of Florida and make it to Yucatan Peninsula?

A.  Well, nothing much happens.  You have to go through the ocean.  There's the Gulf currents, which is really bad.  And you know, there's the weather, which can change suddenly. That's why it's useful to leave at night, so that you arrive to the place where the Gulf currents are in daytime, so you're able to navigate the water there.

Q.  So if I understand, was the first boat trip that you drove a boat from Southwest Florida to Yucatan -- was it a learning experience for you?

MS. KLEPACH:  Objection.  Leading.

THE COURT:  Sustained.  Rephrase, please.

MR. FEIGENBAUM:  Okay.

BY MR. FEIGENBAUM:

Q.  Did you learn anything about driving a boat from Southwest Florida to Yucatan after that first trip?

A.  Correct.

Q.   What types of things?

A.   Could you repeat the question.

Q.   Yes.  The first time -- you just described you drove a boat from Southwest Florida to Yucatan where you arrived in Holbox; is that right?

A.   Correct.

Q.   And during that trip, did you learn things about what was involved with the trip?

A.   Correct.

Q.   You mentioned that there was -- there were Gulf currents. Could you be a little more specific about that.

A.   Well, the Gulf currents are several currents that don't have a specific direction.  It's just two or three different currents that meet at that one place.  And they are also not currents that define a wave, which, normally you use to navigate with the help of the wave or against it to provide for better navigation.

Q.   Knowing that, did that figure into when you would leave the coast of Florida to go to Yucatan?

A.   Correct.

Q.   And what was that time?

A.   Well, normally, it would be to leave here at night, so that you would arrive at the Gulf currents in the morning, or early morning, or noon.

Q.   Why was that important?

A.   Because it's almost a hundred miles more or less in the Gulf currents, and it's not an easy ride.  So the currents can deviate you if you're not paying close attention.

Q.   About how many miles is it from the west coast of Florida -- let's say Naples, Marco Island area -- about how many miles is it on the water to reach Yucatan?

A.   It's around 400, 400 and some, almost 500 miles.

Q.   When you got to the marina, did you meet anyone there?

A.   In the first two trips, no.

Q.   Did you find out who the owner of the marina was?

A.   Correct.

Q.   And who was the owner of the marina?

A.   They called him Neco.

Q.   Okay.  Is he a Mexican national?

A.   Correct.

Q.   When was the first time that you met Neco?

A.   Well, more or less on my third trip, he's the one who introduced himself and he's the one who welcomed me over there at the marina.

Q.   All right.  During that first trip, did you go to any other place besides your hotel and the Marina Akumal?  While you were there, did you go to any other locations?

A.   Well, during the first or second trip, he took me to a restaurant there, called La Finca, because he had to pick something up, but it was not more than five minutes.

Q.   When you say:  "He," who are you talking about?

A.   Jose Miguel.

Q.   All right.  When you got to the place you called La Finca, what did you see?

A.   Well, there were about five or six people.  And when I asked who they were, they said they were the people who took care of it, that lived there.

Q.   All right.  After you went to La Finca, where did you go after that?

A.   Then he took me to the airport at Merida, Yucatan.

Q.   All right.  Now, did there come a time when you were asked again to take a boat from Florida to the -- to Progreso, Mexico?

A.   Could you repeat that.

Q.   Did there come another time after that first trip where you took another boat to Mexico from Florida?

A.   Correct.

Q.   All right.  About how much later after your first trip did you take another boat to Mexico?

A.   A month.  A bit more.

Q.   I can't remember if I asked you.  More or less -- I realize it's along time ago, but more or less do you remember when you took the first boat there, what month and year?

A.   It was at the end of '17, beginning of -- no.  It was April 2018.

Q.   All right.  Tell us about the second time you were asked to drive a boat there.  Tell us about that, how it came about.

A.   Well, Jose Miguel called me.  He said he needed to take a boat over there, that the client wanted to take over there.  And he asked me if I could do it, and I said yes.

Q.   All right.  And what was the next thing after you said yes?  What was the next thing that happened in terms of getting to where you drove the boat to Mexico?

A.   Could you repeat that, please.

Q.   Yeah.  Sure.  You talked about the first time you took a boat, how you went to the west coast of Florida and drove the boat to Mexico, who you met there, the places you went.  Regarding the next trip, I believe you said it was, what, a few months later?

A.   Correct.

Q.   And tell us again -- did you say Jose Miguel, or Mr. Vidal, was the one who contacted you about taking a second boat?

A.   Correct.

Q.   All right.  So that would be sometime in the middle of 2018 more or less?

A.   More or less.  I don't remember well.

Q.   Okay.  So do you remember where you went to from -- you live in Miami Beach?

A.   Correct.

Q.   What part of Miami Beach?

A.   In 7421 --

THE INTERPRETER:  7441.  Correction.

THE WITNESS:  -- Wayne Avenue.

BY MR. FEIGENBAUM:

Q.   Okay.  And do you remember -- if you can.  I know it's a long time -- how you got from your residence in Miami Beach to the west coast of Florida?

A.   I don't remember if it was with Uber or if I hired someone to take me there.

Q.   Okay.  And when you got -- do you remember where that was? Did you go to -- what location?  When you got to the west coast of Florida, do you remember where you went?

A.   To the Naples Walmart.

Q.   All right.  And when you got there, what did you do?

A.   Ramoncito picked me up in his car.

Q.   Okay.  And when you say:  "Ramoncito," that, again, was Ramon Reyes?

A.   Ramon Reyes.

Q.   Okay.  And do you remember where he took you?

A.   We went straight to a house.

Q.   All right.  What did you see when you got there?

A.   When I arrived there, they were finishing, you know, making the boat ready, preparing the fuel tanks and everything.  So all I had to do was get on it and leave.

Q.   When you say:  "Preparing the fuel tanks," what does that

mean?

A. That they had extra fuel tanks on the boat.

Q. Who is "they"?

A. Well, let's see. There was Ramoncito and about two or three others.

Q. Did the boat have external or fuel containers that we've seen photos of as extra fuel?

A. Correct.

Q. And were you giving -- given anything to take on the trip?

A. The boat documents that I always ask for.

Q. All right. And did you leave at the same time that you had left on the first trip, more or less?

A. More or less, yes.

Q. And again, why would you try to leave at a certain time?

A. So that by noon, when the sun was high up in the sky, I could go through the Gulf currents.

Q. Did you follow the same route that you took when you made the first drive of a boat to Mexico?

A. In the second one, correct, yes.

Q. All right. And when you got there to Mexican territory, what did you do?

A. When I got to Holbox, some Mexicans came in a boat and they refueled me.

        THE COURT: Mr. Feigenbaum, the jurors are in need of a break.

MR. FEIGENBAUM:  Oh, yes.

THE COURT:  Let's go ahead and take a 10-minute recess.

MR. FEIGENBAUM:  Sure.

COURT SECURITY OFFICER:  All rise.

(Jury not present, 4:35 p.m.)

THE COURT:  All right.  We're on a 10-minute recess.

(Recess from 4:35 p.m. to 4:45 p.m.)

THE COURT:  All right.  Both sides ready to continue?

MS. KLEPACH:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Judge.

THE COURT:  Hopefully, we have our jurors ready to go.

COURT SECURITY OFFICER:  All rise for the jury.

THE COURT:  Thank you.

(Before the Jury, 4:45 p.m.)

THE COURT:  All right.  Welcome back.

Please be seated.

And we'll continue with the direct examination.

MR. FEIGENBAUM:  Yes, Your Honor.

Thank you, Your Honor.

BY MR. FEIGENBAUM:

Q.  Good afternoon again, Mr. Hernandez.  I want to show you --

MR. FEIGENBAUM:  If I could have the ELMO for the witness only, please.

BY MR. FEIGENBAUM:

Q.   Mr. Hernandez, take a look at what's been marked as Defense Exhibit MM, if you would, please.

A.   Okay.

Q.   Do you recognize it?

A.   Yes.

Q.   Is it an accurate map of something?

A.   Of Yucatan, Mexico.

MR. FEIGENBAUM:   Your Honor, I move into evidence Defense Exhibit MM.

THE COURT:   Is there any objection?

MS. KLEPACH:   No, Your Honor.

THE COURT:   All right.   Admitted into evidence.

(Defendant's Exhibit MM received into evidence.)

MR. FEIGENBAUM:   Please publish, Your Honor.

THE COURT:   You may.

BY MR. FEIGENBAUM:

Q.   Okay.   So this is a little bit more detailed map of the Yucatan Peninsula; is that correct, Mr. Hernandez?

A.   Correct.

Q.   And do we see here at the top Holbox that you had described?

A.   Correct.

Q.   And on the trips that you made by boat from Florida to Yucatan, did you always stop in Holbox?

A.   Correct.

Q.   Okay.  Going back to the second time you drove a boat from Florida to Yucatan, can you tell us again who asked you to make that trip.

A.   Jose Miguel.

Q.   Mr. Vidal?

A.   Yes.

Q.   And when you got to Holbox, did Mr. Vidal go there that time -- the second trip?

A.   No.

Q.   You mentioned that some Mexican people there gave you the fuel.  What do you mean they gave you the fuel?

A.   Some Mexican people over there, they gave me some fuel tanks, so that I could refuel the boat to be able to get to Merida.

Q.   All right.  Did you go from there to Merida?

A.   Correct.

Q.   And where did you deliver the boat?

A.   In Neco's marina itself.

Q.   When you got there, did you meet Neco?

A.   Correct.

Q.   Was that the first time you ever met him in person?

A.   Correct.

Q.   Tell us about your first meeting with him.

A.   When I got to the marina, he was there by himself.  He was

waiting for me to arrive on the boat.  He introduced himself, as he normally would, and then he took me to the hotel himself.

Q.  Okay.  How long did you -- well, I don't know if you can remember.  But how long did you stay in Merida on that second trip?

A.  I don't remember how many days.

Q.  Okay.  And can you remember who paid you for that second trip you took as a captain of a boat?

A.  Neco.

Q.  All right.  Tell us about how Neco would pay you.

A.  At that time, Neco paid me $10,000.  But also at that time we were discussing the business of refurbishing, so that I would buy them and take them to Mexico.

Q.  Okay.  And did Neco tell you what businesses he had besides the marina?

        MS. KLEPACH:  Objection.  Calls for hearsay.

        THE COURT:  Overruled.

        THE WITNESS:  Yes.

BY MR. FEIGENBAUM:

Q.  Okay.  What businesses did you learn he also had?

        MS. KLEPACH:  Objection.  Calls for hearsay.

        THE COURT:  That's sustained.

        MR. FEIGENBAUM:  Can I just -- I need to ask the prosecutor something.

        THE COURT:  Certainly.

(Pause in proceedings.)

BY MR. FEIGENBAUM:

Q.   All right.  You mentioned something about refurbishing boats.  Is that what you said?

A.   Boat refractions.

Q.   Is that like spare parts?

A.   Yes.  Correct.

Q.   Okay.  Did Neco -- did the marina have a repair facility at the marina?

A.   Not really a space.  But in the terrain land area, they did repair boats.

Q.   All right.  What -- did you see that part of Neco's business?

A.   Yes.

Q.   What did you see?

A.   Some boats that saltwater had done a lot of damage to them, so parts had to be changed because they were very damaged. Others -- other that end up hooked into -- locked into the area where there are lots of rocks, and the bottom part becomes damaged, and then they have to be repaired.

Q.   Did Neco have any employees?

A.   Correct.

Q.   All right.  What did those employees do that you observed?

A.   Well, he had mechanics, he had fiber men, he had cooks, he had ship captains, and other people that helped him in his

business.

Q.  All right.  And did you observe more or less about how many employees he had doing those things?

A.  More than seven or eight employees.

Q.  All right.  Did there come a time after that second trip, when you met Neco, that you got involved with spare parts for boats that Neco wanted?

A.  Correct.

Q.  Would those be -- where would you get the spare parts that Neco asked of you?

A.  There were about three stores here that I had, where they knew me and they would sell me those parts.  And sometimes I would order those parts that Neco was requesting, and then I would wait for those to arrive.  And they would give me a discount because I was a regular buyer.

Q.  When Neco ordered parts for boats, is it necessary to give the VIN number -- I say VIN -- or HIN, I think for boats it's called -- to be able to identify which is the correct part?

MS. KLEPACH:  Objection.  Leading.

THE COURT:  Sustained.

MR. FEIGENBAUM:  What was the objection?

THE COURT:  Leading.

MR. FEIGENBAUM:  Leading.  Okay.

BY MR. FEIGENBAUM:

Q.  To be able to order the correct part for a boat, what

information do you need?

A.  It depends on the kind of part.  If it is an engine, then I would have to give them all the models for the engine.  But then -- but normally, for most pieces, if you have the VIN number for the boat, they would know what kind of boat it was, what pieces -- what parts it would need.  And so they would be able to order the parts that were correct for the boat.

Q.  Were there times when you needed that VIN number to be able to order the right part?

A.  Correct.

Q.  How would Neco provide you that information?

MS. KLEPACH:  Objection.  Leading.

THE COURT:  Overruled.

THE WITNESS:  I would tell him that, for the boat that he was requesting the part for, I needed the VIN number so that I could go get the correct part for the boat.

BY MR. FEIGENBAUM:

Q.  And how did he give you that information?  By what method?

A.  He would send me, via WhatsApp message, the VIN number.

MR. FEIGENBAUM:  Okay.  Your Honor, if we're going to adjourn at this time, then this would be a good place.

THE COURT:  Yes.  Thank you.

All right.  Ladies and Gentlemen, I want to thank you in advance for agreeing to adjust your schedules to be here tomorrow.  It will be a full day, from nine to five, of course,

with appropriate breaks.  I thank you once again.

Please remember that, as we adjourn for the evening, you're not to discuss this case with anyone, nor permit anyone to speak with you.  Everything learned about the case is learned in this courtroom.

Have a pleasant evening.

Please place your juror notebooks in the jury room. And if everyone will plan to be here right at nine a.m., so we can get started tomorrow morning.

Have a pleasant afternoon and evening.

COURT SECURITY OFFICER:  All rise.

(Jury not present, 5:02 p.m.)

THE COURT:  All right.  Go ahead and have a seat.

And Mr. Hernandez, go ahead and have a seat, along with Mr. Feigenbaum.

I just want to have an understanding, or perhaps --

THE INTERPRETER:  Your Honor, one moment.

THE COURT:  Oh.  Of course.  Of course.  Let's go ahead and give the interpreter -- thank you -- and Mr. Hernandez an opportunity to make their way to the appropriate tables.

(Pause in proceedings.)

THE COURT:  All right.  As it would appear to be important to have this case to the jury tomorrow, can I have an understanding or an idea as to how much time is needed for this

witness, Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes, Your Honor.

I'm going to be able to kind of economize or reduce what I need to ask him this evening.  I would guess -- I don't think it would be more than an another hour and a half.  But you know, that's my best guesstimate right now.

THE COURT:  All right.  And as far as the cross-examination?

MS. KLEPACH:  I think generously two hours.  But I will try to make it as concise as possible, depending upon what time Mr. Feigenbaum finishes.

MR. FEIGENBAUM:  And then I'll try to economize also for any redirect.

THE COURT:  Well, that would take us to the -- with the lunch break, approximately to 1:30, two p.m.  Does the Government know at this point whether it's going to be calling any rebuttal witnesses?

MS. KLEPACH:  Likely we are not, Your Honor.  But of course, should something come out in testimony that changes that, we can let the Court know as soon as possible.

THE COURT:  All right.  And to the extent that that places us at or around two p.m., how much time is each side requesting for closing arguments?

MS. KLEPACH:  An hour and a half.

THE COURT:  I can't give an hour and a half because

that would take us past the five p.m., and the jury needs to deliberate.

MS. KLEPACH:  An hour between both.

THE COURT:  Why don't we say 45 minutes each side and the Government can divide this.  Would that be acceptable?

MR. FEIGENBAUM:  Judge, let me ask a couple of questions.  First of all, are you anticipating that you want the jury to try to reach a verdict tomorrow?

THE COURT:  If they are not able to reach a verdict tomorrow, then we're going to need to discuss with them when they can all come back.  But I do know that one of the jurors is leaving tomorrow.  I'm not certain when that juror is expected to return.

I'm not certain if the courtroom deputy is with them. Could we see if Liz is still with the jurors and perhaps she can give us an understanding.  So I don't know.  I don't quite have the answer.

Josue, could you see if maybe she's -- I do need her to talk to the jurors or at least give us some information as to when they are available.

(Pause in proceedings.)

THE COURT:  If I am correct, unless the jurors' schedules have changed, we were going to have them return on October 16th.

MR. DOBBINS:  I believe that's today, Judge.

THE COURT:  I'm sorry.  My apologies.  On October -- I think it was the 20 -- I think one of the jurors, as I understood it -- and I just want to get confirmation -- is not going to be here the 18th, 19th, or 20th.  So that would take us to the 23rd.  But let me just get confirmation from Liz.

(Pause in proceedings.)

THE COURT:  I mean, I think at this point, unless Liz has information on each juror's schedule, we can just ask them tomorrow morning, if they needed to come back, when they could return.  I thought it was -- let me just ask, is Liz --

MR. GUERRA:  Your Honor, Liz is talking with at least one of the jurors now about scheduling.

THE COURT:  All right.  Let's just wait a few moments.  Maybe we can get that answer.

In the interim, if I can ask the attorneys to work together with regard to the exhibits that were introduced into evidence, so we have one exhibit list and we have one clean laptop with all of the exhibits uploaded on that laptop.  Because I am going to ask for three confirmations from the parties.  One is whether the laptop is clean.  Secondly, whether the exhibit list contains all of the exhibits that were, in fact, introduced into evidence.  And third, whether all of those exhibits have been properly uploaded on the laptop.

So if we can make arrangements so those three

questions can be answered very quickly after the jury goes into the jury room to deliberate, because I'm going to tell them not to begin deliberations until they have the evidence. So that will certainly expedite the process, if we can make those arrangements ahead of time, so that you're ready to answer those questions, provide the court security officer with the laptop and with the exhibit list.

MS. KLEPACH: Yes, Your Honor.

THE COURT: Do we have any information from the jurors in the event that they needed to come back after tomorrow?

COURTROOM DEPUTY: No.

THE COURT: All right. We'll get the information tomorrow.

MR. FEIGENBAUM: Your Honor, if you had a couple of minutes, I think -- you know, I want to make sure that I'm clear so that I'm an effective representative for my client. Tomorrow is going to be day 11 of the trial. If Your Honor only affords 45 minutes for my closing argument, that's around 4.5 minutes per day of trial. I don't feel -- I feel uncomfortable that I would try to summarize 11 days of trial in an average of less than five minutes per day. I don't -- I don't perceive me being sufficiently effective if I'm limited to that small amount of closing argument. That's one thing.

Number two -- and by the way, Your Honor, this is in great respect to Your Honor. You've been more than kind in the

181

way you've resolved all issues that I have brought before the Court, and I appreciate that very much.  But -- you know, I just want you to know that.  But the 45 minutes -- it would be very difficult.  There's -- I don't even know how many witnesses.  I was going to bring a total of how many witnesses.  But there's a lot.  And I just don't know how I could convey to the jury all that information in summary form in 45 minutes.

The second thing is tomorrow I would need the assistance -- and the Government's been fine with that -- helping me pull up exhibits.  Because the Government spent about six to eight hours with the Case Agent Francisco going through numerous references to the Cellebrite extractions from my client's phone, and I have to address as many of those portions of the extractions that Special Agent Francisco presented.  Because otherwise, the jury is going to believe that we just have no response to what Agent Francisco's comments were about what those meant.  That could be very lengthy.

So number one, I first need the Government to confirm that they will be able to assist me with that.  I could do it myself, but it's going to slow things down by three times as much if I have to try to find out where they are on a flash drive the Government gave me and how to put side by side Spanish and English.  It will be basically two days to get through that.

So I'm concerned about the amount of time for closing argument, and I'm concerned about making sure that I cover everything important during the direct examination of my client.  I'm not sure we can pack that into one day tomorrow, Your Honor.

THE COURT:  All right.  Any response?

MS. KLEPACH:  Judge, we're happy to help Mr. Feigenbaum pull up the exhibits.  The only thing I would ask is that he come prepared with page numbers, since some of these are over 200 pages.  I can't just -- with the software, I can't just find particular words or dates.  I need him to direct me to particular page numbers, but we're happy to help with that.

MR. FEIGENBAUM:  I will be doing that.  I will be able to tell them the exhibit number and the page number to go to.

THE COURT:  All right.

MS. KLEPACH:  And with respect to closings, the Government will certainly abide by whatever times the Court sets.

THE COURT:  We have been in trial for eight and a half days.  I anticipate that it will be nine and a half, and hopefully we'll have an extra day for the jury.

I think that it's logical to assume that the jury is going to need more than a sliver of time in the late afternoon to deliberate, with the number of exhibits.  So once again, I

will ask the courtroom deputy tomorrow to ask the jurors for a date that may be available for a continuation of deliberations.

To that extent, I understand the 45 minutes is a short amount of time.  My hope is that the Court can give each of you one hour to -- obviously, the Government will be able to divide that time.  But let's see where we are in terms of timing.  Quite frankly, I mean, at some point, this trial has to end.

MR. FEIGENBAUM:  Your Honor, how about using one of the alternate jurors to take care of that gap that one juror could not serve?

THE COURT:  Is it just the one juror that was unable to come in on Wednesday, Thursday, Friday?

COURTROOM DEPUTY:  So far, I only have one.  I need to inquire as to -- I just need a realistic time to tell them.

THE COURT:  Okay.  Let's ask all of the jurors --

COURTROOM DEPUTY:  Correct.

THE COURT:  -- about Wednesday, all of the jurors about Thursday, all of the jurors about Friday.  And let's determine which -- if we can get 12, and two of them are part of the panel, maybe we can bring in the alternates by agreement of the parties.

Let's also ask about the 25th, if there wasn't an agreement and we needed them to come back with that one juror.

COURTROOM DEPUTY:  Okay.

THE COURT:  Okay.  So Liz will ask tomorrow, and then

184

we'll have an understanding tomorrow morning when I see you at nine o'clock.

Okay.  Any there other issues that the Court can assist with?

MR. FEIGENBAUM:  No, Your Honor.

MS. KLEPACH:  No, Your Honor.

MR. FEIGENBAUM:  Thank you again.

THE WITNESS:  All right.  Mr. Feigenbaum, if you will work with Ms. Klepach to advise her of specifically what pages within the exhibits, so that she can assist you with the testimony of Mr. Hernandez.

MR. FEIGENBAUM:  Thank you, Your Honor.

THE COURT:  Okay.  All right.  You may certainly leave you items.  The courtroom will remain locked.  And I'll see you tomorrow morning at nine a.m.

MR. FEIGENBAUM:  Have a good evening.

THE COURT:  You as well.

MS. KLEPACH:  Thank you.

(Proceedings adjourned at 5:15 p.m.)

UNITED STATES OF AMERICA        )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 16th day of October, 2023, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 185.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 6th day of June, 2024.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov