IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1


UNITED STATES OF AMERICA,

      Plaintiff,               October 18, 2023
                           10:04 a.m.
    vs.

JAVIER HERNANDEZ,

      Defendant.             Pages 1 THROUGH 114

_____


TRANSCRIPT OF TRIAL DAY 12
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE
And a Jury of  12


Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                     Brian Dobbins, AUSA
                     Arielle Klepach, AUSA
                     99 Northeast 4th Street
                     Miami, Florida 33132


FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                     PO BOX 545960
                     Surfside, Florida 33154-9998


COURT REPORTER:     Yvette Hernandez
                     U.S. District Court
                     400 North Miami Avenue, Room 10-2
                     Miami, Florida 33128
                     yvette_hernandez@flsd.uscourts.gov

2

# I N D E X

Certificate ...................................... 114
Jury Instructions ............................. 5
Government Closing ............................ 24
Defendant Closing ............................. 53
Government Rebuttal Close ..................... 83
Final Jury Instructions ...................... 95
Jury Verdict ................................. 105

(Call to order of the Court, 10:04 a.m.)

THE COURT: All right. Go morning to everyone.

MS. KLEPACH: Good morning.

THE COURT: I believe we are waiting for some jurors.

Can you check and see.

Thank you so much. Appreciate it.

All right. While we're waiting, go ahead and have a seat.

Let me acknowledge the presence of the Defendant.

Thank you.

I have received the exhibit list. And is this exhibit list consistent with the exhibits that were admitted into evidence on behalf of the Government?

MR. DOBBINS: Yes, Your Honor.

THE COURT: On behalf of the Defendant?

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: And the laptop, has it been uploaded with the exhibits that are reflected on the exhibit list?

MR. DOBBINS: We're still finishing that up, Judge. We had a little technical difficulties, but that should be done by the time that our close is finished, and we can show counsel at the --

THE COURT: All right. And I have a redacted copy of the Superseding Indictment. Has this been reviewed by both sides?

MR. FEIGENBAUM:  I --

MS. KLEPACH:  We sent it with the list.

MR. FEIGENBAUM:  Oh, okay.  Thanks.

(Pause in proceedings.)

MR. FEIGENBAUM:  I have reviewed it, Your Honor, now. Thank you.

THE COURT:  All right.  No objection?

MR. FEIGENBAUM:  No objection.

THE COURT:  All right, then.

Are there any items that we need to address at this time?

MS. KLEPACH:  Not on behalf of the Government.

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  All right.  We're waiting for one juror.

(Pause in proceedings.)

THE COURT:  Both sides ready to proceed?

MR. DOBBINS:  Yes, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Let's bring in the jury.

(Before the Jury, 10:20 a.m.)

THE COURT:  All right.  Good morning, Ladies and Gentlemen.

Please be seated, everyone.

It is good to see each of you this morning.

Recall last night I did mention that today the Court

would instruct you on the law that you must follow, and then we will proceed to closing arguments by the attorneys. Each side will have equal time, but the Government is entitled to divide its time between an opening argument and a rebuttal argument after the Defendant has spoken.

Since many of us are visual learners, as opposed to auditory learners, a verbatim copy of the Court's instructions to the jury have been provided to each of you. You are free to read along with me, you are free to put them down and just listen. But either way, I ask you that you pay close attention.

Members of the Jury:

It is my duty to instruct you on the rules of law that you must use in deciding this case. After I have competed these instructions, you will go to the jury room and begin your discussions, what we call your deliberations.

You must decide whether the Government has proved the specific facts necessary to find the Defendant guilty beyond a reasonable doubt.

Your decision must be based only on the evidence presented during the trial. You must not be influenced in any way by either sympathy for or prejudice against the Defendant or the Government.

You must follow the law as I explain it, even if you do not agree with the law. And you must follow all of my

instructions as a whole.  You must not single out or disregard any of the Court's instructions on the law.

The Indictment, or formal charge against the Defendant, is not evidence of guilt.  The law presumes every defendant is innocent.  The Defendant does not have to prove his innocence or produce any evidence at all.  A defendant does not have to testify.  And if the Defendant chose not to testify, you cannot consider that in any way while making your decision.  The Government must prove guilt beyond a reasonable doubt.  If it fails to do so, you must find the Defendant not guilty.

A defendant has a right not to testify.  But since the Defendant did testify, you should decide whether you believe the Defendant's testimony in the same way as that of any other witness.

The Government's burden of proof is heavy, but it doesn't have to prove a defendant's guilt beyond all possible doubt.  The Government's proof only has to exclude any reasonable doubt concerning the Defendant's guilt.

A reasonable doubt is a real doubt, based on your reason and common sense, after you have carefully and impartially considered all the evidence in the case.

Proof beyond a reasonable doubt is proof so convincing that you would be willing to rely and act on it without hesitation in the most important of your own affairs.  If you

are convinced that the Defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

As I said before, you must consider only the evidence that I have admitted in this case. Evidence includes the testimony of witnesses and the exhibits admitted. But anything the lawyers say is not evidence and is not binding on you.

You should not assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence, you may use reasoning and common sense to make deductions and reach conclusions. You should not be concerned about whether the evidence is direct or circumstantial.

Direct evidence is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

Circumstantial evidence is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There is no legal difference in the weight you may give to either direct or circumstantial evidence.

When I say you must consider all the evidence, I do

8

not mean that you just accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say and how important that testimony was. In making that decision, you may believe or disbelieve any witness in whole or in part. The number of witnesses testifying concerning a particular point does not necessarily matter.

To decide whether or not you believe any witness, I suggest that you ask yourself a few questions: Did the witness impress you as one who was telling the truth? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to accurately observe the things he or she testified about? Did the witness appear to understand the questions clearly and answer them directly? Did the witness's testimony differ from other testimony and other evidence?

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact, and ask whether there was evidence that at some other time a witness said or did something, or did not say or do something, that was different from the testimony the witness gave during this trial.

To decide whether you believe a witness, you may consider the fact that the witness has been convicted of a

felony or a crime involving dishonesty or a false statement.

But keep in mind that a simple mistake does not mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

You must consider some witnesses' testimony with more caution than others.

For example, a witness may testify about events that occurred during a time when the witness was using addictive drugs, and so the witness may have an impaired memory of those events. And a witness who has been promised immunity from prosecution, or witnesses who hope to gain more favorable treatment in his own case, may have a reason to make a false statement in order to strike a good bargain with the Government.

So while a witness of that kind may be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other witnesses.

You must consider some witnesses' testimony with more caution than others.

In this case, the Government has made a Plea Agreement

with a codefendant in exchange for his testimony. Such plea bargaining, as it's called, provides for the possibility of a lesser sentence than the codefendant would normally face. Plea bargaining is lawful and proper, and the rules of this court expressly provide for it.

But a witness who hopes to gain more favorable treatment may have a reason to make a false statement in order to strike a good bargain with the Government.

So while a witness of that kind may be entirely truthful while testifying, you should consider that testimony with more caution than the testimony of other witnesses.

And the fact that a witness has pleaded to an offense is not evidence of the guilt of any other person.

If the Government offers evidence that a defendant made a statement or admission to someone after being arrested or detained, you must consider that evidence with caution and great care.

You must decide for yourself, one, whether the Defendant made the statement, and two, if so, how much weight to give to it. To make these decisions, you must consider all the evidence about the statement, including the circumstances under which it was made.

When scientific, technical, or other specialized knowledge might be helpful, a person who has special knowledge, special training, or experience in that field is allowed to

state an opinion about the matter.

But that doesn't mean you must accept the witness's opinion.  As with any other witness's testimony, you just decide for yourself whether to rely upon the opinion.

The Government must prove beyond a reasonable doubt that the Defendant was the person who committed the crime.

If a witness identifies a defendant as the person who committed the crime, you must decide whether the witness is telling the truth.  But even if you believe the witness is telling the truth, you must still decide how accurate the identification is.  I suggest that you ask yourself questions. One:  Did the witness have an adequate opportunity to observe the person at the time the crime was committed; two:  How much time did the witness have to observe the person; three:  How close was the witness; four:  Did anything affect the witness's ability to see; five:  Did the witness know or see the person at an earlier time?

You may also consider the circumstances of the identification of the Defendant, such as the way the Defendant was presented to the witness for identification and the length of time between the crime and the identification of the Defendant.

After examining all the evidence, if you have a reasonable doubt that the Defendant was the person who committed the crime, you must find the Defendant not guilty.

The Indictment charges five separate crimes, called counts, against the Defendant.  Each count has a number. You'll be given a copy of the Indictment to refer to during your deliberations.

Count 1 charges that Defendant Javier Hernandez knowingly and willfully conspired to encourage aliens to enter the United States for financial gain.

Count 2 charges that the Defendant knowingly and willfully conspired to transport stolen vessels.

Count 3 charges that Defendant Javier Hernandez knowingly and willfully conspired to traffic in certain motor vehicles, to export a motor vehicle with a tampered identification number, and to alter motor vehicle identification numbers.

Count 5 charges that the Defendant knowingly and willfully conspired to commit money laundering.

Count 4 charges that Defendant Javier Hernandez committed what is call a substantive offense, specifically that he trafficked in certain motor vehicles.  I will explain the law governing the substantive offenses in a moment.

But first note that the Defendants are not charged in Counts 1, 2, 3, and 5 with committing a substantive offense. They're charged with conspiring to commit those offenses.

I will also give you specific instructions on conspiracy.

Where a statute specifies multiple alternative ways in which an offense may be committed, the Indictment may allege the multiple ways in the conjunctive, that is by using the word "and." If only one of the alternatives is proved beyond a reasonable doubt, that is sufficient for conviction, so long as you agree unanimously as to that alternative.

You'll see that the Indictment charges that a crime was committed on or about a certain date. The Government does not have to prove that the crime occurred on an exact date. The Government only has to prove beyond a reasonable doubt that the crime was committed on a date reasonably close to the date alleged.

The word "knowingly" means that an act was done voluntarily and intentionally, and not because of a mistake or by accident.

The word "willfully" means that the act was committed voluntarily and purposely, with the intent to do something the law forbids, that is, with the bad purpose to disobey or disregard the law. While a person must have acted with the intent to do something the law forbids, before you can find that person acted willfully, the person need not be aware of the specific law or rule that his conduct may be violating.

Title 8, Section, 1324(a)(1)(A), Roman numeral (v)(I) makes it a crime for anyone to conspire with someone else to encourage or induce aliens to come to, enter, or reside in the

United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence is and will be in violation of the law.

A conspiracy is an agreement by two or more persons to commit an unlawful act; in other words, it is a kind of partnership for criminal purpose.  Every member of the conspiracy becomes the agent or partner of every other member.

The Government does not have to prove that all the people named in the Indictment were members of the plan or that those who are members made any kind of formal agreement.  The heart of a conspiracy is the making of the unlawful plan itself, so the Government does not have to prove that the conspirators succeeded in carrying out the plan.

The Defendant can be found guilty only if all of the following facts are proved beyond a reasonable doubt:

First, the Defendant and one or more persons in some way agreed to try to accomplish a shared and unlawful plan.

Second, the Defendant knew the unlawful purpose of the plan and willfully joined in it.

And third, the object of the conspiracy was to encourage or induce an alien to come to, enter, or reside in the United States for the purpose of commercial advantage or financial gain, knowing or in reckless disregard of the fact that such coming to, entry, and residence was or would be in violation of law.

A person may be a conspirator even without knowing all the details of the unlawful plan or the names and identities of all of the other alleged conspirators.

If the Defendant played only a minor part in the plan, but had a general understanding of the unlawful purpose of the plan, and willfully joined the plan on at least one occasion, that is sufficient for you to find the Defendant guilty.

But simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests does not establish proof of conspiracy. Also, a person who does not know about a conspiracy, but happens to act in a way that advances some purpose of one, does not automatically become a conspirator.

The Defendant is charged with conspiring with others to encourage or induce aliens to come to the United States for the purpose of commercial advantage or financial gain. But you may find the Defendant guilty of the crime, even if the conspiracy was not for commercial advantage or financial gain. So if you find the Defendant guilty, you must also determine whether the conspiracy to encourage and induce aliens to travel to the United States was for a commercial advantage or financial gain. And if you unanimously find that the purpose of encouraging and inducing aliens to travel to the United States, you must specify that on the Verdict Form.

It is a separate federal crime for anyone to conspire

16

or agree with someone else to do something that would be another federal crime if it was actually carried out.  A conspiracy is an agreement by two or more people to commit an unlawful act; in other words, it is kind of a partnership for criminal purposes.  Every member of a conspiracy becomes the agent or partner of every other member.

The Government does not have to prove that all the people named in the Indictment were members of the plan or that those who are members made any kind of formal agreement.

The Government does not have to prove that the members planned all the details of the plan or the overt acts that the Indictment charges would be carried out in an effort to commit the intended crime.

The heart of a conspiracy is the making of the unlawful plan itself, followed by the commission of any overt act.  The Government does not have to prove that the conspirators succeeded in carrying out the plan.

The Defendant can be found guilty of this crime only if all the following are proved beyond a reasonable doubt:

One:  Two or more persons in some way agreed to try to accomplish a shared and unlawful plan; two:  The Defendant knew the unlawful purpose of the plan and willfully joined in it; three:  During the conspiracy, one of the conspirators knowingly engaged in at least one overt act, as described in the Indictment; and four:  The overt act was committed at or

about the time alleged, and the purpose of carrying out or accomplishing some object -- and with the purpose of carrying or accomplishing some object of the conspiracy.

An overt act is any transaction or event, even one that may be entirely innocent when viewed alone, that a conspirator commits to accomplish some object of the conspiracy.

A person may be a conspirator without knowing all the details of the unlawful plan or the names and identities of all of the other alleged conspirators.

If the Defendant played only a minor part in the plan, but had a general understanding of the unlawful purpose of the plan, and willfully joined in the plan on at least one occasion, that is sufficient for you to find the Defendant guilty.

But simply being present at the scene of an event, or merely associating with certain people and discussing common goals and interests, does not establish proof of a conspiracy. A person who doesn't know about a conspiracy, but happens to act in a way that advances some purpose of one, doesn't automatically become a conspirator.

Defendant Javier Hernandez is charged in Count 4 with trafficking in certain motor vehicles, in violation of Title 18, United States Code, Section 2321.  It is a federal crime to traffic in certain motor vehicles.

Defendant Javier Hernandez can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

Number one:  Defendant Hernandez acquired or possessed a road motor vehicle or component on which the vehicle identification number, VIN, had been removed, obliterated, tampered with, or altered; two:  The identification number was one required by the United States Department of Transportation; three:  Such removal, obliteration, tampering with, or alteration was done unlawfully; four:  Defendant Javier Hernandez was aware of the unlawful removal, obliteration, tampering with, or alteration; and five: Defendant Javier Hernandez had an intent to sell or otherwise dispose of the motor vehicle or component part.

A motor vehicle includes an automobile, automobile truck, automobile wagon, motorcycle, or any other self-propelled vehicle designed for running on land, but not on rails.

"Tampered with" includes covering a program decal or device affixed to a motor vehicle pursuant to the Motor Vehicle Theft Prevention Act for the purpose of obstructing its visibility.

It is a federal crime to conspire to engage in money laundering or transactions involving the proceeds of specified unlawful activity that violates Title 18, United States Code,

Section 1956.

To violate Title 18, United States Code, Section 1956, Subsection (a), Subsection (2), Subsection (A), an individual knowingly transports, transmits, or transfers a monetary instrument or money to a place in the United States from or through a place outside the United States; and an individual acted with the intent to promote the carrying on of specified unlawful activity.

To transport, transmit, or transfer includes all means to carry, send, mail, ship, or move money. It includes any physical means of transferring or transporting funds, and also electronic transfer by wire or computer or other means.

A monetary instrument includes the coin or currency of any country, travelers or personal checks, bank checks, or money orders, or investment securities, or negotiable instruments in a form that allows ownership to transfer on delivery.

The phrase "with the intent to promote the carrying of specified unlawful activity" means that the individual must have conducted the final transaction for the purpose of making easier or helping to bring about the specified unlawful activity.

The term "specified unlawful activity" means any enumerated offense listed in Title 18, United States Code, Section 1956, Subsection (c), Subsection (7). In the

Indictment, the Government has alleged that the specified unlawful activities are the transportation of stolen vehicles, in violation of Title 18, United States Code, Section 2312; the trafficking in motor vehicles with an altered identification number, in violation of Title 18, United States Code, Section 2321; and an offense against a foreign nation, specifically Mexico, including bribery of a public official, in violation of Title 18, United States Code, Section 1956, Subsection (c), Subsection (7), Subsection (B), Subsection Roman numeral (iv).

It does not matter whether the monetary instrument or money involved in this case was derived from criminal activity. It could be legitimately earned income.

A conspiracy is an agreement by two or more persons to commit an unlawful act; in other words, it is a kind of partnership for criminal purposes. Every member of the conspiracy becomes the agent or partner or every other member.

The Government does not have to prove that all the people named in the Indictment were members of the plan or that those who are members made any kind of formal agreement. The heart of a conspiracy is the making of the unlawful plan itself, so the Government does not have to prove that the conspirators succeeded in carrying out the plan.

The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

One: Two or more people agreed to try to accomplish a common and unlawful plan to violate 18, United States Code, Section 1956; and two, the Defendant knew about the plan's unlawful purpose and voluntarily joined in it.

A person may be a conspirator even without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators.

If the Defendant played only a minor part in the plan, but had a general understanding of the unlawful purpose of the plan, and voluntarily joined in the plan on at least one occasion, that is sufficient for you to find the Defendant guilty.

But simply being present at the scene of an event, or merely associating with certain people and discussing common goals and interests, does not establish proof of a conspiracy. Also, a person who doesn't know about a conspiracy, but happens to act in a way that advances some purpose of one, doesn't automatically become a conspirator.

It is possible to prove Defendant Javier Hernandez guilty of a crime charged in Count 4 even without evidence that the Defendant Javier Hernandez personally performed every act charged.

Ordinarily, any act a person can do may be done by directing another person or agent, or it may be done by acting with or under the direction of others.

A defendant aids and abets a person if the defendant intentionally joins with the person to commit a crime.

A defendant is criminally responsible for the acts of another person if the defendant aids and abets the other person.  A defendant is also responsible if the defendant willfully directs or authorizes the acts of an agent, employee, or other associate.

But finding that a defendant is criminally responsible for the acts of another person requires proof that the defendant intentionally associated with or participated in the crime, not just proof that the Defendant was simply present at the scene of the crime or knew about it; in other words, you must find beyond a reasonable doubt that the Defendant was a willful participant and not merely a knowingly spectator.

You have heard testimony in this case about evidence that was seized from various locations and/or electronic devices pursuant to search warrants.  This evidence obtained from these searches and recordings were admitted in this case and may properly be considered by you.  Whether you approve or disapprove of how the evidence was obtained should not enter into your deliberations.

Each count of the Indictment charges a separate crime against the Defendant.  You must consider each crime and the evidence relating to it separately.  If you find a defendant guilty of one crime, that must not affect your verdict or any

other crime.

I caution you that the Defendant is on trial only for the specific crimes charged in the Indictment. You are here to determine from the evidence in this case whether the Defendant is guilty or not guilty of those specific crimes.

You must never consider punishment in any way to decide whether a defendant is guilty. If you find the Defendant guilty, the punishment is for the Judge alone to decide later.

There are persons whose names you heard during the trial, but who did not testify. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. You should remember my instruction, however, that the law does not impose upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

In addition, some of the people who may have been involved in these events are not on trial. This does not matter. There is no requirement that all members of a conspiracy or all alleged codefendants be charged and prosecuted in one proceeding. You may not draw any inference, favorable or unfavorable, towards the Government or the Defendant from the fact that any person in addition to the Defendant before you is not on trial here. You may also not speculate as to the reasons why other persons are not on trial.

Ladies and Gentlemen, I'm going to ask that you place your jury instructions down and give the attorneys your undivided attention.

Now, they certainly can refer to the jury instructions. I will review the Verdict Form after the closing arguments, but please give the attorneys your undivided attention.

As I stated, each side has equal time, but the attorneys for the Government are entitled to divide this time between an opening argument and a rebuttal argument after the Defendant has spoken.

On behalf of the Government?

MR. DOBBINS: Yes, Your Honor.

May I have one moment just to get set up?

THE COURT: Yes. Of course.

MR. DOBBINS: If we may have the Government's laptop, please.

(Pause in proceedings.)

MR. DOBBINS: May it please the Court, Mr. Feigenbaum.

Ladies and Gentlemen of the Jury, good morning.

Boats, bodies, and bribes. From at least as early as 2018, and continuing on through 2020, there was an organized crime group mostly made up of Cuban nationals operating out of the area of Merida and Progreso, Mexico. This group conducted a number of illegal activities. But their primary illegal

25

activity that was their focus was smuggling Cuban migrants out of Cuba to Mexico, and then holding them in Merida until the smuggling fee was paid, and then taking them up to the southwest border, where the migrants were sent to try to cross the border without permission to then try to claim either asylum or a parole to stay here in the United States under the Cuban Adjustment Act.

Now, once the fee was paid, they would be transported. But oftentimes, the fee could not be paid right away. And the important thing to know is this group was not doing this for humanitarian reasons. They were doing it for the money, $10,000 a head. And what they would do is they would bring the Cubans from Cuba often without any guarantee of payment. And then, of course, what you heard during the trial, is that they would then call the family members here in the United States and demand that payment of that fee. And if the family could not pay that fee, they would then threaten to harm the family members, and oftentimes actually did harm those family members, taking pictures and videos to send to the migrant's family.

So once that extortion was done, and if the family did pay, the migrants would then finally be released and sent up to the southwest border.

But an operation such as this requires a constant stream of money to fuel the engine of this operation and this criminal enterprise. So the group had to pay the Mexican

cartels a tax for operating in Mexico with their permission. The group also had to pay Colombian public officials -- I'm sorry -- Mexican public officials, so that they could continue to operate without interference from the Government of Mexico, including law enforcement.

And that's where the Defendant Javier Hernandez comes in. He plays a vital role in this organization, because this Defendant provided the fuel for the criminal machine to keep operating by stealing boats, by piloting those stolen boats over to Mexico, and also by working with a forger to fraudulently obtain registration documents for those boats, so that they could either be sold or transferred in Mexico.

In addition, the Defendant also took vehicles with altered VINs over to Mexico to provide to the organization, again, for their own use, and to provide as bribes for the Mexican public officials.

And for these services, the Defendant was paid $10,000 per boat and approximately $2,500 per vehicle, and he would transport that cash back to the United States, and the money would also sometimes be wire, transferred, or provided by a person present here in the United States that was holding money for that criminal enterprise.

And so the Defendant's words, text messages, and activities have provided you with the evidence that removes all reasonable doubt that the Defendant participated in the four

conspiracies and the one substantive crime that is charged in the Indictment.

And now is the time, now is the time for you to consider all the evidence that has been presented over these last four weeks. And I know it's been a long trial, and we appreciate all your attention to the detail that has been presented. And so what I'm going to do today is try to go over some of the evidence with you, and go over the Judge's instructions that were just read, so that you can understand where that evidence fits and how it proves the Government's case beyond a reasonable doubt as to this Defendant.

So let's talk a little bit about the charges. The Defendant is charged in Count 1 with conspiracy to encourage and induce aliens to enter the United States for financial gain. That is not a conspiracy to smuggle the aliens. It is a conspiracy to encourage and induce aliens to come to the United States. What that means -- encouraging and inducing simply means to provide help or to encourage somebody.

Count 2, conspiracy to transport stolen vessels. Count 3 is conspiracy to traffic in certain motor vehicles with altered VIN numbers; export a motor vehicle with a tampered identification number, which was the Toyota Tundra that we'll talk about in a second; and to alter those motor vehicle identification numbers.

Count 4 is trafficking -- the actual substantive count

of trafficking in certain motor vehicles.  This pertains to the Toyota Tundra that we'll talk about in a minute.

And Count 5 is a conspiracy to commit money laundering.

So what is it that the Government has to prove?  Let's start with the standard.  It's proof beyond a reasonable doubt. Now, what does that mean?  Well, it's not proof beyond any possible doubt.  It's proof beyond what you consider to be a real doubt, which is something that you can base your reason and common sense on, and use it to be certain in your judgment after you've carefully and impartially considered all of the evidence in this case.

Now, people often ask:  What's the percentage?  Give me a percentage.  And the problem is you can't, because for each individual their reasonable doubt is going to be different.  So the way I look at it is you would set it as if it's a wall.  Right?  And the Government has to get over that wall.  And each piece of evidence and is a block that we can use to get over that wall without having to try to jump or scale, right, to allow us to just step over that wall onto the other side.  And each piece of evidence -- as we stack it block by block, you can use it to say:  "Okay.  That's enough blocks for me.  I have no more reasonable doubt."  And then what's that you base your decision on.

All right.  Let's start with conspiracies.  We've

charged four conspiracies. Two of the conspiracies require overt acts and two don't. Count 1 does not require an overt act, nor does Count 5. And we'll get into that in a second, but let's just talk basically about what a conspiracy is. Conspiracy is an agreement by two or more people to commit an unlawful act, a kind of partnership for criminal purposes.

People often -- when they hear conspiracy, they get -- "Whoa. What is that? That sounds very weird." It's just an agreement. Basically, two or more people decide they are going to commit a crime, and they agree to commit that crime. That is a conspiracy. It's just the agreement. They don't actually have to have taken any steps or actually done anything to commit the crime. They don't even have to have successfully completed the crime or attempted to complete the crime.

Now, with other conspiracies there will be overt acts, which means that they have to commit some act in furtherance of the conspiracy. And we'll get into that in a second. But basically, if you want to think about it -- I don't know if any of you are sports fans, but you can think about it like a team. Right? A team goes out, like say the Miami Heat. There's five members on the floor at one time, but there's also usually five to seven additional bench players, right, who can sub in and out for those players.

But that's not the only people that are participating in making the Miami Heat successful. You have the training

staff.  You have the coaches.  You have the general manager and the businesspeople working the contracts for the players and trying to conduct trades.

All those people are working together for a common goal.  And what is that common goal?  To make the Miami Heat the best team that they can possibly be and possibly win a championship.  That's the goal.

It's similar with a criminal conspiracy, except they're not trying to win a basketball game.  They're trying to commit a criminal act.  And that's what we have here.

Now, just like the trainers, the bench players, and the general manager, every member of a conspiracy becomes the agent or the partner of every other member of the conspiracy.  And what that means is that, just like in basketball, if Dwayne Wade, for instance, when he played for The Heat, scores the winning goal, the whole team wins.  So anything that one member of the conspiracy does on behalf of the conspiracy, everybody else in the conspiracy is equally responsible for.

The heart of a conspiracy is the making of the unlawful plan itself.  The Government does not have to prove that the conspirators succeeded in carrying out that plan.  The conspirators also don't need to know all of the details of the unlawful plan or know the identities of all the other co-conspirators.  We just have to show that, even if the Defendant played only a minor part in the plan, but had a

31

general understanding of the unlawful purpose of the plan and willfully joined in it on at least one occasion, that's sufficient for you to find the Defendant guilty.

Now, again, simply being present at the scene of an event, or merely associating with certain people or discussing common goals, does not establish proof of a conspiracy. They have to willfully join in the conspiracy.

So let's talk about Count 1. As you heard from the Judge, we have to prove certain elements to prove beyond a reasonable doubt. And these are the only things we have to prove beyond a reasonable doubt for you to find the Defendant guilty of these counts. Element one, two or more persons in some way agreed to try to accomplish a shared and unlawful plan. Two, the Defendant knew the unlawful purpose of the plan and willfully joined in it. And three, the object was to encourage or induce aliens to come to and/or reside in the United States, knowing that that would be in violation of law.

So element one and three state that we need two or more people in some way to agree to try and accomplish a shared and unlawful plan. What is our evidence that you heard about this? Well, we had the evidence from the two migrants who came and testified, Esthalin Benitez Castillo and Jose Carlos Martinez Alfonso, and they told you about how the plan worked. But you had a member of the conspiracy come and testify before you. That was Mr. Crespo Marquez, also known as Niño, who came

in to testify before you.

And in addition, you have the evidence that the Defendant admitted to Special Agent Spielvogel, that he knew that Chupa, Jose Miguel Gonzalez Vidal, and Niño, and Neco, the Mexican national who runs the marina, were bringing Cuban migrants to Mexico and charging them about $10,000 per head, and keeping them at the Finca and other houses there until they could pay the fee so that they could get to the US.

You also have the evidence of Mr. Hernandez's. Conversations with his cousin Yisel, right, Government's Exhibit 8A, where he's telling her:  "Hey, we can get the papers for you.  We can do this.  We can do that.  We're just" -- you know -- "and we've got a lot of power in Merida because we've got the officials eating out of our hands.  We've just got to bring this truck over."

We'll get to that in a second.  But you have all of this testimony here that shows there are multiple people in the organization, and they're all trying to encourage these Cuban migrants to come to Mexico on the way to the US by transporting them out of Cuba and to Merida.

All right.  So that takes care of Government's -- of elements 1 and 3 of Count 1.  But the important one, right, is: How does the Government prove that the Defendant knew the unlawful purpose of the plan and willfully joined in it?  And so, what you have to do here is you have to listen to both

direct evidence and circumstantial evidence.  And you heard the example of circumstantial evidence, which is basically if we all came in this morning and we were -- it was bright and sunny outside, and then we were here for a couple hours and somebody comes in in a raincoat with a dripping wet umbrella, it might be reasonable to assume, based on those facts, that it must be raining outside.  And you can use that -- that chain of circumstances, that chain of facts, that establish another fact that you don't have the direct evidence for.

So based on that, what do we have to show that the Defendant willfully joined in this conspiracy?  Well, we have, again, the testimony from Special Agent Spielvogel that the Defendant knew about the migrant smuggling.  He knew all about what -- they were being held.  He knew that these participants were there, and he knew that they were being held at the Finca. He even was at the Finca, according to the Defendant's own admission.  And he knew that they were being charged, and Neco and other people were using their boats to go and pick the migrants up from Cuba and bring them to Progreso, Mexico.

And then we get to Government's Exhibit 6A, Page 5, the chats with Yisel.  Now, here, he's talking to her about: "How's the border?  What do you think?"  He says:  "Things are crazy here, but we have to keep going."  And she says:  "It's bad.  They are still coming over this way with the courts," and things like that.  He's still encouraging her actively.  But

not only that.  He says to her at some point -- again, they're talking here about -- she's talking about entering illegally. And then she thinks about how bad Cuba is, so she still wants to try.  And he says:  "It's okay," and then -- but he's like: "Raids are carried out and all these immigrants were taken."

What else do we have there?  We have -- in that chat, he says:  "Maybe we can get you the papers."  He uses the term "we."  And who is that?  The Defendant doesn't have any access these papers.  He's going to use Neco, and Chupa, and Niño to do that for him.  So he's encouraging Yisel to go to Merida and help and do that, so that she can get the papers and work until she can get the time to try to come back to the US.

We also had Mr. Crespo Marquez's testimony, and that was that the Defendant visited the Finca.  He brought the boats to assist the co-conspirators in making the money.  Again, the money has to drive the conspiracy.  The primary goal is to smuggle the Cubans out of Cuba, and they need the additional money stream to do that.  So that's why there are stolen boats. And also, Crespo Marquez testified that the Defendant would bring these vehicles over, such as the Toyota Tundra, to Mexico to be used as bribes.

Now, you heard an instruction about witnesses who have a reason to -- that you need to treat with more caution.  And that's the case with cooperating witnesses.  We had three in this case.  We had Mr. Crespo Marquez, and we also had

Mr. Reyes Aranda, and we also had Mr. Marrero Cisneros.  And these instructions apply for all of them.  But this is basically:  "A witness who hopes to gain more favorable treatment in their own case may have a reason to make a false statement in order to strike a good bargain with the Government."

So the point of that is they may have an added incentive to lie than just a regular witness that came in here and testified, so you need to treat their testimony with more caution.  But ask yourself this:  Does what they say -- is it corroborated by other evidence that was presented in the case?  Is there other evidence that coincides and corroborates what they said that proves that what they were saying on the stand was the truth?  And I submit to you, when you analyze it that way, you will see that the text messages from the Defendant's phone with the other co-conspirators matches up with what the cooperating witnesses told you on their testimony.

So let's talk about some of that corroboration.  Mr. Crespo Marquez says the Defendant visited La Finca.  That's corroborated by the Defendant's admission.  The Defendant brought the boats to assist the co-conspirators in making money, again, corroborated by Mr. Reyes's testimony, Mr. Hernandez's admissions, and messages to both Neco and Chupa.  Defendant knew about the conspiracy, corroborated by Mr. Reyes's testimony, Mr. Hernandez's admission, and messages

to Neco, Chupa, and Yisel.  And also that the Defendant would bring those vehicles to be used as bribes, corroborated by Mr. Reyes's testimony, Hernandez's admissions, and messages to Neco, Chupa, and Yisel, as well as the cell site data, which shows that he was traveling to Mexico with that Toyota Tundra in 2019.

So therefore, once we've established that, the Government has met its burden of proving beyond a reasonable doubt all three elements of the conspiracy to encourage and induce aliens to enter the United States for financial gain. And so you should check on the Verdict Form that the Defendant is guilty.

There's an additional special finding that you need to make, if you find the Defendant guilty, that the conspiracy was committed for financial gain or commercial advantage.  This is an easy one.  They were charging $10,000 a head.  You heard that testimony from the victims, from Mr. Crespo Marquez, and also from the Defendant's post-Miranda statement.

Let's talk about conspiracy to transport stolen vessels.  Again, you've got to show two or more people made an agreement to accomplish the crime; two, the Defendant knew about the plan and willfully joined in it, and that -- now here's where we get into the overt acts -- that during the conspiracy one of the co-conspirators knowingly engaged in at least one overt act, as described in the Indictment, and that

the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

An example of an overt act is that -- and we will get to that in a second.  Let's just talk first about the agreement.  So one, we have to show that two people agreed to commit the crime and also that the Defendant knew the unlawful purpose of the plan and willfully joined in it.  So what's our evidence as to that?  Well, we have Government's Exhibit 5, the Defendant's WhatsApp chats with Neco; Government's Exhibit 7, the chats with Ramon Reyes Aranda, and he got up on the stand and explained those chats to you; and Mr. Crespo Marquez's testimony, as well as Government's Exhibit 11, the chats with Marrero, who is known as Viejo or Robertico Nuevo, and Marrero's testimony because he also explained what those chats meant during it.

So let's just talk -- I just want to hit the highlights.  There was a lot of chats, but we're going to talk just briefly about some of the highlights.  Government's Exhibit 5, Page 230, Neco's chatting with the Defendant, and it's the Defendant sending a VIN -- I'm sorry -- a hull identification number and the name of the boat, or the brand of the boat, which is a Pursuit 238.  And what do we know happened during the course of this conspiracy?  In December of 2018 and June of 2019, there were two Pursuits stolen, the *Mellow Yellow*

and the *Reel Estate*.

Government's Exhibit 8A, we have Page 37, the chats with Chupa after the delivery of the *Luca Brasi*.  This is where they get into:  "Hey, I need the passport stamp.  Let's -- you know, let's do that."  And at some point, Chupa says to the Defendant:  "Won't Neco just give you the money?  I'm sure you're taking money back to Miami" -- this gets into the money laundering later as well -- and he says:  "Well, I don't have the money this time, and Neco is going to have to give it to me."

We also have the chats with Neco and Mr. Marrero Cisneros about the Everglades vessel, Government's Exhibit 5A.  Okay.  So this is the chats between the Defendant and Neco, as well as the corresponding chats with the Defendant and Viejo or Robertico.

So what you look at is, if you remember, there's an Everglades boat stolen in July of 2019, and that is the *Ultimaytum*.  And if you recall, the testimony has shown that what they would do is they would steal the boat, and then Neco and others here in the United States would work on getting fraudulent documents for these vessels, so that then they could get the importation paperwork in Mexico and then try to either sell the boats or give it away as a bribe.

So what do we have here?  We have an Everglades stolen in July.  And then, in September, we have the Defendant sending

another hull identification number, and Neco is like:  "What's that?"  And the Defendant responds:  "It's the Everglades number."  And then, a little bit later -- a couple weeks later, on October 11th, now Neco sends him -- sends the Defendant a photograph of a Mexican license.  And then now the Defendant says:  "What's this," and Neco says:  "It's so that Robertico can do the paperwork for the Everglades."  And then he asks him:"  Do you have the VIN?"

And of course, if you keep going down that chat, he says -- the Defendant says:  "Yeah.  I already sent it to you." And then Neco sends it to him again just to be safe.  But what does the Defendant do with this information?  He turns around and on the one on the right, Government's Exhibit 11A, Page 100, he then forwards to the forger, Marrero -- he sends him a copy of the driver's license and forwards him the hull identification number, so that Marrero Cisneros can do the paperwork, so they can create the fraudulent ownership documents to make this boat look like it's not the *Ultimaytum*, but a completely different Everglades that they can then register in Mexico and do with it what they wish.

And again we have the things with Reyes:  "The tanks are stored.  They're clean.  They're already.  Hey, the one on the right.  I need you to come back because I need my money." This is when he was coming back after the *Ultimaytum* is stolen -- and we have the travel records to show -- and he's

like:  "Yeah.  I'm going to get into Fort Lauderdale.  I'll tell you when I get into the airport."  And why was he doing that?  Because he was paid the fees.  Right?  That was the testimony, that he was paid -- the Defendant was paid the fee, his fee of $10,000, but also Ramon Reyes Aranda's fees.  So that's why Ramon is so desperate here to find out like:  "Hey, man.  When you coming back?  I need the money."  He was like:  "Oh I'll call you when I get into Fort Lauderdale."

The Defendant also made post-Miranda statements to Special Agent Spielvogel, admitting to driving the boats to Mexico so they could be sold or used for bribery.

And therefore, I submit to you that Government has proven beyond a reasonable doubt elements 1 and 2 of Count 2.

Elements 3 and 4, again, deal with overt acts so let's talk a little bit about that.

So what is an overt act?  An overt act is any transaction or event, even one that is not a criminal act, but may be entirely innocent when viewed alone, that a conspirator commits to accomplish some object of the conspiracy.

So for instance, if you had a bank robbery, and somebody agreed to be part of that conspiracy, and they go into the bank pretending to be a customer, and pretend to be filling out some financial information for, say, a withdrawal -- I guess people don't really to do that anymore.  But while they're in the bank, they're drawing a map, right, of where the

tellers are, where the security is, and all that. And then they go conduct their transaction, they walk out the door, they hand the map to the bank robbers, and then they leave. And then the bank robbery happens and that person that made the map is not there.

Is that person still part of the conspiracy? Of course. Because they did something to help accomplish the common goal, which was to rob the bank. So by drawing the map, and participating in that way, they have committed an overt act in furtherance of that bank robbery conspiracy.

Now, we only have -- the Indictment, as you'll see, has a number of overt acts. But we only have to prove one of those overt acts beyond a reasonable doubt.

So let's just talk about some of the highlights. Again, the overt act does not have to be criminal in nature. But look at Number 11: "On or about June 5th, 2018, the Defendant procured fuel tanks in Miami, Florida." That's where the Mantanques chats come in. That's Government's Exhibit 90, Page 11. He says: "I'm coming over" -- the Defendant says: "I'm coming over to pick up those 18."

Number 12, Overt Acts. We've got the -- you know, more tanks, procured fuel tanks on or about June 21st, 2018. And you see the chats where he's going to go pick up the tanks, and: "When are you going to have them?"

"Seven minutes away from your house."

Government's Exhibit -- I'm sorry -- Number 14 of the overt acts on or about December 14th:  "Do you have tanks at home?  I need 23."

Again -- and some of those dates are obviously significant, right?  June 5th, 2018, that's around the time that the *Reel Estate* is stolen.  December 14th, 2018, that's about the time that the *Luca Brasi* is stolen.

"On or about December 18th, Javier Hernandez traveled from Miami-Dade County, Florida to Marco Island, Florida." Well, that's corroborated and proven beyond a reasonable doubt by the cell sites.  That's Overt Act Number 13.  That's Government's Exhibit 65.

And then we have a number of overt acts that talk about the Defendant returning from Mexico to a South Florida airport, either Miami International or Fort Lauderdale International airports.  And here you have all of those records from CBP of his flight records, which is Government's Exhibit 66.

And again, we have -- overt acts don't need to be committed by the Defendant.  Could be committed by any member of the conspiracy.

Number 25, that Ramon Reyes Aranda sent Mr. Hernandez photos of the *Luca Brasi*.  And we have those chats from Government's Exhibit 7, Page 169, where there were numerous photos of the *Luca Brasi* sent from Ramon Reyes Aranda to this

Defendant.

And another overt act that we've proven beyond a reasonable doubt, that in or around October of 2020, Chupa, in Government's Exhibit's 30 and 30A, sent a message to this Defendant asking him to provide the contact information of a co-conspirator. So just a co-conspirator, not the Defendant, sending that text is an overt act in furtherance of the conspiracy.

So I submit to you that, once you factor all that evidence in, you will find that the Government has proven beyond a reasonable doubt at least one of the overt acts, and therefore we've met all four elements of Count 2, and on the Verdict Form you should check guilty as to Count 2.

Let's talk about Count 3. Count 3, again, conspiracy to traffic in motor vehicles with altered VINs, export a vehicle with a tampered identification number, and to alter VINs. The elements of Count 3 are the exact same as the elements of Count 2, except that the object of the conspiracy this time is what? It's to change the VINs and export the vehicle with a tampered identification number or traffic the vehicle with a tampered identification number.

So let's talk about elements 1 and 2. Two or more people in some way agreed to try and accomplish a shared and unlawful plan. Well, you heard there's -- Neco is getting messages about the VIN for the Toyota and asking for the

Toyota.  The Defendant is also a participant.  And then we also have, of course, Mr. Marrero Cisneros, who testified.  And we went through his texts, which was Government's Exhibit 11, that show that they are basically all working together to alter these vehicles' VIN numbers.  They are cloning them.

So again, you can clone the VIN, and now that white Toyota Tundra stops being a white Toyota Tundra if it's stopped because it's really -- the VIN was for the silver Toyota Tundra that was sold in Memphis, Tennessee and was sitting around in a garage in Mississippi.  But they have a white Toyota Tundra that they need to get rid of, and they don't want to get stopped at the border.  So they take that VIN, and they put it on the white Toyota Tundra, and then they drive it across the border of Mexico, and nobody's the wiser.  And we've got these messages:  "Where are you?  I need the things.  They are waiting to take the Toyota."  This is October 13th.

So there we have it.  We have three participants there in the plan.  Two, if you count just Marrero and Neco.  And then, of course, we have the evidence that the Defendant knowingly and willfully joined in it.  He's the one sending the VIN.  He's the one hounding Marrero:  "I need it.  They are waiting to take possession of the Toyota."

Now, let's just go to the overt acts.  "Overt Acts." Sending of text messages is sufficient.  We have these VINs being sent.  We have photos of the Toyota being sent.  And of

45

course, Mr. Hernandez is like:  "Here's the Toyota with my license," gives him the VIN number.  And then he says -- in response, they get a registration, right, from that car dealership.  Because the car dealership -- the person at the car dealership, Fanny, she's in on it too, right?  Because she's able to then take that information and generate a temporary tag.  And it's only a temporary tag.  This vehicle is never registered -- this white Toyota Tundra, I should say, is never registered permanently with anybody.  It's only temporary tags, and only for 30 days.

And what do we know that Mr. Hernandez does once he gets that temporary tag?  On October 16th through October 17th, cell sites show him driving to Mexico.  And he acknowledged that.  Even -- look, it's the Government's burden to prove this beyond reasonable doubt.  And the Defendant didn't have to testify, but the Defendant testified.  And the Defendant testified -- and you can evaluate his testimony and his credibility the same as any other witness -- but he also admitted that he drove that Toyota Tundra, that white Toyota Tundra, over to Mexico, and gave it to Neco.

He denies that it was an altered VIN.  But what do we know from the chats?  We know they are creating an altered VIN.  They're cloning the VIN from that truck in Mississippi.

So I submit to you, when you analyze all the evidence as to Count 3, the Government has established beyond a

reasonable doubt that all the elements have been met as to Count 3, and you should check guilty on the Verdict Form as to this Defendant for Count 3.

Count 4 is pretty similar, obviously, because it's the substantive act which is the object of the conspiracy in Count 3.  We have to show that the Defendant acquired or possessed the truck on which the VIN was removed, obliterated, tampered with, or altered; the identification number is required by the US Department of Transportation; such removal, obliteration, tampering or altering was done unlawfully; and the Defendant was aware of the unlawful removal, obliteration, tampering, or alteration; and the Defendant had an intent to sell or otherwise dispose of the motor vehicle or component part.

Now, here's another thing that you have to consider. It's called aiding and abetting.  "It's possible to prove the Defendant guilty of the crime even without evidence that the Defendant personally performed every act charged.  A defendant is criminally responsible for the acts of another person if the Defendant aids and abets the other person.  A defendant is responsible if the Defendant willfully directs or authorizes the acts of an agent, employee, or other associate."

So his instructions to Robertico, whatever Robertico does on that is -- pursuant to their agreement to do that is also -- the Defendant is responsible for.  Similarly, by driving that truck over, Robertico is responsible for the

Defendant's actions.

So element 1:  "The Defendant acquired or possessed a motor vehicle in which the VIN had been tampered or altered."  Again, Government's Exhibit 5, we've shown you this.  We already went through it with Counts 3.  The Defendant sends the VIN, says:  "This is for the Toyota."  He sends the VIN to Neco.  He sends the VIN to Robertico.  He's the one acquiring the VIN that they're going to use, the legitimate VIN that they're going to use to clone for that white Toyota Tundra.  So element 1 has been satisfied.

Element 2.  This is an easy one.  It's required by the US Department of Transportation.  You've had the testimony from the agents about that.  So Count 2 -- element 2 of Count 4 is satisfied.

THE COURT:  Mr. Dobbins, you have five minutes on the 40.

MR. DOBBINS:  Thank you, Your Honor.

Element 3, that:  "Such removal, obliteration, tampering with, or alteration was done unlawfully."  Well, you have the testimony of Marrero and you also have the testimony of Special Agent Francisco, who actually went and obtained the documents showing that the actual legitimate Toyota truck for that VIN number is a silver Toyota Tundra that's located in Mississippi, and belonged to a Mr. Jeter.  And he even took pictures of that for you.

Element 4: "The Defendant was aware of the unlawful removal, obliteration, tampering with, or alteration." That's shown, again, by the chats. You are allowed to evaluate those chats and infer the Defendant's intent and knowledge based on what he's saying.

And finally, 5, that the Defendant had an intent to sell or otherwise dispose of the motor vehicle. Again, we know that based on what he's talking to with -- in Government's Exhibit 6A. This is, again, with Yisel. "The man gave it to us. Been doing it for months. It's stored away in Miami. I'm just waiting for the plates to bring it back. And if we can get that truck to him, he will loosen up." Right? That's the police they're talking about there. And then you've got, of course, the cell site data that shows that he traveled there.

So of course he didn't keep it for himself. He didn't register it in his name, just the temp tag. And then after the 30 days was up, that truck just magically disappears, never to be seen again, because it's in Mexico.

Finally, let's go to Count 5, the conspiracy to commit money laundering. Only two elements here. Again: "Two or more people agree to accomplish a common and unlawful plan," and two, that the Defendant knew the plan's unlawful purpose and voluntarily joined in it. "The object of this plan was to transport, transmit, or transfer a monetary instrument and funds to a place in the United States from and through a place

outside the United States, with the intent to promote a specified unlawful activity."

That sounds really complicated, but it's really easy. Did the Defendant transport, or bring, or have somebody send him money from a place outside the US? From Mexico. And did he receive it here in the United States or did he bring the money here to the United States? And you heard that he would take the money -- he would be paid his fee in cash, and he would take it on the plane with him back. And when that didn't happen, he could either pick the money up here from a person or he would have a wire transfer.

Now, what's the specified unlawful activity? In this case, we've got a couple that are options for you. We've got the transportation of the stolen vehicles -- excuse me -- stolen vessels. We've also got the trafficking in motor vehicles with altered VINs. Is he getting money ahead of time to promote this activity? And we've also got the offense against a foreign nation, including bribery of a public official.

So Count 1, again, we know all the members of the -- we don't know all the members. We know most of the members of the conspiracy here. We've got Chupa, Gonzalez Vidal, Crespo Marquez, Niño, Neco, Ramon Reyes Aranda, Robertico, and of course the Defendant, among others.

We've got also the wire transfers from Neco's designee

to the Defendant in Government's Exhibits 5, 5A, Page 243, 244, and Government's Exhibit 97.  That's where Neco sends him a copy of the Western Union receipt.

We've also got testimony from Ramon Reyes Aranda talking about how the payments were made.  And that's corroborated by what Crespo Marquez talked about.

And we've also got the Neco texts to Gonzalez Vidal, which is Government's Exhibit 31A, Page 4, where he's talking about payments, and he includes the Defendant's name in there, give him -- I believe it was 5,000.

So I submit to you that the Government has proven beyond a reasonable doubt element 1 of Count 5.  And now we go to element 2, that the Defendant knew about the plan's unlawful purpose and voluntarily joined in it.

So what is our evidence here?  Well, we have got, again, all the WhatsApp chats with Neco, Government's Exhibit 5 and 5A.  We've got the Defendant's WhatsApp chats with Yisel, again, saying:  "We've got them eating out of our hand.  And we've got the governor, we've got the prosecutor, and soon we will have the chief of police of Merida eating out of our hands, as soon as I can get this truck over there."  Right?  And that's the bribery.

And of course, in his own words in that chat with Yisel, as, again, we've gone over and over, he even says:  "It's all about bribery here," right?  He uses the word

"bribery."  "We have to use bribery here."

We've also got the Western Union records, and we've got Ramon Reyes Aranda's testimony and Mr. Crespo Marquez's testimony.  Obviously, the Defendant's piloting the boats over there for the $10,000 fee.  He's also bringing in the additional money for Ramon, so that Ramon can continue his work in scoping out the boats, finding the boats for the Defendant to bring back.

And unfortunately for them, it all stopped -- at least that part of it did -- when the Defendant was arrested and the *Luca Brasi* was seized in November of 2019.  But it still continued afterwards.  We've got screenshots that the Defendant received payments from Gonzalez Vidal, Government's Exhibit 33.  That was in 2020.  Back during -- before the Defendant was arrested, we've got the chats with Ramon Reyes, which he testified about:  "Javi, I need you to call me to arrange for the pick up of the money that I need."

And then, of course, again, going back to that passport stamp conversation:  "Yes.  Neco will surely give you money to take to Miami."

"Well, no.  Not this time.  The money's already in Miami.  I'm not taking the money with me, so I have to ask him for more money for this passport stamp."

And so I submit to you that the Government has proven beyond a reasonable doubt both elements of Count 5, and you

should check guilty on the Verdict Form as to Count 5.

And Ladies and Gentlemen, I submit, now that you have heard my presentation, hopefully that will guide you in analyzing the evidence.  But there's even more evidence that we didn't touch upon because, of course, there was so much in this case.  But I submit to you that when you analyze all the evidence, and you give it the thoughtful attention that I know you will, you'll come to the only conclusion that the evidence supports and that the law provides for, and that is that the Defendant, Javier Hernandez, is guilty of all five counts in the Indictment, and that you should find him guilty in this case.

I thank you for your time and attention.

THE COURT:  All right.  Thank you, Mr. Dobbins.

Ladies and Gentlemen, we're going to take a 10-minute stretch break.

(Jury not present, 11:28 a.m.)

THE COURT:  All right.  We're on a 10-minute recess.

(Recess from 11:28 a.m. to 11:39 a.m.)

THE COURT:  Are both sides ready to proceed?

MR. FEIGENBAUM:  Your Honor, yes.

I would like a 15-minute warning, please.

THE COURT:  Fifteen minutes.  Yes.  Of course.

MR. FEIGENBAUM:  And the ELMO.

THE COURT:  Okay.  Whenever the jurors are ready.

COURT SECURITY OFFICER:  All rise for the jury.

(Before the Jury, 11:40 a.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated.

And on behalf of the Defendant, Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes.  Thank you.

May it please the Court.

Good morning, everybody.

The first impression I have when the Government did its closing argument -- its initial one, because the Government, because it has the burden of proof, gets to do another closing after I finish.  And so the thing that comes to mind first for me is that we had -- I think this is Day 12 of the trial.  Of course, we didn't have full days sometimes.  But I think we're talking still about maybe 80 hours or so of testimony, and documents, and things like that.  And my big worry is that trying to compress all of that information that came to you is given in such a short time that we have to go over it that we'll miss a lot of points.

But what I'm going to try to do is go over the evidence that you're going to consider in a way that can respond to the Government's summary of what it did, and what the Government will summarize after I step down.  So all I can ask you is that after I finish and they are able to come up --

a prosecutor can come up and have another 20 minutes -- that just, if you would, keep in mind how I might respond to anything that they say in their last chance to speak with you.

There's some principle called primacy and recency, I think it is, where people tend to remember what is first said and what is last said. I'm am in the middle. So if you can just do that, I'd really appreciate it.

So let me start off by -- I'm kind of going to do it in reverse order now than I had originally thought. I'm going to talk about some general things that the evidence shows -- or the lack of evidence shows in this case, and bring it to your attention initially.

So the way it shapes up, as you've heard, is that the Government has to prove each and every element of the five charges beyond and to the exclusion of reasonable doubt. They have to prove beyond a reasonable doubt. What we do in the defense is point out what are the reasonable doubts which have surfaced during this case. So let me start off here by putting up one thing on the screen.

MS. KLEPACH: Judge, I'm going to object. This isn't in evidence.

MR. FEIGENBAUM: It's just my -- as if I had a blackboard, Your Honor, writing it on --

THE COURT: All right. This is what you have written, sir?

55

MR. FEIGENBAUM:  Yes.

THE COURT:  All right.  Overruled.  I'll allow it.

MR. FEIGENBAUM:  So the Indictment alleges in Count 2 that Ramon -- originally, there was a codefendant, as you've heard during the trial -- that he and Javier Hernandez stole four boats.  That's in the copy of the Indictment or the charges that you're getting a copy of.

But let's look at the codefendant -- former codefendant, Reyes.  He came to the trial.  You may recall that he decided to plead guilty and had a thing called a debriefing the Saturday before you-all were picked as jurors.  And during his testimony, he mentioned that he had sat with the prosecution table for about three hours.  And during that time you may recall that Government caught him in a lie.  He had agreed to come to trial in a couple of days and to tell the truth.  But as he is giving information to the prosecution team, just a few days before, he's lying to them.

So the whole part about any of these witnesses who come to trial on behalf of the Government and say they're only going to tell the truth because that's the only way they can get a sentence reduction, things that they -- they're sitting there, and questions were being asked, and they're thinking: "If I don't say this, then I'm probably not going to get my sentence reduced."  And Reyes has a charge, money laundering, that he pled guilty to that has a maximum penalty of 20 years.

So the jury instructions tell you to be cautious about testimony from a person like that.

Now, another interesting thing that I'd like you to look at and consider is that, in Count 2, which is about the stolen boats and transporting them, the -- this charging document, the Superseding Indictment, is what the Government alleges. As the Judge said, it's not evidence. It's just an allegation of what Mr. Hernandez did -- has to be filled with proof beyond a reasonable doubt to have any meaning. But if you look at Count 2, which is about the stolen boats and transporting them, it does not say that Mr. Hernandez took the boats -- the first three boats -- it does not say that he transported them to Mexico.

So only -- when you look at the Indictment, you'll see it will say, for example, in December 2018, Javier Hernandez took possession of a certain boat. Then the next one was, in June of 2019, he took possession of another boat, and it gives the name of the boat. And then, in July of 2019 another boat. And then the last one, in November of 2019, another boat.

But the first three, if you look at that Superseding Indictment, of which you will have a copy, you will see that the only time the Government actually alleges that he transported the boat to Mexico was the last time. And that was the boat they say was the *Luca Brasi*, and we'll get to that.

So the next thing, as if I had a blackboard right

here -- I always go the wrong way.  All right.  Again, under the title, I put there of some of the many reasonable doubts in this case.  The second one I'm showing for you is the one about the *Luca Brasi*, was the fourth boat that, on December 9th of 2019 -- this is a -- I'm, you know, basing it on what -- the evidence that came into the trial.  It says that two FBI agents went to Mexico and took photos of a boat.  Those photos did not match up with the owner photos.

Mr. Hernandez returns to Miami on December 25, 2019. The Naples PD, which was investigating that theft, never contact him.  But being in Mexico, in jail for a number of weeks there, as the evidence showed, the Mexican authorities had all of his personal contact information and so forth.  So he's supposed to -- Mr. Hernandez is supposed to be associated with that *Luca Brasi* boat.  The Mexican authorities have all this information.  The FBI agents come December 8th and December 9th of 2019.  They take pictures of the boat.  They have his personal information as well, because the Mexican authorities had it.  And nobody contacts him when he returns about whether they should ask him about that boat that was in Mexico.

So then 2.4 years later is the first time that Mr. Hernandez is contacted by anybody in law enforcement to ask about that boat and other things.  That was the voluntary interview he gave to the two agents that went to his residence

late at night, around maybe 10 p.m., on April 18, 2022. He sat with them. They gave him Miranda Rights. He did not request an attorney. He related what they were asking.

And I know one of the issues here is that they say: "Well, Mr. Hernandez said he knew these people. He knew what they were doing," and so forth. But the jury instructions tell you that just knowing somebody, even associating with them, or having some kind of a connection to other people, is not evidence beyond a reasonable doubt of committing a crime. So you can know people who are doing this. You can hear about what they do from others. That does not make you a participant in their illegal activities.

So now here's another thing that was very interesting about this fourth boat -- the only one charged in the Indictment with an allegation that he transported it -- is that there was no evidence the boat was ever returned to the owner. Special Agent Spielvogel I believe was asked that, and he said he didn't know what happened to it -- or it could have been Special Agent Francisco. But they don't know that. But you know why? Because it also came out in this case that the -- this particular boat is still listed as being stolen.

And you heard some testimony from Former Palm Beach Sheriff Detective Daniel Riemer, who we called. And what that means is, to this day, the *Luca Brasi* is still considered a stolen boat. And what Mr. Riemer said was that once a boat is

found or recovered that it comes out of the database of the Florida Department of Law Enforcement and it's not there anymore.

Conclusion?  This is not even a reasonable doubt.  The conclusion is that that boat, of which there were pictures and so forth, is not the *Luca Brasi*.  Because the *Luca Brasi*, to this day, is still reported stolen.  And then it makes sense why the owner -- there was no evidence he got it back so far.

All right.  The next thing I wanted to point out was the Government wants you to find Mr. Hernandez guilty relying basically on three convicted felon witnesses who are serving or facing long prison sentences.  They have the greatest of all motives to lie.

Crespo Marquez, you may recall.  He, I believe, was their first witness of this type.  And he was one of the Gonzalez Vidal -- remember, that's a different case.  He was one of the Gonzalez Vidal defendants who pled guilty.  He also was the guy who had a case in 2008, right here in Miami in federal court, with Judge Moore for alien smuggling, and he was on bond.  He promised to appear.  He kept appearing until, of course, his sentence was going to be imposed, and he fled the United States.  And 11 years later -- 11 years later, he is arrested and brought to Miami to face that 2008 case, plus the case of Gonzalez Vidal.

He stated that he was looking at approximately 37

years, or something like that, of time.  At one point before he pled guilty, he could have been looking at life imprisonment.  So he decided to make a deal with the Government, come to court and testify against Mr. Hernandez, and hoping that down the road he will still have some life left after he gets out of prison.

This guy -- Crespo Marquez also is the guy who personally tortured migrants in the Gonzalez Vidal case.  You heard from two witnesses the Government brought.  I think they were the first two witnesses, two young men, who came smuggled in by the Gonzalez Vidal group from Cuba.  And one of them couldn't pay the fee, so he was tortured by Crespo Marquez.  Crespo Marquez testified that, to migrants, they would strip them down, beat them.  And this particular migrant who came to court and testified said they hit him with a wooden board until he bled.  This is the guy who is going to prove beyond a reasonable doubt that Javier Hernandez was involved with them, and he stole boats for them, and he did all these things.

Then we have Roberto Marrero Cisneros.  He's the guy who makes the false VIN numbers and I guess can do paperwork and stuff.  Well, he's a guy who pled guilty in May of this year to a federal case for exporting stolen engines, boat engines, to the tune of $11 million.  And he also has a case pending in Tampa, Florida that we don't really know what it's about, but facing additional time.  And his record -- that's

the witness you may recall that I presented a list of his convictions, and they were numerous.  I had down 19.  He had trouble recognizing that many.  But the jury instruction about taking with caution the testimony of a convicted felon -- think about that times X number of cases.  I mean, it's a lot.  So I would ask you to take that into consideration.

Now, the last one, Mr. Reyes, he came in and he said a number of things.  What was interesting, though, he didn't -- the first time that he met up with Mr. Hernandez, that was because I believe the people in Mexico told Reyes that they had found somebody who could captain boats.  It was through Gonzalez Vidal, whose family member was a friend of family members of Mr. Hernandez in Cuba.  So when Mr. Hernandez got the call, if he was going to be interested in taking a boat from Florida to Mexico, he checked it out, he wanted to know who this person was, and he agreed to do it.

And the conversation, according to Mr. Reyes, was they traveled.  He went and picked him up in Miami and they went to the west coast of Florida, and they just talked about personal things.  Mr. Reyes never said that Mr. Hernandez and he talked about any boats being stolen.

All right.  So next I wanted to point out that -- as to additional reasonable doubts about this -- you will look at the evidence.  You'll take that in consideration of the jury instructions.  And the jury instruction for reasonable doubt

is -- I want to point out a couple of them now to you.  The prosecutor showed you -- well, he didn't actually show you the exact instruction on a reasonable doubt.  He showed you part of it on the screen.  I'm going to show you the next part, which -- it will be in your instructions.  So you're going to see it.

But the -- but the full version of the reasonable doubt instruction says -- he showed you the first part, where it says it doesn't have to be guilt beyond all possible doubt. It just has to be proof to exclude any reasonable doubt. But -- and he may have said also or shown that the reasonable doubt is a real doubt based on your reason and common sense after you've carefully and impartially considered all the evidence in the case.

But the next part -- the next part of that instruction says:  "Proof beyond a reasonable doubt is proof so convincing that you would be willing -- you would be willing to rely and act on it without hesitation in the most important of your own affairs".  That's a very important principle, in addition to the part that the Government emphasized, because this instruction tells you that something that would be the most important affairs in your life -- and each one of us has different ones -- that you would act on it without hesitation.

So if any of these things that I bring before you in my last opportunity, and my only opportunity, to speak with you

directly -- if what they're saying, what they went over really quickly, showing some chats and making general statements, would incline you to find him guilty of these five charges without hesitation, as being one of the most important affairs in your life, I say -- I say the Government has not met that burden.

Let's keep on going.  You're going to see that, in this case, the Indictment or the charging document has -- four out of the five are conspiracy charges.  Now, conspiracy charges mean that you have to be part of an agreement to -- with one or more persons to violate the law.  But what's important about a conspiracy charge is -- let's see if I can find it from the jury instructions.  There's an important part. And I do believe the Judge would have gone over it when she read you all of the instructions.  So let's see if I get it here.

Well, actually, I know it by heart because I've been to this rodeo before.  What you're going to see in it is that merely being present at the scene of a crime, or associating with people, or even knowing what they're doing, does not make you a conspirator, because to be a conspirator you have to knowingly and voluntarily join in the commission of the crime. You can't -- if you go to a place, and you see that there may be criminal activity there, if you know people who are doing criminal activity, that does not make you a criminal

64

conspirator.  Because if that were true, then so many individuals who become aware of others -- could be neighbors or family -- they become aware of criminal activity going on, or they hear about criminal activity going on, and they -- they are not participating in the criminal activity.

So that's very important because of what the FBI agents have said, is that, well, he knew that these other people were doing this stuff.  That's not really the standard that you'll be using to decide guilt or innocence in this case.  Because the standard is whether he joined in or participated, not whether he knew others were doing it or learned about it later when the two FBI agents came to see him on April 18th, 2022, long after these events had occurred.  On the street with others, you can learn about what was going on and what others were doing, but that does not make you a criminal participant in that.  And that's really what we have here in these conspiracy charges, is that he knew about stuff.  And even if he knew about it, at the time that he did other things, that does not make him a co-conspirator and a person who is violating the law.

Mr. Hernandez mentioned one thing in his testimony that I recall now, that you can know people -- let's take, for example, the marina owner, a wealthy man in Progreso, the port and Merida, the nearby city -- you can know somebody like that, who's a businessman, with a marina, with some -- I believe a

tortilla factory, and some bars and taverns that his family has.  That person could be involved in some criminal activity.  But if your relationship with him, and what you're doing for him is not criminal activity, then you're not guilty of any crimes that that person may be committing with others.

And so I fear that the way the evidence has been presented is like everything Neco had to do had to be criminal, that Neco could not want boats for his marina to sell, remodel, rent out, or anything, unless it was criminal.  And unless the evidence shows that everything that Neco did with boats was a criminal activity, then what would be the next step the Government would have to prove would be that the boats that he took for Neco were used -- and he would know it -- first, he would have to know they are stolen.  Second, he would have to -- well, they say he participated in the theft or he knew they were stolen.  And next, then those particular boats were used by the Gonzalez Vidal people to smuggle people out of Cuba, or to resell them and generate money, so Gonzalez Vidal people could smuggle people out of Cuba.

We don't have that here in this case.  The Government just simply throws out a big net and says:  "The Gonzalez Vidal people, they had a human smuggling operation with Cuba to Mexico.  Neco was involved with them.  He brought boats there."  But where is the evidence that any of the boats that Mr. Hernandez took to the marina for Neco then were used for

some illegal purpose, generating funds for the criminal organization, or then used to go to Cuba and bring people?

Remember, they had Crespo Marquez here. They could have said: "Were any of the boats that he allegedly brought to Mexico -- were they actually used to go pick up people in Cuba and bring them to Mexico?" I don't believe we have that. I think Crespo Marquez may have made a general statement that boats that were brought to Mexico were used to -- I think some of them were kept by those members or some may have been resold. But how is any one particular boat identified as evidence that was used as part of the criminal organization for any purpose, and whether there's evidence that Mr. Hernandez knew that particular boat was, A, stolen, and then, B, used for criminal activity? We don't have that. We have just like a general: "He took a boat. Some of the people identified were bad. He has to be a participant in the conspiracy."

Judge, how much time do I have left?

THE COURT: I was going to give you a warning at 12:25.

MR. FEIGENBAUM: Okay. And then I would have 15 minutes after that?

THE COURT: That's correct.

MR. FEIGENBAUM: Thank you.

Okay. So these other charges, the thing about the motor vehicles, I think is very interesting. Because another

thing in this case -- and again, it's so many days and such a long period of time.  But there was testimony from several witnesses that that Toyota Tundra was never reported stolen.

Now, I know when the prosecutor gets back up, whoever -- which of the two it is -- they're going to say: "Well, the charges in Counts 3 and 4 for trafficking in motor vehicles doesn't relate to stolen vehicles.  It's whether it has an altered VIN number or the VIN number was tampered with."  And at the same time, several witnesses said that there's no reason to clone or make a duplicate VIN number, unless the vehicle is stolen.

So let's think about that a second.  Before, we just were shown the elements of the crimes for Counts 3 and 4, and that there's some messages appearing on Mr. Hernandez's phone about VIN numbers and so forth.  If the witnesses said that the reason to get a cloned VIN number is to be able to hide the fact that a vehicle is stolen, then that would be the reason.  And we know from the testimony of Mr. Riemer -- and it may have been one of the Government witnesses as well.  They said there was no evidence that the Tundra with that VIN number in Mississippi was stolen.

And then, you would say:  "Well" -- and I think they would say -- they did during the trial.  They'd say:  "Well, it doesn't matter because the Tundra that Mr. Hernandez registered in his own name, that was stolen."

I mean, that would be the only reason the witnesses say why people want a cloned number.  Where is the evidence that another Tundra 2018, or any Tundra that would, you know, be in some kind of database was stolen?  And so because the Government didn't give you any evidence -- I'm sure law enforcement can find out how many 2018 Tundras were reported stolen around that time, which would be around, you know, September/October of 2019.  But they didn't.  They didn't.

So the original Tundra was not stolen.  The vehicle, he registered in his own name.  And by the way, there's no evidence that he put himself a new VIN number on there.  Marrero testified that he was the one who did that.  And so the thing is, if it's not a stolen vehicle, then there was no reason to put the duplicate VIN number on that.

And by the way, Mr. Hernandez testified that the Tundra was purchased by Neco.  Somebody -- you know, Neco knows a lot of people in Florida.  It was brought to his residence.  And then it was taken to -- for some remodeling and renovations.  And then Mr. Hernandez wanted to register it in his own name with a dealer -- well, it still goes into some kind of a database.  And he would know that -- if there was something wrong with that number, by leaving his own paper trail on purpose by driving it to Texas and then across the border, exposing himself to a potential charge for something if there's anything wrong going on.  So I would appreciate if you

could consider that.

All right.  Another thing I thought about when I went over the mountain of evidence that was presented at trial, there was information about cell phone locations.  I think the way you deal with that was, when your cell phone is being picked up by a cell phone tower -- let's say you're right at the location.  You're at a dock, or a marina, or somebody's house.  And you -- as you're parking your car or you're arriving because you're going to be the person driving the boat, and you make a call, and boom, you know, it's going to show up in the T-Mobile records, for example, that you were right at this location and the boat later is reported stolen.

The fact that you were there, and you were hired to drive that boat away, and you were given the Florida registration, which Mr. Hernandez testified is a requirement, and Mr. Riemer and maybe others testified was a requirement -- the fact that your cell phone showed as being used right at that location, if you didn't steal that boat, and you didn't know that boat was stolen, the fact that your cell phone is located right there is no proof, no proof at all, let alone beyond a reasonable doubt, that you stole that boat.

If a neighbor asks someone to drive a car to help out because the son was going away to college, and they needed to take his car, along with another car with all the students' belongings, and you got in that car, and you drove, and when

you got to North Carolina, and you were stopped, and it turned out that car was stolen, you didn't agree to drive that car. You weren't driving that car knowing it was stolen, but it was. So the question then becomes:  What's the Government's proof beyond a reasonable doubt that you, without hesitation, in the most important affairs of your life, can find that he stole boats?

Reyes?  The guy who lied just a couple of days before he came here and swore to tell the truth?  The guy also, you may recall, who stole by himself a boat brand called Cobia and used it for two and a half years.  But then Agent Francisco, to his credit, confronted the witness they were going to use and said:  "What you're telling us is not true."  And of course, Aranda, at that point, tried to get out of it.

But think of the circumstances under which Aranda Reyes made that statement.  He's sitting with a whole group of people who are running this trial on behalf of the Government, and he's telling them to their face, a couple of days before he's expected to take that stand and tell the truth, and he's telling them a lie.  What kind of certainty without hesitation, what kind of important affair in your life would you rely on what Reyes Aranda was telling you?

Knowing what he's like, if he were to tell somebody to:  "Drive this car, don't worry about -- there's no cliff on the other side," knowing what he's like, what he did, what he

did just days ago, would not be the type of reasonable doubt without hesitation that should be accepted by you as jurors.

All right.  Now, other things the Government uses in this trial to try and find Mr. Hernandez guilty beyond a reasonable doubt for the theft of boats, for being involved with their use later on was never shown.

Weather maps.  Leaving Florida without reports to the Customs and Border Protection, that was part of what they presented.  First of all, the weather maps, that was cleared up pretty quick.  Because everybody -- you don't even need an expert to tell you.  But when you go out on the ocean, especially on a longer journey, you want to check out the weather.

But the one about leaving without reporting to the Customs and Border Protection, well, the first kind of non-criminal witness that the Government brought was a Coast Guard gentleman named Evan Sanborn.  I think he was qualified as an expert in some areas.  And he may have made that statement when he testified.  But later on we had Stephen Farlow, who's with Customs and Border Protection, and Mr. Farlow definitely said that wasn't true.

Let's see.  I'll get to that.  I have a big binder of a lot of stuff.  There we go.

So Stephen Farlow.  He stated that he was with US Customs and Border Protection for 21 years.  And he mentioned

72

his responsibility. He was showing the departures and arrivals information for Mr. Hernandez. And he said that private vessels usually proceed outbound -- private vessels usually proceed outbound without inspection or reporting. He didn't exactly know the answer, other than it's not part of CBP, Customs and Border Protection requirements.

Then I asked him: "To be clear, it's not part of CBP requirements to have an individual notify the agency that they are leaving the country?" He said: "Correct."

So the Government, at the beginning of the case, painted Mr. Hernandez's activity as being illegal because he left the United States without reporting to Customs and Border Protection, and they had one witness who said that he had to. But the specialist for 21 years, who actually works for Customs and Border Protection, came here and said: "You're right. You don't have to -- under those circumstances, with a pleasure craft, have to make any reporting requirements when you leave."

But they wanted to leave the impression with you that all these circumstances, checking the weather maps, leaving without making a CBP notification of some kind, which is not required, and leaving at night -- as you can see, I put that down too. But we learned from Mr. Hernandez -- and you can believe whatever you want to believe about Mr. Hernandez. But he faced a really seasoned prosecutor, who asked him tough questions. And you have to evaluate whether he was able to

73

respond in a way that makes you feel comfortable.  He testified that the really rough part of that journey from Southwest Florida to the Yucatan Peninsula is when you get to a certain part in the water that has some bad currents.  And he wanted to be in that part for navigation during the day, and that's why a night departure was chosen.

But again, the impression by the Government is that's because he has to hide when he's leaving and hide that he's not making any report to CBP, which was not required.  Okay -- oh. Took that off too quick.

Extortion versus bribery.  Now, there were a number of people I asked if they knew who Police Chief -- the top guy in the police in the State of Yucatan, which is very big, if you look at the map -- if they knew about him.  One of the Mexican police officers said yes, he did, he's the top guy.  And then I asked Crespo Marquez about that.  And I don't know if I can find that real quick, but -- anyway.  Crespo Marquez said: "People are afraid of him."  I don't know if you remember that, that Crespo Marquez said:  "Yeah.  People are afraid of him."

And then we talk about Professor Rosenn, a very nice -- a -- very great academic credentials.  Professor Rosenn from the University of Miami Law School came here, and he gave you -- I asked him questions about the difference between bribery and extortion.  And he identified two portions of the Yucatan State Criminal Code, which is one of our exhibits, and

you can look at it. There's -- it's a certified translation from Spanish to English. And what he said basically, Professor Rosenn, was that if a businessman is being told: "You need to pay me something," a government official, like Police Chief Saiden -- "You need to give me something or you personally might have some safety problems or your business might have a lot of problems," okay, in that circumstance, Professor Rosenn said that the crime is being committed by the public official, not the other way around.

And so you can take a look at those certified translations. And under the circumstances of this case, under the testimony in this case of Mr. Hernandez, that described what was going on with the police chief and Neco, this was a case of extortion regarding that Toyota Tundra -- extortion regarding the Toyota Tundra.

And I don't see anything else -- maybe I'm wrong. Maybe the Government prosecutor will correct me when she gets up -- but I don't recall seeing that there was anything else, not just that general statement: "Well, you know, the Gonzalez Vidal organization used bribes of different types, like vehicles, to bribe officials, so they would help them in their criminal organization," or even bribery in this case. The Tundra, again, being something that was destined for Saiden, so he would leave them alone, because he was a man to be afraid of, as Reynaldo Crespo Marquez said.

THE COURT:  Fifteen-minute warning.

MR. FEIGENBAUM:  Fifteen-minute warning?

THE COURT:  Yes.

MR. FEIGENBAUM:  Thank you, Judge.

So the -- I asked Special Agent Francisco whether he knew who Police Chief Saiden was, and he said yes.  I think he said that he actually had met him one time.  But I asked the agent whether he had looked into Saiden's background, and he said no.  So that would have been a key piece of evidence for the Government to put into its computer to find out whether there was a really solid basis to allege bribery against Javier Hernandez, as part of the way the Government was trying to prove the case.  Looking into Police Chief Saiden would have revealed that he was to be feared, that he extorted people, and the view of what happened with that Tundra would have been different.  And furthermore, there was no evidence that Mr. Hernandez ever had met with Saiden, ever gave it to him.  But the main thing is what I was just bringing up.  So please take that into consideration.

Oh, and by the way, just again, the Government, in its closing, was saying:  "So now Javier Hernandez was involved in getting vehicles and taking them to Mexico, so that officials could be bribed to help the criminal activity."  Is there any evidence -- again, maybe I missed it -- but is there any evidence of any other stolen vehicles -- of any stolen

vehicles?  Because the Tundra was not reported stolen.  There was no evidence that what he drove there, another 2018 Tundra, was stolen, and any other vehicles.  Some of the witnesses talked about other vehicles, but where are the -- where's the evidence, I mean, something to back up that general allegation?

All right.  Criminal and non-criminal conduct.  As to all counts, the Government alleges that Javier Hernandez dealt with people who committed crimes, and therefore anything Javier Hernandez did was criminal.  And as I mentioned before, as Javier Hernandez testified, individuals can engage in both criminal and non-criminal conduct.  Obtaining boats does not mean every boat acquired was the product of crime or will be used for crime.

The Government, as far as I recall, did not produce any specific evidence beyond a reasonable doubt, especially that any of the four boats that JH, Javier Hernandez -- that he stole it, or knew it was stolen, or was to be used for a criminal purpose.  That's important, because, again, if somebody has a business -- let's say there's a -- let's say there's a Medicare clinic, for example, and they have patients come in, and they provide services or equipment to a Medicare patient, and everything is fine, but then that clinic does other activities with other people that is Medicare fraud.  They don't provide the services, or they don't give the equipment, or they overbill or things like that.

So a business, like Neco's marina, can have legitimate components to the business. And if Neco was involved in criminal activity, there's no -- there's no reason to find Mr. Hernandez guilty for bringing boats for Neco and getting paid a fee that he said was reasonable -- Mr. Hernandez -- for that dangerous trip, and say automatically, without something else, that those particular boats were used in the promotion of criminal activity. And that's what's missing. And that's what should cause you as jurors to give pause before you make that unbelievable decision about Mr. Hernandez's fate.

This was just the second page I was putting on that, I kind of have gone over already. There's no evidence that Neco only acquired boats exclusively for criminal purposes. Same for others who talked about that issue during the trial. If Crespo Marquez, the guy who tortured people till they bled, said different, his believability is zero, as he faces what is the equivalent of a life sentence in the Gonzalez Vidal case. Plus the 151 months that he's already been sentenced to once he was brought back on the 2008 case, he's looking at another 25 years for the Gonzalez Vidal case.

Same for the other Government witnesses. Like, Ramon Reyes faces up to 20 years for his money laundering guilty plea, just a little -- on September 26th, the first day of the trial, he pled guilty and he faces up to 20 years. He testified to that in his testimony in this case.

And again, Marrero was recently sentenced to five years in May in another federal court in this building, and still has a case pending in Tampa.

Judge, what do I have, about five minutes left?

THE COURT:  You have until 11:40 [sic].

MR. FEIGENBAUM:  Okay.  Thank you.

All right.  So let's talk about that interview which Mr. Dobbins mentioned -- I believe he did.  If not, it was -- in his closing, if not many times during the trial.  On April 18th, 2022, Mr. Hernandez agreed to a voluntary interview with FBI agents who had shown up at his residence.  His -- Mr. Hernandez's wife and child were there.  His wife reached out to -- this is all the testimony of Agent Spielvogel -- reached out to Mr. Hernandez, who was driving for Amazon at that time.  And Mr. Hernandez says he would be late, but he would be glad to meet with them.  So the interview happened at about 10 p.m. on a patio outside that apartment building.

I put:  "Caution.  Interview not recorded."  The prosecutor kept asking Mr. Hernandez:  "Didn't you tell Agent Spielvogel that you did this and you did that, and you knew about this and you knew about that?"  Well, first of all, if Mr. Hernandez told Agent Spielvogel that he knew about things, he could have known about things, according to the law that you will apply in this case, but he didn't participate in those activities.  But he knew about them, and so therefore he's not

guilty of those charges.

Again, you'll see it in the jury instructions.  Merely associating with people, knowing what they do, even if they're committing crimes, as long as you don't voluntarily agree to join in and participate with them, you are not guilty of those crimes because that would be guilt by association and not guilt by participation.

Okay.  Here's what I brought up, all these pages.  This is just a reduction of pages of testimony that I was actually going to go over, but I saw that was not a feasible task.

So I do -- I've lived with this case for quite a while.  I was appointed when Mr. Hernandez was still a target in May of 2022.  So I've learned a lot.  And I have had an opportunity to try and understand the mountain of evidence and see not -- see not just a mountain of evidence, but see what that mountain of evidence really means in terms of finding somebody guilty of a crime.

So I think I'm about -- just about done.  I'm going to go see one last thing.

Oh.  Special Agent Francisco testified for quite a long time.  I think it was about six hours over two days, if I'm not mistaken.  And there came a point in time where -- another thing about Mr. Ramon Reyes Aranda.  It came out in the agent's testimony that the cousin of Mr. Aranda, who lives in

the area of Cancun, Mexico, to this day, who Mr. Reyes Ramon said worked for a newspaper -- Agent Francisco found out that that individual has several warrants outstanding for stolen property.  And to his credit, Agent Francisco brought that out in his testimony.  So there's another thing about former codefendant Ramon Reyes that should cause pretty big hesitation.

Anyway, I thank you for your attention.  It's a tough job you have, going through all of the hours in which people testified and documents were presented.  But I want to leave you with one last thought.  Sometimes there's a highlight in case, in a trial.  And one of the highlights was -- I'm so foggy about all these days, because they were pretty long and then there's things to look at for the next day.  But when I did the redirect examination of Mr. Hernandez, what I did was I asked the Government to put up the hull number, which is like -- for a vessel, which is like a VIN number.

Because what the Government was trying to get at with Mr. Hernandez was -- they showed a chat, I think it was from like October of 2019, about an Everglades boat, which is I believe the third boat that you'll see -- third out of four boat you'll see in the Superseding Indictment.  And let's see right here -- yeah.

Okay.  So this is the charging document, or the Superseding Indictment that you'll have back in the

deliberation room.  So the Government was showing Mr. Hernandez a chat, I believe, from -- I believe it could be September, but it was definitely --

MS. KLEPACH:  Judge, I'm going to object to the display of the Indictment with counsel's notes on them.

THE COURT:  Yes.  In terms of the notes, perhaps we can use a clean Indictment.

MR. FEIGENBAUM:  All right.  Well, I have highlighting on another copy of it.

MS. KLEPACH:  I have a blank copy.

MR. FEIGENBAUM:  Okay.  Great.  Thanks.

So there came a point in time where the Government -- the prosecutor, showed some chats to Mr. Hernandez about an Everglades brand boat.  So there's an Everglades as the third boat charged, that Mr. Hernandez and Reyes stole that boat around July 17th, 2019; in other words, a couple of months before that chat about an Everglades.

And in that chat -- I don't know whether it was Neco or -- yeah.  It must have been Neco providing a hull number, a HIN -- a VIN for vehicles, HIN for vessels -- a HIN number. And we looked at it, and I wrote it down.  And I asked Mr. Hernandez:  "Would you compare the HIN number that was in your chat a couple of months later after this Everglades was reported stolen and see if it's the same HIN number that's in the Superseding Indictment as the third boat you're charged

with stealing?"  And they didn't match.  They didn't match.

So --

THE COURT:  That's time, Mr. Hernandez --
Mr. Feigenbaum.  That's time with regard to Mr. Hernandez.

MR. FEIGENBAUM:  So just the last couple of sentences
is:  There's plenty of cause, there's plenty of hesitation,
which would be fair to find Mr. Hernandez not guilty.

THE COURT:  Thank you, Mr. Feigenbaum.

On behalf of the Government?

MS. KLEPACH:  Judge, could we have a brief restroom
break?

THE COURT:  Certainly.

Let's go ahead and take a short recess.

COURT SECURITY OFFICER:  All rise.

(Jury not present, 12:42 p.m.)

THE COURT:  Okay.  We're on a short recess.

MS. KLEPACH:  Thank you.

(Recess from 12:43 p.m. to 12:50 p.m.)

THE COURT:  Let's see if they're ready to come in.

COURT SECURITY OFFICER:  Please remain standing for
the jury.

MS. KLEPACH:  Judge, can I walk up to set up the
laptop.

THE COURT:  Of course.

(Before the Jury, 12:51 p.m.)

THE COURT:  We're missing a juror.

COURT SECURITY OFFICER:  Are we missing one?

(Pause in proceedings.)

(Before the Jury, 12:53 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated.

And we'll continue with the closing arguments.

On behalf of the Government.

MS. KLEPACH:  Thank you, Your Honor.

Sometimes there isn't more than what meets the eye. Sometimes it really is as simple as it looks.  Sometimes, when we say the word "bribery," we mean bribery.  And when we send fake vehicle and hull identification numbers back and forth to a person whose career it was to create fake documents for boats and cars, sometimes that's really what we're doing.

The themes of the defense in this case are several, and that's how I plan to go through what we've talked about during this trial and this morning.  And I think I will start with what is probably the most important theme, which is the credibility of the witnesses that you have heard from during this trial.

And as my co-counsel told you, the Defense, in this case, and in every case, has absolutely no burden of proof whatsoever.  And the Defendant had the absolute constitutional

right not to testify.  But he did.  And there's going to be a lot to unpack about his testimony and his version of what those messages say and mean.  But your job as jurors is to assess his credibility the same way you would that of any other witness.  And that means that you get to consider what outcome -- what stake he has in the outcome of this case.  And Ladies and Gentlemen, there is nobody, no witness, no person on this planet that has a greater stake in the outcome of this case than the Defendant.  Rightfully so.  But ask yourselves:  If any of the Government's witnesses had testified the way that the Defendant did, what would you do with their testimony?  You would take it like a piece of paper, crumble it up, and throw it in the trash.

But before we get there, let's talk about the Defense's other key witness, Mr. Riemer.  Mr. Riemer, who was qualified as an expert in every category from here to kingdom come, from investigations to marine issues, he was qualified as an expert in interrogation techniques.  The list goes on and on and on.  But Mr. Riemer came here before you and testified that the nature of the Government's investigation was not thorough; that the police didn't do the follow-up that they were supposed to do in canvassing for video surveillance; and that the cell site data, the data that places Javier Hernandez in Naples and Marco Island in and around the time that those boats were stolen, was wrong.  He came here and he told you, no, the data

doesn't show that he was at the places that they say he was at.

The irony of the expert in thorough investigations coming before you and saying that the Government investigation wasn't thorough, when he didn't even look at the raw cell site data, cannot be overstated.  And you know, at the end of the day, the Defendant himself admits that he was in those places at those times when Ramon Reyes Aranda told you he stole all four of these boats.  But where this really becomes more important, and where his credibility as a witness becomes even more important, is when he talked about the *Luca Brasi*.  Because the Defense would have you believe that the *Luca Brasi,* the green boat that was found in Mexico, is some other boat.  They would have you believe that, despite the fact that there were photographs of the *Luca Brasi* found on Javier Hernandez's cell phone, that on or around November 18th and 19th of 2019 Javier Hernandez took some other boat.

And they rely in no small part on the testimony of Mr. Riemer, who came here and said to you:  "Ladies and Gentlemen, that number, that 6CB number right there, that's not the same serial number of the engine that the boat owner reported as being the one that was stolen."

Then when my counsel cross-examined him, he admitted:  "Actually, I have no idea what the number is."  The expert in marine issues told you on one day that's the serial number of an engine, and on another day told you:  "Actually, I have no

idea what that is."

He also told you that the boat was not the same stolen boat.  It's not the *Luca Brasi* because it's not in FCIC and because it's still reported as stolen.  But then, when cross-examined, he admits:  "Well, actually, the Mexican police don't have access to FCIC and the Naples police wouldn't have been able to take the boat out of FCIC if they didn't see it for themselves."

So with respect to the credibility of Mr. Riemer, the witness that came here and told you:  "No.  This green boat that they found, that's not the *Luca Brasi*," his testimony completely falls apart when you think about the way that he testified and the inconsistencies within his testimony.

But now I want to talk about the Defendant's testimony.  Because there are two versions here, right?  There's the Government's version, the version that's supported by all the evidence in this case.  And then there's the Defendant's version, which is not supported by any evidence.

And let me tell you, Ladies and Gentlemen, if you are going to believe the version that the Defendant told you in this courtroom over the last two days, let me tell you, the Defendant must be the unluckiest man in the entire world.  Because what are the chances that Aaron Spielvogel, a dedicated public servant for his entire career, who served in the Marines and has served in law enforcement since that time, but also

Ramon Reyes Aranda, Roberto Marrero, Reynaldo Crespo Marquez, those three or four Mexican police officers, and all of those other people just got together and decided:  "Hey, let's all testify about things that are not true."  Why?  To stick it to Javier Hernandez, the person who the Defense would have you believe just knows these people from the neighborhood and wasn't actually in business with them?  What are the chances that all of those people got together and decided:  "Hey, let's come up with this really great story that he is the one that stole the boats"?  Because in order for you to credit the Defendant's version of what those messages mean and what he did, that's what you would have to believe.

In order for you to believe the Defendant's version of what happened here, you would have to think -- you would have to believe that Aaron Spielvogel was lying.  And at multiple points during cross-examination yesterday, he said:  "That was not true.  That was a lie.  I never told them that.  I never told them this.  Oh, but guess what?  The part where I told him I didn't take that boat, he was telling the truth about that."  How convenient.  "He was telling the truth about the one boat that I deny taking, but lying about all the boats that I admitted to taking"; flies in the face of common sense and reason.

Just because we've walked into federal court doesn't mean you get to check your common sense at the door.  Ask

yourselves if somebody, a friend, someone in the street told you the story that the Defendant told you yesterday, would you believe them? Absolutely not.

But let's talk about what the Defendant told the FBI and what he didn't. What he told the FBI was: "I took those boats and the boat owners were engaged in insurance fraud and they were in on it." There has been no evidence at all in this trial that anybody was engaged in insurance fraud. There has been no claim and there was no testimony regarding the fact that the boat owners were in on it.

What didn't he tell the FBI? "The Mexican law enforcement beat me up," that, "I was extorted by the chief of police in Yucatan" -- or actually, that Neco was extorted by the chief of police in Yucatan, that Reynaldo Crespo Marquez was beat up with a hood over his head, or that: "The Mexican police Tased me in the testicles to get me to do what they wanted me to do."

Ladies and Gentlemen, think -- one of the things in the jury instructions that we've already gone over is how to assess the credibility of a witness, and what that means in terms of their demeanor and the way that they testify in front of you. There are people who came before you on the first day of this trial who were tortured, who were beat as part of this criminal organization that that man is a part of. Think about the difference between Jose Carlos Martinez Alfonso, who was

crying when talking about being beat with a paddle, despite the fact that it happened several years ago, and think about the way the Defendant told you about being electrocuted in the testicles.  Is that somebody who you believe?  Not only because of that, but because of all the messages and calls, and independent evidence that prove to you that what he said was not true.

On the other hand, the cooperators in this case, the people who I told you at the beginning of this trial are not good people, are corroborated.  What are the chances that Ramon Reyes Aranda is making up this story about stealing boats with Javier Hernandez and that everything he told you is corroborated by what's not in his cell phone, but in Javier Hernandez's cell phone?  Who would have been the wiser?  How would he have known that this story, the truth about what he did with Javier Hernandez, was going to be corroborated by the evidence in his phone?

Javier Hernandez also said to you that Ramon was lying when he admitted to taking those boats and engaging in that criminal activity.  So what?  Now we're to believe Javier Hernandez about what crimes Ramon Reyes committed?  Because that's what you would have to believe, right?  He said:  "No. When he said he stole those boats with me, that was a lie." What reason does Ramon Reyes have to say:  "Yeah.  I'm guilty. I'm guilty and I stole those boats with Javier Hernandez," but

for the fact that it's true?

I also want to talk about the keys for a second, because one thing that went unmentioned in the Defense's closing argument is the fact that Javier Hernandez told you that the keys 821 and 827 that were needed to pilot the stolen boats were keys that Javier picked up for Ramon's cousin. Does that make sense? Does that make sense, that Ramon is going to ask Javier in Miami to go pick up some Yamaha keys for his cousin, so that what, his cousin can then go and drive this legitimate boat that Javier has no idea was stolen.

Consider that. And consider the text messages and the testimony of Ramon, where he says: "Yeah. That's the scheme. The scheme is he would go and get the key series of the boats that we needed in order to steal them."

Crespo Marquez. Again, not a good person, but what he told you is corroborated by other evidence. It's corroborated by Hernandez's own words. It's corroborated by Reyes's testimony and by the text messages.

Same thing with Marrero. Everything he told you is corroborated by the text messages, the sending of VINs back and forth, the discussions about the Toyota.

The next theme is that Hernandez only knows them and that he wasn't involved. Ladies and Gentlemen, you don't get to be the person that drives the Toyota from Miami to Mexico and only know them. There is no evidence -- the Defendant

claims that there's no evidence that the boats were used to bring aliens or that the boats were used for any other sort of criminal activity. But guess what? We don't have to prove the boats were stolen -- excuse me. We don't have to prove that the boats were used to bring aliens and we don't have to prove that the car was stolen.

The Defense also wants you to believe that not all of Neco's activities are illegal, and so Javier Hernandez can be in bed with Neco, but not be involved in the criminal activity. Well, Javier Hernandez's version is that Neco is involved in some boat parts business, and that's the only thing that he ever spoke to Neco about. But remember when I asked him: "Is it your testimony that you never spoke to Neco about stealing boats or about boats in general, and all you were in with him was the boat parts? He said: "Yes." And then guess what? He sees the text messages where he's sharing the boat identification numbers with Neco, and that story fell apart very quickly.

THE COURT: Five-minute warning.

MS. KLEPACH: Thank you.

He also wants you to believe that he only knows them. Ladies and Gentlemen, would you -- is it reasonable to believe that you are going to go to Mexico with only somebody that you know, not that you're in business with, watch that person get arrested and beat up, have your passport seized by the Mexican

police, and then a year later, despite that, despite not reporting it to the FBI or the State Department or any American law enforcement official, not even when asked about it by the FBI -- you're not going to say anything, and then a year later you're going to return back to Mexico just to be beat up again, for people that you don't know -- or people that you only know, for people that you're not in business with?  That makes absolutely no sense.

Ladies and Gentlemen, the evidence that the Defendant knew the boats were stolen is overwhelming, not only in the form of the testimony by the cooperators, but by the messages and the circumstantial evidence, such as the fact that the Defendant piloted the boats at night.  The Defendant wants you to believe that that's because of the Gulf Stream.  Well, the Gulf Stream is a stream of currents that runs on the eastern side of the United States, not in the Gulf of Mexico.

So this idea that we're leaving at night to try and avoid some weather patterns is completely contradicted, not only by the text messages where they're talking about the storms and when it's safe to leave, but also by the testimony of Agent Sanborn, who told you this followed a pattern of thefts that they were investigating for years.  The boat thieves would leave at night and they would leave on the cusp of a weather pattern so that they wouldn't get caught by the Coast Guard.

Remember when he told you: "The only business that I did with Neco related to boat parts," and here we are talking about the Everglades, the Everglades, which is a boat, not a boat part.

Remember when he told you that he never spoke to Robertico about boats. But here we are: A hull identification number for a boat. And Ladies and Gentlemen, the Defense would have you believe that because that hull identification number is not the same one in the Indictment that that means that we're not talking about the same boat that they stole. That's the point. The point is that they would re-HIN the boats. They would change the hull identification numbers on the boats so that they wouldn't get caught and so that they wouldn't be able to trace the boat in Mexico to the stolen boat in the United States.

Finally, let's talk about the Toyota and the bribery. I'll start to end the way that I started, which is that sometimes when we say the word "bribe," we mean bribe, we don't mean extortion. Crespo Marquez told you that people are afraid of Saiden because he is powerful and they were doing illegal things. Remember the entirety of his testimony on that point. They were scared of him because they were doing illegal things. And Mr. Hernandez wants you to believe that these messages were a poor choice of words, to quote him, that: "These people are into bribery" is a poor choice of words.

But read the whole conversation.  Because in that conversation he talks about "we."  We, the organization, need him to loosen the reigns.  It's hard for us, the organization, right now."  Why?  Because the police were on to them and knew that they were doing illegal things by bringing over these stolen boats and by bringing over these migrants, who were trying to come to the United States in search of a better life.

Professor Rosenn also said to you that if a police officer is extorting a criminal, and a criminal pays this supposed extortion, they're both guilty of bribery.  So even under his version, they're both guilty of bribery.  Not even to mention the fact that he wants you to believe that this all happened when Neco's daughter is married to the son of the governor of Yucatan.  Does that make sense to you?  Does that make sense to you, that they would be able to get away -- that the police chief would be able to get away with extorting Neco, who is related to the governor of Yucatan by marriage, apparently?  Absolutely not.

Ladies and Gentlemen, sometimes the words mean what they say.  When we say "bribe," we mean bribe.  When we say "us," we mean us; us, the organization, the criminal organization that took advantage of migrants trying to come to the United States in search of a better life.  And this is the man that helped it all happen, because he stole the boats and he gave them the funds that they needed in order to keep their

operation afloat.

I'm going to ask you to return the only verdict that is consistent with the overwhelming evidence in this case.  And that is a verdict of guilty on all five counts.

Thank you.

THE COURT:  Thank you, Ms. Klepach.

Ladies and Gentlemen, you have been permitted to take notes during the trial.  Most of you, perhaps all of you, have taken advantage of that opportunity.

You must use your notes only as a memory aid during deliberations.  You must not give your notes priority over your independent recollection of the evidence.  And you must not allow yourself to be unduly influenced by the notes of other jurors.

I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

Your verdict, whether guilty or not guilty, must be unanimous; in other words, you must all agree.  Your deliberations are secret and you will never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors.  So you must discuss the case with one another and try to reach an agreement.  While you are discussing the case, do not hesitate to re-examine your own opinion and change your

mind if you become convinced that you were wrong. But do not give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you are judges, judges of facts. Your only interest is to seek the truth from the evidence in this case.

When you go back to the jury room, choose one of your members to act as a foreperson. The foreperson will direct your deliberations and will speak for you in court.

A Verdict Form has been prepared for your convenience. Let's review it together.

"The United States of America v. Javier Hernandez, Defendant.

"We, the Jury, find the Defendant Javier Hernandez:

"Count 1: Conspiracy to Encourage Aliens to Enter the United States for Profit.

"As to Defendant Javier Hernandez, as charged in Count 1 of the Superseding Indictment" -- there is a box for guilty. There's a box for not guilty. You are to check only one box.

"If you find Defendant guilty of Count 1, was the conspiracy to encourage and induce aliens to travel to the United States for commercial advantage or financial gain?"

If you find the Defendant guilty as to Count 1, you are to answer that question. There's a line for yes. There's

a line for no.  You are to check only one line.

"Count 2:  Conspiracy to Transport Stolen Vessels.

"As to Defendant Javier Hernandez, as charged in Count 2 of the Superseding Indictment" -- there's a box for guilty.  There's a box for not guilty.  You are to check only one box.

"Count 3:  Conspiracy to Traffic in Certain Motor Vehicles.

"As to Defendant Javier Hernandez, as charged in Count 3 of the Superseding Indictment"-- there's a box for guilty, a box for not guilty.  You are to check only one box.

"Count 4:  Trafficking in Certain Motor Vehicles.

"As to Defendant Javier Hernandez, as charged in Count 4 of the Superseding Indictment" -- there's a box for guilty.  There's a box for not guilty.  You are to check only one box.

"Count 5:  Conspiracy to Commit Money Laundering.

"As to Defendant Javier Hernandez, as charged in Count 5 of the Superseding Indictment" -- there's a box for guilty.  There's a box for not guilty.  You are to check only one box.

"So say we all" -- there's a line for the date, and a line for the foreperson.

Take the Verdict Form with you to the jury room.  When you have all agreed on a verdict, your foreperson must fill in the form, sign it, date it, and bring it back when you return to the courtroom.

If you do wish to communicate with me at any time,

please write down your message or question and give it to the deputy marshal. The deputy marshal will bring it to me, and I will respond as promptly as possible, either in writing or by speaking with you in the courtroom, but I caution you not to tell me how many jurors have voted one way or the other at that time.

Now, Ladies and Gentlemen, in the jury room will be the Superseding Indictment, as well as a laptop that has all of the exhibits that have been uploaded onto the laptop. You will also be given one exhibit list that has all of the exhibits admitted into evidence that correspond with the exhibits on the laptop.

Let me caution you -- I understand that lunch was brought in for you. Certainly you may have lunch as you discuss the case. However, you must only deliberate when all of you are present. If one needs to leave to use the restroom or to take a break, everyone takes a break, and then you reconvene and continue with your jury deliberations. All right?

Now, at this point in time, with the exception of our two alternate jurors, Silvia Occhi and Jamyiah Amia Shinhoster -- I would ask Jamyiah Amia Shinhoster and Silvia Occhi to remain in the courtroom. The remaining 12, I would ask that you go into the jury room. Wait for the evidence to begin your deliberations.

Thank you.

(Jury not present, 1:19 p.m.)

THE COURT:  All right.  Please be seated.

Ms. Occhi and Ms. Shinhoster, I want to thank each of you for the time and attention that you have given in this case.

I also want to advise you of the important role that you have been playing and you'll continue to play.  You have been selected as alternate jurors.  To the extent that one of your fellow jurors is unable to continue their service, then you would be contacted by the courtroom deputy and asked to come back to the courthouse, and your deliberations would begin anew.

Therefore, you are not to discuss this case with anyone, nor permit anyone to speak with you.  The evidence has already been submitted.  At this point in time, the courtroom deputy is going to give you further instructions.  I would wait until the courtroom deputy calls you.  She will call you either way; either your services are not needed or your services are needed.  Until that phone call is received and you have been discharged, and obviously with the thanks of the Court -- until that time, you're not to discuss this case with anyone.

We certainly have, on behalf of myself and my colleagues, a very small token of the great appreciation, and that is a certificate that memorializes the time that you've

spent with us.  It certainly is a very small token for the time and attention that much given to us.  I would ask -- and I'm not sure if you have items that are in the deliberation room. You may have them.  If you will just let the courtroom deputy know, as well as I'm sure you might want your lunch.  She's going to bring that as well.

So I would ask that you just follow Liz outside.  She will retrieve your items and give you further instructions. And I would ask that you wait until you hear from her to be advised of any further instructions and perhaps your role and your service will continue.

So I thank you on behalf of everyone here, and have a pleasant afternoon.

COURT SECURITY OFFICER:  All rise.

(Alternate jurors excused, 1:22 p.m.)

THE COURT:  All right.  I have in my hand the exhibit list, as well as the Superseding Indictment that has been redacted.  I just need the laptop and acknowledgment that all of the exhibits have been uploaded onto the laptop.  And Mr. Dobbins, if there is a passcode, if you can provide it to the court security officer, so that could be provided to the jury.

Is there a passcode that's needed to get in?

MR. DOBBINS:  My understanding is there is not, Judge.

THE COURT:  All right, then.  And have both sides

confirmed that the only items on that laptop are the exhibits?

Mr. Feigenbaum?

MR. FEIGENBAUM:  I have not yet, Your Honor.

THE COURT:  All right.  Let's go ahead and do that, please.

(Pause in proceedings.)

MS. KLEPACH:  Judge, I was reviewing the exhibit list submitted earlier this morning, and there were some lettered exhibits.  For example, we had 53 on there, but 53A through G was not denoted on there.  So I've made those changes and I'm going to send it in to chambers, just to reflect --

THE COURT:  When you say:  "Send it in" -- Josue has what you provided this morning.  So is there one that you can email to us now that we can make a copy of?

MS. KLEPACH:  Yes.

THE COURT:  Remember, the jury is not deliberating until they receive the exhibits.  So as I had cautioned you two times during this trial, it's very important that we get the exhibits back to the jurors.

MS. KLEPACH:  Yes, Your Honor.  The document is on its way to you now and the exhibits are loaded.  We were just actually waiting for Mr. Feigenbaum to confirm.

My understanding is he's confirmed that the exhibits are all properly loaded.

THE COURT:  All right.  Then we just need to make a

copy of the exhibit list. And that's been sent to the bloom@flsd?

MS. KLEPACH: One moment.

(Pause in proceedings.)

MS. KLEPACH: Yes. It's been sent.

MR. DOBBINS: Judge, there were also a couple of physical exhibits, which were the phones. But are we not sending those back? I mean, there's nothing they can do with the phones. So ...

THE COURT: If there are physical exhibits, then let's go ahead and put that in a box, so that the court security officer can also bring that in. I want all the exhibits to be with them.

(Pause in proceedings.)

THE COURT: All right. Then Josue is making a copy of the new exhibit list. We have the exhibit list, the laptop, the Superseding Indictment, as well as the physical evidence.

Have both sides confirmed that that is the physical evidence that was introduced into evidence?

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: We just need the exhibit list.

All right. Then if you will provide Liz with a phone number. I would ask that you -- you don't have to stay right outside. Of course, you should have lunch, as the jurors are having lunch. But I would ask that you provide a phone number,

so Liz can get in contact with you in the event that the jurors have a question or arrive at their verdict.

All right.  So Josue, is that the ...

MR. GUERRA:  I just want to confirm, Judge.

THE COURT:  Thank you.

MR. FEIGENBAUM:  Within how much time of the courtroom should we be?

THE COURT:  I think we could probably say within the next 45 minutes you are free to have lunch.  And after that, I'm not saying that you need to be in the courthouse.  You certainly don't.  But just -- I would not travel outside of this county.

MR. FEIGENBAUM:  I understand.  Let's say within 15 minutes?

THE COURT:  Yes.  Of course.  That's fine.

All right.  So that is the exhibit list?

MR. GUERRA:  Yes.

THE COURT:  All right.  Then is there anything further that we need to address before we adjourn?

MR. FEIGENBAUM:  No, Your Honor.  I just have the phone contact list for Your Honor.

THE COURT:  Perfect.

Okay.  Anything on behalf of the Government?

MS. KLEPACH:  No, Your Honor.

THE COURT:  Okay.  All right.

Have a nice lunch, and please be close at hand.

COURT SECURITY OFFICER:  All rise.

(Recess from 1:27 p.m. to 3:41 p.m.)

THE COURT:  All right.  Welcome back.

Please be seated.

Let me acknowledge the presence of the Defendant.

I did receive a note from the jury that states as follows:  "We have a verdict," signed by the foreperson at 3:25 p.m.

Is there anything we need to address before we bring the jury in?

MS. KLEPACH:  No, Your Honor.

MR. FEIGENBAUM:  No, Your Honor.

THE COURT:  All right.  Let's bring the jury back in, please.

COURT SECURITY OFFICER:  Yes, Your Honor.

(Before the Jury, 3:42 p.m.)

THE COURT:  All right.  Welcome back, Ladies and Gentlemen.

Please be seated, everyone.

I understand that you have provided the Court with a note that states as follows:  "We have a verdict," signed by the foreperson at 3:25 p.m.

I would ask if the foreperson will provide the Verdict Form to the court security officer, who will then provide it to

me, please.

(Verdict Form provided.)

THE COURT:  I find the Verdict Form is legally sufficient, there are no errors or omissions, and I ask the courtroom deputy to publish the verdict.

COURTROOM DEPUTY:  "United States District Court, Southern District of Florida.

"United States of America v. Javier Hernandez, Case Number 22-Criminal-20557.

"Verdict.

"We, the Jury, find the Defendant Javier Hernandez:

"Count 1:  Conspiracy to Encourage Aliens to Enter the United States for Profit.

"As to the Defendant Javier Hernandez, as charged in Count 1 of the Superseding Indictment:

"Guilty.

"If you find the Defendant guilty of Count 1, was the conspiracy to encourage and induce aliens to travel to the United States for commercial advantage or financial gain?

"Yes.

"Count 2:  Conspiracy to Transport Stolen Vessels.

"As to Defendant Javier Hernandez, as charged in Count 2 of the Superseding Indictment:

"Guilty.

"Count 3:  Conspiracy to Traffic in Certain Motor

Vehicles.

"As to Defendant Javier Hernandez, as charged in Count 3 of the Superseding Indictment:

"Guilty.

"Count 4:  Trafficking in Certain Motor Vehicles.

"As to Defendant Javier Hernandez, as charged in Count 4 of the Superseding Indictment:

"Guilty.

"Count 5:  Conspiracy to Commit Money Laundering.

"As to Defendant Javier Hernandez, as charged in Count 5 of the Superseding Indictment:

"Guilty.

"So we all," signed by the foreperson and today's date.

THE COURT:  Thank you, Liz.

Does either side wish the jury to be polled?

MS. KLEPACH:  No, Your Honor.

MR. FEIGENBAUM:  Yes, Your Honor, please.

COURTROOM DEPUTY:  When I call your name, please confirm if the verdict as read is your true verdict.

Juror Number 1, Gloria Zavala, is the verdict as read your true verdict?

JUROR NUMBER 1:  Yes.

COURTROOM DEPUTY:  Juror Number 2, Maria Cisneros, is the verdict as read your true verdict?

JUROR NUMBER 2:  Yes.

COURTROOM DEPUTY:  Juror Number 3, Franklin Mairena, is the verdict as read your true verdict?

JUROR NUMBER 3:  Yes.

COURTROOM DEPUTY:  Juror Number 4, Ireti Ojomo, is the verdict as read your true verdict?

JUROR NUMBER 4:  Yes.

COURTROOM DEPUTY:  Juror Number 5, Marie Tilor, is the verdict as read your true verdict?

JUROR NUMBER 5:  Yes.

COURTROOM DEPUTY:  Juror Number 6, Stephanie Gonzalez, is the verdict as read your true verdict?

JUROR NUMBER 6:  Yes.

COURTROOM DEPUTY:  Juror Number 7, Allan Castro, is the verdict as read your true verdict?

JUROR NUMBER 7:  Yes.

COURTROOM DEPUTY:  Juror Number 6 [sic], Anne Revilla, is the verdict as read your true verdict?

JUROR NUMBER 8:  Yes.

COURTROOM DEPUTY:  Juror Number 9, Vickie Murphy, is the verdict as read your true verdict?

JUROR NUMBER 9:  Yes.

COURTROOM DEPUTY:  Juror Number 10, Antonio Gomez Real, is the verdict as read your true verdict?

JUROR NUMBER 10:  Yes.

COURTROOM DEPUTY:  Juror Number 11, Jonathan Thorp-Fairshter, is the verdict as read your true verdict?

JUROR NUMBER 11:  Yes.

COURTROOM DEPUTY:  Juror Number 12, Joann Armas, is the verdict as read your true verdict?

JUROR NUMBER 12:  Yes.

COURTROOM DEPUTY:  The jury has been polled.

THE COURT:  Ladies and Gentlemen, I want to thank you for the time and attention that you have given to this case.  I also want to advise you of some very special privileges enjoyed by jurors.  No juror can ever be required to talk about the discussions that occurred in the jury room, except by court order.  For many centuries, our society has relied upon juries for consideration of difficult cases, and we have recognized for hundreds of years that a jury's deliberation, discussion, and vote remain your own private affair.

A request may come from those who are simply curious or from those who might seek to find fault with you.  As the days and weeks follow, I hope you will reflect back -- we certainly spent a good amount of time together, and it certainly was a small inconvenience to each of you, but it was a large contribution to our system of justice, and for that I personally thank you.

We do have a very small token of the great appreciation that we have for your time and attention.  They

are certificates that memorialize the time and attention that you've spent with us. The courtroom deputy will see you out and she will give you further instructions. And I personally want to thank you. I recognize that while in time of peace service on a jury is the most important service that you can provide to your country, it is a sacrifice. And because it is a sacrifice, and you have given of yourself and have listened attently to the evidence and have spent a good deal of time in deliberating, I want to thank you for being part of our system of justice. That's why we have the best system in the world. And it only works when individuals like yourself honor your summons and return your call to jury duty. So I thank you.

At this point in time, you have completed your work and you are excused with the thanks of the Court.

Have a pleasant afternoon.

COURT SECURITY OFFICER: All rise for the jury.

(Jury excused, 3:49 p.m.)

THE COURT: Go ahead and have a seat.

Javier Hernandez, consistent with the jury's verdict finding you guilty on each of the five counts in the Superseding Indictment, the Court adjudicates you guilty on the offense of conspiracy to encourage aliens to enter the United States for financial gain, Count 1; conspiracy to transport stolen vessels, Count 2; conspiracy to traffic in certain motor vehicles, to export a motor vehicle with tampered

identification number, and to alter motor vehicle identification numbers, Count 3; trafficking in certain motor vehicles, Count 4; and money laundering, conspiracy, Count 5.

The Court will defer sentencing in your case until Friday, January 5th, at 10:30 a.m., in this courtroom. Between now and then, you and Mr. Feigenbaum will be meeting with a Probation officer that will ask you questions in order to complete a Presentence Investigation Report.

Following the completion of the report, you, as well as the Government, will have a full opportunity to review the report and file any objections to its accuracy.

At the time of the sentencing hearing, which, once again, is Friday, January 5th, 2024, at 10:30 a.m., in this courtroom, if there are individuals that you would like to have present to support you, or individuals to speak on your behalf, please advise those individuals of the date and time of the hearing.

As well, Mr. Hernandez, I do invite you, if there is anything that you would like to say in mitigation of your sentence, that would be the appropriate time to speak.

At this point in time, you will be remanded to the custody of the United States Marshal. And I will see the parties here on January 5th, at 10:30, for Mr. Hernandez's sentencing hearing.

Is there anything further that we need to address?

MS. KLEPACH:  No, Your Honor.  Thank you.

THE COURT:  Mr. Feigenbaum?

MR. FEIGENBAUM:  Do you want him to report to the marshal's office on --

THE COURT:  No, sir.  He's going to be remanded here in this courtroom.

MR. FEIGENBAUM:  Oh, okay.

THE COURT:  Is there anything further on behalf of Mr. Hernandez?

MR. FEIGENBAUM:  Just one moment, Your Honor.

(Pause in proceedings.)

MR. FEIGENBAUM:  Your Honor, you know, I mentioned to my client -- you know, because he wanted to know whether it would be possible to remain on bond until sentencing.

THE COURT:  Does the Government wish to be heard?

MS. KLEPACH:  Your Honor, the Government would oppose such a request.  Certainly, at this point, the presumption is in favor of detention.  I can elaborate further, but the Government does oppose a request for the Defendant to remain on bond at this time.

THE COURT:  Mr. Feigenbaum, would there be any circumstance to be brought to the Court's attention that I should know about as to why Mr. Hernandez should not be immediately remanded to the custody of the United States Marshal?

MR. FEIGENBAUM:  Well, the only things that I would list for Your Honor would be that he does economically support his wife and younger son.  He has been a faithfully complying with all bond conditions.  He lives close by in Miami Beach, and seems that he would be a good candidate for remaining on bond until sentencing.

THE COURT:  I believe the standard is much different, Mr. Feigenbaum, following the jury's verdict, particularly where the jury has found Mr. Hernandez guilty of each of the five counts.  So at this point in time, Mr. Hernandez will be remanded.

All right.  So I'll wait in the courtroom until we have someone from the marshal to take Mr. Hernandez into custody.  And I'll see the parties here on January 5th, at 10:30 a.m., for Mr. Hernandez's sentencing.

MR. FEIGENBAUM:  I guess, Your Honor -- I don't know if this is permitted, but I think Mr. Hernandez wanted to make an additional request, I think, until Monday to remain on bond. But I don't know if the Court would entertain that, if you would want to hear from him.

THE COURT:  Well, Mr. Feigenbaum, I've considered the request that you have made on behalf of Mr. Hernandez.  And you have given the Court the circumstances that you believe would be appropriate, but I do not believe that that meets the requirement of the statute now that he's been found guilty of

113

this offense.

MR. FEIGENBAUM:  I understand, Your Honor.

THE COURT:  Okay.

(Pause in proceedings.)

THE COURT:  All right.  If there's nothing further, we'll stand adjourned.

(Proceedings concluded at 3:54 p.m.)

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698

Case 1:22-cr-20557-BB  Document 249  Entered on FLSD Docket 06/08/2024  Page 114 of 114

114

UNITED STATES OF AMERICA        )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

                    C E R T I F I C A T E

          I, Yvette Hernandez, Certified Shorthand Reporter in

and for the United States District Court for the Southern

District of Florida, do hereby certify that I was present at,

and reported in machine shorthand, the proceedings had the 18th

day of October, 2017, in the above-mentioned court; and that

the foregoing transcript is a true, correct, and complete

transcript of my stenographic notes.

          I further certify that this transcript contains pages

1 - 114.

          IN WITNESS WHEREOF, I have hereunto set my hand at

Miami, Florida, this 6th day of June, 2024.


                        /s/Yvette Hernandez
                        _____
                        Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
                        400 North Miami Avenue, 10-2
                        Miami, Florida 33128
                        (305) 523-5698
                        yvette_hernandez@flsd.uscourts.gov