IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1


UNITED STATES OF AMERICA,

      Plaintiff,                  February 2, 2024
                                  10:13 a.m.

      vs.

JAVIER HERNANDEZ,

      Defendant.                 Pages 1 THROUGH 72

_____


TRANSCRIPT OF SENTENCING DAY 1
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE



Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                    Brian Dobbins, AUSA
                    99 Northeast 4th Street
                    Miami, Florida 33132


FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                    PO BOX 545960
                    Surfside, Florida 33154-9998


COURT REPORTER:     Yvette Hernandez
                    U.S. District Court
                    400 North Miami Avenue, Room 10-2
                    Miami, Florida 33128
                    yvette_hernandez@flsd.uscourts.gov


ALSO PRESENT:       Mercedes Sornoza, USPO

(Call to order of the Court, 10:13 a.m.)

COURTROOM DEPUTY:  Calling Criminal Case Number 22-20557, United States of America v. Javier Hernandez.

Counsel, please state your appearances for the record.

MR. DOBBINS:  Good morning, Your Honor.  Brian Dobbins on behalf of the United States.  Also present at counsel table is Special Agent Sergio Francisco from the Federal Bureau of Investigation.

THE COURT:  Hi.  Good morning to each of you.

MR. FEIGENBAUM:  Good morning, Your Honor.  Marty Feigenbaum on behalf of Javier Hernandez, who is present before the Court with the assistance of a Spanish interpreter.

THE COURT:  Hi.  Good morning to each of you.

And go ahead and have a seat.

Mr. Hernandez, I just want to make sure the earpiece that you are using -- is that allowing you to hear the interpreters?

THE DEFENDANT:  (Through Interpreter.)  Yes.  Correct.

THE COURT:  All right, sir.  If at any time the equipment stops working, or you're unable to hear the interpreters, if you'll let me know.  All right, sir?

THE DEFENDANT:  Okay.

THE COURT:  Thank you.

And may I have the name of the Probation officer that is present in the courtroom.

PROBATION OFFICER: Good morning, Your Honor. Mercedes Sornoza on behalf of US Probation.

THE COURT: Good morning to you.

Mr. Hernandez, as you know, the purpose of this morning's proceeding is to determine an appropriate sentence in your case, a sentence that is sufficient but is not greater than necessary to serve the goals of sentencing.

As you know, on October 18th of last year, you were found guilty by a jury to Counts 1 through 5 of a five-count Superseding Indictment. Count 1 charged you with conspiracy to encourage and induce aliens to enter, come to, or reside in the United States for the purpose of commercial advantage and private financial gain, in violation of 8, United States Code, Section 1324, Subsection (a), Subsection (1), Subsection (A), Subsection Roman numeral (v), Subsection Roman numeral (I).

Count 2 charged you with conspiracy to transport stolen vessels, in violation of 18, United States Code, Section 371.

Count 3 charged you with conspiracy to traffic in certain motor vehicles, to export a motor vehicle with tampered identification number, and to alter motor vehicle identification number, in violation of 18, United States Code, Section 371.

Count 4 charged you with trafficking in certain motor vehicles, in violation of 18, United States Code, Section 2321.

4

And Count 5 charged you with conspiracy to commit money laundering, in violation of 18, United States Code, Section 1956, Subsection (h).

Following the jury's verdict, Docket Entry 188, the Court did adjudicate you guilty of each of those offenses and deferred sentencing until today.

In preparation for this morning's proceeding, the Court has received and reviewed the following items.  I will refer to each by its docket entry, since each was filed for record.  As I stated, Docket Entry 188 is the jury's verdict; Docket Entry 204 is the Draft Disclosure of the Presentence Investigation Report; Docket Entry 208 are objections that Mr. Feigenbaum has filed to the Presentence Investigation Report; Docket Entry 212 are the Government's objections and response to objections to the Presentence Investigation Report; Docket Entry 214 is a Sentencing Memorandum filed on your behalf by Mr. Feigenbaum; Docket Entry 219 is the Final Addendum 1 Disclosure of the Revised Presentence Investigation Report; and Docket Entry 221 is a Notice of Filing Letters in Support of Sentencing; Docket Entry 222 are the Defendant's objections to the Revised Presentence Investigation Report; and Docket 223 is the Government's response to those objections.

Have you had a full opportunity to review each of these documents with your attorney, Mr. Feigenbaum?

THE DEFENDANT:  Yes.

THE COURT: Do you need any additional time, sir?

THE DEFENDANT: No.

THE COURT: Are there any additional documents that the Court should have received and reviewed in preparation for today, Mr. Feigenbaum?

MR. FEIGENBAUM: Thank you, Your Honor.

And let me say good morning.

THE COURT: Good morning, sir.

MR. FEIGENBAUM: So before I forget, if I could just tell the Court that here in support of Javier, sitting in the audience is Cristina, his wife; Joaquin Hernandez, his brother; Julia Martinez Del Valle, an aunt; Ailiuj, a cousin. And we were waiting for one more, but I didn't see him out there.

So anyway, yes, I just would mention, Your Honor, that after I filed my objections to the Revised PSR and Addendum, which, as you mentioned, is Document Number 222, last night, the Government filed its response, and that's Docket 223 from February 1, the Government's response to my objections to the Revised PSR and Addendum. I did go to see Mr. Hernandez yesterday at FDC for about two and a half hours, but I did not have in my possession at that time what the Government filed last night. I think he would be familiar with its contents. So I just wanted to clarify that for the record.

THE COURT: All right. In know there were some agreements by the Government. So perhaps to the extent -- I

think that there were responses to the special skill.  Is there anything new contained within Docket Entry 223 that you feel it's necessary to speak directly with Mr. Hernandez outside the presence of anyone else, or are we ready to proceed?

MR. FEIGENBAUM:  I think we're ready to proceed, Your Honor.

THE COURT:  All right, then.  Then, at this point, it would be appropriate to address any remaining objections.  So if we can begin at this time, please.

MR. FEIGENBAUM:  All right.  Your Honor, may I use the lecturn?  It might be easier because I have a big binder.

THE COURT:  Yes.  Of course.

MR. FEIGENBAUM:  So Your Honor, I think the best way for me to start is to go to the Government's document filed yesterday, ECF Number 223, its objections to -- its response, rather, to my objections to the Revised PSR, which was the previous docket entry of 222.

So we've resolved the -- Paragraph 10, because the Government admits that it should be removed.  That was regarding the word "steal" about fuel.

THE COURT:  And let me just -- because I want to make the record clear, so that the Probation officer understands what is to be revised in the Revised PSI.  So with regard to the objection to Paragraph 10, the Defendant objected to the fuel being stolen, and the Government is conceding that that

word "steal" should be removed from Paragraph 10, correct?

MR. DOBBINS:  Yes, Judge.  I don't believe there was any evidence of the stealing or the theft of fuel for the boats.

THE COURT:  All right.  So now looking at Paragraph 10, let's make sure that that's revised to take out -- "would obtain" -- we'll take out "or steal."

Okay.  The next?

MR. FEIGENBAUM:  Yes, Your Honor.  As to Paragraph 12, which was about Jose Miguel Gonzalez Vidal having people in Mexico wire money to the Defendant, the Government says that is inaccurate and that the Defendant was correct to object to that.  So that allegation in Paragraph 12 of the Revised PSR should be removed.

THE COURT:  Okay.  So let's make sure that the Probation officer is clear.  The sentence:  "Reyes Aranda and Hernandez also were paid by Gonzalez Vidal, who would sometimes have nominees wire money from Mexico to the Southern District of Florida"?

MR. DOBBINS:  Yes, Judge.  The part after the comma should all be stricken.  There was testimony that Gonzalez Vidal contributed to the money that was paid, but there was no testimony or no evidence presented that nominees on behalf of Mr. Gonzalez Vidal wired money.

THE COURT:  All right.  So the only part that would be

taken out would be:  "Who would sometimes have nominees wire money"?

MR. DOBBINS:  "From Mexico to Hernandez."  Yes, Your Honor.

THE COURT:  Okay.  Do you agree, Mr. Feigenbaum?

MR. FEIGENBAUM:  Well, Judge, you know, I don't agree with the parts of the offense conduct that incriminate Mr. Hernandez because he contested intentionally knowing and participating in the offense conduct.  So I do appreciate Mr. Dobbins bringing that up, but I can't agree with the balance of any substance in the offense conduct that would show that Mr. Hernandez is guilty.

THE COURT:  I get that objection.  I want to be very technical, because it's very important that the Probation officer have some guidance.  So looking at Paragraph 12, Mr. Feigenbaum, what portions do you believe should be excised?

MR. FEIGENBAUM:  The part that --

THE COURT:  Let's look at Paragraph 12.  I understand you're at the podium, but it's very important that we not start looking at the entire trial in terms of any facts.  I want to focus on the specific facts that are set forth in Paragraph 12.

MR. FEIGENBAUM:  Well, Judge, again, in total respect to the Court -- but it's my job to make sure that I protect Mr. Hernandez's legal interests.  The first sentence of Paragraph 12, on Page 8, says:  "The conspiracy would often pay

Hernandez in cash." We contested at trial that Mr. Hernandez was a knowing and voluntary participant in the conspiracy. So I would just continue to object to that paragraph as offense conduct.

THE COURT: Okay. Is that the only other paragraph that you're objecting to -- or that portion of Paragraph 12?

MR. FEIGENBAUM: Well, I need to get to that first. I'm just dealing with what Mr. Dobbins filed in his response last night. Okay. So --

THE COURT: So let me -- Mr. Dobbins, is there any evidence that the conspiracy would pay Hernandez in cash and he would fly to the Miami International Airport with that money, and then pay Reyes Aranda his fee for assisting in stealing the boats?

MR. DOBBINS: Yes, Your Honor. Mr. Crespo Marquez, a co-conspirator, testified and -- cooperated and testified that that's how they would pay, and even said that it was because he could bring in less than $10,000. And then, once he got to the US with that cash, he was supposed to pay Ramon Reyes Aranda. Mr. Reyes Aranda, a codefendant in this case, also cooperated and testified about the same thing. They said that there were some variances, but that was the primary way. But then there were other times where certain individuals here in the Southern District of Florida had money on behalf of either Mario Enrique Lopez, also known as Neco, or Javier -- Vidal Gonzalez, also

known as Chupa, and they would pay him here too.  But the primary method was for them to give the cash to Mr. Hernandez in Mexico, and he would bring it back to the United States on a plane.

THE COURT:  And Mr. Feigenbaum, do you agree that there was testimony that was presented at trial that would support the facts contained in Paragraph 12, with the exception of the nominees wiring money to Hernandez?

MR. FEIGENBAUM:  I agree there was such testimony the Government presented.

THE COURT:  All right.  So perhaps we can temper some of these facts by saying Mr. Hernandez denies these facts, because that's obviously -- we'll deal with the obstruction of justice enhancement, and that will be the Government's burden.  But perhaps it would be easier -- rather than parsing through each and every fact, perhaps we can just say, the Defendant, or Mr. Hernandez, denies these facts.  Would that be acceptable?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  Mr. Dobbins, would you agree to that, sir?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  All right, then.

Then with regard to -- we're going to take out, by agreement, the:  "Who would sometimes have nominees wire money from Mexico to Hernandez in the Southern District of Florida," leave in the rest of Paragraph 12, and then we'll say the

Defendant denies that these facts took place. Correct, Mr. Feigenbaum?

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: Okay. All right. The next objection.

MR. FEIGENBAUM: The next one is 13, Your Honor, where Mr. Dobbins says, on Page 2 of his Document 223, that we had objected to the part that says: "Mr. Hernandez was responsible for stealing vessels." The reason is that, if you look at the testimony -- and we have a rough draft transcript that the parties have cited to in their papers for sentencing. If you look at Pages 129, 153 and 54 of Mr. Crespo Marquez's testimony, Mr. -- is this the part -- maybe I shouldn't get there yet and make this kind of argument.

Rather, you know, you tell me, Your Honor. I'm dealing with Mr. Dobbins's objections right now. I have the same argument for later, when I get to actually Mr. Hernandez's objections. So to move things along, I believe that you could say that -- for purposes of the PSR, that we disagree with the statement, but that there was evidence presented at trial of it.

THE COURT: Would that be acceptable, Mr. Dobbins?

MR. DOBBINS: Yes, Your Honor.

THE COURT: All right, then.

Then moving on to the next objection.

MR. FEIGENBAUM: Yes, Your Honor.

On Page 3 of Mr. Dobbins's objections, he says that this paragraph should be struck and the Defendant's objection sustained.

THE COURT:  This is with regard to Paragraph 17, correct?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  All right.

All right.  Then certainly there's no need to engage in argument.  The objection is sustained.  And if the Probation officer will take out Paragraph 17.

The next objection.

MR. FEIGENBAUM:  Next are Paragraphs 18 to 25, which Mr. Dobbins mentions on Page 3 of his Document 223.  I think what Mr. Dobbins is saying -- I appreciate it.  By the way, Mr. Dobbins is very kind.  He always gets back to me quickly about things.  So I just want to acknowledge that.  But here he says that the objection should be overruled because it is true that the evidence showed only Reyes was involved in a theft and shipment of a Cobia pleasure craft to Mexico.  So I objected to it.  But since those words in Paragraph 18 to 25 do not incriminate Mr. Hernandez in that boat theft, I'm okay with that, as long as I state for the record that the Government agrees that Mr. Hernandez was not involved in a Reyes theft of a Cobia boat, as described in Paragraphs 18 to 25 of the Revised PSI.

13

THE COURT: All right.

MR. DOBBINS: That's correct, Your Honor. We don't believe there's any need for any alteration to those paragraphs.

THE COURT: So are you withdrawing your objection to Paragraphs 18 to 25?

MR. FEIGENBAUM: I am, to the extent the Government admits they do not pertain to Mr. Hernandez on their face, is what Mr. Dobbins is saying -- that they do not involve Mr. Hernandez's conduct.

THE COURT: So what do you want to do with these? Obviously, 18 through 24 do not include any statements with regard to Mr. Hernandez. Twenty-five groups them, as well as numerous conversations, and includes Mr. Hernandez about stealing the vessels. So what specifically by way of the Defendant's objection are you requesting?

MR. FEIGENBAUM: Nothing needs to be changed because I'm making a record, and Mr. Dobbins agrees, by his objections -- I'm sorry -- his response to my latest objections, that Mr. Hernandez was not involved in the offense conduct in 18 through 25. So nothing needs to be changed.

THE COURT: But that's -- but Mr. Dobbins is saying the objection should be overruled, and you have made the objection, and Paragraph 25 does refer to Mr. Hernandez. So I just need to know: Are you withdrawing the objection? Are you

14

recognizing that Paragraphs 18 through 24 do not pertain to Mr. Hernandez and there's no need to move forward on the objection? Are you requesting a change in Paragraph 25? What is now, based on Mr. Dobbins's response, the basis of the Defendant's objection?

MR. FEIGENBAUM: One moment, Your Honor.

Since it does not pertain to the Cobia -- Paragraph 25 -- then you could overrule the objection of 18 through 24 that deal with the Cobia. But Paragraph 25, the Government has stated that I guess there is evidence that sustains or supports Paragraph 25. And we would just say for the record that we continue to dispute that, as we have in other parts of the offense conduct.

THE COURT: Well, Mr. Dobbins, why wouldn't that be consistent with your acknowledgment that there was no evidence about Hernandez stealing the vessels? Can we just take Mr. Hernandez out of Paragraph 25?

MR. DOBBINS: Judge, I think this paragraph is actually like a holdover paragraph from Ramon Reyes Aranda's thing because it's talking about what the evidence against Mr. Reyes Aranda would have been, and that there would have been witnesses that would have testified against him, and we know that those witnesses did testify against Mr. Hernandez. And then it states at the end Crespo Marquez would have testified as to the scheme, how it worked, as well as the

numerous conversations that Crespo Marquez, Enrique Lopez, and Gonzalez Vidal had with Reyes Aranda and Hernandez about stealing the vessels. That's still an accurate statement, based on the testimony that they actually did -- those three individuals, Crespo Marquez -- I'm sorry -- Crespo Marquez and Reyes Aranda, those two individuals, did testify about those conversations. So I would say -- submit that that sits there. But I think that that paragraph is actually in reference to Mr. Reyes Aranda's criminal conduct and not at as to Mr. Hernandez. So I feel like we're --

THE COURT: I think what we're -- it does appear that way. But based on what you're saying on the record, Mr. Feigenbaum, I'm still not clear if you're moving forward on that objection, if you're claiming that these facts are not consistent with what was -- with what pertains to Mr. Hernandez or presented at trial. If you can just let me know what relief you're seeking with regard to 18 to 25.

MR. FEIGENBAUM: Okay. As long as Mr. Dobbins agrees that Paragraph 25 appears to be part of the offense conduct against Reyes Aranda only for the Cobia boat, then it can be left like it is and you can overrule the objection.

THE COURT: Okay. Well, the PSI says what it says. So recognizing that it pertains to another individual, are you withdrawing the objection?

MR. FEIGENBAUM: If that's the same for Paragraph 25,

yes.

THE COURT:  All right.  Then let's -- all right.  Then that's withdrawn.  So let's move to the next objection.

MR. FEIGENBAUM:  Okay.  The next one is Paragraph 29 -- no -- I'm sorry -- Paragraph 26.  So this one -- I had a note that Paragraph 26 really said something really different than what Mr. Dobbins was advancing on this one -- on his Page 3 of Document 223.

So if you look at Paragraph 26 of the PSR, then it says things like:  "Hernandez would select identification numbers and then he would enlist the services of Reyes, who would create false documents, decals, stickers, and molds.  Hernandez would imprint, paste, attach, and apply the incorrect ID numbers to the vehicles in his possession."  There was no evidence at trial that Hernandez did any of those things.  So I object still to Paragraph 26 as being unsupported by the facts.

THE COURT:  Would you -- would it be acceptable to say that Mr. Hernandez denies these facts and -- consistent with his testimony at trial, and denies that the evidence supported this?

MR. FEIGENBAUM:  Right.  His testimony at trial would have been consistent with that, and there were no facts otherwise adduced at trial to support the allegations in Paragraph 26.

THE COURT:  You mean Mr. Hernandez's testimony was

inconsistent?

MR. FEIGENBAUM:  Was consistent with him not doing those things.

THE COURT:  Well, inconsistent -- in other words, Mr. Hernandez's testimony -- "Mr. Hernandez claims that his testimony refuted those facts, and denies them."  Would that be acceptable?

MR. FEIGENBAUM:  Yes.  As long as there's an additional thing that the -- yeah.  I mean, yes, that does it.  The evidence didn't support that he did those things, correct.

THE COURT:  So:  "The Defendant denies these facts"?

MR. FEIGENBAUM:  Correct, Your Honor.

THE COURT:  Would that be acceptable for purposes of Paragraph 26?

MR. DOBBINS:  That's acceptable for the Government, Your Honor.  I would just say that the second -- it's the second sentence.  It's a long sentence -- I'm sorry.  It's the third sentence, where it says:  "Hernandez would" -- I'm sorry -- fourth sentence, where it says:  "Hernandez would enlist the services of Reyes Aranda."  I believe that should probably be changed to Marrero -- "Roberto Marrero and others" is how I would phrase it.  I don't believe there was any testimony that Mr. Reyes Aranda did any of those things, but Mr. Marrero certainly testified that he was the person --

THE COURT:  Would you agree with that, Mr. Feigenbaum?

MR. FEIGENBAUM: I just -- I need to disagree with the entire paragraph, Your Honor, because Mr. Hernandez disputed that he did any of those things. And besides what Mr. Dobbins just said, there was no evidence at trial that Hernandez would imprint, paste, attach, and apply ID numbers -- incorrect ID numbers to the vehicle in his possession. There's no evidence that Mr. Hernandez had the capability of imprinting and applying these things.

THE COURT: Would it be acceptable to state that Hernandez denies these facts?

MR. FEIGENBAUM: Yes, Your Honor.

THE COURT: Okay. All right. Do you agree, Mr. Dobbins?

MR. DOBBINS: Yes, Your Honor. Thank you.

THE COURT: All right. Then if we can amend the PSI to include that.

And the next objection?

MR. FEIGENBAUM: Yes, Your Honor. In Paragraph 29 of the Revised PSR, it talks about the loss amount being 1.5 million to 3.5 million. This same statement appears in other parts of the PSR, as we'll see later. But the -- first of all, the -- I tried to present to the Court what's the standard for you deciding whether a aggravating factor and enhancement that raises the offense total complies with kind of the seminal case in the Eleventh Circuit, which is United

States v. Lawrence, 47 F.3d 1559, Eleventh Circuit, 1995, that talks about you have to have reliable and specific evidence that would support a guidelines increase.

Here, the Government wants a 16-level increase for that amount of money, 1.5 million to 3.5 million.  There's no evidence at trial that conformed to the dictates of Lawrence. The values really up till now -- Mr. Dobbins did give me some documents this morning where he will argue to the Court that that loss figure is supported.  But at the time I filed my Document 222, and also when Document 223 was filed, absent the additional documents I got this morning, there just was no evidence adduced at trial, or presented, until maybe what Mr. Dobbins shows you now, support any loss amount.  It was something that was just absent from trial.

We had different boat owners who claimed their boats were stolen.  And they talked about that and how they were discovered, and this, that, and the other.  But there was no evidence of somebody coming in and saying:  "Listen, for the first boat," the *Mellow Yellow,* for example -- which I believe was from December 2018.  I'm going to go by memory -- there just was nothing -- and the same with the subsequent three boats -- that went to the value of those boats.  And even more important, Your Honor, not just the value of the boats, we're talking about loss amount.

The loss amount -- after Dupree, United States v.

Dupree, which I've cited numerous times in my Memorandum of Law -- after that, the Eleventh Circuit says that the loss amount has to be the actual loss suffered by the victim.

So the victims in this case at trial were four owners of boats. And there's no evidence of what those victims themselves actually lost in terms of money. Mr. Dobbins will present to you insurance information, that the insurance companies paid back those boat owners X dollars, but that is not the specific language of the guideline. And under Dupree -- which I don't have the cite handy, but I'm sure I can find it pretty quickly. I'll go to it later. After Dupree, as long as the issue is raised in the district, the district court is not allowed to go to the guidelines -- guidelines commentary application notes for a clarification of what actual loss means. Actual loss must be as stated in the guideline itself, and it's the actual loss of the victim. The insurance companies were not victims. They're removed from it. And there's no evidence of what the actual loss of the owners of those boats were, which was really zero because they got their money back.

So following Dupree, D-U-P-R-E-E, and the exact wording of this guideline, the -- there's no loss amount which is sustained by a preponderance of the evidence. So we disagree with that finding in Paragraph 29 of the Revised PSI.

THE COURT: All right. The Government's response?

MR. DOBBINS: Yes, Your Honor.

First off, the insurance companies are not removed from such a thing. They are equally victims of this theft, as they have to make the victims -- the owners of the boat -- whole, pursuant to their insurance policies. So they are out the money, which initially is the owners are out the money until they can receive their claim from the insurance company. So the insurance companies are just as much victims of Mr. Hernandez's actions, and Mr. Reyes Aranda's actions, as the actual owners of the boat.

THE COURT: So understanding that, and understanding the Eleventh Circuit's decision in Dupree, what evidence is there with regard to the number of stolen boats, the number of stolen vehicles, and the actual loss to the victims?

MR. DOBBINS: Yes, Your Honor.

So you heard testimony from Crespo Marquez that the boats were valued at -- he believed in excess of $200,000. That's how much that Grady-White was, the very first boat that Mr. Hernandez brought over. You heard he said that he knew of at least 10 to 12 boats Hernandez had brought over that were solen, and he knew of at least six to seven vehicles. And he described those vehicles, which were a Camaro, an Infiniti -- I'm sorry -- two Infinitis. And also, he testified that there was a Cadillac Escalade. And he testified as to the fact that they brought over two pickup trucks that he was aware of.

And he talked about all of those things being brought over with the forged documents, so that they could either sell them -- that they were in the business of selling them to make additional money, or that they could then provide them as gifts or bribes to Mexican officials, government officials, to forward that.

Mr. Ramon Reyes Aranda also testified that he participated in stealing between 20 and 22 boats with Mr. Javier Hernandez.  And based on that, what we are prepared to proffer, what had been turned over previously in discovery to Mr. Feigenbaum, which I just brought to his attention, we're willing to proffer -- and I believe Mr. Feigenbaum's in agreement that this would be the testimony of Special Agent Francisco -- but that based on the evidence that they gathered from the victims, Mr. Mauceli, who was the *Luca Brasi* owner, received -- his insurance payment was $120,000.  Although he said that with the aftermarket add-ons that he had put on that vessel, which he used to help identify the vessel in the pictures -- he said that the boat was actually worth more.

THE COURT:  So -- I'm sorry.  So what was the loss to the victim with regard to that vessel?

MR. DOBBINS:  We're going with the conservative amount of $120,000, Judge.

And then we have Mr. Maytum, who owned the Everglades boat, known as the *Ultimaytum*, and he -- his insurance paid him

for the boat $130,000.

THE COURT:  All right.

MR. DOBBINS:  Mr. Teteris's insurance company valued the boat loss at $305,000.  This was the Pursuit, which was known as the *Mellow Yellow,* which was stolen from Marco Island.

And then the Wiesners, who also had a Pursuit, they told law enforcement that they were paid approximately $335,000 by the insurance company.  And then the information from the insurance company that was turned over, I believe said it was maybe $325,000.  So we'll go with 325 for that.  So $10,000 less.

And then, on top of that, you've got the Grady-White that Mr. Crespo Marquez testified was valued at over $200,000.  So I believe that gets us over a million.  And that's for five boats.  And under United States -- and then the testimony from Ramon Reyes Aranda was that the boats were always Pursuits, he said Yellowfins, and Everglades.  And then the last one was the Southport, which was the *Luca Brasi*.  So there's an additional 15 to 17 boats.

And the Court -- you know, based on that and the fact that Mr. Ramon Reyes Aranda also stipulated in his sentencing that the loss amount was over 1.5 million, a conservative estimate puts that loss amount at around $3 million, given all of the types of boats.  The testimony was that these boats were always between 27- and 30-foot-long pleasure boats, with at

least two high-powered Yamaha outboard engines.  They were high-end vessels, and that was the testimony.

And so, under US v. Cobb, 842 F.3d 1213, Your Honor, the Government submits that you can make a finding that the loss amount was in excess of $1.5 million.

THE COURT:  All right.  And I just want to make sure. With regard to the agent, Mr. Feigenbaum, would you agree that the proffer would be sufficient with the agent's testimony if it was presented here at the sentencing hearing with regard to those documents that were provided to you and Mr. Hernandez?

MR. FEIGENBAUM:  Yes.  I agree with Mr. Dobbins that would be the -- what the agent would proffer were he to take the stand.  So yes.  But can I have the number for the third one?  It was 300-and-something.

THE COURT:  The Pursuit?  305,000.

MR. FEIGENBAUM:  305.  Okay.

MR. DOBBINS:  And then the other Pursuit, the *Reel Estate* by the Wiesners, was 325,000.

THE COURT:  So I just want to stay on track with regard to the objection that the Defendant is accountable for a loss of more than 1.5 million, but not less than 3.5; therefore, the offense is increased by 16 levels, looking at 2B1.1(b)(1), Roman -- or letter (I), which is add 16 points.

Looking at Dupree right now, Mr. Feigenbaum, what argument can be made, based on the proffer that's accepted by

you on behalf of Mr. Hernandez and the testimony at trial?

MR. FEIGENBAUM:  Well, Your Honor, for one thing, let me go backwards from what the Government said about there were all these other boats that were allegedly stolen -- 20 or 22, I think he said.

THE COURT:  I think it was 12 boats.  Am I correct that this is what you're calculating for purposes of your conservative estimate?

MR. DOBBINS:  Your Honor, Ramon Reyes Aranda said it was between 20 to 22 boats.  We know the values of five of those boats.

THE COURT:  So are you only calculating the five, plus the vehicles for -- I just want to make sure I understand which calculations equate to what the Government contends is a conservative estimate, of 1.5, but less than 3.5.

MR. DOBBINS:  I'm calculating all of it on an estimate.  The remaining 15 -- we'll go with 20 -- 15 vessels, and then the six or seven vehicles.  But with just a conservative estimate we're coming up with approximately three million, which is consistent with what Ramon Reyes Aranda's finding was during his sentencing.  And we believe they should be equal because they were both participating in primarily the same conduct.

MR. FEIGENBAUM:  Your Honor, first, what a codefendant stipulates to in his own guilty plea cannot be transferred to

inculpate Mr. Hernandez on that stipulation.  So that should not even be considered by the Court, respectfully.

Number two, following the dictates of Lawrence, 47 F.3d 1559, Eleventh Circuit 1995, there's a lengthy discussion -- and I do cite that case numerous times in the filings that I've made -- that the evidence must be reliable and specific.  So when Mr. Dobbins talks about a value for one boat that Mr. Crespo Marquez testified to, you can't take that value and apply it to 10 or 12 other boats.  Because what were those boats, number one?  What were their conditions?  What value did each have?  There's nothing there, Your Honor.

And by not having anything there, that information is just an attorney proffer, and it's not allowed to use attorney proffers for guideline increases.  I cite a case somewhere among all these papers I have.  So the attorney's proffer as to that should be not credited by the Court.

And number two, even if you are allowed to accept an attorney proffer as to 10 or 12 more boats, there's nothing reliable and specific about what kind of boat each one was, what condition it was in, what year it was from, what brand was it, and what was its value.

So we're talking here, actually -- let's don't get away from the focus.  We're talking about loss amount.  So you cannot take the Government's evidence and say the loss amount adds up to the figure of 1.5 --

THE COURT:  I think we're arguing different facts. It's my understanding that the Government is not relying solely on Mr. Crespo Marquez's testimony that one of the vessels had a value of over $200,000, and therefore the Government is merely extrapolating that testimony and applying it to the number of vessels that were stolen.  Mr. Dobbins has specific documents reflecting the amounts that were paid for specific boats that were stolen, the 120,000, 130,000, the 305,000.  And that's why I asked whether the testimony that the agent would give today -- that the proffer that's been made is supported by those documents and would be consistent.

So that's actual evidence for the Court to consider as to the value of the loss, as to what is the amount.  And then calculating the different individuals who suffered a loss, it equates to at least 1.5 million, but less than 3.5.  And I guess that's my question to you, is it's not merely Crespo Marquez testified to $200,000 in a value of a boat and that's being now applied to 15 vessels.  I don't believe that that's what I'm hearing.  And I just want to make sure that the record is clear with regard to what evidence was provided to you before the hearing and what the agent is willing to testify to -- although I believe you're accepting the proffer.

MR. FEIGENBAUM:  No.  I said I agree that that would be the proffer of the agent, not that I agree with it.

THE COURT:  Then why is that not consistent with the

Government's burden of showing that the enhancement is supported by the loss being between 1.5 and 3.5? What is it about the documents that are unreliable?

MR. FEIGENBAUM: Okay. I was going to talk about the Grady-White, which is the fifth boat that Mr. Dobbins mentioned, the $200,000. And that boat, the Grady-White, was from December of 2017. And I'm going to point out transcript pages a little down the road, so I wish you wouldn't make a final decision on any of these factors yet.

THE COURT: Of course.

MR. FEIGENBAUM: But I'm going to show you where Crespo Marquez testified that that Grady-White -- although he testified that Mr. Hernandez drove it to Mexico, that that boat had already been stolen by Reyes with a person that he knew called El Viejo, V-I-E-J-O. And that, after it was stolen, Reyes negotiated with Gonzalez Vidal and Crespo Marquez for a price. And once they agreed on a price, then they needed to find a boat -- a captain, and that's the first time Mr. Hernandez ever drove a boat to Mexico.

And so Mr. Hernandez was not involved in the conspiracy -- Crespo Marquez admits that Hernandez was found after that boat was stolen by Reyes, just for the purpose of driving it to Mexico. So that boat should not even be counted as a -- as part of a victim loss. Because who was the victim, by the way, with that boat? We don't even have a victim or any

reliable specific evidence as to that 200,000.  But it doesn't even relate to Mr. Hernandez.  I have the transcript pages.  But I've got so many pages, Your Honor, I can't just go like out of order right now.

So I don't know what Mr. Dobbins --

THE COURT:  I want to make sure you've completed the argument with regard to the loss and the calculation.

Mr. Dobbins?

MR. DOBBINS:  Yes, Judge.  Again -- first off, again, I don't know if I said this in my first response, but the Government disagrees that Dupree applies.  Dupree was a holding in a narcotics case about whether an inchoate offense, such as conspiracy or attempt could be considered as a drug-trafficking crime.  It had nothing to do with economic crimes, or loss amount, or anything like that.

So therefore, the Government submits that Dupree is not applicable, and that the case law that we currently have is still applicable as to determining loss.  I cited Cobb.  Cobb is a 2016 decision.  So it came after Lawrence, which was, I believe, a 1995 decision.  And it states that the Court may need not determine with precision, that they only need to make a reasonable estimate of the loss given the available information.

And Mr. Feigenbaum continues to sort of pick and choose which facts are favorable to him and not take the

evidence as a whole.  He states that there's no information about the brands of the boat.  That's not true.  Mr. Reyes Aranda testified as to the types of vessels, and he gave the brand names, Yellowfin, Everglades, mostly Pursuits, he said, which were the two that were stolen from the Wiesners and Dr. Teteris, the *Mellow Yellow* and the *Reel Estate*, and the final boat he said was the Southport.

And that was also indicated, of course, in the text messages -- I'm sorry -- the WhatsApp messages, where you had the pictures of the boats being sent back and forth from Mr. Reyes Aranda, including boats that the Government wasn't able to identify.  And we weren't able to identify all 15 to 17 additional boats that Mr. Reyes Aranda talked about, but we were able to identify these five.

And given the fact that he testified about the nature of the -- the nature of the vessels and the types of brands they are, we believe that you can make a conservative estimate based on those, as well as the types of vehicles that were stolen, that this was in excess of over $500,000, which would get us over the 1.5 million mark.

Additionally, you know, the jury disagreed with Mr. Feigenbaum because they did find that Mr. Hernandez was part of this conspiracy.  He keeps trying to segregate:  "Well, Ramon Reyes Aranda stole the boat and then my client just drove it over."  But that's, of course, not what the testimony was.

The testimony was, from Mr. Reyes Aranda, that Mr. Hernandez was picked to drive the boat after they identified the boat, and then he came on over and they stole the boat.  And then also he -- and then Mr. Crespo Marquez testified that Mr. Hernandez was part of this and he was the one responsible for giving the payment -- Mr. Reyes Aranda's fee to Mr. Reyes Aranda.  So they're all -- he's a part of this conspiracy to steal the boats.

So, you know, once you throw all that in, I think that the record is more than sufficient that we have enough in here to establish that the loss amount was greater than 1.5 million.

THE COURT:  All right.  Is there anything further, Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes, Your Honor.  Reyes's testimony -- Reyes -- Codefendant Reyes's testimony, on October 4, 2023, Page 50, talking about the Grady-White -- Reyes is talking about the Grady-White:

"What did you tell Javier Hernandez about that boat?"

Answer:  "That that boat -- he -- any -- that it was stolen."

And question:  "How did he know it was stolen?"

Answer:  "Because we were getting it at night on the back of the marina."

Question:  "And why was that important?"

Then you, Your Honor, say:  "Because he knew that was

being done."

THE COURT:  I'm sorry.  I said that?

MR. FEIGENBAUM:  I'm sorry.

THE COURT:  No.  I didn't say that.

MR. FEIGENBAUM:  No.  No.  You're right.  I'm just reading what the rough transcript at Page 50 says, line 19. But I guess it's me with a question at line 20, Page 50: "Again, he's calling for speculation of what Mr. Hernandez supposedly knew."  And then you, Your Honor, say:  "To that question and answer, sustained."

And after that, I guess Mr. Dobbins asks, on line 25: "Why was it important that you take the boat from the marina" -- turning to Page 50 -- "at night?"  And then I made an objection.  And from my quick skimming of Page 51 of Reyes's testimony, it kind of got dropped as an issue.

"Why was it important that you take the boat from the marina at night," Mr. Dobbins asks on line 17, Page 51.

"Because at that time there was no one.  The area was in construction.  No one would pass by at night, and it was easier to take the boat then."

So what happened was the Government attempted to get Mr. Reyes to say that Mr. Hernandez knew the boat was stolen. You sustained that objection as speculation.  And then Mr. Reyes went on to say:  "Well, at night, there's nobody there and stuff like that," but did not impute knowledge that

the boat was stolen by direct testimony of Mr. Reyes.

THE COURT:  But isn't that argument that you're now making somewhat beside the point?  We're speaking of -- the Government has the burden of showing the amount of the loss here.  I understand that you're refuting the testimony.  But there is testimony that Mr. Hernandez was involved.  And with regard to the loss, Mr. Dobbins has presented evidence -- not only the trial testimony, but evidence with regard to the amount of the loss.

So what I don't want to -- what I want to ensure is that we're not arguing:  "Well, Mr. Hernandez should not be accountable because there wasn't sufficient facts."  There certainly were sufficient facts.  Now the question is:  What is the value of these items that were taken?  Correct?  He was found guilty.

MR. FEIGENBAUM:  No.  I understand.  In other words, certainly Your Honor can say:  "I accept" -- you could say, Your Honor:  "I accept the Government's numbers as being sufficient under Lawrence that are sufficiently reliable and specific."  You can make that finding, Your Honor.  But I need to dispute that and object to it on the record.

THE COURT:  All right.  And I understand the objection with regard to disputing or refuting the testimony at trial.  But in looking at whether the Government has set forth specific facts, based on a preponderance of the evidence, to support an

34

enhancement that the loss was more than 1.5 million, but less than 3.5, it appears that the Government has.

MR. FEIGENBAUM: Your Honor, I think Mr. Dobbins said a little while ago that when you take the Grady-White and add it in to the other ones, you get to a million dollars. And then you could easily, conservatively, he said, get to 1.5 to 3.5 million by extrapolating the value of the Grady-White into 10 or 12 more boats. And then the stolen vehicles -- let me address that right now.

THE COURT: So let's do this. It's the Government's burden. So Mr. Dobbins set forth specifically the documents that either you've been provided by the victims, paid by the insurance companies, or specific testimony with regard to each of the vessels and each of the vehicles that were part of this conspiracy.

MR. DOBBINS: Yes, Your Honor.

THE COURT: And let's do a calculation.

MR. DOBBINS: We start with the Grady-White. The testimony was that that boat was over $200,000 -- that was worth more than $200,000. That was the testimony of Crespo Marquez, who had the ability to observe the boat. He's a seaman. He knows -- he's very familiar with all sorts of boats, and he testified as to what the value of that vessel was. And why they were able to get it for a significant discount was because it was stolen. And he testified that

35

Mr. Hernandez brought that stolen boat over.

And I disagree with Mr. Feigenbaum's characterization of that testimony. Mr. Reyes Aranda told Mr. Hernandez the boat was stolen. So Mr. Hernandez knew.

So that's 200,000. We'll go conservative. It's more than 200,000, but we don't have an exact amount, so we'll just go with 200,000.

The next boat, I believe, that was stolen was the *Mellow Yellow,* which was December of '18. That one was a Pursuit boat, owned by Mr. Teteris. We have the insurance documents that show that the boat was valued at $305,000.

The next boat was the *Reel Estate,* which was owned by Mr. and Mrs. Wiesner. And it was also a Pursuit vessel, and we have the insurance documents that demonstrate that it was paid out at $325,000.

We also have the interviews with the Mr. Maytum, who was the owner of -- the *Ultimaytum* was the name of the boat. It was an Everglades vessel. And he stated that his payout was $130,000 for that vessel. That was his insurance payout.

Then we have the last vessel, which is recovered or was seized by the Mexican authorities, which was the *Luca Brasi*, which was a Southport vessel, owned by Mr. Mauceli, who testified at trial. And Mr. Mauceli provided the agents with the information that he was paid $120,000 for the vehicle -- I'm sorry -- for the vessel. Excuse me.

THE COURT:  Any other testimony that would support the loss with regard to the vessels?

MR. DOBBINS:  So then we have Ramon Reyes Aranda testifying that there were -- that they did a total of between 20 to 22 vessels, and that the vessels were primarily Pursuit vessels, which were the ones that were owned by the Wiesners and Mr. -- Dr. Teteris.  And then he also cited the Everglades, a boat type called the Yellowfin, as well as the Southport and the Grady-White.

So Your Honor, given that, we believe, given those types of vessels and the fact that we have those vessels' amounts -- what their typical payout amount was to these other four owners, we can then estimate based on the amount -- even if we go conservative at $100,000, you can get right there at 15 -- let's go with 15 instead of 17 vessels.  That's $1.5 million right there, on top of the over $1 million that we've established with the -- with the vessels that we do know the value of.

And then, if you throw in the vehicles, we don't have any exact estimates for that, but they are high-end vehicles. You had a Cadillac Escalade.  Two pickup trucks were discussed. We also had the Toyota Tundra that we were unable to identify.

So, you know, part of the problem here is that the scheme is that they cloned legitimately owned vehicles in other states -- they'd clone their vehicle identification number or

their hull identification number so that we can't then identify the exact boat or vessel and then say what the amount is.  So we have to go with, again, a conservative estimate.  And I submit that if you go with that -- it doesn't matter with the vehicles, but that would get us to approximately somewhere between 2.75 million and three million dollars.  And that's why we went with that estimate.  And under Cobb, I believe Your Honor can -- that's -- you have sufficient -- a sufficient factual basis to make that finding and to find that that's the loss amount.

THE COURT:  Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes, Your Honor.  First of all, there's a Lawrence -- when I say:  "Lawrence," I'm going to be meaning throughout this hearing United States v. Lawrence, 47 F.3d 1559, Eleventh Circuit, 1995.  There's a Lawrence violation with the argument that Mr. Dobbins is making.  When he proffers to you, Your Honor, that you should assign a value to 10 or 12 more boats that were of a certain type, that's not specific evidence as to what were the brands, what year were they from, what condition were they in, what value did they have the time of their alleged theft, and when those other thefts occurred.

But the Lawrence violation is the absence of reliable and specific evidence to make a speculative proffer to the Court that you should add X value.  Maybe they were in really

38

bad condition and didn't even -- weren't even worth 25,000.

THE COURT:  But that's speculation, Mr. Feigenbaum. And I think at this point I've heard enough.  I've required the Government, since they have the burden, of setting forth and delineating specifically the value based on competent evidence. And I understand the argument, but Cobb tells this Court that the Court can make a calculation based on the fact that, here, we not only have the Grady-White; the *Mellow Yellow* Pursuit*; the Reel Estate*, the Wiesners; we have the *Luca Brasi*; we have the Yellowfin and the Southport; we have the vehicles, the Cadillac, the two pickup trucks, the Toyota Tundra.  Based on this Court's calculation, it appears that the Government has certainly satisfied their burden for the enhancement of showing that the loss in this case is more than 1.5, but not more than 3.5.  So the Court believes that that enhancement is accurate as calculated by the Probation officer.  So the objection is preserved.

Let's move to the next objection.

MR. FEIGENBAUM:  I need to say for the vehicles, though -- I didn't give you an answer for that.  The vehicles -- there's no year of the vehicle, there's no condition they were in, and there's no value assigned to any of them.  So to just guess -- Mr. Dobbins is guessing that they had a value of thousands of dollars, when there's no evidence that they were worth anything.

THE COURT: Well, let me say this: The Court has conservatively calculated, with regard to the Yellowfin and the Southport, of additional $200 for each vehicle, even though -- each vessel, even though it's consistent with the value of the Wiesner of 325, which gets us to 1280. And even if the Court were to give a value of a hundred dollars for a Cadillac, a hundred dollars for two pickup trucks, and a hundred dollars for a Toyota Tundra, certainly that's past the threshold and supports the enhancement. And I believe that it's speculation to say that these vehicles had no worth and had no value.

MR. FEIGENBAUM: But also, wouldn't the Government have to provide, Your Honor, as to those additional vessels and the vehicles, that they were -- there were actual victims? Because without actual victims and an actual loss, they can't be added to the loss amount.

THE COURT: But Mr. Feigenbaum, either way you do the calculation -- even if the Court weren't to take into consideration the loss that would include these four vehicles, the calculation of the Yellowfin and the Southport that is consistent with the value of the Wiesner is an additional -- it's -- there's -- 1,080, plus those two, would be an additional $650, which would take us past the threshold of $1.5 million. So either way it appears that the testimony certainly supports the enhancement. So let's move to the next objection, please.

MR. FEIGENBAUM:  The next one, Your Honor, is on Page 4 of the Government's Document 223, where they advocate for an obstruction of justice two-level enhancement.  The thing is this, Your Honor, when you go back and you actually -- and I have them for you, when I get to my objections --

THE COURT:  And actually -- I know you're addressing this -- it's the Government's burden.  And I was going to ask Mr. Dobbins -- I understand that certainly Mr. Hernandez testified at trial -- but what evidence would the Court look to that the obstruction enhancement would apply merely because Mr. Hernandez exercised a constitutional right to testify, and, in fact, he did testify?

MR. DOBBINS:  Okay.

THE COURT:  And I'm asking Mr. Dobbins because he's moving for the enhancement.

Is there a written statement that Mr. Hernandez gave?  Is there any evidence that it obstructed the Government's ability to move forward with prosecuting this case?

MR. DOBBINS:  Yes, Your Honor.

As I cited in my objections, he gave a statement to Special Agent Spielvogel.  And in that statement to Special Agent Spielvogel, which Special Agent Spielvogel testified to, he admitted to participating in the thefts of these boats and he admitted to going to the Finca and other houses.  He was able to even identify other houses that were used by the group.

He was able to identify the other members of the alien smuggling conspiracy.  And he was talking about all of that, and that was all testified to by Special Agent Spielvogel.

Then, when Mr. Hernandez gets on the stand -- and certainly the Defendant has a right to testify.  But the Defendant does not have a right to lie and mislead the jury to avoid the -- to avoid justice in this case.  And the fact of the matter is he changes -- he says everything's completely different.  He shows up -- he can't deny, right -- after his own expert says:  "Yes.  His phone was in the area when these boats were stolen," he can't deny that anymore.  So now he says:  "No.  When I showed up, Ramon was there with another vessel.  He gave it to me and he gave me -- and the owner was there too, and he gave me the paperwork.  And then I took it over and I filed it with the -- you know, with the customs officer in Mexico."

Right?  Every time.  Every time, it was a completely different boat.  So at the time that Ramon is stealing these boats, Ramon is also coordinating a pick-up -- a legitimate pick-up of a vessel for Mr. Hernandez to take over.  And of course, that doesn't make any sense.  And that's completely contradicted by his prior statement to Special Agent Spielvogel.

In addition, of course, he states that -- Judge, I mean, the fact that he states that he went over there and he

42

was, you know, captured by the police with Mr. Crespo Marquez, he had to witness Mr. Crespo Marquez being brutally beaten, and then later he was arrested by the Mexican police again at the marina with Neco, where they tortured Neco -- and he even said he was tortured by the fact that he was Tasered in his genital region, which, of course, mirrors what was happening in the testimony by the migrants.  And he says all this, but of course none of that makes sense, right?  Because then why would you be taking -- if you knew that the police were after you and you were wrongfully held twice, you were beaten, you were threatened, why would you ever take a truck over -- after that incident, over to Neco?  And that's what he tried to argue.

And then, of course, what do we have, though?  We have his text messages with not only Neco.  We have his text messages with Gonzalez Vidal, we have his text messages with Marrero and with Ramon Reyes Aranda, which showed that he was lying.  And then, of course, on top of that, we've got the one where he's talking to the woman that's in Mexico about how his group can get her the paperwork, they have all the officials in their pocket, it's bribery.

And when cross-examined, in addition to telling these lies, of course, what does -- and committing perjury.  What does he do?  He says -- he evasive.  He tries to avoid answering the questions put to him on cross-examination.  He even at some points lectures the prosecutor about why she's

asking bad questions, and really one of the more egregious testimonies I think I have witnessed in my time as a prosecutor.

And just, you know, the chutzpah, if you will, to go and try to present this story, which is contradicted by his own statement, his own prior statement, Judge, I believe this is more than deserving of an obstruction enhancement. Because although he has the right to testify, and he has a right to state the facts -- but he does not have a right to lie to the jury, to tell something different.

And then, by the way, in all of his testimony, what was he doing? He was accusing all of the other government witnesses of being liars, obviously, Crespo Marquez, Reyes Aranda, but even Special Agent Spielvogel, the Mexican police. And by the way, the Mexican police were never cross-examined about whether they beat him, or whether they Tased him, or anything like that. They were up there on the stand, and there were no questions asked about that. It was only after Mr. Hernandez got to hear all the testimony that he got to get up there and craft and tailor his story to the jury in an attempt to engender sympathy by imitating the story of the actual migrants who were tortured, and then basically say everybody else was lying and here's what really happened.

And of course, it's beyond -- strains credibility to the -- strains credulity to the maxim, of course, because none

of it makes sense.  And of course, the jury didn't even deliberate very long in assessing this and convicted him.  So that's the Government's argument.

THE COURT:  All right.  Mr. Feigenbaum?

MR. FEIGENBAUM:  Well, Judge.  That's a lot of stuff. I'm going to have to do it all by memory because I couldn't even write notes that fast.  But when he talks about, at the very end -- Mr. Dobbins -- the jury coming back fairly quickly and finding Mr. Hernandez guilty, this brought to light a great fear I had before the trial started.  And that's why I filed, well in advance of trial, a motion in limine to prevent the Government from trying to make Mr. Hernandez be part of the Gonzalez Vidal case, which was in front of Judge Altonaga, and which had charges for RICO, kidnapping, extortion, and allegations of abuse, and threats of death and so forth, of migrants in the Gonzalez Vidal case.

Your Honor found that you would allow that testimony to come into Mr. Hernandez's trial.  And what happened?  The first two witnesses that the Government put on the stand, on the same day that the jury was picked, September 26th, 2023 -- the first two witnesses were two migrants who testified about the abuse they suffered from -- when they got from Cuba to Mexico in the Gonzalez Vidal enterprise.  That they -- one of the second witnesses testified -- I think it was Benitez Martinez -- testified that he was stripped naked, leaned

against a wall, and beaten with a paddle board, some kind of a board, a wooden board, until he bled; and he cried. This is the first thing the jury saw, these two witnesses --

THE COURT: Mr. Feigenbaum, I understand that this was a long trial. It was emotional at times. There were many witnesses testifying. I want to stay on task, sir.

MR. FEIGENBAUM: Okay.

THE COURT: This is with regard to the obstruction of justice. And the three Eleventh Circuit cases that are -- that have been cited to the Court require the Court to make a particularized finding of perjury. So let's focus on the enhancement and the response to the argument.

MR. FEIGENBAUM: Yes, Your Honor.

So Mr. Dobbins also mentioned -- he said that Hernandez testified that when he got to the place where the boats were to be picked up and driven, that Mr. Reyes, who had the boats ready to go from the west coast of Florida, switched those boats and gave Mr. Hernandez a non-stolen boat. That's not what -- I asked Mr. Dobbins to point out where in the trial transcript there's evidence of that. The testimony of Mr. Hernandez was that when he got to where the boat was that Mr. Reyes had ready, he was given what appeared to be a valid Florida registration and that there was nothing for him to suspect that he was driving away a stolen boat.

So this notion that Mr. Hernandez said: "Oh, I didn't

get that boat that was listed in the Indictment.  I got another one," he didn't say that, except maybe as to the fourth one, which was never reported stolen.  But what I'm saying, Your Honor -- I hope you see my point -- that is --

THE COURT:  I see your point.  Can we focus, Mr. Feigenbaum, on Mr. Dobbins's argument that Mr. Hernandez's testimony at trial was inconsistent with his statement made prior to trial.

MR. FEIGENBAUM:  Yes.

On April 18th, 2022, there was a voluntary interview before Mr. Hernandez had counsel.  He was given a target letter on April 18th, 2022, during the interview that Special Agent Spielvogel and someone else -- I think it was Ordonez -- did at his residence.

Agent Spielvogel testified that -- I have the pages here -- testified that -- when I asked him:  "Did Mr. Hernandez ever" -- to the effect of saying that he violated the law. Mr. Spielvogel went on to say -- rather than answer that directly, he went on to say that:  "Well, what we did was, we kind of stopped the interview at that time because Mr. Hernandez went on to talk about insurance fraud," that, if anything, Mr. Hernandez was claiming that he would be driving -- he heard that the boats were owner boats who wanted to report insurance -- you know, the boats were stolen so they could make insurance claims and get compensated for that.

Agent Spielvogel said he stopped the interview at that point because Mr. Hernandez was starting to lie. However, the leading witness for the Government, Crespo Marquez, testified something different. I'm going to tell the Court right now. And this goes exactly to the focus Your Honor wants because Your Honor is dealing with: Is there evidence that Mr. Hernandez was telling the truth about things or was he lying at trial?

So Crespo Marquez, trial transcript, Page 150 -- let me go -- I think it's 154 -- all right -- 155. The prosecutors -- I'm asking questions. On line -- line 4, Page 155, Crespo Marquez: "You also told the prosecutors that there was another way to make some money, and that was to find people who couldn't pay for their boats, correct?"

Answer: "Correct."

"Then your group would offer to take the boats from them" -- meaning the owners -- "so they could claim their boats were stolen?"

Answer: "Correct."

"And you also told the prosecutors that Javier never was the captain for any of those boats?"

"Repeat the question," he asks.

You told the prosecutors, when you had the meeting with them, that Javier never was the captain taking any of those boats?"

Answer:  "For which boats?"

Question:  "The ones where the owners couldn't pay for them and they wanted to make insurance claims."

Answer:  "I told them" -- meaning the prosecutors -- "that was another variant that could be applied.  And as far as I know, Javier never participated in any of that."

So what does it tell Your Honor?  It tells you that Spielvogel, FBI agent interviewer, is saying that:  "I stopped the interview at that point because Javier was lying to me about the fact that there were insurance -- false insurance claims being made by owners," and Spielvogel says:  "No. That's not true."

Here, Crespo Marquez tells you in trial.  On October -- let's see -- September 29th, 2023, these are words from Crespo.  So Javier takes the stand.  He says that there was this issue about insurance fraud, where owners were trying to get rid of their boats to make insurance claims.  Spielvogel says:  "Oh.  He's starting to lie now.  I don't want to talk to him anymore."  He says that Javier lied during the interview with things like that.  And then we have Crespo saying:  "Yeah. That's what my Gonzalez Vidal group was doing in Mexico."

THE COURT:  All right.

MR. FEIGENBAUM:  So --

THE COURT:  I understand the argument.

Mr. Dobbins, is there anything further?

MR. DOBBINS: Judge, my recollection of the testimony was that he denied taking any of the specific boats that we showed during that trial when we had the owners come in. He denied taking those boats, and under Special Agent Spielvogel he had admitted to taking those boats. So that was very distinct. But other than that, I stand on my previous argument, Judge.

THE COURT: All right. And let me say that I have looked at the case law that has been cited in support of the enhancement. And in this case, I do not find, looking at the statement in April of 2022 and the testimony of Mr. Hernandez at the time of trial, that this Court can specifically find instances of specific perjury. I think it was testimony in opposition, but I'm not willing to find that it amounts to an obstruction of justice, and I do not believe that based on the argument made by the Government that the mere fact that Mr. Hernandez -- and I know that it's more than that -- that he was inconsistent with his statement made to Agent Spielvogel, and his testimony may have been incredible to this jury, and they seemingly found so, but I do not find that it's appropriate to -- based on the statement and the testimony, to find that instances of perjury took place to warrant an enhancement of justice -- or an obstruction of justice enhancement, and that -- the objection by the Government is overruled and that two-point enhancement will not be applied.

MR. FEIGENBAUM:  Thank you, Your Honor.

I had made an objection before about the loss amount. I'll just rely on the same one that was as to the Government's filing Number 223 yesterday.  We don't need to deal with --

THE COURT:  All right.  And the objection is preserved, but it's overruled.

MR. FEIGENBAUM:  Okay.

THE COURT:  Well, the enhancement is sustained, but your objection to that enhancement is noted.  It's overruled.

MR. FEIGENBAUM:  Understood, Your Honor.  Thank you.

So then the other things were the Government arguing that there should be a two-point enhancement for being what amounts to a fence or receiving and selling stolen property. I'm going to rely on the arguments that I made, which were pretty extensive with case law in my filing Number 222, and the earlier one 214.

Then --

THE COURT:  I'm sorry.  The objection is to which enhancement?

MR. FEIGENBAUM:  It's -- let me actually go to my objections at this point, Your Honor.  I think that will be an easier way to do it.  I think we're up to --

THE COURT:  Are you withdrawing the special skill objection?

MR. FEIGENBAUM:  No, Your Honor.

THE COURT: Well, I'm just looking at what's remaining.

MR. FEIGENBAUM: Okay. Let me find that in my own filing. I'm looking, Your Honor, for purposes of what we're talking about right now, under my Document 222, which is the objections to the Revised PSR and Addendum. Turning to Page 8, Paragraph 23 -- I'm sorry -- 22. Paragraph 22, which is Guideline 2B1.1(b)(4), of being in the business -- a person in a business of receiving and selling stolen property. In my Memorandum of Law, in that same document, I do make an extensive argument. Let me get to it. That's on Page 19 of my Memorandum of Law, in Document 222.

And I'm going to save time for the Court and rely on the authorities, including the Eleventh Circuit, that say, in this particular case, where the Government accuses Mr. Hernandez of being the thief, that -- who then gives that property to somebody else, he, as a person, is not in the business of receiving and selling stolen property. The thief can't be the person who receives and sells. It's like a fence or a clearinghouse for somebody who says: "Bring me the stolen property and I'll resell it." He was not in that business. If the Government maintains that he was the thief, he can't also be the fence. So it's all laid out in my Memorandum of Law, Pages 19 through 22 of Document 222. I'm just going to rely on that.

THE COURT: All right. Response?

MR. DOBBINS: Yes, Judge.

Again, the Defendant is charged in a conspiracy. There was plenty of testimony here by Crespo Marquez and Ramon Reyes Aranda as to what the business of the conspiracy was, which was to sell the stolen vessels, and vehicles that were stolen from the United States and brought to Mexico with the intent for them to be sold.

And under the relevant conduct, USSG 1B1.3, he's responsible for any of the acts that are reasonably foreseeable by the conspirators. And clearly, it was known, as Crespo Marquez and Reyes Aranda testified, that these boats would be stolen and then resold after they were disguised. And that was shown, of course, by the evidence where this Defendant is actively involved with Mr. Marrero obtaining the documents for the cloned vehicle identification numbers and the cloned hull identification numbers, and also sharing those with Neco, with Mr. Enrique Lopez.

And so getting documents and bringing these vehicles and vessels over, Your Honor, I think that based on his relevant conduct he does not -- they were in the business -- this was a multitasking criminal group over there in Mexico. And one of their businesses was to be in the business of reselling these vessels, so that they could make money in order to support their alien smuggling conspiracy as well.

THE COURT: And I just -- there's an Eleventh Circuit case that Mr. Feigenbaum cited, where the Eleventh Circuit found that that the Defendant's actions as part of the conspiracy would need to support the enhancement. Did you want to address that case?

I know that Mr. Feigenbaum cited to a Seventh Circuit -- Sixth Circuit. I'm concerned with the Eleventh Circuit's decision.

MR. DOBBINS: Are you referring to Maung? M-A-U-N-G.

THE COURT: Let me go back to the case, and I can -- I believe that was the name of the case. Hold on.

(Pause in proceedings.)

THE COURT: I did not print this. I just have my notes. So it just says: "Eleventh Circuit." So Mr. Feigenbaum, do you have --

MR. FEIGENBAUM: Yes, I do.

THE COURT: Can you cite the Court to that case.

MR. FEIGENBAUM: Yes, I do, Your Honor. It's United States v. Maung, M-A-U-N-G, 267 F.3d 1113, Page 1119, Eleventh Circuit, 2001. I quote from it at Page 1119: "Moreover, under a plain meaning consideration of this guideline," quote, "the defendant himself, and not just his co-conspirator, must have received and sold stolen property. A defendant who has not received and sold cannot be," quote, "in the business of selling -- of receiving and selling," end quote. That's the --

54

THE COURT:  Yeah.  That's the case that the Court is inclined to follow.  So how do you distinguish what the Eleventh Circuit has instructed this district court and the facts of this case?

MR. DOBBINS:  But he was in the business of receiving it, Your Honor.  He would receive the vehicles.  There was testimony by Marrero that that specific Toyota Tundra was then provided to him by one of Neco's men, who brought it to him, and then that's the one that they were cloning the VIN.

THE COURT:  But that's not what the enhancement is. "The defendant was in the business of receiving and selling stolen property." Isn't that the enhancement that the Government is seeking?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  So it's not a disjunctive.

MR. DOBBINS:  I see.

Well, then based on that case law, Judge, I think then this objection should be sustained at that point.

THE COURT:  All right.  I do agree that, in following the Eleventh Circuit's decision, I do not believe that that enhancement would apply.  And that was -- I just want to make sure.  That was a --

MR. DOBBINS:  Two-point, I believe.

THE COURT:  Two levels.  So that would reflect the base offense.

All right.  So -- all right.  Any further objections?

MR. FEIGENBAUM:  Yes, Your Honor.  The special skill, we object to that.  I'll rely on the argument I made in my written --

THE COURT:  I don't believe that the facts support not applying the enhancement for a special skill.  Mr. Hernandez was specifically the individual that piloted the vessels.  So how is it that the Court factually is not to apply that enhancement?

MR. FEIGENBAUM:  Well, because, Your Honor, I think I recalled in one of my filings that Your Honor has many Title 46 cases in this district.  And when you have a person who drives these drug boats from, let's say, Colombia to -- through the Caribbean to Dominican Republic, the -- typically, the person who drives the boat does not get a special skill enhancement.

THE COURT:  Well, when you say:  "Typically," I'm not sure that that's supported by the case law.  If the individual used a special skill of being able to pilot a vessel, and to utilize the GPS, and determine the coordinates, then that's a special skill that is not shared by other members of the vessel.

So in this case specifically with Mr. Hernandez, how is it that Mr. Hernandez's special skill does not warrant an enhancement?

MR. FEIGENBAUM:  Because I argue in my papers that

people who own pleasure craft -- the typical pleasure craft owner has a GPS, has things to find out what the weather's going to be like, and makes boat trips -- the typical boat owner, without any special training or licensing, makes these trips to the Bahamas, to Mexico, to other places, and they don't have -- in other words, the ability to drive a boat from the west coast of Florida to Mexico does not require any more special skill or licensing or special education than the typical boat owner has with GPS and other software that you can have in your phone.

THE COURT: A response?

MR. DOBBINS: Yes, Judge.

There was testimony by Mr. Crespo Marquez and Mr. Ramon Reyes Aranda, as well Special Agent Evan Sanborn of the Coast Guard -- I believe even the witnesses -- I believe Mr. Riemer, the Defense witness, and Mr. Hernandez himself testified about the dangers and the dangerous nature of the trip, how it did require a certain knowledge. And obviously to pilot a boat such as this alone across the Gulf, as opposed to to just taking a pleasure boat out and not -- you know, and staying within a certain distance of the coast line of the state of Florida, that was all made very clear during the testimony that this is a very dangerous trip that requires a certain amount of seamanship to be able to accomplish it, a knowledge of the currents, as well as -- you know, and I

believe even Mr. Hernandez testified that after his first couple of trips he realized he needed to be at a certain point where the currents were in flux during the daylight, so it could be easier for him to navigate.  And that certainly is something that is more than just the average owner of a pleasure craft.

THE COURT:  All right.  Is there anything further, Mr. Feigenbaum?

MR. FEIGENBAUM:  Yeah.  That would just show that a person who didn't have any special skill or training learned, after making the trip a couple of times, how to do it a better way.

THE COURT:  I certainly believe that the facts of this case warrant the enhancement.  Mr. Hernandez had a special skill of captaining, maneuvering, operating the vessel on the high seas, and as such the enhancement does apply.  The objection -- well, actually the objection to the Probation officer's application of the enhancement is overruled.

Any further objections by either side?

MR. FEIGENBAUM:  Yes, Your Honor.  Sorry.  One moment.

I objected to the nine-level enhancement for more than 100 migrants.  This is one definitely, Your Honor, where it's a Lawrence violation.  There was absolutely no evidence provided that Mr. Hernandez induced or encouraged more than 100 migrants to try to enter the United States.  In fact, if you look at my

filing 222, at Paragraph 28, which actually starts on the prior -- looking at Pages 9 and 10 of my Document 222, Paragraph 28, that's my objection to the number of migrants.

In the PSI, Your Honor, it says that, quote -- in the PSR, it says: "Beginning in 2009 and continuing through September 5, 2023, Jose Miguel Gonzalez Vidal, Reynaldo Crespo Marquez, and additional associates," parenthesis, "whose conduct is unrelated to Hernandez," end paren, "were members of a criminal organization and an alien smuggling conspiracy operating in various locations," et cetera, et cetera.

So here the PSI states that their conduct in bringing more than a hundred migrants is conduct unrelated to Hernandez. The PSR serves as a stipulation, the equivalent in a civil trial, unless the parties object to the language in it. And here, both in the original and the revised, the Probation officer put that Hernandez's conduct was unrelated to that migrant smuggling operation of what turned out to be the Gonzalez Vidal case.

So that's what I'm asking Your Honor to consider. And beyond that, the jury, although finding Mr. Hernandez guilty of the count for inducing aliens to enter the United States, never decided the number of migrants, and that's an aggravating factor.

More than that, Your Honor, in my Memorandum of Law -- in that same document, I actually lay out for the Court

something that's very interesting. If you look at the Crespo Indictment, and you compare the allegations of when migrants were brought from Cuba to Mexico, the dates do not coincide at all with the dates that Hernandez's Indictment says he drove boats to -- stolen boats to Mexico.

So the Government has not provided any Lawrence-compliant evidence which would support that Mr. Hernandez should be enhanced for more than 100 migrants. He wasn't even part of their smuggling operation from Cuba to Mexico.

THE COURT: All right. Response?

MR. DOBBINS: Yes, Your Honor.

He was part of that conspiracy, as was brought out in trial testimony by Crespo Marquez. And again, remember -- Mr. Feigenbaum is correct. He didn't physically transport any migrants from Cuba to Mexico, but he's part of the conspiracy. And his actions were the fuel that enabled this organization to operate, to continue to go and provide that stuff.

The witnesses testified -- especially Crespo Marquez, that they had to pay a tax to the Mexican cartels because -- to operate this illegal smuggling business, because they are operating illegally in the Mexican cartels' territory. They also had to provide enough bribes to the Mexican Government officials so that they could continue to operate, and that's why they needed these pleasure boats. And they would come

over, and this Defendant would bring those boats over, and the vehicles over, so that they could be used in that regard.

And what Crespo Marquez testified to is that at a certain point this Defendant became so trusted that he then became what was known as a bank for Chupa, also known as Gonzalez Vidal. And that was --

THE COURT: I'm actually going to stop you, Mr. Dobbins, because I want to be very specific with regard to a hundred or more aliens because that's the enhancement. And when I look at Mr. Reyes Aranda's PSI, it speaks of a conspiracy that begins in 2009 and continues to 2023, with Gonzalez Vidal, Crespo Marquez, and additional associates whose conduct is unrelated to Hernandez.

So I understand that there was an overall conspiracy that began in 2009. But if the Court looks specifically at the enhancement, and the enhancement tells the Court that the offense involves the smuggling, transporting, or harboring, there's an increase by nine levels under 2L1.1(b)(2)(C), what involvement does Mr. Hernandez have with regard to the conspiracy, which, by virtue of the Indictment, his involvement occurred much later?

MR. DOBBINS: Right. But again, under the relevant conduct rules of 1B1.3, he's responsible for what is reasonably foreseeable based on the conspiracy. And he had extensive knowledge of the different multiple houses that were being

used, he visited those, he knew all of the co-conspirators, and he was collecting money from the migrants' families for the Chupa -- the Gonzalez Vidal organization. And it is related in that regard because, again, he is helping those people.

And in addition, on top of that, you have his own words in his WhatsApp chats, where he's talking about: "Our group. We have these officials in our pocket. We need them to loosen up so we can continue moving people again."

And all of these defendants in the Gonzalez Vidal RICO Indictment were found to be responsible for over 100 migrants. It was reasonably foreseeable. And that's what -- and his actions facilitated that process. And he was collecting money. He was taking these stolen boats and stolen vehicles over to allow the organization to continue to operate its alien smuggling venture. And so, therefore, Your Honor, he is responsible for the nature -- for what was reasonably foreseeable to him as a member of that conspiracy, and that's over a hundred migrants.

THE COURT: So in this case, Mr. Hernandez was not involved in the act, but he had the knowledge of the smuggling venture when he became part of the conspiracy beginning in May of 2017.

MR. DOBBINS: Yes, Your Honor. And then took actions to help facilitate the operation of that smuggling venture and conspiracy.

THE COURT:  All right.  Mr. Feigenbaum, the objection is preserved.  But looking at the application of 2L1.1(b)(2)(C), it would appear that the offense involved the smuggling, transporting, or harboring of over 100 aliens.  And the objection is preserved, but the enhancement is appropriate.

MR. FEIGENBAUM:  All right, Your Honor.  Let me go on to the next one.

THE COURT:  And I just want to -- the parties had reserved two hours.  It is twelve o'clock.  We are in the middle of a jury trial, and we are starting at one o'clock.  So I need to be sensitive to my staff, who does need an appropriate lunch recess before we begin the trial.

MR. FEIGENBAUM:  Respecting that, Your Honor, I really took a lot of time to deal with the Revised PSR, and the Addendum, and then the Government's objections and what the Government filed last night.  So I'm confident that what I have provided to the Court is sufficient to show why none of the enhancements should be added, especially --

THE COURT:  Well, what other enhancements do we need to deal with?

MR. FEIGENBAUM:  Okay.  Okay, Your Honor.  The ones that are in my -- are in my objections, which were -- it's Document 222.

So the other ones are -- they all relate to the abuse or physical injury that any migrants may have suffered in the

Gonzalez Vidal case. And there, I say there's a total absence of any evidence that Mr. Hernandez knew about any physical abuse or injury to anyone else, or serious risk of death. There's just -- there was no such evidence at trial that showed that Mr. Hernandez had any knowledge of that, and they should not be added to his guideline calculation. They're just not part of the trial evidence.

The two migrants who came in and talked about that, the first two Government witnesses, they said things happened to them at the hands of Gonzalez Vidal and Crespo Marquez. The Government, Your Honor, did not even have them try and identify Mr. Hernandez as being involved. And there was no evidence -- so you bring these two guys. They don't know who Mr. Hernandez is -- well, the Government doesn't even ask them to identify him or whether he was there. Yet, the Government's trying to say those terrible things that were charges in the Gonzalez Vidal case must be added to Mr. Hernandez's guideline calculation.

And furthermore, there was no evidence that Mr. Hernandez ever went to a location where migrants were being abused. There was testimony that he went to some location that was called the Finca, that was very nice, according Mr. Crespo. It had a pool and a bar. And migrants were there, and he did see them -- Mr. Hernandez did -- but there was no evidence or physical abuse of physical injury or anything like that.

64

Therefore, I'm asking the Court to sustain my objections to all of the aggravating factors which the Government and the Probation officer put in the PSR at -- let's see -- Paragraphs -- well, all the paragraphs -- I can find it real quick for Your Honor.

THE COURT: It's Paragraphs 49 and 50.

MR. FEIGENBAUM: Is it 49 and 50, Your Honor?

All right. Let me go right to that.

It was 48. We also object to that too, as I've done. Because there was no evidence that Mr. Hernandez even knew any dangerous weapons were being used against any migrants. Forty-Nine is the creating a substantial risk of death or serious bodily injury. Fifty is that -- if a person died or sustained serious bodily injury.

So all those levels together, four plus two -- six -- that's 12 levels right there that the Government is advocating be added to the base offense level for Count Group 2. They're not justified. They don't have any basis in fact or evidence. And that's my argument on that, Your Honor.

THE COURT: All right. Any response?

MR. DOBBINS: Yes, Your Honor.

Again, there was testimony that this Defendant knew about what was going on when the smuggling venture -- and that Mr. Crespo Marquez testified that he visited the -- what was known as the Finca on a couple of occasions. He was well aware

of what the group was doing. And that was corroborated by Special Agent Spielvogel's testimony about his interview with this Defendant, where the Defendant admitted that he knew about the extortionate threats to get the families to pay, and that -- the fact that the migrants not allowed to move freely and were detained unless they paid, and he knew that anybody that was moving around had paid.

So based on that, Your Honor -- and I would add that it was reasonably foreseeable under 1B1.3 -- this is his part in the conspiracy -- that he knew that the group was using a dangerous weapon because he knew about the threats to the migrants and their families to get them to pay.

As to the offense involving intentionally or recklessly creating a substantial risk of death or serious bodily injury to another, under USSG 2L1.1(b)(6), again, it's reasonably foreseeable that he knew what was happening if the migrants' family didn't pay based on the threats.

In addition to that, knowing the nature of the trip, and knowing the fact that these migrants were being smuggled out of Cuba and into Mexico illegally, and knowing the dangerousness of the trip, again, the Defendant had more than enough knowledge to know that that also provided a substantial reckless -- I'm sorry -- a reckless or intentional risk -- substantial risk of death or serious bodily injury to the migrants. So I would submit that that two-point objection

should also apply under 1B1.3.

And then, again, the final one is the bodily injury under 2L1.1. That goes similar to the dangerous weapon enhancement. Again, this Defendant knew that they were being held against their will. He was able to identify other houses besides the Finca to Special Agent Spielvogel, and other participants in there, and he knew about the fact that they were being held against their will and being threatened. And so, Your Honor, the Government submits that it's reasonably foreseeable that he be held responsible for the bodily injury that those migrants suffered.

THE COURT: All right. And I believe that it needs to be more than reasonably foreseeable based on testimony with regard to actions that may not have had involvement by Mr. Hernandez.

I don't -- with regard to the dangerous weapon being brandished or otherwise used, I do not believe that the testimony supports that enhancement, and the objection is sustained.

With regard to the offense involving intentionally recklessly creating a substantial risk of death or serious bodily injury, I do believe that the testimony supported that this Defendant knew about the smuggling venture. He knew about the threats that were being made. So certainly this Defendant had knowledge, and it was certainly reasonably foreseeable that

there was a substantial risk of death or serious bodily injury. So that enhancement is proper, and the two-point enhancement is appropriate based on the testimony that has been presented at this trial.

With regard to Paragraph 50, there was no testimony that a person died or sustained bodily injury, and I don't believe -- it says: "Migrant sustained permanent life-threatening bodily injury because they were beaten, tortured, and/or raped." I don't believe that there's any support for that six-level enhancement. So the objection is sustained with regard to Paragraphs 50 and 48, and overruled with regard to Paragraph 49.

Any further objections?

MR. FEIGENBAUM: Your Honor, respecting the Court's time, and your staff's time as well, let me just rely on what I filed in terms of my objections, and I would renew them at this time as to any written and oral objections and Memorandum of Law, and the arguments that I have made here today at the sentencing hearing. I want to renew all of those things to preserve the record. I really appreciate all the time you have given us, Your Honor. You are very kind and very --

THE COURT: And given that the parties have exceeded the time that the Court allocated, I'd like to calculate the guidelines, and then -- I see that there are family members that want to speak. I'd like to reset this for purposes of the

3553(a) factors and the imposition of sentence.

MR. FEIGENBAUM: Actually, the family is not going to speak, Your Honor. So --

THE COURT: Well, certainly Mr. Hernandez would have the right to speak, and I'm certain that the attorneys will make further argument. And quite frankly, my court reporter has been here since 8:30 this morning, will be here until five clock p.m. with the trial. So I can't require that she continue. It's just not fair.

All right. So if we can calculate the guidelines, and then we'll reset. And Liz, if you can give me another date for the rescheduling of the sentencing hearing.

COURTROOM DEPUTY: How much time do you think we'll need?

THE COURT: Another 30 minutes, please.

COURTROOM DEPUTY: Okay.

THE COURT: All right. So for purposes of the grouping, if we can begin with Count 1, and I'm just going to ask the Probation officer to recalculate in open court.

PROBATION OFFICER: Yes, Your Honor.

(Pause in proceedings.)

PROBATION OFFICER: So as to Paragraph 40, the base offense level is 24, plus the two-level enhancement because he was convicted under 18 USC Section 1956, plus the two-level enhancement for the special skill, a total offense level of 28.

As to Count Group 2, Paragraph 46, offense level 12, plus a nine-level enhancement for specific offense characteristic, plus a two-level enhancement because the offense involved intentional or reckless creating a substantial risk of death or serious bodily injury, total offense level 23.

As to Paragraph 55, Count Group 1 becomes adjusted offense level 28, with a unit 1.0.  And Count Group 2, adjusted offense level 23, with half a unit.  Total number of units 1.5.

Paragraph 56, the adjusted offense level is 28, plus a one-level increase for the unit, is a combined adjusted offense level of 29.

So total offense level 29, criminal history category I, 87 to 108 months.

THE COURT:  Is that a correct calculation of the advisory guidelines?

MR. FEIGENBAUM:  Well, Your Honor, I could say that she calculated correctly according to Your Honor's ruling.  I just, for the record, don't agree with --

THE COURT:  Based on the Court's rulings, is that a correct calculation of the advisory guidelines?

MR. FEIGENBAUM:  Yes, Your Honor.

THE COURT:  Mr. Dobbins, do you agree, sir?

MR. DOBBINS:  Yes, Your Honor.

THE COURT:  All right, then.

Then, at this point in time, we would proceed to the

3553(a) factors. And the courtroom deputy has given another date. Let me make sure it aligns with your schedule. On February 15th, since we will still be in trial, we can schedule that right at nine o'clock.

Would that work with your schedules? So Thursday, February 15th, at nine a.m.

MR. FEIGENBAUM: I have to turn on my phone, Your Honor.

THE COURT: Yes. Of course.

(Pause in proceedings.)

MR. DOBBINS: I'm sorry, Your Honor. What time on the 15th did you say?

THE COURT: Would nine a.m. work for both sides?

MR. DOBBINS: That would work for the Government, Your Honor. Thank you.

THE COURT: Okay. Take the time and let me know. And I apologize to the family, but the Court did give over the two hours that the parties requested.

MR. FEIGENBAUM: Right. But again, Your Honor, the family members just want to be here. They were not going to speak.

THE COURT: Okay. And they certainly have the right to be heard now and at the rescheduled sentencing hearing. So would February 15th at nine a.m. work, Mr. Feigenbaum?

MR. FEIGENBAUM: I'm turning it on right now. It

should be quick.

Just to be clear, then, the evidentiary portion of the hearing is over?

THE COURT:  I don't believe that there would be any additional -- we're moving to the 3553(a) factors.  So certainly Mr. Hernandez is entitled to speak and any member of the family may as well.

MR. FEIGENBAUM:  I do understand.

Should be real quick, Your Honor.

(Pause in proceedings.)

MR. FEIGENBAUM:  Yes.  Perfect, Your Honor.

THE COURT:  Okay.  We'll see you on February 15th at nine a.m.

Thank you so much.

MR. FEIGENBAUM:  Thanks to you and your staff.

THE COURT:  Have a nice weekend.

Thanks, Yvette.

(Proceedings adjourned at 12:12 p.m.)

UNITED STATES OF AMERICA        )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 2nd day of February, 2024, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 72.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 8th day of June, 2024.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov