IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:22-cr-20557-BB-1


UNITED STATES OF AMERICA,

       Plaintiff,                     February 9, 2024
                                    1:16 p.m.
     vs.

JAVIER HERNANDEZ,

       Defendant.                  Pages 1 THROUGH 36

_____

TRANSCRIPT OF SENTENCING DAY 2
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE


Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                    Brian Dobbins, AUSA
                    Arielle Klepach, AUSA
                    99 Northeast 4th Street
                    Miami, Florida 33132


FOR THE DEFENDANT:  MARTIN A. FEIGENBAUM, ESQ.
                    PO BOX 545960
                    Surfside, Florida 33154-9998


COURT REPORTER:     Yvette Hernandez
                    U.S. District Court
                    400 North Miami Avenue, Room 10-2
                    Miami, Florida 33128
                    yvette_hernandez@flsd.uscourts.gov


ALSO PRESENT:       Mercedes Sornoza, USPO

(Call to order of the Court, 1:16 p.m.)

COURTROOM DEPUTY: Calling Criminal Case Number 22-20557, United States of America v. Javier Hernandez.

Counsel, please state your appearances for the record.

MR. DOBBINS: Good afternoon, Your Honor. Brian Dobbins and Arielle Klepach on behalf of the Government.

THE COURT: Hi. Good afternoon.

MR. FEIGENBAUM: Good afternoon, Your Honor. Marty Feigenbaum on behalf of Javier Hernandez, who is present before the Court with the assistance of a Spanish interpreter.

THE COURT: Good afternoon to each of you.

And Mr. Hernandez, I do see that you are using an earpiece that allows you to hear the interpreter. Is the equipment working properly, sir?

THE DEFENDANT: (Through Interpreter.) Yes.

THE COURT: If at any time the equipment stops working, or you're unable to hear the interpreter, if you'll let me know. All right, sir?

THE DEFENDANT: Okay.

THE COURT: And may I have the name of the Probation officer that's present in the courtroom.

PROBATION OFFICER: Good afternoon, Your Honor. Mercedes Sornoza on behalf of US Probation.

THE COURT: Good afternoon.

Recall that when we were together we had addressed the

objections on both sides to the Presentence Investigation Report.  I had advised Mr. Hernandez of the items that I have reviewed in preparation for the sentencing hearing.  The hearing took a little bit longer than we anticipated.  It was past a two-hour period.  And as such, we agreed that we would reset the portion of the sentencing hearing relating to the 3553(a) factors.

The Court has already calculated the advisory guidelines, based on its ruling on certain objections.  And with the total offense level of 29 and criminal history category of I, the guideline range of imprisonment was 87 to 108 months; is that correct?

MR. DOBBINS:  Yes, Your Honor.

MR. FEIGENBAUM:  That was your ruling, yes, Your Honor.

THE COURT:  All right.  Mr. Hernandez, at this point, in addressing the 3553(a) factors, I certainly want to thank your attorney, Mr. Feigenbaum, who has filed a Sentencing Memorandum, as well as letters in support, but I want to make sure that you understand that if there is anything that you would like to say to the Court certainly you may do so.  If there are individuals on your behalf that would like to come before the Court and speak, they are certainly invited to do so.

Mr. Feigenbaum?

MR. FEIGENBAUM:  Yes, Your Honor.  You would like me to address the 3553 factors now?

THE COURT:  Whatever is your pleasure, sir.

MR. FEIGENBAUM:  Yes.  Thank you, Your Honor.

May I use the lecturn?

THE COURT:  Yes.  Of course.

MR. FEIGENBAUM:  Thank you.

First, Your Honor, thanks again for giving us all this time.

THE COURT:  Of course.

MR. FEIGENBAUM:  Really appreciate it.

Here, in support of Mr. Hernandez -- let me introduce the people who are attending.  We have Cristina, his wife, is present.  We have a cousin, Dayami Hernandez.  We have an aunt, who is Julia Martinez Del Valle.  We have Ailiuj Hernandez, a cousin.  We have Sergio Maya, who is a brother-in-law.  We have Belkys Alvaro, a friend of the family.  And we have Gabriela Hernandez, a cousin.  Thank you.

THE COURT:  Thank you.

MR. FEIGENBAUM:  Your Honor, what I would like to do is first just talk about a couple of overall things under the 3553(a) factors that you consider before imposing sentence. Focusing -- rather than going one by one, because some of them I think we've already discussed before at various times in the last sentencing hearing we had.

But after the nature and circumstances of the offense, the second criterion that the Court looks at is the need for the sentence imposed to reflect certain things, like seriousness, respect for the law, just punishment, adequate deterrence and protecting the public from further crimes.

So when we look at that factor, Your Honor -- in a little while, I'm going to go over the particulars as to the background and how Mr. Hernandez has lived his life since he came to the United States from Cuba in 2005.  So some of these things Your Honor is very familiar with, but let me just bring them up again.

Many defense attorneys turn to Gall v. United States, which is 553 US 38, a 2007 Supreme Court case that dealt with some of the factors that Your Honor already has mentioned as well when imposing a sentence.  For example, that the sentence should be sufficient but not greater than necessary to carry out the objectives of the sentencing statute, and that not all of the seven sentencing factors under 3553(a) need to be given equal weight.  Some Your Honor can give more weight than -- more weight to than others.

An appellate court is not allowed to presume that because you gave a sentence that was not within the advisory guideline range -- that its unreasonable.  Your Honor has a lot of discretion to give a final sentence, even though it doesn't correspond to the guideline range.  And an appellate court

doesn't have any presumption of it being wrong because of your great discretion that you have, Your Honor.

So some of the particular factors regarding Mr. Hernandez's particular situation is he's almost 51 years old.  He has no criminal history points.  You can see that at the PSR, Pages 17 to 19.  He did -- one of the things that's mentioned there, he received a $65 fine for a higher speed than allowed in a manatee zone.  That was in April of 2008, 16 years ago.  After that, you'll see in Pages 18 and 19 of the PSR -- that's Paragraph 66 to 70, he's had some traffic violations that were charged, but not prosecuted or dismissed.  That's pretty much what we have about Javier Hernandez in terms of not respecting the law, except for, of course, the offense conduct in this case.

So as I said, he is almost 51.  He grew up in Cuba. He has an older son, Javier Alfonso Hernandez, age 21.  The son was working as a delivery person for a company called LaserShip, but recently his son went to live with Javier's mother in Spain.  Javier also has another son with his wife Isabel Cristina, who is present today in court.  That son -- his name is Emiliano.  He's age 11.

So Cristina and Emiliano live in the same rental apartment where Javier did until he was taken into custody in -- after the jury verdict.  And that's a place -- a rental apartment where Javier, Cristina, and the two sons had lived

for something like seven to eight years.  And that's where Javier's wife still lives with the younger son this very day.  His family has been very supportive in these difficult times.

So Javier lived in Cuba until 2005, when he came to the United States alone.  And he lived in Miami until 2008, when he took some time in Grand Island, Nebraska for an employment opportunity.

Javier has been living with his wife and two sons in that same apartment, as I said, for around eight years, which is a one-bedroom, one-bathroom apartment.

Javier became a citizen on June 29th, 2012.  The PSR reflects he did not have any history of alcohol, or drug, or substance abuse.  He graduated high school in Cuba and earned a certification there for auto mechanic.  He then earned another degree in mechanical engineering.

Regarding his employment record in the United States, the PSR shows that before trial he was employed full-time as a driver, delivery person for LaserShip, a package delivery service located in Doral.  He was paid a dollar 45 per box, in addition to base pay of $1,000 per week.  Prior to working with LaserShip, the PSR reflects he was also a driver for Amazon and had been employed with Uber from 2014 to November 2021.

Before that employment, from 2007 to 2014, he was a full-time laborer at Avianca Cargo at MIA, earning $12 per hour.  He left that employment to seek better income, and began

driving for Uber and Amazon.

So then, at some point, the offense conduct comes into play -- which, by the way, that employment history is all in the PSR. So then comes the offense conduct. And that pretty much is limited to the years 2018 and 2019.

And at Paragraphs 95 to 101 of the PSR, there is a financial analysis, which concludes that Mr. Hernandez does not have any cash flow. And based upon present financial situation, he does not have the ability to pay a fine because he is in indigent status with appointed counsel. And the $5,000 special assessment is not applicable for that reason, according to the PSR. So we're asking that no fine be imposed, Your Honor. And that information is in the PSR at Paragraph 101.

Now, getting a little more specific about the PSR offense calculation, Your Honor calculated a total offense level of 29, criminal history category I, with an advisory imprisonment range of 87 to 108 months. Here's what we're asking Your Honor to take into account before you decide whether you should impose a sentence in that range or something below -- here's what we'd like to you to consider, Your Honor: The crimes charged against Mr. Hernandez in the Indictment, and later a Superseding Indictment, came about in November 2022 and March of 2023. The latter being for the Superseding Indictment.

The offense conduct was described generally as occurring in 2018 until December 2019.  I believe there was one specific event of a boat that was mentioned in December 2018, and then three more boats during the year 2019, the last one being in December of 2019.

Your Honor may recall from the trial that, as to that last boat -- when Mr. Hernandez arrived in Mexico in late November of 2019, he was arrested a few days later because of that boat, and spent about 30 days in a Mexican jail there, until -- I believe it was December 25 of 2019, about 30 days.  So the last boat that Mr. Hernandez drove to Mexico was seized by the Mexican police.  And they got into contact with the FBI in Florida, in Miami -- and this was all brought out during the trial.  And in fact, some of the FBI agents who were investigating certain events went to Mexico in the middle of December and did some investigation regarding that boat.  The owner of the boat was contacted.  That person, I believe, was from Naples, Florida.  And that was as to the last boat, which was the subject of the case against Mr. Hernandez.

So Mr. Hernandez then comes back from Mexico after being released 30 days later by the Mexican authorities, and he comes back to Miami and he returns to his home and his family. He goes back to work as a delivery person for Amazon.  He lives with his wife and two sons at that same rental apartment where they had lived for many years.

So what I'm trying to bring out to the Court is, yes, there was offense conduct during those two years. There was a jury verdict. There was an opportunity for Mr. Hernandez to present a defense, and the jury made its decision. But what I wanted to bring out was that when Mr. Hernandez got back to Florida, after December of 2019, nothing happened regarding the theft of that last boat from the Naples, Florida area. Mr. Hernandez went back and worked, never had any further law violations. His employment history was fully documented once he got back from Mexico, and he lived a lawful life and supported his family.

So nearly three years pass, Your Honor, after Mr. Hernandez gets back in December of 2019, before the charges are brought against him in November of 2022. And Mr. Hernandez worked and lived as a person who took care of his family -- worked hard, because the delivering of packages is pretty hectic, from what I learned from him over time.

So anyway, Mr. Hernandez continued to live with his family at the same place. Where am I going with all of this? I'm giving you this background, Your Honor, because the sentence we're asking you to consider for Mr. Hernandez is below the low end of the guideline range that Your Honor picked at the last hearing. And here's the way I would request that Your Honor at least consider it: There was a two-level increase at Paragraph 40 in the Revised PSR, which the --

Ms. Sornoza was kind enough to give us the pages that were going to be revised pursuant to Your Honor's rulings last Friday.  And I was able to go visit with Mr. Hernandez for a couple of hours on Tuesday of this week to go over them.

So I believe in the Revised, Page 40, dated February 8, 2024, there is a two-level increase for an offense involving organized scheme to steal or receive stolen vehicles, or vehicle parts, or goods or chattels that are part of a cargo shipment.  So Your Honor found -- and we respect all your rulings, Your Honor -- Your Honor found that there was a two-level increase based on Government witness Crespo Marquez's testimony that Mr. Hernandez drove cars that Crespo said were stolen to Mexico.

And we understand Your Honor's ruling, again.  We're not asking you to change your ruling.  You finalized that already.  But I would just say that the evidence that the vehicles -- any vehicles were stolen which were driven by Mr. Hernandez was on Mr. Crespo's testimony.  And furthermore, Your Honor, the two charges that had to do with vehicles, rather than vessels, Counts 3 and 4 of the Superseding Indictment, they don't have the fact that a vehicle or parts are stolen as part of the charge.

So it's a -- Mr. Hernandez -- there was proof, obviously, that he drove one or more vehicles to Mexico, but there was no testimony that I could find from Mr. Crespo, in

reviewing the transcript pages that we have, that he stated that Mr. Hernandez knew any of the vessels -- any of the vehicles, rather, were stolen.

Mr. Crespo, at Pages 138 to 140 of his testimony, on September 29th, 2023, said that there was another person named Ramon, not the codefendant, who would contact Crespo about what cars were available.  And that was the person, again, at Pages 138 to 140, where -- Mr. Crespo testified that that was the person who provided the vehicles and who did the registrations and any things that had to be done to them.  And I didn't find anything where it said that Mr. Hernandez was either involved in any thefts or knew about any thefts.

But I'm not arguing that now, Your Honor, because we understand your rulings and we're not trying to change that. I'm just saying in the overall scheme of things then, when you look at that additional two points, it might be something you could say the evidence was not great.  It might be a consideration that the charges in Counts 3 and 4 don't require a stolen vehicle.

And so if Your Honor were to look at the level 29 that Your Honor currently has set for his total offense level -- look at those two points as two stolen vehicles, and the evidence that was adduced about them, and then the one point that is given when there's multiple counts -- that can't be combined.  They have to be separately calculated for offense

level.  That's three levels.

And if Your Honor were to take into account everything about Mr. Hernandez's life since he came to the United States, his work history, basically free of any criminal conduct, other than the offense conduct in this particular case, and returned to a lawful life once he came back from Mexico in late 2019, three years passing before he's charged in this case -- when you take that all together, and you look at the two levels that were for the organized scheme for the vehicles or vehicle parts, and the one point that was added for multiple counts, you would come down to -- in thinking about what sentence might be appropriate -- coming down to a level 26.  And a level 26 has an advisory guideline range of 63 to 78 months.

So getting towards the end, Your Honor -- thanks for the time.  If you were to look at a level 26 total as kind of a guidepost to figure out what might be appropriate, sufficient, but not greater than necessary to punish Mr. Hernandez, that has a guideline range of 63 to 78 months.  Taking into consideration the criminal history points, having a history of lawful employment from his arrival in the USA in 2005, working to become a citizen of the United States by 2012, and the history and chronology of this case, we're asking Your Honor to look at all those things and fashion a sentence that meets the goals of the sentencing statute and the guidance that we have in Gall v. United States.

That's pretty much what I have, Your Honor.  Of course -- I think there might be just one family member who wanted to say a few words.  But of course, that's whenever you tell us.  And I believe Mr. Hernandez has a few words for the Court.  And then there's some housekeeping matters at the end that I would -- you know, some requests for a designation and so forth.  But you let me know, Your Honor, when those things should be brought up.

THE COURT:  All right.  Well, at this point, if Mr. Hernandez or the family members would like to speak, this might be the appropriate time.

MR. FEIGENBAUM:  Very well.  May I see which one wanted to speak?

THE COURT:  Yes.  Of course.

(Pause in proceedings.)

THE INTERPRETER:  Your Honor, from the interpreter -- I apologize for interrupting -- will the gentleman be needing Spanish interpretation or will he speak in English?

THE COURT:  Sir, do you speak English?

MR. MAYA:  (In English.)  No.

THE COURT:  Would you be kind enough to assist the gentleman?

THE INTERPRETER:  Of course, Your Honor.

Mr. Feigenbaum, if you could let us know ahead of time, so that we can prepare.

15

MR. FEIGENBAUM:  Introduce him?

THE COURT:  No.  No.  No.  If he's in need of the interpreter's assistance, that we would need to know ahead of time.

MR. FEIGENBAUM:  Yes.  He needs the interpreter's assistance.  I'm sorry.  I should have mentioned that.  I wasn't sure which person was going to speak.

THE COURT:  Okay.

MR. MAYA:  (Through Interpreter.)  Honorable Judge Bloom.

THE COURT:  Sir, what is your name?

MR. MAYA:  Sergio Maya.

THE COURT:  Good afternoon.

MR. MAYA:  Likewise.

First of all, on behalf of the family, friends of Javier Hernandez, we would like to thank you for the opportunity of being able to advocate on his behalf.

We humbly ask you to please be merciful with Javi.  He is a family man of good sentiments towards his loved ones.  He is truly a good husband, a good son, a good brother, and he has two children, especially one that is 11 years old that lives with him.  At this age, the son is of the age where he really needs his father.  I truly tell you that he is not a criminal. He's not capable of doing -- causing that damage to someone.

Your Honor, we implore to you, we want you to take

16

into account that Javier Hernandez, during that year of probation, he complied with, he assisted, and he was available to all conditions that the authorities required of him.  And he has shown that with discipline he is capable of following the orders and the conditions that are required of him.

We ask you to please -- we ask you -- this is a heartfelt request for -- please to give him the least severe possible sanction that you mete out to him.

And I would also like to thank of my young nephew Emiliano -- I would like to thank you on his behalf, and I know he would wish to thank you as well.

I leave everything in God's hand and in your justice.

(In English.)  Thank you.

THE COURT:  Thank you, Mr. Maya.  Appreciate your words, sir.

MR. FEIGENBAUM:  Your Honor, at this time, would you like to hear from Mr. Hernandez?

THE COURT:  If Mr. Hernandez would like to say something, certainly.

MR. FEIGENBAUM:  Would you like him to rise?

THE COURT:  It doesn't -- Mr. Hernandez, you don't have to.  You can remain seated.  Whatever is your pleasure, sir.

THE DEFENDANT:  (Through Interpreter.)  Good afternoon, Your Honor.

THE COURT: Good afternoon.

THE DEFENDANT: First of all, I would like to thank you for giving me the opportunity to address you.

First of all, I would like to let you know that I consider myself as a family man above all things, a working -- hardworking person. I have always been the support of my family. And I would say that these moments have been very hard to me. It's very hard to me not being able to be there to support them.

First of all, I would like to apologize before God. I've been talking to God, addressing God, for a long time already. I would like to apologize to my family, my wife, my children, and all those that are close to me, because of this moment that I'm making them go through it. And above all, I would like to apologize to my wife because of all the health problems that she's had. And my youngest son, I have not been able to help him with his schoolwork. And I would like to please ask you to be merciful, and to please be fair with me.

Thank you very much, Your Honor.

THE COURT: Thank you, sir.

MR. FEIGENBAUM: We don't have anyone else, Your Honor, to speak. I just had some requests, but you tell me when you would like me to do that.

THE COURT: Okay. Perhaps we'll hear from the Government, and then we can certainly entertain the requests.

Mr. Dobbins?

MR. DOBBINS:  Yes, Your Honor.

Thank you.

I -- the Government filed their Sentencing Memorandum, which I know you stated that you had read, which stated our position under the 3553(a) factors and our recommended sentence at that time, which was at the low end of what have the original -- I'm sorry -- the revised Probation report prior to sentencing hearing had reflected.  That was based on the fact that the Government felt that the guidelines are in most cases reasonable as calculated, and therefore a sentence within the advisory guideline range is appropriate, and we recommended 210 months.

Obviously, Your Honor has made several findings that have reduced that.  It's stated currently at 29 -- offense level 29, with a criminal history category I, and an advisory guideline range of 87 to 108 months.

In our guidelines -- just as a basic framework, in our argument, we put in the related defendants, so Your Honor had a sense of what the defendants in the RICO case received as a result of their participation in this conspiracy, particularly the alien smuggling conspiracy, and then also the boat thefts, the vehicle thefts, to generate the bribes and the money laundering conspiracy.

And what you see, Judge, from that, obviously, is that

the two defendants at the top of that chain in the RICO conspiracy received 25 years, which was the maximum for what they pled. And then you had a number of people that fell below that, depending on their roles.

Some of those roles were that they were the minders of migrants, who participated in the torture events. And then all way down to -- I believe his name was Abreu Garcia, who received the lowest sentence, and he was 10 years -- 10 years. And his sentence -- his role in the organization was just to receive the migrants after they had paid the smuggling fee. So he did not participate in any of the torture, or captivity, or the extortionate threats. And yet, he still received 10 years from Judge Altonaga.

I bring this up to use it as a framework for where we think -- to set an appropriate sentence in this case for Mr. Hernandez. It should also be noted that all those sentences came after pleas of guilty.

This Defendant -- you know, the nature and circumstances of the offense -- and I know you sat through the trial, but just to briefly recap. This was an extensive criminal enterprise that took advantage of desperate people to travel from Cuba to the United States. And they took advantage by bringing them to Mexico, and then charging them a fee, and then threatening them and threatening -- extending those threats to the family members so that they could get their

money. And if they didn't get paid in a certain amount of time, of course, they would abuse these desperate people in many ways, and harm them physically and obviously emotionally.

We have a big problem, obviously, because this is alien smuggling. But in addition, they also had the problem of having to pay the cartels and pay the law enforcement and government officials in Mexico to continue operating. And to do that they had to basically corrupt -- or participate in the corruption of law enforcement and government in another country. And the necessary items that they needed to accomplish those goals were provided by this Defendant.

And, you know, when you also take into account the history and characteristics of the Defendant, what Mr. Feigenbaum says is correct, that there's no other prior criminal history. And he brings up his age, which begs the question: What, in your late forties, causes someone to get involved in such an extensive criminal enterprise? And it's clearly money. We know from the statement that he made to Special Agent Spielvogel that he received in excess of $200,000 for all the boats.

He acknowledged -- by the way, this wasn't four boats. That's what was presented that we knew for certain we could prove, was the four boats. But both Mr. Crespo Marquez, both -- and Mr. Reyes Aranda testified that it was in excess of at least 10 to 12 for Mr. Crespo Marquez, and Mr. Reyes Aranda

said between 20 and 22. And this Defendant acknowledged that it was around 20 in his admissions to Special Agent Spielvogel.

And it took place -- this wasn't a one-time occurrence. This wasn't a crime of passion or a one instance of theft or robbery or violence. This was an extended period of time, taking great risk to himself to accomplish this task, of course, traveling -- as he testified, and also the Coast Guard special agent and several of the witnesses testified, this is a dangerous task to get that vessel, a pleasure vessel, from Florida across the Gulf of Mexico to Mexico.

And then, on top of that, as was testified to, he was responsible for bringing back the money in cash to launder those funds and also to pay Reyes Aranda his fee. And later became so trusted by the organization that he became a bank for the organization, and could pick up -- and would pick up money from the family members who were being extorted here in the United States on behalf of the organization.

And then, of course, we have the fact that they're doing -- committing fraud. They're cloning VINs and hull identification numbers, registering those vehicles here, and the vessels here, in the state of Florida so that they can create -- under fraudulent pretenses, so they can create a legitimate document chain to then perpetrate another fraud on Mexico.

And all you have to -- you know, when you analyze the

characteristics of the Defendant, I have no doubt that he is a loving family man. I have no doubt about that. But he's here today because he put himself in this position not just once, not just twice, but over an extended period of time. And you also have the benefit of having seen some of his own words, which I submit to you that his family members aren't aware of. And those were the conversations that he had with Neco and with the woman that was in Mexico, the Cuban woman, where he's talking -- and I would submit boasting, about his role in the organization and the fact that they have the government officials in their pocket, that they are into bribery and we -- he uses "we" -- "We will be bringing them these items," and you know, "that will release some of the pressure and then they will do what we want."

He had a knowledge of the full scope of the organization's activities. He knew that these migrants were being held against their will and also that the family members were being extorted for the money. And I submit to you that, based on that, this very serious case, and his active participation in it, we would recommend a sentence within the advisory guideline range.

When we turn to the other factors, the need for the sentence imposed to reflect the seriousness of the offense and afford adequate deterrence and protect the public, again, I think when you look at it -- you know, Mr. Feigenbaum didn't

necessarily make this argument outright, but I think maybe when he's saying he's in his early fifties, you know, we wouldn't necessarily expect someone like that to reoffend.  But we also wouldn't except somebody in their late forties, who has no criminal history, to get involved in such an extensive operation.

And there's general deterrence, so that the public knows that if you participate in these crimes you are going to face a just punishment for your participation.  But there's also specific deterrence, and that this Defendant needs to understand that this is not right and it's not okay.

And then, we finally get to the need for unwarranted sentencing disparity.  And the only other individual that I would bring up, of course, was Mr. Reyes Aranda, who Your Honor sentenced.  But if you remember, he was -- he scored out at -- his original advisory guideline range was 87 to 108 months.

THE COURT:  That's right.

MR. DOBBINS:  And I would submit to Your Honor that he was not charged -- there was no evidence that he was involved in the alien smuggling conspiracy.  He certainly wasn't involved in the bribery part.  He was just responsible for stealing the boats.  He was convicted of money laundering.  But he was an 87 to 108 months.

Now, of course, he cooperated.  He testified against this Defendant.  And he -- you know, our recommendation at that

time was 57 months, and Your Honor even varied downwards on him to 28 months.  But I would submit that they are not similarly situated.  Their roles were completely different within the organization.

And therefore, Your Honor, we would recommend that a sentence at the high end of the advisory guidelines, as are now calculated, which is 108 months, would be appropriate to satisfy all of the 3553(a) factors.  And that's the -- and one -- and that's the sentence we would ask Your Honor to impose.

THE COURT:  All right.

MR. FEIGENBAUM:  Your Honor, can I respond just briefly?

THE COURT:  Of course.  And what you haven't responded to, Mr. Feigenbaum, is what Mr. Dobbins points out with regard to the other individuals that were part of this larger conspiracy, and the need to ensure that there are no unwarranted sentencing disparities among individuals that are similarly situated.  And I know you've made the argument with regard to the stolen vehicles, but this jury found Mr. Hernandez guilty of each of those offenses, and specifically with regard to the trafficking in certain motor vehicles and the conspiracy, which somewhat belies the argument.

So if you can respond to the other individuals that

were part of this conspiracy, and why Mr. Hernandez is different, and with regard to the jury's verdict, because your argument seems to be inconsistent with their particular finding.

MR. FEIGENBAUM: Yes, Your Honor.

I think it's very, very important overall to think about the time frames involved.

My big fear before trial was that the Government would try to make Javier Hernandez, a defendant in your case, Your Honor, as if he were charged in the Judge Altonaga case, which was the -- let's call it the Gonzalez Vidal case. This is important for time frame, Your Honor. The Gonzalez Vidal case, as Mr. Dobbins said, was a RICO case. It had extortion. It had kidnapping. It had a bunch of really bad charges. And that case was indicted in early 2021.

All of the evidence that the Government had against Mr. Hernandez in your case, Your Honor, the Government had by the time the Gonzalez Vidal case was starting. So the question becomes -- and it's big -- if Mr. Hernandez was part of the conduct of Gonzalez Vidal, Crespo Marquez, and the other five or six defendants in that case, and the Government had all the evidence it needed to say Mr. Hernandez was a part of them, and integral in their organization, and should be responsible for what they did, the fact -- the fact, Your Honor, that the Government did not charge him, having all that evidence, means

26

something.  It means that the Government did not find Mr. Hernandez should be subject to the type of eventual punishment which the Gonzalez Vidal people received because he was not part of them.

The trial before Your Honor involved very, very much about what the Gonzalez Vidal case was.  But the charges that Mr. Dobbins asked Your Honor to consider from the Gonzalez Vidal case -- the conduct from the Gonzalez Vidal case that Mr. Dobbins asks Your Honor to consider were never charged against Mr. Hernandez.  He was not in that case.

In your case, Your Honor, the first count was about alien smuggling.  It never had any detail against Mr. Hernandez that he was involved in bad conduct towards any aliens who were induced to leave Cuba and enter the United States, and there were no charges like there were in the Gonzalez Vidal case.  So we're here now at sentencing, having had a trial which presented evidence that would have been used in the Gonzalez Vidal case if Mr. Hernandez had been charged in it, but he wasn't.  There was nothing -- what I'm trying to say is that Mr. Hernandez should be -- based on the jury's verdict -- and we of course contest the jury's verdict -- but based on the jury's verdict, the things that the jury decided were not the things that were charged in the Gonzalez Vidal case.

And therefore, we're asking Your Honor not to take into account what people in that Gonzalez Vidal case admitted

27

to when they pled guilty, because it's not pertinent to the conduct of Mr. Hernandez in this case.

The proffer of an attorney is not the type of evidence that district courts take into account when they fashion a sentence. It has to be based upon evidence, even if by a preponderance, in a sentencing setting.

So that's what I would say regarding the types of sentences that Mr. Dobbins mentioned to Your Honor people received in the Gonzalez Vidal case. And by the way, those guys in Gonzalez Vidal had other problems. For example, Mr. Crespo Marquez had fled a Judge Moore -- if I remember correctly, had fled a Judge Moore case and was a fugitive for many, many years, and then had to go before Judge Moore and get a sentence in that case. And there were just so many differences that related to Gonzalez Vidal that were not pertinent to Mr. Hernandez's offense conduct -- proven, according to the jury's verdict -- and trying to compare that to a sentence in a case in which the Government could have charged Mr. Hernandez, according to them, but didn't. And they didn't do it, Your Honor.

You can probably safely base that decision by the Government, based on Your Honor's experience in the federal system, that if there were evidence beyond a reasonable doubt that Mr. Hernandez was really part of Gonzalez Vidal, they would have charged him in that case at that time, but chose not

to.

Anyway, what else I would say about that -- so finally -- so when Mr. Dobbins talks about Mr. Hernandez became part of an extensive operation that lasted over a long period of time, and there was all these terrible things that happened to people, that's not Mr. Hernandez's case, Your Honor.

Thank you.

THE COURT: All right. Thank you, Mr. Feigenbaum.

And I believe that you are factually correct with regard to Mr. Hernandez's involvement in this larger conspiracy. Certainly this Court was the Judge who tried this case, listened to the evidence. And this jury, that found Mr. Hernandez guilty of each of the five counts that it was tasked to consider whether the Government had met its burden, did not hear any evidence that Mr. Hernandez participated in any harm to the victims, any torture, any beatings. And that places Mr. Hernandez in a different role than someone like Mr. Ramos Valdes or even Mr. Perez Gonzalez.

So let me state the obvious, Mr. Hernandez. And that is, you're before this Court because the jury found you guilty of five counts. And it's this Court's responsibility to determine an appropriate sentence that is sufficient but not greater than necessary to meet the goals of sentencing. So let me start with the obvious. And that is, at the age of 50, you have had very little involvement in the criminal justice system

before this incident in which you participated in this conspiracy from February 2018 to December 2019.

It's very clear to the Court that you have a supportive family, through the letters that have been written, certainly your family members that are here.  I appreciate Mr. Maya's statement.  It's clear that -- as with many other sentencings that I have witnessed, that it's always the hardest on the family, and in this case, certainly your wife and your very young 11-year-old son.

It is also clear to the Court that you have skills. As Mr. Feigenbaum noted from the Presentence Investigation Report, you have specialized skills in mechanics.  You have a certification in auto mechanics and electrical engineering. And unfortunately, you used that skill here by stealing boats, being part of a scheme to obtain enough fuel so that you could pilot those vessels to Mexico.  And I do not agree that the Court should somewhat -- somewhat excuse or ignore the fact that this jury found you guilty of conspiracy to transport stolen vessels and to traffic in those motor vehicles.

You were part of this conspiracy to encourage these aliens to enter, come in, and reside in the United States.  And it was certainly at risk to each of them, and in circumstances that, as testified to, certainly were inhumane.  But as I stated, I did not find any evidence that you were directly involved in any of the direct harm, and certainly that places

you in a different factual circumstance than some of the other individuals.

Mr. Hernandez, it's clear from the letters that the Court has received that you are a devoted husband, son, brother, father.  And my hope for you is that you will have the support of your family as you serve this Court's sentence.  But respecting the jury's verdict, and acknowledging the facts that were brought out during this trial, I believe that a sentence within the advisory guidelines is sufficient but not greater than necessary to promote respect for the law, serve as an adequate deterrent to you and to others that are contemplating this behavior, and certainly takes into consideration the full nature of the offenses and your personal history and characteristics.

So I thank you for your statement.  After a consideration of the statements, certainly the arguments of the attorneys -- and I appreciate Mr. Maya coming before the Court -- the Presentence Report, which contains the advisory guidelines, and full consideration of the statutory factors of 18, United States Code, Section 3553(a), based on the seriousness of the offenses, certainly to promote respect for the law, and to provide just imprisonment, and, as I stated, to serve as a deterrent to you and to protect the public from future crimes, it is the finding of the Court first and foremost that you do not have the ability to pay a fine, and a

fine will not be imposed.

Mr. Hernandez, it is the judgment of the Court, that you will be committed to the Bureau of Prisons to be imprisoned for a total of 95 months.

This sentence consists of 95 months as to each of Counts 1 and 4, 60 months as to each of Counts 2 and 3., and 95 months as to Count 5. All such terms to run concurrently.

Upon your release from imprisonment, you shall be placed on supervised release for a term of three years as to each of Counts 1 through 5. All such terms to run concurrently.

Within 72 hours of your release from the custody of the Bureau of Prisons, you shall report in person to the Probation office in the district where you are released.

While on supervised release, you shall comply with all mandatory and standard conditions of supervised release. That's referenced in Part F of your Presentence Report. And you must also comply with the following special conditions: There will be a financial disclosure requirement, a permissible search, an association restriction, and the payment of any unpaid restitutions, fines, or special assessments, as noted in Part F of your Presentence Report.

Since you have been found guilty of each of the five counts, you shall immediately pay to the United States a special assessment of $100, as to each of Counts 1 through 5,

32

for a total of $500.

Mr. Dobbins, I neglected to ask whether the Government is seeking forfeiture.

MR. DOBBINS: We were unable to identify any assets, Your Honor. So no, there will be no forfeiture.

THE COURT: All right, then. Now that the sentence has been imposed, Mr. Hernandez, do you or Mr. Feigenbaum object to the Court's findings of fact or the manner in which the sentence was pronounced?

MR. FEIGENBAUM: Your Honor, just let me renew all prior objections to the Presentence Report, made before and during the two sentencing hearings. And I want to make sure that all the written and oral objections and arguments made are renewed at this time. So that is what I would say regarding your pronouncement right now, Your Honor.

THE COURT: Thank you, sir.

Mr. Hernandez, you have the right to appeal the conviction and sentence imposed. Any Notice of Appeal must be filed within 14 days after entry of the judgment.

If you're unable to pay the cost of the appeal, you may apply for leave to appeal in forma pauperis, which means there would be no cost to you.

As the Probation office has possession of Mr. Hernandez's United States and Cuban passports, do you want those returned to you, Mr. Feigenbaum?

MR. FEIGENBAUM: May -- I would say yes.

THE COURT: All right. Certainly.

MR. FEIGENBAUM: But are there instructions what I should do with them afterwards, Your Honor?

THE COURT: Do you want to give those passports to Mr. Hernandez's wife?

MR. FEIGENBAUM: If that's allowed by the Court, I would do that, yes.

THE COURT: Well, certainly there would be no reason why Mr. Hernandez's wife cannot retain his passports.

MR. FEIGENBAUM: Okay.

THE COURT: They were taken while the case was proceeding. But at this point, Mr. Hernandez is going to be serving his sentence. So there's no reason why they can't be returned.

MR. FEIGENBAUM: Yes. I would appreciate that.

THE COURT: And you had some requests, sir?

MR. FEIGENBAUM: Yes, Your Honor.

So if Your Honor could make a recommendation for a designation by the BOP to a facility consistent with his security level closest to Miami, Florida.

THE COURT: Certainly. I'll make that recommendation.

MR. FEIGENBAUM: And secondary would be to Coleman in Florida as well.

THE COURT: I'll make that recommendation.

MR. FEIGENBAUM:  Let me just see, Your Honor.  Let me -- I don't want to forget to thank you very much for your kindness and for your allowing so much time for us to make these arguments.  It really is appreciated by all of us.

THE COURT:  Yes.  Of course.

Mr. Hernandez, do you have any questions, sir?

THE DEFENDANT:  No.  Thank you.

THE COURT:  The best of luck to you, sir.

Anything further on behalf of the Government?

MR. DOBBINS:  Judge, just one thing.  I apologize.  I couldn't remember if this was mandatory -- is there a mandatory restitution or -- no?  Okay.  Nothing further from the Government.

THE COURT:  Okay.  And anything further on behalf of Mr. Hernandez?

MR. FEIGENBAUM:  Your Honor, it's the policy in the Southern District of Florida, if Mr. Hernandez decides to appeal, that the original CJA attorney continue the CJA representation, which I would be willing to do if he wants to appeal.

THE COURT:  Yes.  Mr. Feigenbaum, then you will remain appointed for purposes of any appeal.

MR. FEIGENBAUM:  Thank you, Your Honor.

THE COURT:  Okay.  The best of luck to you, Mr. Hernandez.

COURT SECURITY OFFICER:  All rise.

(Proceedings concluded at 2:38 p.m.)

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698

UNITED STATES OF AMERICA       )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 9th day of February, 2024, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 36.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 8th day of June, 2024.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov